UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -                                                    S6 15 Cr. 379 (PKC)

GEOVANNY FUENTES RAMIREZ,

                          Defendant.

**THE GOVERNMENT'S MOTIONS *IN LIMINE***

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Jacob Gutwillig
Matthew Laroche
Jason A. Richman
Elinor Tarlow
Assistant United States Attorneys
    *Of Counsel*

# <u>TABLE OF CONTENTS</u>

BACKGROUND ................................................................................................ 2

  I.   The Defendant Imports Cocaine to Miami and Solicits Drug-Trafficking Proceeds to Finance His Cocaine Laboratory in Honduras………………………………………………3

  II.  The Defendant Commits Acts of Violence to Help Leonel Rivera and Transports Multiple Drug Loads Totaling Over Approximately 1,000 Kilograms of Cocaine………5

  III.  The Defendant Partners with a Major Honduran Drug-Trafficker and Murders A Law Enforcement Officer After the Defendant's Laboratory is Raided By Police………....... 8

  IV.  The Defendant Seeks Assistance Collecting a Drug-Trafficking Debt and Murders Another Drug Trafficker…………………………………………………………………. 10

  V.  The Defendant Engages In Drug-trafficking Under the Protection of National Party Leaders and the Honduran Military………………………………………………….. 11

  VI.  The Defendant's Arrest and Admissions.......................................................... 14

ARGUMENT ................................................................................................... 16

  I.   Evidence of Narcotics-Related Corruption Is Admissible as Direct Evidence and Pursuant to Rule 404(b) ........................................................................ 16

      A.   Applicable Law ................................................................................ 16

          1.   Direct Evidence of the Defendant's Guilt................................ 16

          2.   Other Acts Evidence Pursuant to Rule 404(b)........................ 17

      B.   Discussion ...................................................................................... 17

  II.  Evidence of Statements by Honduran Officials to Witness-1 is Admissible Under the Hearsay Rules ...................................................................................... 20

      A.   Relevant Statements........................................................................ 20

      B.   Applicable Law ............................................................................... 20

          1.   Rule 801(d)(2)(B): Adoptive Admissions............................... 20

          2.   Rule 801(d)(2)(E): Co-Conspirator Statements ..................... 21

          3.   Rule 804(b)(3): Statements Against Interest ......................... 22

      C.   Discussion ...................................................................................... 23

          1.   Statement 1 and Statement 3 Are Admissible Pursuant to Rule 801(d)(2)(B)..................................................................... 24

          2.   The Statements Are Admissible Pursuant to Rule 801(d)(2)(E)........................ 24

3.    The Statements Are Admissible Pursuant to Rule 804(b)(3) ......................... 26

III.  Evidence of Statements By Former Drug Traffickers and a Member of the Honduran National Police to Leonel Rivera is Admissible Under the Hearsay  Rules…................. 27

    A.   Relevant Statements ................................................................................... 27

    B.   Discussion ................................................................................................. 28

       1.   The Statements Are Admissible Pursuant to Rule 801(d)(2)(E) .................... 28

       2.   Statements by CC-11, CC-5, and CC-7 Are Admissible Pursuant to Rule 804(b)(3) ................................................................................................ 29

IV.  Evidence of the Defendant's Participation in Five Drug-Related Murders Is Admissible…………………………………………………………… ....... 30

    A.   Relevant Facts ........................................................................................... 30

    B.   Discussion ................................................................................................. 30

V.  Electronic Evidence From the Defendant's Cellphones Is Admissible ............................ 32

    A.   Evidence of the Defendant's Receipt of an Official Police Document Concerning a Criminal Investigation of Co-Conspirators is Admissible ........................................ 33

       1.   Relevant Background ........................................................................ 33

       2.   Discussion ....................................................................................... 33

    B.   Evidence of the Defendant's Possession of Firearms and Large Quantities of U.S Currency is Admissible …………………………………………………… 34

       1.   Relevant Background ........................................................................ 34

       2.   Discussion ....................................................................................... 36

    C.   Evidence of the Defendant's Electronic Communications is Admissible ................ 38

       1.   The Comanche Chats are Admissible ................................................ 39

          a.   Background ............................................................................ 39

          b.   Discussion ............................................................................. 42

       2.   The Commissioner Chats are Admissible .......................................... 44

          a.   Background ............................................................................ 44

          b.   Discussion ............................................................................. 44

CONCLUSION ........................................................................................................... 46

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -                                            S6 15 Cr. 379 (PKC)

GEOVANNY FUENTES RAMIREZ,

                              Defendant.

The Government respectfully submits this memorandum in support of motions *in limine*

seeking the following rulings with respect to the defendant's upcoming trial:

1. Evidence of narcotics-related corruption, including the use of drug proceeds to fund
   political campaigns and bribe politicians, at least one judge, and law enforcement, is
   admissible as direct evidence and pursuant to Rule 404(b);

2. Testimony regarding statements by a Honduran politician and a Honduran judge who
   were the defendant's co-conspirators is admissible pursuant to Rules 801(d)(2)(B), 801
   (d)(2)(E), and/or 804(b)(3);

3. Testimony regarding statements by former drug traffickers and a member of the
   Honduran National Police who were the defendant's co-conspirators is admissible
   pursuant to Rules 801(d)(2)(B), 801(d)(2)(E), and/or 804(b)(3);

4. Evidence of the defendant's participation in five murders in furtherance of his drug-
   trafficking activities is admissible as direct evidence and pursuant to Rule 404(b); and

5. Electronic evidence from one of the defendant's cellphones, including pictures of
   machineguns, acts of violence, and communications concerning the Honduran military
   and drug-trafficking associates, is admissible as direct evidence and pursuant to Rules
   404(b), 801(d)(2)(E), and 804(b)(3).[1]

---

[1] The Government is submitting a single consolidated memorandum in support of its five motions
*in limine*.

The defendant worked with other violent, large-scale drug traffickers to import thousands of kilograms of cocaine into the United States. To accomplish this massive level of drug distribution, the defendant relied on protection from high-ranking Honduran officials and the Honduran military; commanded men armed with military grade weapons, including machineguns; controlled a cocaine laboratory that he used to manufacture hundreds of kilograms of cocaine per month; used clandestine airstrips that received planes filled with cocaine; bribed politicians, at least one judge, and law enforcement officials; and engaged in acts of violence, including murder.

The defendant made huge sums of blood money through his egregious course of conduct. He also partnered with high-ranking political and military officials to facilitate his drug-trafficking activities in a country that has been ravaged by drug-related violence. In approximately 2013, the defendant bribed a high-ranking politician (referred to below as CC-4) so that the defendant's drug-trafficking activities would flourish. During meetings with CC-4, the defendant agreed to report directly to CC-4's brother, convicted drug trafficker Tony Hernandez, and to work with CC-4 and Tony Hernandez to use the defendant's cocaine laboratory to import massive quantities of cocaine into the United States. Indeed, as CC-4 put it, the defendant and CC-4 wanted to "shove the drugs right up the noses of the gringos" by flooding the United States with cocaine. The defendant believed that with his powerful allies he could operate with total impunity. Witnesses

---

[2] The Government respectfully submits that all of the evidence described in this brief, including with respect to acts of violence, is admissible as direct evidence of the crimes charged. The Government hereby provides notice that it also intends to offer this evidence, in the alternative, pursuant to Rule 404(b). The Government plans to continue to meet with potential witnesses between now and the trial, and will supplement this notice as necessary should the Government learn of additional acts of violence involving the defendant or other Rule 404(b) evidence.

will testify that he regularly carried and bragged about his automatic weapons, including a machinegun that was given to him by a high-ranking member of Honduras's military. When the defendant's cocaine laboratory was raided by law enforcement, the defendant bribed a high-ranking judge in Honduras so that he would not be investigated. On at least four occasions between approximately 2010 and 2013, the defendant also helped arrange or directly participated in murders in furtherance of his drug-trafficking activities. In one of those incidents, the defendant and a co-conspirator kidnapped a law enforcement officer who dared to investigate the defendant's cocaine laboratory, tortured the officer, and then stabbed him to death.

The Government will establish these facts at trial through testimony from the defendant's former co-conspirators, evidence seized in connection with his arrest (including data from one of his cellphones), and expert testimony regarding drug-trafficking patterns, the relevant history and structure of the Honduran political system, and features of the weapons used by the defendant and his co-conspirators.

I.      **The Defendant Imports Cocaine to Miami and Solicits Drug-Trafficking Proceeds to Finance His Cocaine Laboratory in Honduras**

The defendant was a long-time drug-trafficking partner of an assassin named ███ ███████████ ("CC-1"), who the defendant has known since at least 2003.[3] By 2009, the defendant and CC-1 were operating a cocaine laboratory in Cerro Negro, Omoa, which is a mountainous area in the Cortés Department of northwestern Honduras (the "Laboratory"), and they needed drug-trafficking partners to help finance those operations. As a result, the defendant and CC-1 forged a drug-trafficking relationship with Devis Leonel Rivera Maradiaga and Javier

---

[3] The Government is providing under seal as Exhibit A a key for the co-conspirator numbers.

