UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO. 15-CR-378

**UNITED STATES OF AMERICA**,

    *Plaintiff*,

v.

**FREDY RENAN NAJERA MONTOYA**,

    *Defendant*.

_____/

# DEFENDANT FREDY NAJERA MONTOYA'S
# OBJECTIONS TO PRESENTENCE INVESTIGATION REPORT

Respectfully submitted,

/s/ *Joaquin Perez*
JOAQUIN PEREZ, ESQ.
NYB: 52376532
6790 Coral Way
Miami, Florida 33155
Tel: (305) 261-4000
jplaw1@bellsouth.net

## TABLE OF CONTENTS

I. FACTUAL AND PROCEDURAL BACKGROUND……………..………………….. 1

II. LEGAL ARGUMENT………………..…………………………………………...3

    A. The Government Had Control Over The So-Called Significant Witness That Was Removed From the Country………………………………………4

    B. Najera's Claim To Conflicted Counsel Was Made In Good Faith And Not Intended To Delay The Trial…………......................................................5

    C. Mr. Najera Did Not Threaten A Government Witness Or Engage In Obstructive Conduct Including Lying About His Conversations With Mr. Rivera Maradiaga…………………………………………………….… 8

    D. Mr. Najera's Admitted Responsibility For The Drug Trafficking Charge…..11

III. CONCLUSION …………………………….………….………………….13

Fredy Renan Najera Montoya ("Mr. Najera" or "Najera"), objects to the government's misguided statements that he attempted to delay the trial by raising false claims and, further, that he impeded the government's investigation. Specifically, Mr. Najera objects to the government's suggestion that its concession to allow him to withdraw his plea was based upon the loss of a critical witness. Pre-Sentence Investigation Report (PSIR ¶ 23). This position ignores the history of the case and appears to be solely designed to paint Najera in a bad light in an effort to impact sentencing factors, such as acceptance of responsibility. U.S.S.G §3E1.1 App. Note 4 [1] and 18 U.S.C. §3553(a)(1) [2].

## I. FACTUAL AND PROCEDURAL HISTORY

1. On March 15, 2018, Mr. Najera self- surrendered to the United States. (D.E. 8). Mr. Najera admitted responsibility for his drug trafficking activities in Honduras and attempted to cooperate by attending two proffer sessions.

2. When the government rejected his cooperation efforts and the case was set for trial, Mr. Najera found himself at odds with his attorney, Victor Rocha. On September 19, 2018, Mr. Rocha moved to withdraw as attorney of record alleging "preparation for this trial [was] a tremendous undertaking that would be burdensome upon myself and my staff." (D.E. 37).

3. Attorney Rocha, however, failed to mention his representation of two individuals whose interests were in direct conflict with Mr. Najera. [3] The existing conflict created mutual animosity

---

[1] There may be, however, extraordinary cases in which adjustments under both 3C1.1 and 3E1.1 may apply.

[2] By a different cover Defendant will present a Sentencing Memorandum outlining relevant factors under 18 U.S.C. § 3553(a)(1).

[3] Wilter Blanco, Case No. 16-CR-20602 (SDFL). On August 16, 2017, Mr. Blanco was sentenced to 240 months. (D.E. 39). The government did not request, nor an enhancement was given, for violence or credible threat pursuant to USSG §2D1.1 (b)(2).
Ramon Matta Waldarruga, Case No. 14-CR-442 (EDNY) in December 2017, Matta pleaded guilty to a cocaine importation conspiracy. The Court sentenced to time served on September 30, 2019.

which heightened during the period leading up to the change of plea on December 8, 2018, ultimately resulting in Najera pleading guilty to a 40-year mandatory term of imprisonment. [4]

4. On April 14, 2019, Mr. Najera filed a motion to withdraw his guilty plea arguing that Mr. Rocha's conflicted representation impacted his knowing decision to plead guilty. (D.E. 94).

5. By letter dated April 8, 2019, the government requested, and the Court approved the following briefing schedule. (D.E. 95).

