UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>GEOVANNY FUENTES RAMIREZ,<br><br>　　　　　　　　　　Defendant. | S6 15 Cr. 379 (PKC) |

**THE GOVERNMENT'S REPLY IN FURTHER SUPPORT
OF ITS JANUARY 8, 2021 MOTIONS *IN LIMINE***

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Jacob Gutwillig
Matthew Laroche
Jason A. Richman
Elinor Tarlow
Assistant United States Attorneys
　　*Of Counsel*

# **TABLE OF CONTENTS**

I.   The Defendant's Objections to the Admissibility of Evidence Concerning Narcotics-Related Corruption and Violence Are Meritless.................................................................... 3

    A.   Corruption and Violence Evidence is Direct Proof of the Charged Crimes .......... 3

    B.   Corruption and Violence Evidence is Admissible Under Rule 404(b)................... 5

    C.   Corruption and Violence Evidence is Not Unfairly Prejudicial ........................... 9

    D.   The Government Does Not Object to a Brief Adjournment ................................ 12

II.  The Defendant's Objections to the Admissibility of Co-Conspirator Statements Made to Leonel Rivera Are Meritless ......................................................................................... 12

    A.   The Statements to Leonel Rivera are Admissible Under Rule 801(d)(2)(E)........ 13

    B.   Statements 1 and 5 By CC-1 are Admissible....................................................... 14

    C.   Statements By CC-5, CC-7, and CC-11 are Admissible Under Rule 804(b)(3)... 15

III. The Defendant's Objections to the Admissibility of Co-Conspirator Statements Made to Witness-1 Are Meritless .............................................................................................. 18

IV.  The Defendant's Objections to the Admission of Certain Electronic Evidence From Cellphone-1 Are Meritless......................................................................................... 19

    A.   Photographs of Firearms and Destructive Devices Are Admissible..................... 19

    B.   The Defendant's Electronic Communications Are Admissible............................ 21

V.   The Defendant's Incriminating Statements to Leonel Rivera Are Admissible ............... 25

    A.   Applicable Law................................................................................................. 25

    B.   Discussion........................................................................................................ 27

CONCLUSION............................................................................................................... 30

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

GEOVANNY FUENTES RAMIREZ,

                              Defendant.

S6 15 Cr. 379 (PKC)

The Government respectfully submits this memorandum in further support of its January 8, 2021 motions *in limine* ("Gov't MILs"), and in response to the defendant's January 27, 2021 memorandum opposing those motions and seeking to exclude other evidence ("Def. Br.").[1]

The defendant objects to evidence of his participation in narcotics-related corruption and drug-related murders.  (Def. Br. at 4-16).  His contentions are meritless.  This evidence is relevant and admissible.  As has been clear since the filing of the February 28, 2020 Complaint that contained the initial charges against the defendant, a defining characteristic of the charged drug-trafficking conspiracy and related weapons offenses was the defendant's use of drug proceeds to bribe public officials for protection, as well as the defendant's use of violence to further his drug-trafficking activities.  The defendant's participation in narcotics-related corruption, including the defendant's bribes to CC-4, and violence was therefore central to the success of the charged conspiracies.  In nearly identical circumstances in Tony Hernandez's trial, this Court admitted evidence of corruption and uncharged murders to prove drug-trafficking and firearms offenses.

---

[1] This memorandum uses the same defined terms and naming conventions as set forth in the Government's motions *in limine*.  For the Court's convenience, the defined terms and naming conventions are listed on Exhibit A to this memorandum.

The defendant also objects to certain evidence obtained from Cellphone-1, including photographs of firearms and destructive devices, as well as his communications with Comanche and the Commissioner.  (Def. Br. at 26-29).  The photographs and communications are admissible as direct evidence of the charged crimes because they demonstrate the defendant's (i) possession of firearms that were used to protect drug shipments and commit drug-related murders; (ii) access to Honduran military officials who supported his drug-trafficking activities; and (iii) close relationship with law enforcement officials who provided confidential information to protect his drug shipments and avoid investigation and arrest.  In Tony Hernandez's trial, this Court admitted substantially similar evidence, including pictures of firearms obtained from Tony Hernandez's phone and electronic communications involving co-conspirators.  The defendant also seeks to exclude his prison statements to Leonel Rivera.  The defendant's claim that Leonel Rivera initiated a conversation about the defendant's case is incorrect.  Regardless, the defendant's motion fails because the Government did not direct or encourage Leonel Rivera to elicit information from the defendant.

Finally, the defendant states that if the Court grants certain of the Government's motions *in limine*, including by admitting evidence of corruption and acts of violence, then the defendant would seek an adjournment to investigate those matters.  (Def. Br. at 1, 14-16).  The Government has endeavored throughout this case to notify the defendant of its anticipated evidence, including through the early production of Leonel Rivera's and Javier Rivera's 3500 material on November 17, 2020.  Nevertheless, due to circumstances relating to the COVID-19 pandemic, the Government does not object to a brief adjournment.

I.       **The Defendant's Objections to the Admissibility of Evidence Concerning Narcotics-Related Corruption and Violence Are Meritless**

A.       **Corruption and Violence Evidence is Direct Proof of the Charged Crimes**

The defendant claims that narcotics-related corruption and violence does not "have any bearing on whether Fuentes Ramirez conspired to import narcotics into the United States, or whether he possessed weapons in the course of that conspiracy." (Def. Br. at 4-5). He is wrong.

The Court should reject the defendant's characterization of his efforts to bribe public officials as his participation in "Politically Corrupt Offenses." (*Id.* at 4). While the defendant's and his co-conspirators' conduct was certainly corrupt, the Government is not introducing that evidence to highlight political corruption for its own sake. Rather, corruption and violence was a key feature of the defendant's drug-trafficking and weapons offenses. All of this evidence is admissible because it was undertaken in furtherance of the charged conspiracies.

Beginning in at least 2009, the defendant bribed multiple high-ranking members of the Honduran National Police in exchange for sensitive law enforcement information to support his drug-trafficking activities and to protect the Laboratory. After his Laboratory was raided by law enforcement, the defendant bribed CC-10, a high-ranking Honduran judge, who in exchange agreed to clean the defendant's criminal record and stop law enforcement interference in the defendant's ongoing crimes. Then, in 2013, the defendant contributed large sums of money—derived from proceeds of the crimes at issue—to CC-4's campaign for the Honduran presidency. The defendant made the payments to a co-conspirator, CC-4, in order to further the conspiracy. Specifically, CC-4 promised to protect the defendant from arrest and extradition; promised to help the defendant transport cocaine with the assistance of Honduras's armed forces; and directed the

3

defendant to work directly with Tony Hernandez, CC-4's brother, to import huge quantities of cocaine into the United States.

