

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 22, 2021

**BY ECF**

Hon. P. Kevin Castel
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

      Re:    <u>United States v. Geovanny Fuentes-Ramirez</u>,
               S6 15 Cr. 379 (PKC)

Dear Judge Castel:

      The Government respectfully submits this letter in connection with its motions *in limine* seeking, *inter alia*, the admission of certain WhatsApp communications, including voice memos, on one of the defendant's cellphones, referred to as the "Comanche chats" and the "Commissioner chats." (Gov't MILs at 40-46).[1] The defendant opposes their admission, principally arguing that Comanche and the Commissioner are unidentified. (Def. MILs at 27; Feb. 12, 2021 Tr. at 21-22). At the pretrial conference held February 12, 2021, the Court directed the Government to provide full versions of the relevant communications, excerpts of which were cited in the Government's motions *in limine*. (*Id*. at 28). Attached hereto as Exhibit A are translations of Comanche chats the Government seeks to introduce, and attached as Exhibit B are translations of the Commissioner chats the Government seeks to introduce.

      In support of its motions *in limine*, the Government argued that the content of the chats and the defendant's descriptions of the individuals in his contacts list showed that Comanche and the Commissioner are Honduran government officials, Comanche a likely military officer and the Commissioner a member of the Honduran National Police (Gov't MILs at 40); and that the content of the chats showed the defendant's connections and relationships with military and police officials; his ability to obtain support, assistance, and internal government records from those officials; and their common interests in drug traffickers and drug trafficking, including murders of

---

[1] In this letter, "Gov't MILs" refers to the Government's memorandum of law in support of its motions *in limine* (D.E. 224); "Def. MILs" refers to the defendant's memorandum of law in opposition to the Government's motions (D.E. 236); "[date] Tr." refers to the transcript of proceedings in this matter on the identified date; "D.E. [#]" refers to an entry in the docket in these proceedings; and "*Hernandez* Tr." refers to the transcript of trial in *United States v. Juan Antonio Hernandez Alvarado*, S2 15 Cr. 379 (PKC), held between on or about October 2 and 18, 2019.

traffickers and individuals associated with their common co-conspirator Tony Hernandez. (*Id*. at 40-46).

The attached chats, described in part below, show the connections Comanche and the Commissioner have to the Honduran military and Honduran National Police; the defendant's interest in the trial of a co-conspirator, Tony Hernandez, and violent murders of drug traffickers, including traffickers related to Hernandez and other of the defendant's co-conspirators; the defendant's interest in violent drug murders generally; and the defendant's belief that elements of the Honduran government were behind the murders and violence in order to silence and intimidate potential cooperators and that he was also at risk of violence. The chats also show support and assistance the defendant has received from government officials, as he is alleged to have done in the course of the charged offenses.

### The Comanche Chats

Chats Demonstrating Comanche's Connections to the Honduran Government

The Comanche chats include evidence of Comanche's government role. For example, on or about December 14, 2019, Comanche sent the defendant a photograph of a military officer receiving a medal from another military officer. The defendant asked, "Comanche, who pinned the medal on?" Comanche responded, "My General Velasquez, FUSINA commander." FUSINA is the *Fuerza Nacional de Seguridad Interinstitucional*, a Honduran inter-agency task force of military, police and judicial personnel. (Ex. A at 52).

On or about October 29, 2019, the defendant sent Comanche a video clip of an interview of former Honduran President Porfiro Lobo Sosa[2] in which Lobo Sosa claimed that he had been told that the Honduran government was seeking to assassinate him. (*Id*. at 35-36). The defendant commented: "This shit is ugly, and it is going to get uglier. That's why I say let's go drinking tomorrow . . . . They have wanted to fuck me up like forty times, I don't complain to anyone, comanche. The only one that I have complained to was you, Comanche." (*Id*. at 36-37). Comanche responded, "Haaaahaaaaa, and support was provided." The defendant replied, "One hundred percent, Comanche." Comanche replied with a graphic of a saluting military officer. (*Id*. at 37-38).

On or about November 6, 2019, Comanche sent the defendant the text of a report purportedly authored by a police superintendent regarding the homicide of four individuals in San Pedro Sula, where the defendant engaged in some of his drug-trafficking activities, and which reportedly was committed by individuals dressed in anti-gang police uniforms. (Ex. A at 40-41).

