

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 2, 2021

Via ECF
The Honorable P. Kevin Castel
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007

      Re:    **United States v. Geovanny Fuentes-Ramirez,**
            **S6 15 Cr. 379 (PKC)**

Dear Judge Castel:

      The Government respectfully submits this letter in support of additional motions *in limine* to admit recently seized evidence obtained from electronic accounts belonging to ▇▇▇ ▇▇▇ ("CC-14"), ▇▇▇ ▇▇▇ ▇▇▇, including: (i) photographs of CC-14 with CC-4, the defendant in a bullet proof vest and Honduran military beret, and CC-3 and CC-4; (ii) photographs of firearms, including machineguns, ammunition, and large quantities of U.S. currency; and (iii) electronic communications of CC-14 with, among others, CC-3, during which they discuss the defendant, other co-conspirators, firearms, and the defendant's bodyguards.[1]

## BACKGROUND

      On January 13, 2021, after the Government filed its January 8, 2021 motions *in limine*, the Government obtained emails sent and received by the defendant from prison, including numerous emails between the defendant and CC-14, using his iCloud email account (the "iCloud Account"). On January 14, 2021, the Government produced those emails to the defendant and later described the prison emails that it intends to introduce at trial in the Government's reply in further support of its motions *in limine*. (Dkt. 242 at 7-9, 23-24). In those emails, the defendant and CC-14 discussed, among other things, obtaining non-public information from Honduran law enforcement, including CC-3 and another official named "Salgado"; the Laboratory; and Victim-1, who the defendant murdered. The defendant also disclosed to CC-14 information about the murder of Victim-1 that was not then known by the Government, including that Victim-1 had been "half buried in Choloma," and CC-14's responses reflected his personal knowledge of Victim-1's murder and the Laboratory. On January 19, 2021, cooperating witness Javier Rivera Maradiaga provided the Government, through counsel, with a series of photographs and videos posted by CC-

---

[1] This memorandum uses the same defined terms and naming conventions as set forth in the Government's motions *in limine*.

14 on his Instagram account (the "Instagram Account"), and on January 21, those materials were produced to the defendant as part of Javier Rivera's 3500 material. The posts included, among other things, photographs of firearms, including handguns and machineguns; bulk quantities of U.S. currency; and a remote area of Choloma, Honduras.

Based on the foregoing, on January 25, 2021, the Government obtained search warrants for CC-14's iCloud and Instagram Accounts, and the next day, the Government produced the warrants and supporting affidavit to the defendant. On February 12 and 16, Facebook and Apple, respectively, provided access to materials responsive to the warrants, much of which is in Spanish, and the Government produced those materials to the defendant. Based on its review of the accounts, the Government has identified substantial evidence of CC-14's involvement in the charged crimes that is admissible against the defendant.

Similar to the defendant, CC-14's accounts reflect that he maintained contact information for numerous co-conspirators, including at least a dozen law enforcement or military officials, as well as Owner-1 and Owner-1's family. CC-14's contacts, which the Government intends to offer as evidence at trial, include, among others:

(i) CC-3. The defendant communicated with CC-3 about deleting evidence and codes to check whether the defendant's phone was being intercepted. (Dkt. 250 at 5 & *id.* Ex. B at 3-4). CC-14 maintained the same codes provided by CC-3 to the defendant as a note in CC-14's iCloud account. CC-14 also communicated with CC-3, as described below, about the defendant's bodyguards. The Government expects witnesses will testify at trial that CC-3 provided the defendant with sensitive law enforcement information in connection with his drug-trafficking activities.

(ii) Lieutenant Colonel Salgado. CC-14 represented in prison emails, which the Government intends to introduce at trial, that CC-14 contacted "Salgado" to obtain law enforcement information about Victim-1 and the Laboratory. Salgado's number in CC-14's iCloud Account is the same number that is saved as the contact for the military official "Comanche" in the defendant's Cellphone-1. As described in the Government's motions *in limine*, the Government intends to introduce at trial chats between the defendant and Comanche about, among other things, military support provided to the defendant and the defendant's co-conspirators.

