```
L38KRAM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                           15 CR 379 (PKC)

GEOVANNY FUENTES RAMIREZ,

              Defendant.

------------------------------x
                                       New York, N.Y.
                                       March 8, 2021
                                       9:50 a.m.
Before:

             HON. P. KEVIN CASTEL,

                               District Judge
                                  And A Jury

                 APPEARANCES

AUDREY STRAUSS,
     United States Attorney for the
     Southern District of New York
MICHAEL LOCKARD
JACOB GUTWILLIG
     Assistant United States Attorneys

AVRAHAM CHAIM MOSKOWITZ
ELYAN SCHULMAN
     Attorneys for Defendant

ALSO PRESENT:

MORGAN HURST, USAO Paralegal
BRIAN FAIRBANKS, FBI
JILL HOSKINS, Spanish Interpreter
GABRIEL MITRE, Spanish Interpreter
MIRTA HESS, Spanish Interpreter
```

       (Case called)

       MR. LOCKARD:  Good morning, your Honor.  This is United States Attorney Michael Lockard, for the government.  With me at counsel's table is AUSA Jacob Gutwillig and Paralegal Specialist Morgan Hurst.

       THE COURT:  Thank you.

       And for the defendant?

       MR. MOSKOWITZ:  Good morning, your Honor.  Avram Moskowitz, on behalf of the defendant, Geovanny Fuentes Ramirez.  With me at counsel table is my co-counsel, Elyan Schulman, at the far end of the table.

       THE COURT:  All right.  Good morning to you all.

       And good morning, Mr. Fuentes Ramirez.

       THE DEFENDANT:  Good morning.

       THE COURT:  There was an application by the government with regard to Witness 2 and its request to permit that witness to testify under a pseudonym for safety reasons.

       Is there any objection to that application?

       MR. MOSKOWITZ:  No, your Honor.

       THE COURT:  All right.  That application is granted.

       Further, there is information that came to my attention regarding communications by the son of the defendant with the spouse of a cooperating witness, and the communications could be construed as interfering with, or threatening, or intimidating the individual with regard to the

1     appearance of Witness 2 at trial.
2               The Court instructs the participants in this trial
3     that such conduct is punishable as contempt of court because I
4     order that such conduct not take place.  It could result in new
5     charges for obstruction of justice, 18 U.S.C. 1501 et seq. and
6     the following sections, or may be the basis for a sentencing
7     enhancement if the defendant is found to be involved.
8               So, the parties are admonished that such conduct is a
9     violation of court order and may be punishable by contempt and
10    prosecuted as obstruction.  Of course, there are lawful things
11    that a defense counsel may do in the course of his
12    investigation of a case, and my direction has nothing to do
13    with that, and nothing has come to my attention that in any
14    way, shape, or form casts any reflection on any of the
15    attorneys in this case, any of the defense counsel in this
16    case.  So, enough said on that subject.
17              With regard to the letter of the government of
18    March 2nd, the government has indicated that it does not intend
19    to introduce at trial prison emails or conversations from
20    prison of the defendant.  Is that correct?
21              MR. LOCKARD:  Your Honor, that is partly correct.  We
22    do intend to introduce some prison emails of the defendant that
23    were produced prior to defense counsel's letter objecting to a
24    particular batch of disclosure.  We do not intend to offer any
25    prison emails that were part of the production that defense

1    counsel raised issues with.
2             THE COURT:  All right.
3             With that amendment, is there any objection to the
4    material which the government proposes to offer in the
5    March 2nd letter?
6             MR. MOSKOWITZ:  Your Honor, I will confess, I don't
7    remember the exhibit numbers.
8             THE COURT:  Right.
9             MR. MOSKOWITZ:  There are -- with respect to the
10   defendant's emails, there will be some objections to some
11   portions of them as we go through them.
12            THE COURT:  All right.
13            MR. MOSKOWITZ:  I'll take it on an email-by-email
14   basis.
15            THE COURT:  Understood.
16            With regard to the communications with Comanche and
17   with Commander, I have some questions.  Number one, there is an
18   Exhibit A to the government's letter that was filed on
19   February 22nd, '21.  This is Document 250.  Pages 3 through 34
20   or 33 of that document appear to me to be newspaper articles or
21   headlines -- not even articles, I guess they're just headlines
22   from newspapers, the front page of newspapers, tabloid
23   newspapers, from Honduras, and the front cover of the newspaper
24   is translated, and there are, at times, articles in there.  I
25   certainly wouldn't let anybody offer a domestic newspaper for

1  the content of salacious stories.

