L39HRAM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

        v.                          15 CR 379 (PKC)

GEOVANNY FUENTES RAMIREZ,

             Defendant.              Trial

------------------------------x

                              New York, N.Y.
                              March 9, 2021
                              9:45 a.m.
Before:

                HON. P. KEVIN CASTEL,

                              District Judge
                              and a jury

                    APPEARANCES

AUDREY STRAUSS,
    United States Attorney for the
    Southern District of New York
MICHAEL LOCKARD
JACOB GUTWILLIG
    Assistant United States Attorneys

AVRAHAM CHAIM MOSKOWITZ
EYLAN SCHULMAN
    Attorneys for Defendant

Also Present:

Jill Hoskins, Spanish Interpreter
Gabriel Mitre, Spanish Interpreter
Mirta Hess, Spanish Interpreter
Brian Fairbanks, DEA Agent

L39HRAM1

1             (Trial resumed; jury not present)

2             (A jury of 12 and 4 alternates was impaneled and

3     sworn)

4             THE COURT:  All right.  There's a juror health issue

5     that I want to discuss at the sidebar.  Is the defendant out

6     yet?  Let's bring the defendant out.

7             (At sidebar)

8             THE COURT:  All right.  The defendant is present in

9     the courtroom, and this is a juror health issue that we're

10    taking up at the sidebar.

11            OK.  White noise.  Thanks.

12            So this has been an evolving situation over the last

13    half-hour or so, but Juror No. 5, who was original Juror

14    No. 13, arrived at the courthouse.  Flo went to check up on the

15    jurors, and she reported that she was having heart

16    palpitations.  And she said if she could go home today, she

17    could come back tomorrow.  The story evolved, and Flo learned

18    that about a month ago she had a defibrillator installed that

19    is one that is adjustable by Bluetooth.  And she said, "Oh, the

20    doctor just needs to adjust the defibrillator," and she had

21    called her husband to take her to the doctor who's in the

22    Bronx.

23            I arranged to have the court nurse go down and eyeball

24    the situation.  The court nurse is of the opinion that she's in

25    cardiac arrest and that an ambulance should be called.  Between

L39HRAM1

1    the juror's self-diagnosis and what a nurse says, I'm going to

2    with the nurse.

3              This is a situation that I think is likely -- not

4    likely to recur, but it could recur.  You can imagine with

5    opening statements not even having happened, I'm loath to

6    dismiss a juror this early on.  My colleague, Judge Rakoff, is

7    trying a case now where he has one alternate left, and it's a

8    lengthy trial.  So it's not something I do lightly, and in

9    fact, when this was unfolding, I was coming up with scenarios:

10   Maybe we put this off till 1 o'clock; see what the doctor says.

11   Maybe he can make the adjustment.  You know, he simply goes on

12   his iPhone and hits a button, and the whole thing disappears.

13             I don't think that's it.  So I'm inclined to excuse

14   Juror No. 5.  We'll wait until we have all the other jurors

15   here before I'll make a final decision on that, but that's

16   where I'm leaning now.

17             Any reaction, Mr. Moskowitz?

18             MR. MOSKOWITZ:  Like the Court indicated, obviously

19   prefer to go with the jury that we selected, but I also want to

20   get started.

21             THE COURT:  Yes.

22             MR. MOSKOWITZ:  So I think my hope is that this is a

23   two-week trial, and that we'll survive with three alternates.

24             THE COURT:  Yes.

25             MR. MOSKOWITZ:  But who knows?

L39HRAM1

1          MR. LOCKARD:  Yeah, I agree, based on the Court's

2    assessment and the nurse's assessment, it doesn't seem like

3    there's an option potentially of waiting until tomorrow, but I

4    don't know that that's a cure that's better than the situation

5    we're in right now.

6          THE COURT:  Right, right.  But, obviously, the reason

7    I'm not going to make the decision now is we could find out

8    that we're missing another juror and that we have to wait until

9    tomorrow or some such thing like that.  So I'm just giving --

10   putting you in the loop.

11         There is a second topic I want to bring up while we're

12   at the sidebar, and I'll begin this a little bit obliquely.

13   But as is defense's right, government's right to have Rule 17

14   subpoenas issued in a trial, I issued one such subpoena, so

15   ordered it, and it was returnable yesterday.  There has not

16   been compliance with the letter of the subpoena, and so now

17   it's a question of enforcement of the subpoena.

18         I want to hear first from Mr. Moskowitz.  My judgment

19   is not only is it appropriate, but it may actually be useful to

20   lay this on the record and have this no longer *ex parte* but

21   *inter partes* and put the government on notice of what it is and

22   let them be heard on it, and they may or may not be part of the

23   solution here.  The alternative, Mr. Moskowitz, is this:  As

24   you know, because I'm sure you got the same letter I got, there

25   is a solution path in the letter, in the closing of the letter,

L39HRAM1

1    and I'm going to, in the first instance, hear from you.  If you

2    would like to go with that solution path and leave it at that

3    for now, then we'll leave it at that for now.

4            MR. MOSKOWITZ:  Judge, the problem with the solution

5    offered in that letter is from the time that I get the material

6    till the time that it would be useful to me will be several

7    days.

8            THE COURT:  Right.

9            MR. MOSKOWITZ:  So that's -- without delaying the

10   trial unnecessarily, I think that's not a viable solution.

11           THE COURT:  Right.  OK.

12           MR. MOSKOWITZ:  I think perhaps it's time to bring the

13   government in on it.

14           THE COURT:  OK.

15           MR. MOSKOWITZ:  And maybe they can be helpful.

16           THE COURT:  I wanted to give you the first shot at

17   that.

18           I'm going to ask my law clerk to get the letter, which

19   is down on the shelf, or if you can print it here, that's even

20   better.

21           THE LAW CLERK:  I believe it's in chambers.

22           THE COURT:  So why don't you describe your original

23   subpoena, which I think you served on or about February 21 is

24   my recollection.

25           MR. MOSKOWITZ:  February 16.

L39HRAM1

1           THE COURT:  When?

2           MR. MOSKOWITZ:  February 16.

3           THE COURT:  February 16.  Why don't you describe it.

4           MR. MOSKOWITZ:  So following receipt of some of the

5     Javier and Leonel tapes, we asked -- we served a subpoena on

6     the Bureau of Prisons for all of the phone calls and the

7     emails.  We got no response until the 3rd of March when the BOP

8     lawyer sent a letter to the judge asking if your office's civil

9     division could help them put up a firewall attorney and help

10    them comply.

11          MR. LOCKARD:  OK.

12          THE COURT:  Judge said yes immediately, within hours.

13          MR. MOSKOWITZ:  Judge said yes, and that was the last

14    we heard from anybody.  Apparently somebody from your office

15    was appointed yesterday --

16          MR. LOCKARD:  OK.

17          MR. MOSKOWITZ:  -- to deal with the issue.  I spoke to

18    Ilan Stein yesterday from the Civil Division.  Perfectly

19    pleasant, wanted to be helpful, wrote to the Court, wrote to

20    me, but the solution that he offered was to produce the

21    tapes -- and I limited -- I agreed to limit the scope of the

22    subpoena so that we can get this moving, so to speak, and he --

23    the solution was to provide the tapes next Monday.

24          MR. LOCKARD:  OK.

25          MR. MOSKOWITZ:  I explained to him if I get them next

L39HRAM1

1    Monday, we won't have them translated till Wednesday or

2    Thursday given the number of tapes and emails there are going

3    to likely be, and by that time we're going to be done.  I think

4    neither of us want to recall any of the witnesses.

5                MR. LOCKARD:  No.

6                THE COURT:  Right.  And I want to be temperate in my

7    comments, but it was quite a lag before we heard anything, and

8    this most recent letter, which we'll give you a copy of right

9    now --

10               THE LAW CLERK:  Hand one to everyone, Judge?

11               THE COURT:  Well, Mr. Moskowitz has it already.  This

12   is the letter dated March 8, 2021, from Ilan Stein on the

13   letterhead of the U.S. Department of Justice, Southern District

14   of New York, addressed to me, so I'm tendering it to

15   Mr. Lockard.  But there's a lot in there about the Touhy

16   regulations, and one of the questions I have is do these

17   regulations apply to the United States Attorney's Office when

18   they want tapes, because it seems to me they got them

19   lickety-split?

20               MR. MOSKOWITZ:  It's my understanding it does not

21   apply.

22               THE COURT:  OK.

23               MR. MOSKOWITZ:  But I could be wrong.

24               THE COURT:  Maybe you could ask for them, then, and if

25   you ask for them and you're exempt, that's a solution right

L39HRAM1

| | |
|---|---|
| 1 | there.  But the government does not want to see this trial have |
| 2 | an extended break in it or witnesses recalled.  So we may have |
| 3 | a little bit of a delay in the startup while we wait for |
| 4 | jurors.  You may want to step out and make a preliminary phone |
| 5 | call to get this in motion. |
| 6 | MR. LOCKARD:  So just to put a fine point on it, if I |
| 7 | may, for my understanding. |
| 8 | THE COURT:  Yes, please. |
| 9 | MR. LOCKARD:  Mr. Moskowitz, you would like these |
| 10 | materials in time to be used on cross-examination of |
| 11 | Mr. Rivera.  The Court -- it sounds like the Court's |
| 12 | inclination if that's not the case, the Court right now is |
| 13 | expressing an openness to taking a break in the trial or to |
| 14 | recalling Mr. Rivera for the testimony? |
| 15 | THE COURT:  I certainly am. |
| 16 | MR. LOCKARD:  So I understand that that's the |
| 17 | situation, and we would like to avoid that also. |
| 18 | THE COURT:  Yes.  All right.  So, good. |
| 19 | MR. MOSKOWITZ:  Just so the Court knows, I have |
| 20 | interpreters lined up that I can get this material to |
| 21 | relatively quickly. |
| 22 | THE COURT:  Right, right.  Again, for the record, |
| 23 | that's in particular because you made an application, and I |
| 24 | acted on that application. |
| 25 | MR. MOSKOWITZ:  Absolutely, immediately. |

L39HRAM1

1      THE COURT:  Right.  OK.  So we're in recess for the

2  moment until we hear from Flo about the situation with our

3  jurors, and you're free to step out of the courtroom if you

4  want to make a phone call.

5      MR. MOSKOWITZ:  Judge, can I just raise one other

6  issue?

7      THE COURT:  Yes.

8      MR. MOSKOWITZ:  It's a housekeeping issue, and I

9  raised it with your Honor's clerk last night.  Just from

10  scheduling perspective --

11      THE COURT:  Friday afternoon?

12      MR. MOSKOWITZ:  Friday afternoon.

13      THE COURT:  What time is Shabbat?

14      MR. MOSKOWITZ:  Shabbat is about 5:30.  I need to get

15  to Long Island.  If we break at 3:30, that's fine.

16      THE COURT:  That's fine.

17      MR. MOSKOWITZ:  If you want to break --

18      MR. LOCKARD:  As long as we're here, there's one thing

19  we were going to raise before we started.

20      THE COURT:  Yes.

21      MR. LOCKARD:  This is more to make sure everybody is

22  aware, but we learned last night that one of the Honduran media

23  outlets had published a list of the Appendix A to the Court --

24      THE COURT:  Published the list of?

25      MR. LOCKARD:  The Appendix A to the Court's jury

L39HRAM1

questionnaire that contains the names and places.

THE COURT:  It is marked as -- listen, I went through this analysis in my own mind when the request was made by the press.  It has been marked as Court Exhibit 1 or Court Exhibit A in this trial, and so therefore it became a public record.

MR. LOCKARD:  Sure.

MR. MOSKOWITZ:  What's more troubling, Judge, is the fact that the article that I provided the Court yesterday --

THE COURT:  Yes.

MR. MOSKOWITZ:  -- had a government exhibit as the lead photograph.

MR. LOCKARD:  That photograph was in a public filing, but --

THE COURT:  It was in a public filing?

MR. LOCKARD:  It was.  It was in one of our motions *in limine*.

THE COURT:  All right.  If it's in a public filing --

MR. MOSKOWITZ:  No, obviously.

THE COURT:  So this is not a warning or admonishment because I have no reason to believe that anyone on the government's side has done anything, but the government acknowledges its obligations not to be selectively disclosing to the press information in this trial?

MR. LOCKARD:  Certainly.

L39HRAM1

1          MR. MOSKOWITZ:  Thank you, Judge.

2          MR. LOCKARD:  As the Court knows, we've been concerned

3     about disclosure of issues related to witness safety, so that's

4     been, on the trial team, a serious concern of ours.

5          THE COURT:  Understood.

6          MR. LOCKARD:  Thank you.

7          (In open court)

8          THE COURT:  We have the balance of our jury pool, and

9     we're going to be bringing them up now.

10          All right.  Let me just see the attorneys at sidebar

11     for a moment, please, while we're waiting for our jurors.

12          (At sidebar)

13          THE COURT:  Just to complete the story on Juror No. 5,

14     the juror declined the ambulance, and her husband picked her

15     up.  She said that she had experienced these palpitations

16     before on sort of a regular basis, but they usually went away.

17     So, I mean, this is all confirming to me that this is not

18     necessarily something that wouldn't recur in this trial.

19     That's all.

20          Any news?

21          MR. LOCKARD:  I spoke with my colleagues at the Civil

22     Division.  I expressed that the request was also being made on

23     behalf of the prosecution team.  I believe that will avoid the

24     need to comply with the *Touhy* obligations.  I'm going to be in

25     touch with BOP about the timing of their actually providing the

L39HRAM1

 1    records, and we'll send them over then.

 2              THE COURT:  Good.  Thank you.

 3              (In open court)

 4              (Recess)

 5              THE COURT:  Please be seated, and bring our jurors in.

 6              Are Judge Preska's interns or clerks here?  If so,

 7    identify yourselves.  No?  All right.

 8              (Continued on next page)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L39HRAM1

1                  (Jury present)

2                  THE COURT:  Good morning, ladies and gentlemen.  In

3       non-COVID times, when you entered this courtroom, we'd all

4       stand up.  I'd stand up, everyone in this courtroom would stand

5       up for you, and they'd stand up when you leave.  I hope you'll

6       forgive us for this precaution.  We're told that unnecessary

7       movement is inadvisable, so you'll see that the lawyers will be

8       addressing me in the main from a seated position.  That's

9       pursuant to my instructions.  So they're not being rude by

10      being seated when they speak.  We all learned our manners, but

11      the manners are changing because of the pandemic.

12                  The lawyers will be conducting examinations in the

13      Plexiglas booth, and the witness will be in a Plexiglas booth.

14      You'll notice the white contraption on the top of the booth and

15      there's another white contraption here.  That's a HEPA filter

16      that filters the air in there.  So we have experts who advise

17      the court so we keep everybody nice and safe.  All right.  If

18      you have any issues or questions, please let me know.  You can

19      give them to me through Flo, and that will be perfectly fine.

20                  Now, am I correct that without objection from the

21      government or the defendant, Juror No. 5 is excused?

22                  MR. LOCKARD:  No objection.

23                  MR. MOSKOWITZ:  No objection from the defense.

24                  THE COURT:  All right.  Ladies and gentlemen, we're

25      all going to keep Juror No. 5 in our thoughts and prayers.  I

L39HRAM1

have been kept apprised all morning long.  We care deeply about you, so this is not -- it may have looked like it was just going on and it was just Flo there.  Oh, no, I was on the phone.  We were talking.  I spoke to the direct executive, the clerk of the court.  We all were worrying about our juror, and it sounds like she has the situation under control.  She's going to see her doctor, and so please keep her in your thoughts and please stay healthy.  All right?

You now understand that, as I said yesterday, you're all in this together, we're all in this together, and we can't start unless all of us are here.  So good job this morning, and the reason for the slightly delayed start is for reasons that you now know.

So, ladies and gentlemen, my job is to instruct you as to the law that governs or controls the case, and I will now give you those instructions.  I will give you those instructions at the end of the trial.  There are a few instructions that I wish to give you at the outset of the case.

This is a criminal case.  An indictment filed by a grand jury sitting in this district has charged the defendant with cocaine importation conspiracy, possession of machine guns and destructive devices, and conspiracy to possess machine guns and destructive devices.

The indictment itself is not evidence.  An indictment simply contains the charges that the government is required to

L39HRAM1

prove to the satisfaction of the jury beyond a reasonable doubt.  The defendant, Geovanny Fuentes Ramirez, has entered a plea of not guilty to the indictment.

The law presumes the defendant to be innocent of all of the charges against him.  The burden is upon the prosecution to establish the defendant's guilt beyond a reasonable doubt with respect to each element of the offenses charged.  The burden of proof never shifts to the defendant in a criminal case, and the law never imposes on the defendant the obligation of doing anything in a criminal trial.  The presumption of innocence remains with the defendant throughout the trial unless and until, after hearing and considering all of the evidence and my final instructions on the law, you as jurors unanimously are convinced of the defendant's guilt beyond a reasonable doubt.

Until it is time to deliberate at the conclusion of the case, it is important that you keep an open mind.  You must pay close attention to all the evidence presented.  Evidence consists only of the testimony of witnesses, documents and other things admitted as evidence, or stipulations agreed to by the parties.  Certain things are not evidence and must not be considered by you.  I will list them for you now.

Statements, arguments, and questions by lawyers are not evidence.  Nor are my own statements to you.  For something to be evidence, it's got to be received into evidence.  It's

L39HRAM1

got to be the sworn testimony of a witness.

So in a few minutes from now the government is going to stand up and give you an overview of what it thinks it will be able to show at this trial, all right, a preview of the evidence.  The prosecutor's statement is not evidence.  It's the testimony of the witnesses and the exhibits that are the evidence.  Defense counsel may, if he chooses, deliver an opening statement, but, again, the defendant has no burden and no obligation to make one.  But any statement made by defense counsel to you is not evidence either.

Now, when a lawyer asks a question, the question may have all sorts of details in it:  Were you at the meeting on August 5, 2016, at so-and-so's house in which this happened? Wow, that's a bombshell.  No, it's not.  It's a question.  It's not proof of anything.  It's the witness' answer that makes it evidence, not the fact that a lawyer asked a question.

Objections to questions are not evidence.  Lawyers have an obligation to their client to make an objection when they believe evidence is being offered for an improper purpose under the Rules of Evidence.  You should not be influenced by the objection or by the Court's ruling on it.  If the objection is sustained, ignore the question and any answer that may have been given.  If it is overruled, treat the answer like any other.  If you're instructed that some item of evidence is received for a limited purpose only, then you must follow that

L39HRAM1

1    instruction.

2           Something else that's not evidence is testimony that

3    the Court has excluded or stricken or has told you to

4    disregard.  That's not evidence, and you may not consider it.

5           Something else that's not evidence is anything you may

6    have seen or heard outside the courtroom.  That's not evidence

7    and must be disregarded.  You are to decide the case solely on

8    the evidence presented here in the courtroom.

9           In deciding the facts of the case, you'll have to

10   decide the credibility of the witnesses, that is, how truthful

11   and believable they are.  Now, how do you decide what to

12   believe and what not to believe?  Well, you're going to listen

13   to the witnesses, watch them, and observe them, and then

14   decide, as you would decide questions in your ordinary life:

15   Did they know what they were talking about?  Were they candid,

16   honest, open, and truthful?  Did they have a reason to falsify,

17   exaggerate, or distort their testimony?  Sometimes it's not

18   what a witness says but how he or she says it that may give you

19   a clue as to whether or not to accept that witness' version as

20   credible or believable.

21          In short, the way a witness testifies, may play an

22   important part in your reaching a judgment as to whether or not

23   you can accept the witness' testimony as reliable.  You will

24   use your common sense and good judgment to evaluate their

25   testimony based on all the circumstances.

L39HRAM1

1              I cannot emphasize too strongly that you must keep an

2      open mind until the trial is over.  A case can be presented

3      only step by step, witness by witness, and it would be unfair

4      to one side or the other for you to make up your mind before

5      you've heard all the evidence.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L39KRAM2

1    THE COURT:  (Continuing)  We know from experience that

2    frequently when we hear one side of a story, it turns out that

3    it's very different when you hear the other side.  Also, you

4    may hear somebody give a version of events, but then you hear

5    them questioned about it — here it would be called

6    cross-examination — and what sounded so impressive at first may

7    turn out not to be.

8         In order to ensure that you decide the case only on

9    the evidence and that you not be influenced in any way by

10   anything that might occur outside the courtroom in your

11   presence, I now give you a specific set of instructions.

12        Do not discuss the case among yourselves or with any

13   other person.  You will have the opportunity and, indeed, the

14   duty to discuss the case only after all the evidence is in and

15   the case is given to you to discuss and decide in the jury

16   room.

17        Now, what do I mean by this?  Well, as to you as

18   jurors, when you go into the jury room, after a break, you

19   don't say, wow, that witness was interesting, or that was a

20   bombshell, or I was surprised, or isn't he tall, or wasn't the

21   cross-examination great or awful.  That's talking about the

22   case.  You don't talk about the case.  Don't go down that path

23   at all.

24        Any discussion of what's going on in the courtroom

25   here, unless I'm talking to you about lunch or a snack, is not

L39KRAM2

1    fair game for discussion in the jury room.  Not at all.

2           And as to discussing it with anybody else, you know

3    there's something to be said about having a little mystery in

4    your life.  So, you go home, and your family member, or your

5    partner, or your spouse says what's this all about?  Please, I

6    can tell you all about it when the trial is over; until then,

7    I'm under orders by the judge not to discuss the case, and I

8    don't particularly want to get thrown in jail by the judge for

9    violating the order.  So, don't do that, ladies and gentlemen.

10   You'll be able to talk about the case and tell them everything

11   you saw in this courtroom when this trial is over, not during

12   the trial.

13          It may have been a great experience or you might have

14   thought something was wonderful, or boring, or terrible, or who

15   knows what; that's not something you go home and you talk about

16   until the trial is over.  All right?  And you're going to feel

17   better about yourself, that you're complying with these

18   instructions.

19          The second instruction is you're not to read anything

20   in the newspapers or elsewhere about the case.  You're not to

21   listen to or view any reporting, if there happens to be any

22   reporting.  You're not to conduct any research about the case

23   on the internet.  That means you are not to Google or conduct

24   any other search on any name, events, terminology, laws, legal

25   concepts, or any matter touching in any way upon the trial.  It

L39KRAM2

1   is a violation of your oath as a juror and a violation of this

2   Court's order to seek out your own information about any matter

3   touching upon the trial, including the people and events, the

4   lawyers, or to research the law.  Your considerations must be

5   based on what you hear and observe in the courtroom.

6          I want you to imagine that you had a loved one who was

7   involved in the trial.  Maybe they're the defendant.  You would

8   want that, jurors who were deciding that case on what came out

9   in the courtroom, because when it comes out in the courtroom,

10  both sides have an opportunity to address it, right?  And

11  that's fair, you get to hear both sides.

12         When you do something on your own, maybe you see

13  something, and you say, oh, this is interesting, but if you

14  found out the explanation, you'd find out it was fake news, or

15  there's another side of the story, or that was retracted, or

16  who knows what, but it's unfair, and you want this trial to be

17  fair, as I do.  You'd want it for your family, for yourself,

18  and you should want it here.  So, please observe that rule.

19         Do not send or receive any electronic communications

20  about the case.  This includes texts, and email, and blogging,

21  posting information on social networks sites, or using any

22  other electronic communication to discuss or even mention this

23  case.  For example, you may not even post that you were a juror

24  in this case.  This also means no communication with fellow

25  jurors, lawyers, witnesses, or anyone about the case, or any

L39KRAM2

1    communication at all with any of the participants in the trial.

2    No, don't do it.  No Facebook posts at all.  The world will be

3    fascinated that you were a juror, but let them be fascinated

4    when the trial is over.  All right?

5          If it becomes necessary to send the Court a note about

6    something you saw or heard about any other matter, do not share

7    the content of the note with your fellow jurors.  I think they

8    said when we were in grade school, secrets secrets are no fun,

9    share it with everyone.  Well, that's not the way it works.  So

10   maybe you have a personal matter or maybe you saw something or

11   heard something that you're not sure you were supposed to see

12   or hear.  Send a note, but don't go into the jury room and say,

13   do you think I should send a note to the judge about this?  Or

14   don't let somebody say to you:  What's the note you're writing

15   to the judge?  Why are you writing the judge?  You're not doing

16   anybody a favor because it could happen that whatever it is

17   requires one juror to be excused, but if you share it with the

18   room, the entire trial may have to come to an end.  So, please

19   don't do that.  And please do send a note if you need to.

20         Now, you're not to allow anyone to speak to you about

21   the case.  If you're approached by anyone to speak about it —

22   and I don't think that will happen — politely tell them that

23   the judge has directed you not to speak about the case.  If any

24   person seeks to contact you about the case — again, that won't

25   happen, I'm sure — you're required to report the incident to me

L39KRAM2

promptly.

