L3AKRAM1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                        15 CR 379 (PKC)

GEOVANNY FUENTES RAMIREZ,

                    Defendant.

------------------------------x

                                          New York, N.Y.
                                          March 10, 2021
                                          9:35 a.m.
Before:

                    HON. P. KEVIN CASTEL,

                                          District Judge
                                             And A Jury

                        APPEARANCES

AUDREY STRAUSS,
        United States Attorney for the
        Southern District of New York
MICHAEL LOCKARD
JACOB GUTWILLIG
        Assistant United States Attorneys

AVRAHAM CHAIM MOSKOWITZ
ELYAN SCHULMAN
        Attorneys for Defendant

ALSO PRESENT:

JILL HOSKINS, Spanish Interpreter
GABRIEL MITRE, Spanish Interpreter
MIRTA HESS, Spanish Interpreter
MERCEDES AVALOS, USAO Spanish Interpreter
WALTER KROCHTAL, USAO Spanish Interpreter
BRIAN FAIRBANKS, DEA Agent

L3AKRAM1

```
 1            (In open court; jury not present)

 2            THE COURT:  Flo, mark this as the next court exhibit,

 3   and show it to the government, and show it to defense counsel.

 4   And you're also going to mark that's a juror note from

 5   Juror No. 3.  That's going to be marked as the next court

 6   exhibit.

 7            And there's also an email from Inner City Press, which

 8   I assume everybody received.

 9            With regard to the Inner City Press email, what I

10   would say is that in the world before the pandemic, we would

11   have exhibits physically marked, handed up, the clerk would

12   have them, we could show them to someone.  If an exhibit is

13   received in evidence, it's part of the public record, and the

14   press is entitled to see it.  I'm going to charge the

15   government with arranging its affairs to have all received

16   exhibits available through its press office for press review.

17            MR. LOCKARD:  Yes, your Honor, we often do that, and

18   we will do so here.

19            THE COURT:  Yes.  Well, you'll see in the email, that

20   the belief is that hasn't happened as to all exhibits, so

21   please get that corrected.

22            With regard to the note, which my deputy will show

23   you, my proposed response is:  The note has been received and

24   considered, and if there is anything I need to report to you or

25   any other juror, I will do so.
```

L3AKRAM1

| | |
|---|---|
| 1 | THE DEPUTY CLERK:  The note is Court Exhibit 3, and |
| 2 | the email is Court Exhibit 4. |
| 3 | (Pause) |
| 4 | MR. MOSKOWITZ:  Judge, in light of the nature of the |
| 5 | note and the fact that the case has been receiving some |
| 6 | substantial press coverage -- |
| 7 | THE INTERPRETER:  Excuse me, your Honor. |
| 8 | THE COURT:  Yes.  One second. |
| 9 | (Pause) |
| 10 | THE COURT:  All right.  Mr. Moskowitz? |
| 11 | MR. MOSKOWITZ:  Judge, the note from the juror gives |
| 12 | me just a little bit of concern about the possibility that |
| 13 | maybe he has seen or read some press coverage of the matter, |
| 14 | which has been more extensive than the usual.  I know that your |
| 15 | Honor has already instructed them on that, and routinely does |
| 16 | that, but I don't know if there is more that the Court can do |
| 17 | to admonish them to make sure they're not reading the press |
| 18 | because I know that the press has been extensive on this. |
| 19 | THE COURT:  Well, let me say for the record, with due |
| 20 | respect, these are relative terms.  So relative to your |
| 21 | ordinary felon-in-possession case, there's more press here, but |
| 22 | this is not a case that's being followed in the press.  I just |
| 23 | pulled up Mr. Fuentes Ramirez on Google, there's an Associated |
| 24 | Press, an aljazeera.com, Inner City Press, which is the fine |
| 25 | blog that covers goings-on in this courthouse, Reuters had |

L3AKRAM1

1    something out two days ago, and we know in January, there was a

2    Wall Street Journal article.  There's press coverage, and not

3    that Google is the infallible source of all coverage, but I

4    would hardly call it extensive.

5              MR. MOSKOWITZ:  Judge, I was concerned because there

6    was a New York Times article today that I pulled up online as I

7    was coming up.

8              THE COURT:  Oh, okay.  I didn't know there was one.

9              MR. MOSKOWITZ:  Neither did I until I looked this

10   morning.  So, that was the concern.  I'm not looking to make

11   this a bigger issue, but I think that the note is concerning,

12   obviously.

13             THE COURT:  Yes, well, it does not bespeak having

14   acquired information outside of what went on in the four

15   corners of this courtroom, but I think it is appropriate, and I

16   try to do this, I do this typically at the end of the workweek,

17   go through what the jurors ought not be doing, and I am of the

18   view that you can't do such things often enough.  So, in that

19   sense, I will look for appropriate moments, but don't want to

20   get into it in connection with the note because I think that

21   sends a wrong message, also.

22             MR. MOSKOWITZ:  Understood, Judge.  Thank you.

23             THE COURT:  All right.  Good.

24             So when our jurors are ready, you can bring them in.

25             (Continued on next page)

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen.

3          JUROR:  Good morning.

4          THE COURT:  Good to see you.  My only regret is that

5   we're not outside to enjoy some of the uncharacteristically

6   warm weather that we're getting, but that's the nice thing

7   about heading into spring — there should be a lot more of it.

8   This Sunday, of course, we move the clocks ahead an hour, so we

9   go to Daylight Savings.

10          Now, Juror No. 3, I've received your note, and it's

11   been duly considered.  If there is anything I need to report to

12   you or to the other jurors on any subject, I will do so

13   promptly.

14          Mr. Fairbanks, the Court reminds you that you are

15   still under oath.

16          THE WITNESS:  Yes, your Honor.

17          THE COURT:  All right.  And you may proceed,

18   Mr. Moskowitz.

19          MR. MOSKOWITZ:  Thank you, your Honor.

20   BRIAN FAIRBANKS,

21   CROSS-EXAMINATION CONTINUED

22   BY MR. MOSKOWITZ:

23   Q.  Good morning, Agent Fairbanks.

24   A.  Good morning, sir.

25   Q.  You told us yesterday that you've been with the DEA about

1   12 years, give or take?

2   A.  Since 2009, yes, sir.

3   Q.  And the last three and a half years, you've been in the

4   Bilateral Investigations Unit, correct?

5   A.  Approximately, yes, sir.

6   Q.  And in that unit, you told us you conduct large-scale

7   international drug-trafficking investigations, correct?

8   A.  Yes, sir.

9   Q.  You work with law enforcement agencies in other countries,

10  correct?

11  A.  In some other countries, yes, sir.

12  Q.  The DEA has agents in Honduras, correct?

13  A.  There's one right now currently, I think, sir.

14  Q.  And there has been an agent in Honduras for the last

15  several years, correct?

16  A.  Yes, sir, for the most part.  When you generalize several

17  years, I'm not sure if -- what the situation is day to day down

18  there, but, yes, overall, there's been agents down there.

19  Q.  When necessary, you can enlist the help of local law

20  enforcement, correct?

21          THE COURT:  Are you talking in a specific country or

22  all countries?

23  Q.  Well, when the DEA has agents in place, do they work with

24  local law enforcement?

25  A.  They attempt to work with local law enforcement, sir.

L3AKRAM1                        Fairbanks - Cross

1    Q.  Do they also work with Interpol?

2    A.  I'm not sure what the agents in Honduras -- their access is

3    to other places.  I've never been stationed in Honduras.

4    Q.  Now, after Mr. Fuentes was arrested, you seized his phones,

5    correct?

6    A.  Yes, sir.

7    Q.  And the DEA looked at all of the chats on his phones,

8    correct?

9    A.  We attempted to look at the chats on the phone, yes, sir.

10    Q.  In fact, you translated, or you had somebody translate, all

11    of the chats on his phones, correct?

12    A.  No, sir.

13    Q.  Well, there were thousands of chats, correct?

14    A.  Correct, sir.

15    Q.  And one of the things you wanted to do is you wanted to

16    find out what he was doing in the United States, correct?

17    A.  Yeah, sure, yes.

18    Q.  And you had the chats translated around his trip, correct,

19    before the trip and while he was here, correct?

20    A.  We had some of the chats translated, sir.

21    Q.  And you learned that he was here on business, right?

22    A.  I'm not sure I could conclude exactly why he was here in

23    the U.S.

24    Q.  Well, when you went through the chats, did you see he had

25    set up meetings?

L3AKRAM1                        Fairbanks - Cross

1  A.  I believe that I'm aware of at least one meeting that he

2  had with an individual named Bill, but --

3  Q.  Isn't it a fact, sir, that you learned from the chats that

4  he had meetings set up to negotiate deals to sell wood shims,

5  s-h-i-m-s?

6  A.  No, sir, not exactly.  I understand from -- I understand

7  that he has that business, but I'm not exactly sure what he was

8  doing here in the U.S.

9  Q.  On his phone, you found contracts, correct?

10 A.  Yes, sir.

11 Q.  For the sale of wood shims, correct?

12 A.  Yes, sir.

13 Q.  To companies in Florida, correct?

14 A.  I wouldn't be able to tell you without looking at them

15 where the contracts were, or what they were for, or for how

16 much.

17 Q.  Well, did you do any investigation to determine what he was

18 doing in Florida?

19 A.  Not much, sir.

20 Q.  You didn't think that was important?

21 A.  I understood that he was here visiting family at the time.

22 Q.  Did you do anything to investigate what he was doing here

23 in Florida?

24 A.  We reviewed all the chats in the phone, and that's where we

25 investigate.

L3AKRAM1                          Fairbanks - Cross

1    Q.  The chats did not reflect any drug-related activity while

2    he was here in Florida, correct?

3    A.  For those -- I'm not sure how long he was here for for that

4    stint, but we didn't find any for that stint.

5    Q.  And the chats reflected contracts with companies with --

6    Omega Marble & Granite, does that company ring a bell to you?

7              THE COURT:  Those are two different questions.

8              MR. MOSKOWITZ:  Okay.

9    Q.  Do you remember looking at his chats and seeing a contract

10   with Omega Marble & Granite?

11   A.  Do you have it, that I could see, to refresh my memory?  I

12   remember the contract, I believe, but I don't remember the

13   exact name of the company, sir.

14   Q.  Were there more than one contract that you saw in his

15   chats?

16   A.  Over the entire length of all of the pictures that I looked

17   at, yes, sir, there was more than one contract.

18   Q.  And they were for the sale of wood shims, right, and

19   biomass?

20   A.  Generally speaking.

21   Q.  And did you contact any of those companies to investigate

22   what their dealings were with Mr. Fuentes?

23   A.  No, sir.

24   Q.  And you didn't find out how long they were doing business

25   with him, correct?

L3AKRAM1                    Fairbanks - Cross

1    A.  No, sir.

2    Q.  Now, you reviewed with us, on your direct examination, some

3    chats involving a person identified as Comanche, correct?

4    A.  Yes, sir.

5    Q.  And you had a phone number for him, correct?

6    A.  Yes, sir.

7    Q.  You didn't do anything to contact him, correct?

8    A.  Are you asking me if I called him?

9    Q.  Yes.

10   A.  No, sir, I did not call him.

11   Q.  Did the DEA agent in Honduras go to speak to him?

12   A.  I did not ask the agent in Honduras to go and try and find

13   him.

14   Q.  Other than the chats, do you know anything about the nature

15   of the relationship between Mr. Fuentes and Comanche?

16   A.  I believe the chats show the relationship, but, yes, that's

17   where I could get my information from, is the chats.

18   Q.  But you did nothing else to determine, for example, how

19   long they knew each other?

20   A.  No, sir.

21   Q.  How they met?

22   A.  No, sir.

23   Q.  Now, by the way, the chats that we looked at yesterday,

24   those were not all of the chats between Mr. Fuentes and

25   Comanche, correct?

L3AKRAM1                          Fairbanks - Cross

1    A.  Correct, sir.

2    Q.  They were in fairly regular contact, correct?

3            MR. LOCKARD:  Objection.

4            THE COURT:  If you know.

5            THE WITNESS:  I'm not aware of how often they were in

6    contact, sir.

7    BY MR. MOSKOWITZ:

8    Q.  But you saw many chats, correct?

9    A.  There were -- yes, there were many chats between those two.

10   Q.  And you reviewed every single one of them, correct?

11   A.  I personally did not review every single one of them, sir.

12   Q.  Well, the agents that you were working with doing this

13   investigation, somebody in the group read the chats, correct?

14   A.  We have some translators that work in our group, and we

15   usually ask them to preview stuff and help us decide if it's

16   pertinent, since I don't speak Spanish, as was apparent

17   yesterday when I was trying to read it.

18   Q.  And the translators provided you with English translations

19   of the chats that were considered possibly pertinent, correct?

20   A.  Yes, sir.

21   Q.  One of the things you wanted to see was any discussion, for

22   example, of President Juan Orlando Hernandez, correct?

23   A.  No, sir.

24   Q.  Well, that wasn't of interest to you?

25   A.  Well, it would depend on what they were talking about and

1   the reference in the conversation.  Just the specific person,

2   not always -- like you said, not every chat with Comanche came

3   in because not every chat had stuff that was pertinent to what

4   we were investigating.  So merely being his name, we would have

5   to have some context there.

6   Q.  In the chats, there were times when Mr. Fuentes called or

7   expressed the opinion that President Hernandez should be

8   replaced, correct?

9   A.  I'm not sure.  Could you show me the chat that you're

10  referring to?

11  Q.  Very well.

12          MR. MOSKOWITZ:  Your Honor, I'd ask the government,

13  can we show --

14          MR. LOCKARD:  Objection, your Honor.

15          THE COURT:  Pardon me?

16          MR. MOSKOWITZ:  I have --

17          THE COURT:  Whoa, whoa, whoa, whoa.  Objection to

18  what?

19          MR. LOCKARD:  Maybe I could have a short sidebar?

20          THE COURT:  No.

21          What do you want to do, Mr. Moskowitz?

22          MR. MOSKOWITZ:  Your Honor --

23          THE COURT:  What are you trying to do?

24          MR. MOSKOWITZ:  Your Honor, 201-1, a government

25  exhibit for identification, I'd like to show the witness up on

L3AKRAM1                         Fairbanks - Cross

1    the screen.

2              THE COURT:  For the witness to see?

3              MR. MOSKOWITZ:  Correct.

4              THE COURT:  Are you trying to lay a foundation for its

5    admission, or are you trying to refresh his recollection on

6    something?

7              MR. MOSKOWITZ:  At the moment, I'm trying to refresh

8    his recollection.

9              THE COURT:  Okay.  Let me just see --

10             MR. MOSKOWITZ:  And I'd ask your Honor just lines 139

11   through 173.

12             THE COURT:  Is it on the screen now?  Let me just see

13   whether I can get this enlarged.

14             What line?

15             MR. MOSKOWITZ:  139 to 173.

16             THE COURT:  Starting at 139 and going to where?

17             MR. MOSKOWITZ:  173, Judge.

18             THE COURT:  Okay.  Thank you.

19             Okay.  What's your objection?

20             MR. LOCKARD:  It relates to a motion the defense filed

21   relating to these chats.

22             THE COURT:  Let me see you all at sidebar.

23             (Continued on next page)

24

25

1          (At the sidebar)

2          THE COURT:  This is what I don't understand:  You

3    didn't object to the question that was asked, now you're

4    objecting to an effort to refresh the witness' recollection

5    when he says, I'm not sure, can you show me the chats?

6          MR. LOCKARD:  So, we did object initially --

7          THE COURT:  Wait, wait, wait, you objected to the

8    question?

9          MR. LOCKARD:  Maybe it was the prior question.

10          THE COURT:  In the chats, there were times when

11    Mr. Fuentes called for the resignation.  That was the question.

12    There was no objection to that.

13          MR. LOCKARD:  I apologize, Judge, I don't remember

14    which question I objected to.  I guess my concern is that the

15    line of questioning, based on the fact that defense counsel

16    moved to preclude us from offering a number of his chats and is

17    now questioning about selective portions of those chats, and

18    these are chats --

19          THE COURT:  No, he's not questioning -- no, he's not

20    questioning about selective portions of the chats.  The

21    question is a question that stands apart from the chats; is it

22    not?

23          MR. MOSKOWITZ:  Correct.

24          THE COURT:  You don't need a chat to ask a question,

25    right?

1          MR. MOSKOWITZ:  Correct.

2          THE COURT:  So then he gets an "I'm not sure" answer.

3    In fact, it was the witness who referred to the chats.

4          MR. LOCKARD:  Correct.

5          THE COURT:  And now he wants to refresh the witness'

6    recollection with the chats.  I don't see anything wrong with

7    that.  Maybe I'm missing something.

8          MR. LOCKARD:  I suppose the next question, then, is to

9    ask a question about what the witness saw in the chats.

10          THE COURT:  No, it's not.

11          MR. LOCKARD:  Okay.

12          THE COURT:  That's not how it works.

13          MR. LOCKARD:  Okay.  All right, your Honor.

14          THE COURT:  That's not how it works.  The next

15   question is, having reviewed the chat — the only permissible

16   question — does it now refresh your recollection on the

17   subject?  And if the answer is yes, it's yes.  Please tell me

18   your refreshed recollection.  Am I wrong?

19          MR. MOSKOWITZ:  No, that's exactly right.

20          THE COURT:  Okay.  Objection overruled.

21          (Continued on next page)

22

23

24

25

L3AKRAM1                          Fairbanks - Cross

1              (In open court)

2              THE COURT:  All right.  So you want the witness to

3    look on the screen.  The question here, sir, is, looking at

4    what you're going to look at on the screen, the question will

5    be:  Does it refresh your recollection on the subjects you were

6    asked about?  What does it mean to refresh your recollection?

7    I think in response to one of the questions, you said, "I'm not

8    sure."  You're not being asked to read from the document or

9    confirm what the document says.  You're asked to look at the

10   document.  After you've finished looking at it, put the

11   document aside, ask yourself honestly, having read that

12   document, do you now have a new and refreshed recollection, if

13   you now remember something you didn't remember before, and, if

14   so, you'll be asked to give what that recollection is, and, if

15   not, you'll say so.

16             Do you understand?

17             THE WITNESS:  Yes, your Honor.

18             THE COURT:  All right.  So you can look at the

19   document that's been placed before you.

20   BY MR. MOSKOWITZ:

21   Q.  Let me know when you're finished reading.

22   A.  Oh, I'm finished reading, sir.

23             THE COURT:  Okay.

24   Q.  So, having reviewed that section of Government

25   Exhibit 201-1-T, does it refresh your recollection as to

1  whether Mr. Fuentes, in the chats, ever called for the

2  resignation of President Hernandez?

3  A.  Yes.

4  Q.  And what is your refreshed recollection?

5  A.  That he called for it, and that there was other responses

6  from Comanche.  I don't have it memorized.  I could read it.  I

7  don't have --

8          THE COURT:  That's not what you're being asked to do.

9  You're being asked to do what I said --

10          THE WITNESS:  Yes, sir.

11          THE COURT:  -- you're being asked to do, which is if

12  you have a new and refreshed recollection, give what it is; if

13  you don't, you don't.

14          THE WITNESS:  Yes, sir.

15  BY MR. MOSKOWITZ:

16  Q.  Did Mr. Fuentes, in any of his communications with

17  Comanche, explain why he wanted the president to resign?

18  A.  No, sir, I don't remember that.

19  Q.  Would you take a look at the chat again, please.

20  A.  I can read the chat, but your Honor said I can't just go

21  off of that.  I don't remember the specifics of the chat from

22  my memory, sir.

23  Q.  Okay.  Thank you.

24          MR. MOSKOWITZ:  Can we see Government Exhibit 201-104

25  on the screen, please.

BY MR. MOSKOWITZ:

Q.  You looked at that exhibit yesterday.  Do you recall that?

A.  Yes, sir.

Q.  And you identified it as a man looking at a gun in a case,
correct?

A.  I believe so, sir, yes.

Q.  Do you know who that man is?

A.  No, sir.

Q.  Do you know where the photo was taken?

A.  I know that we got it from the defendant's phone.

Q.  Do you know where the photograph was taken?

A.  No, sir.

Q.  Not even the country it was taken in, correct?

A.  No, sir.

Q.  Now, by the way -- and you also don't know when it was
taken, correct?

A.  Correct.

Q.  Now, most of the pictures on Mr. Fuentes' phone were
restored from an iCloud account, correct?

A.  I don't know if I would categorize it as "most."  I think
there was a restoration, but I don't know what came in the
restoration and what was new on the phone.

          MR. MOSKOWITZ:  Can we have the witness take a look,
please, at 3540-59, page 1.

          Your Honor, I think we have to do this the

L3AKRAM1                      Fairbanks - Cross

1    old-fashioned way.  It's not computer-accessible.

2              THE COURT:  Okay.  So do we have gloves here?

3              THE DEPUTY CLERK:  Yes.

4              THE COURT:  All right.  So, you put on gloves, Flo,

5    and Garrett will do it, and then give Mr. Moskowitz a pair of

6    gloves, and I think the witness gets a pair of gloves, right?

