L3FHRAM1

 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2  ------------------------------x

 3  UNITED STATES OF AMERICA,

 4              v.                          15 CR 379 (PKC)

 5  GEOVANNY FUENTES RAMIREZ,

 6              Defendant.                  Trial

 7  ------------------------------x

 8                                          New York, N.Y.
                                            March 15, 2021
 9                                          9:45 a.m.

10  Before:

11                  HON. P. KEVIN CASTEL,

12                                          District Judge
                                            and a jury

13                      APPEARANCES

14  AUDREY STRAUSS,
         United States Attorney for the
15       Southern District of New York
    MICHAEL LOCKARD
16  JACOB GUTWILLIG
         Assistant United States Attorneys
17
    AVRAHAM CHAIM MOSKOWITZ
18  EYLAN SCHULMAN
         Attorneys for Defendant
19
    Also Present:
20
    Jill Hoskins, Interpreter (Spanish)
21  Sonia Berah, Interpreter (Spanish)
    Mercedes Avalos, USAO Interpreter (Spanish)
22  Walter Krochtal, USAO Interpreter (Spanish)
    Brian Fairbanks, DEA Agent
23

24

25

L3FHRAM1

1          (Trial resumed; jury present)

2          THE COURT:  Good morning, ladies and gentlemen.  Hope

3    you had a good weekend.  Hope you've recovered from the loss of

4    an hour's sleep.  Friday afternoon was pretty glorious.

5    Saturday, a little cold.  Sunday morning was great, but then

6    the wind kicked in.  That was my story at least.

7          I just want to give you a little report on the events

8    of Friday.  At 7:16 a.m. we received a call in chambers, a

9    voice message in chambers, that one of the juror's spouses had

10   worked at a school in Westchester just for the day -- it's not

11   a permanent job or anything -- doing some film work filming,

12   and subsequently the spouse received a phone call that a

13   student at the school had tested positive, and the juror and

14   the juror's spouse went to get tested for COVID-19.  And the

15   juror dutifully called us back at 9 o'clock, gave us an update.

16   This was wonderful.

17          So we were in the loop as to what was going on, and

18   happily, the juror and the juror's spouse both tested negative.

19   But under our protocols -- this is what goes on behind the

20   scenes and what you need not trouble yourselves with, but I'll

21   give you a little window on it -- we have our own standards

22   here.  We have a COVID response team.  And a lawyer who works

23   for the court and who's a member of the COVID response team was

24   able to interview the juror.  The juror was kind enough to

25   cooperate thoroughly, and it was determined that the spouse was

1    wearing an N95 mask at all times, the students were wearing N95

2    masks at all times, and that the spouse was never closer than

3    six feet with any of the students during the time at the

4    school.  On that basis the member of our COVID response team

5    then spoke to our expert, a doctor in epidemiology, to confer,

6    and the conclusion was all clear, and the juror was cleared to

7    return.  You'll recall that around 11:30 I made the decision

8    not to delay you further, let you go home.  I think, given the

9    timeline that followed, that was the right decision since we

10   were going to be leaving early.

11          So that's all there is to the story, but I wanted to

12   let you know and let you know that sometimes we don't need to

13   lay out all the details in advance of what protocols we have,

14   but we have people, including the judge, who worry about such

15   things all the time just to make sure that everybody is kept

16   safe in this courthouse and the jury experience is positive

17   one.

18          So we're back in action.  Mr. Rivera, the Court

19   reminds you you're still under oath.

20          Mr. Moskowitz, you may proceed.

21   DEVIS LEONEL RIVERA MARADIAGA,

22   CROSS-EXAMINATION CONTINUED

23   BY MR. MOSKOWITZ:

24   Q.  Mr. Rivera, last week when we broke, you had told us that

25   during the period of time that you were meeting with the

1    government and negotiating to get a cooperation agreement, you

2    lied to them repeatedly.  Do you remember that?

3    A.   I was truthful to the DEA, sir, whenever I met with them

4    during those meetings.

5    Q.   Remember last week you told us that you withheld

6    information from the government when you met with them?

7    A.   I did withhold information, sir.

8             THE COURT:  All right.  That's the end of the

9    reiteration of last week.  Please proceed.

10   Q.   When you were withholding information from the government,

11   the government did not confront you and say, We understand that

12   you are withholding information, isn't that correct?

13   A.   They didn't say anything about that, sir, because once I

14   met with the DEA here, after I had surrendered in the United

15   States, I told them about what I had withheld.

16   Q.   It took you a while to get to that point, isn't that true?

17   A.   Well, once I was here with them, sir, in meetings with them

18   and we were signing the plea agreement.

19   Q.   So at the time you signed -- by the time you signed the

20   plea agreement, you were telling them the full truth, is that

21   correct?

22   A.   At first, sir, when we were signing, I did not tell the

23   whole truth, sir.

24   Q.   And after you signed the cooperation agreement, did you

25   tell the government the full truth?

1    A.  I told them the full truth, sir.

2    Q.  Because you knew that after you signed the cooperation

3    agreement, if you lied, your agreement would be ripped up, is

4    that correct?

5    A.  Correct, sir.

6    Q.  And you certainly did not want your agreement to be ripped

7    up, correct?

8    A.  No, sir.

9    Q.  I want to ask you some questions about the murder of a man

10   known as El Chino.

11   A.  OK, sir.

12   Q.  You discussed that murder with the government, correct?

13   A.  Yes, sir.

14   Q.  The first time you spoke to the government about that, it

15   was with prosecutors from Virginia, is that correct?

16   A.  I don't remember the first time, sir.

17   Q.  Do you remember going to Miami to meet with some federal

18   prosecutors?

19   A.  Yes, sir.

20   Q.  And you met with other prosecutors, not the ones in front

21   of you, correct, not Mr. Gutwillig and Mr. Lockard?

22   A.  I have met with several prosecutors, sir.

23   Q.  When you were in Miami, you met with other prosecutors, not

24   the two that are prosecuting this case, isn't that correct?

25   A.  I have seen several prosecutors.  I do not recall who they

L3FHRAM1                         Rivera Maradiaga – Cross

1   were, sir.

2   Q.  You were taken down to Miami in May of 2018, correct?

3   A.  I do not recall the date, sir.

4   Q.  Whatever the date was, it was after you signed your

5   cooperation agreement, correct?

6   A.  I do not remember the date, sir.

7   Q.  Putting aside the date, sir, did you go down to Miami after

8   you signed your cooperation agreement?

9   A.  I have been to Miami, sir.

10  Q.  When you were down in Miami, you spoke to the prosecutors

11  about the murder of Chino, correct?

12  A.  I do not remember, sir.

13  Q.  Remember telling prosecutors that Chino had been arrested

14  on a drug charge in Honduras?

15  A.  Generally speaking, I do remember, sir.

16  Q.  Do you remember telling the prosecutors that Ton Montes,

17  T-o-n, M-o-n-t-e-s, was afraid that Chino would cooperate with

18  the police?

19  A.  When Ton Montes sought me out for us to kill Chino, that

20  was the fear, sir.

21  Q.  So it was Ton Montes that was the one who sought you out

22  and asked for your help to kill Chino, correct?

23  A.  Ton Montes and other drug traffickers, sir.

24  Q.  And Ton Montes at the time had a brother who was in jail

25  with Chino, correct?

1    A.   Correct., sir.

2    Q.   And you told the government initially that Ton Montes

3    reached out to his brother in jail and got people to kill

4    Chino, correct?

5    A.   I do not recall that, sir.

6              MR. MOSKOWITZ:  Can we have 3501-07, please.  Could we

7    move it to the bottom of page 6, paragraph 15.  Actually, let's

8    go to the first page, please, very first paragraph.

9              Can I ask, with the help of the interpreter, to just

10   read the first paragraph to the witness.

11             THE INTERPRETER:  Your Honor, may the interpreters

12   have the benefit of the document that is being read?

13             MR. MOSKOWITZ:  Sure.

14             THE COURT:  Yes.

15             THE INTERPRETER:  Thank you.

16             THE COURT:  And for these purposes, it's not necessary

17   to translate what you're reading.  You're just going to read

18   it -- you're going to translate it from English into Spanish,

19   but you don't have to read the English words.

20             This is for the purpose of seeing whether it refreshes

21   the witness' recollection?

22             MR. MOSKOWITZ:  Yes, your Honor.

23             THE COURT:  OK.  So, Mr. Rivera, what this is all

24   about is the interpreter is going to read some language from a

25   document to you.  This is not a document that you may have ever

1    seen before, certainly not anything that you've written, but

2    it's going to be read to you.  And the question is does this

3    give you a new and different recollection on the subject?

4             THE INTERPRETER:  And, your Honor, for the

5    interpreter, is this being read only to the witness?

6             THE COURT:  Correct.

7             THE INTERPRETER:  Yes.  Thank you, Judge.

8             THE WITNESS:  OK, your Honor.

9             THE COURT:  Thank you.

10            MR. MOSKOWITZ:  I'd ask the interpreter to first just

11   read paragraph 1 to the witness.

12            THE INTERPRETER:  Ready, counselor.

13   BY MR. MOSKOWITZ:

14   Q.  Having heard paragraph 1 read to you, does that refresh

15   your recollection that when you went down to Miami, you spoke

16   with prosecutors from Virginia?

17   A.  I do not remember that, sir.

18   Q.  Does it refresh your recollection that you went -- you were

19   down in Miami in May of 2018?

20   A.  I have been to Miami, sir, but I do not remember the exact

21   date.

22            MR. MOSKOWITZ:  Now I'd ask the interpreter to read

23   paragraph 15 to the witness.

24            THE INTERPRETER:  You said paragraph 15, counselor?

25            MR. MOSKOWITZ:  Fifteen, please.

L3FHRAM1                         Rivera Maradiaga - Cross

```
 1              THE INTERPRETER:  Only 15?
 2              MR. MOSKOWITZ:  Only 15.
 3              THE INTERPRETER:  OK.  Thank you.
 4              Ready, counselor.
 5   BY MR. MOSKOWITZ:
 6   Q.  Mr. Rivera, having had paragraph 15 read to you, do you now
 7   recall telling the government that it was Ton Montes who got
 8   his brother to find people in jail to kill El Chino?
 9   A.  I do not remember what I said at that moment, sir, but in
10   general terms, I do remember, sir.
11   Q.  So in general terms do you remember telling the prosecutors
12   that it was Ton Montes that reached out to his brother to find
13   killers for El Chino?
14   A.  I do not remember what the document says, sir.
15   Q.  Not asking you what the document says, sir.  I'm asking you
16   if you remember telling the government that it was Ton Montes
17   that hired the killers -- or got his brother, I should say, to
18   find the killers to kill El Chino?
19   A.  I do not remember what I said the first time, sir.
20   Q.  Well, whatever you said the first time, was it true?
21   A.  Yes, sir, but I do not remember what I said that first
22   time, sir.
23   Q.  Isn't it true, Mr. Rivera, that the first time you
24   discussed the killing of El Chino, you did not tell the
25   government that you were involved?
```

L3FHRAM1                          Rivera Maradiaga - Cross

1   A.   It's just that I don't remember that first time, sir, but

2   generally speaking, I did tell them that I had been involved in

3   Chino's murder, sir.

4   Q.   Do you remember discussing Chino's murder with the

5   prosecutors in New York?

6   A.   I have discussed it in New York and in the other countries

7   where we have met, sir.

8   Q.   Do you remember talking to Mr. Bove, Emil Bove, about the

9   Chino murder?

10  A.   I have discussed this with several prosecutors, sir.  With

11  Mr. Bove, with the prosecutors present here, and others, sir.

12  Q.   In your meeting with Mr. Bove when you discussed the Chino

13  murder, did you tell Mr. Bove that it was Eliel Sierra who

14  asked you for help finding somebody to kill Chino?

15  A.   I do not remember that, sir.

16       MR. MOSKOWITZ:  Can we have 3501-16, please.  Like to

17  go up to page 2, please, Ms. Hurst.

18       Going to ask the interpreter, please, to read the

19  paragraph on -- it's kind of in the middle of page 2 dealing

20  with this issue that we're talking about.  It's with a headline

21  "Chino," just the -- there are five bullet points.

22       THE INTERPRETER:  Yes.

23  BY MR. MOSKOWITZ:

24  Q.   Mr. Rivera, having had that paragraph read to you, do you

25  now recall that when you met with the prosecutors in the

L3FHRAM1                        Rivera Maradiaga – Cross

1    Southern District, you told them that it was Eliel Sierra who

2    asked you to find somebody to kill Chino?

3    A.  I do not remember that document, sir.

4    Q.  Not asking you about the document, Mr. Rivera.  I'm asking

5    you whether you remember telling the prosecutors in the

6    Southern District that it was Eliel Sierra, not Ton Montes who

7    asked you to find somebody to kill Chino?

8    A.  I do not remember where I said that to them, sir.

9    Q.  Do you remember telling the prosecutors in the Southern

10   District that it was you and not Ton Montes who actually

11   contacted Adan Montes, Ton's brother, asked him to find

12   somebody to kill Chino?

13   A.  Generally speaking, I do remember that, sir, but I do not

14   remember where it is that I said it to them, sir.

15   Q.  Was it true that it was Eliel Sierra who reached out to you

16   to find somebody to kill Chino?

17   A.  It was several drug traffickers, sir.

18   Q.  Did Eliel Sierra ask you to find the killer for Chino?

19            MR. LOCKARD:  Objection.

20            THE COURT:  No, if the witness can answer, he can

21   answer.

22   A.  I do not remember, sir.

23   Q.  After discussing the Chino murder with the prosecutors from

24   the Southern District, you had an opportunity to testify about

25   that murder, correct?

1   A.  Can you please repeat the question, sir.

2   Q.  Did there come a point in time, Mr. Rivera, that you

3   testified in a courtroom about the murder of Chino?

4   A.  I gave my testimony to the prosecutors, sir.

5   Q.  Do you remember coming into a courtroom in this courthouse

6   and testifying under oath?

7   A.  Yes, sir.

8   Q.  It was the same oath that you took when you came to testify

9   in this case, correct?

10          THE COURT:  At what point in time are you referring

11  to, Mr. Moskowitz, in your question?

12          MR. MOSKOWITZ:  I'm sorry, Judge?

13          THE COURT:  Your question is asking about an oath

14  given to prosecutors.  At what point in time are you referring

15  to, Mr. Moskowitz?

16          MR. MOSKOWITZ:  I may have misspoken, Judge.

17  Q.  Do you recall testifying in a trial in this courtroom -- in

18  this courthouse under oath?

19  A.  Yes, sir.

20  Q.  And, in fact, Judge Castel was the judge in that case too,

21  correct?

22          THE COURT:  That's irrelevant.

23          MR. MOSKOWITZ:  I'm sorry.

24  Q.  At that trial you told a different story about the Chino

25  murder, isn't that true?

L3FHRAM1                          Rivera Maradiaga - Cross

1    A.  I don't recall that, sir.

2    Q.  Do you remember -- and it's 3501-124.  It's page beginning

3    on page 806, line 14 -- do you recall in the testimony that you

4    gave in this courthouse under oath being asked the following

5    questions and giving the following answers:

6    "Q.  Did you ever talk to Wilter Blanco about a drug worker

7    known as Chino?

8    "A.  Yes, sir.

9    "Q.  Who was Chino?

10   "A.  Chino was a drug trafficker who worked for Wilter Blanco.

11   "Q.  Did Blanco tell you about any problems that arose with

12   respect to Chino?

13   "A.  Yes, sir.

14   "Q.  When approximately did a problem with Chino come up?

15   "A.  In approximately 2013, sir.

16   "Q.  What did Blanco say to you about the problem with Chino in

17   2013?

18   "A.  Wilter Blanco told me that he was worried because he had

19   sent Chino by go-fast boat to pick up a cocaine shipment that

20   was waiting for him in a boat on the open sea and that when he

21   had arrived to the boat to get said cocaine, Chino got

22   arrested.

23   "Q.  Did Blanco ask you to do anything about the problem?

24   "A.  Yes, sir.

25   "Q.  What did Blanco ask you to do?

1    "A.  He asked if I had a contact to murder Chino in the prison.

2    "Q.  How did you respond?

3    "A.  I said yes, sir."

4           Do you remember now testifying under oath, Mr. Rivera,

5    that it was Wilter Blanco that was the one who told you or

6    asked you to find somebody to kill Chino?

7    A.  I recall testifying under oath, sir, but there were many

8    drug traffickers who asked to have Chino murdered, sir.

9    Q.  When you testified under oath, the only one you told them

10   about was Wilter Blanco, correct?

11          THE INTERPRETER:  The question again for the

12   interpreter, please.

13   Q.  When you testified under oath, the only one you told the

14   court about was Wilter Blanco, isn't that correct?

15   A.  I don't recall that, sir.

16   Q.  And hearing your testimony back does not refresh your

17   recollection?

18   A.  I don't recall that, sir.

19   Q.  Let's switch topics, Mr. Rivera.

20          Do you remember how many people you killed with your

21   own hands?

22   A.  I don't recall that, sir.

23   Q.  Do you remember the names of any of the people that you

24   killed with your own hands?

25   A.  No, sir.

1          MR. MOSKOWITZ:  Can we see Appendix A to Exhibit 60,

2     and focus on line 22, please.

3     Q.  Mr. Rivera, on your screen is a line from Appendix A which

4     was the list of murders that you admitted participating in as

5     part of your cooperation agreement.  Take a look at the screen,

6     please, and tell me whether you remember being involved in the

7     murder of an individual known as Mantequilla.

8     A.  Yes, sir.

9     Q.  And that's somebody that you killed with your own hands,

10    correct?

11         THE INTERPRETER:  The interpreter is going to ask the

12    witness to repeat the response.

13    A.  Yes, sir.  I participated in that with other people, sir.

14    Q.  Do you remember killing somebody with your own hand who

15    worked for an individual known as Moncho Cabezas, M-o-n-c-h-o

16    C-a-b-e-s-a-s?

17    A.  Yes, sir, a kidnapper.

18    Q.  And that is another person that you killed with your own

19    hands, correct?

20    A.  Unfortunately, yes, sir.

21    Q.  Other than those two, can you recall anybody else that you

22    killed with your own hands?

23    A.  I remember a kidnapper, sir, who killed the wife of a

24    cousin of mine who was pregnant, sir.

25              (Continued on next page)

L3FKRAM2                         Rivera Maradiaga - Cross

1    BY MR. MOSKOWITZ:

2    Q.  Do you remember that person's name?

3    A.  I don't recall it, sir.

4    Q.  Is that person on the list of the 78 murders that you

5    admitted participating in?

6    A.  Yes, sir.

7    Q.  With respect is to Mantequilla, Mantequilla was somebody

8    who killed a friend of yours, correct?

9    A.  Yes, sir.

10   Q.  So you sent the Martinez brothers to go and kidnap him,

11   correct?

12   A.  Yes, sir.

13   Q.  And they brought him to you, correct?

14   A.  Yes, sir.

15   Q.  He was tied up?

16   A.  I don't recall that, sir.

17   Q.  Well, do you recall the Martinez brothers torturing him

18   while you watched?

19   A.  Yes, sir.

20   Q.  And they tortured him until he admitted to killing your

21   friend, correct?

22   A.  Yes, sir.

23   Q.  And then you shot Mantequilla, correct, and killed him?

24   A.  We killed him between all of us, sir.

25   Q.  Now, the other person we were just talking about was an

L3FKRAM2                      Rivera Maradiaga - Cross

1    individual who worked for Moncho Cabezas, and you said he was a

2    kidnapper, correct?

3    A.  Repeat the question for me, please, sir.

4    Q.  Let's go back.

5          We're talking about the person who was a kidnapper who

6    worked for Moncho Cabezas.  Do you remember that?

7    A.  Yes, sir.

8    Q.  And he kidnapped Eliel Sierra's son, correct?

9    A.  Yes, sir.

10   Q.  And Eliel Sierra was a narco-trafficker that you worked

11   with?

12   A.  Yes, sir.

13   Q.  Now, Eliel Sierra paid some ransom for his son's return,

14   correct?

