L3GKRAM1

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        15 CR 379 (PKC)

5    GEOVANNY FUENTES RAMIREZ,

6              Defendant.

7    ------------------------------x
```

```
8                                       New York, N.Y.
                                        March 16, 2021
9                                       9:48 a.m.
10   Before:

                 HON. P. KEVIN CASTEL,
11
                                        District Judge
12                                        And A Jury

13                       APPEARANCES

14   AUDREY STRAUSS,
          United States Attorney for the
15        Southern District of New York
     MICHAEL LOCKARD
16   JACOB GUTWILLIG
          Assistant United States Attorneys
17
     AVRAHAM CHAIM MOSKOWITZ
18   EYLAN SCHULMAN
          Attorneys for Defendant
19
     ALSO PRESENT:
20
     JILL HOSKINS, Spanish Interpreter
21   SONIA BERAH, Spanish Interpreter
     MERCEDES AVALOS, USAO Spanish Interpreter
22   WALTER KROCHTAL, USAO Spanish Interpreter
     BRIAN FAIRBANKS, DEA Agent
23

24

25
```

L3GKRAM1

1                    (In open court; jury not present)

2                    THE COURT:  Professor, refresh my recollection on the

3        spelling of your last name?

4                    THE WITNESS:  E-u-r-a-q-u-e.

5                    THE COURT:  And that's pronounced?

6                    THE WITNESS:  Euraque.

7                    THE COURT:  Euraque?

8                    Okay.  Thank you.

9                    (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           (Jury present)

2           THE COURT:  Good morning, ladies and gentlemen.

3           JURY MEMBERS:  Good morning.

4           THE COURT:  I should explain to you why the draperies

5    are closed.  We found in other trials in this courtroom, that

6    there was glare that shined off of the Plexiglas booth, and

7    then shined back in the eyes of the jurors, and was blinding

8    them.  So, that's why it is.  I don't know if that still

9    pertains, but we've kept that up.

10           But, anyway, it's good to see you.  Thank you for

11    being here.

12           And, Mr. Euraque, the Court reminds you, you are still

13    under oath.

14           You may continue.

15           MR. SCHULMAN:  May I take my mask off?

16           THE COURT:  Yes, you may.

17           MR. SCHULMAN:  Good morning, your Honor.

18           THE COURT:  Good morning.

19    DARIO EURAQUE,

20    CROSS-EXAMINATION CONTINUED

21    BY MR. SCHULMAN:

22    Q.  Good morning.

23    A.  Good morning.

24    Q.  Professor, I think where we left off yesterday, we had

25    mentioned that one of the reasons that people in Honduras or

1    Hondurans carry weapons is for protection, right?

2    A.   Right.

3    Q.   And the reason for that, or one of the reasons, is because

4    the murder rate in San Pedro Sula is 40 times the amount that

5    we enjoy here in the United States, right?

6    A.   It has been, yes.

7    Q.   It's fair to say that it's a much more violent place than

8    the streets of New York City or here in the United States

9    anywhere, for that matter, right?

10   A.   Yes.

11   Q.   Not only do sometimes people carry weapons for protection,

12   but people who can afford it use body guards for protection,

13   right?

14   A.   Correct.

15   Q.   Many businesses hire bodyguards to protect their executives

16   who are working in Honduras, right?

17   A.   Yes.

18   Q.   Let's step back and talk a little bit about the

19   extraditions that you discussed yesterday.

20        In 1912, there was an extradition treaty between the

21   U.S. and Honduras, correct?

22   A.   Correct.

23   Q.   And that treaty was the basis for the reform that

24   ultimately occurred in 2012; isn't that right?

25   A.   Well, it was the 1928 version of that treaty.

L3GKRAM1                          Euraque - Cross

1    Q.  Okay.  So the updates in 1928 served as the basis for

2    ultimately -- for the reform that occurred in 2012, right?

3    A.  Right.

4    Q.  Notwithstanding the treaty, the Constitution, the Honduran

5    Constitution, didn't allow for extraditions until it was

6    changed back in 2012/2013, right?

7    A.  Correct.

8    Q.  And specifically, in 2012 and 2013, the law changed, right?

9    A.  Correct.

10   Q.  And the constitution was updated?

11   A.  It was amended, yes.

12   Q.  The constitution was amended in 2012/2013?

13   A.  At the -- yes.

14   Q.  The constitution was amended in 2012, and then the

15   legislature had to figure out the logistics, if you will, and

16   that occurred in 2013?

17   A.  Well, it was first -- the supreme court has a role in

18   there, but, yes, pretty much.

19   Q.  Until the update in 2012, if you will, Article 102 of the

20   constitution read that no Honduran may be expatriated, nor

21   handed over to the authorities of a foreign state, right?

22   A.  Yes.

23   Q.  And the amendment in 2012, you would agree, was a

24   relatively radical departure from the prior -- the status with

25   respect to extraditions, right?

1   A.   Yes.

2   Q.   Because the provision had been stable and untouched for so

3   long, more than a hundred years, frankly, or about a hundred

4   years?

5   A.   Yes.

6   Q.   Now, the impetus behind that change was the man who is

7   sitting in the same seat that you're sitting in yesterday,

8   right?

9   A.   I don't know who was sitting here before.

10   Q.   Are you not aware that Leo Rivera testified for the last

11   two or three days of this trial?

12   A.   Yeah, I didn't know he was here yesterday before me, but,

13   yes, he's been -- I understand he's been a witness here.

14   Q.   You understand that he's been testifying --

15   A.   Yes.

16   Q.   -- before the same jury?

17   A.   Of course, yes.

18   Q.   So, like I said, Leo Rivera -- by the way, was the leader

19   of Los Cachiros, right?

20   A.   Yet.

21   Q.   Along with his brother, Javier Rivera?

22   A.   Correct.

23   Q.   Leo Rivera, as you know, has accepted something like 78

24   killings, right?

25   A.   Correct.

L3GKRAM1                          Euraque - Cross

1   Q.  And his brother, Javier Rivera, has admitted to something

2   like 48 murders; isn't that right?

3   A.  I don't know about the latter, but I'm very familiar with

4   the former.

5   Q.  You didn't investigate how many murders his brother has

6   admitted to?

7                MR. GUTWILLIG:  Objection.

8                THE COURT:  Well, let me ask you:  Have you conducted

9   any investigation on these subjects?

10               THE WITNESS:  Sure, but not that specific -- the

11  specific point about how many murders --

12               THE COURT:  Well, let me ask you:  You have

13  investigated this individual?

14               THE WITNESS:  Oh, no, not the individual.  I've read

15  the -- what has been written about that and so forth, yeah, but

16  not --

17               THE COURT:  You read newspaper articles?

18               THE WITNESS:  Well, not just newspaper articles, but,

19  yes, that is --

20               THE COURT:  What else besides newspaper articles?

21               THE WITNESS:  Well, studies done by different academic

22  institutions and --

23               THE COURT:  Academic institutions have done studies on

24  this individual who testified in this courtroom?

25               THE WITNESS:  Not on the individual.

1          THE COURT:  That's what I'm asking you, sir.

2          THE WITNESS:  Okay.

3          THE COURT:  So other than newspaper articles, what do

4     you know about the conduct of the individual who you referred

5     to as having testified in this courtroom?

6          THE WITNESS:  What's in the press primarily.

7          THE COURT:  Okay.  Anything besides what's in the

8     press?

9          THE WITNESS:  No.

10          THE COURT:  Okay.

11          Sustained.

12    BY MR. SCHULMAN:

13    Q.  Well, you claim that --

14          THE COURT:  And any reference to what this witness

15    thinks about what some other witness did or didn't do is not

16    evidence in this case and should be disregarded by you.

17          And the same as to any opinions he may have as to what

18    the defendant on trial did or didn't do.  That's not entitled

19    to any consideration in this case.

20          Keep going.

21    BY MR. SCHULMAN:

22    Q.  Well, it's your position, or you would agree with me, that

23    Los Cachiros played a critical role in the extradition reform

24    in Honduras, right?

25    A.  Yes.  As part of the general violence, yes, of 2011

L3GKRAM1                        Euraque – Cross

1    especially, yes.

2    Q.   And specifically two of the murders --

3    A.   Yes.

4    Q.   -- that -- specifically, two of the murders that Los

5    Cachiros were responsible were the final straw in the

6    reformation of the extradition process, true?

7    A.   Yes.

8    Q.   And one of those murders was in December of 2009, right?

9    A.   Yes.

10   Q.   And that was the murder of General Aristides Gonzalez,

11   right?

12   A.   Correct.

13   Q.   And what made that murder particularly troubling -- well,

14   first of all, he was the head of the antidrug campaign for the

15   country?

16   A.   Correct.

17   Q.   But he was also murdered in Downtown Tegucigalpa?

18   A.   Correct.

19   Q.   He was murdered in broad daylight?

20   A.   Yes.

21   Q.   He was murdered because he was seriously investigating

22   criminal activities?

23   A.   Correct.

24              THE COURT:  Well, that's what you've read?

25              THE WITNESS:  Yes.

L3GKRAM1                          Euraque - Cross

1              THE COURT:  Okay.

2       BY MR. SCHULMAN:

3       Q.  Well, you've also written on this topic and called that the

4       final straw in the change, right?

5       A.  Yes.

6       Q.  And you've published scholarly articles on this exact

7       topic, true?

8       A.  Yes.

9       Q.  And another murder by Los --

10             THE COURT:  Let me just get something straight here.

11      You're an academic, right?

12             THE WITNESS:  Correct.

13             THE COURT:  Yes?

14             THE WITNESS:  Yes.

15             THE COURT:  And you proceed from the assumption that

16      this murder took place --

17             THE WITNESS:  Yes.

18             THE COURT:  -- and that a drug organization was

19      responsible for it, correct?

20             THE WITNESS:  Correct.

21             THE COURT:  But you don't investigate that?

22             THE WITNESS:  No, of course not.

23             THE COURT:  Okay.  Thank you.

24             Keep going.

25

L3GKRAM1                          Euraque – Cross

BY MR. SCHULMAN:

Q.   The other murder that you've called the final straw in the
extradition reformation was the murder of Alfredo Landaverde,
right?

A.   Correct.

Q.   That was in December 2011?

A.   Correct.

Q.   He was assassinated by corrupt police officers, right?

A.   Yes.

Q.   And the corrupt police officers were working in alliance
with Los Cachiros, right?

A.   Yes.

Q.   And according to you, that case remains unsolved?

A.   Yes.

Q.   But are you aware that Leo Rivera has confessed to that
killing?

A.   I may have read press reports about that.

          THE COURT:  You may have?  You don't know?

          THE WITNESS:  Well, it's been –– I mean, I've been
involved mostly here in this case right now.  So before, yes.

          THE COURT:  Do you sit down with the prosecutors and
regularly discuss with them what investigative leads they've
developed?

          THE WITNESS:  No.

          THE COURT:  Do they brief you on what's going on in

L3GKRAM1                         Euraque - Cross

1    their case?

2                    THE WITNESS:  No.

3                    THE COURT:  All right.  So, other than what you read

4    in the newspaper, what do you know?

5                    THE WITNESS:  Well, I have --

6                    THE COURT:  About who murdered who?

7                    THE WITNESS:  I read the Honduran newspapers and so

8    forth.  I mean, just, yeah, newspapers.

9                    THE COURT:  All right.  Thank you.

10                   That's not evidence of anything, ladies and gentlemen.

11                   Now, listen, you're people of common sense.  You could

12   be an academic, you could be a 30-year-old professor, and you

13   could write an article that says something like, you know, the

14   tone of this country changed when John Fitzgerald Kennedy was

15   assassinated by Lee Harvey Oswald in 1963.  There's nothing

16   wrong with writing that article or having that viewpoint as an

17   academic, but that academic didn't do the forensic examination,

18   wasn't on the Warren Commission, doesn't really know who did

19   what.  They accept this as their premise.  So this is an

20   accepted premise in this witness' research, but it's not

21   something that you need to accept as evidence of the conduct of

22   any individual on any particular occasion.  I think you all

23   understand my instruction.  I can see that you do.

24                   So, what this witness says he read in a newspaper is

25   not evidence that a person did or didn't do an act on a given

1   date directed at an individual.  Understood?

2           Thank you.  Proceed.

3   BY MR. SCHULMAN:

4   Q.  Yesterday you mentioned President Lobo visiting Miami as

5   part of the process to update -- to reform the extradition

6   rules, right?

7   A.  Yes.

8   Q.  That was in early 2012, you mentioned, right?

9           Sorry, withdrawn.

10  A.  Yes.  January 18th, 2012.

11  Q.  So January 18, 2012, is when President Lobo went to Miami,

12  right?

13  A.  Yes.

14  Q.  And that was exactly a month after the Landaverde murder,

15  right?

16  A.  Correct.

17  Q.  And, by the way, Landaverde was the chief advisor in the

18  antidrug organization to General Gonzalez, right?

19  A.  Correct.

20  Q.  And at that time, when President Lobo went to Miami,

21  obviously, he was the president of the country, right?

22  A.  Correct.

23  Q.  Juan Orlando Hernandez was the head of congress at the

24  time, right?

25  A.  Correct.

L3GKRAM1                        Euraque - Cross

1   Q.  And Juan Orlando Hernandez went with President Lobo to

2   Miami, correct?

3   A.  Yes.

4   Q.  The two of them were the two main individuals responsible

5   for negotiating and working with the United States to update

6   the extradition rules, right?

7   A.  Correct.

8   Q.  And they came to Miami, and they met with U.S. Government

9   officials to discuss extradition, true?

10  A.  Yes, with the State Department.

11  Q.  Specifically, they met with the Attorney General of the

12  United States?

13  A.  Well, in the State Department release, press release, it

14  didn't mention him specifically.

15  Q.  Well, are you -- well, do you know whether or not they met

16  with Attorney General Eric Holder at the time?

17  A.  Yes.  There were press reports that said that, yes.

18  Q.  And Eric Holder was the Attorney General --

19  A.  Yes.

20  Q.  -- of the United States, right?

21  A.  Correct.

22  Q.  This was under President Obama, correct?

23  A.  Correct.

24  Q.  And within 24 hours of that meeting between now President

25  Hernandez, then President Lobo, and Attorney General Eric

L3GKRAM1                        Euraque - Cross

1    Holder, the Honduran Congress passed the constitutional reform

2    to allow extradition, right?

3    A.   Correct.

4    Q.   And, again, President Hernandez put through or led the

5    reformation because he was the head of congress at the time?

6    A.   Correct.

7    Q.   A week after that, legislation was ratified, right?

8    A.   Yes.

9    Q.   And then there was a reversal on the ban to extradite

10   Honduran nationals at that point, right?

11   A.   Correct.

12   Q.   At the same time -- by the way, the National Party was in

13   control at that time, correct, of the government?

14   A.   Yes.

15   Q.   The National Party was in control of congress, right?

16   A.   Correct.

17   Q.   Because President Hernandez is affiliated with the National

18   Party, right?

19   A.   He had the majority, yes.

20   Q.   And we talked about it yesterday, sort of the reverse

21   policies as we have here in the United States, right?

22   A.   Correct.

23   Q.   So, the National Party was in control of the executive

24   branch through President Lobo, right?

25   A.   Yes.

L3GKRAM1                          Euraque - Cross

1   Q.  They were in control of the congress through -- led by now
2   President Hernandez, right?
3   A.  Correct.
4   Q.  And they were also controlled -- National Party also
5   controlled the supreme court at that time, also; isn't that
6   right?
7   A.  Correct.
8   Q.  And that was also an important part in updating the
9   extradition process, right?
10  A.  Yes.
11  Q.  Because the supreme court, who had been appointed by the
12  Honduran Congress, had to set up and devise the process for
13  extradition, right?
14  A.  Correct.
15  Q.  They had to figure out the logistics, if you will?
16  A.  Yes.
17  Q.  Now, speaking of president -- now President Hernandez, he
18  started as a congressman, right?
19  A.  Yes.
20  Q.  In 1997?
21  A.  '98, I think, but...
22  Q.  Fair enough.
23          He was elected in November of 1997?
24  A.  Correct.
25  Q.  And his term started in the beginning of 1998?

1   A.   Yes.

2   Q.   Now, one of the main focuses of President Hernandez since

3   he's been the president has been he's tried to address

4   corruption, right?

5   A.   Yes.

6   Q.   And he's taken a number of measures to address corruption

7   within the Honduran Government, right?

8   A.   Correct.

9   Q.   He allowed for extraditions to the United States?

10  A.   Correct.

11  Q.   He was one of the two most powerful people in Honduras to

12  put the process into place?

13  A.   Yes.

14  Q.   He led an institutional effort to clean up the police

15  department?

16  A.   Yes.

17  Q.   He established military police, right?

18  A.   Yes.

19  Q.   He legislated the new military -- he created a branch

20  called the new military police for public order, right?

21  A.   Correct.

22  Q.   And this new branch created by President Hernandez was

23  trained by the United States?

24  A.   Most of it, yes.

25  Q.   And that amounted to about 4,000 individuals, right, 4,000

1   members who were in this new branch?

2   A.  Yes.  About, yes.

3   Q.  And, by the way, that was separate from the group of

4   security that succumbed to the coup in 2009 that you mentioned

5   yesterday, right?

6   A.  Correct.

7   Q.  Now, yesterday you mentioned that the term limits have

8   effectively been repealed, right?

9   A.  Yes.

10  Q.  Now, you also are aware -- obviously, you stay up on

11  current politics because you're an expert on the topic, right?

12  A.  Yes.

13  Q.  President Hernandez has made no secret about the fact that

14  this is his last year in office, right?

15  A.  Correct.

16  Q.  And he's leaving in December of 2021, right?

17          THE COURT:  Sustained.

18  Q.  Under President Hernandez, approximately 24 Hondurans have

19  been extradited to the United States, right?

20  A.  About, yes.

21  Q.  The first Honduran to be extradited was a man called Carlos

22  Arnaldo Lobo, right?

23  A.  Yes.

24  Q.  He went by Negro?

25  A.  Negro Lobo, yes.

L3GKRAM1                         Euraque - Cross

1    Q.  Besides the 24 individuals that had been formally

2    extradited, there have been many who have negotiated their

3    surrenders, right?

4    A.  Yes.

5              MR. GUTWILLIG:  Objection.

6              THE COURT:  Sustained.

7    BY MR. SCHULMAN:

8    Q.  In the last seven years that President Hernandez has been

9    in power, there's been a substantial reduction in the

10   narco-trafficking through Honduras; isn't that right?

