L3HHRAM1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                          15 CR 379 (PKC)

5    GEOVANNY FUENTES RAMIREZ,

6                   Defendant.             Trial

7    ------------------------------x

8                                          New York, N.Y.
                                           March 17, 2021
9                                          10:35 a.m.

10   Before:

11                   HON. P. KEVIN CASTEL,

12                                         District Judge
                                           and a jury

13                        APPEARANCES

14   AUDREY STRAUSS,
          United States Attorney for the
15        Southern District of New York
     MICHAEL LOCKARD
16   JACOB GUTWILLIG
          Assistant United States Attorneys
17
     AVRAHAM CHAIM MOSKOWITZ
18   EYLAN SCHULMAN
          Attorneys for Defendant
19
     Also Present:
20
     Jill Hoskins, Interpreter (Spanish)
21   Sonia Berah, Interpreter (Spanish)
     Mercedes Avalos, USAO Interpreter (Spanish)
22   Walter Krochtal, USAO Interpreter (Spanish)
     Brian Fairbanks, DEA Agent
23

24

25

L3HHRAM1                        Sanchez - Cross

1          (Trial resumed)

2          THE COURT:  We're ready.  Mr. Moskowitz, you can take

3     the podium, please.

4          (Jury present)

5          THE COURT:  Good morning, ladies and gentlemen.  Very

6     good to see you.  We're back in action, and the Court reminds

7     the witness that you're still under oath.

8          THE WITNESS:  OK.

9          THE COURT:  You may inquire, Mr. Moskowitz.

10         MR. MOSKOWITZ:  Thank you, your Honor.

11    JOSE SANCHEZ, resumed.

12    CROSS-EXAMINATION

13    BY MR. MOSKOWITZ:

14    Q.  Good morning, sir.  You told us yesterday that you heard a

15    telephone conversation involving Mr. Fuentes in which he

16    mentioned the Cachiros, correct?

17    A.  Correct.

18    Q.  You don't know who he was talking to, correct?

19    A.  Correct.

20    Q.  You heard him say he was going to get back on his feet

21    again because he was going to be working with the Cachiros,

22    correct?

23    A.  That's correct.

24    Q.  After that telephone call, Mr. Fuentes came to Graneros

25    with Isidro Santos, correct?

L3HHRAM1                              Sanchez - Cross

1  A.  Correct.

2  Q.  And Isidro Santos, you told us, was the youngest Cachiro

3  brother, correct?

4  A.  Correct.

5  Q.  And he used -- I'm sorry.  And he used to come to Graneros

6  to sell rice, correct?

7  A.  He only did that one time, the sale of rice.

8  Q.  And one time he came to sell cattle, correct?

9  A.  Correct.

10  Q.  And Mr. Fuentes came with him, correct?

11  A.  That's correct.

12  Q.  And you also know that Mr. Fuentes got a piece of property

13  from the Cachiros, correct?

14  A.  No.

15  Q.  Did you know that Mr. Fuentes had a malanga project?

16  A.  Yes.

17  Q.  And that's a type of vegetation, correct?

18  A.  That's correct.

19  Q.  And he was -- I'm sorry.

20  A.  That's correct.

21  Q.  And he was growing malanga, correct?

22  A.  That's correct.

23  Q.  Did you know that that was on property that he had gotten

24  from the Cachiros?

25  A.  No.

L3HHRAM1                        Sanchez – Cross

1    Q.  You told us yesterday that you were at a meeting in which

2    you saw Mr. Fuentes talking -- excuse me, talking with Juan

3    Orlando Hernandez.   Remember that?

4    A.  Yes.

5    Q.  In fact, you said there were two such meetings, correct?

6    A.  Correct.

7    Q.  And in the first meeting, you told us Mr. Juan Orlando

8    Hernandez said to Mr. Fuentes that he was going to give

9    Mr. Fuentes the phone number of Tony Hernandez, correct?

10   A.  Correct.

11   Q.  And you claimed that you actually saw Juan Orlando

12   Hernandez give the phone number to Mr. Fuentes, correct?

13   A.  No.

14   Q.  You did not see that?

15   A.  I didn't see him giving him the phone number.  I heard when

16   he said that he was going to give it to him.

17   Q.  But after he said he was going to give it to him, you did

18   not see him pass him the piece of paper with the phone number,

19   correct?

20   A.  No.

21   Q.  And you did not hear Juan Orlando Hernandez tell

22   Mr. Fuentes what Tony's phone number was, correct?

23   A.  Correct.

24   Q.  Now, you also told us yesterday that the last time you saw

25   Mr. Fuentes was in around Easter week of 2015, correct?

L3HHRAM1                          Sanchez – Cross

1    A.  Correct.

2    Q.  You didn't actually talk to him on that occasion, correct?

3         THE INTERPRETER:  Repeat the question for the

4    interpreter.

5    Q.  You did not actually talk to him on that occasion, correct?

6    A.  Correct.

7    Q.  You were at a marina, correct?

8    A.  Yes.

9    Q.  You saw him with other people, correct?

10   A.  Correct.

11   Q.  Getting on a yacht, correct?

12        THE INTERPRETER:  For the interpreter, the question

13   again.

14   Q.  Getting on a yacht, correct?

15   A.  Correct.

16   Q.  And you told the prosecutors yesterday that it was his

17   yacht, correct?

18   A.  Correct.

19   Q.  You didn't have -- you didn't check the papers on the

20   yacht, did you?

21   A.  Correct.

22   Q.  You have no personal proof that Mr. Fuentes bought that

23   yacht, correct?

24   A.  Correct.

25   Q.  Now, you told us that at some point in time you found a box

L3HHRAM1                          Sanchez - Cross

1   in the office of your boss, Fuad Jarufe, correct?

2   A.   Correct.

3   Q.   And that box was not addressed to you, correct?

4   A.   Correct.

5   Q.   It was not a box that came from paper store, correct?

6            THE INTERPRETER:  Please repeat the question.

7   Q.   It was not a box that came from a paper store?

8   A.   That's how they would send stationery supplies to me when I

9   bought them, in boxes.

10  Q.   The box, the box itself, did not indicate it was from a

11  stationery store, correct?

12  A.   Correct.

13  Q.   There was nothing on it that said it was addressed to you,

14  correct?

15  A.   Correct.  It was sealed.

16  Q.   But you decided to open it anyway?

17  A.   I took it -- I took it to my office, and I --

18  Q.   And nobody else --

19  A.   I took it to my office and I opened it because I needed the

20  stationery supplies.

21  Q.   And nobody else was around when you opened the box?

22  A.   No.

23  Q.   It was at night?

24  A.   It was around 6:00 in the evening.

25  Q.   The other employees had gone home?

L3HHRAM1                         Sanchez - Cross

1    A.  Correct.

2    Q.  You claimed that you saw some uniforms in there, correct?

3    A.  Correct.

4    Q.  And a note that said it was for Mr. Fuentes, correct?

5    A.  Correct.

6    Q.  You didn't take a picture of the box, correct?

7    A.  No, because there were cameras in my office.

8    Q.  The cameras could see you opening the box, right?

9    A.  Correct.

10   Q.  The cameras could see you looking at what's in the box

11   right?

12   A.  Correct.

13   Q.  The cameras could see the uniforms in the box, correct?

14   A.  No, because I covered the box.

15   Q.  You covered the box intentionally so that the cameras

16   wouldn't see what was in the box?

17   A.  No.  The position the box had on the -- on the chair to my

18   desk and my position to take out the stationery supplies

19   covered the line of view of the camera.  Plus to avoid

20   reprisals, I had to put the box back where it had come from.

21   Q.  There was nobody else around, correct?

22   A.  Only my boss was in his office, but he was in the bathroom

23   at that moment.

24          THE INTERPRETER:  Your Honor, may the interpreter

25   confer with his colleague?

L3HHRAM1                          Sanchez - Cross

1              THE COURT:  He may.

2              THE INTERPRETER:  Thank you.  Interpreter wishes to

3    add to response.

4    A.  I had to put the box where no one would see it.

5              THE INTERPRETER:  Correction.  "I had to put the box

6    where no one would see me."  Thank you.

7              THE COURT:  All right.  You may continue.

8    BY MR. MOSKOWITZ:

9    Q.  When you took the box, you didn't know it had uniforms in

10   it, correct?

11   A.  Correct.

12   Q.  You thought it had stationery, correct?

13   A.  Correct.

14   Q.  So when you took it back to your office to open it, you

15   weren't thinking, oh, I have to open it in such a way that the

16   cameras won't see me, correct?

17   A.  No.

18   Q.  You just thought you were opening up a box of stationery?

19   A.  Correct.

20   Q.  So when you opened the box, you weren't doing anything to

21   hide what you were doing from the cameras?

22   A.  Correct.

23   Q.  And by the way, when you went later, at some later point in

24   time to look at the videos, did you look for the video of this

25   incident?

L3HHRAM1                          Sanchez - Cross

1    A.  No.

2    Q.  You didn't make a copy of the video showing you opening a

3    box of uniforms, correct?

4    A.  Correct.

5    Q.  Now, you told us after you opened the box, you sealed it

6    back up?

7    A.  Correct.

8    Q.  Now, when you say the box came sealed, it was taped up?

9    A.  See-through.

10   Q.  With tape?

11   A.  Tape.

12   Q.  You have to say it -- you have to answer in words, sir.

13   A.  Yes, transparent tape.

14   Q.  And you have to rip the tape off, correct?

15   A.  Yes.

16   Q.  And that's what you did, right?  You took the tape off,

17   right?

18   A.  Correct.

19   Q.  And then you had to reseal the box with the same type of

20   tape, correct?

21   A.  I had that tape in my desk.

22   Q.  Now, a box with -- coming with stationery is heavy, right?

23   A.  Correct.

24   Q.  And it's sealed with heavy tape, correct?

25   A.  No.  They just put see-through tape on it, that's all.

L3HHRAM1                          Sanchez - Cross

1   Q.  Well, it wasn't Scotch tape, right?

2   A.  No.

3   Q.  It was what we call here in the United States masking tape,

4   correct?

5          THE COURT:  Well, I'm going to ask you to rephrase

6   that question.  Describe the kind of tape you're referring to,

7   sir.  Solid, opaque, beige?

8          MR. MOSKOWITZ:  The witness has described it as clear,

9   but it's a heavy -- it's a wide tape, correct?

10          THE COURT:  That's not masking tape, sir.

11          MR. MOSKOWITZ:  I'm sorry.

12          THE COURT:  That's not masking tape at all.  Go to a

13   hardware store, and you'll see.

14          MR. MOSKOWITZ:  Judge, I thought I was describing what

15   it was, but I'll try it in words.

16   BY MR. MOSKOWITZ:

17   Q.  Sir, the tape was a thick tape -- I should say a wide tape,

18   correct?

19   A.  Yes.

20   Q.  So that it would cover both sides of the box as it was

21   being sealed, correct?

22   A.  Correct.

23   Q.  And you said it was transparent so that you could see

24   through it, correct?

25   A.  The box was not transparent.

L3HHRAM1                          Sanchez - Cross

1   Q.  The tape was transparent, correct, so that you could see

2   through the tape to the top of the box?

3           THE INTERPRETER:  The response -- the interpreter

4   requests repetition of the witness' response.

5   A.  What did you ask?

6   Q.  So that when the tape was on the box, you could see through

7   the tape and see the top of the box?

8   A.  No.  As far as I understand, what you're telling me is that

9   I could see through the tape and see what was in the box.

10  Q.  No, that's not what I'm trying to say.

11  A.  OK.

12  Q.  You could see through the tape and see the top of where it

13  was closed?

14          THE INTERPRETER:  Your Honor, once again on behalf of

15  the interpreting team, the interpreters are again not having

16  the opportunity to render the utterances, the interpretations,

17  on a couple of occasions now.

18          MR. MOSKOWITZ:  I'm sorry, Judge.  I'm trying.

19          THE COURT:  Thank you.

20  Q.  You could see through the tape to the top of the box that

21  was closed, correct?

22  A.  Correct.

23  Q.  Did you rip off the tape or did you cut the tape?

24  A.  I cut it.

25  Q.  And when you resealed the boxes, it's your testimony that

L3HHRAM1                          Sanchez - Cross

1   you couldn't tell that it had been opened already?

2   A.  Yes, you could tell.

3   Q.  So you took this box that you resealed and you snuck it

4   back into Mr. Jarufe's office?

5   A.  Correct.

6   Q.  Did you wait for him to leave?

7   A.  No, he was in the bathroom at that moment.

8   Q.  So he was in the bathroom when you picked it up, and he was

9   in the bathroom when you brought it back?

10  A.  He was outside in the patio when I took it.

11  Q.  And he didn't hear you come into his office as far as you

12  know?  I'll repeat it.

13          As far as you know, he did not hear you come into the

14  office?

15  A.  Correct.

16  Q.  So you didn't go in and ask him:  Mr. Jarufe, did you get a

17  box of stationery for me today?

18          THE INTERPRETER:  For the interpreter, please repeat

19  the question.

20  Q.  So you did not ask Mr. Jarufe whether he had gotten a box

21  of stationery that you were looking for?

22  A.  No.

23  Q.  I want to switch topics, sir.

24          You came to the United States for the first time in

25  2012, correct?

L3HHRAM1                         Sanchez - Cross

```
 1   A.  Correct.
 2   Q.  And you came here legally, correct, on a visa?
 3   A.  Correct.
 4   Q.  And you overstayed your visa, correct?
 5   A.  No.
 6   Q.  Well, do you remember telling the FBI when you met with
 7   them in 2019 that when you came here in 2012, you overstayed
 8   your visa?
 9   A.  No.  I came to the United States three times -- four times
10   before staying here.
11   Q.  I'm going to ask the -- with the help of the interpreter to
12   show you 3536-01.  Ask the interpreter to read the second
13   paragraph on the first page.
14           You know what?  Withdrawn.  I'll leave it alone.
15           After being here in 2012, you came back to the United
16   States in October of 2013, is that correct?
17   A.  Correct.
18   Q.  Now, October of 2013 was after you had attended a meeting
19   or been in a meeting with Mr. Fuentes and Juan Orlando
20   Hernandez, is that correct?
21   A.  No.
22   Q.  Well, remember --
23   A.  I have not provided dates of the meetings between the
24   defendant and Mr. Juan Orlando Hernandez because I don't
25   remember them.
```

L3HHRAM1                          Sanchez - Cross

1    Q.  Remember telling us yesterday that the first meeting

2    between Mr. Fuentes and Juan Orlando Hernandez was sometime

3    after March of 2013?

4    A.  You said that.  I didn't say that.

5    Q.  Remember telling us that there were several months in

6    between the first and the second meeting?

7    A.  Correct.

8    Q.  And both meetings took place before the election, correct?

9    A.  Correct.

10   Q.  And the election was in November of 2013?

11   A.  Correct.

12   Q.  So the two meetings that you claim that you attended with

13   Mr. Fuentes were before you went to the United States, correct?

14           THE INTERPRETER:  Interpreter correction.

15   A.  Correct.

16   Q.  So before you came to the -- I'll go back to the beginning

17   of these questions.

18           Before you came to the United States, you had already

19   attended a meeting where you claim that you heard Juan Orlando

20   Hernandez and Mr. Fuentes talking about drug trafficking,

21   correct?

22   A.  I don't recall.  I was coming to the United States only for

23   ten days.

24   Q.  Mr. Suarez, you came to the United States October 14, 2014,

25   correct?

L3HHRAM1                          Sanchez - Cross

1    A.  Correct, I came for ten days.

2    Q.  And you just told us a minute ago that the two meetings

3    with Mr. Fuentes and the president, or the now president, were

4    before you came to the United States in October of 2013,

5    correct?

6    A.  No.

7    Q.  So the meetings took place after you came back from the

8    United States and before the election?

9            THE INTERPRETER:  Repeat the question for the

10   interpreter, please.

11   Q.  Is it your testimony today, sir, that the meetings, the two

12   meetings between Mr. Fuentes and Juan Orlando Hernandez, took

13   place in the period between the time you returned from the

14   United States in late October 2013 and the election in Honduras

15   in November 2013?

16           THE INTERPRETER:  The interpreter's going to correct.

17   The interpreter's going to correct the question.

18   A.  No.

19   Q.  How much time was there between the first meeting that you

20   saw with Mr. Fuentes and Juan Orlando Hernandez and the second

21   meeting?

22   A.  I don't recall.

23   Q.  Do you remember telling us just a few minutes ago that it

24   was several months?

25           THE INTERPRETER:  Repeat the question for the

L3HHRAM1                              Sanchez - Cross

1    interpreter, please.

2    Q.  Do you remember telling us just several minutes ago that

3    there were several months in between the two meetings?

4    A.  Yes, but I don't recall the dates.

5    Q.  But if there were -- let's assume for a moment that the

6    second meeting took place when you came back after the

7    election -- I mean after coming to the United States.  All

8    right.  So that would be in late October 2013.  OK.  Then the

9    first meeting had to be several months before that in

10   September --

11              MR. GUTWILLIG:  Objection.

12   Q.  -- August, or earlier?

13              THE COURT:  Yes, sustained as to form.

14   Q.  Sir, you told us both meetings took place before the

15   election in November 2013, correct?

16   A.  That's correct.

17   Q.  And you told us there were several months in between them,

18   correct?

19   A.  Correct.

20   Q.  So at least one of the meetings had to have taken place

21   before you left to the United States, correct?

22   A.  Correct.

23   Q.  And you told us the first meeting that you heard between

24   Juan Orlando Hernandez and Mr. Fuentes was the meeting where

25   you heard them discussing doing narco-trafficking together,

L3HHRAM1                          Sanchez – Cross

1    correct?

2    A.  That's correct.

3    Q.  And you told us that was the meeting that really scared

4    you, correct?

5    A.  That's correct.

6    Q.  But when you went to the United States in October of 2013,

7    you didn't seek asylum?

8    A.  No.

9    Q.  Even though you were scared for your life, you came back to

10   Honduras, correct?

11   A.  That's correct.

12   Q.  And you remained in Honduras for another almost two years

13   before going to the United States again, correct?

14   A.  That's correct.

15   Q.  And you came to the United States in June of 2015, correct?

16   A.  That's correct.

17   Q.  With your family, correct?

18   A.  Correct.

19   Q.  And that time you overstayed your visa, correct?

20   A.  That's correct.

21   Q.  And you didn't apply for asylum for another four years,

22   correct?

23   A.  I appeared in the Chicago courts.  I spoke to an assistant

24   prosecutor, and I told her what I knew.  And she told me it is

25   your word against the president's, and she told me you have to

L3HHRAM1                      Sanchez - Cross

1   go back to Honduras and get more evidence, which I intended to

2   do.  But I had a call from Honduras, and I was told that

3   Christian Ayala had been raided with bullets and for me to be

4   careful because they were also seeking after me.  And that is

5   the reason why I did not go back to Honduras.

6   Q.  And you did not apply for asylum for another four years,

7   correct?

8   A.  Correct.  No one wanted to take my case because it was so

9   sensitive.

10  Q.  You applied for asylum after hearing about Tony Hernandez

11  getting arrested, correct?

12  A.  Correct.

13  Q.  Now, it is your hope that by testifying here in this

14  courthouse and in this case, you will get some help with your

15  asylum application, correct?

16  A.  I have not requested anything from the U.S. government

17  other than security.

18  Q.  Isn't it a fact, sir, that your lawyer on your behalf asked

19  the United States government to help pay your legal fees for

20  your immigration case?

21  A.  No, I requested that.

22  Q.  You asked the prosecutors to pay your legal fees in your

23  immigration case?

24  A.  No, I paid for those out of my work.

25  Q.  No, I understand you did pay for them, but you asked the

L3HHRAM1                              Sanchez - Cross

1   government to help you with them, correct?

2   A.  No.  Communications were had through my lawyer, and I told

3   them that I did not have money to pay my lawyer so they could

4   communicate with me.  So my lawyer --

5            THE INTERPRETER:  May the interpreter confer with her

6   colleague?

7            THE COURT:  You may.

8   A.  So my lawyer had a discussion with the prosecutors, and now

9   he is not charging a single dime.

10  Q.  My question to you, sir, is on your behalf did your lawyer

11  ask the government to reimburse you for at least part of your

12  fees in the immigration case?

13  A.  No.

14           MR. MOSKOWITZ:  Can I have the witness shown 3536-08,

15  and I'd ask the interpreter just to read to him the first

16  paragraph, first bullet point.

17           THE INTERPRETER:  Ready, counselor.

18  BY MR. MOSKOWITZ:

19  Q.  Mr. Suarez, you met with the government on February 22,

20  2021, correct?

