L3IKRAM1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                        15 CR 379 (PKC)

5    GEOVANNY FUENTES RAMIREZ,

6              Defendant.

7    ------------------------------x

                                        New York, N.Y.
8                                       March 18, 2021
                                        9:40 a.m.
9
     Before:
10
                    HON. P. KEVIN CASTEL,
11
                                        District Judge
12                                        And A Jury

13                       APPEARANCES

14   AUDREY STRAUSS,
          United States Attorney for the
15        Southern District of New York
     MICHAEL LOCKARD
16   JACOB GUTWILLIG
          Assistant United States Attorneys
17
     AVRAHAM CHAIM MOSKOWITZ
18   EYLAN SCHULMAN
          Attorneys for Defendant
19
     ALSO PRESENT:
20
     JILL HOSKINS, Spanish Interpreter
21   GABRIEL MITRE, Spanish Interpreter
     SONIA BERAH, Spanish Interpreter
22   BRIAN FAIRBANKS, DEA Agent

23

24

25

1           (In open court; jury not present)

2           THE COURT:  Please be seated.

3           MR. SCHULMAN:  Your Honor, may I set up in here?

4           THE COURT:  Yes.

5           (Jury present)

6           THE COURT:  Good morning, ladies and gentlemen.

7           JURY MEMBERS:  Good morning.

8           THE COURT:  I know what a sacrifice it is you make

9      serving, and how difficult it is to arrange your schedule so

10     all of you are here on time, and I know the parties appreciate

11     it, and I deeply appreciate it.  It's a sign of respect for the

12     process.  You should be very proud of yourselves.

13          We're ready to go.  The Court reminds the witness that

14     he's still under oath.

15          THE WITNESS:  Yes, sir.

16          THE COURT:  You may proceed, Mr. Schulman.

17          MR. SCHULMAN:  Thank you.  Good morning.

18     SANDALIO GONZALEZ,

19     CROSS-EXAMINATION CONTINUED

20     BY MR. SCHULMAN:

21     Q.  Good morning, agent.

22     A.  Good morning.

23     Q.  Agent, where we left off yesterday afternoon, we were

24     trying to identify how many joint proffer sessions that you did

25     you, and members of your team did, with the Cachiros brothers.

L3IKRAM1                        Gonzalez - cross

1          Do you recall that?

2    A.  Yes, sir.

3    Q.  Did you have an opportunity to reflect on that overnight?

4    A.  Not really.

5    Q.  Well, as you sit here now, do you remember the number of

6    how many joint proffer sessions your team conducted with Los

7    Cachiros?

8    A.  The exact amount?  No, sir.

9          MR. SCHULMAN:  Your Honor, just to expedite this

10   process --

11   Q.  Agent, I'm going to show you 18 DA6s and proffer reports;

12   for the record, 3501-12, 3501-13, 3501-14, 3501-15, 3501-16,

13   3501-19, 3501-20, 3501-21, 3501-22, 3501-26, 3501-27, 3501-29,

14   3501-32, 3501-33, 3501-34, 3501-35, 3501-36, and 3501-98.

15         MR. SCHULMAN:  Your Honor, may I have the witness

16   review these documents just to expedite this all at once?

17         THE COURT:  I don't think that's expedition.  You

18   could have asked him to review them overnight if you wanted.

19   This is not exactly expedition, Mr. Schulman, and --

20         MR. SCHULMAN:  I can do them one by one.

21         THE COURT:  Are you offering these documents into

22   evidence?

23         MR. SCHULMAN:  No, I'm not.  Just to refresh

24   recollection about --

25         THE COURT:  Okay.  If you're showing him documents to

L3IKRAM1                          Gonzalez - cross

1  refresh his recollection, you need not describe on the record,

2  and you should not describe on the record, what you consider

3  the documents to be.  All right?  Because they're not in

4  evidence.

5          MR. SCHULMAN:  Right.

6          THE COURT:  And your description is stricken from the

7  record.  Okay?

8          I'm going to allow you to proceed.  Now, why don't I

9  send the jury back to the jury room.

10         Okay, ladies and gentlemen.  You can go back to the

11  jury room while the witness reviews these documents.  I'll see

12  you in -- how long do you expect?  A half an hour?

13         MR. SCHULMAN:  It's all depending on the witness,

14  Judge.

15         THE COURT:  Well, how many pages are you giving him?

16         MR. SCHULMAN:  If he reviews --

17         THE COURT:  How many pages, sir, approximately?

18         MR. SCHULMAN:  Fifty to 55.

19         THE COURT:  Fifty, 55 pages?  So I'll see you -- we'll

20  give you a call when we're ready.  Thank you, ladies and

21  gentlemen.  I'm very sorry.

22         (Continued on next page)

23

24

25

L3IKRAM1                    Gonzalez - cross

1          (Jury not present)

2          THE COURT:  And I trust this is not going to lead up

3     to:  Does that refresh your recollection as to the number?  Is

4     it still about five or is it maybe more or less?  Is that where

5     we're headed with this, Mr. Schulman?

6          MR. SCHULMAN:  No, Judge.

7          THE COURT:  Oh, okay.  Where are we headed?

8          MR. SCHULMAN:  I'm just trying to get the answer about

9     how many joint proffer sessions, and the witness hasn't

10    answered the question.

11         THE COURT:  I distinctly recall yesterday his saying

12    it was about five, he wasn't sure.

13         MR. SCHULMAN:  Judge, rather than go through them one

14    by one — that's why I'm trying to streamline the process — I'm

15    giving them as --

16         THE COURT:  I've heard the word "streamline."  I don't

17    agree with you, sir.

18         So, now when he looks at it -- listen, perhaps you

19    don't understand this.  You could say:  Do you recall the trial

20    of United States of America against John Jones?

21         And I could say:  Yes.

22         You say:  Do you recall having a session on

23    October 15th of 2017?

24         No, I don't.

25         Let me show you the transcript.  Does this refresh

1      your recollection you had a session on October whatever it is,

2      2017?

3                  The truthful answer would be:  No.

4                  I see the transcript.  It's an authentic transcript.

5      It has the certification of the court reporter on it.  My

6      answer is still no.  Well, you know, am I being untruthful?

7      Not in the slightest.  And if you showed me the next day's

8      transcript and the next day's transcript and the next day's

9      transcript, and asked if I refreshed my recollection that I

10     tried the case in October 2017, the truthful answer would

11     likely be no.

12                 Now, it's possible that, in looking at it, there would

13     be some reference to, gee, I'm leaving to go to the Judicial

14     Conference or something, and then I'd say:  Now I remember it.

15     That's a possibility.  But this is a time waster.  You've got

16     out of this witness what his best recollection is.  You're

17     wasting time.

18                 Have you elicited or requested of the government a

19     stipulation on the number of sessions?

20                 MR. SCHULMAN:  No.

21                 THE COURT:  No.

22                 MR. SCHULMAN:  I would be happy to do that, Judge.

23                 THE COURT:  But you haven't.

24                 MR. SCHULMAN:  Judge, I asked the witness if he --

25                 THE COURT:  No, you heard what I asked you.

1           MR. SCHULMAN:  No, I did not.

2           THE COURT:  Okay.  Why don't you do that.

3           MR. SCHULMAN:  Okay.

4           THE COURT:  Out of the presence of the witness.

5           (Pause)

6           THE COURT:  Do we have a stipulation?

7           MR. GUTWILLIG:  Your Honor, the government needs some

8    time to look at the reports to confirm the accuracy of the

9    number, also to confirm the accuracy of the type of debriefing,

10   whether substantive or operational --

11          THE COURT:  That's great.  Okay, so how much time do

12   we need for this now?

13          MR. SCHULMAN:  I thought it was going is to take two

14   minutes, Judge.  I didn't think -- this was not intended.

15          THE COURT:  Why did you think it was going to be two

16   minutes, Mr. Schulman?  I'm curious.

17          MR. SCHULMAN:  Because ten of those reports were

18   written by the agent, so if he saw them, I would think that it

19   would help him remember.  That's half of them, and the other

20   ten, they're clear references to the fact they were joint

21   proffer sessions with Los Cachiros.

22          THE COURT:  And giving him 50 pages would take two

23   minutes, right?  That's what a person who's not careful would

24   take; a sloppy person would take two minutes.

25          MR. SCHULMAN:  Judge, I started this last night.  I

L3IKRAM1                          Gonzalez - cross

1    hoped that this would have been -- that the government would

2    have understood I was going to continue on this path.  I didn't

3    finish it --

4              THE COURT:  You thought the government understood?

5              MR. SCHULMAN:  Judge, I went through four or five

6    yesterday --

7              THE COURT:  That's why you gave the witness the

8    documents to review overnight?  Or when you got here this

9    morning?

10             Okay, so what do we need?  A half an hour now?

11             MR. GUTWILLIG:  Yes, your Honor.

12             THE COURT:  Okay.  In the meantime, you look at the 55

13   pages.

14             (Recess)

15             THE COURT:  Ladies and gentlemen, I apologize and

16   accept responsibility and blame for the delay.  You should only

17   hold me accountable, and it's not the doing of any party to

18   this case.

19             Ask your next question, please.

20             MR. SCHULMAN:  Your Honor, at this point, I would like

21   to read a stipulation, which I offer as Defense Exhibit D,

22   which is agreed by and between counsel for Mr. Fuentes Ramirez

23   and the government.

24             May I read the stipulation?

25             (Defendant's Exhibit D received in evidence)

1          THE COURT:  You may.

2          MR. SCHULMAN:  "It is hereby stipulated and agreed, by

3   and between the United States of America, by Audrey Strauss,

4   United States Attorney, Jacob Gutwillig and Michael Lockard,

5   Assistant United States Attorneys, and Geovanny Fuentes

6   Ramirez, by and through his attorneys Avraham Moskowitz and

7   Eylan Schulman that on at least ten occasions in 2014 Leonel

8   and Javier Rivera jointly provided information to the Drug

9   Enforcement Agency.  During that same time period, the two men

10  were also interviewed separately on various occasions."

11         THE COURT:  All right.

12         Thank you.

13         MR. SCHULMAN:  Thank you.

14         THE COURT:  Next question.

15  BY MR. SCHULMAN:

16  Q.  Agent, do you recall yesterday discussing a couple of Waze

17  searches that were conducted?

18  A.  Yes, sir.

19         MR. SCHULMAN:  Ms. Hurst, if you could pull up

20  Exhibit 201-201, please.

21  Q.  Now, agent, you have that exhibit in front of you?

22  A.  Yes, sir.

23  Q.  You remember it from yesterday?

24  A.  Yes, sir.

25  Q.  What that reflects is that on two different dates the

L3IKRAM1                        Gonzalez - cross

1   location Casa Presidencial Honduras was entered into Waze as a

2   search, correct?

3   A.  Both as a search and then as a location.

4   Q.  Well, speaking of location, there's a range of error with

5   respect to the location, isn't that right, with Waze?

6   A.  Not that I'm aware of.

7   Q.  Well, have you investigated whether there's a 500-meter

8   range of error in the locations that are indicated in Waze

9   information?

10  A.  No, sir.

11  Q.  Have you investigated the accuracy of the range of error

12  provided in Waze responses?

13  A.  No, sir.

14  Q.  Five hundred meters is approximately 550 yards, more or

15  less; is that right?

16  A.  I don't --

17          THE COURT:  Ladies and gentlemen of the jury, as I

18  instructed you at the beginning of the trial, a lawyer's

19  question is not evidence.  It is the witness' response that is

20  evidence.  You read nothing into a question asked unless the

21  witness' answer makes it evidence.

22  Q.  Agent, the Casa Presidencial Honduras is in downtown

23  Tegucigalpa, correct?

24  A.  Yes, it's in Tegucigalpa.

25  Q.  You've been to Tegucigalpa, right?

L3IKRAM1                      Gonzalez - cross

1   A.  Yes.

2   Q.  You're familiar with that area?

3   A.  A little bit.

4   Q.  You've been to the geographic vicinity of downtown

5   Tegucigalpa?

6   A.  I've been to my hotel where I stayed.

7   Q.  And so you stayed at a hotel in downtown Tegucigalpa?

8          MR. GUTWILLIG:  Objection.

9          THE COURT:  Overruled.

10  A.  Yes.

11  Q.  Downtown Tegucigalpa is in the middle of a commercial zone,

12  correct?

13  A.  I don't know that.

14  Q.  Well, you were in downtown Tegucigalpa, correct?

15  A.  I was at my hotel.

16  Q.  There are coffee shops around that vicinity downtown?

17  A.  I don't know.

18  Q.  There are clothing shops in that area downtown there,

19  right?

20  A.  I don't know.

21  Q.  There are multiple government buildings in that area in

22  downtown Tegucigalpa, right?

23          MR. SCHULMAN:  I don't know.

24  Q.  There are many restaurants in the vicinity of the Casa

25  Presidencial Honduras in downtown Tegucigalpa, right?

L3IKRAM1                        Gonzalez - cross

1    A.  I know of one.

2    Q.  Is that where you ate dinner or you ate your meals?

3    A.  Yes, sir.

4    Q.  And, by the way, Tegucigalpa is the capital city of

5    Honduras, right?

6    A.  Yes, sir.

7    Q.  By the way, over the last 12 years, the only two times

8    you've identified that that phone that you recovered from

9    Mr. Fuentes Ramirez was in that area of downtown Tegucigalpa,

10   was on May 29, 2019, and June 12, 2019; isn't that right?

11             MR. GUTWILLIG:  Objection.

12             THE COURT:  Rephrase it.

13   Q.  Over the last 12 years, you've identified no other times

14   that a search was conducted within Waze for the Casa

15   Presidencial Honduras, which is located in downtown

16   Tegucigalpa; isn't that right?

17   A.  Could you repeat your question, please?

18   Q.  You recovered Mr. Fuentes Ramirez's cell phone, right?

19   A.  Correct.

20   Q.  And you downloaded the data that was located on the cell

21   phone — maybe not you but you arranged for the information to

22   be downloaded — right?

23   A.  Yes, someone did; I did not.

24   Q.  And the exhibit that's in front of you is part of the

25   report of the downloading of the information that had been

1   recovered from the phone, right?

2   A.  Yes.

3   Q.  And the Waze searches that were recovered were incorporated

4   into that download, right?

5   A.  Yes, sir.

6   Q.  And isn't it a fact that the only two times that searches

7   were conducted for Casa Presidencial Honduras were on May 29,

8   2019, and June 12, 2019?

9   A.  I don't know what other searches were conducted.

10  Q.  Well, have you seen any other times that a search was

11  conducted for Casa Presidencial Honduras?

12  A.  No, sir.

13  Q.  And same question in terms of -- and you said that the

14  phone -- it suggested that the phone was in that area, as well,

15  beyond just a Waze search for how to get there?

16  A.  It appears that way.

17  Q.  So, besides the two times that maybe the phone was in

18  downtown Tegucigalpa in the vicinity of Casa Presidencial

19  Honduras, there's no indication that Mr. Fuentes Ramirez was

20  ever there besides on those two occasions in 2019; isn't that

21  right?

22  A.  I don't know, sir.

23              (Continued on next page)

24

25

1   Q.  But to the best of your knowledge, you know of no other

2   occasions besides these two times, right?

3            MR. GUTWILLIG:  Objection.

4            THE COURT:  He phrase it.

5   Q.  Can you tell the jury any other occasions in the last 12

6   years that the phone that Mr. Fuentes Ramirez owned pinged, if

7   you will, was located, in downtown Tegucigalpa besides May 29,

8   2019, and June 12, 2019?

9   A.  No.

10  Q.  Now, speaking of that phone, there were approximately

11  49,000 photos downloaded from that phone, right?

12  A.  I don't know exactly how many.

13            MR. SCHULMAN:  Ms. Hurst, could you just show the

14  witness 3540-18, please.

15  Q.  Could you just read that last line on the top paragraph

16  please to yourself.

17  A.  To myself?

18  Q.  Yes.  And also if you could also just look at the top three

19  lines on the document as well.