Rivera Maradiaga, the former leaders of a violent and prolific drug-trafficking organization in Honduras known as the *Cachiros*, who are now cooperating witnesses against the defendant.

In about 2010, CC-1 met with Leonel Rivera in Honduras to convince him to begin working with the defendant. During that meeting, CC-1 explained, among other things, that CC-1 had known the defendant for several years, and that beginning in about 2008 or 2009, the defendant received approximately two to three kilograms of cocaine per month in Miami from CC-1, which the defendant would sell on CC-1's behalf. CC-1 also said that he wanted to introduce the defendant to Leonel Rivera because the defendant and CC-1 were operating the Laboratory; the defendant also was participating in drug-trafficking activities in the vicinity of the Cortés Department; and the defendant was bribing high-ranking members of the Honduran National Police in connection with those activities.

Several days later, the defendant met with Leonel Rivera, CC-1, and one of CC-1's workers at a gas station belonging to Leonel Rivera in Omoa, Cortés. The defendant arrived to the meeting in a red sedan, armed with a handgun on his waist and with two assault rifles in the backseat. Leonel Rivera and CC-1 entered his car. The defendant told Leonel Rivera that he obtained the rifles from someone in the military who was going to be on the security detail for the recently elected ███████████████████████████ ("CC-2"), who was elected in November 2009. As the Court is aware from the October 2019 trial of Tony Hernandez, CC-2 and CC-4 accepted millions of dollars in drug-trafficking proceeds and, in exchange, promised drug traffickers protection from prosecutors, law enforcement, and (later) extradition to the United States.

During the meeting when the defendant referred to receiving weapons from CC-2's bodyguards, the defendant told Leonel Rivera that he had been receiving between approximately

two to five kilograms of cocaine per month in Miami from CC-1; the drugs were transported in the tires of planes departing from San Pedro Sula, Honduras to Miami; and the defendant sold the drugs on CC-1's behalf in Miami. The defendant also offered his services to the *Cachiros*, explaining that he had close relationships with high-ranking members of the Honduran National Police, including two police officials, ████████████ ("CC-3") and another police chief in the area, who the defendant was bribing for information and assistance protecting drug loads and the Laboratory. The defendant also requested financial support from the *Cachiros* for the Laboratory, which beginning in approximately 2010 was producing approximately 200 to 300 kilograms of cocaine per month and was guarded by over approximately a dozen men armed with assault rifles including AK-47s and AR-15s. Leonel Rivera provided the defendant with approximately $65,000 at the meeting, and in exchange, the defendant provided Rivera with his red sedan and, later, an all-terrain vehicle. The defendant also said during the meeting that one of his family members was sick and was requesting some money to help with related bills. As a result, Leonel Rivera provided an additional approximately $10,000 to the defendant at the meeting.

## II.    The Defendant Commits Acts of Violence to Help Leonel Rivera and Transports Multiple Drug Loads Totaling Over Approximately 1,000 Kilograms of Cocaine

Several months later, the defendant met again with CC-1 and Leonel Rivera at a nightclub in Choloma, a city in the Cortés Department, that was owned by CC-1. During the meeting, the defendant told Leonel Rivera that he had murdered for the *Cachiros* a boat mechanic ("Victim-1"), who had worked on one of the defendant's high-speed boats that he used to transport cocaine. The defendant explained that he overheard Victim-1 at a marina in the Cortés Department say that he had been hired by Leonel Rivera to fix one of Rivera's boats, but that Victim-1 did not do all

the requested repairs and still kept all the money Leonel Rivera had paid him. As a result, the defendant contacted the police chief in the area of Acantilado and instructed that official to capture Victim-1 and deliver him to the defendant, which he did. The defendant shot Victim-1 twice in the head and then he and his workers discarded his body along the border of Honduras and Guatemala. The defendant showed Leonel Rivera a picture on his phone of Victim-1 dead, and assured Leonel Rivera that he would protect his interests. As a result, Leonel Rivera told the defendant that he no longer needed to repay approximately $10,000 of drug-trafficking proceeds that Rivera had given the defendant at their initial meeting for the defendant's sick family member.

Around this time, the defendant and some of his co-conspirators, including CC-1 and █████ ("CC-5"), met with Leonel Rivera to discuss another murder they had committed. CC-5 was a member of the Honduran National Police who worked for years with, among others, the defendant, CC-1, and Leonel Rivera to protect their drug shipments and support their drug-trafficking activities.[4] During that meeting, CC-1 said that the group, including the defendant, had killed two assassins ("Victim-2" and "Victim-3") who were responsible for murdering CC-1's relative. Like the murder of Victim-1, CC-1 explained that they used Honduran National Police members to help locate and capture Victim-3 and Victim-4; brought the men to a property in a remote location of the Cortés Department; tortured the victims, including by cutting off one of their ears; and then killed them. CC-5 told Leonel Rivera that the assassins were killed, at least in part, to ensure they did not target members of the *Cachiros*.

---

[4] ███████████████ CC-5 pled guilty to conspiring to import cocaine into the United States. █
████████████████████████████████

Having built trust with the *Cachiros* through acts of violence, the defendant started to work on drug shipments with their organization and members of the Honduran *Los Valles* cartel, which had a base of operations in the Copán Department in western Honduras.[5]  In about mid-2011, the defendant, CC-1, and several of their workers helped transport approximately 400 kilograms of cocaine by truck from Tocoa, Colon to Entrada, Copán.  The cocaine was sent by plane from a Colombian cocaine supplier, ███████████████████████████████ ("CC-6"), to an airstrip controlled by Sergio Neftali Mejía Duarte in the Gracias A Dios Department of Honduras.[6] Before the plane arrived, the defendant and CC-1 met with Leonel Rivera in Tocoa and agreed to use their police contacts to ensure safe passage of the cocaine to Copán, where it would be received by the *Los Valles* cartel and then transported to the United States by other co-conspirators.  When the cocaine arrived at the airstrip, members of the *Cachiros*, who were armed with machineguns, transported the drugs to Tocoa.  From there, the defendant and his workers, who were also armed with handguns and assault rifles, transported the drugs to the Valles in Copán.  The defendant was paid approximately $40,000 for this work.  Later in 2011, the defendant, CC-1, and several of their workers helped transport approximately 475 kilograms of cocaine from Tocoa to Copán.  CC-6

---

[5] Cooperating witnesses will confirm at trial that the *Los Valles* group was "one of the most prolific Central American narcotics trafficking organizations," which earned that reputation through a "combination of brutal violence and public corruption."  OFAC, *Treasury Targets Honduran Drug Trafficking Organization and Its Network* (Aug. 20, 2014), https://www.treasury.gov/press-center/press-releases/Pages/jl2611.aspx.  In 2016, Miguel Arnulfo Valle Valle and Luis Antonio Valle Valle pled guilty to drug-trafficking charges pending in the Eastern District of Virginia and Southern District of Florida, and they were each subsequently sentenced to 300 months' imprisonment.  *See* No. 13 Cr. 20897 (SDFL).

[6] Mejía Duarte was a Honduran drug-trafficker who was convicted at trial and sentenced to life imprisonment in the Southern District of Florida in 2018.  *See* 15 Cr. 20540 (S.D.F.L.).

sent the cocaine by plane to an airstrip, this time one in the Olancho Department controlled by

Fredy Renan Najera Montoya, a former Honduran congressman and large scale drug trafficker.[7]

As with the previous shipment, the defendant, CC-1, and their workers took control of the cocaine

in Tocoa; transported it by truck to the Valles in Copán; and guarded the shipment with heavy

weaponry, including machineguns.  The defendant was paid approximately $50,000 for this

transportation work.

  After these drug loads, the defendant also received cocaine shipments directly from CC-6,

without the *Cachiros* acting as an intermediary. ████████████████ ("CC-7"), another drug

trafficker who worked with Leonel Rivera, told Rivera that the defendant had received a plane

containing hundreds of kilograms of cocaine from CC-6 in *Cachiros*-controlled territory.  CC-5

also separately called Leonel Rivera, explained that the defendant and CC-5 were working with

CC-6, and asked permission for the group to receive a cocaine-laden airplane in *Cachiros*

controlled territory, which Leonel Rivera authorized.