- Government opposition due by June 10, 2019; and
- Defense reply due by July 1, 2019.

6. On August 2, 2019, the Court considered the merits of the motion at a hearing and requested additional briefing. (D.E. 113).

7. On December 8, 2019, The Court held an evidentiary hearing on the motion to withdraw the guilty plea. The Court did not enter a final ruling but intimated that the conflict of interest claim had merit:

> "And so, the record here is that Mr. Rocha was aware that Mr. Blanco was alleged to have been involved in the murder of the General. He told us that he didn't believe that Blanco was involved. But he was aware that others said he was involved. And of course, Mr. Najera is alleged to have been involved in the General's murder. So in those circumstances, for a lawyer who practices in this district, it would be my expectation that a lawyer would bring that to my attention, the prior representation, so that I could make a decision about whether a *Curcio* hearing should be conducted or not. And that didn't happen here. So that's just another comment that I want the lawyers to think about…" Tr. December 8, 2019 at P211: 21-25, P212: 1-5.

8. On February 8, 2020, the Court granted *on consent* the motion to withdraw the plea and Mr. Najera accepted responsibility by pleading guilty to Count 1, a lesser Count 2, and Count 3 of the Indictment. (D.E. 138).

---

[4] Transcript of December 8, 2018 Change of Plea Hearing.

9. The government now seeks to denigrate Najera's acceptance of responsibility by suggesting the following:

>i) Mr. Najera raised false complaints about his previous attorney, Victor Rocha,
>
>ii) The undersigned counsel delayed the case long enough so that one of the government's witnesses had to be sentenced and removed from the country, and
>
>iii) Mr. Najera presented blatant lies regarding his purported innocence and threats allegedly made to another witness. (*i.e.,* Devis Leonel Rivera Maradiaga) (PSIR ¶ 23).

10. The record evidence shows the government had absolute control over Jorge Alfredo Cruz Chavez whose removal it claims caused significant prejudice. Secondly, the motion to withdraw the plea was made in good faith and not intended to delay the case "long so that the government's witness had to be sentenced and removed from the country." Thirdly, Mr. Najera always admitted responsibility for drug trafficking; and that did not make any threats or purported threats which rose to the level of obstruction of justice. Lastly, by pleading guilty following the Court's granting of the withdrawal of his initial plea—Mr. Najera saved the Court and the government substantial resources - mitigating factors that should be considered in imposing the ultimate sentence.

## II. LEGAL ARGUMENT

It is well established that the prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). This axiom does not simply apply to the process of bringing charges or securing a conviction—it also "must necessarily extend" to the point where a prosecutor advocates for a particular sentence.

See, *United States v. Shanahan*, 574 F.2d 1228, 1231 (5th Cir. 1978) (reviewing sentencing conduct of prosecutor). See *United States v. Stone* (Case 1:19-CR-00018-ABJ) (D.E. 286).

### A. THE GOVERNMENT HAD CONTROL OVER THE SO-CALLED SIGNIFICANT WITNESS THAT WAS REMOVED FROM THE COUNTRY

The government's claim that the undersigned counsel effectively delayed the case "long enough so that one of the government's witnesses had to be sentenced and removed from the country resulting in significant prejudice to the Government's case" is baseless.

On April 4, 2018, when Mr. Najera's motion to withdraw was filed, the government's purported witness, Jorge Alfredo Cruz Chavez ("Mr. Cruz Chavez") was awaiting sentence in *1:13-CR-174-LGS* (SDNY). Presumptuously believing that Mr. Najera's motion would be denied, the government agreed to schedule Mr. Cruz Chavez's sentencing for May 23, 2019, (almost 49 days after Najera's motion was filed and 13 days before the government's deadline to file its response). The government then filed a §5K1.1 motion resulting in a time served sentence. Soon thereafter, Mr. Cruz Chavez was transferred to immigration custody where he remained for fifty-four (54) days prior to his removal to Honduras on July 15, 2019.[5] By then the government had filed its reply, acknowledging that Mr. Cruz Chavez was still in the United States. (D.E. 98). Following his arrival in Honduras on July 25, 2019, Mr. Cruz Chavez told the press that "he had been charged with drug trafficking by mistake but ultimately the case had been dismissed for lack of evidence." [6] Even in Honduras, the government could have secured his testimony by paroling