The defendant also engaged in five murders to gain power and to retaliate against drug-trafficking rivals and law enforcement officials who interfered with his activities. For example, (i) in about 2010, the defendant and CC-1 killed Victim-1, a mechanic who had stolen money from Leonel Rivera, one of their drug-trafficking partners; (ii) in about 2011, the defendant and several of his co-conspirators killed Victim-2 and Victim-3, in retaliation for their murder of a relative of CC-1, one of the defendant's close drug-trafficking partners; (iii) in or about 2012, the defendant and CC-1 killed Victim-4, a law enforcement officer who was involved in the raid of the defendant's Laboratory; and (iv) in or about 2013, the defendant and CC-1 ordered assassins to kill CC-7, who owed the defendant and CC-1 a drug debt.

In Tony Hernandez's trial, which involved many of the defendant's co-conspirators and some of the same cooperating witnesses, the Court admitted similar evidence of narcotics-related corruption and two drug-related murders. In addressing defense objections to that evidence, the Court stated during the pretrial conference:

> [I]t's alleged that the conspiracy utilized the Honduran military and had the protection of the Honduran National Police, and used them as part of the operation; and that the political corruption was . . . the modus operandi of drug traffickers . . . in Honduras. . . . [I]t seems to me at first blush that this would be direct evidence of the conspiracy.

(Dkt. 85, Sept. 13, 2019 Conference Tr. at 4). Similarly, "[w]ith regard to the two murders, again, they are evidence of . . . acts done in furtherance of the conspiracy." (*Id.* at 8); *see also United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) ("An act that is alleged to have been done in

furtherance of the alleged conspiracy . . . is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." (internal quotation marks omitted)).

The same holds true here.  The evidence of the defendant's participation in corruption and violence were acts done in furtherance of the charged conspiracies.  This evidence also details the defendant's drug-trafficking relationship with co-conspirators who were powerful political and law enforcement officials and explains why the defendant and those co-conspirators came together, how they operated, and why they were able to continue crimes of this magnitude unabated for almost a decade.  Thus, this evidence is admissible as direct proof of the charged crimes.  (*See also* Gov't MILs at 18-19).

### B.      Corruption and Violence Evidence is Admissible Under Rule 404(b)

Evidence of narcotics-related corruption and violence is also admissible under Rule 404(b). The defendant claims that the Government "has not identified any issue in controversy to which any aspect" of the evidence is relevant and, thus, the Government's "true purpose" is to suggest the defendant has "traits and affiliations" that make him more likely to have committed the charge offenses.  (Def. Br. at 8).  But as the Government detailed in its motions *in limine*, the corruption evidence is admissible for several purposes, including to show the broader criminal plan of the defendant, CC-4, CC-10, and others, to use drug trafficking to help assert power and control in Honduras, and to show the defendant's motive and intent in joining the conspiracy.  (Gov't MILs at 19 (citing cases)).  Similarly, the drug-related murders are admissible as evidence of the defendant's plan and opportunity to commit the charged drug-trafficking and weapons offenses. (Gov't MILs at 31 (citing cases)).

Instead of addressing those arguments or case law, the defendant claims that the Government provided limited discovery about the drug-related murders; has not investigated them; and that the only evidence of the murders is Leonel Rivera's testimony. These arguments are irrelevant to assessing whether the defendant's participation in drug-related murders is admissible under Rule 404(b). Nevertheless, the defendant's claims are also meritless and misstate the record.

The Government has not provided limited discovery about the murders in this case. From the outset of this prosecution, the Government disclosed to the defendant that narcotics-related corruption and acts of violence were core components of the charged crimes. (*See* Exhibit B, Complaint, Dkt. 1, at ¶¶ 10 (discussing narcotics-related corruption involving CC-4 and law enforcement officials); 11(e) (discussing the defendant paying bribes to law enforcement officials); 11(h) (discussing the defendant's participation in the murder of Victim-4 based on information provided by Leonel Rivera); 11(j) (discussing the defendant's participation in the murder of CC-7 based on information provided by Leonel Rivera); 12 (discussing narcotics-related corruption involving the defendant and CC-4)). In Rule 16 productions, the Government produced, among many other things, the defendant's post-arrest statement in which he acknowledged knowing hitmen such as CC-12 and that he knew CC-7 was a drug-trafficker who was murdered, as well as a forensic image of Cellphone-1 that contained gruesome pictures of murdered individuals. In July 2020, the Government also produced the trial transcript and exhibits from Tony Hernandez's trial, which as the Court is aware, detailed extensive public corruption, including involving CC-4, and violence in furtherance of drug-trafficking activities. On November 17, 2020, well before the Court had set a trial date, the Government also produced Leonel Rivera's and Javier Rivera's 3500 material, far in advance of when the defendant was entitled to receive it, and has continued to

supplement that production on a rolling basis as new 3500 material has been generated.   The *Cachiros'* 3500 material details the defendant's participation in wide-ranging narcotics-related corruption and numerous drug-related murders.   On January 5, 2021, the Government also produced all of the 3500 material from Tony Hernandez's trial, as well as 3500 for other potential witnesses.   The Government has supplemented those productions with recently obtained prison emails in which the defendant references non-public information about acts of violence, including the murder of Victim-1.   In short, this record belies any claim that the Government's disclosures related to drug-related murders were "limited."

The defendant's complaints about the Government's investigation ignore the realities of developing evidence of drug trafficking and acts of violence in Honduras in connection with an investigation targeting, among others, high-ranking officials such as CC-4.   The Government has proffered evidence that the defendant bribed a judge and law enforcement personnel to end Honduran investigations that targeted him and his Laboratory, and took steps with his co-conspirators to hide and, at times, burn the bodies of victims of violence undertaken in furtherance of the charged drug-trafficking conspiracy.   The Government has also proffered evidence that shortly before his arrest, the defendant communicated with the Commissioner about how to avoid his phone being intercepted and deleting evidence.   The defendant cannot successfully challenge the admissibility of such evidence by pointing to the absence of the very types of evidence he sought to destroy:   "police reports," "investigative files," and "forensic evidence" related to the murders.   (Def. Br. at 9-10).