These chats show, among other things, Comanche's identity as an individual with military and police connections, who supported the defendant "one hundred percent" when the defendant faced pressure from other government sources; and who provided the defendant with internal

---

[2] Lobo Sosa's son, Fabio Porfiro Lobo Lobo, pleaded guilty to charges arising from his role in transporting, with the help of the Honduran military, approximately 1.4 tons of cocaine as an associate of Leonel Rivera—one of the defendant's drug-trafficking partners and a cooperating witness against him. *See United States v. Lobo*, 15 Cr. 174 (LGS).

police records about murders possibly committed by Honduran police officials. . In the *Hernandez* trial, this Court admitted chats between two unidentified drug traffickers who exchanged a picture of a kilogram of cocaine bearing Tony Hernandez's initials "TH." (*See* D.E. 78 at 38-43). Here, Comanche identifies himself as a military official and is in direct communication with the defendant about several topics, discussed below, that are relevant to the defendant's charged conduct.

<u>Chats Relating to Press Coverage of Murders Connected to the Tony Hernandez Trial</u>

Comanche and the defendant also exchanged communications about murders relating to co-conspirators, including victims related to Tony Hernandez and the *Los Valles* cartel. For example, between approximately October 26 and 29, 2019, Comanche sent the defendant numerous press articles relating to the murder of Nery Orlando Lopez Sanabria, a drug trafficker whose seized narcotics ledgers were introduced at the *Hernandez* trial in October 2019. (*Hernandez* Tr. 50-51, 224, 767). As reported in articles Comanche sent the defendant: "Narco with Links to Tony in NY Trial Murdered." (Ex. A at 5-6). Comanche sent article after article reporting on Sanabria's murder while held in a Honduran prison, reportedly shot and stabbed by multiple individuals who were let in by prison guards. (*Id*. at 5-6, 10, 13-14, 16, 18, 25-26, 27-28, 31). Many articles also published Sanabria's lawyer's accusation that the Honduran government was responsible for the murder and had been promised a transfer to a different prison if he refuted his drug ledgers. (*Id*. at 6, 7, 12, 16). Comanche also sent the defendant articles about the takeover of the prison administration by FUSINA—the same interagency group headed by the person Comanche calls "my general"—after Sanabria's murder and the murder, weeks later, of the former prison warden. (*Id*. at 22, 24, 26, 54, 55-56, 57, 58-59, 60, 61-62, 64).

Comanche and the defendant also exchanged communications about the murder of a Honduran defense lawyer, who was described as the attorney both for Sanabria and for the members of the *Los Valles* cartel. (*Id*. at 47-50, 59). The *Los Valles* cartel, a violent Honduran drug-trafficking family and the defendant's co-conspirators,[3] were also the subject of extensive testimony at the *Hernandez* trial, including testimony about their participation in an unsuccessful plot to murder CC-4. (*E.g.*, *Hernandez* Tr. 153-56, 200, 381-85, 401-02, 447-51, 766-67,797-98). Less than two months after the reported murder of Sanabria, the attorney was also murdered in Honduras. (Ex. A at 47). The defendant commented: "Well, they knew what they were facing, now. Things are so bad here, as they say things are so bad, those lawyers are going to be subdued, man, very, very clever." (*Id*.). Comanche responded, "Money is go-, it's nice, comanche, money is nice, do you think a lawyer doesn't know it'll be--it's easy as pie, defending a narco like that, the money is nice, but well, you have the consequences there, the enemies." (*Id*.). The defendant told Comanche, "That's right, comanche, we have to pray God for protection, we have to pray for protection, because we are living in difficult times, honestly." (*Id*.).

These chats show, among other things, the defendant's and Comanche's interests in the murder of a drug trafficker who conspired with the defendant's co-conspirators and their interest in press reports about whether the victim was murdered because of his connection to Tony

---

[3] The defendant provided armed security for the delivery of at least two multi-hundred kilogram shipments of cocaine to the *Los Valles* cartel. (Gov't MILs at 7-8).

Hernandez and CC-4 and whether he was murdered in order to prevent his cooperation; their interest in reports about the murder of a lawyer for this victim and for other co-conspirators of the defendants; and their belief that this murder was because the lawyer had "enemies" and that lawyers for potential cooperating defendants will be "subdued." As reflected in other chats described above, the defendant believed that he was a potential target of similar attacks. (*See supra* at 2).