(iii) Four members of the Sauceda family. The Sauceda family includes law enforcement officials who protected the defendant. CC-14 identified his Sauceda contacts as law enforcement officials in the iCloud Account.

CC-14 also maintained photographs, depicted below, reflecting the defendant and CC-14's close relationship with their co-conspirators and law enforcement, including photographs of (i) the defendant in a bulletproof vest and Honduran military beret; (ii) the defendant and CC-14, with CC-14 wearing a Honduran National Police hat; (iii) CC-14 with CC-4, who the defendant referred to as "Juancho" in chats on his iCloud Account; and (iv) CC-3 and CC-4.

The Defendant



CC-14 and the Defendant



CC-4 and CC-14



CC-4 and CC-3 (blue military uniform)



Also like the defendant, CC-14 maintained numerous photographs of firearms, including machineguns; extended magazines and tactical military vests; and bulk quantities of U.S. currency. Some examples include:






    Witnesses are expected to testify that the firearms and extended magazines depicted above are the same types of weaponry the defendant and other co-conspirators used to transport huge quantities of cocaine and engage in acts of violence.  For example, Leonel Rivera is expected to testify that the weapon circled in the top left photograph is a mini AR-15 with a large-capacity

magazine that drug traffickers referred to as "chiche."  Witnesses are expected to testify that the defendant often possessed such a weapon, as well as the other Glock handguns with extended magazines depicted in the same photograph.  CC-14 and the defendant also appear to have used the same type of firearm.  The photograph on the left below, which was posted by CC-14 on his Instagram Account with the translated caption "ARMOR AT FIRST SIGHT [smiling face emoji]" depicts a firearm that appears identical to one the defendant maintained a photograph of him holding on Cellphone-1, which is also depicted below.

Photograph from CC-14's iCloud Account            Photograph from the Defendant's Cellphone




CC-14's accounts also contained several photographs of Tony Montana, the fictional drug lord and violent criminal from the movie Scarface.  For example, CC-14 posted a photograph on his Instagram Account of 30-round capacity magazines, which appear to be compatible with the large-capacity magazine ("chiche") referenced above, in a package with Tony Montana's picture and one of his quotes from the movie:  "All I have in this world is my balls and my word and I don't break them for no one."  The defendant's Cellphone-1 includes a picture of Tony Montana as CC-14's contact profile picture.

Photogram of Scarface Ammunition          CC-14 Contact Picture on Cellphone-1

   

Like the defendant, CC-14 also exchanged text messages and voice notes, using the WhatsApp encrypted messaging application, with CC-3 and others about his criminal activities. For example, in April 2015, CC-3 texted CC-14 that it was "dangerous" for a relative ("Relative-1") to return to Honduras because the defendant is "capable of anything" and, later, that three of the defendant's "bodyguards" who had "worked" for the defendant had been killed in the Cortes Department. In November 2015, CC-14 exchanged messages with individuals about possessing AK-47s and AR-15s, which CC-14 said were only allowed in "private meetings" and were "prohibited . . . in Honduras" because they caused "too many deaths." After the Government filed its initial motions *in limine* on January 8, 2011, CC-14 exchanged messages with another individual in which CC-14 (i) stated that "all of [the defendant's co-conspirators] are there" in the motion, including CC-7, who CC-14 referred to by his first name, and CC-4, who CC-14 referred to as "Juancho"; and (ii) discussed transferring hundreds of thousands of dollars using money remittance services, having "fucked up" by not providing those services a legitimate explanation for the source of the funds, and providing false explanations for the source of the funds. Those chats are described in additional detail below.