2  Is the government planning on offering anything, pages
3  3 through 33, of Exhibit A?

4  MR. LOCKARD:  Yes, your Honor.  And the purpose of
5  offering that evidence is not to prove the truth of the matters
6  that are reported in those newspaper articles; the purpose of
7  that evidence, instead, is to show evidence of the state of
8  mind of Comanche and of the defendant, and, in particular, the
9  high degree of interest that they show in reporting on murders
10 of drug traffickers who in the articles are reported to have
11 been coconspirators, Tony Hernandez, close following of events
12 in the Tony Hernandez trial, and events after the Tony
13 Hernandez trial, which the government submits is evidence of
14 the relationships among the coconspirators in this case.

15 THE COURT:  It appears to me, having reviewed and read
16 the very interesting information in these newspaper articles
17 and the claims — "He did not have an extradition letter, but he
18 already had a support letter.  The warden was face to face with
19 Magdaleno when he was killed.  The killers are going to show up
20 dead or hanging from a beam" — this may be offered not for the
21 truth of its content, but for what was said, but I think there
22 is substantial reason to believe that the probative value of
23 these newspaper articles are substantially outweighed by the
24 danger of unfair prejudice.  As a group, I'm excluding them.
25 If the government wants to make a specific argument that a

1  specific newspaper headline should come in for notice of some

2  particular activity or action, that may be a different story,

3  and I will take that up, but, as a category, the probative

4  value is outweighed by the danger of unfair prejudice.

5          Now, in the Comanche chats, there is the video clip of

6  the interview with Sosa.  Do you intend to offer the video

7  clip?

8          MR. LOCKARD:  Your Honor, again, the answer is yes.

9  And the purpose of that proposed evidence, again, is not to

10 prove the truth of any of the matters that are asserted by

11 Mr. Lobo Sosa in that interview, but, instead, to provide

12 context for the conversation that follows between the defendant

13 and Comanche, the person the government has described as a

14 coconspirator of the defendant's, about the matters discussed

15 by Mr. Lobo Sosa in that interview, and, in particular,

16 evidence reflecting that the defendant has felt to be under

17 pressure or attacked, and that Comanche, an apparent member of

18 the military, or, at the very least, someone with connection

19 with the military, has expressed support for the defendant and

20 his activities.

21         THE COURT:  I thought that might be your position, and

22 it seems to me that it is sufficient to introduce the

23 defendant's comment, which does have probative value, and I do

24 find that Comanche, the important thing, is, from context, a

25 member of the conspiracy, and these were communications during

and in furtherance of the conspiracy, but it's sufficient if you introduce it as there was a video clip of a person who expressed the belief that he might be murdered by someone. There is no evidence that this belief was well-founded.

So you can say that, to set up the clip or set up the comment, but not mentioning Sosa or his belief that he was going to be assassinated by the Honduran government.

And, similarly, with regard to Commissioner, from the context and the nature of the communications back and forth about narcotrafficking, I conclude that Commander also was a member of the conspiracy even though we don't know his precise identity — there is some reason to believe that he's been identified based on, I think it was, a visa or a passport application number having a common telephone number — but, in general, I will allow the statements in.

And, again, Mr. Moskowitz, if there is something which I overlooked and you want to at some point make an argument under 403, I'll hear your argument.

MR. MOSKOWITZ:  Your Honor, if I may?

THE COURT:  Yes.

MR. MOSKOWITZ:  I don't know the order in which the government is intending to offer any of these materials.  I suspect, based on the witnesses that are going to be -- that the government has identified as coming in, that some of these, the government may be looking to offer early in the case before

any substantive evidence has been provided to give the context, to tell the jury who these are, or to establish that these are alleged coconspirators.  If that is to be the case, I would ask the Court to take it subject to connection, without allowing the jury to see these materials when they are initially offered and not be allowed to see them until a proper connection is made.

THE COURT:  Well, I will agree in part.  I will take them subject to connection, but they will be received, and if, for some reason, that connection is not established, it appears from the proffer prior to impanelment of the jury, that that will be made out.  If that turns out not to be the case, then there will be remedies, such as striking instructions, or if you choose to make some other motion, I'll hear that at that point.

Mr. Puskuldjian, come on up.  We'll get the official ruling.

MR. PUSKULDJIAN:  Yes, mask to mask is 72.  It's individual to individual, not arm to arm.

THE COURT:  Got it.

And defense table, are we good there?

MR. PUSKULDJIAN:  It should be the same, yes, sir.

Yes.