Be sure that I'm informed if any person you know comes into the courtroom.  This is a public trial, so it could happen, but it is important that you do not hear from them what may have happened in the court while the jury was not present. If you should see a friend or relative come into court, please send me a note through the clerk at your first opportunity.

Now, I am directing the attorneys, the defendant, and the witnesses not to talk to the jury outside the courtroom, not even to offer a friendly greeting.  I give the same direction back to the jurors.  All right?  So, if you happen to see any of the participants in the trial — in an elevator, in a lobby, going in or out of the building — they will not and should not speak to you.  Ladies and gentlemen, they're not being rude, they know who you are, they are following my orders by treating you as a perfect stranger, so please don't take offense at that.

I will allow the lawyers in this case to leave the courtroom without announcement or interruption, so long as one party, a lawyer for a party, remains.  Please take no offense if this occurs.

Finally, a few words about trial procedure:

First, the lawyers have the opportunity, but are not required, to make opening statements.  The statements are not evidence; they're a preview.  After all the evidence has been

L39KRAM2

1    received, the lawyers then have an opportunity to sum up.

2    There may be review.  They may review the evidence and make

3    arguments to you as to what conclusion they think you should or

4    should not draw from the evidence.  These arguments are also

5    not evidence, but they may be helpful.

6         And then, after these arguments or summations, I will

7    give you detailed instructions as to the law that applies and

8    controls in this case, and you must follow my instructions.

9    Then you will go to the jury room to deliberate and discuss the

10   evidence in order to decide the facts and render a verdict.

11        Now, in the course of the trial, I will prod the

12   attorneys to move along, to pick up the pace, ask them how long

13   they expect to be with a witness, or the like, or even, at

14   times, because it's my job, this is what I get paid by the

15   taxpayers of the United States to do, I may tell a lawyer,

16   please don't do that in this courtroom, that's not the way to

17   go about it.  If I happen to do that, that does not mean I like

18   or don't like somebody or I have a view on the evidence; it's

19   just what judges do and are supposed to be doing.  So, don't

20   draw any conclusion.

21        Now, I know with these fine lawyers, that will never

22   happen, but if it did, that's my point.

23        Now, Mr. Lockard, how long does the government think

24   it wants for its opening statement?

25        MR. LOCKARD:  Twenty minutes, your Honor.

1          THE COURT:  Twenty minutes?  All right.

2          And, Mr. Moskowitz, do you plan to make an opening

3     statement?

4          MR. MOSKOWITZ:  Mr. Schulman will be opening, your

5     Honor.

6          THE COURT:  And how long do you think you want?

7          MR. SCHULMAN:  About the same, Judge, 20 minutes.

8          THE COURT:  Okay.  That's fine.

9          So, without further ado, I think if you want to adjust

10    the podium, you may do so.

11         And you are Mr.?

12         MR. GUTWILLIG:  Mr. Gutwillig, your Honor.

13         THE COURT:  Okay, Mr. Gutwillig.  You can adjust the

14    podium, so it's tilted straight, so you have a better line of

15    sight, and then we'll adjust it again.

16         You can help with the table, Mr. Lockard, if you want

17    to, so the table is not an impediment to turning it.

18         There you go.  That's it.  Well, that's pretty good.

19         We have a protocol, in between speakers, to clean the

20    podium, and you may, now that you're inside, remove your face

21    mask.

22         Whenever you're ready.

23         MR. GUTWILLIG:  Good morning, ladies and gentlemen.

24         Tons of cocaine, guns, violence, brutal murders,

25    bribes, and corruption.  This case is about a violent drug

L39KRAM2                    Opening – Mr. Gutwillig

1    trafficker.  This man, Geovanny Fuentes Ramirez, the defendant,

2    distributed massive quantities of cocaine to the United States.

3    He ran a secret cocaine lab, hidden in the mountains of

4    Honduras, where he produced enormous amounts of cocaine,

5    guarded the lab with men armed with machine guns, and he needed

6    trucks, boats, and airplanes to ship all the cocaine he made.

7    He fiercely protected his drug business by doing what he did

8    best — he bought those he could and he killed those he could

9    not.

10           The defendant's cocaine operation thrived because of

11   his connections to police, military, and political power in

12   Honduras — mayors, congressmen, military generals, and police

13   chiefs, even the current president of Honduras.  The defendant

14   bribed them all, bought and paid for.

15           And when money wasn't enough, the defendant fixed the

16   problem with violence.  When law enforcement tried to shut down

17   his cocaine factory, he took revenge.  He kidnapped one of the

18   officers who participated in the raid, he tied him up, he

19   tortured him, and he stabbed him to death, to send a message,

20   to make sure that no one got in his way.  He bribed and killed

21   to pump cocaine into this country.

22           Because he did these things, because he distributed

23   cocaine to this country, the defendant has been charged with

24   federal crimes, agreeing to distribute drugs into the United

25   States and using firearms for drug trafficking.  And we will

1   prove these charges beyond a reasonable doubt.  The evidence

2   will come in bits and pieces, in different ways, and this is my

3   opportunity to provide you with a brief roadmap to help give

4   some context as you see and hear that evidence.  Here is what

5   the evidence will show:

6          The evidence will show that Honduras sits at a crucial

7   location in the cocaine trade.  Most of the world's cocaine is

8   produced in Colombia, and a lot of that cocaine makes its way

9   north to Honduras, and over 90 percent of the cocaine that

10  reaches Honduras comes to the United States, to this community,

11  here, where one kilo sells for around $30,000.  Getting those

12  drugs from Honduras to the United States is big business, and

13  it's dominated by powerful people — politicians, the military,

14  law enforcement, and, of course, the people who can buy their

15  support, people like the defendant.  Those are the people at

16  the highest levels of the drug trade, and they stand to make

17  massive profits.

18         The evidence will show that in 2008, the defendant

19  started out selling kilogram quantities of cocaine in Miami —

20  one, two, five kilos at a time.  You'll learn that each kilo

21  contains about 8,000 individual doses, valuable and dangerous

22  amounts of cocaine, to be sure, but in relatively small

23  shipments.  I say "relatively" because you will learn that the

24  defendant's cocaine business grew by leaps and bounds.  By

25  2010, the defendant was operating an actual cocaine lab in

1   Honduras, a cocaine factory.  You'll learn that labs like the

2   defendant's are used to mix dangerous poisonous chemicals and

3   turn them into bricks of cocaine.  The defendant produced a lot

4   of bricks, amounting to hundreds of kilos of cocaine a month.

5   The defendant paid a dozen men armed with machine guns to guard

6   his lab, and he hid it with good reason.  This cocaine was

7   worth millions of dollars to the defendant.  With the help of

8   other participants in his scheme, including corrupt members of

9   the Honduran National Police, local and national politicians,

10  and the military, he could transport that cocaine, he could

11  transport it freely, and sell it for massive profits.

12          You'll learn that the defendant's cocaine lab was

13  raided in 2011.  And you will learn that he was never

14  prosecuted for it.  You heard what happened to the officer who

15  participated in that raid, who dared to threaten the

16  defendant's growing drug-trafficking business.  He was

17  kidnapped, he was tortured, and he was murdered because he

18  tried to get in the defendant's way.

19          But the defendant was not satisfied.  He had bigger

20  goals, and he had tons, literally, of cocaine to sell.  You'll

21  learn that the defendant sought out and partnered with some of

22  the largest drug-trafficking organizations in Honduras.  During

23  a meeting with a leader of one of those organizations, the

24  defendant bragged about his cocaine lab, his close

25  relationships with high-ranking members of the Honduras police,

L39KRAM2                          Opening – Mr. Gutwillig

1   and how he could protect large cocaine shipments using heavily

2   armed workers.  He sold what he was bringing to the table —

3   huge amounts of cocaine, police in his pocket, and men with

4   machine guns.

5          And the defendant was successful.  For several years,

6   he worked with some of the most powerful drug organizations in

7   Honduras to transport thousands of kilograms of cocaine that

8   were imported into the United States.  The defendant helped

9   transport huge quantities of cocaine in and from Honduras, used

10  men armed with machine guns and other firearms to transport

11  that cocaine, and bribed law enforcement officials to make sure

12  those cocaine loads traveled freely and were not stopped by the

13  police.

14         As the years passed, the defendant's power grew.

15  You'll learn that by 2013, the defendant partnered directly

16  with a candidate then running for president of Honduras, now

17  the president of Honduras.  You'll learn about secret meetings

18  the defendant had with the president in 2013, in 2014, when

19  they plotted to send as much cocaine as possible to the United

20  States.  The defendant gave the president $25,000 in cash, drug

21  money, and something even more valuable — access to the

22  defendant's cocaine lab — and, in exchange, the president

23  agreed to protect the defendant.  He made the defendant

24  bulletproof.  The president made the defendant promises to

25  protect his drug shipments with the Honduran armed forces, to

L39KRAM2                    Opening - Mr. Gutwillig

1     shield him from prosecution with the help of the attorney

2     general, and that the defendant would team up with the

3     president's own brother, then a major Honduran drug trafficker.

4     With the president's help, the defendant's drug-trafficking

5     business flourished.  He even began carrying around a green

6     submachine gun given to him by a powerful Honduran general, a

7     perfect symbol of the violence and of the corruption that

8     fueled the defendant's drug business.  He was untouchable.

9              So, that is what the evidence will show — that the

10    defendant was a key part of a Honduran narco state.  He was a

11    violent, heavily armed cocaine trafficker who worked with the

12    Honduran military, police, and politicians, including the now

13    president.  He worked with these people to produce thousands of

14    kilos of cocaine in his lab and send those drugs to the United

15    States, a powerful, untouchable drug trafficker who made

16    millions helping the president traffic cocaine.

17             Let me tell you a little bit about how we're going to

18    do this.  You'll hear testimony from expert witnesses.  They

19    will provide background and context for other evidence that

20    you'll see and hear — drugs.  You'll hear from a veteran

21    federal agent about how cocaine is produced in Colombia,

22    shipped through Honduras, and makes its way north to the United

23    States from Honduras.  You'll hear from an expert in Honduran

24    history politics who will describe the Honduran political

25    system, so that you can better understand the defendant's role

L39KRAM2                           Opening - Mr. Gutwillig

1    in the Honduran narco state and guns.

2            At the end of the trial, you'll hear from an expert in

3    machine guns and other weapons, who will testify about the

4    capabilities of the arsenal of deadly weapons the defendant and

5    his associates used to protect their cocaine trafficking.

6    You'll also hear from law enforcement witnesses in this

7    investigation.  The defendant was untouchable in Honduras, but

8    he was not in the United States.

9            You'll hear from an agent with the Drug Enforcement

10   Administration about how the defendant was arrested in 2020 at

11   the airport in Miami.  That agent will describe the defendant's

12   postarrest interview in which he admitted, among other things,

13   that he was given the land to use for his cocaine laboratory

14   and that major Honduran drug traffickers, people you'll hear

15   about during this trial, were the defendant's friends.

16           One of the former drug traffickers at this trial was

17   at the heart of the defendant's cocaine distribution business,

18   Leonel Rivera.  Rivera will testify how he worked directly with

19   the defendant to distribute huge quantities of cocaine.  He

20   will tell you about the defendant's cocaine laboratory, and he

21   will tell you about the bribe the defendant paid.  Rivera will

22   describe the defendant's machine guns and other weapons used by

23   the defendant and his coconspirators.  He will tell you about

24   the defendant's involvement in torture and murder.

25           Make no mistake, Leonel Rivera has committed

L39KRAM2                    Opening - Mr. Gutwillig

1    unspeakable crimes.  He has admitted to his role in 78 murders,

2    in 15 attempted murders, and massive cocaine distribution.

3    Like the defendant, Rivera shipped tons and tons of cocaine to

4    the United States.  Rivera was the type of drug trafficker that

5    the defendant chose to work with, chose to help distribute the

6    cocaine the defendant was making in his lab.  They were

7    partners.  And because the defendant partnered with Leonel

8    Rivera, Rivera is a witness who will give you an insider's view

9    into the defendant's crimes.  The question will not be whether

10   you like Leonel Rivera, it will be whether you believe what he

11   says about the defendant's drug trafficking.  So, please listen

12   carefully when he testifies, scrutinize what he says, and ask

13   yourselves whether his testimony is consistent with, supported

14   by, backed up by the other evidence in this case.

15           Some of that other evidence will be the testimony of

16   regular people, ordinary people, who will tell you what they

17   saw and what they heard, people touched by the defendant's

18   violence and his corruption in Honduras.

19           For example, you'll hear from an accountant, José

20   Sanchez.  He'll tell you about meetings between the defendant

21   and the president.  You'll learn that José Sanchez worked for a

22   business in Honduras, that for over a decade, the defendant

23   used that business to launder drug money.  While Sanchez worked

24   at this company, he had a front-row seat to the defendant's

25   bribes.  You'll hear from Sanchez about the defendant's drug

L39KRAM2                    Opening – Mr. Gutwillig

1    lab, how Sanchez was sent there to deliver the payroll, deliver

2    the payroll to the defendant's armed workers.  And Sanchez will

3    tell you about a meeting weeks later when he saw the defendant

4    bribe a Honduran judge so that he wouldn't be prosecuted.

5          He'll tell you about finding a box in his office that

6    contained military uniforms, bulletproof vests, and police

7    badges.  That box contained a note that said "For Geovanny

8    Fuentes" with a seal from an Honduran military brigade.  And he

9    will tell you how he saw the defendant carrying that green

10   submachine gun he got from an Honduran military commander.

11         José Sanchez will tell you about the defendant's

12   meetings with the president, the shock, the fear he felt when

13   he saw the defendant sitting with the president, the surreal

14   scene that he saw next, how, after they had established their

15   partnership, the president told the defendant that together,

16   they would transport so much cocaine to the United States, that

17   they would, as the president put it, shove the drugs right up

18   the noses of the gringos, the Americans.

19         You'll also learn that the defendant had a phone with

20   him when the Drug Enforcement Administration arrested him in

21   Miami.  And you will see pictures and evidence from that phone,

22   pictures of guns, machine guns, assault rifles, shot guns, and

23   all sort of pistols, the tools of the defendant's vicious

24   trade, and the stacks of cash, the proceeds.

25         All of this evidence will lead to one conclusion,

L39KRAM2                              Opening - Mr. Gutwillig

1    beyond a reasonable doubt, that the defendant is guilty as

2    charged.  He imported thousands of kilograms of cocaine to the

3    United States, and he used guns and violence to do it.

4              At the end of this trial, after you've seen and heard

5    all the evidence, we'll have an opportunity to speak with you

6    again.  Until then, we ask that you please do three things:

7    First, pay close attention to all of the evidence; second,

8    follow Judge Castel's instructions on the law; and, finally,

9    use your common sense, the same common sense that you use in

10   your everyday lives.  If you do those three things, you will

11   reach the only verdict consistent with all the evidence in this

12   case — the defendant is guilty.

13             THE COURT:  Thank you, Mr. Gutwillig.

14             Mr. Gerber, my law clerk, will -- I don't want to

15   embarrass Mr. Gerber, but he is a top graduate of a very fine

16   law school, and he never thought that his job was going to

17   include wiping down latex or any kind of booth or plastic

18   surfaces, or using towels, et cetera, but he's very good at it.

19   So, this is now going to be a course that they're going to

20   teach in law schools.

21             MR. MOSKOWITZ:  Judge?

22             THE COURT:  Yes.

23             MR. MOSKOWITZ:  I know this is not your bailiwick, but

24   our communication devices are not --

25             THE COURT:  All right.  I will see what we can do

L39KRAM2                          Opening - Mr. Schulman

1    here.

2              (Pause)

3              THE COURT:  All right, Mr. Schulman.  Whenever you're

4    ready.

5              MR. SCHULMAN:  Thank you, your Honor.

6              This case is certainly about a violent drug

7    trafficker.  The government's case is built on the shoulders of

8    one of the most vicious murderers to have ever walked on this

9    earth and, certainly, one of the most vial characters ever to

10   testify on behalf of the United States Government.  His

11   testimony will make you sick to your stomach and have you

12   questioning how our government would have made a deal -- would

13   have agreed to make a deal with this devil.

14             Your Honor, counsel, members of the jury:  My name is

15   Eylan Schulman, and along with Avraham Moskowitz, we stand

16   before you representing Geovanny Fuentes Ramirez, an innocent

17   man, wrongly accused of very serious crimes.  As Judge Castel

18   has already told you, the burden of proof rests with the

19   government.  Right now and throughout this trial.  At this

20   point, Mr. Fuentes Ramirez is presumed innocent and will remain

21   that way throughout the trial.  The government must prove each

22   and every element of each and every charge beyond a reasonable

23   doubt before Geovanny can be convicted of anything.  This is a

24   burden that the government will be unable to meet because of

25   the doubt that you will be left with when you use your common

1    sense and you critically analyze the evidence.

2            You will see that the government's case is dependent

3    on self-interested witnesses, with too much to gain, too little

4    to lose, individuals who have made deals with the government to

5    gain leniency for a life of crime or immigration benefits that

6    will enable them to escape the dangerous violent situation in

7    Honduras.

8            The testimony of these desperate witnesses, eager for

9    freedom, will leave you shaking your head about how our

10   government could rely on their testimony.  But, please, don't

11   take my word for it; focus on the witness stand.  At the end of

12   the trial, after you listen to not only the direct

13   examinations, but the cross-examinations by Mr. Moskowitz and

14   me, I am confident that you will conclude that Geovanny is not

15   guilty of any of the crimes charged.

16           From the witnesses, you will learn the following:

17           Honduras, where Geovanny is from, is a country with

18   about 9 million people.  Honduras is known for exporting

19   coffee, bananas, palm oil, lumber.  The U.S. Government enjoys

20   a special relationship with Honduras as Honduras' chief trading

21   partner.  The evidence will show that the two governments share

22   information and work together to address legal challenges, like

23   immigration, narcotics trafficking, and human trafficking.  You

24   will see that in about 2013, Honduran President Juan Orlando

25   Hernandez, the same man that the government accuses of

1    accepting bribes and being complicit in narcotrafficking --

2              MR. GUTWILLIG:  Objection, your Honor.

3              THE COURT:  Overruled.

4              Ladies and gentlemen, as I have said, this is not

5    evidence, it's argument.  If a lawyer describes evidence in the

6    case that is not, in fact, evidence, then you should disregard

7    the statement because it's just a preview.

8              Go ahead.

9              MR. SCHULMAN:  You will see that President Hernandez

10   agreed to send those individuals who violated United States

11   laws to the United States to stand trial.  You may have heard

12   the term "extradition."  About that time, notorious drug

13   traffickers, including the government's star witness, a mass

14   murderer, responsible for the murders of at least 78 people,

15   started approaching the U.S. Government to make deals, in fear

16   that they would be extradited.

17             Please allow me to introduce you to Geovanny Fuentes

18   Ramirez.  Geovanny is 51 years old and has four children, three

19   sons from a prior marriage and five-year-old Priscilla from his

20   current wife, with whom he's been together for about six years.

21   Mr. Fuentes Ramirez also has four grandchildren.

22             THE COURT:  Is this evidence that's coming out in this

23   trial?

24             MR. SCHULMAN:  I expect it to, your Honor.

25             THE COURT:  Go ahead.

1          MR. SCHULMAN:  For the past ten years, Geovanny has

2    been involved in a business that he started, converting wood

3    into energy.  You will see that Geovanny was not the drug

4    trafficker that the government makes him out to be.  He's a man

5    who loves his family and friends and is working hard to make a

6    living, not unlike most people.

7          As a modestly successful businessman, in a dangerous

8    and violent country, Geovanny owned and carried firearms, which

9    he was licensed to carry, including automatic weapons.  You

10   will learn that Geovanny owned and carried those weapons to

11   protect himself in a country ravaged by gangs and

12   narcotraffickers.  Indeed, as his business became more

13   successful, he even had bodyguards to help protect him, not

14   unlike most moderately successful businesspeople in Honduras.

15         You will hear that Geovanny had a business mentor, a

16   man by the name of Fuad Jarufe, who started a rice company and

17   made political contributions to the Honduran president.  Jarufe

18   introduced Geovanny to the president of Honduras and other

19   politicians, including the Honduran vice president and members

20   of the military.  You will also learn that Geovanny came from a

21   small city called Choloma and grew up with some individuals who

22   became drug traffickers.  Geovanny's son, also known as

23   Geovanny, even ended up marrying the niece of the government's

24   star witness, one of the most violent drug traffickers in the

25   world, Devis Leonel Rivera Maradiaga.

1          During this trial, the government will ask you to

2     infer that just because Geovanny knew a few traffickers, he

3     himself was a drug trafficker.  But you know from your own

4     experience and common sense that that inference is not a fair

5     one.  The government's case rests primarily on the shoulders of

6     this mass murderer and international drug kingpin, who, along

7     with his brother, Javier were leaders of one of the world's

8     largest drug-trafficking organizations, known as Los Cachiros.

9     Leo Rivera will claim that Geovanny assisted him by offering

10    access to police and transporting drugs across Honduras.

11    Though Geovanny is related through marriage to this mass

12    murderer, the evidence will show that family means nothing to

13    this murderer.  Indeed, you will hear that amongst Leo Rivera's

14    78 murder victims were members of his own family.  For a person

15    with such little regard to human life, lying is easy, lying to

16    the prosecutors and lying to you.  The bigger question you will

17    be left with is why the government is even trusting him.

18         You will have doubts after hearing the details of some

19    of the 78 murders committed by this coldblooded killer.  The

20    killing of his sister-in-law in Canada while supposedly being

21    reformed and cooperating with our government.  The murder of

22    his own brother-in-law and the brother-in-law's father.  The

23    murder of an innocent female medical doctor.  The murder of a

24    Honduran judge who was a political opponent of one of this

25    man's lovers.  Journalists killed for writing stories that he

didn't like.  And the Honduran general who was leading the

anti-narcotics campaign murdered by this man as well.

This murderer should be facing the certainty of a life

behind bars, but, as you will hear, he made a deal with the

government that could set him free if the government writes a

letter recommending he get leniency, leniency despite all the

murders and leniency despite the tons and tons of cocaine that

he trafficked.  You will see that this murderer will say

anything to get that letter, and you will be left with doubts

about why the government ever made a deal with him.

You will see that he's a man who should never be

allowed to roam free in society and a man whose words, even

under oath, should never be believed.

Without this deal, Leo Rivera faced the prospect of

never being able to hug his wife and kids again, not being

present for his kids' graduations or weddings, and not being in

their lives at all.  By making a deal with the government, he

has a chance to return to society a free man.  You will be left

asking yourselves, how can that happen?

Another witness that you will hear from is an

accountant from an Honduran rice company.  The accountant will

tell you stories about processing bribes from Geovanny to the

president of Honduras.  Supposedly, $25,000 is all it costs to

bribe the president of a country.  He will show you no photos

and no proof.  You'll be forced to rely on the word of a man

L39KRAM2                     Opening - Mr. Schulman

with a lot to gain and little to lose.  Specifically, the

accountant has an asylum application pending with the

immigration service, and the evidence will show that he's

hoping to receive favorable treatment as a result of his

testimony.  This accountant has even asked the government to

reimburse him for his immigration attorney fees and to pay his

travel expenses.  Listen to his testimony carefully, and you

will see that the timing makes no sense.  Similar to the

murderer, the accountant needs the government to accept his

version and to support him, so that his immigration situation

is fixed.

          As important as the evidence that's brought before

you, pay attention to what you don't see connected to Geovanny.

You won't see photographs of Geovanny with drugs.  You won't

see drugs stamped with initials on them, which is typical for

drug traffickers.  You won't see drugs recovered or seized from

Geovanny.  You won't see ledgers with Geovanny's name in them.

You won't see photos of Geovanny with any nonregistered or

nonauthorized weapons.  You won't even see photos of Geovanny

with a gun.  You won't see police reports related to violent

incidents.  You won't see cash seized from Geovanny.  You won't

see pictures of all those men the government just told you were

guarding his lab.  You won't hear audio or see video of

Geovanny talking about drugs, narcotics, violence, or doing

anything illegal at all.  You won't see pictures of any of

L39KRAM2                        Opening - Mr. Schulman

1      those hidden airstrips you just heard about.

2              The government will show you pictures of guns and

3      money downloaded from Geovanny and his son's phones.  In the

4      social media world that we live in today, you will all know

5      that the images could have come from anywhere.  The government

6      won't tell you who took the pictures, when the pictures were

7      taken, or whose money is even shown.  Don't be fooled by the

8      images.  Though the government asks you to conclude that since

9      Geovanny's son had photos on his phone after Geovanny's arrest,

10     that somehow proves that Geovanny is a drug dealer.

11             Finally, as you listen to the testimony and look at

12     the exhibits, pay close attention to the inferences the

13     government is asking you to draw.  The government will show you

14     chats in which Geovanny discussed events in his homeland and

15     ask you to conclude that the chats prove that he was a drug

16     dealer.