7              And you also have the paper spray.

8              THE LAW CLERK:  Yes.

9              THE COURT:  They have to spray the document.

10             It will be a pleasure for all of us when we return to

11   a day when we don't have to take these kinds of precautions,

12   huh?  Let's hope it's soon enough.

13             Okay.

14   BY MR. MOSKOWITZ:

15   Q.  Agent Fairbanks, have you had a chance to look at 3450-59?

16   A.  Yes, sir.

17   Q.  Isn't it a fact, sir, that most of the pictures on

18   Mr. Fuentes' cell phone were restored to the cell phone?

19   A.  No, sir.

20   Q.  Well, a large portion of them were, correct?

21   A.  According --

22             THE COURT:  You're not allowed -- the document is not

23   in evidence.  You're not allowed to read from the document.

24             THE WITNESS:  Okay.  Yes, sir.

25             From my memory, it was a specific folder, that a large

L3AKRAM1                         Fairbanks - Cross

1   portion of that specific folder was from an iCloud backup, is

2   what I remember being told, but --

3   BY MR. MOSKOWITZ:

4   Q.  And the photographs that we looked at, many of them were in

5   that folder, correct?

6   A.  Some of them were, yes, sir.

7   Q.  And what happened was, I guess, a prior phone had an iCloud

8   backup, correct, and it was restored from that?

9   A.  I don't understand how -- it's an iCloud backup.  I don't

10  know if the defendant backed up his phone and retrieved an old

11  backup, if he bought a new phone.  There's lots of ways that I

12  understand that could happen.

13  Q.  But the result of that was that there was no way for you or

14  the DEA to determine the date of those pictures, correct?

15  A.  Correct, sir.

16  Q.  All of the pictures that were restored had the same date,

17  meaning they were on the new phone or on the phone that you

18  got, they all had the same date, correct?

19  A.  Correct.  They're the ones from the iCloud backup.

20          MR. MOSKOWITZ:  Could we see, up on the screen,

21  Government Exhibit 201-111.

22  Q.  Again, that is a picture you identified yesterday of a hand

23  holding a gun, correct?

24  A.  Correct, sir.

25  Q.  And you have no idea who the hand belongs to, correct?

L3AKRAM1                           Fairbanks - Cross

1  A.  No, sir, I don't.

2  Q.  Or where the picture was taken, correct?

3  A.  No, sir.  I can only tell you where we found the photo.

4  Q.  In terms of -- we saw several pictures yesterday with hands

5  holding guns, correct?

6  A.  Yes, sir.

7  Q.  And we talked yesterday about the one with the watch.  That

8  one -- put that one aside.  All of the other pictures with the

9  hands holding the phone -- the gun, you have no idea whose hand

10  it was, correct?

11  A.  No, sir.

12  Q.  Meaning -- "No, sir" meaning, that's correct, you don't

13  know?

14  A.  Correct, sir, I do not know whose hand that is.

15  Q.  Thank you.  Okay.

16          MR. MOSKOWITZ:  Can we see Government Exhibit 201-54.

17          Can we blow that up just a little bit, so we can see

18  it.

19  Q.  Now, that is a page of the contacts from Mr. Fuentes'

20  phone, correct?

21  A.  It is some of the contacts from his phone, yes, sir.

22  Q.  And you identified some of them as Comisionado, meaning

23  commissioner, correct?

24  A.  I did not identify them, sir.  That is how they came on the

25  phone.

L3AKRAM1                        Fairbanks - Cross

1  Q.  We talked about them yesterday, right?

2  A.  Yes, sir.

3  Q.  You understand a little bit Spanish, but you and I both

4  understand Comisionado means commissioner, correct?

5  A.  I'm not sure what the relative correlation is, but I

6  understand it to be a police officer of some rank.

7  Q.  Now, did you check Mr. Fuentes' phones to see whether he

8  had any communications with Comisario Zierra?

9  A.  Yes, sir.

10  Q.  Did you find any?

11  A.  No, sir.

12  Q.  Did you find any communications with Comisionado Alvarenga?

13  A.  I don't remember if we found any or not, sir.

14  Q.  We talked about Comisionado Martinez.  That one, you

15  certainly did find, correct?

16  A.  Yes, sir.

17  Q.  How about Coronel Leandro Flores, did you find any

18  communications with him?

19  A.  Not to my memory, sir.

20  Q.  How about Coronel Melgar?

21  A.  El Comandante de Fusina, the line you're reading?

22  Q.  Yes, sir.

23  A.  I do not remember, sir, finding any of his.

24          (Continued on next page)

25

L3AHRAM2                          Fairbanks - Cross

1    Q.  The bottom line, General Ponce Fonseca, did you find any

2    communications with him?

3    A.  No sir, just both phone numbers, all the names from the

4    contact list, all that is in the phone.

5    Q.  And you were looking for those contacts, correct?  You

6    wanted to see what contacts he had with law enforcement,

7    correct?

8    A.  Yes, sir.  We were looking for what contacts he had with

9    law enforcement.

10   Q.  And when we talk about contacts or lack of contacts, we're

11   talking about there were no telephone calls that you saw,

12   correct?

13   A.  Could you be a little more specific in that?

14   Q.  On the call log, you didn't see any calls from Mr. Fuentes'

15   phone to the numbers of these police officers?

16   A.  I don't remember the entire call logs, sir.

17   Q.  Were you looking for the calls to those -- those police

18   officers?

19   A.  We did some.

20   Q.  And you don't recall whether you found any?

21   A.  Not back and forth do I remember at this time.

22   Q.  How about text messages?  Did you find any text messages

23   with those police officers?

24   A.  Some of them, yes.

25   Q.  Well, besides Commissioner Martinez, did you find any text

L3AHRAM2                        Fairbanks - Cross

1   messages?

2   A.  Yes, there were text messages on his phone.

3   Q.  Did you find any text messages with the other police

4   officers shown on Government Exhibit 201-54?

5   A.  I don't remember, but I don't believe so, sir.

6   Q.  Did you look for WhatsApp chats?

7   A.  Yes, sir.

8   Q.  Did you find any WhatsApp chats with any of the police

9   officers shown on 201-54 other than Commissioner Martinez?

10  A.  Well, sir, I don't believe so.  The question's a little

11  difficult to answer because everybody can change their name on

12  WhatsApp if they had a second phone, but with these number, I

13  don't believe so.

14  Q.  And the same question with respect to Colonel Leandro

15  Flores.  Did you find any communications, either phone calls,

16  text messages, or WhatsApp chats, with him?

17  A.  I don't remember, sir.

18  Q.  And how about General Fonseca Ponce?  Did you find any text

19  messages with him?

20  A.  I do not believe so, sir.

21  Q.  Phone calls with him?

22  A.  I do not believe.

23  Q.  WhatsApp chats with him?

24  A.  I do not believe so.  I just think we found his contact in

25  his cell phones and verified those against our visa

L3AHRAM2                          Fairbanks - Cross

1   applications specifically for Ponce Fonseca, making sure it was

2   the same number.

3   Q.  But you found no communications whatsoever, correct?

4   A.  I do not believe so.

5   Q.  Same questions with respect to the    Bayron Saucedo.  Do

6   you know who that is?

7   A.  Not specifically, no.

8   Q.  At some point in the investigation you came across a police

9   officer with the name Saucedo, correct, or Sauceda?

10  A.  Not -- I'm not recollecting it at this time, sir.

11  Q.  That's fine.

12          Can we see Government Exhibit 201-165, please.

13          201-165 you identified yesterday as a list of

14  registered guns, correct?

15  A.  Correct, sir.

16  Q.  OK.  You don't know whose guns they are, correct?

17  A.  At least two of them I know -- I believe I know whose guns

18  they are.

19  Q.  Whose are they?

20  A.  If you look at the serial number and compare those to the

21  gun registration cards from Geovanny Fuentes from the iCloud

22  account, to my memory right now, two of those serial numbers

23  match.

24  Q.  Meaning the son's?

25  A.  It was the son's iCloud account, but it was his dad's gun

1  registration cards from Honduras.

2  Q.  The other two you don't know?

3  A.  The other two I do not know.

4  Q.  And do you know whose handwriting that is?

5  A.  No, sir.

6      MR. MOSKOWITZ:  Can we see Government Exhibit 926,

7  please.  Can we blow that up a little bit, please.

8  Q.  Now, Government Exhibit 926 is some contacts from Gio

9  Fuentes, or Gio Gutierrez, Mr. Fuentes' son, correct?

10 A.  Correct, sir.

11 Q.  The one who lives in Florida?

12 A.  Correct, sir.

13 Q.  And it also shows phone numbers for what appear to be

14 police officers, correct?

15 A.  Correct, sir.

16 Q.  Did you check Gio's phone, the son's phone, to see whether

17 there were any contacts with the policemen on the list?

18 A.  So those weren't direct -- those are from the iCloud

19 account, and so we did review the return from the iCloud

20 account, but it wasn't exactly like the defendant's phone.  We

21 don't have his phone specifically.

22 Q.  But there were chats backed up, correct?

23 A.  There were some backed up, yes, sir.

24 Q.  And there were call logs backed up, correct?

25 A.  Some.

L3AHRAM2                           Fairbanks - Cross

1   Q.   Did you check the call logs to see if there were any calls

2   to any of the police officers on here?

3   A.   Yes, sir.

4   Q.   Did you find any?

5   A.   Some.

6   Q.   Would that be with Commissioner Martinez?

7   A.   Yes, sir.

8   Q.   Other than Commissioner Martinez, did you check -- did you

9   find any communications with any of the other police officers

10  on here?

11  A.   I don't remember at this time, but I don't believe so, sir.

12  Q.   Again, just so the record is clear, by communications we're

13  talking about phone calls, chats, or WhatsApps?

14  A.   Correct, sir.

15  Q.   Now, by the way -- can we see the next page.

16          One moment, Judge.   One moment, Judge.

17          The 927, officer, shows additional police contacts,

18  correct?

19  A.   Correct, sir.

20  Q.   Is it fair to say, sir, that you did not find any contact,

21  meaning any communications, between Gio and any of the police

22  officers on this list?

23  A.   I don't -- I don't believe so, but that's a very big

24  question with nine people and all their communications that

25  were on there, sir.

1    Q.  But as you're sitting here, you don't recall seeing any

2    communications either by phone or by text or by chat with any

3    of these people, correct?

4    A.  I do not at this time, sir.  Thank you.

5    Q.  By the way, Gio, we've established, lives in Florida,

6    correct?

7    A.  To my knowledge, he does, sir.

8    Q.  Did you ask to look at his phone?

9    A.  No, sir.

10   Q.  Did you subpoena his phone records?

11   A.  No, sir.

12   Q.  And you certainly didn't get a search warrant, correct?

13   A.  We got a search warrant for the iCloud account.

14   Q.  But not for his phone?

15   A.  No, sir.

16   Q.  Did you attempt to interview Gio Gutierrez, the son?

17   A.  No, sir.

18   Q.  Do you know what he does for a living?

19   A.  I believe he told me the day I met him that he had a

20   granite company, but I don't know anymore than that.

21              MR. MOSKOWITZ:  Could we see -- withdrawn.  Nothing

22   further, Judge.

23              THE COURT:  All right.  Redirect?

24              MR. LOCKARD:  Yes, your Honor.

25              THE COURT:  All right.  You may proceed.

1          One second, please.  Let's just make sure we have

2     whatever we need taken care of.

3          OK.  Mr. Lockard, you may go ahead.

4          MR. LOCKARD:  Thank you, your Honor.

5     REDIRECT EXAMINATION

6     BY MR. LOCKARD:

7     Q.  Special Agent Fairbanks, good morning.

8     A.  Good morning, sir.

9     Q.  On cross-examination just now, you were asked some

10    questions about what the defendant's son, Geovanny Jr., does

11    for a living?

12    A.  Yes, sir.

13         MR. LOCKARD:  Ms. Hurst, can we please see Government

14    Exhibit 924.

15    Q.  Agent Fairbanks, can you remind us, where was this

16    photograph found?

17    A.  From the iCloud account of Geovanny Gutierrez, the son of

18    Mr. Fuentes.

19    Q.  And Government Exhibit 922, where was that picture found?

20    A.  Again, the iCloud of Geovanny Gutierrez, the son of

21    Mr. Fuentes.

22    Q.  And Government Exhibit 920, where was that found?

23    A.  The iCloud account of the same individual.

24    Q.  You were also asked some questions yesterday about a

25    WhatsApp screenshot.

1              Ms. Hurst, can we please see Government

2     Exhibit 201-101.

3              Agent Fairbanks, do you recall those questions?

4     A.  Yes, sir, I do.

5     Q.  Can you remind us, what type of file is this that we're

6     looking at?

7     A.  It's a screenshot or just an image.

8     Q.  And from the image itself, are the voice notes that are

9     reflected there, are they accessible?

10    A.  No, sir, they're not.

11    Q.  You were asked some questions about whether you knew who

12    the sender of this screenshot was.

13    A.  Correct, if I knew who Cristhian was.

14    Q.  Right.  Where was this screenshot found?

15    A.  It was found in the defendant's phone.

16    Q.  And if we look at the sequence of communications, what does

17    it appear that the sender sent to the recipient?

18    A.  Pictures.

19    Q.  And what are those pictures of?

20    A.  AR-15-style rifle, just the butt of it in the very top

21    photo.  And then the bottom photo, or the second photo, seems

22    to be the AR-15s wrapped in some type of cellophane and maybe

23    broken down in some fashion.

24    Q.  While we don't know the content of the response, did the

25    receiver send a response?

1  A.  Yes.

2  Q.  And after the receiver sent those voice mails, what did the

3  sender then provide?

4  A.  A text.

5  Q.  And what was the content of that text?  Maybe we can see

6  201-101-T.

7  A.  It says they are here in SPS, meaning San Pedro Sula,

8  $2,500 each.

9  Q.  In other words, after those voice notes, whose content we

10  do not know, the sender responded with location and pricing?

11  A.  Yes, sir.

12  Q.  Agent Fairbanks, we've also talked about some gun licenses.

13         Can we please see Government Exhibit 932 and also

14  201-105.

15         Between these two pictures, how many apparent gun

16  licenses does it seem like we're looking at here?

17  A.  Can you blow up the one on the right a little bit, please,

18  sir.

19         It appears there's three total.  The one on the bottom

20  right seemed to be the same as the one from the defendant's

21  phone with the serial number 778233.

22         MR. LOCKARD:  Can we please blow up that image of that

23  license.

24  Q.  Now, what does it appear is licensed in this photograph?

25  A.  It appears to me to be an AR-15-style rifle.  Under make it

L3AHRAM2                     Fairbanks - Redirect

1    has an acronym, CLT, which I would take to be the Colt.

2    Q.  Is there also a serial number?

3    A.  There is, sir.

4    Q.  Does that appear to be a license for a particular weapon?

5    A.  It does.

6    Q.  In your search of the phone and the iCloud accounts, did

7    you find more than these three licenses?

8    A.  That belonged to Mr. Fuentes?

9    Q.  Correct, sir.

10   A.  No, sir, I think these are all that we found.

11   Q.  In your search of the defendant's cell phone in the iCloud,

12   did you find pictures of more than three weapons?

13   A.  Yes, sir.

14        MR. LOCKARD:  Could we please see Government

15   Exhibit 201-103, I believe.

16   Q.  Now, is that a picture of a Colt AR-15-style rifle?

17   A.  Yes, sir.

18   Q.  Can you see the serial number on that rifle?

19   A.  I cannot.

20        MR. LOCKARD:  Can we see Government Exhibit 201-100.

21   Q.  How many AR-15-style rifles are shown in this picture?

22   A.  I count five, sir.

23   Q.  Can you see the serial numbers of any of them?

24   A.  No, sir, I cannot.

25        MR. LOCKARD:  Could we please go back to Government

L3AHRAM2                          Fairbanks - Redirect

Exhibit 932.

Q.  Now, in this photograph does it appear that there's
something that looks like a gun license for a handgun or a
pistol?

A.  Yes, sir.  The top right picture appears to be a pistol.

Q.  And what does that appear to relate to, what kind of
weapon?

A.  Under the make it says "GLC," which I would take to be a
Glock.

Q.  And in your review of the defendant's cell phone, did you
find pictures of handguns that were not Glocks?

A.  Yes, sir.

        MR. LOCKARD:  Ms. Hurst, could we please see
Government Exhibit 201-114.

Q.  Agent Fairbanks, does this appear to be a Glock?

A.  It does not appear to me to be a Glock.

        MR. LOCKARD:  Can we see Government Exhibit 201-111.

Q.  Does that appear to be a Glock?

A.  No, sir, not to me.

Q.  Now, you were asked some questions about -- could you
please leave that back up.  Thank you.  201-111.

        You were asked some questions about whether you knew
whose hand was shown in that photograph.  Do you remember those
questions?

A.  Yes, sir, I do.

1   Q.  Where did you find this photograph?

2   A.  In the defendant's phone.

3   Q.  And in addition to this photograph, did you also find

4   photographs of other weapons?

5   A.  Yes, sir.

6   Q.  And did you also find photographs showing a hand holding

7   those weapons?

8   A.  On some of them, sir, yes.

9           MR. LOCKARD:  Could we see Government Exhibit 201-106.

10  Q.  Does this picture also have a hand holding a weapon?

11  A.  Yes, sir.

12  Q.  In the other photographs we looked at, could you see the

13  person's wrist where their watch would be?

14  A.  No, sir.

15  Q.  Agent Fairbanks, you were asked some questions about dates

16  relating to certain data that was found, I think in particular

17  on the defendant's cell phone.  Do you recall those questions?

18  A.  Yes, sir.

19  Q.  There was some discussion about whether those dates

20  reflected that there may have been a restoration or some type

21  of event like that on the phone?

22  A.  Yes, sir.

23  Q.  Do you recall when that occurred, approximately?

24  A.  No, sir, I don't.

25          MR. LOCKARD:  Ms. Hurst, could you show Agent

1    Fairbanks 201-R, I believe.

2              THE COURT:  Is this in evidence?

3              MR. LOCKARD:  It is not, your Honor.

4              THE COURT:  OK.

5              MR. LOCKARD:  And if we could go to the next page,

6    please.

7    Q.  Agent Fairbanks, is there any information on this sheet

8    that refreshes your recollection about the date of that

9    potential --

10             THE COURT:  Let me recast that.  Look at the

11   information on the sheet and see whether any of it refreshes

12   your recollection.

13   A.  No, sir, I was never aware of the actual date.  I was only

14   aware that it happened.

15   Q.  OK.  Is there date information of particular images or

16   chats that you did review?

17   A.  I'm sorry.  Can you repeat the question.

18   Q.  So instead of asking about dates generally with respect to

19   the images or chats on the phone, are there particular images

20   or chats that you recall looking at the date information for

21   those?

22   A.  Yes, sir, specifically the one with the watch and the money

23   and the watch and the gun.

24   Q.  So let's go to Government Exhibit 201-106 again.  Do you

25   recall the date information that was associated with that

L3AHRAM2                        Fairbanks – Redirect

1   picture?

2   A.   I don't remember the specific date information, but I

3   remember that it was before relatively closely before, the time

4   of the arrest of Mr. Fuentes.

5   Q.   Agent Fairbanks, you were also asked some questions about

6   whether you had reviewed chat or contact information for

7   individuals other than Commissioner Martinez.  Do you remember

8   those questions?

9   A.   Yes, sir.

10            MR. LOCKARD:  Can we please look at Government

11   Exhibit 201-14-T.

12   Q.   Is this a chat with Commissioner Martinez?

13   A.   It is.

14   Q.   And what is the date of that chat?

15   A.   February 25, 2020.

16   Q.   Do you know whether that is before or after the date of the

17   potential phone restoration?

18   A.   No, sir.

19            MR. LOCKARD:  And if we can look on page, I think, 3

20   of this chat.  Let's look at page 4.

21   Q.   In this chat that you did find on the defendant's phone,

22   what, if anything, does Commissioner Martinez tell the

23   defendant?

24            MR. MOSKOWITZ:  Objection, Judge.

25            THE COURT:  Basis?

1          MR. MOSKOWITZ:  Beyond the scope.

2          THE COURT:  I'll allow it.

3    A.   Throughout the whole page, sir?

4    Q.   Yeah.  If you're able to summarize what it is that -- or

5    describe the topic that Commissioner Martinez is addressing in

6    this chat.

7    A.   Yeah.  He's trying to talk to Mr. Fuentes about how to tell

8    if his phone's being tapped or if somebody's listening to his

9    phone calls.

10   Q.   Do you recall looking at date information with respect to

11   images posted on the defendant's son's Instagram account?

12   A.   Yes, sir.

13         MR. LOCKARD:  Ms. Hurst, could we pull up Government

14   Exhibit 1125 and 1124.

15   Q.   Did you review date information relating to these two

16   posts?

17   A.   I did.

18   Q.   And do you recall approximately when they were posted?

19   A.   I believe that they were posted before Mr. Fuentes' arrest

20   on March 1, 2020.