15   A.  I don't recall that, sir.

16   Q.  But at some point, the son was returned, correct?

17   A.  Yes, sir.

18   Q.  And after Eliel Sierra's son was returned, you contacted

19   two police officers who you had bribed, correct?

20   A.  I don't recall who I communicated with, sir, but, yes,

21   several people of us were involved, sir.

22   Q.  Do you remember reaching out to Flores Maradiaga and Subal

23   Barro to ask them to find out who did the kidnapping?

24   A.  Yes, sir.

25   Q.  And a few days later, they told you they had found the

1   kidnapper, correct?

2   A.  Yes, sir.

3   Q.  And they brought him to you, correct?

4   A.  To me and to Eliel Sierra, sir.

5   Q.  And then in your presence, Eliel Sierra tortured him,

6   correct?

7   A.  Yes, sir.

8   Q.  He tortured him with an electric cattle prod, correct?

9   A.  Yes, sir.

10  Q.  While you watched, correct?

11  A.  Unfortunately, yes, sir.

12  Q.  And then, eventually, the man passed out, correct?

13  A.  That, I don't recall, sir.

14  Q.  At the end, you and Eliel Sierra shot the man to death,

15  correct?

16  A.  Yes, sir.

17  Q.  Now, a few months later, Moncho Cabezas was arrested,

18  correct?

19  A.  Yes, sir.

20  Q.  And Eliel Sierra had Mr. Cabezas killed in jail, correct?

21  A.  Yes, sir.

22  Q.  You were not involved in that murder, correct?

23  A.  No, sir.

24  Q.  You were not involved, right?

25  A.  I don't recall, sir.

1          MR. MOSKOWITZ:  One moment.

2          Can we put up on the screen, for the witness, 3501-56,

3     page 7.

4          I'm going to ask the interpreter to read in the --

5     there's a paragraph that says 2010 or 2011, Cabezas, and the

6     last two bullet points to the witness, please.

7          THE INTERPRETER:  For the interpreter, will you repeat

8     that statement, please?

9          MR. MOSKOWITZ:  In the paragraph on the page that was

10    handed to you that starts up on top "2010 or 2011, Cabezas,"

11    the last two bullet points, would you read them to the witness,

12    please.

13         (Pause)

14    Q.  Having heard those paragraphs read to you, sir, do you

15    remember whether or not you were involved in the murder of

16    Moncho Cabezas?

17    A.  I don't recall that, sir.

18    Q.  Do you remember telling the government that you were not

19    involved in that murder?

20    A.  I don't recall that, sir.

21    Q.  Are there murders, sir, that you participated in that you

22    don't remember?

23    A.  Some, yes, sir; others, no, because I don't recall, sir.

24         MR. MOSKOWITZ:  Can we show the witness line 32 on

25    Appendix A of Government Exhibit 60.

L3FKRAM2                         Rivera Maradiaga - Cross

1    Q.  Mr. Rivera, if you look on the screen in front of you,

2    highlighted is line 32 on Appendix A to your plea agreement,

3    which is the list of people that you admitted to murdering.

4             Among the people on that list is Moncho Cabezas,

5    correct?

6             THE INTERPRETER:  For the interpreter --

7    A.  It says Moncho Cabezas there, sir.

8    Q.  If you don't recall participating in the murder of Moncho

9    Cabezas, sir, why did you include him on the list of the

10   murders that you admitted?

11   A.  I told the prosecutors all the truth, sir, and they did

12   their investigation, and if the name is there, I guess it's

13   because it's the truth, sir.

14   Q.  Did you tell the government that you participated in the

15   murder of Moncho Cabezas, or did they tell you you participated

16   in that murder?

17   A.  I don't recall that, sir.

18   Q.  Do you remember what role you had in the murder of Moncho

19   Cabezas?

20   A.  I don't recall, sir.

21   Q.  Let's switch to a different topic.

22            You told us last week that you met with the government

23   for the first time in November of 2013 -- I should say with the

24   DEA in November of 2013, correct?

25   A.  It was in November, sir, around that time, sir.

L3FKRAM2                        Rivera Maradiaga - Cross

 1  Q.  Now, your decision to speak to the DEA was not made

 2  overnight, right?  It was not a sudden decision?

 3  A.  I thought -- I analyzed it and talked to my lawyer and then

 4  to the DEA, sir.  It was my brother and my children.

 5          THE INTERPRETER:  Interpreter correction:

 6  A.  I spoke -- I thought about it, I spoke to my brother, to

 7  ask my brother whether I should speak to the prosecutors or the

 8  DEA.  It was myself, my brother, my family, and my children.

 9  Q.  And that process of having those discussions took place

10  over several weeks, correct?

11  A.  Several days, sir.

12  Q.  Now, your decision to cooperate, or offer to cooperate with

13  the government, was not based on the fact that all of a sudden

14  you didn't want to be a narco-trafficker anymore, correct?

15  A.  I decided to cooperate with the government because I felt

16  cornered, sir, by the United States.

17  Q.  It was not because you realized that you had lived a life

18  of crime and you wanted to face the consequences of that life,

19  correct?

20  A.  I surrendered to the DEA, sir, because they didn't mention

21  other drug traffickers, they only mentioned me.

22  Q.  Before you agreed to cooperate, you were sanctioned twice

23  by OFAC, correct?

24          THE INTERPRETER:  May the interpreter provide her

25  interpretation:

L3FKRAM2                         Rivera Maradiaga - Cross

1    A.  Yes, sir.

2              THE INTERPRETER:  Thank you.

3    Q.  That made it difficult for you to do business, correct?

4    A.  Can you please ask the question differently, sir?  I am not

5    understanding it.

6    Q.  The OFAC sanctions made it difficult for you to do

7    business?

8    A.  Yes, sir.

9    Q.  In addition to the OFAC sanctions, around the same time,

10   the Government of Honduras decided it was going to begin

11   extraditing Honduran nationals to the United States, correct?

12   A.  Extradition was already in place, sir.

13   Q.  Nobody had yet been extradited when you made the decision,

14   correct?

15   A.  I do not remember, sir.

16   Q.  But you were afraid or concerned that you might be

17   extradited to the United States, correct?

18   A.  Yes, sir, since the OFAC mentioned me.

19   Q.  And you understood that if you were extradited to the

20   United States, you faced the prospects of spending a long time

21   in prison in the United States, correct?

22   A.  Yes, but I was certain, sir, that I would not be extradited

23   because I was paying off politicians, sir.

24   Q.  You had paid off President Lobo, correct?

25   A.  Correct, sir.

L3FKRAM2                           Rivera Maradiaga - Cross

1   Q.  And you paid off President Hernandez, correct?

2   A.  Yes, sir.

3   Q.  But you couldn't be sure that they would live up to their

4   part of their agreement, correct?

5   A.  Up until that date, sir, they did meet their agreement,

6   sir, because I was not extradited, I surrendered to the United

7   States Government, sir.

8   Q.  And you also understood that in order for you to get a good

9   deal with the government, you had to give them some real

10  evidence, correct?

11  A.  What I did is tell them the truth, sir.

12  Q.  You understood, Mr. Rivera, that the United States

13  Government wasn't just going to take your word for things, they

14  had to corroborate your testimony, correct?

15  A.  I did not know that, sir, but I was telling them the truth.

16  Q.  Oh, even before you met with the prosecutors -- or with the

17  DEA, I'm sorry.  Even before you met with the DEA, you began to

18  tape meetings that you had with other drug dealers, correct?

19  A.  Correct, sir.

20  Q.  And when you met with the DEA, you turned over those tapes

21  to them?

22  A.  I turned them over to the attorney, sir.

23  Q.  And the attorney turned them over to the DEA on your

24  behalf, correct?

25  A.  He turned them over to the DEA, sir.

L3FKRAM2                    Rivera Maradiaga – Cross

1    Q.   Now, while you were making tapes for yourself, before you

2    met with the DEA, you never made any tapes with Mr. Ramirez,

3    correct, Mr. Fuentes Ramirez, correct?

4    A.   About Fuentes Ramirez?  I do not remember, sir.

5    Q.   You don't remember whether or not you made recordings of

6    meetings or phone calls with Mr. Fuentes Ramirez?

7    A.   No, I did not make them, sir.

8    Q.   When you were working as a narco-trafficker, you did a lot

9    of communications by BlackBerry Messenger, correct?

10   A.   BlackBerry and phone, sir.  Communications varied.

11   Q.   When you were communicating by BlackBerry, that would be by

12   Messenger, correct?

13   A.   Yes, sir.

14   Q.   And the people that you communicated with had PIN names,

15   correct?

16   A.   Some of them, sir.

17   Q.   And you turned over the PIN names of your drug-dealing

18   comrades to the government, correct?

19   A.   The ones that I did, I did, sir, and not the ones that I

20   did not have.

21   Q.   You never gave the government a PIN name for

22   Mr. Fuentes Ramirez, correct?

23   A.   I do not remember, sir.

24   Q.   You did not give the government any chats with Mr. Ramirez

25   that you had on your BlackBerry Messenger, correct?

L3FKRAM2                         Rivera Maradiaga - Cross

1    A.  I do not remember that, sir.

2    Q.  I want to focus your attention, sir, on the period of

3    November 2013.  That's the time that you were beginning to

4    cooperate with the government.  Okay?

5    A.  Yes, sir.

6    Q.  From the period of October 30th until the end of November

7    of 2013, while you were negotiating with the DEA to come in and

8    meet with them, you committed or participated in four murders;

9    isn't that correct?

10   A.  Around the time that I was talking with them, yes, sir.

11   Q.  The first one in that period of time was the murder of

12   Metro, correct?

13   A.  Around that time, yes, sir.

14   Q.  And Metro, by the way, was a cousin of yours, correct?

15   A.  Yes, sir.

16   Q.  And the last of the four murders during that period of time

17   was your sister-in-law, Sonia Ramos, correct?

18   A.  Yes, sir.

19   Q.  When Metro was killed, one of his bodyguards was also

20   killed, correct?

21   A.  Yes, sir.

22   Q.  The other person that you killed during the month of

23   November 2013, while you were negotiating to speak with the

24   DEA, was a woman who was a rival of your girlfriend, Wendy

25   Caballero, correct?

L3FKRAM2                          Rivera Maradiaga - Cross

1            THE INTERPRETER:  The first name again for the

2     interpreter, please, counselor?

3            MR. MOSKOWITZ:  Wendy.

4            THE INTERPRETER:  Wendy?  Thank you.

5     A.  Yes, sir.

6     Q.  Ms. Caballero was your girlfriend, right?

7     A.  Yes, sir.

8     Q.  And she was a judge in San Pedro Sula?

9     A.  Yes, sir.

10    Q.  Wendy, Ms. Caballero, told you about this rival that was

11    threatening to run against her in an election, correct?

12    A.  Correct, sir.

13    Q.  And she asked you to have her killed, correct?

14    A.  Yes, sir.

15    Q.  So you contacted Vaquero, correct?

16    A.  Yes, sir.

17    Q.  You paid him 100,000 lempiras, correct?

18    A.  I do not remember the amount that I paid to him, sir.

19    Q.  But Vaquero then went out and murdered the woman who was a

20    rival of your girlfriend, correct?

21    A.  Yes, sir.

22    Q.  You don't even know the woman's name, correct?

23    A.  No, sir.

24    Q.  Now, Sonia Ramos, you arranged to have killed in Canada,

25    correct?

L3FKRAM2                          Rivera Maradiaga - Cross

1   A.  Yes, sir, through Ton Montes.

2   Q.  Ton Montes asked you to have her killed, correct?

3   A.  Yes, sir.

4   Q.  And he gave you the address that she was living at in

5   Canada?

6   A.  Yes, sir.

7   Q.  So you contacted a sicario that you knew who was in Canada,

8   correct?

9   A.  Yes, sir.

10  Q.  A guy by the name of Aldo Barrios?

11  A.  Yes, sir.

12  Q.  And you gave Mr. Barrios the address for Ms. Ramos,

13  correct?

14  A.  Yes, sir.

15  Q.  And Mr. Barrios got another sicario to work with him,

16  correct?

17  A.  Correct, sir.

18  Q.  And they went out and they killed your sister-in-law,

19  correct?

20  A.  Yes, sir.

21  Q.  And, by the way, your brother, Javier, he was also involved

22  in that murder, correct?

23  A.  Yes, sir.

24  Q.  And you did all of that while you were negotiating to come

25  in and talk to the DEA, correct?

L3FKRAM2                          Rivera Maradiaga - Cross

1   A.  It was around that time, sir, in those days.

2   Q.  Now, when you met with the DEA in November 2013, you didn't

3   tell them, I just finished killing four people, right?

4   A.  No, sir.

5   Q.  You never told them that while you were negotiating the

6   terms of your meeting with them, you were also out killing

7   people?

8   A.  I did not say that to them, sir.

9   Q.  Now, by the way, the four murders we just talked about that

10  you did in the late October and the first three weeks in

11  November of 2013, those are the ones that you remember,

12  correct?

13  A.  Can you please repeat the question, sir?

14          MR. MOSKOWITZ:  Can I have the question read back?

15          THE COURT:  I think there's an implication in the

16  question that you may wish to clarify.  Are you suggesting

17  they're the only murders he remembers?

18          MR. MOSKOWITZ:  Yes, your Honor.

19          THE COURT:  That's the question?  Then put it in those

20  terms.

21  BY MR. MOSKOWITZ:

22  Q.  Mr. Rivera, the four murders that we just talked about that

23  took place from October 30 till the time you met the DEA, those

24  are the only four murders that you recall doing during that

25  period of time?

1          THE COURT:  Well, I don't understand when you say

2     "during that period of time."  During the period of time that

3     he committed the four murders, they're the only four murders

4     that he recalls committing?  Is that your question?

5          MR. MOSKOWITZ:  No, Judge.  I'll try --

6          THE COURT:  Rephrase your question.

7     BY MR. MOSKOWITZ:

8     Q.  From October 30, 2013, until the time you met with the DEA

9     in November of 2013, you can only remember committing four

10    murders; is that correct?

11         THE COURT:  During that period?

12         MR. MOSKOWITZ:  During that period.

13         THE COURT:  Okay.

14         THE WITNESS:  Those were the last ones, sir.

15    Q.  Are you sure there aren't any others?

16         THE COURT:  During the time period you referenced?

17         MR. MOSKOWITZ:  Yes.

18         THE COURT:  Thank you.

19         THE WITNESS:  Yes, sir.

20    BY MR. MOSKOWITZ:

21    Q.  Do you remember testifying about this very subject in this

22    courthouse?

23         THE COURT:  Do you understand the question?

24         THE WITNESS:  No, sir.

25    Q.  Do you remember being asked the following question under

L3FKRAM2                              Rivera Maradiaga - Cross

1    oath — it's 3501 and 124 —

2              MR. LOCKARD:  Objection.

3              THE COURT:  Basis?

4              MR. LOCKARD:  Improper refreshment.

5              MR. MOSKOWITZ:  I'm not refreshing; I'm impeaching.

6              THE COURT:  No, you have to go back and restate the

7    question.  Do you remember testifying about this very subject

8    in this courthouse?  Please state in your question what subject

9    you're referring to.

10   BY MR. MOSKOWITZ:

11   Q.  Do you remember testifying in a matter in this courthouse

12   about the number of murders that you committed in November of

13   2013?

14   A.  I remember having testified about the 78 individuals, sir.

15   Q.  Do you remember being questioned about the murders that you

16   committed in November of 2013?

17   A.  I do not remember that, sir.

18   Q.  Do you remember being asked the following question and

19   giving the following answer —

20             MR. LOCKARD:  Objection.

21             THE COURT:  Basis?

22             MR. LOCKARD:  Again, improper refreshment.

23             THE COURT:  I'll allow it.

24             This is for impeachment, right?

25             MR. MOSKOWITZ:  Yes, your Honor.

L3FKRAM2                          Rivera Maradiaga - Cross

```
1              THE COURT:  Go ahead.
2    BY MR. MOSKOWITZ:
3    Q.  Do you remember being asked the following question and
4    giving the following answer?
5    "Q.  Other than the three murders that you committed in
6    November of 2013, while you were cooperating with the DEA, did
7    you commit any other murders while you were cooperating with
8    the DEA?
9    "A.  I do not recall, sir."
10   A.  I do not recall, sir.  Those were the last individuals
11   against whom we committed that crime, sir.
12   Q.  You told us last week that you know a person by the name of
13   Ramon Matta, correct?
14   A.  Correct, sir.
15   Q.  And he's a narco-trafficker, correct?
16   A.  Yes, sir.
17   Q.  While you were -- withdrawn.
18              After you met with the DEA in November of 2013, you
19   began a period of active cooperation with the DEA, correct?
20   A.  Yes, sir.
21   Q.  And during that period of time, you remained in Honduras,
22   correct?
23   A.  Yes, sir.
24   Q.  You met with various narco-traffickers, correct?
25   A.  Yes, sir.
```

L3FKRAM2                          Rivera Maradiaga - Cross

1   Q.  You met with politicians?

2   A.  That, too, sir.

3   Q.  You made tape recordings?

4   A.  Some, sir.

5   Q.  And you would provide information to the DEA?

6   A.  Through my lawyer, sir.

7   Q.  Well, you were also meeting with the DEA during that period

8   of time, correct?

9   A.  Yes, sir.

10  Q.  You would meet with Agent Gonzalez, correct?

11  A.  With him and several others, sir.

12  Q.  Sometimes you'd meet with him in Honduras, correct?

13  A.  On one occasion, I met with several agents, sir.

14  Q.  And sometimes you would meet with the agents outside of

15  Honduras, like in Belize, correct?

16  A.  Yes, sir.

17  Q.  While you were cooperating with the DEA, after

18  November 2013, Ramon Matta suggested that you and he form a

19  partnership, correct?

20  A.  Yes, sir.

21  Q.  He also discussed with you the fact that some of his

22  property was being seized in Honduras, correct?

23  A.  Yes, sir.

24  Q.  And Mr. Matta told you that he suspected that somebody

25  close to him was providing the Government of Honduras with

L3FKRAM2                        Rivera Maradiaga - Cross

1   information about his property, so that it could be seized,

2   correct?

3   A.  Yes, sir.

4   Q.  And Mr. Matta told you that the properties that were being

5   seized had been hidden, so only the people closest to him knew

6   about it, correct?

7   A.  What -- yes, sir.

8   Q.  Mr. Matta asked you for help to find out who was providing

9   information -- who within his organization was providing

10  information to law enforcement in Honduras, correct?

11  A.  Yes, sir.

12  Q.  So you contacted a woman by the name of Liana Bueso,

13  L-i-a-n-a B-u-e-s-o?

14  A.  Yes, sir.

15  Q.  Ms. Bueso told you that there were rumors that a person by

16  the name of Alex Berrios was the person giving information to

17  law enforcement about Matta's property, correct?

18  A.  Yes, sir.

19  Q.  She sent you that information in a BlackBerry Messenger

20  chat?

21  A.  Yes, sir.

22  Q.  After you got that information, you passed it along to

23  Ramon Matta?

24  A.  Yes, sir.

25  Q.  You told Mr. Matta that Alex Berrios was the snitch in his

L3FKRAM2                         Rivera Maradiaga - Cross

1  organization, correct?

2  A.  Unfortunately so, yes, sir.

3  Q.  And when you passed that information along, you did not

4  discuss that with the DEA?

5  A.  I withheld information, sir.

6  Q.  You passed information about a potential cooperator to a

7  known narco-trafficker, correct?

8  A.  Can you please repeat the question?  I am not understanding

9  it.

10  Q.  You passed information about Mr. Berrios to Ramon Matta,

11  who you knew was a drug trafficker?

12  A.  Unfortunately, yes, sir.

13  Q.  And you knew Mr. Matta was a violent man?

14  A.  Yes, sir.

15  Q.  And you knew there was a good chance that Mr. Berrios was

16  going to get killed because of the information you passed to

17  Mr. Matta?

18  A.  I was not sure -- well, I was certain, sir, that he would

19  not be killed because by the time, Ramon Matta's properties had

20  already been raided.

21  Q.  Did you think, Mr. Rivera, that Ramon Matta was just going

22  to say to Mr. Berrios, please don't do that again?