11             MR. GUTWILLIG:  Objection.

12             THE COURT:  Well, you put this witness on.  So the

13   government put this witness on as an expert on conditions in

14   Honduras.  That's a fair question.  The objection is overruled.

15             THE WITNESS:  Can you repeat the question, please?

16   BY MR. SCHULMAN:

17   Q.  Yes, of course.

18             Over the past eight years or seven years that

19   President Hernandez has been in power, there's been a

20   substantial reduction in the amount of narco-trafficking

21   through Honduras; isn't that right?

22   A.  Correct.

23   Q.  Specifically, in approximately 2013, approximately

24   87 percent of cocaine smuggling flights from South America

25   first landed in Honduras, you know that, right?

L3GKRAM1                          Euraque - Cross

1    A.  Yes.

2    Q.  And this year, that number is down to 4 percent; isn't that

3    right?

4    A.  I don't know the exact number, but it has been

5    substantially down, yes.

6    Q.  So, more or less -- I'm not holding you to the exact

7    statistics, but, more or less, the number went from 87 percent

8    of trafficking coming up towards the United States -- excuse

9    me, withdrawn.

10            The number went from 87 percent of cocaine traveling

11   from South America up to the United States, stopping in

12   Honduras, to now, more or less, let's call it, being 5 percent?

13   A.  About.

14   Q.  An 82 percent reduction, at least?

15   A.  Pretty much.

16   Q.  You mentioned the Marlene Banegas murder yesterday.  You

17   remember that?

18   A.  Yes.

19   Q.  You said that she worked for the Attorney General's Office

20   in Honduras?

21   A.  Yes.

22   Q.  Now, Ms. Banegas was killed by narcotics traffickers; isn't

23   that right?

24   A.  Yes.

25   Q.  And she was -- in connection with MS-13 gang members; isn't

L3GKRAM1                          Euraque - Cross

1    that right?

2    A.  Correct.

3    Q.  And corrupt police officers, right?

4    A.  Correct.

5    Q.  And those individuals were prosecuted for their crimes,

6    right?

7    A.  Yes.

8    Q.  And they were found guilty of killing Ms. Banegas; isn't

9    that right?

10   A.  Yes.

11   Q.  You also mentioned Rene Orlando Ponce Fonseca yesterday.

12   You remember that?

13   A.  Yes.

14   Q.  He's currently the chief of the Honduras Air Force; is that

15   right?

16   A.  No.

17   Q.  What's his current position?

18   A.  I don't know what his current position is.  He was

19   appointed head of the armed forces in late 2017.  I don't think

20   he remains in that position.  I think he was -- there was a

21   replacement for him, I think, last year.

22   Q.  So he was appointed chief of the Honduras armed forces in

23   December 2017?

24   A.  Yes.

25   Q.  He was born in 1961, right?

1    A.  About, yes.

2    Q.  He joined the Honduran armed forces back in the '80s?

3    A.  The early '80s.

4    Q.  He completed U.S. training courses, right?

5    A.  Yes.

6    Q.  Graduated from the U.S. Army Corps of Engineers?

7    A.  He took courses there.

8    Q.  In approximately 1992, I believe; is that right?

9    A.  Uh-huh.

10   Q.  Trained in South Carolina as well?

11   A.  Yes.

12   Q.  And he headed the 105th Brigade at some point, right?

13   A.  Yes.

14   Q.  Just for about a year; is that right?

15   A.  Yes.

16   Q.  From 2013 to 2014?

17   A.  About, uh-huh.

18   Q.  He was also the head of the FUSINA, which you talked about

19   yesterday; is that right?

20   A.  Yes.

21   Q.  Now, prior to this trial, you'd never heard the name

22   Geovanny Fuentes Ramirez, right?

23   A.  No.

24   Q.  Like you're not aware, before you came here, of

25   Mr. Fuentes Ramirez in any way, right?

L3GKRAM1                          Euraque – Cross

1   A.   Nope.

2   Q.   Now, this is not the first time you're testifying on behalf

3   of the U.S. Government, right?

4   A.   No.

5   Q.   And you're being paid for your testimony, right?

6   A.   Correct.

7   Q.   Approximately $150 an hour; is that right?

8   A.   Correct.

9   Q.   How many hours have you worked on this case so far?

10  A.   I haven't tabulated it.

11  Q.   More or less, how many hours have you worked on this case

12  so far?

13  A.   Gees.  Maybe 40, 50 hours.

14  Q.   You were here yesterday, obviously?

15  A.   Uh-huh.

16  Q.   Right?

17  A.   Uh-huh.

18  Q.   Is that a yes?

19          THE COURT:  You have to answer in words.

20          THE WITNESS:  Okay.  Yes.

21  BY MR. SCHULMAN:

22  Q.   You were here on Friday; is that right?

23  A.   Yes.

24  Q.   You were here on Thursday; is that right?

25  A.   Right.

L3GKRAM1                          Euraque - Cross

1    Q.  And you were here before Thursday, that wasn't the first

2    day you were here, was it?

3    A.  No.

4    Q.  You were here three or four days before even last Thursday?

5    A.  Yes.

6    Q.  Working with the attorneys on this case; is that right?

7    A.  Yes.

8    Q.  And working with other attorneys who are not even sitting

9    here, right?  Other attorneys who are working in coordination

10   with this group of attorneys?

11          Withdrawn.  It's not important.

12          Besides the time that you've spent here in the last

13   week, you're in touch with them at night, also; is that right?

14   A.  I send them emails, yes.

15   Q.  They send you emails, right?

16   A.  Yes.

17   Q.  They ask you to look up certain individuals, right?

18   A.  Correct.

19   Q.  They tell you individuals that they're looking into, if you

20   will, right?

21   A.  Yes.

22   Q.  And then you conduct your own research to support them in

23   the work that they're doing; fair to say, right?

24   A.  I tell them what I know about the individual, yes.

25   Q.  But you also do independent research about the individuals

L3GKRAM1                          Euraque - Cross

1   that they ask you about, right?

2   A.  Yes.

3   Q.  Like, obviously, all that information about General

4   Fonseca, you did research to figure all that information out,

5   correct?

6   A.  Uh-huh.

7             THE COURT:  Remember to answer in words.

8             THE WITNESS:  Yes.

9   BY MR. SCHULMAN:

10  Q.  Of course, they prepared you in advance of your testimony,

11  right?

12  A.  What do you mean, prepared me?

13  Q.  The attorney for the government told you the questions that

14  he was going to be asking you when you came up here and

15  testified; isn't that right?

16  A.  He mentioned certain institutions and individuals that I

17  would be asked about.

18  Q.  He didn't specifically -- you didn't specifically run

19  through the direct examination, and he practiced the questions

20  he was going to ask, and you practiced the answers that you

21  would share?

22  A.  Some of them, yes.

23  Q.  And you did that in the prior time that you worked with the

24  government; isn't that right?

25  A.  Correct.

L3GKRAM1                         Euraque - Cross

1  Q.  And you testified for them, similarly, back in 2019, right?

2  A.  Correct.

3  Q.  And you were paid at that same rate that you're being paid

4  now --

5  A.  Yes.

6  Q.  -- back in 2019, right?

7  A.  Correct.

8  Q.  And approximately how much did you earn working on that

9  case?

10  A.  I think, in total, about $11,000.

11  Q.  And, more or less, is that what you expect to earn on this

12  case?

13  A.  No.

14  Q.  You expect to earn more or less?

15  A.  Oh, less, much less.

16  Q.  Your hours are a little bit less on this one?

17  A.  Much less.

18          MR. SCHULMAN:  Your Honor, I'm all set.  Thank you.  I

19  have no further questions.

20          THE COURT:  All right.

21          Redirect?

22          Ladies and gentlemen, would you like to stand up and

23  stretch a little bit?

24          THE WITNESS:  Can I stretch?

25          THE COURT:  You may stand, sure.

L3GKRAM1                    Euraque - Redirect

 1              (Pause)

 2              MR. GUTWILLIG:  May I inquire, your Honor?

 3              THE COURT:  You may.

 4    REDIRECT EXAMINATION

 5    BY MR. GUTWILLIG:

 6    Q.  Professor Euraque, you just testified about the reduction

 7    in narcotics trafficking from Honduras; is that correct?

 8    A.  Yes, I did.

 9    Q.  Can you say whether that's attributable to the efforts of

10    Juan Orlando Hernandez or the efforts of the DEA?

11    A.  Can you repeat the question?

12    Q.  Sure.

13              Can you say whether that reduction is attributable

14    only to Juan Orlando Hernandez?

15    A.  Oh, I don't think it's attributable only to Juan

16    Orlando Hernandez.

17    Q.  Could it also be attributable to efforts by the DEA?

18    A.  Yes.

19    Q.  Other organizations?

20    A.  Yes.

21    Q.  Are you aware of allegations that former President Lobo

22    received bribes to prevent extradition?

23    A.  I read -- I read reports, press reports, about that.

24    Q.  So, you are aware of that?

25    A.  Yes.

1    Q.  Are you aware of allegations that Juan Orlando Hernandez

2    received bribes to prevent extradition?

3    A.  Yes, I read about that.

4    Q.  And you testified, correct, it wasn't until after a meeting

5    with the United States Justice Department, including the

6    Attorney General, that that changed, right?

7    A.  Correct.

8            THE COURT:  Allegations are only relevant to the

9    extent that they affect somebody else's conduct.  You know, if

10   you hear somebody is charged with something, maybe you won't go

11   to their birthday party, I don't know, but it's not proof of

12   anything.

13           Go ahead.

14   BY MR. GUTWILLIG:

15   Q.  You testified a moment ago about the final straw before the

16   extradition rules were changed; is that right?

17   A.  Yes.

18   Q.  You testified about two murders specifically, right?

19   A.  Correct.

20   Q.  Were there other factors or pressures that led to the

21   change in the extradition laws?

22   A.  Well, there was much condemnation internationally from

23   different human rights organizations about those, particularly

24   about the rate of impunity that was associated with the range

25   of the increase in violence, particularly in 2010 and 2011.

1    Q.  Was there pressure from the United States to change the

2    extradition laws?

3    A.  Very much.

4    Q.  Was there pressure from the United States State Department

5    to change the extradition laws?

6    A.  Yes.

7    Q.  And in addition to the Cachiros, which you mentioned, were

8    there also other large drug-trafficking organizations that

9    contributed to the change in the extradition laws?

10   A.  Yes.

11   Q.  Was Los Valles one of those organizations?

12   A.  Yes.

13   Q.  Are you familiar with the mission to support the fight

14   against corruption and impunity?

15   A.  I don't know what that is.

16   Q.  You were asked some questions on cross-examination about

17   the relationship between Honduras and the United States; is

18   that right?

19   A.  Yes.

20   Q.  And you described it as -- could you remind me how you

21   described it?

22   A.  Well, the attorney described it, and I assented to it.  I

23   don't remember the exact wording, his wording.

24   Q.  Sure.

25            Well, recently, have any United States senators

L3GKRAM1

1    proposed legislation relating to Honduras?

2              MR. SCHULMAN:  Objection.

3              THE COURT:  Sustained.

4              THE WITNESS:  Yes.

5              THE COURT:  Sustained, stricken.

6              When I sustain an objection, you don't answer the

7    question.  Okay?

8              THE WITNESS:  Thank you.

9              MR. GUTWILLIG:  Can I have a moment, please, your

10   Honor?

11             (Pause)

12             MR. GUTWILLIG:  Nothing further, your Honor.

13             THE COURT:  All right.  You may step down.

14             THE WITNESS:  Thank you.

15             (Witness excused)

16             THE COURT:  Let me hear from the government.  How many

17   witnesses do you have left in your case?

18             MR. GUTWILLIG:  Your Honor, we have two fact

19   witnesses, two expert witnesses, and possibly a third who would

20   be a short expert witness.

21             THE COURT:  All right.

22             And the two fact witnesses, how long do you expect

23   their direct testimony to be for each of them?

24             MR. GUTWILLIG:  I think approximately four hours for

25   Witness 1 and approximately an hour and a half for Witness 2.

L3GKRAM1

1          THE COURT:  Four hours for Witness 1, hour and a half
2    for Witness 2.
3          Now, the two experts, how long do you expect their
4    direct testimony to be?
5          MR. GUTWILLIG:  And I misspoke earlier.  A law
6    enforcement witness, one expert, and then potentially a second
7    expert.
8          THE COURT:  Just hang on a second.  So you said two
9    expert witnesses.  In fact, it's one expert witness and one law
10   enforcement witness; is that correct?
11         MR. GUTWILLIG:  That's correct.
12         THE COURT:  Okay.  Now, tell me how long you expect
13   the direct testimony to be for each of them.
14         MR. GUTWILLIG:  I would say that the law enforcement
15   witness will be around two and a half hours, the expert witness
16   would be no more than an hour, and then the possible second
17   expert witness would be very short, maybe half an hour.
18         THE COURT:  All right.
19         And that would conclude your case?
20         MR. GUTWILLIG:  That's right.
21         THE COURT:  All right.
22         I'm going to direct you and Mr. Lockard to review your
23   outlines of your examinations and see whether you can be more
24   succinct, so that we can accommodate our jurors in this case
25   and bring this case fairly and efficiently to conclusion.

L3GKRAM1

1            Will you do that?

2            MR. GUTWILLIG:  Yes, your Honor.

3            THE COURT:  Mr. Lockard, will you do that?

4            MR. LOCKARD:  Yes, your Honor.

5            THE COURT:  All right.  Thank you very much.

6            You may call your next witness.

7            MR. GUTWILLIG:  Your Honor, this is one of the

8     witnesses for whom we've made the motion to close the public

9     access line.

10            THE COURT:  Yes.  And that's been granted.

11            For anyone on the public access line, you should look

12     at the transcript of yesterday's proceedings after the jury was

13     dismissed, and you can read all about my ruling on this issue.

14            Ladies and gentlemen, this is an open courtroom.

15     Members of the public are welcome in this courtroom.  We also

16     provide alternate facilities for anyone who can't fit into the

17     courtroom to see it and hear it.  This is what we do in every

18     trial, not just this trial; this trial is not anything special

19     in that regard.

20            A telephone access line was something that we did in

21     this courthouse when we were not letting people in the front

22     door.  How else can the public know what is going on in the

23     courthouse, other than by having a public access line?  But

24     that need no longer exists now that the door to the courthouse

25     is open to anyone who wants to come.  Any member of the public

L3GKRAM1

1   is welcome.  I told you this in jury selection, or I guess the

2   first day, I said, you may have a friend who comes into the

3   courtroom, just let me know, it's perfectly fine if they come

4   in.  So, that's all, this is a routine trial management issue.

5   Thank you.

6            (Pause)

7            MR. MOSKOWITZ:  Your Honor, may we approach briefly?

8            THE COURT:  Yes, sure.

9            (Continued on next page)

L3GKRAM1

1          (At the sidebar)

2          MR. MOSKOWITZ:  Your Honor, I appreciate your Honor's

3     comments to the jury, but Mr. Gutwillig's announcing in open

4     court that -- in front of the jury that the government has

5     asked to close the public access with respect to two specific

6     witnesses raises a specter that is unfair to

7     Mr. Fuentes Ramirez.  It raises a specter that perhaps these

8     witnesses have a legitimate fear of Mr. Fuentes Ramirez.  In my

9     estimation, it requires a mistrial.

10          THE COURT:  All right.  Thank you.

11          Mr. Gutwillig?

12          MR. GUTWILLIG:  Your Honor, the motion to seal was

13     filed on the public docket.  We discussed this --

14          THE COURT:  And handed out to the jury?

15          MR. GUTWILLIG:  No, your Honor.

16          THE COURT:  So what is it, the fact that it's on the

17     public docket, have to do with Mr. Moskowitz's motion?

18          MR. GUTWILLIG:  I suppose it doesn't, your Honor.

19          THE COURT:  Okay.  Thank you.  Now, start again.

20          MR. GUTWILLIG:  Your Honor, I don't think there is any

21     prejudice to the witnesses.  There can be any number of reasons

22     for the public phone line.  There are people in the courtroom,

23     there have been people in the courtroom continuously, there has

24     been press in the courtroom.  This was reported; there is a

25     transcript of all of this.  This is no adverse inference to be

L3GKRAM1

1  drawn that would require a mistrial here.

2            THE COURT:  All right.

3            The Court went out of its way in its comments to make

4  it clear to the jury that this was, I think, as I put it,

5  routine case management, and I explained what this was all

6  about and how it was no longer necessary, and, therefore, the

7  impact of a stray comment is inconsequential.

8            On top of that, it will come out, and should come out,

9  in front of this jury, that the witnesses are testifying under

10  a pseudonym.  That's absolutely appropriate for that testimony

11  to come out.  They're not going to use their real name, and

12  there's nothing wrong with it coming out that it's simply

13  they're using a pseudonym with the permission of the Court.

14  You're not allowed to ask questions about why or what caused

15  anybody to ask for that.  Do you understand that?

16            MR. GUTWILLIG:  Yes, your Honor.

17            THE COURT:  But the fact that it's not the person's

18  actual name is appropriately elicited on direct examination or

19  on cross.

20            MR. MOSKOWITZ:  Your Honor, I'm going to object in

21  advance to bringing out that testimony.  I believe that does

22  prejudice Mr. Fuentes Ramirez.  The implication to a lay jury

23  that doesn't understand all of that and is going to presume

24  that there's something about Mr. Fuentes Ramirez, or his

25  supporters, or people that he's associated with that present a

L3GKRAM1

 1    risk to these witnesses, and that is prejudicial to

 2    Mr. Fuentes Ramirez.

 3         THE COURT:  So you would propose to have the person

 4    lie about their name and make no comment on it?  The premise in

 5    trials is that members of the public may know a witness or may

 6    come to learn of a witness, and the fact that the witness is

 7    not testifying with their true name may be relevant.  It may

 8    come out in documents, it could come out in cross-examination.

 9    So, that's my ruling.  Unless you have some contrary authority.

10    If you have authority from the circuit, from the Supreme Court,

11    or from other district courts, I'm all ears.

12         MR. MOSKOWITZ:  Your Honor, I have not researched this

13    because it was my understanding, my presumption, perhaps —

14    maybe I was wrong — that it wasn't going to come out.  That's

15    certainly the way we've approached it throughout the pretrial.

16         THE COURT:  You don't want to bring it out?  If you

17    don't want to bring it out, that's fine with me.  Okay.

18         (Continued on next page)

19

20

21

22

23

24

25

L3GHRAM2                         Sanchez - Direct