21  A.  That's correct.

22  Q.  With Mr. Gutwillig and Mr. Lockard?

23  A.  I do not recall.  I do not quite recall.

24  Q.  You met with the two gentlemen sitting at the table?

25  A.  It was with Matthew, and I do not remember the last name.

L3HHRAM1                          Sanchez - Cross

1   Q.  And Agent Fairbanks sitting in the back was there?

2   A.  Correct.

3   Q.  And your lawyer was present?

4   A.  That's correct.

5   Q.  And there was an interpreter present?

6   A.  No.

7   Q.  When you met with the government, didn't you have an

8   interpreter with you to help the government understand what you

9   were saying?

10  A.  That's correct, yes.

11  Q.  Having had the paragraph read to you, do you remember that

12  when you -- do you now remember that when you met with the

13  government in February of 2021, just last month, that your

14  lawyer in your presence asked the government to reimburse you

15  for part of the fees that you have paid for your immigration

16  asylum case?

17  A.  I ignored that, I can honestly tell you that.  I was

18  sincerely unaware of that.  All I can say is that all I was

19  asking was for them to cover my stay here and provide me with

20  protection and also perhaps for the days that I was out of work

21  so that I'd be able to pay rent.  That is all that I asked for,

22  which I do believe is fair for being here risking my life.

23  Q.  But your lawyer did make the request, isn't that true?

24          MR. GUTWILLIG:  Objection.

25          THE COURT:  Yes, the question is do you remember

L3HHRAM1                        Sanchez - Cross

1   whether your lawyer.

2             MR. MOSKOWITZ:  Correct.

3   Q.  Do you remember whether your lawyer made the request?

4   A.  No.

5             MR. MOSKOWITZ:  Can I have one moment, Judge?

6             THE COURT:  Yes.

7             (Counsel confer)

8   BY MR. MOSKOWITZ:

9   Q.  Now, in connection with your asylum application, you had to

10  prepare an affidavit, correct?

11  A.  Excuse me?

12  Q.  You had to prepare a statement under oath?

13  A.  That's correct.

14  Q.  You told your lawyer various facts, correct?

15  A.  That's correct.

16  Q.  And the lawyer wrote it up, correct?

17  A.  Correct.

18  Q.  And he read it to you?

19  A.  Correct.

20  Q.  And it was translated to you into Spanish, correct?

21  A.  That's correct.

22  Q.  And in your affidavit, you said that you feared going back

23  because you would be killed by the government of Honduras,

24  correct?

25  A.  That's correct.

L3HHRAM1                          Sanchez - Redirect

1             MR. MOSKOWITZ:  One moment.

2             (Counsel confer)

3             MR. MOSKOWITZ:  Nothing further, Judge.

4             THE COURT:  All right.  Redirect?  Give us a second to

5    wipe down.

6             Ladies and gentlemen, if you want to stand up and

7    stretch for a minute, that's fine.

8             All right.  Whenever you're ready, Mr. Gutwillig.

9    REDIRECT EXAMINATION

10   BY MR. GUTWILLIG:

11   Q.  Good morning, Mr. Sanchez.

12   A.  Good morning.

13   Q.  In Honduras you were a chief accountant for Graneros,

14   right?

15   A.  I was an accountant.

16   Q.  Graneros was the largest rice processing company in

17   Honduras, correct?

18   A.  That's correct.

19   Q.  You made a good living, right?

20   A.  That's correct.

21   Q.  You worked for a wealthy and influential boss?

22   A.  Yes.

23   Q.  You were respected in your profession?

24   A.  Yes.

25   Q.  Were you born in Honduras?

L3HHRAM1                          Sanchez - Redirect

1   A.  Yes.

2   Q.  Did you live there for most of your life?

3   A.  That's correct.

4   Q.  What do you do for a living now?

5   A.  I'm a carpenter.

6   Q.  Are you making money as a carpenter while you're here in

7   New York testifying?

8   A.  No.

9   Q.  How are you paying your rent?

10  A.  I am behind.

11  Q.  How are you paying for your asylum application?

12  A.  With my work.

13  Q.  Did your lawyer offer to reimburse you a portion of the fee

14  that you had paid him for the asylum application?

15  A.  No.

16  Q.  Has the government paid for your legal fees?

17  A.  No.

18  Q.  Did the government cover the cost of your travel to

19  New York?

20  A.  Only the hotel.

21  Q.  Is that why you're here?

22  A.  Yes.

23              (Continued on next page)

24

25

1    BY MR. GUTWILLIG:

2    Q.  You testified on cross-examination about coming to the

3    United States in 2013; is that right?

4    A.  Yes.

5    Q.  But you didn't stay here, right?

6    A.  Correct.

7    Q.  You went back to Honduras?

8    A.  Yes.

9    Q.  Why did you go back to Honduras at that time?

10   A.  Because my family was there and because I wouldn't have

11   changed the life that I had in Honduras for anything.

12   Q.  But you did leave Honduras again, correct?

13   A.  Correct.

14   Q.  You left Honduras in 2015, right?

15   A.  That's correct.

16   Q.  A few days after you got to the United States, did you

17   receive a call from a secretary who worked at Graneros?

18   A.  That's correct.

19   Q.  What did that person tell you?

20           MR. MOSKOWITZ:  Objection.

21           THE COURT:  Hang on a second.

22           Not for the truth of its content, but for the fact it

23   was said.

24           Go ahead.

25   A.  She called me, and she told me that Cristian Ayalla had

L3HKRAM2                       Sanchez - Redirect

1    been riddled with bullets and that the defendant was

2    desperately asking about me, where I lived, and about my

3    whereabouts.

4              THE COURT:  Let me see you at sidebar.

5              THE INTERPRETER:  Your Honor, should the

6    interpreter --

7              THE COURT:  Yes, you can interpret the remainder.

8    A.   And to destroy the cell phone that I had been provided,

9    because through it, they could trace my location.

10             THE COURT:  Thank you.

11             THE INTERPRETER:  Thank you, Judge.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  Why shouldn't I strike this?

3          MR. GUTWILLIG:  Your Honor, the questions on

4   cross-examination went directly to why the defendant came to

5   the United States.

6          THE COURT:  I'm not talking about relevance.  This is

7   not a relevance issue.

8          MR. GUTWILLIG:  If there is a suggestion that he is

9   not scared, that he has not applied for asylum just because he

10  wants to stay here and not because he doesn't have a legitimate

11  fear, he does have a legitimate fear of the defendant, this is

12  the basis or part of that.

13         THE COURT:  Well, no, he may have a fear of the

14  defendant because some crackpot called him up on the phone and

15  said the defendant is out to get you, but it doesn't

16  necessarily make it a legitimate fear unless it's being

17  received for the truth of its content, and I said it's not.

18         MR. GUTWILLIG:  It is not being received for the truth

19  of its contents.

20         THE COURT:  So, then, why does it have to do with a

21  legitimate fear that the defendant is out to get him?

22         MR. GUTWILLIG:  Because he's being called by an

23  employee from the company that he worked at days after he left

24  saying that the defendant is looking for you and to cut off all

25  communication and contact so he can't find you.

1          THE COURT:  Why isn't that an out-of-court statement

2     being offered for the truth of its content that the defendant

3     is, in fact, looking for him?

4          MR. GUTWILLIG:  The intention is to offer it for

5     context for his asylum application and not for the truth.

6          THE COURT:  Well, you keep vacillating on this.

7     You're saying that you're offering it because it shows that his

8     fear of the defendant is legitimate.

9          MR. GUTWILLIG:  He was asked a number of questions

10    about whether he was afraid.

11         THE COURT:  I said it's not a question of relevance.

12    Right, you're not arguing relevance?

13         MR. GUTWILLIG:  I take your point, your Honor.  The

14    reason it is being offered is to suggest to the extent there

15    was a suggestion, which I think there was, that the asylum

16    application was not based on legitimate reasons, that he did,

17    in fact, have those.  And I take your Honor's point that you

18    would have those if that were being offered for the truth of

19    the matter, and that is not the government's intention.

20         THE COURT:  Okay.  Okay.

21         MR. MOSKOWITZ:  Your Honor, if I may, the

22    cross-examination was not as to did he have a legitimate fear.

23    The point of the cross examination was the stated fear, was

24    that he feared being killed by the Government of Honduras.

25    That would be a sufficient basis for an application under any

L3HKRAM2                        Sanchez – Redirect

1    circumstances.

2              THE COURT:  I'm going to clear it up as best as I can.

3    Thank you.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3HKRAM2                          Sanchez - Redirect

1          (In open court)

2          THE COURT:  So, ladies and gentlemen, an issue arose

3     during cross-examination whether or not there was a basis for

4     the witness' claim of fear on an asylum application.  I think

5     the question might have been phrased with regard to the fear of

6     the Government of Honduras, but, in any event, I've allowed the

7     testimony that you just heard on the basis that it's fair game

8     for the government to show that the defendant did have a fear.

9     However, I did not admit the statement for the truth of its

10    content.  To use an extreme example, a crackpot could call you

11    up and tell you that somebody is out to get you.  All right?

12    That person may not know what they're talking about.  They may

13    have some motive of their own to make a statement like that.

14    But the fact that you got such a phone call could affect your

15    actions, your beliefs, and your response.  All right?  Even if

16    the person who made the call to you had absolutely no basis for

17    the statements they made, it still may explain why you did

18    certain things.  All right?  And that's all it means to be

19    accepted for the fact that it was said, and you may not

20    consider it for the truth of its content.

21          You may continue.

22    BY MR. GUTWILLIG:

23    Q.  You testified on cross-examination about going to deliver

24    money to Cerro Negro.  You didn't go past the gate; is that

25    right?

L3HKRAM2                         Sanchez - Redirect

1   A.  Yes.

2   Q.  You didn't go into the building that looked like a coffee

3   processing plant, right?

4   A.  No.

5   Q.  You were stopped at the gate, correct?

6   A.  That's correct.

7   Q.  By a man who had a semiautomatic pistol?

8   A.  That's correct.

9   Q.  What was your understanding of why he didn't let you go any

10  farther?

11          MR. MOSKOWITZ:  Objection.

12          THE COURT:  Sustained.

13  BY MR. GUTWILLIG:

14  Q.  Was that individual dressed like a coffee farmer?

15  A.  No.

16  Q.  You testified on cross-examination that you knew that the

17  money you were depositing from the defendant, you were

18  committing money laundering; is that correct?

19  A.  That's correct.

20  Q.  And that you knew you were committing a crime, right?

21  A.  That's correct.

22  Q.  For that to be money laundering, the money had to be from

23  the illegal proceeds of something, right?

24          MR. MOSKOWITZ:  Objection.

25          THE COURT:  If you know.

1          THE INTERPRETER:  I'm sorry.  For the interpreter,

2     your Honor?

3          THE COURT:  I qualified the question with the

4     statement:  If the witness knows, if you know.

5     A.  Can you please repeat the question?

6     Q.  Sure.

7          I said for it to be a crime of money laundering, the

8     proceeds had to be from some sort of illegal activity, right?

9          THE COURT:  Now, okay, so you didn't hear what I said?

10    You didn't hear the qualification on the question, I put on the

11    question?

12         MR. GUTWILLIG:  I apologize, your Honor.

13         THE COURT:  You didn't hear it?  All right, let me try

14    it again.

15         If the witness knows.  You didn't hear me say that?

16         MR. GUTWILLIG:  I did hear you say that.

17         THE COURT:  Okay.  You should have put the qualifier

18    in your question.

19         Now, ask it again.

20    BY MR. GUTWILLIG:

21    Q.  If you know, Mr. Sanchez, for that to have been money

22    laundering, the money must have come from something illegal, if

23    you know?

24    A.  Yes.

25         THE COURT:  And, ladies and gentlemen, this witness is

L3HKRAM2                          Sanchez - Redirect

```
 1   not a lawyer.  This is what he believes.  It's not an
 2   instruction on the law.  Okay?
 3   BY MR. GUTWILLIG:
 4   Q.  You testified that you were following instructions when you
 5   did this, right?
 6   A.  That's correct.
 7   Q.  Whose instructions did you believe you were following?
 8   A.  My boss, who was being ordered to deposit the money.
 9   Q.  Why did you feel like you needed to follow those
10   instructions?
11   A.  Because I was merely an employee.
12   Q.  And you had seen the defendant give the money to Juan
13   Orlando Hernandez, correct?
14   A.  Yes.
15   Q.  On cross-examination, defense counsel asked if you spoke
16   with your boss about the meetings between Juan Orlando
17   Hernandez and the defendant.  Do you recall that?
18   A.  Yes.
19   Q.  Your boss was there for those meetings, right?
20   A.  Right.
21   Q.  Did he hear the same conversations you heard?
22   A.  No.
23   Q.  If he was there, you didn't need to tell him about those
24   meetings, did you?
25   A.  Right.
```

L3HKRAM2                          Sanchez - Redirect

1    Q.  And you already knew what he thought about it, right?

2              MR. MOSKOWITZ:  Objection.

3              THE COURT:  One second.

4              Sustained.

5    BY MR. GUTWILLIG:

6    Q.  On cross-examination, defense counsel asked if you believed

7    that Juan Orlando Hernandez would have you killed.  Do you

8    remember that?

9    A.  Yes.

10   Q.  Did you believe that he could?

11   A.  Yes.

12   Q.  And you testified that he didn't threaten you, right?

13   A.  Right.

14   Q.  He was a powerful person, correct?

15   A.  Correct.

16   Q.  Did he have to say it for you to feel threatened?

17   A.  Yes.

18   Q.  Defense counsel asked you about a box that you found at

19   Graneros.  Do you recall that?

20   A.  Yes.

21   Q.  You said that you wanted to avoid reprisal; is that right?

22   A.  Right.

23   Q.  What did you mean by that?

24   A.  If anybody found out that I had opened the box, that I had

25   seen its contents, and whom it was for, reprisals would have

L3HKRAM2                              Sanchez – Redirect

1   been taken against me.

2   Q.  After you opened the box, what was your reaction?

3   A.  I got scared.

4   Q.  Why were you scared?

5   A.  Because I was looking at police badges, vests, military

6   uniforms that were addressed to the defendant.

7   Q.  Did you want to see the things in the box?

8   A.  No.

9   Q.  Did you want to see the meetings between the defendant and

10  Juan Orlando Hernandez?

11  A.  No.

12  Q.  Did you want to leave Honduras?

13  A.  No.

14  Q.  Are you still scared today?

15  A.  Yes.

16  Q.  Why are you testifying?

17          MR. MOSKOWITZ:  Objection.

18          THE COURT:  Rephrase your question.  Sustained.

19          MR. GUTWILLIG:  One moment, please, your Honor?

20          (Pause)

21          MR. GUTWILLIG:  No further questions, your Honor.

22          THE COURT:  All right.

23          Ladies and gentlemen, we'll take a ten-minute recess.

24  Please do not discuss the case among yourselves or with anyone

25  else.  And we'll be back in action in ten minutes.  Thank you

L3HKRAM2                          Medina - Direct

1    very much.

2            Please wait for the jurors to clear the elevator area

3    before exiting the courtroom.  I'll give you the signal when

4    you can leave.

5            (Jury not present)

6            THE COURT:  Okay.  We are in recess.

7            (Recess)

8            THE COURT:  Bring them in, please.

9            (Jury present)

10           THE COURT:  All right.  The government may call its

11   next witness.

12           MR. LOCKARD:  Thank you, your Honor.

13           The government calls Jorge Medina.

14    JORGE MEDINA,

15       called as a witness by the Government,

16       having been duly sworn, testified as follows:

17           THE COURT:  You may inquire.

18           MR. LOCKARD:  Thank you, your Honor.

19   DIRECT EXAMINATION

20   BY MR. LOCKARD:

21   Q.  Good afternoon, Mr. Medina.

22   A.  Good afternoon.

23   Q.  Where are you from, sir?

24   A.  San Pedro Sula, Honduras.

25   Q.  Do you currently live in Honduras?

L3HKRAM2                          Medina - Direct

1    A.  Yes.

2    Q.  What is your profession?

3    A.  Agricultural engineer.

4    Q.  What does an agricultural engineer do?

5    A.  He is in charge of planting and making crops grow.

6    Q.  What kinds of crops have you worked with as an agricultural

7    engineer?

8    A.  Palm, corn, and rice.

9    Q.  Are you familiar with a company called Ganaderos?

10   A.  Yes.

11   Q.  Did you work there?

12   A.  Yes.

13   Q.  Who owned Ganaderos?

14   A.  Javier Rivera.

15           MR. LOCKARD:  Ms. Hurst, if you could show us

16   Government Exhibit 104.

17   Q.  Mr. Medina, do you recognize that person?

18   A.  Yes.

19   Q.  And who is that?

20   A.  Javier Rivera.

21           MR. LOCKARD:  Thank you, Ms. Hurst.

22   Q.  Mr. Medina, when did you start working at Ganaderos?

23   A.  2007/2008.

24   Q.  And when did you stop working at Ganaderos?

25   A.  End of 2012.

L3HKRAM2                      Medina - Direct

1  Q.  When you started working at Ganaderos, where were you first
2  located?
3  A.  Tacoa, Colon.
4  Q.  For how long were you based in Tacoa, Colon?
5  A.  Some months; eight to ten months.
6  Q.  And where did you work next?
7  A.  Choloma, Cortes.
8  Q.  When you were based in Choloma, Cortes, what were your
9  responsibilities with Ganaderos?
10  A.  I supervised the planting of rice and corn.
11          MR. LOCKARD:  Ms. Hurst, if we could see Government
12  Exhibit 103, please.
13  Q.  Mr. Medina, do you recognize that person?
14  A.  Yes.
15  Q.  And, Mr. Medina, if you can understand some of my questions
16  in English, I'd ask that you please allow the interpreter to go
17  ahead and complete the interpretation.
18  A.  That's fine.
19  Q.  Thank you, sir.
20          Do you recognize the person shown in this picture?
21  A.  Yes.
22  Q.  Who is that?
23  A.  Geovanny Fuentes.
24  Q.  When did you first meet Mr. Fuentes?
25  A.  2010.

L3HKRAM2                          Medina – Direct

1   Q.  And who introduced you to Mr. Fuentes?

2   A.  Melvin Sandrez and Isidro Rivera.

3          MR. LOCKARD:  Ms. Hurst, could we see Government

4   Exhibit 107, please.

5   Q.  Mr. Medina, do you recognize that person?

6   A.  Yes.

7   Q.  And who is that?

8   A.  Melvin Sandrez.

9   Q.  And who was Melvin Sandrez?

10  A.  He was a cousin of Javier Rivera.

11  Q.  Did Mr. Sandrez have a nickname?

12  A.  Yes.

13  Q.  What was his nickname?

14  A.  Metro.

15         MR. LOCKARD:  Ms. Hurst, could you show Mr. Medina

16  Government Exhibit 305.

17         THE COURT:  Keep your voice up, please.

18         MR. LOCKARD:  Yes, your Honor.

19  BY MR. LOCKARD:

20  Q.  Mr. Medina, do you recognize either of the individuals in

21  this picture?

22  A.  Yes.

23  Q.  Who is the individual on the left?

24  A.  Melvin Sandrez.

25         MR. LOCKARD:  The government offers Exhibit 305.

L3HKRAM2                          Medina - Direct

1          MR. MOSKOWITZ:  No objection.

2          THE COURT:  Received.

3          (Government's Exhibit 305 received in evidence)

4    BY MR. LOCKARD:

5    Q.  So, Mr. Medina, the person on the left, in the baseball

6    cap, is Melvin Sandrez; is that right?

7    A.  Yes.

8    Q.  And who is the person on the right?

9    A.  Yankel Rosenthal.

10         MR. LOCKARD:  Thank you, Ms. Hurst.

11   Q.  Mr. Medina, when did you first meet Melvin Sandrez?

12   A.  End of 2009.

13   Q.  Under what circumstances did you first meet him?

14   A.  At a party for Javier Rivera's daughter.

15   Q.  And where was that party?

16   A.  At one of the ranches that he had in Choloma.

17   Q.  Who else did you see at that party?

18   A.  The Valles were there.

19   Q.  What was your understanding of who the Valles were?

20         MR. MOSKOWITZ:  Objection.

21         THE COURT:  Yes, sustained.  I don't think the jury

22   has heard this otherwise.  What this witness' understanding is

23   does not strike me as particularly relevant.

24   BY MR. LOCKARD:

25   Q.  Mr. Medina, was anyone at that party armed?

1    A.  Yes.

2    Q.  Who was armed at that party?

3    A.  The security people of the people who were there.

4    Q.  Who had security of the people who were at the party?

5    A.  Javier, the Valles, and Metro.

6    Q.  What kind of weapons were the security carrying?

7    A.  They had semiautomatic pistols and some had AR-15s.

8    Q.  Mr. Medina, during the time that you worked at Ganaderos,

9    were there other times when you saw Javier Rivera in person?