20  A.  Yes, sir.

21  Q.  Does that help -- now I'll ask the question again.

22            There were approximately 49,000 photos downloaded from

23  Mr. Fuentes Ramirez's iPhone, isn't that right?

24            MR. GUTWILLIG:  Objection.

25            THE COURT:  Yes, I think that question was asked,

L3IHRAM2                         Gonzalez - Cross

1    wasn't it?

2              MR. SCHULMAN:  He said he didn't remember, Judge.

3              THE COURT:  That's right.

4              MR. SCHULMAN:  Well, I tried to refresh his --

5              THE COURT:  So ask him if it refreshes his

6    recollection.

7              MR. SCHULMAN:  Fair enough.

8    BY MR. SCHULMAN:

9    Q.  Have you had an opportunity to read that last sentence in

10   the top -- in the top section of that document?

11   A.  Yes, sir.

12   Q.  Does that help you refresh your recollection about there

13   being 49,000 photos downloaded from Mr. Fuentes Ramirez's

14   phone?

15   A.  No, sir.

16   Q.  OK.  Now, to the best of your -- speaking of Mr. Fuentes

17   Ramirez's phone, to your knowledge, he did not have any contact

18   information for Tony Hernandez on his phone, right?

19   A.  Not that I'm aware of.

20   Q.  There was no record of phone calls between him and Tony

21   Hernandez, right?

22   A.  Not that I recall, no.

23   Q.  No record of phone calls between him and President

24   Hernandez, right?

25   A.  No, sir.

L3IHRAM2                    Gonzalez - Cross

1   Q.  No record of calls between Mr. Fuentes Ramirez and Vice

2   President Alvarez?

3   A.  Not that I saw.

4   Q.  No record of calls between Mr. Fuentes Ramirez and Rene

5   Fonseca, right?

6   A.  I don't know.

7   Q.  To the best of your knowledge, there is no indication of

8   any calls between Mr. Fuentes Ramirez and Rene Fonseca,

9   correct?

10  A.  I did not review the calls.  I don't know.

11  Q.  So you have not come across any -- any evidence of phone

12  calls between Mr. Fuentes Ramirez and Rene Fonseca, is that

13  right?

14          MR. GUTWILLIG:  Objection.

15          THE COURT:  Basis?

16          MR. GUTWILLIG:  Asked and answered.

17          THE COURT:  The witness has already answered.

18  Q.  You've seen no record of calls between Mr. Fuentes Ramirez

19  and Attorney General Crivelli, right?

20          MR. GUTWILLIG:  Objection.

21          THE COURT:  Basis?

22          MR. GUTWILLIG:  Withdrawn.

23          MR. MOSKOWITZ:  Can I have a moment?

24          (Counsel confer)

25          MR. SCHULMAN:  Now I'm going to withdraw the question

L3IHRAM2                        Gonzalez - Cross

1      just to correct myself.

2      BY MR. SCHULMAN:

3      Q.  You saw no record of --

4                 THE COURT:  OK.

5                 MR. SCHULMAN:  I'll clarify.  I'll withdraw.

6                 THE COURT:  That's fine.  Thank you.

7      Q.  There was no record of calls between Mr. Fuentes Ramirez

8      and Attorney General Chinchilla, correct?

9      A.  I don't know.

10     Q.  To your knowledge, there's no evidence of any phone calls

11     between Geovanny Fuentes Ramirez and Attorney General

12     Chinchilla, isn't that right?

13                MR. GUTWILLIG:  Objection.

14                THE COURT:  Sustained.

15                You asked a question, and I'm reading it:  "There was

16     no record of calls between Mr. Fuentes Ramirez and Attorney

17     General Chinchilla, correct?"  You asked that question, and

18     then you asked again:  "To your knowledge, there's no evidence

19     of any phone calls between Geovanny Fuentes Ramirez and

20     Attorney Chinchilla, isn't that right?"  You're asking the same

21     question twice.

22                MR. SCHULMAN:  OK.  I thought I asked it a little

23     differently, Judge.

24                THE COURT:  You did.  You are correct, Mr. Schulman,

25     you did have different words there.  It's the same question,

L3IHRAM2                    Gonzalez - Cross

1    though.  You can ask the same question and it can be the same

2    question though the wording is slightly different.  It still

3    amounts to the same question.

4           Do you want to tell me what the difference between

5    those two were?

6           MR. SCHULMAN:  It's fine, Judge.  I'll move on.

7           THE COURT:  No, no.  I mean, if there's a difference,

8    please let me know.

9           MR. SCHULMAN:  The only difference that I would

10   suggest is I'm saying to his knowledge there's no evidence of

11   any communications between the two.  That's all I'm saying.

12          THE COURT:  The witness hasn't been here for the

13   trial, so it's also objectionable to be asking any witness, any

14   witness, about what the evidence in the case is.

15          MR. SCHULMAN:  I'm saying based on his investigation,

16   as one of the investigating officers, your Honor.  That's what

17   I'm asking.

18          THE COURT:  What's the difference between that and the

19   question that you asked, "There was no record of calls between

20   Mr. Fuentes Ramirez and Attorney General Chinchilla, correct?"

21   What's the difference between those questions, then?

22          MR. SCHULMAN:  Well, I was being a little broader when

23   I said is there any evidence of it generally.

24          THE COURT:  Well, that's objectionable because a

25   witness who is here for only one part of a trial is not

L3IHRAM2                          Gonzalez - Cross

1    qualified to speak to what's in evidence.

2               MR. SCHULMAN:  Judge, I'm not -- I wasn't --

3               THE COURT:  If that's the only distinction, then it's

4    objectionable on that basis as well.

5               MR. SCHULMAN:  OK.  No problem, Judge.  So I'll move

6    on.

7               THE COURT:  You don't have to move on.  I'm just

8    sustaining the objection.

9    BY MR. SCHULMAN:

10   Q.  OK.  There was no -- there has been no record of calls

11   between Mr. Fuentes Ramirez and Mayor Crivelli, isn't that

12   right?

13   A.  I don't know.

14   Q.  Well, you've not seen any indication of calls between

15   Mr. Fuentes Ramirez and Mayor Crivelli, isn't that right?

16   A.  I haven't reviewed his calls.

17   Q.  You've not come across any record of messaging between

18   Mr. Fuentes Ramirez and President Hernandez, right?

19   A.  I've not reviewed his messages.

20   Q.  But you've not been -- you've not seen any messages between

21   Mr. Fuentes Ramirez and President Hernandez, right?

22               MR. GUTWILLIG:  Objection.

23               THE COURT:  I think the witness previously asked about

24   calls.

25               MR. SCHULMAN:  Right now I'm talking about messages.

L3IHRAM2                           Gonzalez - Cross

1          THE COURT:  Is that why this is not duplicative?

2          MR. SCHULMAN:  I'm talking about messaging as opposed

3     to phone calls, Judge.

4          THE COURT:  OK.  Now we're on to messaging.

5          OK.  You can answer the question.

6     A.  No, I've not reviewed those messages.

7     Q.  None of the agents that work under you told you about any

8     messaging between Mr. Fuentes Ramirez and President Hernandez

9     either, right?

10    A.  No, sir.

11    Q.  And you've not been presented with any evidence of

12    messaging between Mr. Fuentes Ramirez and Vice President

13    Alvarez, right?

14    A.  Not that I recall.

15    Q.  Not presented with any evidence of messaging between

16    Mr. Fuentes Ramirez and Rene Fonseca, right?

17    A.  Not that I recall.

18    Q.  Not presented with any evidence of messaging between

19    Mr. Fuentes Ramirez and Attorney General Chinchilla, right?

20    A.  Not that I recall.

21    Q.  If there was, that would be important to you, right?

22    A.  Yes, sir.

23    Q.  And it would be helpful to your investigation in this case,

24    right?

25    A.  Possibly, yes.

L3IHRAM2                          Gonzalez - Cross

1    Q.  And you certainly would have presented it to the Assistant

2    U.S. Attorneys, right?

3              MR. GUTWILLIG:  Objection.

4              THE COURT:  Sustained.

5    Q.  There was no record of any messaging between Mr. Fuentes

6    Ramirez and Mayor Crivelli, correct?

7    A.  I don't know, sir.

8    Q.  Well, your agents had not presented you with any evidence

9    of messaging between Mr. Fuentes Ramirez and Mayor Crivelli,

10   isn't that right?

11             MR. GUTWILLIG:  Objection.

12             THE COURT:  Sustained.

13             I explained that to you previously, Mr. Schulman, in

14   the presence of the jury just a minute ago.

15   Q.  There's been -- you've come across no evidence of

16   Mr. Fuentes Ramirez trying to bribe anybody on his phone,

17   right?

18             THE COURT:  OK.  Let's see you at sidebar, please.

19             Mr. Moskowitz, you could come if you'd like.

20             (Continued on next page)

21

22

23

24

25

L3IHRAM2                    Gonzalez - Cross

1              (At sidebar)

2              THE COURT:  Why do you think you're at the sidebar?

3              MR. SCHULMAN:  I'm trying to move through different

4       topics, Judge.  I'm not trying to repeat questions.  It's a

5       different question I'm asking him.  If he's saying I don't

6       know, you know, I don't see it as a problem to ask the

7       question.  If he says he doesn't know, then he doesn't know,

8       but I don't think it's irrelevant.  It is relevant.  He's the

9       supervisor of this whole investigation.  These are just factual

10      questions I'm asking him, Judge.

11             THE COURT:  Now, I told you you can't ask a question

12      of the witness as to evidence in the case.

13             MR. SCHULMAN:  OK.

14             THE COURT:  Sustained.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1              (In open court; jurors present)

2              THE COURT:  Wow, that was me.  Right here.  Sorry

3     about that.  The marvels of technology.

4              Please proceed, Mr. Schulman.

5              MR. SCHULMAN:  Thank you, your Honor.

6     BY MR. SCHULMAN:

7     Q.  Agent, there's been -- you've come across no indication of

8     text messages between Mr. Fuentes Ramirez and drug dealers,

9     isn't that right?

10    A.  I wasn't reviewing his text messages.

11    Q.  Well, you had your -- the agents under your supervision go

12    through his text messages, isn't that right?

13    A.  Some of them.

14    Q.  And the agents under your supervision presented you with no

15    text messaging between Mr. Fuentes Ramirez and any drug

16    dealers, isn't that right?

17    A.  Not that I recall.

18    Q.  The agents under your supervision provided you with no

19    indication of chats between Mr. Fuentes Ramirez and drug

20    dealers or narco-traffickers, right?

21    A.  Not that I recall.

22    Q.  There's no -- there's not even an indication that

23    Mr. Fuentes Ramirez had Leonel Rivera's phone number, did he?

24    A.  I don't know.

25    Q.  Well, have you been presented with any information

L3IHRAM2                        Gonzalez - Cross

1  suggesting that Mr. Fuentes Ramirez had Leonel Rivera's phone

2  number?

3  A.  No, sir.

4  Q.  Same question with respect to Javier Rivera.  You've not

5  seen any indication that Mr. Fuentes Ramirez had Javier

6  Rivera's phone number, right?

7  A.  No, sir.

8  Q.  Similarly --

9          THE COURT:  Had it in his phone or what?

10          MR. SCHULMAN:  Yes, correct, in his phone.

11  Q.  The agents under your supervision provided you with no

12  indication that Mr. Fuentes Ramirez had Javier Rivera's phone

13  number in his phone?

14  A.  Not that I recall.

15  Q.  As one of the contacts in his phone, right?

16  A.  Not that I recall.

17  Q.  By the way, as part of your investigation, you came to

18  learn that Mr. Fuentes Ramirez has four children, right?

19          MR. GUTWILLIG:  Objection.

20          THE COURT:  Sustained.

21  Q.  Yesterday you talked about text messaging involving

22  Mr. Fuentes Ramirez --

23          THE COURT:  I'm going to reverse myself on that.  The

24  question, I'll allow the question.  So, by the way, as part of

25  your investigation, you came to learn that Mr. Fuentes Ramirez

L3IHRAM2                          Gonzalez - Cross

1     has four children, right, is that correct?

2     A.  I don't know exactly how many children he has.

3              THE COURT:  All right.  Thank you.

4              Next question.

5     Q.  He has three older sons, right?  Do you know that?

6     A.  He has three sons that I'm aware of.

7     Q.  He has a baby child who's only four or five.  Are you aware

8     of that?

9              MR. GUTWILLIG:  Objection.

10             THE COURT:  I'll allow it.

11    A.  That, I don't know.

12    Q.  His oldest son -- three older sons, you said, that you're

13    aware of?

14    A.  Three sons.

15    Q.  Do you know how old they are?

16    A.  No, sir.

17    Q.  The oldest one is named Cristian, right?

18    A.  I know one of them is Cristian.  I don't know which is the

19    oldest.

20    Q.  He has another son named Geovanny, correct?

21    A.  Correct.

22    Q.  He has another son named Jose Simon, isn't that right?

23    A.  I think that's his name.

24    Q.  I mean, you asked the officers under your supervision what

25    the names of his sons were, right?

L3IHRAM2                      Gonzalez - Cross

 1   A.  No, sir.

 2   Q.  Well, you did review email communications between

 3   Mr. Fuentes Ramirez and his sons, right?

 4   A.  Some of them.

 5   Q.  We went through them yesterday.  You saw emails from

 6   Mr. Fuentes Ramirez to his sons, right?

 7            THE COURT:  Pause.  You asked the question:  "Well,

 8   you did review email communications between Mr. Fuentes Ramirez

 9   and his sons, right?"  And the witness answered:  "Some of

10   them."  And then you asked:  "We went through them yesterday.

11   You saw emails from Mr. Fuentes Ramirez to his sons, right?"

12   What's the difference between the two questions?

13            MR. SCHULMAN:  I was just being a little more focused

14   about the emails that were entered into evidence yesterday,

15   your Honor.

16            THE COURT:  But the question didn't ask that.  It

17   said:  "We went through them yesterday.  You saw emails from

18   Mr. Fuentes Ramirez to his sons, right?"  That's just a

19   question.  The same question you asked:  "Well, you did review

20   email communications between Mr. Ramirez and his sons, right?"

21   So please avoid duplicative questions.  Thank you.

22            MR. SCHULMAN:  Thank you.

23   BY MR. SCHULMAN:

24   Q.  Now, yesterday -- you understand that Mr. Fuentes Ramirez

25   has a wife as well, right?

1    A.  I know he has an ex-wife.  I'm not sure he has a current

2    wife.

3    Q.  Do you understand that he has a -- there's a woman that

4    he's been together with with whom he has a young child who's

5    approximately four years old.  Do you know that?

6    A.  No, I don't know that.

7    Q.  Did the agents that you were working with tell you that

8    Mr. Fuentes Ramirez has been with a woman for the last six

9    years named Krizia Murillo?

10   A.  No, sir.

11   Q.  So, as I recall, yesterday --

12          THE COURT:  Again, ladies and gentlemen, as I said to

13   you, a question by a lawyer is not evidence.  It's the witness'

14   answer that makes it evidence.

15          Thank you.  Next question.

16   Q.  Did you ask the agents who were working under your

17   supervision to give you the name of Mr. Fuentes Ramirez's

18   significant other?

19   A.  No, I did not.

20   Q.  Well, you went through a series of emails that Mr. Fuentes

21   Ramirez sent to his family members, right?

22   A.  Yes, sir.

23   Q.  And when you were -- when you went through those emails,

24   did you try to identify who was who within the email

25   communications?

L3IHRAM2                          Gonzalez - Cross

1   A.  I did not.

2   Q.  Well, did the agents under your supervision try to go

3   through the emails to identify who Mr. Fuentes Ramirez was

4   sending messages to?

5   A.  The agents and the rest of the prosecution team, I believe,

6   did.

7   Q.  As part of that process, did you identify who were his sons

8   and who were his other family members?

9           THE COURT:  You're asking whether this witness

10  identified?