## III.    The Defendant Partners with a Major Honduran Drug-Trafficker and Murders A Law Enforcement Officer After the Defendant's Laboratory is Raided By Police

  While the defendant was working with the *Cachiros*, the *Los Valles* cartel, and CC-6 to

transport massive cocaine shipments, he also continued to use his Laboratory to produce and

transport hundreds of kilograms of cocaine per month.  In about 2011, the defendant and CC-1 met

with Leonel Rivera to discuss the Laboratory.  During that meeting, the defendant was armed with

---

[7] On February 19, 2020, Najera Montoya pled guilty to conspiring to import cocaine into the United States and weapons offenses, related to his use and possession of machineguns and destructive devices.  *See* No. 15 Cr. 378 (PGG).  Najera Montoya is scheduled to be sentenced in March 2021.

an assault rifle and a handgun that the defendant said was modified to fire automatically. The defendant explained that his Laboratory was still producing approximately 200 to 300 kilograms of cocaine per month, but that he was becoming concerned about police investigations because the police contact whom he was bribing had been replaced in the Cortés Department. As a result, the defendant partnered with another major drug-trafficker named ████████████████ ████████████ ("CC-8"), who financially supported the defendant's Laboratory and had additional police contacts that the defendant hoped would help stop investigations.[8] The defendant also helped CC-8 receive cocaine at airstrips the defendant controlled in Cortés. For example, in about 2011, CC-1 told Leonel Rivera that CC-8 had received a shipment of approximately 300 kilograms of cocaine by airplane into Honduras, that the defendant had assisted in unloading the cocaine from the airplane, and that the narcotics were later seized by law enforcement. On another occasion, the defendant received a plane shipment of approximately 275 kilograms of cocaine at the airstrip he controlled in Cortés, which had been sent by another cooperating witness at Leonel Rivera's direction.

Despite CC-8's assistance, Honduran law enforcement eventually raided the defendant's Laboratory, which led the defendant to go into hiding for a brief period of time. The defendant, however, was not investigated or arrested despite the fact that the property on which the Laboratory was found was recorded in his name on public records. Indeed, public source reporting reflected

_____

[8] ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

that one of the police officials who commented about the raid was ███████████ ("CC-9"), who the defendant told others protected him.[9]  Moreover, shortly after the raid, the defendant bragged that he was happy that he was protected from investigation or arrest.  The defendant also met with, among others, a high-ranking judge in Honduras, ███████████ ("CC-10"), who assured the defendant, in substance and in part, that he would not be investigated or arrested based on the raid of his Laboratory.  At the end of the meeting, the defendant bribed CC-10 with approximately 30,000 lempiras for his assistance.

Following the raid, the defendant and CC-1 also met with Leonel Rivera in San Pedro Sula.  During that meeting, the defendant said that he had killed one of the police officers involved in the raid ("Victim-4").  He explained that the officer was identified when he talked about his involvement in the raid at a nightclub that, unbeknownst to Victim-2, was owned by CC-1.  As a result, and in retaliation for the raid, the defendant and CC-1 kidnapped Victim-2, tied him up, tortured him, and stabbed him to death.

## IV.  The Defendant Seeks Assistance Collecting a Drug-Trafficking Debt and Murders Another Drug Trafficker

In about 2013, the defendant met again with Leonel Rivera to seek his assistance collecting a drug-trafficking debt owed by a Honduran trafficker ███████████ ("CC-11"), who was based in Guatemala.  The defendant approached Leonel Rivera about this issue because Rivera had worked with CC-11 in the past, including by hiring several of CC-11's assassins who unsuccessfully attempted to kill one of the *Cachiros*' rivals.  During the meeting, the defendant

---

[9] *See, e.g.*, La Prensa, Honduras: Alleged Narco Laboratory Found (Mar. 9, 2011), *available at* https://www.laprensa.hn/sucesos/549002-97/honduras-hallan-supuesto-narco-laboratorio. Exhibit B is an original copy of the article together with a draft translation.

said that he and CC-1 were owed several million dollars from CC-11 for approximately 500 kilograms of cocaine, and that the defendant would give Leonel Rivera five percent of that figure if the *Cachiros* helped collect the debt. Leonel Rivera agreed to help, and held a series of meetings in Guatemala with CC-1 and CC-11, among others, during which CC-11 acknowledged that the defendant had provided him with several hundred kilograms of cocaine and promised to pay him back using the proceeds from a then-pending drug shipment from Colombia.

A few months later in 2013, the defendant solicited $1 million in drug-trafficking proceeds from the *Cachiros*. During a meeting between CC-1 and Leonel Rivera, CC-1 said that he and the defendant had an opportunity to participate in a large cocaine shipment that was being transported by sea, and requested that the *Cachiros* invest $1 million. Leonel Rivera declined. In a subsequent meeting, CC-7 told Leonel Rivera that the defendant and CC-1 were upset at CC-7 because he owed them approximately 300 kilograms of cocaine from a drug shipment and were also upset that the *Cachiros* did not invest $1 million as requested. CC-7 was concerned that the defendant and CC-1 were going to kill him and then the *Cachiros*, and asked that Leonel Rivera intervene.

Following this meeting, the defendant and CC-1 hired assassins who killed CC-7. After CC-7's murder, Leonel Rivera hired an assassin named █████ ("CC-12") who had worked with the defendant and CC-1 in the past to kill CC-1, and that same assassin later attempted to kill the defendant at Leonel Rivera's direction.

## V. The Defendant Engages In Drug-trafficking Under the Protection of National Party Leaders and the Honduran Military

By late 2013, the defendant partnered directly with CC-4 and high-ranking officials in the Honduran military. At this time, CC-4 was pursuing election as the President of Honduras as a member of the *Partido Nacional de Honduras* (the "National Party"). Leonel Rivera will testify

that they and other drug-traffickers were paying massive bribes to CC-4 in exchange for protection from law enforcement and extradition to the United States. Among other things, and as established at Tony Hernandez's trial, in about 2013, CC-4 accepted approximately $1 million in drug-trafficking proceeds that was provided to his brother by the former leader of the Sinaloa Cartel, Joaquín Guzman Loera ("Chapo").

On a number of occasions in late 2013, CC-4 attended meetings at a business in the Cortés Department ("Business-1"). The owner of that business ("Owner-1") was a large financial supporter of the National Party. The defendant also had a longstanding relationship with Business-1 and Owner-1, and the defendant used Business-1 to launder drug-trafficking proceeds. On a periodic basis between about 2004 and 2015, the defendant provided large amounts of U.S. currency to employees at Business-1 who would, at Owner-1's direction, deposit the money in Business-1's bank accounts. In exchange, the defendant received checks from Business-1.

During meetings at Business-1 involving CC-4 and Owner-1 in 2013, at least some of which were observed by a lay witness ("Witness-1"), CC-4 solicited large campaign contributions from Business-1. CC-4 also discussed widespread public corruption by himself and the National Party, including that CC-4 was embezzling aid money provided by the United States through fraudulent non-governmental organizations and stealing money from Honduras's social security system. On a number of occasions, CC-4 was given checks from Business-1 at the direction of Owner-1 in the amount of approximately 250,000 lempiras on each occasion.

Around this time, the defendant also had two meetings with CC-4 at Business-1. During the meetings, the following occurred, in substance and in part: (i) the defendant gave CC-4 approximately tens of thousands of dollars in exchange for an ongoing promise of protection by

CC-4 from law enforcement scrutiny and military support of his drug-trafficking activities; (ii) CC-4 told the defendant that he was interested in access to the defendant's Laboratory because of its proximity to Puerto Cortés, a key shipping port on the northern coast of Honduras that was minutes away from the Laboratory; (iii) CC-4 agreed to use the Honduran armed forces as security for the defendant's drug-trafficking activities; (iv) CC-4 said the Attorney General of Honduras would help protect the defendant's drug-trafficking activities; (iv) CC-4 said that Tony Hernandez was managing drug-trafficking activities in Honduras, that the defendant should report directly to Tony Hernandez for purposes of drug trafficking, and CC-4 provided the defendant with Tony Hernandez's phone number; and (v) CC-4 said that he wanted to make the U.S. Drug Enforcement Administration think that Honduras was fighting drug trafficking, but that instead he was going to eliminate extradition and "shove the drugs right up the noses of the gringos," referring to flooding the United States with cocaine. The defendant, in substance and in part, was excited to have CC-4's protection and agreed to work with CC-4 and his brother to import cocaine into the United States.

Following the defendant's meetings with CC-4, the defendant received support from high-ranking members of the Honduran military. For example, on several occasions, the defendant carried a green submachinegun, which he said was provided to him by ███████████████ █████ ("CC-13"), then the commander of the 105th Military Brigade. The defendant also received other equipment from the military, including a box that contained military uniforms, bullet proof vests, and police badges. The box contained a note that said for "Geovanny Fuentes" with a seal of the 105th Military Brigade.

## VI.    The Defendant's Arrest and Admissions

On March 1, 2020, the defendant was arrested in Miami, waived his *Miranda* rights, and

made incriminating statements to law enforcement.[10]   For example, the defendant admitted to

knowing and having relationships with his key drug-trafficking co-conspirators:

- CC-1:  The defendant said he had known CC-1 for a long time; that he had heard from others, including media reporting and CC-3, that CC-1 engaged in drug trafficking with the *Cachiros*; that CC-1 owned a nightclub in Choloma, which the defendant went to "several times"; that "sometimes there were meetings" at the nightclub; and that CC-1 introduced the defendant to Leonel Rivera.

- CC-12:  The defendant admitted to knowing CC-12, who the defendant said "started working with [CC-1] . . . like in security"; "threaten[ed] one [of the defendant's] sons"; "was a hitman"; and was later killed.