---

[5] While in immigration custody, the government made no effort to keep Mr. Cruz Chavez' by filing a Material Witness Complaint pursuant to 18 U.S.C. §3144. *See*, 18 U.S.C. § 3144 ("[i]f it appears from an affidavit filed by a party that the testimony of a person is material in a criminal proceeding, and if it is shown that it may become impracticable to secure the presence of the person by subpoena, a judicial officer may order the arrest of the person and treat the person in accordance with the provisions of section 3142 of this tile").

[6] See, https://www.latribuna.hn/2019/07/15/retorna-a-honduras-exoficial-que-habia-sido-pedido-en-extradicion/amp/.

him or securing his testimony pursuant to Fed. R. Crim. P. 15. The following chart belies the government's claim that the ***undersigned delayed*** the case long enough so that Mr. Cruz Chavez had to be removed from the country.



Although the government is entitled to "strike hard blows, it is not at liberty to strike foul ones." *Berger, supra*, at 16. The government trivializes Mr. Najera's acceptance of responsibility by falsely claiming that the withdrawal of the prior plea was due to the loss of "a significant government witness." This claim is undignified, intemperate, and inconsistent with the history of the case.

### B. NAJERA'S CLAIM TO CONFLICTED COUNSEL WAS MADE IN GOOD FAITH AND NOT INTENDED TO DELAY THE TRIAL

The Supreme Court instructed that "the right to counsel guaranteed by the Constitution contemplates the services of an attorney devoted solely to the interests of his client," an admonition which we ourselves have had occasion to observe. *Glasser v. United States*, 315 U.S. 60 (1942). "Undivided allegiance and faithful, devoted service to a client,' the Court declared, 'are prized traditions of the American lawyer. It is this kind of service for which the Sixth Amendment makes provision.'" *United States v. Hurt*, 543 F.2d 162 (D.C. Cir. 1976) (*citing Von Moltke v. Gillies*,

332 U.S. 708, 725 (1948)). Effective assistance of counsel required the undersigned to move to withdraw Mr. Najera's plea.

The government's argument that Mr. Najera made false complaints is unworthy of consideration. First, the Court found merit in the underlying claim that Mr. Rocha's performance was deficient due to his prior representation of Wilter Blanco:

> " I would say I would be surprised in a case that involve lawyers who practice in this district…in a case that involved allegations of murder…that a defense lawyers representing an individual who was alleged to be involved in the murder… did not disclose he represented another client who was alleged to be involved in that murder so that I can then make a determination as to whether a *Curcio* hearing would be necessary." Tr. Dec. 8, 2020 P211, 21-25, P. 212 1-5.

The Court's criticism applies with equal force not only to Mr. Rocha but to the prosecution team as they had met with Wilter Blanco and Attorney Rocha in Honduras in 2015. On March 15, 2019, (fifteen months after Mr. Najera surrendered on March 15, 2018, and seven months after the change of plea on December 10, 2018,) the government revealed for the first time what had been previously concealed from Mr. Najera and the Court:

> "[I]n May 2015, Mr. Rocha represented Blanco in a meeting with one of the undersigned prosecutors and several DEA agents. Blanco was not (and is not) charged in this District, and the meeting was conducted outside the United States pursuant to a standard proffer agreement used this office. During the proffer, Blanco admitted to drug-trafficking activities dating back to approximately 1999. Blanco did not mention the defendant, and he did not describe participating in acts of violence." [7] [8]

---

[7] The Government's Opposition to the Defendant's Motion to Withdraw His Guilty Plea, at page 36, Lines 9 - 13. (D.E. 98).