More broadly, in this case and others, the Government's ability to investigate foreign criminal conduct often depends in large part on a combination of cooperating witnesses and

voluntary assistance from the foreign government. This criminal investigation has established that corruption is endemic in Honduras, and given the target set at issue, assistance from the Honduran government in support of these ongoing prosecutions has hardly been forthcoming. For example, the Honduran government has provided only limited records in response to a treaty request for evidence relating to Tony Hernandez, and not honored extradition requests relating to other charged co-conspirators—and potential witnesses against the defendant and CC-4—such as co-defendant Mario Jose Calix Hernandez and former Honduran mayor Arnaldo Urbina Soto, *see* No. 18 Cr. 497 (S.D.N.Y.). In this context, and in light of the defendant's efforts to halt investigations and destroy evidence, it is hardly surprising and not a bar to the admissibility of evidence that the Government has proceeded based in part on reliable testimony from cooperating witnesses.

The defendant is also incorrect that the only evidence of these crimes comes from Leonel Rivera. The defendant has made glaring admissions corroborating Leonel Rivera about the murders. During the defendant's post-arrest statement, the defendant stated, among other things, that he knew CC-12 (who participated in at least one of the drug-related murders); CC-12 was a hitman; he knew CC-7 (who the defendant murdered with others); CC-7 was involved in drug trafficking; and CC-7 was killed. More recently, the defendant sent incriminating prison emails about the murder of Victim-1—the mechanic who the defendant murdered to impress the *Cachiros*. (Gov't MILs at 5-6). For example, on December 25, 2020, the defendant emailed several of his family members that he "urgently" needed to obtain information for his trial about, among other things, "a mechanic from Guatemala that showed up half-buried in Choloma. I think that was 2011 or 12." At the time the defendant sent this email, the Government had not developed evidence, through Leonel Rivera or otherwise, that Victim-1 was "half-buried in Choloma." Thus,

the defendant's own admissions are powerful evidence of his participation in the drug-related murders, and the evidence of these acts of violence should be admitted.

### C.      Corruption and Violence Evidence is Not Unfairly Prejudicial

The defendant makes several Rule 403 arguments, none of which has merit.  First, the defendant claims that the Government seeks to admit corruption and violence evidence "regardless of its prejudicial effect and lack of relevance, [because] the direct evidence of [the] offense is particularly damning."  (Def. Br. at 12-13).  This misstates the Government's position.  The defendant is charged with substantive and conspiracy violations of Section 924 because the crimes at issue involved—at their core—monumental drug trafficking involving machineguns, rocket propelled grenade launchers, and extensive violence.  In light of the nature of those crimes, it is difficult to fathom how evidence of narcotics-related corruption and additional acts of violence committed by the defendant, all in furtherance of the drug-trafficking conspiracy charged in Count One, could be unfairly prejudicial.  The challenged evidence does "not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged," and it is extraordinarily relevant to the charged crimes.  *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).  Thus, as at the trial of Tony Hernandez, this evidence is not barred by Rule 403.  (Dkt. 83 at 8); *see, e.g.*, *United States v. Naseer*, 775 F. App'x 28, 30 (2d Cir. Aug. 20, 2019) (rejecting a Rule 403 argument where the challenged evidence helped "establish the existence of a terrorism conspiracy, as well as the conspiracy's purpose and its modus operandi").

Second, it is not true that the defendant has "been provided with very little information about" the defendant's drug-related murders and, thus, cannot present a defense to them.  (Def. Br. at 13).  For the reasons discussed above, the defendant has been provided ample information about

the murders—the Government produced pertinent witness statements in November 2020 and has supplemented those disclosures as it has developed additional evidence. The defendant has more access to witnesses and evidence in Honduras than the Government, and he is represented by experienced counsel who is fully capable of cross examining the Government's witnesses about these events and otherwise making arguments about the quantum of the Government's proof.

Third, the fact that the evidence of these murders will come principally through the testimony of Leonel Rivera does not make the evidence unfairly prejudicial in a case involving charges relating to the use of machineguns and destructive devices in furtherance of a massive drug-trafficking crime, as charged in Counts Two and Three. The defendant's contention goes to the weight, not admissibility, of the evidence. *See United States v. Muyet*, 225 F.3d 647, 2000 WL 1275925, at *2 (2d Cir. 2000) (unpublished decision) (affirming Rule 403 ruling where the "contention that the [evidence] was not probative because it contained conclusory statements goes to its weight rather than its admissibility"). In Tony Hernandez's trial, the Court admitted evidence of two drug-related murders based on the testimony of cooperating witnesses. For example, evidence relating to Hernandez's participation in the 2011 murder of Franklin Arita was admitted principally through testimony of Amilcar Alexander Ardon Soriano. (*See* Trial Tr. 427-29). The Court also permitted Leonel Rivera to testify regarding the murder of "Chino," which Hernandez ordered. (*See* Trial Tr. 437, 807). The Rule 403 balancing with respect to the violence at issue in the defendant's trial is substantially similar, including the same Section 924 charges and testimony from some of the same cooperating witnesses with extensive histories of violence that will be probed on cross-examination. Thus, as at the Hernandez trial, there is nothing unfairly prejudicial

about the introduction of evidence related to the defendant's five drug-related murders, which were all committed in furtherance of his drug-trafficking activities.

Finally, the defendant argues that if the jury believes he participated in corruption in Honduras, "the jury is highly likely to reject every piece of defense evidence that is sourced from or tied to Honduras as the product of corruption, even in the absence of any legitimate basis to question the authenticity of the defense's documentary evidence or the truthfulness of its witnesses." (Def. Br. at 14). If the defendant intends to introduce documentary evidence at trial, he should produce it to the Government as soon as possible. The Government has complied with its discovery obligations under Rule 16(a)(1)(E)-(F), and has requested in writing reciprocal discovery from the defendant pursuant to Rule 16(b) on two occasions in letters dated July 9, 2020 and October 20, 2020. To date, the defendant has not provided reciprocal discovery. The Government is entitled to any such materials if and when they are obtained by the defendant. *See United States v. Lobo*, No. 15 Cr. 174 (LGS), 2017 WL 1102660, at *5 (S.D.N.Y. Mar. 22, 2017) (granting motion to compel reciprocal Rule 16 discovery in case involving politically connected Honduran drug trafficking); *United States v. Jasper*, No. 00 Cr. 825 (PKL), 2003 WL 223212, at *6 (S.D.N.Y. Jan. 31, 2003).