Chats Relating to Other Drug-Related Murders

On or about November 18, 2019, Comanche texted the defendant about the murder in Honduras of a son of Arnulfo Valle Valle, one of the leaders of the *Los Valles* cartel who had been extradited to the United States. (*Id.* at 44). The defendant responded, "Arnulfo's son was nailed. . . The competition. Or the cops. It's the end for these people, comanche." (*Id.*). Comanche responded, among other things, that "those guys have taken advantage of many people who they have fucked with money from products they are given and don't pay." (*Id.* at 45). The defendant responded, in part, that "now that they don't, uh, they have no power anymore, anyone can fuck them up." Comanche responded, "It's not just anyone, they are going to get fucked up, you'll see." (*Id.*).

On or about December 22, 2019, Comanche sent the defendant press articles about murders of inmates at two Honduran prisons. (*Id.* at 68-69). The defendant commented, "This is a disaster . . . They are uncovering the government's charade of having secure prisons." Comanche responded, "It's only a pressure tactic, those men show whatever." The defendant replied, "Comanche, I assure you it will get worse. Those people's structure gets stronger every day, comanche." (*Id.* at 69-70).

Like the chats described above, these chats show, among other things, the defendant's and Comanche's interest in murders of drug traffickers in Honduran prisons as a "pressure tactic," that is, to silence and to intimidate potential cooperating defendants. They also show the defendant's and Comanche's familiarity with their co-conspirators, the *Los Valles* cartel: the defendant referred to Arnulfo Valle Valle by his first name, and Comanche demonstrated familiarity with the Valle Valle's drug trafficking business (*e.g.*, that they had failed to pay for cocaine shipments they received). When the defendant observed that, because of the Valle Valles' declining power in Honduras, "anyone" could harm them, Comanche responded, "not just anyone," demonstrating that he understood that someone in particular was behind the attacks. Combined with the defendant and Comanche's communications about suspected Honduran government complicity in murders of drug traffickers, it appears that Comanche was likely communicating his understanding that the Honduran government was behind the attacks on the Valle Valle family.

The defendant's chats with Comanche do not reflect the idle interest of ordinary citizens in current events. Rather, they reflect a deep and personal interest in these matters and a degree of insider knowledge and familiarity that is further evidence of the defendant's commission of the charged offenses.

### The Commissioner Chats

Similarly, the Commissioner chats include evidence of the Commissioner's position in the police forces. The name for the Commissioner in the defendant's contact list is "Comicionado Martines," which means Commissioner Martines. Moreover, the telephone number associated with the Commissioner's WhatsApp account links to a 2018 visa application by Ramon Aldaberto Martinez Hernandez, who listed his employer as the Honduran National Police. Martinez Hernandez's LinkedIn profile includes photographs of Martinez in uniform and a photograph of Martinez with CC-4.

On or about February 25, 2020, the defendant and Commissioner Martinez exchanged a series of communications reflecting their concern about electronic surveillance of their cellphones and means to detect and disrupt any surveillance. The defendant asked, "Colonel, how are we doing? Do you still have that code for erasing?" Commissioner Martinez responded affirmatively, and the defendant replied, "Send it. So I can check my phone." Commissioner Martinez sent the defendant a series of instructions, which included what to do "if it's tapped" or "if the calls are being forwarded," and how "to untap the calls." (Ex. B at 3-4). Commissioner Martinez advised that "I was tapped last week." Shortly afterwards, the defendant sent Commissioner Martinez a voice memo advising that "I told you last time that my friend over there told me that, that they were checking us out, that they had us, uh, there, that they were listening to us, that I should not be talking so much crap."

These chats show, among other things, that the defendant and Commissioner Martinez were worried about law enforcement surveillance, especially wiretaps of their phones, and that they took steps to defeat and evade that surveillance, including attempts to block any wiretaps and to avoid "talking so much crap" on the phone—that is, talking openly about their criminal activities. These chats also show that the defendant has yet more corrupt connections with Honduran law enforcement, such as his "friend over there" who warned the defendant about electronic surveillance of the defendant and his associates.

### Conclusion

As shown in these chats, and as described above, these communications are relevant and admissible as (1) admissions of the defendant, (2) non-hearsay statements reflecting the defendant's state of mind, and (3) admissible hearsay statements of co-conspirators of the

defendant. For these reasons, and those set forth in the Government's motions *in limine*, the chats should be admitted into evidence at trial.

        Respectfully submitted,

        AUDREY STRAUSS
        Acting United States Attorney

by: _____/s/_____
        Jacob Gutwillig
        Matthew Laroche
        Michael D. Lockard
        Assistant United States Attorneys
        (212) 637-2215 / 2420 / 2193

cc: Defense counsel of record (by ECF)