I.  **PHOTOGRAPHS OF CO-CONSPIRATORS AND THE DEFENDANT FROM CC-14's ELECTRONIC ACCOUNTS ARE ADMISSIBLE AT TRIAL**

Photographs of the defendant and his co-conspirators, including CC-14, who the defendant contacted from prison to obtain information about Victim-1 and his drug-trafficking Laboratory, are admissible as direct evidence of the charged crimes. Photographs of the defendant in a bulletproof vest with handcuffs and a Honduran military beret, and CC-14 in a Honduran National Police hat, are relevant and admissible to show the defendant's significant connections with Honduran military and law enforcement officials, which witnesses will explain the defendant used to commit his drug-trafficking and weapons offenses. (Gov't MILs at 42-43). Similarly, photographs of CC-4 with CC-14 and CC-3 are admissible to show the close relationships between CC-4 and his co-conspirators, including the defendant. *See, e.g.*, *United States v. Alston*, No. S3 15 CR 435 (CM), 2016 WL 5806790, at *8 (S.D.N.Y. Sept. 27, 2016) (rejecting motion to exclude evidence of the defendant with his co-conspirators even where the photographs themselves did not depict criminal activity). Moreover, the picture of CC-4 and CC-14 depicted above is only one half of that photograph. The defendant maintained the other half on Cellphone-1, which depicts CC-4 with the defendant's ▬▬▬▬. The defendant and CC-14's ▬▬▬▬▬▬ photographs with CC-4 are further evidence of the defendant's connections with a significant and powerful co-conspirator, CC-4, as well as other influential public officials, all of which witnesses will explain the defendant corruptly used to protect and promote his drug-trafficking offenses.

Photograph of CC-4 From Cellphone-1



Photograph of CC-4 with CC-14 From the iCloud Account



## II. PHOTOGRAPHS OF FIREARMS, AMMUNITION, AND BULK CASH FROM CC-14's ELECTRONIC ACCOUNTS ARE ADMISSIBLE AT TRIAL

As the Court found with respect to Cellphone-1, evidence from CC-14's electronic accounts of CC-14's possession of firearms, ammunition, and large quantities of U.S. currency is admissible as proof of the drug-trafficking and § 924 charges. (*See* Feb. 12, 2021 Tr. at 20-21).

The fact that CC-14, who has apparent knowledge of the defendant's drug-trafficking activities at the Laboratory, has photographs of the same or nearly identical firearms that the defendant possessed to engage in drug trafficking is probative of the defendant's guilt as to the substantive and conspiracy weapons offenses charged in Counts Two and Three. Similarly, photographs of the defendant's coconspirators possessing firearms and large quantities of U.S. currency is direct evidence of the conspiracy element of Count One, the defendant's drug-trafficking crime. *See, e.g., United States v. Muniz*, 60 F.3d 65, 71 (2d Cir. 1995) ("[T]here are innumerable precedents of this court approving the admission of guns in narcotics cases as tools of the trade."); *United States v. Gonzalez*, 922 F.2d 1044, 1056 (2d Cir. 1991) (holding that possession of large, unaccounted for amounts of currency is admissible to prove the defendant's participation in narcotics dealings). The photographs of firearms and ammunition also are admissible to rebut one of the defendant's defenses as articulated at the final pretrial conference— namely, that the Government cannot establish that he actually possessed any of the firearms depicted on Cellphone-1. As described above, at least one of the firearms depicted from CC-14's electronic accounts and on the defendant's Cellphone-1 appears to be identical, and CC-14 discussed in chats the defendant's firearms, including those identified on Cellphone-1.

As an alternative, photographs of firearms from CC-14's accounts are admissible under Rule 404(b) because CC-14 ███████████████ and the photographs show the defendant's opportunity to access firearms in connection with his drug-trafficking crimes. *See, e.g., United States v. Rodriguez*, 761 F. App'x 53, 59 (2d Cir. 2019) ("The government argues that it introduced the challenged testimony to establish that Hilario-Bello had access to guns. The cooperator's testimony may be allowed for that purpose. The District Court did not abuse its discretion in so ruling." (citation omitted)); *United States v. Slaughter*, 248 F. App'x 210, 212 (2d Cir. 2007) (upholding admission of evidence of prior firearm possession under Rule 404(b) as demonstrating opportunity to access firearms, which was relevant to firearms charges in instant case); *United States v. Tubol*, 191 F.3d 88, 95 (2d Cir. 1999) (evidence that defendant possessed a gun when he was arrested was admissible "to show that he had the means to commit" armed robberies).