THE COURT:  Now, with regard to jury selection, let me just talk everybody through this to reduce surprises or the

like.

We will have something on the order of 42, 45 jurors in the jury assembly room.  There is a video hookup to the overflow room, which I believe is 9C, the ceremonial courtroom.  I will be questioning jurors using a document which we will hand out to you now.  And this is not a questionnaire, it's just an aid to memory, and affirmative answers, obviously, will get followed up, and depending on what the affirmative answer is, it might be very extensive follow-up.  It's not intended as the voir dire, but it is an outline of the subject areas to be covered.

We will use the jury box method for selecting the jury.  So, I want you to imagine — we'll first talk about regular jurors — an imaginary jury box consisting of the jurors in the first 12 seats downstairs.  Now, just to put your mind at rest:  The first 12 seats are not the first 12 people who have arrived.  They were given a random number.  So, they're in those seats randomly.  It might be Juror No. 62 is in seat one; in fact, you could have been the first-arriving juror and been assigned to 9C.  So we designed this to be random.

So when you arrive as a juror, you get a seat number, and the seat number might be in the jury assembly room or it might be in the overflow.  So, those who are in the first 12 seats have been randomized.

And I will go through the voir dire with them.  In

fact, I might go through it with more than just the 12, I might go up to, let's say, 20 in the voir dire, but you will then be called upon, in the first round, to exercise, the defense, two strikes and the government one strike, from the first 12 jurors.  So, after the first round, three jurors will disappear and nine will be left.  We will then have the imaginary jury box filled with three additional jurors, and since I've already done the questions up to Juror No. 20, this should not be very difficult, but then you would exercise challenges — defense two, the government one — and you can exercise your challenge against somebody you didn't exercise on the first round, because it's a comparative judgment, right?

If you say I only want to exercise one of my two challenges in this round, that challenge is gone forever, obviously.  And then when we get to the end of the government's challenges, after we've gone through six, then you'll have your additional four, which you would exercise at one time.  And then we will have our regular jurors.

I'm going to impanel four, not six, alternates, and I'll explain why.  If I impanel six, the two seats would be right behind where the court reporter is sitting, and I view that as somewhat suboptimal, from my perspective, unless I need the extra jurors.  If I needed them, if I felt I needed them, I'd do six, and it would be fine, but I think we can do with four alternates in this case.

             So, that's it.  And, of course, once we get our
regular jury, then we'll select the alternates, and each side,
per the rule, have two strikes on the alternates.  So, we'll
qualify eight, and there will be collectively four strikes, two
for each side, and that will give us our four alternates.
             If, for some reason, a challenge is waived, the jurors
with the highest number will be seated.  I don't usually get
too many waivers, though.
             Any questions about this?  We're going to be set up
downstairs.  This is how this is going to work.  My friends
from the Marshals Service are going to take the defendant down
to the ground floor, and there is an entranceway — I don't know
it, I've never traveled it in my life, but I assume you know —
how to get into the jury assembly room area.  There is
actually, I think what we used to call in the old days, a
vestibule or foyer in the clerk's office where we will all
assemble.  You'll all go downstairs, I'll go downstairs, and
we're going to have an order of march where we're all going to
go in, the judge included, through the door and across the
bench, with defense counsel, and then either the marshal next,
then the defendant next, and then the marshal, the second
marshal, after, if that's the way they want to line it up, but
the fact of the matter is we'll all be in one procession so the
jurors don't know who is who or why anybody is in any
particular order.

>           There are two tables.  I think at the two tables, it will not be possible for three people to sit.  So auxiliary counsel is going to have, or co-counsel is going to have, to stand, and I will give you reasonable opportunities to consult with one another — that's fine — and then we will have sidebars, as appropriate.  I will have the jurors stand up and go to a microphone to answer routine inquiries, and when we get to the sensitive areas, we'll go over to the sidebar.  It sounds much harder to visualize than it will be actually when we get into practice.
>
>           So that's it.  We're waiting for a call from downstairs.
>
>           MR. MOSKOWITZ:  Your Honor, if I may?
>
>           THE COURT:  Yes.
>
>           MR. MOSKOWITZ:  I'd like to bring an issue of concern to the Court's attention.
>
>           Last night, I was made aware of a newspaper article that was written about this case, which contains information, including potential government exhibits, that was very distressing.  It was written in Univision, which is obviously a media outlet for Hispanic -- primarily Hispanic, although I got the article in English.  It seems to me the only way that that information could have gotten to the press was a leak from the government's side.  It is entirely inappropriate to be leaking that information.  And I have a copy of the article, if the

Court would like to see it, because it is really a distressing article in terms of the potential for impacting on the fairness of jury selection and the proceedings in this case.