17             As you will see, the conclusions are not reasonable

18     and don't support the government's claims against Geovanny.

19     The government will make a big deal about Geovanny having

20     friends in law enforcement.  Since when is that a crime?

21             I won't discuss every witness who will testify.

22     Geovanny trusts that you will critically analyze the evidence,

23     bring your life experience to evaluating the information

24     presented.  Your common sense is the most important tool of

25     all.  Reserve judgment until the end of the case.  Listen to

L39KRAM2                    Opening - Mr. Schulman

1    not only the witnesses' direct examinations, but their

2    cross-examinations as well.  Notice the way the witness'

3    demeanor changes on cross-examination, because it's often

4    through cross-examination that the truth comes to light.

5          Geovanny has been waiting to clear his name, for the

6    opportunity to have a jury like you examine the evidence and

7    take a three-dimensional look.  Go beyond the sensational

8    accusations and the name-dropping, beyond the fact that

9    Geovanny may know a particular government official or grew up

10   with a person who later became a drug trafficker.  You will be

11   left with doubts.  Geovanny has been waiting for justice, to

12   return to his family, and to enjoy the back end of his life.

13         At the end of the case, my colleague, Mr. Moskowitz,

14   will stand before you and deliver you a closing argument.

15   Mr. Moskowitz will ask you to return the only verdict

16   consistent with justice, with the evidence, and with truth — a

17   verdict of not guilty.

18         Thank you.

19         THE COURT:  Thank you, Mr. Schulman.

20         Ladies and gentlemen, would you like a break now, or

21   should we resume with the first witness?  You're okay going

22   ahead, or would anybody like a break?  Okay.  So let's take a

23   ten-minute recess.

24         Ladies and gentlemen, please do not discuss the case

25   among yourselves or with anyone.  We'll be back in action in

L39KRAM2

1    ten minutes, and you may go down to room 11B.  Thank you.

2              Please do not leave the courtroom until the jurors

3    have exited.

4              (Jury not present)

5              THE COURT:  All right.  We are in recess.

6              (Recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L39HRAM3

1          THE COURT:  Please be seated.  Jury entering.

2          (Jury present)

3          THE COURT:  All right.  Ladies and gentlemen, we're

4     ready to begin.

5          The government may call its first witness.

6          MR. LOCKARD:  The government has one short stipulation

7     to read.

8          THE COURT:  Yes.

9          MR. LOCKARD:  And then we call Special Agent Brian

10    Fairbanks.

11         THE COURT:  All right.  Is this a stipulation of fact

12    or testimony?

13         MR. LOCKARD:  It is a stipulation of fact, your Honor.

14         THE COURT:  All right.  Ladies and gentlemen, a

15    stipulation of fact is an agreement between the parties in this

16    case that a certain fact is so.  You must treat that fact as

17    having been established.  However, the weight, if any, of that

18    fact is entirely up to the jury to decide.

19         You may proceed.

20         MR. LOCKARD:  Thank you, your Honor.

21         In the matter of the United States of

22    America v. Geovanny Fuentes Ramirez --

23         THE COURT:  All right.  We're going to have to have

24    you maybe lift the microphone up on a book or a box or

25    something or you're going to have to get closer to it.  And, of

L39HRAM3

1  course, you may take your mask off.

2          MR. LOCKARD:  In the matter of the United States of

3  America v. Geovanny Fuentes Ramirez, it is hereby stipulated

4  and agreed by and among the United States of America by Audrey

5  Strauss, United States Attorney for the Southern District of

6  New York, Jacob Gutwillig and Michael Lockard, Assistant United

7  States Attorneys, of counsel, and Geovanny Fuentes Ramirez, the

8  defendant, by and with the consent of his attorneys, Avery

9  Moskowitz, Esq., and Eylan Schulman, Esq., that:

10         1.  Government Exhibit 103 is a photograph of Geovanny

11 Fuentes Ramirez, the defendant, taken on or about March 1,

12 2020, and is a true and accurate depiction of the defendant.

13         2.  Government Exhibit 103 and this stipulation marked

14 Government Exhibit 1004 may be received in evidence at trial.

15         THE COURT:  All right.  And you're offering the

16 exhibit and the stipulation?

17         MR. LOCKARD:  The government offers Exhibit 1004 and

18 Government Exhibit 103.

19         THE COURT:  Any objection?

20         MR. MOSKOWITZ:  No objection, Judge.

21         THE COURT:  Received.

22         MR. LOCKARD:  The government calls DEA Special Agent

23 Brian Fairbanks.

24         (Government's Exhibits 103 and 1004 received in

25 evidence)

L39HRAM3                          Fairbanks - Direct

1    BRIAN FAIRBANKS,

2            called as a witness by the Government,

3            having been duly sworn, testified as follows:

4                  THE COURT:  You may inquire.

5                  MR. LOCKARD:  Thank you, your Honor.

6    DIRECT EXAMINATION

7    BY MR. LOCKARD:

8    Q.  Mr. Fairbanks, who is your employer?

9    A.  The Drug Enforcement Administration.

10   Q.  What is your title?

11   A.  Special agent.

12   Q.  For how long have you been a special agent with the DEA?

13   A.  Since 2009.

14   Q.  Where were you first assigned?

15   A.  I was first assigned in Nogales, Arizona.

16   Q.  For how long were you assigned in Nogales, Arizona?

17   A.  Approximately six and a half years.

18   Q.  Generally speaking, what types of cases did you investigate

19   during your assignment in Nogales?

20   A.  Generally speaking, we did a lot of drug

21   transportation-type cases from Mexico.

22   Q.  What types of drugs?

23   A.  All types of illegal drugs: cocaine, heroin, meth,

24   marijuana.

25   Q.  After your assignment in Nogales, where were you next

L39HRAM3                          Fairbanks - Direct

1   assigned?

2   A.   Tucson, Arizona.

3   Q.   And for how long were you in Tucson?

4   A.   Approximately two years.

5   Q.   After Tucson, where were you assigned next?

6   A.   I was assigned to our special operations division in

7   Virginia.

8   Q.   Is that your current assignment?

9   A.   It is.

10   Q.   Are you assigned to any particular group within the special

11   operations division?

12   A.   I am.  I'm assigned to the bilateral investigations unit.

13   Q.   What types of investigations does the bilateral

14   investigations unit conduct?

15   A.   It conducts large-scale international drug trafficking

16   investigations.

17   Q.   Agent Fairbanks, I'd like to direct your attention to

18   March 1, 2020.  Were you on duty that day?

19   A.   I was.

20   Q.   Where were you working?

21   A.   I was working in Miami.

22   Q.   Did you conduct any law enforcement actions on that day?

23   A.   I did.

24   Q.   What did you do on March 1 of 2020?

25   A.   We arrested Geovanny Fuentes at the Miami International

L39HRAM3                          Fairbanks – Direct

1    Airport.

2              MR. LOCKARD:  Ms. Hurst, could you pull up Government

3    Exhibit 103, please.

4    Q.  Do you recognize that individual?

5    A.  I do.

6    Q.  Who is that?

7    A.  That's Geovanny Fuentes.

8    Q.  What, if any, electronic devices did the defendant have

9    with him when he was arrested?

10   A.  He had two cell phones.

11   Q.  I'd like to direct your attention to what's been marked as

12   Government Exhibit 201, which should be with you in the witness

13   box.

14             THE COURT:  Excuse me, sir.

15             (Discussion off the record)

16   BY MR. LOCKARD:

17   Q.  Do you have Exhibit 201?

18   A.  I do.

19   Q.  Do you recognize it?

20   A.  I do.

21   Q.  And how do you recognize it?

22   A.  I recognize it by the case number, exhibit number, and my

23   signature on the back.

24   Q.  And what does Government Exhibit 201 consist of?

25   A.  201 is the cell phones that we took from Geovanny Fuentes.

L39HRAM3                       Fairbanks - Direct

1           MR. LOCKARD:  Your Honor, the government will now read

2      another stipulation that is marked as Government Exhibit 1001.

3           THE COURT:  Please proceed.

4           MR. LOCKARD:  In the matter of the United States of

5      America v. Geovanny Fuentes Ramirez, it is hereby stipulated

6      and agreed by and between the United States of America, by

7      Audrey Strauss, United States Attorney, Jacob Gutwillig and

8      Michael Lockard, Assistant United States Attorneys, and

9      Geovanny Fuentes Ramirez, by and through his attorneys, Avram

10     Moskowitz, Esq., and Eylan Schulman, Esq., that:

11          1.  On March 1, 2020, Geovanny Fuentes Ramirez was

12     arrested before boarding an international flight at Miami

13     International Airport.  In connection with Ramirez's arrest,

14     law enforcement officers lawfully seized from Ramirez the

15     following electronic devices:  (a) an iPhone cell phone, (the

16     "Ramirez iPhone"), and (2) a Samsung cell phone (the "Ramirez

17     Samsung phone").

18          If called to testify, Joseph Suszko, an investigative

19     technology specialist with the Drug Enforcement Administration,

20     would testify that:

21          3.  Government Exhibit 201 is the Ramirez iPhone.

22          4.  Government Exhibit 201-R is a disc that contains a

23     report and related files that were lawfully extracted from the

24     cell phone marked Government Exhibit 201 and are true and

25     accurate copies of data and records from Government

L39HRAM3                         Fairbanks - Direct

Exhibit 201.

　　　　　5.  Government Exhibit 202 is the Ramirez Samsung
phone.

　　　　　6.  Government Exhibit 202-R is a disc that contains a
report and related files that were lawfully extracted from the
cell phone marked Government Exhibit 202 and are true and
accurate copies of data and records from Government
Exhibit 202.

　　　　　It is further stipulated and agreed that this
stipulation marked Government Exhibit 1001 may be received in
evidence at the trial in the above-referenced matter.

　　　　　And the government offers the stipulation Government
Exhibit 1001.

　　　　　MR. MOSKOWITZ:  No objection.

　　　　　THE COURT:  Received.

　　　　　(Government's Exhibit 1001 received in evidence)

BY MR. LOCKARD:

Q.  Special Agent Fairbanks, I'd like to now draw your
attention to a disc that should be with you there in the
witness box.  That should be labeled Government Exhibit 200-D,
as in delta.

A.  The disc?  Yes.

Q.  OK.  Do you recognize the disc, Government Exhibit 200-D?

A.  I do.

Q.  And how do you recognize that disc?

L39HRAM3                          Fairbanks - Direct

1   A.  I recognize my initials and date on the corner of it.

2   Q.  Before your testimony today, did you review the contents of

3   that disc?

4   A.  I did.

5   Q.  Did you compare the records on that disc to electronic

6   records and data in Government Exhibit 201-R?

7   A.  Yes, sir.

8   Q.  And does that disc contain electronic data that was pulled

9   from or copied from Government Exhibit 201-R?

10  A.  It does.

11          MR. LOCKARD:  So there are a series of exhibits on

12  that disc that the government would now offer and can read the

13  exhibit numbers accordingly.  They are Government Exhibit 201-1

14  through 201-14, 201-50 through 201-59, 201-100 through 201-114,

15  201-150 through 201-171, and 201-200 and 201-201.

16          THE COURT:  Any objection?

17          MR. MOSKOWITZ:  Your Honor, may we approach?

18          THE COURT:  Sure.

19          (Continued on next page)

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  Yes, Mr. Moskowitz.

3          MR. MOSKOWITZ:  Your Honor, as your Honor recalls, we

4    had a discussion yesterday about these exhibits and the hard

5    copies that we have and, in fact, the computerized copies that

6    we have have in them the materials that your Honor ruled cannot

7    be offered.  So --

8          THE COURT:  You're talking about the newspaper

9    headlines?

10          MR. MOSKOWITZ:  Yes.

11          THE COURT:  Yes.

12          MR. MOSKOWITZ:  So --

13          THE COURT:  Or the front covers of the newspapers, to

14    be more specific.

15          MR. MOSKOWITZ:  In accepting them, I don't know where

16    the government's starting and where it's ending.

17          THE COURT:  Well, let's find out.

18          MR. LOCKARD:  Fair enough.  That's an oversight on my

19    part.  We can retract our offering some of those exhibits, and

20    we'll just focus on the ones that aren't affected by the

21    Court's in limine ruling.

22          THE COURT:  If you can do that, is there a way you can

23    do that, you can do that right now?

24          MR. LOCKARD:  Yes, we can do it right now.

25          THE COURT:  Do it on the record right here.

L39HRAM3                        Fairbanks – Direct

1           MR. LOCKARD:  One thing that I'll just front for both

2    Mr. Moskowitz and for the Court, the Court had one *in limine*

3    ruling about a particular video recording.

4           THE COURT:  Yes.

5           MR. LOCKARD:  The Court is use the limiting

6    instruction.

7           THE COURT:  Sosa?

8           MR. LOCKARD:  Yes.  Our proposal was just to ask a

9    leading question that complies with the Court's ruling.

10          THE COURT:  That's fine.

11          MR. MOSKOWITZ:  I assumed that would be fine.

12          THE COURT:  Right.  And I'm going to ask -- this is

13   understandable, but I'm going to ask both sides to endeavor to

14   keep the sidebars to a minimum.  That is a pandemic

15   requirement, actually.

16          MR. MOSKOWITZ:  Understood.

17          THE COURT:  Thank you.

18          (Continued on next page)

19

20

21

22

23

24

25

1              (In open court; jurors present)

2              THE COURT:  Please proceed, Mr. Lockard.

3              MR. LOCKARD:  Thank you, Judge.

4              The government offers Government Exhibit 201-50

5    through 201-59.

6              THE COURT:  You're withdrawing your last offer and

7    you're making a new offer, is that what you're doing, sir?

8              MR. LOCKARD:  Correct, your Honor.

9              THE COURT:  OK.

10             MR. LOCKARD:  Government Exhibit 201-50 through

11   201-59, 201-100 through 201-114, 201-150 through 201-171,

12   201-200 and 201-201.

13             MR. MOSKOWITZ:  May I have a brief moment, Judge?  I

14   have objections to some of them, Judge.

15             THE COURT:  All right.  You want to state your

16   objections, or what are we doing here?

17             MR. MOSKOWITZ:  I'm happy to state the objections,

18   Judge.

19             THE COURT:  Go ahead.

20             MR. MOSKOWITZ:  201-51, relevance.  201-52, relevance.

21             THE COURT:  All right.  Can you show me the exhibits?

22   Do you have the exhibits there, Mr. Lockard?  201-01, go ahead.

23             MR. MOSKOWITZ:  We started with 201-51, Judge.

24             THE COURT:  All right.  I can't see the number on the

25   screen the way it's projected.  Somebody want to read -- now I

L39HRAM3                          Fairbanks - Direct

1     can read it.  Go ahead.  Next one.

2               MR. MOSKOWITZ:  52.

3               THE COURT:  Go ahead.

4               MR. MOSKOWITZ:  56, 57.

5               THE COURT:  Wait a minute.  Blow it up larger, please.

6     OK.  Go ahead.

7               MR. MOSKOWITZ:  Just running through them, Judge.

8               No objections to the ones 100 through 114.

9               THE COURT:  They're received.

10              (Government's Exhibits 201-100 through 201-114

11    received in evidence)

12              MR. MOSKOWITZ:  And no objections to 150 through 171.

13              THE COURT:  All right.  Keep your voice up and speak

14    into the microphone when you speak.

15              MR. MOSKOWITZ:  No objections to 150 to 171.

16              THE COURT:  All right.  They're received.

17              (Government's Exhibits 201-150 through 201-171

18    received in evidence)

19              THE COURT:  Are you done, Mr. Moskowitz?

20              MR. MOSKOWITZ:  Yes, I'm done, Judge.  Those are it.

21              THE COURT:  OK.  Thank you.

22              With regard to the ones where an objection has been

23    lodged, I'll allow the government to lay a foundation with the

24    witness.  The others have been received.

25              OK.  Go ahead.

1          MR. LOCKARD:  OK.  Ms. Hurst, could you please pull up

2     Government Exhibit 201-57, which is now in evidence.

3     Q.  Special Agent Fairbanks, do you recognize this photo?

4     A.  I do.

5          THE COURT:  Keep your voice up, Mr. Lockard.

6          MR. LOCKARD:  Yes, your Honor.

7     Q.  Is that a photograph that was on the defendant's cell

8     phone?

9     A.  Yes, sir.

10    Q.  Do you recognize any of the individuals in the photograph?

11    A.  Yes, sir, I do.

12    Q.  Who do you recognize?

13    A.  I recognize the defendant, Mr. Fuentes, one of his sons and

14    what appears to be John Frederick Jarufe Dox.

15         MR. LOCKARD:  Ms. Hurst, could you pull up

16    Exhibit 201-58.

17         THE COURT:  Ladies and gentlemen, are you able to see

18    all right?  Yes.  OK.  Thank you.

19         MR. LOCKARD:  I think, depending on the size of the

20    image, we may be able to enlarge them somewhat if some of them

21    are difficult to see.

22    Q.  Special Agent Fairbanks, do you recognize this photograph?

23    A.  I do.

24    Q.  Was this also found on the defendant's cell phone?

25    A.  Yes, sir.

1   Q.  Who does that depict?

2   A.  It appears to depict Mr. Fuentes.

3           MR. LOCKARD:  Ms. Hurst, could you pull up

4   Exhibit 201-159.

5   Q.  Agent Fairbanks, do you recognize anyone in this

6   photograph?

7   A.  Yes, sir.

8   Q.  Who do you recognize?

9   A.  It appears to be one of Geovanny's sons to my left as I

10  look at the photo.

11          MR. LOCKARD:  Could we now look at Government

12  Exhibit 201-102.

13  Q.  Agent Fairbanks, do you recognize this photograph?

14  A.  Yes, sir.

15  Q.  Is this a photograph that was on the defendant's cell

16  phone?

17  A.  Yes, it is.

18  Q.  What is depicted in this photograph?

19  A.  AR-15-style rifle.

20          MR. LOCKARD:  Can we see Government Exhibit 201-105.

21  Perhaps enlarge that just a bit.  Thank you, Ms. Hurst.

22  Q.  Agent Fairbanks, do you recognize this photograph?

23  A.  Yes, sir.

24  Q.  What appears to be depicted here?

25  A.  It appears to be a Honduran license for an AR-15-style

L39HRAM3                           Fairbanks - Direct

1    rifle.

2    Q.  And a license apparently issued to whom?

3    A.  To Geovanny Daniel Fuentes Ramirez.

4         MR. LOCKARD:  Ms. Hurst, pull up Exhibit 201-165.

5    Q.  Agent Fairbanks, do you recognize this photograph?

6    A.  Yes, sir.

7    Q.  Is this a photograph from the defendant's cell phone?

8    A.  Yes, sir, it is.

9    Q.  And what appears to be listed in the enumerated lines?

10   A.  It appears to be weapons and with serial numbers.

11   Q.  Do you have an understanding of what this list appears to

12   be?

13   A.  It appears to be weapons that are registered in a name, in

14   someone's name.

15        MR. LOCKARD:  Let's turn to Government

16   Exhibit 201-100.

17   Q.  Agent Fairbanks, do you recognize this photograph?

18   A.  Yes, sir.

19   Q.  Is this a photograph from the defendant's cell phone?

20   A.  It is.

21   Q.  What appears to be depicted here?

22   A.  Approximately five AR-15-style rifles laid on a beach

23   towel.

24   Q.  Are any of the serial numbers of these AR-15-style rifles

25   discernible from this photograph to your eye?

L39HRAM3                      Fairbanks - Direct

```
 1    A.  No, sir.
 2              MR. LOCKARD:  Could we turn to Government
 3    Exhibit 201-103.
 4    Q.  Agent Fairbanks, do you recognize this photograph?
 5    A.  Yes, sir.
 6    Q.  Is this a photograph from the defendant's cell phone?
 7    A.  It is.
 8    Q.  And what is depicted here?
 9    A.  It appears to be an up-close picture of the AR-15-style
10    rifle.
11    Q.  And from your view of this photograph, does the serial
12    number of that weapon appear to be discernible?
13    A.  No.
14              MR. LOCKARD:  Ms. Hurst, could you bring up
15    Exhibit 201-101.
16    Q.  Agent Fairbanks, do you recognize this photograph?
17    A.  Yes, sir.
18    Q.  Is this also from the defendant's cell phone?
19    A.  It is.
20    Q.  What appears to be depicted here?
21    A.  It appears to be a screenshot of a WhatsApp communication.
22              THE COURT:  Ladies and gentlemen, can you see it?  All
23    right.  Good.  Thank you.
24              MR. LOCKARD:  At this time the government has another
25    stipulation to read.
```

1            THE COURT:  All right.  Please proceed.

2            MR. LOCKARD:  In the matter of the United States of

3    America v. Geovanny Fuentes Ramirez, it is hereby stipulated

4    and agreed by and between the United States of America, by

5    Audrey Strauss, United States Attorney, Jacob Gutwillig and

6    Michael Lockard, Assistant United States Attorneys, and

7    Geovanny Fuentes Ramirez, by and through his attorneys, Avram

8    Moskowitz, Esq., and Eylan Schulman, Esq.:

9            1.  If called to testify, Maria Elana Alvarado, an

10   expert in the translation of Spanish to English, would testify

11   that the following government exhibits are fair and accurate

12   English translations or transcripts of Spanish writing or audio

13   appearing in the corresponding exhibit numbers.

14           And what follows is a chart of a little bit more than

15   two pages of English translation exhibits and the corresponding

16   original exhibit which I can read or, if your Honor prefers, I

17   can hand to the court reporter.

18           THE COURT:  All right.

19           MR. LOCKARD:  Skipping down past the end of the chart,

20   the stipulation continues:

21           It is further stipulated and agreed that this

22   stipulation marked Government Exhibit 1002 may be received in

23   evidence at the trial in the above-referenced matter.

24           So at this time the government offers Government

25   Exhibit 1002.

L39HRAM3                          Fairbanks - Direct

1           THE COURT:  This is the translation?

2           MR. LOCKARD:  That's correct, your Honor.

3           THE COURT:  All right.

4           MR. MOSKOWITZ:  No objection.

5           THE COURT:  OK.  It's received.

6           (Government's Exhibit 1002 received in evidence)

7           THE COURT:  And tell me, the translations are of what,

8    sir?

9           MR. LOCKARD:  The translations are of Spanish writing

10   or audio appearing in the exhibits listed on the right-hand

11   column in the stipulation.

12          THE COURT:  All right.  Ladies and gentlemen, the

13   translations are certified translations, and you must accept

14   the accuracy of the translations.  The exhibits themselves are

15   the evidence.  These are the translations, and you must accept

16   them.  All right.

17          MR. LOCKARD:  At this time the government offers

18   Exhibit 201-101-T.

19          THE COURT:  Any objection?

20          MR. MOSKOWITZ:  No objection.

21          THE COURT:  Received.

22          (Government's Exhibit 201-101-T received in evidence)

23          MR. LOCKARD:  OK.  Ms. Hurst, if you could please pull

24   up that exhibit, and turning to the next page.

25   BY MR. LOCKARD:

L39HRAM3                          Fairbanks - Direct

1    Q.  So, Agent Fairbanks, we have here a translation of the

2    exhibits we were just looking at.  Could you please tell us the

3    translation in English of the text line marked No. 9 from the

4    sender Cristhian Bienes Raices.

5    A.  It states, "They are here in SPS."

6    Q.  And do you understand what "SPS" refers to?

7    A.  I do.

8    Q.  What does it refer to?

9    A.  Usually refers to San Pedro Sula town in Honduras.

10   Q.  And then in line 11, what is the message that Cristhian

11   Bienes Raices sends there?

12   A.  "$2,500."

13   Q.  And then on line 13?

14   A.  "Each."

15           MR. LOCKARD:  Ms. Hurst, if you could expand the

16   photograph that's in line 3 of that text.

17   Q.  Agent Fairbanks, what do you see depicted in that

18   photograph?

19   A.  It appears to be, on the top part of the photograph, an

20   AR-15-style rifle and then below it individually Saran Wrapped,

21   what I take it as, individually Saran Wrapped rifles.

22   Q.  And is the individual Saran Wrapping consistent with

23   original manufacturer packaging?

24   A.  Not in my experience, sir.

25   Q.  What do you understand the sender Cristhian Bienes Raices

1    to be sending in this text?

2              MR. MOSKOWITZ:  Objection, Judge.

3              THE COURT:  No, I'm going to allow it.

4              Ladies and gentlemen -- first of all, let me ask

5    Mr. Lockard to lay a foundation for this witness' ability to

6    offer testimony on his view of the meaning of the words.

7              MR. LOCKARD:  Your Honor, I think we can actually --

8    we can forgo that question and move on to the next exhibit.