21         MR. LOCKARD:  Ms. Hurst, can you pull up 1125-T and

22   1124-T.  OK.

23   Q.   In these two chats about snitches, are there any weapons

24   shown in the photographs?

25   A.   On the right-hand side, the picture of the bomb and a

L3AHRAM2                          Fairbanks - Redirect

1    plastic gun.

2    Q.  So a bomb emoji and a firearm emoji?

3    A.  Yes, sir.

4    Q.  But not a picture of an actual physical weapon?

5    A.  Correct.

6            MR. LOCKARD:  Ms. Hurst, could we see Government

7    Exhibit 1107 and 1113.

8    Q.  Agent Fairbanks, did you review date information associated

9    with these two postings to the defendant's son's Instagram

10   account?

11   A.  Yes, sir.

12   Q.  Do you recall when they were posted?

13   A.  I believe they were posted after his arrest.

14   Q.  And in these posts after the defendant's arrest, are there

15   weapons along with the emoticon for a snitch?

16   A.  Yes, sir, in both of them.

17           MR. LOCKARD:  If we could look now at Exhibit 1216.

18   Q.  Now, this is a LinkedIn profile that we were looking at

19   yesterday.  Do you recall this profile?

20   A.  Yes, sir, I do.

21   Q.  Is this one of the two profiles that Commissioner Martinez

22   maintained at LinkedIn?

23   A.  It is.

24   Q.  Do you recall approximately when one of your colleagues at

25   the DEA captured these images from the LinkedIn account?

L3AHRAM2                          Fairbanks - Redirect

1    A.  Within the past month or so.

2    Q.  Since that time have you attempted to access this LinkedIn

3    account?

4    A.  I have.

5    Q.  And when did you attempt to access that LinkedIn account?

6    A.  Within the last week.

7    Q.  Were you able to?

8    A.  No, sir.

9    Q.  What, if anything, did you find when you tried to access

10   this LinkedIn account?

11   A.  A page that said that it was no longer available.

12   Q.  Are you aware if there had been anything made public

13   relating to this account between the time that your colleague

14   reviewed the account and the time that you attempted to review

15   the account?

16   A.  Yes, sir.

17   Q.  And what's that?

18   A.  Filings in this case.

19          MR. MOSKOWITZ:  Objection.

20          THE COURT:  Excuse me?

21          MR. MOSKOWITZ:  Objection.

22          THE COURT:  Basis?

23          MR. MOSKOWITZ:  Hearsay.

24          THE COURT:  No.  Overruled.  Go ahead.

25   BY MR. LOCKARD:

L3AHRAM2                      Fairbanks - Redirect

```
 1    Q.  So, Agent Fairbanks, what was made public about this
 2    account between the time that your colleague reviewed this
 3    account and captured these images and the time that you
 4    attempted to access the account and found that it was
 5    unavailable?
 6              THE COURT:  Made public by whom?
 7              MR. LOCKARD:  Oh, I believe the witness said that they
 8    were public filings in this case.
 9              THE COURT:  Public filings in this case?
10              MR. LOCKARD:  Yes, your Honor.
11              THE COURT:  Go ahead.
12              THE WITNESS:  Can you repeat the question.  Sorry,
13    sir.
14              MR. LOCKARD:  Sure.
15              THE COURT:  No, I think that was a good suggestion on
16    your part.  I'd like it repeated, too.
17    BY MR. LOCKARD:
18    Q.  So the question is between the date that your colleague
19    obtained these images from the LinkedIn account and the date
20    that you attempted to access the account and found it
21    unavailable, what was made public about this account?
22    A.  That we had identified Comisionado Martinez as Ramon
23    Adalberto Martinez Hernandez.
24              MR. LOCKARD:  May I have just a moment to consult,
25    your Honor?
```

L3AHRAM2                          Fairbanks - Redirect

1                THE COURT:  Yes.

2                (Counsel confer)

3                MR. LOCKARD:  Nothing further, your Honor.

4                THE COURT:  All right.  Thank you.  You may step down.

5                MR. MOSKOWITZ:  Judge, may I have two or three

6        questions?

7                THE COURT:  On what?

8                MR. MOSKOWITZ:  Just on the redirect.

9                THE COURT:  No, no, you may not, but you may have two

10       or three questions on the question of Commissioner Martinez and

11       the erasure of calls which you objected to as beyond the scope

12       of the direct.  If you want to ask on that, I will allow it.

13               MR. MOSKOWITZ:  No, thank you.

14               THE COURT:  OK.  You may step down.

15               THE WITNESS:  Thank you, your Honor.

16               (Witness excused)

17               THE COURT:  Just so you know, ladies and gentlemen,

18       the rules are Mr. Moskowitz was absolutely -- it's appropriate

19       for him to ask for leave to conduct a recross, but the rules

20       are, in general, that a witness testifies on direct, then

21       they're cross-examined and then there's a redirect.  For good

22       reason, extraordinary reasons, good cause shown, I could allow

23       further recross, re-redirect, re-re-recross, so on and so on,

24       but the general rule is direct examination, cross-examination,

25       and redirect.  So that's what we're doing.

L3AHRAM2                    Mervis - Direct

 1              The government may call its next witness.

 2              MR. GUTWILLIG:  Your Honor, the government calls

 3  Special Agent Gregg Mervis.

 4              THE COURT:  All right.  You may sit down and take off

 5  your mask, please.

 6              THE WITNESS:  OK.

 7  GREGG MERVIS,

 8       called as a witness by the Government,

 9       having been duly sworn, testified as follows:

10              THE COURT:  All right.  You may inquire,

11  Mr. Gutwillig.

12  DIRECT EXAMINATION

13  BY MR. GUTWILLIG:

14  Q.  Good morning, Special Agent Mervis.

15  A.  Good morning.

16  Q.  Where do you work?

17  A.  At Drug Enforcement Administration, also known as the DEA.

18              THE COURT:  You have to speak into that microphone

19  because that's the only way we'll ever hear you.

20              THE WITNESS:  I'm sorry.  Understood.  Sorry.

21  Q.  What's your current title at the DEA?

22  A.  Special agent staff coordinator.

23              THE COURT:  All right.  So back up a little bit so it

24  doesn't pop.  You're getting in the zone there.

25              THE WITNESS:  Understood.

L3AHRAM2                          Mervis – Direct

1   Q.   When did you first begin working at the Drug Enforcement

2   Administration?

3   A.   1997.

4   Q.   When you first joined the DEA, what position did you hold?

5   A.   I was a linguist.

6   Q.   What did you do as a linguist?

7   A.   I translated recorded communications from Spanish to

8   English.

9   Q.   Are you fluent in Spanish?

10  A.   Yes.

11  Q.   Do you have a degree in Spanish?

12  A.   Yes.

13  Q.   What degree is that?

14  A.   Bachelor of arts from George Mason University.

15  Q.   Approximately when did you graduate from George Mason

16  University?

17  A.   1996.

18  Q.   After serving as a linguist, what was your next position at

19  the DEA?

20  A.   I entered the DEA academy in Quantico, Virginia, in 1998.

21  Q.   Did you later become a special agent with the DEA?

22  A.   Yes.

23  Q.   Before you become a special agent, do you undergo any kind

24  of training?

25  A.   Yes.

L3AHRAM2                        Mervis - Direct

1   Q.  Can you please describe that training generally.

2   A.  It's about four months of training at the DEA academy in

3   Quantico which involves training on basic investigative

4   techniques, surveillance, confidential source management,

5   report writing, wiretap, legal training, firearms.

6   Q.  Have you also participated in a complex conspiracy

7   training?

8   A.  Yes.

9   Q.  Approximately when was that?

10  A.  2001.

11  Q.  Generally, what did that training consist of?

12  A.  The training was to get us to focus on expanding our

13  investigations from a local level outside of our local focus to

14  the source of supply, whether they be domestic or

15  international.

16  Q.  What do you mean by "source of supply"?

17  A.  Looking for those individuals that were providing the

18  narcotics traffickers with narcotics in our areas, so tracing

19  that flow of narcotics back.

20  Q.  To the source of narcotics, is that right?

21  A.  That's correct.

22  Q.  Once you finished at the DEA academy, where were you

23  stationed?

24  A.  Imperial County, California.

25  Q.  Generally, where is Imperial within California?

L3AHRAM2                          Mervis - Direct

A.   It's about two hours east of San Diego, right on the

U.S.-Mexico border.

Q.   Approximately how long were you stationed in Imperial

County?

A.   About six years.

Q.   Generally, what were your responsibilities while you were

stationed there?

A.   Our focus was on the narcotics transportation organizations

based out of Mexicali, Baja, California, that were sending

their narcotics shipments through Imperial County to the

Los Angeles, California, area.

Q.   What was the primary narcotic that you saw being imported

while you were stationed at Imperial?

A.   Cocaine.

Q.   While you were stationed in Imperial, or Imperial County,

did you investigate any international drug trafficking

organizations?

A.   Yes.

Q.   From which countries?

A.   Well, being close to the border there and so close to

Mexico, our investigations quickly took us back into Mexico,

starting with Baja, California, Mexico, and then down as we

moved up the food chain there it took us into the interior of

Mexico and then ultimately Central and South America.

Q.   If you were working as a DEA in California, why were you

L3AHRAM2                          Mervis - Direct

1   focused on drug trafficking organizations in Mexico, Central

2   America, and South America?

3   A.   Because our goal as DEA agents, especially in that region,

4   is to trace the flow of narcotics back, so not just look at

5   those individuals operating within Baja, California, but also

6   identify the individuals supplying them with the narcotics and

7   trace the flow back.

8   Q.   As a special agent in Imperial County, approximately how

9   many investigations were you involved in?

10  A.   Hundreds.

11  Q.   What were some of the investigative techniques you used

12  while working in Imperial County to learn about these topics?

13  A.   Confidential sources, we have a lot of confidential sources

14  operating within an area.  We did a lot of surveillance,

15  wiretaps.  We also made a lot of seizures on the border there.

16  From those seizures, we made arrests.  So we had

17  confidential -- I'm sorry, cooperating defendants that we

18  arrested that we then debriefed and obtained information from.

19  We also -- with those seizures of narcotics, we seized

20  electronic devices, cell phones, also documents, and exploited

21  those documents for the information.

22  Q.   As part of that work, did you coordinate with Mexican law

23  enforcement?

24  A.   Yes.

25  Q.   Were you briefed on Mexican investigations of narcotics

L3AHRAM2                              Mervis - Direct

1    traffickers?

2    A.  Yes.

3    Q.  OK.  Turning your attention to early 2005, did you leave

4    your post at Imperial County, California?

5    A.  Yes.

6    Q.  Where were you stationed next?

7    A.  The Caracas country office in Caracas, Venezuela.

8    Q.  When you were stationed in Caracas, what were your primary

9    responsibilities?

10   A.  It was to liaison with the Venezuelan counterparts, as well

11   as target narcotics traffickers operating within Venezuela.

12   Q.  What were some of the investigative techniques you used

13   while you were working in Venezuela?

14   A.  Once again, confidential sources were key.  We had numerous

15   confidential sources operating within Venezuela.  We also, like

16   I said, liaisoned with the Venezuelan counterparts and worked

17   closely with our -- because we bordered Colombia, we worked

18   closely with our DEA offices in Bogota and Cartagena.

19   Q.  And are Bogota and Cartagena located in Colombia?

20   A.  Yes.

21   Q.  If you were stationed in Venezuela, why were you

22   coordinating with Colombian law enforcement?

23   A.  During my tour there, it became clear that Venezuela served

24   as a transshipment point for cocaine loads coming out of

25   Colombia.  Because it bordered Colombia, what we'd see

1    frequently was shipments of cocaine that would come across the

2    border and be dispatched to other locations from Venezuela.  It

3    also became clear that the individuals calling the shots, the

4    upper-level narcotic traffickers in Venezuela, were actually

5    Colombian.

6    Q.  You said "transshipment."  Can you just explain in simple

7    terms what that means.

8    A.  Yes.  So, like I said, these cocaine shipments were coming

9    over from Colombia, but they were being sent out to different

10   locations in the world from Venezuela.

11   Q.  In the course of your work, did you learn about cocaine

12   production facilities in Colombia?

13   A.  Yes.

14   Q.  And while you were in Venezuela, did you investigate the

15   methods and routes used to transport cocaine through that

16   region to the United States?

17   A.  Yes.

18   Q.  What were the -- what was the primary type of narcotic

19   involved in your investigations in Venezuela?

20   A.  Cocaine.

21   Q.  You testified that you began working in Venezuela in 2005.

22   Turning your attention to 2008, did you move to a new station?

23   A.  Yes.

24   Q.  Where were you next stationed?

25   A.  The Baltimore district office in Baltimore, Maryland.

L3AHRAM2                          Mervis - Direct

1   Q.  What were your responsibilities in Baltimore?

2   A.  To target narcotic traffickers operating within the

3   Baltimore-Washington area.

4   Q.  For how long were you stationed there?

5   A.  About one year.

6   Q.  And while you were stationed there, did you keep apprised

7   of developments in Central and South America and Mexico related

8   to drug trafficking?

9   A.  Yes.

10  Q.  How did you do that?

11  A.  I maintained contact with some of the same confidential

12  sources that were working down in that region.  I also kept in

13  contact and abreast of investigations that were being run by my

14  former coworkers back at the embassy there in Caracas.  I also

15  read intelligence briefings and significant activity reports

16  regarding seizures and arrests made in that region.

17  Q.  For how long were you stationed in Baltimore?

18  A.  About one year.

19  Q.  Where did you go next?

20  A.  I went to the Washington division office detail HIDTA task

21  force in Annandale, Virginia.

22  Q.  You said HIDTA task force.  What does that stand for?

23  A.  HIDTA is high intensity drug trafficking area.

24  Q.  For how long were you stationed there?

25  A.  About five years.

L3AHRAM2                          Mervis – Direct

1   Q.  And while you were stationed at –- I should ask, where is

2   Annandale?  What state is Annandale located in?

3   A.  Virginia.

4   Q.  While you were stationed in Virginia, did you stay apprised

5   of information relating to drug trafficking in Central and

6   South America and Mexico?

7   A.  Yes.

8   Q.  How did you do that?

9   A.  I still had contact with some of those sources that were

10  providing information regarding that region.  I kept in contact

11  with some of the same agents working in Caracas, and I also

12  would read the intelligence briefings and activity reports

13  coming out of that region regarding seizures and significant

14  arrests.

15  Q.  When you say "seizures," can you just explain what you're

16  referring to.

17  A.  Sure.  So if there's a large-scale seizure made down there

18  or a big investigation where a high-profile narcotics

19  trafficker was arrested in Colombia, that would be produced

20  DEA-wide, and, you know, I keep abreast of that stuff.  It

21  would come across my desk frequently.

22  Q.  I should ask a different question.  What types of things

23  were you seizing or what types of things are you referring to?

24  A.  Cocaine primarily.

25  Q.  Turning your attention to March of 2014, did you join a new

L3AHRAM2                        Mervis - Direct

1    component of the DEA?

2    A.  Yes.

3    Q.  Which one?

4    A.  I joined the Special Operations Division's bilateral

5    investigation unit.

6    Q.  What is the Special Operations Division?

7    A.  It's essentially a conglomerate of law enforcement

8    agencies -- DEA, FBI, HSI, ATF, among others -- that come

9    together to coordinate investigations.

10   Q.  What's the focus of the bilateral investigations unit?

11   A.  It's to target narcotics traffickers operating

12   internationally.

13   Q.  Were you assigned to any particular unit or any particular

14   group within the bilateral investigations unit?

15   A.  Yes.

16   Q.  Which group is that?

17   A.  Latin America group.

18   Q.  Did you focus on any particular countries as part of your

19   work in that group?

20   A.  Yes.

21   Q.  Which ones?

22   A.  Colombia, Venezuela, Honduras, Guatemala, and Mexico.

23   Q.  Did these investigations focus on any particular type of

24   narcotic?

25   A.  Yes.

L3AHRAM2                        Mervis - Direct

1    Q.   What narcotic?

2    A.   Cocaine.

3    Q.   And while you were working at the bilateral investigations

4    unit, what were some of the investigative techniques you used

5    during these investigations?

6    A.   We relied on confidential sources.  We had numerous

7    confidential sources operating within those countries that I

8    mentioned.  We also, through seizures made and arrests made

9    down there, primarily starting with arrests, confidential --

10   I'm sorry, cooperating defendants that were arrested in those

11   investigation, we would debrief those defendants and obtain

12   information.  Also through seizures made down in that -- in

13   those regions, there were always electronic devices, cell

14   phones, other communication devices that were exploited that

15   yielded information, as well as documents connected to those

16   investigations.  And we worked with the DEA offices within

17   those countries as well as primarily with the Colombian

18   counterparts in Bogota and Cartagena.

19   Q.   Did you coordinate with Honduran law enforcement?

20   A.   No.

21   Q.   You said you coordinated with Colombian law enforcement.

22   Did you attend any presentations from Colombian law

23   enforcement?

24   A.   Yes.

25   Q.   What types of information generally was presented?

L3AHRAM2                          Mervis - Direct

A.   They would present intelligence briefings related to their

investigations, so it would be -- whether it's through their

wiretaps, information they developed from their confidential

sources, seizures they made within Colombia, documents and

electronic device, downloaded electronic devices that were

related to those seizures, that information was presented to us

in intelligence briefings.

Q.   While you were working with the bilateral investigations

unit, did you also work in coordination with an organization

called PANEX?

A.   Yes.

Q.   What is PANEX?

A.   PANEX is a joint law enforcement task force made up of DEA

agents and other law enforcement entities that targets -- its

focus is maritime narcotics trafficking.  So that's narcotics

transportation via vessels.

          THE COURT:  I hope you're going to tie up the

relevance of this testimony to something to do with this case.

          MR. GUTWILLIG:  Yes, your Honor.

          THE COURT:  If you could, please.

Q.   Special Agent Mervis, did you leave the bilateral

investigations unit at some point?

A.   Yes.

Q.   Approximately when was that?

A.   2015.

L3AHRAM2                          Mervis - Direct

1   Q.   And what was your next assignment?

2   A.   Group supervisor back at the Annandale task force.

3   Q.   What's your current assignment?

4   A.   I'm special agent staff coordinator back at the Special

5   Operations Division.

6   Q.   Do you keep apprised of information relating to

7   international drug trafficking?

8   A.   Yes.

9   Q.   In the same ways that you described earlier?

10  A.   Yes.

11  Q.   Using all of the investigatory methods you described, have

12  you learned about the routes used to transport cocaine to the

13  United States from South and Central America?

14  A.   Yes.

15  Q.   Have you learned about the methods used by drug trafficking

16  organizations to manufacture and transport the cocaine along

17  those routes?

18  A.   Yes.

19  Q.   Did you learn about the price of cocaine along those drug

20  trafficking routes?

21  A.   Yes.

22  Q.   Did you become familiar with the law enforcement target

23  subjects in Central America?

24  A.   Yes.

25  Q.   In testifying today, will you be relying on the synthesis

L3AHRAM2                          Mervis - Direct

1    of all these different types of investigatory methods you've

2    described?

3    A.  Yes.

4    Q.  You have testified previously as an expert at a federal

5    trial?

6    A.  Yes.

7    Q.  What generally was the subject matter of that testimony?

8    A.  The transportation of cocaine from South America via

9    Central America to Mexico and into the U.S.

10          MR. GUTWILLIG:  Your Honor, the government moves to

11   qualify Special Agent Mervis as an expert in the drug

12   trafficking routes and counter-narcotics investigatory methods.

13          THE COURT:  Any objection?

14          MR. SCHULMAN:  Your Honor, I hate to do it, but may I

15   have a brief voir dire?

16          THE COURT:  You may.  Can you do it from your place?

17   That would be the best way if you have your microphone there.

18          MR. SCHULMAN:  Of course, Judge.

19          THE COURT:  Thank you.

20          MR. SCHULMAN:  Do I stand or stay seated?

21          THE COURT:  Stay seated, if you will, with my

22   permission.

23   VOIR DIRE EXAMINATION

24   BY MR. SCHULMAN:

25   Q.  Good morning, Agent Mervis.

L3AHRAM2                          Mervis - Direct

1   A.  Good morning.

2   Q.  You just heard that there was an application in terms of

3   your expertise in drug trafficking, right?

4   A.  Yes.

5   Q.  Now, you haven't worked in the Latin American group since

6   the summer of 2015, isn't that right?

7           MR. GUTWILLIG:  Objection, your Honor.  Asked and

8   answered.

9           THE COURT:  This is voir dire.  Go ahead.

10  Q.  You haven't worked in the Latin America group since the

11  summer of 2015, correct?

12  A.  Correct.

13  Q.  Specifically, it's been six years since you were assigned

14  to the Latin America group, right?

15  A.  Almost six years, correct.

16  Q.  You haven't traveled to Latin America since 2015?

17  A.  No.

18  Q.  You haven't managed cooperating witnesses in Latin America

19  since 2015, right?

20  A.  Correct.

21  Q.  You haven't run wiretaps in Latin America since 2015?

22  A.  I never ran wiretaps in Latin America.

23  Q.  OK.  So you've never ran wiretaps in Latin America period,

24  right?