23  A.  I did not know that, sir.

24  Q.  You suspected that something was going to happen to

25  Mr. Berrios, correct?

L3FKRAM2                         Rivera Maradiaga - Cross

1   A.  Had I suspected it, I would not have told him, sir.

2   Q.  But you certainly didn't warn him -- you didn't warn

3   Mr. Berrios that you were letting Mr. Matta know about the fact

4   that he was cooperating with law enforcement, correct?

5           THE INTERPRETER:  Please repeat your response for the

6   interpreter.

7   A.  I did not know Mr. Berrios, sir.

8   Q.  About a month after you passed the information about

9   Mr. Berrios to Ramon Matta, Mr. Berrios was killed, correct?

10  A.  They killed him, sure, but I don't know approximately how

11  long after that information was passed along it was that they

12  killed him.

13  Q.  It wasn't very long, correct, before he was killed?

14          THE INTERPRETER:  Repeat the question for the

15  interpreter.

16  Q.  It was not very long after you passed along the information

17  that Mr. Berrios was killed, correct?

18  A.  It was fast, sir.

19  Q.  Now, in addition to the 78 people -- withdrawn.

20          Mr. Berrios is not on the list of 78 people for whose

21  murder you took responsibility, correct?

22          THE COURT:  How much longer do you have,

23  Mr. Moskowitz?

24          MR. MOSKOWITZ:  I'm moving on to another topic, Judge.

25          THE COURT:  No, I didn't ask you that question.

L3FKRAM2                           Rivera Maradiaga – Cross

1              MR. MOSKOWITZ:  It's going to take several more hours.

2              THE COURT:  All right.  Ladies and gentlemen, we'll

3     take our midmorning recess.  Please do not discuss the case

4     among yourselves or with anyone else.  We'll be back in action

5     in ten minutes.  Thank you.

6              THE INTERPRETER:  Your Honor, there was a response

7     pending.

8              THE COURT:  All right.  One second, please.

9              Go ahead.

10             THE WITNESS:  No, he does not appear on that list.

11             THE COURT:  Thank you.

12             THE INTERPRETER:  Thank you, your Honor.

13             THE COURT:  Please remain until the jurors clear the

14    lobby area.

15             (Jury not present)

16             THE COURT:  Okay.  We're in recess.  Thank you.

17             (Continued on next page)

18

19

20

21

22

23

24

25

1              THE COURT:  Please be seated in the back of the

2      courtroom.  Thank you.

3              MR. SCHULMAN:  Your Honor, Mr. Moskowitz will be one

4      minute, OK?

5              THE COURT:  He's here.

6              (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3FHRAM3                          Rivera Maradiaga – Cross

1             (Jury present)

2             THE COURT:  Mr. Moskowitz, you may continue.

3             MR. MOSKOWITZ:  Thank you, your Honor.

4    BY MR. MOSKOWITZ:

5    Q.  Mr. Rivera, you were a narco-trafficker from approximately

6    2002 to 2013?

7    A.  Correct, sir.

8    Q.  During that period of time, you trafficked tons of cocaine?

9    A.  Yes, sir.

10   Q.  You told us last week it was over 100 tons, correct?

11   A.  Approximately, sir.

12   Q.  In fact, it was more than 150 tons, correct?

13   A.  Approximately more than 100 tons, sir.

14   Q.  Do you remember pleading guilty in this courthouse?

15   A.  Yes, sir.

16   Q.  At the time of your plea, did you tell the judge that you

17   trafficked more than 150 tons of cocaine?

18   A.  I don't recall that, sir.

19             MR. MOSKOWITZ:  Can we show the witness, please,

20   3501-62, yes.

21             Your Honor, I'll move on.

22   Q.  Do you remember testifying -- withdrawn.

23             Do you remember testifying in a courtroom and being

24   asked questions about the amount of drugs that you trafficked?

25   A.  Yes, sir.

L3FHRAM3                         Rivera Maradiaga - Cross

1   Q.  And do you remember minimizing the amount of drugs that you

2   sold?

3   A.  I don't recall, sir.

4           MR. MOSKOWITZ:  Could we show the witness, please,

5   3501-90, page 65, beginning at line 20.

6   Q.  Do you remember telling the Court when you testified under

7   oath that you trafficked around 20 tons of cocaine?

8   A.  That's why I always use approximate numbers, because I

9   don't recall exact, sir, exactly, sir, but that's why I said it

10  was more than 100 tons.

11  Q.  Do you remember telling the Court it was around 20 tons?

12  A.  I don't recall, sir.

13  Q.  Do you remember being asked under oath the following

14  questions and giving the following answer?

15          MR. LOCKARD:  Objection.

16          THE COURT:  Basis?

17          MR. LOCKARD:  Improper refreshment.

18          THE COURT:  I don't think it's for refreshment.

19          MR. LOCKARD:  OK.

20          THE COURT:  It's for impeachment.  Go ahead.

21  BY MR. MOSKOWITZ:

22  Q.  Do you remember being asked the following questions and

23  giving the following answers:

24  "Q.  Do you have any idea how many kilos you, your brother,

25  your family, your organization moved?

L3FHRAM3                          Rivera Maradiaga - Cross

1    "A.  Around 20 tons and more, sir.

2    "Q.  How much more?

3    "A.  I don't have the exact date.  I don't remember.

4    "Q.  That's the best estimate you can give us as to the amount

5    of cocaine that your organization moved" -- withdrawn.  OK.

6    "Q.  I'm sorry.  Twenty tons, that's the best estimate you can

7    give us as to the amount of cocaine that your organization

8    moved throughout its entire existence?

9    "A.  Yes, sir."

10            When you testified in court that the best estimate of

11   how much you and your organization trafficked was 20 tons, that

12   wasn't true, was it?

13   A.  I said approximately more than 20 tons of cocaine, sir.

14   Q.  So when you said 20 tons, you mean up to 100, between 20

15   and 100, is that what you're telling us?

16   A.  No, sir.  What I said is more than 100 tons.  That's why I

17   say approximately, sir.

18   Q.  And what I'm asking you, sir, is when you testified under

19   oath it was 20 tons was your best estimate, that wasn't true,

20   correct?

21            THE COURT:  Well, accurately quote the testimony.

22            MR. MOSKOWITZ:  Twenty tons and more.

23            THE COURT:  Thank you.

24   Q.  That wasn't true, was it?

25            THE INTERPRETER:  May the interpreter hear the

L3FHRAM3                          Rivera Maradiaga - Cross

1   question again.  Thank you.

2   Q.  When you testified under oath that your best estimate as to

3   the amount of cocaine that you and your organization trafficked

4   was 20 tons and more, that was not true?

5   A.  It's true, sir.  That's why I say it was approximately.  It

6   could have been 100, 110, 120.  That's why I say approximately,

7   sir.

8   Q.  I'm not asking you, sir, about the time last week when you

9   said it was 100 tons and more.  I'm asking you about the time

10  when you said it was 20 tons and more.  That testimony wasn't

11  true.

12          THE INTERPRETER:  The interpreter wishes to correct.

13          Please repeat the response.

14  A.  Repeat the question for me, sir.

15          MR. MOSKOWITZ:  Your Honor, may I have the question

16  read back, please?

17          THE COURT:  It does not appear to be a question.  So

18  restate it.

19  Q.  When you told the Court under oath that your best estimate

20  of how much cocaine you and your organization trafficked was

21  20 tons and more, that testimony was not true, correct?

22  A.  It's -- that was true because I always repeat to you that

23  it was more approximately, sir.

24  Q.  Let's move on.

25          You made a lot of money while you were drug

L3FHRAM3                          Rivera Maradiaga - Cross

1    trafficking, correct?

2    A.   Correct, sir.

3    Q.   You made about five to $6 million in profits a year,

4    correct?

5    A.   Approximately, sir.

6    Q.   And over your career as a drug trafficker, you made more

7    than $50 million in profits, correct?

8    A.   Approximately, sir.

9    Q.   You invested that money?

10   A.   Yes, sir.

11   Q.   You bought real estate?

12   A.   Yes, sir.

13   Q.   Houses?

14   A.   Yes, sir.

15   Q.   Cars?

16            THE INTERPRETER:   Repeat the question for the

17   interpreter, please.

18   Q.   Cars?

19   A.   Yes, sir.

20   Q.   An airplane?

21   A.   Yes, sir.

22   Q.   Jewelry?

23   A.   Yes, sir.

24   Q.   Before you were sanctioned by OFAC, you tried to hide as

25   many assets as you could, correct?

1  A.  Yes, sir.

2  Q.  You withdrew your money from the bank, correct?

3  A.  Yes, sir.

4  Q.  And then you hid the money?

5  A.  Yes, sir.

6  Q.  So that the government could not find it, correct?

7  A.  Correct, sir.

8  Q.  And, more importantly, so that the government couldn't

9  seize it, correct?

10  A.  They did not confiscate anything, sir, because I was

11  notified with -- I was given advance notice.

12  Q.  You withdrew about 100 million lempiras from the bank

13  before the OFAC sanction, correct?

14  A.  Approximately, sir.

15  Q.  And that's about $4 million, correct?

16  A.  Approximately, sir.

17  Q.  Because lempiras are -- the exchange rate is between 24 and

18  25 for the dollar, correct?

19  A.  Approximately, sir.

20  Q.  And you hid that cash, correct?

21  A.  Yes, sir.

22  Q.  You haven't told the government where it is, correct?

23  A.  Yes, sir.

24  Q.  The government has not asked you to turn over the money,

25  correct?

L3FHRAM3                              Rivera Maradiaga - Cross

1    A.  Not up to the present moment, sir.

2    Q.  You still have access to the money, correct?

3    A.  I had access to the money, sir, but they stole it from me

4    because I had it stashed in some traps in a car, sir.

5    Q.  Whatever assets you still have, you have access to,

6    correct?

7    A.  My family has access to them, sir.

8    Q.  And in the period since you have surrendered to the

9    government in 2015, you were able to use your money and your

10   assets to support your family, correct?

11   A.  Correct, sir.

12   Q.  You were able to use your drug money to buy cars for your

13   daughter's mother, correct?

14   A.  Correct, sir.

15   Q.  And your daughter's mother was able to buy a house with the

16   drug money that you gave her, correct?

17   A.  Correct, sir.

18   Q.  You were able to provide monthly support for your mother,

19   correct?

20   A.  Yes, sir.

21   Q.  You gave her $3,000 a month in drug money, correct?

22   A.  Approximately, sir.

23        THE COURT:  At what point in time was this?

24   Q.  During what period of time were you giving your mother

25   $3,000 a month of drug money?

1   A.  For approximately four years, sir.

2   Q.  So from about 2015 when you surrendered to sometime in

3   2019?

4   A.  Yes, sir.

5   Q.  And during that same period of time, you gave another

6   $10,000 in drug money to your wife, correct?

7   A.  Yes, sir.

8   Q.  And you gave another $7,000 in drug money to the mother of

9   one of your daughters, correct?

10  A.  Yes, sir.

11  Q.  And another one of your daughter's mothers got $3,000 a

12  month in drug money, correct?

13  A.  Yes, sir.

14  Q.  And all of that was going on while you were cooperating

15  with the government, correct?

16  A.  Yes, sir.

17  Q.  And the government never asked you to turn over your drug

18  money, correct?

19  A.  No, sir.

20  Q.  Now, when you -- in 2014, shortly before you surrendered,

21  you had about $6 million in cash, correct?

22  A.  I don't recall that, sir.

23  Q.  Do you remember having a million dollars or approximately a

24  million dollars in jewelry?

25  A.  Yes, sir.

1  Q.  Do you remember having another approximately $20 million in

2  real estate and hotels and equipment?

3          THE INTERPRETER:  The interpreter would like to hear

4  the last part of the question.

5          MR. MOSKOWITZ:  Equipment.

6  A.  Yes, sir, approximately.

7  Q.  And some of that property was held in other people's names,

8  correct?

9  A.  Yes, sir.

10 Q.  So that it wouldn't be seized by the Honduran government,

11 correct?

12 A.  Yes, sir.

13 Q.  And the government has not asked you to tell them or to

14 give them a list of who's holding property for you, correct?

15 A.  Up until the present date, no, sir.

16 Q.  And in the last couple of years, you've also sold some of

17 that property, correct?

18 A.  My family has been selling properties and cars in order to

19 support my family here, sir.

20 Q.  And you told us earlier this morning that you began meeting

21 with the DEA in November 2013, correct?

22 A.  Approximately, sir.

23 Q.  And then you surrendered to the United States government in

24 January 2015, correct?

25 A.  Yes, sir.

L3FHRAM3                         Rivera Maradiaga – Cross

1    Q.  And between the time you began cooperating and the time

2    that you surrendered, you met with DEA agents on numerous

3    occasions, correct?

4    A.  Yes, sir.

5    Q.  And after your surrender, you continued to meet with

6    representatives of the United States government, correct?

7    A.  Yes, sir.

8    Q.  In those meetings you told the government representatives

9    whatever you knew about the narco-trafficking world in

10   Honduras, correct?

11   A.  Yes, sir.

12   Q.  While you were cooperating actively before your surrender,

13   you told the agents who was getting drug shipments, correct?

14   A.  Yes, sir.

15   Q.  You told the agents where the shipments were coming from?

16   A.  The shipments of what, sir?

17   Q.  The shipments of cocaine.

18   A.  Yes, sir.

19   Q.  On occasion you would give the agents the airplane --

20   registration number of the airplane that was carrying the

21   drugs, correct?

22   A.  Yes, sir.

23   Q.  And you would give the agents the coordinates of landing

24   strips where the airplanes were landing?

25   A.  Sometimes, sir.

L3FHRAM3                          Rivera Maradiaga - Cross

1   Q.  During that entire period of active cooperation, you did

2   not give them any operation about Mr. Fuentes Ramirez, correct?

3   A.  We talked about him sometimes, sir.

4   Q.  I want to focus only on the period of time between

5   November 2013 when you began cooperating and January of 2015,

6   during that period of active cooperation.  OK.  You got that

7   period in your mind, sir?

8   A.  Yes, sir.

9   Q.  During that period between November 2013 and your surrender

10  in January 2015, you did not give the government any

11  information on Mr. Fuentes Ramirez, isn't that true?

12  A.  I gave them information, sir.  If I had not given them

13  information, the defendant would not be here.

14  Q.  Sir, I'm asking you just about a specific period of time

15  when you were actively cooperating.  Isn't it a fact that

16  during that period, between November 2013 and January 2015, you

17  did not tell them anything about Mr. Fuentes Ramirez?

18  A.  Ever since cooperation started with the DEA and the

19  government, sir, the -- the defendant, Mr. Fuentes, has been

20  mentioned on several occasions, sir, but I do not remember the

21  exact date.

22  Q.  During that period of time when you were actively

23  cooperating, you did not provide the government with any

24  information about shipments of drugs that were coming to

25  Honduras for Mr. Fuentes Ramirez, correct?

L3FHRAM3                          Rivera Maradiaga - Cross

1    A.  Of course I did, sir.  I provided information about planes

2    that the defendant was receiving and on what airstrips he was

3    receiving them, sir.

4    Q.  Is it your testimony, Mr. Rivera, that in the period of

5    your active cooperation, you provided information to the

6    government about planes that were coming in with loads of

7    cocaine for Mr. Fuentes Ramirez?

8    A.  I did provide information, sir, about two cocaine loads

9    that arrived, sir -- about three loads, sir, with the last

10   one -- including the last one that the defendant did, sir.

11   Q.  So you testified about all of that on direct examination,

12   but I'm trying to focus you on the period of your active

13   cooperation.  Can you focus on that period of time?

14   A.  I am focused on it, sir.

15   Q.  The three shipments that you talked about on direct

16   examination that you claim involve Mr. Fuentes Ramirez, those

17   did not take place during the period of your active

18   cooperation, correct?

19   A.  That was in 2011, sir, but I did state what he had done

20   during my active cooperation with the government, sir.

21   Q.  During the period 2013 to 2015, were you aware of any --

22   withdrawn.

23        During the period from November 2013 to January 2015,

24   were you aware of any drug shipments sent to Mr. Fuentes

25   Ramirez?

L3FHRAM3                        Rivera Maradiaga – Cross

1   A.   What the defendant asked me for in 2013, sir, was for me to

2   lend him $1 million because he was going to have a cocaine

3   shipment sent to him from Colombia to Puerto Cortes.

4   Q.   Mr. Rivera, I'm going to ask you again to just focus on the

5   period after November 2013 until the time that you surrendered

6   in 2015.   During that period of time after you had already

7   begun cooperating and you were actively cooperating, you did

8   not provide any information to the government about a shipment

9   that Mr. Rivera -- Mr. Ramirez received, isn't that true?

10  A.   Sir, I did provide to the U.S. government and to the DEA

11  information about shipments received by the defendant between

12  2011 and 2012, sir.   I did provide information to them about

13  it.   Ever since I started cooperating, sir, I have provided

14  information to them about him and about other drug traffickers.

15  Q.   Now, isn't it a fact, sir, that the very first time you

16  ever mentioned Mr. Fuentes Ramirez to the government was in

17  August of 2015?

18  A.   I do not remember the date, sir, but ever since I started

19  cooperating with the U.S. government in 2013, we have been

20  discussing the gentleman, sir, but I do not remember the date.

21         MR. MOSKOWITZ:   Can we show the witness, please,

22  3501-56, the bottom of page 4 and then the top of page 5.

23  Let's start at the top, first.   Let's show him the first page

24  first.

25  Q.   Mr. Rivera, I'm going to direct your attention to

L3FHRAM3                     Rivera Maradiaga - Cross

1    August 20, 2015.  Do you remember meeting with the government

2    in August of 2015?

3    A.  I do not recall, sir.

4    Q.  Do you recall meeting with the government numerous times

5    after your surrender?

6    A.  We met on several occasions, sir.

7               MR. MOSKOWITZ:  Now can we show the witness the bottom

8    of page 4 and the top of page 5, and I'd ask the interpreter to

9    read from the bottom of page -- the last line on page 4 and

10   then the bullet points till the first break in page 5.

11              THE INTERPRETER:  Again, may the interpreter have the

12   benefit of the document?  Thank you, counselor.

13              THE COURT:  How much time left, Mr. Moskowitz?

14              MR. MOSKOWITZ:  We'll certainly go to the lunch break,

15   probably a little longer than that.

16              THE COURT:  I didn't hear anything other than the

17   words "lunch break."

18              MR. MOSKOWITZ:  I said, Judge, I'm certain we'll go to

19   the lunch break and a little bit longer after that.

20              THE COURT:  Thank you very much.

21              THE INTERPRETER:  Thank you, counsel.

22   BY MR. MOSKOWITZ:

23   Q.  Having had that document read to you, Mr. Rivera, does that

24   refresh your recollection about the first time that you ever

25   mentioned Mr. Fuentes Ramirez to the government?

1   A.  I do not remember, sir.

2   Q.  Do you remember talking to the government about the murder

3   of Pluto?

4   A.  I do recall, sir.

5   Q.  And you told the government that it was Metro who paid

6   Vaquero to kill Pluto, correct?

7   A.  I do not remember that, sir.

8   Q.  And having the document read to you does not refresh your

9   recollection?

10  A.  I do not remember that, sir.

11  Q.  Do you remember that the first time you discussed the Pluto

12  murder, you didn't mention Mr. Fuentes Ramirez at all?

13  A.  Can you please repeat the question.

14  Q.  Do you remember that the first time you talked to the

15  government about Pluto's murder, you did not mention

16  Mr. Fuentes Ramirez at all?

17  A.  I remember, sir -- well, I don't remember if it was the

18  first time of several meetings that we had with the DEA, but I

19  did mention to them, sir, that the defendant had ordered

20  Pluto's murder and cocaine shipments that the defendant had

21  received, sir.

22  Q.  Sir, isn't it a fact that it wasn't until last year that

23  you first inserted Mr. Fuentes Ramirez in the story of Pluto's

24  murder?

25  A.  I do not recall, sir.

L3FHRAM3                          Rivera Maradiaga - Cross

1   Q.  Do you remember discussing with the government the murder

2   of the policeman?