```
 1                  (In open court; jury present)

 2                  THE COURT:  That last question was directed to the

 3      government, so the record is clear.

 4                  All right.  Call your next witness.

 5                  MR. GUTWILLIG:  Your Honor, the government calls Jose

 6      Sanchez.

 7                  THE COURT:  All right.

 8                  THE DEPUTY CLERK:  You can take your mask off.  Raise

 9      your right hand.  You could sit.

10      JOSE SANCHEZ,

11           called as a witness by the Government,

12           having been duly sworn, testified as follows:

13                  THE COURT:  You may inquire.

14      DIRECT EXAMINATION

15      BY MR. GUTWILLIG:

16      Q.  Good morning, Mr. Sanchez.

17      A.  Good morning.

18      Q.  How old are you?

19      A.  Forty-five years old.

20      Q.  Where were you born?

21      A.  San Pedro Sula.

22                  THE COURT:  You have to hold the microphone -- twist

23      the tip of the microphone so it faces you, sir.  The tip, the

24      end of it, has to be facing you.  Thank you.

25      Q.  How long did you live in Honduras?
```

1   A.  Forty years.

2   Q.  Do you still live in Honduras now?

3   A.  No.

4   Q.  Do you live in the United States now?

5   A.  Yes.

6   Q.  When did you come to the United States?

7   A.  In the year 2015.

8   Q.  Why did you come to the United States?

9   A.  I fled my country.

10  Q.  Why did you flee your country?

11  A.  Because my life was in danger.

12  Q.  Why did you believe your life was in danger?

13  A.  Because I was a witness and was present at two meetings

14  between defendant and Mr. Juan Orlando Hernandez.

15          MR. GUTWILLIG:  Ms. Hurst, could you please pull up

16  what's in evidence as Government Exhibit 103.

17  Q.  Mr. Sanchez, do you recognize this picture?

18  A.  Yes.

19  Q.  Who is it?

20  A.  Geovanny Fuentes Ramirez.

21          MR. GUTWILLIG:  Thank you, Ms. Hurst.

22  Q.  You testified a moment ago that you were present for

23  meetings between the defendant and Juan Orlando Hernandez, is

24  that correct?

25  A.  Yes.

L3GHRAM2                        Sanchez - Direct

1   Q.  What were some of the things they talked about at those

2   meetings?

3   A.  Protection and transportation of drugs.

4   Q.  Did the defendant give anything to Juan Orlando Hernandez

5   during those meetings?

6   A.  Yes.

7   Q.  What did the defendant give Juan Orlando Hernandez during

8   those meetings?

9   A.  He paid him two bribes.

10  Q.  For how much?

11  A.  One of $15,000 and another of $10,000.

12  Q.  Did you ever see the defendant give money to any other

13  government official in Honduras?

14  A.  Yes.

15  Q.  To whom?

16  A.  Mr. Julio Cesar Barahona.

17  Q.  Who is Julio Cesar Barahona?

18  A.  At the time he was the judiciary president of the Honduran

19  judiciary branch.

20          THE INTERPRETER:  Interpreter correction:  "Judicial

21  branch."

22  Q.  Approximately when did you see the defendant give him

23  money?

24  A.  That was in 2011.

25  Q.  And for what purpose did the defendant give him money?

L3GHRAM2                           Sanchez - Direct

1           MR. MOSKOWITZ:  Objection.

2           THE COURT:  If you know.  Lay a foundation for how he

3   would know.

4   Q.  Were you present when the defendant gave Julio Cesar

5   Barahona money?

6   A.  Yes.

7   Q.  Were you present -- were they talking while you were

8   present?

9   A.  No.

10  Q.  Did you hear either of them say anything while you were

11  present?

12  A.  Yes.  Yes, Mr. Julio Cesar Barahona.

13  Q.  And what did Julio Cesar Barahona say?

14  A.  He came into the office, greeted everyone, and he said:

15  Here I am.  The boss has sent me to help the guy in whatever I

16  could.

17  Q.  OK.  We'll come back to that later.

18          Did you ever hear the defendant talk on the phone

19  about the Cachiros?

20  A.  Yes.

21  Q.  Did you ever hear the defendant on the phone talking about

22  drug trafficking with the Cachiros?

23  A.  Yes.

24  Q.  What did you hear him say?

25  A.  He was answering a telephone call, and he was telling the

L3GHRAM2                           Sanchez - Direct

1   person on the other line that he would soon get on his feet
2   because he was starting to work with the Cachiros.
3   Q.  Based on your understanding of what you heard, what does
4   "get on his feet" mean?
5           MR. MOSKOWITZ:  Objection.
6           THE COURT:  No, I'll allow it.
7   A.  That he was going to financially do well.
8   Q.  What did you do for work when you lived in Honduras?
9   A.  I was an accountant.
10  Q.  Did you go to school to become an accountant?
11  A.  Yes.
12  Q.  What school did you attend?
13  A.  I graduated from the Instituto Departamental Debe y Haber.
14  Q.  With what degree did you graduate?
15  A.  The degree -- a degree in business and public accounting.
16  Q.  Where in Honduras did you work as an accountant?
17  A.  San Pedro Sula and Choloma.
18  Q.  Did you work at a particular company as an accountant?
19  A.  At Graneros Nacionales.
20  Q.  What type of business is Graneros Nacionales?
21  A.  It's a rice company.
22          MR. GUTWILLIG:  Ms. Hurst, could you please pull up
23  for the witness what's marked as Government Exhibit 6.
24  Q.  Do you recognize this?
25  A.  That is the Choloma city map.

L3GHRAM2                          Sanchez - Direct