10   A.  Yes.

11   Q.  Did he have security with him on those occasions?

12   A.  Several times.

13   Q.  What type of security did he have with him?

14   A.  Two, three people, four people who are around who are there

15   with him, taking care of him, protecting him.

16   Q.  During the time that you worked for Ganaderos, did you see

17   Leonel Rivera Maradiaga in person?

18   A.  Yes.

19   Q.  On those occasions, did he have armed security?

20   A.  Yes.

21   Q.  And can you describe what kind of armed security he had?

22   A.  Yes.  He had several people with him.  He had several

23   bodyguards, several security people, with him.

24   Q.  And approximately --

25   A.  More than seven.

L3HKRAM2                         Medina - Direct

```
 1    Q.  And what types of weapons did Leonel Rivera's bodyguards
 2    carry?
 3    A.  Semiautomatic pistols and some AR-15s.
 4    Q.  Mr. Medina, did there come a time when you understood that
 5    Leonel and Javier Rivera were involved in drug trafficking?
 6            MR. MOSKOWITZ:  Objection.
 7            THE COURT:  Lay a foundation.
 8    BY MR. LOCKARD:
 9    Q.  So, Mr. Medina, you were an employee of Ganaderos for
10    several years; is that correct?
11    A.  Yes.
12    Q.  During that time, you saw Javier Rivera on several
13    occasions; is that right?
14    A.  Yes.
15    Q.  And you saw Leonel Rivera on several occasions?
16    A.  Yes.  A little bit less than Javier.
17    Q.  Did you have discussions with other employees at Ganaderos
18    about what other kinds of business Javier and Leonel Rivera
19    were involved in?
20            MR. MOSKOWITZ:  Objection.
21            THE COURT:  That's a yes-or-no question.  You can
22    answer it.
23    A.  Yes.
24            THE COURT:  All right.
25    Q.  In those discussions, did you hear the phrase "the
```

L3HKRAM2                          Medina – Direct

1    Cachiros"?

2              MR. MOSKOWITZ:  Objection.

3              THE COURT:  Yes, let me see you at sidebar.

4              Sorry, ladies and gentlemen.

5              (Continued on next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  So the gist of what you're trying to

3    establish is that the Cachiros are drug dealers and that this

4    witness learned that Mr. Rivera was a Cachiros.  Is that it?

5          MR. LOCKARD:  This particular line of questioning is

6    just to establish that the witness was aware that his employers

7    were associated with drug trafficking.

8          THE COURT:  Okay.  So this is all offered for the

9    truth of its content, right?

10         MR. LOCKARD:  No.  This is offered, and he's going to

11   say that he was not personally involved in drug trafficking.

12         THE COURT:  No, that's not -- that he was not

13   personally involved in drug trafficking.  It has nothing to do

14   with whether he was involved in drug trafficking.  I'm not

15   suggesting that you're trying to get this in as a coconspirator

16   statement.

17         MR. LOCKARD:  No, not at all.

18         THE COURT:  I didn't suggest that.  I didn't think

19   that.  But you're trying to establish that they were involved

20   in drug trafficking.

21         MR. LOCKARD:  That it was known by him and others.

22         THE COURT:  Just in the ether?

23         MR. LOCKARD:  In the -- right.

24         THE COURT:  Like you bring in somebody who I've read

25   in the newspaper is a member of the Gambino Crime Family, and I

L3HKRAM2                        Medina - Direct

1    say, well, they're in organized crime.  I have no idea whether

2    they are.  There's a newspaper article, and kind of a lot of

3    people just assume that they're in organized crime.  That's not

4    anything other than hearsay.  So, sustained.

5            MR. LOCKARD:  Okay.  Thank you, Judge.

6            (Continued on next page)

L3HKRAM2                        Medina - Direct

1                  (In open court)

2                  MR. LOCKARD:  May I resume, your Honor?

3                  THE COURT:  Pardon me?

4                  MR. LOCKARD:  May I resume, your Honor?

5                  THE COURT:  You may.

6                  MR. LOCKARD:  Thank you.

7    BY MR. LOCKARD:

8    Q.  Mr. Medina, when did you first see the defendant,

9    Mr. Fuentes?

10   A.  In 2010.

11   Q.  Under what circumstances?

12   A.  They came to Choloma because Javier Rivera was going to

13   rent out a property of one of those that he had to him,

14   Geovanny Fuentes, Metro, and Isidro Rivera, so that they could

15   plant a malanga project.

16   Q.  For the benefit of those of us who aren't familiar with

17   malanga, what kind of crop is that?

18   A.  Malanga is a type of root vegetable.  It's a vegetable.

19   Q.  Did you have any responsibilities relating to that malanga

20   property?

21   A.  Just to supervise for Isidro Rivera the part that was --

22   that belonged to him.

23   Q.  How far was that property from the farm where you worked?

24   A.  I was taking care of four ranches, but that one was about

25   five kilometers away.

1   Q.   From that time on, approximately how often would you see
2   the defendant?
3   A.   He would come by there several times because he was the
4   person responsible for that malanga crop.  He was the one who
5   had knowledge about malanga as a crop.
6   Q.   And so how frequently would you see him?
7   A.   Three, four times a week.
8   Q.   Now, did there come a time when you learned of a raid on a
9   drug lab near Choloma?
10  A.   Yes.
11  Q.   After you learned of that, how much time passed before you
12  saw the defendant again?
13  A.   One or two months.
14  Q.   Mr. Medina, did there come a time when you learned that the
15  defendant was selling rice seed to Isidro Rivera?
16  A.   Yes.
17  Q.   And what did you learn about that?
18  A.   Because when we were planting the seed, the workers that I
19  had who were planting called me, and they told me that that
20  seed was no good.
21            MR. MOSKOWITZ:  Objection.
22            THE COURT:  It's not for the truth of its content.
23  Overruled.
24  BY MR. LOCKARD:
25  Q.   So, Mr. Medina, what, if anything, did you do next?

L3HKRAM2                        Medina - Direct

1   A.  I called Isidro Rivera, and I reported to him that the seed

2   was useless.

3   Q.  After that, did you hear from the defendant?

4   A.  Yes.  He called me, very upset over that.

5   Q.  What did the defendant say to you?

6          MR. MOSKOWITZ:  Objection.

7          THE COURT:  Overruled.

8   A.  Ah, he said why were we messing with this, not to be

9   snitches, otherwise he was going to waste us.

10  Q.  And what was his tone?

11  A.  Oh, no, he was mad.

12  Q.  After that, did you have a conversation with someone else?

13  A.  Yes.  With Isidro.

14  Q.  Now, Mr. Medina, did there come another time when you

15  learned that Isidro was selling woodchips to the defendant?

16         MR. MOSKOWITZ:  Objection, your Honor.  May we

17  approach?

18         THE COURT:  No, I'll allow it.

19         Go ahead.

20  A.  Yes.

21  Q.  And what did you learn about that?

22  A.  Because he asked me to help him with that project.

23  Q.  And so what did you learn?

24  A.  Through an Agroforestal Fuentes worker, that we were being

25  paid too low a price and that others were getting paid more.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           MR. MOSKOWITZ:  Objection.

2           THE COURT:  All right.  That's not for the truth of

3    whether they were getting too low of a price, but simply that's

4    what was said.

5           Go ahead, next question.

6    BY MR. LOCKARD:

7    Q.  And what is Agroforestal Fuentes?

8    A.  Agroforestal Fuentes was a wood chipping purchasing

9    company.

10   Q.  And who was its owner?

11   A.  Geovanny Fuentes.

12   Q.  What happened after you were told that information about

13   the woodchips?

14          MR. MOSKOWITZ:  Objection.

15          THE COURT:  Overruled.

16   A.  Geovanny Fuentes called me, very mad.

17   Q.  Before Mr. Fuentes called you, was there a decision about

18   whether to continue to sell the woodchips to Agroforestal?

19   A.  Yes.  Isidro called me that we would not continue selling

20   to them for that price.

21   Q.  And then you said you heard from Mr. Fuentes?

22   A.  Yes.

23   Q.  What did he say to you?

24   A.  Not to stick my nose where it didn't belong, that that was

25   not my business, and to stop being a snitch, or he was going to

L3HKRAM2                              Medina – Direct

1    waste me.

2    Q.  Did Isidro find another buyer for those woodchips?

3    A.  Yes.

4    Q.  Did you later receive a phone call about the delivery of

5    those woodchips to the new buyer?

6    A.  Yes, that's right.

7    Q.  And who called you?

8    A.  The person to whom we were selling the woodchips called me.

9    Q.  And where was that person when he called you?

10   A.  He was in the middle of a --

11           THE INTERPRETER:  Interpreter correction:

12   A.  He was at a checkpoint.

13   Q.  What did he say was happening at the checkpoint?

14           MR. MOSKOWITZ:  Objection.

15           THE COURT:  One second.

16           All right.  Let me see you at sidebar.

17           (Continued on next page)

18

19

20

21

22

23

24

25

L3HKRAM2                          Medina - Direct

1           (At the sidebar)

2           THE COURT:  So, what's the answer to this question

3     going to be?

4           MR. LOCKARD:  So the witness, we suspect, is going to

5     say that the person called from the checkpoint, and he will say

6     the truck is being seized, I'm at a police checkpoint.

7           THE COURT:  All right.  So, the thrust of this is what

8     that relates to this indictment?

9           MR. LOCKARD:  Yes, your Honor.

10          We expect the witness will describe the second phone

11    call after this where the same person says I'm at a location

12    where I was directed to unload the contents of the truck, and a

13    truck owned by the defendant is here picking up that cargo, and

14    the relevance of that is there's been testimony about the

15    defendant's relationships with law enforcement and ability to

16    use law enforcement, and this is an illustration of using that

17    same ability and contacts this time not for drugs, but

18    essentially to steal a shipment of agricultural products.

19          THE COURT:  That's what this witness is here for?

20          MR. LOCKARD:  That's what this line of questioning is

21    for, and then we're going to move on.

22          THE COURT:  Well, is this witness here for anything

23    else?

24          MR. LOCKARD:  Yes.

25          THE COURT:  What?

L3HKRAM2                          Medina - Direct

1          MR. LOCKARD:  He will also testify that after the

2     Cachiros were designated, the defendant instructed him to go

3     meet with Fuad Jarufe, who then told the witness that Fuad

4     Jarufe is close with the National Party, including Juan

5     Orlando Hernandez, and in exchange for $5 million, would

6     protect the Cachiros.

7          THE COURT:  Okay.

8          MR. MOSKOWITZ:  Your Honor, I object to the entire

9     line of questioning.  That last point may be relevant, arguably

10    is relevant.  All of this point till now, the two

11    conversations, were merely offered to argue that the defendant

12    has a violent disposition or a bad temper and threatening.

13    There's no relevance to it at all.

14         This is very far afield.  It requires a lot of

15    assumptions as to how things happened and why things happened

16    that neither this witness, nor the person who talked to him can

17    provide.

18         THE COURT:  So, tell me again how this ties in with

19    law enforcement.

20         MR. LOCKARD:  So, there is -- this is then, and then a

21    couple of other things that the witness will testify if we --

22    after this conversation.  The first is the use of the police

23    checkpoint to seize and take the contents of this truck.  This

24    witness can also say --

25         THE COURT:  Well, you didn't establish it was a police

L3HKRAM2                          Medina - Direct

1    checkpoint, did you?

2              MR. LOCKARD:  No, we stopped before we got to that

3    part, but he will say it was a police checkpoint and a police

4    seizure of the truck.

5              MR. MOSKOWITZ:  He can't say anything.  He can say

6    what somebody told him.  He also can't say why they stopped him

7    or what the basis -- if they seized it, why they seized it.

8              MR. LOCKARD:  And we think because of these calls, I

9    think the witnesses' testimony establishes that the person

10   who's calling him is describing something that's happening at

11   that moment, that it's admissible as a present-sense

12   impression.

13             THE COURT:  Yes, but that may be true about, oh, my

14   goodness, somebody just seized the truck, but is he going to

15   say the police seized the truck?

16             MR. LOCKARD:  Yes.  He's going to say it's a police

17   checkpoint.

18             THE COURT:  No, you told me that already.  I'm asking

19   you, the person on the phone who's telling him this.

20             MR. LOCKARD:  Oh.  Yes, yes.  The caller describes it

21   as a police checkpoint and a police seizure of the truck, and

22   we're navigating around any of the other part of this

23   conversation to just focus on those two phone calls.

24             THE COURT:  All right.  I'm going to give an

25   instruction to the jury on this.

L3HKRAM2                              Medina - Direct

1              (In open court)

2              THE COURT:  Ladies and gentlemen, the testimony you've

3     been hearing and the testimony you're about to hear do not

4     relate to activities of the defendant that are charged in the

5     indictment as part of a crime.  And the evidence may not alone

6     be sufficient for you to find that the defendant is guilty of

7     any of the charges in the indictment.  The evidence is being

8     offered to show the relationships between the defendant and

9     other groups, other people, and it is the government's

10    position, which the defendant vigorously disagrees with, that

11    this will show, or help shed some light, on those

12    relationships.  But, again, it's not evidence of the crime

13    charged in this case and may not be the basis for your

14    consideration of anything other than on how defendant's

15    influence, control, or relationship with other groups, and then

16    it's only entitled to such weight as you, the jury, believes it

17    should be given.

18             Go ahead.

19             MR. LOCKARD:  Thank you, your Honor.

20    BY MR. LOCKARD:

21    Q.  Mr. Medina, on the phone call that you received, what did

22    the person who called you describe as happening during that

23    phone call?

24    A.  Yes.  He called me, and he told me that the vehicle was

25    being taken away from him, that he was at a checkpoint in

L3HKRAM2                          Medina - Direct

1    Choloma, and that the biomass that we were selling was being

2    taken from him.

3    Q.   Did he say taken by whom?

4    A.   Yes.  He says that the car was returned to him, but that

5    the biomass was dumped on the ground.

6            THE COURT:  Listen to the words of the question that

7    was asked and answer the question that was asked.

8            Mr. Reporter, can you repeat the question.

9            (Record read)

10   A.   Yes.  The police.

11           THE COURT:  Next question.

12   BY MR. LOCKARD:

13   Q.   And Mr. Medina, did you later get another phone call from

14   the same person?

15   A.   Yes.

16   Q.   On that call, did he describe to you something that was

17   happening at the moment that he called you?

18   A.   Yes.

19   Q.   What did he describe was happening at that moment?

20           MR. MOSKOWITZ:  Objection.

21           THE COURT:  I'll allow it, subject to the instruction

22   I just gave you.

23           Go ahead.

24   A.   That the biomasses that had been taken away from him was

25   being loaded onto an Agroforestal Fuentes vehicle.

L3HKRAM2                          Medina - Direct

1    Q.   Now, Mr. Medina, did there come a time when Ganaderos

2    closed?

3    A.   Yes.

4    Q.   And who did you begin working for after Ganaderos closed?

5    A.   Mr. Fuad Jarufe and Geovanny Fuentes sought me out to run a

6    biomass project.

7    Q.   And is Fuad Jarufe the owner of a company called Graneros?

8    A.   Yes.

9    Q.   Did there come a time when you spoke to Mr. Jarufe about

10   Javier Rivera?

11   A.   Yes.

12   Q.   How did that conversation come about?

13   A.   Geovanny Fuentes told me that Mr. Fuad Jarufe wanted to

14   speak to me.

15   Q.   And did you go speak with Mr. Jarufe?

16   A.   Yes.

17   Q.   When?

18   A.   That was between middle 2012 and 2013.

19            THE COURT:  All right.  We're going to pause, ladies

20   and gentlemen, we're going to take our midday break.  We're

21   going to pick up at 1:45.  Please do not discuss the case among

22   yourselves or with anyone else.  Please enjoy your lunch.  And

23   we'll be back 1:45.  Thank you.  And, ladies and gentlemen,

24   please let our jurors leave before exiting the courtroom.

25            (Luncheon recess)

L3HHRAM3

                         AFTERNOON SESSION

                             1:50 p.m.

          (In open court; jury not present)

          THE COURT:  Before our jury comes in, I want to read a

note which has been marked as Court Exhibit 10:  "Would the

judge be able to give us an estimate of time or if we need to

possibly be here next week?"  Juror No. 4.  "My boss was asking

me if there were any updates."

          I heard what the government had to say, so I'm

expecting their prediction to ring true, and so I will give

them an update soon.

          All right.  Take the podium, please.

          (Continued on next page)

L3HHRAM3                          Medina - Direct

1              (Jury present)

2              THE COURT:  All right.  You may continue.

3              MR. LOCKARD:  Thank you, your Honor.

4     JORGE MEDINA, resumed.

5     DIRECT EXAMINATION CONTINUED

6     BY MR. LOCKARD:

7     Q.  Mr. Medina, good afternoon.

8     A.  Good afternoon.

9     Q.  Before the lunch break, I had asked you about whether you

10    had had a conversation with Fuad Jarufe about Javier Rivera?

11    A.  Yes.  Yes, I did have.

12    Q.  And how did that conversation come about?

13    A.  How did it come about or what happened in it?

14    Q.  First, how did it come about?

15    A.  Geovanny Fuentes told me that Fuad Jarufe wanted to talk to

16    me.

17    Q.  And how long after that conversation did you meet with

18    Mr. Jarufe?

19    A.  The following day.

20    Q.  And at that time had Ganaderos stopped doing business?

21    A.  Yes, it was no longer active.

22    Q.  And why was Ganaderos no longer active?

23    A.  Because reports had already come out from the United

24    States, from the Department of State, that had declared them a

25    drug trafficking organization.

1    Q.  And so when you met with Mr. Jarufe, what did he say?

2    A.  He was sending a proposal to Mr. Javier Rivera.  It was to

3    provide security for him at one of his properties where no one

4    would touch him, because he was someone who had cooperated a

5    lot with the National Party and said that he could run that

6    with -- that he could manage that with Juan Orlando Hernandez.

7    That was in exchange for $5 million.

8    Q.  And how, if at all, did you respond to Mr. Jarufe?

9    A.  Yes, I told him that I would try to let Mr. Rivera know

10   about that.

11   Q.  Now, after that conversation, did you have a conversation

12   with Javier Rivera?

13   A.  Yes, I did have one.

14   Q.  And after that conversation, did you speak again with

15   Mr. Jarufe?

16   A.  Yes, he made the same proposal to me, asked me if I had

17   already spoken to Javier.

18   Q.  And what did Mr. Jarufe say about that?

19   A.  What did Jarufe say?

20   Q.  Yes, what did Mr. Jarufe say when he spoke to you again

21   about the proposal?

22   A.  He asked me if I already -- if I had already spoken to the

23   big man about his proposal to provide him security.

24   Q.  And what did you say to Mr. Jarufe?

25   A.  No, I said that I had not yet had communication with him.

L3HHRAM3                         Medina - Direct

1    Q.  And did you hear again from the defendant about this

2    matter?

3    A.  Yes.  On the second call he repeated to me that Mr. Jarufe

4    wanted to talk to me.

5    Q.  So the defendant asked you again to meet with Mr. Jarufe?

6    A.  Yes.

7    Q.  Is that when you had the conversation you just described a

8    moment ago?

9    A.  Correct.

10   Q.  Mr. Medina, during the time that you were working with the

11   defendant and Mr. Jarufe, did the defendant ever speak to you

12   about one of his firearms?

13   A.  Yes.

14   Q.  And which firearm did he talk to you about?

15   A.  Yes, he showed me an AR-15 that he had at his house.

16   Q.  And what did the defendant say about that AR-15?

17   A.  No, he just showed it to me.  He just showed it to me.

18   Q.  And what, if anything, did he say about where he had

19   obtained it?

20   A.  Oh, he said that it had been given to him by a high-ranking

21   police officer, high-ranking military man.  I don't know

22   whether it was policeman -- police or military.

23           MR. LOCKARD:  Your Honor, may I have one moment?

24           THE COURT:  You may.

25           (Counsel confer)

L3HHRAM3                           Medina - Cross

1              MR. LOCKARD:  No further questions.

2              THE COURT:  All right.  You may cross.

3              MR. MOSKOWITZ:  One moment, your Honor.

4              THE COURT:  Yes.

5              MR. MOSKOWITZ:  May I proceed, your Honor?

6              THE COURT:  You may.

7    CROSS-EXAMINATION

8    BY MR. MOSKOWITZ:

9    Q.  Good afternoon, Mr. Medina.

10   A.  Good afternoon.

11   Q.  If I may, can you kind of scooch forward a little bit in

12   your chair so I can actually see you.  Thank you.

13           You began working for Javier Rivera in 2006, correct?

14   A.  2007, 2008.

15   Q.  And you worked with him until sometime in either late 2012

16   or 2013, is that correct?