11          MR. SCHULMAN:  Sorry.  Withdrawn.

12  Q.  Did the agents under your supervision identify who

13  Mr. Fuentes Ramirez's sons were and who his other family

14  members were?

15  A.  I believe they identified who some of them were.

16  Q.  And did they share that information with you?

17  A.  Not that I recall.

18  Q.  Well, yesterday you indicated that Krizia Murillo is

19  Mr. Fuentes Ramirez's son, is that right?

20  A.  Yes, sir.

21  Q.  Where did you get that information from?

22  A.  From one of the members of the prosecution team.

23  Q.  So one of the members of the prosecution team told you that

24  Mr. Fuentes Ramirez's son is named Krizia Murillo?

25  A.  No, sir.

L3IHRAM2                        Gonzalez - Cross

1    Q.   Isn't that what you just told me?

2    A.   No, sir.

3    Q.   Just to clarify, what did you mean by what you just said?

4    A.   The person that was using Krizia Murillo's name in that

5    particular email exchange was one of his sons.

6    Q.   So Krizia -- can we agree that Krizia Murillo is Mr. -- do

7    you know Krizia Murillo to be Mr. Fuentes Ramirez's significant

8    other?

9    A.   No, I did not.

10   Q.   Did the prosecutors tell you that Krizia Murillo is the

11   mother of Mr. Fuentes Ramirez's youngest daughter?

12   A.   No, sir.

13   Q.   They just told you that Krizia Murillo is a name that's

14   being used in emails?

15   A.   That's not what they said that I recall.

16   Q.   Now, your first meeting with Los Cachiros was back in

17   approximately November 2013, right?

18   A.   It was late 2013.  I'm not sure the month.

19   Q.   Prior to that meeting, Los Cachiros had been put on the

20   OFAC list, right?

21   A.   Correct.

22   Q.   Their finances had been frozen?

23   A.   I don't know.

24   Q.   Well, as part -- you're familiar with the OFAC process,

25   right?

L3IHRAM2                         Gonzalez - Cross

1   A.  Somewhat.

2   Q.  Tell us a little bit about that process.

3              MR. GUTWILLIG:  Objection.

4              THE COURT:  Sustained.

5   Q.  What do you know about the OFAC process?

6              THE COURT:  Sustained.

7   Q.  As part of the OFAC process, financial holdings of

8   narco-traffickers that are accessible are frozen, isn't that

9   right?

10  A.  What do you mean by "accessible"?

11  Q.  As part of the OFAC process -- that's why I'm asking you

12  what you understand the situation to be because -- I'm not

13  trying to go back and forth.

14             THE COURT:  Just ask questions.

15  Q.  As part of the OFAC process, financial accounts tied to

16  narco-traffickers are frozen; meaning, they become inaccessible

17  to the narco-traffickers, right?

18  A.  In the United States.

19  Q.  And as well as if -- financial institutions that have

20  relationships with the United States banks also freeze the

21  accounts of individuals who are targets of OFAC, right?

22  A.  Can you repeat that, please.

23  Q.  If there's a financial institution in Honduras that has a

24  relationship with the United States financial institutions, the

25  Honduran -- the foreign Honduran -- the foreign financial

L3IHRAM2                        Gonzalez - Cross

1  institutions also freeze the accounts of narco-traffickers who
2  are on the OFAC list, right?
3  A.  I don't know what the foreign governments or banks do, sir.
4  Q.  Well, when the Rivera brothers started becoming
5  confidential sources for you, there was financial pressure on
6  them, right?
7  A.  Yes, sir.
8  Q.  They didn't have access to money at that point, right?
9  A.  I don't know.
10  Q.  The extradition rules in the United -- the Honduran
11  extradition rules had changed at the time the Rivera brothers,
12  or Los Cachiros, started cooperating with you, right?
13  A.  I don't know exactly when the extradition laws changed.
14  Q.  You didn't look into -- you're not familiar with the
15  extradition process?
16  A.  No, I didn't say that.
17  Q.  But you're not -- when would you say, to the best of your
18  recollection, the extradition laws changed between Honduras and
19  the United States?
20              THE COURT:  In what respect?
21  Q.  Well, do you recall that in early 2013, the Honduran
22  legislature implemented a process whereby individuals could be
23  extradited from Honduras to the United States?
24  A.  I don't know when they did that, sir.
25  Q.  Well, was it before or after your first meeting with

L3IHRAM2                          Gonzalez - Cross

1    Los Cachiros in November 2013?

2    A.  I don't know.

3    Q.  So are you saying it's possible that the extradition rules

4    went into effect after your first meeting with Los Cachiros?

5              MR. GUTWILLIG:  Objection.

6              THE COURT:  Yes, sustained as to form.

7    Q.  When Los Cachiros started -- became confidential sources

8    for you in November 2013, one of the things that you and your

9    team had them do was obtain recordings, right?

10   A.  Yes, sir.

11   Q.  They worked as confidential sources for you from

12   approximately the end of 2013, like you said, till sometime in

13   the early part of 2016, isn't that right?

14   A.  They weren't just working for me.

15   Q.  Well, I'm saying you and your team that you were a part of

16   at least.  They were confidential sources for you from

17   approximately the end of 2013 till the early part of 2016,

18   isn't that right?

19   A.  Not just me and my team.  There were others they were

20   working with as well.

21   Q.  Others within the U.S. government that were relying on them

22   to obtain information?

23   A.  Yes.

24   Q.  And make recordings?

25   A.  Yes.

L3IHRAM2                        Gonzalez - Cross

1   Q.  Recordings of influential politicians?

2   A.  Of anyone engaged in criminal activity with them.

3   Q.  OK.  One of the people that they made recordings of was

4   Fabio Lobo, isn't that right?

5   A.  Yes, sir.

6          MR. SCHULMAN:  Ms. Hurst, if you don't mind, could you

7   please put up, publish, what's in evidence as Government

8   Exhibit 504.

9   Q.  And you see Exhibit 504, agent?

10  A.  Yes, sir.

11  Q.  Fabio Lobo is second from the left, isn't that right?

12  Sorry, second down on the left-hand column, right?

13  A.  Yes, sir.

14  Q.  And he was the son of the former president, right?

15  A.  Correct.

16  Q.  And Leonel Rivera obtained recordings between him and Fabio

17  Lobo, right?

18  A.  Yes, sir.

19  Q.  Leonel Rivera also obtained recordings of -- between him

20  and Tony Hernandez, right?

21  A.  Yes, sir.

22  Q.  He obtained recordings between him and Fredy Nájera, right?

23  I might be pronouncing it wrong, but Fredy Nájera?

24  A.  I believe he did.

25  Q.  And Fredy Nájera is the individual depicted on the bottom

L3IHRAM2                        Gonzalez - Cross

1    on the left-hand column, isn't that right?

2    A.  Yes, sir.

3    Q.  And he was a Congressman in Honduras, right?

4    A.  Yes, sir.

5    Q.  Leonel Rivera obtained recordings with -- of illicit or

6    improper -- withdrawn.

7         Leonel Rivera obtained recordings with Oscar Nájera,

8    right?

9    A.  I don't recall.

10   Q.  Do you recall Leonel Rivera obtaining recordings with

11   Yankel Rosenthal?

12   A.  With which Rosenthal?

13   Q.  With Yanky Rosenthal.  Maybe you call him Yankel?

14   A.  There's two there's Yany and Yankel.  You're kind of

15   combining them.

16   Q.  I'm saying Yanky is short for Yankel.  Leonel Rivera

17   obtained recordings with Yankel Rosenthal?

18   A.  I believe so.

19   Q.  And that was the individual that was depicted in a picture

20   yesterday that we used?  I forget which exhibit that was.

21   A.  I don't recall a picture of Yankel Rosenthal yesterday.

22   Q.  Leonel Rivera obtained audio recordings of not only

23   politicians but also narco-traffickers, right?

24   A.  Yes, sir.

25   Q.  And he was instructed, when you and your team and other

L3IHRAM2                          Gonzalez - Cross

1   members of the government were relying on him as a confidential

2   source, to not only obtain recordings of politicians but also

3   of narco-traffickers, right?

4   A.  As best he could, yes.

5   Q.  And he obtained recordings between him and Los Valles?

6   A.  I believe so.

7   Q.  Both of them, right, not just one?  By the way, the Valles

8   are two brothers who are the head of the Valles drug

9   trafficking organization, right?

10  A.  Yes, sir.

11  Q.  And Leonel Rivera obtained recordings between not just one

12  of Los Valles but both of the Los Valles brothers, right?

13  A.  I'm not sure.

14  Q.  But you recall that he obtained recordings with at least

15  one of the Los Valles brothers?

16  A.  Yes, sir.

17  Q.  He also obtained recordings with Hector Emilio Hernandez --

18  sorry, Hector Emilio Fernandez-Rosa, right?

19  A.  I don't recall.

20  Q.  Hector Emilio Fernandez-Rosa is depicted in Exhibit 504 in

21  front of you, right?

22  A.  Yes, sir.

23  Q.  And he's the man who's depicted just below Leonel Rivera on

24  the column on the right-hand side, right?

25  A.  Yes, sir.

L3IHRAM2                         Gonzalez - Cross

1    Q.   And Hector Emilio Fernandez-Rosa was a narco-trafficker who

2    worked with the Cachiros, right?

3    A.   I believe so.

4    Q.   And he was from Honduras, right?

5    A.   Yes, sir.

6    Q.   Under your team's supervision, Leonel Rivera obtained

7    recordings from Ramon Matta, right?

8    A.   I was not involved in anything that I recall with Matta.

9    Q.   Ramon Matta was a drug trafficker?

10   A.   Yes, sir.

11   Q.   So to the best of your recollection -- or as I understand,

12   you're saying you're not aware or you don't know if Leonel

13   Rivera obtained recordings with Ramon Matta?

14   A.   I'm saying I don't know if it was the team that I was

15   working in.

16   Q.   While we have this exhibit up on the screen, just really

17   quickly, during your interview with Mr. -- with Geovanny at the

18   time of his arrest, you asked him about a man by the name of

19   Mejia Vargas, right?

20   A.   Yes, sir.

21   Q.   And now depicted on this document on the lowest -- the

22   bottom image on the right-hand column is a man called Alfonso

23   Sierra Vargas, aka Renteria, right?

24   A.   Yes, sir.

25   Q.   Yesterday do you recall the government through you entering

1  into evidence what was Exhibit 119 which was an image of this

2  man, Alfonso Sierra Vargas, aka Renteria?  Do you remember

3  that?

4  A.  Yes, sir.

5  Q.  And that's a different individual than the Mejia Vargas

6  that you were asking Mr. Fuentes Ramirez about, right?

7  A.  Yes, sir.

8          MR. SCHULMAN:  Ms. Hurst, you can take that down.

9  Thank you.

10  Q.  Now, when Mr. Rivera, both Riveras, were working as

11  confidential sources for you, you and your team trained them on

12  how to operate as confidential sources, right?

13  A.  How do you mean?

14  Q.  What I mean is you instructed them to obtain recordings,

15  right?

16  A.  Whenever they could, yes.

17  Q.  And in the process of obtaining recordings, the intention

18  was that the person that they were recording wouldn't know that

19  they were being recorded, right?

20  A.  Typically.

21  Q.  Well, you would never -- you didn't intentionally tell Leo

22  Rivera, hey, warn the person you're recording that you're

23  recording them, or something like that?

24  A.  No, sir.

25  Q.  I mean, you would never do something like that?  That

L3IHRAM2                          Gonzalez - Cross

1   doesn't really make sense, right?

2   A.  No, sir, I wouldn't.

3   Q.  And they were able to successfully get recordings on the

4   narco-traffickers that we talked about, right?

5   A.  Yes, sir.

6   Q.  And they never figured out that they had been recording

7   those communications in any way, right?

8   A.  I do not know that.

9   Q.  Well, you were never presented with any indication that the

10  people that they were recording kind of figured out that they

11  had been -- that they were being surreptitiously recorded,

12  right?

13  A.  Eventually, they did.

14  Q.  Well, when the world knew and you announced it, but it was

15  never figured out during the course of the meetings, right?

16  A.  Not that I'm aware of.

17  Q.  We could agree that the Riveras became good at tricking

18  these politicians into making admissions, right?

19  A.  I wouldn't say they had to trick anybody.

20  Q.  But they were able to elicit the admissions from certain

21  politicians, right?

22  A.  They had conversations with people.

23  Q.  And they were able to have, successfully have,

24  conversations while working for you with narco-traffickers as

25  well, right?

L3IHRAM2                          Gonzalez - Cross

A.  Yes, sir.

Q.  And when I say "you," I mean you and your team, of course,
and the government.

        Now, throughout the course of the investigation, you
never uncovered any photographs of Geovanny with any kind of
narcotics, right?

A.  No, sir.

Q.  You haven't recovered any kind of -- any drugs stamped with
Geovanny's initials on them, right?

A.  No, sir.

Q.  And you know that it is -- it's sometimes typical for drug
traffickers to stamp narcotics with their initials, right?

A.  I wouldn't call that typical.

Q.  But you've seen it where drug traffickers stamp their
initials onto kilos of cocaine, for example, right?

A.  I believe on one occasion, maybe two.

Q.  You did a big case two years ago, right, where a trafficker
had stamped his initials on kilos of cocaine, right?

A.  Yes, sir.

Q.  And you said that there was a second case that you worked
on where another trafficker stamped his initials onto kilos of
cocaine, right?

A.  No, I did not say that.

Q.  You just said one, maybe two.  What was the second one you
were thinking of?

L3IHRAM2                    Gonzalez - Cross

1    A.   I believe I heard another trafficker say he may have done

2    that, but I can't recall specifically.

3    Q.   OK.  So you remember the one that -- from the case a couple

4    years ago and you remember the reference from the other

5    trafficker that's more -- a little more vague?

6    A.   Yes, sir.

7    Q.   There were no drugs recovered from Mr. Fuentes Ramirez,

8    right?

9    A.   When do you mean?

10   Q.   I mean anytime.  You never recovered any drugs from

11   Mr. Fuentes Ramirez?

12   A.   I did not, no.

13   Q.   And no members of your team recovered any drugs from

14   Mr. Fuentes Ramirez, right?

15   A.   No, sir.

16   Q.   Certainly if you did, you would bring them into court here,

17   right?

18   A.   Yes, sir.

19   Q.   There were no images that you came into -- that you were

20   able to review of drugs on Mr. Fuentes Ramirez's phone, right?

21   A.   Correct.

22   Q.   There were no drug ledgers that had Mr. Fuentes Ramirez's

23   name in it, right?

24   A.   No, sir.

25   Q.   And drug ledgers including amounts of drug transactions are

L3IHRAM2                      Gonzalez - Cross

1  one of the things that you look for during the course of your
2  investigations, right?
3  A.  Yes, sir.
4  Q.  And if you obtain ledgers, that's certainly something that
5  you would provide to the government to use in a case like this,
6  right?
7  A.  Yes, sir.
8  Q.  You haven't obtained Mr. Fuentes Ramirez's fingerprints
9  that had been lifted off any kind of narcotics, for example,
10 right?
11 A.  No, sir.
12 Q.  You didn't obtain his palm prints that were lifted from any
13 kind of narcotics of any type, right?
14 A.  Correct.
15 Q.  You didn't recover any cash from Mr. Fuentes Ramirez,
16 right?
17 A.  He had cash on his person when he was arrested.
18 Q.  When you say that he had cash on his person when he was
19 arrested, he had, I think, less than a thousand dollars on him.
20 Is that what you're referring to?
21 A.  I didn't count the amount.
22 Q.  Well, when you say that he had cash on him when he was
23 arrested, what's your recollection of how much money he had?
24 A.  I don't have any.  I didn't deal with it.
25 Q.  Well, he certainly didn't have thousands of dollars, right?