- CC-8:  The defendant admitted to knowing CC-8 very well; that CC-8 "studied" commerce with the defendant; that CC-8 was "very close" with Owner-1; and that CC-8 did "drug trafficking stuff" for a living.

- CC-7:  The defendant said that he knew CC-7; that he met CC-7 in Choloma; that "at the end we realized that [CC-7] was involved in drug trafficking things"; and that CC-7 was killed.

- *The Cachiros*:  The defendant said he met Leonel Rivera and Javier Rivera and that Javier Rivera's daughter married the defendant's son, but he claimed that he never did anything illegal with them.  The defendant also said that he had a meeting with Leonel Rivera at a gas station that Rivera owned in Omoa, Cortés, which the defendant went to because it was close to a "marina" at "Acantilados."  The defendant also said that he sold Leonel Rivera two cars for tens of thousands of dollars, which Leonel Rivera paid for in two installments of U.S. currency.

- Owner-1:  The defendant admitted to knowing Owner-1 very well; that Owner-1 had financed one of the defendant's businesses with loans; and that Owner-1 was a financial supporter of CC-4.

---

[10] The interview was conducted in Spanish.  English translations and summaries of Spanish-language documents and communications set forth herein are preliminary drafts subject to revision during the Government's preparations for trial.  *See, e.g.*, *infra* Discussion Section V.

- CC-4:  The defendant admitted that CC-4 was at Business-1 "all the time" when he was campaigning.

- Honduran National Police:  The defendant admitted to having relationships with several police officers, including Commissioner Martinez and "the Saucedas," one of whom the defendant said he was particularly close to.

The defendant also made admissions about the Laboratory in "Cerro Negro."  The defendant said that "[m]any years ago, there was a lab that was discovered in one of the properties that belonged to [Owner-1]" and that the lab was "supposedly" for "cocaine" but "nothing was found there."  He also said that when law enforcement raided the Laboratory, he gave a statement to law enforcement because he "provided maintenance" to a "coffee plantation" located on the property.  The defendant also admitted that at some point the property with the Laboratory belonged to him because Owner-1 "gave it to [him]."

 After the defendant was arrested in Miami, he was transferred to the Metropolitan Correctional Center in New York, where he has been incarcerated since April 23, 2020.  In about September 2020, the defendant approached and talked to Leonel Rivera on two occasions.  During those interactions, the defendant stated, among other things, that he believed he was in prison because of CC-4.  The defendant explained that prior to his arrest, the defendant and CC-3 had met with a military official who said he was sent by CC-4 and who told them to sell one of the defendant's companies to CC-4 so that CC-4 could use it to launder, among other things, millions of dollars in drug-trafficking proceeds.  The defendant told Rivera that he met with CC-4 on two occasions when CC-4 was running for office, paid CC-4 approximately 450,000 lempiras both times and, in exchange, received CC-4's assurance that he would support the defendant with anything he needed.  The defendant also admitted that CC-1 killed Victim-2, but he denied any involvement in the murder.

<u>**ARGUMENT**</u>

I.   **Evidence of Narcotics-Related Corruption Is Admissible as Direct Evidence and Pursuant to Rule 404(b)**

The defendant and his co-conspirators, including cooperating witnesses, relied on drug proceeds to bribe numerous politicians, at least one judge, and law enforcement officials who helped ensure the safe passage of their cocaine and protected them from law enforcement in Honduras. Thus, evidence of narcotics-related corruption is admissible at trial, as direct evidence and pursuant to Rule 404(b), in order to establish the nature of the conspiracy and the defendant's role in it, the relationships between co-conspirators, and the defendant's motive and intent.

A.   **Applicable Law**

1.   **Direct Evidence of the Defendant's Guilt**

Relevant evidence "need only tend to prove the government's case," such as "evidence that adds context and dimension to the government's proof of the charges." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Thus, background evidence is relevant and admissible, pursuant to Rule 401, where it tends "to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* (internal quotation marks omitted). Evidence is also admissible if it relates to conduct that: (i) "'arose out of the same transaction or series of transactions as the charged offense'"; (ii) "'is inextricably intertwined with the evidence regarding the charged offense'"; or (iii) "'is necessary to complete the story of the crime on trial.'" *United States v. Gohari*, 227 F. Supp. 3d 313, 317 (S.D.N.Y. 2017) (quoting *United States v. Robinson*, 702 F.3d 22, 36-37 (2d Cir. 2012)). "Evidence fitting within one of these three categories is considered direct evidence and Rule 404 is not applicable." *United States v. Fiumano*, No. 14 Cr. 518, 2016 WL 1629356, at *3 (S.D.N.Y.

Apr. 25, 2016).

## 2. Other Acts Evidence Pursuant to Rule 404(b)

Under Rule 404(b), courts "may allow evidence of other acts by the defendant if the evidence is relevant to an issue at trial other than the defendant's character and if the risk of unfair prejudice does not substantially outweigh the probative value of the evidence." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 479 (S.D.N.Y. 2015). "This Circuit follows the inclusionary approach, which admits all other act evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (internal quotation marks omitted). In general, evidence is admissible under Rule 404(b) "if (1) it is introduced for a proper purpose, (2) it is relevant to the charged offense, (3) its prejudicial effect does not substantially outweigh its probative value and (4) is admitted with a limiting instruction if requested." *United States v. Rutkoske*, 506 F.3d 170, 176-77 (2d Cir. 2007).

## B. Discussion

As is clear from the Background section above, one of the defining characteristics of the charged drug-trafficking conspiracy and related weapons offenses is the use of drug proceeds to bribe public officials in exchange for protection and support of traffickers, including but not limited to the defendant. The Government will establish this deeply corrupt *quid pro quo* through, *inter alia*, testimony from witnesses and evidence from the defendant's cellphones showing his relationship with public officials and the military.

The defendant's use of drug proceeds to bribe public officials was staggering and escalated over time. Beginning in at least 2009, the defendant bribed multiple high-ranking members of the

Honduran National Police in exchange for sensitive law enforcement information to support his drug-trafficking activities and to protect the Laboratory. Among those police officials was CC-3, who remained in contact with the defendant until shortly before his arrest. The defendant touted these connections to convince other drug traffickers, including Leonel Rivera, to work with him, and then the defendant leveraged his contacts to help him transport large loads of cocaine through Honduras.

As the defendant became more powerful, so did his political allies. After his Laboratory was raided by law enforcement, the defendant was not investigated or arrested. Instead, the defendant bribed CC-10, a high-ranking Honduran judge, who in exchange agreed to clean the defendant's criminal record and stop law enforcement interference. Then, in 2013, the defendant contributed large sums of money to CC-4's campaign for the Honduran presidency. In exchange, CC-4 promised to protect the defendant from arrest and extradition; promised to help the defendant transport cocaine with the assistance of Honduras's armed forces; and directed the defendant to work directly with Tony Hernandez, CC-4's brother, to import huge quantities of cocaine into the United States.

Thus, evidence of high-level political corruption involving the defendant, CC-4, CC-10, members of the Honduran National Police, and other traffickers is admissible as direct proof because it is inextricably intertwined with the charged crimes and necessary to complete the story of the crime on trial. *See Gohari*, 227 F. Supp. 3d at 317. The evidence tends to explain, for example, why the co-conspirators came together, how they operated, and why there able to continue crimes of this magnitude unabated for almost a decade. *See United States v. Delligatti*, No. 15 Cr. 491, 2018 WL 1033242, at *6 (S.D.N.Y. Feb. 23, 2018) ("[W]here potential evidence

explains the development of the illegal relationship . . . and explains the mutual trust that existed between the coconspirators, it will be plainly admissible." (internal quotation marks omitted)); *cf. United States v. Robles*, 193 F.3d 519, 1999 WL 707902, at *7 (5th Cir. 1999) (finding evidence sufficient in drug-trafficking case where jury could infer that defendant "intend[ed] to pay bribes or otherwise provide protection to the [drug-trafficking organization] by finding out whether members of the organization were targets of police investigations").

In the alternative, and for similar reasons, the corruption evidence is admissible pursuant to Rule 404(b) because it illustrates the broader criminal plan of the defendant, CC-4, CC-10, and others, to use drug trafficking to help assert power and control in Honduras, and is probative of the defendant's motive and intent in joining the conspiracy, *i.e.*, to enrich himself by partnering with powerful public officials. *See United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) (noting that evidence is admissible under Rule 404(b) "to explain how a criminal relationship developed" and "help the jury understand the basis for the co-conspirators' relationship of mutual trust"). Thus, evidence of narcotics-related corruption involving the defendant and his co-conspirators is relevant and has substantial probative value.

Finally, this evidence is not unduly prejudicial relative to other proof the Government expects to offer. The defendant's drug shipments traversed Honduran waters and airspace based on information from the Honduran police and support from the Honduran military. Honduran police escorted his cocaine so that it would not be seized. The defendant, the police, and other security personnel participated in these activities while heavily armed, including at times with military-grade weapons. And these activities involved extensive violence. Accordingly, evidence of the full breadth of the corruption involved in the defendant's crimes is not barred by Rule 403.