[8] When the Court asked Mr. Rocha about a potential conflict, Mr. Rocha states that "my client [Wilter Blanco] has said that he's not present, but he does not wish to testify, He does not wish to testify. I cannot compel him to testify. It would be unethical to force him or ask him even to testify." Trans Dec. 10th at 20:1-5



While meeting with Wilter Blanco in 2015, the prosecution neglected to question him about a July 22, 2013, Honduran Special Intel Report that found him responsible for General Gonzalez's assassination. Also noteworthy was the government's failure to inquire as to Mr. Blanco's prior crimes of violence - a standard procedure when interviewing a prospective cooperator. Thus, they ignored Wilter Blanco's involvement in another state sponsored assassination with the same trappings as the Gonzalez assassination. See *United States v. Juan Antonio Hernandez Alvarado*, Case No. 15-cr-379-PKC, Trial Transcript at pages 435-437 (SDNY). According to the government, Wilter Blanco recruited law enforcement officers to carry out the assassination of an individual known as a/k/a "El Chino." [9]

General Gonzalez's death was not an inconsequential accusation to be easily ignored. The government offered this heinous crime to paint Mr. Najera as a dangerous and violent drug trafficker. Although presently maintaining the evidence was irrelevant to prove Najera's guilt, it is worth noting that on the eve of the December 10, 2018 trial, the government maintained the alleged violent act was "probative [to the ] drug traffick[ing] conspiracy charge in Count 1 as well

---

[9] Cristian Daniel Duron Hernandez, aka Chino. Wilter Blanco had him killed while in custody at the Tamara prison in Honduras. The assassinations of Chino and General Gonzalez's were strikingly similar in that state actors were used to commit the homicides; thus, calling into question the prosecutors' failure to question Wilter Blanco about his involvement in crimes of violence.

as the firearms charge in Count 2 and 3." Moreover, they argued that evidence of the assassination was "inextricably intertwined with the brutal drug business in which defendant participated, including the firearms offense at issue." Therefore, this testimony was not collateral – but rather, the centerpiece of its case against Mr. Najera.

This case presented more than "a fair and just cause" justifying the withdrawal of the plea to achieve the ends of justice. When the motion to withdraw the guilty plea was granted, Mr. Najera **immediately accepted** responsibility to all the counts in the Indictment. See, Trans. February 19, 2020 Hearing at 4:1-5. Therefore, the motion to withdraw was not an obstructive tactic designed to delay the case long enough to prejudice the government. [10]

### C. MR. NAJERA DID NOT THREATEN A GOVERNMENT WITNESS OR ENGAGE IN OBSTRUCTIVE CONDUCT INCLUDING LYING ABOUT HIS CONVERSATIONS WITH MR. RIVERA MARADIAGA

The government argues that Mr. Najera made false assertions regarding Rivera Maradiaga in a letter dated October 2, 2019, and in a sworn statement filed with the Court on July 28, 2019. More specifically, the government asserts that Mr. Najera "lied about a purported threat allegedly made to him by Maradiaga." PSIR ¶ 23 L. 9-10. In both, Najera recounts Rivera's assertion that he would be a witness against him. He mentioned that Rivera advised him against fighting the government, suggesting that cooperation is a more viable alternative. Rivera also told Najera that he should assume responsibility for General Gonzalez's death consistent with Rivera's prior testimony in *United States v. Fabio Porfirio Lobo*, SDNY 1:15-CR-00175-LGS. [11] Finally, Najera

---

[10] In *United States v. Flynn*, General Flynn filed a motion to withdraw, *also alleging an attorney client conflict*. The Department of Justice not only set aside the plea, but also dismissed the case. See SDNY Case No. 17-CR-232

[11] Question: "Who are some of the other drug traffickers that you spoke to about General Aristides?
  Answer: "Fredy Najera, Neftali Duarte Mejia, Elier Sierra, Moncho Matta, Luis Valle, Arnulfo Valle, Wilter Blanco, Tom Montes, Tit Motes, and Juan Carlos Montes." (D.E. 167) Trans. March 6, 2018 18:12-16

recounted Rivera's statement that things would 'go real bad' if Najera did not agree with his version of events.