Regardless, the defendant cannot prevail under Rule 403 by claiming that otherwise-admissible evidence will be unduly prejudicial with respect to as-of-yet unspecified evidence that he has either not obtained or produced to the Government. Depending on the nature of any such defense evidence, there may be entirely appropriate arguments for the Government to make regarding why the defendant's history of corrupt conduct in furtherance of his crimes is relevant to the jury's assessment of the authenticity and weight to which the defense proof is entitled. For

11

example, the jury should be able to consider any defense evidence in light of the defendant's efforts to bribe political, military, judicial, and law enforcement officials to protect him from investigation and arrest. The jury should also be able to consider any such evidence in light of the defendant's attempts to hide and conceal evidence, including with the help of law enforcement officials such as the Commissioner.

On the other hand, if and when the defendant proffers evidence that is subject to this type of issue, the Court can fashion appropriate limiting instructions relating to the jury's consideration of that evidence. "As the Supreme Court has frequently observed, the law recognizes a strong presumption that juries follow limiting instructions." *United States v. Snype*, 441 F.3d 119, 129-30 (2d Cir. 2006). Courts also regularly "minimize[] the risk of unfair prejudice through limiting instructions." *United States v. Abu-Jihaad*, 630 F.3d 102, 133 (2d Cir. 2010).

### D.    The Government Does Not Object to a Brief Adjournment

The defendant states that he "has not had an opportunity to investigate" allegations of political corruption and acts of violence, or to prepare a defense to these allegations. (Def. Br. at 15 & n.1). The Government has complied with its disclosure obligations in this case and began producing 3500 materials in November 2020, far in advance of when the defendant was entitled to receive them. Nevertheless, in light of challenges posed by the ongoing COVID-19 pandemic, the Government does not object to a brief adjournment to allow the defendant to conduct an appropriate investigation.

## II.    The Defendant's Objections to the Admissibility of Co-Conspirator Statements Made to Leonel Rivera Are Meritless

The Government's motions *in limine* sought pretrial rulings regarding the admissibility of six sets of statements the defendant's co-conspirators (CC-1, CC-7, CC-5, and CC-11) made to

Leonel Rivera.  (*See* Gov't MILs at 20, 27-28).  The defendant argues that (i) all of the statements are inadmissible under Rule 801(d)(2)(E); (ii) CC-1's statements to Leonel Rivera are also inadmissible because Leonel Rivera murdered CC-1; and (iii) statements by CC-5, CC-7, and CC-11 are inadmissible under Rule 804(b)(3).  These arguments are without merit.

## A.   The Statements to Leonel Rivera are Admissible Under Rule 801(d)(2)(E)

The defendant contends that the statements to Leonel Rivera are inadmissible because there is "no independent, corroborating evidence to substantiate the alleged co-conspirator statements . . . or to establish that the statements were made in furtherance of a conspiracy involving [the defendant]."  (Def. Br. at 19).  The defendant's argument misstates the law and the facts.

Under Rule 801(d)(2)(E), when determining whether the predicate conspiracy has been established, "the district court may consider the hearsay statement itself" as evidence of "the existence of a conspiracy," but "there must be some independent corroborating evidence of the defendant's participation in the conspiracy."  *United States v. Padilla*, 203 F.3d 156, 161 (2d Cir. 2000).  The defendant incorrectly suggests, however, that the statements themselves must be corroborated.  As to the question of admissibility, the corroboration requirement relates only to evidence of the defendant's participation in the conspiracy.

In that respect, the Government will present substantial evidence that the defendant, CC-1, CC-7, CC-5, and CC-11 were co-conspirators.  Leonel Rivera will testify in detail concerning the defendant's drug-trafficking activities with each of those individuals.  (Gov't MILs at 2-15).  The Government also expects that at least one other cooperating witness will testify concerning Leonel Rivera's drug-trafficking activities with the defendant and at least some of the other co-conspirators in this section.  And the defendant acknowledged during his post-arrest statements

that he had relationships with CC-1 and CC-7, and that he knows CC-1 murdered Victim-2.  Thus, the Government has proffered more than enough evidence to establish, by a preponderance of the evidence, that "the . . . alleged coconspirators entered into a joint enterprise with consciousness of its general nature and extent."  *In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 138 (2d Cir. 2008) (internal citations and quotations omitted).  Moreover, each of the statements relate directly to the defendant and furthered his drug-trafficking activities.  (Gov't MILs at 28-29).  The statements are therefore admissible under Rule 801(d)(2)(E).

### B.    Statements 1 and 5 By CC-1 are Admissible

The defendant next claims that Statements 1 and 5 are inadmissible because Leonel Rivera caused CC-1's unavailability by murdering him.  While Leonel Rivera did cause CC-1's murder, he did not do so while he was working for the Government.  The defendant's suggestion otherwise is baseless.  In any event, the defendant's argument fails because CC-1's statements are admissible through Leonel Rivera regardless of CC-1's unavailability as a witness.   Under Rule 801(d)(2)(E)—the rule through which the Government seeks to introduce Statements 1 and 5— co-conspirator statements are admissible irrespective of whether the co-conspirator is available as a witness.  *See, e.g.*, *United States v. Borrero*, 630 F. App'x 20, 24 (2d Cir. 2015) ("The 'co-conspirator exception to the hearsay rule is steeped in our jurisprudence,' and admission of such testimony does not require the unavailability of the declarant or a judicial finding of reliability in order to comport with the Confrontation Clause." (quoting *Bourjaily v. United States*, 483 U.S. 171, 183, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)).