Finally, admitting the photographs would not be unduly prejudicial. Evidence of CC-14's possession of firearms and large amounts of currency does "not involve conduct any more sensational or disturbing than the crimes with which" the defendant is charged. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990). Accordingly, this evidence is not barred by Rule 403.

## III. ELECTRONIC COMMUNICATIONS OF CC-14 ARE ADMISSIBLE AT TRIAL

The Government seeks to admit portions of three chats from the iCloud Account involving CC-14 and others. The final translations of those chats are included as Exhibits A, B, and C,

respectively. As described below, each of those chats is relevant and admissible under the hearsay rules.

### A. CC-14's Chats About the Defendant's Dangerousness and Bodyguards Are Admissible

In 2015, CC-14 and CC-3 exchanged communications reflecting CC-14 and the defendant's close relationship with CC-3. For example, in communications in April 2015, CC-3 said he was in contact with the defendant, that the defendant was angry with CC-14, and that CC-14 should send the defendant a message explaining CC-14's conduct. CC-14 also told CC-3 that he would be returning to Honduras from the United States, and CC-3 responded that CC-14 should tell Relative-1 "not to come. It's dangerous. Mr. Geovanny is so angry with [Relative-1]." CC-14 responded that Relative-1 would not return with him but might have to return to Honduras soon, to which CC-3 stated, "It's best if Geovanny doesn't know that [Relative-1] is coming, you know ▉▉ is capable of anything, he has this hatred for [Relative-1], it's best to be careful."

Later, on April 3, 2015, the following exchange occurred concerning the defendant's bodyguards who had been murdered in the Cortes Department:

> CC-3: Did you know the 3 that were killed in Cortes in a white truck? In a Chevrolet tahoo [*sic*].
>
> CC-14: Not really. Why?
>
> CC-3: Because they were saying that they were ▉▉ bodyguards. The 3 of them.
>
> CC-14: I don't believe it. I'm going to look into it now.
>
> CC-3: Yes, the people in Cortes told me that those guys had worked with ▉▉. The police from Cortes called me and told me.
>
> CC-14: I'll look into it now.

These chats are admissible to show the existence of the charged conspiracy involving the defendant, CC-3, and CC-14; the close relationship between the defendant and CC-3; the fact that the defendant and his co-conspirators were receiving non-public information from law enforcement; and to corroborate witnesses who are expected to testify about the defendant's acts of violence and use of armed bodyguards in furtherance of his drug-trafficking activities. These chats are also admissible under the hearsay rules as co-conspirator statements pursuant to Rule 801(d)(2)(E). (Gov't MILs at 21-22). As detailed above and in the Government's other motions *in limine*, the Government will establish by a preponderance of the evidence that the defendant, CC-3, and CC-14 were members of the charged drug-trafficking and weapons conspiracies. The statements at issue were also in furtherance of that conspiracy. CC-3's statements were designed to assure CC-14 that he had the continued support of the defendant, to inform CC-14 of the status of the conspiracy and the dispute with Relative-1, and to provide CC-14 with information about the defendant's murdered bodyguards.

For similar reasons, the statements are admissible under Rule 804(b)(3) because the declarants are unavailable and their remarks would be probative of their guilt were they to stand trial on drug-trafficking or weapons charges. (Gov't MILs at 22-23). CC-3 and CC-14 are believed to be located abroad, outside the Government's subpoena power; and, even if subpoenaed, would likely invoke their Fifth Amendment rights if questioned under oath regarding their activities. The statements were also against the penal interest of the declarants because the Statements "implicated [the declarants] in [illegal] activity," and each declarant "would not have made the statement unless he believed it to be true." *United States v. Dupree*, 870 F.3d 62, 80 (2d Cir. 2017). Accordingly, the statements are admissible.