THE COURT: Well, I'm glad you brought it to my attention, and I will have my deputy mark it as a court exhibit. We'll pick it up from you in a moment. In fact, on a break, you can hand it up, but I'm glad you pointed that out, and I do agree with you that the Rules of Professional Responsibility certainly dictate what may be said about a criminal case to the press, and I'm going to give the government an opportunity to respond.

Do either of the Assistant United States Attorneys before me have any knowledge of the source of the information in the Univision article?

MR. LOCKARD: Your Honor, neither the assistants at the table were aware of the article and are hearing about it for the first time from Mr. Moskowitz, so we will review the article and develop a further response from there.

THE COURT: All right.

Thank you for bringing it to my attention, Mr. Moskowitz.

Is there any other preliminary matter, or do we need only wait for the call from the jury assembly room?

MR. LOCKARD: Your Honor, the government has one additional matter with respect to the motions in limine.

|   |   |
|---|---|
| 1 | THE COURT:  Right.  Go ahead. |
| 2 | MR. LOCKARD:  The Court earlier addressed the |
| 3 | government's March 2nd letter relating to the defendant's |
| 4 | emails to one of his sons. |
| 5 | THE COURT:  Yes. |
| 6 | MR. LOCKARD:  That motion also addresses additional |
| 7 | evidence relating to one of the defendant's sons who the |
| 8 | government has alleged is a coconspirator, evidence obtained |
| 9 | from that coconspirator's -- |
| 10 | THE COURT:  This is CC 14? |
| 11 | MR. LOCKARD:  That's correct, your Honor. |
| 12 | The iCloud account and social media account. |
| 13 | THE COURT:  Yes.  I haven't received any opposition |
| 14 | from the defense on that, or if there is, I'm not aware of it. |
| 15 | MR. MOSKOWITZ:  Your Honor, I did not respond because, |
| 16 | again, I have to wait to see how the evidence develops as to |
| 17 | whether or not there is a sufficient basis to claim that he is, |
| 18 | in fact, a coconspirator, and then we'll deal with it on that |
| 19 | basis. |
| 20 | THE COURT:  I think that sounds reasonable.  The point |
| 21 | is that there is no pretrial ruling from this Court restricting |
| 22 | the use of the evidence.  Like all litigants who stand before a |
| 23 | jury, anyone acts at their peril when they say the evidence |
| 24 | will show or we will offer evidence.  If it's excluded, it's |
| 25 | excluded; I can't help that.  So we are where we are.  It's not |

1   excluded, but I haven't ruled on any specific objection by
2   Mr. Moskowitz.
3           MR. LOCKARD:  Understood, your Honor.
4           THE COURT:  All right.  Flo, could you call down there
5   and see how we're doing.
6           (Pause)
7           if anybody needs a comfort break, we can take that
8   now.  Please don't go too far and please be back here in three
9   minutes.  So we're going to get a phone call, and we want to
10  get going.
11          MR. MOSKOWITZ:  The article is on the table, if you
12  like.
13          THE COURT:  Thank you.
14          MR. MOSKOWITZ:  And I have extras for the government.
15          THE COURT:  Thank you.
16          Garrett, do you have gloves?
17          We do have protocols.  We haven't used them in a
18  while.
19          (Pause)
20          THE COURT:  Brandon, can you check in 11D to see
21  whether we have the paper spray?
22          (Pause)
23          THE COURT:  Mr. Moskowitz, did you receive an email
24  from me today?
25          MR. MOSKOWITZ:  Yes, I did, your Honor.  Thank you.

1  I'll take care of that at a break.

2          THE COURT:  Thank you.

3          I'm going to direct that we adjourn to the jury
4  assembly room now.  I'm going to have the marshals take the
5  defendant down.  We will meet in that vestibule area that I
6  described.

7          And, Andrew, we can meet you there, and then you'll go
8  out, and you can set up in the courtroom while we're still
9  waiting.  The same thing with our interpreter.  All right?

10         For members of the public and spectators, the jury
11 assembly room has limited viewing area.  There is an overflow
12 room in 11D, where you can watch, or, if there is enough space
13 for social distancing along the back wall, you can stand in the
14 room by the back wall.  There is no seating for you; you may
15 not sit in any seat.  All right?

16         So, you're welcome to observe the proceedings, but in
17 the manner which I just described.  Thank you.

18         See everybody in the vestibule downstairs.

19         (Jury voir dire ensued)