9              Ms. Hurst, if you could pull up Government

10   Exhibit 201-107.

11   Q.  Agent Fairbanks, are you familiar with this photograph?

12   A.  Yes, sir.

13   Q.  Is this also a photograph from the defendant's cell phone?

14   A.  Yes, sir, it is.

15   Q.  What appears to be depicted here?

16   A.  Appears to be a shotgun.

17   Q.  Turning to Government Exhibit 201-100 -- I'm sorry, 110, my

18   error, Agent Fairbanks, are you familiar with that photograph?

19   A.  Yes, sir.

20   Q.  Is that also a photograph from the defendant's cell phone?

21   A.  It is.

22   Q.  What's depicted in this photograph?

23   A.  Appears to be a shotgun on the ground.

24   Q.  Turning now to Government Exhibit 201-104, is this a

25   photograph from the defendant's cell phone?

1   A.  Yes, sir, it is.

2   Q.  What do you see depicted in this photograph?

3   A.  It appears that there's a male individual looking at a

4   handgun and a handgun case.

5   Q.  Turning to Government Exhibit 201-112, is this a photograph

6   from the defendant's cell phone?

7   A.  Yes, sir.

8   Q.  What's depicted in this photograph?

9   A.  Another handgun.

10  Q.  Is this handgun in a case?

11  A.  It is in a case.  It also has a magazine up on top and what

12  I would call replacement grips on the bottom right-hand side of

13  the photo.

14  Q.  OK.  For the benefit of the jury, could you explain in

15  general terms what a replacement grip is.

16  A.  Yes.  The back of the weapon, you can adjust how thick it

17  is and how far it sticks out from your hand.  So depending how

18  big you are, usually when you buy a new handgun, at least my

19  experience with Glocks, they'll put a couple extra in there so

20  you can customize a little bit the back of the handle, of the

21  grip.

22  Q.  Turning to Government Exhibit 201-108, is this a photograph

23  from the defendant's cell phone?

24  A.  Yes, sir.

25  Q.  What's depicted in this photograph?

1    A.  Another handgun along with two extra magazines and, again,

2    some extra grip, it appears.

3    Q.  Does this appear to be the same type of handgun that we

4    just saw in Exhibit 201-112?

5    A.  Was that the one you just previously showed me?

6    Q.  Yeah.

7           Ms. Hurst, maybe we could pull them up side by side.

8    A.  Sorry.  No, they do not appear to be the same.

9           MR. LOCKARD:  If we could turn to Government

10   Exhibit 201-111.

11   Q.  Agent Fairbanks, is this a photograph from the defendant's

12   cell phone?

13   A.  It is.

14   Q.  And what appears to be depicted here?

15   A.  A hand holding a handgun.

16          MR. LOCKARD:  And could we turn now to Government

17   Exhibit 201-113.

18   Q.  What appears to be depicted here?

19   A.  Another handgun.

20          MR. LOCKARD:  If we could pull up 201-111 again.

21   Actually, instead of 111, let's pull up 201-108 next to

22   201-113.

23   Q.  Do these appear to be the same handgun?

24   A.  No, sir.

25   Q.  And what's different between the two of them?

1    A.  I would say the writing at the very top where it says

2    "CZ P-07" on the left hand of the photo, left picture looks

3    like it's in white and on the right it looks like it's the

4    color black.

5          MR. LOCKARD:  Ms. Hurst, could we see Government

6    Exhibit 201-114.

7    Q.  Agent Fairbanks, is this a photograph from the defendant's

8    cell phone?

9    A.  Yes, sir.

10   Q.  And what's depicted here?

11   A.  A hand holding a handgun with the box in the background.

12   Q.  And turning now to Government Exhibit 201-109, is this also

13   a photograph from the defendant's cell phone?

14   A.  Yes, sir.

15   Q.  And what appears to be depicted here?

16   A.  It appears to be a handgun.

17         MR. LOCKARD:  And if we could turn now to Government

18   Exhibit 201-106.

19   Q.  What appears to be depicted here, Agent Fairbanks?

20   A.  It appears to be, again, a hand holding a pistol with an

21   extended magazine out the bottom of the pistol.

22   Q.  And could you briefly explain what you mean by "an extended

23   magazine."

24   A.  Yes, sir.  The extended magazine would allow you to have

25   more rounds so you wouldn't have to reload as often if that's

1   pushed all the way in.

2   Q.  And is this a photograph from the defendant's cell phone?

3   A.  Yes, sir, it is.

4   Q.  And does the style of handgun depicted in this photograph

5   appear to be the same as any of the previous handguns that

6   we've seen?

7   A.  No, sir.

8   Q.  I'd like to turn now to Government Exhibit 201-168.  Agent

9   Fairbanks, are you familiar with this photograph?

10  A.  Yes, sir, I am.

11  Q.  Is this from the defendant's cell phone?

12  A.  Yes, sir, it is.

13  Q.  What appears to be depicted here?

14  A.  Appears that Mr. Fuentes is holding what appears to be cash

15  of some kind.

16  Q.  Are you able to determine the type of currency or the

17  amount from this photograph?

18  A.  No, sir.

19  Q.  Turning now to Government Exhibit 201-154, Agent Fairbanks,

20  is this a photograph from the defendant's cell phone?

21  A.  Yes, sir.

22  Q.  What appears to be depicted here?

23  A.  It appears to be a pile of cash in the middle of the table.

24  It appears to me that that's Cristian Fuentes, Mr. Fuentes'

25  brother, and perhaps some currency by his right elbow, the left

L39HRAM3                         Fairbanks - Direct

1    side of the photo.

2    Q.   From this photograph are you able to determine the amount

3    of currency shown on the table in front of his brother or at

4    his elbow?

5    A.   No.

6    Q.   Turning now to Government Exhibit 201-167, Agent Fairbanks,

7    is this a photograph from the defendant's cell phone?

8    A.   Yes, it is.

9    Q.   What appears to be depicted here?

10   A.   Appears to be bundles of U.S. currency.

11   Q.   I'd like to turn now to Government Exhibits 201-54 and

12   201-55.  Agent Fairbanks, do you recognize this?

13   A.   Yes, sir.

14   Q.   And what's represented in Government Exhibit 201-54?

15   A.   Some of the contacts that were found in Mr. Fuentes' phone.

16   Q.   And turning to 201-55, are these additional contacts from

17   the defendant's cell phone?

18   A.   Yes, sir.

19            THE COURT:  Yes?  Can't see it?  Thank you.

20            MR. LOCKARD:  Government offers Government

21   Exhibits 201-54 and -55.

22            THE COURT:  Any objection?

23            MR. MOSKOWITZ:  No objection.

24            THE COURT:  Received.

25            (Government's Exhibits 201-54 and 201-55 received in

evidence)

            THE COURT:  Are you publishing it now?  Yes.

            Can you see it now?  Sometimes there's a delay.  Let

me know when you can see it.  Yes?  OK.  Good.  Thank you.

BY MR. LOCKARD:

Q.  So we're now looking at some contact information from the

defendant's cell phone.  Before we get into these particulars,

Agent Fairbanks, are you also familiar with contact information

from an iCloud account of the defendant's son Geovanny David

Fuentes Ramirez?

A.  Yes, sir.

            MR. LOCKARD:  Your Honor, we have another stipulation

to read.

            This is a stipulation that has been marked for

identification as Government Exhibit 1006.  It reads:

            In the matter of the United States of

America v. Geovanny Fuentes Ramirez, it is hereby stipulated

and agreed by and between the United States of America, by

Audrey Strauss, United States Attorney, Jacob Gutwillig and

Michael Lockard, Assistant United States Attorneys, and

Geovanny Fuentes Ramirez, by and through his attorneys, Avram

Moskowitz, Esq., and Eylan Schulman, Esq., that:

            1.  If called to testify, a records custodian from

Apple Inc. ("Apple") would testify that Government Exhibits 901

through 935 are true and accurate copies of electronic records

L39HRAM3                        Fairbanks - Direct

1    stored in the Apple iCloud account gfuentes10@iCloud.com

2    maintained by Apple on its server and which were stored by

3    Apple in the ordinary course of its business.

4              2.  This stipulation may be received in evidence at

5    trial as Government Exhibit 1006.

6              And the government offers Government Exhibit 1006.

7              MR. MOSKOWITZ:  No objection to the stipulation.

8              THE COURT:  And the underlying exhibits themselves, is

9    that correct?

10             MR. LOCKARD:  We do offer those as well.

11             THE COURT:  OK.  Any objection?

12             MR. MOSKOWITZ:  Yes, Judge.  Objection to the

13   exhibits.

14             THE COURT:  OK.  Let me hear your objection.

15             MR. MOSKOWITZ:  Sidebar or open court?

16             THE COURT:  All right.  I'll hear you at sidebar.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  Was this the subject of an *in limine*

3    objection?

4          MR. MOSKOWITZ:  Yes, Judge.

5          THE COURT:  And how did I rule?  If you want to

6    preserve your objection, you can just preserve your objection.

7          MR. MOSKOWITZ:  Your Honor, at this point your Honor

8    has said that your Honor would take these things subject to

9    connection.

10          THE COURT:  Right, yes.

11          MR. MOSKOWITZ:  So this is -- this is exactly the

12    point.  We were at the very beginning of the case.  There's no

13    context for the jurors to see any of this.

14          THE COURT:  No, it's subject to connection.  It's not

15    connection first.  It's subject to connection.  If the

16    government fails to lay the connection, then I'll consider a

17    motion to strike, and I think, as I said very clearly, you may

18    have other applications that you would make if they were

19    appropriate.

20          MR. MOSKOWITZ:  Very well.

21          THE COURT:  So I think I addressed this.

22          (Continued on next page)

23

24

25

1              (In open court; jurors present)

2              THE COURT:  The exhibits are received into evidence.

3              (Government's Exhibits 901 through 935 and 1006

4     received in evidence)

5              THE COURT:  Go ahead.

6              MR. LOCKARD:  Thank you, your Honor.

7              Ms. Hurst, can we look at Government Exhibit 926 and

8     927.

9     BY MR. LOCKARD:

10    Q.  Special Agent Fairbanks, do you recognize these two

11    exhibits?

12    A.  Yes, sir.

13    Q.  What is reflected in Government Exhibits 926 and 927?

14    A.  They are contacts from the iCloud of Geovanny Gutierrez,

15    Mr. Fuentes' son.

16             MR. LOCKARD:  At this time the government has a

17    further stipulation.

18             THE COURT:  All right.

19             MR. LOCKARD:  This is marked Government Exhibit 1005.

20             In the matter of the United States of

21    America v. Geovanny Fuentes Ramirez, it is hereby stipulated

22    and agreed by and among the United States of America, by Audrey

23    Strauss, United States Attorney for the Southern District of

24    New York, Jacob Gutwillig and Michael Lockard, Assistant United

25    States Attorneys, of counsel, and Geovanny Fuentes Ramirez, the

L39HRAM3                              Fairbanks – Direct

defendant, by and with the consent of his attorneys, Avram

Moskowitz, Esq., and Eylan Schulman, Esq., that:

        1.  If called to testify, a custodian from the United

States Department of State would testify that Government

Exhibits 801, 802, 803, 804, 805, 806, 807, 808, 809, 810, 811,

812, 813, 814, 815, 816, and 817 are true and correct copies of

visa application records maintained by the United States

Department of State.

        It is further stipulated and agreed that this

stipulation marked as Government Exhibit 1005 may be received

in evidence as a government exhibit at trial.

        The government offers Government Exhibit 1005.

        THE COURT:  You're not offering the exhibits?

        MR. LOCKARD:  We do also offer the exhibits 801

through 817.

        MR. MOSKOWITZ:  Subject to the same objection, then.

        THE COURT:  All right.  Received subject to the same

objection.

        (Government's Exhibits 801 through 817 and 1005

received in evidence)

        (Continued on next page)

1           MR. LOCKARD:  Ms. Hurst, would you please blow up for

2     Mr. Fairbanks what's been marked for identification as

3     Government Exhibit 502.

4     BY MR. LOCKARD:

5     Q.  Agent Fairbanks, do you recognize Government Exhibit 502?

6     A.  Yes, sir.

7     Q.  And, generally speaking, what's Government Exhibit 502?

8     A.  Generally speaking, the exhibit is a chart with contacts

9     from Mr. Fuentes' phone, contacts, information from Geovanny's

10    phone, the son, the iCloud account, as well as --

11          JUROR:  We don't have it again.

12          THE COURT:  You don't have it up on the screen?

13          MR. LOCKARD:  It hasn't been offered yet, your Honor.

14          THE COURT:  It hasn't been offered yet, that's the

15    reason.

16          Go ahead.

17    BY MR. LOCKARD:

18    Q.  Is the information from the defendant's cell phone in

19    columns 1 or 2 reflected in Government Exhibits 201-54 and 55

20    that we looked at a minute ago?

21    A.  Yes, sir.

22    Q.  The information in the two columns relating to the

23    defendant's son's iCloud account, is that from the Exhibits 926

24    and 927 that we looked at a moment ago?

25    A.  Yes, sir.

L39KRAM4                          Fairbanks - Direct

1    Q.  Is the information in the two columns relating to the

2    information from the Exhibits 800 through 817?

3    A.  Yes, sir.

4    Q.  Did you participate in preparing this chart?

5    A.  I did.

6              MR. LOCKARD:  The government offers Exhibit 502.

7              MR. MOSKOWITZ:  Subject to the same objection.

8              THE COURT:  Received.

9              (Government's Exhibit 502 received in evidence)

10             THE COURT:  Ladies and gentlemen, trial may only be

11   conducted witness by witness, item of testimony by item of

12   testimony, and some exhibits, I am receiving subject to

13   connection, that they will be connected by later testimony in

14   the trial.  If that later testimony does not materialize, then

15   I may strike those exhibits, but I'm taking them subject to

16   connection, and that's been the case with the last several

17   exhibits.

18             Go ahead.

19             MR. LOCKARD:  Thank you, your Honor.

20   BY MR. LOCKARD:

21   Q.  Special Agent Fairbanks, are we now looking at the first

22   page of the chart that we just described?

23   A.  Yes, sir.

24   Q.  And looking at the first line, what is the contact in the

25   defendant's cell phone?

L39KRAM4                        Fairbanks – Direct

1   A.   Presidente Juan Orlando.

2   Q.   And there's a phone number listed there.  Is that from the

3   defendant's cell phone?

4   A.   It is.

5   Q.   And what kind of telephone number is that described as in

6   the defendant's cell phone?

7   A.   It's described as a mobile or a cell phone.

8   Q.   Did the defendant have any other contact information for

9   Presidente Juan Orlando in his phone?

10  A.   Yes, sir.

11  Q.   What did he have?

12  A.   He had a Gmail account.

13  Q.   Looking over to the fifth column of the chart, does the

14  phone number in the defendant's cell phone match any of the

15  phone numbers that Mr. Juan Orlando provided in connection with

16  the visa application in 2011?

17  A.   Yes, sir.

18  Q.   Which number is that?

19  A.   The other, the third one down.

20         MR. LOCKARD:  Ms. Hurst, could we look at Government

21  Exhibit 201-150.

22  Q.   Agent Fairbanks, is this a photograph from the defendant's

23  cell phone?

24  A.   Yes, sir, it is.

25  Q.   Do you recognize any of the individuals in this photograph?

L39KRAM4                          Fairbanks - Direct

1    A.  I do.

2    Q.  Who do you recognize?

3    A.  It appears to me to be, on the far -- my far right, in the

4    blue shirt, President Juan Orlando Hernandez, and in the

5    middle, in the white shirt, Christian Fuentes, the brother of

6    Mr. Fuentes, and on the left would be the wife of President

7    Hernandez in the black dress.

8            MR. LOCKARD:  Ms. Hurst, if you could also pull up

9    Government Exhibit 201-154.

10   Q.  Does the person in the middle of 150 appear to be the same

11   person that we saw in Government Exhibit 201-154?

12   A.  Yes, sir, it appears to me to be the same.

13           MR. LOCKARD:  If we could see Government

14   Exhibit 201-151.

15   Q.  Agent Fairbanks, is this another photograph from the

16   defendant's cell phone?

17   A.  Yes, sir, it is.

18   Q.  And do you recognize the individual holding the microphone?

19   A.  It appears to be Presidente Juan Orlando Hernandez.

20   Q.  Turning to Government Exhibit 201-163, is this also from

21   the defendant's cell phone?

22   A.  Yes, sir, it is.

23   Q.  Do you recognize the individual holding the microphone?

24   A.  Yes, sir.  Again, it appears to be President Juan Orlando

25   Hernandez.

L39KRAM4                        Fairbanks – Direct

1  Q.  Turning to Government Exhibit 201-153, is this a photograph

2  from the defendant's cell phone?

3  A.  Yes, it is.

4  Q.  Do you recognize either of the individuals shown there?

5  A.  I do.

6  Q.  Who do you recognize?

7  A.  I recognize the person on the left, from my left, which

8  appear to be President Juan Orlando Hernandez.

9  Q.  Government Exhibit 201-169, is this from the defendant's

10  cell phone?

11  A.  Yes, sir, it is.

12  Q.  Do you recognize the person in the middle?

13  A.  I do.

14  Q.  Who is that?

15  A.  It appears to be President Juan Orlando Hernandez.

16  Q.  And looking at Government Exhibit 201-160, is this on the

17  defendant's cell phone?

18  A.  Yes, sir.

19  Q.  Who do you recognize from this photograph?

20  A.  On the right, it appears -- in the white shirt, it appears

21  to me to be Juan Orlando Hernandez, and the individual on the

22  left, in the green shirt and the block cap, it appears, or at

23  least the green cap, appears to be Christian Fuentes,

24  Mr. Fuentes' brother.

25          MR. LOCKARD:  If we could look at Government

L39KRAM4                          Fairbanks - Direct

1   Exhibits 201-166 and 201-156.

2   Q.  Are these also photographs on the defendant's cell phone?

3   A.  Yes.

4   Q.  What's shown -- do you recognize any of the people shown

5   here?

6   A.  Yes, sir.

7   Q.  Who do you recognize?

8   A.  It appears to me that the individual on the right would be

9   President Juan Orlando Hernandez and the person on the left

10  would be one of Mr. Fuentes' sons.

11  Q.  Agent Fairbanks, you should have there, in the witness box

12  with you, an exhibit marked as Government Exhibit 203.

13  A.  Yes, sir.

14  Q.  Do you recognize Government Exhibit 203?

15  A.  Yes, sir, I do.

16  Q.  And how do you recognize it?

17  A.  I recognize the case number, the exhibit number, and my

18  signature on the back.

19  Q.  What's contained inside that evidence bag?

20  A.  It's a cell phone.

21  Q.  Whose cell phone is it?

22  A.  Mr. Juan Antonio Hernandez Alvarado, or Tony Hernandez.

23  Q.  What, if any, relationship is there between Tony Hernandez

24  and Juan Orlando Hernandez Alvarado?

25  A.  Tony Hernandez is Juan Orlando's brother.

1          MR. LOCKARD:  Ms. Hurst, could you please show Agent

2     Fairbanks 203-1.

3     Q.  Agent Fairbanks, do you recognize that photograph?

4     A.  Yes, sir.

5     Q.  How do you recognize that photograph?

6     A.  It came from a cell phone of Tony Hernandez.

7          MR. LOCKARD:  The government offers Exhibit 203-1.

8          MR. MOSKOWITZ:  Subject to the same objection.

9          THE COURT:  All right.  And received on that basis,

10    also.

11         (Government's Exhibit 203-1 received in evidence)

12    BY MR. LOCKARD:

13    Q.  Agent Fairbanks, what appears to be depicted in this

14    photograph from Tony Hernandez's phone?

15    A.  It appears to be a fully automatic weapon with the selector

16    switch on the left-hand side above the trigger, with a stamp

17    Juan Orlando Hernandez, President of the Republic, but in

18    Spanish, de la Republica, sorry.

19         MR. LOCKARD:  Ms. Hurst, if you could please enlarge

20    the area above the trigger of the weapon up to the top of the

21    weapon.  Including a little bit more below that.

22    Q.  Agent Fairbanks, enlarged on the screen, is that the area

23    you were just describing?

24    A.  Yes, sir.

25    Q.  You mentioned a selector switch.  What were you referring

L39KRAM4                        Fairbanks - Direct

1   to?

2   A.   The switch here with the white marking that you would

3   depress with your thumb that goes from safe, to shooting one

4   round at a time, to shooting multiple rounds at a time, to

5   being fully automatic on the very left side.

6   Q.   So, Agent Fairbanks, a few moments ago, we talked about

7   some contact information from the iCloud account of the

8   defendant's son.  Have you also reviewed other evidence from

9   that iCloud account?

10  A.   Yes, sir.

11          MR. LOCKARD:  Ms. Hurst, could we see Government

12  Exhibit 916.

13  Q.   Is this a photograph of the defendant's son's iCloud

14  account?

15  A.   Yes, sir.

16  Q.   Do you recognize any of the people depicted here?

17  A.   Yes, sir.

18  Q.   And who do you recognize?

19  A.   It appears to be Mr. Fuentes all the way to the right and

20  then his three sons, Geovanny, Christian, and José Simon.

21          MR. LOCKARD:  Ms. Hurst, could we see Government

22  Exhibit 905.

23  Q.   Agent Fairbanks, is this a photograph from the defendant's

24  son's iCloud account?

25  A.   Yes, sir.

1   Q.  And what appears to be depicted here?

2   A.  Three handguns.

3              MR. LOCKARD:  Ms. Hurst, could you also bring up

4   Government Exhibit 201-106.

5   Q.  Agent Fairbanks, do any of the guns shown in the iCloud

6   photograph appear similar to the guns shown in the photograph

7   from the defendant's cell phone, 201-106?

8   A.  Yes, sir, the gold one looks similar.

9   Q.  Can you describe some of the aspects of that gun that

10  appears similar in the two photographs?

11  A.  Yes, sir.  The gold coloring and the extended magazine

12  sticking out the bottom of the weapon.

13  Q.  In the picture on the right, where is the forefinger of the

14  person who's holding that gun?

15  A.  It's on the trigger.

16             MR. LOCKARD:  Ms. Hurst, could we see Government

17  Exhibit 932.

18  Q.  Agent Fairbanks, are you familiar with this photograph?

19  A.  Yes, sir.

20  Q.  Is this a photograph from the iCloud account of the

21  defendant's son?

22  A.  Yes, sir.

23  Q.  And what's shown in this photograph?

24  A.  It appears to be three Honduran licenses for guns, two of

25  them AR-15 style rifles and one pistol, all to Mr. Fuentes,

L39KRAM4                        Fairbanks - Direct

1    Geovanny Daniel Fuentes Ramirez.

2    Q.  The defendant?

3    A.  Yes, sir.

4              MR. LOCKARD:  Ms. Hurst, could we see Government

5    Exhibit 906.

6    Q.  Agent Fairbanks, is this a photograph from the iCloud

7    account?

8    A.  Yes, sir.

9    Q.  What's shown here?

10   A.  Another handgun with one very large extended -- what

11   appears to be a very large extended magazine in the handgun and

12   then three extra magazines to the right of that with rounds in

13   them.

14   Q.  When you say the three magazines on the right have rounds

15   in them, what are you describing?

16   A.  The gold and silver at the very top, that looks like a

17   bullet.

18             MR. LOCKARD:  Can we turn to Government Exhibit 912.

19   Q.  Agent Fairbanks, is this another photograph from the iCloud

20   account?

21   A.  Yes, sir.

22   Q.  What appears to be shown here?

23   A.  It's another Glock handgun with a couple of extra magazines

24   that appear -- at least one appears to be empty with a

25   backstrap addition, a gun case, and a gun lock on the

L39KRAM4                          Fairbanks – Direct

1    right-hand side.

2    Q.  What is the use of a gun lock?

3    A.  It's to be able to lock the trigger, so that it doesn't go

4    off accidentally or that no one gets a hold of it.

5         MR. LOCKARD:  Can we see Government Exhibit 914.

6    Q.  Agent Fairbanks, is this from the iCloud account?

7    A.  Yes, sir.

8    Q.  What appears to be shown here?

9    A.  It appears to be two different Glocks, again with the two

10   extra magazine rounds, and in the middle, the extra backstraps

11   through the grip part of the gun, and they're both in handgun

12   cases.

13        MR. LOCKARD:  Can we turn now to Government

14   Exhibit 910.

15   Q.  Is this also a photograph from the iCloud account?

16   A.  Yes, sir.

17   Q.  What appears to be shown in this photograph?

18   A.  It appears to be a gun range with three handguns, again,

19   the very large -- what appear to be very large magazines on the

20   left-hand side and the right-hand side, so four magazines,

21   maybe five in the middle.

22   Q.  In addition to the five magazines, what else is shown

23   there?

24   A.  Rounds of ammunition in the magazine and a box of ammo next

25   to the magazines.

1           THE COURT:  Special Agent Fairbanks, did you describe

2      that as a gun range?

3           THE WITNESS:  Yeah, it appears to be a gun range.

4           THE COURT:  What leads you to believe that from this

5      picture?