25  A.  Correct.

L3AHRAM2                          Mervis - Direct

1   Q.  No foreign intercepts in Latin America since at least 2015,

2   right?

3   A.  Is that a question?

4   Q.  Yes, that's a question.

5         You have not run any wiretap -- foreign intercepts in

6   Latin America since 2015, isn't that right, sir?

7   A.  Yeah, I never ran foreign wire intercepts.

8   Q.  OK.  You never ran foreign intercepts in Latin America?

9   A.  No.

10  Q.  You haven't conducted any surveillance in Latin America

11  since at least 2015, right?

12  A.  Yeah, I never did surveillance in Latin America.

13  Q.  You never did surveillance in Latin America ever?

14  A.  No.

15  Q.  OK.  Have you ever published in the area of drug

16  trafficking routes?

17  A.  No.

18  Q.  Have you ever published in the area of counter-narcotics

19  methods?

20  A.  No.

21  Q.  Have you ever authored training materials as it relates to

22  drug trafficking through Latin America?

23  A.  Authored training?

24  Q.  Have you ever authored training materials?

25  A.  Written training?

L3AHRAM2                          Mervis - Direct

```
 1   Q.  I'm sorry?

 2   A.  You mean have I ever wrote it?

 3   Q.  Have you ever authored training materials --

 4           THE COURT:  Well, no, the question you're being asked,

 5   and I think it's fair -- can you please state it differently.

 6   When you say "authored," the word "author" is a noun.  You're

 7   using it as a verb.  So please explain what you mean.

 8           MR. SCHULMAN:  I'm sorry if I was unclear.

 9   Q.  Have you ever written training materials in the areas of

10   drug trafficking through Latin America into the United States?

11   A.  No.

12   Q.  Have you ever written -- and you've not written any memos

13   on strategies and tactics in dealing with Honduras, correct?

14   A.  No.

15   Q.  You've also not written memos on strategies in dealing with

16   drug trade through Latin America, isn't that right?

17   A.  No.

18   Q.  By the way, you were not the group supervisor when you were

19   in that --

20           THE COURT:  Watch your tone.

21           MR. SCHULMAN:  Sorry, Judge.

22   Q.  Were you the group supervisor when you were in the Latin

23   American group from March 2014 to the summer of 2015?

24   A.  No.

25   Q.  And your time -- you would agree that your time in the
```

L3AHRAM2                          Mervis - Direct

1   Latin American group was limited, right?

2   A.   It was about 18 months.

3   Q.   From, again, March 2014 to the summer of 2015, right?

4   A.   Correct.

5   Q.   And then prior to that you spent about three years in

6   Venezuela from 2005 to 2008, is that right?

7   A.   That's correct.

8   Q.   And while you were in the Latin American group, how many

9   countries were you focused on?

10  A.   When I was in the Latin America group?

11  Q.   Yes.

12  A.   Colombia, Venezuela, Honduras, Guatemala, Mexico, those

13  five.

14  Q.   And at some point you did focus on Honduras for some period

15  of time, right?

16  A.   Oh, correct.

17  Q.   In developing an expertise in the areas that the government

18  has proffered you in, you've only visited Honduras one time, is

19  that right?

20  A.   That's correct.

21  Q.   One time your whole life?

22  A.   My whole life.

23  Q.   And, in fact, that time that you visited Honduras, you were

24  only there for three days, is that true?

25  A.   That's true.

L3AHRAM2                     Mervis - Direct

1           MR. SCHULMAN:  OK.  Your Honor, at this point I have

2      to oppose the witness being received.  I don't believe --

3           THE COURT:  Thank you.  I got the drift of your voir

4      dire.  Overruled.

5           Ladies and gentlemen, an expert witness is nothing

6      more and nothing less than a person, as a result of study or

7      experience, who certainly would know more on a subject than the

8      average layperson, and the purpose of their testimony may be to

9      offer an opinion on a subject.  And you, as the trier of fact,

10     get to weigh the value, significance, importance, or lack of

11     value, significance, or importance of the expert's opinion.

12          So I will take it.  Go ahead.

13     DIRECT EXAMINATION CONTINUED

14     BY MR. GUTWILLIG:

15     Q.  Special Agent Mervis, in your experience, what country is

16     the greatest producer of cocaine?

17     A.  Colombia.

18     Q.  What country consumes the most cocaine in the world?

19     A.  United States.

20     Q.  Roughly what percentage of cocaine that is consumed in the

21     United States is produced in Colombia?

22     A.  Upwards of 90 percent.

23     Q.  What types of facilities is cocaine produced within

24     Colombia?

25     A.  Laboratories.

1   Q.   Where are those labs typically located?

2   A.   They're located within the remote mountainous or jungle

3   regions of Colombia.

4   Q.   And generally speaking, what is the process by which

5   cocaine is produced in these laboratories?

6   A.   The process starts with the coca leaf.  The coca leaf is

7   soaked in gasoline and other chemicals to extract coca base.

8   Once you have the coca base, ammonia and other chemicals are

9   added to form cocaine base.  This substance is then poured

10  through a cloth to make it more pure.  Hydrochloric acid and

11  acetone are added and a heating and pressing process begins.

12  The heating process is done through the use of microwaves.  At

13  the completion of the heating process, what you have left is

14  the actual powder cocaine.  This powder cocaine is then pressed

15  into the brick rectangular packages with each package weighing

16  about one kilogram.

17  Q.   Approximately how many pounds does a kilogram weigh?

18  A.   About 2.2 pounds.

19  Q.   Approximately how many individual doses of cocaine are in a

20  kilogram?

21  A.   About 8,000.

22  Q.   You testified that 90 percent of the cocaine consumed in

23  the United States is produced in Colombia.  Is cocaine

24  typically sent directly from Colombia to the United States?

25  A.   No.

L3AHRAM2                          Mervis - Direct

1              MR. GUTWILLIG:  Ms. Hurst, could you please pull up

2      for the witness Government Exhibit 1.

3      Q.  Do you recognize this, Special Agent Mervis?

4      A.  Yes.

5      Q.  What is it?

6      A.  It's a map of the northern part of South America, Central

7      America, the Caribbean, Mexico, and the southern part of the

8      U.S.

9      Q.  Is this map a fair and accurate representation of those

10     areas?

11     A.  Yes.

12             MR. GUTWILLIG:  Your Honor, government offers

13     Government Exhibit 1.

14             THE COURT:  Any objection?

15             MR. SCHULMAN:  No objection, Judge.

16             THE COURT:  Received.

17             (Government's Exhibit 1 received in evidence)

18     BY MR. GUTWILLIG:

19     Q.  Special Agent Mervis, using Government Exhibit 1, can you

20     describe the process by which or the primary route by which

21     cocaine travels from Colombia to the United States?

22     A.  Yes.  It starts, obviously, in Colombia, comes across the

23     border to Venezuela, and from Venezuela it leaves on what we

24     call, typically call, the Central American route from Venezuela

25     via air up to the eastern part of Honduras.  Once it's in

L3AHRAM2                          Mervis - Direct

Honduras and moves west to the Honduras-Guatemala border, it's

moved through Guatemala and across the border into Mexico.  And

then once it's in Mexico, it's moved up through the interior of

Mexico to the U.S.-Mexico border where it is crossed via

various locations across the U.S.-Mexico border into the United

States.

Q.  I think you just referred to that as the Central American

route, is that correct?

A.  Correct.

Q.  Approximately when did the Central American route emerge --

or strike that.

        Is the Central American route the primary route by

which cocaine comes from Colombia to the United States?

A.  Yes.

Q.  And approximately when did the Central American route

emerge as the primary route for cocaine coming from Colombia to

the United States?

A.  In the early 2000s.

Q.  What are some of the circumstances that led to the

emergence of the Central American route at that time?

A.  What happened was the U.S. began working with Colombia, and

Colombia began extraditing Colombian narcotics traffickers from

Colombia to the United States to face charges here.  So the

Colombian traffickers thought of a way to create a layer

between themselves and the United States.  This layer being the

L3AHRAM2                           Mervis – Direct

 1   Central American route.

 2   Q.  Let's talk more specifically about that route.  You said

 3   that cocaine is typically transported from Colombia to Honduras

 4   as part of that route, is that correct?

 5   A.  Correct.

 6          MR. GUTWILLIG:  Ms. Hurst, could you please pull up

 7   for the witness what's been marked as Government Exhibit 2.

 8   Q.  Special Agent Mervis, do you recognize this?

 9   A.  Yes.

10   Q.  What is it?

11   A.  It's a map of Central America, the southern part of Mexico,

12   and some of the Caribbean countries.

13   Q.  Is it a fair and accurate representation of those places?

14   A.  Yes.

15          MR. GUTWILLIG:  Your Honor, the government offers

16   Government Exhibit 2.

17          THE COURT:  Any objection?

18          MR. SCHULMAN:  No objection, your Honor.

19          THE COURT:  Received.

20          (Government's Exhibit 2 received in evidence)

21          MR. GUTWILLIG:  If you could publish that, please,

22   Ms. Hurst.

23   BY MR. GUTWILLIG:

24   Q.  Can you please describe on the map where Honduras is

25   located.

L3AHRAM2                           Mervis - Direct

1   A.  Yes.  It's pretty much in the center of the map.

2   Q.  And when cocaine is brought into Honduras from Colombia and

3   Venezuela, on which side of Honduras does it typically arrive?

4   A.  The eastern side.

5   Q.  After arriving on the East Coast, in which direction is it

6   typically transported?

7   A.  West.

8   Q.  What are the primary ways that cocaine is transported from

9   Colombia to Honduras?

10  A.  Via maritime route.

11  Q.  What do you mean by maritime route?

12  A.  Maritime route is via sailing vessel, fishing vessel, or

13  also what we call a go-fast vessel.

14  Q.  What's a go-fast vessel?

15  A.  It's a smaller, high-powered speed boat that's modified

16  with extra fuel tanks that allow it to make the journey from

17  Colombia to Honduras.

18  Q.  What are the advantages of using a go-fast boat to

19  transport narcotics?

20  A.  They're quicker and they're smaller and therefore less

21  likely to be detected by maritime law enforcement.

22  Q.  Is cocaine also transported from Colombia to Honduras by

23  air shipment?

24  A.  Yes.

25  Q.  When types of aircraft are typically used?

1  A.  These are private, smaller aircraft that have essentially

2  the pilots and the shipment of cocaine aboard.

3  Q.  Are you familiar with the concept of aircraft registration

4  numbers?

5  A.  Yes.

6  Q.  What does a registration number signify?

7  A.  It's the identifier for that aircraft.

8  Q.  When a cocaine shipment is being sent by aircraft to

9  Honduras, from where does it typically depart?

10  A.  The Apure region of Venezuela, A-p-u-r-e.

11  Q.  From what types of air fields are these air shipments

12  typically made?

13  A.  These are clandestine airstrips located within the Apure

14  region, which is typically favored by the traffickers because

15  of its flat terrain and its dry climate.

16  Q.  Can you describe generally clandestine, what types of

17  places these air fields are located?

18  A.  Yes, these aren't commercial airports.  There's no air

19  traffic control tower, no terminals.  They're created with the

20  use of bulldozers and other equipment.

21  Q.  Why do these air shipments fly from Venezuela to Honduras

22  instead of directly from Colombia to Honduras?

23  A.  Because within Colombia there is a strong

24  relationship/partnership between U.S. law enforcement,

25  especially the DEA and the Colombian counterparts.  There also

L3AHRAM2                         Mervis - Direct

1   is a big presence with DEA within Colombia, both in the

2   Cartagena region as well as within Bogota.  The same is not

3   happening in Venezuela.

4   Q.  After cocaine lands in Honduras, to which country is it

5   typically transported next?

6   A.  Guatemala.

7   Q.  After the cocaine goes to Guatemala, where does it go?

8   A.  Mexico.

9   Q.  You mentioned boats and planes.  Are you familiar with

10  cocaine being transported in trailers?

11  A.  Yes.

12  Q.  Are you familiar with cocaine being transported in trailers

13  used typically to carry livestock?

14  A.  Yes.

15  Q.  In your experience, why would that be done?

16  A.  Well, specific to Honduras, what we'd see is these cattle

17  trailers, because you're talking about -- when I say "cattle

18  trailers," they're connected to a big rig, a tractor-trailer,

19  except the trailer is normally used to haul cattle.  We're

20  talking about hundreds of kilos.  Just the quantity alone you

21  have to have a tractor-trailer to move it.  And these cattle

22  trailers are frequent in this -- in these remote areas of

23  Honduras.

24  Q.  When cocaine reaches Mexico, who typically is responsible

25  for it?

L3AHRAM2                        Mervis - Direct

1    A.   The Mexican cartels.

2    Q.   And in the time period of approximately 2009 through 2020,

3    what was the largest cartel in Mexico?

4    A.   The Sinaloa cartel.

5    Q.   During that time who was the leader of the Sinaloa cartel?

6    A.   Joaquin Guzman Loera, also known as Chapo Guzman.

7    Q.   What did the Mexican cartels do with cocaine once it

8    arrives from Guatemala?

9    A.   They move it north to the U.S.-Mexico border and then cross

10   it into the United States.

11   Q.   And in general, approximately what percentage of the

12   cocaine transported along this Central American route ends up

13   in the United States?

14   A.   Upwards of 90 percent.

15   Q.   Let's talk about price.  You've testified about the

16   different countries through which cocaine is transported from

17   Colombia to the United States.  Why isn't that cocaine sold in

18   the countries along the way on the Central American route?

19   A.   These countries have smaller populations.  Therefore, they

20   don't have the same consumer market to support the quantities,

21   the hundreds of kilos of cocaine that are being moved through

22   that area, whereas the U.S. does.

23   Q.   What approximately is the size of the population of

24   Honduras?

25   A.   It's about 9 million.

L3AHRAM2                        Mervis - Direct

1    Q.   In general, what happens to the price of cocaine as it
2    moves along the Central American route north to the United
3    States?
4    A.   It incrementally increases.
5    Q.   What approximately is the price of a kilogram of cocaine in
6    Colombia?
7    A.   It's about $2,500 to $3,000 per kilogram.
8    Q.   Approximately what's the price of a kilogram of cocaine in
9    Honduras?
10   A.   It's about -- goes up five to $6,000 per kilogram.
11   Q.   It goes up to five or $6,000?
12   A.   Increases by.  So 7,500 to -- what would that be? --
13   $9,000, more or less.
14   Q.   Approximately how much does a kilogram of cocaine cost in
15   Mexico near the border with Guatemala?
16   A.   Anywhere from 12- to $16,000 per kilogram.
17   Q.   And approximately how much does a kilogram of cocaine cost
18   in the United States?  And I should clarify.  I'm talking about
19   prior to COVID.
20   A.   Understood.  Thirty to $35,000 per kilogram.
21   Q.   And what about the price here in New York, again, prior to
22   COVID?
23   A.   It's about $30,000 per kilogram.
24   Q.   Were those prices different in 2009?
25   A.   Yes.

1   Q.  And over time have the relative increases in the prices

2   along the way remained consistent?

3   A.  Yes.

4   Q.  I just have a few more questions about the tools that the

5   DEA has used to target drug traffickers.

6           What is the Office of Foreign Assets Control?

7   A.  That's also known as OFAC.  They operate under the U.S.

8   Department of Treasury and work closely with DEA to identify

9   and target assets within the United States and within U.S.

10  financial institutions and essentially seek to deny the

11  narcotics traffickers that are operating internationally access

12  to the assets within the United States.

13  Q.  Does OFAC sanction drug traffickers?

14  A.  Yes.

15  Q.  What are some of the consequences of a drug trafficker

16  being sanctioned?

17  A.  Well, first of all, they -- when they sanction them, there

18  is a press release done.  So their names are provided via the

19  media, whether it's print media or television.  Additionally,

20  there is an OFAC list that is published on the OFAC website and

21  is available for the public to view.

22  Q.  Why is this information publicly available and

23  disseminated?

24  A.  Because it not only puts the narcotics trafficker on notice

25  but also the entities, businesses or banking institutions, that

L3AHRAM2                          Mervis - Direct

1    they are dealing with within the United States on notice as

2    well.

3    Q.  Why is this a useful enforcement tool?

4    A.  Because these narcotics traffickers, even if they're

5    operating internationally, they need access to dollars.

6    They're dealing with businesses and entities that deal in

7    dollars, so they need access to this assets that are in the

8    United States.

9    Q.  Does the DEA have any ability to order Honduran banks or

10   financial institutions to seize assets?

11   A.  No.

12   Q.  Can the DEA compel businesses in Honduras to provide

13   evidence to the DEA?

14   A.  No.

15   Q.  Is the DEA authorized to conduct searches in Honduras?

16   A.  No.

17   Q.  Can the DEA conduct arrests --

18            MR. SCHULMAN:  Objection to form, Judge.

19            THE COURT:  Overruled.

20   Q.  Can the DEA conduct arrests in Honduras?

21   A.  No.

22            MR. GUTWILLIG:  If I can just have a moment, please,

23   your Honor?

24            THE COURT:  Yes.

25   Q.  Special Agent Mervis, just a few more things.  We spoke

L3AHRAM2                        Mervis - Direct

earlier about airplane registrations.  Are airplanes typically

registered by country?

A.  Yes.

Q.  What's the significance of a registration number that

begins with "N"?

A.  Means it's registered within the United States.

Q.  What body controls registration of airplanes within the

United States?

A.  The FAA.

Q.  Special Agent Mervis, can United States agents run wiretaps

in foreign countries?

A.  No.

Q.  What ability does U.S. law enforcement have to conduct

surveillance in foreign countries?

A.  We don't.  We rely on the particular country's law

enforcement entity to do that.

        MR. GUTWILLIG:  No further questions, your Honor.

        THE COURT:  All right.  Ladies and gentlemen, we're

going to take our midmorning break.  Please do not discuss the

case among yourselves.  Do not discuss it at all, all right,

and keep an open mind.  There's a lot more to come.  We'll be

back in action in ten minutes.  Thank you.

        Please remain in the courtroom until the jurors clear

the elevator lobby area.

        (Jury excused)

L3AHRAM2                    Mervis – Direct

1              THE COURT:  Mr. CSO, if you could just let me know

2      when they've about cleared.  I know it will take a few minutes

3      because of the elevator restrictions.

4              OK.  Thank you.  We're in recess.

5              (Recess)

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3AKRAM3                          Mervis - Cross

1              MR. LOCKARD:  Your Honor, there was just a logistical

2       issue with the witness interpreters we just wanted to make sure

3       we were fine with before the next witness starts, so whenever

4       the Court wants to --

5              THE COURT:  Is the issue resolved?

6              THE INTERPRETER:  Kind of, your Honor.  For now, it's

7       resolved.

8              THE COURT:  Okay.  Thank you.

9              Our jurors are on their way up.

10              (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3AKRAM3                          Mervis - Cross

1              (Jury present)

2              THE COURT:  Mr. Schulman, you can return to the

3    podium.

4              Whenever you're ready.

5              MR. SCHULMAN:  Thank you, your Honor.

6    GREGG MERVIS,

7    CROSS-EXAMINATION

8    BY MR. SCHULMAN:

9    Q.  Good afternoon, Agent Mervis.

10   A.  Good afternoon.

11   Q.  You testified on direct examination about a number of

12   investigative methods that you rely on when you do your job.

13   Do you recall that?

14   A.  Yes.

15   Q.  You talked about using -- relying on confidential sources,

16   right?

17   A.  Yes.

18   Q.  You discussed relying on surveillance, right?

19   A.  Yes.

20   Q.  I understand that maybe it's not accessible in every

21   country, but, generally, you rely on surveillance, right?

22   A.  Generally, yes.

23   Q.  Wiretaps?

24   A.  Yes.

25   Q.  Seizures, you rely on as an investigative tool, if you

L3AKRAM3                           Mervis - Cross

1   will, right?

2   A.  Yes.

3   Q.  Specifically about confidential informants, they are

4   accessible to you in foreign countries, right?

5   A.  Yes.

6   Q.  In Honduras, for example, you rely on confidential sources,

7   right?

8   A.  Yes.

9   Q.  When you have them, you speak to them, of course, right?

10  A.  Yes.

11  Q.  You rely on them as a tool to gather additional

12  information, right?

13  A.  Yes.

14  Q.  And we could agree that you prefer to not rely exclusively

15  on confidential sources, right?

16  A.  I think we take that information, but we also want to

17  corroborate it through other confidential sources or other

18  information.

19  Q.  You took the words right out of my mouth.

20        You take measures to corroborate the information

21  that's provided by confidential sources?

22  A.  That's correct.

23  Q.  Sometimes cooperators are unreliable; is it fair to say?

24  Would you agree with that?

25  A.  Sometimes they're found to be unreliable, yes.

L3AKRAM3                      Mervis - Cross

1  Q.  You mentioned about financial investigations that are

2  conducted.  You called it OFAC; is that right, OFAC?