3   A.  I do remember, sir, from several occasions that the one who

4   killed the policeman, sir, were the defendant and Metro, sir.

5   Q.  I want you to focus on the very first time you discussed

6   that murder with the government.

7        Isn't it a fact, sir, that when you first discussed

8   the murder of the policeman with the government, you told the

9   government it was Metro that killed the police officer in

10  Choloma?

11  A.  I don't remember if it was the first time, sir, but I do

12  remember that I told the government that it was Metro and the

13  defendant who killed -- who killed and tortured the policeman,

14  sir, because the defendant himself had told me.

15  Q.  Isn't it a fact, sir, that when you first discussed the

16  murder of the policeman with the government, you told them that

17  you learned about the murder from a lawyer and a former

18  policeman named Valladares?

19  A.  I don't remember about the first time, sir, but what I do

20  remember is that I told the U.S. government and the DEA what

21  the defendant had told me, that he killed and tortured the

22  police officer, sir.

23  Q.  When you first discussed the murder with the police -- with

24  the government, you never told them that you had spoken to

25  Mr. Fuentes Ramirez about it, correct?

1    THE COURT:  That question was asked and answered.

2    Q.  When you first discussed the murder of the policeman with

3    the government, you never told them that the murder had

4    anything to do with the drug lab in Cerro Negro, isn't that

5    true?

6    A.  What I told the government, sir, was that the defendant had

7    told me that he tortured and killed a police officer because he

8    had been investigating the drug lab on the hill in the

9    department of Cortes, sir.

10   Q.  And the first time you ever mentioned that to the

11   government was in 2020, isn't that correct?

12   A.  That's not correct, sir.

13   Q.  When you first discussed -- withdrawn.

14        In August of 2015, do you remember telling the

15   government that Metro wanted to kill you?

16   A.  I don't remember the date, sir, but I did tell the

17   government that Metro and the defendant intended to kill me,

18   sir.

19   Q.  Do you remember telling the government that you paid

20   Vaquero to kill Metro?

21   A.  On occasions I did tell the government, sir, that I paid to

22   have Metro and the defendant killed, sir, because the defendant

23   intended to kill me and my brother, sir.

24   Q.  Isn't it a fact, Mr. Rivera, that you told the government

25   that Vaquero on his own decided he wanted to kill Mr. Fuentes?

L3FHRAM3                         Rivera Maradiaga – Cross

1    A.   What I told the government, sir, was that I paid Vaquero to

2    kill Metro and the defendant because both of them wanted to

3    kill me and my brother because I had refused to lend them a

4    million dollars for them to bring cocaine from Colombia, sir.

5    Q.   Isn't it a fact, Mr. Rivera, that you told the government

6    that Vaquero wanted to kill Mr. Fuentes Ramirez because

7    Mr. Fuentes Ramirez had called the police on him when he shot

8    and killed somebody at a horse race?

9    A.   What I told the government, sir, was that I had paid

10   Vaquero to kill the defendant and Metro because they both

11   wanted to kill me and my brother, sir, as I will repeat and

12   respectfully so, sir.

13   Q.   Are you denying telling the government that Vaquero wanted

14   to kill Mr. Fuentes because Mr. Fuentes had called the police

15   on him when he shot somebody at a horse race?

16   A.   I do not recall that, sir, but I do remember that Vaquero

17   was going to kill the defendant and Metro because of what the

18   two of them wanted to do to me and my brother, sir.

19   Q.   So you don't remember ever telling a different story about

20   why Vaquero wanted to kill Mr. Fuentes, is that your testimony?

21         THE COURT:   That appears to be subsumed in the

22   question you asked.   Asked and answered.   Sustained.

23         MR. MOSKOWITZ:   Can we show Government Exhibit 306 to

24   the witness, please.

25   Q.   Mr. Rivera, you have previously seen Government

L3FHRAM3                          Rivera Maradiaga - Cross

1   Exhibit 306, correct?

2   A.  Correct, sir.

3   Q.  And that is a chart put out by OFAC showing the

4   Los Cachiros drug trafficking organization, correct?

5   A.  Correct, sir.

6   Q.  At the head of the organization is you and your brother

7   Javier, correct?

8   A.  Yes, sir.

9   Q.  Now, the Los Cachiros organization was a family business,

10  correct?

11  A.  Yes, sir.

12  Q.  Your father was involved, correct?

13  A.  My father was involved, sir, but not in the sales of drugs

14  but rather in putting properties in his name, sir.

15  Q.  Your mother was involved, correct?

16  A.  Yes, sir.

17  Q.  Your sister was involved, correct?

18  A.  Yes, sir.

19  Q.  And your other brother Santos, correct, he was also

20  involved?

21  A.  He was involved with the properties, sir.

22  Q.  They all assisted you in your drug trafficking, correct?

23  A.  They assisted with the properties, sir.

24  Q.  So they weren't involved in your organization or they were?

25  A.  Everyone who received drug trafficking money was involved,

1    sir.

2    Q.  Now, you've testified about that, about their involvement

3    in your organization, under oath, correct?

4    A.  Yes, sir.

5    Q.  And when you were asked whether they were involved in your

6    drug trafficking organization, you said first you didn't

7    remember, correct?

8    A.  Can you please ask me the question again, sir.

9    Q.  When you testified about your family's involvement in your

10   drug organization, you said you couldn't remember if they were

11   involved, correct?

12              MR. LOCKARD:  Objection.

13              THE COURT:  That was an objection?

14              MR. LOCKARD:  Yes, your Honor.

15              THE COURT:  Basis?

16              MR. LOCKARD:  Ambiguous.

17              THE COURT:  Excuse me?

18              MR. LOCKARD:  Form.

19              THE COURT:  Yes.  Rephrase it, please.

20              MR. MOSKOWITZ:  One moment, Judge.

21   BY MR. MOSKOWITZ:

22   Q.  You testified under oath at a prior proceeding about your

23   family's involvement in drug trafficking, is that correct?

24   A.  I do not remember, sir, but since my family was on the OFAC

25   list, it's because they were involved, sir.

1    Q.  Do you remember testifying about their involvement?

2    A.  I do not remember, sir.

3    Q.  Do you remember being asked whether they were involved in

4    the conspiracy to import drugs into the United States?

5    A.  I do not recall, sir.

6    Q.  Do you remember testifying under oath and being asked the

7    following questions and giving the following answer:

8    "Q.  Sir, was your family involved in the conspiracy you later

9    pled guilty to of trafficking illegal narcotics with the intent

10   to import into the United States, yes or no?

11   "A.  I don't know, sir."

12   Q.  Do you remember being asked those questions and giving that

13   answer, sir?

14   A.  I don't recall, sir.

15   Q.  Now, you told us last week that as part of your agreement

16   with the United States, your family members were allowed into

17   the United States?

18              MR. LOCKARD:  Objection.

19   A.  Yes, sir.

20   Q.  In fact, ten family members are here, correct?

21   A.  I don't know the number of family members, sir, but, yes,

22   there are several here.

23   Q.  You don't know the number of family members that you have

24   that have come to the United States since you've started to

25   cooperate?

1    A.  On my behalf, I have my wife, my children, my mother, and

2    my father who passed away already, sir.

3    Q.  And how many people in total?

4    A.  Approximately five people, sir.

5    Q.  And when you talk about your mother, you're talking about

6    the woman that's shown on the Government Exhibit 306?

7    A.  I don't know the number, sir, but my mother does appear on

8    this chart.

9    Q.  Now, as part of your cooperation agreement with the

10   government, you're not allowed to commit any additional crimes,

11   correct?

12   A.  No, sir.

13   Q.  You're not allowed to violate any laws, correct?

14          THE INTERPRETER:  May the interpreter hear the

15   question again.

16   Q.  You're not allowed to violate any laws?

17   A.  Tell the truth and state -- and provide testimony is what

18   the agreement says, sir.

19   Q.  And you discussed this obligation not to violate any laws

20   and not to commit any additional crimes with the government

21   before you signed your agreement, correct?

22   A.  Everything that is in the agreement, sir.

23   Q.  So you discussed that with the government, correct?

24   A.  That is what is in the agreement, sir.

25   Q.  Now, among the rules that you are required to follow are

1    the rules of the prison that you are housed in, correct?

2    A.  I don't know, sir, whether that is included also.

3    Q.  Did you understand, Mr. Rivera, that after signing your

4    cooperation agreement, you were not allowed to have contraband

5    in the MCC?

6    A.  What kind of contraband are you talking about, sir?

7    Q.  Let's start very broadly.  Anything that you understood to

8    be contraband, did you understand you weren't allowed to have

9    that at the MCC?

10   A.  The agreement says for me to testify whenever I'm called,

11   to tell the truth, and not to commit any more crimes, sir.

12   Q.  Did you understand, Mr. Rivera, that smuggling contraband

13   into the MCC is a crime?

14   A.  It's a crime, sir.

15   Q.  And did you understand that possessing smuggled contraband

16   in the MCC is a crime?

17   A.  That is a violation of MCC rules, sir.

18   Q.  Did you understand that possession of contraband in the MCC

19   is a crime?

20   A.  It is a violation of rules at the prison, sir.

21          MR. MOSKOWITZ:  Your Honor, can we ask the witness to

22   answer the question?

23          MR. LOCKARD:  Objection.

24          THE COURT:  No.  Do you know, sir, whether that's a

25   violation of the criminal laws to possess contraband at the

L3FHRAM3                         Rivera Maradiaga - Cross

1   MCC?

2            THE WITNESS:  I don't know, sir.  All I know is that

3   it's a violation of prison rules.

4            THE COURT:  Next question.

5   BY MR. MOSKOWITZ:

6   Q.  And the government told you you have to follow the rules in

7   the prison too, correct?

8   A.  Yes, sir.

9   Q.  Isn't it a fact, Mr. Rivera, that after you signed your

10  cooperation agreement, you had a cell phone in the MCC?

11  A.  They lent me that cell phone, sir, for several hours, sir.

12  Q.  You rented the cell phone, correct?

13           THE INTERPRETER:  Interpreter correction.  Interpreter

14  correction.

15  A.  Correct, sir.

16  Q.  One of your fellow inmates smuggled the phone into the MCC,

17  correct?

18  A.  I don't know, sir.  When I got there, the telephone was

19  already there in that wing.

20  Q.  Well, you knew, Mr. Rivera, that the MCC did not allow cell

21  phones, correct?

22  A.  Yes, sir.

23  Q.  You know that if an inmate at the MCC wants to make a phone

24  call, they have to use the official phones that the MCC

25  provides, correct?

L3FHRAM3                        Rivera Maradiaga - Cross

1    A.  Correct, sir.

2    Q.  And those telephone calls made from the phones provided by

3    the MCC are tape-recorded, correct?

4    A.  Yeses.

5    Q.  And the phone calls that you make on an illegally obtained

6    cell phone at the MCC, those aren't recorded, correct?

7    A.  No, sir.

8    Q.  So the government has no idea who you spoke to on that cell

9    phone, correct?

10   A.  I told the government, sir, who I had spoken to.

11   Q.  The government does not have any proof of that, correct?

12   A.  They have the telephone, sir.

13   Q.  And the government -- the government has no idea about what

14   you spoke to on that -- withdrawn.

15          The government has no idea about what subject matters

16   you discussed on that illegal cell phone, correct?

17          MR. LOCKARD:  Objection.  Objection, your Honor.

18          THE COURT:  Basis?

19          MR. LOCKARD:  Speculation.

20          THE COURT:  Rephrase it.

21   BY MR. MOSKOWITZ:

22   Q.  The phones -- withdrawn.

23          The government asked you what you spoke about when you

24   used the cell phone, correct?

25   A.  Yes, sir.

L3FHRAM3                         Rivera Maradiaga - Cross

1   Q.  And you provided them with some answers, correct?

2   A.  Yes, sir.

3   Q.  Other than your telling them what you spoke about, to your

4   knowledge, does the government have any evidence as to what you

5   spoke about?

6   A.  I don't know, sir.

7   Q.  Among the people that you spoke to using the illegal cell

8   phone was somebody by the name of Edwin Palacios, correct?

9   A.  Yes, sir.

10  Q.  And Mr. Palacios is helping your family handle your

11  business affairs in Honduras, correct?

12  A.  He's selling the cars, selling all the cars, sir, to help

13  my family, sir.

14  Q.  He's selling -- when you say "all the cars," we're talking

15  about three cars, correct?

16  A.  There were several cars, sir.

17  Q.  Do you remember how many cars?

18  A.  No, sir.

19  Q.  He was also dealing with your livestock, correct?

20  A.  Yes, sir.

21  Q.  And he was taking the money from that, from those

22  transactions, and he was giving it to your family, correct?

23  A.  Correct, sir.

24  Q.  Now, the government found out that you were using an

25  illegal cell phone, correct?

L3FHRAM3                          Rivera Maradiaga - Cross

1   A.  When they confiscated it from me, sir.

2   Q.  And the government, the United States Attorney's Office,

3   has not ripped up your agreement because of that, correct?

4   A.  No, sir, but I spent about four months in the box at MCC

5   because of that telephone, sir.

6   Q.  But your agreement did not get ripped up, correct?

7   A.  No, sir, otherwise I would not be here.

8          MR. MOSKOWITZ:  Judge, I'm about to start something

9   new, so if you want to break now, it's perfect time.

10  Otherwise, I could continue.

11         THE COURT:  Ladies and gentlemen, we're going to break

12  for lunch.  It's 1 o'clock now, and we'll try and get you back

13  up here, if it's all right with you, at 1:45, all right, so we

14  can proceed.

15         What am I about to tell you?  Please do not discuss

16  the case among yourselves or with anyone in any way, shape, or

17  form.  Do not discuss the case.  Have a pleasant lunch, and

18  keep an open mind.  See you at 1:45.  Thank you.

19         Please wait for the jurors to exit.

20         (Jury excused)

21         (Continued on next page)

22

23

24

25

L3FHRAM3

1          (Jury not present)

2          THE COURT:  On Friday I received a note from Juror

3     No. 15.  He writes:  "Dear, Judge Castel, I wanted to inform

4     you of existing travel airplane plans scheduled for Thursday,

5     March 25, in case the trial should run over.  I am traveling to

6     take care of family members.  Warmly," and then his name and

7     Juror No. 15.

8          I'm going to ask the clerk to mark that as the next

9     exhibit.

10          All right.  In a moment we'll get the clearance

11     signal, and then I'll see you all at 1:45.  Thank you.

12          All right.  We're in recess until 1:45.  Thank you.

13          (Lunch recess)

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1                          AFTERNOON SESSION

2                            12:52 PM

3            (In open court; jury not present)

4            THE COURT:  Bring our jury in, please.

5            And, Mr. Moskowitz, please take the podium.

6            (Jury present)

7            THE COURT:  All right.  You may continue.

8     DEVIS LEONEL RIVERA MARADIAGA,

9    CROSS-EXAMINATION CONTINUED

10   BY MR. MOSKOWITZ:

11   Q.  Mr. Rivera, you and your brother began transporting

12   shipments of cocaine for the Valles in about 2005 or 2006,

13   correct?

14   A.  I started in approximately 2002, sir.

15   Q.  I understand that that's when you started in the drug

16   business.  I asked you something else.

17            Did you start transporting shipments for the Valles in

18   around 2005?

19   A.  I don't recall the exact date, but it was around then, sir,

20   after 2002.

21   Q.  At that time, you were also working with a Colombian named

22   Turco, T-u-r-c-o?

23   A.  Yes, sir.

24   Q.  And Turco sold cocaine to the Valles, correct?

25   A.  I don't know, sir.

L3FKRAM4                        Rivera Maradiaga - Cross

1   Q.  Now, your job was to receive shipments of cocaine and

2   deliver them to the Valles, correct?

3   A.  We received by boat and delivered to several -- we

4   received, and bought, and sold to several drug traffickers,

5   sir.

6   Q.  When you were transporting drugs to deliver to other

7   narco-traffickers, you were transporting them by truck,

8   correct?

9   A.  In crates, in trucks, in a long boy, and different types of

10  vehicles, sir.

11  Q.  When you began doing that transporting work, you had a

12  cousin who would pay the police to open up the roads for you,

13  correct?

14  A.  Yes, I had a cousin and several other people doing that,

15  sir.

16  Q.  Your cousin's name was Orlin Maradiaga Rivera, correct?

17  A.  Maradiaga Lopez, sir.

18  Q.  And Orlin had a relationship with an assistant commissioner

19  in the national police, correct?

20  A.  I don't recall, sir.

21  Q.  He was the one who introduced you to Flores Maradiaga,

22  correct?

23  A.  No, sir.

24  Q.  Around the time that you began transporting shipments for

25  the Valles and other drug traffickers, that's when you met

L3FKRAM4                          Rivera Maradiaga - Cross

1  Flores Maradiaga, correct?

2  A.  I met Flores Maradiaga in 2003 or 2004, when the partner of

3  the defendant introduced him to me, sir.

4          MR. MOSKOWITZ:  May I have a moment, Judge?

5          THE COURT:  You may.

6          (Pause)

7  BY MR. MOSKOWITZ:

8  Q.  Let me show you what has been marked as 3501-16.

9          MR. MOSKOWITZ:  And I ask that page 4 be put up on the

10  board for the witness.

11          May I arrange to have this shown to the interpreter?

12          I'd ask the interpreter to read the sixth bullet point

13  at the top of the page to the witness.

14          (Pause)

15  Q.  Mr. Rivera, isn't it a fact that when you spoke to the

16  government, you told them that your cousin, Orlin, would pay

17  the police when you were transporting shipments for the Valles?

18          THE COURT:  Was that last go-round to refresh the

19  witness' recollection, or what was the purpose of that?

20          MR. MOSKOWITZ:  Actually to impeach, Judge.

21          THE COURT:  Go ahead with your question.

22          THE WITNESS:  I don't recall that document, sir.

23  BY MR. MOSKOWITZ:

24  Q.  Putting aside the document, did you tell that to the

25  government?

1    A.  I don't recall, sir.

2    Q.  Do you recall telling the government that it was your

3    cousin, Orlin, that had a relationship with Flores Maradiaga?

4    A.  I don't recall that, sir.

5    Q.  Do you remember telling the government that Flores

6    Maradiaga used police and private personnel for armed security

7    cars when you were transporting shipments for the Valles?

8    A.  I don't recall that, sir.

9    Q.  Try something else.

10          When you first began working, transporting shipments,

11   you also developed contacts in the military, correct?

12   A.  Police and military, sir.

13   Q.  And the military contacts that you had would provide you

14   information about police activity, correct?

15   A.  Yes, sir.

16   Q.  They would even give you radar information when you were

17   working, bringing in planes with cocaine, correct?

18   A.  Yes, sir.

19   Q.  And the Cachiros also developed a lot of contacts with

20   politicians, correct?

21   A.  Yes, sir.

22   Q.  And those politicians helped you in your drug trafficking,

23   correct?

24   A.  Some of them, sir.

25   Q.  You worked with Oscar Najera, correct?

1    A.  Correct, sir.

2    Q.  When did you begin working with him?

3    A.  I don't recall the date, sir, but it was approximately

4    2006.

5    Q.  And he was a congressman, correct?

6    A.  Yes, sir.

7    Q.  Another politician you worked with was an individual by the

8    name of Juan Gomez, correct?

9    A.  Yes, sir.

10   Q.  What was his job?

11   A.  He was -- he had contracts with the government, sir.

12   Q.  Contracts to do what?

13   A.  Highway construction, sir.

14   Q.  And Mr. Gomez helped you get contracts to launder your drug

15   proceeds, correct?

16   A.  Yes, sir.

17   Q.  You worked with a politician known as Adam Funes,

18   F-u-n-e-s?

19          THE INTERPRETER:  For the interpreter, the question

20   again, please?