```
 1   Q.  Is it a fair and accurate representation of Choloma city?
 2   A.  Yes.
 3             MR. GUTWILLIG:  Your Honor, the government offers
 4   Government Exhibit 6.
 5             MR. MOSKOWITZ:  No objection.
 6             THE COURT:  Received.
 7             MR. MOSKOWITZ:  I would note, Judge, my monitor
 8   doesn't appear to be working.
 9             THE COURT:  All right.  Let's see whether we can get
10   that fixed.  If you need to get up and look at the other
11   monitor, that's perfectly acceptable for the moment.
12             MR. MOSKOWITZ:  Got it.
13             THE COURT:  The old jiggle the wire trick.
14             Go ahead.
15   BY MR. GUTWILLIG:
16   Q.  Is Graneros located somewhere on this map?
17   A.  Yes.
18   Q.  Could you please describe where.
19   A.  To the right of the highway that leads to Puerto Cortes.
20             MR. GUTWILLIG:  Ms. Hurst, could you please pull up
21   for the witness what's been marked as Government Exhibit 8.
22   Q.  Do you recognize this?
23   A.  Yes.
24   Q.  What is it?
25   A.  It's a map showing the location of the company.
```

L3GHRAM2                          Sanchez – Direct

1    Q.   What do you mean by "the company"?

2    A.   The grounds where the company is located.

3    Q.   What's the name of the company?

4    A.   Graneros Nacionales S.A. de Choloma.

5    Q.   Is this a fair and accurate representation of a map showing

6    Graneros Nacionales in Choloma?

7    A.   Yes.

8            MR. GUTWILLIG:   The government offers Government

9    Exhibit 8.

10           Graneros Nacionales.

11           MR. MOSKOWITZ:   No objection.

12           THE COURT:   Received.

13           (Government's Exhibit 8 received in evidence)

14   BY MR. GUTWILLIG:

15   Q.   About how long did you work at Graneros Nacionales?

16   A.   Around 15 years.

17   Q.   Generally, what were your responsibilities when you worked

18   there?

19   A.   Preparation of financial statements, as well as control of

20   income and expenses of the company.

21   Q.   Were you responsible for issuing and receiving checks?

22   A.   Yes.

23   Q.   Who owned Graneros?

24   A.   Mr. Fuad Jarufe Larach.

25   Q.   Did Mr. Fuad Jarufe have any children?

L3GHRAM2                          Sanchez - Direct

1   A.  Yes.

2   Q.  Did any of them work at Graneros?

3   A.  Yes.

4   Q.  What were their names?

5   A.  Licenciado Jorge Jarufe and John Jarufe, engineer.

6   Q.  About when did you meet the defendant?

7   A.  Around 2003.

8   Q.  How did you meet him?

9   A.  My boss' younger son, John Jarufe, engineer, brought him to

10  the company.

11  Q.  When was the first time you saw the defendant at the

12  company?

13  A.  In 2003.

14  Q.  And to be clear, by "company," do you mean Graneros?

15  A.  Yes.

16  Q.  When he first began coming to the company, about how often

17  did the defendant come?

18  A.  Once per week.

19  Q.  Did he come alone or with others?

20  A.  He was accompanied by one individual.

21  Q.  What were some of the things that the defendant would do at

22  Graneros?

23  A.  He would come in to visit and greet John Jarufe, the

24  engineer.

25  Q.  Did the defendant bring money to Graneros?

L3GHRAM2                        Sanchez - Direct

1    A.   On occasion, yes.

2    Q.   How, in what form, did the defendant bring money to

3    Graneros?

4    A.   It was wrapped in rubber bands, in $20 bills.

5    Q.   $20 U.S. currency bills?

6    A.   Yes.

7    Q.   At the beginning about how much money would the defendant

8    to Graneros at each time?

9    A.   Ten to $15,000.

10   Q.   About how frequently would he bring that money?

11   A.   Sometimes twice, sometimes three times per month.

12   Q.   Over time did the defendant begin coming to Graneros more

13   frequently?

14   A.   Yes.

15   Q.   About how often?

16   A.   Three, four times until he started coming in every day.

17   Q.   Over time did he begin bringing more money each time he

18   came?

19   A.   It was always twice, three times per month.

20   Q.   About how much money did he bring on those occasions?

21   A.   $10,000, $15,000.

22   Q.   And how was that money packaged?

23   A.   In bundles, $20 bills wrapped in rubber bands.

24   Q.   On each of these occasions, did you personally accept this

25   money from the defendant?

L3GHRAM2                              Sanchez – Direct

1    A.  I did receive it.

2    Q.  What did you do with the dollars you accepted from the

3    defendant?

4    A.  I would organize them, count them, and then deposit them.

5    Q.  What did you give him in exchange?

6    A.  A check in lempiras.

7    Q.  Was the defendant the only Graneros customer from whom you

8    purchased dollars in $20 bills?

9    A.  Yes.

10   Q.  In Honduras is there a deposit limit for $20 bills?

11   A.  Yes.

12   Q.  What was that limit?

13   A.  $2,000.

14   Q.  $2,000 per deposit, is that correct?

15   A.  Per deposit, yes.

16   Q.  When was the last time you saw the defendant exchange U.S.

17   dollars at Graneros?

18   A.  In 2014.

19   Q.  Did you have an understanding as to the source of the U.S.

20   dollars the defendant brought to Graneros?

21   A.  Yes.

22   Q.  And what was that understanding?

23              MR. MOSKOWITZ:  Objection, Judge.

24              THE COURT:  Yes, unless you lay a foundation,

25   sustained.

L3GHRAM2                              Sanchez - Direct

1   Q.  Did there come a time when you saw a cattle truck accident?

2   A.  Yes.

3   Q.  Where was that?

4   A.  On the highway to Puerto Cortes as I was heading to

5   San Pedro Sula.

6   Q.  What did you see?

7   A.  It was a white cattle transportation truck.

8   Q.  Did you recognize anything about the truck?

9   A.  Yes.

10  Q.  And what did you recognize?

11  A.  It's one of the ones that are used in Honduras for drugs

12  transportation.

13          MR. MOSKOWITZ:  Objection.

14          THE COURT:  Yes, sustained.  Stricken.  Lay a

15  foundation.

16  Q.  What did the truck look like?

17  A.  It was hauling a trailer with openings for the cattle to be

18  able to breathe.

19  Q.  Was it the type of truck that could be used to transport

20  livestock?

21  A.  Yes.

22  Q.  After you saw this, did you talk with one of the

23  defendant's workers?

24  A.  Yes.

25  Q.  Where did that conversation occur?

L3GHRAM2                          Sanchez – Direct

1    A.   At Graneros Nacionales security area.

2    Q.   About how long after you saw the cattle truck accident did

3    that happen?

4    A.   Two days later.

5    Q.   Did that person talk about the cattle truck accident?

6    A.   Yes.

7    Q.   What did he say?

8            MR. MOSKOWITZ:   Objection.

9            THE COURT:   One second, please.   I'll allow it as an

10   admission against interest.

11           Go ahead.

12           MR. MOSKOWITZ:   Your Honor, can we be heard on this?

13           THE COURT:   Sure.   Ladies and gentlemen, you can stand

14   up and stretch for a moment.

15           (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. MOSKOWITZ:  Your Honor, the current state of the

3     record is that somebody who worked for Mr. Fuentes in some

4     capacity makes a statement about what was in the cattle car

5     without any foundation as to how he would know, whether he was

6     involved in it, whether it wasn't against his penal interest.

7     Your Honor's going to direct the jury that the fact that you

8     know something doesn't mean that you're involved, doesn't mean

9     that you -- that you're part of the conspiracy.  There's no

10    basis for saying that the statement is against this person's

11    penal interest.

12         THE COURT:  Well, yes, there is.  Why don't you step

13    back a little bit.

14         So there's a fair point in what you made, and I'll

15    address the fair point.  But the statement by a man with a

16    cattle truck that the cattle truck is carrying drugs, that he

17    knows that it's carrying drugs, is a statement against his

18    penal interest when he makes it.  Tying it to the defendant is

19    an entirely different matter.  That doesn't tie it to the

20    defendant.

21         MR. MOSKOWITZ:  I think what's missing, Judge, is we

22    don't have any evidence that this person was driving the truck,

23    was in the truck.  The government hasn't elicited that, and

24    they can't elicit it because they don't know.  They're not

25    going to say -- this witness is not going to say the man told

1   me I was driving the truck that had drugs in it.

2          THE COURT:  So what's the proffer as to the man?

3          MR. GUTWILLIG:  The proffer as to the man is that he

4   was one of the defendant's workers.  I don't have a specific

5   proffer that he was driving the truck or was with the truck.  I

6   think that I will be able to elicit that the witness had seen

7   this person previously with the defendant; that the day he had

8   this conversation, the defendant was at Graneros.  And what I

9   expect the witness to say is that he will say something to the

10  effect of "we lost the load" and that --

11         THE COURT:  The individual will have said this?

12         MR. GUTWILLIG:  Will say something, the worker.

13         THE COURT:  Right.  It appears to me -- not the

14  business about him being the defendant's worker.  That's a

15  separate issue -- but the fact that "we lost the load," if

16  that's what the government's understanding is, makes it, in my

17  view, a statement against the penal interest of the declarant

18  when made, and that's all I'm ruling on right now.  Tying it in

19  to the defendant is a whole different kettle of fish.

20         (Continued on next page)

21

22

23

24

25

L3GHRAM2                          Sanchez - Direct

1                    (In open court; jurors present)

2                    THE COURT:  You may proceed.

3       BY MR. GUTWILLIG:

4       Q.  A moment ago we were talking about a conversation you had a

5       couple days after you saw the cattle truck accident.  I think

6       where we left off is that I had asked what the individual said

7       to you at Graneros.

8       A.  I was in the security area, and I approached him to ask him

9       to vacate the area because it was a prohibited area, and he

10      told me that he was there because his boss was annoyed because

11      his deal had fallen through.

12      Q.  Did he use a particular Spanish phrase in saying that to

13      you?

14      A.  *Se le había caído la vuelta.*

15      Q.  And what do you understand that *se le cayó la vuelta* to

16      mean?

17      A.  That his drugs had been seized.

18      Q.  Had you heard that phrase used before?

19      A.  Yes.  Yes, it's a very common phrase in Honduras.

20      Q.  In what context had you heard it before?

21      A.  Same context.

22      Q.  What do you mean by same context?

23      A.  In Honduras, *se le cayó la vuelta* is always referring to a

24      deal gone bad.

25      Q.  Had you ever heard that phrase used in connection with drug

L3GHRAM2                          Sanchez - Direct

1   traffickers in Honduras?

2   A.   Yes.

3   Q.   Any drug traffickers in particular?

4           MR. MOSKOWITZ:   Objection.

5           THE COURT:   Yes, that's sustained.   You've established

6   your point.   Go ahead.

7   Q.   At the time you had this conversation -- or strike that.

8           Did you see the defendant the day you had this

9   conversation?

10  A.   Yes, he was in my boss' office.

11  Q.   Your boss Fuad Jarufe, is that right?

12  A.   Yes.

13  Q.   And what was the defendant's demeanor when you saw him?

14  A.   His demeanor was that of being upset.

15  Q.   You testified earlier that you overheard the defendant on

16  the phone talking about the Cachiros.   Was that after you saw

17  the cattle truck accident?

18  A.   Yes.

19  Q.   Do you know who the Cachiros are?

20  A.   Yes.

21  Q.   Who are they?

22  A.   At the time, they were the most powerful drug trafficking

23  gang in Honduras.

24  Q.   Did you ever meet a Cachiros?

25  A.   Yes.

L3GHRAM2                          Sanchez – Direct

1    Q.  Which one?

2    A.  The youngest one, Santos Isidro Rivera Maradiaga.

3    Q.  Where did you meet him?

4    A.  At the office in Graneros Nacionales.

5    Q.  About when did that meeting occur?

6    A.  That was in 2012.

7    Q.  When you met him, did you know who he was?

8    A.  No.

9    Q.  Other than Isidro, have you met any other of the Cachiros?

10   A.  No.

11   Q.  For what reason was Isidro at Graneros when you met him?

12   A.  He was selling a load of rice.

13   Q.  How did you respond?

14   A.  I was rude to him, and -- because it was my lunch hour, and

15   I told him that not even one's lunch hour was being respected.

16   Q.  What did you do next?

17   A.  I prepared the check.  I gave him the check for the rice.

18   I told him to wait in my office for me, but he came after me,

19   and so we went to my boss' office for him to sign the check.

20   And then once in his office, my boss asked me if I knew who the

21   Cachiros were, and I said that I had heard of them, but I did

22   not know any of them.  And he said that this was Cachirin,

23   referring to Santos.

24   Q.  What was your reaction?

25   A.  Fear.

L3GHRAM2                          Sanchez - Direct

1    Q.  Did there come a time that Santos Isidro came to Graneros

2    with the defendant?

3    A.  Yes.

4    Q.  For what purpose?

5    A.  Santos came to sell some cattle heads.

6    Q.  About how much cattle was he selling?

7    A.  500 heads of cattle.

8    Q.  For approximately what price was he selling each head?

9    A.  I do not remember the price, but it was a price lower than

10   50 percent.

11   Q.  And based on your experience working at Graneros, why would

12   the price be lower than usual?

13            MR. MOSKOWITZ:  Objection.

14            THE COURT:  Overruled.

15   A.  At the time the price for each head of cattle was 7,500

16   lempiras, and he was selling each head for 3,000 lempiras.

17   Q.  Did you believe that there was a significance to the lower

18   price?

19   A.  Yes.

20   Q.  Based on your experience at Graneros, what was that

21   significance in your view?

22   A.  It was cattle used in drug transportation.

23   Q.  Did you ever see Santos Isidro and the defendant together

24   on other occasions?

25   A.  Yes.

L3GHRAM2                              Sanchez - Direct

1   Q.  At Graneros?

2   A.  Yes.

3   Q.  About how often?

4   A.  I saw him two more times.

5   Q.  Turning to a different topic, did you ever deliver money to

6   the defendant or to his workers?

7   A.  Yes.

8   Q.  Who asked you to do that?

9   A.  My boss, Mr. Fuad Jarufe.

10  Q.  About how many times did he ask you to do that?

11  A.  On two occasions.

12  Q.  And about when did those two occasions occur?

13  A.  They were before the drug lab raid.

14  Q.  What do you mean by "the drug lab raid"?

15  A.  The raid that was carried out on defendant's property where

16  a drug lab was discovered.

17  Q.  About when did that occur?

18  A.  In 2011.

19  Q.  You were asked to deliver money after that, is that

20  correct?

21  A.  Before the raid.

22  Q.  Where were you asked to deliver the money?

23  A.  To the Cerro Negro property.

24  Q.  Focusing on the first time, who told you to deliver the

25  money?

1    A.  My boss, Mr. Fuad Jarufe.

2    Q.  What, if anything, did Fuad Jarufe ask you to do?

3    A.  He said to me:  Please do me a favor and take this money,

4    because there's nobody else to bring it to Geovanny's property.

5    And I said yes.

6    Q.  What, if anything, did he say that the money was for?

7            MR. MOSKOWITZ:  Objection.

8            THE COURT:  Overruled.

9    Q.  What, if anything, did he say that the money was for?

10   A.  It was payroll to pay the defendant's employees.

11   Q.  About how much money was it?

12   A.  It was around 14,000 lempiras.

13   Q.  How was the money packaged?

14   A.  It was in a manila folder in several denominations.  It was

15   a manila envelope in several denominations.

16           THE INTERPRETER:  Interpreter correction:  "In several

17   denominations."

18   Q.  How did you travel from Graneros to Cerro Negro?

19   A.  It's close to the company.  I leave the company, turn left

20   at the light.  I drive to Aldea La Jutosa.  I go past the

21   village, and I do up the hill.

22   Q.  Were you armed?

23   A.  No.

24   Q.  Did anyone go with you?

25   A.  No.

L3GHRAM2                          Sanchez - Direct

1          MR. GUTWILLIG:  Ms. Hurst, could you please pull up

2     for the witness Government Exhibit 5.

3     Q.  Do you recognize this?

4     A.  Yes.  It's access map to Aldea La Jutosa.

5     Q.  Is that a fair and accurate representation of the access

6     the way you took to La Jutosa?

7          THE INTERPRETER:  For the interpreter, repeat the

8     question, please.

9     Q.  Is that a fair and accurate representation showing the area

10    you just described?

11    A.  Yes.

12         MR. GUTWILLIG:  Your Honor, the government offers

13    Government Exhibit 5.

14         THE COURT:  Any objection?

15         MR. MOSKOWITZ:  No objection.

16         THE COURT:  Received.

17         (Government's Exhibit 5 received in evidence)

18    BY MR. GUTWILLIG:

19    Q.  Do you see Choloma on this map?

20    A.  Yes.

21    Q.  And do you see La Jutosa on this map?

22    A.  Yes.

23    Q.  Does this map reflect the route you took from Graneros to

24    Cerro Negro?

25    A.  Yes.

L3GHRAM2                              Sanchez - Direct

1          MR. GUTWILLIG:  Ms. Hurst, could you please pull up

2     for the witness what's marked as Government Exhibit 7.

3     Q.  Do you recognize this map?

4     A.  Yes.

5     Q.  And what is it?

6     A.  That's the map of Choloma.

7     Q.  Is it a fair and accurate representation of that place?

8     A.  Yes.

9          MR. GUTWILLIG:  The government offers Government

10    Exhibit 7.

11         MR. MOSKOWITZ:  No objection.

12         THE COURT:  Received.

13         (Government's Exhibit 7 received in evidence)

14    BY MR. GUTWILLIG:

15    Q.  Could you please describe where on the map Cerro Negro is

16    located.

17    A.  After La Jutosa, that whole area is called Cerro Negro.

18    Q.  Was there a port located near this property at Cerro Negro?

19    A.  Yes.

20         MR. GUTWILLIG:  Ms. Hurst, could you please pull up

21    for the witness Government Exhibit 9.

22    Q.  Do you recognize this?

23    A.  Yes.

24    Q.  And what is it?

25    A.  It's how to drive from Cerro Negro towards Puerto Cortes.

L3GHRAM2                          Sanchez - Direct

1    Q.  Is that a fair and accurate representation of that area?

2    A.  Yes.

3              MR. GUTWILLIG:  Your Honor, the government offers

4    Government Exhibit 9.

5              THE COURT:  Any objection?

6              MR. MOSKOWITZ:  No objection.

7              THE COURT:  Received.

8              (Government's Exhibit 9 received in evidence)

9    BY MR. GUTWILLIG:

10   Q.  When you arrived at the defendant's property at Cerro

11   Negro, what did you observe?

12   A.  When I entered, a person approached me and asked me what I

13   wanted.

14   Q.  How was that person dressed?

15   A.  Like a city person.

16   Q.  Can you describe what that means.

17   A.  The way I'm dressed.

18   Q.  Was that person armed?

19   A.  Yes.

20   Q.  With what?

21   A.  With a semiautomatic pistol.

22   Q.  Did you see other individuals on the defendant's property

23   at Cerro Negro that day?

24   A.  Yes.  At some distance from him, there were three persons.

25   Q.  How were they dressed?

L3GHRAM2                          Sanchez - Direct

1   A.  The same, like city people.

2   Q.  Were they armed?

3   A.  Yes.

4   Q.  With what?

5   A.  AK-47.

6   Q.  Did you give the money to the person who had approached you

7   when you drove up?

8   A.  Yes.

9   Q.  What happened next?

10  A.  I said I bring some money.  I handed it to him.  I put the

11  car in reverse, and I left the area.

12  Q.  Focusing on the second time you delivered money to Cerro

13  Negro, about how long after the first time did that occur?

14  A.  Around three months went by.

15  Q.  And on that occasion, who asked you to go to the

16  defendant's property at Cerro Negro?

17           THE INTERPRETER:  For the interpreter, please.

18  Q.  And on that occasion, who asked you to go to the

19  defendant's property at Cerro Negro?

20  A.  Again my boss, Mr. Fuad Jarufe.

21  Q.  What did he ask you to do?

22  A.  To do him the favor again of taking money to the property,

23  to the defendant's property.

24  Q.  What, if anything, did he say that the money was for?

25  A.  It was payroll for the -- to pay the defendant's employees.

1   Q.   About how much money?

2   A.   It was around 17,000 lempiras.

3   Q.   And how was it packaged?

4   A.   In a manila envelope, in several denominations.

5   Q.   This time did you drive by yourself again?

6   A.   Yes.

7   Q.   When you arrived, what happened?

8   A.   Again that person approached me and asked me what I wanted.

9   I told him I bring money.  I handed it to him.  I put the

10  vehicle in reverse, and I left.

11  Q.   When you said "that person," was it the person who you'd

12  given money to the first time?

13  A.   Yes.

14  Q.   How was he dressed this time?

15  A.   Like a city person.

16  Q.   Was he armed?

17  A.   Yes.

18  Q.   Did you see that individual on other occasions?

19  A.   Yes.

20  Q.   About how many times?

21  A.   Around three times more.

22  Q.   Where did you see that person the other three times?

23  A.   At Graneros Nacionales.

24  Q.   Was the defendant there as well when you saw this person

25  the other times?

L3GHRAM2                          Sanchez - Direct

```
1    A.   Yes.