17   A.  Yes, for Ganaderos Agricultores del Norte, yes.

18   Q.  And after Ganaderos went out of business, you maintained

19   contact with Javier Rivera, correct?

20   A.  When he was still in Honduras, yes.

21   Q.  And there came a point in time when Javier Rivera came to

22   the United States, correct?

23   A.  Yes.

24   Q.  You have been -- and after that you maintained contact with

25   his family, correct?

L3HHRAM3                          Medina - Cross

1   A.  With his wife.

2   Q.  And when was the last time you spoke with Javier Rivera?

3   A.  Last time I spoke to him when I pitched -- when I pitched

4   Mr. Jarufe's proposal to him in Honduras.

5   Q.  Have you spoken to him since he's been in the United

6   States?

7   A.  He called me and asked me if I wanted to come and testify

8   regarding things I said to Fuad Jarufe.

9           THE INTERPRETER:  Interpreter wishes to confer, your

10  Honor, with my colleague.

11  A.  He called me and asked me if I wanted to testify regarding

12  things I said to Mr. Fuad Jarufe --

13          (Interpreters confer)

14  A.  If I wanted to testify to things that I told him about what

15  I said to Mr. Fuad Jarufe and Geovanny Fuentes.

16  Q.  Before you came to testify here, Mr. Javier Rivera called

17  you and asked you if you would agree to come and testify,

18  correct?

19  A.  That's right.

20  Q.  And after he spoke to you, he put you on the phone with a

21  DEA agent, correct?

22  A.  Yes, by text.

23  Q.  And that's how you came to testify here, correct?

24  A.  That's right.

25  Q.  You understood from your conversation with Mr. Rivera that

L3HHRAM3                        Medina - Cross

1    he was cooperating with the government, correct?

2    A.  No.

3    Q.  Sir, other than the conversation that you just described

4    when he asked you about whether you'd be willing to testify,

5    did you have any other communications with Mr. Rivera -- I'm

6    sorry, since he's been in the United States?

7    A.  No.

8    Q.  Did you have a conversation with Mr. Rivera as part of a

9    three-way call with his wife?

10   A.  No, I don't understand.  How is that?

11   Q.  Let's try to simplify it.

12           In January of this year, did you get a call from -- or

13   did you have a telephone conversation with Mrs. Rivera,

14   Javier's wife?

15   A.  Yes.

16   Q.  And during that telephone conversation, did Mrs. Rivera

17   connect you by telephone to Javier Rivera?

18   A.  Yes.

19   Q.  And during that telephone conversation, did you discuss a

20   document that you had written and sent to Javier Rivera?

21   A.  Yes.

22   Q.  Javier Rivera -- before the telephone call, Javier Rivera

23   asked you to prepare a document that related to your

24   conversations with Fuad Jarufe, isn't that correct?

25   A.  For him to -- for me to remind him of what I had said to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1  Mr. Fuad Jarufe.

2          THE INTERPRETER:  Interpreter correction.

3  A.  To remind him of what I had said to him about Mr. Fuad

4  Jarufe.

5  Q.  So he asked you to prepare a document about your

6  communications with Mr. Jarufe and what you had told him about

7  those communications, correct?

8  A.  Yes.

9  Q.  And then when you spoke to Mr. Javier Rivera in January of

10 this year, he told you he wasn't satisfied with the document

11 that you prepared, correct?

12 A.  No.

13 Q.  Isn't it a fact, sir, that when you spoke to Javier Rivera

14 in January of this year while he was on a three-way call with

15 his wife, Mr. Rivera told you you have to make sure you put in

16 the document that it was Mr. Fuentes who communicated with you

17 and asked you to speak to Fuad Jarufe?

18 A.  No.

19          MR. MOSKOWITZ:  One moment, Judge.

20          (Counsel confer)

21 Q.  Mr. Medina, I'm going to show you a document that I've

22 marked as Defendant's Exhibit C for identification and ask you

23 to take a look at it.  I'm going to direct your attention

24 specifically to the middle of page 3, beginning -- of course

25 you can look at the whole document if you'd like.

1          Please take a look at the text that begins on line 18

2    and goes through the next page.

3    A.   What other page do I look at, did you say?

4    Q.   Page 4, and then actually go through page 5.

5    A.   And what paragraph on page 4?

6    Q.   If you can, take a look at all of page 4 and page 5, and

7    when you finish with page 5, let me know.

8          THE INTERPRETER:  The witness has turned the document

9    over to the interpreter.

10   Q.   Have you had an opportunity to review the portions of

11   Defendant's Exhibit C that I asked you to look at?

12   A.   Yes.

13   Q.   Now, sir, when you spoke to Mr. Javier Rivera in January on

14   the call that his wife connected you to, you knew he was in

15   jail, correct?

16   A.   Yes.

17   Q.   In the United States, correct?

18   A.   Yes.

19   Q.   But you didn't know that the phone call was being taped,

20   correct?

21   A.   No, no, I didn't know.

22   Q.   Having reviewed the document that I showed you, does it

23   refresh your recollection that when you spoke to Mr. Javier

24   Rivera in January of this year, he told you to make sure that

25   when you wrote the document for him, you put in that Geovanny

L3HHRAM3                        Medina - Cross

1   Fuentes was the one who told you to speak to Fuad Jarufe?

2   A.  Yes, he did say that, but honestly, it was Geovanny Fuentes

3   who told me that Fuad Jarufe wanted to speak to me because he

4   was my go-between with Fuad Jarufe all the time.

5   Q.  Now, before you had this conversation with Javier Rivera,

6   you had written up a document for him describing your

7   communications with Fuad Jarufe, correct?

8   A.  That's right.

9   Q.  And when you wrote it up the first time, you didn't mention

10  Mr. Fuentes at all, correct?

11  A.  Yes, because Mr. Fuentes didn't have anything to do -- or

12  rather, he was not there during our conversation with Fuad

13  Jarufe.

14  Q.  When you spoke to -- withdrawn.

15          And it was only in the conversation with Javier Rivera

16  that he told you, please make sure when you write up the

17  document you put the name of Mr. Fuentes in the document,

18  correct?

19  A.  Yes.

20  Q.  And, by the way, just to follow up on your previous answer,

21  when you spoke to Fuad Jarufe about the offer he was making to

22  Javier Rivera, Mr. Fuentes wasn't there, correct?

23  A.  No, no, he wasn't.

24  Q.  You never discussed with him the substance of what you

25  discussed with Mr. Fuad Jarufe, correct?

L3HHRAM3                              Medina  -  Redirect

```
 1    A.  Yes, yes.  I did tell him, but he didn't say anything back
 2    to me.  He didn't share anything with me.
 3    Q.  You told him what Mr. Jarufe said to you, but he didn't
 4    respond at all, correct?
 5    A.  No, nothing.
 6            MR. MOSKOWITZ:  One moment, Judge.
 7            Nothing further, your Honor.
 8            THE COURT:  All right.  Redirect.
 9    REDIRECT EXAMINATION
10    BY MR. LOCKARD:
11    Q.  Mr. Medina --
12    A.  Yes.
13    Q.  -- when you testified about your meeting with Mr. Jarufe,
14    did you testify truthfully?
15            MR. MOSKOWITZ:  Objection.
16            THE COURT:  Overruled.
17    A.  Yes.
18    Q.  And when you spoke with Javier Rivera and he asked you to
19    include information about the defendant, was the information
20    that you described about the defendant true?
21    A.  Yes, it was true.
22    Q.  Did you make up anything about the defendant because Javier
23    Rivera asked you to?
24    A.  No.  Everything I'm saying is the truth.
25    Q.  Have you been promised anything by Javier Rivera or his
```

L3HHRAM3                          Medina  -  Redirect

1   family?

2   A.  No, nothing.

3   Q.  Will you benefit financially from Javier Rivera or his

4   family based on your testimony today?

5   A.  No, nothing.

6              MR. MOSKOWITZ:  May I have a moment, your Honor?

7              THE COURT:  You may.

8              MR. LOCKARD:  No further questions.

9              THE COURT:  All right.  You may step down.

10             (Witness excused)

11             THE COURT:  Call your next witness.

12             MR. GUTWILLIG:  Your Honor, the government calls

13  Special Agent Sandalio Gonzalez.

14             MR. SCHULMAN:  Your Honor.

15             THE COURT:  Yes.

16             MR. SCHULMAN:  Could we approach on an issue that we

17  have about this witness' testimony.

18             THE COURT:  About this witness?

19             MR. SCHULMAN:  The upcoming witness, there may be an

20  issue that I would think would be better to address beforehand.

21             THE COURT:  Let me see you at sidebar.

22             Ladies and gentlemen, you can stand up and stretch.

23             (Continued on next page)

24

25

1                (At sidebar)

2                MR. SCHULMAN:  Your Honor, last night we were served

3     with what's marked as Government Exhibit 504, which is a list

4     of a bunch of individuals that appear --

5                THE COURT:  Get your hand off of -- there's an

6     imaginary cone around the court reporter, OK?  You don't invade

7     that.

8                MR. SCHULMAN:  Of course.  So it's listed as

9     defendants first arrested in the Southern District of New York.

10    It's almost like a list of different people with images,

11    different places.  Yesterday when I tried to inquire of the

12    expert about different people who had been extradited from

13    Honduras, I was not permitted, and then last night we get a

14    list of all these different images of different people

15    extradited from all over the world.  So before it becomes an

16    issue with the witness here, I thought it prudent to address it

17    with the Court now.

18                THE COURT:  What's the issue?

19                MR. SCHULMAN:  It should be inadmissible.

20                THE COURT:  Why?

21                MR. SCHULMAN:  For the same reason that I wasn't

22    allowed to cross-examine the expert on it yesterday.  It's

23    irrelevant.  It has nothing to do --

24                THE COURT:  Which expert?

25                MR. SCHULMAN:  Dario Euraque.

1              THE COURT:  Did you try to cross-examine on this

2      document?

3              MR. SCHULMAN:  I tried to cross-examine on different

4      individuals who were extradited, who surrendered, and this is a

5      list of different people who surrendered or were extradited and

6      different things along those lines.

7              THE COURT:  I don't recall that line of questioning.

8      Was there an objection made or --

9              MR. GUTWILLIG:  I don't recall that questioning

10     either.  I do recall there being some general questions about

11     extraditions.  The purpose of this document -- and I don't know

12     that it's something that that witness would have opined on.

13     He's an expert witness -- the purpose of this document is to

14     show that individuals regarding whom there's been testimony

15     during this trial who the government would characterize as

16     joint offenders were first brought to the Southern District of

17     New York by various ways.  The special agent will say that he

18     has reviewed this chart.  He has --

19             THE COURT:  He has what?

20             MR. GUTWILLIG:  He has reviewed this chart, he has

21     reviewed the accuracy of this chart, and it reflects --

22             THE COURT:  Well, I'll hear the foundation.  Thank

23     you.

24             (Continued on next page)

25

L3HHRAM3                          Gonzalez - Direct

1              (In open court; jurors present)

2              THE COURT:  Get your witness up.  How long do you have

3     with this witness?

4              MR. GUTWILLIG:  I would estimate somewhere between

5     probably two and a half hours, your Honor.

6              THE COURT:  I think it's going to be a lot shorter

7     than that, I predict, and I suggest you should adjust your

8     examination accordingly.

9              MR. GUTWILLIG:  Yes, your Honor.

10    SANDALIO GONZALEZ,

11        called as a witness by the Government,

12        having been duly sworn, testified as follows:

13             MR. GUTWILLIG:  May I inquire, your Honor?

14             THE COURT:  You may inquire.  Get at it.

15    DIRECT EXAMINATION

16    BY MR. GUTWILLIG:

17    Q.  Good afternoon, Special Agent Gonzalez.

18    A.  Good afternoon, sir.

19    Q.  Where do you work?

20    A.  I work at the DEA.

21    Q.  For how long have you worked at the DEA?

22    A.  Approximately 21 years.

23    Q.  What is your position at the DEA?

24    A.  I'm a group supervisor.

25    Q.  In any particular group?

L3HHRAM3                         Gonzalez - Direct

```
 1    A.  Yes.
 2    Q.  And what group is that?
 3    A.  The bilateral investigations unit of the Special Operations
 4    Division.
 5    Q.  And has your work in the bilateral investigations unit
 6    focused on any particular region?
 7    A.  Yes, sir.
 8    Q.  And what region is that?
 9    A.  Latin America.
10    Q.  Any particular countries within that region?
11    A.  Yes, sir.
12    Q.  Which countries?  Could you list a few, please.
13    A.  Colombia, Venezuela, Honduras, Guatemala, Mexico.
14    Q.  How long have you been with the DEA?
15    A.  Twenty-one years.
16          THE COURT:  We've had that already.  That's the second
17    time.
18    Q.  Directing your attention to March 1 of 2020, did you
19    complete a law enforcement action on that day?
20    A.  Yes, sir.
21          MR. GUTWILLIG:  Ms. Hurst, could you please publish
22    what's in evidence as Government Exhibit 103.
23    Q.  Special Agent Gonzalez, do you recognize that picture?
24    A.  Yes, sir.
25    Q.  Who is it?
```

L3HHRAM3                        Gonzalez - Direct

1    A.   That's Geovanny Fuentes.

2    Q.   On March 1, 2020, did you arrest that individual?

3    A.   Yes, sir.

4    Q.   After you arrested the defendant, did you later conduct a

5    postarrest interview?

6    A.   Yes, sir.

7    Q.   In what language did you conduct that interview?

8    A.   Spanish.

9    Q.   Are you fluent in Spanish?

10   A.   Yes, sir.

11   Q.   Was the interview videotaped?

12   A.   Yes, it was.

13   Q.   Special Agent Gonzalez, on the witness stand is a disc

14   marked Government Exhibit 401-D.

15   A.   Yes, sir.

16   Q.   Do you recognize that disc?

17   A.   Yes, I do.

18   Q.   How do you recognize it?

19   A.   I reviewed it and initialed it earlier today.

20   Q.   And have you reviewed its contents?

21   A.   Yes, sir.

22   Q.   What are the contents of the disc generally?

23   A.   Videotape of the postarrest interview of Mr. Fuentes.

24            MR. GUTWILLIG:  Your Honor, at this time the

25   government offers -- I can read off the Government Exhibits.

L3HHRAM3                         Gonzalez - Direct

1    It's Government Exhibit 401-1, 401-3, 401-4, 401-5, 401-6,

2    401-8, 401-9, 401-10, 401-12, 401-13, 401-14, 401-15, 401-16,

3    401-17, 401-19, 401-20, 401-21, 401-22, 401-23, and your Honor

4    also 401-24, though we have something to take up with your

5    Honor on that exhibit perhaps when there's a good time for

6    that.

7              THE COURT:  So what are you doing?

8              MR. GUTWILLIG:  Offering all of those exhibits.

9              THE COURT:  Including the one that you have to take up

10   with me?

11             MR. GUTWILLIG:  Including that one, yes, sir.

12             THE COURT:  Any objection?

13             MR. SCHULMAN:  No objection subject to a potentially

14   adding some excerpts for context reasons.

15             THE COURT:  All right.  Received.

16             (Government's Exhibits 401-1, 401-3, 401-4, 401-5,

17   401-6, 401-8, 401-9, 401-10, 401-12, 401-13, 401-14, 401-15,

18   401-16, 401-17, 401-19, 401-20, 401-21, 401-22, 401-23, and

19   401-24 received in evidence)

20             MR. GUTWILLIG:  Ms. Hurst, could you please pull up

21   for the witness what's marked as Government Exhibit 401-T.

22   BY MR. GUTWILLIG:

23   Q.  Special Agent Gonzalez, do you recognize this?

24   A.  Yes.

25   Q.  What is it?

L3HHRAM3                        Gonzalez - Direct

1   A.  Looks to be the first page of the translation of the

2   postarrest interview.

3   Q.  Is it a transcript of certain of these video clips?

4   A.  Yes, sir.

5   Q.  Have you reviewed it in preparation for your testimony

6   today?

7   A.  Yes.

8           MR. GUTWILLIG:  Your Honor, the government offers

9   Exhibit 401-T.

10          THE COURT:  Any objection?

11          MR. SCHULMAN:  No, no objection subject to the same

12  issue with context, Judge.

13          THE COURT:  All right.  Received.

14          (Government's Exhibit 401-T received in evidence)

15          MR. GUTWILLIG:  Ms. Hurst, could you please play

16  what's in evidence as Government Exhibit 401-1.

17          (Video played)

18          THE COURT:  Stop it for a second.

19          Am I correct that the words that are appearing on my

20  screen are from the transcript that was just received into

21  evidence?

22          MR. GUTWILLIG:  That's correct, your Honor.

23          THE COURT:  Including the translation, or specifically

24  the translation?

25          MR. GUTWILLIG:  That's correct, your Honor.

L3HHRAM3                      Gonzalez - Direct

1          THE COURT:  OK.  Go ahead.

2          (Video played)

3    BY MR. GUTWILLIG:

4    Q.  Special Agent Gonzalez, during the course of that segment,

5    you provided the defendant with a form.  What form was that?

6    A.  The advice of rights form.

7    Q.  Is that a standard DEA form?

8    A.  Yes, sir.

9          MR. GUTWILLIG:  Ms. Hurst, could you please pull up

10   for the witness what's marked as Government Exhibit 402 and

11   402-T.

12   Q.  Do you recognize these?

13   A.  Yes, sir.

14   Q.  What are they?

15   A.  On the left is the advice of rights form that I read to

16   Mr. Fuentes and he initialed and signed, and on the right is a

17   translation.

18         MR. GUTWILLIG:  Your Honor, the government offers

19   Exhibits 402 and 402-T.

20         MR. SCHULMAN:  No objection, your Honor.

21         THE COURT:  Received.

22         (Government's Exhibits 402 and 402-T received in

23   evidence)

24   BY MR. GUTWILLIG:

25   Q.  Special Agent Gonzalez, directing your attention to the

L3HHRAM3                         Gonzalez - Direct

1   right side of Exhibit 402, is there a signature in the bottom

2   right?

3   A.  Yes, sir.

4   Q.  Whose signature is that?

5   A.  Geovanny Daniel Fuentes, the defendant.

6   Q.  Let's turn to another portion of the interview.  During

7   this interview, did you discuss with the defendant an

8   individual by the name of Melvin Sandrez?

9   A.  Yes, sir.

10          MR. GUTWILLIG:  Ms. Hurst, could you please pull up

11   what's in evidence as Government Exhibit 107.

12   Q.  Do you recognize that picture?

13   A.  Yes, sir.

14   Q.  Who is it?

15   A.  It's Melvin Sandrez, aka Metro.

16   Q.  Based on your involvement in this investigation, who is

17   Metro?

18   A.  Metro's a Honduran drug trafficker.

19   Q.  Does he have a familial relationship to anyone else you've

20   investigated?

21   A.  Yes, sir.

22   Q.  What is that?

23   A.  He's cousin to Devis Rivera and Leonel Rivera -- excuse me,

24   Javier Rivera.

25   Q.  Thank you.

L3HHRAM3                         Gonzalez - Direct

1            Ms. Hurst, could you please play Government

2     Exhibit 401-2.

3            (Video played)

4            MR. GUTWILLIG:  Ms. Hurst, could you please pull up

5     Government Exhibit -- for the witness, Government Exhibit 102.

6     Q.  Do you recognize this?

7     A.  Yes, sir.

8     Q.  What is it?

9     A.  Picture of Devis Leonel Rivera.

10            MR. GUTWILLIG:  Your Honor, the government offers

11    Government Exhibit 102.

12            THE COURT:  Any objection?

13            MR. SCHULMAN:  No objection.  I thought this was in

14    evidence, Judge.

15            THE COURT:  Received.

16            (Government's Exhibit 102 received in evidence)

17            MR. GUTWILLIG:  Ms. Hurst, could you please also

18    publish what's in evidence as Government Exhibit 104.

19    BY MR. GUTWILLIG:

20    Q.  Do you recognize that?

21    A.  Yes, sir.

22    Q.  And what is it?

23    A.  It's a picture of Javier Rivera.

24    Q.  Collectively are these two individuals referred to as

25    anything?

L3HHRAM3                          Gonzalez – Direct

1   A.   Yes, sir.

2   Q.   What is that?

3   A.   The Cachiros.

4   Q.   During the interview, did you discuss the Cachiros with the

5   defendant?

6   A.   Yes, sir.

7          MR. GUTWILLIG:  Ms. Hurst, could you please play

8   Government Exhibit 401-4 through the 38 second mark.

9          (Video played)

10  Q.   During the interview, did you ask the defendant about

11  Graneros?

12  A.   Yes, sir.

13         MR. GUTWILLIG:  Ms. Hurst, could you please play from

14  the 38 second mark to the end of this clip.