L3IHRAM2                          Gonzalez - Cross

```
 1   A.  I don't believe so.
 2   Q.  Certainly if he did, you would have let the prosecutors
 3   know about that, right?
 4   A.  Yes, sir.
 5   Q.  During the course of your investigation, you haven't come
 6   across any audio of Mr. Fuentes Ramirez talking about drugs,
 7   right?
 8   A.  Not that I'm aware of.
 9   Q.  Your team has not secured any audio or any recordings of
10   any type of Mr. Fuentes Ramirez -- withdrawn.
11           Your team has not recovered recordings of any type of
12   Mr. Fuentes Ramirez talking about drugs, right?
13   A.  Not that I'm aware of.
14   Q.  You've not obtained any recordings of Mr. Fuentes Ramirez
15   talking about violence, right?
16   A.  Recordings, no.
17   Q.  You haven't obtained any recordings of Mr. Fuentes Ramirez
18   talking about violence, right?
19   A.  I don't think so.
20   Q.  You haven't obtained any recordings of Mr. Fuentes Ramirez
21   talking about bribes, right?
22   A.  I don't think so.
23   Q.  No videos of Mr. Fuentes Ramirez bribing the president, for
24   example, right?
25   A.  Not that I've seen, no.
```

L3IHRAM2                          Gonzalez - Cross

1   Q.  No videos of any transactions involving Mr. Fuentes Ramirez

2   and any narco-traffickers, right?

3   A.  No, sir.

4   Q.  Certainly no videos about Mr. Fuentes Ramirez committing

5   any acts of violence, none of that, right?

6   A.  No, sir.

7   Q.  No videos of Mr. Fuentes Ramirez talking about acts of

8   violence, right?

9   A.  I don't believe so.

10  Q.  Frankly, there's no video that you've uncovered during your

11  investigation of Mr. Fuentes Ramirez doing anything illegal at

12  all, right?

13         MR. GUTWILLIG:  Objection.

14         THE COURT:  Overruled.

15  A.  I haven't reviewed all the videos to know if there was any

16  illegal act committed on all of them or any of them.

17  Q.  Well, you were certainly looking for any -- you and your

18  team were certainly looking for any illegal acts that were

19  committed by Mr. Fuentes Ramirez, right?

20         THE COURT:  Under the law of what country?

21  Q.  Under the laws of the United States, right?

22         THE COURT:  Well, no, I'm asking you.

23         MR. SCHULMAN:  I'm asking about the laws --

24         THE COURT:  Don't say "right" to me.

25         MR. SCHULMAN:  I'm asking about the laws of the United

L3IHRAM2                          Gonzalez - Cross

1     States, Judge.

2                    THE COURT:  Thank you.

3     A.  I'm not familiar with all the laws governing illegal

4     activity in the United States.

5     Q.  Well, to your knowledge, you have not come across any

6     videos of Mr. -- withdrawn.

7                    You've not come across any videos of Mr. Fuentes

8     Ramirez doing any -- committing any violations of U.S. laws

9     that you're aware of, is that fair to say?

10    A.  Correct.

11    Q.  Now, you mentioned that Mr. Ramirez was found with some

12    money when you arrested him back in February 2020, right?

13    A.  Yes, sir.

14    Q.  And it's your testimony now you don't remember how much

15    money that was?

16    A.  Not that I don't remember.  I don't know.  I didn't count

17    it.

18    Q.  Well, were there pictures of it taken?

19    A.  I believe so.

20    Q.  Did you review -- you reviewed the postarrest video that

21    you took in connection -- withdrawn.

22                    You interviewed Mr. Fuentes Ramirez after his arrest,

23    right?

24    A.  Yes, sir.

25    Q.  You were one of the two officers that arrested him, right?

L3IHRAM2                          Gonzalez - Cross

1   A.  Yes, sir.

2   Q.  It was you and Agent Fairbanks, right?

3   A.  Correct.

4   Q.  And, obviously, you testified yesterday that you reviewed

5   the postarrest video that you conducted of Mr. Fuentes Ramirez,

6   right?

7   A.  Yes, sir.

8   Q.  When you arrested him, obviously, you went through his

9   baggage, right?

10  A.  I did not.

11  Q.  Well, a member -- a member of your team under your

12  supervision certainly went through his baggage, right?

13  A.  Yes, sir.

14  Q.  There were no drugs recovered from his baggage, right?

15  A.  No, sir.

16  Q.  There were no weapons in his bags, right?

17  A.  No, sir.

18  Q.  In fact, he told you:  Look, go through my bags.  He didn't

19  resist in any way, right?

20  A.  Correct.

21  Q.  He didn't tell you:  Don't go through my bags, you're not

22  allowed, get a warrant, anything like that, right?

23  A.  No, he did not.

24  Q.  In fact, I think we could agree that he was cooperative

25  when you took him into custody, right?

L3IHRAM2                          Gonzalez - Cross

1    A.  Yes, sir.

2    Q.  He agreed to speak to you, right?

3    A.  Yes, sir.

4    Q.  He wasn't disrespectful towards you?

5    A.  No, sir.

6    Q.  He was polite throughout the process?

7    A.  Yes, sir.

8    Q.  In fact, he spoke to you and he even waived his right to

9    have an attorney present in that meeting, in that interview,

10   that you reviewed yesterday, right?

11   A.  Yes, sir.

12   Q.  There was no attorney sitting next to him during that

13   meeting, right?

14   A.  Correct.

15   Q.  Not me and not Mr. Moskowitz, right?

16   A.  No, sir.

17   Q.  And he willingly answered the questions that you put to

18   him, right?

19   A.  Yes, sir.

20   Q.  Now, at some point you entered into a proffer agreement

21   with Leonel Rivera, right?

22           MR. GUTWILLIG:  Objection.

23           THE COURT:  Sustained.

24           MR. SCHULMAN:  Your Honor, if I may publish what's in

25   evidence as Exhibit A, please?

L3IHRAM2                         Gonzalez – Cross

1          THE COURT:  If it's in evidence, you may.

2          MR. SCHULMAN:  It's in evidence, Judge.

3    BY MR. SCHULMAN:

4    Q.  You recognize this document, agent?

5    A.  No, sir.

6    Q.  You're familiar with proffer agreements, right?

7    A.  Yes, sir.

8          MR. SCHULMAN:  Ms. Hurst, if you could just please

9    scroll down to page 4, please.

10   Q.  You see on the second row and then right side "S.G."?

11   Those are your initials, right?

12   A.  Yes, sir.

13         MR. SCHULMAN:  Ms. Hurst, if you could scroll back up

14   to page 3 now.

15   Q.  Now, you've been in proffer meetings, right?

16   A.  Yes, sir.

17   Q.  And in proffer meetings, members of the government are

18   present, right?

19   A.  Yes, sir.

20   Q.  An individual who's a participant in a proffer agreement is

21   present, right?

22   A.  Yes, sir.

23   Q.  And proffer meetings are the process where -- during which

24   the government decides whether or not they're going to enter

25   into a cooperation agreement with a confidential source, right?

1           MR. GUTWILLIG:  Objection.

2           THE COURT:  Yes, sustained.

3  Q.  During proffer sessions, individuals provide information,

4  right?

5  A.  Yes, sir.

6  Q.  Confidential sources provide information during proffer

7  sessions, right?

8  A.  They're not always confidential sources.

9  Q.  OK.  The individual who is being proffered provides

10 information during proffer sessions, right?

11 A.  Yes, sir.

12 Q.  During a proffer session, an individual, confidential

13 source, may produce recordings that they had obtained while out

14 in the field, right?

15 A.  It's possible.

16 Q.  Warnings are given at the beginning of each proffer

17 session, right?

18 A.  Yes, sir.

19 Q.  The person is warned to tell the truth, right?

20 A.  Yes, sir.

21 Q.  The person is told that it's in the person's interest to

22 tell the truth, right?

23 A.  Yes, sir.

24 Q.  And if somebody is not being truthful, they won't get a

25 cooperation agreement, right?

1          MR. GUTWILLIG:  Objection.

2          THE COURT:  Sustained.

3  Q.  It's a crime to lie to the federal government, right?

4  A.  I don't know about lying to the federal government.

5  Q.  Well, it's a crime to lie during one of these -- Ms. Hurst,

6  if you'd go up to page 1, please.

7          The proffer agreement in the third paragraph

8  specifically outlines that a person may be prosecuted for false

9  statements during the course of a proffer agreement, isn't that

10  right?

11  A.  I believe it says for cross-examination.

12  Q.  If you could read in paragraph 2 --

13  A.  Oh, you said three.

14  Q.  I meant -- well, I was saying the third one down.  Yes, I'm

15  talking about paragraph 2.

16          Thank you, Ms. Hurst.

17          THE COURT:  What's your question?

18  Q.  My question is an individual could be prosecuted for false

19  statements made during the course of a proffer agreement?

20  A.  I suspect he could be.

21  Q.  In fact, in these proffer agreements, the government agrees

22  not to offer statements that the person makes against the

23  individual unless he's being prosecuted for false -- for making

24  false statements, right?

25          MR. GUTWILLIG:  Objection.

L3IHRAM2                          Gonzalez - Cross

1      THE COURT:  Sustained.  This witness is not a party to

2  this agreement.

3  Q.  Well, at the beginning of these proffer meetings -- and you

4  know Leo Rivera attended many of them, right?

5  A.  Yes, sir.

6  Q.  In fact, this is Leo Rivera's proffer -- this is one of his

7  proffer agreements, right?

8  A.  Can I see the first page?  Yes, sir, it is.

9      MR. SCHULMAN:  Ms. Hurst, if you could scroll down to

10  page -- start at page 3.

11  Q.  Now, at the beginning of each meeting, a member -- you see

12  where it says, "Initials of counsel, client, AUSA, and

13  witness"?

14  A.  Yes, sir.

15  Q.  At the beginning of each meeting, the initials of the

16  counsel, the individual who's being proffered, an AUSA, and a

17  witness all initial the document, right?

18  A.  Yes, sir.

19  Q.  And that's when the -- and the person is certifying that he

20  will be truthful during the course of the proffer session,

21  right?

22      THE COURT:  Rephrase your question.  Who is

23  certifying?

24  Q.  The individual who is being proffered certifies that he

25  will be truthful during the course of the proffer agreement,

L3IHRAM2                          Gonzalez - Cross

1   right?

2                MR. GUTWILLIG:  Objection.

3   Q.  During the course of the proffer session, right?

4                THE COURT:  All right.  Ladies and gentlemen, the

5   agreement which is in evidence is an agreement between

6   Mr. Fuentes Ramirez and Preet Bharara, United States Attorney

7   for the Southern District of New York, by one of the Assistant

8   United States Attorneys.  It's witnessed by other people who

9   are present as such.

10               Next question.

11               MR. LOCKARD:  I'm sorry, Judge.  With Leonel Rivera

12  Maradiaga.

13               THE COURT:  I'm sorry.  I said Fuentes Ramirez.  I

14  meant Leonel Rivera.  Please disregard what I said.  That was a

15  mistake on my part.  It was Mr. Rivera who you saw at this

16  trial previously.

17               Thank you.

18  BY MR. SCHULMAN:

19  Q.  One of the warnings that's given to the person who's being

20  proffered is he's told that withholding information is as bad

21  as a lie, right?

22  A.  I don't know if that's stated in here.

23  Q.  I'm not asking if it's stated in here.  I'm saying there

24  are a series of verbal instructions that are given to the

25  person being proffered at the beginning of these proffer

L3IHRAM2                          Gonzalez – Cross

1    sessions, right?

2    A.  No, this is what is read to him.

3    Q.  I'm saying at the beginning of a proffer session, there's

4    not a reminder, hey, you have to be honest right now?

5    A.  I believe that's what this document covers.

6    Q.  OK.  At the end, that person, he initials that he

7    understands the contents of the document, right?

8    A.  I don't know if his initials mean he's understood it or

9    he's acknowledging that it was read to him.

10   Q.  OK.  Obviously, one of the AUSAs initials the document,

11   right?

12   A.  Yes, sir.

13   Q.  For example -- Ms. Hurst, just going to the next page --

14   you've even initialed proffer agreements involving Leo Rivera,

15   right?

16   A.  Yes.  I see my name there -- my initials there, excuse me.

17   Q.  One of the things that you instruct him, and I'm sure you

18   always instructed him, is that withholding information from you

19   is as bad as a lie, right?

20           MR. GUTWILLIG:  Objection.

21           THE COURT:  Well, let's find out.

22           Do you make such an instruction at a proffer session?

23           THE WITNESS:  No, I do not.

24           THE COURT:  OK.  Next question.

25   BY MR. SCHULMAN:

L3IHRAM2                              Gonzalez - Cross

1   Q.  Well, generally when you've worked with Leo Rivera, have

2   you warned him that withholding information is as bad as a lie?

3   A.  No, sir.

4   Q.  Have you told him -- did you tell Mr. Rivera to be

5   completely open and honest with you?

6   A.  Yes, sir.

7   Q.  And you certainly didn't -- it wouldn't have been a problem

8   for you if Mr. Rivera was withholding information?

9   A.  No, sir.

10  Q.  So he could pick and choose what he wanted to share with

11  you?  That was the policy, that was the approach that you took?

12  A.  No, sir.

13  Q.  So then explain that to me, then.

14          THE COURT:  No, rephrase your question.

15  Q.  In terms of the cooperation as a confidential source,

16  you're trying to develop trust in the person, right?

17  A.  Sometimes.

18  Q.  So sometimes you're not trying to develop trust with the

19  person?

20  A.  No.

21  Q.  You want to be -- you want to be getting truthful

22  information from the confidential source, right?

23  A.  Yes, sir.

24  Q.  If the confidential source is lying to you, you may end up

25  pursuing improper investigations basically, right?

L3IHRAM2                          Gonzalez - Cross

1              MR. GUTWILLIG:  Objection.

2              THE COURT:  I'll allow it.

3    A.  Not necessarily.

4    Q.  You don't want to follow -- you don't want to go into

5    investigations based on flawed information, do you?

6    A.  No, sir.

7    Q.  You certainly wouldn't want to prosecute people for crimes

8    that they didn't commit, right?

9    A.  No, sir.

10   Q.  Now, during the postarrest interview -- Ms. Hurst, you

11   could take that down.  Thank you.

12             You asked Mr. Fuentes Ramirez about a number of

13   narco-traffickers during the course of your postarrest

14   interview, right?

15   A.  Yes, sir.

16   Q.  You asked him about Los Cachiros, right?

17   A.  Yes, sir.

18   Q.  Leo Rivera?

19   A.  Yes, sir.

20   Q.  Javier Rivera?

21   A.  Yes, sir.

22   Q.  You asked him about Chepe Handal, right?

23   A.  Yes, sir.

24   Q.  And he told you, we saw in the video, that they had both

25   studied at the same high school together, right?

L3IHRAM2                      Gonzalez - Cross

1    A.   That's what he said.

2    Q.   You asked him about Pluto, right?

3    A.   Yes, sir.

4    Q.   And he told you that he drank with him one night or met him

5    in a bar one night by chance?

6    A.   I don't think he said "by chance," but he did say he did

7    drink with him.

8    Q.   And you had asked him about Mejia Vargas, right?

9    A.   Yes, sir.

10   Q.   Not to be confused with that exhibit yesterday of Alfonso

11   Sierra Vargas, right?

12   A.   Correct.

13   Q.   Different person, right?

14   A.   Yes, sir.

15   Q.   He told you that he had known Mejia Vargas from Choloma,

16   right, from growing up together, right?

17   A.   Yes, sir.

18   Q.   Did you ask him about Wilter Blanco?

19   A.   I don't recall if I did.

20          MR. SCHULMAN:  Ms. Hurst, can you pull up 401-T-37 and

21   show it to the witness, please, the original 401-T, the 401-T

22   that you sent to us.

23          (Discussion off the record)

24          MR. SCHULMAN:  Judge, I'll move on.  I'll ask another

25   question.  I don't have to go through this one by one with the

1   document.