## II. Evidence of Statements by Honduran Officials to Witness-1 is Admissible Under the Hearsay Rules

Several Honduran officials made statements in the presence of Witness-1 regarding the drug-trafficking conspiracy and their joint efforts to protect the defendant and increase their power in Honduras. Evidence of statements to or in the presences of Witness-1 is either not hearsay, exempted under the hearsay rules, or both, and has significant probative value for the reasons set forth above in Section I.

### A. Relevant Statements

The Government respectfully submits that the following statements, referred to below as "Statement [number]," are admissible through testimony of Witness-1:

1. In approximately 2011 or 2012, CC-10 told the defendant that he would intervene with law enforcement to prevent the defendant from being investigated or arrested for operating the Laboratory.

2. In approximately 2013, CC-4 solicited large campaign contributions from Owner-1 and described participating in widespread public corruption within the Honduran government, including embezzling United States aid through non-governmental organizations and stealing from Honduras's social security fund.

3. In approximately 2013 and 2014, CC-4 promised to protect the defendant from arrest and extradition; promised to help the defendant transport cocaine with the assistance of Honduras's armed forces; said he wanted to use the defendant's Laboratory because of its proximity to a key shipping port; directed the defendant to work with Tony Hernandez (CC-4's brother) with respect to drug-trafficking activities; and stated that he was going to "shove the drugs right up the noses of the gringos."

### B. Applicable Law

#### 1. Rule 801(d)(2)(B): Adoptive Admissions

Rule 801(d)(2)(B) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and . . . is one party manifested that it adopted or believed to be true." "When a statement is offered as an

adoptive admission, the proponent must show that the party against whom the statement is offered adopted or acquiesced to the statement and that 'adoption or acquiescence may be manifested in any appropriate manner.'" *Penguin Books U.S.A., Inc. v. New Christian Church of Full Endeavor, Ltd.*, 262 F. Supp. 2d 251, 258 (S.D.N.Y. 2003) (quoting Fed. R. Evid. 801(d)(2)(B), advisory comm. notes). Adoption is evaluated by "examining the behavior of the party it is to be offered against," and the "adoption of another's statement can be manifest by any appropriate means, such as language, conduct or silence." *Id.*; *see also United States v. Rollins*, 862 F.2d 1282, 1296 (7th Cir. 1988) (explaining that the rule does not require an explicit statement of adoption; all that is necessary is some "manifestation of a party's intent to adopt another's statements, or evidence of the party's belief in the truth of the statements").

## 2. Rule 801(d)(2)(E): Co-Conspirator Statements

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement pursuant to this Rule, the Court must find two facts by a preponderance of the evidence: *first*, that a conspiracy that included the declarant and the defendant existed; and *second*, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

Once a conspiracy is shown to exist, the "evidence sufficient to link another defendant to it need not be overwhelming," and "the 'in furtherance' requirement of Rule 801(d)(2)(E) is satisfied" when, for example, "a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance." *United States v. Paone*, 782 F.2d 386,

390 (2d Cir. 1986) (internal quotation marks omitted). Statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy, *United States v. Simmons,* 923 F.2d 934, 945 (2d Cir. 1988), as do statements "that apprise a co-conspirator of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).

### 3. Rule 804(b)(3): Statements Against Interest

Under Rule 804, if a declarant is "unavailable," there is an exception to the hearsay rule where:

> (A) a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and

> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3). This rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994).

To satisfy Rule 804(b)(3), the proponent of the statement must show by a preponderance of the evidence: "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (internal quotation marks omitted). A declarant is unavailable for

purposes of Rule 804 if, as relevant here, the declarant is "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies," Fed. R. Evid. 804(a)(1), or "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony," *id.* 804(a)(5)(B).

"A statement will satisfy Rule 804(b)(3)'s requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant." *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011) (internal quotation marks omitted). Moreover, a declarant need not "be aware that the incriminating statement subjects him to immediate criminal prosecution," but instead, that the "incriminating statement sufficiently tended to subject the declarant to criminal liability so that a reasonable man in his position would not have made the statement unless he believed it to be true." *United States v. Lang*, 589 F.2d 92, 97 (2d Cir. 1978) (internal quotation marks and citation omitted).

Finally, the Second Circuit requires corroboration of both the declarant's and the statement's trustworthiness. *United States v. Doyle*, 130 F.3d 523, 543-44 (2d Cir. 1997). Statements made to co-conspirators, not in response to questioning, and not made in coercive atmospheres are sufficiently reliable for purposes of this Rule. *See, e.g.*, *United States v. Matthews*, 20 F.3d 538, 546 (2d Cir. 1994).

### C.    Discussion

The Statements by Honduran officials to Witness-1 are relevant and admissible under the hearsay rules. First, insofar as Statement 3 reflects requests and instructions to the defendant, it is not hearsay and therefore admissible. *See, e.g.*, *United States v. Kuthuru*, 665 F. App'x 34, 38 (2d

Cir. 2016) ("Questions and commands are ordinarily not hearsay . . . ."). Second, as discussed in more detail below, Statements 1 and 3 are admissible pursuant to Rule 801(d)(2)(B), and all the Statements are admissible pursuant to Rule 801(d)(2)(E) and Rule 804(b)(3). Finally, these statements are not unduly prejudicial in the context of other evidence, and the proof of these statements will come from a single witness who will testify at the trial regarding related matters irrespective of the Court's ruling. Thus, admitting the statements would not violate Rule 403.

### 1. Statement 1 and Statement 3 Are Admissible Pursuant to Rule 801(d)(2)(B)

Statements 1 and 3 are not hearsay under Rule 801(d)(2)(B) because the defendant was present when they were made and manifested that he believed those statements to be true. For example, the Government will establish through testimony that, after CC-10 made Statement 1, the defendant paid CC-10 a large sum of money for his promise to protect the defendant from investigation and arrest. Similarly, Witness-1 will explain that, after CC-4 made Statement 3, the defendant expressed that he desired to engage in drug trafficking with CC-4 and Tony Hernandez, and he paid CC-4 large bribes for his assistance. Thus, with respect to Statements 1 and 3, the defendant's behavior plainly establishes his intent to adopt them as true.

### 2. The Statements Are Admissible Pursuant to Rule 801(d)(2)(E)

All of the Statements are admissible under Rule 801(d)(2)(E). The Government will establish by a preponderance of the evidence that the defendant, CC-4, and CC-10 were members of the charged drug-trafficking conspiracy, as well as a related conspiracy to leverage drug trafficking to maintain and enhance their political power and the control of the National Party in Honduras. *See United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002) ("[T]he objective of the joint venture that justifies deeming the speaker as the agent of the defendant need not be criminal

at all."). The defendant told Rivera Maradiaga, as early as 2009 or 2010, that he hoped to increase his drug-trafficking activities by bribing public officials, including in addition to members of the Honduran National Police, the mayor of Choloma. Moreover, Leonel Rivera will testify that by the time CC-4 made Statements 2 and 3, CC-4 had solicited and accepted bribes from drug traffickers to finance his political campaigns and facilitate the importation of huge quantities of cocaine into the United States. The Government will also establish that the defendant, CC-10, and CC-4 were co-conspirators. For example, the defendant paid CC-10 for his promise to protect the defendant's drug-trafficking activities. Similarly, on at least two occasions the defendant paid large bribes to CC-4 in exchange for promises to protect the defendant's Laboratory and drug-trafficking activities.

The statements at issue were also in furtherance of the conspiracy. Statements 1 and 3 by CC-10 and CC-4 involved promises of protection and other favors that were designed to induce the defendant to engage in drug trafficking and bribe CC-10 and CC-4. Statement 3 by CC-4 also conveyed a request to the defendant to work with Tony Hernandez on drug-trafficking activities. *See United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999) (finding "in furtherance" requirement met where statements "induce a coconspirator's assistance"); *United States v. Beech-Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989) (finding "in furtherance" requirement met where statements "prompt the listener to respond in a way that facilitates the carrying out of criminal activity" (internal quotation marks omitted)); *United States v. Persico*, 832 F.2d 705, 716 (2d Cir. 1987) (finding "in furtherance" requirement met where statements "solicited [listener's] assistance"). Statement 2 by CC-4 also furthered the conspiracy because it spurred assistance from Owner-1 and established the relationship necessary for CC-4 to conduct drug-trafficking

negotiations with the defendant at Business-1.

### 3.    The Statements Are Admissible Pursuant to Rule 804(b)(3)

Statements 1 through 3 are also admissible under Rule 804(b)(3) because the declarants are unavailable and their remarks would be probative of their guilt were they to stand trial on drug trafficking or money laundering charges.