The circumstances surrounding the conversation in question shed light on issues of credibility and motive. On March 15, 2018, following his self-surrender, Mr. Najera was placed in Unit 7 North at the Metropolitan Correctional Center ("MCC") in Manhattan. Much to his concern, on August 1, 2018, Rivera Maradiaga, the primary witness against him and a person who had previously attempted to kill him twice was transferred to the same unit. Inexplicably, the separation order allegedly put in place by the prosecutor prohibiting Rivera and Mr. Najera from being housed together was ignored. What is significant is that Mr. Najera, as opposed to Rivera, was the one who sounded the alarm by conveying the following message through Attorney Rocha.

By letter dated August 2018, Mr. Najera advised Rocha that:

> "if anything happens to me the person responsible will be Devis Leonel Rivera Maradiaga because this individual spoke to [Mr. Najera] in a threatening manner stating that he, Rivera, would be the first witness against [Mr. Najera] and that he should not go to trial because things would be real bad for him."

The Government bears responsibility for placing antagonistic individuals in the same unit at the MCC, and while the prosecutors in this case claim that they "immediately contacted the Bureau of Prisons to ensure that the order was in enforced," they failed to mention that Mr. Najera **was the one** who brought to their attention his concerns about being housed with Mr. Rivera. (D.E. 153).

There is no evidence supporting the government's claims that Mr. Najera told blatant lies about threats made to him by Leonel Maradiaga. Mr. Najera's sworn statement filed with the Court on July 28, 2018 [12] reads as follows:

---

[12] *See*, D.E. 112-2.

> "Last year Leonel "Cachiro" was placed in Unit 7 North. He urged me to plead guilty and that as long as my testimony was in accord with his testimony, he would get three to four years. However, I had to agree with him including responsibility for the death of General Gonzalez. "Cachiro" told me that I had to admit the death of Mr. Gonzalez and also add that we had been engaged in drug trafficking for a long time. When I told him that I would never agree to do that and urged him to tell the prosecutors the truth and admit that he was lying, he told me that he had to maintain his position because if not he would be denied the benefits of his cooperation agreement and would have to spend the rest of his life in jail. I only saw Leonel "Cachiro" twice in the outside."

During debriefings before the scheduled trial date, members of the prosecution team asked Mr. Rivera about conversations had with Najera, "a represented defendant" while both were confined in the same unit. During the debriefings, Rivera never expressed fear or suggested that Mr. Najera threatened him in any manner. The government is displeased with Najera's unwillingness to accept Rivera's accusations, and more specifically, to admit his participation in General Gonzalez's death. This particular claim was the litmus test - and a major impediment to Najera's ability to reach a cooperation agreement. As more fully discussed below, the government was deeply committed to Rivera's credibility and version of events. As such, it did not welcome testimony placing doubt in Rivera's credibility - particularly concerning an important claim such as his testimony of the individuals involved in Gonzales's assassination.

There has been no showing that Najera's testimony or conduct caused the unnecessary expenditure of substantial governmental or court resources, or that it caused substantial interference with the administration of justice. *See United States v. Weissman*, 22 R. Supp. 2d 187, 194 (SDNY 1998) (noting that absent a finding that the conduct caused the unnecessary expenditure of substantial governmental or court resources - the offense level increase does not apply). *Id*.

In sum, Mr. Najera did not obstruct justice. He accepted responsibility for the offense. Therefore, Mr. Najera's objection to the obstruction of justice enhancement should be granted and

he should receive recognition for his acceptance of responsibility both under the U.S.S.C. 3§1.1 and 18 U.S.S.C. § 3553(a).