The defendant nevertheless argues that, as a matter of fairness, Leonel Rivera should not be permitted to "profit from his wrongdoing" by testifying as to CC-1's statements.  In support of

14

this argument, the defendant attempts to draw a parallel to Rule 804(b)(6), under which "a party forfeits the right to object on hearsay grounds to the admission of a declarant's prior statement when the party's deliberate wrongdoing or acquiescence therein procured the unavailability of the declarant as a witness." Fed. R. Evid. 804(b)(6) advisory note. This rule typically is applied in situations "where a defendant has silenced a witness through the use of threats, violence or murder" and, as a result, forfeits his right to object to hearsay testimony. *United States v. Mastrangelo*, 693 F.2d 269, 272 (2d Cir. 1982). Here, the defendant contorts the rule, arguing that Leonel Rivera is benefiting from murdering CC-1 by testifying as to CC-1's statements. Leonel Rivera pled guilty to murdering CC-1 and he is facing a mandatory life sentence for that and other abhorrent conduct unless he testifies truthfully. There is no evidence to suggest, and it strains credulity to argue, that Leonel Rivera killed CC-1 to gain a benefit on the theoretical chance that, one day, admissions made by CC-1 to Leonel Rivera would be offered as evidence against the defendant. Thus, even if Rule 804(b)(6) were applicable here, which it is not, its animating principle—that the defendant forfeits his right to confrontation if he causes the unavailability of a witness—would not be served by barring the admission of Statements 1 and 5.

## C.    Statements By CC-5, CC-7, and CC-11 are Admissible Under Rule 804(b)(3)

The defendant's arguments under Rule 804(b)(3) are without merit. First, the defendant contends that the statements of CC-5, CC-7, and CC-11 "had no tendency to imperil the declarants' penal interests" because the declarants believed they were immune from prosecution. (Def. Br. at 23). But whether or not an individual believes they will be apprehended or prosecuted is not a consideration under Rule 804(b)(3). *United States v. Lang*, 589 F.2d 92, 97 (2d Cir. 1978) (a declarant need not "be aware that the incriminating statement subjects him to immediate criminal

prosecution"). Rather, "[a] statement will satisfy Rule 804(b)(3)'s requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant." *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011) (internally quotation marks omitted). For all the reasons set forth in the Government's motions *in limine*, these statements satisfy that test. *See generally* Gov't MILs at 22-23.

Second, the statements are also sufficiently reliable. The defendant's argument on this point, in short, is that statements made during the course of a long-running criminal conspiracy are unreliable because criminals lie to one another. However, the aphorism the defendant cites— "there is no honor among thieves"—has no legal weight. (Def. Br. at 24). Rather, Second Circuit precedent holds that statements made to co-conspirators, not in response to questioning, and not made in coercive atmospheres are sufficiently reliable for purposes of Rule 804(b)(3). *See, e.g.*, *United States v. Matthews*, 20 F.3d 538, 546 (2d Cir. 1994). Each of the statements in question meet those requirements.

Third, the defendant's specific objections to Statement 2 also fail. In Statement 2, CC-7 told Leonel Rivera that the defendant had received a plane containing hundreds of kilograms of cocaine from CC-6 in *Cachiros*-controlled territory. The defendant claims that it was not against CC-7's penal interest to make those statements. (Def. Br. at 24). But CC-7 was a massive drug trafficker. It was plainly against CC-7's penal interest to admit to one of his co-conspirators that he was aware of a huge drug shipment involving the defendant because CC-7's awareness, coupled with other testimony from Rivera about CC-7's role, is probative of CC-7's role in drug-trafficking activities. For similar reasons, the defendant's claim that CC-7's statement was unreliable fails. CC-7 was not an innocent bystander who happened upon a drug shipment; rather, he was one of

the defendant's co-conspirators with direct knowledge of the defendant's drug-trafficking activities who was later murdered by the defendant over a drug-trafficking debt.  In short, CC-7's criminal activities put him in the position to have reliable knowledge of the defendant's drug-trafficking activities.

Finally, the defendant claims that CC-5 is available as a witness because he has pleaded guilty.  The Government has contacted CC-5's counsel to confirm that he would invoke his privilege against self-incrimination if called to testify.  If counsel confirms that CC-5 would in fact invoke his Fifth Amendment rights, then CC-5 is unavailable as a witness.  *See, e.g.*, *United States v. Chan*, 184 F. Supp. 2d 337, 341 (S.D.N.Y. 2002) ("[T]he Second Circuit has held that co-conspirators who have already been sentenced are unavailable if they assert their Fifth Amendment privilege." (citing *United States v. Williams*, 927 F.2d 95, 98–99 (2d Cir. 1991)).  Indeed, although CC-5 received immunity in his plea agreement for drug-trafficking offenses between 2004 and June 2014, his statements to Leonel Rivera in 2011 or 2012 reflect assistance to major drug traffickers that could be used against him in a prosecution for drug-trafficking crimes arising out of criminal proceedings pending in other U.S. District Courts.  *See United States v. Gupta*, 747 F.3d 111, 127 (2d Cir. 2014) ("The proffered statement [need] not have been sufficient, standing alone, to convict [the declarant] of any crime, so long as it would have been probative in a criminal case against him." (internal quotation marks omitted)).  Regardless, as discussed above, CC-5's statements are admissible pursuant to Rule 801(d)(2)(E) irrespective of his unavailability.[2]

---

[2] On the last page of his brief, the defendant claims that the Government intends to introduce multiple statements from CC-7 that were not addressed in its motions *in limine*.  (Def. Br. at 30).

### III.   The Defendant's Objections to the Admissibility of Co-Conspirator Statements Made to Witness-1 Are Meritless

In its motions *in limine*, the Government seeks to admit three Statements made to Witness-1 under Rules 801 and 804.  The defendant does not contest the Government's arguments under those rules.  Instead, the defendant objects to the admission of Statements 1 and 3 for the same reasons discussed above with respect to narcotics-related corruption.  (Def. Br. at 26).  The defendant's arguments are meritless for the reasons discussed in Point I.