### B. CC-14's Chats About Machineguns Are Admissible

On November 26, 2015, CC-14 exchanged communications with other individuals ("Person-1" and "Person-2," among others) about CC-14's possession of machineguns and other firearms. In particular, CC-14 sent a photograph of a handgun and machinegun to the group and said, "I have those in Honduras." Person-1 responded that those weapons "are not allowed here," to which CC-14 said, "Same here. . . . They're not allowed in public. Only in private meetings. . . . Or in private property they have them." Person-1 responded, "I can just imagine the type of meetings." Later, Person-1 asked CC-14 how much an "AR-15" costs in the United States. CC-14 responded, "Around 4000" and added that they were "banned" in Honduras because "[t]here are too many deaths from the R15 and AK-47."

These chats are admissible to, among other things, demonstrate access to machineguns and other firearms by another member of the charged conspiracy (CC-14), whose ▮▮▮▮ relationship with the defendant supports an inference of constructive possession by the defendant, as well as that the firearms identified on the defendant's Cellphone-1 and CC-14's electronic accounts were not used for legitimate purposes, but to support illegal conduct ("private meetings" relating to drug trafficking) and to engage in acts of violence ("too many deaths from the R15 and AK-47"). The chats are admissible under Rule 804(b)(3) because CC-14 is unavailable and his remarks would be probative of his guilt were he to stand trial on drug-trafficking or weapons charges.

### C. CC-14's Chats About His Co-Conspirators

Between January 11 and 18, 2021, CC-14 exchanged communications with another individual ("CC-15") about the defendant and his co-conspirators.[2] On January 11, 2021, a few days after the Government filed its initial motions *in limine*, CC-15 wrote to CC-14, "Cc10 julio Barahona . . . CC1 Melvin . . . Sandres" and CC-14 responded, "Dawg, I know everything. . . . All of them are there. Edgar. Juancho is Cc4." CC-15 responded, "So are they bringing them back to life or what the heck," to which CC-14 said, "Dude they're talking nonsense." Later in the

---

[2] The screenname for CC-15 in the iCloud Account is "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. However, the individual communicating with CC-14 in the foregoing chats appears to be ▮▮▮▮▮▮▮▮▮▮▮▮ based on the fact that (i) CC-15 sent an identification card for ▮▮▮▮▮▮▮ to CC-14; (ii) CC-14 refers to CC-15 as ▮▮▮ and (iii) voice notes sent by CC-15 are of an apparent man's voice.

exchange, CC-15 asked how the media "know[s] about the green rifle," referring to the green submachinegun provided to the defendant by CC-13, a Honduran military official. CC-14 responded, "It's in the report. That's what the prosecutors say."

These chats are admissible to, among other things, show the existence of the charged conspiracy involving the coconspirators identified in the Government's motions *in limine* ("All of them are there"); demonstrate CC-14's knowledge of the identities of other members of the conspiracy, including CC-7 ("Edgar") and CC-4 ("Juancho"); show CC-14 and CC-15's knowledge that some of the defendant's co-conspirators, including CC-1 and CC-7, had been murdered ("are they bringing them back to life"); and corroborate anticipated witness testimony about the defendant receiving a green submachinegun from CC-13. The chats are also admissible under Rule 804(b)(3) because CC-14 and CC-15, who is also believed to be in Honduras, are unavailable and their remarks would be probative of their guilt were they to stand trial on drug-trafficking or weapons charges.

## CONCLUSION

For the foregoing reasons, the Government respectfully submits that the Court should grant the relief requested herein.

                              Respectfully submitted,

                              AUDREY STRAUSS
                              United States Attorney

by:   /s/_____
      Jacob Gutwillig
      Matthew Laroche
      Michael D. Lockard
      Assistant United States Attorneys
      (212) 637-2215 / 2420 / 2193

cc: Defense counsel of record (by ECF)