6           THE WITNESS:  From all the rounds on the ground, and

7      the padding on the side of the wall, and then this bench that

8      normally goes down where the shooter stands.

9           THE COURT:  I see.

10          All right.  Next question.

11          MR. LOCKARD:  Ms. Hurst, could we see Government

12     Exhibit 911, please.

13     Q.  Agent Fairbanks, is this a photograph from the iCloud

14     account?

15     A.  Yes, sir.

16     Q.  What appears to be shown here?

17     A.  Two handguns.

18     Q.  Two handguns arranged in a square shape?

19     A.  Yes, sir.  The butt of the guns seem to be touching and the

20     muzzle of the guns seem to be touching.

21          MR. LOCKARD:  Ms. Hurst, could we see Government

22     Exhibit 909.

23     Q.  Agent Fairbanks, is this from the iCloud account?

24     A.  Yes, sir.

25     Q.  What appears to be shown here?

L39KRAM4                        Fairbanks - Direct

1    A.  Two handguns sitting in someone's lap, with a black Glock

2    handgun having the extended magazine.

3    Q.  From what's shown in this picture, are you able to tell

4    where that person is sitting?

5    A.  Not exactly.  It appears to be in a car.

6              MR. MOSKOWITZ:  Objection.

7              THE COURT:  Excuse me.

8              When you say you can't tell where it is, are you

9    guessing or --

10             THE WITNESS:  Well, I'm using the leather seat and

11   then what appears to be a console to me on the left-hand side,

12   but I don't have any other clues besides those two items.

13             THE COURT:  All right.  I'll allow the testimony to

14   stand.

15   BY MR. LOCKARD:

16   Q.  Turning now to Government Exhibit 908, Agent Fairbanks, is

17   this from the iCloud account?

18   A.  Yes, sir.

19   Q.  And what appears to be depicted in this photograph?

20   A.  These appear to be two 30-round magazines for a .9

21   millimeter handgun or a .9 millimeter weapon.

22   Q.  And we've talked about standard magazines versus extended

23   magazines.  Are either of those two types shown in this

24   photograph?

25   A.  Yes, sir.  I would consider them both extended magazines.

L39KRAM4                    Fairbanks - Direct

1    Q.  Turning to Government Exhibit 907, is this a photograph

2    from the iCloud account?

3    A.  Yes, sir.

4    Q.  What's shown in this picture?

5    A.  A Glock handgun, with three magazines, with ammo -- you can

6    see in the very top, the gold parts -- and then one large

7    extended magazine, and then what appears to be a circular drum

8    at the bottom of the handgun.

9          MR. LOCKARD:  Ms. Hurst, if we could pull up

10   Government Exhibit 909 next to 907.

11   Q.  Agent Fairbanks, how, if at all, does the setting of

12   Exhibit 907 relate to the setting in which the photograph in

13   909 was taken?

14   A.  It appears that you can see the leather seat at the very

15   top of the image with a bag placed in it, what would probably

16   be the center console, leather bound, with the guns sitting in

17   another leather seat with a seatbelt marker in the very bottom

18   left corner with a red press button.

19   Q.  Turning now to Government Exhibit 913, is this a photograph

20   from the iCloud account?

21   A.  Yes, sir.

22   Q.  What's shown in this photograph?

23   A.  It appears to be the barrel of a weapon.

24   Q.  And from what perspective?

25   A.  Looking straight into the barrel.

1          MR. LOCKARD:  Ms. Hurst, could we see Government

2   Exhibit 903.

3   Q.  Agent Fairbanks, is this a photograph from the iCloud

4   account?

5   A.  Yes, sir.

6   Q.  What appears to be shown here?

7   A.  It appears to be an AR-15 style rifle and a handgun.

8   Q.  Do you note any features of the AR-15 style rifle?

9   A.  Yes, sir.  The front of it has what I would term like a

10  muzzle reducer flash.

11  Q.  And, generally speaking, what's the purpose of a flash

12  reducer?

13  A.  To reduce the flash that comes out of the end of the

14  weapon.

15  Q.  Meaning when it's fired?

16  A.  Yes, sir.

17         MR. LOCKARD:  Ms. Hurst, if you could also pull up

18  Government Exhibit 201-100.

19  Q.  So, 201-100 is a photograph from the defendant's cell

20  phone.  Can you remind us, Agent Fairbanks, what type of weapon

21  is shown in 201-100?

22  A.  It's also an AR-15 style rifle.

23  Q.  Are the AR-15 style rifles in the two photographs the same

24  AR-15 style rifle?

25  A.  No, sir.

L39KRAM4                        Fairbanks - Direct

1    Q.  Are they both AR-15 style rifles?

2    A.  Yes, sir, that's what they appear to be.

3            MR. LOCKARD:  Ms. Hurst, could we look at Government

4    Exhibit 902.

5    Q.  Agent Fairbanks, is this a photograph from the iCloud

6    account?

7    A.  Yes, sir.

8    Q.  What appears to be shown in this photograph?

9    A.  Another AR-15 style rifle on the top and a handgun below

10   it.

11   Q.  Do you note anything about the coloring of the AR-15 style

12   rifle on the top?

13   A.  The upper seems to be -- the upper part of it seems to be

14   green, and the lower part seems to be black.

15   Q.  Is there any kind of insignia or logo on the magazine?

16   A.  Yes, sir.  It says, "United States Navy."

17           MR. LOCKARD:  Ms. Hurst, could we see Government

18   Exhibit 901.

19   Q.  Agent Fairbanks, is this a photograph from the iCloud

20   account?

21   A.  It is.

22   Q.  What appears to be depicted here?

23   A.  Two AR-15 style rifles in a large gun case and two handguns

24   in the same gun case.

25           MR. LOCKARD:  Ms. Hurst, if we could see Government

L39KRAM4                         Fairbanks - Direct

1   Exhibit 201-106 again.

2   Q.  Again, 201-106 is from the defendant's cell phone?

3   A.  Yes, sir.

4   Q.  Agent Fairbanks, do you notice any similarities between the

5   weapon and -- the defendant's cell phone and any of the weapons

6   shown from the iCloud account?

7   A.  Yes, sir.  The gold one with the extended magazine seems to

8   be very similar to the one from the phone from the -- the one

9   on the left to the one on the right.  Sorry.

10  Q.  I followed you.

11         MR. LOCKARD:  Ms. Hurst, could we see Government

12  Exhibit 904.

13  Q.  Is this a photograph from the iCloud account?

14  A.  Yes, sir, it is.

15  Q.  What appears to be shown here?

16  A.  An AR-15 style rifle in the passenger kind of floorboard,

17  between the floorboard and the seat of the vehicle.

18  Q.  Do you note anything else shown in the seat area of the

19  car?

20  A.  A purse of some sort.

21  Q.  Do you note anything about the coloring of the AR-15 style

22  rifle that is in the floorboard area of the passenger side

23  seat?

24  A.  It appears to be green in color.

25  Q.  Turning now to Government Exhibit 929, Agent Fairbanks, is

L39KRAM4                          Fairbanks - Direct

1   this a photograph from the iCloud account?

2   A.  Yes, sir.

3   Q.  What appears to be shown here?

4   A.  The two AR-15 rifles, the green one on the left with the

5   Navy insignia and the black one on the right, as well as the

6   gold pistol and an extra magazine with a round sticking out the

7   top.

8   Q.  Where do those weapons --

9           THE COURT:  All right.  Mr. Lockard, at this point,

10  we're going to take our midday lunch break.

11          Ladies and gentlemen, please remember what I said:  Do

12  not discuss the case among yourselves or with anyone.  Please

13  have a relaxing lunch.  And we'll see you, ready for action, at

14  2:00 o'clock.  Thanks very much.

15          And no one leave the courtroom until the jurors have

16  exited.

17          (Jury not present)

18          THE COURT:  Wait for the jurors to clear the elevator

19  area.  Okay, Flo?  Have they cleared the elevator area?

20          THE DEPUTY CLERK:  No, not yet.

21          THE COURT:  Okay.

22          Flo, let me know when they have.  Yes?

23          (Pause)

24          THE COURT:  Okay.  Thank you.  We are in recess.

25          (Luncheon recess)

L39KRAM4

                              AFTERNOON SESSION

                                   2:25 PM

          (Trial resumed)

          (Jury present)

          THE COURT:  Good afternoon, ladies and gentlemen.  I
wanted to just briefly mention olden times, a year ago, there
might be 12, maybe as many as 20 courtrooms running at one time
in this courthouse, maybe as many as six juries impaneled, and
then we all know what happened.  We had a wonderful cafeteria
going, but with the pandemic, the company that operated the
cafeteria went out of business, and we were very sad about
that, but the happy news was that Steve, one of the employees
of the company, was going to bid on taking over the cafeteria,
and Steve got the job, and today is the first time that we've
had two juries needing lunch.  Needless to say, it didn't go
well.

          In fact, I knew we were going to break at
1:00 o'clock, and Flo and I talked yesterday about getting the
lunch for 12:30 just in case, and then we were worried your
food would get cold, and we talked about, well, there's a
microwave that you could use, et cetera, thinking that it was
going to arrive at 12:30, go down at 1:00 o'clock, it might be
a little bit cool, but at least it wouldn't be late.  Well, we
know what happened, but we're going to give Steve a break
because he's a good guy, and we want him to succeed.

L39KRAM4B                    Fairbanks - Direct

1             So, with that, Mr. Lockard, you may continue.

2             And, Special Agent Fairbanks, you are still under

3      oath.

4             THE WITNESS:  Yes, sir.

5             MR. LOCKARD:  Thank you, your Honor.

6      BRIAN FAIRBANKS, resumed.

7             MR. LOCKARD:  Ms. Hurst, if you could please pull up

8      Government Exhibit 929 again.

9      DIRECT EXAMINATION CONTINUED

10     BY MR. LOCKARD:

11     Q.  So, this is the exhibit that we were looking at just before

12     the lunch break.

13             THE COURT:  You've got to keep your voice up.

14             MR. LOCKARD:  Yes.  Apologies, your Honor.

15     Q.  And, Agent Fairbanks, again, this is a photograph from the

16     iCloud account; is that right?

17     A.  Yes, sir.

18             MR. LOCKARD:  And, Ms. Hurst, could you also pull up

19     Government Exhibit 201-106.

20     Q.  And this, again, is a photograph from the defendant's cell

21     phone; is that right?

22     A.  Yes, sir.

23     Q.  What, if any, similarities do you see between the firearm

24     on the right and any of the firearms in the left?

25     A.  The gold pistol on the left seems to be similar to the gold

L39KRAM4B                    Fairbanks - Direct

1    pistol on the right.

2    Q.  The one from the defendant's cell phone and the one from

3    the iCloud account?

4    A.  Yes, sir.

5            MR. LOCKARD:  Ms. Hurst, can we please look at

6    Government Exhibit 924.

7    Q.  Agent Fairbanks, do you recognize this photograph?

8    A.  I do.

9    Q.  Is this from the iCloud account?

10   A.  It is.

11   Q.  What's shown in this photograph?

12   A.  U.S. currency bundled by rubber bands, what appear to be

13   rubber bands.

14   Q.  Can you describe, generally, how it is bundled?

15   A.  All I can see is a $100 bill closest to me, the face of a

16   100-dollar U.S. bill, and then there are big rubber bands that

17   seem to go around either the entire amount or at least half of

18   it, and then there's little tiny rubber bands going around

19   individual stacks inside.

20           MR. LOCKARD:  Ms. Hurst, can we please turn to

21   Government Exhibit 922.

22   Q.  Agent Fairbanks, do you recognize this photograph?

23   A.  Yes, sir.

24   Q.  What's shown here?

25   A.  U.S. currency bundled in someone's lap and also contained

L39KRAM4B                    Fairbanks - Direct

1   in a cardboard box.

2   Q.  Is this a photograph from the iCloud account?

3   A.  It is.

4   Q.  Looking at the bands wrapping up the bundles, what is

5   written on those bands?

6   A.  2,000.

7   Q.  Approximately how many of those bundles are shown in this

8   photograph?

9   A.  I count ten.

10          MR. MOSKOWITZ:  Turning to Exhibit 923.

11  Q.  Agent Fairbanks, do you recognize this picture?

12  A.  Yes, sir.

13  Q.  Is this from the iCloud account?

14  A.  It is.

15  Q.  What's shown in this photograph?

16  A.  Again, bundles of U.S. currency in 100, 20, and -- I guess

17  100-dollar denominations, 50 denominations, and 20

18  denominations, all seated in someone's lap.  You can still kind

19  of see the cardboard box at the top portion of the photo.

20  Q.  Again, what, if anything, is written on the bands that are

21  bundling up those parcels of cash?

22  A.  2,000.

23          MR. LOCKARD:  Ms. Hurst, could we look at Government

24  Exhibit 921.

25  Q.  Agent Fairbanks, are you familiar with this picture?

1    A.  Yes, sir.

2    Q.  Where is this picture from?

3    A.  The iCloud account.

4    Q.  What's shown here?

5    A.  It appears to be U.S. currency bundled together, again in

6    the same kind of bundling as the previous pictures, but this

7    time it's on a black suitcase of some kind in a car seat, a

8    leather car seat, with a sweater on the other side.

9    Q.  Approximately how many bundles are shown in this

10   photograph?

11   A.  I count 17.

12          MR. MOSKOWITZ:  If we could look at Government

13   Exhibit 920.

14   Q.  Do you recognize this picture?

15   A.  Yes, sir.

16   Q.  What is shown here?

17   A.  Again, U.S. currency bundled in what appear to be $2,000

18   straps in 100 and 50 denominations that I can see, in someone's

19   lap, and you can see there what appears to be a left hand with

20   a watch on it.

21   Q.  Agent Fairbanks, I'd like to turn your attention back to

22   March 1st, 2020, the date of the defendant's arrest.

23   A.  Yes, sir.

24   Q.  In addition to the phone that we talked about earlier, was

25   other property also recovered from the defendant?

1   A.   The defendant had other property that we ended up giving

2   back to his sons.

3            MR. LOCKARD:  Ms. Hurst, could you show Agent

4   Fairbanks Government Exhibit 403.

5   Q.   Do you recognize that?

6   A.   I do.

7   Q.   What's shown in this photograph?

8   A.   It's a wrist watch that Mr. Fuentes was wearing the day

9   that I arrested him.

10           MR. LOCKARD:  The government offers Government

11  Exhibit 403.

12           THE COURT:  Any objection?

13           MR. MOSKOWITZ:  No objection.

14           THE COURT:  I'm sorry?

15           MR. MOSKOWITZ:  No objection.

16           THE COURT:  Thank you.

17           Received.

18           (Government's Exhibit 403 received in evidence)

19           MR. LOCKARD:  If we could publish that and pull up

20  Exhibit 920 next to it.

21           And, Ms. Hurst, if we could zoom in somewhat on the

22  watch in Exhibits 403 and 920.

23  BY MR. LOCKARD:

24  Q.   Agent Fairbanks, what, if any, similarities do you see

25  between the watch on the left, the watch the defendant was

1    wearing on the date of the arrest, and the watch on the right,

2    the one depicted in the photograph with the cash?

3    A.   The band seems to be very similar, and the dial seems to be

4    very similar around the watch.  The dark three circles on the

5    left-hand side of the screen seem to match the dark three

6    circles on the right-hand side of the screen.  The dials with

7    which he would, I guess, control the watch, there's one, two,

8    three on the left-hand side of the screen, there appears to be

9    the same number on the right-hand side of the screen.  And

10   those -- I mean, those are the similarities that I notice.

11          MR. LOCKARD:  Now, Ms. Hurst, could you please take

12   down Exhibit 920 and bring up Government Exhibit 201-106 along

13   with 403.

14   Q.   Agent Fairbanks, Exhibit 201-106, again, is a photograph

15   we've seen from the defendant's cell phone?

16   A.   Yes, sir.

17   Q.   And what, if any, similarities do you see between the watch

18   on the wrist of the individual in the picture from the

19   defendant's cell phone and the watch the defendant was wearing

20   on the date of his arrest?

21   A.   So, if you look at the bottom of the picture or, I guess --

22   yeah, the bottom of the picture, to the left, the watch the

23   defendant was wearing the day we arrested him, you can see that

24   the length of the silver band is pretty elongated underneath

25   the black wrist strap, and it seems to be similar to the style

1    or to the length of the clasp, the silver clasp, on the

2    right-hand side of the photo.

3    Q.  And what, if any, similarities do you note between the band

4    itself on the two watches?

5    A.  The band itself seems to be very similar in color and

6    texture, I guess.

7    Q.  What, if anything, did you do with the watch that the

8    defendant was wearing when he was arrested?

9    A.  I gave it to his son -- his two sons, Geovanny Fuentes, and

10   his other son, Cristian.

11   Q.  Now, have you reviewed any date information associated with

12   Government Exhibit 201-106 and Government Exhibit 920?

13   A.  Yes, sir.

14   Q.  That is, date information associated with the electronic

15   file from the phone and from the iCloud?

16   A.  Yes, sir.

17   Q.  And --

18          THE COURT:  All right.  This is what you need to

19   understand:  There are air vents above us.  There's the HEPA

20   filter above you, and there's one in here, so there is

21   background noise in this courtroom.  You may have to lift your

22   mic up even further if you can maybe assist with a second box.

23          Is there a second box you can give him?

24          MR. LOCKARD:  Unfortunately, your Honor, the cord on

25   the microphone doesn't seem to extend.

1              THE COURT:  Doesn't fit?

2              You're, unfortunately, either going to have to shrink

3    in height, which is an unreasonable request on my part, or lean

4    into the mic, or speak louder.

5              MR. LOCKARD:  I apologize, your Honor.  I will make

6    myself heard.

7              THE COURT:  We can give you this microphone if it

8    would make your life easier.

9              THE DEPUTY CLERK:  You want to try this one?

10             THE COURT:  Step out for a second.  I don't know

11   whether you can hear the vents.

12             MR. LOCKARD:  With the Court's permission, I'll

13   continue and try to prevent --

14             THE COURT:  That's fine.  Thank you very much.

15             THE DEPUTY CLERK:  You don't want this?

16             THE COURT:  No.  He's going to give it a go.

17   BY MR. LOCKARD:

18   Q.  So, Special Agent Fairbanks, we were just talking about

19   your view of date information associated with the two images,

20   the one from the cell phone, Government Exhibit 201-106, and

21   the image from the iCloud account, Government Exhibit 920.

22             Starting with Government Exhibit 201-106 --

23             MR. LOCKARD:  And, Ms. Hurst, if you could zoom back

24   out on that one.

25   Q.  -- what, if anything, did that date information indicate

1    about the time that that picture was taken?

2    A.   That it was approximately before the arrest date of

3    Mr. Fuentes.

4    Q.   Looking at Government Exhibit 920, what, if anything, did

5    the electronic date information indicate about when that

6    photograph may have been taken?

7    A.   That it was taken approximately after Mr. Fuentes was

8    arrested and that I had returned the watch to his sons.

9            MR. LOCKARD:   If we could look again at Government

10   Exhibit 502, the first page.

11   Q.   Before the lunch break, we were talking about the contact

12   information that the defendant had in his cell phone for

13   Presidente Juan Orlando reflected in the first line of the page

14   of the chart?

15   A.   Yes, sir.

16   Q.   If we could look at the Government's Exhibit --

17           MR. LOCKARD:   I think I may have been part of the

18   problem.   I think the mute button was being depressed at times.

19   Q.   So, looking at Government Exhibit 915, Agent Fairbanks,

20   where is this photograph from?

21   A.   The iCloud account, sir.

22   Q.   Do you recognize any of the individuals shown in this

23   photograph?

24   A.   Yes, sir.

25   Q.   Who do you recognize?

L39KRAM4B                      Fairbanks - Direct

1   A.  I recognize what appears to be Juan Orlando Hernandez, the

2   president of Honduras, to the left and another son of

3   Mr. Fuentes to the right.

4           MR. LOCKARD:  And, Ms. Hurst, if you could bring up to

5   the left of this exhibit -- sorry, the other side -- Government

6   Exhibit 201-156.

7   Q.  Can you remind us, Agent Fairbanks, where the photograph on

8   the left, 201-156, where that came from?

9   A.  The defendant's phone.

10  Q.  And the photograph on the right, Exhibit 915?

11  A.  From the iCloud account of his son.

12          MR. LOCKARD:  And then if we could also see

13  Government's Exhibit 930.

14  Q.  Where is this photograph from?

15  A.  The iCloud account.

16  Q.  And does this look like a complete photograph of the two

17  halves that we just looked at?

18  A.  Yes, sir.

19  Q.  And, again, who's shown in this photograph?

20  A.  It appears to be Juan Orlando Hernandez in the middle with

21  two of Geovanny's sons on either side of him.  Mr. Fuentes's

22  sons.  My apologies.

23          MR. LOCKARD:  We have another stipulation to read --

24          THE COURT:  All right.

25          MR. LOCKARD:  -- marked as Government's Exhibit 1007.

L39KRAM4B                    Fairbanks – Direct

1              In the matter of the United States of America v.

2    Geovanny Fuentes Ramirez, it is hereby stipulated and agreed by

3    and between the United States of America, by Audrey Strauss,

4    United States Attorney, Jacob Gutwillig and Michael Lockard,

5    Assistant United States Attorneys, and Geovanny Fuentes

6    Ramirez, by and through his attorneys, Avraham Moskowitz, Esq.,

7    and Eylan Schulman, Esq., that (1) if called to testify, a

8    records custodian from Facebook, Inc., "Facebook," would

9    testify that Government Exhibits 1101 through 1125 are true and

10   accurate copies of electronic records stored in the Instagram

11   account "Daniel F.G.15" maintained by Facebook on its servers

12   and which were stored by Facebook in the ordinary course of its

13   business.

14              THE COURT:  All right.  Ladies and gentlemen, a

15   stipulation as to testimony is an agreement by the parties

16   that, if the witness were called to the witness stand, that

17   their testimony would be as said in the stipulation.  The

18   weight to give to that testimony is entirely up to you, but you

19   must accept that the witness would have testified to it.

20              Go ahead.

21              MR. LOCKARD:  Number (2), this stipulation may be

22   received in evidence at trial as Government Exhibit 107.

23              The government offers Government Exhibit 1007.

24              MR. MOSKOWITZ:  No objection.

25              THE COURT:  Received.

L39KRAM4B                         Fairbanks - Direct

1              (Government's Exhibit 1007 received in evidence)

2              MR. LOCKARD:  The government also offers Exhibits 1101

3    through 1125.

4              MR. MOSKOWITZ:  Again, subject to the same objection.

5              THE COURT:  And the same ruling.  Thank you.

6              It's received.

7              (Government's Exhibits 1101 through 1125 received in

8    evidence)

9    BY MR. LOCKARD:

10   Q.  Agent Fairbanks, have you reviewed records from the

11   Facebook account that was described in the stipulation?

12   A.  Yes, sir.

13             MR. LOCKARD:  Can we please pull up Government

14   Exhibit 1114.

15   Q.  Do you recognize this photograph?

16   A.  I do.

17   Q.  Is it from the Instagram account referenced in the

18   stipulation?

19   A.  It is.

20   Q.  And who do you recognize in that photograph?

21   A.  It appears to me that it is Geovanny Gutierrez,

22   Mr. Fuentes' son.

23   Q.  And where does Mr. Gutierrez appear to be located in this

24   picture?

25   A.  On a boat in the water.

L39KRAM4B                    Fairbanks - Direct

1           MR. LOCKARD:  Turning to Exhibit 1102.

2   Q.  Agent Fairbanks, do you recognize this photograph?

3   A.  Yes, sir.

4   Q.  Who appears to be shown here?

5   A.  It appears to me that it is Mr. Fuentes in the white shirt

6   at the bottom of the photo surrounded by his three sons, also

7   with an individual whose face is covered by an emoji.

8           MR. LOCKARD:  Turning to Exhibit 1102 -- I'm sorry,

9   1115.

10  Q.  Is this also a photograph from the Instagram account?

11  A.  It is.

12  Q.  And what's shown here?

13  A.  It appears to me that one of Mr. Fuentes' sons is in the

14  forefront, in the background is Mr. Fuentes, and it appears

15  that the son in the front has a ball cap on with some

16  decorative insignia on the corner of it and something that

17  looks like it says policia on the front of the cap.

18          MR. LOCKARD:  If we could look at Government

19  Exhibit 1101.

20  Q.  Is this a photograph from the Instagram account?

21  A.  It is.

22  Q.  And what's shown in this photograph?

23  A.  It appears to be a dirt road surrounded by greenery with

24  something tagged on it that says Choloma Cortes.

25  Q.  Are you familiar with what the reference Choloma Cortes

1   means?

2   A.  Yes.  It's a place in Hondurans.

3   Q.  Earlier you testified about a town in Honduras called

4   San Pedro Sula?

5   A.  Yes.

6   Q.  Where in relation to San Pedro Sula is Choloma?  Are they

7   nearby or far away?