3  A.  I did mention OFAC, yes.

4  Q.  You mentioned -- and there are news releases done related

5  to seizing finances in the United States and in banks that have

6  relationships overseas; is that right?

7  A.  There's press releases.  When somebody is designated and

8  added to the OFAC list, that's made public, yes.

9  Q.  By the way, you worked in Honduras from -- sorry.  You

10  worked in the Latin America group, and we mentioned it earlier,

11  from March 2014 to the summer of 2015, right?

12  A.  Yes.

13  Q.  One of the cooperating or confidential informants that you

14  handled was Leo Rivera; is that right?

15  A.  No, that wasn't right.

16  Q.  Is it your testimony that you didn't work with Leo Rivera

17  during the time that you were working in the Latin American

18  group?

19  A.  What's your definition of working with?

20  Q.  You arranged for Leo Rivera to gather recordings; is that

21  right?

22  A.  I was not his handler.  I participated in interviews of

23  Leo, yes.

24  Q.  And when you say you participated in interviews, you gave

25  them directions about certain corroborating information that

L3AKRAM3                          Mervis - Cross

1   you wanted him to acquire, right?

2   A.  No, I didn't.  I was not the primary agent dealing with

3   him.

4   Q.  But you were present, and you assisted the primary agent in

5   providing Leo Rivera with directions about what information

6   should be acquired?

7   A.  I participated in the interview.  I was not his primary

8   contact on the DEA side, no.

9   Q.  And Leo Rivera did gather some recordings for his primary

10  handler, if you will, right?

11  A.  He did.

12  Q.  Now, there are no recordings that he gathered with my

13  client, Geovanny Fuentes Ramirez, right?

14  A.  Not that I'm aware of.

15  Q.  No foreign intercepts that Leo Rivera supported related to

16  Geovanny Fuentes Ramirez; is that right?

17  A.  That he supported?  I'm sorry.

18  Q.  Leo Rivera did not assist you or the primary handler in

19  gathering any recordings with Geovanny Fuentes Ramirez; isn't

20  that right?

21  A.  I can say I'm not aware of any recordings of Mr. Fuentes.

22  Q.  And there were certainly no video images that Leo Rivera

23  was able to get for his primary handler related to Geovanny

24  Fuentes Ramirez, we could agree with that, right?

25  A.  Not that I'm aware of.

L3AKRAM3                         Mervis - Cross

1    Q.  Leo Rivera did not assist in the seizing of any illegal

2    narcotics for Geovanny Fuentes Ramirez; isn't that right?

3           MR. GUTWILLIG:  Objection.

4           THE COURT:  Yes, I think that's -- I think you can

5    answer that question, though.

6           THE WITNESS:  Can you repeat it?

7           THE COURT:  "Leo Rivera did not assist in the seizing

8    of any illegal narcotics from Geovanny Fuentes Ramirez; is that

9    right?"

10          THE WITNESS:  Not that I'm aware of.

11          THE COURT:  Okay.

12   BY MR. SCHULMAN:

13   Q.  And he also didn't assist in the seizure of any money from

14   Geovanny Fuentes Ramirez, to your knowledge, of course?

15   A.  Not that I'm aware of.

16   Q.  And you were working with Leo Rivera in your time when you

17   were in the Bilateral Investigations Unit; isn't that right?

18          MR. GUTWILLIG:  Objection; mischaracterizing the

19   testimony.

20          THE COURT:  Yes, I think the witness, in response to

21   your questions, has already explained what the nature of the

22   relationship was.

23          MR. SCHULMAN:  But just focusing on the time frame,

24   Judge, you were working with him during -- in March 2014 to the

25   summer of 2015.

L3AKRAM3                        Mervis - Cross

1              THE COURT:  Well, no, no.  The question doesn't just

2    focus on the time frame.  It adopts your characterization in

3    the premise of the question.

4              MR. SCHULMAN:  I'll withdraw the question, then.

5              THE COURT:  So it's misleading to tell a witness that

6    it only focuses on the time frame.  The question is an entire

7    question, and a yes answer adopts everything in your question,

8    right, Mr. Schulman?

9              MR. SCHULMAN:  Of course, Judge.

10             THE COURT:  Okay.  So rephrase it.

11             MR. SCHULMAN:  Of course.

12   BY MR. SCHULMAN:

13   Q.  The time that you worked with Leo Rivera was between March

14   of 2014 and the summer of 2015, right?

15   A.  Like I said, what's your definition of work?  I

16   participated in interviews during that time frame of

17   Mr. Rivera.

18   Q.  You participated in interviews of Mr. Rivera between March

19   of 2014 and the summer of 2015, right?

20   A.  Yes.

21   Q.  And you also arranged for Leo Rivera to make certain

22   recordings during that time, not as the primary handler, but

23   you were part of the team, if you will; is that fair to say?

24   A.  I did not direct Mr. Rivera to do anything.  I was not his

25   primary contact with the DEA.

L3AKRAM3

1    Q.  By the way, to your knowledge, during the time you were

2    working with Leo Rivera, you have no indication that he

3    provided any information about my client, Geovanny Fuentes

4    Ramirez; isn't that right?

5    A.  I don't recall, no.

6    Q.  So, to your memory, you don't recall him saying anything at

7    all about Geovanny Fuentes Ramirez over that 18-month period,

8    right?

9    A.  That's correct.

10          MR. SCHULMAN:  I have nothing further, Judge.  Thank

11    you.

12          THE COURT:  All right.

13          Redirect?  Can you do it from your seat,

14    Mr. Gutwillig?

15          MR. GUTWILLIG:  Yes, your Honor.

16          If I could just have one moment, please?

17          THE COURT:  Yes.

18          (Pause)

19          MR. GUTWILLIG:  No further questions, your Honor.

20          THE COURT:  All right.  You may step down.

21          (Witness excused)

22          THE COURT:  And you may call your next witness.

23          MR. LOCKARD:  The government calls Leonel Rivera

24    Maradiaga.

25          THE COURT:  All right.

L3AKRAM3                          Rivera Maradiaga - Direct

1              We have to clean the witness box and the attorney

2     area.

3              (Pause)

4              THE COURT:  Remain seated.  Please state your full

5     name and spell it.

6              MR. RIVERA MARADIAGA:  Devis Leonel Rivera Maradiaga.

7              THE COURT:  Spell it, please.

8              THE WITNESS:  D-e-v-i-s L-e-o-n-e-l R-i-v-e-r-a

9     M-a-r-a-d-i-a-g-a.

10             THE COURT:  Okay.

11    DEVIS LEONEL RIVERA MARADIAGA,

12         called as a witness by the Government,

13         having been duly sworn, testified as follows:

14             THE COURT:  You may inquire.

15             MR. LOCKARD:  Thank you, Judge.

16             Your Honor, may Mr. Rivera remove his face mask while

17    he's in --

18             THE COURT:  Yes, you may take off your face mask.

19             THE WITNESS:  Thank you.

20    DIRECT EXAMINATION

21    BY MR. LOCKARD:

22    Q.  Good afternoon, sir.

23    A.  Good afternoon, sir.

24    Q.  Where are you from?

25    A.  Honduras.  Honduras.

L3AKRAM3                          Rivera Maradiaga – Direct

1    Q.  You may be a little bit too close to the microphone.

2    A.  Correct, sir.

3    Q.  And, Mr. Rivera, where do you live right now?

4    A.  In prison, sir.

5    Q.  In prison in what country?

6    A.  United States, sir.

7    Q.  Were you extradited to the United States?

8              THE INTERPRETER:  For the interpreter, repeat, please.

9    Q.  Were you extradited to the United States?

10   A.  No, sir.

11   Q.  How did you arrive to the United States?

12   A.  I surrendered to the U.S. Government, sir.

13   Q.  When, approximately, did you surrender?

14   A.  2015, sir.

15   Q.  Before your surrender, what did you do for a living?

16   A.  I was a drug trafficker, sir.

17   Q.  What kind of drugs did you traffic?

18   A.  Cocaine, sir.

19   Q.  Where were you located when you were trafficking cocaine?

20   A.  In the Colon region, sir.

21   Q.  Is that a region of Honduras?

22   A.  Yes, sir.

23   Q.  When did you stop trafficking --

24             THE INTERPRETER:  For the interpreter, repeat the

25   question, please.

L3AKRAM3                          Rivera Maradiaga - Direct

1    Q.  When did you stop trafficking --

2             THE COURT:  Repeat it again, please.

3    Q.  When did you stop trafficking cocaine, sir?

4    A.  When I surrendered to the DEA in 2015, sir.

5    Q.  So, what were you doing between 2013 and your surrender to

6    the United States in 2015?

7    A.  I was working for the DEA, sir.

8    Q.  After you surrendered to the United States, did you plead

9    guilty to any crimes?

10            THE INTERPRETER:  Interpreter correction.

11            (Pause)

12   A.  Yes, sir.

13   Q.  Did you make that plea under a cooperation agreement?

14   A.  Yes, sir.

15   Q.  What crimes did you plead guilty to?

16   A.  Conspiracy for more than five kilos of cocaine, money

17   laundering, possession of military weapons, homicide, and head

18   of a band of drug traffickers, sir.

19   Q.  Do you currently face a mandatory minimum sentence as a

20   result of that plea?

21   A.  Yes, sir.

22   Q.  What is that mandatory sentence?

23   A.  Life plus 30 years.

24   Q.  You mentioned a crime relating to being the leader of a

25   drug organization.  What was the name of that drug

L3AKRAM3                         Rivera Maradiaga - Direct

1  organization?

2  A.  Los Cachiros, sir.

3  Q.  During your time with the Cachiros organization, did you

4  commit murders?

5  A.  Yes, sir.

6  Q.  How many murders are you responsible for?

7  A.  Seventy-eight murders, sir.

8  Q.  Does that include murders you personally participated in as

9  well as murders that you hired others to commit?

10  A.  Correct, sir.

11  Q.  Were others injured, but not killed, in connection with

12  those murders?

13          THE INTERPRETER:  For the interpreter, please repeat

14  the question.

15  Q.  Were there others who were injured, but not killed, in

16  connection with those murders?

17  A.  Yes, sir.

18  Q.  Did you participate in torture while you were with the

19  Cachiros organization?

20  A.  Yes, sir.

21  Q.  Mr. Rivera, do you know a man named Geovanny Fuentes

22  Ramirez?

23  A.  Yes, sir.

24  Q.  I'd like to show you Government Exhibit 103.

25          Do you recognize the person in that photograph?

L3AKRAM3                          Rivera Maradiaga - Direct

1    A.  Yes, sir.

2    Q.  And who is that?

3    A.  Geovanny Fuentes, sir.

4    Q.  When, approximately, did you first meet the defendant?

5    A.  Approximately between the year 2009 and 2010, sir.

6    Q.  Did you have business with the defendant?

7    A.  Yes, sir.

8    Q.  What kind of business?

9    A.  Drug trafficking, sir.

10   Q.  Generally speaking, what kinds of drug-trafficking work did

11   the defendant do with you?

12   A.  He provided protection for shipments of cocaine from Colon,

13   from the region of Colon, to Espiritu Copan.  He received loads

14   of cocaine by plane that came from Venezuela.

15   Q.  Between approximately what years did you have a

16   narcotics-trafficking business with the defendant?

17   A.  Approximately between 2011 and 2013, sir.

18   Q.  Why did you stop having a drug-trafficking business with

19   the defendant in approximately 2013?

20   A.  Due to several arguments that arose between the defendant

21   and myself, sir.

22   Q.  What did those arguments result in?

23   A.  In breaking up our relationship, sir.

24   Q.  Did you murder his partner?

25            THE INTERPRETER:  For the interpreter, please repeat

L3AKRAM3                        Rivera Maradiaga - Direct

1    the question.

2    Q.  Did you murder his partner?

3    A.  Yes, sir.

4    Q.  And did you attempt to have the defendant murdered?

5    A.  Yes, sir.

6    Q.  Why did you do those things?

7    A.  Because the defendant and his partner wanted to kill me and

8    my brother, sir.

9    Q.  Let's talk a little bit more about the Cachiros

10   organization.

11            THE INTERPRETER:  For the interpreter, repeat the

12   question, please.

13   Q.  Let's talk a little bit more about the Cachiros

14   organization.

15            What was your role in the Cachiros?

16   A.  Leader, sir.

17   Q.  Were there any other leaders of the Cachiros?

18   A.  Yes, sir.

19   Q.  What other leader or leaders did the Cachiros have?

20   A.  Javier Rivera, sir, my brother.

21   Q.  Mr. Rivera, could you please look at Government

22   Exhibit 104.

23            Do you recognize that person?

24   A.  Yes, sir.

25   Q.  Who is that?

L3AKRAM3                          Rivera Maradiaga - Direct

1    A.  My brother, Javier Rivera.

2              MR. LOCKARD:  The government offers Government

3    Exhibit 104.

4              MR. MOSKOWITZ:  No objection.

5              THE COURT:  Received.

6              (Government's Exhibit 104 received in evidence)

7    BY MR. LOCKARD:

8    Q.  Mr. Rivera, when, approximately, did you first become

9    involved in narcotics trafficking?

10   A.  Approximately in 2002, sir.

11   Q.  When you first became involved in drug trafficking,

12   approximately what quantities of deals were you involved in?

13             THE INTERPRETER:  For the interpreter, question,

14   please repeat.

15   Q.  When you first became involved in drug trafficking,

16   approximately what quantities were the deals you were involved

17   in?

18   A.  Approximately with one kilo of cocaine, sir.

19   Q.  And over time, did you become involved in larger cocaine

20   transactions?

21   A.  Yes, sir.

22   Q.  By 2009, what types of drug-trafficking activities were you

23   involved in with the Cachiros?

24   A.  Receiving boats loaded with cocaine that were coming from

25   Colombia and Venezuela and to receive aircraft loaded with

L3AKRAM3                          Rivera Maradiaga – Direct

1   cocaine that were coming Venezuela and Colombia.

2   Q.  When cocaine arrived in Honduras from Venezuela or Colombia

3   by boat or by plane, would you transport that cocaine?

4   A.  We received aircraft, sir, that came loaded with cocaine

5   from Venezuela.

6   Q.  Would you then transport that cocaine elsewhere in

7   Honduras?

8   A.  Correct, sir.

9            (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3AHRAM4                          Rivera Maradiaga - Direct

1    BY MR. LOCKARD:

2    Q.   Generally speaking, where would you transport that cocaine?

3    A.   The cocaine would generally arrive in the Gracias a Dios

4    and the Sico area and then would be transported to Tocoa,

5    Colon.  Other portions of it would arrive at the port in Cortes

6    and were transported by vehicle to Espiritu, sir.

7    Q.   Did you ultimately deliver to buyers near Guatamala?

8                THE INTERPRETER:  For the interpreter please, repeat

9    the question.

10   Q.   Did you ultimately deliver those cocaine shipments to

11   buyers near Guatamala?

12   A.   Correct, sir.

13   Q.   You mentioned receiving loads of cocaine by airplane from

14   Venezuela and Colombia.  How much cocaine would a typical

15   airplane shipment be?

16   A.   Depending, sir.  When it was a large aircraft, we would

17   receive up to 2,000 kilos of cocaine, and when it was a small

18   aircraft, it would bring approximately 400 to 600 kilos of

19   cocaine, sir.

20   Q.   You also mentioned receiving cocaine by boat.  How much

21   would a typical boatload of cocaine be?

22   A.   Approximately 1,500 to 3,500 kilos of cocaine, sir.

23   Q.   Approximately how much cocaine did you help to distribute

24   before you started to cooperate with the DEA?

25   A.   Approximately more than 100 tons of cocaine, sir.

L3AHRAM4                          Rivera Maradiaga – Direct

1   Q.  Do you have an understanding of where that cocaine

2   ultimately ended up?

3   A.  Yes, sir.

4   Q.  Where did that cocaine ultimately end up?

5   A.  In the United States of America, sir.

6   Q.  How did the Cachiros used the drug money earned from those

7   cocaine trafficking transactions?

8   A.  We would use the money to pay politicians that were

9   assisting us in providing protection or escort for the drugs

10  that were coming in from Colombia.  We would also pay the

11  military police.  We would pay the preventive police, and also

12  MS-13 gang members.

13  Q.  Did you pay others with whom you were working?

14          THE INTERPRETER:  Can you please repeat that for the

15  interpreter.

16  Q.  Did you pay others with whom you were working?

17  A.  Correct, sir.

18  Q.  Did you buy businesses with the drug money?

19  A.  Yes, sir.

20  Q.  What types of businesses did the Cachiros buy using drug

21  money?

22  A.  We would start up construction front companies to work with

23  the Honduran government contracts that were being provided

24  through the Inrimar company which was being utilized for money

25  laundering, sir.  And we would also start agricultural

L3AHRAM4                          Rivera Maradiaga - Direct

1    companies that would work with planting rice, sir, and then

2    these would be sold --

3              THE INTERPRETER:  Interpreter correction:

4    A.  We would plant rice and other products, and these products

5    would then be sold in order to launder money.  They'd be sold

6    to other legal companies, sir.  We also had a livestock

7    company, sir, by the name of Gan, G-a-n, and we would sell

8    cattle to meat packaging companies, and that way we would

9    launder drug trafficking money.

10   Q.  Did you also buy and operate other kinds of businesses in

11   addition to the construction businesses and the farming and

12   livestock businesses you mentioned?

13   A.  Yes, sir.

14   Q.  Did your construction business engage in actual

15   construction projects?

16   A.  Yes, sir.

17   Q.  Did your farming business produce actual crops?

18   A.  Yes, sir.

19   Q.  Did your livestock business produce actual cattle?

20   A.  Yes, sir.

21   Q.  And how would you use those companies to launder drug

22   money?

23   A.  Well, we took the drug moneys, sir.  We would invest the

24   moneys in cattle.  We would invest the moneys in a lot of rice.

25   And once the rice crop was produced, it would be sold to other

L3AHRAM4                          Rivera Maradiaga - Direct

1   legally established companies.  Then we would be paid by check

2   for the rice.  In that way it became drug trafficking laundered

3   money.

4   Q.  Did the Cachiros use weapons to protect the cocaine that it

5   trafficked?

6           THE INTERPRETER:  Could you please repeat that for the

7   interpreter.

8   Q.  Did the Cachiros use weapons to protect the cocaine that it

9   trafficked?

10  A.  Yes, sir.

11  Q.  What kind of weapons were used?

12  A.  Well, we would use military grade weapons, sir, AR-15s,

13  AK-47s.

14          THE INTERPRETER:  May the interpreter confer?

15          THE COURT:  Yes.

16          (Discussion off the record)

17          THE INTERPRETER:  Thank you, your Honor.

18  A.  Machine guns, RPG-7s, semiautomatic pistols, handguns,

19  semiautomatic pistols with selector switch in order to convert

20  to allow it to fire in burst, amongst other weapons, sir.

21  Q.  Did you also use grenade launchers?

22  A.  Yes, sir.

23  Q.  Did you use Claymore mines?

24  A.  Yes, sir.

25  Q.  Were there other people who helped the Cachiros to protect

L3AHRAM4                          Rivera Maradiaga - Direct

1  your cocaine?

2  A.  Yes, sir.

3  Q.  What are some of the type of people that helped the

4  Cachiros?

5  A.  MS-13 mareros, gang members, police officers, the military,

6  among other drug traffickers, sir.

7  Q.  Why would those other types of people help the Cachiros?

8  A.  For the cocaine to be moved safely from one place to where

9  it finally arrived.

10  Q.  What did those people receive for helping the Cachiros?

11  A.  Drug trafficking money, sir.

12  Q.  Mr. Rivera, you said earlier that you first met the

13  defendant in approximately 2009 or 2010.  Who introduced you to

14  the defendant?

15  A.  Melvin Sandrez, sir.

16  Q.  Mr. Rivera, could you look at Government Exhibit 107.  Do

17  you recognize that person?

18  A.  Yes, sir.

19  Q.  Who is that?

20  A.  Melvin Sandrez, Geovanny Fuentes as partners, sir.

21          MR. LOCKARD:  Government offers Exhibit 107.

22          MR. MOSKOWITZ:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibit 107 received in evidence)

25  BY MR. LOCKARD:

L3AHRAM4                          Rivera Maradiaga - Direct

1   Q.   Did Mr. Sandrez go by any other names?

2   A.   Yes, sir.

3   Q.   By what other name or names did Mr. Sandrez go?

4   A.   Metro, sir.

5   Q.   And how did you know Mr. Sandrez, or Metro?

6   A.   Through my cousin, Ruben Santos, sir.

7   Q.   And was Metro also a relative of yours?

8   A.   Half relative, sir.

9   Q.   Did Metro work with the Cachiros?

10  A.   Yes, sir.

11  Q.   What type of work did Metro do for the Cachiros?

12  A.   Well, he would kill people, sir, a *sicario*.  He would also

13  escort cocaine shipments that were being moved from place to

14  place.  He would also receive cocaine that was coming in from

15  Colombia via go-fast boats and planes, sir.

16  Q.   And when Metro start working with the Cachiros?

17          THE INTERPRETER:  May the interpreter please confirm

18  with the witness?