21   Q.  You worked with another politician called Adam Funes,

22   F-u-n-e-s?  I'm guessing at the pronunciation.

23   A.  Yes, sir.

24   Q.  What was his job?

25   A.  Adam Funes had a bus company, and he was the mayor of

L3FKRAM4                         Rivera Maradiaga - Cross

1    Tacoa, Colon, sir.

2    Q.  And he provided you information about police activity?

3    A.  I don't recall, sir.

4    Q.  When did you start working with Mr. Funes?

5    A.  Approximately 2003, sir.

6    Q.  You worked with another politician called Midence Oqueli,

7    O-q-u-e-l-i?

8    A.  Yes, sir.

9    Q.  What was his job?

10   A.  He is a member of the national congress, sir.

11   Q.  And when did you start working with him?

12   A.  In approximately 2003, sir.

13   Q.  So, from the very beginning of the time that you were a

14   narco-trafficker, you developed these political connections,

15   correct?

16   A.  Yes, sir.

17   Q.  Eventually, you developed relationships with the president

18   of Honduras, correct?

19   A.  Yes, sir.

20   Q.  You had a relationship with President Lobo, correct?

21   A.  Yes, sir.

22   Q.  And his full name was Pepe Lobo, right?

23   A.  His full name is Porfirio Lobo Sosa, sir.

24   Q.  Everybody called him Pepe?

25   A.  Yes, sir.

L3FKRAM4                           Rivera Maradiaga - Cross

1   Q.  And he was the president from 2009 to 2013, correct?

2   A.  Correct, sir.

3   Q.  And you paid a bribe to him in 2009, correct?

4   A.  Yes, sir.

5   Q.  Between 250 and 300 thousand dollars, correct?

6   A.  Approximately, sir.

7   Q.  And for that bribe, you got protection from the president,

8   correct?

9   A.  Correct, sir.

10  Q.  And that was protection against getting arrested, correct?

11  A.  Yes, sir.

12  Q.  And protection against your property being seized, correct?

13  A.  Yes, sir.

14  Q.  And protection against being extradited, correct?

15  A.  Correct, sir.

16  Q.  And to make sure that your relationship with President Lobo

17  remained intact, you paid him a second bribe, correct?

18  A.  Correct, sir.

19  Q.  You even went to his house to meet with him, correct?

20  A.  Correct, sir.

21  Q.  You went with your brother, Javier, correct?

22  A.  On one occasion, my brother, Javier, did come along, sir.

23  Q.  When you met with President Lobo, you specifically

24  discussed with him protection against extradition, correct?

25  A.  Extradition and other topics, sir.

L3FKRAM4                        Rivera Maradiaga - Cross

1   Q.  Even at the time of President Lobo's campaign, you were

2   already concerned about being extradited, correct?

3   A.  Yes, sir.

4   Q.  Now, both bribes were paid to President Lobo before his

5   election, correct?

6   A.  Yes, sir.

7   Q.  After the election, you met with President Lobo again,

8   correct?

9   A.  Yes, sir.

10  Q.  And that meeting was at the presidential house, correct?

11  A.  No, sir.

12  Q.  Where did you meet with him after the election?

13  A.  It was at Chimbo's house, where he lives, sir.

14  Q.  When you met with President Lobo after the election, he

15  told you you didn't have to worry about being extradited,

16  correct?

17  A.  Correct, sir.

18  Q.  And he told you that you didn't have to worry about being

19  protected, correct?

20  A.  Can you please repeat the question?

21  Q.  I'll rephrase it better.

22          He told you you would be protected under his

23  administration, correct?

24  A.  Correct, sir.

25  Q.  And he told you who to contact if you had any problems,

L3FKRAM4                          Rivera Maradiaga - Cross

1   correct?

2   A.  Yes, sir.

3   Q.  He told you to call Juan Gomez, correct?

4   A.  Yes, sir.

5   Q.  And Juan Gomez would then call the president's son,

6   correct?

7   A.  Yes, sir.

8   Q.  And, if necessary, the president's son would call General

9   Pacheco Tinoco on your behalf, correct?

10  A.  Correct, sir.

11  Q.  Now, after that meeting, you began working with President

12  Lobo's son, correct?

13  A.  Yes, sir.

14  Q.  And on occasion, he would accompany you when you were

15  transporting drug shipments, correct?

16  A.  Yes, sir.

17  Q.  And when President Lobo's son was with you, you felt safe,

18  correct?

19  A.  Yes, sir.

20  Q.  Because you understood that if you got stopped, he would

21  talk to the police for you, correct?

22  A.  He would talk to the police and then, also, the military

23  police, which was the presidential escort team, was also with

24  me, and they would protect me on behalf of Tinoco Pacheco, sir.

25  Q.  Now, one time when President Lobo's son came to help you

L3FKRAM4                         Rivera Maradiaga - Cross

1    with a transport, he came with three SUVs, correct?

2    A.   They had about three to four trucks, sir, Prado trucks.

3    Q.   When you say trucks, we're not talking about the cattle

4    trucks that we've looked at before, right, we're talking about

5    SUV-type vehicles, right?

6    A.   Toyota Prado trucks, sir.

7    Q.   And the people in the cars, or the trucks, or the SUVs,

8    whatever they are, in the Prado's, they were dressed in

9    military uniforms, correct?

10   A.   There were in the military and civilians, sir.

11   Q.   On this occasion that we're talking about, when President

12   Lobo's son came with the various Toyota Prados, you actually

13   hit a checkpoint, correct?

14   A.   Yes, sir.

15   Q.   And as you were hitting the checkpoint, the president's son

16   told the driver of his car to put on the sirens, correct?

17   A.   Every time that we would go through a checkpoint, they

18   would turn on the Toyota Prado sirens, sir.

19   Q.   And you would go right through the checkpoint, correct?

20   A.   Yes, sir.

21   Q.   Now, during the administration of President Lobo, from 2009

22   to 2013, there were also times when you would contact President

23   Lobo's son and give him advance notice that you were getting a

24   shipment of drugs, correct?

25   A.   Correct, sir.

L3FKRAM4                      Rivera Maradiaga - Cross

1    Q.  And on many of those occasions, you didn't ask him to

2    accompany you, correct?

3    A.  I do not remember, sir.

4    Q.  Well, were there times when you told him about a shipment

5    that was coming in, but did not ask him to accompany you?

6    A.  On every occasion, on several occasions, he accompanied me,

7    sir.

8    Q.  Was it on every occasion or just on some occasions?

9    A.  I remember that it was on all occasions, sir.  I am not so

10   sure.

11   Q.  So, for four years, when President Lobo is in power, every

12   time a shipment came in, he would accompany -- his son would

13   accompany you so that you would have safe passage for the

14   shipment, correct?

15   A.  Yes, sir, but there were several groups.  It wasn't just

16   Fabio Lobo's group.

17   Q.  Now, in 2012, President Lobo's term was starting to come to

18   an end, correct?

19   A.  Yes, in approximately 2012, sir.

20   Q.  There was going to be an election in 2013, correct?

21   A.  I believe so, sir.

22   Q.  In advance of the election, you told us you paid a bribe to

23   Juan Orlando Hernandez, correct?

24   A.  In approximately 2012, sir.

25   Q.  And you gave that money -- you gave $250,000 to his sister,

L3FKRAM4                         Rivera Maradiaga - Cross

1  correct?

2  A.  I didn't give it to him directly, sir.  It was through

3  Oscar Najera, my brother, and Hilda Hernandez.  That is

4  President Juan Orlando Hernandez's sister, sir.

5  Q.  The bribe that you gave to the president was for

6  protection, correct?

7  A.  Yes, to continue to launder drug-trafficking money, sir,

8  and so that we would not be extradited.

9  Q.  The money that you gave had several different purposes,

10  correct?

11  A.  I don't understand that question, sir.

12  Q.  One reason you gave the -- Juan Orlando Hernandez money was

13  to protect you against being extradited, correct?

14  A.  Me and my brother.  Me and my brother, sir.

15  Q.  And to protect you and your brother against getting

16  arrested, correct?

17  A.  From being arrested?  Yes, sir.

18  Q.  And also so that he would give you contracts, government

19  contracts, so that you could launder money, correct?

20  A.  Exactly, sir.  Correct.

21  Q.  You were looking to make the same deal with him that you

22  had with President Lobo, correct?

23  A.  Correct, sir.

24  Q.  And, by the way, when you paid the bribe to Juan

25  Orlando Hernandez, it was before the election, correct?

L3FKRAM4                         Rivera Maradiaga - Cross

1   A.  Correct, sir.

2   Q.  And he wasn't the only presidential candidate that you

3   bribed?

4   A.  There were several.

5   Q.  You paid other presidential candidates money for the same

6   type of protection if they got elected, correct?

7   A.  Correct, sir.

8   Q.  And even before President Lobo, you had a deal with

9   President Zelaya Rosales, correct?

10  A.  Correct, sir.

11  Q.  You paid him half a million dollars, correct?

12  A.  Approximately, sir.

13  Q.  And that was for the same type of protection that you got

14  from President Lobo, correct?

15  A.  The time that Manuel Zelaya Rosales was given that money,

16  sir, was because Manuel Zelaya Rosales promised that he would

17  appoint my cousin, Midence, as a minister, sir.

18  Q.  He was going to appoint him as a minister of justice,

19  right?

20  A.  Over there, it's called security minister, sir.

21  Q.  That appointment never actually happened, correct?

22  A.  Correct, sir.

23  Q.  But you did understand that the half a million dollars that

24  you gave to President Zelaya was going to give you some

25  protection, correct?

L3FKRAM4                         Rivera Maradiaga - Cross

1   A.  Yes, sir.

2   Q.  So, over the years, you've paid a million dollars or more

3   to various presidents to provide you protection, correct?

4   A.  We paid many millions of dollars, sir.

5   Q.  Bribing the president is not cheap, correct?

6   A.  It's not cheap, sir.  It's expensive.

7   Q.  I want to switch topics on you now, Mr. Rivera, and talk to

8   you about the drug lab that you've testified about.

9           You told us that the first time you met Mr. Fuentes,

10  he asked you if you would be interested in partnering in a drug

11  lab, correct?

12  A.  Correct, sir.

13  Q.  And you never invested in the lab, correct?

14  A.  I did invest, sir, $70,000 that I gave to the defendant,

15  sir.

16  Q.  The defendant sold you two cars, correct?

17  A.  Yes, sir.

18  Q.  By the way, when you first met with Mr. Fuentes Ramirez, he

19  told you he needed a loan because his mother had medical

20  expenses, correct?

21  A.  Yes, sir.

22  Q.  You never visited the lab, correct?

23  A.  No, sir.

24  Q.  At some point, you heard that a lab in Cerro Negro was

25  raided, correct?

L3FKRAM4                          Rivera Maradiaga - Cross

1   A.  Correct, sir.

2   Q.  And you discussed the lab with Metro, correct?

3   A.  With Metro and the defendant, sir.

4   Q.  Metro told you the lab was going to be closed, correct?

5   A.  The defendant told me that the lab had been seized, sir.

6          MR. MOSKOWITZ:  Had been, I'm sorry?

7          THE INTERPRETER:  Seized.  Seized s-e-i-z-e-d.

8   Q.  As far as you understood, after the raid, the lab was

9   closed down, correct?

10  A.  The police seized it, sir.

11  Q.  And it was closed, correct?

12  A.  It was seized, sir.

13  Q.  Now — switch topics again — you told us last week about the

14  murder of sicarios who had killed Metro's brother.  Remember

15  that?

16  A.  Yes, sir, perfectly well.

17  Q.  You gave us a lot of details about that murder, correct?

18  A.  What I told you, sir, was what the defendant and Metro did

19  along with the corrupt police officer, Avila Meza, sir.

20  Q.  You told us how Metro explained to you that Avila Meza put

21  his car in front of the sicarios' car to block it, correct?

22  A.  What I said, sir, was that the defendant had put his car

23  across in front of the sicarios and that Avila Meza had put his

24  car behind them, sir.

25  Q.  You're sure of that?

1    A.  Yes, sir.

2    Q.  And you also told us that after the car was blocked, they

3    pulled the sicarios out of the car, correct?

4    A.  The defendant and Avila Meza's police officers took them

5    out of a car, sir.  That is what the defendant, Metro, and

6    Avila Meza told me, sir.

7    Q.  You also told us last week that they were taken to a place

8    called Naco Cortez, correct?

9    A.  Yes, sir.

10   Q.  And Metro told you how they tortured those sicarios,

11   correct?

12   A.  Metro, Avila, and the defendant did, sir.

13              MR. MOSKOWITZ:  May I have a moment, Judge?

14              (Pause)

15   Q.  Do you remember being asked the following question and

16   giving the following answer, sir?

17   "Q.  What else did Metro say about this event?

18   "A.  Metro said that Avila Meza had placed his car in the back

19   of the sicarios' car and the defendant placed his car in front

20   of the sicarios' car, therein leaving the sicarios' car in the

21   middle."

22              Do you remember that?

23   A.  Correct, sir.

24   Q.  Now, did you ever tell a different version of the events of

25   the murder of the sicarios?

1    A.  I don't remember, sir, but that was the version that the

2    defendant, Metro, and Avila told me.

3    Q.  I want to focus on one part of the version you testified

4    about last week.

5         You told us last week that it was the defendant,

6    Mr. Fuentes Ramirez, who poured gasoline on the victims,

7    correct?

8    A.  That is what the defendant told me, that he had used a drum

9    of gasoline that he had in the back of his car and poured gas

10   over them, sir.

11   Q.  Do you remember telling the government that it was

12   Avila Meza who had poured the gas on the victims?

13   A.  No, sir.

14   Q.  Do you remember telling the government that it was Avila

15   Meza who lit them on fire?

16   A.  Yes, sir.

17   Q.  It wasn't the defendant who did that, correct?

18   A.  No.  What the defendant told me was that he had tortured

19   the two guys and he had poured gas over them, sir.

20             MR. MOSKOWITZ:  Can I have a moment, please?

21             (Pause)

22   Q.  I'm going to show you what has been marked as 3501-125.

23             MR. MOSKOWITZ:  Can you put that up on the board.  And

24   the last paragraph on page 8 is the one I want to focus on.

25             I'd ask the interpreter to just show the date on the

L3FKRAM4                          Rivera Maradiaga - Cross

1    first page to Mr. Rivera and then the last paragraph on page 8.

2    BY MR. MOSKOWITZ:

3    Q.  Mr. Rivera, do you recall discussing the murder of the

4    sicarios who killed Metro's brother with the government in

5    2020, last year?

6    A.  I don't recall that, sir.

7    Q.  Do you remember discussing that incident with Assistant

8    United States Attorney Tarlow and Agent Fairbanks, who's in the

9    courtroom?

10   A.  I don't recall, sir.

11   Q.  Isn't it a fact, Mr. Rivera, that when you discussed the

12   murder of the sicarios who killed Metro's brother with Agent

13   Fairbanks and AUSA Tarlow, you did not mention

14   Mr. Fuentes Ramirez being involved in that incident?

15   A.  I don't recall, sir.  What I recall is what the defendant

16   told me, which is what I told the prosecutors, sir.

17   Q.  Do you remember ever telling that story to the prosecutors

18   without including Mr. Fuentes Ramirez in the story?

19   A.  What I recall is what Mr. Fuentes told me, sir.  That's all

20   I recall, sir.

21   Q.  Sir, you don't recall anything you told the prosecutors in

22   this case?

23   A.  I told them what the defendant told me, was that he had

24   tortured and killed the police officer who had begged for his

25   life saying that he had a small daughter and didn't want to

L3FKRAM4                        Rivera Maradiaga - Cross

1    leave her orphaned, sir.

2    Q.  But you have no recollection of telling that exact same

3    story without mentioning the defendant; is that correct?

4    A.  What I recall is what the defendant told me, sir.

5              THE COURT:  All right.  We're now more than an hour

6    after the lunch break.  How much longer do you have,

7    Mr. Moskowitz?

8              MR. MOSKOWITZ:  We'll get -- I should finish by the

9    next break, Judge.  I'm working as fast as I can.

10             THE COURT:  It's not a question of how fast you're

11   working.  You recall I've asked you now several times, and you

12   gave me an estimate, gave the jury an estimate, before the

13   lunch break, and it appears that that is now substantially

14   changing.

15             MR. MOSKOWITZ:  Judge, I understand.  I am trying to

16   move as quickly as possible.  I'm hoping to finish before the

17   afternoon break.

18             THE COURT:  Ask your next question.

19   BY MR. MOSKOWITZ:

20   Q.  Mr. Rivera, did you discuss the incident about the murder

21   of Metro's sicarios -- or the killers of Metro's brother just

22   last month with the government?

23   A.  I don't recall the exact date, but we've talked several

24   times about the defendant having killed the police officer,

25   sir.

1  Q.  When you discussed it just last month, did you tell the

2  government that it was Avila Meza that set the people on fire?

3  A.  What I told the government is what the defendant told me,

4  sir.

5  Q.  Mr. Rivera, you told us that when you first met with Metro

6  and he discussed Mr. Fuentes Ramirez, Metro told you about

7  their deal selling drugs in Miami, correct?

8  A.  He said that Metro and the defendant were selling drugs in

9  Miami, sir.

10 Q.  And Metro explained to you that he was sending the drugs to

11 Mr. Fuentes in Miami, correct?

12 A.  Metro explained to me that he was sending drugs to the

13 defendant in Miami, between one and five kilos a month, so that

14 he could sell them.

15 Q.  And Metro told you that when the drugs arrived in Miami,

16 Mr. Fuentes Ramirez would break them down, cut them, and sell

17 them on the street, correct?

18 A.  What Metro told me was that he sold them to the defendant

19 and that he broke them down.  He sent him between one and five

20 kilos a month.  He did not give me any more details.

21 Q.  Remember testifying --

22       THE INTERPRETER:  Interpreter correction.  The

23 interpreter would like to add that he sold them in smaller

24 portions.  Thank you.

25 Q.  And it was your understanding that during that period of

1    time, Mr. Fuentes Ramirez was in Miami receiving the shipments

2    of cocaine, breaking them down, and selling it, correct?

3    A.   What I understood was that Metro gave them to the defendant

4    so that he could sell them, sir, the kilos of cocaine.

5    Q.   And you understand that Mr. Fuentes was selling the cocaine

6    in smaller quantities in Miami, correct?

7    A.   What Metro told me was that he sold it in one to five

8    kilos, sir, for him to sell.  He didn't give me any more

9    information.

10   Q.   Let's switch topics.

11          You told us last week that when Mr. Fuentes was

12   arrested, you spoke to him at the MCC, correct?

13   A.   When he was at MCC, sir, I spoke to him there.

14   Q.   Now, by the time Mr. Fuentes was arrested, you had already

15   testified in cases in this courthouse, correct?

16   A.   I don't understand you, sir.

17   Q.   Mr. Fuentes was arrested in 2020, correct?

18   A.   I don't recall the date, sir.

19   Q.   Sir, you've been in jail, in the United States, since 2015,

20   correct?

21   A.   Correct, sir.

22   Q.   And you've had several opportunities to testify in matters

23   in this courthouse, correct?

24   A.   I've given testimony on several occasions, sir.

25   Q.   And that testimony was before Mr. Fuentes was arrested,

1    correct?

2    A.  I don't understand you, sir.

3    Q.  Did you testify in this courthouse before you met

4    Mr. Fuentes in the MCC?

5    A.  Before I --

6           THE INTERPRETER:  Interpreter is going to correct his

7    question.

8    A.  When the defendant was arrested and taken to MCC, that's

9    when I met him, sir.  He talked to me.

10          MR. MOSKOWITZ:  Your Honor, can we get the witness to

11   answer the question about just the timing?

12          THE INTERPRETER:  One moment.  The interpreter wishes

13   to correct the translation.

14          (Pause)

15   A.  When the defendant was arrested and taken to the MCC, that

16   is when I spoke to him.

17   Q.  Yes, I understand --

18          THE COURT:  All right.  Mr. Rivera, there was a point

19   in time that you saw Mr. Fuentes Ramirez at the MCC, right?

20          THE WITNESS:  Yes, sir.

21          THE COURT:  Had you testified in any proceeding in

22   this courthouse prior to that time?

23          THE WITNESS:  Yes, I had given testimony, your Honor,

24   but in other cases.

25          THE COURT:  Thank you.

1  BY MR. MOSKOWITZ:

2  Q.  And you were aware, sir, that your testimony in those other

3  cases was reported widely in the Honduran newspapers and media,

4  correct?