2    Q.   Was this person armed on other occasions when you saw him?

3    A.   Yes.

4    Q.   That day at Cerro Negro, did you see anyone else?

5    A.   Yes.   There were another two people.

6    Q.   How were they dressed?

7    A.   Like city people.

8    Q.   Were they armed?

9    A.   Yes.

10   Q.   After you delivered the money to the property at Cerro

11   Negro, did you later learn that law enforcement had raided that

12   property?

13   A.   Yes.

14   Q.   How did you learn about that?

15   A.   News programs.

16   Q.   And about when did you learn about it?

17   A.   In 2011.

18   Q.   And generally, what did you learn?

19          MR. MOSKOWITZ:   Objection.

20          THE COURT:   Yes.   Sustained.

21   Q.   After you learned about the law enforcement action, when

22   did you next see the defendant?

23   A.   Around 30 or 40 days went by.

24   Q.   Where did you next see the defendant?

25   A.   At my boss' office.
```

1    Q.  Are you referring to Graneros?

2    A.  Yes.

3    Q.  Was it typical for the defendant to be away from Graneros

4    that long?

5            MR. MOSKOWITZ:  Objection.

6            THE COURT:  Overruled.  If you know.

7    A.  Not at that time.

8    Q.  Within the office, where was the defendant when you saw him

9    at Graneros?

10   A.  At the round table in my boss' office.

11   Q.  Who, if anyone else, was at the office in your boss' office

12   at that time?

13   A.  At that moment Mr. Julio Cesar Barahona arrived.

14           MR. GUTWILLIG:  Ms. Hurst, could you please pull up

15   for the witness what's marked as Government Exhibit 315.

16   Q.  Do you recognize this picture?

17   A.  Yes.

18   Q.  Who is it?

19   A.  Mr. Julio Cesar Barahona.

20           MR. GUTWILLIG:  Your Honor, the government offers

21   Exhibit 315.

22           MR. MOSKOWITZ:  No objection.

23           THE COURT:  Received.

24           (Government's Exhibit 315 received in evidence)

25   BY MR. GUTWILLIG:

L3GHRAM2                              Sanchez – Direct

1    Q.  What was Julio Cesar Barahona's position at that time?

2               THE COURT:  All right.  Ladies and gentlemen, we're

3    going to hold you in suspense and take our midday –– midmorning

4    break.  Please do not discuss the case among yourselves or with

5    anyone.  We'll be back in action in ten minutes.

6               Juror No. 3, you advised us during jury selection of a

7    commitment, and I told you at the sidebar when we first all met

8    each other that I would honor that commitment, and I will.

9    I'll give everybody instructions on that.

10              All right.  You may return to the jury room.

11              Juror No. 1, if you don't mind remaining behind for a

12   moment, please.  Thank you.

13              (Jury excused)

14              (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

L3GKRAM3                        Sanchez - direct

1              (Jury not present, except Juror No. 1)

2              THE COURT:  Are you comfortable speaking from where

3     you are?

4              JUROR:  Yes.

5              THE COURT:  Okay.  Just one second.

6              I think I can hear you pretty well.

7              So what's going on?

8              JUROR:  I had a trip planned out before jury duty for

9     this Friday, the 19th.  I'm leaving early in the morning.  I

10    booked the hotel prior to starting jury duty, and I want to

11    know if that's okay, you know, if I'm excused that day?

12             THE COURT:  So, a couple of things, just to let you

13    know:

14             First of all, am I correct, this is not on the record

15    during jury selection?  So, at the beginning of jury selection,

16    I announced that this trial was expected to last two weeks.

17             JUROR:  Okay.

18             THE COURT:  And I asked anyone if there was a hardship

19    or a reason why they could not serve.

20             JUROR:  Right.

21             THE COURT:  And I don't believe this was brought to my

22    attention.

23             Plus, as the jury department advises all jurors, that

24    all jurors should expect that when they come, they will be

25    asked to serve for at least two weeks.  This is not like some

things in life, like when I was in college, if I missed a

class, that was okay, I got the class notes from another

student, and then life went on.  Jury duty doesn't work like

that.  As you saw when we had the incident last Friday, it all

stops.

      This, then, has the effect of extending the jury

service for other jurors.  I already have a note from someone

who's alerting me to a commitment they have the following week.

To the extent that your not being here on Friday causes the

trial to shut down, that means the trial goes longer.  That

means it extends the service of all other jurors.

      So, I would respectfully ask you to see whether you

can get your arrangements moved so that we can continue with

this trial.  Can you do that?

      JUROR:  Understood.

      THE COURT:  Okay.  Well, thank you very much for being

so understanding.  We're all joined in this exercise together,

as you've seen, and so it can only work with good people like

you who are willing to make sacrifices.  So, I very much

appreciate it, and I know the parties to this case, for whom

this trial is important — it's important to both sides in this

case — appreciate very much your great spirit.  Thank you.

      JUROR:  You're welcome.

      THE COURT:  All right.  Thanks.

      (Juror not present)

L3GKRAM3                          Sanchez - direct

1           THE COURT:  Okay.  We're in recess.  Thank you.

2           Just let the one juror get into the elevator, and then

3      we're all fine.

4           (Recess)

5           THE COURT:  There is a matter that relates to another

6      defendant that I want to raise in this courtroom because of

7      possible impact here.

8           So, Juan Antonio Hernandez is scheduled to be

9      sentenced by me on March 23rd, next Tuesday, and I believe my

10     jurors will follow the instruction not to read anything about

11     the case or listen to anything, but, as some have observed,

12     sometimes a juror sees the headline and says, oh, my goodness,

13     I can't read this, but then they dutifully report they saw the

14     headline.  That's what an honest person does and a juror who's

15     following the Court's instructions.  You don't know you're not

16     supposed to read something until you read enough to know that

17     you're not supposed to read it, right?  That's just common

18     sense.  I don't know how this would cut.  I don't know --

19     certainly, I haven't made up my mind on the sentence.  I don't

20     know how the sentence could cut or the publicity about the case

21     would cut.  It may be fabulously helpful to the defense, it may

22     be fabulously helpful to the government, and it may have no

23     impact on anybody.  But do the parties to this action have any

24     view about my conducting the sentencing while this jury is

25     impaneled?

1          MR. LOCKARD:  With the Court's leave, could we have a

2     chance to discuss that amongst ourselves back at the office and

3     let the Court know our position?

4          THE COURT:  Thank you.

5          Mr. Moskowitz?

6          MR. MOSKOWITZ:  I also would like to cogitate on that,

7     at least for a little bit, before I respond off the cuff.

8          THE COURT:  Yes.  You have to figure out who it's

9     fabulously helpful for.  I don't blame you.  Those are the

10    rules of life.  I don't fault you for that.  But it occurred to

11    me, I can come up with scenarios where it could spin either

12    which way, and you all have great imaginations.  I'll let you

13    use your own imaginations on that.  So I put it on the table.

14         MR. MOSKOWITZ:  Judge, I want to raise one other kind

15    of bureaucratic matter, which I've already raised with the

16    government.  I have been advised by my client that he has been

17    told by the MCC that in the middle of the trial, meaning

18    tonight, they intend to move him from one unit to another, for

19    God knows what reason.  Obviously, that's disruptive under the

20    best of circumstances.  To do that in the middle of a trial,

21    when the defendant has all of his belongings that then have to

22    be packed up and may not make it, his legal materials and so

23    on, I don't know if the Court can delay that move, but,

24    certainly, if anything can be done, either on the part of the

25    government or through the Court's intervention, that would be

1    appreciated.

2            THE COURT:  I would ask the government to look into

3    the issue.

4            MR. LOCKARD:  We will, your Honor.  And we told

5    Mr. Moskowitz that's what we would do when he raised it a

6    moment ago.

7            THE COURT:  Okay.  Thank you.

8            And tomorrow morning is the morning we're going to

9    have a late start because Juror No. 3 has his second

10   vaccination at 9:30.  And, as you remember, in voir dire, I

11   said you'll get your second shot.  So I don't know if that

12   helps any.  There will probably be a later start tomorrow.  I'm

13   thinking telling our jurors to come in at 10:30.  It may be a

14   little bit optimistic, but from what I've seen, the

15   vaccinations go quickly.

16           Our jurors are ready.  Bring them in, please.

17           (Continued on next page)

18

19

20

21

22

23

24

25

L3GKRAM3                           Sanchez - direct

1          (Jury present)

2                THE COURT:  All right.  You may continue.

3                MR. GUTWILLIG:  Your Honor, I don't recall whether

4      we'd offered Government Exhibit 315, but I do believe that the

5      witness said that he recognized the individual.

6                We did; it was received.

7                THE COURT:  To avoid doubt, you're offering it

8      again --

9                MR. MOSKOWITZ:  No objection.

10               THE COURT:  -- and received.

11               (Government's Exhibit 315 received in evidence)

12     BY MR. GUTWILLIG:

13     Q.  Mr. Sanchez, would you please remind us who this individual

14     is?

15     A.  That is Mr. Julio Cesar Barahona.

16     Q.  At the time you saw him, what was Julio Cesar Barahona's

17     position within the Honduran Government?

18     A.  He was the president of the judiciary, of the judicial

19     branch.

20     Q.  Do you know who appointed him to that job?

21     A.  Yes.

22     Q.  Who appointed him to that job?

23     A.  Mr. Juan Orlando Hernandez.

24     Q.  Did you see Julio Cesar Barahona at Graneros?

25     A.  Yes.

L3GKRAM3                          Sanchez - direct

1    Q.  Where did you see him?

2    A.  At the office of my boss, Mr. Fuad Jarufe.

3    Q.  And who, if anyone else, was there when you saw him?

4    A.  My boss and the defendant were there.

5    Q.  Did you hear Julio Cesar Barahona say anything?

6    A.  Yes.

7    Q.  Where were you when you heard that?

8    A.  I was sitting in front of my boss' desk.

9    Q.  What did you hear him say?

10   A.  He entered, greeted everybody, and said, the boss is

11   sending me here so that I can help the fellow out any way I

12   can.

13   Q.  Who did you understand the boss to be?

14            MR. MOSKOWITZ:  Objection.

15            THE COURT:  No, I'll allow it.

16            THE WITNESS:  Mr. Juan Orlando Hernandez.

17   BY MR. GUTWILLIG:

18   Q.  Who did you understand this fellow to mean?

19   A.  The defendant.

20   Q.  What happened next?

21   A.  I went to my office.  They stayed behind, talking.  Then

22   they called me so that I could make a check out to Mr. Julio

23   Cesar Barahona for 30,000 lempiras to the account of

24   Mr. Geovanny Fuentes.

25   Q.  What did you then do?

L3GKRAM3                          Sanchez - direct

1        THE INTERPRETER:  For the interpreter, please repeat

2   your response.

3   A.  I made the check out, went to my boss' office, he signed it

4   for me, and then I handed it to Mr. Julio Cesar Barahona.

5   Q.  What, if anything, did Julio Cesar Barahona say?

6   A.  Only what he said when he came in, the boss is sending me

7   here so I can help the fellow out any way that I can.

8   Q.  And based on what you saw, what did you understand "help

9   the fellow out" to mean?

10       MR. MOSKOWITZ:  Object.  Objection.

11       THE COURT:  Now, as I've said, ladies and gentlemen,

12  in the context of a conversation, you speak with people with

13  whom you regularly interact with at work or at home, and

14  sometimes we speak in less than complete sentences that a total

15  stranger would understand.  So, you should listen to the

16  answer -- listen to the question, listen to the answer given in

17  response to that question, and give the answer such weight as

18  you feel it deserves, no more, no less.

19       Overruled.

20  BY MR. GUTWILLIG:

21  Q.  What did you understand "help the fellow out" to mean?

22  A.  That he was going to wipe the defendant's record clean.

23  Q.  Who do you mean by "he"?

24  A.  Mr. Geovanny Fuentes.

25  Q.  Who was the check made out to?

L3GKRAM3                          Sanchez - direct

1    A.   To Mr. Julio Cesar Barahona.

2    Q.   Who was the check made from?

3    A.   It was a check from the company, Graneros Nacionales.

4    Q.   Did you understand this check to be a loan?

5            MR. MOSKOWITZ:  Objection.

6            THE COURT:  Lay a foundation here.

7    BY MR. GUTWILLIG:

8    Q.   What did you understand -- well, strike that.

9            Who did you give the check to?

10   A.   To Mr. Julio Cesar Barahona.

11   Q.   What, if anything, did the defendant say?

12   A.   No, he didn't say anything.

13   Q.   Why was the check made out from Graneros?

14   A.   Mr. Geovanny Fuentes asked my boss for a loan, sir.

15           MR. MOSKOWITZ:  Objection.

16           THE COURT:  Overruled.

17           How do you know that?

18           THE WITNESS:  Because he asked me to charge to his

19   account.

20           THE COURT:  Next question.

21   Q.   Did the defendant pay back Graneros for that loan?

22   A.   He would make sporadic payments to his account.

23   Q.   In what form would he make those payments?

24   A.   In 20-dollar bills.

25   Q.   You testified earlier that Fuad Jarufe owned Graneros.

1                Was Fuad Jarufe involved in politics?

2   A.   Yes, yes.

3   Q.   Does he support any particular party?

4   A.   Yes.

5   Q.   What party did he support?

6   A.   The National Party.

7   Q.   How did he support the National Party?

8   A.   With financial contributions.

9   Q.   Is there a particular individual whom he supported?

10  A.   Mr. Juan Orlando Hernandez.

11  Q.   Who is Juan Orlando Hernandez?

12  A.   The current president of Honduras.

13  Q.   Did Juan Orlando Hernandez ever come to Graneros when you

14  were there?

15  A.   Yes.

16  Q.   Directing your attention to when Juan Orlando Hernandez was

17  running for president, about when was that?

18  A.   In the year 2013.

19  Q.   During that time, did he come to Graneros?

20  A.   Yes, on many occasions.

21  Q.   Did you ever see Juan Orlando Hernandez arrive at Graneros?

22  A.   Yes.

23  Q.   How did you see him arrive?

24  A.   He would arrive in a helicopter.

25  Q.   What kind of helicopter?

L3GKRAM3                          Sanchez – direct

1   A.  He would arrive in a military helicopter, and on two

2   occasions, he arrived in a blue helicopter.

3   Q.  Where would the helicopter land when you saw it?

4   A.  On an empty lot next to my boss' office.

5   Q.  When you saw Juan Orlando Hernandez arrive, did he arrive

6   with others?

7   A.  Yes.

8   Q.  About how many people did you typically see him arrive

9   with?

10          THE INTERPRETER:  Repeat your response, please.

11  A.  He would come with his bodyguards, and he was always

12  accompanied by two to three people from the City of

13  Tegucigalpa.

14  Q.  When you saw them, were the bodyguards armed?

15  A.  Yes.

16  Q.  While Juan Orlando Hernandez was running for president, for

17  what purpose would he come to Graneros?

18  A.  He would come for his monthly campaign contributions and

19  when he had meetings at the National Party headquarters in the

20  City of Choloma.

21  Q.  Do you know how he received these campaign contributions?

22  A.  With a check from the company, Graneros Nacionales.

23  Q.  Do you know who gave him the checks?

24  A.  Yes.

25  Q.  Who?

L3GKRAM3                          Sanchez - direct

1    A.  Me.

2    Q.  Each time he came, were you the one who gave him the check?

3    A.  Yes.

4    Q.  Was he allocated a particular amount each month?

5    A.  Yes.

6    Q.  About how much?

7    A.  250,000 lempiras.

8    Q.  During the time Juan Orlando Hernandez was running for

9    president, did you ever see him talking with Fuad Jarufe?

10   A.  Yes.

11   Q.  About how many times?

12   A.  On several occasions.

13   Q.  On those occasions, did you personally see and hear Juan

14   Orlando Hernandez?

15   A.  Yes.

16   Q.  On one of those occasions, did Juan Orlando Hernandez talk

17   about what he would do when he became president?

18   A.  I don't understand the question.

19   Q.  On one of the occasions you saw Juan Orlando Hernandez

20   talking at Graneros, did he talk about what he would do when he

21   became president?

22   A.  He spoke -- on many occasions, he said that they'd be

23   untouchable.

24   Q.  Did he say anything in particular about remaining in power?

25   A.  Yes, he did.

L3GKRAM3                        Sanchez - direct

1   Q.  Were you there when he said that?

2   A.  Yes.

3   Q.  What did he say?

4   A.  He told my boss, Mr. Fuad Jarufe, that his plan was to

5   remain in power for a minimum of 25 years, whatever it took,

6   but that to do it, he needed the support of businessmen because

7   he said the business was too good to let it go in four years.

8   Q.  Other than businessmen, who, if at all, did he say would

9   help him remain in power?

10  A.  The military.

11          MR. GUTWILLIG:  Ms. Hurst, could you please show the

12  witness what's marked for identification as Government

13  Exhibit 318.

14          THE WITNESS:  Mr. Juan Orlando Hernandez with Attorney

15  General Chinchilla.

16  BY MR. GUTWILLIG:

17  Q.  Do you recognize the individuals in this, what you're

18  seeing right now on the screen?

19  A.  Yes.

20          MR. GUTWILLIG:  Your Honor, the government offers

21  Government Exhibit 318.

22          MR. MOSKOWITZ:  No objection.

23          THE COURT:  Received.

24          (Government's Exhibit 318 received in evidence)

25  Q.  Could you please identify which individual is which of the

L3GKRAM3                          Sanchez – direct

 1   two you just mentioned?

 2   A.  The one to the left, with glasses, is Mr. Juan Orlando

 3   Hernandez, and the bald man to the right is Attorney General

 4   Chincilla.

 5   Q.  When talking about staying in power, did Juan Orlando

 6   Hernandez mention Chinchilla?

 7   A.  Yes.

 8   Q.  What did he say?

 9   A.  That he had appointed him to that post to protect them and

10   to evade charges.

11   Q.  What post was that?

12   A.  The republic's attorney general.

13            MR. GUTWILLIG:  Ms. Hurst, could you please show the

14   witness what's marked for identification as Government

15   Exhibit 319.

16   Q.  Do you recognize this?

17   A.  Yes.

18   Q.  What is it?

19   A.  Mr. Juan Orlando Hernandez with the President of Congress,

20   Mauricio Oliva.

21            MR. GUTWILLIG:  Your Honor, the government offers

22   Government Exhibit 319.

23            MR. MOSKOWITZ:  No objection.

24            THE COURT:  Received.

25            (Government's Exhibit 319 received in evidence)

L3GKRAM3                          Sanchez - direct

1  BY MR. GUTWILLIG:

2  Q.  You mentioned two individuals in this picture.  Could you

3  please say which is on the left and which is on the right?

4  A.  On the left is Mr. Juan Orlando Hernandez, and on the

5  right, Mauricio Oliva.

6  Q.  And during this time, when Juan Orlando Hernandez was

7  talking about staying in power, did he mention Mauricio Oliva?

8  A.  Yes.

9  Q.  What did he say?

10 A.  That together with Chinchilla, they were already working on

11 amending the laws in his favor.

12 Q.  Do you know who Rafael Leonardo Callejas Romero is?

13         THE INTERPRETER:  Can you repeat the name for the

14 interpreter?

15         MR. GUTWILLIG:  Rafael Leonardo Callejas Romero.

16 A.  Yes.

17 Q.  Who is that person?

18 A.  At the time, he was the biggest corrupt man in Honduras.

19         MR. MOSKOWITZ:  Objection.

20         THE COURT:  Yes, sustained.  Stricken.

21 BY MR. GUTWILLIG:

22 Q.  Do you know what that person's position within Honduran

23 Government was?

24 A.  Whom are you referring to?

25 Q.  Callejas.

L3GKRAM3                              Sanchez – direct

1   A.   He was the president of FENAFUTH, the national federation

2   of soccer.

3   Q.   Prior to that, did he hold any governmental positions in

4   Honduras?

5   A.   He was a former president of the republic.

6   Q.   While Juan Orlando Hernandez was running for president, did

7   you ever hear him talk about Callejas?

8   A.   Yes.

9   Q.   Where were you?

10  A.   Across the desk in my boss' office, Mr. Fuad Jarufe.

11  Q.   Who, if anyone else, was there?

12  A.   Juan Orlando Hernandez with some members of his circle who

13  were coming from Tegucigalpa.

14  Q.   What, if anything, did Juan Orlando Hernandez say about

15  Callejas?

16  A.   He was boasting about how they were stealing Social

17  Security funds and other state funds, and he said, we are

18  stealing better than in Callejas times, and nobody can touch

19  us.

20  Q.   Do you know who Leopoldo Crivelli is?

21  A.   Yes.

22  Q.   Who is Leopoldo Crivelli?

23  A.   At the time, he was mayor of the City of Choloma.

24  Q.   Did he have a nickname?

25  A.   Yes.

L3GKRAM3                        Sanchez - direct

1    Q.   What was it?

2    A.   Polo.

3    Q.   Did you ever see Leopoldo Crivelli with Juan Orlando

4    Hernandez?

5    A.   Yes.

6    Q.   Where?

7    A.   In my boss' office.

8    Q.   Was this during the time Juan Orlando Hernandez was running

9    for president?

10   A.   Yes.

11   Q.   During that meeting, what, if anything, did Juan

12   Orlando Hernandez say about the Honduran people?

13   A.   They were seated at the round table, and Juan Orlando, in

14   his manner of speech amongst his circle, said to Paulo:  So,

15   Paulo, are you ready to snag it again or not?

16          And then Paulo replied:  Don't be fooled.  The

17   Honduran people have opened their eyes.

18          And Juan Orlando said:  Don't believe that.  The

19   Honduran people are idiots.  Give them a piece of meat, a beer,

20   and they'll give you their vote.  And then he smiled.

21   Q.   You testified earlier that you were present for meetings

22   between the defendant and Juan Orlando Hernandez.  How many

23   times were you present for meetings between the defendant and

24   Juan Orlando Hernandez?

25   A.   On two occasions.

L3GKRAM3                          Sanchez – direct

1   Q.  Let's focus on the first one.  Did the first meeting occur

2   while Juan Orlando Hernandez was running for president?

3   A.  Yes.

4   Q.  Where did that meeting take place?

5   A.  At Graneros Nacionales, in my boss' office.

6   Q.  Did you know that Juan Orlando Hernandez was coming to

7   Graneros that day?

8   A.  Yes.

9   Q.  How did you know that?

10  A.  My boss told me early in the morning.

11  Q.  What did your boss tell you?

12  A.  He told me, get ready, Juan Orlando is coming in the

13  afternoon, and he wants us to buy dollars from him.

14  Q.  Did you go to Graneros that day?

15  A.  Yes.

16  Q.  When you arrived at Graneros that day, what, if anything,

17  did you see outside?

18  A.  A military helicopter.

19  Q.  Where within Graneros did that meeting take place?

20  A.  At the round table in my boss' office.

21  Q.  Why were you there?

22  A.  Because I was going to receive the dollars in order to make

23  the cash exchange into lempiras.

24  Q.  Who, if anyone, was there when you walked into your boss'

25  office?

L3GKRAM3                          Sanchez - direct

1   A.  My boss, Fuad Jarufe, was there reviewing some documents,

2   and at the round table talking were Juan Orlando Hernandez and

3   Mr. Geovanny Fuentes.

4   Q.  Could you please describe for me what the office looked

5   like?

6   A.  As you're coming in through the front door, there is my

7   boss' desk.  To the right of my boss' desk, looking outwardly,

8   there's a round table.  Across from the round table, there's a

9   blue couch.  And then you see, also, a coffee machine, and a

10  dishwasher, and also a small liquor bar.

11  Q.  When you arrived, where in the office was Fuad Jarufe?

12  A.  At his desk.

13  Q.  Where was Juan Orlando Hernandez?

14  A.  At the round table.

15  Q.  Where was the defendant?

16  A.  Also at the round table.

17  Q.  Where did you sit or stand?

18  A.  I came in, and my boss said to me, sit down and wait for a

19  while.  So, I sat on the blue couch across from the round

20  table.

21  Q.  About how close were you to Juan Orlando Hernandez and the

22  defendant?

23  A.  A meter, a meter and a half.  That was it.

24  Q.  What was your reaction to seeing them together?

25  A.  Fear.  I couldn't believe what I was watching at that

1   moment.

2   Q.   Why were you afraid?

3           MR. MOSKOWITZ:  Objection.

4           THE COURT:  Overruled.

5           THE WITNESS:  Because I was looking at the

6   presidential candidate meeting with a drug trafficker.

7   BY MR. GUTWILLIG:

8   Q.   How, if at all, did the defendant address Juan Orlando

9   Hernandez?

10  A.   Juancho.

11  Q.   Did you call Juan Orlando Hernandez Juancho?

12  A.   No.

13  Q.   Who, if anyone else, did you hear call Juan Orlando

14  Hernandez Juancho?

15  A.   Just those closest to him.

16  Q.   Let's talk about some of the things that were discussed at

17  that meeting.

18          Generally, what did Juan Orlando Hernandez and the

19  defendant discuss during that meeting?

20  A.   Mr. Juan Orlando Hernandez would tell him that he was

21  interested in having him and his drug lab work for him.

22  Q.   Who do you mean by "him" and "his"?

23  A.   For Mr. Geovanny Fuentes together with his drug lab work

24  for him.

25  Q.   Who is "him"?

L3GKRAM3                          Sanchez - direct

1   A.  For Mr. Juan Orlando Hernandez.

2   Q.  What did the defendant say in response?

3   A.  He smiled.

4   Q.  What, if anything, did Juan Orlando Hernandez say next?

5   A.  Juan Orlando Hernandez told them not to worry about the law

6   because Attorney General Chinchilla was working on it --

7           THE INTERPRETER:  Interpreter correction:

8   A.  -- had been appointed to protect them and also the drugs

9   transportation through the different routes, and that these

10  transportations will have the protection of the military and

11  the police, and that they would handle security of the drugs,

12  and that by the time the United States came to know the truth,

13  they would have amended the law in their favor because Oliva

14  and Chinchilla were already on it, that they'd be untouchable.

15          He then took a sip of his drink, and he said, we are

16  going to snuff drugs up the gringos' noses, and they're never

17  even going to know it.

18  Q.  Based on your understanding, what did "gringos" refer to?

19  A.  A mockery of the United States people.

20  Q.  You mentioned amending the law.  What did you mean by that?

21          MR. MOSKOWITZ:  Objection.

22          THE COURT:  What did you understand those who referred

23  to "amending the law" to mean?

24          THE WITNESS:  That they would amend the law in their

25  favor, such that nobody would be able to charge them, and that

L3GKRAM3                          Sanchez - direct

1   they would get rid of extradition.

2   BY MR. GUTWILLIG:

3   Q.  Do you know who Tony Hernandez is?

4   A.  Yes.

5   Q.  Who is he?

6   A.  Juan Orlando Hernandez's brother.

7   Q.  During this meeting, what, if anything, did Juan Orlando

8   Hernandez say about Tony Hernandez?

9   A.  That he would be providing Mr. Fuentes Tony's cell phone

10  number so he would put himself at his disposal.

11  Q.  What did you understand those to mean who said put at his

12  disposal?

13  A.  That he would be following Tony's instructions.

14  Q.  Who would be following Tony's instructions?

15  A.  The defendant.

16  Q.  What was your understanding, based on what they said, of

17  what he would be following instructions to do?

18  A.  That he would be following Tony Hernandez's instructions.

19  Q.  His instructions to do what?

20  A.  For the transportation of drugs.

21  Q.  Did the defendant have anything with him during the

22  meeting?

23  A.  Yes.

24  Q.  What did he have with him?

25  A.  A midsized black briefcase.

L3GKRAM3                          Sanchez - direct

1   Q.   Did the defendant open the briefcase during the meeting?

2   A.   Yes.

3   Q.   About when during the meeting did he do that?

4   A.   More or less, after Juan Orlando uttered the phrase

5   snuffing the drugs up gringos' noses and they would not even

6   know it.

7   Q.   Did you see what was in the briefcase?

8   A.   Yes.

9   Q.   What was in it?

10  A.   Dollars in 20-dollar denominations.

11  Q.   Where were you when the defendant opened the briefcase?

12  A.   Across from them.

13  Q.   About how much money did he take out?

14  A.   $15,000.

15  Q.   How do you know that?