15         (Video played)

16         MR. GUTWILLIG:  Ms. Hurst, could you please play

17  Government Exhibit 401-5.

18         (Video played)

19  Q.   During the interview, did you ask the defendant how he met

20  the Cachiros?

21  A.   Yes, sir.

22         MR. GUTWILLIG:  Ms. Hurst, could you please play

23  Government Exhibit 401-6.

24         (Video played)

25         MR. GUTWILLIG:  Ms. Hurst, could you please play

L3HHRAM3                          Gonzalez - Direct

1    Government Exhibit 401-22.

2              (Video played)

3    Q.  During the interview, did the defendant also say whether he

4    knew Javier Rivera?

5    A.  Yes.

6              MR. GUTWILLIG:  Ms. Hurst, could you please play

7    Government Exhibit 401-13.

8              (Video played)

9    Q.  During the interview, did you ask the defendant whether he

10   did business with the Cachiros?

11   A.  Yes, sir.

12             MR. GUTWILLIG:  Ms. Hurst, could you please play

13   Government Exhibit 401-20.

14             (Video played)

15             MR. GUTWILLIG:  And, Ms. Hurst, could you please play

16   Government Exhibit 401-8.

17             (Video played)

18   Q.  During the interview, did you ask the defendant when was

19   the last time he had spoken with the Cachiros?

20   A.  Yes, sir.

21             MR. GUTWILLIG:  Ms. Hurst, could you please play

22   Government Exhibit 401-16.

23             (Video played)

24   Q.  During the interview, did you ask the defendant about a

25   cocaine lab located in Cerro Negro?

L3HHRAM3                        Gonzalez – Direct

```
 1  A.  Yes, sir.
 2           MR. GUTWILLIG:  Ms. Hurst, could you please play 401-9
 3  through 3 minutes and 20 seconds.
 4           (Video played)
 5  Q.  During the interview, did you ask the defendant about other
 6  individuals?
 7  A.  Yes, sir.
 8  Q.  Did you ask the defendant about individuals that, based on
 9  your involvement in this investigation, you've identified as
10  drug traffickers?
11  A.  Yes, sir.
12           MR. GUTWILLIG:  Ms. Hurst, could you please pull up
13  what's in evidence as Government Exhibit 109.
14  Q.  Do you recognize that?
15  A.  Yes, sir.
16  Q.  Who is that?
17  A.  That's Edgar Rios, aka Pluto.
18  Q.  Based on your involvement in this investigation, who is
19  Pluto?
20  A.  Drug trafficker in Honduras.
21  Q.  During the interview, did you ask the defendant whether he
22  knew Pluto?
23  A.  Yes.
24           MR. GUTWILLIG:  Ms. Hurst, could you please play
25  Government Exhibit 401-14.
```

L3HHRAM3                              Gonzalez - Direct

1          (Video played)

2    Q.   During the interview, did you ask the defendant whether he

3    knew an individual named Vaquero?

4    A.   Yes, sir.

5    Q.   Did he say whether he knew Vaquero?

6    A.   Yes, sir.

7    Q.   Based on your involvement in this investigation, do you

8    know who Vaquero is?

9    A.   Yes, sir.

10   Q.   Who is Vaquero?

11   A.   He's a hitman in Honduras.

12          MR. GUTWILLIG:  Ms. Hurst, could you please play

13   Government Exhibit 401-10.

14          (Video played)

15   Q.   During the interview, did you ask the defendant whether he

16   knew an individual named Chepe Handal?

17   A.   Yes, sir.

18   Q.   Did he say whether he knew Chepe Handal?

19   A.   Yes, sir.

20   Q.   Based on your involvement in this investigation, who is

21   Chepe Handal?

22   A.   A Honduran drug trafficking.

23          MR. GUTWILLIG:  Ms. Hurst, could you please play

24   Government Exhibit 401-12.

25          (Video played)

L3HHRAM3                        Gonzalez - Direct

1   Q.  During the interview, did you ask the defendant whether he

2   knew who the Valles were?

3   A.  Yes, sir.

4        MR. GUTWILLIG:  Ms. Hurst, could you please play

5   Government Exhibit 401-19.

6        (Video played)

7   Q.  Based on your involvement in this investigation, do you

8   know who the Valles are?

9   A.  Yes, sir.

10  Q.  Who are the Valles?

11  A.  It's a very powerful Honduran drug trafficking cartel.

12       MR. GUTWILLIG:  Ms. Hurst, could you please pull up

13  for the witness what's marked as Exhibit 201-8-T.

14  Q.  Do you recognize this?

15  A.  Yes, sir.

16  Q.  Is this a communication from the defendant's cell phone?

17  A.  Yes, sir.

18  Q.  Have you reviewed it in preparation for today's testimony?

19  A.  Yes, sir.

20       MR. GUTWILLIG:  Your Honor, the government offers

21  201-8-T and also the underlying document, 201-8.

22       THE COURT:  Any objection?

23       MR. SCHULMAN:  No objection, Judge.

24       (Government's Exhibits 201-8 and 201-8-T received in

25  evidence)?

L3HHRAM3                      Gonzalez - Direct

BY MR. GUTWILLIG:

Q.  Focusing on the first line of 201-8-T, the first line from

Comanche, could you please read the text in the second column

under translation.

A.  "The son of extradited Arnulfo Valle Valle is murdered in

Copan.  The victim is businessman Josue Caceres."

Q.  Directing your attention to line 3, how does the defendant

respond?

A.  "Arnulfo's son was nailed."

Q.  Directing thing your attention to line 5, what does

Comanche write?

A.  "Yeah, man, it's fucked up."

Q.  And on line 7, how does the defendant respond?

A.  "The competition.  Or the cops?"

Q.  Directing your attention to line 15, could you please read

what the defendant said, what the defendant said.

A.  "Yes.  Yes, if the bull is not there when the big boss

leaves, crazy.  It's best to stop them with a smash, but the

thing is that they want to nail all of them."

          MR. GUTWILLIG:  Ms. Hurst, could you please pull up

for the witness what's marked as Government Exhibit 201-10-T,

and 201-10.

Q.  Do you recognize these documents?

A.  Yes, sir.

Q.  Are these communications from the defendant's cell phone?

L3HHRAM3                         Gonzalez - Direct

1    A.  Yes, sir.

2    Q.  Have you reviewed them in preparation for your testimony

3    today?

4    A.  Yes, sir.

5            MR. GUTWILLIG:  Your Honor, the government offers

6    Government Exhibits 201-10 and 201-10T.

7            MR. SCHULMAN:  No objection, Judge.

8            THE COURT:  Received.

9            (Government's Exhibits 201-10 and 201-10T received in

10   evidence)

11   BY MR. GUTWILLIG:

12   Q.  Focusing on 201-10-T, directing your attention to line 1,

13   what does Comanche write?

14   A.  "Attorney Luis Pinto, the lawyer for the Valles, has just

15   been murdered."

16   Q.  And on line 5, what does the defendant say?

17   A.  "Well, they knew what they were facing now.  Things are so

18   bad here, as they say, things are so bad, those lawyers are

19   going to be subdued man.  Very, very clever."

20   Q.  And on line 9, what does Comanche say?

21   A.  "Money is -- it's nice, Comanche, money is nice.  Do you

22   think a lawyer doesn't know it'll be -- it's easy as pie

23   defending a narco like that.  The money is nice, but, well, you

24   have the consequences there, the enemies."

25   Q.  How does the defendant respond on line 11?

1   A.  "That's correct, Comanche."

2          MR. GUTWILLIG:  Thank you, Ms. Hurst.

3   Q.  During the interview, the postarrest interview, did you ask

4   the defendant about donating to politicians?

5   A.  Yes, sir.

6   Q.  Did you ask him about donating to Leopoldo Crivelli?

7   A.  Yes, sir.

8   Q.  Based on your investigation, do you know who Leopoldo

9   Crivelli is?

10  A.  Yes, sir.

11  Q.  Who is he?

12  A.  He's the mayor of Choloma.

13  Q.  Does he have a nickname?

14  A.  Yes, he does.

15  Q.  What's his nickname?

16  A.  Polo.

17         MR. GUTWILLIG:  Ms. Hurst, could you please play

18  Government Exhibit 401-15.

19         (Video played)

20         MR. GUTWILLIG:  Ms. Hurst, could you please pull up

21  for the witness what's marked as Government Exhibit 818.

22  Q.  Directing your attention to the top left, do you recognize

23  that?

24  A.  Yes, sir.

25  Q.  What is it?

L3HHRAM3                    Gonzalez - Direct

1   A.  Picture of Leopoldo Crivelli.

2   Q.  And have you reviewed this document before your testimony

3   today?

4   A.  Yes, sir.

5            MR. GUTWILLIG:  Your Honor, the government offers

6   Government Exhibit 818.

7            MR. SCHULMAN:  No objection, Judge.

8            THE COURT:  Received.

9            (Government's Exhibit 818 received in evidence)

10  BY MR. GUTWILLIG:

11  Q.  Directing your attention to the second page of this

12  document, on the left side of the page next to "telephone,"

13  could you please read the two numbers.

14  A.  "95050816 (home), 26691774 (work)."

15           MR. GUTWILLIG:  Ms. Hurst, could you please pull up

16  for the witness what's marked as Government Exhibit 201-60.

17  Q.  Do you recognize this?

18  A.  Yes, sir.

19  Q.  What is it?

20  A.  They're phone numbers.

21  Q.  Is this from the defendant's phone?

22  A.  Yes, sir.

23           MR. GUTWILLIG:  Your Honor, the government offers

24  Government Exhibit 201-60.

25           MR. SCHULMAN:  No objection.

L3HHRAM3                          Gonzalez - Direct

1          THE COURT:  Received.

2          (Government's Exhibit 201-60 received in evidence)

3    BY MR. GUTWILLIG:

4    Q.  Directing your attention to the middle column, could you

5    please read the entry on the top row.

6    A.  "Polo."

7    Q.  And the number to the right of that, could you please read

8    that.

9    A.  "9505-0816."

10         MR. GUTWILLIG:  Ms. Hurst, could you please pull you

11   for the witness what's marked as Government Exhibit 502-1.

12   Q.  Do you recognize this?

13   A.  Yes, sir.

14   Q.  What is it?

15   A.  Part of a spreadsheet of the contact information taken from

16   the defendant's phone.

17   Q.  Directing your attention to the rightmost column, do you

18   recognize that picture?

19   A.  Yes, sir.

20   Q.  And what is it?

21   A.  A picture of Leopoldo Crivelli.

22   Q.  And directing your attention to the first column, what's

23   the name there?

24   A.  Polo.

25         MR. GUTWILLIG:  Thank you, Ms. Hurst.

L3HHRAM3                       Gonzalez - Direct

1    Q.  During this interview, did you discuss an individual named

2    Pepe Lobo with the defendant?

3    A.  Yes, sir.

4    Q.  Who is Pepe Lobo?

5    A.  He's the son of a former Honduran president Porfirio Lobo.

6           MR. GUTWILLIG:  Ms. Hurst, could you please play

7    Government Exhibit 401-25.

8           (Video played)

9    Q.  During the interview, did you ask the defendant about Juan

10   Orlando Hernandez?

11   A.  Yes, sir.

12          MR. GUTWILLIG:  Ms. Hurst, could you please resume

13   playing.

14          (Video played)

15   Q.  During the interview, did you ask the defendant whether he

16   had ever contributed to Juan Orlando Hernandez?

17   A.  Yes, sir.

18          MR. GUTWILLIG:  Ms. Hurst, could you please play

19   Government Exhibit 401-23.

20          (Video played)

21   Q.  During the interview, did you ask the defendant whether he

22   knew any Honduran police officers?

23   A.  Yes.

24   Q.  Did the defendant name some police officers?

25   A.  Yes, sir.

1          MR. GUTWILLIG:  Ms. Hurst, could you please play

2    Government Exhibit 401-17.

3          (Video played)

4          (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3HKRAM4                          Gonzalez - Direct

1   BY MR. GUTWILLIG:

2   Q.   During this portion of the interview, you asked the

3   defendant about Mejia Vargas.  Who is Mejia Vargas?

4   A.   Mejia Vargas is a former Honduran police officer.

5          MR. GUTWILLIG:  Ms. Hurst, could you please pull up

6   for the witness what's marked as Government Exhibit 119.

7   Q.   Do you recognize this?

8   A.   Yes.

9   Q.   What is it?

10  A.   A photo of Alfonso Sierra Vargas, alias Renteria.

11         MR. GUTWILLIG:  Your Honor, the government offers

12  Government Exhibit 119.

13         MR. SCHULMAN:  Sorry, Judge.  No objection.

14         THE COURT:  Received.

15         (Government's Exhibit 119 received in evidence)

16         MR. GUTWILLIG:  Ms. Hurst, could you please pull up

17  for the witness what's marked as Government Exhibit 507.  I'm

18  sorry, 504, my apologies.

19         Do you recognize that document?

20         THE COURT:  Take that down, ladies and gentlemen.

21  We're going to break for our mid-afternoon break.  Please don't

22  discuss the case among yourselves or with anyone.  Keep an open

23  mind.  And we'll be back in action in about ten minutes.  Thank

24  you very much.  Please remain in the courtroom until the jury

25  has exited the courtroom.

L3HKRAM4                        Gonzalez - Direct

1              You may remain seated, sir.

2              (Continued on next page)

L3HKRAM4                        Gonzalez - Direct

```
 1              (Jury not present)
 2              THE COURT:  Okay.  After this witness, you have one
 3    more law enforcement witness; is that correct?
 4              MR. LOCKARD:  That's correct, your Honor, a firearms
 5    expert.
 6              THE COURT:  Okay.
 7              Understanding the defendant has no obligation to put
 8    on a case — and I will tell the jury that, of course — is it
 9    fair to say that if you put on a case, it will be no more than
10    one or two witnesses?
11              MR. MOSKOWITZ:  Yes, your Honor.
12              THE COURT:  Okay.
13              So, I'm going to tell the jury that I don't know when
14    the evidence is going to end but when it ends, there will be
15    closing arguments and the Court's instructions to the jury, so
16    that I think the probabilities are that the jury will not get
17    the case by the end of the day Friday but may get the case the
18    end of the day Monday.
19              How does that sound to the government?
20              MR. LOCKARD:  That sounds fine.  Thank you, your
21    Honor.
22              THE COURT:  Mr. Moskowitz, again, it's not binding.
23              MR. MOSKOWITZ:  Your Honor, that's fine.
24              THE COURT:  I mean, I'm asking everybody, as members
25    of the bar, whether that's a reasonable thing to tell the jury?
```

L3HKRAM4                         Gonzalez - Direct

1          MR. MOSKOWITZ:  Yes, Judge.  If we put on a case, I

2     think that that's certainly fair.

3          THE COURT:  Okay, all right.  That's what I'm going to

4     tell them.  And I will tell them, listen, it could be that the

5     evidence will close Friday morning, it may be that it doesn't

6     close until the end of the day Friday, but these are all

7     estimates, but for planning purposes, they should assume and

8     they should plan to be here on Monday, and it could be shorter

9     it could be longer, but that's what I'm going to tell them.

10          MR. MOSKOWITZ:  That's fine, Judge.

11          THE COURT:  Okay.  Thank you.

12          Let's just wait for the all-clear.  Flo, if you don't

13     mind waiting for that.  Thank you.

14          (Recess)

15          THE COURT:  Please have your witness take the stand.

16          (Continued on next page)

17

18

19

20

21

22

23

24

25

L3HKRAM4                         Gonzalez - Direct

1          (Jury present)

2          THE COURT:  Folks, I feel like I've known you forever.

3     And you probably feel like you've been here forever.  When we

4     first got together — can you think back that far — I estimated

5     that the trial would last about two weeks.  I've conferred with

6     counsel, and while it's an estimate — and, of course, the

7     defendant is not obligated to put on any case or do anything in

8     a criminal trial — I've conferred and gotten into detail with

9     the attorneys, and it is a good-faith estimate that the case

10    will be in your hands late on Monday.  Now, Monday is a little

11    bit more than two weeks, but keep in mind we lost a day for

12    unforeseen reasons that were no fault of anyone.

13         Now, when I say estimate, could it be sooner than

14    that?  Yes; it could be that you will get it Friday.  Could it

15    be longer than that?  It could be, but I am not one to over- or

16    underestimate; you have lives, you have appointments, and you

17    have commitments, so when I give you that as my good-faith

18    estimate, having conferred with counsel, that's what it is.

19    And that may mean some of you may have to adjust obligations or

20    the like.

21         Now, this is what happens:  At some point, the

22    government rests.  The government says it has one witness after

23    this.  The defendant is free to put on a case, but a defendant

24    has no obligation in a criminal trial to do that.  At the close

25    of the entire evidence, then there will be the opportunity for

1    the attorneys to sum up, to tell you what they think the

2    evidence shows.  Again, the defendant has no obligation to sum

3    up, or defense counsel, I should say.

4            And then, following that, the Court has detailed

5    instructions to give you on the law.  I should tell you — I

6    think I might have mentioned it way back when — that I will

7    give those instructions to you orally, but I'm also going to

8    give you a typed set of the instructions so you'll have that

9    with you in the jury room during deliberations.  Once the case

10   is in your hands, there are no time restrictions, in the sense

11   that if you want to come in early, you want to stay late, you

12   want to leave early, those are things which are, within reason,

13   in your control, and there is no time limit on the deliberation

14   process.  So, my estimate does not include the time for the

15   jury to discuss and deliberate on the case.

16           So, that's what I wanted to tell you.  It's been on my

17   mind, but if I spoke sooner than I did, I realize that I ran a

18   grave risk of being way off, so that's why you're hearing it

19   now and not sooner.  That's the way it is in trial practice.

20           You may continue.

21           MR. GUTWILLIG:  Ms. Hurst, could you please pull up

22   for the witness what's marked as Government Exhibit 504.

23   BY MR. GUTWILLIG:

24   Q.  Do you recognize this, Special Agent Gonzalez?

25   A.  Yes.

L3HKRAM4                     Gonzalez - Direct

1   Q.  Is it a chart of defendants who were first brought to the
2   Southern District of New York?
3   A.  Yes, sir.
4   Q.  Have you reviewed it in preparation for your testimony
5   today?
6   A.  Yes, sir.
7            MR. GUTWILLIG:  Your Honor, the government offers
8   Government Exhibit 504.
9            MR. SCHULMAN:  Objection, Judge.
10           THE COURT:  Having heard the objection at the sidebar,
11  it's overruled and it will be received.
12           (Government's Exhibit 504 received in evidence)
13           MR. GUTWILLIG:  Thank you, Ms. Hurst.
14           THE COURT:  Ladies and gentlemen, this is a
15  demonstrative exhibit.  The exhibit is not itself evidence of
16  anything but I'm advised that it will illustrate the testimony
17  of this witness.  So, it's the testimony that is the
18  substantive evidence.  This document, Government Exhibit 504,
19  is an illustration of that which the testimony will be.
20           MR. SCHULMAN:  Judge, I'm sorry, Geovanny can't hear
21  the translation.
22           THE COURT:  All right.  We'll make share that he can.
23           (Pause)
24           THE COURT:  I would ask the interpreters to translate
25  or interpret the instruction that I gave, that you have, I

L3HKRAM4                          Gonzalez - Direct

1     assume, on your screen.

2              (Pause)

3              THE COURT:  You may proceed.

4              MR. GUTWILLIG:  Thank you, your Honor.

5     BY MR. GUTWILLIG:

6     Q.  Special Agent Gonzalez, directing your attention to the

7     first row, was Devis Leonel Rivera Maradiaga first brought to

8     the Southern District of New York when he was arrested in 2015?

9     A.  Yes, sir.

10    Q.  The row below — was Juan Manuel Avila Meza first brought to

11    the Southern District of New York when he was arrested in 2016?

12    A.  Yes, sir.

13    Q.  Was Hector Emilio Fernandez-Rosa first brought to the

14    Southern District of New York when he was arrested in 2015?

15    A.  Yes, sir.

16    Q.  Was Fabio Porfiro Lobo first brought to the Southern

17    District of New York when he was arrested in 2015?

18    A.  Yes, sir.

19    Q.  Was Victor Diaz-Morales, a/k/a Rojo, first brought to the

20    Southern District of New York when he was arrested in 2017?

21    A.  Yes, sir.

22    Q.  Was Fredy Renan Najera Montoya first brought to the

23    Southern District of New York when he was arrested in 2018?

24    A.  Yes, sir.

25    Q.  Was Alfonso Sierra-Vargas, a/k/a Renteria, first brought to

L3HKRAM4                    Gonzalez - Direct

1    the Southern District of New York when he was arrested in 2012?