2   Q.  Did you ask Mr. Fuentes Ramirez about Avila Meza?

3   A.  Yes, I believe so.

4   Q.  Did you ask him about the Ardon brothers?

5   A.  Yes, sir.

6   Q.  From Copan?

7   A.  Yes, sir.

8   Q.  Did you ask him about the Montes family?

9   A.  Yes, sir.

10  Q.  Did you ask him about the Valles family?

11  A.  Yes, sir.

12  Q.  Did you ask him about Luis Escalante?

13  A.  I'm not sure.

14  Q.  Remember asking him about Elvin Escalante?

15  A.  Yes.

16  Q.  Have did ask him Randolfo Vienieva?

17  A.  Yes.

18  Q.  Did you ask him about Hector Emilio?

19  A.  Yes, sir.

20          MR. SCHULMAN:  Ms. Hurst, if you could pull up 702-T,

21  please, what's in evidence.

22  Q.  Now, you recall testifying about this drug lab from Cerro

23  Negro, right?

24  A.  I recall reading about it in the emails, yes.

25  Q.  You know what I'm talking about.  There was a drug lab

L3IHRAM2                              Gonzalez - Cross

1   found in Cerro Negro in about 2011, in 2011?

2   A.  Yes, sir.

3   Q.  And you tried to get information about -- you tried to get

4   records related to the investigation into that drug lab, right?

5   A.  I did not.

6   Q.  Well, your team certainly tried to get records in Honduras

7   about any evidence -- withdrawn.

8          Your team tried to get any records related to the

9   investigation into that drug lab, right?

10  A.  I believe the U.S. Attorney's Office sent an official

11  request to the government of Honduras, but I don't know what

12  all it contained.

13  Q.  Well, you have at least one agent working in Honduras,

14  right?

15  A.  Yes.

16  Q.  In fact, did you work in Honduras for some time?

17  A.  No, sir.

18  Q.  Well, was the agent that's stationed in Honduras requested

19  to seek information about any kind of records related to this

20  supposed drug lab or -- withdrawn -- any records of the

21  investigation into the drug lab?

22  A.  I believe the agents that were stationed there at the time

23  were asked if they had obtained any information about the drug

24  lab.

25  Q.  Now, there's been -- to your knowledge, of course, there's

L3IHRAM2                        Gonzalez - Cross

1    been no evidence of any kind of record of Mr. Fuentes
2    Ramirez -- Mr. Fuentes Ramirez having a property interest in
3    the property where the lab was supposedly located, right?
4    A.  Other than what he said?
5    Q.  There's no evidence of any kind of records of Mr. Fuentes
6    Ramirez having any kind of interest in property where the lab
7    was located, right?
8            THE COURT:  Sustained as to form.
9    Q.  Did your team --
10           THE COURT:  Excuse me.  Answer's stricken.
11           MR. SCHULMAN:  Sorry.
12           THE COURT:  Thank you.
13   Q.  Did your team try to obtain any kind of deeds related to
14   that property?
15   A.  I don't know what all was in the request that the U.S.
16   Attorney's Office made to the government of Honduras.
17   Q.  And as you read this email, this was Mr. -- as you
18   understand it, it was Mr. Fuentes Ramirez just trying to get --
19   getting proof or any kind of records related to that lab,
20   right?
21   A.  I believe so.
22   Q.  It's not a crime for somebody to try to get records related
23   to the subject of a case, right?
24   A.  Not that I'm aware of.
25   Q.  In the same way that the U.S. Attorney's Office made a

L3IHRAM2                         Gonzalez – Cross

1    request to get records related to this supposed lab, right?

2    A.   Not in the same way.

3              (Continued on next page)

L3IKRAM3                      Gonzalez - Cross

```
 1   BY MR. SCHULMAN:
 2   Q.  The point is --
 3            THE COURT:  Are you asking him whether the United
 4   States Attorney's Office made any effort to get records?  Is
 5   that the question?
 6            MR. SCHULMAN:  Well, he said that already, Judge, so
 7   I'm not asking that question.
 8            THE COURT:  Do you know whether the United States
 9   Attorney's Office tried to get any records?
10            THE WITNESS:  I don't know what all their requests
11   contained, sir.
12            THE COURT:  All right.  Thank you.
13   BY MR. SCHULMAN:
14   Q.  Was there any request, to your knowledge, for police
15   reports related to this raid of this drug lab?
16   A.  I don't know.
17   Q.  Well, have you been able to review any kind of police
18   reports or police records related to this investigation into
19   this drug lab?
20   A.  No, sir.
21   Q.  You also -- in the same message, you see that
22   Mr. Fuentes Ramirez had requested records related to a mechanic
23   who was killed, right?
24   A.  Yes, I believe so.
25   Q.  Now, have you come across any Honduran reports of
```

L3IKRAM3                         Gonzalez - Cross

1    Mr. Fuentes Ramirez committing any kind of murders?

2    A.   Honduran reports?  No.

3    Q.   Have you come across any autopsy records related to

4    individuals who supposedly got killed by Mr. Fuentes Ramirez?

5    A.   No, sir.

6    Q.   Have you come across any kind of crime scene records

7    related to individuals who were supposedly killed by

8    Mr. Fuentes Ramirez?

9    A.   Not that I'm aware of.

10   Q.   Have you reviewed any forensic analyses related to any

11   investigations of people who supposedly were hurt or harmed by

12   Mr. Fuentes Ramirez?

13   A.   No, sir.

14   Q.   In fact, the only evidence that you reviewed are statements

15   that Leo Rivera told you about it, right?

16   A.   No, sir.

17   Q.   Well, can you point to anything besides what Leo Rivera

18   told you?

19           MR. GUTWILLIG:  Objection.

20           THE COURT:  Sustained.

21   Q.   And, by the way, there's nothing illegal about

22   Mr. Rivera -- withdrawn.

23           There's nothing illegal about Mr. Fuentes Ramirez

24   trying to obtain records related to some crimes that supposedly

25   occurred in Honduras, right?

L3IKRAM3                         Gonzalez - Cross

1   A.  Not that I'm aware of.

2   Q.  The same as you and your team made efforts to obtain

3   records, right?

4   A.  I don't think he made requests in the same way that the

5   U.S. Attorney's Office did.

6   Q.  But the point is you and your team tried to obtain records,

7   right?

8           MR. GUTWILLIG:  Objection.

9           THE COURT:  Overruled.

10          THE WITNESS:  I believe there was on official request

11  for a lot of things.  I don't know how he made his request.

12  BY MR. SCHULMAN:

13  Q.  Did you and your team obtain any records at all?

14  A.  I don't know if we've gotten a response from the Government

15  of Honduras.

16  Q.  Well, you haven't seen any records, right?

17  A.  No, sir.

18  Q.  And your agent that's on the field there, he hasn't

19  recovered anything, right?

20  A.  No, sir.

21          MR. SCHULMAN:  Your Honor, if I may have a moment,

22  please?

23          THE COURT:  Yes.

24          (Pause)

25          MR. SCHULMAN:  I have nothing further, Judge.  Thank

L3IKRAM3                        Gonzalez - Cross

1    you.

2             THE COURT:  All right.  Thank you.

3             Ladies and gentlemen, please stand up and stretch.

4             JUROR:  Judge, can I run to the restroom?

5             THE COURT:  Yes.

6             JUROR:  Thank you.

7             THE COURT:  You know, ladies and gentlemen, in

8    non-COVID times, we have wonderful jury rooms that are right on

9    the same floor as the courtroom, and it's a lot easier.

10   However, we're trying to make things safe, so it's more

11   cumbersome for that reason.

12            (Pause)

13            THE COURT:  Are you enjoying the extra daylight at the

14   end of the day?  I am.

15            All right.  Mr. Gutwillig, whenever you're ready.

16            THE LAW CLERK:  Judge --

17            THE COURT:  Oh, I'm sorry.  I wish I knew.

18            THE LAW CLERK:  I'll be quick.

19            THE COURT:  That's okay.  You take your time, do it

20   right.  Top student at Cornell Law School.

21            (Pause)

22            MR. GUTWILLIG:  May I inquire, your Honor?

23            THE COURT:  You may.

24

25

L3IKRAM3                          Gonzalez - Redirect

1    REDIRECT EXAMINATION

2    BY MR. GUTWILLIG:

3    Q.  Agent Gonzalez, prior to the pandemic, about how often did

4    you debrief witnesses?

5    A.  It depends on the need of the case.

6    Q.  Is it correct that you've done hundreds of debriefings

7    since 2014?

8    A.  It could be.

9    Q.  You don't remember the exact date of all your debriefings,

10   do you?

11   A.  No, sir.

12   Q.  You mentioned yesterday that it's not always feasible to

13   debrief witnesses in the same investigation separately,

14   correct?

15   A.  Correct.

16   Q.  Sometimes that's because of time constraints, correct?

17   A.  Yes, sir.

18   Q.  Sometimes you debrief witnesses together because they're

19   working together proactively, correct?

20   A.  Yes, sir.

21   Q.  And working proactively is kind of like an undercover

22   operation, right?

23   A.  Yes, sir.

24   Q.  You need both witnesses to hear your instructions, so that

25   they're on the same page, right?

1          MR. SCHULMAN:  Objection; leading, Judge.

2          THE COURT:  Take a look at the rule.  It's not

3    permissible on direct, it's expressly permissible on cross, and

4    there is no rule on redirect.  The nature of redirect is to

5    bring the witness' attention to something that has previously

6    occurred.

7          Overruled.

8          MR. GUTWILLIG:  Can we have the question read back,

9    please?

10          THE COURT:  No.  Ask a fresh question.

11    BY MR. GUTWILLIG:

12    Q.  As part of this, sometimes you need both witnesses to hear

13    your instruction so they're on the same page, correct?

14    A.  Yes, sir.

15    Q.  And part of that is that so the investigation works as well

16    as possible, right?

17    A.  Yes, sir.

18    Q.  Part of it also could be for the witness' safety, right?

19    A.  Yes, sir.

20    Q.  Are those some of the reasons that Leo Rivera and Javier

21    Rivera were debriefed together on occasion in 2014?

22    A.  Yes, sir.

23    Q.  Did they surrender in 2015?

24    A.  Yes, they did.

25    Q.  They were in custody after they surrendered, correct?

L3IKRAM3                              Gonzalez - Redirect

1    A.   Correct.

2    Q.   And after they were in custody, they weren't debriefed

3    together, right?

4    A.   No, sir.

5    Q.   And since they've stopped working proactively, they've

6    stopped being debriefed together; is that right?

7    A.   Correct.

8    Q.   When they came here and surrendered and were in custody, is

9    that when the focus of the debriefings shifted to historical

10   information and memories?

11   A.   Yes, sir.

12   Q.   And those debriefings were done completely separately,

13   right?

14   A.   Yes, sir.

15   Q.   You were asked some questions about conducting an

16   investigation in Honduras on cross.  Do you recall that?

17   A.   Yes, sir.

18   Q.   Do you consider it a viable investigative step to try to

19   collect records and evidence from the government of a country

20   whose officials you're targeting?

21   A.   No, sir.

22   Q.   And you can't just go right there and do it yourself,

23   right?

24   A.   Correct.

25   Q.   You lack authority to do that in a foreign country, right?

L3IKRAM3                        Gonzalez - Redirect

1    A.  Yes, sir.

2    Q.  Can you go to Honduras and execute an arrest?

3    A.  No, sir.

4    Q.  You were asked some questions on cross-examination about

5    certain types of evidence.

6            MR. GUTWILLIG:  Ms. Hurst, could you please pull up

7    what's in evidence as Government Exhibit 201-14-T.

8    Q.  Directing your attention to the fourth page, you were asked

9    some questions on cross-examination about, for example, the

10   lack of communications between the defendant and certain other

11   individuals; is that right?

12   A.  Yes, sir.

13   Q.  Directing your attention to line 69 of the chat, could you

14   please read the communication from Comisionado Martinez?

15   A.  "First step:  Asterisk number 21 number if it's tapped;

16   second step, asterisk number 52 number if the calls are being

17   forwarded; third step, number number 002 number to untap the

18   calls."

19   Q.  How does 071 Geovanny respond, the defendant respond?

20   A.  Like an emoji of hysterical laughter.

21   Q.  Going down to line 73, what does Comisionado Martinez write

22   there?

23   A.  "To see if you have been tapped already, asterisk number 06

24   number.  You will see that IME, and if you see /1, you have

25   been tapped once and so on."

L3IKRAM3                      Gonzalez - Redirect

1   Q.   Based on your involvement in this investigation, do you

2   have an understanding of the position within Honduran

3   Government that Comisionado Martinez held?

4   A.   Roughly.

5   Q.   And, roughly, what is that?

6   A.   High-ranking police official in the Honduran National

7   Police.

8   Q.   Based on your review of these communications and your

9   involvement in the investigation, what do you understand untap

10  the calls to mean?

11  A.   A wire intercept of a phone call, interception, listening

12  to the call.

13  Q.   You were also asked on cross-examination about whether

14  there were videos made by Leonel Rivera involving the

15  defendant; is that right?

16  A.   Yes, sir.

17  Q.   And you said that there weren't any videos, right?

18  A.   Not to my recollection.

19  Q.   Based on your understanding of the investigation, about

20  when did Leonel Rivera start making videos of folks?

21  A.   I believe late 2014.

22  Q.   And was it your understanding by that point, that the

23  defendant and Leonel Rivera had tried to kill one another?

24  A.   Yes, sir.

25  Q.   You were asked some questions today about traffickers

L3IKRAM3                          Gonzalez – Redirect

1   putting initials on kilograms of cocaine; is that correct?

2   A.  Yes, sir.

3   Q.  You said you've seen that a couple of times, right?

4   A.  Yes, sir.

5   Q.  And one of the traffickers who did that was Tony Hernandez;

6   is that correct?

7   A.  Yes, sir.

8   Q.  He's the brother of Honduran President Juan Orlando

9   Hernandez?

10  A.  Yes, sir.

11        MR. GUTWILLIG:  Ms. Hurst, could you please pull up,

12  for the witness, what's marked as Government Exhibit 316.  My

13  apologies 321, please.

14  Q.  Do you recognize that?

15  A.  Yes, sir.

16  Q.  What is it?

17  A.  It looks to be a kilogram of cocaine with the stamp and the

18  initials TH on it.

19  Q.  Are you familiar with this photograph from your

20  investigation?

21  A.  Yes, sir.

22  Q.  And based on your involvement in the investigation, who

23  does TH refer to?

24  A.  Tony Hernandez.

25        MR. GUTWILLIG:  Your Honor, the government offers

L3IKRAM3                          Gonzalez - Redirect

1    Government Exhibit 321.

2              THE COURT:  Any objection?

3              MR. SCHULMAN:  No, no objection.  I thought it was in

4    evidence, actually.

5              THE COURT:  Thank you.

6              (Government's Exhibit 321 received in evidence)

7    BY MR. GUTWILLIG:

8    Q.  Putting your name on a kilogram of drugs is risky, right?

9    A.  Yes, sir.

10   Q.  Because it makes it easier for law enforcement to identify

11   the trafficker, right?

12   A.  Yes, sir.

13   Q.  And a trafficker putting their initials on a kilo can

14   indicate that that trafficker feels particularly powerful,

15   right?

16   A.  Yes, sir.

17   Q.  It can signal that the trafficker considers himself to be

18   untouchable by law enforcement?

19   A.  Yes, sir.

20   Q.  Such as in the instance of Tony Hernandez, right?

21   A.  Correct.

22   Q.  Where the trafficker believes that he has protections from

23   the highest level of government?

24   A.  Yes, sir.

25             MR. GUTWILLIG:  Can I have a moment, please, your

L3IKRAM3

1     Honor?

2              THE COURT:  Yes.

3              (Pause)

4              MR. GUTWILLIG:  No further questions, your Honor.

5              THE COURT:  All right.  Thank you.

6              You may step down.

7              (Witness excused)

8              THE COURT:  Call your next witness, please.

9              MR. LOCKARD:  The government calls Jonathan Fox.

10    JONATHAN FOX,

11         called as a witness by the Government,

12         having been duly sworn, testified as follows:

13             THE DEPUTY CLERK:  Please state your name and spell it

14    for the record, please.