CC-10 and CC-4 are located abroad, outside the Government's subpoena power, and would likely invoke the Fifth Amendment if they were questioned under oath regarding these activities. *See United States v. Savoca*, 335 F. Supp. 2d 385, 390 (S.D.N.Y. 2004) ("[T]he 'unavailability' component is established by the fact that [the declarant] is expected to invoke his Fifth Amendment privilege."); *see also United States v. Ortiz*, 962 F. Supp. 2d 565, 573 (S.D.N.Y. 2013) (finding witness unavailable where located outside United States at time of trial).  Statements 1 through 3 were against the penal interest of the declarants because the Statements "implicated [the declarants] in [illegal] activity," and each declarant "would not have made the statement unless he believed it to be true."  *United States v. Dupree*, 870 F.3d 62, 80 (2d Cir. 2017); *see also Ortiz*, 962 F. Supp. 2d at 573.

The statements are also sufficiently reliable because they were made in confidence in the presence of Owner-1, Witness-1, and, with respect to Statements 1 and 3, the defendant, "a person whom the declarant[s] believe[d] [was] an ally, not a law enforcement official."  *United States v. Sasso*, 59 F.3d 341, 349 (2d Cir. 1995).  Moreover, the Statements do not reflect "effort to shift blame" away from the declarants, and there is no possibility that they would have uttered these remarks "solely to curry favor with the authorities."  *Id.*; *see also Dupree*, 870 F.3d at 80 (finding sufficient trustworthiness where declarant spoke to perceived ally and did not attempt to shift

blame). Finally, because CC-4 and CC-10 all occupied high positions in the Honduran government, these declarants had "no need to attempt to impress [their] subordinate[]," the defendant and/or Witness-1, by making "self-incriminating statements without a foundation of truth." *United States v. Gupta*, 747 F.3d 111, 129 (2d Cir. 2014). Therefore, Statements 1 through 3 also admissible under Rule 804(b)(3).

### III. Evidence of Statements By Former Drug Traffickers and a Member of the Honduran National Police to Leonel Rivera is Admissible Under the Hearsay Rules

CC-1, CC-7, CC-5, and CC-11 made certain statements to Leonel Rivera during the course of the defendant's crimes, including about the roles in the conspiracy played by the defendant. Testimony from Leonel Rivera regarding these statements is admissible under Rules 804(b)(3) and/or 801(d)(2)(E).

### A. Relevant Statements

The Government respectfully submits that the following statements, referred to below as "Statement [number]," are admissible through testimony of Leonel Rivera:

1. In approximately 2010, CC-1 told Leonel Rivera that CC-1 had been sending the defendant approximately two to three kilograms of cocaine per month in Miami since 2008 or 2009; CC-1 wanted to introduce the defendant to Leonel Rivera because the defendant and CC-1 were operating the Laboratory; the defendant was participating in drug-trafficking activities in the vicinity of the Cortés Department; and the defendant was bribing high-ranking members of the Honduran National Police in connection with those activities.

2. In about 2011 or 2012, CC-7 told Leonel Rivera that the defendant had received a plane containing hundreds of kilograms of cocaine from CC-6 in *Cachiros*-controlled territory.

3. In or about 2011 or 2012, CC-5 told Leonel Rivera that the defendant, CC-5, and others were working with CC-6, and CC-5 asked permission for the group to receive a cocaine-laden airplane in *Cachiros*-controlled territory.

4. In about 2013, CC-11 told Leonel Rivera that the defendant had provided CC-11 with several hundred kilograms of cocaine and CC-11 had promised to pay the defendant back using the proceeds from a then-pending drug shipment from Colombia.

5. In about 2013, CC-1 said that CC-1 and the defendant had an opportunity to participate in a large-scale cocaine shipment that was being transported by sea, and requested that the *Cachiros* invest $1 million in the shipment.

6. In about 2013, CC-7 told Leonel Rivera that he owed the defendant and CC-1 approximately 300 kilograms of cocaine from a drug shipment and that the defendant and CC-1 were upset with CC-7 and the *Cachiros* for not investing $1 million in a drug load.

## B. Discussion

### 1. The Statements Are Admissible Pursuant to Rule 801(d)(2)(E)

As discussed above in the Background section, the Government will establish that the defendant, CC-1, CC-7, CC-5, and CC-11 were co-conspirators through testimony from Leonel Rivera. The Government also expects that at least one other cooperating witness will testify concerning Leonel Rivera's drug-trafficking activities with the defendant and at least some of the other co-conspirators in this section. Moreover, the defendant acknowledged during his post-arrest statements that he had relationships with CC-1 and CC-7, and that he knows CC-1 murdered Victim-2.

The Statements were all in furtherance of the defendant's drug-trafficking conspiracy. As an initial matter, to the extent Statements 1, 3, and 5 reflect a request to Leonel Rivera, they are not hearsay and therefore admissible. *See Kuthuru*, 665 F. App'x at 38. Statements 1, 3, 5, and 6 were also designed to induce Leonel Rivera's assistance in the drug-trafficking conspiracy. For example, in Statement 1, CC-1 described the defendant's drug-trafficking activities and corrupt police connections to entice Leonel Rivera to meet and engage in drug-trafficking activities with the defendant. In Statement 3, CC-5 wanted Leonel Rivera's permission to allow the defendant,

CC-5, and others to receive a cocaine-laden aircraft in *Cachiros*-controlled territory. In Statement 5, CC-1 wanted to spur the *Cachiros* to invest in a large cocaine shipment with CC-1 and the defendant. In Statement 6, CC-7 hoped to secure Leonel Rivera's help during a time when the defendant and CC-1 were upset that CC-7 owed them a drug-trafficking debt. *See, e.g.*, *Gigante*, 166 F.3d at 82; *Beech-Nut Nutrition Corp.*, 871 F.2d at 1199; *Persico*, 832 F.2d at 716. Statement 2 by CC-7 also furthered the conspiracy by informing Leonel Rivera that the defendant was working independently with CC-6, which the defendant had not told Leonel Rivera. Similarly, Statement 4 by CC-11 furthered the conspiracy by assuring Leonel Rivera, CC-1, and others that CC-11 would repay a drug debt to the defendant.

## 2. Statements by CC-11, CC-5, and CC-7 Are Admissible Pursuant to Rule 804(b)(3)

As explained above, CC-11 and CC-7 are unavailable for purposes of Rule 804(b)(3) because they are deceased. CC-5 is unavailable because he is in custody and would likely invoke the Fifth Amendment in response to questioning. All of the Statements from those co-conspirators were against the declarants' penal interest because they implicated themselves, the defendant, and others in drug-trafficking activities. The Statements also bear sufficient indicia of reliability because they spoke in private and did not appear to shift blame, *e.g.*, *Dupree*, 870 F.3d at 80, and they made the statements to a drug-trafficking co-conspirator with whom they had a long-standing, criminal relationship, *see United States v. Saget*, 377 F.3d 223, 230 (2d Cir. 2004) (reasoning that "speaking with a friend" in a "private setting" was another consideration suggesting reliability). Therefore, the Statements by CC-11, CC-5, and CC-7 to Leonel Rivera are admissible pursuant to Rule 804(b)(3).

**IV.    Evidence of the Defendant's Participation in Five Drug-Related Murders Is Admissible**

The defendant conspired with CC-1, CC-5, and others to have five people murdered, by the defendant himself in certain instances and at his direction on other occasions, in furtherance of his drug-trafficking activities.    Testimony from Leonel Rivera regarding these incidents is admissible as direct evidence related to Counts One, Two, and Three, and, in the alternative, pursuant to Rule 404(b).    Under either theory, the evidence has significant probative value with respect to the cocaine-importation conspiracy charged in Count One and the weapons offenses charged in Counts Two and Three, and is not unduly prejudicial under Rule 403.

**A.    Relevant Facts**

As explained in the Background section, the defendant participated in five murders between in or about 2010 and 2013:  (i) in about 2010, the defendant and CC-1 killed Victim-1, who had stolen money from Leonel Rivera; (ii) in about 2011, the defendant, CC-1, CC-5, and others, killed Victim-2 and Victim-3, in retaliation for their murder of CC-1's relative; (iii) in or about 2012, the defendant and CC-1 killed Victim-4, a law enforcement officer who was involved in the raid of the defendant's Laboratory; and (iv) in or about 2013, the defendant and CC-1 ordered assassins to kill CC-7, who owed the defendant and CC-1 a drug debt.

**B.    Discussion**

Evidence of the defendant's role in these murders is probative of his participation in the drug-trafficking conspiracy charged in Count One, including the connections to the Honduran National Police that the defendant relied upon in connection with the conspiracy and the great lengths to which the defendant was willing to go in order to protect himself and his co-conspirators. *See Ulbricht*, 79 F. Supp. 3d at 485 (reasoning that "murder-for-hire evidence is directly relevant

to proving the elements of the narcotics offense" because "the context of each of the alleged solicitations involves narcotics dealers"); *see also United States v. Gadsden*, 300 F. App'x 108, 110 (2d Cir. 2008) (affirming admission of "past violent acts" because "such evidence helps to explain the mutual trust that existed between coconspirators" (internal quotation marks omitted)); *United States v. Arrington*, 867 F.2d 122, 130 (2d Cir. 1989) (reasoning that a "plot to silence witnesses further[ed] the goals" of a narcotics conspiracy); *United States v. Barret*, No. 10 Cr. 809, 2011 WL 6704862, at *5 (E.D.N.Y. Dec. 21, 2011) ("Acts of violence are frequently deemed to have been performed as overt acts in furtherance of, and thus are direct evidence of, an alleged drug distribution conspiracy."). The defendant's participation in these murders with drug-trafficking co-conspirators therefore has significant probative value with respect to Count One.