### D. MR. NAJERA'S ADMITTED RESPONSIBILITY FOR THE DRUG TRAFFICKING CHARGE

Mr. Najera voluntarily came to the United States to admit his culpability. Preliminarily, Najera had a perfect justification to avoid extradition. In 2012, he had on ongoing criminal case involving the death of Rigoberto Mendez Acosta. He was found not guilty, but the Honduran Supreme Court reinstated the criminal case placing him in house arrest pending trial in 2016. The pendency of the criminal charge exempted him from extradition until the Honduran case was concluded or until he finished serving a potential sentence. The United States is a signatory to the Montevideo Treaty of 1933 which enshrines the principle of comity amongst nations in the Western Hemisphere. See *Article 6 of the Convention on Extradition (Inter-American), December 26, 1933, surrender of the accused to the demanding state shall be deferred until trial ends or his sentence is served.*" [13] In lieu of using the pending charge as a pretext to remain in Honduras, as other political figures have done, Mr. Najera confronted his wrongdoing by surrendering to DEA agents in Guatemala who arrested him and subsequently flew him to the Southern District of New York.

Once in the United States, Mr. Najera participated in two lengthy proffers held in March and May 2018. He admitted his involvement in drug trafficking but refused to accept responsibility for General Gonzalez's assassination. By waiving his protection under Rule 410 of

---

[13] *See,* Article 6 of the *Convention on Extradition (Inter-American),* December 26, 1933 ("[w]hen a person whose extradition is sought shall be under trial or shall be already condemned in the State from which it is sought to extradite him, for an offense committed prior to a request for extradition, said extradition shall be granted at once but the surrender of the accused to the demanding state shall be deferred until trial ends or his sentence is served.").

the Federal Rules of Criminal Procedure, Mr. Najera limited his trial options placing himself at the government's mercy; however, his potential testimony did not concur with the government's theory of the case.

Knowing that Rivera had previously testified under oath that Mr. Najera was one of the participants in General Gonzalez's assassination, the government had significant stakes riding on Rivera's credibility which explains the government's insistence in suggesting that Mr. Najera made "false assertions" about his conversations with Rivera. Najera's participation in General Gonzalez's death became the government's litmus test of his credibility, a central reason why his cooperation was rejected. As shown by notes of the proffer sessions, Mr. Najera admitted to facilitating drug trafficking activities.[14] When he divulged this information, he knew that the government could directly or indirectly use his testimony in order to foreclose his Sixth Amendment right to proceed to trial.

What Mr. Najera will never admit is his participation in the assassination of General Gonzalez simply because all available information including Honduran Police Reports, audiotapes, and testimony from a variety of witnesses belies the claim that he was a participant in the murder. The government has now conceded, or at least takes the position, that Mr. Najera was not implicated in the assassination:

> THE COURT: …Let me be more specific. The government has in connection with this case maintained that the defendant played a role in the assassination of an individual who was the head of the Honduran Drug Enforcement Agency. Is that going to be an issue that I'm going to have to contend with in terms of sentencing?
> MS. TARLOW: The government does not intend to offer evidence of that assassination at sentencing.
> MR PEREZ: I couldn't hear.
> MS. TARLOW: The government does not intend to offer evidence of that assassination at the sentencing.

*Trans. February 19, 2020 at 29:12-22*

### III. CONCLUSION

Although easier to blame Najera for the unusual course of events in this case, he was entitled bring to the Court's attention his prior attorney's conflicted representation and, more importantly, to deny his involvement in a murder he did not commit. While the government may have been annoyed by the extra work done in the case, and Najera's challenge to Rivera's credibility, his self-surrender and acknowledgment of responsibility for the crimes charge should not be ignored. The amount of time the government spent litigating the motion to withdraw the plea should not be a sentencing consideration. Time spent seeking the truth is time wisely spent.

Respectfully submitted,

/s/ *Joaquin Perez*
JOAQUIN PEREZ, ESQ.
NYB: 52376532
6790 Coral Way
Miami, Florida 33155
Tel: (305) 261-4000
jplaw1@bellsouth.net

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this document has been filed with the Clerk of Court using the CM/ECF Filing System on this 23rd day of November 2020.

/s/ *Joaquin Perez*

JOAQUIN PEREZ, ESQ.