The defendant also challenges Statement 2 by CC-4.  In that statement, CC-4 solicited large campaign contributions from Owner-1 and described participating in widespread public corruption within the Honduran government in about 2013.  The defendant claims that this statement "does not on its face relate to Fuentes Ramirez or to the offenses alleged in the Indictment."  (Def. Br. at 26).  But Statement 2 by CC-4 furthered the conspiracy because it spurred assistance from Owner-1 and established the relationship necessary for CC-4 to conduct drug-trafficking negotiations with the defendant at Business-1.  Even if Statement 2 had no direct connection to the defendant, evidence that is probative of "the conspiracy alleged in the indictment" is relevant and not unduly prejudicial.  *United States v. Dugue*, 763 F. App'x 93, 95 (2d Cir. 2009); *see also United States v. Salameh*, 152 F.3d 88, 111 (2d Cir. 1998) ("Where a defendant is a member of a conspiracy, all the evidence admitted to prove that conspiracy, even evidence relating to acts committed by codefendants, is admissible against the defendant." (citation omitted)).  Here, evidence that Owner-1, like the defendant, bribed CC-4 in connection with CC-4's widespread political

---

The defendant has not identified those specific statements or explained how they differ from CC-7's statements addressed above.

corruption to maintain power provides critical context for the other meetings involving the defendant and CC-4, as well as the nature of their criminal relationship. CC-4 needed to maintain his political power to advance the defendant's drug-trafficking activities because CC-4 used Honduran law enforcement and military officials to help the defendant. For example, after the defendant bribed CC-4, the defendant was protected by the Honduran military and was provided a green submachinegun by CC-13, then the commander of the 105th Military Brigade. Accordingly, these statements should be admitted.

## IV.   The Defendant's Objections to the Admission of Certain Electronic Evidence From Cellphone-1 Are Meritless

### A.       Photographs of Firearms and Destructive Devices Are Admissible

The defendant does not address the case law cited in the Government's motions *in limine* holding that evidence of the defendant's possession of firearms is admissible as direct evidence and/or Rule 404(b) evidence of each of the crimes charged in the Indictment. (*See* Gov't MILs at 36-38 (citing cases)). Instead, the defendant claims that (i) "the record at trial will reveal that Fuentes Ramirez has several gun licenses and legally possessed handguns and automatic weapons in Honduras"; and (ii) the defendant is not depicted in the photographs possessing firearms and there is no other evidence that he possessed or used these weapons. These arguments are meritless.

As this Court instructed the jury in Tony Hernandez's trial, "the fact that a defendant has a license to carry a firearm is not a defense to Count Two." (Trial Tr. at 1242: 24-25). The defendant is not charged with possessing firearms without a gun license in Honduras—he is charged with possessing firearms and destructive devices in furtherance of drug-trafficking activities. The defendant's purported gun licenses did not give him authority to distribute massive amounts of cocaine or commit multiple murders. The defendant also does not even attempt to allege that he

possessed a license to carry rocket propelled grenade launchers (or that such a license would constitute a defense to his criminal conduct), such as the one depicted in the photograph below obtained from Cellphone-1.



The defendant's argument that there is no evidence that the photographs from Cellphone-1 depict firearms possessed or used by the defendant fares no better.  The defendant has all but conceded in his brief that the firearms belonged to him by admitting that he "has several gun licenses and legally possessed handguns and automatic weapons in Honduras."  (Def. Br. at 26). Putting that admission aside, the fact that the photographs were found on Cellphone-1 is substantial evidence that the firearms belonged to or were used by the defendant and/or his co-conspirators, which is relevant both to his possession of machineguns and destructive devices as charged in Count Two and his conspiracy with others to do the same as charged in Count Three.  Several witnesses are also expected to testify concerning the defendant's possession of firearms, including firearms similar to the ones depicted on Cellphone-1, in furtherance of his drug-trafficking activities.  In similar circumstances in Tony Hernandez's trial—that is, where pictures of firearms were found on Tony Hernandez's phone—the Court admitted the photographs into evidence.  The

same approach should apply here.

Finally, admitting the photographs would not be misleading and unfairly prejudicial under Rule 403, as the defendant claims. (Def. Br. at 27). The defendant is free to argue to the jury that the photographs do not establish possession. But there is nothing unduly prejudicial about evidence relating to firearms from Cellphone-1 in the context of the charges at issue and anticipated witness testimony about the use of similar weapons. Accordingly, this evidence should be admitted.

### B.      The Defendant's Electronic Communications Are Admissible

The defendant contends that his electronic communications with Comanche and the Commissioner are inadmissible because (i) the Government has not established that Comanche and the Commissioner were involved in the charged crimes; and (ii) the communications contain multiple levels of hearsay. The defendant's arguments are meritless.

*First*, these communications are relevant and admissible regardless of whether Comanche and the Commissioner were involved in the charged crimes. Under Rule 401, evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence." With respect to Comanche, the communications are relevant to show that the defendant has (i) significant connections with Honduran military officials such that the defendant confirmed in one of the text messages, "100 Comanche," that the military supported him; (ii) a relationship with certain of his co-conspirators, including the *Los Valles* cartel, which the defendant worked with extensively during the charged drug-trafficking conspiracy (Gov't MILs at 7-8); and (iii) the opportunity to commit his drug-trafficking and weapons offenses with military officials on the large scale to be described by witnesses (Gov't MILs at 42-43). Similarly, with respect to the

Commissioner, the communications are relevant to (i) demonstrate the defendant's consciousness of guilt based on his attempts to conceal evidence; (ii) corroborate witness testimony about the defendant's corrupt connections to law enforcement; and (iii) show the defendant's preparations and plan for seeking to avoid detection in connection with his drug-trafficking activities and related violence.  (*Id.* at 44-45).  There is no additional requirement under Rule 401 that Comanche and the Commissioner be co-conspirators for the communications to be admissible.

Regardless, the foregoing communications coupled with other evidence in this case show that Comanche and the Commissioner were involved in the defendant's crimes.  For example, on November 18, 2019, the defendant, using Cellphone-1, and Comanche made incriminating statements about the *Los Valles* cartel.  In response to public reporting about the murder of the son of Arnulfo Valle (a former leader of the cartel), the defendant and Comanche exchanged the following messages:

| | |
|---|---|
| The defendant: | Arnulfo's son was nailed. |
| Comanche: | Yeah, man, it's fucked up. |
| The defendant: | The competition.  Or the cops.  It's the end for these people, Comanche. |
| Comanche: | I think that's true because they won't settle down and keep a low profile. They want to leave the impression that nothing has happened. |
| The defendant: | Yes, the bull is not there, when the big boss leaves, crazy.  It's best to stop them with a smash, but the thing is that they want to nail all of them. |
| Comanche: | And besides that, those guys have taken advantage of many people who they have fucked with money from products they are given and then they don't pay. |
| The defendant: | the clouds, those assholes, Comanche, they have their head in the clouds.  They fool themselves.  And now that they don't . . . uh, they have no power anymore, anyone can fuck them up. |

Comanche:        It's not just anyone, they are going to get fucked up, you'll see.