8   A.  I'm not sure, sir, how far away they are.

9        MR. LOCKARD:  If we could turn to Government

10  Exhibit 1111.

11  Q.  Is this from the Instagram account?

12  A.  Yes, sir, it is.

13       MR. LOCKARD:  The government also offers

14  Exhibit 1111-T.

15       THE COURT:  Any objection?

16       MR. MOSKOWITZ:  No objection.

17       THE COURT:  Received.

18       (Government's Exhibit 1111-T received in evidence)

19       MR. MOSKOWITZ:  Subject to the same objection, your

20  Honor.

21       THE COURT:  Thank you.

22  BY MR. LOCKARD:

23  Q.  Agent Fairbanks, what does the phrase that is stamped on

24  that picture, what does it say?

25  A.  You want me to read it in Spanish or the translation at the

1    bottom?

2    Q.  Let's stick with the translation, please.

3    A.  Yes, sir.  It says, "Sales are looking so bad."

4    Q.  And what is shown in the photograph?

5    A.  It's a picture of U.S. currency in at least a hundred

6    denominations and 20 denominations.

7            MR. LOCKARD:  If we could turn to Exhibit 1109.

8    Q.  Agent Fairbanks, where is this photograph from?

9    A.  The Instagram account.

10   Q.  And does this appear to be another version of the

11   photograph of cash that we looked at earlier from the iCloud

12   account?

13   A.  Yes, sir.

14           MR. LOCKARD:  The government offers 1109-T.

15           MR. MOSKOWITZ:  Subject to the same objection.

16           THE COURT:  All right.  It's received.

17           (Government's Exhibit 1109-T received in evidence)

18           MR. LOCKARD:  If we could pull up the translation

19   exhibit, please.

20   BY MR. LOCKARD:

21   Q.  So, again, Agent Fairbanks, if you could describe what's

22   shown in the photograph?

23   A.  It's U.S. currency bundled together sitting on a -- the

24   front seat of a car is what it appears to be.

25   Q.  What does the English stamp say above the cash?

1  A.  "Sunday fun day.  Happy payday Sunday."

2          MR. LOCKARD:  Now, if we could turn to Exhibit 1112.

3  Q.  Is this a picture from the Instagram account?

4  A.  Yes, sir, it is.

5          MR. LOCKARD:  The government offers 1112-T.

6          MR. MOSKOWITZ:  Subject to the same objection.

7          THE COURT:  Received.

8          (Government's Exhibit 1112-T received in evidence)

9  BY MR. LOCKARD:

10  Q.  And now looking at the translation exhibit, can you tell us

11  what's shown in the photograph?

12  A.  It's a gold handgun.

13  Q.  What is --

14  A.  Golden color, sorry.

15  Q.  And what has been written or pasted on that photograph?

16  A.  "Love at first sight."

17          MR. LOCKARD:  Turning now to Exhibit 1106.

18  Q.  Is this from the Instagram account?

19  A.  Yes, sir.

20  Q.  And what's shown in this picture?

21  A.  A Glock handgun in its carrying case with a couple of extra

22  magazines and the extra components to it.  You can see a Glock

23  bag in the back, and a Glock sticker on the side of a chair,

24  and a little Glock pendant hanging from a strap that would go

25  around your neck, as well as a couple of emojis.

1          MR. LOCKARD:  If we could turn now to Exhibit 1108.

2     Q.  Is this a picture from the Instagram account?

3     A.  Yes, sir.

4     Q.  What's shown in this picture?

5     A.  Another Glock in a Glock case, as well as the extra

6     components, the extra magazines, a gun lock, and it also

7     appears to be stamped .10 millimeter.

8     Q.  What is .10 millimeter a reference to in the context of a

9     firearm?

10    A.  The size of the round that goes in the firearm.

11         MR. LOCKARD:  Turning now to Exhibit 1103.

12    Q.  Is this a photograph from the Instagram account?

13    A.  Yes, sir.

14    Q.  And, generally speaking, what does this appear to depict?

15    A.  A 30-round AR-15 style rifle magazine.

16         MR. LOCKARD:  And, Ms. Hurst, if you could zoom us in

17    on the writing on the white label on the left-hand side.  Thank

18    you.

19    Q.  Agent Fairbanks, can you read what that labeling says about

20    the contents of that magazine?

21    A.  Yes, sir.  It says, "Rifle magazine, 5.56x45 NATO/.223

22    Remington, 30-round capacity."  Underneath that, it says

23    "Compatibility:  AR-15, M16, and M4."

24         MR. LOCKARD:  Now, Ms. Hurst, if you could show Agent

25    Fairbanks Government Exhibit 201-57 for identification.

1  Q.  Agent Fairbanks, do you recognize what's shown in that

2  picture?

3  A.  Yes, sir.

4  Q.  Is that from the defendant's cell phone?

5  A.  Yes, sir.

6  Q.  And how, if at all, does that picture relate to other

7  information from the defendant's cell phone that we've talked

8  about today?

9  A.  It is the contact picture for Geovanny Gutierrez, his son.

10            MR. LOCKARD:  The government offers 201-57.

11            THE COURT:  Any objection?

12            MR. MOSKOWITZ:  Nope.

13            THE COURT:  Received.

14            (Government's Exhibit 201-57 received in evidence)

15            MR. LOCKARD:  And, Ms. Hurst, if we can also bring up

16  Exhibit 1103.

17  Q.  And, Agent Fairbanks, are you familiar with the cultural

18  reference that's depicted in the defendant's son's cell phone

19  contact icon?

20  A.  The Instagram account?  Is that what you're talking about?

21  Q.  Let me start all over.

22            Do you recognize the cultural reference in the image

23  on the right, which is the picture associated with the

24  defendant's son in the defendant's cell phone?

25  A.  Yes, sir.

1    Q.  What is that?

2    A.  It's from the movie Scarface.

3          MR. LOCKARD:  Ms. Hurst, if you can zoom in on the

4    graphic on the magazine packaging.

5    Q.  Agent Fairbanks, what's reflected there?

6    A.  It's an image also from the Scarface movie as well as words

7    from the movie.

8    Q.  Can you read the movie quote that's on that magazine

9    packaging?

10   A.  Yes, sir.  It says, "All I have in this world is my balls

11   and my word, and I don't break them for no one."

12         MR. LOCKARD:  Ms. Hurst, if we could see Exhibit 1104,

13   please.

14   Q.  Is this a photograph from the Instagram account?

15   A.  Yes, sir.

16   Q.  What's shown here?

17   A.  It appears to be an AK-47 style rifle, a target that has

18   rounds that have pierced it.  Again, it appears to me to kind

19   of be a range, a firing range.  There are a couple of spent

20   round casings on the table along with an ammo box.

21         MR. LOCKARD:  If we could turn to Exhibit 1105.

22   Q.  Is this from the Instagram account?

23   A.  Yes, sir.

24   Q.  What's shown in this photograph?

25   A.  AR-15 style rifle with, again, a target, but no rounds have

1    pierced the target that I can see.  Again, it appears to me to

2    be in a firing range where the spent casings are on the floor,

3    and there's a bench to lay the rifle.

4    Q.  What is the color of that AR-15 style rifle?

5    A.  It's green in the middle.

6          MR. LOCKARD:  If we could turn to Exhibit 1110.

7    Q.  Is this also a photograph from the Instagram account?

8    A.  Yes, sir.

9          MR. LOCKARD:  The government also offers

10   Exhibit 1110-T.

11         MR. MOSKOWITZ:  Subject to the same objection.

12         MR. LOCKARD:  I'm sorry, Judge, was that received?

13         THE COURT:  I'm sorry?

14         MR. LOCKARD:  I'm sorry, I was just waiting to confirm

15   that it was received.  This is the 1110-T.

16         THE COURT:  I see it, I see it.

17         It's received.  Thank you.

18         MR. LOCKARD:  Thank you, Judge.

19         (Government's Exhibit 1110-T received in evidence)

20   Q.  Agent Fairbanks, have we seen a photograph similar to this

21   from the defendant's iCloud account?

22   A.  Yes, sir.

23   Q.  I'm sorry?

24   A.  No, sir.  It's from the son's iCloud account.

25   Q.  The son's iCloud account.  Thank you.

1          What is the translation of the writing on that

2     photograph?

3     A.   "The prettiest thing you will see today" with a hand emoji

4     and a face emoji.

5     Q.   Now, with respect to Government Exhibit 1116 through 1124,

6     are you familiar with some videos that were posted to the

7     Instagram account of the defendant's son?

8     A.   Yes, sir.

9          MR. LOCKARD:  Ms. Hurst, if we could please play 1116.

10         (Video played)

11    BY MR. LOCKARD:

12    Q.   Agent Fairbanks, what's shown in that video?

13    A.   It appears to be a golden color pistol with the extended

14    magazine resting on the center console.  There's a wallet also

15    on the center console and an AR-15 rifle in the passenger --

16    where your feet would go for the passenger, and he appears to

17    be driving in the video because you can see the gun move

18    around.

19    Q.   Are the other videos, are they similar in content to that

20    video?

21    A.   Yes, sir.

22    Q.   I'd like to look now at Government Exhibit 1125.  Is this

23    something that was posted to the Instagram account?

24    A.   Yes, sir.

25         MR. LOCKARD:  Government also offers Exhibit 1125-T.

1            MR. MOSKOWITZ:  Subject to the same objections, Judge.

2            THE COURT:  Received.

3            (Government's Exhibit 1125-T received in evidence)

4     BY MR. LOCKARD:

5     Q.  Agent Fairbanks, what is the translation of the message

6     that was posted to the Instagram account?

7     A.  "Start to" with a frog or a toad emoji and a frog/toad

8     emoji.

9     Q.  What is the significance of a frog or toad emoji in

10    Spanish?

11           MR. MOSKOWITZ:  Objection.

12           THE COURT:  Well, lay a foundation.  How would this

13    man now?

14           MR. LOCKARD:  Referring to the translator's note that

15    is below the translation in Exhibit 1125-T.

16           THE COURT:  All right.  So what do you need the

17    witness' testimony for?

18    BY MR. LOCKARD:

19    Q.  Agent Fairbanks, could you read the translator's note below

20    the translation.

21    A.  Yes, sir.  Says, "A frog, toad in Spanish is a *sapo*, a

22    common word also meaning snitch."

23           MR. LOCKARD:  If we could look at Exhibit 1124.

24    Q.  Agent Fairbanks, is this an image that was posted to the

25    Instagram account?

1    A.  Yes, sir.

2             MR. LOCKARD:  The government also offers

3    Exhibit 1124-T.

4             THE COURT:  Any objection?

5             MR. MOSKOWITZ:  Same objection.

6             THE COURT:  Received.

7             (Government's Exhibit 1124-T received in evidence)

8             MR. LOCKARD:  If we could pull up that translation.

9    BY MR. LOCKARD:

10   Q.  What is the translation of that message posted to the

11   Instagram account?

12   A.  "And where is the one who is out free," frog/toad emoji,

13   "SOB" bomb emoji, gun emoji.  "That and more," smile emoji.

14   Q.  Again, what is the translator's note about the meaning of

15   the frog/toad emoji?

16   A.  "A frog/toad in Spanish is a *sapo*, which is a common word

17   also meaning snitch."

18            MR. LOCKARD:  If we could turn to Exhibit 1107,

19   please.

20   Q.  Is this something that was posted to the Instagram account?

21   A.  Yes, sir.

22   Q.  And what is depicted in the photograph?

23   A.  It appears to be somebody in the passenger seat of a car

24   with a pistol sat right next to him, his leg, with an AR-15

25   rifle in the leg well where your leg and feet would go.

1    Q.  And what has been pasted above the AR-15-style rifle?

2    A.  Three frog or toad emojis.

3              MR. LOCKARD:  Government also offers Government

4    Exhibit 1107-T.

5              MR. MOSKOWITZ:  May I see it on the screen?

6              Objection.

7              THE COURT:  All right.  I'm sorry?

8              MR. MOSKOWITZ:  Objection, Judge.

9              THE COURT:  Well, is this the objection you had made

10   at the sidebar before, subject to connection?

11             MR. MOSKOWITZ:  No, your Honor.

12             THE COURT:  OK.  What's the objection?

13             MR. MOSKOWITZ:  There's nothing to translate on this

14   one.

15             THE COURT:  Right.  OK.  So it comes in without a

16   translation.  You can later provide a translation.

17             MR. MOSKOWITZ:  1107, Judge, is the picture.  1107-T

18   purports to be a translation for which a picture -- for which

19   no translation is necessary.  There are no words to translate.

20             THE COURT:  I agree.  I agree.  Sustained.  You can

21   have the witness describe the picture.

22   BY MR. LOCKARD:

23   Q.  So turning back to 1107.  Thank you.

24             Again, in this photograph with a picture of a handgun

25   at the bottom and an AR-15-style rifle in the middle, what are

1  the three emojis right above those guns?

2  A.  The frog or toad emoji.

3  Q.  And according to the translator's notes that we've talked

4  about previously, what is the meaning of a frog or toad emoji

5  in this concept?

6  A.  It means *sapo*, which can be translated as snitch.

7          MR. LOCKARD:  If we could now look at Exhibit 1113.

8  Q.  Is this an image that was posted to the Instagram account?

9  A.  Yes, sir.

10  Q.  And starting just with what's depicted in the photograph,

11  can you describe generally what kind of firearms are shown

12  here.

13  A.  Handguns and AR style 15 -- sorry, a rifle that's an AR-15

14  style and some extra long magazines.

15  Q.  And are bullets visible in the magazines?

16  A.  Yes, sir, in some of them, not all the magazines.

17  Q.  What about the item of clothing shown at the top?

18  A.  It appears to be a vest of some sort with which you would

19  carry extra magazines.

20  Q.  And what kind of magazine appears to be attached to the

21  AR-15-style rifle?

22  A.  It's a drum style that can hold more rounds than the normal

23  longer style.

24  Q.  And in the middle right, the gold and black firearm --

25  A.  Yes, sir.

L39HRAM5                          Fairbanks - Direct

1    Q.  -- does that appear similar to a firearm that we've seen in

2    other photographs?

3    A.  Yes, sir.

4         MR. LOCKARD:  And now the government offers

5    Exhibit 1113-T.

6         THE COURT:  Any objection?

7         MR. MOSKOWITZ:  Same objection, Judge.

8         THE COURT:  The "subject to connection" objection?

9         MR. MOSKOWITZ:  Yes, Judge.

10        THE COURT:  OK.  It's received.

11        (Government's Exhibit 1113-T received in evidence)

12   BY MR. LOCKARD:

13   Q.  And what is the meaning of the word and image that's been

14   posted on this photograph of a table full of firearms and

15   magazines?

16   A.  "Hi," frog/toad emoji.

17   Q.  So taking into account the translator's note, what does

18   that mean?

19   A.  "The frog/toad in Spanish is a *sapo* which is a common word

20   also meaning snitch."

21   Q.  So does that say hi, snitch?

22   A.  Yes, sir.

23   Q.  If we could look now back at Government Exhibit 502, again,

24   this is a chart of contact information from the defendant's

25   phone, his son's iCloud account, and correlating visa

L39HRAM5                          Fairbanks - Direct

1    information, is that right?

2    A.  Yes, sir.

3           MR. LOCKARD:  Could we turn to page 2 of this chart.

4    Q.  What's reflected in the second line of page 2?

5    A.  As far as name, it says Comisionado Martinez.

6    Q.  OK.  Does that contact appear in both the defendant's cell

7    phone and his son's iCloud account?

8    A.  Yes, sir.

9    Q.  Do those phone numbers match a phone number provided in the

10   visa information in the right two columns?

11   A.  Yes, sir.

12   Q.  And of the two numbers, home and other, which is the number

13   that appears to match?

14   A.  The home number.

15   Q.  And according to the visa information, what is the

16   employment of that individual?

17   A.  He works for the National Police in Honduras.

18   Q.  And what is that man's name?

19   A.  Ramon Aldaberto Martinez Hernandez.

20   Q.  The person described as Comisionado Martinez in his son's

21   cell phone and iCloud account?

22   A.  Yes, sir.

23          MR. LOCKARD:  Could we see Government Exhibit 201-161.

24   Q.  Where is this photograph from?

25   A.  The defendant's phone.

1   Q.  And do you recognize that person?

2   A.  I do.

3   Q.  Who is that person?

4   A.  It's the same Ramon Martinez Hernandez that we just talked

5   about.

6           MR. LOCKARD:  Could we see Government Exhibit 201-53.

7   Q.  Is this also from the defendant's phone?

8   A.  Yes, sir.

9   Q.  And who is that?

10  A.  The same individual, Ramon Martinez Hernandez.

11          MR. LOCKARD:  And if we could see Exhibit 201-164.

12  Q.  Is this also from the defendant's cell phone?

13  A.  Yes, sir.

14  Q.  Who's shown in this photograph?

15  A.  It appears to be -- appears to me to be Ramon Martinez

16  Hernandez and one of Geovanny Fuentes' sons.

17          MR. LOCKARD:  We have one more stipulation for the

18  afternoon.

19          THE COURT:  All right.

20          MR. LOCKARD:  In the matter of the United States of

21  America v. Geovanny Fuentes Ramirez, it is hereby stipulated

22  and agreed by and between the United States of America, by

23  Audrey Strauss, United States Attorney, Jacob Gutwillig and

24  Michael Lockard, Assistant United States Attorneys, and

25  Geovanny Fuentes Ramirez, by and through his attorneys, Avraham

Moskowitz, Esq., and Eylan Schulman, Esq., that:

1.  If called to testify, an agent from the Drug Enforcement Administration would testify that Government Exhibits 1201 to 1220 contain screenshots obtained from an open source profile maintained online by LinkedIn Corp. ("LinkedIn") with a vanity name "Ramon Aldaberto Martinez Hernandez."

THE COURT:  All right.

MR. LOCKARD:  2.  If called to testify, a custodian from LinkedIn Corp. would testify that Government Exhibits 1221 through 1229 are true and accurate copies of electronic records stored in the LinkedIn accounts associated with the URLs, and then are identified two specific URL addresses, maintained by LinkedIn on its servers and which were stored by LinkedIn in the ordinary course of its business.

And, finally, three:  The stipulation may be received in evidence at trial as Government Exhibit 1008.

THE COURT:  All right.  And you're offering the stipulation?

MR. LOCKARD:  We are, your Honor.

THE COURT:  Any objection?

MR. MOSKOWITZ:  No objection to the stipulation.

THE COURT:  All right.  It's received.

(Government's Exhibit 1008 received in evidence)

MR. LOCKARD:  And we also offer Government Exhibits 1201 through 1229.

1                    MR. MOSKOWITZ:  Subject to the same objection, Judge.

2                    THE COURT:  All right.  It's received subject to

3        connection.

4                    (Government's Exhibits 1201 through 1229 received in

5        evidence)

6                    MR. LOCKARD:  Ms. Hurst, would you pull up Government

7        Exhibit 1215.

8        BY MR. LOCKARD:

9        Q.  Now, Agent Fairbanks, are you familiar with LinkedIn

10       profiles maintained by Ramon Adalberto Martinez Hernandez?

11       A.  Yes, sir.

12       Q.  How many LinkedIn profiles are you aware of?

13       A.  Two.

14       Q.  Is this one of them?

15       A.  Yes, sir.

16                   MR. LOCKARD:  Ms. Hurst, if you could zoom in just a

17       little bit on the profile pic.

18       Q.  What is Officer Hernandez, Martinez Hernandez, wearing in

19       that profile pic?

20       A.  It appears to be a uniform.

21       Q.  And if we could turn to Exhibit 1216.

22                   Agent Fairbanks, what's shown in this exhibit?

23       A.  The second account for Ramon Martinez Hernandez.  Yes,

24       sorry.

25                   MR. LOCKARD:  I'd like to look at some of the pictures

L39HRAM5                          Fairbanks - Direct

1    that have been posted to this account.  If we could start with

2    1203.  Thank you.

3    Q.  Agent Fairbanks, what appears to be shown here?

4    A.  Mr. Martinez in front of a bunch of flags wearing a

5    uniform.

6              MR. LOCKARD:  And if we could see Exhibit 1211.

7              We offer Government Exhibit 1211-T.

8              THE COURT:  Any objection?

9              MR. MOSKOWITZ:  Same as before, Judge.

10             THE COURT:  All right.  Subject to connection, it's

11   received.

12             (Government's Exhibit 1211-T received in evidence)

13   BY MR. LOCKARD:

14   Q.  What is the -- Agent Fairbanks, what does the caption on

15   that photograph say?

16   A.  "Visiting the director of Carabineros de Chile, or Chilean

17   National Police Force."

18             MR. LOCKARD:  And if we could turn to Government

19   Exhibit 120-4.  Ms. Hurst, if we could zoom in on that.  Thank

20   you.

21   Q.  Is Commissioner Martinez's name on this certificate?

22   A.  Yes, sir.

23   Q.  As comisionado de policia?

24   A.  Yes, sir, it's right below there.

25             MR. LOCKARD:  If we could turn to Exhibit 1208.  At

1    this time we offer Exhibit 1208-T.

2              THE COURT:  Any objection?

3              MR. MOSKOWITZ:  Same objection, Judge.

4              THE COURT:  All right.  It's received.

5              (Government's Exhibit 1208-T received in evidence)

6    BY MR. LOCKARD:

7    Q.  What is the caption of this photograph, Agent Fairbanks?

8    A.  "Handing over my last posting for director of finance for

9    the National Police."

10   Q.  And in the file name of that image that begins with

11   screenshot underscore, is there a date and time stamp in that

12   file name?

13   A.  There appears to be, yes, sir.

14   Q.  What does that date appear to be?

15   A.  February 2017, February 6, is the way I would read that

16   date.

17             MR. LOCKARD:  And if we could look now at

18   Exhibit 1202.

19   Q.  In this picture from Comisionado Martinez's LinkedIn

20   profile, what's shown in this photograph?

21   A.  It appears to be Mr. Martinez shaking hands with President

22   Juan Orlando.

23             MR. LOCKARD:  Ms. Hurst, if you could please also pull

24   up Exhibit 918.

25   Q.  Agent Fairbanks, is Exhibit 918 a photograph from the

1    iCloud account of the defendant's son?

2    A.  Yes, sir.

3    Q.  And what's shown in Exhibit 918?

4    A.  It appears to be a similar photo with Mr. Martinez waiting

5    for President Juan Orlando to shake his hand.

6           MR. LOCKARD:  Could we turn now to Exhibit 1201.  And

7    the government offers 1201-T as well.

8           MR. MOSKOWITZ:  Same objection.

9           THE COURT:  Received.

10          (Government's Exhibits 1201-T received in evidence)

11   BY MR. LOCKARD:

12   Q.  Agent Fairbanks, could you tell us what is shown in this

13   photograph from Mr. Martinez's LinkedIn profile including the

14   translation of the writing on that picture.

15   A.  Yeah.  It appears to be a pin of some sort.  It says,

16   "Police Observer Course United Nations," and the caption is

17   "U.N. course for police observers."

18          MR. LOCKARD:  If we could look at Exhibit 1210.  If we

19   could zoom in on that a bit.

20          The government also offers 1210-T.

21          THE COURT:  Any objection?

22          MR. MOSKOWITZ:  Same objection.

23          THE COURT:  Received.

24          (Government's Exhibit 1210-T received in evidence)

25   BY MR. LOCKARD:

L39HRAM5                        Fairbanks - Direct

1    Q.  So does this picture appear to depict a certificate?

2    A.  It does.

3            MR. LOCKARD:  Ms. Hurst, I don't know if it's possible

4    to enlarge the photograph of the certificate.

5    Q.  And is police commissioner Ramon Adalberto Martinez

6    Hernandez's name on that certificate?

7    A.  Yes, sir.

8    Q.  At the bottom of the translation, what is that certificate

9    for?

10   A.  For international course in best policing practices.

11           MR. LOCKARD:  Could you please show Agent Fairbanks

12   Government Exhibit 201-14-T.

13   Q.  Are you familiar with this exhibit?

14   A.  Yes, sir.

15   Q.  So this is a translation.  Does it relate to a WhatsApp

16   chat on the defendant's phone?

17   A.  Yes, sir, it does.

18   Q.  And who are the participants in that WhatsApp chat?

19   A.  Comisionado Martinez and Geovanny F.

20           MR. LOCKARD:  Government offers Exhibit 201-14 and

21   201-14-T.

22           MR. MOSKOWITZ:  Same objection.

23           THE COURT:  Received.

24           (Government's Exhibits 201-14 and 201-14-T received in

25   evidence)

1        MR. LOCKARD:  Ms. Hurst, could you take us to page 3

2   of the translation, and if you could enlarge for us lines 49 on

3   down.

4   BY MR. LOCKARD:

5   Q.  So, Agent Fairbanks, on lines 49, on line 49, what is the

6   text from Geovanny F.?