19          THE COURT:  Yes.

20  A.   2003, sir.

21  Q.   Why was Mr. Sandrez --

22          THE COURT:  I'm going to ask the interpreter to speak

23  into the microphone because this proceeding, yes, this

24  proceeding is a public proceeding, and members of the public

25  need to hear it.  OK.

L3AHRAM4                      Rivera Maradiaga – Direct

1              THE INTERPRETER:  Of course, Judge.  Thank you.

2              THE COURT:  Thank you.

3              THE DEPUTY CLERK:  You have one?

4              THE COURT:  It doesn't seem to be working.

5              THE DEPUTY CLERK:  Tap the top.

6              THE INTERPRETER:  Testing, testing.

7              THE COURT:  Can you turn the volume up on that, Flo?

8    Do you have the ability?

9              What we'll do is we'll get this straightened out over

10   the lunch break, but let's continue for now.

11             Flo, do you want to give her the other microphone for

12   the time being?

13             THE INTERPRETER:  Thank you.

14             THE COURT:  OK.

15             MR. LOCKARD:  OK.

16             THE COURT:  Next question.  Thank you.

17   BY MR. LOCKARD:

18   Q.  Mr. Rivera, why was Mr. Sandrez known as Metro?

19   A.  Because Metro would commonly hang out with Honduras

20   metropolitan police, sir.  Hence, he was dubbed Metro, sir.

21   Q.  Were any of these police involved in drug trafficking?

22   A.  Yes, sir.

23   Q.  When Metro first introduced you to the defendant or before

24   Metro first introduced you to the defendant, what, if anything,

25   did Metro tell you about the defendant?

L3AHRAM4                          Rivera Maradiaga - Direct

A.  Well, what Metro told me was he had had a friend who had been

working in Miami selling drugs, sir, and that he had several

contacts in Honduras, both with the military police and the

preventive police.

Q.  And who did Metro say was the friend who was selling drugs

in Miami and had contacts with the military and the police?

A.  Geovanny Fuentes, sir.

Q.  And what, if anything else, did Metro say about the work

that he and the defendant had done in Miami?

A.  That he had been working with the defendant for

approximately two years, sir, and that the defendant was

selling approximately one to five kilos of cocaine per month,

and that he would sell them in small amounts, sir.

Q.  And what, if anything, did Metro tell you about why he

wanted to introduce the defendant to you?

A.  Well, the defendant wanted to work with me, sir, in

escorting cocaine shipments, sir.

Q.  And how would the defendant be able to help transport the

cocaine?

A.  By transporting it from one place to another, sir, and by

escorting it, by providing security for it, sir.

Q.  And what, if anything, did the defendant's contacts with

the preventive police --

          MR. MOSKOWITZ:  Objection.

          THE COURT:  Let me hear the full question.

L3AHRAM4                        Rivera Maradiaga - Direct

```
 1    Q.  What, if anything, did the defendant's contacts with the
 2    preventive police and the military police have to do with his
 3    abilities to help transport the cocaine?
 4              MR. MOSKOWITZ:  Leading.
 5              THE COURT:  Overruled.
 6    A.  Well, that was very important, sir, because whenever the
 7    police would set up checkpoints or any other operations on the
 8    road, the defendant would call his police contacts, and then
 9    they would remove them, sir.
10    Q.  So did there come a time when you met in person with the
11    defendant?
12    A.  Yes, sir.
13    Q.  Where did you meet him?
14    A.  Well, I met several times with the defendant, sir.  The
15    first time was at a dance club in Choloma, and then we also met
16    at a gas station that I used to have in Omoa, Cortes.
17    Q.  So I want to focus on the very first time that you met the
18    defendant.  Where is the very first time you met the defendant?
19    A.  Omoa, Cortes, sir.
20    Q.  And where is Omoa, Cortes, what type of place?
21    A.  This was at a gas station that I used to own, sir, a gas
22    station by the name Brisas Del Mar.
23    Q.  Why did you meet with the defendant at that particular gas
24    station?
25    A.  Because it was a gas station that I owned, and it was a
```

L3AHRAM4                          Rivera Maradiaga - Direct

1    safe place, sir.

2    Q.   Why was safety important to you?

3    A.   For my own safety, sir, to prevent my being killed or

4    kidnapped, sir.

5    Q.   When you met at the gas station, where did you meet

6    specifically?

7    A.   On the gas station's parking lot, sir.

8    Q.   Were you in a car or outside?

9            THE INTERPRETER:   For the interpreter, please.

10   Q.   Were you inside of a car or outside?

11   A.   Inside a car, sir.

12   Q.   And who was with you inside that car?

13   A.   Metro and the defendant, sir.

14   Q.   Did the defendant have anything with him?

15   A.   Yes, sir.

16   Q.   What did the defendant have with him?

17   A.   Well, he had a semiautomatic pistol, a Glock, and two

18   sawed-off rifles, sir, two little ones.

19   Q.   And what do you mean by a little rifle?

20   A.   Two sawed-off AR-15s, sir.

21   Q.   And where were those two AR-15s?

22   A.   On the rear seat, sir.

23   Q.   Did Metro have anything with him?

24   A.   Yes, sir.

25   Q.   What did Metro have?

1    A.  He had a semiautomatic pistol, a gold 92F, sir.

2    Q.  Did you have anything with you?

3    A.  Yes, sir.

4    Q.  What did you have?

5    A.  I had a 9 millimeter 93R, sir.

6    Q.  Were there any armed men also in the area around the car?

7    A.  Yes, sir.

8    Q.  And who did they work for?

9    A.  They worked for me, sir, and also Geovanny Fuentes.  And

10   Metro's security was there, sir.

11   Q.  Inside that car with the defendant and Metro, what, if

12   anything, did the defendant tell you?

13   A.  Well, the defendant said:  Look, cousin, Metro has already

14   told you that I worked with him for approximately two years in

15   Miami.  At times he would give me one kilo of cocaine, and then

16   I moved it for him, and then others he would give me two to

17   five kilos per month.  And so that's how we were working

18   together, cuz, he said.  But, you know, that deal fell through,

19   and then I just came to Miami.

20           THE INTERPRETER:  Interpreter correction:  "Then I

21   left Miami and I came back to Honduras," he said.

22   Q.  And what, if anything, did the defendant tell you about his

23   working with the Cachiros?

24   A.  The defendant said:  Look, cousin, I have good contacts

25   here in Honduras.  I have the military police, the preventive

L3AHRAM4                      Rivera Maradiaga – Direct

1    police.  For whatever it is that you might need, I can help you

2    by escorting your cocaine shipments from one place to the

3    other, whatever you need, cousin.

4    Q.  And what did you understand the defendant to mean when he

5    said he had contacts in the police and the military?

6    A.  What I understood, sir, was that the police worked with

7    him, sir.

8    Q.  Did the defendant make any proposals to you in that

9    meeting?

10   A.  Yes, sir.

11   Q.  What did the defendant propose?

12           THE COURT:  All right.  We're going to hold it there.

13   Ladies and gentlemen, we're going to hold you in suspense until

14   after lunch.  Please do not discuss the case among yourselves

15   or with anyone.  Please keep an open mind.  There's more to

16   come, and I'll see you for startup at 2 o'clock today.

17           All right.  Thank you.

18           Please let our jurors exit and clear the elevator area

19   first.

20           (Jury excused)

21           (Lunch recess)

22           (Continued on next page)

23

24

25

L3AHRAM4                          Rivera Maradiaga - Direct

 1                          AFTERNOON SESSION

 2                              2:05 p.m.

 3           (In open court; jury not present)

 4           THE COURT:  Remain seated.  Our jurors are coming up.

 5           (Jury present)

 6           THE COURT:  Ladies and gentlemen, I hope your lunch

 7  came reasonably on time, reasonably hot if it was supposed to

 8  be hot, or cold if it was supposed to be cold.  Good.  Anyway,

 9  we're back in action.

10           Mr. Rivera, the Court reminds you that you are still

11  under oath.

12           All right.  You may continue.

13           MR. LOCKARD:  Thank you, your Honor.

14           Your Honor, may the witness again remove his mask

15  while he's in the witness chair?

16           THE COURT:  He may.

17  DEVIS LEONEL RIVERA MARADIAGA, resumed.

18  DIRECT EXAMINATION CONTINUED

19  BY MR. LOCKARD:

20  Q.  Good afternoon, sir.

21  A.  Good afternoon, sir.

22  Q.  So earlier you were describing your meeting with the

23  defendant and Metro inside the car at your gas station in Omoa.

24  A.  Correct, sir.

25  Q.  During that meeting, did the defendant make you any

L3AHRAM4                          Rivera Maradiaga - Direct

1    proposals?

2    A.  Yes, sir.

3    Q.  What was that proposal?

4    A.  To partner up with him on -- in this drug laboratory that

5    belonged to the defendant, sir.

6    Q.  And what, if anything, did the defendant say about his drug

7    laboratory?

8    A.  The defendant said to me:  Look, cousin, for approximately

9    two months now, I have been working with this drug laboratory

10   that I and Metro own.  I want to ask you if you would be

11   interested in partnering up, and I want you to invest between

12   300 and $500,000 so that we can bring in base from Colombia.

13   Q.  Mr. Rivera, what is base?

14   A.  The base is an ingredient of the cocaine product, sir.

15   Q.  And when you imported cocaine from Colombia and Venezuela

16   to Honduras, did you import base or did you import finished

17   cocaine?

18   A.  Finished cocaine, sir.

19   Q.  And what, if anything, else did the defendant tell you

20   about the operations of the cocaine laboratory?

21   A.  The defendant said:  Look, cousin, I have had this drug lab

22   for approximately two months now.  I have armed people there.

23   I have approximately 20 to 30 people, armed people, who are

24   securing the drug lab.

25   Q.  Did the defendant say what those men were armed with?

1   A.  Yes, sir.

2   Q.  What did the defendant say about that?

3   A.  He said that his men, the men that were securing the drug

4   lab, were carrying AR-15, AK-47s, grenade launchers, and that

5   they were dressed in military and police uniforms, sir.  That

6   they were mixed.

7   Q.  And did the defendant say what he proposed to do with the

8   investment he was asking from you?

9   A.  Well, he proposed -- or what the defendant said he proposed

10  was to pay these armed people, the armed people that were

11  securing the drug lab, and to buy and bring more cocaine base

12  from Colombia, sir.

13  Q.  At that meeting did the defendant ask you for anything

14  else?

15  A.  Yes, sir.

16  Q.  What else did he ask you for?

17  A.  If I could buy two cars that he was selling.  He had a red

18  sedan, a Chrysler.

19  Q.  And what was your response to the defendant's request that

20  you buy the cars?

21  A.  What I responded to him, sir, that I would buy the cars

22  from him, but it was only to help him out because I was not

23  interested in the cars.

24  Q.  How much did you pay for the cars?

25  A.  The two cars were valued at approximately $20,000, sir.

L3AHRAM4                          Rivera Maradiaga - Direct

1   Q.   And how much did you give to the defendant?

2   A.   $70,000 for everything, sir.

3   Q.   And in what form did you give the money?

4   A.   Cash, sir.

5   Q.   In what currency did you pay?

6   A.   U.S. money in $20 bills, sir.

7   Q.   What was your response to the defendant's request that you

8   invest in the drug laboratory?

9   A.   That I would think about it and let him know.

10  Q.   Were you interested in that proposal?

11  A.   No, sir.

12  Q.   Why not?

13  A.   Well, because the risk in bringing cocaine, the cocaine

14  base, from Colombia was doubled, sir.  That it was better to

15  bring the pure cocaine, sir.

16  Q.   And what do you mean that it's riskier to bring base and

17  finish it in Honduras than it is to import finished cocaine?

18  A.   Well, because if one brings the base, one could be caught

19  by law enforcement out in open seas, sir, and one could be

20  arrested.  And the same method was used for cocaine, and so it

21  was more dangerous, sir.  So it was best to bring in pure

22  cocaine than the base, sir.

23  Q.   After your meeting with the defendant and Metro at the gas

24  station, did you have another conversation about their proposal

25  to work with the Cachiros?

L3AHRAM4                          Rivera Maradiaga - Direct

1   A.  Yes, sir.

2   Q.  What was your next conversation about that proposal?

3   A.  Well, the next conversation was in San Pedro Sula when the

4   defendant's partner, Metro, tells me -- he asks me if I was

5   going to invest in the business that the defendant had proposed

6   to me.

7   Q.  Before we talk about what Metro said at that meeting, where

8   was that meeting held?

9   A.  In San Pedro Sula, sir, at a mechanic's shop called Torre

10  Servicio, sir.

11  Q.  And what, if any, significance did that repair shop have to

12  the Cachiros' drug business?

13  A.  Well, I -- I held several meetings there with different

14  drug traffickers, sir, and we carried out transactions, money

15  transactions, that is, with drug money.  And at that mechanic

16  shop, sir, the traps were installed in the vehicles that were

17  being used to transport the cocaine, such as trucks, cars, and

18  crates.

19  Q.  When you say the traps were installed in those vehicles,

20  what is a trap?

21  A.  Well, a trap, sir, is when a truck with a container, for

22  instance, sir, is given a false bottom so that the cocaine can

23  be hidden in it, sir.

24  Q.  Secret compartments?

25  A.  Correct, sir.

L3AHRAM4                          Rivera Maradiaga - Direct

1    Q.  Why did you want to meet with Metro again at the repair

2    shop?

3    A.  To ask him about the contacts that defendant had that he

4    had mentioned to me at the gas station, sir.

5    Q.  And what contacts were those?

6    A.  Well, the contacts, based on what Metro had explained to me

7    that the defendant had, were police officers, sir, from the

8    National Police that had worked with this drug trafficker in

9    San Pedro Sula, sir.

10        THE INTERPRETER:  Interpreter correction:

11   A.  This drug trafficker from San Pedro Sula, sir.

12   Q.  And at the meeting at the repair shop, what did Metro say

13   about that?

14   A.  He said:  Look, cousin, Geovanny's contacts are good,

15   cousin.  These are contacts that have worked with Paico here,

16   the one from San Pedro Sula, he said to me.

17   Q.  And what, if anything, did Metro say about who these

18   officers were?

19   A.  He mentioned the names of the police officers, sir.

20   Q.  Can you tell us some of the names that Metro mentioned?

21   A.  Yes, sir.  Colonel Motino, sir, Comisionado Martinez, a

22   police officer by the last name Nuila, and another police

23   officer by the last name Rojas.

24   Q.  And what is your understanding of the rank of comisionado?

25   A.  He was a comisionado, a high-ranking officer with the

L3AHRAM4                        Rivera Maradiaga - Direct

1    National Police, sir.

2    Q.  And what, if anything, did Metro say about Comisionado

3    Martinez?

4    A.  That this comisionado had worked with Paico's drug

5    trafficking gang from San Pedro Sula, sir, and that he was now

6    working with Geovanny, sir.

7    Q.  And when Metro mentioned Paico, did you understand who he

8    was talking about?

9    A.  He was referring to a drug trafficker from San Pedro Sula,

10   sir, a powerful drug trafficker in San Pedro Sula, sir.

11   Q.  Did Metro say if these officers had worked with any other

12   drug traffickers?

13   A.  Yes, sir.

14   Q.  What did Metro say about that?

15             THE INTERPRETER:  The interpreter needs to clarify a

16   term with the witness, your Honor.

17             THE COURT:  Yes.

18   A.  Metro said that these police officers had been working with

19   Paico, and the defendant in receiving cocaine shipments at this

20   airstrip near the Ulua River in Progreso, Yoro, sir.

21   Q.  And what, if anything, did Metro say about these police

22   contacts being of service to the Cachiros?

23   A.  Metro said that just like these police officers had worked

24   with Paico and the defendant, that just in that way they could

25   work with us, sir, led by the defendant to escort cocaine

L3AHRAM4                        Rivera Maradiaga – Direct

1    shipments or anything we needed, sir.

2    Q.  In the business of drug trafficking, why are corrupt police

3    contacts important?

4    A.  Because corrupt contacts are important to help with

5    checkpoints when the drugs are being transported from place to

6    place.

7            THE INTERPRETER:  May the interpreter correct her

8    interpretation:

9    A.  Because corrupt contacts can help in removing checkpoints

10   when the drugs are being transported from place to place.

11   Q.  And you said these drugs were being transported on trucks

12   with secret compartments?

13           THE INTERPRETER:  Again for the interpreter, please.

14   Q.  You said that these cocaine shipments were carried on

15   trucks inside secret compartments?

16   A.  Correct, sir.

17   Q.  How much cocaine might be in a typical truck?

18   A.  Approximately between 1,500 to 3,000 kilos, sir.

19   Q.  How much money might that much cocaine be worth?

20   A.  If it's 3,000 kilos, sir, approximately $30 million, sir.

21   Q.  Were these police contacts located in any particular place

22   inside of Honduras?

23   A.  Yes, sir.

24   Q.  And where, generally, were these corrupt contacts?

25           THE INTERPRETER:  For the interpreter, repeat the

L3AHRAM4                         Rivera Maradiaga - Direct

1    question, please.

2    Q.   Where were these corrupt contacts?

3    A.   Throughout Honduras, sir.

4    Q.   And where was the defendant located at that time?  Where

5    did he live?

6    A.   In Cortes department, sir.

7              MR. LOCKARD:  Ms. Hurst, could we look at Government

8    Exhibit 4, or Mr. Rivera can look at Government Exhibit 4.  And

9    maybe we can enlarge that just a bit.

10             THE COURT:  Keep your voice up, if you will, please.

11             MR. LOCKARD:  Yes, your Honor.

12   Q.   OK.  Do you recognize what's shown in this map?

13   A.   Yes, sir.

14   Q.   And does it fairly and accurately depict the location

15   inside the map?

16   A.   Yes, sir.

17             (Continued on next page)

18

19

20

21

22

23

24

25

L3AKRAM5                    Rivera Maradiaga – Direct

1         MR. LOCKARD:  The government offers Government

2    Exhibit 4.

3              MR. MOSKOWITZ:  No objection.

4              THE COURT:  Received.

5              (Government's Exhibit 4 received in evidence)

6    BY MR. LOCKARD:

7    Q.  So, Mr. Rivera, we have in front of us a map of Honduras.

8    Does this map show the different departments of Honduras?

9    A.  Yes, sir.

10   Q.  Are departments a political subdivision, like a state?

11   A.  Yes, sir.

12   Q.  When the Cachiros organization received cocaine by boat or

13   by airplane, generally speaking, in what area of Honduras did

14   those boats and planes arrive?

15   A.  They arrived in the Department of Cortes, in Gracias a

16   Dios, in Yoro, in Santa Rosa de Copan, which that encompasses

17   El Espiritu, Copan, sir.  San Esteban, Olancho.

18              THE INTERPRETER:  For the interpreter, please repeat.

19   A.  Among others, sir.

20   Q.  Now, did the Cachiros organization have its own corrupt

21   contacts in the police and military?

22   A.  Yes, sir.

23   Q.  Why were you interested in the defendant's corrupt

24   contacts?

25   A.  Because the defendant was located in the Department of

L3AKRAM5                          Rivera Maradiaga - Direct

1    Cortes, sir.

2              THE INTERPRETER:  Please repeat for the interpreter.

3    A.  And we respected each department with its -- wherever --

4    with whatever drug-trafficking organization was located there.

5    Q.  So by working with the defendant, you could strengthen your

6    contacts inside --

7              MR. MOSKOWITZ:  Objection.

8              THE COURT:  Yes, sustained.  Leading.

9    BY MR. LOCKARD:

10   Q.  What was your response to Metro after this meeting?

11   A.  I responded to Metro that I was interested in working with

12   the defendant because the police officers that Metro had

13   mentioned, which were the defendant's contacts, I had already

14   heard them mentioned from another cartel that was located in

15   Francia, Colon, sir.

16   Q.  Mr. Rivera, did there come a time when you met again with

17   the defendant in person?

18   A.  Yes, sir.

19   Q.  Approximately how long after your meeting with Metro at the

20   repair shop was it that you saw the defendant again?

21   A.  Approximately between three and six months afterwards, sir.

22   Q.  Where did you see the defendant again?

23   A.  I saw him at a club in Choloma, sir.

24   Q.  Who owns that club?

25             THE INTERPRETER:  For the interpreter, repeat the

L3AKRAM5                          Rivera Maradiaga - Direct

1    question, please.

2    Q.  Who owned that club?

3    A.  It was Mr. Metro, sir.

4    Q.  How did that meeting come about?

5    A.  Through Metro, sir.

6    Q.  What did Metro say about that meeting?

7    A.  Cousin, he says, come over here because I'm putting

8    together a party here at the club, he says to me.

9    Q.  And what did Metro say about the reason for meeting with

10   the defendant?

11   A.  He said that the defendant wanted to talk to me, sir.

12   Q.  So, when you met with the defendant at Metro's nightclub,

13   who was there?

14   A.  I was there, Metro was there, the defendant was there, and

15   my security was there, as well as the security of Metro and the

16   defendant, sir.