5  A.  I knew it was on the internet and in newspapers, sir, and

6  on television because we would see it there once in a while,

7  over there in prison.

8  Q.  Now, when you met Mr. Fuentes Ramirez in the MCC, he told

9  you he knew you were going to testify against him?

10 A.  Yes, sir.

11 Q.  And, yet, it's your testimony that he voluntarily told you

12 statements about Juan Orlando Hernandez; is that correct?

13 A.  The defendant spoke to me about Juan Orlando Hernandez,

14 sir.

15 Q.  Even after he told you he knew you were going to testify

16 against him, correct?

17 A.  What the defendant said, sir, was that he was not going to

18 go to trial.

19 Q.  I'm going to ask you a couple of last questions about your

20 cooperation agreement.

21      You told us that as part of your agreement, if you

22 comply with your agreement, you hope to get a letter from the

23 government before your sentencing, correct?

24 A.  Correct, sir.

25 Q.  That's called a 5K letter, correct?

L3FKRAM4                          Rivera Maradiaga - Cross

1    A.  Yes, sir, 5K1.

2    Q.  And it is the government that decides whether you get a 5K1

3    letter, correct?

4    A.  Yes, sir.

5    Q.  It is the government that decides whether you have complied

6    with all of your obligations under the agreement, correct?

7    A.  The government decides, sir, correct.

8    Q.  And if you get that agreement, then the mandatory minimum

9    sentences that you pled guilty to no longer are in effect,

10   correct?

11   A.  That, I don't know, sir.  That's -- a reduction of

12   sentence, the person who decides that is the judge.

13   Q.  You do understand that if you get the 5K, then the judge

14   does not have to impose any of the mandatory minimum sentences

15   that you pled guilty to; isn't that correct?

16   A.  What I understand is that it's a reduction of sentence,

17   sir.

18   Q.  You had pled guilty to charges that carried a mandatory

19   life sentence, correct?

20   A.  Plus -- life sentence plus 30 years, sir.

21   Q.  The continuing criminal enterprise charge was the mandatory

22   life charge, correct?

23   A.  I don't know, sir.  I don't know anything about laws.  All

24   I know is what the agreement says, sir.

25   Q.  And the agreement says that if you get the 5K letter, the

L3FKRAM4                          Rivera Maradiaga - Cross

1   judge does not have to give you a mandatory life sentence,

2   correct?

3   A.  I know no law, sir.  As I repeat to you, that's the judge.

4              THE INTERPRETER:  I will ask the witness to repeat the

5   response.

6   A.  I don't know about law, sir.  That is a reduction of

7   sentence.  The person that's going to decide my sentence is the

8   judge.

9   Q.  Sir, I'm not asking you about what the law is.  I'm asking

10  you about your understanding of your agreement.

11             Is it your understanding that if you get the 5K

12  letter, the judge can impose a sentence less than life in

13  prison?

14  A.  That's according to what the judge decides, sir.

15  Q.  And, in fact, you understand, sir, that if you get the 5K

16  letter, the judge can let you go with time served at the time

17  of your sentence, correct?

18  A.  Whatever the judge decides, sir.

19  Q.  And you certainly hope to get out of jail at the time of

20  your sentencing, correct?

21  A.  My thought is to be free, sir, but whatever is decided,

22  that is going to be in the hands of the judge.

23  Q.  Sir, if you thought you were going to get a life sentence

24  at the end of all of this, you would never have made the

25  agreement with the government; isn't that true?

A.  I entered the agreement, sir, knowing that the judge can

give me a life sentence, a life sentence, life plus 30, or can

release me, sir.

Q.  But you certainly did not expect, when you entered into the

agreement, that you'd get the life sentence; isn't that true?

A.  That is the judge's decision, sir.

            MR. MOSKOWITZ:  Your Honor, nothing further.

            THE COURT:  All right.

            Ladies and gentlemen, we'll take our midafternoon

break.  Please do not discuss the case among yourselves or with

anyone.  Please keep an open mind.

            It's 3:08.  We'll be back in action in about ten

minutes, and we'll go till 5:00 o'clock today.  Thank you, all,

very much.

            Please do not leave the courtroom until the jurors

have cleared the elevator area.

            (Jury not present)

            THE COURT:  Sir, just wait a minute, please.

            Okay.  We are in recess.  Thank you.

            (Recess)

L3FHRAM5                          Rivera Maradiaga - Redirect

1                (Jury present)

2                THE COURT:  All right.  Good afternoon.  Mr. Lockard,

3      whenever you're ready.

4                MR. LOCKARD:  Your Honor?

5                THE COURT:  Yes.

6      REDIRECT EXAMINATION

7      BY MR. LOCKARD:

8      Q.  Mr. Rivera, good afternoon.

9      A.  Good afternoon, Mr. Prosecutor.

10     Q.  Mr. Rivera, on cross-examination this morning, you were

11     asked about Ramon Matta and Alex Berrios.  Do you recall those

12     questions?

13     A.  Yes, sir.

14     Q.  And you informed Mr. Matta that Berrios may be a person

15     informing, is that correct?

16     A.  Correct, sir.

17     Q.  And you later learned that Mr. Berrios had been killed, is

18     that right?

19     A.  Yes, sir.

20               MR. LOCKARD:  Ms. Hurst, if we could pull up

21     Government Exhibit 10, page 8.

22     Q.  Mr. Rivera, you were asked if Mr. Berrios was in the chart

23     of 78 murders that is contained in your plea agreement.  Do you

24     recall that?

25     A.  Yes, sir.

1    Q.  Mr. Rivera, I'd like you to turn your attention to page 4

2    of your agreement.

3              Ms. Hurst, if you could encharge clause vii in the

4    care over paragraph.

5              And that clause refers to communications with a

6    Honduran drug trafficker regarding a potential law enforcement

7    source in or about September of 2014 which appear to have

8    resulted in the murder of four people at the direction of that

9    drug trafficker.

10             Do you understand if that's a reference to Mr. Matta

11   and Mr. Berrios?

12   A.  Yes, sir.

13   Q.  Do you understand that that conduct will be taken into

14   account by the judge who imposes your sentence?

15   A.  Yes, sir.

16             MR. LOCKARD:  Thank you, Ms. Hurst.

17   Q.  Mr. Rivera, on cross-examination this morning you were also

18   asked about the murder of Moncho Cabezas.  Do you recall that

19   question?

20   A.  Yes, sir.

21   Q.  You were asked if you were involved in the murder of Moncho

22   Cabezas?

23   A.  Yes, sir.

24   Q.  You were shown one bullet point from a set of notes about

25   Moncho Cabezas.  Do you recall that?

```
 1    A.  Yes, sir.
 2              MR. LOCKARD:  Ms. Hurst, can you please show
 3    Mr. Rivera 3501-56, page 7.
 4              If the interpreter could please read to Mr. Rivera the
 5    fourth and fifth bullet points on that page.
 6              THE INTERPRETER:  May the interpreter have the benefit
 7    of the document?
 8              Ready, counsel.
 9    Q.  So, Mr. Rivera, had Eliel Sierra asked for your help to
10    murder Moncho Cabezas?
11    A.  Yes, sir.
12    Q.  And had you helped him?
13    A.  Yes, sir.
14    Q.  Including by providing hitmen?
15              THE INTERPRETER:  For the interpreter, including by
16    providing?  Thank you, counsel.
17    Q.  Is that correct?
18    A.  Yes, sir.
19    Q.  And that resulted in a shootout at Moncho Cabezas's home?
20    A.  Correct, sir.
21    Q.  But Moncho Cabezas was not killed?
22    A.  No, sir.
23    Q.  So although you were not involved in the final act that
24    killed Mr. Cabezas in prison, you had agreed with Mr. Sierra to
25    kill Moncho Cabezas?
```

1    A.  Correct, sir.

2    Q.  And that death is listed in your plea agreement?

3    A.  Correct, sir.

4           MR. LOCKARD:  Thank you, Ms. Hurst.

5    Q.  Mr. Rivera, you were also asked on cross-examination about

6    whether you had previously testified about trafficking 20 tons

7    or more of cocaine from 2002 to 2013.  Do you recall those

8    questions?

9    A.  Correct, sir.

10          MR. LOCKARD:  Ms. Hurst, could you show Mr. Rivera

11   3501-87 at page 13.

12   Q.  Mr. Rivera, at that proceeding do you recall being asked:

13          Question:  "Between 2009 and 2013, what is your best

14   estimate of the amount of cocaine that you and the Cachiros

15   help to distribute?"

16          And giving the answer:  "Many tons of cocaine?"

17          And then being asked:  "More that 20 tons?"

18          And answering:  "Yes, sir, more."

19          Is that where the testimony of 20 tons of cocaine came

20   from?

21   A.  Correct, sir.

22          MR. LOCKARD:  Thank you, Ms. Hurst.

23   Q.  Mr. Rivera, you've described beginning to cooperate with

24   the DEA in approximately November of 2013, is that right?

25   A.  Correct, sir.

1    Q.  And when you began meeting with the DEA, you also recorded

2    meetings that you were having with drug traffickers, is that

3    right?

4    A.  Correct, sir.

5    Q.  And you had already begun recording some meetings before

6    you spoke with the DEA, is that right?

7    A.  That is right, sir.

8    Q.  And did the DEA give you directions about what targets to

9    focus on for recordings?

10   A.  Yes, sir.

11   Q.  And did those meetings -- or did those recordings focus on

12   people with whom you had ongoing drug business?

13   A.  Yes, sir.

14   Q.  And, for example, you recorded meetings that involved Fabio

15   Lobo?

16   A.  Correct, sir.

17   Q.  And you recorded meetings that involved Tony Hernandez?

18   A.  Correct, sir.

19   Q.  And did you record meetings that involved Freddy Nájera?

20   A.  Correct, sir.

21   Q.  And what was Mr. Nájera's position in Honduras at that

22   time?

23   A.  Member of the Honduran Congress, sir.

24   Q.  And did you record meetings with Oscar Nájera?

25   A.  Yes, sir.

1    Q.  And did you record meetings with Yankel Rosenthal?

2    A.  Correct, sir.

3    Q.  And was Mr. Rosenthal a part of the Juan Orlando Hernandez

4    government?

5    A.  Yes, sir.

6    Q.  Was he also a money launderer for drug traffickers?

7    A.  Yes, sir.

8    Q.  Did you record meetings with Honduran police officers?

9    A.  Yes, sir.

10   Q.  Now, during the time that you were cooperating with the DEA

11   and making recorded meetings, had you stopped having any drug

12   business with the defendant?

13   A.  Yes, sir.

14   Q.  And was that because you had learned that he was planning

15   to kill you and your brother?

16   A.  Correct, sir.

17   Q.  Because you had attempted unsuccessfully to kill him?

18   A.  Yes, sir.

19   Q.  In addition to the Honduran government officials that we

20   talked about just a moment ago, were you also recording

21   meetings with drug traffickers and cartel leaders?

22   A.  Yes, sir.

23   Q.  For example, you recorded meetings with members of the Los

24   Valles cartel, is that right?

25   A.  Correct, sir.

L3FHRAM5                      Rivera Maradiaga - Redirect

1    Q.  And did you record meetings with Hector Emilio Fernandez?

2    A.  Correct, sir.

3    Q.  And was he a large-scale drug trafficker in Honduras at

4    that time?

5    A.  Correct, sir.

6    Q.  Were you recording meetings with Ramon Matta?

7    A.  Correct, sir.

8    Q.  So prior to your surrender, you weren't negotiating the

9    terms of your plea, you were collecting evidence for the DEA?

10   A.  Correct, sir.

11   Q.  Now, there also came a time when you began meeting with

12   federal prosecutors as well as DEA agents?

13   A.  Correct, sir.

14   Q.  And during this time, you continued to record meetings that

15   you were having with drug traffickers and corrupt Honduran

16   government officials?

17   A.  Correct, sir.

18   Q.  In these meetings were you asked questions about drug

19   traffickers and drug trafficking?

20   A.  Correct, sir.

21   Q.  And were you asked questions about Honduran government

22   officials that you had bribed with drug money?

23   A.  Correct, sir.

24   Q.  And were those questions asked by the DEA agents and the

25   prosecutors?

L3FHRAM5                       Rivera Maradiaga - Redirect

1    A.  Correct, sir.

2    Q.  And were you told that there would come a time when you

3    would also be asked questions about murders and violence?

4    A.  Yes, sir.

5    Q.  And were you told that when you were asked those questions,

6    you had to be truthful in your responses?

7    A.  Yes, sir.

8    Q.  Now, Mr. Rivera, you said that you surrendered in early

9    2015, is that right?

10   A.  Correct, sir.

11   Q.  And when you surrendered, had anyone promised you that you

12   would get a cooperation agreement?

13   A.  No, sir.

14        MR. LOCKARD:  Ms. Hurst, can we please see Defendant's

15   Exhibit A.

16   Q.  So, Mr. Rivera, you were asked questions about this

17   document which governed the meetings that you were having with

18   the DEA agents and with the government.

19   A.  Yes, sir.

20        MR. LOCKARD:  Ms. Hurst, if we could focus in on

21   paragraph 1.

22   Q.  And this paragraph says that the document is not a

23   cooperation agreement?

24   A.  Correct, sir.

25   Q.  And later on in the sentence, it says that:  "By receiving

L3FHRAM5                          Rivera Maradiaga - Redirect

1    the client's" -- meaning your, Mr. Rivera's -- "proffer, the

2    government does not agree to make a motion on the client's

3    behalf or to enter into a cooperation agreement, plea

4    agreement, immunity, or non-prosecution agreement."

5              THE COURT:  Is that a question?

6              MR. LOCKARD:  There's going to be a question to

7    follow.

8    Q.  Mr. Rivera, when you surrendered, did you understand that

9    you had no promises that you would receive a plea agreement or

10   a cooperation agreement?

11   A.  Correct, sir.

12   Q.  And you did not negotiate the terms of this proffer

13   agreement, is that right?

14   A.  Yes, sir.

15             MR. LOCKARD:  Thank you, Ms. Hurst.

16   Q.  Now, after your surrender, were you asked questions about

17   murders and violence?

18   A.  Yes, sir.

19   Q.  And were there a number of those meetings?

20   A.  Yes, sir.

21   Q.  And during those meetings, did you understand that you

22   still had no promise of receiving a cooperation agreement or

23   plea agreement?

24   A.  Yes, sir.

25   Q.  And during those meetings, did you describe your

L3FHRAM5                        Rivera Maradiaga - Redirect

1   involvement in the murders of the 78 people listed in the

2   appendix to the plea agreement?

3   A.  Yes, sir.

4   Q.  Now, yesterday you were asked some questions about the

5   murder of Nahum Palacios, a Honduran journalist.

6   A.  Yes, sir.

7         MR. LOCKARD:  Ms. Hurst, if we could see Government

8   Exhibit 10, page 9, line 23.  Maybe page 8.  I'm sorry.

9   Q.  Is that murder covered in your plea agreement?

10  A.  Yes, sir, it is covered.

11  Q.  And at the time you surrendered to the United States, were

12  you yet charged with that murder?

13  A.  No, sir.

14        MR. LOCKARD:  Ms. Hurst, if we can see the next line.

15  Q.  Yesterday on cross-examination you were asked about the

16  murder of Yorleny Sanchez, Mr. Palacios' girlfriend.

17  A.  Yes, sir.

18  Q.  Now, at the time of Mr. Palacios' murder, did you know that

19  Ms. Sanchez had been killed?

20  A.  I did not know, sir.

21        MR. LOCKARD:  Ms. Hurst, if you could show Mr. Rivera

22  Government Exhibit 11.

23  Q.  Mr. Rivera, was it, in fact, reported that Mr. Palacios'

24  girlfriend had also died as a result of that attack?

25  A.  Yes, sir.

L3FHRAM5                           Rivera Maradiaga - Redirect

1   Q.  And did you understand that you were responsible for it

2   even if you didn't intend that particular victim?

3   A.  Yes, sir.

4   Q.  And you were required to accept responsibility for that

5   death in your plea agreement, is that right?

6   A.  Correct, sir.

7           MR. LOCKARD:  Thank you, Ms. Hurst.

8   Q.  Mr. Rivera, you were asked to murder Mr. Palacios by

9   Midence Martinez Turcios.

10  A.  Yes, sir.

11  Q.  And what was Mr. Martinez Turcios' position in Honduras at

12  that time?

13  A.  He was a member of the Honduran Congress, sir.

14  Q.  To your knowledge, has Martinez Turcios ever been charged

15  for that murder in Honduras?

16  A.  No, sir.

17  Q.  But you've accepted responsibility for it here in the

18  United States, is that right?

19  A.  Correct, sir.

20          MR. LOCKARD:  Ms. Hurst, if we could see Government

21  Exhibit 10, page 8, line 19.

22  Q.  Mr. Rivera, yesterday you were asked some questions about

23  the 2009 assassination of Julian Aristides Gonzalez, the head

24  of the Honduran antidrug police force.  Do you remember those

25  questions?

1    A.  Correct, sir.

2    Q.  At the time of your surrender, had you been charged with

3    that murder?

4    A.  No, sir, at no time.

5    Q.  And after your surrender, did you describe your

6    participation in that assassination?

7    A.  Yes, sir.

8    Q.  And did you plead guilty to it?

9    A.  Correct, sir.

10   Q.  Did you also tell the DEA and prosecutors about the

11   involvement of other drug traffickers in that assassination?

12   A.  Correct, sir.

13   Q.  And was Ramon Matta involved in the agreement to

14   assassinate Aristides Gonzalez?

15   A.  Yes, sir.

16   Q.  And were members of the Los Valles cartel involved in that

17   agreement?

18   A.  Correct, sir.

19   Q.  And also Neftali Duarte Mejia?

20   A.  Yes, sir.

21   Q.  And also Freddy Nájera?

22   A.  Yes, sir.

23   Q.  And others?

24   A.  Yes, sir.

25   Q.  To your knowledge, have any of those individuals been

L3FHRAM5                    Rivera Maradiaga - Redirect

1   charged with the murder of Aristides Gonzalez in Honduras?

2   A.  No, sir, not one.

3   Q.  But have you accepted responsibility for that murder here

4   in the United States?

5   A.  Yes, sir, I accepted it.

6   Q.  Now, Mr. Rivera, did you continue to meet with DEA agents

7   and prosecutors even after your guilty plea?

8   A.  Yes, sir.

9   Q.  And in those meetings, was it the agents and the

10  prosecutors who asked the questions?

11  A.  Yes, sir.

12  Q.  And during those meetings, were there times that you would

13  ask about -- you would be asked about a particular person in

14  more than one meeting?

15  A.  Yes, sir.

16  Q.  Were there times that the meeting ran short before there

17  was time to discuss all the details of particular events?

18  A.  Correct, sir.

19  Q.  And were there times when you were told to continue to

20  think about persons or events in between meetings in order to

21  refresh your memory about those events and those people?

22  A.  Yes, sir.

23  Q.  Now, did there come a time when you had a number of

24  meetings to discuss Fabio Lobo?

25  A.  Yes, sir.

L3FHRAM5                          Rivera Maradiaga - Redirect

1   Q.  And was that in preparation to testify at a hearing?

2   A.  Correct, sir.

3   Q.  And during those meetings, did the agents and prosecutors

4   focus principally on Mr. Lobo?

5   A.  Yes, sir.

6   Q.  Did there come a time when you had a number of meetings

7   focused on Freddy Nájera?

8   A.  Correct, sir.

9   Q.  Was that in preparation to testify at a trial?

10  A.  Yes, sir.

11  Q.  Did there come a time when you had a number of meetings

12  focused principally on Tony Hernandez?

13  A.  Yes, sir.

14  Q.  And was that also in preparation to testify at a trial?

15  A.  Correct, sir.

16  Q.  Now, Mr. Rivera, did there come a time when DEA agents and

17  prosecutors asked you specifically about the defendant here?

18  A.  Yes, sir.

19  Q.  At the time that you were specifically asked about the

20  defendant, was that before the defendant was arrested?