16  A.   Because he handed it over to Mr. Juan Orlando Hernandez,

17  and Mr. Juan Orlando Hernandez handed it over to me.

18  Q.   What did the defendant say about the money in the

19  briefcase?

20  A.   He told him, for you to help yourself with the campaign.

21  Q.   He told who?

22  A.   To Juan Orlando Hernandez.

23  Q.   What did the defendant do with the money in the briefcase?

24  A.   He handed it over to Juan Orlando Hernandez.

25  Q.   What did Juan Orlando Hernandez do after receiving the

L3GKRAM3                        Sanchez – direct

1  money?

2  A.  He said to me:  José, exchange these for me.

3  Q.  Did you say anything to him?

4  A.  I asked him to whom the check should be payable.

5  Q.  After he handed you the money, what did you then do?

6  A.  I removed the rubber bands, organized it, and counted it.

7  Q.  Where did you count the money?

8  A.  At the round table.

9  Q.  Was Juan Orlando Hernandez in the room while you counted

10  the money?

11  A.  Yes.

12  Q.  What was he doing?

13  A.  Having a drink and checking his cell phone.

14  Q.  Was the defendant in the room while you were counting the

15  money?

16  A.  Yes.

17  Q.  What was he doing?

18  A.  Checking his cell phone.

19  Q.  After you finished counting the money, what did you do

20  next?

21  A.  I asked Mr. Juan Orlando Hernandez in whose name he wanted

22  the check.

23  Q.  What did he say?

24  A.  He told me he wanted cash.

25  Q.  What did you --

L3GKRAM3                      Sanchez - direct

1           THE COURT:  All right.  Ladies and gentlemen, we're

2    going to take our midafternoon break.  We're going to pick up

3    at -- we'll come and get you at 1:45, if that's all right with

4    you.  And, as always, keep an open mind and do not discuss the

5    case among yourselves or with anyone.  Do have a very pleasant

6    lunch, and we'll be back in action at 1:45.  Thank you.

7           THE INTERPRETER:  Your Honor, my apologies.  The

8    interpreter is speaking.  Just a very brief correction --

9           THE COURT:  Yes.

10          THE INTERPRETER:  -- on the phrase stuff the drugs up

11   their noses.

12          THE COURT:  Yes.

13          THE INTERPRETER:  The interpreter inadvertently said

14   snuff the drugs.  The actual term was stuff the drugs up their

15   noses.

16          THE COURT:  Thank you very much.

17          THE INTERPRETER:  Thank you very much.

18          THE COURT:  All right.  You may leave.

19          And everyone else remain until the jury clears the

20   elevator area.

21          (Jury not present)

22          THE COURT:  Please remain in the courtroom until Flo

23   gives you the signal that you may leave.  Thank you.

24          (Luncheon recess)

25

1                          AFTERNOON SESSION

2                              1:45 p.m.

3          (In open court; jury not present)

4          THE COURT:  Our jurors are on their way.  In fact, I

5   think they're here.

6          Jury can enter.

7          (Jury present)

8          THE COURT:  All right.  Good afternoon.  The witness

9   is reminded that he is still under oath.

10         Mr. Gutwillig, whenever you're ready, you may proceed.

11  JOSE SANCHEZ, resumed.

12  DIRECT EXAMINATION

13  BY MR. GUTWILLIG:

14  Q.  Mr. Sanchez, we were just talking about the first meeting

15  you witnessed between the defendant and Juan Orlando Hernandez,

16  and you mentioned that Juan Orlando Hernandez told you that he

17  wanted cash.  What did you do next?

18  A.  Yes.  They suggested that I make the check out in my name,

19  to which I refused.

20  Q.  What happened next?

21  A.  My boss, Fuad Jarufe, said to make the check out to him and

22  to take it to him and he would cash it.

23  Q.  How did the meeting end?

24  A.  I handed the check to him, and I took the dollars so that I

25  could deposit them in several banks.

L3GHRAM4                          Sanchez – Direct

1    Q.   Handed the check to whom?

2    A.   To my boss.

3    Q.   Directing your attention to the second meeting, what, if

4    anything, were you asked to do that day?

5    A.   Yes, in the morning my boss called me and told me that Juan

6    Orlando would be arriving in the afternoon, and he said that we

7    were going to buy some dollars from him.

8    Q.   Did you go to Graneros that day?

9    A.   Yes.

10   Q.   Did you see Juan Orlando Hernandez and the defendant that

11   day?

12   A.   Yes.

13   Q.   Where did you see them?

14   A.   At my office in my boss' office talking at the round table.

15   Q.   Where did you sit or stand?

16            THE INTERPRETER:  For the interpreter, please repeat

17   the question.

18   Q.   Where did you sit or stand?

19   A.   I entered the office.  They told me to wait again, and I

20   sat down on the blue couch.

21   Q.   Generally, what were they talking about?

22   A.   About politics.

23   Q.   What happened next?

24   A.   Defendant took out his briefcase and then pulled a wad of

25   $20 bills out of it.  He handed that to Mr. Juan Orlando

1    Hernandez and told him again, "So that you can help yourself

2    out in your campaign."  Juan Orlando handed them to me.

3    Q.  What did you do next?

4    A.  I organized the money, and I counted it.

5    Q.  How much was there?

6    A.  $10,000.

7    Q.  Following these meetings, do you know whether the defendant

8    received protection from the Honduran government?

9            MR. MOSKOWITZ:  Objection.

10           THE COURT:  Ask it a different way.

11   Q.  After this meeting, did you later hear the defendant talk

12   about Honduran police?

13           THE INTERPRETER:  For the interpreter, please repeat

14   the question.

15   Q.  After this meeting, did you later hear the defendant talk

16   about the Honduran police?

17   A.  I don't understand the question.

18   Q.  I'll move on.

19           Ms. Hurst, could you please show the witness what's

20   marked for identification as Government Exhibit 320.

21           Do you recognize this?

22   A.  Yes.

23   Q.  What is it?

24   A.  Mr. Leonel Sauceda.

25           MR. GUTWILLIG:  Your Honor, the government offers

L3GHRAM4                        Sanchez – Direct

1    Government Exhibit 320.

2              THE COURT:  Any objection?

3              MR. MOSKOWITZ:  No objection.

4              THE COURT:  Received.

5              (Government's Exhibit 320 received in evidence)

6    BY MR. GUTWILLIG:

7    Q.  What was Leonel Sauceda's position?

8    A.  As far as I knew, he was chief of the National Police.

9    Q.  Did you ever hear the defendant say anything about Leonel

10   Sauceda?

11   A.  Yes.

12   Q.  Where were you?

13   A.  In my boss' office.

14   Q.  Where was the defendant?

15   A.  At the round table.

16   Q.  What did you hear him say?

17   A.  My boss was getting ready to come to the U.S. for a medical

18   checkup, and he called me to give me instructions.  And

19   Mr. Fuentes said -- told him to take down his number and

20   Mr. Fuentes' number and to give it to Jose if anything were

21   needed.

22   Q.  To take down whose number?

23             THE INTERPRETER:  For the interpreter again, the

24   question.

25   Q.  To take down whose number?

1   A.  His number and Sauceda's number.

2            THE COURT:  Who is "his"?

3            THE WITNESS:  The defendant.

4            MR. GUTWILLIG:  Thank you, Ms. Hurst.

5   Q.  Do you know who Nelvin Sauceda is?  Do you know who Nelvin

6   Sauceda is?

7   A.  Yes.

8   Q.  Who is he?

9   A.  He's the brother of Leonel Sauceda.

10  Q.  Did he have a position within Honduras?

11  A.  Yes.

12  Q.  What was that?

13  A.  At that time he was chief of police in Choloma.

14  Q.  Did you ever see the defendant with him?

15  A.  Yes.

16  Q.  Where?

17  A.  At my boss' office.

18  Q.  Turning to a different topic, did you ever find a box at

19  Graneros containing military supplies?

20  A.  Yes.

21  Q.  About when was that?

22  A.  In 2014.

23  Q.  Where did you find it?

24  A.  It was in my boss' office.

25  Q.  What did the box look like?

1    A.  It was a midsized cardboard box.

2    Q.  Did you open it?

3    A.  Yes.

4    Q.  Why did you open it?

5    A.  I took it to my office by mistake, thinking it was some

6    stationery that I had ordered.

7    Q.  What was inside the box?

8    A.  There were police vests and Army and police uniforms.

9            MR. GUTWILLIG:  Ms. Hurst, could you please pull up

10   what's in evidence as Government Exhibit 917.

11   Q.  Did the vests you found look similar to this one?

12   A.  There was one of those.

13   Q.  Could you please describe it.

14   A.  The police ones are different.

15   Q.  Do you recognize the individual in this picture?

16   A.  Yes.

17   Q.  Who is it?

18   A.  The defendant.

19           MR. GUTWILLIG:  Thank you, Ms. Hurst.

20   Q.  What, if anything else, did you find in the box?

21   A.  There was a piece of paper inside the box that said "for

22   Geovanny Fuentes," and on the side of it was something like a

23   seal that said "105th Brigade."

24   Q.  What is your understanding of what the 105th Brigade refers

25   to?

L3GHRAM4                          Sanchez - Direct

1   A.  To the infantry battalion located in San Pedro Sula.

2   Q.  What was your reaction to finding this note?

3   A.  I got scared.  I closed the box immediately and put it back

4   in its place before anyone found out about it.

5   Q.  You testified a moment ago about the 105th military

6   brigade.  Do you know who was in charge of that brigade?

7   A.  Yes.

8   Q.  Who?

9   A.  Mr. Hector Orlando Ponce Fonseca.

10          MR. GUTWILLIG:  Ms. Hurst, could you please pull up

11   for the witness what's marked as Government Exhibit 308.

12   Q.  Do you recognize this?

13   A.  Yes.

14   Q.  Do you recognize the individual in this picture?

15   A.  Yes.

16   Q.  Who is it?

17   A.  Ponce Fonseca.

18          MR. GUTWILLIG:  Your Honor, the government offers

19   Government Exhibit 308.

20          MR. MOSKOWITZ:  No objection.

21          THE COURT:  Received.

22          (Government's Exhibit 308 received in evidence)

23          MR. GUTWILLIG:  Thank you, Ms. Hurst.

24   BY MR. GUTWILLIG:

25   Q.  Did there come a time when you were in the defendant's

L3GHRAM4                                        Sanchez - Direct

1    truck?

2    A.  Yes.

3    Q.  Was that after you had found the box at Graneros containing

4    military supplies?

5    A.  Yes.

6    Q.  Why were you in the defendant's car?

7    A.  I needed to go pick up money for some payrolls, and there

8    were no bodyguards at the company.

9    Q.  Payrolls for what?

10   A.  To pay employees of Graneros Nacionales.

11   Q.  Why did you need bodyguards?

12           THE INTERPRETER:  For the interpreter, the question

13   repeat, please.

14   Q.  Why did you need bodyguards?

15   A.  Because of the amount of money that I was going to pick up.

16   Q.  Who, if anyone, directed you to go with bodyguards?

17   A.  Anytime I picked up payroll, I went with the bodyguard.

18   Q.  Did you get into the car?

19   A.  Yes.

20   Q.  Who, if anyone else, was in the car?

21   A.  The driver and the defendant.

22   Q.  Where did you sit?

23   A.  The front passenger seat.

24   Q.  What, if anything, did you see in the car?

25   A.  Many weapons.

L3GHRAM4                              Sanchez - Direct

1   Q.  About how many?

2   A.  The driver had a shotgun at the door, a semiautomatic

3   pistol in his legs, and near where the stick shift is, an

4   AK-47.

5   Q.  Was the defendant in the car?

6   A.  Yes, he got into the car.

7   Q.  What, if anything, did he show you?

8   A.  He pulled out from underneath the seat a military grade

9   weapon that was green in color.

10  Q.  What kind of weapon was it?

11          THE INTERPRETER:  The interpreter wishes to correct:

12  "Olive green color, olive green."

13          May I have the question again, please?

14  Q.  What kind of weapon was it?

15  A.  It was a heavy -- a heavy military-grade weapon.

16  Q.  What, if anything, did the defendant say about that weapon?

17  A.  "I hope someone crosses my path so I can debut this new

18  little toy that a friend gave me as a gift."

19  Q.  In context, who did you understand "friend" to mean?

20          MR. MOSKOWITZ:  Objection.

21          THE COURT:  I'll allow it.  Go ahead.

22  A.  The military.

23  Q.  Did you see the defendant with the green weapon on any

24  other occasions?

25  A.  Yes.

L3GHRAM4                         Sanchez - Direct

1   Q.   Where?

2   A.   In Monterrey at my boss' ranch.

3   Q.   Was the defendant carrying that weapon?

4   A.   Yes.

5   Q.   Were there security cameras at Graneros?

6   A.   Yes.

7   Q.   Did they make video recordings?

8   A.   Yes.

9   Q.   Were those video recordings stored at Graneros?

10  A.   Yes.

11  Q.   Were any of the meetings you've discussed today videotaped?

12  A.   Yes.

13  Q.   Which meeting or meetings?

14  A.   I got a copy of the video of the meeting -- I got a video

15  copy of the meeting where Juan Orlando Hernandez spoke about

16  stealing from Social Security and the second meeting where the

17  defendant was with Juan Orlando Hernandez.

18  Q.   When you say the meeting about Social Security, are you

19  referring to the meeting where Juan Orlando Hernandez

20  referenced Callejas?

21  A.   Yes.

22  Q.   How did you obtain copies of these videos?

23  A.   John Jarufe, the engineer, was the person in charge of the

24  cameras.  He was on vacation for a few days, and he left the

25  PIN number to Jorge Jarufe so that he could take care of -- so

L3GHRAM4                          Sanchez - Direct

1     that he could take care of us.  I asked Jorge one day to check

2     the cameras, and he said that he had a commitment, and he gave

3     me the PIN number so that I could do it.

4     Q.  How many copies of those two videos did you make?

5     A.  Two of each.

6     Q.  Did you give copies of either video to any person?

7     A.  Yes.

8     Q.  To more than one person?

9     A.  Yes.

10    Q.  What is the name of the first person you gave a copy of one

11    of the videos?

12    A.  Prosecutor Marlene Banegas.

13    Q.  Which video did you give that person a copy of?

14    A.  The one where Juan Orlando talked about stealing from

15    Social Security.

16    Q.  What was the name of the other person to whom you gave a

17    copy of a video?

18    A.  Christian Ayala.

19    Q.  And what video did you give that person a copy of?

20    A.  The meeting between the defendant and Juan Orlando

21    Hernandez.

22    Q.  The first meeting or the second meeting?

23    A.  The second meeting.

24    Q.  Did you look for a video recording of the first meeting?

25              THE INTERPRETER:  Repeat the question for the

L3GHRAM4                         Sanchez - Direct

1    interpreter, please.

2    Q.  Did you look for a video recording of the first meeting

3    between the defendant and Juan Orlando Hernandez?

4    A.  Yes.

5    Q.  Did you find it?

6    A.  I did not find it that day.

7    Q.  When you left Graneros, did the defendant have an

8    outstanding balance with the company?

9    A.  Yes.

10   Q.  About what was that balance?

11   A.  Around 480,000 lempiras in several accounts.

12   Q.  Based on your time working at Graneros as an accountant,

13   was that a lot or a little for an individual?

14   A.  It was -- it was a lot of money.

15   Q.  About when was the last time you saw the defendant?

16   A.  In the year 2015, during Easter week.

17   Q.  Where did you see the defendant?

18   A.  At the Puerto Cortes nautical club.

19   Q.  What was the defendant doing when you saw him?

20   A.  He was going to board his yacht.

21   Q.  What did the yacht look like?

22   A.  Big and pretty.

23   Q.  Did you see other individuals with the defendant?

24   A.  Yes.

25   Q.  Were they armed?

1   A.  Yes.

2   Q.  With what?

3   A.  With semiautomatic pistols.

4          MR. GUTWILLIG:  Your Honor, may I have a moment?

5          THE COURT:  You may.

6          MR. GUTWILLIG:  No further questions, your Honor.

7          THE COURT:  All right.  Thank you.

8          Ladies and gentlemen, why don't you stand up and

9   stretch for a moment while Garrett does his work.

10          Ladies and gentlemen, one programming note.  Tomorrow

11   morning we will start at 10:30 a.m., 10:30 a.m.

12          Will that work?  OK.  Good.  I hear they're pretty

13   fast, and if you get there early, they even -- thank you.

14          All right.  You may cross-examine, Mr. Moskowitz.

15          MR. MOSKOWITZ:  Thank you, your Honor.

16   CROSS-EXAMINATION

17   BY MR. MOSKOWITZ:

18   Q.  Good afternoon, Mr. Sanchez.

19   A.  Good afternoon.

20   Q.  You and I have never met, correct?

21   A.  That's correct.

22   Q.  We've never had a chance to speak?

23   A.  Never.

24   Q.  You've had many opportunities to speak to the government

25   lawyers, correct?

L3GHRAM4                        Sanchez - Cross

1   A.  Correct.

2   Q.  And in the course of your discussions with them, they

3   reviewed with you the questions they were going to ask you when

4   you came to testify, correct?

5   A.  Correct.

6   Q.  And you had a chance to practice giving the answers that

7   you gave here this morning and this afternoon, correct?

8   A.  Yes.

9   Q.  Now, you told us that you met Mr. Fuentes for the first

10  time around 2003, is that correct?

11  A.  Correct.

12  Q.  And he was brought to Graneros by John Jarufe, correct?

13  A.  Correct.

14  Q.  And you understood that Mr. Fuentes and John Jarufe were

15  friends, correct?

16  A.  Correct.

17  Q.  In fact, they were very close friends, correct?

18  A.  That's correct.

19  Q.  They had grown up together, correct?

20  A.  Correct.

21  Q.  And Mr. Fuentes also knew John Jarufe's father, your boss,

22  Fuad Jarufe, correct?

23  A.  Correct.

24  Q.  They also had a close relationship?

25              THE INTERPRETER:  Your Honor, may the witness repeat

1   the answer for the interpreter?

2           THE COURT:  Yes, please.

3   A.  He did not have a close relationship with Mr. Fuad.

4   Q.  Now, Mr. Jarufe Sr. would lend Mr. Ramirez money, correct?

5   A.  That's correct.

6   Q.  John Jarufe went into business with Mr. Fuentes, correct?

7   A.  That's correct.

8   Q.  They opened a coffee business together, correct?

9   A.  That's correct.

10  Q.  And your boss, Fuad Jarufe, also went into business with

11  Mr. Fuentes, correct?

12  A.  That's correct.

13  Q.  They went into the bio mask business together, correct?

14  A.  That's correct.

15  Q.  Mr. Fuentes had a contract to provide bio masks, correct?

16  A.  That's correct.

17  Q.  It was a large contract, several million dollars, correct?

18          THE INTERPRETER:  For the interpreter, several

19  million?

20          MR. MOSKOWITZ:  Dollars.

21  A.  That's correct.

22  Q.  Now, your boss, Mr. Jarufe, was a successful businessman,

23  correct?

24  A.  That's correct.

25  Q.  He was considered a rich man in Honduras, correct?

1    A.   Correct.

2    Q.   Graneros was the biggest rice producer in Honduras,

3    correct?

4    A.   That's correct.

5    Q.   Mr. Fuad Jarufe was also involved in politics, correct?

6    A.   That's correct.

7    Q.   And you told us he was a supporter of the National Party,

8    correct?

9    A.   That's correct.

10   Q.   And in Honduras successful business people are -- many of

11   them are involved in politics, correct?

12   A.   That's correct.

13   Q.   And all political parties try to get political

14   contributions from the successful business people in Honduras,

15   correct?

16   A.   That's correct.

17   Q.   Mr. Fuad Jarufe gave political contributions to the

18   National Party, correct?

19   A.   Correct.

20   Q.   And he gave political contributions to the National Party

21   even before Juan Orlando Hernandez was running for president,

22   correct?

23   A.   That's correct.

24   Q.   He was giving -- from the time that you joined the company

25   in 2000 until the time you left, he continued to give political

1   contributions to the National Party, correct?

2   A.  That's correct.

3   Q.  And he would not only give to candidates for president, but

4   he would also give, for example, to candidates for Congress,

5   correct?

6   A.  No, not for Congress.

7   Q.  How about for mayor?

8   A.  Yes.

9   Q.  So he'd give to the national candidates and to the local

10  candidates, like for mayor, correct?

11  A.  That's correct.

12  Q.  Now, in addition to giving money to the National Party,

13  Mr. Jarufe, Fuad Jarufe, allowed National Party figures to use

14  offices at Graneros to have meetings, correct?

15  A.  That's correct.

16  Q.  So, for example, Juan Orlando Hernandez, when he was

17  running for president, would come to Graneros and have meetings

18  with a bunch of business people, correct?

19  A.  That's correct.

20  Q.  And it was your understanding that at that -- at those

21  meetings, Mr. Juan Orlando Hernandez would solicit campaign

22  contributions from the businessmen that were there, correct?

23  A.  That's correct.

24  Q.  Now, you did not like Juan Orlando Hernandez, correct?

25  A.  He was not of my liking upon witnessing how he would make a

1    mockery of the Honduran people and stole from the state.

2    Q.  In fact, you complained to your boss, Fuad Jarufe, about

3    the fact that he was contributing money to Juan Orlando

4    Hernandez?

5    A.  Yes, once.

6    Q.  Now, you told us that the first time you met Juan Orlando

7    Hernandez was when he was running for president, correct?

8    A.  That's correct.

9    Q.  And that was in 2013, correct?

10   A.  That's correct.

11   Q.  And the first -- withdrawn.

12           How many times overall can you tell us you actually

13   met or saw Juan Orlando Hernandez?

14   A.  Between nine and 11 times.

15   Q.  And if you can, sir, did you meet Mr. Juan Orlando

16   Hernandez in the beginning of 2013, in the middle of 2013, or

17   later in 2013?

18   A.  Beginning of 2013.

19   Q.  And the first few times that you saw him, he was coming to

20   get campaign checks from your boss, correct?

21   A.  Correct.

22   Q.  And you told us he was getting 250,000 lempiras a month

23   from Graneros, correct?

24   A.  That's correct.

25   Q.  And just -- by the way, do you know the exchange rate

L3GHRAM4                          Sanchez - Cross

1   between lempiras and dollars?

2              THE COURT:  As of what point in time?

3   Q.  As of -- around 2013, approximately what the exchange rate

4   was.

5   A.  19.03.

6   Q.  And at some point the exchange rate went up to 24 or 25

7   lempiras for the dollar, correct?

8   A.  That was not what it was when I left Honduras.

9   Q.  Now, how many times did you meet and hand a check --

10  withdrawn.

11             When Mr. Juan Orlando Hernandez was running for

12  president and coming to Graneros once a month to pick up

13  checks, how many times did you hand him a check before you

14  actually saw him with Mr. Fuentes?

15  A.  Three occasions.

16  Q.  So if you started giving him checks in January of 2013, so

17  we're talking about January, February, and March, during that

18  period of time, you would have handed Mr. Juan Orlando

19  Hernandez checks, correct?

20  A.  That's correct.

21  Q.  So it would have been sometime after March that you first

22  saw Mr. Fuentes with Juan Orlando Hernandez, correct?

23  A.  I do not remember the date.

24  Q.  Well, do you remember -- do you remember that when you met

25  Mr. Fuentes, it was after the third time you had given checks,

L3GHRAM4                          Sanchez - Cross

1  political campaign checks, to Juan Orlando Hernandez?

2  A.  Yes.  I had already delivered checks to Juan Orlando

3  Hernandez on three occasions.

4  Q.  When you saw Mr. Fuentes with Mr. -- with Juan Orlando

5  Hernandez, he was not yet the president, correct?

6  A.  That's correct.

7  Q.  Now, you told us on direct examination -- hold on for one

8  minute -- sir, the first time you met with the government was

9  in 2019, correct?

10 A.  That's correct.

11 Q.  And you met with some agents of the FBI, is that correct?

12 A.  That's correct.

13 Q.  And when you met with the agents of the FBI, you told them

14 about a meeting that you observed between Mr. Fuentes and Juan

15 Orlando Hernandez, correct?

16 A.  Correct.

17 Q.  And you told them that that meeting took place a few weeks

18 after the raid on the lab in Cerro Negro, correct?

19 A.  No.

20 Q.  Do you remember telling the FBI when you met with them the

21 first time that the meeting with Mr. Fuentes and Juan Orlando

22 Hernandez took place in March of 2014?

23 A.  No.

24 Q.  And do you remember telling the FBI when you met with them

25 in 2019 that the meeting between Juan Orlando Hernandez and

L3GHRAM4                        Sanchez – Cross

1    Mr. Fuentes took place three weeks after the raid on the lab in

2    Cerro Negro?

3    A.  No.

4    Q.  And do you remember telling the FBI that at the meeting

5    Juan Orlando Hernandez told Mr. Fuentes that he was going to

6    help him reopen the lab?

7    A.  No.

8    Q.  Mr. Sanchez, I'd like to show you a document that has been

9    marked 3536-01, and I will make arrangements to have the

10   interpreter get a copy.  I'd like to direct your attention to

11   the second paragraph on page 2 and ask the interpreter to read

12   the first two sentences to the witness.

13            It should be the first three sentences, I'm sorry.

14            THE INTERPRETER:  Can we just confirm the last word in

15   that third sentence?  Actually, I'm OK.  Thank you, counselor.

16            MR. MOSKOWITZ:  OK.

17            THE INTERPRETER:  Ready, counselor.

18   BY MR. MOSKOWITZ:

19   Q.  Sir, you do recall your meeting with the FBI, correct?

20   A.  Yes.

21   Q.  It was a very important meeting for you, correct?

22   A.  That's correct.

23   Q.  You were going to tell the FBI what you knew about Juan

24   Orlando Hernandez, correct?

25   A.  That's correct.

L3GHRAM4                          Sanchez - Cross

1    Q.   And you met with various -- with several different agents,

2    correct?

3    A.   That's correct.

4    Q.   And there was an interpreter in the room, correct?

5    A.   Yes, there was an interpreter there.

6    Q.   And you noticed that somebody was taking notes, correct?

7    A.   Yes.

8    Q.   Now, having had the document read to you, does it refresh

9    your recollection as to what you told the agents when you met

10   with them in 2019?

11   A.   I believe that the writing was not drafted adequately

12   because at the time they were very confused with what I was

13   telling them.

14            THE COURT:  All right.  The concept of refreshing your

15   recollection, sir, is you're asked to listen to the words of

16   the document, listen to them, and then tell us whether this

17   gives you a new and refreshed recollection.  And if it does,

18   then you'd say, yes, I have a new and refreshed recollection,

19   and you'd tell us what that new and refreshed recollection is.

20   If, on the other hand, it does not, you would simply say it

21   does not refresh my recollection.

22            All right.  Next question, please.

23   BY MR. MOSKOWITZ:

24   Q.   Now, having heard the document read to you, do you remember

25   telling the FBI that the drug lab --

1              THE COURT:  You've asked the witness already whether

2     having had the document read to you, does it refresh your

3     recollection as to what you told the agents when you met with

4     them in 2019?  The witness has said no.  Move on, please.

5     Q.  Do you deny telling the FBI that you met -- that the

6     meeting that you attended with Juan Orlando Hernandez and the

7     defendant took place three weeks after the raid on the lab in

8     Cerro Negro?

9     A.  Correct.

10             THE COURT:  Ladies and gentlemen, there's no evidence

11     in the record as to what this individual did or did not tell

12     any agent.

13             Go ahead.  Next question.

14     Q.  Now, you told us about a meeting that Mr. Juan Orlando

15     Hernandez had with some political leaders, is that correct?

16     A.  That's correct.

17     Q.  And that is the meeting in which you heard him talking

18     about stealing from the Social Security system in Honduras,

19     correct?

20     A.  That's correct.

21     Q.  And Mr. Fuentes was not at that meeting, correct?

22     A.  That's correct.

23     Q.  Who was at that meeting?

24     A.  It was just individuals from Tegucigalpa.

25     Q.  Did you know any of their names?

L3GHRAM4                        Sanchez - Cross

1   A.  No, just that it was Juan Orlando Hernandez's close circle.

2   Q.  And at some point in that meeting, you entered and you gave

3   Juan Orlando Hernandez a check?

4   A.  Yes.

5   Q.  Now, was it in that meeting, sir, that you called Juan

6   Orlando Hernandez a thief?

7   A.  No.

8   Q.  There was a meeting, however, in which you called Juan

9   Orlando Hernandez a thief, correct?

10  A.  Yes.

11  Q.  When was that meeting?

12  A.  It was at the end of 2013.

13  Q.  Was it before or after he was elected president?

14  A.  Before.

15  Q.  And the election was in November?

16  A.  Yes.

17  Q.  So it was sometime before November of 2013, correct?

18  A.  Correct.

19  Q.  Who was present at that meeting?

20  A.  It was my boss, Juan Orlando, and two more National Party

21  individuals.

22  Q.  And do you know their names?

23  A.  No.

24  Q.  Now, what did you hear Juan Orlando Hernandez say on that

25  occasion that caused you to call him a thief?