2    A.  Yes, sir.

3           THE COURT:  All right.  Ladies and gentlemen, what is

4    the Southern District of New York?  It's the geographic

5    district in which this Court sits.  It consists of Manhattan,

6    the Bronx, Westchester, Dutchess, Orange, Rockland, Putnam, and

7    Sullivan Counties.  So now you know what the Southern District

8    of New York consists of.

9           MR. GUTWILLIG:  Thank you, Ms. Hurst.

10   Q.  Special Agent Gonzalez, were you involved in the

11   prosecution of Juan Antonio Hernandez Alvarado?

12   A.  Yes, sir.

13   Q.  Do you know him by any other names?

14   A.  Yes, sir.

15   Q.  What names?

16   A.  Tony Hernandez.

17   Q.  Have you reviewed public filings in that case?

18   A.  Yes, sir.

19   Q.  Directing your attention to May 28, 2019, was there a

20   filing in the Tony Hernandez case that day?

21   A.  Yes, sir.

22          MR. GUTWILLIG:  Ms. Hurst, could you please pull up

23   for the witness what's marked as Government Exhibit 12.

24   Q.  Special Agent Gonzalez, do you recognize this document?

25   A.  Yes, sir.

L3HKRAM4                         Gonzalez – Direct

1    Q.  Is it a declaration along with the government's May 28

2    public filing in the Tony Hernandez matter?

3    A.  Yes, sir.

4              MR. GUTWILLIG:  Your Honor, the government offers

5    Government Exhibit 12.

6              MR. SCHULMAN:  Objection, Judge.

7              THE COURT:  Basis?

8              MR. SCHULMAN:  Hearsay.

9              THE COURT:  Yes, why isn't it hearsay?

10             MR. GUTWILLIG:  Your Honor, it's being offered to

11   explain, for context for a later exhibit.

12             THE COURT:  What?

13             MR. GUTWILLIG:  It's not -- I can explain to your

14   Honor at the sidebar, if that would be helpful.

15             THE COURT:  All right.

16             (Continued on next page)

17

18

19

20

21

22

23

24

25

L3HKRAM4                         Gonzalez - Direct

1              (At the sidebar)

2              THE COURT:  Remember now, the objection is not

3    relevance, the objection is hearsay.

4              Go ahead.

5              MR. GUTWILLIG:  And, your Honor, perhaps it may make

6    sense -- the purpose of this testimony is to highlight that

7    there were in fact public filings on two days in this case, and

8    to also refresh -- as opposed to put in that Special Agent

9    Gonzalez was aware of these, I can move along and not include

10   these as hearsay and just ask Special Agent Gonzalez the

11   questions.

12             THE COURT:  Listen, something that would otherwise be

13   hearsay could be admissible on notice that a person became

14   aware of a filing because that has some significance.  Is that

15   what you're arguing?

16             MR. GUTWILLIG:  Yes, your Honor.  The significance of

17   the filing is that it first made public allegations against

18   Juan Orlando Hernandez in May 28.  That's part of the

19   declaration, part of an exhibit --

20             THE COURT:  But you can't just say:

21             Are you aware of any filings that were made in this

22   case on such-and-such a date?

23             And he says:  I don't remember.

24             Let me show you this document and see whether it

25   refreshes your recollection as to when.

1                    Oh, May blah blah blah.

2                    Okay, what was filed on May blah blah blah?

3                    Okay, there was an indictment; I don't know what the

4       document is.

5                    What did that document reveal?

6                    Oh, was that known previously?

7                    Not as far as I'm aware.

8                    You can proceed in that manner, without introducing

9       the declaration, which is an out-of-court statement -- offer it

10      on notice?  To whom?  I mean, it shows that the world was aware

11      of it, but it doesn't show that the world was not aware of it

12      before it.

13                   MR. GUTWILLIG:  Understood, your Honor.

14                   To flag one thing for the Court:  In addition to these

15      two exhibits which the government will not offer but will use

16      to refresh, there is also a third exhibit from a public filing

17      in this matter, and it's just an exhibit, which was a sealed

18      exhibit to that filing, listing the coconspirators in this

19      matter.  The government would offer that just for a factual

20      basis that these are the coconspirator, these are their names,

21      for reference, for a chat, that the government intends to offer

22      later.

23                   If your Honor has the same issue with that, then we

24      can just use it to --

25                   THE COURT:  Well, I'm just trying to think this

1   through.  So, there is an exhibit you're going to offer, and

2   the exhibit is going to refer to, let's say, CC3, okay?

3              MR. GUTWILLIG:  Correct.

4              THE COURT:  So, you can ask the question, you know, in

5   these recordings, who is CC3, who are CC4?  If he forgets, you

6   can show him the document, refresh his recollection, and then

7   you can offer it to illustrate his testimony on this point, so

8   that it's in as a demonstrative, not as a substantive.

9              Do you have any objection?

10             MR. SCHULMAN:  What counsel has not articulated is

11  what the effect of the filing --

12             THE COURT:  What?

13             MR. SCHULMAN:  There's not been a proffer about the

14  effect of the filing on anybody.

15             THE COURT:  No, I know.  That's a relevance objection.

16  We'll find out.

17             MR. SCHULMAN:  Okay.  But at this point, there's no --

18             THE COURT:  There's true with anything.  I don't know

19  what the next question is and how the next question is going to

20  be relevant, right?

21             MR. SCHULMAN:  Of course not, Judge.

22             THE COURT:  So, it's going to be subject to

23  connection.  He's going to make a point of some sort that this

24  is the first time the world knew about something, and we're

25  going to find out what the something is and how it's relevant;

L3HKRAM4                        Gonzalez - Direct

1    and if it's not, I'm going to strike it.

2              MR. SCHULMAN:  I mean, obviously, that's part of that

3    hearsay exception, is -- okay, fair enough.

4              THE COURT:  No, we've taken care of the hearsay.  The

5    declaration isn't coming in.  Where's the hearsay?

6              MR. SCHULMAN:  Okay, fine.  Thank you.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3HKRAM4                          Gonzalez – Direct

1              (In open court)

2              THE COURT:  You may proceed.

3              Okay, now the mics are off.

4              (Pause)

5              THE COURT:  Okay.  You may inquire.

6              MR. GUTWILLIG:  Thank you, your Honor.

7    BY MR. GUTWILLIG:

8    Q.  Special Agent Gonzalez, you testified that you were aware

9    of a public filing in the Tony Hernandez case on May 28 of

10   2019; is that correct?

11   A.  Yes, sir.

12   Q.  Did that filing reveal anything related to the

13   investigation?

14              I can rephrase.

15   A.  Please.

16   Q.  Special Agent Gonzalez, did that filing reveal anything

17   related to allegations against Juan Orlando Hernandez?

18   A.  Yes, sir.

19   Q.  Was that the first time such allegations had been made

20   public?

21   A.  Yes, sir.

22   Q.  Directing your attention to June 12 of 2019, was there a

23   filing in the Tony Hernandez case that day?

24   A.  Yes, sir.

25   Q.  Did that filing also involve related topics to the ones you

L3HKRAM4                          Gonzalez - Direct

1   just mentioned?

2   A.  Yes, sir.

3           MR. GUTWILLIG:  Ms. Hurst, could you please pull up

4   for the witness what's marketed as Government Exhibit 201-201.

5   Q.  Do you recognize this document?

6   A.  Yes, sir.

7   Q.  Is it information from the defendant's cell phone?

8   A.  Yes, sir.

9   Q.  Is it information from a particular application on the

10  defendant's cell phone?

11  A.  Yes, sir.

12  Q.  And what application is that?

13  A.  Waze application.

14  Q.  Based on your involvement in this investigation, just

15  generally, what is the Waze application used for?

16  A.  The Waze application is used for direction and location

17  when traveling, looking for a location.

18          MR. GUTWILLIG:  Your Honor, the government offers

19  Government Exhibit 201-201.

20          THE COURT:  Any objection?

21          MR. SCHULMAN:  No objection to this.

22          THE COURT:  Received.

23          (Government's Exhibit 201-201 received in evidence)

24  Q.  Directing your attention to line 4, could you please read

25  the date and time in the timestamp column?

1   A.   5/29/2019, 10:49:44 in the morning.

2   Q.   Directing your attention to the description column, all the

3   way on the right, could you please read the first row of that?

4   A.   "Casa Presidencial Honduras."

5   Q.   Directing your attention to line 5, same question:  Can you

6   please read the date in the, I believe it's the middle column

7   there?

8   A.   5/29/2019, 10:57 a.m.

9   Q.   And, again, on the rightmost column, what is the location

10  reflected there?

11  A.   Casa Presidencial Honduras.

12  Q.   Now, directing your attention to line 25, could you please

13  read the date there in the middle column?

14  A.   6/12/2019.

15  Q.   And all the way on the right, what location does that

16  reflect in the rightmost column?

17  A.   Casa Presidencial Honduras.

18  Q.   Directing your attention to line 26, same question:  Middle

19  column, could you please read the date?

20  A.   June 12, 2019.

21  Q.   And the rightmost column, what is the location reflected

22  there?

23  A.   Casa Presidencial Honduras.

24  Q.   Special Agent Gonzalez, in this prosecution of this

25  defendant, has the government made public filings?

L3HKRAM4                        Gonzalez - Direct

1    A.  Yes.

2    Q.  Have you reviewed certain of those public filings?

3    A.  Yes.

4    Q.  Directing your attention to January 8, 2021, did the

5    government make a public filing that day?

6    A.  Yes, sir.

7    Q.  In that filing, did the government identify certain of the

8    defendant's alleged coconspirators?

9    A.  Yes, sir.

10            MR. GUTWILLIG:  Ms. Hurst, could you please pull up

11   for the witness what's marked as Government Exhibit 935 and

12   935-T.

13   Q.  Special Agent Gonzalez, when the government made the filing

14   you just mentioned, was there also a document that identified

15   the coconspirators referenced in the government's filing?

16   A.  Yes, sir.

17   Q.  That referenced the coconspirator number and the

18   individual's name; is that correct?

19   A.  Correct.

20   Q.  Was that filing public when it was made?

21   A.  No, sir.

22   Q.  And directing your attention now to Government Exhibits 935

23   and 935-T, do you recognize these documents?

24   A.  Yes, sir.

25   Q.  What are they?  Sorry, go ahead.

L3HKRAM4                          Gonzalez – Direct

1    A.  It's an Apple iCloud backup.

2    Q.  Are these documents from the defendant's son's iCloud

3    account?

4    A.  Yes, sir.

5              MR. GUTWILLIG:  Your Honor, the government offers

6    Government Exhibits 935 and 935-T.

7              THE COURT:  Any objection?

8              MR. SCHULMAN:  Objection, Judge; hearsay.

9              THE COURT:  Overruled.

10             (Government's Exhibit 935 and 935-T received in

11   evidence)

12   BY MR. GUTWILLIG:

13   Q.  You just testified the government made a public filing on

14   January 8; is that correct?

15   A.  Yes, sir.

16   Q.  Directing your attention to the top of 935-T, what is the

17   date of these communications?

18   A.  January 11 through 12, 2021.

19   Q.  Who are the participants in this communication?

20   A.  Geovanny Daniel Gutierrez, Geo, and Krizia Murillo.

21   Q.  Do you know who, based on your involvement in this

22   investigation, Geovanny Daniel Gutierrez, Geo, is?

23   A.  Yes.

24   Q.  Who is he?

25   A.  One of the defendant's sons.

L3HKRAM4                        Gonzalez – Direct

1   Q.   And based on your involvement in this investigation, do you
2   know who Krizia Murillo is.
3   A.   Yes.
4   Q.   Who is that?
5   A.   Another one of the defendant's sons using that name.
6   Q.   Directing your attention to line 1, could you please read
7   what Krizia Murillo writes?
8   A.   CC10 Julio Barahona.
9   Q.   Based on your review of the documents included in the
10  government's public filings, are you aware who CC10 was in
11  those filings?
12  A.   Yes.
13  Q.   Was it Julio Cesar Barahona?
14  A.   Yes.
15  Q.   Was the identity of the coconspirators made public when the
16  government made its filing?
17  A.   No, sir.
18  Q.   Directing your attention to line 7, what does Geo write in
19  response?
20          MR. SCHULMAN:  Objection, Judge.
21          THE COURT:  Basis?
22          MR. SCHULMAN:  Relevance.
23          THE COURT:  Line 10?  What line number?
24          MR. GUTWILLIG:  I believe it was line 7, your Honor.
25          THE COURT:  I'll allow it.

L3HKRAM4                    Gonzalez – Direct

1    BY MR. GUTWILLIG:

2    Q.  Could you please read what's on line 7, Special Agent

3    Gonzalez?

4    A.  "I know all of them."

5    Q.  Directing your attention to line 9, could you please read

6    that?

7    A.  "CC1 Melvin Saberes."

8    Q.  Was there a CC1 identified in the government's filings?

9    A.  Yes.

10   Q.  Based on your review of those filings and your involvement

11   in the investigation, who is -- do you know who CC1 is?

12   A.  Yes, sir.

13   Q.  Who is CC1?

14   A.  Melvin Sandrez, a/k/a Metro.

15   Q.  And was Melvin Sandrez, a/k/a Metro's identity as CC1 made

16   public at the time of the government's filing?

17   A.  No, sir.

18   Q.  Directing your attention to line 15, could you please read

19   what Geo writes?

20   A.  "All of them are there."

21   Q.  Directing your attention to line 17, could you please read

22   what Geo writes there?

23   A.  "Edgar."

24   Q.  Based on your involvement in this investigation, who do you

25   understand "Edgar" to refer to?

1   A.  Edgar Rios, alias Pluto.

2   Q.  Do you know whether Pluto was listed as a coconspirator in

3   the government's public filings?

4   A.  Yes, sir.

5   Q.  Was his identity made public as part of those filings?

6   A.  No, sir.

7   Q.  Directing your attention to line 19, what does Geo write?

8   A.  "CC4 is Juancho."

9   Q.  Based on your involvement in this investigation, do you

10  have an understanding of what "Juancho" refers to?

11  A.  Yes.

12  Q.  Is Juancho a nickname for someone?

13  A.  Yes, sir.

14  Q.  Who is it a nickname for?

15  A.  Juan Orlando Hernandez.

16  Q.  Directing your attention to line 21, could you please read

17  what Krizia Murillo writes?

18  A.  "So are they going to bring them back to life or what the

19  heck?"

20  Q.  Special Agent Gonzalez, do you know whether Melvin Sandrez,

21  a/k/a Metro, is alive?

22  A.  No, he is not.

23  Q.  Do you know whether Edgar Rios, a/k/a Pluto, is alive?

24  A.  No, he is not.

25  Q.  Since you arrested the defendant on March 1 of 2020, has he

L3HKRAM4                        Gonzalez - Direct

1   been in prison?

2   A.  Yes, sir.

3   Q.  Including at the Metropolitan Correction Center?

4   A.  Yes, sir.

5   Q.  During that time, has he sent emails from prison?

6   A.  Yes, sir.

7   Q.  Have you reviewed certain of those emails in preparation

8   for your testimony today?

9   A.  Yes, sir.

10          MR. GUTWILLIG:  Your Honor, the government would offer

11  a stipulation at this point.

12          THE COURT:  Yes.

13          MR. GUTWILLIG:  If called to testify -- this

14  stipulation is marked Government Exhibit 1003.

15          If called to testify, a representative from the Bureau

16  of Prisons would testify that:  The defendant was detained at a

17  prison operated by the Bureau of Prisons, facility 1, from

18  March 2020 through the present.

19          In accordance with the policy of the Bureau of

20  Prisons, phone calls made by inmates are recorded according to

21  a unique PIN number provided to each inmate.

22          Government Exhibit 701 contains an email communication

23  sent and/or received by the defendant while incarcerated at

24  facility 1 on December 26, 2020, at approximately 8:03 p.m.

25          Government Exhibit 702 contains an email communication

L3HKRAM4                         Gonzalez - Direct

sent and/or received by the defendant while incarcerated at

facility 1 on December 27, 2020, at approximately 10:36 p.m.

            Government Exhibit 703 contains an email communication

sent and/or received by the defendant while incarcerated at

facility 1 on December 28, 2020, at approximately 7:50 p.m.

            Government Exhibit 704 contains an email communication

sent and/or received by the defendant while incarcerated at

facility 1 on December 27, 2020, at approximately 7:36 p.m.

            Government Exhibit 705 contains an email communication

sent and/or received by the defendant while incarcerated at

facility 1 on December 31, 2020, at approximately 6:01 p.m.

            Government Exhibit 706 contains an email communication

sent and/or received by the defendant while incarcerated at

facility 1 on January 7, 2021, at approximately 6:02 p.m.

            Government Exhibit 707 contains an email communication

sent and/or received by the defendant while incarcerated at

facility 1 on January 7, 2021, at approximately 6:05 p.m.

            Government Exhibit 708 contains an email communication

sent and/or received by the defendant while incarcerated at

facility 1 on January 7, 2021, at approximately 8:07 p.m.

            Government Exhibit 709 contains an email communication

sent and/or received by the defendant while incarcerated at

facility 1 on January 8, 2021, at approximately 8:36 p.m.

            Under Bureau of Prisons regulations, third-party or

three-way calls are not authorized.

L3HKRAM4                    Gonzalez – Direct

1           It is further stipulated and agreed that this

2   stipulation, marked as Government Exhibit 1003, may be received

3   in evidence at the trial in the above-referenced matter.

4           THE COURT:  All right.  Were you offering it?

5           MR. GUTWILLIG:  Yes, your Honor.

6           THE COURT:  You're offering Government Exhibit 1003,

7   is that it?

8           MR. GUTWILLIG:  Correct, your Honor.

9           THE COURT:  Any objection?

10           MR. SCHULMAN:  No objection.

11           THE COURT:  Received.

12           (Government's Exhibit 1003 received in evidence)

13           MR. GUTWILLIG:  Ms. Hurst, could you please pull up,

14   for the witness, what's marked as Government Exhibit 701 and

15   701-T.

16   BY MR. GUTWILLIG:

17   Q.  Does this contain an email the defendant sent or received

18   from the Metropolitan Correction Center?

19   A.  Yes, sir.

20           MR. GUTWILLIG:  Your Honor, the government offers

21   Government Exhibits 701 and 701-T.

22           THE COURT:  Any objection?

23           MR. SCHULMAN:  No objection, Judge.

24           THE COURT:  Received.

25           (Government's Exhibits 701 and 701-T received in

L3HKRAM4                          Gonzalez - Direct

1    evidence)

2    BY MR. GUTWILLIG:

3    Q.   Directing your attention to the portion at the beginning,

4    could you please read the sentence beginning "as you know,"

5    through "process"?

6    A.   "As you know, on March 8, I have court, the trial, so time

7    has run out, and I need some specific information that I have

8    been asking you for since the beginning of this process."

9    Q.   Farther down --

10             MR. GUTWILLIG:   Ms. Hurst, could you please highlight

11   the portion beginning "we need to get the following urgently"

12   and the three items listed below it?

13   Q.   Focusing on the first item, could you please read the text

14   next to 1?

15   A.   "The DPI facts for Gonzalez."

16   Q.   Focusing on the second item, could you please read the text

17   next to 2?

18   A.   "A mechanic from Guatemala that showed up half buried in

19   Choloma, I think that was 2011 or '12."

20   Q.   Focusing on the third item, could you please read the text

21   next to 3?

22   A.   "Facts about the thing at Cerro Negro."

23   Q.   Now, directing your attention to the third line down on the

24   second page, do you see Geo and Cristian?

25   A.   Yes.

L3HKRAM4                          Gonzalez - Direct

1    Q.   Do you know who Geo or Cristian is?

2    A.   Yes.

3    Q.   Who is Geo?

4    A.   Two of the defendant's sons.

5    Q.   Geo and Cristian are two of the defendant's sons?

6    A.   Yes, sir.

7    Q.   Later down the line beginning "Cristian, on Monday" --

8             MR. GUTWILLIG:   Could you please highlight that,

9    Ms. Hurst?

10   Q.   -- could you please read that, Special Agent Gonzalez?

11   A.   "Cristian, on Monday, I want confirmation about whether you

12   spoke to Martinez and Comanche."

13   Q.   Based on your involvement in this investigation, do you

14   have an understanding of who Martinez refers to?

15   A.   Yes.

16   Q.   Who is that?

17   A.   An Honduran police officer, Comisionado Martinez.

18            MR. GUTWILLIG:   Ms. Hurst, could you please pull up

19   for the witness Government Exhibit 702 and T.

20   Q.   Does this contain an email the defendant sent and received

21   from the MCC?