15             THE WITNESS:  Jonathan, J-o-n-a-t-h-a-n, Fox, F-o-x.

16             THE COURT:  Whenever you're ready, you may inquire.

17             MR. LOCKARD:  Thank you, your Honor.

18             Before we begin, the government has some additional

19    exhibits to offer.  At this time, we offer Government Exhibits

20    401-2, 401-25, 401-26, 401-TR, and 401-24-R.

21             THE COURT:  Any objection?

22             MR. SCHULMAN:  No objection, Judge.

23             THE COURT:  Received.

24             (Government's Exhibits 401-2, 401-25, 401-26, 401-TR,

25    and 401-24-R received in evidence)

L3IKRAM3                          Fox - Direct

1   DIRECT EXAMINATION

2   BY MR. LOCKARD:

3   Q.  Good afternoon, sir.

4   A.  Good afternoon.

5   Q.  Where do you work?

6   A.  I work at the Nassau County Office of the Medical Examiner,

7   Division of Forensic Services.

8   Q.  And for how long have you been with the Nassau County

9   medical examiner's office?

10  A.  Six months.

11  Q.  What's your title there?

12  A.  A forensic scientist III.

13  Q.  Are you in a particular part of the forensic sciences unit?

14  A.  Yes, I am.

15  Q.  What is that?

16  A.  It's the firearms section.

17  Q.  What do you do in the firearms section?

18  A.  We test, identify, and perform operability tests on

19  firearms.  We also microscopically examine ballistic evidence,

20  such as cartridge casings, bullets, and bullet fragments.

21  Q.  Where did you work prior to six months ago?

22  A.  Prior to that, I was a member of the New York City Police

23  Department, where I was a detective for 22 years.

24  Q.  What was the last position you held at the NYPD?

25  A.  I worked at the police laboratory, firearms analysis

L3IKRAM3                           Fox - Direct

1   section.

2   Q.  What did you do at the firearm analysis section of the NYPD

3   forensics lab?

4   A.  Pretty much the same of what I'm doing now currently —

5   performed firearm operability tests, identified different types

6   of firearm and ammunition, as well as microscopically examine

7   ballistic evidence.

8   Q.  For how long did you do that at the firearm analysis

9   section at the NYPD forensics lab?

10  A.  I got there in 2004.

11  Q.  Generally speaking, what do you do to test a firearm or an

12  ammunition for operability?

13  A.  We would take the firearm and ammunition that was received

14  at the laboratory, we would test fire that firearm.

15  Essentially, we would fire the gun into what's called a bullet

16  recovery system, or a water tank, we could also fire the gun

17  down range, and if the gun worked, we would determine that the

18  firearm was operable, and, obviously, if it didn't work, it

19  would be inoperable.

20  Q.  What types of training have you received in firearm and

21  ammunition identification and operability?

22  A.  When I was first assigned to the firearms analysis section

23  in 2004, I was trained in firearms identification and

24  operability.  That initial training program lasted six months,

25  where we learned to identify all the different types of

L3IKRAM3                         Fox - Direct

firearms and ammunition.  I took written and practical

examinations.  I sat with senior members of the firearms

analysis section.

        At the end of that training course, I took what's

called a competency test.  Essentially I was given a firearm, I

would test fire that firearm, determine its operability.  Once

I completed and passed that competency test, I was able to

perform firearm examinations.

        After doing that for a year or two, I went into the

microscopic training section.  That training section lasted a

year and a half, or 18 months.  We based that training program

off of AFTE, A-F-T-E.  AFTE stands for the Association of

Firearm and Tool Mark Examiners.  It's an association that's

recognized in 42 countries and has over a thousand members

worldwide.  They set the standard for firearm identification

and tool mark identification.

        So, during that 18 months, I took, once again, written

practical examinations.  The majority of that time, we learned

how firearms were manufactured, how tools that manufacture

those firearms leave unique characteristics on those firearms,

and we would microscopically examine those characteristics.

        At the end of that training program, I took three

competency tests.  All three competency tests were given

outside the New York City Police Department by the

collaborative testing service.  I completed and passed those

L3IKRAM3                          Fox - Direct

1    three competency tests and was able to perform firearm or

2    microscopic examinations.  Every year since that I've been

3    trained as a microscopist, I'm given a proficiency test, which

4    is given outside the New York City Police Department.

5          I am also trained in NIBIN, which is the National

6    Integrative Ballistic Identification Network.  It's where we

7    put cartridge casings into a computer, the computer takes

8    pictures of those cartridge casings, and then they correlate

9    the cartridge casings in a database to see if those cartridge

10   casings that are recovered at crime scenes or test fires from a

11   firearm match other types of ballistic evidence.

12   Q.  In addition to that, have you taken other steps to stay

13   current with firearms identification operability issues?

14   A.  Yes.  We have what's called professional development.  If

15   there's anything new in the field of microscopy and firearms

16   identification, we would get it through an AFTE journal, which

17   is a scientific journal, and then we'd review anything new, and

18   then if we needed more training, we would tailor our training

19   to do so.

20   Q.  Do you also provide training in firearms identification and

21   operability?

22   A.  Partly, right now, I'm training two other forensic

23   scientists at the Nassau County medical examiner's office.

24   Q.  Have you been qualified as an expert in state and federal

25   courts?

L3IKRAM3                        Fox - Direct

1   A.  Yes, I have.

2   Q.  Approximately how many times?

3   A.  I've testified over 400 times.

4          MR. LOCKARD:  Your Honor, the government offers

5   Forensic Scientist Fox as an expert in the field of firearms

6   and ammunition analysis, identification, and operability.

7          MR. SCHULMAN:  No objection.

8          THE COURT:  Okay.  So qualified.

9          MR. LOCKARD:  Ms. Hurst, could we see Government

10  Exhibit 201-100.

11  BY MR. LOCKARD:

12  Q.  What types of weapons are shown here?

13  A.  The weapons shown in that photo are five AR-15

14  semiautomatic rifles.

15         MR. LOCKARD:  Ms. Hurst, if we could also bring up

16  Government Exhibit 201-102.

17  Q.  Now, what type of weapon is shown in that photograph?

18  A.  That photograph also represents an AR-15 type semiautomatic

19  rifle.

20  Q.  Do you have with you a firearm that you could use to help

21  you explain to the jury how an AR-15 works?

22  A.  Yes, I do.

23  Q.  And what type of firearm is that?

24  A.  It's a Colt M16 assault rifle.

25  Q.  Are the M16 and AR-15 similar firearm models?

L3IKRAM3                         Fox - Direct

1    A.   They are.

2               MR. LOCKARD:   The government offers --

3    Q.   Could you please grab Government Exhibit 601 out of the

4    cart.

5               MR. LOCKARD:   The government offers Government

6    Exhibit 601 as an aid to the jury.

7               THE COURT:   All right.

8               Any objection?

9               MR. SCHULMAN:   No, no objection, Judge.

10              THE COURT:   All right.   Received.

11              (Government's Exhibit 601 received in evidence)

12   BY MR. LOCKARD:

13   Q.   Just for the comfort of everyone in the courtroom, has that

14   firearm been disabled and is unloaded?

15   A.   It is unloaded and been deemed safe, yes.

16   Q.   So, could you please, using Government Exhibit 601,

17   describe how that firearm works?

18   A.   Sure.

19              So, the basic premise on how firearms work, you'd have

20   to know what a cartridge or a unit of ammunition is.   So, every

21   unit of ammunition has four components — the bullet, the

22   cartridge case, the propellant or gunpowder, which goes inside

23   the cartridge case, and at the base of that cartridge, what

24   would be called a primer.   So, for that bullet to be fired, the

25   primer would need to be struck by a firing pin or a hammer that

L3IKRAM3                          Fox - Direct

1   would leave an indent into the back of that cartridge.  Once

2   that primer is struck, it causes a spark.  That spark ignites

3   the gunpowder, the propellant, and when gunpowder is lit, it

4   turns into a gas, and that builds up enough pressure to force

5   the bullet out of the firearm.

6          So, this particular rifle is an M16 .556 millimeter

7   assault rifle.  This firearm is capable of shooting

8   semiautomatic and automatic.  The difference between

9   semiautomatic and automatic is for a semiautomatic rifle, every

10  time I press the trigger, one round is fired.  Even if I press

11  and hold back the trigger, it will only fire one round.  For an

12  automatic, if I press the trigger rearward on this firearm, and

13  it was loaded, it would empty the contents of the magazine

14  until I depressed my finger off the trigger.  So on an

15  automatic rifle, all I have to do is hold down the trigger, and

16  the gun will keep firing continuously until I release the

17  trigger.  So this particular rifle and an AR-15 are similar in

18  nature except that an AR-15 is designed to be a semiautomatic

19  rifle.

20         But you take a magazine, you'd place it in the

21  magazine well of the firearm, lock it into place.  This what's

22  called a charging handle.  So to load that firearm, I pull that

23  charging handle rearwards.  Inside the firearm, there's what's

24  called a bolt carrier and a bolt.  Once I depress the firearm's

25  bolt carrier release button, the bolt would go forward, and now

L3IKRAM3                          Fox - Direct

1    it's ready to be fired.

2              This is what's called a stock.  This stock is

3    collapsable.  It moves forward and inward.  If the gun is more

4    compact, you could use it in certain areas, as opposed to the

5    gun being longer, where it might be harder to use in certain

6    type of areas, wherever you're using it.

7              So, to fire this weapon, I press the trigger on the

8    firearm, a firing pin in the bolt would strike the back of the

9    cartridge, causing that explosion for the propellant to light

10   the gas.  The bullet would travel through the barrel, leave the

11   front of the barrel, so everything has an equal and opposite

12   reaction.  For example, if you lit a firework and threw it in

13   the air, if would blow up into little pieces.  Well, in this

14   particular firearm, the cartridge casing is sealed into the

15   chamber before it's fired.  So during that explosion, when the

16   firing pin strikes the primer and the propellant is lit,

17   there's only two places for the bullet and the cartridge to

18   go — the bullet out of the firearm, the gas is pushed rearward,

19   but now the casing has to go somewhere, so it goes backwards

20   with the help of those gases.

21             So, when that bullet -- when that casing is going

22   backwards, the bolt opens, and the cartridge is ejected from

23   the firearm, then the bullet will go forward again, and that's

24   called a cycle of fire, and every -- you could basically fire

25   this until, obviously, the magazine is empty.

L3IKRAM3                        Fox - Direct

1    Q.  You mentioned the AR-15 is not manufactured to be fully an

2    automatic firearm; is that right?

3    A.  That's correct.

4    Q.  Can an AR-15 be modified to be fully automatic?

5    A.  Yes.

6    Q.  Are you familiar with that kind of modification?

7    A.  Yes, I am.

8    Q.  How would you modify an AR-15 to be fully automatic?

9    A.  There's an internal component to this firearm.  This

10   firearm, or semiautomatic rifle, is broken into a lower

11   receiver and an upper receiver.  The lower receiver, which

12   holds the trigger mechanism, also has what's called a sear.  A

13   sear is a mechanism in the firearm that when you press the

14   trigger, it allows for a safety with the firing pin.  So every

15   time you press the trigger on a semiautomatic handgun, the sear

16   will only allow the firing pin to fire once.

17          So there's what's called an AR sear.  Basically what

18   it is, you would replace that sear with that AR sear, and it

19   could be modified to fire fully automatic.  So that sear would

20   allow the firing pin and the bolt to go back and forth just

21   while holding the trigger down.

22   Q.  In an AR-15 modified to be fully automatic, what,

23   approximately, would the firing rate be?

24   A.  So, you would be able to empty a 35, 40-round magazine in

25   ten seconds.

L3IKRAM3                          Fox - Direct

```
 1   Q.  Are you familiar with the operation "sawed-off" as it

 2   relates to a gun barrel?

 3   A.  Yes.

 4   Q.  Generally speaking, what does a sawed-off gun barrel mean?

 5   A.  It means you took a gun that had a long barrel, and you cut

 6   it down to make it a short barrel.

 7   Q.  Can you saw off an AR-15?

 8   A.  It's possible, yes.

 9   Q.  Are there AR-15s with longer and shorter barrels?

10   A.  Yes, there are.

11          MR. LOCKARD:  Ms. Hurst, could we look at Government

12   Exhibit 201-103.

13   Q.  Forensic Scientist Fox, what appears to be shown in this

14   picture?

15   A.  It appears to be a Colt AR-15, the closeup view to an

16   assault -- to the rifle with the magazine.

17   Q.  Now, there appears to be a piece of brown paper placed on

18   the firearm.  What type of information typically would be in

19   that area?

20   A.  That's where the serial number for that type of firearm

21   would be.

22          MR. LOCKARD:  Could we look at Government

23   Exhibit 203-1, please.

24   Q.  What type of weapon is depicted in that photograph?

25   A.  That's a handheld machine pistol.  That type of firearm is
```

L3IKRAM3                         Fox - Direct

made by CZ, which is a gun manufacturing company.  I believe

the model is a Scorpion.  And that type of assault rifle or

assault machine weapon, handheld, is designed only for military

use only.

Q.  Does the gun shown in this picture have a selector switch?

A.  Yes.  That gun has four selections.  So, the white dot

would refer to safe — that means you can't fire it.  The red

dot would be semiautomatic.  The second dot would be, if you're

going right to left, so it would be the third dot or the second

red dot, that would be -- you could fire that in bursts.  So if

you held down the trigger, it would fire three rounds.  You

release the trigger, depress the trigger again, it would fire

three more rounds.  And then, finally, the fourth dot, or the

third red dot, if you put the selector switch on that dot, you

would be able to fire that fully automatic.

Q.  Is there a firearm with you that you could use to help you

explain to the jury how this CZ Scorpion firearm works?

A.  Yes.

          MR. LOCKARD:  The government offers Government

Exhibit 604 as an aid to the jury.

          THE COURT:  Any objection?

          MR. SCHULMAN:  No objection.

          THE COURT:  Received.

          (Government's Exhibit 604 received in evidence)

L3IKRAM3                        Fox – Direct

BY MR. LOCKARD:

Q.  With the assistance of Government Exhibit 604, could you

explain how that weapon works?

A.  Sure.

        Like I said, this is a machine pistol.  This one here

is only capable of firing semiautomatic.  This is a magazine.

You place the cartridges in the magazine, put the magazine in

the magazine well, slam it into place, make sure it's locked.

You pull back the handle, release the slide, the cartridge will

be placed in the -- into the chamber.  Now, for the most part,

guns operate the same way — you have a firing pin or a hammer,

and the cartridges all work the same way.  Once that primer is

struck, that explosion of gases force the bullet out of the

firearm.  But if this was the firearm in the photo here, if you

held down the trigger in automatic mode, it would just keep

firing, and depending on what type of magazine you have, this

can fire a very high rate of speed, probably higher rate of

speed than the M16.

        MR. LOCKARD:  Ms. Hurst, could we look at Government

Exhibit 203-107.  And also 203-110.

Q.  What kind of weapon is depicted in these photographs?

A.  The two weapons depicted here are pump action shotguns.

Q.  And is there a firearm next to you that you could use to

help explain to the jury how a pump action shotgun works?

A.  Yes.

L3IKRAM3                        Fox - Direct

1            MR. LOCKARD:  The government offers Government

2    Exhibit 611 as an aid to the jury.

3            MR. SCHULMAN:  No objection.

4            THE COURT:  Received.

5            (Government's Exhibit 611 received in evidence)

6    BY MR. LOCKARD:

7    Q.  Forensic scientist Fox, using Government Exhibit 611, could

8    you explain to the jury how a pump action shotgun works?

9    A.  Sure.

10           So, first of all, a shotgun doesn't fire a cartridge;

11   it fires what's called a shot shell or a -- which is

12   essentially a large -- a 12-gauge shot shell could fire small

13   BBs, or small wet balls.  The shotgun is good for once you fire

14   it, all those wet balls will scatter out of the firearm, so if

15   you're firing at something up close, you have a good chance of

16   hitting whatever you're firing at.