Evidence related to the murders is also probative of the defendant's ability to cause, aid, and abet others in the use of firearms in furtherance of the drug-trafficking conspiracy, as charged in Count Two, and his conspiracy with others to use firearms in furtherance of the drug-trafficking conspiracy, as charged in Count Three. *See United States v. Abdalla*, No. 14 Cr. 716, 2018 WL 5819799, at *4 (S.D.N.Y. Oct. 23, 2018) (reasoning that murder in furtherance of uncharged drug-trafficking conduct was "probative of the Defendants' opportunity to conspire to use and carry firearms in furtherance of drug crimes"); *see also United States v. Barnes*, 560 F. App'x 36, 41 (2d Cir. 2014) (reasoning that defendant's admission "about killing a rival drug dealer" was admissible "as direct proof of the charged crack conspiracy and of [defendant's] firearms possession related to that conspiracy"). Thus, the evidence is plainly relevant and has even more probative value than the murder in *Abdalla* because the murders in question here were in furtherance of Count One rather than uncharged drug-trafficking in another controlled substance.

Finally, evidence related to these murders is admissible under Rule 403. "Since 'drug trafficking is often attended by violence,' courts in this Circuit repeatedly have declined to preclude evidence of violence in narcotics cases." *Ulbricht*, 79 F. Supp. 3d at 487 (quoting *United States v. Sureff*, 15 F.3d 225, 228-29 (2d Cir. 1994) and collecting cases); *see also Abdalla*, 2018 WL 5819799, at *4; *United States v. Baptiste*, 264 F.3d 578, 590 (5th Cir. 2001) ("Although the evidence of the murders and attempted murders was prejudicial, it was necessary for the jury to understand the brutal nature of the conspiracy."); *United States v. Chin*, 83 F.3d 83, 88 (4th Cir. 1996) (finding no Rule 403 violation where "the murder demonstrated the extent to which [defendant] was willing to go, or at least threaten, in order to ensure that the heroin deal and any future deals went smoothly"). The Rule 403 balancing with respect to these five murders must also take into account the fact that the evidence in this case relates to extremely violent drug trafficking carried out by heavily armed criminals. For example, Rivera Maradiaga has admitted to causing 78 murders in connection with his cooperation agreement. Particularly in that context, evidence related to the defendant's participation in five murders is not unduly prejudicial.

## V.    Electronic Evidence From the Defendant's Cellphones Is Admissible

Law enforcement seized two cellphones that were in the defendant's possession on the day of his arrest. One of the cellphones ("Cellphone-1") contained (i) a photograph of an official Honduran law enforcement document identifying some of the defendant's co-conspirators who were under investigation; (ii) photographs depicting firearms, including machineguns and handguns, and destructive devices; (iii) photographs depicting large quantities of U.S. currency; and (iv) communications about the Honduran military, some of the defendant's co-conspirators, and destroying evidence. For the reasons set forth below, the Government respectfully submits

that this evidence is admissible.

### A. Evidence of the Defendant's Receipt of an Official Police Document Concerning a Criminal Investigation of Co-Conspirators is Admissible

#### 1. Relevant Background

Cellphone-1 contains a photograph of an official document, dated June 14, 2016, from a law enforcement officer ("Agent-1") directed to a senior law enforcement official in the Cortés Department (the "Investigation Document"). The Investigation Document requests information about twenty individuals who are being investigated for crimes related to money laundering, including Owner-1, members of Owner-1's family, and Yankel Antonio Rosenthal Coello, a former cabinet-level official in CC-4's administration.[11] The Investigation Document is signed by Agent-1, whose title includes "Organized Crime," with a Honduras "Public Ministry" notary stamp.[12]

#### 2. Discussion

The Investigation Document is admissible as direct evidence of the charged crimes. The Investigation Document is probative of the defendant's access to law enforcement in the Cortés Department, which one or more witnesses will explain was the location of, among other things, the defendant's Laboratory; one or more clandestine airstrips the defendant controlled; events

---

[11] In 2017, Rosenthal pleaded guilty to attempted money laundering in this District. *See* No. S6 13 Cr. 413 (JGK). In 2018, he was sentenced principally to 29 months' imprisonment and a $50,000 fine.

[12] A translation of the Investigation Document is attached as Exhibit C. The Government respectfully requests that Exhibit C be maintained under seal temporarily because of the sensitive information—including personally identifiable information—that it contains.

leading to the murders of Victim-1, Victim-3, and Victim-4; multiple meetings between the defendant and Leonel Rivera; and multiple meetings involving the defendant and CC-4. Similar to the Comanche chats, the Investigation Document reflects that the defendant had access through sources to sensitive information about law enforcement activities and corroborates witnesses who will testify concerning the same. The Investigation Document also corroborates anticipated testimony from Witness-1 that the defendant was close with Owner-1 and members of Owner-1's family, and that he spent a significant amount of time at Business-1. As an alternative, the Investigation Document is admissible pursuant to Rule 404(b) to show the defendant's opportunity and knowledge of his co-conspirators, including Owner-1. Finally, for all the reasons described in the preceding sections, introducing the Investigation Document would not be unfairly prejudicial under Rule 403.

### B. Evidence of the Defendant's Possession of Firearms and Large Quantities of U.S. Currency is Admissible

#### 1. Relevant Background

Cellphone-1 contains numerous photographs of firearms, including machineguns, handguns, and destructive devices. Cellphone-1 also includes a photograph of a document listing several firearms and their serial numbers, including a "Colt AR-15" and "40 mm pistolo barretta." Cellphone-1 also contains photographs of large amounts of U.S. currency, including in the defendant's possession. Several examples are provided below:










### 2. Discussion

Evidence of the defendant's possession of firearms and large quantities of U.S. currency is admissible as direct proof of the charges, to corroborate anticipated witness testimony, and, in the alternative, pursuant to Rule 404(b).

The fact that the defendant has photographs of firearms, including some that appear to show him holding firearms, is highly probative of his guilt of the firearms offenses contained in Counts Two and Three. Similarly, photographs of firearms and large quantities of U.S. currency is direct evidence of his drug-trafficking crime. Firearms constitute a tool of the drug trade. *See, e.g.*, *United States v. Muniz*, 60 F.3d 65, 71 (2d Cir. 1995) ("[T]here are innumerable precedents of this court approving the admission of guns in narcotics cases as tools of the trade."); *United States v. Vegas*, 27 F.3d 773, 778 (2d Cir. 1994) ("[T]his Court has repeatedly approved the admission of firearms as evidence of narcotics conspiracies, because drug dealers commonly keep firearms on their premises as tools of the trade." (internal quotation marks omitted)). That is particularly true where, as here, the defendant and his co-conspirators used heavy weaponry, including machineguns and destructive devices, to protect their drug shipments and commit acts

of violence in furtherance of their activities. Similarly, large, unaccounted for amounts of currency is another hallmark of narcotics trafficking. *See United States v. Gonzalez*, 922 F.2d 1044, 1056 (2d Cir. 1991) (holding that possession of large, unaccounted for amounts of currency is admissible to prove the defendant's participation in narcotics dealings).

Moreover, several witnesses are expected to testify concerning the defendant's possession of firearms and possession of large amounts of U.S. currency in connection with his drug-trafficking crimes. Thus, photographs of firearms and large amounts of U.S. currency on the defendant's Cellphones directly corroborates that testimony. *See United States v. Riccardi*, 620 F. App'x 11, 15 (2d Cir. 2015) ("The district court acted well within its discretion in concluding that the guns and ammunition were not being offered to prove propensity but, rather, as direct evidence of the charged robbery crimes as well as corroboration for [a cooperating witness's] testimony that Riccardi had provided him with the guns he used to commit the robbery."); *United States v. Scott*, 677 F.3d 72, 81 (2d Cir. 2012) ("We have 'consistently held [other act evidence] admissible to corroborate crucial prosecution testimony." (quoting *United States v. Everett*, 825 F.2d 658, 660 (2d Cir. 1987))).

As an alternative, photographs of firearms and currency on the defendant's Cellphones are admissible under Rule 404(b) because they show the defendant's opportunity to access firearms in connection with his drug-trafficking crimes and that at least part of his motive for committing his crimes was to obtain large amounts of money. *See, e.g.*, *United States v. Rodriguez*, 761 F. App'x 53, 59 (2d Cir. 2019) ("The government argues that it introduced the challenged testimony to establish that Hilario-Bello had access to guns. The cooperator's testimony may be allowed for that purpose. The District Court did not abuse its discretion in so ruling." (citation omitted));

*United States v. Slaughter*, 248 F. App'x 210, 212 (2d Cir. 2007) (upholding admission of evidence of prior firearm possession under Rule 404(b) as demonstrating opportunity to access firearms, which was relevant to firearms charges in instant case); *United States v. Tubol*, 191 F.3d 88, 95 (2d Cir. 1999) (evidence that defendant possessed a gun when he was arrested was admissible "to show that he had the means to commit" armed robberies).