The defendant and Comanche were plainly aware that, notwithstanding the convictions of the former leaders of the *Los Valles* cartel in 2016, the cartel was continuing to engage in drug trafficking (Comanche:  "they won't settle down and keep a low profile"; The defendant:  "Yes, the bull is not there, when the boss leaves, crazy") and owed co-conspirators money from cocaine transactions (Comanche:  "those guys have taken advantage of many people who they have fucked with money from products they are given and then they don't pay").  The defendant and Comanche also expected that additional acts of violence would be carried out against the cartel (the defendant: "they have no power anymore, anyone can fuck them up") and Comanche said that he had specific knowledge of such violent acts (Comanche:  "It's not just anyone, they are going to get fucked up, you'll see").

There also is ample evidence that the Commissioner was involved in the defendant's crimes.  As discussed in the Government's motions *in limine*, the defendant and the Commissioner discussed concealing evidence of their criminal behavior, and in those communications the Commissioner commented that he was "getting calls" from prosecutors who "are crucifying me." Witnesses will also testify that the defendant engaged in drug-trafficking activities with Commissioner Martinez, and the defendant admitted during his post-arrest statement that he had a relationship with Commissioner Martinez.  Moreover, as noted above, on December 25, 2020, the defendant emailed family members that he "urgently" needed to obtain information for his trial about "Victim-1," as well as the "facts about the thing at Cerro Negro" (that is, the Laboratory). In the same email, the defendant asked one of his sons to confirm that he "spoke to Martines and Comanche."  In the days that followed, the defendant exchanged emails with his sons in which

they confirmed that they communicated with Comanche and Martines about attempting to obtain non-public information relating to Victim-1's murder and the Laboratory. When those emails were sent, the Government had not publicly disclosed that the defendant was involved in Victim-1's murder or that the Laboratory was located in "Cerro." Nevertheless, Comanche and the Commissioner apparently understood that the defendant was seeking information about those matters based on the limited information provided. Thus, there is substantial evidence that Comanche and the Commissioner were involved in or at least aware of the defendant's crimes.

*Second*, the defendant's communications with Comanche and the Commissioner are admissible under the hearsay rules. The defendant's statements are admissible as statements of a party opponent under Rule 801(d)(2)(A). Comanche's and the Commissioner's statements are admissible on several bases. To start, their statements constitute adoptive admissions pursuant to Rule 801(d)(2)(B) in that the defendant was involved in the communications when they were made and manifested that he believed those statements to be true in that he continued communicating with Comanche and the Commissioner. (Gov't MILs at 20-21). Comanche's and the Commissioner's statements also are admissible as co-conspirator statements pursuant to Rule 801(d)(2)(E). (*Id.* at 21-22). As detailed above, the Government will establish by a preponderance of the evidence that the defendant, Comanche, and the Commissioner were members of the charged drug-trafficking conspiracy. The statements at issue were also in furtherance of that conspiracy. Comanche's statements were designed to assure the defendant that he had the continued support of the Honduran military and to provide the defendant with information concerning the status of his co-conspirators, including the Valles. Similarly, the Commissioner's statements assisted the defendant in hiding evidence of his crimes.

For similar reasons, the statements are admissible under Rule 804(b)(3) because the declarants are unavailable and their remarks would be probative of their guilt were they to stand trial on drug trafficking charges.  (Gov't MILs at 22-23).  Comanche and the Commissioner are believed to be located abroad, outside the Government's subpoena power, and would likely invoke the Fifth Amendment if they were questioned under oath regarding their activities.  The statements were also against the penal interest of the declarants because the Statements "implicated [the declarants] in [illegal] activity," and each declarant "would not have made the statement unless he believed it to be true."  *United States v. Dupree*, 870 F.3d 62, 80 (2d Cir. 2017).  Accordingly, the statements are admissible.

## V.       The Defendant's Incriminating Statements to Leonel Rivera Are Admissible

The defendant seeks to preclude his statements to Leonel Rivera in prison, claiming that Rivera deliberately elicited them as a government agent.  However, the defendant made statements to Leonel Rivera about his criminal conduct without prompting and, in any event, Leonel Rivera was not directed by the Government to elicit any information from the defendant.

### A.       Applicable Law

In *United States v. Massiah*, 377 U.S. 201, 205-06 (1964), the Supreme Court held that surreptitious interrogations conducted by law enforcement after a defendant's indictment, through an informant and outside the presence of counsel, violated a defendant's right to counsel. However, not all statements elicited or received from a represented defendant violate a defendant's right to counsel.  Courts only exclude such statements if they are "obtained as a result of an intentional effort on the part of the government."  *United States v. Stevens*, 83 F.3d 60, 64 (2d Cir.

1996) (internal quotation marks omitted); *see also id.* ("the *Massiah* rule does not apply to statements made completely voluntarily by an accused").

"[A]n informant becomes a government agent for purposes of [*Massiah*] only when the informant has been instructed by the police to get information about the particular defendant." *United States v. Birbal*, 113 F.3d 342, 346 (2d Cir. 1997) (finding testimony of jailhouse informant about conversations with defendant properly admitted); *see also United States v. Miller*, 116 F.3d 641, 665 (2d Cir. 1997) ("[W]ith respect to the detention of a cooperating witness in proximity to other defendants, the *Massiah* rule applies only to situations that 'look' like government interrogations." (citing *Stevens*, 83 F.3d at 64)). As the Supreme Court has explained, the "primary concern of the *Massiah* line of decisions is secret interrogation by investigatory techniques that are the equivalent of direct police interrogation. . . . [T]he Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements." *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986) (reversing Court of Appeals' decision granting habeas corpus petition where government placed defendant in cell with informant, who then testified about incriminating conversations that occurred over a three-day period).