7   A.  Says, "Colonel, how are we doing?"

8   Q.  And what does he text then?

9   A.  "Do you still have that code to do the erasing?"

10  Q.  And after Comisionado Martinez responds "Yes," what does

11  the defendant say?

12  A.  On line 55:  "Send it."

13  Q.  And on line 57?

14  A.  "So I can check my phone."

15  Q.  And what does Comisionado Martinez respond on line 59?

16  A.  "OK."

17       MR. LOCKARD:  Ms. Hurst, if we could turn to page 4,

18  and if you could bring us in on lines 69 to the bottom.

19  Q.  On lines 69 what does Comisionado Martinez text to the

20  defendant?

21  A.  "First step, *#21# if it's tapped.  Second step, *#62# if

22  the calls are being forwarded.  Third step, ##002# to untap the

23  calls."

24  Q.  And how does the defendant respond?

25  A.  With an emoji of someone laughing so hard they're crying is

L39HRAM5                          Fairbanks - Direct

1    what it appears to me.

2    Q.  And what else does Comisionado Martinez instruct in the

3    next text?

4    A.  "To see if you've been tapped already, *#06#.  You will see

5    the IME, and if you see /1, you have been tapped once, and so

6    on."

7              MR. LOCKARD:  Ms. Hurst, if we could turn to page 5.,

8    and if we could zoom in on lines 77 through 87.

9    Q.  What does Comisionado Martinez say on line 77?

10   A.  "I was tapped last week."

11             MR. LOCKARD:  Ms. Hurst, if we could look at lines 87

12   through 91.

13   Q.  What does the defendant tell Comisionado Martinez in

14   line 87?

15   A.  "We sure do talk a lot of crap," with a smiley face emoji

16   that looks like it's laughing and crying is what it looks like

17   to me.

18   Q.  And then there's a voice note, and what does Comisionado

19   Martinez describe in that voice note?

20   A.  "The thing is that before, before doing the first steps,

21   you had to do the last one, and I sent it last.  So then I

22   imagine it comes up differently.  Because with the first three

23   steps, you already erased everything.  I mean, if you had a

24   wiretap at home, everything -- everything -- everything was

25   diverted."

1    Q.  And in the responding voice note, what does the defendant

2    say?

3    A.  "I told you last time that my friend over there told me

4    that, that they were checking us out, that they had us, uh,

5    there, that they were listening to us, that I should not be

6    talking so much crap.  Don't you remember that I told you?"

7            MR. LOCKARD:  Ms. Hurst, if we could turn back to the

8    first page.

9    Q.  What is the approximate date of that exchange of WhatsApp

10   communications?

11   A.  February 25, 2020, approximately.

12           MR. LOCKARD:  If we could please look at Government

13   Exhibit 928.

14   Q.  Agent Fairbanks, where is this data from?

15   A.  The iCloud account.

16   Q.  Of the defendant's son?

17   A.  Yes, sir.

18           MR. LOCKARD:  Ms. Hurst, if you could also bring up

19   from Government Exhibit 201-14-T, page 4, line 69.

20   Q.  Agent Fairbanks, what's shown in the note on the

21   defendant's son's iCloud account?

22   A.  On the body where it says "body," towards the bottom of the

23   picture it says "*#21#, *#62#, **002#."

24   Q.  Are those the same instructions that Comisionado Martinez

25   sent to the defendant to untap his phone?

1   A.  Yes, sir.

2              MR. LOCKARD:  If we could turn to Exhibit 933.

3              And the government offers 933-T.

4              MR. MOSKOWITZ:  Let me see it for a moment, Judge.

5              THE COURT:  Any objection?  Are you looking,

6   Mr. Moskowitz?

7              MR. MOSKOWITZ:  Can I take a peek?

8              THE COURT:  Yes, sure.

9              MR. MOSKOWITZ:  Same objections as before.

10             THE COURT:  OK.  It's received subject to connection.

11             (Government's Exhibit 933-T received in evidence)

12  BY MR. LOCKARD:

13  Q.  Agent Fairbanks, where is this WhatsApp communication from?

14  A.  The iCloud account.

15  Q.  And who are the participants in this WhatsApp exchange?

16  A.  Comisionado Martinez and Geovanny Daniel Gutierrez.

17  Q.  Does he have the nickname Gio?

18  A.  Yes, sir.

19  Q.  What is the date range of these WhatsApp communications?

20  A.  Says April 1 through April 3, 2015.

21             MR. LOCKARD:  Ms. Hurst, if we could turn to page 3

22  and focusing in on April 3.

23  Q.  Agent Fairbanks, what does Comisionado Martinez text the

24  defendant's son on April 3, 2015?

25  A.  Line 1 says, "Greetings."  Line 3 says, "Hey, Gio."

1    Q.  And after Gio responds, "What's up?  How are you?" what did

2    Comisionado Martinez say?

3    A.  Line 7:  "Fine, Gio."  And then line 9:  "Did you know the

4    three that were killed in Cortes in a white truck?"

5            MR. LOCKARD:  And if we could turn to the next page.

6    Q.  Focusing in on lines 11 through 17, what did comisionado

7    say about the three men who were killed in the white truck?

8    A.  At line 11:  In a Chevrolet Tahoe -- Tahoo, I guess, is how

9    it's written.

10   Q.  And on line 15 and 17, how does Gio respond to that

11   question?

12   A.  "Not really."  And line 17:  "Why?"

13           MR. LOCKARD:  And if we could look now at lines 19

14   through 31.

15   Q.  How did Comisionado Martinez answer Gio's question?

16   A.  "Because they were saying that they were your dad's

17   bodyguards, the three of them."

18   Q.  And on lines 23 and 25, how did Gio respond to that

19   information?

20   A.  "I don't believe it.  I'm going to look into it now."

21   Q.  And on line 27, what else did Comisionado Martinez tell

22   Gio?

23   A.  "Yes, the people in Cortes told me that those guys had

24   worked with your dad.  The police from Cortes called me and

25   told me."

L39HRAM5                        Fairbanks - Direct

```
 1    Q.  And on line 31?
 2    A.  Gio responds, "I'll go look into it now."
 3              MR. LOCKARD:  If we could look now at Government
 4    Exhibit 201-162.
 5    Q.  Is this a photograph from the defendant's cell phone?
 6    A.  Yes, sir.
 7              MR. LOCKARD:  The government also offers
 8    Exhibit 201-162-T.
 9              MR. MOSKOWITZ:  No objection.
10              THE COURT:  Pardon me?
11              MR. MOSKOWITZ:  No objection.
12              THE COURT:  Received.
13              (Government's Exhibit 201-162-T received in evidence)
14    BY MR. LOCKARD:
15    Q.  So according to this photograph of the letter, who is this
16    letter from?
17    A.  You want me to -- it says -- the heading is partially cut
18    off the photo, and then it says Technical Agency of
19    Investigation, ATIC.
20    Q.  And does the document bear an official communication
21    number?
22    A.  Yes, sir.
23    Q.  And where and when does that communication appear to
24    originate?
25    A.  San Pedro Sula, Cortes, June 14, 2016.
```

L39HRAM5                        Fairbanks - Direct

1    Q.  And who does it appear to be addressed to?

2    A.  Chief of Aguas de Choloma, Cortes, your office.

3    Q.  Can you read for us the request from San Pedro Sula,

4    Cortes, to the chief of Aguas de Choloma.

5    A.  "Most respectfully, I am writing to you wishing you success

6    in your daily work and requesting from you in an urgent manner

7    that within 24 hours you instruct the appropriate person to

8    provide us with information on the company

9    records/registration, the numbers of the accountants signed to

10   them, and the real estate residences for each of the people

11   whom I list below."

12   Q.  Now, there are a number of names in this list.  If we could

13   turn to the second page of the translation, and looking at

14   lines 14 through 19, who are some of the people identified in

15   this request?

16   A.  Fuad Jarufe Larach, Jacqueline Jarure Dox, Janene Jarufe

17   Dox, Jenny Jarufe Dox, John Frederick Jarufe Dox, Jorge Fuad

18   Jarufe Dox.

19   Q.  And in the following paragraph, what other information is

20   provided in this request to the chief of Aguas de Choloma?

21   A.  "The above is in consideration with the compliance with

22   investigative proceedings known to this Technical Agency for

23   Criminal Investigation (ATIC) [Agencia Técnica de Investigación

24   Criminal] relating to complaint number 40-2016 for the crime of

25   money laundering to the detriment of the economy of the state

1  of Honduras.  Legal basis Article No. 3 of the Public

2  Prosecutor's office code and Articles No. 272 and 273 of the

3  Criminal Procedure Code.

4         "Thanking you in advance and in wait of a prompt and

5  affirmative response to the above request I remain.

6  Respectfully."

7         Stamp from the Honduran Public Prosecutor's Office,

8  Republic of Honduras, Technical Agency of Investigation, San

9  Pedro Sula, and signature agent Jose Flores.

10 Q.  This was a document that was found on the defendant's cell

11 phone, is that right?

12 A.  Yes, sir.

13        MR. LOCKARD:  Could we turn back to Exhibit 502,

14 please.

15 Q.  Again, this is a chart of contact information from the

16 defendant's cell phone and his son's iCloud account, correct?

17 A.  Yes, sir.

18        MR. LOCKARD:  If we can't turn to page 2, please.

19 Q.  So on line 2 is contact information for Comisionado

20 Martinez who you've talked about a little bit.  What is the

21 contact line below Comisionado Martinez's contact?

22 A.  Comisionado Alvarenga.

23 Q.  And according to visa application information, who is the

24 employer of Comisionado Alvarenga?

25 A.  Direccion de logistica de la Policia Nacional.

1    Q.  And if we could turn to page 3.

2            Are there other contact -- other contacts of the

3    defendants' phone and iPhone.

4            THE COURT:  One moment, please.  OK?

5    Q.  Are there other contacts in the defendant's phone in his

6    son's iCloud with police or military titles in their names?

7    A.  Yes, sir.

8    Q.  Who is the top line on this page of the chart?

9    A.  Comisionado Martinez Alvarado.

10   Q.  And going down a few lines, is there an entry for Subcomi

11   Munguia Antunez?

12   A.  Yes, sir.

13   Q.  And a Sup. Comisionado Sauceda?

14   A.  Yes, sir.

15   Q.  And a Comisario Zierra?

16   A.  Yes.

17   Q.  If we could turn to the next page.

18           Are there contact entries with military titles on this

19   sheet?

20   A.  Yes, sir.

21   Q.  And who is the top?

22   A.  General Ponce Fonseca.

23   Q.  And according to visa application information, who is that

24   individual's employer?

25   A.  Fuerzas Armadas de Honduras.

1   Q.  Is that the Honduran military?

2   A.  It is.

3   Q.  And is there a colonel listed below General Ponce Fonseca?

4   A.  Yes, sir.

5   Q.  And another colonel below that?

6   A.  Yes.

7   Q.  And who's listed below Colonel Melgar FUSINA?

8   A.  Fuad Jarufe, Jarufe.

9           MR. LOCKARD:  If we could pull up along with this

10  Government Exhibit 201-162-T, the second page, line 14.

11  Q.  Was Fuad J. Jarufe Larach one of the subjects of request

12  for the Technical Agency for Criminal Investigation relating to

13  money laundering investigations?

14  A.  Yes, sir.

15  Q.  And that individual is also in the defendant's cell phone

16  contacts?

17  A.  Yes, sir.

18          MR. LOCKARD:  Could we turn to Government

19  Exhibit 9371.

20  Q.  Do you recognize this photograph?

21  A.  Yes, sir.

22  Q.  And where is this from?

23  A.  The iCloud account.

24  Q.  And do you recognize anyone in the picture?

25  A.  I do.

1   Q.  Who do you recognize?

2   A.  It appears to me that Mr. Fuentes is on the left in a ball

3   cap.

4   Q.  And what is the individual on the right wearing?

5   A.  It appears to be a uniform.

6           MR. LOCKARD:  If we could turn to Exhibit 201-155.

7   Q.  Where is this photograph from?

8   A.  The defendant's phone.

9   Q.  Who do you recognize in this photograph?

10  A.  I recognize Geovanny, or Mr. Fuentes, on the left-hand side

11  again with the ball cap.

12  Q.  And what is the individual on the right wearing?

13  A.  Appears to be a vest with the Honduran flag, handcuffs, and

14  a radio.

15          MR. LOCKARD:  Could we look back at Exhibit 502,

16  page 3.

17  Q.  Who's the contact listed at the bottom of that sheet?

18  A.  Comanche in Mr. Fuentes' phone.

19  Q.  And how is that individual listed in the defendant's son's

20  iCloud?

21  A.  Teniente Coronel Salgado.

22  Q.  And are those phone numbers the same?

23  A.  They are.

24  Q.  And did that phone number also match visa application

25  information from 2015?

1   A.  It did.

2   Q.  Does that individual's name appear to be Teniente Coronel

3   Salgado?

4   A.  No.

5            MR. LOCKARD:  I'd like to look at a WhatsApp chat from

6   2019 from the defendant's phone.  If you could pull up for

7   Agent Fairbanks 201-11 and 201-11-T.

8   Q.  Agent Fairbanks, do you recognize that chat?

9   A.  Yes, sir.

10  Q.  Who are the participants in that chat?

11  A.  Comanche and Geovanny F.

12  Q.  And what's the date of that chat?

13  A.  December 14, 2019.

14           MR. LOCKARD:  The government offers Exhibit 201-11 and

15  201-11-T.

16           MR. MOSKOWITZ:  Same objection.

17           THE COURT:  I will take it subject to connection, if

18  that's the objection.  Thank you.

19           (Government's Exhibits 201-11 and 201-11-T received in

20  evidence)

21           MR. LOCKARD:  Ms. Hurst, could we look at page 2 of

22  the translation, and if we could focus in on the text and

23  picture box.

24  BY MR. LOCKARD:

25  Q.  Agent Fairbanks, what did Comanche text to the defendant in

L39HRAM5                        Fairbanks - Direct

1   line 1 on December 14 of 2019?

2   A.  It appears to be a picture of uniformed individuals.

3   Q.  And what was the defendant's response?

4   A.  On line 3 he said, "Comanche, who pinned the medal on?"

5   Q.  And what was Comanche's response?

6   A.  My general Velasquez, FUSINA commander.

7   Q.  And generally speaking, are you familiar with the word

8   FUSINA?

9   A.  Generally, yes.

10  Q.  And is that an agency or task force in Honduras?

11  A.  It is.

12  Q.  What, if any, relationship is there between FUSINA and

13  narcotics investigations or counter-narcotics efforts?

14  A.  I believe they're supposed to investigate narcotics.

15          MR. LOCKARD:  Ms. Hurst, could you pull up for Agent

16  Fairbanks Government Exhibit 201-4 and 201-4-T.

17  Q.  Agent Fairbanks, are you familiar with this WhatsApp chat?

18  A.  Yes, sir.

19  Q.  From what device was this WhatsApp chat?

20  A.  The defendant's phone.

21  Q.  Was that on October 29 of 2019?

22  A.  The message, yes.

23  Q.  And who are the participants to this chat?

24  A.  Geovanny F., Ramon Zuniga, and Comanche.

25          MR. LOCKARD:  The government offers 201-4 and 201-4-T.

L39HRAM5                        Fairbanks - Direct

1              MR. MOSKOWITZ:  Objection.

2              THE COURT:  Basis?

3              MR. MOSKOWITZ:  Sidebar.

4              THE COURT:  All right.  Ladies and gentlemen, if you'd

5     be comfortable standing up and stretching, you may do so.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  Yes.

3          MR. MOSKOWITZ:  This one has a little wrinkle because

4    we have a third participant in here that is not alleged to be a

5    coconspirator, and there's no -- government hasn't alleged it

6    in any of its papers.  There's been no indication until now.

7          THE COURT:  OK.  Who is the person, this

8    non-coconspirator?

9          MR. MOSKOWITZ:  Ramon Zuniga.

10         THE COURT:  Ramon Zuniga?

11         MR. MOSKOWITZ:  Zuniga.

12         THE COURT:  Zuniga.

13         OK.  Now, are the statements of Mr. Zuniga being

14   offered for the truth of their content?

15         MR. LOCKARD:  No, your Honor.

16         THE COURT:  All right.  Well, tell me why it isn't

17   appropriate for me to say that in this conversation Mr. Zuniga

18   is a participant, and his statements are not offered for the

19   truth of their content?

20         MR. MOSKOWITZ:  I have to look at the statement,

21   Judge --

22         THE COURT:  I know.

23         MR. MOSKOWITZ:  -- at all the statements, but I'm not

24   sure you can -- I'm not sure that doing that would allow the

25   context of anything else.

1      THE COURT:  Well, that's precisely the point.  In

2  other words, if there's an argument here that there's something

3  coming out of his mouth which injects an extraneous issue in

4  this case that's otherwise highly prejudicial or prejudicial,

5  that's a different story, but if he's a participant in the

6  conversation and he, in essence, furthers the conversation,

7  maybe asks questions or reacts to things that people say,

8  saying -- telling the jury that his statements cannot be

9  considered for the truth of their content, they only give

10  meaning to the statements by the other two participants in the

11  conversation, that would seem to do it.

12      MR. MOSKOWITZ:  I hear you.

13      THE COURT:  OK.  Well, if there's any other argument,

14  you want to make, I'm happy to hear it.

15      MR. MOSKOWITZ:  I just have to take two minutes to

16  take a look at the exact context.

17      THE COURT:  OK.

18      (Continued on next page)

1            (In open court; jurors present)

2            THE COURT:  Ladies and gentlemen, I propose that we go

3    till 4:30 today.  If you would like a break now, we can take a

4    break.  If you want to continue on through, we can continue on

5    through.  Would anybody like a break?

6            OK.  Then we're going to continue on through to 4:30.

7    Thank you.  If you change your mind on that, you'll let me

8    know, OK?

9            MR. MOSKOWITZ:  Subject to the Court's ruling, we're

10   fine.

11           THE COURT:  OK.  Thank you.

12           Now, ladies and gentlemen, I'm required by law to

13   instruct you that those lunch menus are not evidence.

14           So it appears that there will be three participants in

15   a conversation.  One of them, a Mr. Zuniga, if I'm pronouncing

16   that correctly.  As to any statements he makes, they are not to

17   be considered for the truth of their content.  He was also a

18   participant, and maybe he said something to facilitate the

19   conversation or reacting.  You can only take it in the context

20   of what the other two participants said and not anything --

21   consider the substance of anything he may have said.  All

22   right.

23   BY MR. LOCKARD:

24   Q.  OK.  Special Agent Fairbanks, now before we pick up with

25   the text and voice notes beginning on lines 3 and below, are

1  you familiar with the content of a video file that was sent

2  immediately -- or sent prior to that text and voice note chain?

3  A.  Yes, sir.

4  Q.  And in sum and substance, did that video file reflect

5  statements by an individual expressing concern for his life?

6  A.  Yes.

7  Q.  So beginning with line 3, what does Mr. Zuniga say?

8  A.  "This is getting ugly, brother."

9  Q.  And what is the defendant's reply in the voice note on

10  line 5?

11  A.  "Things are getting ugly, Ramoncito.  This shit is ugly,

12  and it's going to get uglier.  That's why I say we go drinking

13  tomorrow.  You just name the place, and we'll go there."

14        MR. LOCKARD:  And if we could turn to the next page.

15  Q.  Now, there's an exchange of graphics between -- or by

16  Comanche, and then on line 11, what does the defendant say?

17  A.  "This is really bad."

18  Q.  And then what does he say in the following voice note?

19  A.  "They have wanted to fuck me up like 50 times.  I don't

20  complain to anyone, Comanche.  The only one that can be is you,

21  Comanche."

22  Q.  And does that reflect an unintelligible comment in the

23  middle of that statement there?

24  A.  Yes, sir.

25  Q.  And how does Comanche respond?

L39HRAM5                        Fairbanks - Direct

1   A.  On line 15?  "This is really bad, gentlemen."

2   Q.  And on line 17, what does Comanche say?

3   A.  "Haha, and he was given support."

4   Q.  And who is Comanche talking to when he says "and he was

5   given support?"

6   A.  Who is he talking to?

7   Q.  Yes.

8   A.  Geovanny F.

9   Q.  And what is the defendant's response?

10  A.  "A hundred percent, Comanche."

11          MR. LOCKARD:  And if we could turn to the next page.

12  Q.  What does Comanche respond with?

13  A.  Sticker of a soldier saluting.

14          MR. LOCKARD:  Ms. Hurst, if you could pull up

15  Government Exhibit 201-6 and 201-6-T.

16  Q.  Agent Fairbanks, are you familiar with what's shown in

17  these two exhibits?

18  A.  Yes, sir.

19  Q.  And is this another WhatsApp chat from the defendant's cell

20  phone?

21  A.  It is.

22  Q.  And who are the participants to that chat?

23  A.  Geovanny F., Comanche, and Ramon Zuniga.

24  Q.  What is the date range on these chats?

25  A.  November 6 through 7, 2019.

1          MR. LOCKARD:  The government offers Exhibit 201-4 and

2     201-4-T.

3          MR. MOSKOWITZ:  With the same objection, Judge.

4          THE COURT:  All right.  Same objection as at the

5     sidebar?

6          MR. MOSKOWITZ:  Yes, Judge.

7          THE COURT:  OK.  All right.  So it's subject to the

8     same instruction that I gave you.  Go ahead.

9          (Government's Exhibits 201-4 and 201-4-T received in

10     evidence)

11          MR. LOCKARD:  So, Ms. Hurst, if you could please pull

12     up 201-6-T and move to the first page of text in this exhibit.

13     Should be the page numbered -- actually, starting here on

14     page 2.

15     Q.  What is reflected in the defendant's video file?

16     A.  On line 1?

17     Q.  Yes, sir.

18     A.  It says, "No voices, sound of gunfire."

19     Q.  And what is Comanche's response?

20     A.  "These Brazilians are complete men."

21     Q.  And what is the defendant's response in a voice note?

22     A.  "Don't spout crap, Comanche."

23     Q.  And what is Comanche's response?

24     A.  That's the way it should be, man.

25          MR. LOCKARD:  And if we could turn to the page

L39HRAM5                         Fairbanks - Direct

1    numbered 5 -- perfect, 3.

2    Q.  On line 8 of this page, what does it appear that Comanche

3    has sent by text?

4    A.  I don't see any lines.  I only see page 3.

5    Q.  Do you see a line 8 at the top left?

6    A.  Oh, yes, sir.

7    Q.  What does this, the text of this chat, appear to reflect?

8            MR. MOSKOWITZ:  Objection, Judge.

9            MR. LOCKARD:  I can rephrase the question.

10           THE COURT:  Rephrase it, yes.

11   Q.  If you could go down to the line that begins "Preliminary

12   report."

13   A.  Yes, sir.

14   Q.  What does that line say?

15   A.  "Preliminary report of male persons dead in a violent

16   manner," and then "firearm" in quotations.

17   Q.  Above that is there a date?

18   A.  Thursday, July 11, 2019.

19   Q.  And above that is there a location?

20   A.  San Pedro Sula, Cortes.

21   Q.  And after the line stating "Preliminary report of male

22   persons dead in a violent manner, firearm," what is the next

23   line of that report?

24   A.  "Good evening, sir.  I respectfully proceed to inform you

25   of the details below."

1  Q.  And below that is some narrative.  Can you summarize for us

2  what's described in that narrative.

3  A.  It's a narrative about -- about finding four people that

4  were dead.

5  Q.  Does it appear to describe a shooting?

6  A.  It does.

7  Q.  And what does it say about individuals dressed as anti-gang

8  forces?

9  A.  It says, according to the people present, individuals

10  dressed as anti-gang forces arrived at the site and asked to

11  check out the house, and without exchanging any words, they

12  shot the four individuals and fled in a white pickup vehicle.

13  Q.  And what does this report say with respect to motive?

14  A.  Turf war.

15  Q.  And at the bottom, what police department is identified, or

16  what police force?

17  A.  Preventive police.

18  Q.  And is there a name and title of the apparent police

19  officer?

20  A.  Yes, sir, Deputy Police Inspector Jasson Quintanilla;

21  driver, Alex Herrera.

22        MR. LOCKARD:  If we could turn to the next page.

23  Q.  Does Comanche also send the defendant some picture images?

24  A.  Yes, sir.

25  Q.  And what appears to be depicted in those pictures?

L39HRAM5                        Fairbanks - Direct

1   A.   Individuals that have been shot laying on the ground with

2   blood around most of them.

3   Q.   And if we could go to the next page, down on line 20, could

4   you read the voice note from the defendant.

5   A.   "Comanche, the thing is they are killing so many people

6   here in San Pedro.  One is Canelo, Comanche."  And it says in

7   brackets, "Canelo may be a name or may mean 'fool.'"