17   Q.  Were any of those men armed?

18   A.  Yes, sir.

19   Q.  Who was armed?

20          THE INTERPRETER:  Please repeat for the interpreter.

21   A.  My security was there, the defendant's security was there,

22   Metro's security was there, and the others, sir.

23          THE INTERPRETER:  Interpreter correction.

24          Interpreter correction:

25   A.  My security, the defendant's security, and Metro's

L3AKRAM5                        Rivera Maradiaga - Direct

```
 1   security, and us.

 2   Q.  Is that everyone?

 3   A.  Yes, sir.

 4   Q.  What weapons was everyone armed with?

 5   A.  AR-15 and .9 millimeters.  I had a grenade launcher, sir.

 6   Q.  Was the grenade launcher inside the club?

 7   A.  No, sir.

 8   Q.  Where was the grenade launcher?

 9   A.  My security was carrying that, sir, downstairs, sir,

10   downstairs, sir, in the cars.

11   Q.  What did the defendant tell you when you met him in the

12   nightclub?

13   A.  First, he greeted me, and he showed me a photograph, sir.

14   Q.  What was the photograph?

15   A.  The photo was of a boat mechanic that owed me money, sir.

16   Q.  And what did the defendant say about that photograph of the

17   mechanic?

18   A.  The defendant asked me if I knew that person who was in the

19   photograph, sir.

20   Q.  And what did you say?

21   A.  I told him, yes, sir.

22   Q.  What did the defendant say then?

23   A.  The defendant said, look, this man was badmouthing the

24   owner of a gas station in Omoa, Cortes, he said that he had

25   ended up owing him some money.  This was money that the owner
```

of the gas station in Omoa, Cortes had given to him, to the

boat mechanic, so that he could buy two engines for a boat that

he had that was in disrepair.  We were drinking several beers,

he says, with that man there, and he was making fun of the

owner of the gas station, sir, with the boat mechanic.

Q.  You said that boat mechanic, in fact, owed you money?

     THE INTERPRETER:  For the interpreter, repeat.

Q.  And you said that that boat mechanic, in fact, owed you

money?

A.  Correct, sir.

Q.  How much money?

A.  $40,000, approximately, sir.

Q.  What, if anything, did the defendant say about what

happened next while he and the mechanic were drinking together?

A.  The defendant said, cousin, I understand that that boat

mechanic was talking about you.

Q.  And then?

A.  Then, cousin, he said, because the man was talking about

you, I got annoyed at the man, he said.  I immediately called

the police chief, who was in Acantilado, where the boat

mechanic was going to go by.

     THE INTERPRETER:  Repeat for the interpreter, please?

A.  Because that officer, he says to me, cousin, is a friend --

is a friend of mine, among the contacts that I have, and I told

him to stop him, to detain him, cousin, and hold him and bring

L3AKRAM5                          Rivera Maradiaga - Direct

1   him to me once he went through that checkpoint there in

2   Acantilado, cousin, he says to me.

3   Q.  And according to the defendant, what happened after that?

4   A.  The defendant said that he had taken the boat mechanic to

5   kill him on the border with Honduras and Guatemala near

6   Corintio.

7   Q.  And according to the defendant, did he, in fact, murder the

8   mechanic?

9   A.  Yes, sir.

10  Q.  What, if anything, did the defendant say was done to the

11  mechanic?

12  A.  He said that he had tortured him, he had cut off his

13  finger, he had beat him in the face, and that, finally, he had

14  finished him off with two bullets to the head, sir.

15  Q.  When the defendant was telling you this --

16          THE INTERPRETER:  Interpreter would like to add to

17  this:

18  A.  Finish him off with two mercy shots to the head, sir.

19  Q.  While the defendant was telling you about murdering the

20  mechanic, did he show you anything?

21  A.  Yes, sir.

22  Q.  What did he show you?

23  A.  He showed me another photograph, sir.

24  Q.  What was in that photograph?

25  A.  It showed the mechanic face-up and bloody, sir.

L3AKRAM5                    Rivera Maradiaga - Direct

1   Q.  Mr. Rivera, had you asked the defendant to do anything

2   about the mechanic?

3   A.  At no time, sir.

4   Q.  Had you asked anyone to kill the mechanic?

5   A.  No, sir.

6   Q.  How would the defendant's murder affect your interest in

7   working with him in drug trafficking?

8   A.  Repeat the question for me, sir.  I don't --

9   Q.  I'll rephrase it.

10          Did you have an understanding of why the defendant was

11  telling you this story?

12          MR. MOSKOWITZ:  Objection.

13          THE COURT:  No.  If he had an understanding, he can

14  testify to it.  Obviously, he doesn't know what's in another

15  person's mind, but when you're having a conversation, sometimes

16  the context is not spelled out with words.  I'll allow the

17  answer.

18          THE WITNESS:  What I understood at that moment, the

19  defendant is telling me what he did with the boat mechanic was

20  that the defendant wanted to earn my trust, so that then I

21  could give him work regarding loads of cocaine, sir.

22  BY MR. LOCKARD:

23  Q.  Metro was also with you at the nightclub; is that right?

24  A.  Correct, sir.

25  Q.  What, if anything, did Metro say about the defendant's

L3AKRAM5                          Rivera Maradiaga - Direct

1    murder of the boat mechanic?

2    A.   Metro said, look, cuz, cousin, Geovanny is a good person to

3    have on our side because you saw already he's a good cousin, he

4    can kill anyone we want if we ask him to.

5    Q.   Mr. Rivera, did there come a time when you and the

6    defendant worked on a drug shipment together?

7    A.   Yes, sir.

8    Q.   Approximately when was the first time that you worked on a

9    drug shipment with the defendant?

10   A.   Approximately in the year 2011, sir.

11   Q.   How did you contact the defendant?

12   A.   Through Metro, sir.

13   Q.   And what did you tell Metro?

14   A.   I told Metro, cousin, I have a load coming in from

15   Venezuela, an aircraft loaded with cocaine.  Tell defendant to

16   come, so they can escort that load.  I'm going to give them

17   their first job, I said.

18   Q.   And then after that conversation, did you meet the

19   defendant?

20   A.   Yes, sir.

21   Q.   Where did you meet him?

22   A.   In Tacoa, Colon, sir, in a Finca located in the Village of

23   El Tigre, sir.

24   Q.   Okay.  Let's talk a little bit about that cocaine shipment

25   that came in from Venezuela.

1          How much cocaine arrived on the airplane?

2     A.   There was approximately 425 to 530 kilos of cocaine, sir.

3     Q.   Where did that airplane full of cocaine land?

4     A.   It landed in the area of Sico, Colon, sir.

5     Q.   And who sold that cocaine to you?

6     A.   It was sold by a drug trafficker from Colombia, sir.

7     Q.   Were you selling that cocaine?

8     A.   Yes, sir.

9     Q.   Where were your buyers located?

10    A.   In Espiritu Copan, sir, and in Guatemala, and in Mexico.

11         MR. LOCKARD:  Ms. Hurst, could you show Mr. Rivera

12    Government Exhibit 501.

13    Q.   Mr. Rivera, is this a map of Honduras?

14    A.   That's correct, sir.

15    Q.   You said this cocaine shipment was landing at Sico, Colon;

16    is that right?

17    A.   Correct, sir.

18    Q.   Do you see Sico, Colon, on here?

19    A.   Yes, sir.

20         MR. LOCKARD:  The government offers Exhibit 501.

21         MR. MOSKOWITZ:  No objection.

22         THE COURT:  Received.

23         (Government's Exhibit 501 received in evidence)

24         MR. LOCKARD:  Ms. Hurst, could you highlight Sico.

25

```
 1  BY MR. LOCKARD:
 2  Q.  Mr. Rivera, is the area circled in red where the plane
 3  landed?
 4  A.  Correct, sir.
 5  Q.  You said you met with the defendant at a ranch near
 6  El Tigre?
 7  A.  Yes, sir.
 8  Q.  Do you see El Tigre on this map?
 9  A.  Yes, sir.
10          MR. LOCKARD:  Ms. Hurst, could you highlight El Tigre,
11  please.
12  Q.  Where did the cocaine need to be transported to?
13  A.  From Sico it was transported to El Tigre, and then from El
14  Tigre to Espiritu, Copan, sir.
15  Q.  At the time that you met with the defendant near El Tigre,
16  where was the cocaine?
17  A.  It was in a truck, sir.
18  Q.  Where was that truck?
19  A.  There, at the El Tigre ranch, sir.
20  Q.  Who did you meet with at El Tigre?
21  A.  With the defendant, with Metro, with the truck driver, with
22  two of Metro's security men, and with the Colombian who was in
23  charge of counting the cocaine, Yuca, sir.
24  Q.  Who did Yuca work for?
25  A.  For the Colombian Renteria cartel, sir.
```

L3AKRAM5                          Rivera Maradiaga - Direct

1    Q.   Was anyone at that meeting armed?

2    A.   We were all armed, sir.

3    Q.   What was the defendant carrying?

4    A.   He was carrying a green Glock with a selector switch, and

5    an AR-15, sir.

6    Q.   What does a selector switch do?

7    A.   Fire in bursts, sir.

8    Q.   What was Metro carrying?

9    A.   Metro was carrying a grenade launcher and a gold handgun,

10   sir.

11   Q.   What were you carrying?

12   A.   I was carrying an AR-15, sir, and a 93R.

13   Q.   Were there others near the ranch where you were meeting who

14   were also armed?

15   A.   Yes, sir.

16   Q.   Who did they work for?

17   A.   For me and the defendant, sir.

18   Q.   What, if anything, did the defendant and Metro bring with

19   them to El Tigre to transport the cocaine in addition to the

20   firearms?

21   A.   They had a car with a false bottom, with a hidden

22   compartment, sir, where they were carrying several weapons that

23   they were using for safety, for security, sir.

24   Q.   Were there other cars as well as the one with the trap for

25   the weapons?

L3AKRAM5                          Rivera Maradiaga – Direct

1    A.  Yes, sir.

2    Q.  So, whenever everyone met at the ranch at El Tigre, what

3    happened?

4    A.  The cocaine was counted, and then it was put in the truck

5    that was going to be transporting the cocaine in the hidden

6    compartment that the truck had, sir.

7    Q.  What, if anything, did the defendant tell you about how

8    they would secure the shipment of cocaine when it was driven to

9    its destination?

10   A.  The defendant said that he had about three to four security

11   cars, and that he would be driving behind the truck on

12   occasion, and on other occasions ahead of it, in order to

13   provide security for the truck that was transporting the

14   cocaine.

15   Q.  What, if anything, did the defendant say about what would

16   happen if there was a checkpoint?

17   A.  The defendant said that if there happened to be a

18   checkpoint or a military operation, that he would then call the

19   contact that he had with the military police.  He also said

20   that if it happened to be a preventive police checkpoint, that

21   he would then call Comisionado Martinez for him to remove the

22   checkpoint, sir.

23   Q.  Was the purpose of the security also to be able to repel an

24   attack?

25   A.  Yes, sir.

L3AKRAM5                          Rivera Maradiaga – Direct

1   Q.  What, if anything, did the defendant say about how they

2   would repel an attack?

3   A.  He said, look, cuz, if anything were to ever happen, if

4   there were an attack on the truck that is transporting the

5   cocaine, I am with the -- we are always carrying AR-15s and

6   grenade launchers, and that is why we have three or four

7   security cars always with us, so that we can repel any attacks

8   that might come against that cocaine, and so to prevent any

9   theft of the cocaine.

10  Q.  Are you familiar can the type of grenade launcher the

11  defendant was referring to?

12  A.  Yes, sir.

13  Q.  What's the term sometimes used for that kind of grenade

14  launcher?

15  A.  Monitos, sir, the Mono.

16         MR. LOCKARD:  Ms. Hurst, could you show Mr. Rivera

17  Government Exhibit 613.

18  Q.  Do you recognize what's shown in that photograph?

19  A.  Yes, sir.

20  Q.  Have you owned a weapon similar to that?

21  A.  Yes, sir.

22  Q.  Have you seen the defendant with a weapon similar to that?

23  A.  Yes, sir.

24         MR. LOCKARD:  The government offers Exhibit 613.

25         MR. MOSKOWITZ:  No objection.

1          THE COURT:  Received.

2          (Government's Exhibit 613 received in evidence)

3   Q.  Mr. Rivera, you were talking about a Monito.  Is this a

4   Monito?

5   A.  Yes, sir.

6   Q.  Was that shipment of cocaine successfully delivered to its

7   destination?

8   A.  Yes, sir.

9   Q.  Who were the buyers?

10  A.  The Valle Brothers' cartel, sir.

11  Q.  How did you learn that the cocaine was delivered to the

12  Valle Brothers' cartel?

13  A.  Because the defendant called me on the phone once they had

14  arrived at the Valle ranch sir, and the Valle Brothers also

15  confirmed for me that they had received the cocaine shipment

16  that had been delivered by the defendant and his partner,

17  Metro, sir.

18  Q.  Who were the leaders of the Valle Brothers cartel?

19  A.  Luis Valle, sir, and Arnulfo Valle, sir.

20          MR. LOCKARD:  Ms. Hurst, could you show Mr. Rivera

21  Government Exhibit 106.

22  Q.  Do you recognize that individual?

23  A.  Yes, sir.

24  Q.  Who is that?

25  A.  Luis Valle, sir.

L3AKRAM5                        Rivera Maradiaga - Direct

1          MR. LOCKARD:  The government offers Exhibit 106.

2          MR. MOSKOWITZ:  No objection.

3          THE COURT:  Received.

4          (Government's Exhibit 106 received in evidence)

5          MR. LOCKARD:  Ms. Hurst, can you also show Mr. Rivera

6    Exhibit 108.

7    Q.  Mr. Rivera, do you recognize the individual in Exhibit 108?

8    A.  Yes, sir.

9    Q.  And who is that?

10   A.  Arnulfo Valle, sir.

11         MR. LOCKARD:  The government offers Exhibit 108.

12         MR. MOSKOWITZ:  No objection.

13         THE COURT:  Received.

14         (Government's Exhibit 108 received in evidence)

15   Q.  Have you sold other shipments of cocaine to the Valles

16   cartel?

17   A.  Yes, sir.

18   Q.  Did you learn from the Valles Brothers where they sent the

19   cocaine after they received it from you?

20   A.  Yes, sir.

21   Q.  Where did the Valles cartel send their cocaine?

22   A.  To the Mexicans, and the final destination is the United

23   States, sir.

24   Q.  The cocaine shipment where the defendant provided security

25   and transportation, how did the Valles pay you for that

L3AKRAM5                    Rivera Maradiaga – Direct

1   cocaine?

2   A.  Cash, sir.

3   Q.  In what currency?

4   A.  American money, sir.

5           THE COURT:  All right.  We're going to take our

6   mid-afternoon break.

7           Ladies and gentlemen, please do not discuss the case

8   among yourselves or with anyone.  We will be back in action in

9   ten minutes.  Thank you.

10          (Jury not present)

11          THE COURT:  Ma'am, ma'am, please come back.  Did you

12  hear my instruction, ma'am?

13          AUDIENCE MEMBER:  Yes.  Sorry.

14          THE COURT:  Thank you.

15          (Pause)

16          THE COURT:  Okay.  Thank you.

17          (Recess)

18          (Continued on next page)

19

20

21

22

23

24

25

L3AHRAM6                        Rivera Maradiaga - Direct

1                    (In open court; jury not present)

2                    MR. LOCKARD:  At the podium or at the table?

3                    THE COURT:  At the podium, please, all the time when

4        we resume.  We save 23 seconds, and that's 23 seconds we can

5        use.

6                    Sir, you can take your face mask off.

7                    THE WITNESS:  (In English) Thank you, sir.

8                    (Continued on next page)

 1              (Jury present)

 2              THE COURT:  All right.  Good afternoon, ladies and

 3      gentlemen.

 4              Mr. Lockard, you may continue.

 5              MR. LOCKARD:  Thank you, your Honor.

 6      BY MR. LOCKARD:

 7      Q.  Mr. Rivera, before the break we were talking about payment

 8      for the shipment of cocaine, and you said that the Valle cartel

 9      paid you in U.S. dollars and cash?

10      A.  Yes, sir.

11      Q.  How did you pay the defendant?

12      A.  In cash, sir.

13      Q.  How was that delivered?

14      A.  In person, sir.

15      Q.  Who was it delivered to?

16      A.  To the defendant and Metro, his partner, sir.

17      Q.  And where did you deliver the cash?

18      A.  In San Pedro Sula, sir.

19      Q.  Where in San Pedro Sula?

20      A.  At the same repair shop, Torre Servicio, sir.

21      Q.  How much did you pay them?

22      A.  Approximately between $60,000 and $70,000, sir.

23      Q.  What kind of truck was used to transport the cocaine in the

24      shipment?

25      A.  An NPR truck, sir.

L3AHRAM6                        Rivera Maradiaga - Direct

1   Q.  What kinds of trucks would the Cachiros use to transport

2   cocaine throughout Honduras?

3   A.  We used NPRs, 12-foot long.  We would use Freightliners,

4   Mercedes from 18 to 20 feet long, 40-feet-long long boys.  We

5   would also use cattle crates, you know, in order to make it --

6   in order to hide the cocaine within the crates.

7           MR. LOCKARD:  Ms. Hurst, could you show Mr. Rivera

8   Government Exhibit 316.

9   Q.  Mr. Rivera, is this similar to the kinds of trucks that the

10  Cachiros would use to transport cocaine?

11  A.  Yes, sir.

12          MR. LOCKARD:  The government offers Exhibit 316.

13          MR. MOSKOWITZ:  No objection.

14          THE COURT:  Received.

15          (Government's Exhibit 316 received in evidence)

16  BY MR. LOCKARD:

17  Q.  Mr. Rivera, what kind of truck is this?

18  A.  That was a crate used for the transportation of cattle,

19  sir.  It's Freightliner.

20  Q.  When the Cachiros used cattle trucks with secret

21  compartments to transport cocaine, where would those secret

22  compartments be?

23  A.  The top, sir, on the sides.

24  Q.  Mr. Rivera, did there come a time when you and the

25  defendant worked on another drug shipment?

1   A.  Yes, sir.

2   Q.  How long after the shipment that we were just talking about

3   did you and the defendant work on another drug shipment?

4   A.  Approximately three to four months, sir.

5   Q.  And how did you contact the defendant?

6   A.  Same thing, through Metro, sir.

7   Q.  And what did you say?

8   A.  I reached out to Metro, and I said:  Cuz, come over to

9   Tocoa so that you can come and receive the shipment that I am

10  going to deliver to you just the way that we did last time.

11  Q.  And what did Metro say?

12  A.  Metro said:  Wait up, cuz.  Let me -- I'm going to call

13  Geovanny so he can -- so we can both come with the people and

14  do that job for you.

15  Q.  And did you meet Metro and the defendant?

16  A.  Yes, sir.

17  Q.  Let's talk about this second shipment of cocaine.  How did

18  this cocaine arrive in Honduras?

19  A.  It arrived in a plane, sir.

20  Q.  And how much cocaine was on that airplane?

21  A.  Approximately between 500 and 570 kilos, sir.

22  Q.  Where in Honduras did that airplane arrive?

23  A.  In San Esteban, Olancho, sir.

24  Q.  And who -- was that at an airstrip?

25  A.  Yes, it was a clandestine airstrip, sir.

L3AHRAM6                          Rivera Maradiaga - Direct

1    Q.   Who controlled that airstrip?

2    A.   Freddy Nájera, sir.

3    Q.   Who sold you that cocaine?

4    A.   Rafael Sierra, sir.

5    Q.   What, if any, relationship is there between Rafael Sierra

6    and the Renteria organization in Colombia?

7    A.   He is one of the Renteria cartel leaders, sir.

8    Q.   And did you sell the cocaine?

9    A.   Yes, sir.

10   Q.   To whom?

11   A.   To the Valle Brothers cartel, sir.

12   Q.   And where did you need to have the cocaine delivered in

13   order to sell it to the Valles?

14   A.   La Entrada, Copan, sir.

15   Q.   Now, a moment ago you said that the airstrip where that

16   airplane full of cocaine landed was controlled by Freddy

17   Nájera?

18   A.   Yes, sir.

19           MR. LOCKARD:  Ms. Hurst, could you show Mr. Rivera

20   Government Exhibit 116.

21   Q.   Mr. Rivera, do you recognize that person?

22   A.   Yes, sir.

23   Q.   Who is that?

24   A.   Freddy Nájera, sir.

25           MR. LOCKARD:  The government offers Exhibit 116.

1          MR. MOSKOWITZ:  No objection.

2          THE COURT:  Received.

3          (Government's Exhibit 116 received in evidence)

4    Q.  Did Mr. Nájera have any official positions in Honduras?

5    A.  Yes, sir.

6    Q.  What was his official position?

7    A.  He was a member of the Honduras Congress, sir.

8    Q.  And did you engage in drug trafficking with Freddy Nájera?

9    A.  Yes, sir.

10         MR. LOCKARD:  Ms. Hurst, could we see page 2 of

11   Government Exhibit 501.

12   Q.  Where was Freddy Nájera's airstrip?

13   A.  San Esteban, Olancho, sir.

14         MR. LOCKARD:  And, Ms. Hurst, could you please

15   highlight San Esteban.