21  A.  Yes, sir.

22  Q.  And in meetings with DEA agents and prosecutors, did you

23  describe the drug trafficking that you had engaged in with the

24  defendant?

25  A.  Yes, sir.

L3FHRAM5                          Rivera Maradiaga - Redirect

1    Q.  Including his corrupt police contacts?

2    A.  Correct, sir.

3    Q.  Including what you had learned about his involvement in

4    murders?

5    A.  Yes, sir.

6    Q.  And including the cocaine lab that he had operated?

7    A.  Yes, sir.

8    Q.  And did you also tell DEA agents and prosecutors that you

9    had attempted to kill the defendant?

10   A.  Yes, sir.

11   Q.  Mr. Rivera, when the time comes for you to be sentenced, do

12   you believe that the judge will take into account the drug

13   trafficking you have conducted with the defendant?

14   A.  Yes, sir, I do believe that.

15   Q.  And when the time comes for you to be sentenced, do you

16   believe that the judge will take into account your attempt to

17   have the defendant killed?

18   A.  Yes, sir, he will take it into account.

19   Q.  Will that include information that you have provided to the

20   DEA agents and to the prosecutors?

21   A.  Yes, sir, it will also include that.

22   Q.  Now, Mr. Rivera, you've told us about the mandatory minimum

23   sentence that you currently face of life plus 30 years.  Do you

24   remember that?

25   A.  Yes, sir, I remember.

L3FHRAM5                          Rivera Maradiaga - Redirect

1  Q.  You understand that if you comply with the terms of your

2  cooperation agreement, the government will write a letter to

3  the judge that will allow the judge to sentence you to

4  something less than life plus 30 years?

5  A.  Yes, sir, I do believe so.

6  Q.  Do you understand that the prosecutors will not recommend a

7  sentence to the judge?

8  A.  Yes, I understand that, sir.

9  Q.  At this time no sentencing has been scheduled, is that

10  right?

11  A.  That's correct, sir.

12  Q.  Do you understand that if you do not comply with your

13  cooperation agreement, the government does not have to write

14  that letter?

15  A.  I understand that too, sir.

16  Q.  And that includes your obligation to testify when asked?

17          THE INTERPRETER:  The interpreter did not hear the

18  last part of the question, please.

19  Q.  And those obligations under the cooperation agreement

20  include the obligation to testify when asked?

21  A.  Yes, sir.

22  Q.  Regardless of who the defendant is?

23  A.  Yes, sir.

24  Q.  And your obligations in your cooperation agreement include

25  the obligation to provide truthful information and testimony,

1   is that right?

2   A.  Correct, sir.

3   Q.  Mr. Rivera, you were asked some questions on

4   cross-examination this afternoon about your conversations with

5   the defendant at MCC in the jail?

6   A.  Yes, sir.

7   Q.  And you described how the defendant spoke to you about his

8   meetings with Juan Orlando Hernandez?

9   A.  Yes, sir.

10  Q.  And you described how the defendant said that he did not

11  intend to go to trial?

12  A.  Yes, sir.

13  Q.  Did the defendant say anything else about his intention not

14  to go to trial?

15  A.  Yes, sir.

16  Q.  What did he say about that?

17  A.  The defendant said that he was going to ask the DEA to let

18  him out of prison for a month.  The defendant had evidence,

19  photos and videos, that would show how Juan Orlando, the

20  president of Honduras, was receiving shipments of cocaine.

21  These were coming from Colombia and arriving in the airports of

22  San Pedro Sula and Tegucigalpa, and he said that he was doing

23  it in the presence of the DEA, but that the DEA didn't realize

24  it.  And he said that Juan Orlando was making fun of the DEA,

25  sir.

1          MR. LOCKARD:  Your Honor, may I have a moment to

2     consult?

3          THE INTERPRETER:  May the interpreter hear the

4     question again?

5          THE COURT:  Yes.  Would you like the question read

6     back, sir?

7          THE INTERPRETER:  No.

8          MR. LOCKARD:  I'll ask it again.  Your Honor, may I

9     have a moment to consult?

10          THE COURT:  Yes.

11          (Counsel conferred)

12          MR. LOCKARD:  Your Honor, no further questions.

13          THE COURT:  All right.  Thank you very much.  The

14     witness may step down.

15          THE WITNESS:  Thank you, your Honor.

16          (Witness excused)

17          THE COURT:  All right.  Ladies and gentlemen, you may

18     stand up and stretch while we prepare the witness box for the

19     next witness.

20          No, we're good on the questioner, Garrett.  Oh, you're

21     doing it.  Yes, it needs to be done.  Thank you.  Sorry.

22          I'm sorry we don't have more variety on the menu, but

23     that's the way it is.  The budget does not permit us to call in

24     a Midtown restaurant to bring China and candelabras and

25     beverages.

1          And a program reminder for those of you who celebrate

2     the holiday, Wednesday, March 17, is St. Patrick's Day, and

3     next Saturday, the 20th, is the first day of spring.

4          All right.  The government may call its next witness.

5          MR. GUTWILLIG:  The calls Dario Euraque.

6          THE COURT:  All right.  Please be seated.  You may

7     take your mask off.

8     DARIO EURAQUE,

9          called as a witness by the Government,

10         having been duly sworn, testified as follows:

11         THE COURT:  All right.  Thank you.

12         You may inquire, Mr. Gutwillig.

13    DIRECT EXAMINATION

14    BY MR. GUTWILLIG:

15    Q.  Good afternoon, Professor Euraque.

16    A.  Good afternoon.

17    Q.  Where were you born?

18    A.  Tegucigalpa, Honduras.

19    Q.  How long did you live in Honduras?

20    A.  Until late 1967.

21    Q.  Where did you live after that?

22    A.  A lived in New Orleans.

23    Q.  Where do you work today?

24    A.  I'm a professor at Trinity College in Hartford,

25    Connecticut.

L3FHRAM5                          Euraque - Direct

1    Q.   What do you do at Trinity College?

2    A.   I teach Latin American history.

3    Q.   And approximately how long have you been a professor of

4    Latin American history at Trinity College?

5    A.   Thirty years.

6    Q.   What's the focus of your teaching at Trinity?

7    A.   Latin American history and Central American history in

8    particular.

9    Q.   Have you held any leadership positions at Trinity College?

10   A.   I've been chair of the history department at Trinity

11   College and chair of the international studies program.

12   Q.   Professor Euraque, what degrees do you hold?

13   A.   I have a B.A. degree in history and philosophy from

14   Marquette University and a master's degree and Ph.D. in Latin

15   American history from University of Wisconsin in Madison.

16   Q.   Do you hold a doctorate degree?

17   A.   Yes, I do.

18   Q.   What degree do you hold?

19   A.   I have a Ph.D.

20   Q.   Ph.D. in what?

21   A.   In Latin American history.

22   Q.   From which university was that?

23   A.   University of Wisconsin in Madison, Wisconsin.

24   Q.   Have you taught outside the United States?

25   A.   Yes, sir, I have.

1   Q.  What are some of the countries that you've taught in?

2   A.  All the countries of Central America, Mexico, some

3   countries in South America, couple times in Europe.

4   Q.  Are you familiar with the University of Honduras?

5   A.  Yes.

6   Q.  Have you taught there?

7   A.  Yes.

8   Q.  What courses did you teach at the University of Honduras?

9   A.  Mostly introductions to Latin American -- I'm sorry, to

10  Honduran history and courses on method and theory of history.

11  Q.  Have you focused on a particular subject in your research?

12  A.  Well, what is called modern Honduran history, 19th and 20th

13  century Honduran history.

14  Q.  Would you please describe a little bit about your specialty

15  in that area.

16  A.  Well, it ranges from the history of political systems,

17  institutional history, some -- I've written a couple books on

18  race and ethnicity in Honduran history, also some on violence

19  in Latin -- in Honduran history.

20  Q.  Are you a member of any professional associations?

21  A.  A member of the American Historical Association, the Latin

22  American Studies Association, the New England Council of Latin

23  American Studies.

24  Q.  Have you held any government positions?

25  A.  Yes.

1    Q.  In what country?

2    A.  Honduras.

3    Q.  What position did you hold in Honduras?

4    A.  I was director of the Honduran Institute of Anthropology

5    and History.

6    Q.  Approximately when were you in that position?

7    A.  Between 2006 and 2009.

8    Q.  How were you appointed to that position?

9    A.  I was appointed by the minister of culture of Honduras at

10   the time.

11   Q.  And what were your responsibilities generally in that role?

12   A.  By Honduran law the Institute of Anthropology and History

13   is charged with administering the cultural heritage of the

14   country, meaning all the museums, archeological sites,

15   historical monuments, pretty much.

16   Q.  Did there come a time that you left that position?

17   A.  Yes.

18   Q.  How did that come about?

19   A.  In June of 2009 there was a coup in Honduras.  I was

20   removed from government.

21   Q.  Were you initially asked to stay in that role?

22   A.  Yes.

23   Q.  What was your response?

24   A.  I said no -- well, I said no because the new government

25   wanted to reappoint me to the position.

L3FHRAM5                        Euraque - Direct

1   Q.  Did you decline that reappointment?

2   A.  I declined the reappointment.

3   Q.  Are you a member of any political party?

4   A.  No.

5   Q.  Was there publicity about your dismissal from that

6   position?

7   A.  Yes.

8   Q.  Can you describe that briefly.

9   A.  Well, I'm and have been --

10          MR. SCHULMAN:  Objection.  Hearsay, Judge.

11          THE COURT:  The publicity is not for the truth of its

12   content but for the effect it may have had on the witness.  All

13   right?  So, ladies and gentlemen, whatever the publicity was,

14   we don't take publicity as the truth, but sometimes it's

15   relevant to know that there was publicity because it may have

16   affected the conduct of persons.

17          Go ahead.

18   Q.  Professor Euraque, was there publicity surrounding your

19   dismissal from that position?

20   A.  Yes.

21          (Continued on next page)

22

23

24

25

L3FKRAM6                          Euraque - Direct

1   BY MR. GUTWILLIG:

2   Q.  Can you describe that briefly?

3   A.  Well, there were many letters written in different

4   newspapers in different parts of the world, here in the United

5   States and in Latin America, in Europe, letters supporting my

6   role in the cultural policy work that we'd been doing.  There

7   were letters also by different academic and professional

8   organizations here in the United States and also in Central

9   America.

10          THE COURT:  All right.  That's sufficient.  Go ahead.

11  Q.  Just briefly, Professor Euraque, as the director of the

12  Institute of Anthropology and History, what were some of your

13  day-to-day responsibilities?

14  A.  My basic day-to-day responsibilities involved traveling

15  throughout the country, meeting with my regional directors in

16  virtually all parts of Honduras, to follow up on making sure

17  that policies that we designed in the Capital City of

18  Tegucigalpa was being followed by my subordinates.  And another

19  important element or part of my activities was to meet in

20  different parts of the country with mayors, particularly with

21  mayors in different regions of the country, especially those

22  mayors of municipalities that had within their jurisdiction

23  monuments, archeological sites, and museums.

24  Q.  Approximately how much of Honduras did you see in person

25  during your work in that role?

1    A.   95 percent.

2    Q.   What was the topic of your doctoral thesis?

3    A.   It was economic history of Northern Honduras.

4    Q.   Have you published any books related to modern Honduran

5    history?

6    A.   Six.

7    Q.   Have you published any journal articles relating to modern

8    Honduran history?

9    A.   Yes.

10   Q.   Approximately how many?

11   A.   About 50 or 60.

12   Q.   Has any of your work been subject to peer review in the

13   United States?

14   A.   Yes.

15   Q.   Have you ever acted as a peer reviewer for work related to

16   Honduras?

17   A.   Many times.

18   Q.   Have you ever participated in legal proceedings as an

19   expert in the United States?

20   A.   Yes.

21   Q.   In what kinds of cases?

22   A.   As an expert on country conditions in applications for

23   asylum in the United States.

24   Q.   How many times, approximately, have you acted as an expert

25   on behalf of asylum applicants?

1    A.  About 50, 55 times.

2    Q.  Were you paid for that work?

3    A.  Sometimes.  Sometimes I was pro bono.

4    Q.  Are you being paid for your work today?

5    A.  Yes.

6    Q.  What, approximately, is the rate?

7    A.  $150 an hour.

8    Q.  Is your fee dependent on the outcome of this trial?

9    A.  No.

10   Q.  What, if any, steps do you take to stay current regarding

11   Honduran history and its social and political systems?

12   A.  Well, I do the usual things that scholars do, which is

13   review the academic literature not only in history, but because

14   I do contemporary and modern Honduran history work by

15   anthropologists, political scientists, sociologists.

16           Because of my work as an expert on country conditions,

17   I also, of course, keep very close tabs on the media coverage

18   of Honduras both here in the United States, in Central America,

19   of course in Honduras.

20           I also, at least until the COVID, visited Honduras and

21   participated in many conferences over many years and usually

22   visited Honduras four, or five, or six times a year.

23   Q.  Will you be relying on a synthesis of those different types

24   of sources and methods during the course of your testimony

25   today?

1    A.  Yes.

2            MR. GUTWILLIG:  Your Honor, the government offers

3    Professor Euraque as an expert in Honduran history and its

4    social and political systems.

5            MR. SCHULMAN:  No objection, your Honor.

6            THE COURT:  Okay.  So offered and received.

7    BY MR. GUTWILLIG:

8    Q.  Are there political parties in Honduras?

9    A.  Yes.

10   Q.  What are the two largest political parties?

11   A.  Well, historically, it's been the National and the Liberal

12   Party.  More recently, after the coup of 2009, there's a third

13   party, which is in competition now with those first two

14   parties.

15   Q.  Do those parties have political platforms?

16   A.  Yes.

17   Q.  And how, if at all, are the parties' political platforms

18   relevant to elections?

19   A.  Well, they're not very directly relevant because while they

20   have position papers and platforms, the actual campaigning does

21   not involve, for example, debates over particular issues.

22   Individual politicians will refer to the issues, but, let's

23   say, unlike here in the United States where there's debates

24   that are scheduled and so forth amongst candidates, that does

25   not occur in Honduras.

1   Q.  Is there currently a term limit for serving as the

2   president of Honduras?

3   A.  No.

4   Q.  Was there previously a term limit?

5   A.  There was a term limit until early 2015.

6   Q.  Can you describe how that changed?

7   A.  The term limit existed because of Article 239 in the

8   Honduran current constitution from 1982, and in late 2014, a

9   number of deputies of the National Party of Honduras, who have

10  the majority in the congress, presented a -- basically a motion

11  or a brief to the Constitutional Chamber of Honduras, which is

12  kind of a subset or a grouping of five judges from the Honduras

13  Supreme Court, claiming that the Article 239 that limited the

14  terms of a president, and not only limited the term to four

15  years, but to reelection, the chamber -- the Constitutional

16  Chamber accepted the argument made by these congressional

17  deputies that claimed that the Article 239 was unconstitutional

18  because it violated the constitutional right that Honduran

19  citizens have to run for election.

20  Q.  When was Juan Orlando Hernandez elected president of

21  Honduras?

22  A.  In November of 2013.

23  Q.  When was his first term set to expire?

24  A.  To expire?  At the end of 2017.

25  Q.  And when was the limit on terms removed?

1    A.   2015.

2    Q.   Let's turn to another topic.

3             Is there a treaty in place between Honduras and the

4    United States relating to extradition?

5    A.   Yes.

6    Q.   Approximately how long has that treaty been in place?

7    A.   Well, there was an original treaty in 1912 that was amended

8    in 1928.

9    Q.   Did the 1912 treaty permit extradition for Honduran

10   drug-trafficking crimes?

11   A.   No.

12   Q.   Was that part of the treaty ever modified?

13   A.   1928.

14   Q.   And what was added in 1928?

15   A.   It permitted the extradition of Honduran citizens to the

16   United States if involved -- if it involved charges of drug

17   trafficking.

18   Q.   Prior to 2012, what, if anything, did the Honduran

19   Constitution say about extradition of Hondurans?

20   A.   It prohibited Honduran citizens from being extradited to

21   the -- to anywhere, in fact, for crimes, political crimes or

22   other kinds of crimes.

23   Q.   Were there any changes in 2012?

24   A.   In early 2012, January of 2012, congress, at the time,

25   amended the constitution, the 1982 constitution, to include a

clause, in effect, referencing that treaty of 1928 using the

language that inclusive of extradition now would be Honduran

citizens charged with trafficking, international trafficking,

of illegal drugs.

Q.   Were there any meetings of note that preceded that change?

A.   There was a meeting that was acknowledged in the press and

as well as a U.S. department press release of a meeting in

Miami on June -- I'm sorry, of January 18th that involved

President Pepe Lobo at the time in a delegation of state

Department Officials, and while what was actually discussed at

that meeting is not public, but what happened the day after, on

the return to Honduras from that visit to Miami, President Lobo

convened -- with the support of the president of the congress,

Juan Orlando Hernandez, and convened a special session of

congress and proposed the new language that I mentioned with

respect to amending the constitution to include language that

would involve the possibility of extraditing citizens of

Honduras charged with illegal drug trafficking.

Q.   You said January 18.  What year was that?

A.   2012.  I'm sorry.

Q.   What was the net effect of this change that happened?

A.   Well, the net effect is that it made real the existing

treaty of 1928, and then the supreme court, through a judgment,

accepted the change, and actually in the next year, in 2013,

and by -- I think at the end of 2013, certainly the beginning

of 2014, the United States submitted its first request for

extradition of Hondurans that it identified as involved in

international drug trafficking to the United States.  And so,

from 2014, the first extraditions began.

Q.  So to take a step back, the effect of this provision was to

allow extraditions for drug trafficking; is that correct?

A.  Yes.

Q.  What, if any, developments preceded that change?

A.  Well, the January 18th meeting of 2012 was preceded by

2011, of course, by two different phenomena.  One was the

broader phenomenon of the extraordinary amount of increased

violence associated with drug trafficking within Honduras —

massacres and various assassinations, very public — and a

citizens' call for doing something about that.

          But, more specifically, there was a murder in

December 2011 of a gentleman named Alfredo Landaverde, who was

a key advisor in drug policy, drug containment policy, if you

will, illegal drug containment policy, to another man whose

name was General Julian Aristides Gonzalez Irias, who was

murdered in December of 2009.  So these two murders between

December 2009 and the murder of December 2011 were sort of the

very public face of broader violence that was going on

throughout 2011 and even before.  And the 2011 murder, like the

December 2009 murder of General Aristides Gonzalez, was very

public murders that took —- that were hits, basically, in

1    public streets, which, of course, got not only a lot of

2    national press, but international press, and so it was after

3    the latter murder, that is in December of 2011, that a month or

4    so after Pepe Lobo went to Miami and had that meeting with the

5    State Department delegates.

6    Q.  So, by 2012, was there growing pressure to make an

7    exception to Honduras' policy of not extraditing people?

8    A.  Very much.

9    Q.  Was that pressure related to allowing Honduras to extradite

10   drug traffickers?

11   A.  Yes.

12   Q.  Is there a publicly available record of who voted in favor

13   of that legislation?

14   A.  No.

15   Q.  Has there recently been any proposed legislation in

16   Honduras related to extradition?

17   A.  Not proposed legislation.

18   Q.  Have there been any recent developments related to

19   extradition in Honduras?

20   A.  There have been pronouncements by various high level,

21   particularly National Party, political figures that it may be

22   time to reconsider the extradition treaty.

23   Q.  Time to reconsider what?

24   A.  The fact that it exists.

25   Q.  Effectively to end extraditions; is that right?

L3FKRAM6                        Euraque - Direct

1   A.  Yes.

2            MR. SCHULMAN:  Objection to form, Judge.

3            THE COURT:  I'll allow it.

4   BY MR. GUTWILLIG:

5   Q.  A few questions about Honduras generally, Professor.

6            What, approximately, is the median income in Honduras?

7   A.  Between 2500 to 3,000 dollars annually.

8   Q.  Is that a current figure?

9   A.  Yes.

10  Q.  In approximately 2010, what were those figures?

11  A.  About $2,000 annually.

12  Q.  Are you familiar with the Honduran City of Choloma?

13  A.  Yes.

14  Q.  What, approximately, is the population of the City of

15  Choloma?

16  A.  Choloma's population is about 200,000.

17  Q.  Is there a larger region that includes the Municipality of

18  Choloma?

19  A.  Choloma is the capital of the Municipality of Choloma, the

20  same names, and yes.