```
 1   A.  When I try to come into the office, his bodyguard was not

 2   letting me in, and he tried to take out his handgun to threaten

 3   me.  And then he asked me:  Is it that you do not know who is

 4   inside?  I told them:  I do.  It's a thief, and that is whom

 5   you're defending.

 6   Q.  Did you call Juan Orlando a thief to his face?

 7   A.  Yes.  Then I went inside the office, and my boss asked me

 8   what it was that was going on outside.  And I told him that the

 9   bodyguard would not allow me in because he was asking me if I

10   did not know who was inside, and then Juan Orlando Hernandez

11   asked me:  And what did you respond?  And I said to him:  That

12   a thief was inside.  And then he smiled.  He then tried to

13   shake my hand, I refused, and I asked him to sign the check for

14   me.

15   Q.  And then what happened?

16   A.  I left the office.

17   Q.  Did he sign the check for you?

18   A.  Yes.

19   Q.  And when you say "he," you're talking about Juan Orlando

20   Hernandez or your boss?

21   A.  About Juan Orlando Hernandez.

22   Q.  So you made out a check to Juan Orlando Hernandez?

23   A.  No.

24   Q.  You made out a check to his political campaign fund,

25   correct?
```

L3GHRAM4                         Sanchez - Cross

1          THE INTERPRETER:  Repeat the question for the

2     interpreter, please.

3     Q.  You made out a check to his political campaign fund?

4     A.  Correct.

5     Q.  And he endorsed it?

6     A.  Yes.

7     Q.  And then you went and got cash?

8     A.  No.  Juan Orlando kept the check.

9     Q.  And when you called Juan Orlando Hernandez a thief, he

10    smiled at you, correct?

11    A.  Correct.

12    Q.  He didn't get angry at you, correct?

13    A.  No.

14    Q.  He didn't threaten you, correct?

15    A.  Correct.

16    Q.  He offered to shake your hand?

17    A.  That's correct.

18    Q.  And you refused to shake his hand?

19    A.  Correct.

20    Q.  You insulted him, correct?

21    A.  No.  I told him a truth that no one has told him.

22    Q.  You did not consider calling him a thief to be an insult?

23    A.  In Honduras, politicians have a phrase very, very personal

24    to them.  They say:  I'd rather someone -- people say, "There

25    goes a thief" and not "There goes an idiot."  Politicians do

1    not get bothered in Honduras when people call them thieves.   It

2    amuses them.

3    Q.   And in Honduras when somebody offers you to shake their

4    hand, is it not considered an insult to refuse to shake their

5    hand?

6    A.   It depends on who's shaking it.

7    Q.   When you refused to shake the hand of Juan Orlando

8    Hernandez, you certainly intended to insult him, correct?

9    A.   No.

10   Q.   You intended to show him that you had no respect for him,

11   correct?

12             MR. GUTWILLIG:   Objection.

13             THE COURT:   Overruled.

14   A.   No.

15   Q.   Well, then what was your intention?

16   A.   For he and I as well to be equals.

17   Q.   And shaking hands means you're not equals?

18   A.   No.   It means that one is selective with one's friends.

19   Q.   And you thought it was important also for him to know that

20   you thought he was a thief, correct?

21   A.   Correct.

22   Q.   When you said that, you weren't afraid that he was going to

23   do something to you, correct?

24   A.   No.

25   Q.   He was about to become president of the country, correct?

L3GHRAM4                         Sanchez - Cross

1   A.  Yes.

2   Q.  And your testimony -- withdrawn.

3        This meeting when you refused to shake his hand which

4   took place late in 2013, that was after you had already seen

5   Mr. Fuentes with Mr. Hernandez, correct?

6   A.  Correct.

7   Q.  And it was after you claim that you heard Juan Orlando

8   Hernandez and Mr. Fuentes talking about going into the

9   narco-trafficking business together, correct?

10  A.  That's correct.

11  Q.  And it was after you told us -- it was after the meeting in

12  which you told us that when you saw the two of them together,

13  meaning Mr. Hernandez and Mr. Fuentes, you were scared for your

14  life?

15  A.  Yes.

16  Q.  And the reason you were scared for your life was because

17  the president, you believed -- or you claim you believed that

18  the president of your country was going to be a

19  narco-trafficker, correct?

20  A.  No, I did not -- I did not fear Juan Orlando.  I feared the

21  defendant.

22  Q.  You did not fear that you were a witness to the president

23  of your country becoming a narco-trafficker?

24  A.  Yes.  But I think no one here in this room knows the

25  defendant as I do.

L3GHRAM4                        Sanchez - Cross

1   Q.  That's certainly true.  I'm asking you about Mr. Juan

2   Orlando Hernandez.

3           You have told this jury that you saw the president of

4   your country conspiring with a drug trafficker, correct?

5           THE INTERPRETER:  Please repeat the question for the

6   interpreter.

7   Q.  You told us that you saw the president of your country

8   talking about going into the drug business with a drug

9   trafficker, correct?

10  A.  Correct.  He was not president yet.

11  Q.  He was about to become president, correct?

12  A.  Yes.

13  Q.  And when you called him a thief, he was a month away or

14  just a few weeks away from becoming president, correct?

15  A.  He was in the last place in the polls without any

16  possibilities of winning the presidency.

17  Q.  But he became president, correct?

18  A.  Correct.

19  Q.  And you have told the government you were afraid of him,

20  correct?

21  A.  Yes.  But I had the hope that he would not become

22  president.

23  Q.  He did become president, correct?

24  A.  Correct.

25  Q.  The man that you called the thief became the president,

L3GHRAM4                          Sanchez - Cross

1   correct?

2   A.  Yes, through fraud.

3   Q.  Now I want to ask you -- switch topics for a moment.

4           Honduras is a violent country, correct?

5   A.  Yes.

6   Q.  There are a lot of gangs, correct?

7   A.  Yes.

8   Q.  Many people get killed?

9   A.  Yes.

10  Q.  It is common for people in Honduras to carry guns, correct?

11  A.  Yes.

12  Q.  And many people carry guns for protection, correct?

13  A.  Correct.

14  Q.  And businesses had security, correct?

15  A.  Correct.

16  Q.  For example, Graneros had security, correct?

17  A.  That's correct.

18  Q.  Around the Graneros plant, there was a gate to get in,

19  correct?

20          THE INTERPRETER:  For the interpreter, repeat the

21  question, please.

22  Q.  Where the Graneros offices and plant were, there was a gate

23  which people had to pass through to get in, correct?

24  A.  Correct.

25  Q.  And a guard had to open the gate for anybody to come in,

L3GHRAM4                        Sanchez – Cross

 1   correct?

 2   A.  Correct.

 3   Q.  And the guard was armed, correct?

 4   A.  Yes.

 5   Q.  And Mr. Jarufe, Fuad Jarufe, had a bodyguard, correct?

 6   A.  Yes.

 7   Q.  And his bodyguard was armed, correct?

 8   A.  Correct.

 9   Q.  You talked about semiautomatic pistols.  Do you remember

10   that?

11   A.  Yes.

12   Q.  In Honduras, semiautomatic pistols were marketed to

13   business people, correct?

14   A.  Yes.

15   Q.  Because they provided a little more protection against the

16   violence, correct?

17   A.  I'm not sure about that.

18              (Continued on next page)

19

20

21

22

23

24

25

L3GKRAM5                        Sanchez - Cross

1    BY MR. MOSKOWITZ:

2    Q.  Well, did you have a gun?

3    A.  No.

4    Q.  You never owned a gun?

5    A.  No.

6    Q.  When you went -- you told us, when you went to the bank to

7    pick up payroll, you always had a bodyguard, correct?

8    A.  Yes.

9    Q.  At least one, correct?

10   A.  Yes.

11   Q.  Because it was dangerous for you to carry a large amount of

12   money even from the bank just back to your office, correct?

13   A.  Correct.

14   Q.  And sometimes the security guards at Graneros weren't

15   available to take you to the bank, correct?

16   A.  Correct.

17   Q.  So, on some occasions, if Mr. Fuentes was there, he might

18   accompany you to the bank, correct?

19   A.  It was only on one occasion.

20   Q.  Were there other occasions when he sent a bodyguard to go

21   with you?

22   A.  No.

23   Q.  So, it was only one occasion that you went to the bank with

24   Mr. Fuentes; is that correct?

25   A.  Yes, correct.

```
 1    Q.  Now, by the way, when you first met Mr. Fuentes, he lived

 2    in Choloma, correct?

 3    A.  Yes.

 4    Q.  And that's a dangerous city, correct?

 5    A.  Correct.

 6    Q.  And, at some point, he moved to San Pedro Sula, correct?

 7    A.  That's correct.

 8    Q.  And that's an even more dangerous city, correct?

 9    A.  Yes.

10    Q.  Now, by the way, in Honduras, people are allowed to own

11    guns, correct?

12    A.  Yes.

13    Q.  You need a license, correct?

14    A.  Correct.

15    Q.  And you don't know whether Mr. Fuentes had a gun license,

16    correct?

17    A.  Yes.

18    Q.  You never asked him, correct?

19    A.  No.

20    Q.  You told us on direct examination that when you first met

21    Mr. Fuentes, in 2003, he would come to the office occasionally,

22    correct?

23    A.  Yes.

24    Q.  When he'd come, he would come to exchange dollars for

25    lempiras, correct?
```

1   A.  Not at the beginning.

2   Q.  When did that start, when he would come to exchange dollars

3   for lempiras?

4   A.  As of 2004.

5   Q.  So, when you first met him, he was just coming to Graneros

6   to hang out with John Jarufe?

7   A.  That's correct.

8   Q.  And then sometime in 2004, he began to come to Graneros and

9   occasionally give you dollars to exchange for lempiras,

10   correct?

11   A.  Yes, he would say to tell John the engineer to talk to my

12   boss so that he could exchange dollars for lempiras for him.

13   Q.  And your boss told you it was okay to exchange dollars for

14   lempiras, correct?

15   A.  He accepted, he honored, his son's request.

16   Q.  When you got the dollars from Mr. -- withdrawn.

17       You told us that Mr. Fuentes would bring you somewhere

18   around $10,000 at that time, correct?

19   A.  Correct.

20   Q.  And that, usually, the money was in twenties, correct?

21   A.  Always.

22   Q.  And at the time, Honduras had a law limiting how many

23   20-dollar bills could be deposited in the bank at one time,

24   correct?

25   A.  Correct.

1    Q.  Now, when we say that there is a limit, it's not that you

2    can't deposit the money, but that if you deposit more than

3    $2,000 in twenties, you have to fill out a form, correct?

4    A.  That's correct.  You have to justify the money coming in.

5    Q.  When you got this $10,000 from Mr. Fuentes, you deposited

6    that money in the bank, correct?

7    A.  Yes.

8    Q.  And you had to fill out a form, correct?

9    A.  I deposited it in several banks so that I only had to fill

10   out one form.

11   Q.  Was that something that you decided on your own, or did

12   your boss tell you to do that?

13   A.  I did it to save myself time at the bank.

14   Q.  Well, if you deposited $10,000 in twenties, you'd have to

15   fill out one form, correct?

16   A.  Three forms.

17   Q.  The form was for deposits over $2,000, correct?

18   A.  Correct.

19   Q.  Are you telling us that if it's $3,000, you have to fill

20   out one form, if it's $5,000, you have to fill out two forms,

21   and if it's $10,000, you have to fill out three forms?  Is that

22   the way it works?

23   A.  When you deposit $10,000 and above, you have to fill out

24   three forms.  For minor amounts, you only fill out one form.

25   Q.  So, if you deposited $9,000, you have to fill out one form,

L3GKRAM5                        Sanchez - Cross

1     correct?

2     A.   Correct.

3     Q.   And if you deposited $1,000, you don't have to fill out any

4     forms, correct?

5     A.   If I deposit 1,000, no.

6     Q.   Now, when you filled out the form, they ask you where you

7     got the money from, correct?

8     A.   Correct.

9     Q.   And when you filled out the form, when you were depositing

10    the money you got from Mr. Fuentes, you told the truth,

11    correct?

12    A.   Correct.

13    Q.   You would identify that you got the money from Mr. Fuentes,

14    correct?

15    A.   On one form, yes; on another, no.

16    Q.   When you didn't put his name down on the form, that is a

17    decision you made by yourself, correct?

18    A.   Correct, so that they would not reject my deposit.

19    Q.   Nobody directed you to lie on the form that you filled out

20    for the bank, correct?

21         THE INTERPRETER:   Please repeat the question for the

22    interpreter.

23    Q.   Nobody directed you to lie on the form that you completed

24    for the bank?

25    A.   True.

L3GKRAM5                          Sanchez - Cross

1   Q.  That was a decision you made all on your own?

2   A.  Yes, because I needed to deposit money.

3   Q.  Now, on the forms that you filled out that identified

4   Mr. Fuentes as the source of the money, you were telling the

5   bank that you were getting thousands of dollars in twenties

6   from Mr. Fuentes, correct?

7   A.  Correct.

8   Q.  Those were anti-money laundering forms, correct?

9   A.  That's correct.

10  Q.  And you weren't hiding from the bank the fact that you got

11  thousands of dollars in twenties from Mr. Fuentes?

12  A.  That's correct.

13  Q.  By the way, money laundering is a crime in Honduras,

14  correct?

15  A.  Yes.

16  Q.  And when you were depositing the money that you got from

17  Mr. Fuentes, you did not believe you were committing a crime,

18  did you?

19  A.  I only followed instructions.

20  Q.  Sir, nobody told you to lie on the forms, correct?

21  A.  Yes, but they sent me to deposit the money, and I have to

22  deposit the money.

23  Q.  Did you think, at the time, that you were committing the

24  crime of money laundering?

25  A.  Yes.

L3GKRAM5                         Sanchez - Cross

1   Q.  And that was a decision you made all on your own, correct?

2   A.  Correct.

3   Q.  Now, I want to switch topics again and talk to you about

4   going to Cerro Negro.

5              THE COURT:  All right.  Ladies and gentlemen, we're

6   going to take our midafternoon break.  Please do not discuss

7   the case among yourselves or with anyone.  We'll be back in

8   action in ten minutes.  Thank you.

9              (Jury not present)

10             THE COURT:  Okay.  Thank you.

11             (Recess)

12             (Jury present)

13             THE COURT:  All right.  Mr. Moskowitz, why don't you

14   take the podium.

15             Thank you.  You may continue.

16             MR. MOSKOWITZ:  Thank you, your Honor.

17   BY MR. MOSKOWITZ:

18   Q.  Mr. Sanchez, you told us that you went up to Cerro Negro

19   two times, correct?

20   A.  That's correct.

21   Q.  And each time you went, you went at your boss' request,

22   correct?

23   A.  That's correct.

24   Q.  And the boss told you that you were going to deliver

25   payroll for Mr. Fuentes' employees, correct?

L3GKRAM5                              Sanchez - Cross

1    A.  That's correct.

2    Q.  The first time you went, you took 14,000 lempiras, correct,

3    approximately?

4    A.  Yes.  That's what I was told was there.

5    Q.  And just so that we can put that in perspective for the

6    jury, 14,000 lempiras, at the rate that you recall of 19

7    lempiras for the dollar and change, that comes out to a little

8    over $700, correct?

9    A.  Correct.

10   Q.  And the second time you went, you told us you took 17,000

11   lempiras, correct?

12   A.  Yes.

13   Q.  And that was several months later, correct?

14   A.  That's correct.

15   Q.  And 17,000 lempiras translates in dollars to less than

16   $900, correct?

17   A.  Correct.

18   Q.  Now, when you got to Cerro Negro, to the property at Cerro

19   Negro, you never actually entered into the property, correct?

20   A.  I did enter the property.

21   Q.  You got to the entrance, right?

22   A.  Yes, I got to the entrance, and then a person came in my

23   way.

24   Q.  So, when you got to the entrance, you didn't go past the

25   entrance to the property, correct?

L3GKRAM5                        Sanchez - Cross