22   A.   Yes, sir.

23            MR. GUTWILLIG:   The government offers Government

24   Exhibits 702 and T.

25            THE COURT:   Any objection?

1          MR. SCHULMAN:  No, no objection to this document.

2          THE COURT:  Received.

3          (Government's Exhibits 702 and 702-T received in

4     evidence)

5     BY MR. GUTWILLIG:

6     Q.  Directing your attention to the second page, there is an

7     email and response to the defendant from Geovanny Gutierrez.

8          Do you know who Geovanny Gutierrez refers to?

9     A.  Yes.

10    Q.  And who is that?

11    A.  One of the defendant's sons.

12    Q.  Could you please read the highlighted text beginning "good

13    morning."

14    A.  "Good morning.  I spoke to Salgado and Martinez now, and he

15    says that the only way is to go to the public ministry and

16    request the documents through a petition for them to request it

17    from the appropriate entity that holds those documents, because

18    otherwise they already both tried and were unable to."

19    Q.  Directing your attention to the first page of this email.

20         MR. GUTWILLIG:  Ms. Hurst, if you would please

21    highlight the email from the defendant sent on December 27, at

22    7:34, the portion beginning "I spoke to a friend" through

23    "requested by the consulate."

24    Q.  And Special Agent Gonzalez, could you please read the

25    highlighted text?

1    A.  "I spoke to a friend.  What we need is a certificate of

2    removal of the body.  This is for Gonzalez and a Guatemalan

3    mechanic that showed up in Choloma, I believe in 2012, but he's

4    telling me that in order to use it over here, it has to be

5    requested by the consulate."

6              MR. GUTWILLIG:  Ms. Hurst, could you please pull up,

7    for the witness, what's marked as Government Exhibits 703 and

8    703-T.

9              Your Honor, at this point, the government would offer

10   Government Exhibits 703, 703-T, 704, 704-T, 705, 705-T, 706,

11   706-T, 707, 707-T, 708, 708-T, 709, and 709-T.

12             THE COURT:  Any objection?

13             MR. SCHULMAN:  Not to the emails from Geovanny, Judge.

14             THE COURT:  All right.  The exhibits are received.

15             (Government's Exhibits 703, 703-T, 704, 704-T, 705,

16   705-T, 706, 706-T, 707, 707-T, 708, 708-T, 709, and 709-T

17   received in evidence)

18             MR. GUTWILLIG:  Ms. Hurst, could you please publish

19   what's in evidence as Government Exhibit 703-T.

20   BY MR. GUTWILLIG:

21   Q.  And directing your attention to the email on page 1 from

22   Cristian Fuentes, dated December 26 at 3:51 p.m., could you

23   please read the sentence beginning "Comanche."

24   A.  "Comanche says he will get a reference as well and see what

25   he can get for the Cerro thing case."

L3HKRAM4                          Gonzalez - Direct

1    Q.  Based on your involvement in this investigation, what do

2    you understand "the Cerro thing" to mean?

3    A.  A reference to the drug lab seizure at Cerro Negro.

4           MR. GUTWILLIG:  Ms. Hurst, could you please publish

5    what's in evidence as Government Exhibit 704-T.

6    Q.  Directing your attention to the email dated December 26,

7    2020, at 3:06, could you please read the sentence beginning

8    "yes, dad."

9    A.  "Yes, Dad.  I am tapping Sauceda all the" time.

10           THE COURT:  No, no, look at it again.

11           THE WITNESS:  Yes, Dad, I am tapping Sauceda all the

12    same."

13           Thank you, Judge.

14    BY MR. GUTWILLIG:

15    Q.  Special Agent Gonzalez, based on your review of certain of

16    these prison emails, did the defendant reference obtaining help

17    from Honduran Government officials?

18    A.  Yes.

19           MR. GUTWILLIG:  Ms. Hurst, could you please pull up

20    what's in evidence as Government Exhibit 708-T.

21    Q.  Directing your attention to the sentence beginning "look,

22    son," could you please read that sentence?

23    A.  "Look, son, I know that people are difficult, but I need

24    you to pressure Sauceda.  If not, talk to Chincilla and see if

25    he can request them legally."

L3HKRAM4                        Gonzalez - Direct

1    Q.  Based on your involvement in this investigation, are you

2    aware of the Honduran Government official with the surname

3    Chincilla?

4    A.  Yes, sir.

5    Q.  Who is that?

6    A.  It's the Attorney General of Honduras.

7          MR. GUTWILLIG:  Ms. Hurst, could you please publish

8    what's in evidence as Government Exhibit 706-T.

9    Q.  Directing your attention to the email from the defendant

10   dated January 6, 2021, at 12:34 p.m., could you please read

11   beginning question?

12   A.  "But will they give you the letter saying that I have not

13   been investigated?  And the other one, son?  The other thing is

14   definitely imperative.  We have to see how we get it issued.

15   Gonzalez and Cerro, that is the key."

16         MR. GUTWILLIG:  Ms. Hurst, could you please publish

17   what's in evidence as Government Exhibit 707-T.

18   Q.  And directing your attention to the email from the

19   defendant dated January 7, 2021, at 6:05, could you please read

20   the sentence beginning "look"?

21   A.  "Look, that is critical for me.  Without it, I am done for,

22   in terms you can understand.  Ask him if he can get a letter

23   that says that I do not appear in any crime, please."

24         MR. GUTWILLIG:  Ms. Hurst, could you please pull up

25   what's in evidence as Government Exhibit 705-T?

L3HKRAM4                        Gonzalez - Direct

1   Q.  Special Agent Gonzalez, you've testified about the

2   defendant's emails referencing a mechanic; is that correct?

3   A.  Yes.

4   Q.  During the course of reviewing certain of these emails, did

5   you see multiple references to a mechanic?

6   A.  Yes.

7   Q.  Directing your attention to an email on December 27, 2020,

8   at 10:21, could you please read what GG writes, Geovanny

9   Gutierrez writes?

10  A.  "Do you happen to have the name of that mechanic?  Isn't it

11  in the discovery?"

12          MR. GUTWILLIG:  Ms. Hurst, could you please pull up

13  what's in evidence as Government Exhibit 709-T.

14  Q.  And directing your attention to the email from the

15  defendant on January 8, 2020, at 8:36 p.m., could you please

16  read the sentence beginning "the reports about."

17  A.  "The reports about Cerro and the mechanic Gonzalez are

18  urgent."

19  Q.  And what was the date of that email, Special Agent

20  Gonzalez?

21  A.  January 8, 2020.

22          MR. GUTWILLIG:  Your Honor, may I have a moment,

23  please?

24          THE COURT:  Yes.

25          (Pause)

1           MR. GUTWILLIG:  No further questions, your Honor.

2           THE COURT:  All right.  Thank you, Mr. Gutwillig.

3           You may cross-examine, Mr. Schulman.

4           MR. SCHULMAN:  Thank you.

5           May I proceed, your Honor?

6           THE COURT:  You may.

7    CROSS-EXAMINATION

8    BY MR. SCHULMAN:

9    Q.  Good afternoon, Agent.

10   A.  Good afternoon.

11   Q.  You mentioned that you're the group supervisor of the Latin

12   American team; is that right?

13   A.  One of the Latin American teams.

14   Q.  You're the group supervisor of one of the Latin American

15   teams, right?

16   A.  Yes, sir.

17   Q.  And as the group supervisor, obviously, you were a special

18   agent before being group supervisor, right?

19   A.  Yes.

20   Q.  And as a group supervisor, you train your -- is it fair to

21   call them subordinates, the agents working under you?

22   A.  We don't usually use that term.

23   Q.  Well, what term are you comfortable with?

24   A.  Agents.

25   Q.  Okay.  So, you train the agents that are working with you,

L3HKRAMA4                           Gonzalez - Cross

1    right?

2    A.  No, I do not.

3    Q.  You don't train -- the agents that you're supervising, you

4    don't train them in best practices?

5    A.  No, sir.

6    Q.  You don't give them suggestions about how to conduct steps

7    in the work that they're taking?

8    A.  If they come to me.

9    Q.  So how are the responsibilities of a supervisor different

10   than just being a regular special agent?

11   A.  We have to approve reports -- we have to approve reports

12   and participate in certain meetings.

13   Q.  So the only difference between being a special agent and

14   being a group supervisor is approving reports and participating

15   in certain meetings?

16   A.  No.

17   Q.  So, please share, what other differences are there?

18   A.  You have responsibility to oversee the investigations that

19   are within your group.

20   Q.  And what does overseeing the investigations look like?

21   A.  You have to review them every six months to make sure they

22   contain all the necessary reports that they need and the

23   reports are up to date.

24   Q.  Do you make suggestions to the agents that are working

25   under you in terms of how to proceed with certain investigative

L3HKRAMA4                         Gonzalez - Cross

1    steps?

2    A.   On occasion.

3    Q.   Now, obviously, when you work with -- you work with

4    cooperating witnesses, right?

5    A.   Yes, sir.

6    Q.   And you've been working with cooperating witnesses for a

7    long time?

8    A.   Yes, sir.

9    Q.   You're on the job now, if you will, 21 years, you

10   mentioned?

11   A.   Yes, sir.

12   Q.   And you worked with cooperating witnesses in this case,

13   right?

14   A.   Yes, sir.

15   Q.   And we could agree that, I think, there are best practices

16   to working with cooperating witnesses; isn't that right?

17   A.   Yes, sir.

18   Q.   And, frankly, there are best practices to working with any

19   witness, cooperating or not, right?

20   A.   I think so.

21   Q.   For example, it's preferred to isolate witnesses, right?

22   A.   What do you mean?

23   Q.   Well, I mean, for example, you may be working on a case,

24   and there's more than one cooperating witness, right?

25   A.   Do you mean someone incarcerated?

L3HKRAMA4                        Gonzalez - Cross

1    Q.  I mean a witness that's providing the agents on the case

2    with information.

3    A.  Sometimes they work together.

4    Q.  No.  My question is that you may be working on one

5    investigation, and you may have multiple different cooperating

6    witnesses on that particular case?

7    A.  Yes, sir.

8    Q.  And you would agree that -- let's say, for example, there

9    were five cooperating witnesses supporting the DEA.

10            You have cases like that?

11   A.  Yes, sir.

12   Q.  And you would agree that it's preferable that you wouldn't

13   debrief -- withdrawn.

14            Please share with the jury what it means to debrief a

15   witness.

16   A.  To conduct an interview of the witness of the information

17   he or she may have.

18   Q.  During a debriefing session, a cooperating witness or any

19   witness provides information to you?

20   A.  Yes, sir.

21   Q.  And, theoretically, you use that information to then go and

22   gather additional information?

23   A.  Sometimes.

24   Q.  So, you would agree with me that it's preferable to not

25   debrief cooperating witnesses as a group, right?

L3HKRAMA4                          Gonzalez - Cross

1    A.  Not usually.

2    Q.  When you say "not usually," there are certain pressures, if

3    you will -- withdrawn.

4          One problem with debriefing cooperating witnesses as a

5    group is that one person's information might influence what the

6    other one is saying, right?

7    A.  It depends what you're debriefing about.

8    Q.  But, theoretically, if you have multiple cooperating

9    witnesses in a room together, the information that one is

10   sharing might influence the information that the other one

11   shares, right?

12   A.  Again, it depends on what's being discussed.

13               (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1    Q.  But generally speaking, you certainly wouldn't want one

2    cooperating witness to improperly influence another cooperating

3    witness' information, right?

4    A.  Correct.

5    Q.  Obviously, you want to reach the right result.  You want to

6    get accurate information in these debriefing sessions, right?

7    A.  Yes.

8    Q.  You want to rely on truthful information from the

9    cooperating witnesses that you work with, right?

10   A.  Yes, sir.

11   Q.  So it's fair to say that information that you might receive

12   from one cooperator or one witness could influence the

13   information that you receive from another, right?

14   A.  Not necessarily.

15   Q.  But possibly?  Let's just say it's an option or it's

16   something to keep on your radar, if you will?

17   A.  OK.

18   Q.  Let's say you go outside and you -- two witnesses observe a

19   car accident, right?  You'd rather speak to them separately,

20   right?

21              MR. GUTWILLIG:  Objection.

22              THE COURT:  I'll allow it.

23   A.  I don't speak to anyone involved in car accidents.

24   Q.  The point is you want to get each person's independent

25   information that they observed, right?

L3HHRAM5                          Gonzalez - Cross

1    A.   Yes.

2    Q.   And if one person says something, the other witness might

3    pick some of that information up, and it could influence them

4    consciously or subconsciously, right?

5    A.   I don't know what would influence another person.

6    Q.   Well, if there are two cooperating witnesses in a room that

7    have a relationship, forget about conscious or subconscious,

8    what one witness shares -- you don't know about the pressure,

9    the interpersonal dynamic between two of those witnesses,

10   right?

11               MR. GUTWILLIG:   Objection.

12               THE COURT:   Sustained.

13   Q.   For example, if there are two cooperating witnesses in the

14   room, you don't know whether one person is putting pressure on

15   the other person to say certain things or not?

16               MR. GUTWILLIG:   Objection.

17               THE COURT:   Sustained.

18   Q.   Well, can we agree it's preferred to not meet with

19   cooperating witnesses together?

20   A.   Again, it depends on the circumstance.

21   Q.   Well, I'm asking you for best practices, agent.  Is that --

22   "agent" is the right term to use?

23   A.   That's fine.

24   Q.   All right.  Best practices, it's preferred to not meet with

25   cooperating witnesses together, right?

L3HHRAM5                          Gonzalez - Cross

1    A.   Again, it depends on the circumstance.

2    Q.   Well, in your 21 years of practice, you would agree that

3    it's unusual to put cooperating witnesses in the room together,

4    right?

5    A.   No, I wouldn't say that's unusual.

6    Q.   So it's normal protocol for you to put cooperating

7    witnesses in the same room and debrief them as a group?

8    A.   It depends on the situation.

9    Q.   Obviously, you want to test the credibility of the

10   information the cooperating witnesses share, right?

11   A.   Information that they share?

12   Q.   Information that cooperating --

13            THE COURT:  Rephrase your question.  It's ambiguous

14   and not clear.  Rephrase it.

15   Q.   You want to ensure that the information you're getting from

16   cooperating witnesses is accurate, right?

17   A.   Yes, sir.

18   Q.   You want to make sure that the information you're getting

19   from the -- withdrawn.

20            You want to make sure that the cooperating witnesses

21   are being honest with you, right?

22   A.   Yes.

23   Q.   Now, in this case you did multiple sessions where you put

24   two cooperating witnesses in the same room together, isn't that

25   right?

1    A.  I don't recall.

2    Q.  You were working with Leo Rivera in this case, right?

3    A.  Yes, sir, we were.

4    Q.  And another -- and fair to call Leo Rivera a cooperating

5    witness?

6    A.  Yes, sir.

7    Q.  Another cooperating witness that you worked with is -- was

8    his brother, right?

9    A.  Very little, but, yes, sir.

10   Q.  Are you saying that his brother was not a cooperating

11   witness?

12   A.  No, I said "very little."

13   Q.  Leo Rivera's brother was called Javier, or is called

14   Javier?

15          THE COURT:  What do you mean by "very little"?  Very

16   little cooperator or very little you worked with him?

17          THE WITNESS:  Very little that I worked with him, sir.

18          THE COURT:  Thank you.

19          Next question.

20   BY MR. SCHULMAN:

21   Q.  Javier Rivera is not a very little cooperator, is he?

22          MR. GUTWILLIG:  Objection.

23          THE COURT:  Rephrase it.  I was just clarifying an

24   ambiguous answer.  Rephrase your question.

25   Q.  Well, Javier Rivera is a cooperator, right?

L3HHRAM5                        Gonzalez - Cross

1    A.  Yes, sir.

2    Q.  It's not like little cooperators and big cooperators,

3    right?  Cooperators are cooperators, right?

4                MR. GUTWILLIG:  Objection.

5                THE COURT:  We've already established that the

6    reference to "little" had to do with this witness' personal

7    involvement with the witness.  It didn't have to do with the

8    degree of cooperation.  So move on.

9    Q.  Well, the first time --

10                THE COURT:  If you're playing off of the witness'

11    answer, you're playing a dead end here.

12    Q.  The first time that you debriefed Leo Rivera was in

13    February of 2014, right?

14    A.  I don't recall the exact date.

15    Q.  Well, you did debrief Leo Rivera, is that right?

16    A.  Yes, sir.

17    Q.  Well, would it refresh your recollection if I show you the

18    report from the first time that you debriefed Leo Rivera?

19    A.  Perhaps.

20                MR. SCHULMAN:  Ms. Hurst, could you pull up 3501-12,

21    please.

22    Q.  Special agent, please review that document, even the top

23    items 1 through 10, and let me know if that refreshes your

24    recollection about the question I just asked you.

25                Do you remember the answer to my question?

L3HHRAM5                    Gonzalez - Cross

1    A.  Yes, I do.

2    Q.  The first time that you debriefed Leo Rivera was on

3    February 4, 2014, is that right?

4    A.  I'm not certain, no.

5            MR. SCHULMAN:  Ms. Hurst, could you pull up to the top

6    of that document, please.

7            THE COURT:  The question is, looking at the document,

8    does it refresh your recollection as to the date of the first

9    interview?

10           THE WITNESS:  No, it does not.

11           THE COURT:  All right.  Next question.

12           MR. SCHULMAN:  Sorry, Judge.

13   Q.  Well, the first time that you met with the Cachiros as a

14   group was on February 4, 2014, is that right?

15   A.  I do not recall.

16   Q.  Well, why don't you look at item No. 10 that's on the

17   screen in front of you and let me know if that refresh your

18   recollection about the first time that you met with Los

19   Cachiros as a group.

20   A.  It does not.

21   Q.  It's not on the screen right now.

22           Ms. Hurst, could you go up to the top of the document

23   and focus on item 10.  Right there.  Thank you.

24   A.  No, it does not.

25   Q.  That is a report that you completed, is that right?

L3HHRAM5                        Gonzalez - Cross

1   A.  Yes, sir.

2   Q.  Does that help you refresh your recollection about having a

3   joint debriefing session with Javier and Leo Rivera?

4   A.  Yes, it reflects that there was a debriefing of two

5   individuals on that date.

6          THE COURT:  The document is not in evidence, and you

7   can't read from it.  So it doesn't matter what it reflects.

8   The question is what you remember.  Do you remember you had a

9   debriefing of the two of them together?

10         THE WITNESS:  No, I do not.

11  Q.  Well, how about do you recall having a debriefing with

12  Javier Rivera and Leo Rivera together in March of 2014,

13  approximately a month later?

14  A.  No, I do not.

15         MR. SCHULMAN:  Ms. Hurst, could you please pull up

16  3501-13.

17  Q.  Special agent, if you could please focus on Nos. 1 through

18  10.  Just review those and pick your head up when you're done.

19         THE COURT:  Well, you've already directed the witness'

20  attention to item 10.  So you can't do it twice.

21         MR. SCHULMAN:  This is a different document, Judge.

22         THE COURT:  Oh, I'm sorry.

23         MR. SCHULMAN:  This is the next date.

24         THE COURT:  I stand corrected.  OK.  Thank you.  Sorry

25  my mistake.

L3HHRAM5                          Gonzalez - Cross

1   BY MR. SCHULMAN:

2   Q.  So, agent, does this help refresh your recollection about

3   doing a joint debriefing session with Javier Rivera and Leo

4   Rivera together on March 18, 2014?

5   A.  No, it does not.

6   Q.  Does this help refresh your recollection about doing a

7   joint debriefing session with Javier and Leo Rivera on

8   March 21, 2014?

9   A.  No, it does not.

10  Q.  All right.  Well, perhaps -- I'm going to ask you, with the

11  Court's permission, to review the rest of the document, and

12  maybe that will help refresh your recollection, agent.

13              THE COURT:  Why don't you excuse me, ladies and

14  gentlemen.

15              (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          THE COURT:  Unaccustomed as I am to giving out

3    unsolicited advice, wouldn't you get where you want to be if

4    you asked him:  Do you remember having a joint debriefing

5    session with him?

6          MR. SCHULMAN:  I thought I did that, Judge, and I

7    thought he told me no every time I ask the question.

8          THE COURT:  What you keep doing now is saying:  Does

9    that refresh your recollection that you had a joint debriefing

10   session on March 21?  And he says, no, it doesn't because it's

11   one complete question that incorporates the date.  So ask

12   him -- you might want to consider, I don't care, but you might

13   want to consider asking him if he remembers a joint debriefing

14   session, does he remember that it took place in the first three

15   months of the year, something like that.  You might be able to

16   move this along.  All right?  But you don't have to do that.

17   You can do it the way you're doing it.  OK.

18         MR. SCHULMAN:  I want to be as efficient as possible,

19   of course, Judge.