17           This is the pump action shotgun.  To load this, the

18   magazine on this type of weapon is in this tube right here.

19   So, you would load the live shot shells into this tube.  To

20   load this weapon, you bring the pump forward, and now it's

21   ready to be fired.  Once I press the trigger on the shotgun --

22   let me just make sure.  Once I press the trigger on the

23   shotgun, it's essentially like a semiautomatic firearm, I'd

24   have to reload it, though, but I manually reload it by pulling

25   this rearward and then forward.  Now it's loaded and ready to

L3IKRAM3                        Fox - Direct

1    be fired.  After firing that, and pulling back on that pump,

2    the cartridge is ejected from the chamber, and there's a feed

3    ramp here, so when it goes forward, at the feed ramp will be

4    another shot shell and place it into the chamber.

5              THE COURT:  How many cartridges?

6              THE WITNESS:  These can typically hold -- you can

7    modify the tube.  It can hold up to five, but, generally, it's

8    two to three.

9              THE COURT:  Thank you.

10             MR. LOCKARD:  Ms. Hurst, if we could look at

11   Government Exhibit 201-112 and also Government Exhibit 1108.

12   BY MR. LOCKARD:

13   Q.  Forensic scientist Fox, what types of weapons are shown in

14   these two pictures?

15   A.  These two pictures represent Glock semiautomatic handguns.

16   Q.  And is one of those a .10 millimeter?

17   A.  Yes.

18   Q.  Are you also familiar with the .9 millimeter Glock?

19   A.  Yes, I am.

20   Q.  Do you have firearms with you that you could use to help

21   explain to the jury how a Glock works?

22   A.  Yes.

23             MR. LOCKARD:  The government offers Exhibits 615 and

24   602 as aids to the jury.

25             MR. SCHULMAN:  No objection.

L3IKRAM3                         Fox - Direct

1          THE COURT:  Received.

2          (Government's Exhibits 615 and 602 received in

3  evidence)

4  BY MR. LOCKARD:

5  Q.  What is the difference between a .9 millimeter and a

6  .10 millimeter Glock?

7  A.  It's the caliber.  The .9 millimeter Glock is a smaller

8  caliber cartridge than a .10 millimeter.  So it's basically

9  just the caliber or the unit of ammunition that gun is designed

10 to fire.

11 Q.  Otherwise, they're substantially identical?

12 A.  They work exactly the same way.

13 Q.  So, using either one of those exhibits, can you describe

14 for the jury how a Glock handgun works?

15 A.  So, I'm using Exhibit 602.  This is a Glock .10 millimeter

16 semiautomatic pistol.  This is a magazine.  You load

17 .10 millimeter cartridges into the magazine, place it into the

18 magazine well, which is usually the grip of the firearm on the

19 semiautomatic handgun.  Now, the slide is rearward.  To load

20 this firearm with the magazine and the cartridges in place, you

21 release the slide, the slide goes forward, it takes a cartridge

22 and places it into the chamber.  This works the same exact way

23 as the previous weapons I told you.  I depress the trigger, the

24 firing pin in the slide, which is located right here, would

25 strike the back of the cartridge, hitting the primer, the

L3IKRAM3                          Fox - Direct

1    bullet travels out of the firearm, and all those gases force

2    the slide rearward.

3              Now, in the semiautomatic handgun, on the slide,

4    there's what's called an extractor and an ejector.  The

5    extractor is essentially like a hook that pulls the cartridge

6    out of the chamber, and now as the slide is going rearward, the

7    slide is pulling the cartridge out of the chamber, and it hits

8    what's called an ejector rod, and once it hits an ejector rod,

9    the cartridge is ejected from the firearm, generally three to

10   six feet to the right and back to the rear of whoever is firing

11   it, depending on how you're holding it.  The slide would then

12   go forward, the cartridge would be placed back into the

13   chamber, and we call that a cycle of fire of a semiautomatic

14   handgun.

15             THE COURT:  Is there a magazine that goes with that?

16             THE WITNESS:  Yes.

17             THE COURT:  And what does that hold?

18             THE WITNESS:  This is called a detachable box

19   magazine.

20             THE COURT:  No.  What does it hold?

21             THE WITNESS:  This particular magazine holds 15

22   cartridges.

23             THE COURT:  15?  Thank you.

24   BY MR. LOCKARD:

25   Q.  Can a Glock be modified with a selector switch?

L3IKRAM3                              Fox - Direct

1    A.   Yes.

2    Q.   What does it mean for a Glock to be modified with a

3    selector switch?

4    A.   A Glock actually has what's called a Glock sear or a Glock

5    selector switch.  So, on the back of the slide of this firearm,

6    there's what's called a back plate.  You would have to take

7    this back plate off, you would have to put that Glock switch in

8    replace of this back plate.  Now, once that switch is there,

9    there's -- like I said, there's mechanisms in this slide and in

10   the trigger assembly with the sear that only allowed to fire

11   semiautomatic.  Now, with that selector switch, it will be

12   protruding out of the back of the Glock.  Once you selected it

13   to automatic, it adjusts the sear for when you press the

14   trigger, that all you have to do is hold the trigger down, and

15   it deactivates the sear, so it allows the slide and the firing

16   pin just to go back and forth until it's out of ammunition.

17   Q.   And in a Glock that's been modified with the selector

18   switch, what would be the rate of fire with a single depression

19   of the trigger?

20   A.   If you had this 15 magazine -- 15-round magazine, and you

21   had that switch on automatic, you'd probably be able to empty

22   the magazine in five seconds, if that.

23   Q.   What are some of the advantages of a Glock .9 millimeter or

24   .10 millimeter?

25            THE COURT:  Keep your voice up, please.

L3IKRAM3                        Fox - Direct

1           MR. LOCKARD:  Yes, your Honor.

2      BY MR. LOCKARD:

3      Q.   What are some of the advantages of a Glock .9 millimeter or

4      .10 millimeter?

5      A.   The advantages are they're easily concealed.  They fire a

6      small round ammunition, but the round is big enough where it

7      could stop whatever you're shooting at.  But, generally, it's

8      for concealment, and it's generally used in, you know, private,

9      police and military.

10          MR. LOCKARD:  Ms. Hurst, could we see Government

11     Exhibit 907.

12     Q.   Forensic Scientist Fox, could you explain what's depicted

13     in this photograph?

14     A.   There's five different types of magazines.  Starting from

15     the left, the three magazines are just your typical detachable

16     magazines that come with the firearm.  The second one -- so the

17     longer detachable magazine, that's what's called an extended

18     magazine.  The purpose of that is that you can place that into

19     the Glock magazine well, and instead of holding 15 rounds a

20     magazine, it could hold 35 to 40.

21     Q.   And then what's on the far right?

22     A.   That's a drum magazine.  So, essentially, that allows you

23     to carry a large amount of cartridges at one time, anywhere up

24     from 50 up to a hundred.

25     Q.   Are there magazines next to you that you could use to help

L3IKRAM3                          Fox - Direct

1    explain to the jury how they work?

2    A.  Yes.

3            MR. LOCKARD:  The government offers Exhibits 605 and

4    606 as aids to the jury.

5            MR. SCHULMAN:  No objection.

6            THE COURT:  Received.

7            (Government's Exhibits 605 and 606 received in

8    evidence)

9    BY MR. LOCKARD:

10   Q.  So, beginning with the extended magazine, could you explain

11   the features of that and its advantages?

12   A.  Oh, this is an extended magazine.  The regular detachable

13   magazines hold 15 rounds.  This holds 30 rounds.  And you place

14   the magazines in from the top.  The advantage of this is

15   obvious — you get to carry more -- you give your gun the

16   capability of firing more ammunition than having normal

17   magazines, and you're still able to conceal the firearm with

18   the extended magazine, but it just gives you more ammunition.

19   Q.  And then the drum magazine?

20   A.  So, this drum magazine, this allows you to fire 50 rounds

21   of .9 millimeter ammunition.  So you load the cartridges at the

22   top, and they basically just go around in a circle.  The

23   obvious advantages for this is that you get to hold a lot of

24   ammunition without reloading.  The disadvantage would be that

25   this would be very hard to conceal on your body if you were

L3IKRAM3                         Fox - Direct

1    trying to conceal a handgun.

2    Q.  In the instance of a modified Glock with a selector switch

3    set to automatic mode, how long would it take to fire the

4    contents of a drum magazine?

5    A.  So, if you had, let's say, ten of these magazines, so it

6    would be 500 rounds, you could easily fire that in a minute.

7           MR. LOCKARD:  Ms. Hurst, could we look at Government

8    Exhibit 203-106.

9    Q.  What type of weapon is shown in this photograph?

10   A.  That's a Beretta semiautomatic pistol with an extended

11   magazine.

12   Q.  Do you have a firearm with you that will help to explain to

13   the jury how the Beretta works?

14   A.  Yes.

15          MR. LOCKARD:  The government offers Exhibit 603 as an

16   aid to the jury.

17          MR. SCHULMAN:  No objection.

18          THE COURT:  Received.

19          (Government's Exhibit 603 received in evidence)

20          Now, if you notice the trigger on this type of

21   firearm, right now, it's in double action mode.  If I put the

22   hammer rearwards and lock it into place, the trigger moves

23   backwards.  So, the advantage to that is all I have to do is

24   lightly press the trigger, and the firearm goes off.  So, it's

25   less trigger pull, which means you're not pulling on the gun as

L3IKRAM3                          Fox - Direct

1    heavy, so the gun is more accurate.

2              This firearm also has a safety, so if I had the hammer

3    in the rearward position, and I didn't want to fire it, I would

4    just hold the safety down, and the hammer would go forward.

5    That wouldn't fire the weapon, but now it's safe to be fired,

6    and I can press the trigger all I want, and it won't go off.

7    But to fire this the same exact way, you place the magazine in

8    the magazine well, rearward, the slide, then forward, and this

9    works the same exact way as the Glock semiautomatic handgun.

10             THE COURT:  How many millimeter ammunition?

11             THE WITNESS:  This is a .9 millimeter.

12   BY MR. LOCKARD:

13   Q.  And in the photograph, you said it appears that this

14   Beretta has an extended magazine?

15   A.  Yes.

16   Q.  Approximately how many rounds of ammunition would an

17   extended magazine like this hold?

18   A.  Anywhere from 20 to 30.

19             MR. LOCKARD:  Ms. Hurst, could we please look at

20   Government Exhibit 201-114 and 201-111.

21   Q.  Forensic Scientist Fox, what types of weapons are shown in

22   these two photographs?

23   A.  Both firearms represented in these photos are CZ, which is

24   a gun manufacturer, semiautomatic handguns.

25   Q.  And do they work in the same manner as you've described

L3IKRAM3                        Fox - Direct

1    with the Glock and the Beretta?

2    A.  Yes, they do.

3              MR. LOCKARD:  Could we look at Government

4    Exhibit 1113, please.

5    Q.  So, Forensic Scientist Fox, could you describe what types

6    of items are shown in this photograph?

7    A.  So, all the items that are shown in this photograph, we

8    already showed how they worked and what they represented.  So

9    in the very top portion of that picture is what's called a

10   ballistic vest.  That vest stops -- acts like a bulletproof

11   resistant vest, so if you get hit with that vest, hopefully it

12   will stop the bullet.  It also has pockets where you hold

13   magazines and other type of firearm-related equipment.  Then

14   you have multiple size magazines for multiple calibers.

15             Next to the -- below the vest, there's four magazines,

16   all different sizes.  Those are designed to be held in an AR-15

17   type rifle.  The picture on the right appears to be an AR-15

18   type rifle with a drum magazine.  Like I said, the drum

19   magazine allows it to hold a lot of ammunition without you

20   having to reload that firearm.

21             Then you have two firearms depicted.  One is a Glock,

22   one is a Beretta.  They're both semiautomatic handguns.  And

23   around them are the different types of magazines.  Obviously,

24   you see the extended ones and the regular detachable ones.

25   Obviously, the extended magazines give you the advantage of not

L3IKRAM3                        Fox - Direct

1    having to reload as fast as you would with a regular magazine.

2    Q.  Does it appear that there's ammunition in some of those

3    magazines?

4    A.  It appears there are, yes.

5    Q.  Looking at the AR-15 style weapon on the top right, now,

6    are you able to determine, from this photograph, whether that

7    AR-15 has been modified or not?

8    A.  I'm not able to tell based on the photo.

9    Q.  In a modified AR-15, what would the rate of fire be, and

10   how long would it take to fire the contents of a drum magazine?

11   A.  If you had multiple drum magazines, you could fire 600

12   rounds a minute with that type of firearm.

13          MR. LOCKARD:  Ms. Hurst, could we look at Government

14   Exhibit 612, please.  I'm sorry, 613.  My mistake.  There we

15   go.

16   Q.  So, Forensic Scientist Fox, what type of weapon is shown in

17   this photograph?

18   A.  That's an M79 grenade launcher that is designed to shoot

19   .40 millimeter grenades.

20   Q.  Do you have a weapon next to you that you could use to help

21   explain to the jury how a .40 millimeter grenade launcher

22   works?

23   A.  Yes.

24          MR. LOCKARD:  The government offers Exhibit 608 as an

25   aid to the jury.

1         MR. SCHULMAN:  No objection.

2         THE COURT:  All right.  Received.

3         (Government's Exhibit 608 received in evidence)

4    BY MR. LOCKARD:

5    Q.  So, using Exhibit 608, could you explain to the jury how

6    the grenade launcher works?

7    A.  So, the grenade launcher would work the same exact way as

8    any type of firearm.  The .40 millimeter grenade is essentially

9    a huge bullet that, upon impact, will explode like an explosive

10   device.  It's effective up to 400 to 500 yards.  It's designed,

11   obviously, as a handheld grenade launcher.  You'd place the

12   .40 millimeter grenade in the barrel, or the tube, you'd lock

13   it in place.  So this type of firearm, the way I loaded it,

14   this is what's called a top brake weapon.  So, once I fired

15   this weapon, the only way for me to get that grenade out of

16   this tube would be to pull that silver, and it would pop out.

17   Then I'd place another one in it and lock it into place.  Now

18   it's ready to be fired.  I point to whatever I want to fire it

19   at, I press the trigger, the firing pin would strike the back

20   of the .40 millimeter grenade, which has a firing pin, the

21   firing pin would ignite the propellant, release the grenade

22   from the grenade housing, so to speak, which is like a large

23   shot shell at that point or a cartridge.  Once it's flying out

24   of the firearm, if it was, in fact, a grenade, it would

25   detonate upon impact of whatever it hit.

L3IKRAM3                         Fox - Direct

1   Q.   What is the grenade launcher manufactured for?

2   A.   It's designed for military use.  It was designed back in

3   the 1960s.  It was used a lot in Vietnam.  It's designed for

4   special operations and special forces to have a lightweight

5   weapon that's capable of destroying, you know, possibly small

6   vehicles, small armored vehicles, or firing it into a position

7   with multiple targets.

8            MR. LOCKARD:  May I have one moment, your Honor?

9            THE COURT:  Yes.

10           (Pause)

11           MR. LOCKARD:  No further questions.

12           THE COURT:  All right.  Ladies and gentlemen, we'll

13   take our lunch break.  We'll be back at 1:45.  Please do not

14   discuss the case among yourselves or with anyone.  Enjoy, and

15   see you soon.

16           (Continued on next page)

17

18

19

20

21

22

23

24

25

L3IKRAM3                          Fox - Direct

1              (Jury not present)

2              THE COURT:  Please wait for our jurors to clear the

3     floor before exiting the courtroom.

4              So, how much time does the government think it wants

5     for its initial summation?

6              MR. LOCKARD:  The government would request an hour and

7     a half, if not less.

8              THE COURT:  All right.  And for its rebuttal?

9              MR. GUTWILLIG:  Thirty minutes, your Honor, if not

10    less.

11             THE COURT:  And Mr. Moskowitz?

12             MR. MOSKOWITZ:  I expect, Judge, that I can cover it,

13    maximum, an hour and a half.  I don't think I'll be that long.