Finally, admitting the photographs would not be unduly prejudicial. Evidence of the defendant's possession of firearms and large amounts of currency does "not involve conduct any more sensational or disturbing than the crimes with which" he was charged. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Indeed, at least one witness will testify about multiple murders committed by the defendant and his co-conspirators. Accordingly, this evidence is not barred by Rule 403.

### C. Evidence of the Defendant's Electronic Communications is Admissible

In 2019 and 2020, the defendant exchanged electronic communications, including text messages and voice notes, using the WhatsApp encrypted messaging application with an apparent Honduran military official identified as Comanche and a law enforcement official identified as "Commissioner Martines" (the "Commissioner"). During those chats, the defendant, among other things, (i) exchanged messages about Tony Hernandez's trial, including news clippings about a drug trafficker who was murdered following trial in a Honduran prison; (ii) acknowledged that the Honduran military had protected him; (iii) obtained internal police reports about acts of violence in Honduras that attached images depicting firearms and individuals who had been murdered; and (iv) requested and received assistance about how to determine whether the defendant's phone was being intercepted and how to delete information on his phone.

1. **The Comanche Chats are Admissible**

   a. **Background**

The defendant and Comanche communicated on a regular basis using WhatsApp. In some of those chats, Comanche, who appears to be a military official, and the defendant discussed CC-4, other military officials, and the Tony Hernandez trial. For example, on October 27 and 28, 2019, Comanche sent the defendant a video concerning Nery López Sanabria and an image of a news article, pictured below, reporting that López Sanabria had been murdered in a Honduran prison known as El Pozo. During Tony Hernandez's trial, which ended less than two weeks before López Sanabria's murder, the Government had introduced Sanabria's drug ledgers containing notations for "Tony Hernandez" and CC-4's initials, along with corresponding entries reflecting large payments to them.



On or about the same day that Comanche sent the defendant information about Sanabria's murder, he also sent the cover of a news article, depicted below, with a photograph of one of the Valles and a headline that translates roughly to, "RELATIVES AND DEFENSE FEAR THAT REYNERIO VALLE WILL BE KILLED IN EL POZO." In other chats with Comanche, the defendant commented on the murder of another Valle, stating, in substance and in part, that they "nailed" Arnulfo Valle's son; that it must have been "the competition or the police"; and that this is the end of those people. Comanche responded, among other things, that the Valles took advantage of many people by not repaying others for "products" or "merchandise."



On October 30, the defendant complained that the situation in Honduras was "getting ugly" and that others have tried to come after him on numerous occasions, but he has only complained to Comanche about it. In response, Comanche said that his group has offered or provided the defendant with the support the defendant has needed, to which the defendant said "100 Comanche." Comanche then sent a picture of a military official saluting.

Several days later, on November 8, 2019, Comanche sent the defendant an internal police report that was signed by a police commissioner of a metropolitan unit in San Pedro Sula. In that internal report, the police commissioner wrote that officers had investigated a crime scene in which four people were murdered and firearms were recovered. The report also attached three photographs of individuals who appeared to be murdered, one of which is depicted below.



### b.    Discussion

The defendant's chats with Comanche in October and November 2019 are admissible as direct evidence of the charged crimes.  As an initial matter, the chats reflect that the defendant had significant connections with Honduran military officials such that the defendant confirmed "100 Comanche" that the military supported him.  This statement is plainly admissible to show that the defendant had the protection of the Honduran armed forces in support of his drug trafficking and to corroborate witnesses who will testify to the same.  *See Riccardi*, 620 F. App'x at 15.  Indeed, the defendant's close relationship with Comanche is reflected in chats in November 2019 in which Comanche sent the defendant an internal report from a police commissioner discussing investigations into murders and sending photographs of the crime scene.  These communications also corroborate witnesses who will explain that that the defendant received sensitive law enforcement information in connection with his drug-trafficking activities, as well as assistance from law enforcement to commit murders.

The defendant's chats with Comanche also are admissible because they are additional evidence of the defendant's relationship with the Valles and other of his co-conspirators.  For example, days after the Tony Hernandez trial, the defendant and Comanche exchanged messages about the Valles, including messages in which Comanche acknowledged that the Valles had enemies because they owed people money from drug-trafficking activities.  Relatedly, the defendant's receipt of news articles related to López Sanabria—a prominent figure at Tony Hernandez's trial—is relevant given that the defendant claimed during his post-arrest statement that he did not know Sanabria.

In the alternative, and for similar reasons, the Comanche chats are admissible pursuant to Rule 404(b). The defendant's strong support from the Honduran armed forces shows that the defendant had the opportunity to commit his drug-trafficking and weapons offenses on the large scale described by witnesses. *See United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017) (noting that a court may "admit evidence of prior acts as probative knowledge and intent if the evidence is relevant to the charged offense, *i.e.*, if there is a similarity or connection between the charged and uncharged acts"). Similarly, the defendant's communications with Comanche are probative of the background of the conspiracy and the relationship of trust between co-conspirators. *See Dupree*, 870 F.3d at 76 (observing that the district court can, for example, "admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators"); *United States v. Brennan*, 798 F.2d 581, 590 (2d Cir. 1986) (admitting such evidence where prior dealings between two co-conspirators show "the basis for the trust between" the co-conspirators").

Finally, the Comanche chats are not unduly prejudicial relative to other proof in this case. For all the reasons described above, the defendant's activities in this case involved extensive violence and corrupt connections to high-ranking politicians, law enforcement, and military officials. Accordingly, evidence of the full breadth of those relationships and the substance of his conversations with co-conspirators is not barred by Rule 403.

### 2. The Commissioner Chats are Admissible

#### a. Background

The defendant and the Commissioner regularly used WhatsApp to exchange messages. On February 25, 2020, days before the defendant's arrest in this case, the defendant asked whether the Commissioner, who he referred to as the "colonel," still had "that code used to delete"; the Commissioner replied that he did; and the defendant requested that the Commissioner "send it over" because the defendant needed "[t]o check my phone." The Commissioner then sent the defendant a three-step process to determine whether his calls have been intercepted, explaining that "if you see IME/1[.] It is because they have intercepted you." The Commissioner later wrote that if the defendant's phone was being intercepted, then the defendant likely "deleted everything" by following the Commissioner's instructions. The defendant responded: "Last time, I told you that [pause] that friend over there told me that [pause] that they were checking on us [pause] that they had us there [pause] I mean, that they were listening to us. To try to avoid talking so much nonsense. Don't you remember when I told you that?" The Commissioner responded yes, to which the defendant said, "[n]evertheless, we have been able to elude them."

#### b. Discussion

The defendant's chats with the Commissioner are admissible for several reasons. First, the chats are admissible as consciousness of guilt. It is well settled that circumstantial evidence of an offense may "include acts that exhibit a consciousness of guilt," such as attempts to conceal criminal behavior. *United States v. Gordon*, 987 F.2d 902, 907 (2d Cir. 1993). Here, the defendant did just that by seeking assistance from the Commissioner to learn whether his phone was being intercepted and delete information, as well as the defendant's admission that he would try to "avoid

talking so much nonsense" as directed by his friend who warned him that he was being intercepted. *See, e.g.*, *United States v. Zichettello*, 208 F.3d 72, 105 (2d Cir. 2000) (holding that evidence was sufficient to support the jury's finding of the defendant's knowing participation in a conspiracy in part based on efforts to "conceal" certain actions, which "evidenc[ed] consciousness of guilt"). Second, the defendant's chats with the Commissioner are also admissible to corroborate Leonel Rivera. As detailed above, Leonel Rivera will testify that the defendant relied on law enforcement officials for assistance with his drug-trafficking activities. The foregoing chats plainly corroborate that testimony by showing that the defendant was in fact receiving information from law enforcement about hiding evidence. *See Riccardi*, 620 F. App'x at 15. Finally, in the alternative, the chats are admissible pursuant to Rule 404(b) to show the defendant's preparations and plan for seeking to avoid detection in connection with his drug-trafficking activities and related violence.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should grant

the relief requested herein.

Dated:  New York, New York
        January 8, 2021

                                        Respectfully Submitted,

                                        AUDREY STRAUSS
                                        Acting United States Attorney for the
                                        Southern District of New York

                            By:    _____/s/_____
                                        Jacob Gutwillig
                                        Matthew Laroche
                                        Jason A. Richman
                                        Elinor Tarlow
                                        Assistant United States Attorneys
                                        212-637-2215 / 2420 / 2589 / 1036

Cc:     Defense Counsel
        (Via ECF & Email (unredacted))