Accordingly, "[m]ore than a cooperation agreement is required to make an informant a government agent with regard to a particular defendant. An informant becomes a government agent vis-a-vis a defendant when the informant is 'instructed by the police to get information about the particular defendant.'" *United States v. Whitten*, 610 F.3d 168, 193 (2d Cir. 2010) (quoting *Birbal*, 113 F.3d at 346). Thus, in order to establish a Sixth Amendment violation, a defendant must demonstrate that law enforcement, in directing its informant, took deliberate action to elicit incriminating remarks. *See, e.g.*, *Kuhlmann*, 477 U.S. at 459; *see also Birbal*, 113 F.3d at 345

26

("Although 'the government [has] an affirmative obligation not to *solicit* incriminating statements from the defendant in the absence of his counsel,' there is no constitutional violation when a government informant merely listens and reports." (quoting *Rosa*, 11 F.3d at 329)).

"A defendant's claim of a *Massiah* violation does not automatically require an evidentiary hearing."  *Miller*, 116 F.3d at 665.  "In order to require a hearing on such a claim, assuming that the government has not interfered with the attorney-client relationship deliberately, the defendant bears the burden of alleging specific facts that indicate communication of privileged information to the prosecutor and prejudice resulting therefrom."  *Id.* (citation and quotation marks omitted).

### B.    Discussion

The defendant makes three arguments in an effort to exclude his incriminating statements to Leonel Rivera.  First, the defendant claims that Leonel Rivera approached the defendant in prison and "questioned" him about his case on multiple occasions.  (Def. Br. at 28-29; Def. Affirmation ¶ 3).  But Leonel Rivera will testify if asked that the defendant initiated conversations with him on two occasions and that the defendant's statements were not made in response to any questions about his case.  Leonel Rivera's testimony is supported by the substance of the defendant's statements in question.  For example, instead of discussing his activities with Leonel Rivera, the defendant disclosed information about CC-4 that Leonel Rivera knew nothing about, including that CC-4 wanted to use one of the defendant's companies to launder drug-trafficking proceeds and that the defendant bribed CC-4 on two occasions while CC-4 was running for office. The defendant also told Leonel Rivera that ████████████████████████████████ ████████████████████████████████████.  The very nature of these statements belies the defendant's claim that Leonel Rivera was asking questions about the

defendant's case.  *See, e.g.*, *United States v. Edwards*, 342 F.3d 168, 182 (2d Cir. 2003) ("Nothing in the record . . . suggests that any government agent prompted defendant either to speak to [the witness] or to discuss with him any specific subject.").

Regardless, the Court need not resolve these disputes to deny the defendant's motion to preclude his statements to Leonel Rivera.  Even if Leonel Rivera elicited the defendant's statements, the statements are admissible because the Government did not direct or encourage Leonel Rivera to obtain information about or from the defendant.  *See Whitten*, 610 F.3d at 193 ("Even assuming that [the cooperating witness] deliberately elicited information from [the defendant] [the cooperating witness] was not a government agent at that time."); *Birbal*, 113 F.3d at 346 ("[A]n informant becomes a government agent only when the informant has been instructed by the police to get information about the particular defendant.").  Even assuming that Leonel Rivera participated in a conversation with the defendant about the case, Leonel Rivera did so without any direction or suggestion by the Government that he should obtain information from anyone, much less the defendant.  Thus, the statements do not "look like government interrogations," *Stevens*, 83 F.3d at 64, and should not be excluded under *Massiah* and its progeny.

*Second*, the defendant argues that the Government should have placed Leonel Rivera "in the prison traditionally used to house cooperators, the Queens Detention Facility ['GEO']" and that the Government had a role in "plac[ing Leonel Rivera] right alongside Fuentes Ramirez in the MCC."  (Def. Br. at 28).  The Bureau of Prisons controls inmates' housing designations, not the Government.  On April 23, 2020, the day the defendant arrived in custody in New York City, the Government submitted a separation order to the United States Marshals, the Federal Bureau of Prisons, and the MCC requesting that the defendant be separated from Leonel Rivera and other

cooperators and/or co-conspirators.  (*See* Exhibit C).  The fact that the Government submitted the initial order strongly undercuts any suggestion that the Government encouraged Leonel Rivera to elicit statements from the defendant.  The defendant also makes much of the fact that his interactions with Leonel Rivera occurred during the pandemic when the MCC has, at times, been on lockdown.  (Def. Br. at 28).  If the defendant is claiming that the Government assisted Leonel Rivera in communicating with the defendant, such a claim is baseless.  Indeed, Leonel Rivera will testify that on one of the occasions that the defendant interacted with him, the defendant went to Leonel Rivera's cell and initiated conversation.

Finally, the defendant argues that another defendant—Fredy Renan Najera Montoya— made statements to Leonel Rivera in prison "in violation of the *Massiah* rule."  (Def. Br. 29-30). In particular, the defendant claims that Leonel Rivera "repeatedly questioned and threatened [Najera], outside the presence of counsel, in an apparent effort to elicit inculpatory statements and omissions that would bolster Leonel Rivera's own anticipated testimony."  This is false.  In July and October 2019, Najera filed statements with the court in his case claiming that Leonel Rivera had threatened him and told him to plead guilty even though Najera was in fact innocent.  (No. 15 Cr. 378 (PGG), Dkt. 112-2, Dkt. 124-1).  Najera has since admitted that those were lies.  On February 19, 2020, Najera pled guilty pursuant to a plea agreement in which he admitted that he "*willfully* attempted to obstruct and impede the administration of justice with respect to the prosecution of the instant offenses of conviction" by, *inter alia*, "making false assertions" regarding Leonel Rivera in the aforementioned Court documents.  (*See* Exhibit D, Najera Plea Agmt. at 5 ¶ 20 (emphasis added)).  While Najera has since filed objections to his Presentence Investigation Report in which his counsel argues that Najera did not obstruct justice or lie about

his interactions with Leonel Rivera, Najera swore under oath at his plea proceeding that he had reviewed his plea agreement and understood and agreed to its provisions, including the provision in which he admitted to lying about Leonel Rivera.  (No. 15 Cr. 378 (PGG), Dkt. 138, at 20-21). Thus, the defendant's claims with respect to Najera are also meritless.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should grant its motions *in limine* and deny the defendant's request to preclude his statements to Leonel Rivera.

Dated: New York, New York
      February 5, 2021

Respectfully Submitted,

AUDREY STRAUSS
United States Attorney for the
Southern District of New York

By:      */s/*
      Jacob Gutwillig
      Matthew Laroche
      Jason A. Richman
      Elinor Tarlow
      Assistant United States Attorneys
      212-637-2215 / 2420 / 2589 / 1036

Cc:    Defense Counsel
      (Via ECF)