8        MR. LOCKARD:  And if we could now turn to Government

9   Exhibit 917.

10  Q.   Agent Fairbanks, are you familiar with this photograph?

11  A.   Yes, sir.

12  Q.   And where is this photograph from?

13  A.   The iCloud account.

14  Q.   And what's depicted in those photograph?

15       THE COURT:  What do you mean by "the iCloud account"?

16       THE WITNESS:  My apologies, Judge.  The iCloud account

17  belonging to Geovanny Gutierrez, Mr. Fuentes' son.

18       THE COURT:  Thank you.

19  Q.   And what appears to be depicted in this picture?

20  A.   Mr. Fuentes, who's wearing a beret, a vest with a

21  Honduran -- what appears to me to be the Honduran flag, with

22  handcuffs and a radio and making a saluting gesture.

23       MR. LOCKARD:  Your Honor, if I may have just one brief

24  moment to consult?

25       THE COURT:  Yes.

1          MR. LOCKARD:  No further questions, your Honor.

2          THE COURT:  All right.  I'm going to call upon my law

3   clerk or deputy -- oh, good.  Garrett's here.  Thank you.  Suit

4   up, Garrett, if you will.

5          All right.  Whenever you're ready, Mr. Moskowitz or

6   Mr. Schulman, whoever will do the honors.

7          MR. MOSKOWITZ:  Thank you.  I got it, your Honor.

8          THE COURT:  Thank you.

9   CROSS-EXAMINATION

10  BY MR. MOSKOWITZ:

11  Q.  Good afternoon, Agent Fairbanks.

12  A.  Good afternoon, sir.

13  Q.  You told us that you arrested Mr. Fuentes, correct?

14  A.  Yes, sir.

15  Q.  And at or around the time of his arrest, you met two of his

16  sons, correct?

17  A.  Yes, sir.

18  Q.  OK.  You met Gio, right?

19  A.  I believe so, yes, sir.

20  Q.  And Cristian, correct?

21  A.  Yes, sir.

22  Q.  And, in fact, you gave back Mr. Fuentes' property to them,

23  correct?

24  A.  Correct.

25  Q.  Now, both -- withdrawn.

1              Gio lives in Florida, correct?

2   A.  I believe so.

3   Q.  And so does Cristian, correct?

4   A.  I'm not sure where Cristian lives.  When I got his ID, it

5   was a Honduran ID.

6   Q.  But certainly Gio lives in Florida, correct?

7   A.  I believe so.

8   Q.  And it is Gio's iCloud account that you took some

9   photographs from, correct?

10  A.  It's one of the places there was photographs from, yes,

11  sir.

12  Q.  And his Instagram account, correct?

13  A.  I believe so, yes.

14  Q.  Now, in Florida a citizen over 21 is allowed to own guns,

15  correct?

16  A.  Not always, sir.

17  Q.  OK.  Someone who has not been convicted of a crime is

18  allowed to own a gun, correct?

19  A.  I believe so, but I'm not very familiar with Florida gun

20  laws.

21              (Continued on next page)

22

23

24

25

L39KRAM6                              Fairbanks - Cross

BY MR. MOSKOWITZ:

1   Q.  Are you aware, sir, that in Florida, you can own a gun

2   without a license?

3   A.  No, sir, I'm not aware.

4   Q.  Are you aware, sir, that in Florida, you can own assault

5   style rifles?

6   A.  No, sir, I'm not aware.

7   Q.  As part of your job, when you looked at the photographs on

8   Mr. Geo -- Junior, let's call him -- on Junior's --

9   A.  Yeah, I understand, it's complicated, but I'm having the

10  same problem.

11  Q.  I'll call the son Geo, okay?

12  A.  Yes, sir.

13  Q.  When you looked at the photographs on Geo's account, did

14  you want to find out whose guns they were?

15  A.  I believed they were Geo's guns.

16  Q.  And Geo meaning the son?

17  A.  Yes, sir.

18        I'm going to use the same terminology you use, if

19  that's okay.

20  Q.  Based on that belief, did you look to see whether he owned

21  them legally?

22  A.  No, sir.

23  Q.  That was of no concern to you?

24  A.  No, sir.

1    Q.  Now, in addition to the photographs that you have shown us

2    from Mr. Fuentes' phone, there were many, many more

3    photographs, correct?

4    A.  Correct, sir.

5    Q.  Thousands of photographs, correct?

6    A.  Yes, sir.

7    Q.  Photographs of Mr. Fuentes with his family, correct?

8    A.  Correct.

9    Q.  And we have seen pictures of three of his sons, correct?

10   A.  Yes, sir, I believe so.

11   Q.  That's Geo, Cristian, and Simon, I think you identified,

12   correct?

13   A.  That's what I believe their names are, sir.

14   Q.  You also saw pictures of his daughter on the phone,

15   correct?

16   A.  Yes, sir.

17   Q.  And the daughter is young, like four or five, correct?

18   A.  Relatively young, yes, sir.

19   Q.  And do you see a picture of Mr. Fuentes Ramirez with his

20   grandchildren?

21   A.  I don't know who the other individuals are in the pictures

22   that I saw, sir.

23   Q.  Now, we saw contact lists from Mr. Fuentes' phone, correct?

24   A.  Yes, sir.

25   Q.  One of the contacts was for President Hernandez, correct?

L39KRAM6                        Fairbanks - Cross

1    A.  It was, sir.

2    Q.  Do you know -- were you able to tell when the contact was

3    put into Mr. Fuentes' phone?

4    A.  No, sir.

5    Q.  When you looked through the phone, did you look to see

6    whether there was any contact between Mr. Fuentes and President

7    Hernandez?

8    A.  Yes.

9    Q.  And you didn't find any, correct?

10   A.  Correct.

11   Q.  With respect to Tony Hernandez, the president's brother,

12   there was no contact listed for Tony Hernandez, correct?

13   A.  I did not find one, sir.

14   Q.  And you had Tony Hernandez's phone information, correct?

15   A.  Yes, sir.

16   Q.  When you checked Mr. Fuentes' phone, you did not see any

17   contacts between Mr. Fuentes and Tony Hernandez, correct?

18   A.  Not between the phones that we actually seized, sir.

19   Q.  Well, you got two phones from Mr. Fuentes, correct?

20   A.  I do.

21   Q.  How many phones did you get from Tony Hernandez?

22   A.  Two as well, sir.

23   Q.  And in none of those phones were there contacts, correct?

24   A.  Not that I found, sir.

25   Q.  And just so that we're clear, when we talk about contacts,

L39KRAM6                        Fairbanks - Cross

1   there were no emails, correct?

2   A.  I don't remember going through emails, sir.

3   Q.  You had Mr. Fuentes' phone, correct?

4   A.  Correct.

5   Q.  Did you look to see whether he had emails on the phone?

6   A.  I don't think we went through his actual emails, sir.

7   Q.  Did you check to see whether there were any emails between

8   Mr. Fuentes and the president?

9   A.  From emails, sir, we didn't go through those.

10  Q.  So let's talk about chats.

11  A.  Okay.

12  Q.  Did you look to see whether there were any text messages

13  between Mr. Fuentes and President Hernandez?

14  A.  We did not find any, sir.

15  Q.  And there were no chats between Mr. Fuentes and Tony

16  Hernandez, correct?

17  A.  We did not find any WhatsApp chats.

18  Q.  How about text messages?

19  A.  No, sir.

20  Q.  That goes both with respect to the president and with

21  respect to Tony Hernandez, correct?

22  A.  Correct, sir.

23  Q.  Did Mr. Fuentes have contact information in his

24  phone -- withdrawn.

25          Mr. Fuentes did not have contact information for

L39KRAM6                          Fairbanks - Cross

1    Leonel Rivera, correct?

2    A.  I do not believe so, sir, but -- yeah, I don't think that

3    his phone -- his contact information was in there.

4    Q.  And he did not have contact information for Javier Rivera,

5    correct?

6    A.  I do not believe so.

7    Q.  Now, let's take the photographs from Mr. Fuentes' phone,

8    and those are -- well, everything you got from Mr. Fuentes'

9    phone is in what we'll call the 200 series, Government Exhibits

10   200, 201...

11   A.  Yes, sir.

12   Q.  You know what I'm talking about, right?

13   A.  Yes, I do know exactly what you're talking about.

14   Q.  So the 200 series are the items you got from Mr. Fuentes'

15   phone, correct?

16   A.  Correct.

17   Q.  And if I'm not mistaken, the 900 series comes from the

18   iCloud account belonging to his son, correct?

19   A.  Correct.

20   Q.  And the 1100 series is the Instagram account, correct?

21   A.  That is correct.

22   Q.  And the Instagram account we're talking about is also for

23   the son, Geo, correct?

24   A.  Correct, sir.

25   Q.  Now, with respect to the photographs that you testified

1   about on direct examination, do you know, with respect to any

2   of them, whether Mr. Fuentes took those photographs?

3   A.  No, sir, I don't know that.

4   Q.  Do you know whether they were taken on his phone or whether

5   they were sent to him?

6   A.  Some of the images come in like image versus like in a

7   chat.  So there is some distinction on some of the photos, but,

8   I mean, all I know is that that's where it came from, is from

9   the data that we got off the phone.

10  Q.  But you can't tell whether -- or you don't know, as you're

11  sitting here, whether any of the photographs we looked at were

12  taken by Mr. Fuentes' phone as opposed to an image that was

13  sent to him either by email or by some other fashion, correct?

14  A.  Correct, sir.  I don't know the difference.

15  Q.  And you don't know when they were taken, correct?

16  A.  There's a date stamp associated with some of the photos.

17  Q.  With respect to the photos that we looked at, you did not

18  identify any dates as to when they were taken, correct?

19  A.  Correct, sir.

20  Q.  And you showed us a lot of photographs, for example, of

21  guns.  You don't know when they were taken, correct?

22  A.  Generally speaking, no, we did not.

23  Q.  And you don't know where they were taken, correct?

24  A.  Correct.

25  Q.  You don't know whether they were taken in Honduras,

L39KRAM6                          Fairbanks - Cross

1    correct?

2    A.  Correct.

3    Q.  Or in Florida, correct?

4    A.  Correct.

5    Q.  Or anywhere else in the world, correct?

6    A.  Correct.

7    Q.  By the way, it is not illegal to have photographs of guns

8    on your phone, correct?

9    A.  No, sir.

10   Q.  With respect to the photos in the iCloud account from Geo's

11   iCloud account, could you tell when any of those photos were

12   taken?

13   A.  Some of those photos, as well, come with a date timestamp

14   in the file image portion.

15   Q.  You did not identify for us when any of them were taken,

16   correct?

17   A.  We did identify the ones with the watch, so that they

18   were -- according to the data, one was taken after the arrest

19   and one was taken before.  And one was from the defendant's

20   phone, so in that series, we did identify a date range.

21   Q.  Well, when you identified the date range, did you identify

22   the date that the photo was taken or when it was posted?

23   A.  I'm not sure.  It just has a date timestamp on the iCloud

24   return information.

25   Q.  The photograph that was posted or that was in the iCloud

1    account was a photograph of a hand with money, correct?

2    A.  Correct.

3    Q.  And it was wearing a watch, correct?

4    A.  Yes, sir.

5    Q.  And that was taken after Mr. Fuentes was already arrested,

6    correct?

7    A.  Correct.

8    Q.  And you don't know where that picture was taken, correct?

9    A.  No.

10   Q.  Or by whom, correct?

11   A.  Correct, sir.

12   Q.  And you don't know the source of that money, correct?

13   A.  That's correct.

14   Q.  Now, with respect to the guns depicted in any of the

15   photographs in the iCloud account, do you know whose guns they

16   are?

17   A.  No, sir.

18   Q.  Do you know when they were bought or if they were bought?

19   A.  I do not.

20   Q.  So, all we know is that there are pictures of guns,

21   correct?

22   A.  Lots of pictures of guns.

23   Q.  And, again, nothing wrong with that, right?

24   A.  No, sir.

25   Q.  Now, there was --

1      MR. MOSKOWITZ:  Can we get 201-101 up, please.

2  Q.  Now, this is a chat or something sent to Mr. Fuentes' cell

3  phone, correct?

4  A.  No, sir.

5  Q.  Well --

6  A.  It's a screenshot, so it came in the photo section.  That's

7  all that came, was just the screenshot.  So it appears that

8  somebody -- since it didn't come in a chat, maybe the phone was

9  screenshotted to save that image.

10  Q.  Okay.  So somebody took these photographs and sent them to

11  Mr. Fuentes, correct?

12  A.  I don't know that anybody sent them to him.  All I know is

13  that they were in a picture on his phone, just like that, sir.

14  Q.  And you don't know the person on the top, Cristhian Bienes

15  Raices, you don't know who he is, correct?

16  A.  I do not know who he is.

17  Q.  And you don't know where these pictures were taken either?

18  A.  I would assume in San Pedro Sula since that's where it says

19  they are.

20  Q.  You don't know when it was taken, correct?

21  A.  No, but the image has a timestamp of 4:16 p.m.  That's all

22  I know.

23  Q.  And there is nothing in Mr. Fuentes' phone that indicates a

24  response to any of the communications on this screenshot,

25  correct?

L39KRAM6                          Fairbanks - Cross

1    A.  I don't know that, sir.  I don't know who the communication
2    is, with and there's voice notes there.  I don't know who sent
3    those or who's talking.
4    Q.  Well, did you listen?
5    A.  I can't listen to it, sir; it's an image.
6    Q.  Did you try to see whether there was a response on the
7    phone to this image or to this communication?
8    A.  If I'm reading this right, sir, the green are response
9    notes and the white is what's being sent.  So, those are -- I
10   think those are two different conversations, but because it's a
11   picture, we can't listen to what's in the green.
12   Q.  So, we don't know -- the items that were interpreted, which
13   was a price of some sort, we don't know whether there was any
14   response to that, correct?
15   A.  I believe there's a response but we don't know what the
16   response is, yes, sir.
17   Q.  Now, in some of the pictures we have seen guns being held,
18   correct?
19   A.  Correct, sir.
20   Q.  You don't know who's holding the guns, correct?
21   A.  Apart from -- yeah, no, sir.  Apart from the one with the
22   back of the watch, which we showed earlier, where the finger is
23   on the trigger, and we show the similarity between that watch
24   and the watch that I took from Mr. Fuentes at the time of his
25   arrest and gave to his sons, apart from that, we weren't able

L39KRAM6                          Fairbanks - Cross

1  to distinguish any clues in the other photos with hands.

2  Q.  And we don't know when that photograph that you're talking

3  about was taken, correct?

4  A.  According to the data, it showed that it was probably taken

5  before he was arrested.

6  Q.  And, by the way -- you don't know where it was taken,

7  correct?

8  A.  Correct, sir.

9  Q.  And it was a picture of a hand holding a handgun, correct?

10  A.  Correct, sir.

11  Q.  And Mr. Fuentes had a license for a handgun, correct?

12  A.  He at least had one license, yes.

13  Q.  Now, among the photographs we looked at from the

14  defendant -- from Mr. Fuentes' phone, we looked at some

15  photographs of an individual that you identified as his

16  brother, Cristian Fuentes, correct?

17  A.  I believe so, yes.

18  Q.  And it took you a while to identify Mr. Fuentes, correct?

19  A.  Correct, sir.

20  Q.  He's a politician in Honduras, correct?

21  A.  I believe he's running for some kind of office, yes, sir.

22  Q.  And there's a picture of him with another politician,

23  right, with the president?

24  A.  With President Juan Orlando, yes, sir.

25  Q.  And, by the way, the picture that shows him standing right

1  next to Juan Orlando and his wife was taken at the president's

2  birthday party, correct?

3  A.  I believe that's what I discovered; his birthday party in

4  2017, sir.

5  Q.  So, he was already president, correct?

6  A.  Yes, sir.

7  Q.  In fact, he was elected in 2012 or 2013, correct?

8  A.  I believe the latter, sir, but, yes, one of those years.

9  Q.  The beginning of 2013, right?

10  A.  I think so.

11  Q.  And President Juan Orlando Hernandez is a member of the

12  Nationalist Party or the National Party?

13  A.  I believe it's called the National Party, sir, yes.

14  Q.  And so is Cristian Fuentes, correct?

15  A.  I believe so.

16  Q.  The photograph of Cristian Fuentes with the president was a

17  public-sourced document, correct?  It was on a website where

18  the president posted photos from his birthday party, correct?

19  A.  No, sir, not that I found.

20  Q.  Did you know that the president posted the photos from his

21  birthday party online?

22  A.  I did find those, sir, and I found one that has Cristian in

23  the background, but I didn't find the exact photo that we found

24  in his phone on open source.

25  Q.  Well, when you looked on open source, you looked at the

L39KRAM6                         Fairbanks – Cross

1  pictures from the president's birthday party, right?

2  A.  Yes, that's where I found similar type clothing and stuff

3  that would match the photo in the phone.

4  Q.  You did not find any photos of Mr. Fuentes at the party,

5  correct?

6  A.  Correct, sir.

7  Q.  And you were looking, right?

8  A.  I would have noticed, I believe, sir.

9  Q.  Mr. Fuentes' son Gio is married, correct?

10  A.  I believe so.

11  Q.  And you know he's married to the daughter of Javier Rivera,

12  correct?

13  A.  That's what I've been told, is that they're married.

14  Q.  And they have children together, right?

15  A.  I don't know if they have children together.

16  Q.  Now, among the pictures that you showed us were pictures

17  that you said came from a shooting range, correct?

18  A.  It looked like a shooting range to me, sir.

19  Q.  Well, it had all of the equipment from a shooting range,

20  right?

21  A.  The ones that I frequented, yes, it looked very similar.

22  Q.  It had the padding on the side of the area where the guns

23  were shot, right?

24  A.  Yes, sir.

25  Q.  And that's to dampen the noise, right?

L39KRAM6                        Fairbanks - Cross

1   A.   Exactly, sir.

2   Q.   And it had the bench where you would put the guns, right?

3   A.   Uh-huh, yes, sir.

4   Q.   It's legal in the United States to go to a shooting range

5   and shoot, right?

6   A.   In some places.  I don't know if I would categorize it as

7   the entire United States but there's obviously places you can

8   go shoot, yes.

9   Q.   How about in Florida?

10  A.   I don't know, sir.  I assume that there's gun ranges there,

11  but I don't know.

12  Q.   Now, one of the pictures we looked at was a picture of

13  Cristian Fuentes with some money on the table.  Do you remember

14  that?

15  A.   Are you referring to the brother or the son, sir?

16  Q.   The brother.

17  A.   Yes, sir.

18  Q.   And do you recall the money was red, right?

19  A.   That's what it appeared in the photo, sir.

20  Q.   In the United States we don't have red money, right?

21  A.   No, sir.

22  Q.   By the way, as part of your involvement in this case, are

23  you aware of the exchange rate between lempiras and dollars?

24  A.   No, sir, I'm not.

25  Q.   So you're not aware, for example, that lempiras are about

L39KRAM6                        Fairbanks - Cross

1   24 or 25 to the dollar?

2          MR. LOCKARD:  Objection.

3   A.  I'm not at all, sir.

4   Q.  Now, the photos from the Instagram account, just going back

5   to the basic questions, we know when they were posted to

6   Instagram, correct?

7   A.  I believe that's what they show, is when he puts them on

8   there.

9   Q.  But you don't know when they were taken, correct?

10  A.  Correct.

11  Q.  And you don't know where they were taken, correct?

12  A.  You're so generalizing every photo.  I'm trying to remember

13  the photos.  I mean, generally speaking, we could tell some of

14  them are taken in cars, on boats, but if you're talking

15  specific locations --

16  Q.  I'm talking about, you don't know if they're in the United

17  States or Honduras, for example?

18  A.  No, sir.

19  Q.  You don't know if they were in Florida or in New York?

20  A.  I do not.

21  Q.  And the photos that were posted, that you showed here, for

22  example — the photos of the cash, the United States currency —

23  they were posted after Mr. Fuentes' arrest, correct?

24  A.  I'm not sure, sir, if they were posted before or after.

25  Q.  Did you look for that information?

1    A.  I did.  I just don't remember off the top of my head.

2              MR. MOSKOWITZ:  Your Honor, this may be a perfect

3    time.  I have a little bit more, but it would help me out if we

4    could get it organized.

5              THE COURT:  So, what are we going to do for the next

6    four minutes?  Look at each other?

7              All right, listen, I like to go, usually, right to the

8    end there, so we use our time efficiently.  My clock says that

9    this would be an early four-minute break, and I'm going to go

10   along with that.  So, we'll break early, at 4:26.

11             Ladies and gentlemen, have a very pleasant evening.

12   Remember what I've said to you, and I will say it again:

13   Please do not discuss the case among yourselves or with anyone

14   else.  Do not do any research of your own; it's not fair.  And

15   please be back in time so that we can get a good 9:30 start.

16   And perhaps the most important:  Please stay healthy and safe.

17             And we hope to have a report on the juror who is not

18   with us.  So, Flo has the contact information, and we will try

19   and get an update for you.  But have a very pleasant evening.

20   See you tomorrow morning.

21             JUROR:  Thank you, your Honor.

22             THE COURT:  Flo, do you want to do something with the

23   menus?

24             THE DEPUTY CLERK:  Yes.

25             THE COURT:  Please wait for the jurors to exit.

1          We'll give them a minute to clear the elevator bank.

2     And, again, it would be helpful if you're here at 9:15 for any

3     contingencies that arise.

4          Other than that, have a very pleasant evening.  And

5     wait until the elevator area is clear before heading out there.

6     All right?  Thank you very much.

7          MR. LOCKARD:  Your Honor, may I make one hopefully

8     modest request?

9          THE COURT:  Yes.  Let's hear the modest request.

10          MR. LOCKARD:  The witness is on cross-examination, of

11     course, but he is also assisting the trial team with things

12     like witness logistics and things like that.

13          THE COURT:  Witness what?

14          MR. LOCKARD:  Witness logistics for prep and things

15     like that.  We would request permission to maintain

16     communication with him solely for that purpose, and I would not

17     speak to Agent Fairbanks at all until his cross is finished, if

18     Mr. Moskowitz is okay with that.

19          MR. MOSKOWITZ:  No objection.

20          THE COURT:  All right.  So, with that instruction,

21     that you aren't to discuss his direct or the cross in any way,

22     permission is granted on the consent of the defense.

23          MR. LOCKARD:  Thank you, your Honor.

24          THE COURT:  See you all tomorrow.

25          (Adjourned to March 10, 2016 at 9:15 a.m.)  * * *

```
 1                      INDEX OF EXAMINATION

 2   Examination  of:                         Page

 3   BRIAN FAIRBANKS

 4   Direct By Mr. Lockard  . . . . . . . . . . .63

 5   Cross By Mr. Moskowitz . . . . . . . . . . 167

 6                    GOVERNMENT EXHIBITS

 7   Exhibit No.                          Received

 8    103 and 1004  . . . . . . . . . . . . . .62

 9    1001   . . . . . . . . . . . . . . . . .67

10    201-100 through 201-114  . . . . . . . . .72

11    201-150 through 201-171  . . . . . . . . .72

12    1002   . . . . . . . . . . . . . . . . .78

13    201-101-T  . . . . . . . . . . . . . . .78

14    201-54 and 201-55  . . . . . . . . . . .85

15    901 through 935 and 1006   . . . . . . . .89

16    801 through 817 and 1005   . . . . . . . .90

17    502  . . . . . . . . . . . . . . . . . .92

18    203-1  . . . . . . . . . . . . . . . . .97

19    403  . . . . . . . . . . . . . . . . . 114

20    1007   . . . . . . . . . . . . . . . . 121

21    1101 through 1125  . . . . . . . . . . . 121

22    1111-T   . . . . . . . . . . . . . . . 123

23    1109-T   . . . . . . . . . . . . . . . 124

24    1112-T   . . . . . . . . . . . . . . . 125

25    201-57   . . . . . . . . . . . . . . . 127
```

```
1   1110-T    . . . . . . . . . . . . . . . . 129

2   1125-T    . . . . . . . . . . . . . . . . 131

3   1124-T    . . . . . . . . . . . . . . . . 132

4   1113-T    . . . . . . . . . . . . . . . . 135

5   1008    . . . . . . . . . . . . . . . . 138

6   1201 through 1229   . . . . . . . . . . . 139

7   1211-T    . . . . . . . . . . . . . . . . 140

8   1208-T    . . . . . . . . . . . . . . . . 141

9   1201-T    . . . . . . . . . . . . . . . . 142

10  1210-T    . . . . . . . . . . . . . . . . 142

11  201-14 and 201-14-T   . . . . . . . . . . 143

12  933-T   . . . . . . . . . . . . . . . . . 147

13  201-162-T   . . . . . . . . . . . . . . . 149

14  201-11 and 201-11-T   . . . . . . . . . . 155

15  201-4 and 201-4-T   . . . . . . . . . . . 163
```

```
16

17

18

19

20

21

22

23

24

25
```