16   Q.  And after the airplane landed, where did you meet the

17   defendant and Metro?

18   A.  Fifteen minutes from Tocoa, sir, in Zamora, Colon.

19         MR. LOCKARD:  And, Ms. Hurst, could you highlight the

20   area around Tocoa.

21   Q.  When you met with the defendant and Metro near Tocoa, where

22   was the cocaine?

23   A.  It was at the Zamora, Colon, ranch, sir.

24   Q.  And who did you meet with at the *finca* near Tocoa?

25   A.  With the defendant, with Metro, with the truck driver, and

L3AHRAM6                        Rivera Maradiaga – Direct

1   the Renteria man, sir.

2   Q.  Who was the Renteria man?

3   A.  Yuca, sir.

4   Q.  Is that the same Yuca who was involved in the shipment that

5   departed from El Tigre?

6   A.  Yes, sir.

7   Q.  Were any of those men armed?

8   A.  Yes, sir.

9   Q.  Which of them?

10  A.  All of them, sir.

11  Q.  And were you armed?

12  A.  Yes, sir.

13  Q.  Were you all carrying the same weapons as when you met at

14  the El Tigre *finca*?

15  A.  Yes, sir.

16  Q.  What was the defendant's role in this cocaine shipment?

17  A.  To escort the cocaine from the Colon region to La Entrada,

18  Copan, sir.

19  Q.  And how did the defendant do that?

20  A.  Accompanied by Metro and his security, sir, using the same

21  cars that they use for the first drug shipment, sir.

22  Q.  And was that shipment successfully delivered to the Valles?

23  A.  Yes, sir.

24  Q.  And how did you learn that?

25  A.  Because I was at the *finca* where the drug shipment was

1   delivered, sir.

2   Q.  And were you there with the Valles?

3   A.  Yes, sir.

4   Q.  When the cocaine was delivered to the Valles ranch, where

5   was the defendant?

6   A.  The defendant was at the gas station in La Entrada, Copan,

7   sir, with his partner Metro and their security, sir.

8   Q.  And did you speak with the defendant?

9   A.  Yes, sir.

10   Q.  What did he tell you?

11   A.  That he would wait there at the gas station together with a

12   police officer who was in charge of La Entrada, Copan, and

13   together with Metro, sir.

14   Q.  Were you paid for the shipment by the Valles?

15   A.  Yes, sir.

16   Q.  And how did they pay you?

17   A.  In cash, sir.

18   Q.  And did you pay the defendant?

19   A.  Yes, sir.

20   Q.  How did you pay the defendant?

21   A.  In cash, sir.

22   Q.  And where did you deliver that money?

23   A.  In San Pedro Sula, sir.

24   Q.  Where in San Pedro Sula?

25   A.  At the same mechanic shop where he had been paid for the

L3AHRAM6                          Rivera Maradiaga - Direct

1   previous load, sir.

2   Q.  After this second delivery of cocaine to the Valles, did

3   there come a time when you and the defendant worked on another

4   drug shipment?

5   A.  Yes, sir.

6   Q.  And approximately when was that?

7   A.  Approximately 2012, sir.

8   Q.  And how did you contact the defendant?

9   A.  Through Metro, sir.

10  Q.  And what did you say?

11  A.  I told Metro:  You know, I have an airplane coming in

12  loaded with cocaine proceeding from Colombia.  Let's see if you

13  can receive it at Compita's landing trip, that landing strip

14  where Geovanny works.

15  Q.  And what did Metro say?

16  A.  Yes, cuz, I'll receive it for you, but hold on.  Let me

17  call.  Let me call Geovanny so that he can receive it for you.

18  Q.  You mentioned an airstrip, Compita's airstrip?

19  A.  Yes, sir.

20  Q.  What did you mean by that?

21  A.  A place where airplanes loaded with cocaine landed.  It was

22  a clandestine landing strip, a private, clandestine landing

23  strip that Compita had there by the river.

24  Q.  Where was the airstrip?

25  A.  In the area of Baracoa, Cortes, sir.

L3AHRAM6                        Rivera Maradiaga - Direct

1   Q.  And who is Compita?

2   A.  Compita was a drug trafficker who received cocaine for us,

3   sir.

4   Q.  And why would you ask Metro about the defendant receiving

5   cocaine at an airstrip that Compita owned?

6   A.  Because the defendant had control of that landing strip

7   that belonged to Compita, sir.

8   Q.  So let's talk a little bit about this third cocaine

9   shipment that you worked on with the defendant.

10          The cocaine was arriving by airplane?

11          THE INTERPRETER:  For the interpreter, the question,

12  please.

13  Q.  The shipment was arriving by airplane?

14  A.  Yes, sir.

15  Q.  And how much was this shipment?

16  A.  Approximately 425 to 500 kilos, sir.

17  Q.  Whose cocaine was this shipment?

18  A.  It belonged to Jack, Guatemalan drug trafficker, sir.

19  Q.  What was the Cachiros' role in this drug shipment?

20  A.  To receive that load for Jack, sir.

21  Q.  Were you buying this cocaine?

22  A.  No, sir.

23  Q.  Who was Jack selling the cocaine to?

24  A.  Jack was selling drugs to the Mexicans and bringing --

25  taking drugs to the United States, sir.

L3AHRAM6                         Rivera Maradiaga - Direct

1   Q.  And where did Jack need the cocaine delivered after it was

2   received at Compita's airstrip?

3   A.  Toward Espiritu, Copan, sir.

4          MR. LOCKARD:  Ms. Hurst, can we bring up page 3 of

5   Exhibit 501.

6   Q.  Was Compita's airstrip near any town or city?

7   A.  Yes, sir.

8   Q.  What town or city is that?

9   A.  Tapon de los Oros, sir.

10          MR. LOCKARD:  Ms. Hurst, could you highlight Tapon

11   de los Oros.

12   Q.  After speaking with Metro, who else did you speak to about

13   receiving and transporting this drug shipment?

14   A.  With Jack, sir, the owner of the cocaine.

15   Q.  And was the airplane received at Compita's airstrip?

16   A.  Correct, sir.

17   Q.  And how did you learn that?

18   A.  When the aircraft arrived, they're loaded at Compita's

19   landing strip.  Metro reached out to me and communicated that

20   it had already arrived, sir.

21   Q.  And what did you learn about how the cocaine was

22   transported to Espiritu?

23   A.  The defendant had transported it by truck to the Valle in

24   Espiritu, Copan, sir.

25   Q.  And what were the Valles to do with the cocaine after the

L3AHRAM6                        Rivera Maradiaga - Direct

1    defendant delivered it there?

2    A.   Deliver it to Jack, the drug trafficker, sir.

3    Q.   And was the cocaine successfully delivered to the Valles in

4    Espiritu?

5    A.   Correct, sir.

6    Q.   And how did you learn that?

7    A.   Once the drugs reached Espiritu, Copan, I spoke to the

8    defendant, and I spoke to the Valle Brothers who had received

9    the cocaine, sir.

10   Q.   Did Jack pay you for receiving and transporting this

11   shipment?

12   A.   Yes, sir.

13   Q.   And what did Jack pay you?

14   A.   Ten percent of the cocaine, sir.

15   Q.   And was that paid to you in money or in cocaine?

16   A.   With cocaine, sir.

17   Q.   And what did you pay to Metro and the defendant?

18           THE INTERPRETER:  Repeat, please.

19   A.   I also paid him in cocaine, sir.

20   Q.   What, if anything, did Metro tell you about the cocaine

21   that he was being paid for transporting this shipment?

22   A.   That once he received that cocaine, he was going to pay --

23   he was going to sell it to -- he was going to sell that cocaine

24   and then pay his partner, his partner Geovanny Fuentes.

25   Q.   Did you work with Jack on other narco-trafficking

L3AHRAM6                        Rivera Maradiaga - Direct

1   transactions?

2   A.  Yes, sir.

3   Q.  What types of transactions did you work with Jack?

4   A.  As partners on planes that Jack sent to Guatamala from

5   Venezuela.

6            THE COURT:  All right, pause.

7            THE INTERPRETER:  Interpreter corrects:  "From

8   Guatamala to Venezuela."  Interpreter correction.

9            THE COURT:  Pause.  Let's stand up and stretch.

10           Go ahead.

11  BY MR. LOCKARD:

12  Q.  Mr. Rivera, you said that you and Jack were partners in

13  airplanes?

14  A.  Yes, sir.

15  Q.  What did you do in your partnership with Jack for

16  airplanes?

17  A.  Jack bought the airplanes here in the United States.  If an

18  airplane cost a million dollars, Jack would put out $500,000,

19  and I would put out another $500,000, sir.  That way we would

20  send it to Venezuela, and there several drug traffickers would

21  load it with the load of cocaine.  And once it arrived in

22  Honduras, the cocaine that came in the airplane, we would split

23  it up in equal portions, sir.

24  Q.  And those airplanes that you and Jack bought from the

25  United States, are those the same airplanes that Jack used to

L3AHRAM6                        Rivera Maradiaga – Direct

1   fly the cocaine to Honduras?

2   A.  Yes, sir.

3   Q.  Was this one of those airplanes?

4   A.  Yes, sir.

5   Q.  Did you work with other drug traffickers that also used

6   airplanes obtained from the United States?

7   A.  Yes, sir.

8   Q.  Did Renteria use airplanes obtained from the United States?

9   A.  Yes, sir.

10  Q.  During this shipment that Jack sent to Honduras and

11  transported to Espiritu, did one of your workers have problems

12  with law enforcement?

13  A.  Yes, sir.

14  Q.  What happened?

15  A.  One of my workers was on the highway there where the

16  defendant was going to come out with the cocaine.  When he was

17  out there keeping an eye out, watching, a patrol, a police

18  patrol car came, and they arrested him.

19  Q.  Was that worker armed?

20  A.  Yes, sir.

21  Q.  What happened after your worker was arrested?

22  A.  The defendant said to me that they had given Comisionado

23  Martinez --

24          THE INTERPRETER:  The interpreter correction:

25  A.  The defendant said to me that he had spoken to Comisionado

1  Martinez.

2  Q.  And what did the defendant say happened next?

3  A.  The officer who arrested my worker hadn't heard him when he

4  called him to release the worker of mine that he had arrested.

5  Q.  So what happened then?

6  A.  The defendant said that he'd reached out to Polo, who was

7  mayor of Choloma, so that he could reach out to the officer and

8  have him release him, sir.

9  Q.  So what happened after the defendant called the mayor of

10  Choloma?

11  A.  The mayor of Choloma called the officer who had arrested my

12  worker so that he would release him, sir.

13  Q.  And was your worker released?

14  A.  Yes, sir, they let him go right there on the spot.

15  Q.  And what about the weapons he was carrying?

16  A.  They gave that one back to him.

17  Q.  What did you learn in general about the mayor of Choloma

18  about the defendant?

19  A.  The mayor of Choloma gave them information when the

20  anti-drug police would show up.  They would come from

21  Tegucigalpa or from San Pedro Sula, and they would run

22  checkpoint operations there in Choloma, which is where the

23  defendant lived, and that way the defendant would remove the

24  weapons that he had at his house so that the police wouldn't

25  confiscate them in case they raided his property, sir.

L3AHRAM6                              Rivera Maradiaga - Direct

1    Q.  What was the name of the mayor of Choloma?

2    A.  Polo Crivelli, sir.

3    Q.  Polo --

4    A.  Crivelli, Crivelli.  Crivelli, C-r-i-v-e-l-l-i.

5    Q.  Is Polo a nickname?

6              THE INTERPRETER:  Again for the interpreter.

7    Q.  Is Polo a nickname?

8    A.  Yes, sir.

9    Q.  What was the mayor's first name?

10   A.  Leopoldo Crivelli, sir.

11   Q.  Mr. Rivera, during your first meeting with the defendant at

12   your gas station in Omoa, the defendant told you about his

13   cocaine lab, is that right?

14   A.  Correct, sir.

15   Q.  Did there come a time when the defendant asked to meet with

16   you again about the cocaine lab?

17   A.  Yes, sir.

18   Q.  And how did that meeting come about?

19   A.  Through Metro, sir.

20   Q.  And what were you told?

21   A.  Defendant said he was worried because they were

22   investigating a laboratory that he had with Metro in *cerro*

23   Cortes -- in a hill on -- on a hill --

24             THE INTERPRETER:  Interpreter correction:

25   A.  A drug laboratory that he had with Metro on a hill in the

L3AHRAM6                         Rivera Maradiaga – Direct

1   department of Cortes.

2   Q.  And did you meet with the defendant?

3   A.  Yes, sir.

4   Q.  Where did you meet him?

5   A.  In San Pedro Sula, sir.

6   Q.  And where in San Pedro Sula did you meet the defendant

7   about this investigation of his cocaine lab?

8   A.  At CEMCOL, sir.

9            MR. LOCKARD:  Ms. Hurst, could you show Mr. Rivera

10  Government Exhibit 505.

11  Q.  Mr. Rivera, do you recognize that?

12  A.  Yes, sir.

13  Q.  And how do you recognize it?

14  A.  Because that's where we had a meeting with the defendant,

15  sir.

16           MR. LOCKARD:  Government offers Exhibit 505.

17           MR. MOSKOWITZ:  No objection.

18           THE COURT:  Received about.

19           (Government's Exhibit 505 received in evidence)

20  BY MR. LOCKARD:

21  Q.  Did you have other meetings related to narco-trafficking at

22  this same location?  Did you have other meetings regarding

23  narco-trafficking at this same location?

24  A.  Yes, sir.

25  Q.  At your meeting with the defendant, what did he say about

L3AHRAM6                          Rivera Maradiaga - Direct

1   the lab?

2   A.   The defendant said he was worried because the investigative

3   police of San Pedro Sula were investigating him.  He said he

4   had a drug laboratory on a hill there in Cortes department.  It

5   was on property owned by someone named Fuad who was a local

6   businessman.

7   Q.   What, if anything, did the defendant say about how he

8   learned of this investigation?

9   A.   Through contacts in the police who had warned -- who had

10  warned him and through this politician Crivelli, sir.

11         THE INTERPRETER:  Interpreter correction:

12  A.   And through Polito Crivelli, sir.

13  Q.   And who is Polito Crivelli?

14  A.   That's the son of the mayor of Choloma, Leopoldo Crivelli,

15  sir.

16  Q.   Did the defendant say whether he had done anything about

17  the investigation?

18  A.   Yes, sir.

19  Q.   And what had he done?

20  A.   The defendant said he had met with another drug trafficker

21  from the San Pedro Sula area, and his name is Chepe Handal.

22  And he said that they had entered into partnership, sir.  And

23  he said that Chepe Handal would control the police who were

24  investigating the defendant's drug laboratory, sir.

25  Q.   What kind of partnership did the defendant say he would

L3AHRAM6                          Rivera Maradiaga - Direct

1   have with Chepe Handal?

2   A.  A partnership in the drug laboratory that he was -- that he

3   had, sir, where he was processing cocaine.

4   Q.  Did the defendant express any concerns to you?

5   A.  Yes, sir.

6   Q.  What did the defendant say he was worried about?

7   A.  The defendant was worried that they would be mentioning

8   that businessman from Choloma, sir, Fuad.

9   Q.  And when you say that they would be mentioning Fuad, what

10  does that mean?

11  A.  That the investigative police were mentioning this

12  businessman Fuad, sir.

13  Q.  Did the defendant ask you anything?

14  A.  Defendant asked me regarding the drug laboratory, could I

15  also investigate through my -- through the contacts that I had

16  in the police.

17  Q.  And how did you respond?

18  A.  I said yes to him, sir.

19  Q.  And so what did you do?

20  A.  I reached out to one of the contacts that I had there with

21  the investigative police.

22  Q.  And what did you learn?

23  A.  Nothing, sir.  He told me that he would be looking into it

24  and that he would let me know later, sir.

25  Q.  After that, what did you tell the defendant?

L3AHRAM6                          Rivera Maradiaga - Direct

1   A.  I told them that I would be looking into it through my

2   contact and that I would be reaching out to Carlos Valladares,

3   who was the contact that I had with the investigative police,

4   sir.

5   Q.  Did there come a time when you learned that the lab had

6   been raided?

7   A.  Yes, sir.

8   Q.  How did you learn that?

9   A.  Through the defendant and Metro, sir.

10  Q.  Had you seen anything about it on the news?

11  A.  Yes, sir.

12  Q.  And did you meet with Metro and the defendant?

13  A.  That's right, sir.

14          THE COURT:  All right.  That's where we're going to

15  leave it.

16          Ladies and gentlemen, we're going to call it a day for

17  the trial.  Please remember, do not discuss the case among

18  yourselves or with anyone.  Do not do any Internet research,

19  fact-checking, looking into who's who, Google searches,

20  anything of the like.  That's a violation of your oath as a

21  juror and also of the Court's instructions to you.

22          So please keep up the good work of getting here on

23  time.  We'll start tomorrow morning at 9:30.  Have a very

24  pleasant evening.  See you.

25          (Jury excused)(Continued on next page)

L3AHRAM6

1          (Jury not present)

2          THE COURT:  For anyone who's interested -- off the

3     record.

4          (Discussion off the record)

5          MR. MOSKOWITZ:  Judge, just a matter -- on the record.

6          With respect to the subpoenaed materials that we have

7     addressed on previous occasions, some of that material was

8     received last night.  The material that relates to this witness

9     has not yet been received, so -- which means, obviously, it

10    hasn't been reviewed; it hasn't been translated.  I don't know

11    when it will be received.  I'm hoping -- this is certainly not

12    on Mr. Lockard and the U.S. Attorney's Office.  I know that

13    when they get it, I get it, and we even made arrangements for

14    the interpreters to use the government's equivalent of Dropbox

15    to get the materials.

16         So I don't know where the holdup is, but I can tell

17    the Court we still don't have it, which means there may be some

18    delay.

19         THE COURT:  All right.  Well --

20         MR. LOCKARD:  I can provide --

21         THE COURT:  I've pretty much made up my mind.  I'll

22    hear people on it, but my -- when I say I've made up my mind,

23    my leaning is that it would be a recall situation if it came to

24    that.

25         MR. LOCKARD:  I can provide a update for Mr. Moskowitz

L3AHRAM6

1  and the Court.  As Mr. Moskowitz mentioned, we did have some
2  folks drive out MDC yesterday to pick up materials from there.
3  We just received materials from the MCC this afternoon, and I
4  believe they are right now being uploaded to the file share
5  site, so they should have access to them right now, basically.
6          THE COURT:  Let's be hopeful.
7          MR. MOSKOWITZ:  Thank you, your Honor.
8          MR. LOCKARD:  I try.
9          THE COURT:  All right.  Good.  Thank you.
10          All right.  You may leave now.
11          Mr. Lockard, just your best estimate as to how much
12  you have left with the witness on direct?
13          MR. LOCKARD:  I think we'll probably go towards the
14  end of the day tomorrow.
15          THE COURT:  I'll never get Tuesday back.
16          MR. MOSKOWITZ:  Tuesday's a half day.
17          THE COURT:  Tuesday was the day that we had a witness
18  who said --
19          MR. MOSKOWITZ:  A juror.
20          THE COURT:  No, a witness who said, yes, this is a
21  picture of cash; yes, this is a picture of a gun.  But -- and
22  I'm sure it was edifying.
23          OK.  We're adjourned.  See you all tomorrow at
24  9:30 a.m.  Thank you.
25          (Adjourned to March 11, 2021, at 9:30 a.m.)

```
 1                      INDEX OF EXAMINATION

 2   Examination  of:                          Page

 3   BRIAN FAIRBANKS

 4   Cross By Mr. Moskowitz . . . . . . . . . . . 192

 5   Redirect By Mr. Lockard  . . . . . . . . . . 216

 6   GREGG MERVIS

 7   Direct By Mr. Gutwillig  . . . . . . . . . . 229

 8   Cross By Mr. Schulman  . . . . . . . . . . . 262

 9   DEVIS LEONEL RIVERA MARADIAGA

10   Direct By Mr. Lockard  . . . . . . . . . . . 269

11                      GOVERNMENT EXHIBITS

12   Exhibit No.                            Received

13   1    . . . . . . . . . . . . . . . . . . . . 249

14   2    . . . . . . . . . . . . . . . . . . . . 251

15   104  . . . . . . . . . . . . . . . . . . . . 275

16   107  . . . . . . . . . . . . . . . . . . . . 281

17   4    . . . . . . . . . . . . . . . . . . . . 298

18   501  . . . . . . . . . . . . . . . . . . . . 306

19   613  . . . . . . . . . . . . . . . . . . . . 311

20   106  . . . . . . . . . . . . . . . . . . . . 312

21   108  . . . . . . . . . . . . . . . . . . . . 312

22   316  . . . . . . . . . . . . . . . . . . . . 316

23   116  . . . . . . . . . . . . . . . . . . . . 319

24   505  . . . . . . . . . . . . . . . . . . . . 330

25
```