21  Q.  Does the broader municipality include a greater population?

22  A.  Probably another 75,000 or so.

23  Q.  Is Choloma municipality and the city itself a relatively

24  large city within Honduras?

25  A.  It's -- yeah, it must be one of the sixth -- sixth,

1    seventh, right around there, largest city of Honduras.

2    Q.  Are you familiar with the City of Puerto Cortes?

3    A.  Yes.

4    Q.  What is that?

5    A.  Puerto Cortes is the largest port -- export and import port

6    for goods coming from Europe and elsewhere, United States

7    especially.  It's located on the Caribbean coast of Honduras,

8    about 30 miles from Choloma, right on the Caribbean coast of

9    Honduras.  It's the largest exporting and importing port in all

10   of Central America, in fact.

11   Q.  Within the Honduran National Police, is there a rank of

12   commissioner?

13   A.  Yes.

14   Q.  Approximately how many commissioners at a time are there?

15   A.  Probably around 25 now.

16   Q.  Is that an important rank within the police?

17   A.  The highest rank.

18   Q.  I'd like to ask you about a few individuals and

19   organizations.

20            Are you familiar with Leopoldo Crivelli?

21   A.  Yes.

22   Q.  Who is Leopoldo Crivelli?

23   A.  Leopoldo Crivelli is the Mayor of Choloma.

24   Q.  Approximately how long has he been the Mayor of Choloma?

25   A.  He was elected the first time in November of 2005.

1   Q.  Are you familiar with FUSINA?

2   A.  FUSINA, yes.

3   Q.  What is that?

4   A.  FUSINA is the Spanish acronym for what an English

5   translates into the institute -- interinstitutional Security

6   Force, which was established around 2014, and it consists of --

7   it's basically a task force charged with investigating drug

8   trafficking in Honduras especially, and it consists of members

9   of different institutions who also have, to some degree, the

10  same charge.  So it's got members from the armed forces, it's

11  got members from the National Police, it's got a representative

12  from the Attorney General's Office, it's got members from the

13  Ministry of Security, and I think it also has a membership from

14  the Ministry of Defense.

15  Q.  Are you familiar with Leonel Sauceda?

16  A.  Yes.

17  Q.  Who is Leonel Sauceda?

18  A.  Leonel Sauceda Guifarro is a very high level commissioner

19  of police of Honduras.

20  Q.  About how long has he been a commissioner of police in

21  Honduras?

22  A.  I think he was promoted in 2018.

23  Q.  Are you familiar with Nelvin Sauceda?

24  A.  Nelvin Sauceda Argueta is the brother of Leonel Sauceda

25  Guifarro on the father's side.

1    Q.  And what's his position?

2    A.  He is a subcommissioner of police in the National Police of

3    Honduras.

4    Q.  Are you familiar with Rafael Leonardo Callejas Romero?

5    A.  Yes.

6    Q.  What position in Honduran government did that person hold?

7    A.  Rafael Leonardo Callejas Romero was President of Honduras

8    between 1994 and -- I'm sorry, between 1990 and 1994.

9    Q.  Was he known, in particular, for anything?

10   A.  Well, he was known for many things.

11   Q.  Was he known for being corrupt?

12   A.  Very much.

13              MR. SCHULMAN:  Objection, Judge.

14              THE COURT:  Again, ladies and gentlemen, this is

15   simply a reputation.  Some people have reputations that are

16   poorly deserved.  It doesn't mean they've done anything wrong.

17   This is how they're perceived.

18              I'll allow it, in context.

19   BY MR. GUTWILLIG:

20   Q.  Was President Callejas known for being corrupt?

21   A.  Well, he was charged in 1994 with many counts of abuse of

22   authority, embezzlement, larceny, and so -- and he was also

23   eventually, in 2015, charged by the U.S. Justice Department for

24   wire fraud, racketeering, and he eventually handed himself in

25   in early 2015 on that charge.

1         And the Honduran charges, he was never found guilty.

2    Q.  Are you familiar with Graneros Nacionales?

3    A.  Yes.

4    Q.  What is that?

5    A.  Graneros Nacionales is Honduras' most important rice

6    processing plant in the country.

7    Q.  Are you familiar with Fuad Jarufe?

8    A.  Fuad Jarufe, yes.

9    Q.  And who is that?

10   A.  He is one of the owners of Graneros Nacionales.

11   Q.  Where is Graneros Nacionales located within Honduras?

12   A.  It is located in Choloma.

13   Q.  Are you familiar with Rene Orlando Ponce Fonseca?

14   A.  Yes.

15   Q.  What role within Honduran government did that person hold?

16   A.  Well, in November 2017, he was appointed head of the armed

17   forces of Honduras by President Juan Orlando Hernandez.  Before

18   that, he also headed FUSINA on the North Coast of Honduras.

19   FUSINA has different bases.  And before that, he was commander

20   of the 105 Battalion, which is located in San Pedro Sula, which

21   is about ten minutes south of Choloma.

22   Q.  Are you familiar with Mel Zelaya?

23   A.  Yes.

24   Q.  What position within Honduran government did that person

25   hold?

L3FKRAM6                          Euraque - Direct

1    A.  He was President of Honduras between 2006 and 2009.

2    Q.  Are you familiar with Ricardo Alvarez?

3    A.  Yes.

4    Q.  And what position within Honduran government does that

5    person hold?

6    A.  He was mayor of the Capital City of Honduras, Tegucigalpa,

7    between 2006 and 2014.  And a member of the National Party.

8    Q.  Does he hold a position now?

9    A.  He is Vice President designee in the presidency of

10   Juan Orlando Hernandez.

11   Q.  Is Ricardo Alvarez a member of the National Party?

12   A.  Yes.

13   Q.  Are you familiar with Mauricio Oliva?

14   A.  Yes.

15   Q.  What position within Honduran government does that person

16   hold?

17   A.  He is President of the National Congress of Honduras.

18   Q.  Approximately how long has he been in that role?

19   A.  Since 2014.

20         MR. GUTWILLIG:  A couple of more names, your Honor.

21   Q.  Are you familiar with Oscar Fernando Chinchilla?

22   A.  Yes.

23   Q.  And what position within Honduran government does that

24   person hold?

25   A.  He is the Attorney General.

L3FKRAM6                         Euraque - Direct

1  Q.  For approximately how long has he been the Attorney

2  General?

3  A.  I also think since 2014.

4  Q.  Is he a member of any particular party?

5  A.  I am not sure of that.

6  Q.  Are you familiar with Marlene Banegas?

7  A.  Yes.

8  Q.  Who is that person?

9  A.  Marlene Banegas was an assistant attorney with the attorney

10  general's office who was assassinated in San Pedro Sula in

11  October of 2014.  She was at that time coordinator of assistant

12  attorney generals for that region.

13  Q.  As a coordinator, what would her responsibilities have

14  been?

15  A.  Basically supervising the cases that the different attorney

16  generals -- I mean assistant attorney generals in the region

17  were handling.

18  Q.  Was she a prosecutor?

19  A.  Yes.

20          MR. GUTWILLIG:  If I could just have a moment, please,

21  your Honor?

22          THE COURT:  You may.

23          (Pause)

24          MR. GUTWILLIG:  No further questions, your Honor.

25          THE COURT:  All right.

1              Mr. Schulman, would it be convenient for you to do

2       your cross from the seated position?

3              MR. SCHULMAN:  No, Judge.  I'd rather use the --

4              THE COURT:  All right.

5              MR. SCHULMAN:  With apologies to Garrett, Judge.

6              THE COURT:  That's quite all right.  I didn't know

7       whether you had a lengthy cross or a short cross.

8              MR. SCHULMAN:  I'm just not so comfortable with this

9       microphone over here and with the mask on, Judge.

10             THE COURT:  All right, that's fine.

11             But do you know how long your cross will be?

12             MR. SCHULMAN:  As brief as possible, Judge, but would

13      you like me to give you a time estimate?

14             THE COURT:  That was the thrust of the question.

15             MR. SCHULMAN:  More than six minutes.

16             THE COURT:  Thank you.

17             MR. SCHULMAN:  20 minutes to 30 --

18             THE COURT:  Thank you.

19             MR. SCHULMAN:  -- in that range.  I don't want to say

20      something and then have an issue with you, Judge.  But if I

21      tried to guess, I would say between 20 and 30 minutes 20, 25

22      minutes.

23             THE COURT:  But an estimate is a good-faith estimate,

24      and if it's in good faith and it's an estimate that's fine, but

25      overestimating doesn't make an estimate better if it's not a

L3FKRAM6                          Euraque - cross

```
 1    good-faith estimate.  I take your estimates as good faith.
 2              MR. SCHULMAN:  Of course, Judge.
 3              THE COURT:  All right.
 4              So you may inquire.
 5              MR. SCHULMAN:  Thank you.
 6    CROSS-EXAMINATION
 7    BY MR. SCHULMAN:
 8    Q.  Good afternoon, Professor.
 9    A.  Good afternoon.
10    Q.  Professor, there are two main political parties in
11    Honduras, right?
12    A.  Yes.
13    Q.  One of them is the Liberal Party?
14    A.  Yes.
15    Q.  And the other one is the National Party, right?
16    A.  Yes.
17    Q.  The Liberal Party does not have the same meaning as it has
18    here in the United States; is that fair to say?
19    A.  That's fair to say.
20    Q.  Similarly, the National Party is not associated with
21    nationalistic policies; you'd agree with that, right?
22    A.  I agree.
23    Q.  In fact, you would almost consider the National Party to be
24    almost the reverse as a party that's associated with
25    nationalistic policies; would you agree with that?
```

1    A.  Possibly.

2    Q.  And then there was a third party that has come onto the

3    scene over the last few years, correct?

4    A.  Correct.

5    Q.  The Libre Party; is that right?

6    A.  Libre.

7    Q.  Libre Party; is that right?

8    A.  Yes.

9    Q.  In 2013, that's the party that you supported; is that

10   right?

11   A.  No.

12   Q.  Well, you were outspoken in your support for the candidate

13   from that party; is that right?

14   A.  I had my opinion about it.

15   Q.  And you spoke about your opinion about the candidate from

16   that party, right?

17   A.  I may have, yes.

18   Q.  Now, generally, you would agree that Honduras and the

19   United States have a healthy relationship, right?

20               MR. GUTWILLIG:  Objection.

21               THE COURT:  I'll allow it.

22   A.  Yes.

23   Q.  The U.S. military trains the Honduran armed forces, right?

24   A.  Yes.

25   Q.  And even recently, the United States military is involved

L3FKRAM6                    Euraque - cross

1   in the training of Honduran military and Honduran armed forces;

2   is that right, Professor?

3   A.   Yes.

4   Q.   The United States is Honduras' biggest trading partner,

5   true?

6   A.   Yes.

7   Q.   Approximately 30 percent of the exports from Honduras come

8   here to the United States, right?

9   A.   Probably.

10  Q.   And the primary exports of Honduras include coffee as well

11  as bananas, right?

12  A.   Yes.

13  Q.   Now, over the last approximately eight years, let's say,

14  since the fall of 2012, call it nine years, San Pedro Sula is

15  recognized as the deadliest city in the whole world, right?

16          MR. GUTWILLIG:  Objection.

17          THE COURT:  I'll allow it.  By reputation, not for the

18  truth of its content but the reputation.

19  A.   I don't think it might be any more.  It was certainly in

20  2013, '14, '15.

21  Q.   Okay.  So in 2013 and 2014, 2015, San Pedro Sula was

22  recognized as the deadliest city in the world, right?

23          THE COURT:  It had that reputation.

24  Q.   It had that reputation?

25  A.   Yes.

L3FKRAM6                        Euraque - cross

1   Q.  And Honduras was recognized as the deadliest country in the

2   whole world, right?

3            THE COURT:  It had that reputation?

4            MR. SCHULMAN:  Thank you, Judge; apologize.

5            THE COURT:  As to the truth of it.

6   BY MR. SCHULMAN:

7   Q.  Honduras had the reputation of being the deadliest country

8   in the whole world?

9   A.  Well, I would qualify it by the fact that when that was

10  often stated — and it was stated — it was of countries not at

11  war.

12  Q.  Okay.  So, of countries not at war, Honduras was thought to

13  be the --

14  A.  Yes.

15  Q.  -- had the repetition — let me finish, please — had the

16  reputation to be the deadliest country in the world?

17  A.  Yes.

18  Q.  That statistic, if you will, that reputation that the

19  statistic is borne on is measured by the number of homicides

20  per 1,000 people in the population; is that right?

21  A.  Correct.

22  Q.  And the rates of impunity in Honduras in those years — in

23  2013, 2014, 2015 — was accepted to be approximately 90 percent,

24  right?

25  A.  90, 95 percent, yep.

1   Q.   When I say the rates of impunity, I'm talking about the

2   percentage of crimes that are not being prosecuted; right?

3   A.   Yes.

4   Q.   That's what you understand -- that's what that means,

5   right?

6   A.   Yes.

7   Q.   Honduras has, during this time that we're talking about,

8   has a murder rate, had the reputation of a murder rate, 20

9   times that which we enjoy here in the United States, right?

10  A.   Often, yes, depending what year, but, yes, more or less.

11  Q.   And San Pedro Sula, for example, was known to have a murder

12  rate of 40 times what we have here in the United States, right?

13  A.   Depending on what year, yes.

14  Q.   And individuals carry weapons for protection because of

15  these staggeringly high murder rates and violence rates, right?

16  A.   Well, I think they carry it for that and many other

17  reasons, yeah.

18  Q.   One of the reasons that people carry weapons is for

19  protection --

20  A.   Yes.

21  Q.   -- as a result of the high rates of violence within the

22  country, right?

23  A.   Definitely.

24           THE COURT:  All right, ladies and gentlemen, we're

25  going to call it a day.  I appreciate your cooperation today.

L3FKRAM6                          Euraque – cross

1    I clipped your lunch break and then I kept you here longer.  So

2    what kind of a friend am I?  But we're going to start up

3    tomorrow morning at 9:30, and we'll address your concerns.

4              What am I going to tell you?  Do not discuss the case

5    among yourselves or with anyone, keep an open mind.  Have a

6    pleasant evening, stay safe, and be here for a 9:30 sharp

7    start.  Thank you.  Leave the lunch orders in the jury room

8    filled out, if you possibly can.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (Jury not present)

2              THE COURT:  Let me hear from the government.  What

3    happens after we're done with this witness?

4              MR. LOCKARD:  It's hard to break the habit of standing

5    up.

6              After this witness, we expect we'll have two more fact

7    witnesses, Witness 1 and Witness 2 --

8              THE COURT:  I'm sorry.

9              MR. LOCKARD:  We'll have Witness 1 --

10             THE COURT:  Two more fact witnesses?

11             MR. LOCKARD:  Witness 1 and Witness 2.

12             THE COURT:  Witness 1 and witness 2?

13             MR. LOCKARD:  -- which will raise the issue addressed

14   in our letter from yesterday, followed by one more law

15   enforcement witness, and then one firearms expert witness, and

16   possibly an electronics expert, to be determined.

17             THE COURT:  Okay, all right.  A couple of things:

18             I have a note from Juror No. 1.  "Hello.  I have a

19   out-of-town trip on Friday the 19th.  I planned it out a few

20   weeks before jury duty."

21             I propose to speak to the juror tomorrow morning in

22   the presence of counsel, and it seems to me, I won't prejudge

23   it until I hear what he has to say, but jurors knew, from jury

24   selection, that this was scheduled to be about a two-week

25   trial, and this is within that two-week window.  Furthermore,

L3FKRAM6                        Euraque - cross

1      they were summoned for two weeks of jury duty.  That's the time

2      period that they're told by the jury department when they're

3      summoned.

4              So, it was not raised in voir dire, as best as I

5      recall, by Juror No. 1.  So, absent something unusual or

6      extraordinary, I'm expecting that I will not be excusing the

7      juror, nor will I be postponing the trial.  I think that's not

8      warranted under the circumstances.

9              Now, I received an email — and I think you all did —

10     from Inner City Press on the issue of access.

11             Let me hear what the position of the defendant is in

12     response to the government's position on this call-in line.  Is

13     there any objection to the call-in line not being available,

14     particularly during the testimony of Witness 1 and 2?

15             MR. MOSKOWITZ:  Your Honor, the defense position is

16     that while we would prefer that the line remain open, we were

17     not able to find any legal authority that would require your

18     Honor to do so; and, therefore, we leave it up to the

19     discretion of the Court.

20             THE COURT:  All right.

21             Well, let me start from the position that there was an

22     incident here in which the government learned -- sir, you may

23     step down.

24             THE WITNESS:  Okay.

25             (Witness temporarily excused)

L3FKRAM6                    Euraque - cross

1        THE COURT:  The government learned that some of the
2   court proceedings held on March 11th were audio-recorded and
3   posted to the internet on various social media and video
4   streaming sites.  As the Court pointed out, this is a flat-out
5   violation of the rules of this Court, specifically Rule 1.8,
6   and the government has expressed concern about this continuing
7   during the testimony of other witnesses, particularly witnesses
8   for whom the voice is a unique identifier.
9        Masking the voice is easier said than done because the
10   witness' voice would not be masked here in the courtroom, so it
11   would have to be some sort of a device that interfaced on the
12   telephone but not in the courtroom.
13        So, as I indicated when we first addressed this issue,
14   where did this phone line idea come from?  It arose during the
15   pandemic that there were times when the courthouse was closed
16   to the public and proceedings were held by the judge virtually
17   with the parties calling in, and the AT&T access line was the
18   only viable means for the public to participate or to hear.
19   There is a promise, in the Sixth Amendment, of a speedy and
20   public trial by an impartial jury.  And while these were not
21   trials, these were proceedings, and to ensure that the public
22   had access to these proceedings, since they could not enter the
23   courthouse, certainly, I would say from -- well, the last jury
24   in the first half of 2020 returned a verdict a year ago
25   tomorrow, and it was shortly after that that access to the

courthouse was limited and it remained limited until September, and then it opened up and then, again, with the Thanksgiving holiday, it closed down again, and then reopened on or about February 15, 2021.

So, the courthouse is open, and this courtroom is open, and I will note for the record that during the taking of testimony there have been a good number of spectators, about eight or ten spectators or perhaps they're affiliated with somebody in the case, but I've noted that there have been members of the press here. And the Court, prior to the impaneling of this jury, arranged for an overflow courtroom, courtroom 11D, for others who wanted to observe, where they could see and hear the trial in that courtroom.

So, the public access that exists today, wholly apart from this AT&T line, is the equivalent of the public access that has existed in this court for years. And, certainly, if the overflow courtroom, which does require social distancing, ever got crowded or close to being crowded, we'd open a second courtroom, but, under the present circumstances, without the AT&T line, the public has access to this proceeding, full access. No one has been excluded from this courtroom by this Court as long as there's a seat. And I think some people may find it more convenient to observe in an empty courtroom, where they can take notes and come and go as they please, without risking interference with the proceeding.

L3FKRAM6                          Euraque – cross

1                So, I'm going to grant the government's application.

2        In fact, I don't expect anticipating or continuing the AT&T

3        line in the future.  If there were another trial next week, I

4        probably wouldn't even start with the AT&T line because it's no

5        longer necessary for those who want to observe a trial.  So,

6        that's where I am.

7                Have a pleasant evening.  Remember, you all owe me a

8        letter tonight on the jury instructions.  Thank you, all, very

9        much.

10               (Adjourned to March 16, 2016 at 9:30 a.m.)

11                                 * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                    Page

DEVIS LEONEL RIVERA MARADIAGA

Cross By Mr. Moskowitz . . . . . . . . . . . 470

Redirect By Mr. Lockard  . . . . . . . . . . 559

DARIO EURAQUE

Direct By Mr. Gutwillig  . . . . . . . . . . 577

Cross By Mr. Schulman  . . . . . . . . . . . 599