```
 1   A.  Yes.  There was an old wooden gate with a green sign that
 2   said "Do Not Enter."
 3   Q.  And so you stopped at the gate, correct?
 4   A.  In front of the gate, yes.
 5   Q.  And somebody came out to meet with you, correct?
 6   A.  That's correct.
 7   Q.  And both times, it was the same person who came out to
 8   greet you, correct?
 9   A.  That's correct.
10   Q.  You gave him the payroll, correct?
11   A.  That's correct.
12   Q.  Didn't have much of a conversation, right?
13   A.  Correct.
14   Q.  And then just left?
15   A.  That's right.
16   Q.  Now, when you got to the gate, you could see a building in
17   front of the property, or at the front part of the property,
18   correct?
19   A.  Correct.
20   Q.  And that property appeared to be a coffee processing plant,
21   correct?
22   A.  Yes, it did have the appearance of a small coffee ranch.
23   Q.  And you knew that Mr. Fuentes and John Jarufe had gone into
24   the coffee business together, correct?
25   A.  That's correct.
```

1    Q.  And if you're going to grow and process coffee, you're

2    going to need some employees, correct?

3    A.  Right.

4    Q.  And you never went inside the building that you saw when

5    you arrived at Cerro Negro, correct?

6    A.  Correct.

7    Q.  When you described the finca that you went to, you called

8    it Mr. Fuentes' property, correct?

9    A.  Right.

10   Q.  Now, you have never seen any of the real estate documents

11   showing who actually owned the property, correct?

12   A.  Correct, but --

13            MR. MOSKOWITZ:  Your Honor, there was a yes-or-no

14   question.  Everything else -- I asked him if he saw the

15   deeds --

16            THE COURT:  I'm not going to interrupt the

17   translation, Mr. Moskowitz.

18            MR. MOSKOWITZ:  Sorry.

19            THE COURT:  Do you understand?

20            MR. MOSKOWITZ:  Yes, your Honor.

21            THE COURT:  Okay.

22            Go ahead.

23   A.  But I paid several installments that were charged to

24   Mr. Fuentes' account.

25   Q.  So, based on that, you believed he owned the property,

L3GKRAM5                          Sanchez - Cross

1    correct?

2    A.  Correct.

3    Q.  And you don't know how large the property was, do you?

4    A.  Correct.

5    Q.  And you don't know whether any part of the property was

6    rented out, correct?

7    A.  Correct.

8    Q.  Now, by the way, the property was in the mountains,

9    correct?

10   A.  Correct.

11   Q.  Cerro Negro is a mountain, right?

12   A.  Yes.

13   Q.  And it's difficult to get to, correct?

14   A.  Correct.

15   Q.  And it's not so safe, right?

16   A.  Around -- at that time, La Jutosa was the safest area of

17   Choloma.

18   Q.  Choloma itself was not so safe, right?

19   A.  Right.

20   Q.  And so calling Jutosa the safest place in Choloma doesn't

21   mean it was a safe place?

22   A.  Yes, it was safe because there was a beach there that

23   people would visit, and people would watch it.

24   Q.  The area around the finca was isolated, correct?

25   A.  Correct.

1  Q.  And if you're working there and coming home in the dark,

2  it's not so safe, right?

3  A.  Correct.

4  Q.  Now, you told us that you learned about the raid on the

5  property from the newspaper, correct?

6  A.  On TV, news programming.

7  Q.  And you saw pictures, right?

8  A.  Images, photos, and everything.

9  Q.  None of the things that you saw on the television could be

10 seen from the front gate, correct?

11 A.  The house could.

12 Q.  Meaning just the first building that we were talking about,

13 correct?

14 A.  Correct.

15 Q.  The one that looked like a coffee processing plant?

16 A.  Correct.

17 Q.  Now, you told us that about a month or a little bit more

18 than a month after the raid, you witnessed a meeting between

19 Mr. Fuentes and Mr. Barahona, correct?

20 A.  That's correct.

21 Q.  And just so that we have a time frame, the raid on

22 Cerro Negro was in March of 2011, correct?

23 A.  That's correct.

24 Q.  And at that time, Juan Orlando Hernandez was not yet

25 president, correct?

1   A.  He was the president of congress.

2   Q.  But he was not president of the country, correct?

3   A.  Correct.

4   Q.  He was not running for president of the country yet,

5   correct, in 2011?

6   A.  Right.

7   Q.  And you had not met him yet, correct?

8   A.  Correct.

9   Q.  Now, Mr. Barahona, you told us, was the president of the

10  judicial institute or something like that; is that correct?

11  A.  President of the judiciary.

12  Q.  And that is a job that is appointed by the president,

13  correct?

14  A.  The president of congress appoints him.

15  Q.  And at that time, you said Mr. Hernandez was the president

16  of congress, correct?

17  A.  Correct.

18  Q.  Now, when you walked into the meeting with Mr. Barahona,

19  you had never met him before, correct?

20  A.  Correct.

21  Q.  You had never spoken to him before, correct?

22  A.  Correct.

23  Q.  And you didn't know who his boss was, correct?

24  A.  I did know.

25  Q.  You believed you knew, correct?

L3GKRAM5                        Sanchez - Cross

1    A.  No.  When he was appointed president of the judiciary, he

2    was reported on the news as an honest person.

3    Q.  You had never spoken to him about who he reported to,

4    correct?

5    A.  Correct.

6    Q.  And you heard him make some comment about the fact that his

7    boss had sent him, correct?

8    A.  That's correct.

9    Q.  And you never asked him who he was referring to, correct?

10   A.  Correct.

11   Q.  And you heard him say that he had come to clean up

12   Mr. Fuentes' record, correct?

13   A.  That's what I understood.

14   Q.  At the time that you heard that, Mr. Fuentes had not been

15   arrested, correct?

16   A.  Correct.

17   Q.  There were no charges against him, correct?

18   A.  That's correct.

19   Q.  He did not have a criminal record, correct?

20   A.  I would not know.

21   Q.  Now, you told us about seeing a cattle car that turned

22   over, correct?

23   A.  That's correct.

24   Q.  And that a few days after that, you spoke to one of

25   Mr. Fuentes' workers, correct?

L3GKRAM5                        Sanchez - Cross

1    A.  Correct.

2    Q.  When you say one of his workers, you mean a bodyguard,

3    correct?

4    A.  That's correct.

5    Q.  Other than accompanying Mr. Fuentes when he came to

6    Graneros, you didn't know what this person did for Mr. Fuentes,

7    correct?

8    A.  Correct.

9    Q.  And you heard him say that Mr. Fuentes was upset, correct?

10   A.  That's what he said.

11   Q.  Because his deal had been ruined, correct?

12   A.  Correct.

13   Q.  And you, in your own mind, translated that to mean, must be

14   a drug deal, correct?

15   A.  In my country, we say read between the lines.

16   Q.  That's what you were doing, correct?

17   A.  That phrase is only used amongst those people.

18   Q.  You've never heard anybody else say, my deal fell through?

19   A.  Yes, people engaged in that business.

20   Q.  Nobody else -- you've never heard anybody else in Honduras,

21   in a business, talk about a deal falling through?

22   A.  I have heard.

23   Q.  By the way, how many drug dealers do you think you know?

24   A.  None other.

25   Q.  So, you haven't heard drug dealers talking among

L3GKRAM5                          Sanchez - Cross

1    themselves, correct?

2    A.  Correct.

3    Q.  You are not an expert on how drug dealers talk to each

4    other, correct?

5    A.  Correct.

6    Q.  But you interpreted the phrase that Mr. Fuentes' worker

7    used to be referring to a drug deal?

8    A.  Correct.

9    Q.  Now, after you had that conversation, sometime after that,

10   you met Santos Isidro Rivera Maradiaga, correct?

11   A.  Correct.

12   Q.  And you met him for the first time at Graneros, correct?

13   A.  Correct.

14   Q.  You had no idea who he was?

15   A.  Correct.

16   Q.  When you met him, did he introduce himself?

17   A.  No.

18   Q.  You had heard, by that time, of Los Cachiros, correct?

19   A.  Correct.

20   Q.  And when you referred to Los Cachiros or the Los Cachiros

21   that you thought about, you talked about you were thinking

22   about Leonel Rivera, correct?

23   A.  Correct.

24   Q.  And Javier Rivera, correct?

25   A.  Correct.

L3GKRAM5                          Sanchez - Cross

1   Q.   They were on the news a lot, right?

2   A.   Correct.

3   Q.   And you had seen pictures of them, correct?

4   A.   Correct.

5   Q.   But you had never heard of their youngest brother, Santos

6   Isidro, correct?

7   A.   Correct.

8   Q.   By the way, when you met Santos Isidro, he was pretty

9   young, right?

10  A.   Right.

11  Q.   About 20, maybe?

12  A.   I do not remember.  I would not be able to tell you how old

13  he was.

14  Q.   Substantially younger than you, right?

15  A.   Right.

16  Q.   And much younger than Mr. Fuentes Ramirez, correct?

17  A.   Correct.

18  Q.   When you meet Mr. Santos Isidro, you were rude to him,

19  correct?

20          THE INTERPRETER:  For the interpreter, please, can you

21  correct that?

22  Q.   When you met Santos Isidro, you were rude to him?

23  A.   That's correct.

24  Q.   He didn't threaten you, did he?

25  A.   No.  I apologized to him, and he kindly accepted.

L3GKRAM5                        Sanchez - Cross

1    Q.   At some point that day, you find out that he is related to

2    Leonel Rivera, correct?

3    A.   That's correct.

4    Q.   And to Javier Rivera?

5    A.   Correct.

6    Q.   You find that out from your boss, correct?

7    A.   Correct.

8    Q.   And Fuad Jarufe makes no -- doesn't try to hide the fact

9    that he's about to do a business deal to buy rice from the

10   youngest brother of Leonel and Javier Rivera, correct?

11   A.   That's correct.

12   Q.   And you don't object to Graneros doing business to buy rice

13   from the youngest Rivera brother?

14   A.   When I drawn the check, I did not know who he was, and he

15   had the necessary rice producer identification card.

16   Q.   You had no knowledge -- withdrawn.

17           At no time did you ever have any knowledge that

18   Mr. Santos Isidro was involved in drug trafficking, correct?

19   A.   I don't understand the question.

20   Q.   You had no knowledge that Santos Isidro was involved --

21   Rivera was involved in drug trafficking, correct?

22   A.   Correct.

23   Q.   He sold rice to Graneros, and you paid him by check,

24   correct?

25   A.   Correct.

L3GKRAM5                      Sanchez - Cross

1   Q.  He didn't ask you for cash, correct?

2   A.  Correct.

3   Q.  Now, you told us that you saw Santos Isidro a second time,

4   correct?

5   A.  That's correct.

6   Q.  How long after the first time did you see him a second

7   time?

8   A.  It was the same week when he sold the rice.

9   Q.  What year was that?

10  A.  In 2012.

11  Q.  Now, in 2012, the Cachiros were -- there was an

12  announcement that the Cachiros were sanctioned by OFAC,

13  correct?

14  A.  Correct.

15  Q.  And you heard about that, right?

16  A.  But that was not early in 2012.

17  Q.  So, both of these meetings that you had with Santos Isidro

18  were in early 2012?

19  A.  Yes.

20  Q.  Now, on the second meeting that you saw Santos Isidro, he

21  came to sell some cattle, correct?

22  A.  That's correct.

23  Q.  And you told us that he was selling the cattle at a

24  discounted price, correct?

25  A.  That's correct.

L3GKRAM5                         Sanchez - Cross

1    Q.  And you assumed that the reason he was selling the cattle

2    at a reduced price is because the cattle was used for drug

3    trafficking; is that what you said?

4    A.  That kind of cattle that is sold cheap in Honduras is used

5    for that purpose, of transporting drugs.

6    Q.  Sir, did you talk to anybody -- well, withdrawn.

7             Did you ask Santos Isidro why the cattle was being

8    sold so cheaply?

9    A.  No.

10   Q.  Do you know, from your own personal knowledge, whether Los

11   Cachiros ever used cattle to carry drugs?

12   A.  Yes, through the news.

13   Q.  You have no personal knowledge, correct?

14   A.  Correct.

15   Q.  You've never spoken to Leonel Rivera about his drug

16   trafficking, correct?

17   A.  Correct.

18   Q.  You've never spoken to Javier Rivera, correct?

19   A.  Nor do I hope to.

20   Q.  And you have never spoken to anybody who worked with them

21   carrying drugs on the backs of cattle, correct?

22   A.  Not on the backs of cattle.  It goes inside of cattle.

23   Q.  Did you actually inspect the cattle?

24   A.  No.

25             In Choloma, there was a case of a veterinarian who was

1    very well-known who was murdered.

2              MR. MOSKOWITZ:  Judge, can we have the answer

3    stricken, please?  There's no question that he's responding to.

4              THE COURT:  Stricken, everything after the word "No."

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3GHRAM6                        Sanchez - Cross

1   Q.  As a businessman, Mr. Sanchez, you know that people sell

2   assets at a discount for all kinds of reasons, correct?

3   A.  Not at that price.

4   Q.  Are you an expert in cattle prices, sir?

5        THE INTERPRETER:  The question again for the

6   interpreter, please.

7   Q.  You're not an expert in cattle prices, are you,

8   Mr. Sanchez?

9   A.  I have knowledge.

10  Q.  Did you do a study on cattle prices?

11  A.  No.  My boss fattened and sold cattle.

12  Q.  Your boss was happy to buy the cattle at that price,

13  correct?

14  A.  Correct.

15  Q.  Did you ever tell Fuad Jarufe that you suspected that the

16  reason the price was so cheap was that the cattle was used for

17  drug trafficking?

18  A.  Yes.

19  Q.  And what did he say?

20  A.  He wasn't interested.

21  Q.  Now I want to go back for a second just to make something

22  clear.  You told us that in the meeting that Mr. Fuentes had

23  with Mr. Barahona, you gave Mr. Barahona a check, correct?

24        THE INTERPRETER:  Could the interpreter hear the

25  question again, please.  Thank you.

1   Q.  You told us in the meeting that Mr. Fuentes had with

2   Mr. Barahona, you entered the meeting and you gave Mr. Barahona

3   a check, correct?

4   A.  That's correct.

5   Q.  And you described that payment as a bribe, correct?

6   A.  That's correct.

7   Q.  And the books and records of Graneros showed that the money

8   was coming out of an account that was attributed to

9   Mr. Fuentes, correct?

10          THE INTERPRETER:  Again, sorry.  The interpreter

11   requests repeat of the question.

12          MR. MOSKOWITZ:  I'm sorry.  Let me try to simplify it.

13   Q.  You told us that Mr. Fuentes maintained an account --

14   several accounts on the books and records of Graneros, correct?

15   A.  That's correct.

16   Q.  And this money on the books and records of Graneros was

17   reflected as a loan to Mr. Fuentes from Graneros, correct?

18   A.  Correct.

19   Q.  So there was a paper trail showing that the check that went

20   to Mr. Barahona was paid on behalf of Mr. Fuentes, correct?

21   A.  Charged to Mr. Fuentes.

22   Q.  Now I want to talk to you about the meetings that you say

23   that you saw between Mr. Fuentes and Juan Orlando Hernandez.

24   OK?

25   A.  That's fine.

1    Q.  You told us that you walked in on two meetings between

2    Mr. Hernandez and Mr. Fuentes, correct?

3    A.  Correct.

4    Q.  And the first one was sometime after March of 2013,

5    correct?

6    A.  Correct.

7    Q.  And you told us that you were invited into the room because

8    you understood you were going to be exchanging dollars for

9    lempiras, correct?

10   A.  That's correct.

11   Q.  And when you walked into the office, your boss, Fuad

12   Jarufe, was there, correct?

13   A.  Correct.

14   Q.  Along with Juan Orlando Hernandez and Mr. Fuentes, correct?

15   A.  Correct.

16   Q.  And according to your testimony, you walked in when

17   Mr. Hernandez was talking to Mr. Fuentes about joining him in

18   the narco-trafficking business, correct?

19   A.  He wanted him to work for him.  Juan Orlando wanted him to

20   work for him.

21   Q.  Juan Orlando wanted Mr. Fuentes to work for him as a drug

22   trafficker, correct?

23   A.  With his drug laboratory, yes.

24   Q.  Now, this was two years after the raid on Cerro Negro,

25   correct?

L3GHRAM6                        Sanchez – Cross

1   A.   Correct.

2   Q.   The laboratory, if one existed, had been closed down,

3   correct?

4   A.   That's what they said.

5   Q.   And it's your testimony that Mr. Orlando Hernandez openly,

6   in front of you, talked to Mr. Fuentes about reopening a drug

7   lab, is that correct?

8   A.   Yes.  They spoke in a volume that I could hear.

9   Q.   They weren't trying to hide anything is what you're telling

10  us, correct?

11  A.   That's correct.  They felt comfortable.

12  Q.   They didn't know how you felt about narco-trafficking,

13  correct?

14          THE INTERPRETER:  The question again, please.  Repeat

15  the question for the interpreter.

16  Q.   Mr. Hernandez did not know what your views were on

17  narco-trafficking, correct?

18  A.   That's correct.

19  Q.   He had no idea whether you were going to go to the press

20  and tell them that he was a drug dealer?

21  A.   Correct.

22  Q.   And he was in the middle of a presidential campaign,

23  correct?

24  A.   Correct.

25  Q.   And public acknowledgment or public disclosure of his doing

L3GHRAM6                        Sanchez - Cross

1    a drug deal would have been devastating to his campaign,

2    correct?

3    A.  That's correct.

4    Q.  But yet he spoke to you -- he spoke about this right in

5    front of you?

6    A.  Correct.

7    Q.  And Mr. Hernandez never said to you:  Listen, Mr. Sanchez,

8    you better not disclose a word of this to anybody?

9    A.  That's correct.

10   Q.  He was a very powerful person, correct?

11   A.  Yes.

12   Q.  He could have had you killed, correct?

13   A.  Yes.

14   Q.  But he never threatened you?

15   A.  Correct.

16   Q.  In fact, he never said anything to you, correct, about the

17   conversation, correct?

18   A.  Correct.

19   Q.  And, by the way, Mr. Fuad Jarufe, he's in the room too,

20   right?

21   A.  Yes.

22   Q.  And to your knowledge, sir, your boss wasn't a

23   narco-trafficker, correct?

24   A.  That's correct.

25   Q.  Did you ever discuss with Fuad Jarufe the conversation you

1  claim that you heard between Mr. Juan Orlando Hernandez and

2  Mr. Fuentes Ramirez?

3  A.  Not to him, but to someone else, yes.

4  Q.  Now, at the end of the meeting, you told us -- or at the

5  end of your presence at the meeting, you told us that

6  Mr. Fuentes Ramirez took out some money, correct?

7  A.  Correct.

8  Q.  $15,000, correct?

9  A.  Correct.

10  Q.  And he gave it to Juan Orlando Hernandez, correct?

11  A.  Correct, yes.

12  Q.  And what he said was:  This is for your campaign, correct?

13  A.  Correct.

14  Q.  He made a campaign contribution, correct?

15  A.  I wouldn't be able to tell you.

16  Q.  Well, when he gave the money to Juan Orlando Hernandez, you

17  said Mr. Fuentes said to him:  This is for your campaign,

18  correct?

19  A.  Correct.  But they could have said that so that I believed

20  that.

21  Q.  They could have said it for a lot of different reasons, but

22  that's what he said, correct?

23  A.  Correct.

24  Q.  And you wanted to give Juan Orlando Hernandez a check for

25  the money, correct?

L3GHRAM6                           Sanchez - Cross

1    A.  Correct.

2    Q.  But he didn't want to take -- he wanted cash, correct?

3    A.  Correct.

4    Q.  So what you did was you wrote a check out to your boss,

5    Fuad Jarufe, correct?

6    A.  Correct.

7    Q.  For the equivalent of $15,000 in lempiras, correct?

8    A.  Correct.

9    Q.  And then you gave Mr. Juan Orlando Hernandez that amount in

10   lempiras, correct?

11   A.  No, I did not hand it over to Juan Orlando Hernandez in

12   lempiras.  I left the office.

13            THE INTERPRETER:  Please repeat your answer.

14   A.  I delivered the check in the office.  I took the dollars

15   and went to the bank to deposit them.

16   Q.  On that occasion how much -- how many banks did you deposit

17   the money into?

18   A.  In three banks.

19   Q.  You made the decision to split the money up among three

20   banks, correct?

21   A.  Correct.

22   Q.  Did you do 5,000, 5,000, and 5,000?

23   A.  No.

24   Q.  How did you split up the money?

25   A.  3,000, 3,000, and the difference in another bank.

1    Q.  So that would be 9,000 in the last bank, correct?

2    A.  Correct.

3    Q.  Now, for each deposit, since it was more than $20,000, you

4    had to fill out an anti-money laundering form, correct?

5    A.  Correct.

6    Q.  And when you filled out the anti-money laundering form, you

7    told them -- you had to tell them the source of the money,

8    correct?

9    A.  Correct.

10   Q.  And you told -- on the form you put down the truth,

11   correct?

12   A.  On one, yes.

13   Q.  On one of the forms, you identified the source of the cash

14   as Mr. Fuentes Ramirez, correct?

15   A.  No.

16   Q.  Well, what did you put down on the three forms as the

17   source of the money?

18   A.  On the 9,000 one, I said purchase of dollars from Mr. Juan

19   Orlando Hernandez, and on the other two for 3,000, I put that

20   it was payment installments from clients.

21   Q.  So you made the decision as to what to put on the forms,

22   correct?

23   A.  That's correct.

24   Q.  Nobody told you what to do, correct?

25             THE COURT:  I think that's been covered in

L3GHRAM6                          Sanchez - Cross

1   cross-examination, Mr. Moskowitz.

2               MR. MOSKOWITZ:  Your Honor, that was on another

3   transaction completely.

4               THE COURT:  My apologies.

5   Q.  You put down that the $9,000 came from Juan Orlando

6   Hernandez, correct?

7   A.  Correct.

8   Q.  You knew that the money came from Mr. Fuentes Ramirez,

9   correct?

10  A.  Correct.

11  Q.  You were the one who made the decision to lie on the form,

12  correct?

13  A.  I did not lie.  I bought the dollars from Juan Orlando

14  Hernandez, not from the defendant.

15  Q.  And the other two forms where you said that they came from

16  clients of the company, those forms weren't true, were they?

17  A.  Correct.  I have to conduct the transactions that I'm asked

18  to.

19  Q.  Nobody told you to put down that the money came from your

20  clients of the company, right?

21  A.  From the time I'm told to go deposit the money, I already

22  know what I have to do.

23  Q.  Nobody told you what to put on the forms, correct?

24  A.  Correct.

25  Q.  When you lied on the forms and said the form -- the money

L3GHRAM6                          Sanchez - Cross

1    came from clients of Graneros, that was your decision?

2    A.  Correct.

3    Q.  Now, by the way, you told us on direct examination that

4    when you walked into that meeting and you heard Juan Orlando

5    Hernandez speaking with Mr. Fuentes Ramirez about

6    narco-trafficking, you got scared, right?

7    A.  Correct.

8    Q.  You were afraid for your life, correct?

9    A.  Correct.

10   Q.  You did not leave Honduras until 2015, correct?

11   A.  Correct.

12   Q.  And in the period between 2013 -- between the time you had

13   this meeting and the time you left Honduras, you saw Juan

14   Orlando Hernandez several times more, correct?

15   A.  Correct.

16   Q.  And he never threatened you, right?

17   A.  Correct.

18   Q.  You also saw Mr. Fuentes Ramirez several times more,

19   correct?

20   A.  Correct.

21   Q.  And he never threatened you?

22   A.  No.  He did not out of respect for my boss.

23   Q.  And you know that because you asked him how come he's not

24   threatening you, or is that just something that you assumed?

25   A.  No, my boss told me, as long as you're working for me,

L3GHRAM6                         Sanchez - Cross

1    you're going to be protected.

2    Q.  Now, you told us on direct examination that there came a

3    point in time that you went to the Graneros video machines to

4    look for the videos of the meetings involving Juan Orlando

5    Hernandez, correct?

6    A.  Correct.

7    Q.  And the first meeting that you went looking for was the

8    meeting in which Juan Orlando Hernandez talked about stealing

9    from the Social Security system, correct?

10   A.  No, I rewinded the video until it came to whatever it

11   came -- to whatever came up.  The system did not have the

12   ability to conduct a search per day.

13   Q.  But you were looking for a particular meeting, correct?

14   A.  Correct.

15   Q.  And you knew approximately when the meeting happened,

16   correct?

17   A.  Correct.

18   Q.  And you found the meeting on the backup tape, correct?

19   A.  I found two.

20   Q.  And you made copies of two meetings, correct?

21   A.  Correct.

22   Q.  You made two copies, correct?

23   A.  Correct.

24   Q.  Of both meetings, correct?

25   A.  Of the second meeting, of the meeting where the discussion

L3GHRAM6                        Sanchez - Cross

1   was had about the Social Security theft.

2   Q.  And of the first meeting you only made one copy?

3   A.  I did not find that one.

4   Q.  I think there's a little bit of confusion, so let me try to

5   clear it up.

6           One meeting that you copied was the meeting in which

7   Juan Orlando Hernandez talked about stealing from the Social

8   Security system in Honduras, correct?

9   A.  That's correct.

10  Q.  At that meeting Mr. Fuentes Ramirez was not present,

11  correct?

12  A.  Correct.

13  Q.  You made two copies of that meeting, correct?

14  A.  Correct.

15  Q.  And then you searched for another meeting, correct?

16  A.  Yes.

17  Q.  And you claim that you found the meeting with Mr. Fuentes

18  and Mr. -- and Juan Orlando Hernandez, correct?

19  A.  Yes, correct.

20  Q.  And the meeting that you found was the second meeting

21  between Mr. Fuentes Ramirez and Juan Orlando Hernandez,

22  correct?

23  A.  Correct.

24  Q.  That is not a meeting -- that is not the meeting that we've

25  been talking about where they were discussing going into

1   business together as narco-traffickers, correct?

2   A.  Correct.

3   Q.  The second meeting, you told us that when you walked in,

4   Mr. Fuentes Ramirez handed $10,000 to Juan Orlando Hernandez,

5   correct?

6   A.  That's correct.

7   Q.  And he said:  This is for your campaign, correct?

8   A.  Correct.

9   Q.  And that was the end of the conversation, correct?

10  A.  Correct.

11  Q.  And that's the meeting that you taped -- that you were able

12  to put on a backup disc, correct?

13  A.  Correct.

14          THE COURT:  How much longer do you have in your

15  cross-examination?

16          MR. MOSKOWITZ:  It's going to go over till tomorrow,

17  Judge.

18          THE COURT:  That really wasn't the question I asked

19  you, Mr. Moskowitz.

20          MR. MOSKOWITZ:  Judge, probably a half-hour, 45

21  minutes.

22          THE COURT:  OK.  That was the question I asked.  I

23  appreciate your answering that one.

24          MR. MOSKOWITZ:  I'm sorry, Judge.

25          THE COURT:  Thank you.

L3GHRAM6

1          OK.  So, ladies and gentlemen, we're going to pick up

2     tomorrow at 10:30.  We're going to have some coffee brought

3     into the jury room around 10 o'clock if you get here early.

4     And as always, what am I going to tell you?  Please do not

5     discuss the case among yourselves or with anyone.  Please keep

6     an open mind.

7          We'll see you tomorrow morning for a 10:30 start.  So

8     please get here plenty of time ahead so we can start at 10:30,

9     and I think Flo would like to hand out some menus which you can

10    fill out and leave behind.

11         Please let our jurors leave first.

12         (Jury excused)

13         THE COURT:  OK.  Thank you.  See you tomorrow.

14         (Adjourned to March 17, 2021, at 10:30 a.m.)

15

16

17

18

19

20

21

22

23

24

25

```
 1                         INDEX OF EXAMINATION

 2   Examination  of:                            Page

 3   DARIO EURAQUE

 4   Cross By Mr. Schulman . . . . . . . . . . . 612

 5   Redirect By Mr. Gutwillig  . . . . . . . . . 636

 6   JOSE SANCHEZ

 7   Direct By Mr. Gutwillig  . . . . . . . . . . 646

 8   Cross By Mr. Moskowitz . . . . . . . . . . . 711

 9                       GOVERNMENT EXHIBITS

10   Exhibit No.                             Received

11    8   . . . . . . . . . . . . . . . . . . . 652

12    5   . . . . . . . . . . . . . . . . . . . 666

13    7   . . . . . . . . . . . . . . . . . . . 667

14    9   . . . . . . . . . . . . . . . . . . . 668

15    315 . . . . . . . . . . . . . . . . . . . 672

16    318 . . . . . . . . . . . . . . . . . . . 686

17    319 . . . . . . . . . . . . . . . . . . . 687

18    320 . . . . . . . . . . . . . . . . . . . 702

19    308 . . . . . . . . . . . . . . . . . . . 705

20

21

22

23

24

25
```