20         THE COURT:  All right.

21         (Continued on next page)

22

23

24

25

L3HHRAM5                     Gonzalez – Cross

1            (In open court; jurors present)
2    BY MR. SCHULMAN:
3    Q.  Agent, you were the group leader in charge of this
4    investigation, is that right?
5    A.  No, sir.
6    Q.  You were one of the group leaders responsible for this --
7    sorry -- the group supervisor in charge of this investigation,
8    right?
9    A.  Not then, no.
10   Q.  So when did you become the group supervisor in charge of
11   the investigation?
12   A.  Sometime in 2020, I believe.
13   Q.  Well, back in 2014, you were one of the special agents
14   working on the investigation, right?
15   A.  Yes, sir.
16   Q.  And as one of the special agents working on the
17   investigation, you did joint debriefings with Javier and Leo
18   Rivera, right?
19   A.  Sometimes.
20   Q.  Well, when was the first time that you did a joint
21   debriefing with Javier and Leo Rivera?
22   A.  I don't remember.
23   Q.  Well, what's, to the best of your recollection -- let's
24   take it step -- a step back.  Withdrawn.
25            Approximately how many joint debriefings did you do

L3HHRAM5                          Gonzalez - Cross

1     with Javier and Leo Rivera in connection with your

2     investigation into Los Cachiros, the drug trafficking

3     operations, and then obviously any other related criminal

4     activity?

5     A.  I don't remember how many.

6     Q.  Well, would it help refresh your recollection -- well,

7     would you guess off the top of your head --

8              THE COURT:  No guessing.

9     Q.  Well, was it more than five joint debriefings together or

10    less than five?

11             MR. GUTWILLIG:  Objection.

12             THE COURT:  No, I'll allow that question.

13    A.  I'm not sure how many exactly they were together.

14    Q.  Approximately, officer.  Was it more than a hundred or less

15    than a hundred?  We could start broad and we could narrow it

16    down.

17    A.  It was less than a hundred.

18    Q.  Was it more than 75 joint debriefings with Los Cachiros

19    together or less than 75 together?

20    A.  Less than 75.

21    Q.  More than 50; less than 50?

22    A.  Less than 50.

23    Q.  More than 40; less than 40?

24    A.  Less than 40.

25    Q.  More than 30; less than 30?

1    A.  Less than 30.

2    Q.  More than 20; less than 20?

3    A.  Less than 20.

4    Q.  More than 15 or less than 15?

5    A.  Not sure.

6    Q.  We're getting pretty close, though?

7    A.  Less than 15, I would say.  We didn't meet very often.

8    Q.  More than ten or less than ten?

9    A.  I would say less than ten.

10   Q.  So it's your testimony that you had joint -- your team had

11   joint debriefings with Javier and Leo Rivera less than ten

12   times?

13   A.  To the best of my recollection.

14   Q.  Was it less than five; more than five?

15   A.  I would say it's maybe around there.

16   Q.  So it's your testimony that you had approximately around

17   five joint debriefings with Javier and Leo Rivera?

18   A.  To the best of my recollection.

19   Q.  All right.  Does the first document that I showed you,

20   3501-12, does that help refresh your recollection about a joint

21   debriefing on February 4, 2014?

22   A.  The whole document?

23   Q.  Sure.

24            MR. GUTWILLIG:  Objection.

25            THE COURT:  You've asked this question about five

L3HHRAM5                          Gonzalez - Cross

1    different times.

2               MR. SCHULMAN:  OK.  So could we pull up, Ms. Hurst,

3    3501-14 dated March 31, 2014.

4    Q.  Do you recall a joint debriefing with your group on

5    March 31, 2014, agent?

6    A.  No.

7    Q.  Does this document help refresh your recollection about a

8    joint debriefing between the Cachiros and members of your team

9    on March 31, 2014?

10              MR. GUTWILLIG:  Objection.

11              THE COURT:  Basis?

12              MR. GUTWILLIG:  Asked and answered.

13              THE COURT:  No, it's a different document.

14              MR. GUTWILLIG:  Apologies.

15   A.  No, I don't see my name there.

16   Q.  You were debriefing those Cachiros in Belize for some

17   period of time, right?

18   A.  We did, yes.

19   Q.  Before -- in the early stages of their cooperation, you

20   were meeting them in Belize, right?

21   A.  Yes, sir.

22   Q.  And Los Cachiros would come to Belize together, right?

23   A.  Yes, sir.

24   Q.  And they would meet with you and members of your team in

25   undisclosed locations, right?

1   A.  Yes.

2   Q.  And then afterwards they were free to leave, right?

3   A.  Yes, sir.

4   Q.  And then they would go back to Honduras, right?

5   A.  I'm not sure where they went back to, but I believe so.

6   Q.  You weren't keeping track of where they were going during

7   the time that they were cooperating with you?

8   A.  No.

9   Q.  It was of no interest to you where they were going at that

10  time?

11  A.  No.

12  Q.  I mean, they were working under your supervision, if you

13  will, at that time, right?

14  A.  Supervision of multiple people, yes.

15  Q.  I mean, they were actively trying to get additional

16  evidence for you and your team at that time, right?

17  A.  Yes.

18  Q.  Do you recall a fourth session in April -- on April 1,

19  2014, a fourth joint debriefing with members of your team and

20  Los Cachiros?

21  A.  No, sir.

22          MR. SCHULMAN:  Ms. Hurst, could we please pull up

23  3501-15.

24  Q.  Special agent, do you recall a meeting in San Pedro,

25  Belize, on April 1, 2014?

L3HHRAM5                        Gonzalez - Cross

1    A.  No, sir.

2    Q.  Now, Los Cachiros had -- they were sharing a lawyer, right?

3    A.  Yes, sir.

4    Q.  To this day they share a lawyer, right?

5    A.  As far as I know.

6    Q.  He goes by the name of Rene Sottorio, something like that?

7    A.  Yes, sir.

8    Q.  Is that right?

9         And he would come to Belize for these joint debriefing

10   sessions that members of your team had with Los Cachiros,

11   right?

12   A.  Yes, sir.

13   Q.  Looking at this document, does it help remember -- refresh

14   your recollection about the fourth joint debriefing session

15   that you had with Los Cachiros?

16   A.  No, sir.

17        MR. SCHULMAN:  Ms. Hurst, if you could scroll down the

18   document.

19   Q.  And, agent, if you could just look through that document.

20   Perhaps if you look at it a little closer it will help refresh

21   your recollection.

22   A.  No, it does not.

23   Q.  OK.  Do you recall a joint debriefing on -- I hate to skip

24   around because I was just asking you about April 1, 2014, but

25   do you recall a joint debriefing on March 6, 2014, a month

L3HHRAM5                          Gonzalez - Cross

1   earlier than that?

2   A.  No, sir.

3         MR. SCHULMAN:  Ms. Hurst, can you please pull up

4   3501-21.

5   Q.  Special agent, I'd ask you to take a look at that document

6   and pick your head up when you're done.

7         Do you want to scroll through the document?  We can

8   ask Ms. Hurst to scroll through the document for you.

9   A.  OK.

10        MR. SCHULMAN:  Thank you, Ms. Hurst.

11  Q.  Does this help refresh your recollection about a joint

12  debriefing session on March 6, 2014?

13  A.  Yes, sir.

14  Q.  So we could agree on March 6, 2014, you had a joint

15  debriefing session with you and the Los Cachiros together,

16  right?

17  A.  Yes, sir.

18  Q.  And that one on March 6, 2014, was in Honduras, right?

19  A.  Can you scroll back up to the top, please.  Yes, sir.

20  Q.  That's because sometimes you debriefed Los Cachiros in

21  Honduras, right?

22  A.  I think it was only one time.

23  Q.  So March 6, 2014, is the only time you debriefed the

24  brothers in Honduras?

25  A.  To my recollection.

1    Q.  Every other time that you had debriefing sessions with him,

2    it was in Belize?

3    A.  I'm not sure if we did it in any other country.  I can't

4    recall right now.

5    Q.  Off the top of your head, are there any other countries

6    that stick out in your mind as locations that you had

7    debriefing sessions with Los Cachiros?

8              MR. GUTWILLIG:  Objection.

9              THE COURT:  Sustained as to form.

10   Q.  Do you recall any other countries besides Honduras and

11   Belize where you debriefed Los Cachiros?

12   A.  We may have met them in the Caribbean on one occasion, but

13   I'm not 100 percent certain that a debriefing occurred.

14   Q.  When you met them in the Caribbean, did you meet them as a

15   pair?

16   A.  I don't recall.

17   Q.  Did you sometimes meet them individually, or when you would

18   meet them -- Belize is a different country than Honduras,

19   right?

20   A.  Yes, sir.

21   Q.  And when you would meet them in Belize, did you meet them

22   always as a group or did you sometimes meet them one at a time,

23   if you will?

24   A.  I'm not sure if both of them came every single time.  I

25   can't recall.

1    Q.  But you do recall meeting them in Honduras on March 6,

2    2014, right?

3    A.  Yes.

4    Q.  By the way, you were a part of that debriefing session,

5    right?

6    A.  Yes.

7    Q.  It wasn't just other members of your team; you were in that

8    meeting with them, right?

9    A.  There were other people there too.

10   Q.  I understand.  But you were physically present in the room

11   with them, right?

12   A.  Yes.

13   Q.  By the way, just because one of the other members of your

14   team conducted the debriefing session doesn't mean that you

15   don't review that, the report that comes out of it, right?

16   A.  No.

17   Q.  You would agree that you try to review the reports that

18   your teammates, if you will, generate, right?

19   A.  No.

20   Q.  You're not -- you don't try to review the reports after

21   people that you're working on the project with conduct the

22   debriefing session?

23   A.  Not necessarily, no.

24   Q.  Is it not important for you to stay up to date on the

25   information that's being shared with your colleagues?

1   A.  I was at the debriefing.

2   Q.  I understand that, but I'm saying -- I'm talking about the

3   times when you're not in the room is it important to review the

4   reports that your colleagues are generating?

5   A.  You mean after they're written?

6   Q.  I'm asking the importance of just staying up to date on the

7   information that your team is acquiring.

8   A.  OK.

9   Q.  I'm just asking, is that an important thing that you try to

10  do in these situations, in these investigations?

11  A.  Yes, you try to.

12  Q.  So sometimes -- you're not at every debriefing, right?

13  A.  Yes, sir.

14  Q.  In fact, many of the debriefings with Los Cachiros you

15  weren't present at, right?

16  A.  I wouldn't say "many."

17  Q.  So you were present at most of the debriefings with Los

18  Cachiros?

19  A.  I think so.

20  Q.  All right.  When you weren't there, did you not try to

21  inquire about what happened in those meetings?

22  A.  Yes.

23  Q.  Tried to inquire, right?

24  A.  Eventually, yes.

25  Q.  Because you wanted to get -- you wanted to get all the

L3HHRAM5                        Gonzalez - Cross

1    information, right?

2    A.  Well, we all share the information, yes.

3    Q.  So you would review the report that was generated in

4    connection with that debriefing session?

5    A.  Not necessarily.

6    Q.  So if not review the report, you might review an email that

7    one of your colleagues generates that summarizes it, something

8    like that, right?

9    A.  Usually a telephone call.

10   Q.  OK.  So if you don't review the report, you have a personal

11   call with one of the agents that was in the room, and they

12   update you on what happened, right?

13          MR. GUTWILLIG:  Objection.

14          THE COURT:  Sustained as to form.

15   Q.  One way or another you try to get updated on what happens

16   in these proffer sessions, right?

17   A.  Yes, sir.

18   Q.  And you want to know who's in the room for these proffer

19   sessions, right?

20   A.  What do you mean?

21   Q.  You want to know who's participating in the proffer

22   sessions?

23   A.  You mean a proffer when they're here incarcerated or --

24   Q.  Let's call it debriefing just to keep it clear.

25          Before they're formally even here, in the debriefing

L3HHRAM5                        Gonzalez - Cross

1   sessions with Los Cachiros, you wanted to get as much

2   information about what happened in those meetings, right?

3   A.  Yes.

4   Q.  Let's go to the next meeting because we've talked about

5   approximately four joint debriefings so far.

6           OK.  Do you recall a joint debriefing on April 22,

7   2014?

8   A.  No.

9           MR. SCHULMAN:  Ms. Hurst, could you pick up -- pull up

10  3501-22.

11  Q.  Special agent, please review that, and if it's necessary

12  for Ms. Hurst to scroll down, just let us know.

13          Does that help you remember conducting a joint

14  debriefing session with both Cachiros brothers on April 22,

15  2014?

16  A.  I remember receiving that information, but I don't remember

17  if there was a joint debriefing session.

18  Q.  Do you remember being present in a joint debriefing session

19  with Los Cachiros on April 22, 2014?

20  A.  No.

21  Q.  Do you remember being present in a joint debriefing with

22  Los Cachiros the next day on April 23, 2014?

23  A.  No.

24  Q.  Would it help for you to review that document again and

25  perhaps you'll -- it will help you remember that you were

L3HHRAM5                          Gonzalez - Cross

1   present in a joint debriefing with Los Cachiros on April 23,

2   2014?

3           MR. GUTWILLIG:  Objection.

4           THE COURT:  Yes, review the document and see whether

5   it refreshes your recollection as to whether or not you were at

6   a meeting with Los Cachiros on April 23, 2014.

7   A.  No, sir.

8   Q.  You had a chance to review it?

9   A.  Uh-huh.

10  Q.  So it doesn't help you remember being in the joint

11  debriefing with them?

12          MR. GUTWILLIG:  Objection.

13          THE COURT:  Yes, sustained.

14  Q.  How about a month later on May 22, 2014?  Do you remember

15  being -- do you remember there being a joint debriefing with

16  Los Cachiros?

17  A.  No.

18          MR. SCHULMAN:  Ms. Hurst, can you please pull up

19  3501-26.

20  Q.  By the way, special agent, there's a form called a DEA-6,

21  right?

22  A.  Yes, sir.

23  Q.  And DEA-6s are reports that you generate in connection with

24  debriefing sessions, right?

25  A.  Yes.

1    Q.   Among other reasons.  There are multiple reasons that you

2    might generate a DEA-6, right?

3    A.   Correct.

4    Q.   But after a debriefing session, that's one of the times

5    that you would generate a DEA-6, right?

6    A.   Could be, yes.

7    Q.   Do you recall a joint debriefing involving you on May 22,

8    2014, with both Javier and Leo Rivera?  And please feel free to

9    review that document, because perhaps it will help you

10   remember.

11              Do you recall --

12              THE COURT:  No, there's a pending question.

13              THE WITNESS:  I didn't hear that.

14              THE COURT:  There's a pending question.

15   A.   Can you repeat the question, please.

16              THE COURT:  All right.  Can you read back the

17   question, please.

18              (Record read)

19   A.   The document does refresh my recollection.

20              THE COURT:  No, the question is whether it refreshes

21   your recollection.

22              THE WITNESS:  Yes.

23              THE COURT:  OK.  Thank you.

24              Ladies and gentlemen, we'll end there.  Please do not

25   discuss the case among yourselves or with anyone.  We'll be

L3HHRAM5                         Gonzalez – Cross

1    back in action at 9:30 tomorrow morning.  Have a very pleasant

2    one.  Thank you for your patience.

3              (Jury excused)

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3HHRAM5

1          (Jury not present)

2          THE COURT:  Mr. Moskowitz, I have questions about the

3    document that you gave to Flo for my review, etc.  I think it

4    would be best if we could wait until after the government has

5    rested because I have some questions I need to ask you.

6          MR. MOSKOWITZ:  Judge, if we may do this off the

7    record, I can kind of explain to you the necessity for that and

8    why I'm asking for it at this time.  It's just a matter of

9    funding.

10         THE COURT:  Yes, but you're going to have to tell me a

11   lot more because there was no -- I know nothing.  I don't know

12   who the person is, I don't know whether or not there were

13   conferences on the dates referenced, and I am being asked to

14   attest that the person appeared at a scheduled judicial

15   proceeding or pretrial conference and is entitled to receive

16   statutory fees and expenses.  Now, I've got it.  Somebody wants

17   their money.  I'm not opposed to the concept, but I need a lot

18   more information on the record before I could make that

19   attestation.

20         MR. MOSKOWITZ:  I'm happy to do that.  I don't think

21   it's appropriate to do this with the government.

22         THE COURT:  Well, that's why I wanted to put it on the

23   record under seal.  I thought it would be easier to do it after

24   the government rests.

25         MR. MOSKOWITZ:  The only issue is timing, Judge,

L3HHRAM5

1    because of the --

2              THE COURT:  Well, let's do it under seal now at the

3    sidebar.

4              MR. MOSKOWITZ:  That's fine.

5              (Pages 918 through 920 SEALED)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3HHRAM5

1          (In open court)

2          THE COURT:  All right.  See everybody tomorrow.  One

3    homework assignment.  Think about what you think you might want

4    in terms of your closing argument time, recognizing you can't

5    always get what you want, but you may get what you need.  So I

6    urge you to be reasonable.  The trial was not that long, and so

7    I will be asking that question in no uncertain terms tomorrow.

8    All right.

9          MR. LOCKARD:  Understood.

10          MR. MOSKOWITZ:  Judge, just for scheduling purposes I

11    think for the parties, if the defense does not put on a case, I

12    assume the government will rest tomorrow even by lunch or maybe

13    right after lunch, depending on how the crosses go.

14          THE COURT:  I can read your mind.  I know your

15    question.  Friday morning.

16          MR. MOSKOWITZ:  Friday morning.  Thank you, Judge.

17          THE COURT:  So that's what we'll do, and that way

18    we'll get it all in in one day.

19          Now, Mr. Moskowitz, it may be if the government has

20    some ridiculous length of time, I'm going to make them start on

21    Friday.  I won't make you go, but I'll make them start.

22          MR. MOSKOWITZ:  OK.

23          THE COURT:  Is that all right with you?

24          MR. MOSKOWITZ:  That's perfect.

25          THE COURT:  That's even better for you, right?

L3HHRAM5

1              MR. MOSKOWITZ:  That's even better.

2              THE COURT:  All right.  So we'll see.

3              MR. MOSKOWITZ:  But I will be ready.

4              THE COURT:  We'll see how reasonable the government is

5    in their request, unless you know already.

6              MR. LOCKARD:  I'd rather talk about it tomorrow.

7              THE COURT:  That's a very good plan.

8              All right.  Thank you all very much.  Have a pleasant

9    evening.

10             (Adjourned to March 18, 2021, at 9:30 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          INDEX OF EXAMINATION

 2    Examination  of:                          Page

 3    JOSE SANCHEZ

 4    Cross By Mr. Moskowitz . . . . . . . . . . . 767

 5    Redirect By Mr. Gutwillig  . . . . . . . . . 787

 6     JORGE MEDINA

 7    Direct By Mr. Lockard  . . . . . . . . . . . 800

 8    Cross By Mr. Moskowitz . . . . . . . . . . . 825

 9    Redirect By Mr. Lockard  . . . . . . . . . . 831

10    SANDALIO GONZALEZ

11    Direct By Mr. Gutwillig  . . . . . . . . . . 835

12    Cross By Mr. Schulman  . . . . . . . . . . . 887

13                        GOVERNMENT EXHIBITS

14    Exhibit No.                              Received

15     305   . . . . . . . . . . . . . . . . . . . 804

16     401-1, 401-3, 401-4, 401-5, 401-6,  . . . . 838

17             401-8, 401-9, 401-10, 401-12,

18             401-13, 401-14, 401-15,

19             401-16, 401-17, 401-19,

20             401-20, 401-21, 401-22,

21             401-23, and 401-24

22    401-T  . . . . . . . . . . . . . . . . . . . 839

23    402 and 402-T  . . . . . . . . . . . . . . . 840

24    102  . . . . . . . . . . . . . . . . . . . . 842

25    201-8 and 201-8-T  . . . . . . . . . . . . . 847
```

```
 1   201-10 and 201-10T   . . . . . . . . . . . 849

 2   818   . . . . . . . . . . . . . . . . . . 851

 3   201-60   . . . . . . . . . . . . . . . . . 852

 4   119   . . . . . . . . . . . . . . . . . . 855

 5   504   . . . . . . . . . . . . . . . . . . 861

 6   201-201   . . . . . . . . . . . . . . . . . 870

 7   935 and 935-T   . . . . . . . . . . . . . . 873

 8   1003   . . . . . . . . . . . . . . . . . . 879

 9   701 and 701-T   . . . . . . . . . . . . . . 879

10   702 and 702-T   . . . . . . . . . . . . . . 882

11   703, 703-T, 704, 704-T, 705, 705-T, . . . . . 883

12           706, 706-T, 707, 707-T, 708,

13           708-T, 709, and 709-T
```