14             THE COURT:  Thank you.

15             All right.  Ponder this over lunch.  Thank you.

16             Flo, when we get the all-clear --

17             THE DEPUTY CLERK:  Okay.

18             THE COURT:  Thank you.

19             (Luncheon recess)

20

21

22

23

24

25

L3IHRAM4                          Fox – Cross

                            AFTERNOON SESSION

1                                1:00 p.m.

2

3              (In open court; jury present)

4              THE COURT:  Welcome back.

5              Mr. Schulman, whenever you're ready.

6              MR. SCHULMAN:  Thank you, your Honor.

7              MR. SCHULMAN:  May I proceed?

8              THE COURT:  Yes.

9    JONATHAN FOX, resumed.

10   CROSS-EXAMINATION

11   BY MR. SCHULMAN:

12   Q.  Good afternoon.

13   A.  Good afternoon.

14   Q.  Sorry, we're a little obstructed over here.

15   A.  I can move over.  Sorry.

16   Q.  None of the guns that you demonstrated today were seized

17   from Geovanny Fuentes Ramirez, is that right?

18   A.  That's correct.

19   Q.  In fact, you were not provided with any weapons that were

20   seized from Geovanny Fuentes Ramirez, right?

21   A.  That's correct.

22   Q.  All of the guns that you demonstrated with and you worked

23   with today came from a government repository, right?

24   A.  That's correct.

25   Q.  Directing your attention to the photos that you were shown

L3IHRAM4

1   on the screen earlier this morning, do you know whose weapons

2   they were?

3   A.   I do not.

4   Q.   Do you know whose phones those images came from?

5   A.   I do not.

6            MR. SCHULMAN:  That's all I have, Judge.  Thank you.

7            THE COURT:  All right.  Redirect?

8            MR. LOCKARD:  No, your Honor.

9            THE COURT:  OK.  You may step down.

10           THE WITNESS:  Thank you, your Honor.

11           (Witness excused)

12           THE COURT:  Government may call its next witness.

13           MR. LOCKARD:  At this time the government rests.

14           THE COURT:  All right.  Mr. Moskowitz, you may

15  proceed.

16           MR. MOSKOWITZ:  Your Honor, I think there's things

17  that need to be done --

18           THE COURT:  At the sidebar?  That's fine, absolutely

19  fine.  Let's do that.

20           And, ladies and gentlemen, you can stand up and

21  stretch.

22           (Continued on next page)

23

24

25

L3IHRAM4

1    (At sidebar)

2    MR. MOSKOWITZ:  At this time, your Honor, the defense

3 moves for -- pursuant to --

4    THE COURT:  I can hear you.

5    MR. MOSKOWITZ:  Pursuant to Rule 29 for a motion for

6 verdict of acquittal.  I know the standards, but I do want to

7 make one specific argument, Judge.

8    The indictment in this case was returned in May of

9 2020.  There is not a single piece of evidence of anything that

10 Mr. Fuentes did after 2013.  Maybe, maybe there's something in

11 2014, but there is certainly nothing in this record reflecting

12 any illegal activity by Mr. Fuentes in the statute of

13 limitations period.

14    THE COURT:  OK.

15    MR. LOCKARD:  Your Honor, the evidence does include

16 evidence of overt acts in furtherance of the conspiracy after

17 the date of March 2015, which I think is the date the

18 indictment -- five years prior to the returned indictment,

19 including, for example, communications relating to

20 investigations of the murders of Mr. Fuentes' bodyguards which

21 evidence shows were individuals involved in drug trafficking,

22 including communications about efforts to defeat law

23 enforcement surveillance and other coconspirators' statements

24 within the statute period.

25    THE COURT:  Mr. Moskowitz.

MR. MOSKOWITZ: Your Honor, the efforts to obtain records by Mr. Fuentes were efforts by a defendant facing charges in a criminal case in a foreign country, asking people that he knew in Honduras to try to help him get records to defend himself in this case. There's nothing illegal about that. Even if you -- even if you went to law enforcement contacts that he knew -- I mean, if I knew a police officer and I asked him for help to get records in a case, police officer says I can or I can't, but the request itself is not illegal.

Excuse me. I'm having a little difficulty.

THE COURT: Sure.

MR. MOSKOWITZ: The communication with Police Officer Martinez is also -- there's nothing illegal about checking whether or not your phone was being surveilled. That could be for a lot of different reasons, and there's no evidence that it had anything to do with this particular case.

THE COURT: All right. Well, here is another question. Just as a matter of black letter law, apart from the evidence in this case for the moment, if a person is found to have joined a conspiracy, is there not a presumption that the membership continues unless and until there is an affirmative act of withdrawal?

MR. MOSKOWITZ: The question for the Court, I think -- yeah, the answer is as a matter of black letter law, that would be correct. If the government had put in any evidence of

L3IHRAM4

1    criminal activity by coconspirators in 2015, that may be an

2    argument, but there is none of that in this case.

3              THE COURT:  I hear what you're saying.

4              OK.  What I'm going to do at this juncture, I'm

5    denying the motion but subject to renewal, if necessary, in a

6    Rule 29 motion after verdict.

7              MR. MOSKOWITZ:  Understood.

8              THE COURT:  All right.  Now, Mr. Moskowitz, one other

9    thing.  Have you explained to your client that he has a right

10   to testify even if his lawyer objects or tells him it's a bad

11   idea?  He still has a right to testify.

12             MR. MOSKOWITZ:  We've had quite a few conversations on

13   this subject, most recently yesterday when we discussed it, and

14   I gave him my advice.  I told him -- I explained it to him,

15   with the assistance of the interpreter, and so, yes, he is well

16   aware of the fact that he has the right to testify.  And he and

17   I have made the decision jointly that he does not want to

18   testify.

19             THE COURT:  All right.  Thank you.

20             MR. MOSKOWITZ:  There is one other matter.  Excuse me.

21             THE COURT:  Take your time.

22             MR. MOSKOWITZ:  Sometimes it's harder than others.

23             The government and the defense are in the process of

24   working out a stipulation with respect to a couple of prior

25   inconsistent statements, and because of that, I don't want to

L3IHRAM4

1    rest in front of the jury at this point.  What I would suggest

2    that we do is that we can offer that stipulation in the

3    morning --

4                THE COURT:  Right.

5                MR. MOSKOWITZ:  -- before summations, rest then, and

6    go into summations.

7                THE COURT:  I think a way to do this, and probably an

8    appropriate way, particularly because I propose to send the

9    jury home, is for you to rest subject to the matters raised at

10   sidebar.

11               MR. MOSKOWITZ:  OK.  That's fine.

12               THE COURT:  All right.  Then I will explain to the

13   jury that there may be some stipulations, but other than that,

14   the evidence is in, etc.

15               MR. MOSKOWITZ:  Is it your Honor's practice to voir

16   dire the defendant on the right to testify?

17               THE COURT:  I usually do.

18               MR. MOSKOWITZ:  I see some judges do that.  That,

19   obviously, would have to be done outside the presence of the

20   jury.

21               THE COURT:  I mean, based on your representation that

22   you have discussed this, is there any doubt in your mind

23   that --

24               MR. MOSKOWITZ:  Absolutely not.

25               THE COURT:  -- the defendant understands that he has

L3IHRAM4

 1    the right, even if his lawyer tells him it's a very bad idea or

 2    you can't do it, he knows he can do it?

 3              MR. MOSKOWITZ:  I have absolutely no doubt.

 4              THE COURT:  That he understands it?

 5              MR. MOSKOWITZ:  That he understands that.

 6              THE COURT:  Thank you.

 7              All right.  That's sufficient as far as I'm concerned.

 8    Any question from the government?

 9              MR. LOCKARD:  No, your Honor.

10              THE COURT:  OK.  Thank you.

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (In open court; jurors present)

2      THE COURT:  Mr. Moskowitz.

3      MR. MOSKOWITZ:  Your Honor, at this time, subject to

4  the issues raised at sidebar, the defense rests.

5      THE COURT:  All right.  Mr. Fuentes Ramirez, you heard

6  what your lawyer said.  Is that acceptable to you?

7      THE DEFENDANT:  Yes, your Honor.

8      THE COURT:  Thank you.

9      Ladies and gentlemen, there may be tomorrow morning a

10  written stipulation or two that may be entered into the record,

11  but with that, the evidence in this case is closed.  That does

12  not mean the case is over.  What happens now?  Well, we're

13  going to start closing arguments tomorrow morning, all right,

14  and I expect that we will get through closing arguments and the

15  Court's final instructions to you midafternoon tomorrow, and

16  then you will be able to deliberate, discuss the case among

17  yourselves.

18      As I told you once before, once you're in the

19  deliberation mode, you have much more flexibility.  You can

20  leave earlier, as long as you let me know what you're doing;

21  you can stay longer, as long as you let me know what you're

22  doing.  We will accommodate you.  That's the way it's going to

23  work.  But we'll, of course, have your lunch and everything for

24  you.  So that's basically the process, and at that point, and

25  only at that point, would you be able to discuss the case among

L3IHRAM4

1    yourselves.

2            So that's where we are, and I will see you tomorrow

3    morning bright and early for a 9:30 start.  In fact, let me

4    ask, is there anyone who would have difficulty if we started

5    tomorrow at 9:00 o'clock?

6            Mr. Moskowitz would.

7            MR. MOSKOWITZ:  Yes, just because of the train

8    schedules, Judge, it would be very difficult for me.

9            THE COURT:  What would be the earliest?

10           MR. MOSKOWITZ:  Judge, I would push trying to get here

11   by 9:00, but I may be a few minutes late.

12           THE COURT:  Quite seriously, if you tell me I can

13   comfortably be here about 9:15, we'll make it 9:15.

14           MR. MOSKOWITZ:  I can be here by 9:15 for sure.

15           THE COURT:  So let's say that.  Is that difficult for

16   anybody?  If not, let's start at 9:15 tomorrow morning.  And as

17   I've said to you all along, keep an open mind.  Do not discuss

18   the case among yourselves or with anyone.  Remember, this is

19   going to be the attorneys' opportunity to sum up to you, to

20   tell you what they believe the evidence showed or didn't show,

21   all right?  The lawyers' arguments to you are not evidence.

22   And if any lawyer states a fact that is different from your

23   recollection of the facts, it's your recollection that

24   controls.

25           All right.  Also, I have instructed the lawyers as to

L3IHRAM4

1    the law that I will be giving to you, my final instructions,

2    and they are permitted to say something along the lines of "I

3    expect that the Court will instruct you that," OK?  If one of

4    the lawyers happens to say that, that's saying it with my

5    blessing, with this important qualification.  If any lawyer

6    states a principle of law different than what I tell you in my

7    final instructions, it's my final instructions that you must

8    follow, not the lawyer's version of what the law is, even if he

9    says, "I expect that the judge will instruct you."  If I don't

10   instruct you on that or I give you a different instruction,

11   you'll follow my instruction.  You understand that.

12            At times a lawyer might be tempted to say, "Well,

13   that's not how I remember the evidence," in the middle of

14   another lawyer's closing argument or "That's a

15   mischaracterization" or "That's not the evidence."  Well, you

16   may hear me say if that happens -- I'm not saying it will

17   happen.  I don't know what's going to happen, but if something

18   like that happens, I might say:  Ladies and gentlemen, as I've

19   told you before, it's your recollection of the evidence that

20   controls, and if any lawyer states a fact which is not as you

21   remember it in the evidence, it's your recollection.  And of

22   course, if necessary, we have the transcript of the

23   proceedings, and we can call you back into the courtroom and

24   have the transcript read for you if necessary.

25            You will have during deliberations the electronic

L3IHRAM4

1    exhibits received into evidence, and Flo will make sure that

2    the jurors find out how they access this.  I gather there will

3    be a thumbnail with all -- thumb drive with all the received

4    exhibits that will be loaded onto the jurors' computer

5    downstairs.

6          All right.  So with that, have a pleasant afternoon

7    and evening.  See you tomorrow for a 9:15 start, which means

8    get here a little bit earlier than that.  Thank you very much,

9    ladies and gentlemen.

10          (Jury excused)

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Jury not present)

2          THE COURT:  OK.  A few words on the work that remains

3  to be done.  So the government has to prepare this thumb drive

4  that's capable of being loaded on the computer downstairs.

5  Please make sure that you've cleared things with Mr. Moskowitz

6  so that there are no surprises here; that he knows what's on

7  that thumb drive.  That's number one.

8          It's not my practice generally to read an indictment,

9  but with the proper instruction that an indictment is not

10  evidence, it's just the accusation, etc., I will ask the

11  government to have 12 copies -- well, actually, one to be

12  marked as a court exhibit, one for Mr. Moskowitz, and 12 for

13  the jurors.  And also to get Mr. Moskowitz, Mr. Schulman a copy

14  of the verdict sheet.  You should be able to do that tonight so

15  they see it and then have an appropriate number of copies of

16  them, one for each juror, recognizing that only one is going to

17  be signed and returned by the foreperson of the jury.

18          I think that's all we need on mechanics.  And I think

19  that with great care -- in fact, I'm going to leave this to the

20  district executive's office to move the podium forward so

21  you'll be closer to the jury, if that's what everybody's

22  preference would be.  I assume it is.  So let's see.

23          (Discussion off the record)

24          THE COURT:  All right.  Anything else?

25          MR. MOSKOWITZ:  Your Honor, I know that we had

L3IHRAM4

1  previously signed off on the charge, but in light of the

2  discussion at sidebar, I would ask the Court to add a statute

3  of limitations charge, which I think is appropriate under the

4  circumstances.  I know it's been a while, but I know that Judge

5  Sand in his instructions had one, and I have no objection to

6  that.  I believe -- I could be wrong, Mr. Lockard -- but I

7  think the indictment was returned in May.  I know because I was

8  litigating the speedy trial issue on this matter early on in

9  the case with AUSA Tarlow when we were trying to get the case

10  indicted.

11          THE COURT:  All right.  I think that will be the easy

12  part of the puzzle.  And this is what I want to make plain.  We

13  will take a look at Sand and Siffert, but the government and

14  defense is also invited to submit anything they wish to on the

15  issue, but it's going to have to be done -- you know, it's

16  2:18.  We're going to have to get it by 5:30 this afternoon,

17  and we will take a look at it.

18          All right.  That's it.  Without that, I think we're

19  adjourned.  Let me just see when the indictment was returned

20  against this defendant.  I have an S6 filed on June 3, 2020.  I

21  don't know if there's one before that.

22          MR. MOSKOWITZ:  That's sounds right, Judge.

23          THE COURT:  All right.  OK.  So that's what we have.

24  See you all tomorrow morning.  Thank you.

25          (Adjourned to March 19, 2021, at 9:15 a.m.)

1                            INDEX OF EXAMINATION

2      Examination of:                               Page

3      SANDALIO GONZALEZ

4      Cross By Mr. Schulman . . . . . . . . . . . 926

5      Redirect By Mr. Gutwillig . . . . . . . . . 988

6      JONATHAN FOX

7      Direct By Mr. Lockard . . . . . . . . . . . 996

8      Cross By Mr. Schulman . . . . . . . . . . .1022

9                           GOVERNMENT EXHIBITS

10     Exhibit No.                              Received

11      321   . . . . . . . . . . . . . . . . . . 994

12      401-2, 401-25, 401-26, 401-TR, and  . . . . 995

13            401-24-R

14      601   . . . . . . . . . . . . . . . . . . .1001

15      604   . . . . . . . . . . . . . . . . . . .1006

16      611   . . . . . . . . . . . . . . . . . . .1008

17      615 and 602   . . . . . . . . . . . . . . .1010

18      605 and 606   . . . . . . . . . . . . . . .1014

19      603   . . . . . . . . . . . . . . . . . . .1015

20      608   . . . . . . . . . . . . . . . . . . .1019

21                           DEFENDANT EXHIBITS

22     Exhibit No.                              Received

23      D   . . . . . . . . . . . . . . . . . . . 932

24

25