L3JHRAM1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        15 CR 379 (PKC)

 5   GEOVANNY FUENTES RAMIREZ,

 6                Defendant.              Trial

 7   ------------------------------x

 8                                        New York, N.Y.
                                          March 19, 2021
 9                                        9:20 a.m.
10   Before:

11                  HON. P. KEVIN CASTEL,

12                                        District Judge
                                          and a jury

13                       APPEARANCES

14   AUDREY STRAUSS,
          United States Attorney for the
15        Southern District of New York
     MICHAEL LOCKARD
16   JACOB GUTWILLIG
          Assistant United States Attorneys
17
     AVRAHAM CHAIM MOSKOWITZ
18   EYLAN SCHULMAN
          Attorneys for Defendant
19
     Also Present:
20
     Gabriel Mitre, Interpreter (Spanish)
21   Sonia Berah, Interpreter (Spanish)
     Brian Fairbanks, DEA Agent
22

23

24

25
```

L3JHRAM1

1                    (Trial resumed; jury not present)

2                    THE COURT:  Good morning.  Four things I want to

3        address with you, and I'm going to start with the easiest.

4                    So marked as Court Exhibit 11 are the final jury

5        instructions.  Court Exhibit 12 are the marked to show changes

6        pages.  So that's easy one number one.

7                    Number two, I spent time yesterday with regard to

8        moving the lawyers' podium.  I discovered it can't be moved.

9        What I can offer you -- and I have the AV person in the room

10       here -- is we could set up a podium proximate to the jury box,

11       but there is a distinct disadvantage.  You'd have to wear your

12       mask.

13                   Number three, if you wanted to, you could -- another

14       alternative, you could deliver your closing argument from the

15       witness box, but I present that to you.  If you have a

16       preference other than delivering it from the lawyer podium that

17       is presently set up in the courtroom, speak now.

18                   All right.  There is no request for the alternate

19       podium, so I thank you, William, for being with us this

20       morning.

21                   MR. JARRETT:  Thank you, your Honor.

22                   THE COURT:  What?  Hello?  Did somebody say something?

23       No.  OK.  Thank you.

24                   All right.  The next issue is the statute of

25       limitations.  I took a look at it at the suggestion and at the

L3JHRAM1

request and on the application of the defendant yesterday.  The

charges, the three counts in the indictment, are subject to

Section 3582's five-year statute of limitations.  That is the

starting point.  However, the conspiracy charged in Counts One

and Three do not require proof of an overt act.  You can take a

look at *Shabani*, 513 U.S. 10, and *Grammatikos*, 633 F.2d 1013.

Conspiracy is a continuing offense, and that's true for the two

conspiracies charged.  Where a conspiracy statute does not

require proof of an overt act and the indictment alleges a

conspiracy that contemplates a continuity of purpose and a

continued performance of acts, and the government has

introduced sufficient evidence to show that such a conspiracy

existed, the conspiracy is presumed to exist until there is an

affirmative showing that it has been terminated.  And where the

government has presented sufficient evidence to show a

conspiracy that has continuing purposes or goals, the burden is

on the defendant to prove that the conspiracy was terminated,

which is usually demonstrated by showing that the goals of the

conspiracy were accomplished in some final manner or that he

took affirmative steps to withdraw.

So as continuing offenses, the indictment was timely

returned within five years from the period of time that the

conspiracy was alleged to have continued to.  In fact, the

grand jury has charged that the conspiracy existed from in or

about 2009, up to and including in or about 2020, and the

L3JHRAM1

1  indictment was filed on the public docket on June 3, 2020.

2           Now, turning to the next issue, the defendant's letter

3  last evening from Mr. Schulman with regard to the 900 and 1100

4  series of exhibits and the argument that there has to be

5  evidence that the defendant's son, who I'll refer to as

6  Mr. Gutierrez, Geovanny Daniel Gutierrez, was a member of the

7  conspiracy for his hearsay statements to be admissible as

8  coconspirator's statements.  Mr. Schulman is correct in that

9  regard.

10          Now, when faced with a question of either relevance or

11 connection or other preliminary questions, they are decided by

12 the Court on a preponderance of the evidence standard.  And the

13 question the Court asked itself is whether a jury could

14 reasonably find the fact by a preponderance of the evidence.

15 Here, there certainly was evidence from Rivera that there was a

16 conspiracy and that defendant was a member of that conspiracy

17 and certain other persons, not including Mr. Gutierrez, were

18 members of that conspiracy.  Evidence seized from the iCloud

19 and Instagram accounts of Gutierrez included photographs.

20 Photographs are not statements.  They're physical evidence.  So

21 cash and photographs of cash are both physical evidence.  The

22 fact that something is a photograph of cash goes to weight as

23 distinguished from cash itself, but the photographs show the

24 defendant in a bulletproof vest and a Honduran military beret,

25 the defendant and Gutierrez wearing -- or the defendant and

L3JHRAM1

1    Gutierrez together with Gutierrez wearing a Honduran National

2    Police hat.  This is in the context of testimony from other

3    sources about the defendant co-opting and purchasing the

4    nonintervention and cooperation of the Honduran police force as

5    well as the military, pictures of Gutierrez and Juan Orlando

6    Hernandez, pictures of Commissioner Martinez and Juan Orlando

7    Hernandez, and pictures of firearms and bulk quantities of

8    currency.

9          Now, as in many or most drug conspiracy cases, some of

10   these items could have an innocent explanation, all right, of

11   that is used for -- could be used for cooking a drug product,

12   could also be used to bake bread or to grind coffee beans, or

13   the like, or other products.  It doesn't mean that it can't be

14   a tool of the trade.  But in combination these physical items

15   of evidence, i.e., photographs of cash, bulletproof vests,

16   presence with other persons who from other evidence were shown

17   to be members of the conspiracy, photographs of firearms, all

18   together weave together to place Mr. Gutierrez in the

19   conspiracy.

20         Now, when you look at his statements -- and I can

21   consider his statements in the context of the overall decision.

22   I can't base it entirely on statements, and I haven't -- but

23   the statements further demonstrate this, including identifying

24   or using the word *sapo*, or frog, which is a pejorative to

25   identify a snitch.  This makes it even more persuasive.

L3JHRAM1

1          So I conclude that the statements made by

2   Mr. Gutierrez were during and in furtherance of the conspiracy

3   and are admissible under 801(d)(2)(E), or because of their

4   unavailability and the fact that the statements would prove

5   Gutierrez's and Martinez's guilt, they would be admissible

6   under 804(b)(3) alternatively.  So that evidence stands, and

7   the motion to strike the evidence is denied.

8          At this point, unless there's anything further, I

9   propose to bring our jurors up.

10          Garrett, can you make that happen.  They're here?  OK.

11          (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3JHRAM1

1          (Jury present)

2          THE COURT:  Good morning, ladies and gentlemen.  Thank

3   you all for being here.  As I told you yesterday -- I'm just

4   going to repeat this briefly -- this is the opportunity for the

5   lawyers to sum up and tell you what they believe the evidence

6   shows.

7          By the way, was there a stipulation or some matter,

8   preliminary matter?  Go ahead, Mr. Moskowitz.

9          MR. MOSKOWITZ:  Yes, your Honor, if I may.

10          THE COURT:  Yes.  My apologies.

11          This was the additional housekeeping matter that I

12   said we would -- that Mr. Moskowitz could take up.

13          Go ahead.

14          MR. MOSKOWITZ:  Good morning, your Honor.

15          THE COURT:  And this is evidence, not argument right

16   now.

17          MR. MOSKOWITZ:  There's a stipulation between the

18   parties that reads as follows:

19          It is hereby stipulated and agreed by and between the

20   United States of America by Audrey Strauss, United States

21   Attorney, Jacob Gutwillig and Michael Lockard, Assistant United

22   States Attorneys, and Geovanny Fuentes Ramirez, by and through

23   his attorneys, Avraham Moskowitz and Eylan Schulman, that

24   Government Exhibit 15 reflects notes taken by one of the

25   participants at a meeting between Assistant United States

L3JHRAM1

1    Attorney Emil J. Bove III, DEA Special Agent Evan Martinez,

2    Devis Leonel Rivera Maradiaga, and a Spanish-language

3    interpreter on or about August 20, 2015.

4           Two, on or about October 25, 2019, Jose Sanchez, his

5    immigration attorney, FBI Washington field office agents Justin

6    Holgate and Steve Weatherhead, U.S. Department of Justice's

7    Narcotics and Dangerous Drug section trial attorney Anthony

8    Aminoff, and a Spanish-language interpreter met.  Notes of that

9    meeting taken by one of the participants state, among other

10   things:  That a drug lab in Cerro Negro "was raided by Honduran

11   forces working with the DEA in March 2015" and that "one of the

12   conversations overheard between President Hernandez and Fuentes

13   took place three weeks after the raid and involved the

14   president offering Fuentes help to reopen the lab."

15          Paragraph 3, Government Exhibit 15 and this

16   stipulation, Government Exhibit 1009, may be received in

17   evidence at trial.

18          And then, your Honor, if the Court -- with the Court's

19   permission, I'd ask Ms. Hurst to put Government Exhibit 15 up

20   on the board for the jury.

21          THE COURT:  Permission granted.

22          By the way, you're offering the stipulation?

23          MR. MOSKOWITZ:  Offering the stipulation.

24          THE COURT:  And the exhibit?

25          MR. MOSKOWITZ:  And the exhibit.

L3JHRAM1

1          THE COURT:  Any objection?

2          MR. MOSKOWITZ:  I may have misspoken.  I think I said,

3   just going back to paragraph 2, the date of the raid that was

4   quoted in the stipulation was March 2014.  I think I got that

5   right, but I could have misspoken.

6          THE COURT:  OK.  Any objection to the stipulation and

7   the exhibit?

8          MR. LOCKARD:  No, your Honor.

9          THE COURT:  They are received into evidence.

10          (Government's Exhibits 15 and 1009 received in

11   evidence)

12

13          THE COURT:  Again, the stipulation is what and the

14   exhibit is what number?

15          MR. MOSKOWITZ:  The stipulation is 1009.

16          THE COURT:  Yes.

17          MR. MOSKOWITZ:  The exhibit is 15.

18          THE COURT:  Thank you.  They're received.

19          Go ahead, you may publish.

20          Mr. Moskowitz, what I would suggest is, number one,

21   the exhibit, the two exhibits -- oh, here it is.  Here we are.

22   Good.  Thank you, Garrett.

23          MR. MOSKOWITZ:  OK.  There we go.  It's relatively

24   short, so I'm going to just go through it with the jury, your

25   Honor.

L3JHRAM1

1          Bullet number one reads:

2          "Metro is Ruben Santos' cousin's stepbrother.  Metro

3    introduced LR to Lopez Mejia, comisario, who helped LR find

4    sicarios to kill Coqui.

5          "Two, Metro helped with transportation for Cachiros.

6    On a few occasions, Metro would coordinate with police, such as

7    Avila, Mejia Vargas, LZ.

8          "Metro paid Vaquero to kill Pluto.  Pluto was a

9    trafficker who was to receive a plane in Roatan.  Military

10   tried to interdict.  Pluto called LR and got plane diverted to

11   Olancho.  And the pilots, one male, one female, died landing

12   the plane.

13         "In 2010 or 2011, Metro stopped working with Cachiros

14   as much but was still friendly.  Metro started working with

15   Yuca and then some other Colombians.  Valladares, (attorney and

16   former police officer) told LR that Metro killed the policeman

17   in Choloma.  Metro was telling them Cachiros did the murder.

18         "LR called Metro and asked why he was killing people

19   and blaming Cachiros.

20         "Metro had a partner, Geovanny Fuentes.  In Gomoa,

21   Cortes, a mini lab was interdicted.  Metro told people the lab

22   was Cachiros.

23         "LR also heard that Metro was starting to try to

24   have" --

25         THE COURT:  It says "head."  You can argue whatever

L3JHRAM1

1    you want, but it says "head."

2             MR. MOSKOWITZ:  Where was I?

3             "LR also head that Metro was starting to try to have

4    LR killed.

5             "LR met with Metro and things calmed down for a while,

6    but then Vaquero told LR that after the meeting Metro told

7    Vaquero M would pay V 100K to kill LR.  LR asked V if he had

8    people to kill Metro, and V agreed.

9             "V told LR that Metro was sleeping in a house and that

10   V and others disguised as police went in and killed Metro.  V

11   said that Metro shot at them as they entered, and that V killed

12   another person who was there.

13            "LR paid about 30K.

14            "On his own, Vaquero tried to kill Geovanny Fuentes.

15   V said he was at a horse race and killed someone, and GF called

16   the police.  Vaquero went to jail 2-3 years.  After V was

17   released and V killed Metro, V tried to kill GF.  V told LR

18   that he went into GF's security firm and started shooting at

19   GF.  V said that GF was not injured."

20            That's the --

21            THE COURT:  All right.  Thank you.

22            All right.  And with that, the defendant's case --

23   defendant rests, is that correct?

24            MR. MOSKOWITZ:  Yes, that is correct.

25            THE COURT:  Yes.  And there's no rebuttal case from

L3JHRAM1

1      the government, correct?

2                  MR. LOCKARD:  No, your Honor.

3                  THE COURT:  All right.  So, ladies and gentlemen, as I

4      told you yesterday, when the lawyers now stand at the podium,

5      the statements they make are not evidence.  They're a review of

6      the evidence.  They're what they believe the evidence shows.

7      But it's your recollection of the evidence that controls, and

8      if necessary, you can look at the exhibits or we could have the

9      testimony read back for you if you'd like during the

10     deliberation process.

11                 As I also told you, I've told the lawyers how I plan

12     to instruct you in my final instructions.  They may refer to

13     that by saying, I expect that the judge will tell you thus and

14     so, but if any lawyer states a principle of law different from

15     what I tell you, it's what I tell you that controls.

16                 With that, Mr. Lockard, you're going to deliver the

17     initial summation?

18                 Now, ladies and gentlemen, as you've heard from me

19     many times, it is the government, and the government alone,

20     that has the burden of proof in this case.  So the government

21     will deliver an initial summation, and then the defendant may,

22     but is not required, to deliver a summation after that, defense

23     counsel.  And the government, as the party with the burden of

24     proof, gets to deliver a brief rebuttal summation.  So this is

25     fair because the government is the party with the burden of

1    proof, so they go first and they go last.  And they're the only

2    party with the burden of proof in this case.

3            So, Mr. Lockard, whenever you're ready.

4            MR. LOCKARD:  Over the last two weeks of this trial,

5    you have seen overwhelming evidence that the defendant,

6    Geovanny Fuentes Ramirez, produced, manufactured, and

7    trafficked in tons of cocaine destined for communities in the

8    United States, and he did so using weapons and violence.

9    You've learned about the defendant's cocaine lab in the hills

10   outside of his hometown in Honduras.  You've learned that he

11   produced huge quantities of cocaine at that lab and that he

12   guarded it and defended it with armed men carrying

13   semiautomatic pistols and assault rifles.

14           You've learned how he used bought-and-paid-for cops

15   and politicians to protect his drug trafficking.  You've

16   learned how he used briefcases of cash and kilos of cocaine to

17   buy a corrupt bargain with the soon to be president of Honduras

18   and to obtain protection from the highest levels of his own

19   government.  You've also learned about the deadly and

20   destructive tools that the defendant used to protect his drug

21   trafficking.  To move the literal tons of cocaine, the

22   defendant used handguns, handguns modified to fire

23   automatically, assault rifles, and grenade launchers.

24           Now, the defendant did not start out as a multiton

25   trafficker.  He started out selling kilogram quantities of

L3JHRAM1                    Summation - Mr. Lockard

1   cocaine in Miami.  So how did he make that rise happen?  He
2   made it happen by partnering with the biggest and most
3   dangerous cartels he could find.  He did it by buying the
4   highest-ranking police officers that were for sale.  He
5   murdered anyone who threatened his business or his partners.
6   He did what the defendant did best.  He killed those he could
7   and bought those that he couldn't.
8           This summation is my opportunity to put together the
9   evidence that you've heard over the course of this trial to
10  help explain how it fits together and how it leads inescapably
11  to one conclusion:  That the defendant, Geovanny Fuentes
12  Ramirez, conspired to import tons of cocaine into this country,
13  that he possessed and conspired to possess weapons, including
14  machine guns and destructive devices in furtherance of that
15  conspiracy.
16          Now, over the course of this trial you've learned that
17  Geovanny Fuentes Ramirez got started in the drug business by
18  partnering with Melvin Sandrez, called Metro, to sell kilogram
19  quantities of cocaine in Miami.  You've also learned who Metro
20  is.  He's a cousin of the leaders of the Cachiros cartel,
21  Javier and Leonel Rivera Maradiaga.  They were the leaders of
22  what was at the time one of the most powerful cartels in
23  Honduras.
24          You also know that Mr. Sandrez is himself a drug
25  trafficker and a sicario, a hitman, and someone who obtains

1    hitmen for others.  You also know that the defendant and Metro

2    were partners, close partners, for years in drug trafficking

3    and in murder.  In the 2000s the defendant and Metro worked

4    together to send cocaine to Miami.  They were sending

5    relatively small quantities, one or two or five kilograms at a

6    time, from Honduras.  And I say "relatively small" because each

7    kilogram of cocaine contains approximately 8,000 doses.  So,

8    ladies and gentlemen, these are not small quantities, but they

9    are dwarfed by the amounts of cocaine that the defendant would

10   soon be trafficking.

11         When the work in Miami fell through, Geovanny Fuentes

12   Ramirez and his partner Metro started a new venture.  In about

13   2009 or 2010, they started a drug lab together in the mountains

14   of Cerro Negro outside of their hometown of Choloma, but they

15   needed money for that lab.  They needed money to pay for the

16   chemicals and the equipment.  They needed money to pay for the

17   men who would guard it and the weapons they would carry.  They

18   needed money to buy the cocaine base, the semi-processed

19   cocaine smuggled in from South America that would be processed

20   into finished cocaine at that lab.

21         The defendant and his partner Metro needed that money

22   because once the lab was up and running, it would produce huge

23   quantities of cocaine and the huge amounts of money that would

24   go with it.  You have heard, for example, how the defendant

25   eventually would be bringing in cocaine base by the boatload to

L3JHRAM1                    Summation - Mr. Lockard

1    process at that drug lab, the same boats that the defendant

2    would later convert into fishing boats and he would give to his

3    coconspirators Javier and Leonel Rivera.

4         This lab would be big business for the defendant.

5    You've heard the expert testimony, for example, that in

6    Honduras a kilogram of cocaine is worth about $9,000.  That's

7    about three times the annual median salary of a Honduran

8    household for one kilogram.  And for every thousand kilograms

9    of cocaine base that the defendant processed and turned into

10   finished cocaine, that's $9 million worth of cocaine.  That

11   same kilogram, once it moves near the Mexico-Guatemala border

12   is worth 12 to $16,000, and in the United States that kilogram

13   is worth around $30,000.  Every thousand kilograms of cocaine

14   base that the defendant processed was worth $30 million in the

15   United States.  This lab was incredibly important to the

16   defendant.

17        Now, I expect defense counsel is going to deny that

18   the defendant had anything to do with this drug lab, but

19   there's no dispute that the lab actually existed.  You've heard

20   how it was raided.  And there's no dispute that it existed on

21   land that the defendant controlled.  He acknowledges he had a

22   coffee plantation there.  Ladies and gentlemen, you've seen the

23   evidence that shows unequivocally that the defendant owned and

24   operated that lab.

25        So let's talk about how the evidence shows you that.

1    First, the defendant told Leonel Rivera about the lab.

2    In his first meeting with Leonel Rivera, sitting in that car at

3    Rivera's gas station in Omoa, Honduras, surrounded by teams of

4    armed security, the defendant described how his lab had

5    recently started up.  He described how he guarded the lab with

6    men carrying AR-15s, AK-47s, and other weapons.  Mr. Fuentes

7    asked Leonel Rivera to invest in his lab and to help pay for

8    cocaine base smuggled from South America.

9    Second, the defendant told Leonel Rivera again about

10   the lab and about a Honduran police investigation and a raid

11   that eventually came out of that investigation.  The defendant

12   said that the investigation was about his lab in the Cerro

13   region of the Cortes department, but because of the defendant's

14   corrupt police contacts, those of himself and his drug

15   trafficking partner Chepe Handal, he knew about the raid ahead

16   of time, and he moved the cocaine out of the lab.  And when the

17   raid hit, no drugs were found.

18   Third, the defendant told Leonel Rivera again about

19   the lab when he told Rivera that he had found and murdered the

20   police officer who had led that investigation.  The defendant

21   didn't just murder the police officer.  He tortured and

22   executed him.  The defendant, Metro, and their hitmen, they

23   found that police officer on a night out at Metro's club.  They

24   kidnapped him.  They drove him to an isolated area outside of

25   town.  The defendant put a bread bag over the officer's head

1    and beat him.  Metro used the butt of his gun to beat the

2    officer in the head and to smash his fingers, all the while the

3    victim was begging for his life.  And then the defendant

4    murdered the officer with two shots to the head.  He called

5    them mercy shots.

6            So why did the defendant kidnap, torture, and murder

7    the police officer?  It wasn't just revenge for the raid.

8    After all, because he had been tipped off, the defendant didn't

9    lose any of his cocaine.  The raid hadn't hurt him all that

10   much.  The defendant did this to get information.  Mr. Fuentes

11   wanted to know if the police had learned that Fuad Jarufe, the

12   wealthy Choloma businessman who acted as the defendant's bank,

13   was involved in the investigation.  But the investigation

14   hadn't uncovered Jarufe's role, and so the defendant was happy.

15   After kidnapping, torturing, and murdering a police officer,

16   the defendant was happy because the man who helped bankroll his

17   drug trafficking was in the clear.

18           Fourth, Javier Choloma told Leonel Rivera about the

19   defendant's drug lab.  You see, because of the raid on the drug

20   lab, the defendant and Metro had transferred their interest in

21   a Choloma soccer club into Javier Choloma's name.  So even

22   though the defendant had closed one investigation into the drug

23   lab by a Honduran police force based in San Pedro Sula, there

24   was a second investigation being conducted by a police force

25   based in the nation's capital.  So to protect their assets from

L3JHRAM1                    Summation - Mr. Lockard

1     being seized, the defendant and Metro used Javier Choloma as a

2     frontman to hide and protect their business.

3            Fifth, Jose Sanchez, the accountant at Jarufe's

4     company, he knew about the defendant's lab.  Before the lab was

5     raided, Jarufe instructed Sanchez to deliver cash to the

6     defendant's property at Cerro Negro, and Sanchez went twice,

7     delivering several thousand lempiras, the Honduran currency, to

8     that location.  Both times armed security stopped Sanchez from

9     entering.  Armed men in street clothes, not coffee farmers,

10    stopped him at the gate.  And just like the defendant had

11    described to Leonel Rivera, Mr. Sanchez saw men armed with

12    AK-47s along with their semiautomatic pistols.

13           Sixth, Mr. Sanchez told you what happened after the

14    raid.  Two things happened:  The first thing that happened is

15    that the defendant laid low.  Although Mr. Fuentes came to Fuad

16    Jarufe's company on an almost daily basis, after the lab he

17    wasn't seen for about a month.  You heard the same thing from

18    Jorge Medina, the agricultural engineer for the Cachiros'

19    company, Ganaderos.  He witnessed exactly the same thing.

20           Now, when the defendant returned from laying low, the

21    second thing happened.  You see, he returned because he had

22    found a way to fix the second investigation.  The defendant had

23    killed his way out of the first investigation and he bribed his

24    way out of the second.  This man, the head of the Honduran

25    courts, traveled from the nation's capital to Jarufe's business

L3JHRAM1                    Summation - Mr. Lockard

1   to meet with the defendant.  He said that his boss had sent him

2   to help the defendant out.  And Jarufe, using money that he was

3   holding for the defendant, paid Julio Cesar Barahona a 30,000

4   lempira bribe.  And that shows you exactly what Leonel Rivera

5   had said.  There were two investigations that the defendant had

6   to solve.

7           Seventh, Mr. Sanchez told you that Mr. Fuentes later

8   partnered with a presidential candidate, Juan Orlando

9   Hernandez, and with his brother, Tony Hernandez.

10          Now, in about 2013, Juan Orlando Hernandez was the

11  president of the Honduran Congress.  He was also the man who

12  had appointed Julio Cesar Barahona to his position as the head

13  of the Honduran court system.  Juan Orlando Hernandez was

14  running for president, and presidential candidates in Honduras

15  can reap enormous bribes.  You heard how the Cachiros paid huge

16  sums of money to presidents and to presidential candidates, to

17  Juan Orlando Hernandez, to his predecessor Pepe Lobo, to his

18  predecessor Manuel Zelaya, to Ricardo Alvarez who would become

19  vice president, and to many others.  The defendant took a page

20  from that same playbook, using Jarufe's powerful political

21  connections to buy protection.

22          So Mr. Sanchez saw Jarufe and the defendant and Juan

23  Orlando Hernandez meeting in the office to seal their deal.

24  The defendant gave the president-to-be $15,000 in cash in

25  United States currency.  But Juan Orlando Hernandez didn't just

L3JHRAM1                    Summation - Mr. Lockard

1    want the defendant's cash, he wanted access to the defendant's

2    cocaine.  The defendant's drug lab was a short distance from

3    Honduras' biggest port city, Puerto Cortes, and Juan Orlando

4    wanted the defendant's cocaine so he could export it through

5    that port.  Access to the defendant's lab would be worth

6    millions, and Juan Orlando Hernandez's protection was priceless

7    to the defendant.

8            So Hernandez said that he would give the defendant the

9    contact information for his brother, Tony Hernandez.  Tony

10   Hernandez, like Juan Orlando Hernandez, is one of the

11   defendant's narcotics trafficking partners.  He's the man who

12   ran drug trafficking for Juan Orlando.  Tony Hernandez is the

13   man who accepted bribes of drug money from the Cachiros.  He is

14   the man who stamped kilograms of cocaine with his own initials.

15           So from the evidence you know that the defendant owned

16   and operated that cocaine lab outside of Choloma, and you know

17   that he protected it with men armed with AK-47s and

18   semiautomatic pistols and that he imported cocaine base from

19   Colombia to process it into finished cocaine to import into the

20   United States.  And as the defendant also said in his first

21   meeting with Leonel Rivera, he wanted the Cachiros to partner

22   with him to invest in that lab, but the Cachiros never did, and

23   the defendant found other partners, partners like Chepe Handal,

24   the San Pedro Sula drug trafficker, partners like Juan Orlando

25   Hernandez and Tony Hernandez.

1    The defendant also wanted to work with the Cachiros in

2    other cocaine operations.  The defendant's partner had done

3    work for the Cachiros since around 2003 providing security for

4    drug shipments and introducing sicarios, hitmen.  Now the

5    defendant and Metro wanted to work with the Cachiros together.

6    So in or about 2009 or 2010, Metro started pitching his

7    cousins, pitching them on the defendant's corrupt police

8    contacts and how those dirty cops could help the Cachiros move

9    huge shipments of cocaine through Honduras safely.  You heard

10   how shipments of hundreds or even thousands of kilograms of

11   cocaine were brought in from South America to Honduras in boats

12   and in planes.  And when that cocaine arrived, it had to be

13   moved.  It had to be transported to where the buyers were,

14   buyers in western Honduras near the Guatemalan border, and it

15   had to be protected.  It was transported in cattle trucks and

16   in freight trucks, and it was accompanied by armed men in armed

17   vehicles to give protection from rivals, protection from

18   robbers, and protection from the police.

19   And you've also learned, ladies and gentlemen, that

20   the defendant had those corrupt police contacts.  He had a

21   Rolodex worth.  You've heard how he worked with dirty cops who

22   had also worked for other Honduran drug traffickers, cops like

23   Commissioner Martinez, one of the highest-ranking police

24   officers in Honduras.  Both Metro and Mr. Fuentes told Leonel

25   Rivera how the defendant worked with Commissioner Martinez to

L3JHRAM1                    Summation - Mr. Lockard

1   protect drug shipments.

2            Now, the position of commissioner is a high rank in

3   Honduras.  There are only about 20 in the entire country.  And

4   you saw from Commissioner Martinez's own LinkedIn page, that

5   is, before he took it down after he was identified as a

6   conspirator, that he had been the director of finance for the

7   Honduran National Police.  This powerful police officer was

8   touting his coursework in good police practices while he was

9   protecting cocaine traffickers.  And the defendant needed

10  Commissioner Martinez because if there was a police checkpoint

11  in the way of a drug shipment, the commissioner could remove it

12  with a phone call.  And you know that what the defendant told

13  Leonel Rivera is true because that evidence is all over his

14  very own cell phone.  You saw the contact information.  You saw

15  the pictures, you saw the family photos, and you saw

16  instructions about evading law enforcement, about detecting and

17  deleting wiretaps from as recently as February of 2020.

18  Commissioner Martinez warned the defendant that Martinez

19  himself might be subject to wiretaps, and the defendant

20  confirmed that another law enforcement contact had also warned

21  him, had warned him not to talk so much crap on the phone, not

22  to talk so openly about his criminal activities.

23            Commissioner Martinez was a powerful ally of the

24  defendant, but he was not the only one.  You've also learned

25  how the defendant had other corrupt police and military

L3JHRAM1                      Summation - Mr. Lockard

1    contacts.  Some of these came through his partner Metro who

2    spent so much time around corrupt metropolitan police that it

3    gave him his nickname, Metro.  Some came from other drug

4    traffickers in the San Pedro Sula area who had used a group of

5    dirty police to help transport and protect cocaine shipments.

6           And the defendant's phone lists police contact after

7    police contact, officer after officer.  You've heard about some

8    of them, like Leonel Sauceda and Melvin Sauceda, a commissioner

9    and a subcommissioner who met with the government at Fuad

10   Jarufe's offices.  You've learned about the defendant's

11   military contacts as well.  The defendant was given a green

12   AR-15 rifle by his military friends.  Mr. Sanchez and

13   Mr. Medina both saw that weapon, and the defendant talked to

14   both of them about that gift, bragging about it, telling them

15   that it had come from his military friends.  And you saw that

16   the defendant's son has pictures of an assault rifle that match

17   that description.  And you've learned that the defendant got

18   other equipment and assistance from the military as well:

19   uniforms, police vests, handcuffs.  And you know that the

20   defendant had that equipment because it's also on his phone.

21          Now, those were gifts from the Honduran 105th military

22   brigade which is based in San Pedro Sula, just south of

23   Choloma.  At the time the head of that brigade was Orlando

24   Ponce Fonseca, a man who would later become the commander of

25   the Honduran anti-drug trafficking force for the north coast of

L3JHRAM1                       Summation - Mr. Lockard

Honduras, an important coast for drug trafficking and

transportation.  And General Fonseca is also a contact in the

defendant's phone.  You know that the defendant had these

contacts because he used them.  He used them to protect his

cocaine on its path through Honduras, on its way to the United

States.

          Now, the defendant's roster of dirty cops and dirty

military contacts was a major selling point in his pitch to

work with the Cachiros.  Those contacts would prove invaluable

in protecting multimillion-dollar shipments of cocaine across

Honduras, transporting it from its point of entry from South

America to the buyers on the western border near Guatamala

where the cocaine would be taken further north through Mexico

and into the U.S.

          But the defendant didn't just rely on his roster of

dirty cops.  He also relied on his own savagery.  The defendant

wanted to work with the Cachiros so badly that he literally

killed for the chance.  One night when the defendant was out

drinking with a boat mechanic, he learned that the mechanic had

cheated Leonel Rivera out of several thousand dollars.  As the

mechanic told this story to his new drinking partner, the

defendant saw an opportunity, an opportunity to ingratiate

himself with the Cachiros.  So he called another corrupt police

contact, he had the mechanic arrested, he had the mechanic

brought to him, and he beat and he murdered the mechanic, and

L3JHRAM1                    Summation - Mr. Lockard

he took pictures of his crime so that he could prove his
handiwork.  He treated torture and murder like a job interview.

          So Metro called Leonel Rivera to meet at the nightclub
so that the defendant could brag about it.  He was proud of it.
He was excited about it.  And like his partner Metro said, it
proved that the defendant would do anything.  He would use his
corrupt contacts, he would protect the cocaine, and he would
kill.  And soon enough, the defendant got what he wanted, and
he started working with the Cachiros.  And as you've already
heard, and we'll talk about it a little bit later, he also
started working with other large and violent cartels.  But
first let's talk about the work that he did for Leonel Rivera.

          Over the period of approximately a year, the defendant
protected and transported three huge cocaine shipments.  First
was a 425- to 530-kilogram shipment of cocaine that arrives in
eastern Honduras from South America by airplane.  It's a
shipment that was sent by the Colombian cocaine trafficker
Alfonso Sierra Vargas Renteria.  The defendant protected and
transported that cocaine from a ranch near El Tigre to near the
Guatamalan border where it was delivered to Los Valles cartel.

          Second was a shipment of 500 to 570 kilograms of
cocaine that arrived by plane at another the airstrip in
eastern Honduras.  This was an airstrip controlled by the
Honduran Congressman Fredy Nájera.  This cocaine was also
supplied by the Colombian cartel leader Renteria, and the

1  defendant transported and protected that cocaine from a ranch

2  near Tocoa to the Los Valles cartel near the Guatamalan border.

3        Third was a shipment of about 425 to 500 kilograms of

4  cocaine that arrived again by airplane to an airstrip not too

5  far from Choloma.  This was sent by a drug trafficker called

6  Jack.  The defendant transported and protected that cocaine to

7  a location near Guatamala so that Jack could deliver it to his

8  Mexican buyers for them to take it to the United States.

9        And to protect and transport that cocaine, the

10  defendant used his police contacts and he used his armory.  He

11  used heavy-duty military-grade weapons, handguns modified to

12  fire in bursts like an automatic weapon, assault rifles,

13  grenade launchers.  And you heard how the defendant described

14  how he would repel an attack with grenade launchers and assault

15  rifles that they carried in their cars that accompanied the

16  truck with the cocaine concealed inside it, weapons that are

17  designed for taking out small armored vehicles.

18        But the defendant wasn't satisfied with protecting

19  someone else's cocaine.  He wanted to be the principal.  He

20  wanted to be the one buying and selling for himself.  He was

21  using boats, boats to bring in cocaine base, base to the lab

22  where it could be processed into finished cocaine, and he also

23  started to become a buyer of finished cocaine from South

24  America as well.

25        And the defendant wasn't working with just the

1    Cachiros.  You've learned how he partnered up with the Sinaloa

2    cartel, the largest and most dangerous cartel in Mexico headed

3    at that time by the infamous drug trafficker Chapo Guzman.  And

4    you heard how Chapo Guzman's cousin Juanito described the

5    business that Sinaloa had done with the defendant.  The

6    defendant had sold a 500-kilogram shipment to Sinaloa, then he

7    had sold a thousand kilogram shipment to Sinaloa, and then a

8    1,500-kilogram shipment, 3,000 kilos, three tons of cocaine,

9    all destined for the United States through the Mexican cartels.

10          Now, by this time the defendant and his partner Metro,

11   they weren't small time.  They were large-scale traffickers,

12   even rivals to the Cachiros, and things fell apart between

13   them.  There came a time when the defendant asked Leonel Rivera

14   for a million-dollar loan so that he could buy 2,000 kilos of

15   cocaine from a Colombian supplier and ship it by boat to Puerto

16   Cortes on the north coast of Honduras near Choloma.  Mr. Rivera

17   refused to make the loan, and losing that deal made the

18   defendant and his partner angry, so angry that they decided to

19   have the Cachiros killed.

20          Leonel Rivera learned of that plot to murder him and

21   his brother from the would-be assassin, a sicario named

22   Vaquero.  And in this trial you learned how the defendant and

23   Metro hired Vaquero to murder another man, Edgar Rios, who went

24   by the name Pluto.  The defendant had given Pluto 100 kilograms

25   of cocaine to sell, but Pluto couldn't sell it because the

L3JHRAM1                    Summation - Mr. Lockard

1    cocaine was wet, which destroyed its value.  And because Pluto

2    couldn't sell the wet cocaine, he couldn't pay the defendant,

3    but the defendant didn't care why Pluto couldn't pay, and so he

4    and Metro hired Vaquero to kill Pluto.

5            That murder was just part of a string of murders that

6    the defendant and Metro had been committing.  We've already

7    talked this morning about the murder of the mechanic.  We've

8    talked about the murder of the police officer.  There was also

9    the murder they committed of two hitmen, two sicarios, who had

10   killed Metro's brother over a drug debt.  In this trial you've

11   learned how the defendant and Metro and a corrupt cop named

12   Juan Manuel Avila Meza.  They found those two sicarios, they

13   kidnapped them from their car, they drove them outside the city

14   where they beat and tortured and murdered those two hitmen, and

15   the defendant emptied a can of gasoline on them and Avila Meza

16   lit the match.

17           So after the murder of Pluto, Leonel Rivera spoke to

18   Vaquero, and Vaquero told Rivera about the defendant and

19   Metro's plan to have the Cachiros brothers murdered and offered

20   to turn on the defendant and Metro and to murder them instead.

21   Rivera agreed, and Vaquero took a number of armed men to the

22   house where Metro was staying, and they invaded and they shot

23   Metro.  The defendant proved a tougher target, and he fought

24   off the attack on his home, chasing away the attackers and

25   wounding some of Vaquero's men.  And after that, as you've

L3JHRAM1                    Summation - Mr. Lockard

1    learned, the defendant and Mr. Rivera called a truce.  And

2    shortly after that, Mr. Rivera started cooperating with the DEA

3    and had no more contact with the defendant.

4         Now, in this trial you've also learned how the

5    defendant partnered with Fuad Jarufe, the owner of a company in

6    Choloma, and how Jarufe acted as the defendant's personal bank

7    and money launderer.  Because the profits you earn, the U.S.

8    dollars in cash from drug dealing, are no good unless you can

9    launder them.  So you heard from Jose Sanchez about how the

10   defendant regularly brought in unexplained U.S. cash, $20 bills

11   bundled $10,000 and $15,000 at a time so that he could exchange

12   those dollars for Honduran currency.  And you learned that the

13   defendant was the only person that Jarufe's company did this

14   for, but the defendant was friends with Jarufe's son, and he

15   was able to use the company to launder the money.  And Sanchez,

16   an accountant for Jarufe's company, he knew right away that

17   there wasn't a good explanation for where this cash was coming

18   from, and he acknowledged to you that he knew he was laundering

19   the defendant's money.

20        Now, I expect defense counsel may argue to you that

21   the defendant's business with Jarufe's company was legitimate

22   business and that it was the only business that the defendant

23   did, not drug trafficking, that the defendant is just a biomass

24   businessman, but you already know that that's not true.  You've

25   learned how drug traffickers use seemingly legitimate

L3JHRAM1                         Summation - Mr. Lockard

businesses to launder large sums of drug money.  You heard it

from Leonel Rivera.  Drug money, U.S. dollars, are used to fund

the business operations and then the business gets paid in

local currency.  It's exactly the same model that the Cachiros

used, and once again the defendant took a page from the

Cachiros' playbook.

        Jarufe was important to the defendant for another

reason.  Jarufe is the one who gave the defendant the land in

Cerro Negro where the defendant operated his drug lab.  That

was the reason that the defendant tortured and murdered the

police officer to make sure that Jarufe was protected.

        Now I want to turn back to the defendant's partnership

with the president of Honduras, Juan Orlando Hernandez, which

started when Hernandez was running for president.  We've

already talked about that partnership and about the deal that

they struck and about the involvement of the president's

brother, Tony Hernandez.  But I expect that defense counsel may

argue to you that even if the defendant did operate the lab,

which you know that he did, that the lab was shut down after

the police raid in 2011.

        (Continued on next page)

L3JKRAM2                    Summation — Mr. Lockard

1          MR. LOCKARD:  (Continuing)  And there are a number of

2     reasons why you know that that is not true.  One is that the

3     defendant had no reason to shut the lab.  There was a raid, but

4     he'd been tipped off.  No drugs had been seized.  The officer

5     conducting that investigation was dead.  The head of the

6     Honduran court system was bribed.

7          There's another reason you know the defendant didn't

8     shut the lab.  There was too much money to be made.  For all

9     the same reasons that the defendant started the lab, for all

10    the reasons he had to turn cocaine base into a $9,000-kilogram

11    of finished cocaine, those reasons were still there.

12         You also know that the defendant still had his drug

13    trafficking relationships.  Those didn't stop when Leonel

14    Rivera started to work with the DEA.  His partnership with

15    Chepe Handal was still there, his ability to sell to Sinaloa

16    was still there, his Colombian suppliers were still there.

17         You also know that that lab didn't shut down because

18    the defendant had reached an agreement with Juan Orlando and

19    Tony Hernandez to continue operating that lab.  That is not a

20    reason to wind down the cocaine lab.  It is a reason to wind it

21    up, to make it grow, to keep it going.

22         And there's one more reason you know that the

23    defendant didn't stop manufacturing and distributing cocaine —

24    it's because he kept doing the same things after 2013 and after

25    2014 that he had done before.  As recently as 2019, the year

L3JKRAM2                    Summation — Mr. Lockard

before his arrest, the defendant continued to meet with, and
pay bribes to, President Hernandez.  When the defendant saw
Leonel Rivera in jail, he described how he'd had two meetings
the prior year with President Hernandez and had paid him bribes
in both meetings.  And he described a meeting that the
defendant had had along with Commissioner Martinez, with a
senior military official, at Hernandez's request, to talk about
a money-laundering company.

           Now, you've also heard how the defendant's
coconspirator and the president's brother, Tony Hernandez, was
arrested here in the United States, and you've heard that
during that trial, certain allegations about President
Hernandez were made public for the first time.  One of those
times was on May 28th of 2019.  And the very next day,
May 29th, 2019, the defendant was getting Waze directions to
the presidential palace in the Honduran capital, Tegucigalpa.
Not once, repeatedly.  And afterwards, the defendant searched
other locations in Tegucigalpa, including the Ministry for
Economic Development.

           Now, there was another filing in the Tony Hernandez
prosecution related to those same allegations in June, and
again, the next day, the defendant was getting driving
directions to the presidential palace.  What does that mean?
It means the defendant and President Hernandez were keeping
close tabs on the case against their coconspirator, Tony

L3JKRAM2                     Summation — Mr. Lockard

Hernandez.  It means that what the defendant told Leonel Rivera
about meeting with the president was true.  It means that the
defendant kept doing what he'd been doing all along, right up
until his arrest.

Now, there are a few other reasons why you know the
defendant has continued to commit the crimes that he worked so
hard to establish and build.  And one of the reasons you know
that, again, is his phone.

Now, the defendant may attempt to portray himself as a
humble biomass business owner, but his phone contacts show that
that is not the case.  This is not the contacts list of a
humble businessman.  The defendant has a Who's Who of corrupt
politicians and police in his contacts.  He has the president
of his country's cell phone number, and the vice president's
cell phone number, and the former president's home number.  He
has the regional head of the anti-narcotics task force cell and
home numbers, and as you've seen, nearly a dozen other
high-level police, military, and political officials.

Now, I want to talk briefly about the defendant's
admissions.  As you know, the defendant gave an interview after
his arrest in Miami, and you've seen some of the things that he
said in that interview.  We're not going to talk about them
all; you've seen them recently, and I trust that you remember
them.

I submit to you that the defendant attempted to

L3JKRAM2                    Summation — Mr. Lockard

conceal his crimes from the DEA, but I also submit to you that
the defendant was not as careful as he had hoped, and he made
some key admissions that you should consider.  One of those is
Vaquero.  The defendant admitted that he knew Vaquero, the
hitman that he and Metro had hired to kill Pluto and had tried
to hire to kill the Cachiros.  He admitted that he knew Vaquero
was a hitman, and he said that Vaquero had threatened his own
family, and that the defendant had spoken to Metro about that
threat.

          Ladies and gentlemen, the defendant admitted that he
had a dispute with a narcotics sicario and that he went to a
narco-trafficker to address that threat.

          The defendant also admitted that he knew Pluto, and
that he knew his real name, Edgar, and that Pluto, too, was a
drug trafficker.

          The defendant admitted that he knew Chepe Handal.  He
knew him so well, he calls him Chepito.  This is the drug
trafficker that the defendant partnered with in his cocaine
laboratory.  This is the drug trafficker whose contacts were
used to tip the defendant off about the raid.  And the
defendant tried to claim that everybody knows Chepito, but I'll
submit to you that not everybody knows Chepito the way the
defendant does.  And the defendant admitted that he was
introduced to the Cachiros by Metro, just like you learned
through other evidence in this trial.

L3JKRAM2                    Summation — Mr. Lockard

1          Now, ladies and gentlemen, you know that the events

2     that we've talked about this morning have happened because

3     you've heard about them from the witnesses, you've seen the

4     evidence, the defendant himself has admitted critical facts

5     about his crimes, and that evidence proves the defendant's

6     guilt beyond a reasonable doubt.  I'm going to turn to one more

7     argument that I expect you may hear from defense counsel, and

8     with this argument and any others that I've talked about, it's

9     important to remember that the defendant is not required to

10    make any arguments at all, not required to introduce any

11    evidence, not required to cross-examine any witnesses, and

12    that's because the burden always rests with the government, as

13    it should, but if the defendant does choose to make arguments,

14    then you're entitled to examine those arguments, and you're

15    entitled to view them in the light of the evidence and in the

16    light of your common sense, and when you do, I submit to you

17    that you will find that the defendant's arguments don't make

18    any sense.

19          I expect that the defendant will suggest to you that

20    you should just not believe the evidence, that you should not

21    believe the witnesses who've testified.  I expect the defendant

22    may ask you to conclude that those witnesses lied, to believe

23    that Leonel Rivera simply invented meetings, discussions, and

24    phone calls, to believe that he made up one and a half tons in

25    cocaine transactions, that he made up murders, to believe that

L3JKRAM2                     Summation — Mr. Lockard

1   Leonel Rivera falsely confessed to his own attempted murder.  I
2   submit that you know that that doesn't make any sense.  It
3   doesn't make any sense to falsely confess to an attempted
4   murder.  And you also know, because you've heard, that Leonel
5   Rivera has cooperated extensively since before his surrender
6   and after his surrender.  You've heard how he's cooperated
7   extensively against corrupt Honduras presidents, members of
8   congress, police officers, cartel leaders.  He has testified in
9   other cases.  And you know there is no reason for Leonel Rivera
10  to just make up stories about Geovanny Fuentes Ramirez.

11       I believe you may be asked to believe that José
12  Sanchez, the accountant, is also lying, that he made up stories
13  about meetings between the defendant and the President of
14  Honduras about drug labs and about bribes, that he falsely
15  admitted to helping the defendant to launder money.  You
16  already know that Mr. Sanchez never wanted to have to flee his
17  country, to have to leave his home and his profession behind.
18  He never wanted to witness the things that he witnessed.
19  There's no reason for Mr. Sanchez to invent stories about the
20  defendant.

21       So, ladies and gentlemen, you know that that argument
22  doesn't make any sense.  It's just beyond belief that so many
23  witnesses would decide to lie about the defendant, and you've
24  seen them testify, and you know that they testified credibly
25  and consistently, and were corroborated by the other witnesses

L3JKRAM2                    Summation — Mr. Lockard

1    and by the evidence.  We've reviewed a bunch of that this

2    morning.  There's no need to go through it again.  You saw it

3    during this trial.

4            So now let me talk for a moment about how that

5    evidence demonstrates the elements of the charges.  There are

6    three charges:  Conspiracy to violate the narcotics laws,

7    violating the U.S. firearms laws, and conspiring to commit a

8    firearms offense.

9            Now, I expect Judge Castel will instruct that you

10   Count One has two elements — the existence of an agreement to

11   violate the U.S. drug laws and that the defendant knowingly and

12   intentionally associated himself with and joined in that

13   agreement.  And I also expect that the Court will instruct you

14   that you will be asked to find whether that agreement involved

15   cocaine and whether it involved at least five kilograms of

16   cocaine.

17           The conspiracy in Count One has three alleged objects,

18   and as I expect you'll be instructed, you need only find one of

19   them, but you must be unanimous about which one, but I submit

20   that the evidence demonstrates all three of the objects.  The

21   first is to import cocaine into the United States; the second

22   is to manufacture or distribute cocaine, knowing or intending

23   that it would be imported into the United States; and the third

24   is to possess cocaine onboard an aircraft registered in the

25   United States, intending to distribute it.

1     The first two objects, importing cocaine and
2  manufacturing or distributing cocaine knowing or intending that
3  it will be imported into the U.S., are shown by the
4  overwhelming evidence of the defendant's participation in a
5  large-scale and wide-ranging narco-trafficking conspiracy.
6  That conspiracy included his drug lab in Cerro Negro, where he
7  manufactured and distributed cocaine.  It included his
8  protecting and transporting shipments of cocaine by others.  It
9  included importing and selling cocaine on his own account,
10  cocaine from South America, and sold to buyers in Guatemala and
11  Mexico.

12     And not only did the defendant conspire to manufacture
13  and distribute cocaine, he knew full well that it was destined
14  for the United States.  He started his drug-dealing by sending
15  cocaine from Honduras to Miami.  When he was working in
16  Honduras, he sold to Guatemalan and Mexican buyers, the same
17  buyers that, as Leonel Rivera told you, distributed that
18  cocaine further north, through Mexico, and into the United
19  States.  The defendant was paid in U.S. dollars, the dollars
20  that U.S. drug users pay when it's distributed on the streets.

21     You've heard expert witness testimony that more than
22  90 percent of cocaine trafficked through Central America is
23  destined for the United States.  And you've heard how President
24  Hernandez, the defendant's coconspirator, laughed about how
25  they would shove cocaine up the gringos' noses, up the noses of

L3JKRAM2                    Summation — Mr. Lockard

the Americans.

For the third object, I'm going to remind you about one of the airplane shipments that the defendant protected, a shipment of cocaine that came from South America to Honduras. Now, I expect Judge Castel will instruct you that you do not need to find that the defendant knew that the airplane was registered in the United States, just that a U.S.-registered aircraft was used or was intended to be used. And you heard evidence of how the defendant received airplane shipments of cocaine to be transported to Guatemala for the Mexican buyers and provided security for the arrival and transportation.

The airplanes that the trafficker, Jack, used, as you heard, were all U.S.-registered airplanes, and they all had the November registration number, the registration that begins with the letter N. And that, I submit, establishes Count Three or object three of Count One.

And, finally, with respect to drug type and drug quantity, the evidence establishes that at least five kilograms of cocaine were involved in the conspiracy, and, in fact, you know that it involved tons, tons of cocaine. Every shipment that the defendant protected or imported was in the hundreds or thousands of kilograms of cocaine.

I'll turn now to Count Two, where I expect, again, that Judge Castel will instruct you that there are two elements — one, that the defendant committed the

L3JKRAM2                    Summation — Mr. Lockard

drug-trafficking offense charged in Count One; and, Two, that
the defendant knowingly used or carried a firearm during and in
relation to the drug-trafficking crime or possessed a firearm
in furtherance of the drug-trafficking crime, or aided and
abetted another in such using, carrying, or possessing of a
firearm.

          We've already talked about the first element, the
drug-trafficking offense, and I submit to you that the second
element is shown by overwhelming evidence that the defendant
used, carried, and possessed firearms during and in relation to
that narco-trafficking activity and in furtherance of it.  You
know that, for one thing, because he had a license to carry
certain weapons, although, certainly, not all of the weapons
were licensed.

          Now, I think you've heard suggestion at various points
in this trial that a licensed weapon is a legitimate weapon,
but you know that's not true.  A license to possess a firearm
is no excuse to use that firearm in furtherance of drug
trafficking or murder.  If a drug trafficker uses and carries a
gun, licensed or not, in furtherance of crime, that is also a
crime.  You've heard evidence of how the defendant was always
armed, he was armed at every meeting to discuss drug
trafficking, meetings to discuss law enforcement
investigations, meetings to discuss murders.  You've heard
evidence of how he was always armed receiving and transporting

L3JKRAM2                    Summation — Mr. Lockard

cocaine, and how the defendant admitted that he used his

firearms to murder people in furtherance of the drug

conspiracy, murders of police officers to quash investigations

that would disrupt the trafficking, the murder of another

person to promote himself with his drug-trafficking partners,

the murder of two hitmen who had assassinated one of his

partner's family members over a drug debt, and each of those

occasions, the defendant admitted to his partners that he

personally had carried and used his firearms.

You'll also be asked to find whether the firearm that

the defendant used, carried, or possessed included a machine

gun and if it included a destructive device.  And I expect you

will be told that a machine gun is a firearm that automatically

shoots more than one shot with a single depression of the

trigger, and that a destructive device includes an explosive

grenade, and you've heard about both of those in this trial.

You've heard about the defendant's modified Glock that

has a selector switch that allows it to automatically fire

burst rounds with one depression of the trigger.  You've heard

about the grenade launcher that fires 40-millimeter grenades

that explode on impact.  And you've heard how the defendant

used the grenade launcher, how he described to Leonel Rivera

how it would be deployed in the event of an attack on a truck

carrying cocaine.  And I expect you'll also be instructed that

referring to a machine gun or a destructive device so that

L3JKRAM2                    Summation — Mr. Lockard

1    others present will know that it's available if needed can

2    constitute the use of that machine gun or destructive device,

3    and the defendant's telling other people about his grenade

4    launcher and how he would use it is just such a use.

5           And the defendant also aided and abetted others in

6    using, carrying, and possessing firearms, including machine

7    guns and grenade launchers, and I expect Judge Castel will

8    instruct you that if you find that the defendant actively

9    participated in the drug-trafficking crime charged in Count One

10   and had advance knowledge that another participant in the crime

11   would use or carry a machine gun or a destructive device during

12   and in relation to, or in furtherance of that crime, then the

13   defendant has aided and abetted that other person.

14          Here, the defendant trafficked cocaine with many, many

15   others that he knew to be armed with semiautomatic pistols,

16   AR-15s, AK-47s, and grenade launchers.  He trafficked with

17   Metro, who was always armed and always had armed security.  He

18   trafficked with Leonel Rivera, who was always armed and who

19   always had armed security, including, as he told you, machine

20   guns and grenade launchers.

21          The defendant's participation in drug-trafficking

22   activity with people that he knew to be armed, and to be armed

23   in furtherance of the drug-trafficking conspiracy, amounts to

24   aiding and abetting.

25          The last count, Count Three, charges a conspiracy to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3JKRAM2                        Summation — Mr. Lockard

violate the U.S. gun laws, and I expect Judge Castel will

instruct you that that offense has two elements, just like

Count One does — the existence of the agreement to violate the

gun laws, and that the defendant knowingly and intentionally

associated himself with and joined in that conspiracy, and the

object of that conspiracy is the same as what we just talked

about with Count Two.

Now, one final word about venue:  I expect you will be

told that the law provides that certain acts done or committed

outside the territorial jurisdiction of the United States are

chargeable under U.S. law, and that venue for those crimes is

established if you find that the point of entry where any

coconspirator of the defendant was first brought into the

United States was the Southern District of New York.

So, for example, if you find that one of the

defendant's coconspirators was first brought into the United

States in this district, then venue would be appropriate in

this district for the defendant.  And you saw that a number of

the defendant's coconspirators were first brought to the

Southern District of New York, and that was Government

Exhibit 504.  You saw that Leonel Rivera, who the defendant

trafficked about one and a half tons of cocaine with, was first

brought to the Southern District.  Renteria, the supplier of

most of that cocaine, was also first brought in the Southern

District.  Avila Meza, the corrupt Honduran police officer who

L3JKRAM2                        Summation — Mr. Lockard

1    participated in the murder of the two hitmen, was first brought

2    in this district.  Fredy Najera, the Honduran congressman whose

3    airstrip was used to land one of the shipments of cocaine that

4    the defendant transported to the Valles, he was first brought

5    to this district.  And you heard how other drug traffickers who

6    worked with the Cachiros have also been first brought to this

7    district — Hector Emilio Fernandez Sosa, Victor Diaz-Morales,

8    and Fabio Porfiro Sosa — all who are coconspirators with Leonel

9    Rivera and all of whom first arrived in this district.

10           If you find that any one of those is a coconspirator

11   of the defendant's, then you may find venue.

12           Okay, we're at the end now.  You've been through two

13   weeks of trial, two weeks of unusual circumstances, and now

14   you've been through a little bit more than an hour of

15   summation, and so in a couple of minutes, I'm going to sit

16   down.  Then you'll hear from Mr. Moskowitz, for the defense,

17   and after Mr. Moskowitz is finished, my colleague,

18   Mr. Gutwillig, will have an opportunity to speak to you for

19   just a little bit more before you receive your instructions

20   from the Judge and begin your deliberations.

21           So, before I leave you, I would like to remind you of

22   three things that Mr. Gutwillig asked you to do at the

23   beginning of this trial:  First, he asked you to pay close

24   attention to the evidence.  And, ladies and gentlemen, I know

25   that you absolutely have done that, and I thank you for the

L3JKRAM2                    Summation — Mr. Lockard

1    close attention that you've paid.

2          Second, Mr. Gutwillig asked you to follow the Judge's

3    instructions on the law, and I know you'll do that as well.  I

4    know that you followed the instructions you've received so far

5    and will follow the instructions that you're given in your

6    deliberations.

7          And, third, Mr. Gutwillig asked you to use your common

8    sense.  And now that you've paid close attention to the

9    evidence, and after you've heard Judge Castel's instructions on

10   the law, and when you apply your common sense, I submit to you

11   that you will be led inescapably to one conclusion — that the

12   evidence shows that Geovanny Fuentes Ramirez conspired to

13   traffic in tons of cocaine bound for the United States, and

14   that he used guns and violence to do so, that he conspired to

15   violate U.S. narcotics laws, that he carried, used, and

16   possessed weapons, including machine guns and grenade

17   launchers, in furtherance of that conspiracy, and that he

18   conspired to carry, use, and possess firearms in furtherance of

19   that conspiracy, that Fuentes Ramirez is guilty of the crimes

20   charged beyond a reasonable doubt.

21         Thank you.

22         THE COURT:  All right.

23         Ladies and gentlemen, let's take a ten-minute break,

24   and we'll give Mr. Moskowitz an opportunity to set up for his

25   closing arguments.

L3JKRAM2                    Summation — Mr. Lockard

1          Remember, do not discuss the case among yourselves or

2     with anyone.  There's more to be heard.  Still keep an open

3     mind.  You haven't heard the defense closing argument, and you

4     haven't heard my instructions on the law.  See you in ten

5     minutes.

6          Please wait for the jurors to exit the floor before

7     leaving the courtroom.

8          (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3JKRAM2                          Summation — Mr. Lockard

1                    (Jury not present)

2                    THE COURT:  There's a note that reads:  "Please tell

3       the lawyers to speak louder.  Thank you."  We'll have it marked

4       as the next court exhibit.

5                    MR. MOSKOWITZ:  I promise, your Honor, that won't be a

6       problem.

7                    THE COURT:  I didn't think it would, Mr. Moskowitz.  I

8       didn't think it would.  The reality is that we have a HEPA

9       filter running, and we have the ventilation system running,

10      and, quite appropriately, we have an interpreter speaking into

11      a microphone softly, but speaking.  The combination of the

12      foregoing has, at all times during this trial, required people

13      to speak up.

14                   (Pause)

15                   THE COURT:  Okay.  We're in recess.

16                   (Continued on next page)

17

18

19

20

21

22

23

24

25

L3JKRAM2                           Mr. Moskowitz — Summation

1              (Recess)

2              THE COURT:  All right.  Anytime you're ready,

3      Mr. Moskowitz.

4              MR. MOSKOWITZ:  Thank you, your Honor.

5              May it please the Court, Judge Castel, members of the

6      prosecution, ladies and gentlemen of the jury:

7              I'd like you to imagine the following nightmare

8      scenario.  Imagine you're coming home from a business trip or a

9      vacation abroad, you're in a country where you don't speak the

10     language, you get to the airport, and you are arrested by the

11     local police, or the government police.  And they tell you that

12     you're being charged with crimes that could put you in jail for

13     the rest of your life.  You're scared and confused.  And you

14     ask, who's accusing me of these terrible crimes?  And the

15     answer to the question that you get sends a chill down your

16     spine.  The police officer tells you:  Your accuser is Leonel

17     Rivera, one of the 21st Century's most significant drug

18     traffickers and a mass murderer on a scale that none of us have

19     really ever experienced, I'm sure, a man who's admitted to

20     murdering 78 people.  That, ladies and gentlemen, is the

21     nightmare that Geovanny Fuentes Ramirez faced a little bit more

22     than a year ago today.  And he is the one that is facing the

23     evidence and the story that was put together by Leonel Rivera.

24     And you have the power to end that nightmare for him.

25             Ladies and gentlemen, during the jury selection, and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L3JKRAM2                          Mr. Moskowitz — Summation

1    again before the case started, and then at various points

2    throughout the trial, the Judge told you that in our criminal

3    justice system, the defendant is presumed innocent, and that

4    the government has the burden of proving a defendant's guilt

5    beyond a reasonable doubt.  And all of you have to be

6    unanimously convinced that the government's evidence is

7    sufficient beyond a reasonable doubt.

8            Now, the concepts of the presumption of innocence and

9    the burden of proof beyond a reasonable doubt, you've probably

10   all heard them before — certainly if you watch any police

11   procedurals, you've heard that before — but they're not empty

12   concepts, and they're not mere platitudes.  They are the

13   bedrock principles on which our criminal justice system exists.

14   They are what make our criminal justice system the envy of

15   countries around the world.  Those two concepts — the

16   presumption of innocence and the burden of proof — protect us

17   all from the awesome powers of the government and from people

18   who might choose to accuse us falsely of things that we didn't

19   do.  And those two concepts — the presumption of innocence and

20   the burden of proof beyond a reasonable doubt — is what

21   protects Geovanny here in this courtroom.

22           In this case, as we're going to talk about going

23   forward, you will, I am sure, conclude that the government has

24   failed to overcome the presumption of innocence, and has failed

25   to prove Geovanny's guilt on any of the charges beyond a

L3JKRAM2                     Mr. Moskowitz — Summation

1    reasonable doubt.

2           Now, where is the reasonable doubt in this case?  I'm

3    not going to discuss with you the legal definition of

4    reasonable doubt — Judge Castel will do that in some great

5    detail in his jury instructions — but you'll get the idea.  In

6    determining whether there is reasonable doubt in this case, the

7    obvious place to start is with the government's star witness,

8    Leonel Rivera.

9           Now, as I was sitting listening to Mr. Lockard's

10   summation, something struck me.  He told you a story, he told

11   you a story of what he claims happened and who did what.  But

12   what you didn't hear coming out of his mouth was, Leonel Rivera

13   told you this story, this is a story authored by Leonel Rivera,

14   with maybe some edits by a couple of other witnesses and some

15   footnotes by a couple of other witnesses.  But Leonel Rivera is

16   the key to their case, and if he is not believed, there is

17   reasonable doubt.  And there is a lot of reason not to believe

18   Leonel Rivera.

19          Now, let's start with what we know about him.  He is

20   one of the world's most significant drug traffickers.  By his

21   own admission from the witness stand, he trafficked more than a

22   hundred tons of cocaine into the United States.  Now, of

23   course, that's not necessarily what he said under oath when

24   asked about it in another case, but we'll get to that.

25          He made over $50 million trafficking cocaine.  He

L3JKRAM2                        Mr. Moskowitz — Summation

murdered 78 people — men, women, children, high-ranking

government officials, his own family members.  He murdered or

participated in the murder of five people while he was

negotiating, cooperating with the government.  It's

astonishing.  On the one hand, he's going to the United States

Government and says I want to come in, I want to cooperate with

you, and while he's doing that, he's murdering four people

between October 30th and the end of November, and then another

one where he provides information to a drug trafficker and the

guy gets killed — Alex Berrios, you remember him.  All of that

while involved in negotiations with our government.

          It's unbelievable.  That man has got to be the most

vial, despicable person that any of us has ever encountered in

any walk of life.  And that's who the government put on the

witness stand and asked you to believe beyond a reasonable

doubt.  That man has no morals, he has no scruples, and he

probably has no soul, and I submit to you, he can't be believed

about anything beyond a reasonable doubt.

          But you don't have to rely on my describing his

character to find reasonable doubt.  You can base your

reasonable doubt on his own testimony.  What am I talking

about?  He got on the stand, and he admitted to you that while

he was cooperating with the government, while he was being

debriefed, while he was telling the government why they should

sign him up for a cooperation agreement, he lied to them for

L3JKRAM2                         Mr. Moskowitz — Summation

months, and months, and months, repeatedly, without getting

caught.  What does that tell you?  He's a really good liar.  He

lied to these people, he lied to their colleagues, with

impunity.  And then he claims that one day he decided, you know

what, I'm going to have a conversation with my lawyer, and,

poof, now I'm going to tell the truth.

          Can we see Defense Exhibit A on the screen, please.

Second page, please.  Yes, the next one.

          That's the proffer agreement.  That's the agreement

that covered the preliminary meetings when Mr. Rivera was

negotiating for his cooperation agreement.  And you remember,

we went through it, there's —— I think, if my count is right,

there are about 19 or 20 meetings, he initialed it each time,

and each time he's told, you have to tell the truth, and he

quibbled with me about, well, is withholding information the

same thing as lying?  Did I get that warning, did I not get

that warning?  We all know what the truth is.  The truth is the

truth; you either tell the truth or you don't tell the truth.

If something happened, and you tell about two people who were

there, and you don't tell about the third, that's not the

truth.  He doesn't know what the truth is.

          And then I asked him, okay, you said at some point,

you stopped lying, can you tell me when in the process of these

20 meetings you stopped lying?  When did you have this

revelation that it's time to tell the truth?  His answer was:

L3JKRAM2                           Mr. Moskowitz — Summation

1    I don't know, I don't remember.

2              So I asked him:  Okay, when you finally signed your

3    cooperation agreement in April of 2016, by then, had you

4    stopped lying?

5              And he said:  Yes, by then, I stopped lying.

6              But we know that's not true.  How do we know that's

7    not true?  Because twice, in this courthouse, under oath, he

8    lied, and he lied about stupid things.  He was asked from the

9    witness stand:  How much cocaine did you traffic?  What's your

10   best estimate?

11             And he said:  Twenty tons or more.  We know it's a

12   hundred tons or more.  And he knew that.  But for whatever

13   reason, he didn't want to give that up at that time.  He

14   testified under oath, and he couldn't tell the truth.

15             When else did he lie?  He was asked a question about

16   his family and were they involved in his drug-trafficking

17   conspiracy.  And what did he say under oath?  I don't remember.

18   Really?  You're in business with your family, your father, your

19   mother, your brothers, and you don't remember if they're

20   involved in the drug-trafficking conspiracy?  Ridiculous.

21             (Continued on next page)

22

23

24

25

L3JHRAM3                    Summation - Mr. Moskowitz

1          MR. MOSKOWITZ:  (Continued) That's what he said under

2     oath after he signed his cooperation agreement.  But you know

3     what?  He got away with it, and that just emboldened him.  He

4     didn't have his cooperation ripped up.  The prosecutors didn't

5     say:  You lied under oath.  That's it.  You're done.  We're

6     finished with you.  No, they trotted him out again here to tell

7     his stories, to weave his fiction.  Unbelievable.

8          He says he didn't remember when he stopped lying or

9     when he -- or whether his family was in the drug trafficking

10     business with him.  So that would make you think maybe his

11     memory's really bad.  But, you know, one of the things that I'm

12     sure you realized was how different Mr. Rivera's testimony was

13     on direct and on cross.  On direct examination he had

14     incredible recall of conversations that took place in 2009, he

15     says, or 2010.  He remembered exactly what he claims Geovanny

16     said to him and what Metro said to him in specific detail.  Not

17     only did he remember the conversations, he could tell you where

18     they happened; he could tell you what gun everybody had.  I'm

19     carrying a semiautomatic.  He's carrying an AK-47.  He's

20     carrying an AR-15.  Specific details about events 11 years ago.

21          On cross-examination a completely different story.  He

22     couldn't remember anything.  His memory disappeared.  He

23     couldn't remember the details of murders he committed.  When

24     you asked him about the murders he committed:  I'm sorry.  I

25     don't remember.  When you asked him what he told the government

L3JHRAM3                       Summation - Mr. Moskowitz

1    about the murders he committed, he couldn't remember, and those

2    events are a lot closer than the random events he's claiming he

3    remembers of a drug deal he did 11 years ago.  The murders he

4    can't remember; the drug deals with Geovanny, those he

5    remembers.  The conversations, he remembers.

6         What else couldn't he remember?  He couldn't remember

7    whether he told different versions of the same event to the

8    prosecutors when he was being debriefed.  Every time he gets

9    confronted:  Sorry, I don't remember." Show him things to

10   refresh his recollection:  Sorry, doesn't refresh my

11   recollection.  Completely don't recall.

12        Perhaps most tellingly, he told you he couldn't

13   remember anything about the very first meeting he had with the

14   DEA representatives of the United States government.  I want

15   you to picture this.  You are a longtime drug trafficker.

16   You're a multi-millionaire.  You're living the life of luxury.

17   You've got armed bodyguards.  You are the king of the hill as

18   far as drug trafficking in Honduras, and suddenly you decide

19   I'm going to turn myself in or I'm going to consider turning

20   myself in to the United States government.  I'm going to

21   arrange a meeting and go talk with them and see if we could

22   work out a deal.  You have to imagine, imagine in your own

23   lives an event that seismic.  Your whole world from before is

24   going to change.  You're going to go from a multi-millionaire,

25   king of the hill to a prisoner in a United States jail.  You're

L3JHRAM3                     Summation - Mr. Moskowitz

about -- you're transitioning towards that.  You would think
that first meeting would be burned in Leonel Rivera's memory.
He couldn't give you the most simple details of that meeting.
Remembered barely approximately when it took place, although we
know it took place in November of 2013.  Couldn't remember
whether it took place in Honduras or in Belize, couldn't
remember the names of any of the agents that he spoke to.

         Really?  An event that important in his life and he
wouldn't give you a single detail about it.  Do you really
believe he didn't remember it or he just didn't want to talk
about it?  Was he telling the truth or was he lying?  Is his
memory completely shot or was he just lying and playing games
with you?

         You know what else he couldn't tell you that I found
astonishing and I'm sure many of you will?  He told you that he
surrenders to the United States in 2015, January 2015, and he
is really worried about the family that he's left behind, his
wife, his children.  So I asked him:  So when did they get
here?  No idea.  Which family members are here?  Can't
remember.  Those little lies, those refusals to give you the
very basic facts that you know he knows tells you he was
playing games from that witness stand and that you can't
believe him.

         Another stark indicator that Leonel Rivera can't be
believed is just the difference in his demeanor between direct

1    and cross and redirect.  Now, maybe I'm a little bit more

2    sensitive to it because this is what I do for a living, but

3    we're all watching people to try to determine, are they telling

4    us the truth or not?  On direct examination he was respectful,

5    he was responsive:  "Yes, sir"; "no, sir."  "Can you repeat the

6    question?  I didn't quite understand it."  He gave answers to

7    the questions that he practiced giving with the government.

8         But on cross-examination the real Leonel Rivera showed

9    up, the drug-dealing murdering Leonel Rivera, the one for whom

10   rules and the law don't mean anything.  On cross-examination

11   did a couple of things.  First of all, couldn't remember

12   anything, and second of all, regardless of what the question

13   was, what did he say?  Oh, I did it just like your client did.

14   Or, yes, I'm responsible, but so your client.  Or the corrupt

15   politicians helped me do it.  None of that was relevant, but he

16   had a script.  He had a point.  He wasn't here as an objective

17   witness.  He wasn't here to tell you what happened.  He was

18   here to tell you and sell you his fiction.  He was here to bury

19   Geovanny, and he wasn't going to let my questions get in his

20   way.  And remember, he knew -- by the time he got on that

21   witness stand, he knew that he could lie under oath and get

22   away with it because he had already done it twice.

23        So now let's spend a little time just looking at some

24   of the details in Mr. Rivera's story that don't make sense and

25   why you should -- why the substance of his testimony should not

L3JHRAM3                     Summation - Mr. Moskowitz

1    be believed.

2              Now, throughout the trial you heard testimony that Los

3    Cachiros, the drug trafficking organization headed by Leonel

4    Rivera and Javier Rivera, was one of the most powerful drug

5    trafficking organizations in the world.  Leonel Rivera told you

6    that he bribed the last three or four presidents of Honduras,

7    that he paid millions of dollars in bribes to get protection

8    from the highest levels of government, protection against

9    arrest and protection against extradition.  You also heard that

10   he had bribed countless police officers and other politicians

11   and military people.  He had so much money he could just give

12   it out, bribe here, bribe there.  Millions of dollars he paid

13   to bribe the presidents of Honduras for protection, and yet he

14   wants you to believe that in 2010 he decided he needed

15   Geovanny -- Geovanny's police contacts.  This is a guy who told

16   you that between 2009 and 2013, when he owned President Lobo

17   Sosa because he had bribed him with $500,000, or something like

18   that, and he had a deal where President Sosa's son accompanied

19   every drug shipment that he brought into the country -- that's

20   what he told you.  I asked him:  Were there times he didn't go

21   with you that you just kind of gave him notice that it was

22   coming?  He said:  No, he rode with me every single time.  And

23   what did he tell you about what happened when the president's

24   son was riding with him?  They got through a checkpoint.  The

25   president's son told his people:  Put on your sirens.  He

L3JHRAM3                    Summation - Mr. Moskowitz

1    rolled down his window.  He gave them a salute, and they were

2    let through.  When you have that kind of clout, when you have

3    that kind of weight, are you going to pick, you know, go --

4    claim that you need the police contacts of somebody that you

5    don't know?  You're going to bring them into the business?

6    Really?  Does that make any sense at all?

7              But you know what else doesn't make any sense?  It

8    doesn't make any sense that Mr. Fuentes, who according to

9    Leonel had been selling cocaine in Miami, was starting a

10   cocaine lab, it doesn't make any sense that Mr. Fuentes would

11   kill a boat mechanic who happened -- he happened to hear stole

12   some money from Leonel Rivera and that he would do it without

13   even asking Leonel whether he wants him to.  First of all, it's

14   hard to believe -- we're talking about Leonel Rivera here, OK,

15   guy does 78 murders -- he's going to let some little boat

16   mechanic rip him off and not pay the price?  You think he's

17   going to wait?  You think Leonel is going to wait for Geovanny

18   to volunteer to take him out?  Really?  For months he's going

19   to let that guy think he can steal from Leonel Rivera?  Doesn't

20   make any sense.

21             What else doesn't make any sense is according to

22   Leonel Rivera, Geovanny was -- had opened a cocaine lab, was

23   bringing in cocaine base from Colombia, had his own business.

24   Why is he going to go work as a security guard transporting

25   cocaine, somebody else's cocaine, for a few bucks from Leonel

L3JHRAM3                    Summation - Mr. Moskowitz

1    Rivera?  Does it make any sense to you?  He says, oh, he's got

2    his own business.  What I'm going to go -- I'm going to go work

3    overtime as a security guard?  Doesn't make any sense.

4              Now, here's another way you can tell that Leo was

5    lying.

6              Could we see Exhibit 15 up on the board.

7              Now, I'm sure this morning when Exhibit 15 was put up

8    on the board -- the page with the text, please -- I'm sure when

9    Government Exhibit 15 was put up on the board this morning and

10   I read it to you, you're thinking to yourself, what's that all

11   about?  Well, I want you to compare the statements here with

12   Leo's testimony about the same events at this trial.  OK.

13   First of all, if you read the document, what you see is he's

14   saying Metro paid Vaquero to kill Pluto.  He learned about the

15   murder of the police officer from Valladares and that Metro

16   killed the police officer.  He told you that -- and this is the

17   most important one, really, because it just -- it also gives

18   you a little bit of information about Geovanny that Leonel

19   didn't want to admit to you.

20             Look at the last one.  Remember what Leonel said at

21   trial?  Leonel said at trial that he hired Vaquero to kill

22   Metro and to kill Geovanny, and that what happened was Vaquero

23   took his sicarios to Geovanny's house, there was a firefight,

24   some of his men got hit, and Vaquero withdrew and, poof, after

25   that there's peace between Geovanny and Leonel.  But what did

1   Leonel tell the government in the secret of their offices that

2   he wouldn't admit from the stand?  On his own, Vaquero tried to

3   kill Geovanny Fuentes.  Vaquero said he was at a horse race and

4   killed someone, and Geovanny Fuentes called the police.

5   Vaquero went to jail for two or three years.  After Vaquero was

6   released and Vaquero killed Metro, Vaquero tried to kill

7   Geovanny Fuentes.  That's not the story that you heard from

8   Leonel Rivera on the witness stand.  That's not the story he'd

9   even admit telling the government when I confronted him about

10  it, but that's what he told the government.

11          With that lie alone, with that alone can you believe

12  anything else that Leonel Rivera told you about Geovanny

13  Fuentes?  Vaquero had his own reasons to kill Geovanny, at

14  least that's what Leonel told the government.  What were those

15  reasons?  Geovanny called the cops on him and he went to jail

16  for two or three years.  What self-respecting drug dealer is

17  going to call the cops on one of his sicarios?  That's what

18  Leonel said he was, that Vaquero worked for Geovanny.  How

19  absurd is his testimony from the witness stand in light of that

20  statement?

21          Another fact that just doesn't make sense -- and let

22  me just suggest something to you.  You know, a trial is like a

23  puzzle.  You've got to try to see if the pieces fit.  If at the

24  end of the trial you're left with a bunch of pieces that don't

25  fit, that's reasonable doubt.  They tell you things and it

L3JHRAM3                    Summation - Mr. Moskowitz

doesn't make any sense, that's reasonable doubt.

So what else is reasonable doubt?  Leonel would like
you to believe that after years of working -- couple years of
working with Mr. Fuentes and paying him money, that Geovanny
decided he wants to kill Leonel and Javier because he wouldn't
invest in a drug deal.  Does that make any sense at all?
According to Leonel, according to the government, Geovanny,
because he was working for Leonel, had all these contacts with
all the other drug dealers that he was dropping drugs off at.
He knew the Valles.  He knew the other guys, Hector Emilio.  If
there's a cocaine deal to be made and the Cachiros don't want
it, you go down the block to the next drug dealer.  You don't
say, you know what?  You don't want to invest a million bucks
with me.  I'm going to kill you.  That makes no sense.  There's
no logic to it because it didn't happen.

And by the way, if Geovanny -- according to the
government, if Geovanny needed money, he knew where he could
go.  He had a sugar daddy.  He had Fuad Jarufe, according to
the government.  He could go to him:  Listen, I have a business
proposition.  Could you lend me some money?  Doesn't make sense
that a guy who was, even by Leonel's account, a nobody, a
little guy compared to Leonel, would decide, you know, I'm
going to take out the head of the Cachiros because he won't
lend me some money.  That story doesn't make any sense.

What else doesn't make sense?  Leonel wants you to

L3JHRAM3                    Summation - Mr. Moskowitz

believe and the government wants you to believe that Geovanny

gets arrested and he meets Leonel in prison after Leonel had

already testified against various narco-traffickers, after he

had testified against Tony Hernandez, after his name was all

out on the Internet as a government cooperating witness, that

he runs into him in prison and he immediately decides, you know

what?  I'm going to make some incriminating statements to you.

Sure, let me tell you about my deal with Juan Orlando

Hernandez.  Really?  Really?  In some real world does that

actually happen or is that a fiction that Leonel made up?  And

keep in mind, Leonel told you Geovanny knew.  Geovanny said to

him:  I know you're cooperating against me.  So, of course, the

next statement is going to be:  Let me tell you about -- let me

give you some additional evidence against me.  Does that story

make any sense to you?

          OK.  Those are just a few examples of parts of

Leonel's story that don't make any sense, but let's look for

some additional reasonable doubt.  If his character and lack of

morality is not enough, if his repeated lying isn't enough, if

the parts of his story that don't make sense isn't enough to

give you reasonable doubt, let's consider the total lack of

corroboration.  You would think if the government is going to

rely on somebody as evil as Leonel Rivera, they'd do their

homework.  They'd try to corroborate those parts of the story

that they could.

L3JHRAM3                        Summation - Mr. Moskowitz

1           Now, you have heard a lot about Agent Fairbanks and
2      Agent Gonzalez about the DEA's limitations about getting
3      information out of Honduras.  OK.  I can understand some things
4      might be sensitive, but there was testimony about the ownership
5      of the land in Cerro Negro.  They claimed that it was owned by
6      Geovanny at the time of the raid.  Geovanny told you, you saw
7      it on his postarrest statement, that it was Mr. Jarufe's
8      property and that later, after the raid, it was given to him by
9      Mr. Jarufe.  Property ownership, land deeds, you would think
10     that would be something that the DEA might be able to get if
11     they tried just a little bit, but you didn't hear -- you
12     certainly didn't see it and you didn't hear that "We went to
13     the land registry case, and they wouldn't give us a copy of the
14     deed."  There's no effort, no real effort, to corroborate Leo.
15          All right.  Let's put Honduras on the side for a
16     minute.  Leonel Rivera tells you that before he actually meets
17     Geovanny, he's told that Geovanny and Metro had a deal where
18     Metro was sending cocaine to Miami and Geovanny was collecting
19     it in Miami and distributing it in small amounts.  So what does
20     that fact mean?  It means Geovanny had to be in Miami to pick
21     up the drugs, the kilos, the one to five kilos he's getting a
22     month, break it up and sell it in small amounts.  So if
23     Geovanny is in the United States, what kind of evidence do you
24     think the United States government might have on that?  Do you
25     think they might have records from border control of Geovanny

1    coming into the country?  If he was here for an extended period

2    of time, do you think there might be records as to when he came

3    and when he left?  Wouldn't you like to know or see or have

4    proof that that part of the story is true?  It's in the

5    government's control.  All they have to do is think about doing

6    it, but they didn't.  They didn't bring that to you.  Would

7    have been a small thing to give some credibility to Leo Rivera,

8    but they didn't do it.  They relied on Leo's fiction.

9           Now, you know that there are no audiotapes, there are

10   no videotapes of Geovanny and Leo.  There's no pictures of them

11   together.  There's no calls on Geovanny's phone to Leonel or

12   Javier Rivera.  There's no text messages.  There's no WhatsApp

13   chats.  There's no emails.  Indeed, the government failed to

14   produce any documentary evidence of any actual contact between

15   Geovanny and any of the alleged drug dealers who were part of

16   this conspiracy or even any contacts between Geovanny and the

17   politicians he supposedly owned.  You saw he had numbers,

18   people's phone numbers, in his phone, but what you didn't see

19   were calls or texts or chats or emails or any actual contacts.

20          Now, in the absence of kind of documentary or physical

21   corroboration, you might think maybe the government could call

22   another witness.  Well, let's see.  Who might that be?  We

23   heard that Leonel Rivera and Javier Rivera came in out of the

24   cold together.  We heard Javier Rivera, the co-head of the

25   Cachiros, is a cooperating witness.  You would expect that he

L3JHRAM3                    Summation - Mr. Moskowitz

1   might have something to say about whether Los Cachiros were in

2   business with Geovanny Fuentes.  But who's missing from this

3   trial?  Whose name do you barely ever hear?  Javier Rivera.

4   Javier Rivera, as despicable as he may be, may have been able

5   to corroborate some of what Leonel said, you would think

6   anyway.  His absence here speaks volumes.  The government

7   didn't call him, and you can ask why.  I suggest you should

8   conclude they didn't call him because he wasn't going to

9   corroborate Leonel.  His absence is one of the elephants, one

10  of the elephants in the room.

11          The government has contended, is going to contend,

12  that Leonel has every incentive to tell the truth and no

13  incentive to lie.  That's not true.  In a rational world, that

14  should be true, but it's not true.  Leonel's incentive is to

15  get a letter from the government addressed to his sentencing

16  judge which will allow the judge, allow the judge, not

17  guarantee, but allow the judge to completely ignore the

18  mandatory minimums.  And he's facing, as he told you, life plus

19  30 years mandatory minimum.

20          His only, only chance to get out of prison, to be a

21  free man again, is to get that letter from the government.  So

22  he's going to do what he thinks the government wants him to do,

23  truth be damned.  We know -- again, I hate to beat this dead

24  horse -- but we know he doesn't care about lying under oath

25  because he's done it twice already, and he got away with it.

L3JHRAM3                    Summation - Mr. Moskowitz

1    We know rules mean nothing to him.  We know he's told you've

2    got to tell the truth in your proffers, and he lies.  We know

3    he's told you can't violate any laws again, and what does he

4    do?  Not only does he lie under oath, but even stupid things,

5    he possessed a contraband cell phone in prison and then kind of

6    quibbled with me as, well, I'm not sure if possessing it is a

7    crime.  I know smuggling it is a crime, but possessing it, I'm

8    not sure.  Really?  Really, does that make any sense?  He gets

9    away with things.  The government lets him get away with

10   things.  So where is the incentive?  Where's the hammer?  The

11   agreement, the cooperation agreement reads as if there is a

12   real hammer over Leonel's head.  You lie.  We're going to rip

13   up this agreement.  You're going to go to jail for the rest of

14   your life.  Reality tells us that's not the way this deal

15   works, not the way it works for Leonel Rivera.

16          Ladies and gentlemen, I'm going to move on from Leonel

17   Rivera, but I want to suggest to you that, based on everything

18   I've said to you so far, there is nothing that he says or said

19   that you should believe beyond a reasonable doubt.  He is

20   undoubtedly the worst person any of you have ever seen.  It's

21   appalling, disgraceful, that our government made a deal with

22   him.  They're allowed to.  They're certainly allowed to.  Judge

23   is going to tell you they can make a deal with him, but really,

24   folks, that's the kind of person our government is going to

25   make a deal with?  You can't believe him beyond a reasonable

L3JHRAM3                    Summation - Mr. Moskowitz

1   doubt, and by your verdict, by finding Geovanny not guilty, you

2   should tell the government, stop using guys like that.

3          Now let's talk a little bit about Jose Sanchez.  He's

4   the next linchpin, not quite as important, but the next

5   linchpin in the government's case.  And you remember he told

6   you that he attended or participated in two meetings in which

7   he claims that Mr. Fuentes paid bribes to Juan Orlando

8   Hernandez, the president of Honduras, when he was running for

9   president.  The first one he told you he heard them talking

10  about the president -- or Juan Orlando telling Mr. Fuentes:

11  I'm going to protect you, and I want you to reopen, reopen,

12  your drug lab, and I'll get the military to transport your

13  drugs and so on.  Now, at first blush that testimony -- oh, and

14  the rest of the story is, of course, Mr. Fuentes, in gratitude,

15  pulls out $15,000 and hands it to the soon-to-be president, and

16  the president says:  No, I don't want -- I don't want the

17  dollars; I want cash.  So that's what Mr. Sanchez is doing

18  there.

19         So why doesn't that sense -- why doesn't that story

20  make any sense?  First of all, according to Mr. Sanchez, both

21  meetings take place in the months before the presidential

22  election, and so think about it.  You're running for president.

23  You've got the ultimate goal in your sight.  So what you're

24  going to do is you're going to go meet with a purported drug

25  trafficker, invite a third party into the meeting who's not

L3JHRAM3                    Summation - Mr. Moskowitz

part of the deal, and then talk about your drug trafficking

deal in front of that third party and risk, risk losing the

golden ring.  It's there.  It's in his sights, and he's going

to bring in a third party he doesn't know, who he can't

necessarily trust, and he's going to let him know I'm going to

go be in bed with a drug trafficker.  Does that make any sense

to you?

        Also, remember Leonel Rivera told you -- and this is

probably one of the few things he said that was true -- that

bribing a president isn't cheap.  He said, I have to pay

$250,000 to Juan Orlando Hernandez.  I have to give half a

million dollars to Mr. Sosa, Lobo Sosa.  I gave half a million

dollars to the prior president.  The government wants you to

believe -- they opened on this.  Mr. Gutwillig actually said in

his opening -- for $25,000 Geovanny supposedly owned Juan

Orlando Hernandez.  He bribed -- $25,000, that's what's going

to get him the president of Honduras?  Does that make any sense

to you?

        What else?  So let's talk about the money exchange,

because this was interesting.  Mr. Sanchez tells you he takes

the cash and he goes to the bank, and he has to fill out these

anti-money laundering forms because it's more than $2,000.  So

I asked him:  Well, what did you put on -- how did you break it

up and what did you put on the money laundering forms?  So he

says:  Well, on some of them, I put down that the money came

L3JHRAM3                    Summation - Mr. Moskowitz

from Mr. Fuentes, and on -- that was on one meeting.  And the

other one, he said on the second time he did it, I put that the

money came from Juan Orlando Hernandez.  You're going to

launder drug money and you go to the bank and you fill out the

form telling the bank and the government, who's supposedly

looking at these forms:  Here's the drug dealer that I got the

money from.  Here's the corrupt politician I got the money

from.  Go ahead.  And by the way, most importantly, he told you

nobody told him how to fill out the forms.  Geovanny didn't say

to him, according to Mr. Sanchez:  Listen, whatever you do,

don't put my name on those forms.  Juan Orlando Hernandez

didn't say to him:  Whatever you do, don't put my name on the

forms.  Any lies that he told on the forms -- and he admitted

to you that he lied on some of the forms -- those were his

decisions.  Does that story ring true to you?  What

self-respecting drug dealer or corrupt politician is going to

have his name put on a money laundering form?  Sure.  The cash

is mine.  Don't worry about it.

        Mr. Sanchez tells another story that doesn't make a

lot of sense, the story about Mr. Barahona.  So he tells you

that one day he's at work, and Mr. Barahona, the head of the

judiciary in Honduras, walks in and says, and I think I got

this quote right:  "The boss sent me to help the fellow out any

way I can."  That's the quote, and you can look it up in the

transcript.

1           Mr. Sanchez, who had never met Mr. Barahona before,

2      interprets in his mind, oh, what that means is Juan Orlando

3      Hernandez sent him to clean up Geovanny Fuentes' record.  No

4      factual basis for that interpretation, but that's how he

5      interprets it.  And what's the problem with it?  Well, first of

6      all, and most importantly, there was nothing to clean up.

7      Geovanny hadn't been arrested.  There were no charges against

8      him.  There were no convictions.  He didn't have a record to

9      clean up.  What's he coming to clean up?

10          Then he tells you at the end of the meeting he writes

11     a check to Mr. Barahona as a bribe.  OK.  I assume none of you

12     have done bribes before, and that's of course, but bribes are a

13     crime.  Bribes are done in secret.  The last thing you want to

14     do if you're bribing somebody is give them a check.  OK.  So he

15     gives him a check from Graneros, but what does he do?  He

16     charges the check to Geovanny's loan account at Graneros so

17     that if anybody bothered to check, what's the story with the

18     check, if anybody thought Barahona was crooked and we need to

19     do an investigation, it's going to come right back to Geovanny.

20     That's the story Mr. Sanchez tells you.  Does that make any

21     sense?  Have you ever heard of somebody paying a bribe by

22     check?  Doesn't make any sense.

23          Now, another fact that doesn't make any sense is about

24     Mr. Sanchez's story is the timeline.  He tells you that the two

25     meetings take place before -- in 2013 before the election, and

1  we sparred about that.  You may remember he was -- he was in

2  the United States for October of 2013, and he was not

3  remembering exactly when it took place, but he said there were

4  a few months in between and they both took place before the

5  election.  So we had a little bit of going around in circles on

6  that.  But ultimately, he admits, yes, they both took place in

7  2013 before the election.

8          So he tells you at the very first meeting he sees

9  Geovanny talking to Juan Orlando Hernandez, and they have that

10 drug-related conversation.  He says I got scared.  I'm scared

11 that I'm going to get killed because I know too much.  OK.

12 Well, what do we know?  No threats were made against him at the

13 meeting or subsequent to the meeting.  He goes to the United

14 States in October of 2013 and comes back.  So was he really

15 scared?  Did he see anything that would have made him scared?

16 If so, go to the United States, tell them what you saw, claim

17 asylum, bring your family.  That's what he ultimately does.  He

18 doesn't do it then.

19         Now, not only that, he told you how scared he was of

20 Juan Orlando and of the defendant, but what happens when he

21 comes back?  He has this amazing meeting where he calls the

22 next president of Honduras a thief to his face, and then when

23 the president laughs it off and tries to shake his hand, he

24 refuses to shake Juan Orlando's hand.  Is that a guy who's

25 scared of the president, that they're going to kill him, or is

L3JHRAM3                     Summation - Mr. Moskowitz

1    that a guy now who's looking to get asylum here and making a

2    claim?  If he was really afraid, if he was really afraid, why

3    did he wait till 2015?  Why did he wait to make an asylum

4    application another four years after arriving in the United

5    States with his family?  He comes in June 2015.  He doesn't

6    make an asylum application until October 2019.  The story

7    doesn't make sense.  It gives you reasonable doubt.

8           You know, there was another part of the stipulation we

9    read this morning, and I'm sure you're scratching your head

10   about that too.  It was just a small piece of a statement that

11   he made when he was interviewed by the FBI in October 2019.

12   The stipulation is in evidence.  It's Government Exhibit 1009,

13   and what it tells you is that when Mr. Sanchez met with the

14   government, the FBI, in October 2019 and began this process

15   that brought him to testify here, he told the government that

16   the raid at the drug lab took place in 2014 and that the

17   meeting between Geovanny and the president took place three

18   weeks later.  So what does that tell you?  He had no idea when

19   these events took place.  We know that the raid took place in

20   2011.  He had no idea, and he screwed up the story.  He messed

21   it up.  Somehow he managed to correct the story by the time he

22   got here.  That should give you reasonable doubt.

23          And by the way, what should also give you reasonable

24   doubt is the fact that he denied messing up the story.  I asked

25   him on cross-examination:  When you met with the government,

1    did you tell them that the raid took place in 2014?

2              No.

3              Did you tell them that the meeting with the president

4    and Geovanny took place three weeks after the raid?

5              No.

6              And why is the three-week period important?  Because,

7    according to Sanchez, Geovanny wasn't around for two months.

8    How could the meeting have taken place three weeks after the

9    raid?  The initial story he told the FBI didn't make sense, so

10   he changed it.

11             Now, the biggest flaw in Mr. Sanchez's testimony, and

12   this is huge, is the lack of corroboration.  Now, this is not

13   the same as Leonel.  Remember what Sanchez tells you?  One day

14   he gets the code to the video system at Graneros from Jorge

15   Jarufe, and he decides he's going to go into the video system

16   and he's going to look for meetings between Geovanny and Juan

17   Orlando Hernandez or meetings with Juan Orlando Hernandez where

18   he said bad things.  And he tells you he finds two meetings.

19   The first one was a meeting between Juan Orlando Hernandez and

20   some other politicians from Tegucigalpa, and Juan Orlando

21   Hernandez allegedly says -- or brags about how they're

22   stealing -- he's stealing from the government health care

23   system, and he's better at it than former president Callejas.

24             So he finds that meeting and he downloads it, and he

25   makes two copies of the meeting on flash drives.  Second

1  meeting is the -- he says he finds the second meeting between

2  Geovanny and Juan Orlando Hernandez when Geovanny supposedly

3  hands Juan Orlando Hernandez $10,000 and tells him:  This is

4  for your campaign.  And, again, according to Mr. Sanchez, he

5  makes two copies of that meeting on flash drives.  Mr. Sanchez

6  tells you, with respect to the first meeting, the health care

7  fraud or stealing meeting, he gave one copy to a prosecutor who

8  subsequently is murdered by gang members, and the second copy

9  he gives to his friend Cristian Ayala.

10         Well, what does that tell you?  He kept a copy of

11  each.  He kept a copy of each meeting.  I don't know, folks.

12  Did you see the meeting on your screen?  If he kept a copy of

13  the meeting, where was it?  How come the government didn't

14  provide you with those videos?  Either Sanchez didn't do it, he

15  never made the video, or it's being withheld, but whatever it

16  is, you haven't seen it.  That might have corroborated

17  Sanchez's testimony, but you didn't see it.  The failure to

18  show you those videos should give you more than ample

19  reasonable doubt to doubt the claims that Sanchez made and to

20  reject his entire testimony.  If the videos existed, there was

21  no rational reason they weren't produced to you.

22         I'm going to talk for a minute about the government's

23  expert Mr. Euraque, and his testimony should also give you some

24  reasonable doubt.  He told you Honduras is a very violent

25  country.  Many people carry guns for protection.  People who

L3JHRAM3                    Summation - Mr. Moskowitz

1   can afford it have bodyguards.  And those two facts, the

2   violence and the gun culture and the bodyguards -- three facts,

3   certainly help explain some of what you've heard about Geovanny

4   and some of what you've seen.  Not surprising that a

5   businessman in Honduras, a guy with a $5 million contract for

6   biomass is going to carry a gun or two.  You know he has

7   licenses for it.  You've seen the licenses.  He has licenses

8   for automatic weapons.  No surprise that he's going to have

9   bodyguards.  That -- the government's own expert helps explain

10  some of that.

11        But what's most important about the professor's

12  testimony is what he told you about Juan Orlando Hernandez.

13  The government's whole theory is that Mr. Fuentes paid off Juan

14  Orlando Hernandez, who's a corrupt politician, but the

15  statistics, the objective facts, don't support the government's

16  theory.  Professor Euraque told you Juan Orlando Hernandez was

17  one of the leaders of the legislation -- or one of the guys who

18  helped pass legislation that got the extradition law changed so

19  that drug traffickers could be extradited to the United States.

20  Professor Euraque also told you that in the period of time

21  since Juan Orlando Hernandez became president in 2013 till

22  today, drug trafficking through Honduras has gone down over

23  80 percent.  That's a hell of a corrupt drug trafficking

24  president.

25        Where are the facts?  The government's own expert told

1   you that Juan Orlando Hernandez started an anti-corruption

2   campaign, created a new police unit to fight corruption and

3   drug trafficking, and has cut drug trafficking through Honduras

4   by over 80 percent.  That alone cuts the legs off of the

5   government's theory with respect to Geovanny and the president.

6           Now, you know, before I got up to speak, before, I

7   said to Mr. Schulman, there was something missing from the

8   government's summation, and I realized it just before I got up.

9   Mr. Medina, Jorge Medina, you did not hear a word from

10  Mr. Lockard about his testimony.  Now, I can understand that,

11  because it's hard to understand why they called him in the

12  first place, but putting that all aside, the most important

13  part of Mr. Medina's testimony was his claim that Fuad Jarufe

14  made an offer through him to Javier Rivera that in exchange for

15  $5 million I will protect you from extradition.  I've got

16  connections with the president.  I can do that.  And Mr. Medina

17  told you from the stand that it was Mr. Fuentes who called him

18  and said:  Listen, Fuad Jarufe wants to talk you.  And he did

19  that twice.  Now, Mr. Medina admitted that if the meetings took

20  place, that Mr. Fuentes wasn't there and didn't know what was

21  being said in the meetings because he was not there, but he

22  claimed that it was Mr. Fuentes who told him to make the calls.

23          Problem with that is Javier Rivera's calls from the

24  MCC were taped.  And what we learned from Mr. Medina on the

25  stand, reluctantly, was that in January of this year, before he

1    had agreed to come to the United States -- and by the way, we

2    learned that it was Javier Rivera that put him in touch with

3    the DEA so that he could come here -- but before that, he had a

4    three-way call from -- with Mr. Javier Rivera from prison.  And

5    what happened on that three-way call?  Well, Mr. Medina told

6    you that Javier Rivera had asked him to write up a summary of

7    what happened between him and Fuad Jarufe and that offer

8    about -- you know, how that offer came about, and Mr. Medina

9    said I wrote it up and I sent it to Javier Rivera.  And what

10   happens on the phone call?  On the phone call, according to

11   Mr. Medina, he candidly admits, Javier Rivera says to him:  No,

12   you got to put Geovanny in the story, add to the story that it

13   was Geovanny who told you to call Fuad Jarufe.  Well, now you

14   know.  Now you know why the government decided his testimony

15   wasn't worth talking about in their summation.

16        Now, the government in its -- in its summation and

17   throughout the trial has made a big deal about Geovanny's

18   police contacts.  Now, first of all, I think you all know that

19   being friendly with police officers, people in the military,

20   even politicians, may be bad, may be a bad idea, may show bad

21   taste to some people, but it's certainly not a crime.  In fact,

22   one might argue that having police officers and military people

23   as your friends tells a little bit about your character.

24   You're hanging out with law enforcement.  For some people

25   that's a good thing.  (Continued on next page)

L3JKRAM4                    Mr. Moskowitz — Summation

1          MR. MOSKOWITZ:  (Continuing)  It's not -- you would

2     think, you would think, that a drug dealer, the last place he

3     wants to be is hanging out with law enforcement, but, according

4     to Mr. Fuentes' contacts, he certainly had a lot of friends, or

5     at least a lot of people that he knew, that were in law

6     enforcement.

7          So, second, keep in mind that with the exception of

8     the couple of chats with Commissioner Martinez and a couple of

9     chats with Comanche, all of the names that the government

10    flashed up that were in Mr. Fuentes' contacts on his phone —

11    there were no calls, there were no texts, there were no chats.

12    So, maybe he ran into them once or twice, maybe they were

13    willing to give him his phone number, he's a successful

14    businessman, you know, but the bottom line is, there's no proof

15    of any corrupt dealings with all of those cops and politicians.

16    You don't see any phone calls to Juan Orlando, you don't see

17    any phone calls -- he doesn't even have Tony Hernandez's phone

18    number, despite the fact that Sanchez said the president was

19    going to give it to him.  All of the people that they try to

20    connect to him, there are no calls, there are no chats, there

21    are no texts.  Really, he managed to keep it off the radar, for

22    all those years?

23          Now, the chats that the government showed you between

24    Mr. Fuentes and Comanche, they made a big deal about it, but

25    what is it really?  It's two friends talking about current

L3JKRAM4                          Mr. Moskowitz — Summation

1    events and speculating, oh, this drug dealer got killed, got to

2    be either somebody inside or the competition, or, you know,

3    things are really getting bad.  That's the way friends talk to

4    each other.  Imagine -- look, there are plenty of people among

5    us who take an interest in the Mafia or read, you know, stories

6    of gang-related violence, and if you're talking to your friend

7    about it, you may say, boy, those gangs are really at each

8    other, or I wonder what that guy did to deserve getting

9    whacked.  That's the tenor of those conversations.  There's

10   nothing criminal about it.

11          And then the government wants to make a big deal about

12   Mr. Fuentes' emails to his law enforcement friends or to his

13   military friends asking for help on his trial.  I want you to

14   think about that for a minute.  You're in jail in the United

15   States, you're accused of committing terrible crimes, murders

16   and drug-dealing in your home country, and there's no evidence,

17   no police reports, no forensics, nothing, that supports the

18   charges against you; all you've got is Leonel Rivera's

19   testimony.  You're getting ready for trial, you don't know the

20   system, what are you going to do?  You've got friends in law

21   enforcement back home.  What are you going to do?  You're going

22   to call them and say, listen, can you help me?  I'm desperate

23   here, I don't know what's going on, can you get me the records

24   about that murder?  Maybe there's something in there that we

25   can use to show that I didn't do it.  That's all that is.  It's

L3JKRAM4                        Mr. Moskowitz — Summation

1    a guy from a foreign country reaching out for his friends back

2    home for help with his trial.  You would expect that that's

3    what a person interested in defending himself would do, and

4    that's what he did.  Nothing more, nothing less.

5           Let's talk a little bit about the guns.  I shouldn't

6    say the guns, I should say the pictures of the guns.  Well,

7    obviously, you all know that having pictures of guns is not

8    illegal.  In fact, in Honduras, having guns, if they're

9    licensed, is not illegal.  In many parts of our country -- you

10   know, we live in New York, we have a different mindset about

11   guns — many of us do anyway — but in many parts of our country,

12   the gun culture is normal.  You can buy as many guns as you

13   want, you can own assault rifles, and that's normal, and people

14   are proud of it.  Some people have pictures of their dogs, some

15   people have pictures of their guns.  But we don't even know

16   that the pictures that were on Mr. Fuentes' phones were of guns

17   that he owned, of guns that he was looking to buy, of guns that

18   he liked that he might have wanted to buy, of guns that he

19   bought for the guards that were protecting him or the guards

20   that were protecting his businesses.  We don't know anything

21   about the pictures other than they were on his phone.  What

22   does that tell you?  Nothing.  Pictures of guns on the phone?

23   Nothing.

24          Even less of a nothing are the pictures taken from his

25   son's phone and from his son's Instagram account.  I don't know

L3JKRAM4                      Mr. Moskowitz — Summation

1    how many of you have children, but I venture to guess for those

2    of you who have children, none of you would want to be held

3    responsible for what might be found on your kids' phone or what

4    they might post on social media.  Really, you're going to find

5    that somehow pictures of guns on Geo's phone, his son's phone,

6    prove that somehow he's a drug dealer?  And let's put to rest

7    this nonsense about the pictures with the sapo and the frog.

8    Let's assume for a moment, give him the benefit of the doubt,

9    that sapo meant snitch, okay?  Let's assume that that's true in

10   the context.  You have a father who's sitting in prison accused

11   of crimes that the son thinks he didn't commit.  Wouldn't you

12   expect the son to be angry?  Wouldn't you expect that maybe if

13   he's not so mature, he'd lash out on social media?  But one

14   thing we know — we know the threats weren't serious, and even

15   the government didn't think they were serious.  How do we know

16   that?  Because when I asked Agent Fairbanks, well, you saw

17   these pictures, right?  And pictures of guns, and sapo, and

18   snitch beware, and whatever, did you go speak to Geo, did you

19   do any investigation to see whether those threats were real?

20   No.  If the threats were real, if it wasn't just some stupid

21   kid blowing off steam on social media, you know Agent Fairbanks

22   or somebody on his team would have been down there speaking to

23   him and maybe even arresting him if they thought it was

24   serious.

25            We're almost done.  One last thing:

L3JKRAM4                        Mr. Moskowitz — Summation

1        Geovanny spoke to Agent Gonzalez when he got arrested.

2   He waived his rights, didn't ask for an attorney, answered

3   Agent Gonzalez's questions.  Now, you would expect, if he was a

4   drug dealer, and he had something to hide, he would say Metro?

5   I don't know any Metro.  The Riveras?  I don't know him.

6   Vaquero?  I don't know him.  But that's not what he does.  He's

7   asked a question, he tells them, this is the guy I know, this

8   is the guy I don't know, this is how I know him.

9        And look at the video.  Compare Geovanny's demeanor in

10  what had to be an incredibly stressful and anxious time,

11  compare his demeanor, his straightforwardness, his candor with

12  what you saw on the witness stand from the government's mass

13  murderer.  Compare those two, and ask yourself:  Which one of

14  them told the truth?

15       By the way, of course, you only saw excerpts, so what

16  does it tell you?

17       Okay.  Ladies and gentlemen, thank you for your

18  patience.  Thank you for your attention.  In my remarks, I've

19  tried to cover the most important evidence in the case and show

20  you why there is ample reasonable doubt that requires that you

21  find Geovanny not guilty.  When I sit down, as the Judge told

22  you, I will undoubtedly –– well, he didn't tell you this, I'm

23  telling you — when I sit down, I am going to –– I guarantee

24  you, I'm going to say, oh, God, I forgot something.  That's the

25  way life is.  But this is my last chance to talk to you, so I'm

L3JKRAM4

1    going to ask you to keep an open mind.  When you go into the

2    jury room -- you know, the government gets a rebuttal

3    summation, and they get the last word, and that's appropriate

4    because, as the Judge said, they have the burden of proof.

5    When you go into the jury room, I'm going to ask you if there

6    are questions that Mr. Gutwillig raises that I didn't address

7    or didn't answer, try to think about how maybe there is another

8    answer and see whether that answer or the question he asks

9    makes any sense or whether there's a logical explanation for

10   it.  Most importantly, when you enter into the jury room to

11   begin your deliberations, remember that even as you go into the

12   jury room, the presumption of innocence still cloaks Geovanny,

13   it still protects him, and the burden of proof remains with the

14   government beyond a reasonable doubt.  They haven't satisfied

15   that burden.  And when you go back into the jury room, think

16   about the points I made, and I'm sure, I'm confident, Geovanny

17   is confident, he's put his life in your hands, he is confident

18   you will find the government has failed to prove him guilty

19   beyond a reasonable doubt, and you will return the only verdict

20   supported by the evidence, and that is not guilty.

21            Thank you.

22            THE COURT:  Thank you, Mr. Moskowitz.

23            Ladies and gentlemen, please stand up and stretch.

24   Let me tell you what I propose, and you will let me know if

25   this sounds reasonable.  I propose that we hear the rebuttal

L3JKRAM4                          Mr. Gutwillig — Rebuttal

1    summation of the government, which will not exceed 30 minutes,

2    then we take our lunch break.  We'll take a full 45 minutes,

3    all right, and then you'll come back, and then you'll hear my

4    instructions on the law.

5             Does that sound sensible?  Or does anybody want to

6    break now and have the government rebuttal after lunch?

7             All right, let's do it now.  Thank you.

8             Mr. Gutwillig, whenever you're ready, and after we're

9    finished cleaning up.  I think we're done with the cleaning, so

10   whenever you're ready.

11            MR. GUTWILLIG:  Ladies and gentlemen, the defense just

12   told you about the defendant's nightmare, when he got arrested,

13   but that is not what the evidence at this case has shown.  What

14   the evidence in this case has shown is the nightmare that the

15   defendant created, the nightmare he created for Americans by

16   pumping cocaine into this country, the nightmare he created in

17   his country with the violence and the corruption that went with

18   it.  Let me be very clear — this is not a close case.  Not at

19   all.

20            We are almost done.  This is officially the beginning

21   of the end.  I'm going to speak for a little while, Judge

22   Castel will instruct you on the law, and then you'll be able to

23   begin your deliberations.  And as Judge Castel has said, the

24   government has the burden of proving these charges beyond a

25   reasonable doubt.  We should.  That's something that we

L3JKRAM4                          Mr. Gutwillig — Rebuttal

1    embrace, we welcome it, and that burden never changes, but if

2    the defense does make arguments, like they just did, you should

3    scrutinize them carefully, just the way that we've asked you to

4    scrutinize the evidence that we put on at trial.  So let's talk

5    about some of those arguments.

6            Defense counsel said a lot of things over the past

7    hour or so.  I'm not going to address each and every one.  I'm

8    not going to talk about how guns are like dogs.  Did you see a

9    lot of pictures of dogs on the defendant's cell phone?  These

10   arguments are just distractions.  And it's understandable.

11   It's understandable that defense counsel would do that because

12   they are confronted with a mountain of evidence.  Let's talk

13   about it.

14           You saw and heard all that evidence.  You saw the

15   pictures, you saw the machine guns, the semiautomatic pistols,

16   the weapons that the defendant used to transport massive

17   amounts of cocaine, the cash.  Where do you think that came

18   from?

19           And remember what the defendant wrote about deleting

20   wiretaps?  You saw the numbers of corrupt cops, law

21   enforcement, crooked politicians, and the location data

22   searching Casa Presidencial to see his drug-trafficking

23   partner, the president.

24           You heard from José Sanchez, the accountant.  You

25   probably noticed how his testimony was tucked into the end of

L3JKRAM4                          Mr. Gutwillig — Rebuttal

1    defense counsel's summation.  You saw the fear that he had when

2    he testified, and there was a good reason why — because he came

3    in here, and he took the stand, and he made allegations against

4    the president of his country.  No small wonder he was scared.

5    He watched the president and the defendant join forces to flood

6    this country with cocaine.  And the defendant didn't just team

7    up with the president; there was a lot of talk about no drugs.

8    The defendant teamed up with the president's brother, Tony

9    Hernandez.  You saw a kilogram of cocaine with his initials on

10   it.  That's pretty clear.  That's who the president directed

11   the defendant to work for.

12        And you heard from Leonel Rivera.  We'll get to

13   defense counsel's arguments, but remember this:  I told you

14   straightaway that he had done bad things, it was not him.  What

15   I told you was that he would give you an inside look, and he

16   did.  How does he know all those things?  Because the defendant

17   was his partner.  That's how he knows those things.  That is

18   why he's a witness.

19        And you read the defendant's prison emails, emails

20   where he admits to knowing information about one of his murder

21   victims that only he could.  And when you focus on these

22   things, when you focus on the evidence, on the facts, when you

23   consider this evidence without distraction, there can be no

24   reasonable doubt, none, that the defendant is guilty as

25   charged.  The evidence is consistent, it's corroborated, and it

L3JKRAM4                         Mr. Gutwillig — Rebuttal

1    is overwhelming.

2              Defense counsel told you that the only evidence in

3    this case is witnesses — Leonel Rivera — and that is dead

4    wrong.  Here is all the other evidence you have:  You have the

5    defendant's phones.  I've already talked about the guns.  You

6    saw scores and scores of pictures.  Did you see a license for

7    every one?  Not just guns, machine guns, customizable weapons,

8    extended magazines to fire more bullets faster, a laundry list

9    of police, military, and politicians on his phone, probably

10   just friends he was calling to catch up with.

11             You heard Mr. Lockard talk about Comanche and

12   Commissioner Martinez.  Defense counsel said, well, why weren't

13   there more chats?  Because Commissioner Martinez told the

14   defendant how to delete –- avoid wiretaps.  And the chats that

15   you did see?  Some of them were talking about the Valles,

16   powerful drug traffickers that the defendant claimed not to

17   know in his postarrest.  Arnufo's son got nailed.  Think he

18   knew what that meant?  It seemed pretty clear, didn't it?

19             And also in that phone contact information, cell

20   phone, Juan Orlando Hernandez.  He didn't just call him up, he

21   searched for directions to Casa Presidencial on two important

22   days in the prosecution of the president's brother.  You

23   watched some of the defendant's postarrest interview.  He

24   admitted to knowing a Who's Who of drug traffickers in

25   Honduras — Metro, the Cachiros, Pluto, Vaquero.  You should

L3JKRAM4                        Mr. Gutwillig — Rebuttal

1    look at the videos.  You should watch them.  The defendants

2    explained it all away.  They knew each other, Choloma is a

3    small town.  Yeah, one of about 200,000 people, one of the

4    biggest cities in Honduras.

5           You read the defendant's emails.  You read him ask his

6    son to get help from Chinchilla, the Attorney General of

7    Honduras, where he sent details about a murder he participated

8    in, the half-buried mechanic from Choloma, and to get

9    information about the Cerro Negro thing.  You've heard evidence

10   about that.  He had the audacity to send these emails from

11   prison.

12          And you've also seen his son's iCloud and social

13   media — more of the same, guns.  And this isn't just blowing

14   off steam on social media.  Some of the guns looked pretty

15   similar to the guns you saw in the defendant's phone.  And hola

16   sapo, hi snitch?  On a table full of guns?  If you want to help

17   someone who's being prosecuted, call a lawyer.  This was the

18   same tactic that the defendant used — intimidation and kill.

19          You also saw chats from the son's account talking

20   about how we could possibly know about the defendant's green

21   rifle.  That's been connected throughout this entire case —

22   José Sanchez, Jorge Medina — as Mr. Lockard told you in his

23   summation.

24          Defense counsel told you this case was just about

25   witnesses, and that is wrong.  They also talked about all the

L3JKRAM4                        Mr. Gutwillig — Rebuttal

1    investigative steps that we could have, should have, would have

2    taken.  They focus on all the evidence you don't have,

3    supposedly, despite the mountain of evidence that you do have.

4    They talked about not having drugs, not having cash, not having

5    recordings.  That's just another distraction.  You want to know

6    why there aren't drugs on the table?  Because the defendant got

7    tipped off before law enforcement raided his lab.  No recorded

8    conversations?  Already talked about the chat where he was told

9    how to delete them.  No police reports?  You heard about what

10   happened to the officer who participated in that raid.  The

11   defendant kidnapped him, tortured him, killed him.  No police

12   reports.

13          No calls from Leonel Rivera?  Metro was his point of

14   contact.  Metro was the defendant's partner; Metro was Leonel

15   Rivera's cousin.  That makes sense.  And why are there no video

16   recordings from Leonel Rivera to the defendant?  Well, it turns

17   out by the time he started doing that, they had tried to kill

18   each other and had a bit of a falling-out.  It would have been

19   strange if you had seen those recordings.

20          It's not surprising you don't have those things.

21   Through the defendant's corruption and violence, he made sure

22   you did not.  The defendant also raised all sorts of arguments

23   about how the government didn't march down to Honduras and get

24   all the evidence.  We didn't because we couldn't.  You heard

25   law enforcement tell you, you heard law enforcement witnesses

L3JKRAM4                        Mr. Gutwillig — Rebuttal

1    tell you that the Drug Enforcement Administration can't, on its

2    own, go collect documents or evidence in Honduras.  They have

3    to rely on the Honduran Government, the same government headed

4    by Juan Orlando Hernandez, one of the defendant's

5    coconspirators.  It should be pretty clear by now why the DEA

6    thought that might be a dead end.  Don't be distracted by these

7    arguments.  These are just a sideshow.  And as I expect Judge

8    Castel will instruct you, the government doesn't have to prove

9    its case by any particular way.  Just think about all the ways

10   that the government has.

11        Let's talk about Leonel Rivera.  The defense argued

12   that Leonel Rivera is telling you lies so that he can get a

13   better sentence.  I will start again with the same fundamental

14   point — Leonel Rivera has done terrible things.  We are not

15   asking you to like him; we're asking you to scrutinize his

16   testimony and use your common sense.

17        You heard about negotiations with the government, when

18   those happened, 20 tons and more.  Those are distractions.

19   Leonel Rivera didn't pull any punches about himself when he was

20   up there.  He admitted to 78 murders.  He told you about them.

21   He talked about bribing presidents.  And on the stand, in front

22   of the judge who will sentence him, he talked about trying to

23   kill the defendant.  This is all a distraction.

24        But put that aside for a second.  Don't worry about

25   his incentives for a moment.  Think about how his testimony is

L3JKRAM4                            Mr. Gutwillig — Rebuttal

1    corroborated by the other evidence in this case.  His story

2    matches up with José Sanchez's.  Leonel Rivera told you that

3    the defendant's cocaine lab at Cerro Negro was raided and that

4    the defendant murdered one of the law enforcement officers

5    responsible.  José Sanchez told you about that raid, too.  He

6    told you about it from the other end when he saw the defendant

7    bribe a judge to make sure that he wouldn't be prosecuted.

8         José Sanchez told you he never met Leonel Rivera.  You

9    saw them both.  You think a hardened drug trafficker is hanging

10   out with an accountant?  You think they just got together and

11   made up some story together to nail the defendant?  That is

12   ridiculous.

13        Leonel Rivera is also corroborated by the defendant's

14   own statements in his postarrest interview.  We don't need to

15   run over the listing all over again, but here are the basics:

16        The defendant told you, just like Leonel Rivera did,

17   that he was introduced to the Cachiros by Metro, their cousin,

18   at a nightclub, and he told you about all the drug dealers he

19   knew.  Leonel Rivera told you about those people, also, the

20   coconspirators, joint offenders.  They were the defendant's

21   business partners and rivals.

22        He also told you about the boat mechanic who was

23   murdered, and I want you to remember this:  Leonel Rivera

24   didn't decide on his own to walk up there and take the stand.

25   He is a witness in this case because the defendant chose him.

L3JKRAM4                          Mr. Gutwillig — Rebuttal

1    He is a witness in this case because the defendant wanted to

2    work with him, wanted to be like him.  Why does Leonel Rivera

3    remember all the small details about the guns and the drugs?

4    Because they were partners.  You remember the people you work

5    with.  That's just common sense.  And did Leonel Rivera seem

6    like the type of person to forget where he put 500 kilograms of

7    cocaine?

8            The defendant wants you to believe that Leonel Rivera

9    is a liar, but he wants you to believe that selectively.  He

10   wants you to believe it when he's talking about the defendant;

11   he doesn't want you to believe it when he's talking about

12   himself.

13           Leonel Rivera is not a Boy Scout — we wish he were —

14   but the reason that he knows all this is because he was a

15   violent drug trafficker like the defendant, and they worked

16   together.  So now think again about his incentives.  He faces

17   30 years plus life in prison if he lies.  When he came here

18   first, it was a ten-year mandatory minimum.  He has bought

19   himself quite a bit of time.  But think about what he looked

20   like up there, think about the other corroboration, think about

21   whether it's believable.  Don't believe him because he's a good

22   person, believe him because he's a selfish person, and it isn't

23   in his interest to lie -- to tell the truth in this case —

24   because if he lies, he faces a certainty of life in prison.

25           The defense spent a lot of time on notes.  Let's talk

L3JKRAM4                          Mr. Gutwillig — Rebuttal

1    about Leonel Rivera's first.

2            Take a closer look at those notes.  Those notes talk

3    about Metro being the defendant's partner, just like you heard

4    in the case.  Just like you heard in the testimony, it's

5    consistent with Leonel Rivera's testimony at trial.  You don't

6    have to decide who killed Pluto to find the defendant guilty at

7    this trial.

8            And look at what else the notes say.  In 2015, Leonel

9    Rivera identified the defendant as a drug trafficker.  That is

10   what this trial is about.  What these notes show is that the

11   defendant -- is that Leonel Rivera was telling the truth about

12   what the defendant did.  The defense just wants you to pick and

13   choose from what he said when it's convenient.

14           Let's talk about José Sanchez.  What we're talking

15   about here is a date discrepancy.  That's it.  I expect that

16   Judge Castel will instruct you that dates can be approximate,

17   but what are we actually talking about in those notes?  José

18   Sanchez watching the defendant bribe the president.  And he was

19   the president of congress before he was the president of the

20   country.  So, the statement in these notes, that one of the

21   defendant's meetings with the president was sometime or

22   another, could have referred to either position.  It's just

23   noise.

24           You heard José Sanchez talk about those meetings.  You

25   saw him, you heard him talk about how the defendant called the

L3JKRAM4                          Mr. Gutwillig — Rebuttal

1    president Juancho, and you have the corroboration to back it

2    up.  You have the kilo with the president's brother's initials

3    on it, and you have the evidence on the defendant's cell phone

4    getting directions to Casa Presidencial.

5           Let's talk about José Sanchez now.  Defense counsel

6    tried to downplay his testimony.  He couldn't have been scared,

7    he called the president a thief.  If he had really been that

8    scared, he would have stayed in the United States and claimed

9    asylum.  This man came into court, came into federal court here

10   in the United States, he got on that stand, and he told you

11   that he saw a narco-trafficker conspire with the president of

12   his country.  Think about the gravity of that.  Mr. Sanchez

13   fled his country because of what he saw, because of the crimes

14   that he saw the defendant commit with people, judge, president,

15   at the highest levels of the Honduran Government.  He is an

16   example of a person whose life was completely rocked by what

17   the defendant did.  He had to flee his country where he lived

18   his entire life because he knew too much, because he had seen

19   the defendant and the president talk about flooding the United

20   States with cocaine.  That meeting was burned into his memory.

21   You saw him up there.  He remembered every last bit of it.  He

22   remembered that he sat on a blue couch, and he remembers all of

23   it because that meeting changed his life.  He told you that he

24   wouldn't have traded his life in Honduras for anything.

25   Unfortunately, he didn't have a choice.

L3JKRAM4                         Mr. Gutwillig — Rebuttal

1          One thing on withholding the video:  Don't you think

2     that if we had it, it would have been the first thing on the

3     screen?  The accusation that it's being withheld is absurd.

4          The defense also made a lot of noise about José

5     Sanchez's money laundering.  Yeah, he said, he knew it was a

6     crime, he did it.  And why was it a crime?  Because he was

7     laundering drug money.  What was he laundering?  He was

8     laundering the defendant's drug money.  You think he did that

9     all by himself?  You think he just decided to go to the bank

10    and drop off stacks of cash?  No.  He was an accountant, he was

11    an employee, he was scared, and he was dealing with high levels

12    of political power and high levels of violence.

13         So, when you think about José Sanchez's testimony, and

14    you think about what he looked like up there, think about what

15    he did — you are right that he was scared.  He had every reason

16    to be.  But he still did it.

17         Defense counsel also suggested that at those meetings,

18    $25,000 couldn't possibly be enough to bribe the president.

19    Remember, the president got something much more valuable than

20    the money.  José Sanchez told you that the president got the

21    defendant's cocaine lab to work for him, the defendant's

22    cocaine factory.  The president got access to it.  It was so

23    close to the most important port in Honduras, Puerto Cortes.

24    You heard Mr. Lockard describe how the value of cocaine

25    increases as it makes its way to the United States.  Just think

L3JRAM4

1    about the value of that pipeline.

2            Also, these just happened to be the only two meetings

3    that José Sanchez saw, it doesn't mean there weren't others.

4    And, in fact, the defendant told Leonel Rivera at the MCC, in

5    2020, that he had recently bribed Juan Orlando Hernandez twice.

6    Take a look at the Waze data to figure out when.

7            Ladies and gentlemen, very soon this case will be in

8    your hands.  I'd like to leave you with one final thought.

9    It's the same request I made a couple of weeks ago.  Use your

10   common sense.  You have the evidence, you'll have the law, you

11   saw the witnesses, you'll make your determination.  I know you

12   will.  And use your common sense.  And when you do, you'll find

13   that this is not a complicated case, and it's not a close one.

14   The evidence at trial has shown that the defendant is exactly

15   who we said he was — he is a violent drug trafficker, who

16   distributed massive amounts of cocaine, through corruption and

17   murder.  It's a horrific story, and it is a simple one.  Hold

18   him responsible for what he did.  Find the defendant guilty.

19           THE COURT:  Thank you, Mr. Gutwillig.

20           Ladies and gentlemen, you may retire for lunch.  You

21   may not discuss the case among yourselves or with anyone.  You

22   have to keep an open mind because you haven't heard my final

23   instructions on the law.  But have a very pleasant lunch.

24   We'll pick up in about 45 minutes.  Thank you very much.

25           Everyone else, remain in the courtroom until the

L3JRAM4

1     jurors clear the elevator lobby.

2              (Jury not present)

3              THE COURT:  Thank you very much.  See you after lunch.

4     Please be back in 45 minutes or less.

5              (Continued on the next page)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3JHRAM5                          Charge

AFTERNOON SESSION

2:10 p.m.

(In open court; jury not present)

THE COURT:  Please be seated.  Bring our jury in.

(Jury present)

THE COURT:  A change of view.  Ladies and gentlemen, it might be self-evident, but the reason I'm seated here is I can deliver my instructions safely without the face mask.  Hope you enjoyed your lunch.

Members of the jury, you have now heard all the evidence in the case as well as the final arguments of counsel. We've reached the point where you are about to undertake your final function as jurors.  You've paid careful attention to the evidence, and I'm confident that you will act together with fairness and impartiality to reach a just verdict in this case.

It has been my duty to preside over the trial and to decide what testimony and evidence was relevant under the law for you to consider.  My duty at this point is to instruct you as to the law.  It is your duty to accept these instructions of law and to apply them to the facts as you determine them.

If any attorney has stated a principle of law different from any that I state to you in my instructions, it is my instructions you must follow.  You must not substitute your own idea of what the law is or ought to be.

You are not to infer from any of my questions or

L3JHRAM5                    Charge

 1    rulings or anything else that I've said or done during the

 2    trial that I have any view as to the credibility of the

 3    witnesses or how you should decide the case.

 4         I will give you the typed text of these instructions

 5    for your use in the jury room.  It is possible that there might

 6    be a slight variation between the words I have spoken and the

 7    typed text that I will give you.  The words I have spoken

 8    control over the typed text.

 9         As members of the jury, you are the sole and exclusive

10    judges of the fact.  You pass on the evidence.  You determine

11    the credibility of the witnesses.  You resolve such disputes as

12    there may be in the testimony.  You draw whatever reasonable

13    inferences you decide to draw from the facts as you have

14    determined them.  You decide the weight of the evidence.

15         You have taken an oath as jurors.  It is your sworn

16    duty to determine the facts and to follow the law as I give it.

17         It is the duty of the attorneys to object when the

18    other side offers testimony or other evidence that the attorney

19    believes is not properly admissible.  Therefore, you should

20    draw no inference from the fact that an attorney objected to

21    any evidence.  Nor should you draw any inference from the fact

22    that I sustained or overruled an objection.

23         Your verdict must be based solely upon the evidence

24    developed at trial or the lack of evidence.  The parties in

25    this case are entitled to a trial free from prejudice about a

1   party's race, religion, national origin, sex, or age.  Our

2   judicial system cannot work unless you reach your verdict

3   through a fair and impartial consideration of the evidence.

4          Similarly, under your oath as jurors, you're not to be

5   swayed by sympathy.  Once you let fear, prejudice, bias, or

6   sympathy interfere with your thinking, there is a risk that you

7   will not arrive at a just and true verdict.  Your verdict must

8   be based exclusively upon the evidence or the lack of evidence

9   in the case.

10          The fact that the prosecution is brought in the name

11   of the United States of America entitles the government to no

12   greater and no lesser consideration than accorded to any other

13   party to a litigation.  All parties, whether the government or

14   an individual, stand as equals under the law.

15          The defendant in this case, Geovanny Fuentes Ramirez,

16   has entered a plea of not guilty to the indictment.  As I told

17   you before, the law presumes the defendant to be innocent of

18   all charges against him.  The defendant is to be presumed by

19   you to be innocent throughout your deliberations until such

20   time, if ever, that you as a jury are satisfied that the

21   government has proven the defendant's guilt beyond a reasonable

22   doubt.

23          The presumption of innocence alone is sufficient to

24   require an acquittal of a defendant unless and until, after

25   careful and impartial consideration of all the evidence, you as

1    jurors are convinced unanimously of the defendant's guilt

2    beyond a reasonable doubt.

3           The question naturally comes up, what is a reasonable

4    doubt?  The words almost define themselves.  It's a doubt

5    founded in reason and arising out of the evidence, or the lack

6    of evidence.  It is a doubt that a reasonable person has after

7    carefully weighing all the evidence.  Proof beyond a reasonable

8    doubt must therefore be proof of such a convincing nature that

9    a reasonable person would not hesitate to rely and act upon it

10   in the most important of his or her own affairs.  Proof beyond

11   a reasonable doubt is not proof beyond all possible doubt.

12          Reasonable doubt is a doubt that appeals to your

13   reason, your judgment, your experience, your common sense.  It

14   is not a caprice, whim, or speculation.  It is not an excuse to

15   avoid the performance of an unpleasant duty.  It is not

16   sympathy for a defendant.

17          The government must prove each and every element of

18   the crimes charged beyond a reasonable doubt.  This burden

19   never shifts to the defendant.  The law never imposes upon a

20   defendant in a criminal case the burden of calling any

21   witnesses or producing any evidence.  The fact that one party

22   called more witnesses and introduced more evidence does not

23   mean that you should find in favor of that party.  It is the

24   quality of the evidence that matters.

25          If, after a fair, impartial, and careful consideration

1    of all the evidence, you can honestly say that you are not

2    satisfied of the guilt of a defendant -- that is, if you have a

3    doubt that would cause you as a prudent person to hesitate

4    before acting in matters of importance to yourself -- then you

5    have a reasonable doubt.  In that circumstance, it is your duty

6    to return a not guilty verdict for the defendant.

7          On the other hand, if, after a fair, impartial, and

8    careful consideration of all the evidence, you can honestly say

9    that you are satisfied of the guilt of a defendant and that you

10   do not have a doubt that would prevent you from acting in

11   important matters in the personal affairs of your life, then

12   you have no reasonable doubt.  Under that circumstance, you

13   should return a guilty verdict for the defendant.

14         The evidence in this case is the sworn testimony of

15   the witnesses, the exhibits received into evidence, and the

16   stipulations made by the parties.

17         By contrast, the questions of a lawyer are not

18   evidence.  It is the witness' answers that are evidence, not

19   the questions.

20         Testimony that has been stricken or excluded by me is

21   not evidence and may not be considered in rendering your

22   verdict.  If I have instructed you that evidence is received

23   for only a limited purpose, then it may be considered only for

24   that limited purpose.

25         Arguments by lawyers are not evidence because the

L3JHRAM5                    Charge

lawyers are not witnesses.  What the lawyers have said to you
in their openings and in their closings is intended to help you
understand the evidence.  If, however, your recollection of the
facts differs from the lawyers' statements, it's your
recollection that controls.

        To constitute evidence, exhibits must first be
admitted or received in evidence.  Exhibits marked for
identification but not admitted are not evidence, nor are
materials brought forth to refresh a witness' recollection.

        It is for you alone to decide the weight, if any, to
be given to the testimony you have heard and the exhibits you
have seen.

        Generally, there are two types of evidence that you
may consider in reaching your verdict.

        One type is direct evidence.  Direct evidence is when
a witness testifies about something he or she knows by virtue
of his or her own senses -- something he or she has seen, felt,
touched, or heard.  Circumstantial evidence is evidence from
which you may infer the existence of certain facts.  Let me
give you an example to help you understand what is meant by
circumstantial evidence.

        Well, it's a little bit peculiar to give this example
because it's pretty close to what we have here.  So I want you
to imagine this courtroom with the draperies drawn.  Well, lo
and behold, you're in a courtroom with the draperies drawn.  So

L3JHRAM5                         Charge

1    you really can't see out.  You don't know what the weather is

2    outside, all right?  Now I want you to imagine that the doors

3    of the courtroom open and a person walks in with a raincoat and

4    brushing off perhaps droplets on their shoulder.  And the next

5    person comes in with an umbrella, and they're shaking the

6    umbrella.  Well, from these combination of facts, it would

7    be -- remember, you can't look out the window -- but from these

8    combination of facts, it would be reasonable for you to infer

9    that it had been raining.

10           That's all there is to circumstantial evidence.  You

11   draw an inference from one fact or combination of facts to

12   another.  All right.  And it's based on reason and experience

13   and common sense.

14           Circumstantial evidence is of no less value than

15   direct evidence.  The law makes no distinction between direct

16   evidence and circumstantial evidence.  It simply requires that

17   your verdict must be based on all the evidence.

18           You have had the opportunity to observe all the

19   witnesses.  It is now your job to decide how believable each

20   witness was in his or her testimony.  You are the sole judges

21   of the credibility of each witness and of the importance of his

22   or her testimony.

23           You should carefully scrutinize all of the testimony

24   of each witness, the circumstances under which each witness

25   testified, the impression the witness made when testifying, and

L3JHRAM5                        Charge

any other matter in evidence that may help you decide the truth

and the importance of each witness' testimony.

In other words, in assessing credibility, you may size

up a witness in light of his or her demeanor, the explanations

given, and all the other evidence in the case.  In making your

credibility determinations, use your common sense, your good

judgment, and your everyday experiences in life.

If you believe that a witness knowingly testified

falsely concerning any important matter, whether at trial or in

a prior proceeding, you may distrust a witness' testimony

concerning other matters.  You may reject all of the testimony

or you may accept such parts of the testimony that you believe

are true and give it such weight as you think it deserves.

The testimony of a witness may be discredited by

showing that the witness testified falsely concerning a matter

or by evidence that at some point, some other time, the witness

said or did something or failed to say or do something which is

inconsistent with the testimony the witness gave at this trial.

Evidence of a prior inconsistent statement may not be

considered by you as affirmative evidence of the fact asserted

in the statement or the defendant's guilt.  Evidence of the

prior inconsistent statement was placed before you for the more

limited purpose of helping you decide whether to believe the

trial testimony of the witness who contradicted himself.  If

you find that the witness made an earlier statement that

L3JHRAM5                    Charge

conflicts with his or her testimony, you may consider that fact

in deciding how much of his or her testimony, if any, to

believe.  If you believe that a witness has been discredited in

this matter, it is exclusively your right to give the testimony

of that witness whatever weight you think it deserves.

        In making this determination, you may consider whether

the witness purposely made a false statement or whether it was

an innocent mistake, whether the inconsistency concerns an

important fact or whether it had to do with a small detail,

whether the witness had an explanation for the inconsistency,

and whether that explanation appealed to your common sense.

        In deciding whether to believe a witness, you may take

account of any evidence of hostility or affection that the

witness may have towards the defendant or the government.  You

may consider any evidence that a witness may benefit in some

way from the outcome of the case, and any loyalty, incentive,

or motive that might cause the witness to shade the truth.  You

should carefully scrutinize all of the testimony of each

witness, the circumstances under which each witness testified,

and any other matter in evidence that may help you decide the

truth and importance of each witness' testimony.

        In deciding whether a witness was -- whether or not a

witness was truthful, you may ask yourself:  How did the

witness appear?  Was the witness candid, frank, and forthright

or did the witness seem evasive or suspect in some way?  How

L3JHRAM5                     Charge

did the witness testify on direct compared with how the witness

testified on cross-examination?  Was the witness consistent or

contradictory?  Did the witness appear to know what he or she

was talking about?  Did the witness have the opportunity to

observe the facts he or she testified about?

It is your duty to consider whether the witness has

permitted any bias or interest to color his or her testimony.

In short, if you find that a witness is biased, you should view

his or her testimony with caution, weigh it with care, and

subject it to close and searching scrutiny.

It is for you to decide from your observations

applying your common sense and experience and all other

considerations mentioned whether the possible interest of any

witness has intentionally or otherwise colored or distorted his

or her testimony.  You are not required to disbelieve an

interested witness.  You may accept as much of his testimony as

you deem reliable and reject as much as you deem unworthy of

acceptance.

You have heard testimony of law enforcement officers.

The fact that a witness may be employed by a federal, state, or

local government as a law enforcement officer does not mean

that his or her testimony is deserving of more or less

consideration or greater or lesser weight than that of an

ordinary witness.  It is fair for you to consider whether the

testimony of a law enforcement witness has been colored by a

L3JHRAM5                    Charge

personal or professional bias or interest in the outcome of the
case.  It is your decision, after reviewing all the evidence,
whether to accept the testimony of the law enforcement witness
and to give that testimony whatever weight, if any, you find it
deserves.

You have heard evidence of certain statements
allegedly made by the defendant to the DEA.  Ultimately, you
are to give the statements such weight, if any, as you feel
they deserve in light of all the circumstances.

Among the exhibits in evidence some documents are
redacted.  You saw some on the screen.  There are blacked out
portions.  "Redacted" means that part of the document was
covered.  You're to concern yourself only with the part of the
item that has been admitted into evidence.  You should not
consider any possible reason why the other part of the document
has been covered.

One or more witnesses in this trial testified using
the Spanish language.  That testimony was translated for you by
a court-certified interpreter.  Even if you speak Spanish, you
are obligated under the law to accept as binding the
translation of witness testimony provided to you by the
court-certified interpreter.

Stipulations.  In this case you heard evidence in the
form of a stipulation of testimony.  A stipulation of testimony
is an agreement between the parties that, if a witness is

L3JHRAM5                    Charge

1    called, the person would give certain testimony.  You must

2    accept as true the fact that the witness would have given that

3    testimony.  However, it is for you to determine the effect to

4    be given that testimony.

5         In this case you've heard evidence in the form of a

6    stipulation of fact.  A stipulation of fact is an agreement

7    between the parties that a certain fact is true.  You must

8    regard such agreed upon-fact as true.  The weight or importance

9    of the fact is a matter for you, the jury, to decide.

10        You have heard testimony from a witness who testified

11   that he was involved in certain crimes and is cooperating with

12   the government in the hope of receiving a lower sentence.  The

13   law allows the use of such testimony.  The testimony of a

14   cooperating witness may alone be enough to establish the

15   elements of a crime if the jury believes that the testimony

16   establishes the elements beyond a reasonable doubt.

17        A cooperator's testimony should be scrutinized with

18   greater care than the testimony of an ordinary witness and

19   viewed with particular caution when you decide how much of that

20   testimony to believe.  It does not follow, however, that simply

21   because a person has admitted to participating in one or more

22   crimes that he is incapable of giving truthful testimony.

23        The fact that a witness is cooperating with the

24   government may be considered by you as bearing upon his

25   credibility.  You may consider whether a cooperating witness,

L3JHRAM5                          Charge

1   like any other witness called in this case, has an interest in

2   the outcome of the case or is biased in favor or against the

3   defendant or the government, and if so, whether it has affected

4   his testimony.

5        It is no concern of yours why the government made an

6   agreement with a particular witness.  Your sole concern is

7   whether a witness has given truthful testimony.

8        In evaluating the testimony of a cooperating witness,

9   you should ask yourself whether the witness would benefit more

10  by lying or by telling the truth.  Was his testimony made up in

11  any way because he believed or hoped that he would somehow

12  receive favorable treatment by testifying falsely?  Or did he

13  believe that his interest would be best served by testifying

14  truthfully?  If you believe that the witness was motivated by

15  hopes of personal gain, was the motivation one that would cause

16  him to lie, or was it one that would cause him to tell the

17  truth?  Did this motivation color his testimony?

18       Like the testimony of any other witness, cooperating

19  witness testimony should be given the weight that it deserves

20  in light of the facts and circumstances before you, taking into

21  account the witness' demeanor, candor, the strength and

22  accuracy of witness recollection, his background, and the

23  extent to which his testimony is or is not corroborated by

24  other evidence in the case.

25       If you find that the testimony was false, you should

1  reject it.  However, if, after a cautious and careful

2  examination of a cooperating witness' testimony and assessment

3  of his credibility, you are satisfied that the witness told the

4  truth, you should accept it as credible and act upon it

5  accordingly.  Even if you find that a witness testified falsely

6  in one part, you still may accept his testimony in other parts,

7  or you may disregard all of it.  This is a determination

8  entirely for you, the jury.

9          You have heard testimony from government witnesses who

10  have -- or a government witness who has entered a guilty plea

11  to charges arising out of the same or similar facts.  You are

12  instructed that you are to draw no conclusions or inference of

13  any kind about the guilt of the defendant from the fact that a

14  prosecution witness pleaded guilty to similar charges.  The

15  decision of that witness to plead guilty was a personal

16  decision that he made about his guilt.  It may not be used in

17  any way as evidence against or unfavorable to the defendant on

18  trial here.

19          You have heard testimony about evidence seized in

20  connection with certain searches conducted by law enforcement

21  officers or otherwise obtained by law enforcement.  Evidence

22  obtained from these searches was properly admitted in this case

23  and may be properly considered by you.  Such searches were

24  appropriate law enforcement actions.

25          Whether you approve or disapprove of how this evidence

L3JHRAM5                    Charge

1   was obtained should not enter into your deliberation because I

2   now instruct you that the government's use of this evidence is

3   entirely lawful.  You must, therefore, regardless of your

4   personal opinions, give this evidence full consideration, along

5   with all the other evidence in the case in determining whether

6   the government has proved the defendant's guilt beyond a

7   reasonable doubt.

8           Video and audio recordings of various foreign-language

9   conversations have been admitted into evidence and transcripts

10  of English-language translations of those foreign-language

11  recordings have been admitted into evidence.  I instruct you

12  that it is the English translation of the conversation

13  reflected on those transcripts that is evidence.  The parties

14  have stipulated that the English translation of the

15  conversations are accurate and admissible as evidence.  As a

16  result, you should not substitute your own understanding of any

17  foreign language for that of any translation that was admitted

18  into evidence.  You must accept the translations without regard

19  to your own understanding of those foreign languages.

20          Whether you approve or disapprove of the recordings

21  may not enter into your deliberations.  I instruct you that the

22  recordings were made in a lawful manner, that no one's rights

23  were violated, that the government's use of this evidence is

24  lawful, and that it was properly admitted into evidence.  Of

25  course, it is up to you to decide what weight, if any, to give

L3JHRAM5                        Charge

1   to this evidence.

2           There is no legal requirement that law enforcement

3   agents investigate crimes in a particular way or that the

4   government prove its case through any particular means.  While

5   you are to carefully consider the law enforcement evidence

6   introduced by the government, you are not to speculate as to

7   why they used the techniques they did or why they did not use

8   other techniques.  The government is not on trial.  Law

9   enforcement techniques are not your concern.

10          Your concern is to determine whether, on the evidence

11  or lack of evidence, the defendant's guilt has been proven

12  beyond a reasonable doubt.

13          You have heard evidence of other acts allegedly

14  committed by defendant and/or his alleged coconspirators that

15  do not form the basis for any charge against the defendant.

16          The evidence was received for a limited purpose, and

17  if believed, you may consider it only for that limited purpose.

18  You are not to consider the evidence for any other purpose.

19  You may not use this evidence to conclude that because the

20  defendant or his alleged coconspirators committed the other

21  acts, then the defendant must also have committed the acts

22  charged in the indictment.  You are not permitted to make such

23  inferences.

24          Let me remind you that the defendants are not on trial

25  for committing acts not alleged in the indictment.

L3JHRAM5                          Charge

Accordingly, you may not consider evidence of prior acts as a

substitute for proof that the defendants a criminal personality

or bad character.  The evidence of other prior acts was

admitted for a much more limited purpose, and you may consider

it only for that limited purpose.

        You have heard evidence during the trial that

witnesses have discussed the facts of the case and their

testimony with the lawyers before the witness appeared in

court.

        You may consider that fact when you're evaluating a

witness' credibility.  There is nothing either unusual or

improper about a witness meeting with lawyers before testifying

so that the witness can be aware of the subjects he or she will

be questioned about, focus on those subjects, and have the

opportunity to review relevant exhibits before being questioned

about them.  Such consultation helps conserve your time and the

Court's time.  In fact, it would be unusual for a lawyer to

call a witness without such consultation.

        You have heard testimony from what we call expert

witnesses.  An expert is a witness who by education or

experience has acquired learning or experience in a specialized

area of knowledge.  Such witnesses are permitted to give their

opinions as to relevant matters in which they profess to be an

expert and give their reasons for their opinions.  Expert

testimony is presented to you on the theory that someone who is

L3JHRAM5                          Charge

experienced in a specialized field can assist you in

understanding the evidence or in reaching an independent

decision on the facts.

        Your role in judging credibility applies to experts as

well as to other witnesses.  You should consider the expert

opinions which were received in evidence in this case and give

them as much or as little weight as you think they deserve.  If

you should decide that the opinion of an expert was not based

on sufficient education or experience or on sufficient data, or

if you should conclude that the trustworthiness or credibility

of an expert is questionable for any reason, or if the opinion

of the expert was outweighed, in your judgment, by other

evidence in the case, then you might disregard the opinion of

the expert entirely or in part.

        On the other hand, if you find that the expert opinion

was based on sufficient data, education, and experience, and

the other evidence does not give you reason to doubt the

expert's conclusions, you would be justified in placing

reliance on his testimony.

        The government has presented some exhibits in the form

of what I call demonstrative exhibits or summary exhibits.

These charts and summaries were admitted in place of the

underlying documents in some instances, or they may have been

to illustrate what's in the documents that have been received

into evidence.  If it is a demonstrative, then it's only as

L3JHRAM5                        Charge

good as the underlying evidence.  There were no summaries

admitted in lieu of the underlying documents, so you don't need

to consider that.  So the only demonstratives you saw

illustrated other evidence that came into the case, and I'm

thinking there was a chart there with some pictures of

individuals and then some other information on there.  That

other information came into evidence through other means.  So

the demonstrative is only as good as the underlying evidence.

          Some of the people who may have been involved in the

events leading to this trial are not on trial.  There's no

requirement that all members of a conspiracy be prosecuted or

that all members be tried together in the same proceeding.

          You may not draw any inference, favorable or

unfavorable, from the fact that any person in addition to the

defendant is not on trial here.  You also may not speculate as

to the reason why other persons are not on trial.  Those

matters are wholly outside your concern and have no bearing on

your function as jurors.

          There are people whose names you heard during the

course of trial but who did not appear to testify.  I instruct

you that each party had an equal opportunity or lack of

opportunity to call any of these witnesses.  Therefore, you

should draw no inference or reach no conclusion as to what they

would have testified to had they been called.  Their absence

should not affect your judgment in any way.

1      You should remember my instruction, however, that the

2   law does not impose on the defendant in a criminal case the

3   burden or duty of calling any witnesses or producing any

4   evidence.

5      Under the Constitution a defendant has no obligation

6   to testify or to present any evidence because it is the

7   government's burden to prove the defendant guilty beyond a

8   reasonable doubt.  That burden remains with the government

9   throughout the entire trial and never shifts to a defendant.  A

10  defendant is never required to prove that he is innocent.

11  Therefore, you must not attach any significance to the fact

12  that the defendant did not testify.  No adverse inference

13  against the defendant may be drawn by you because he did not

14  take the witness stand, and you may not consider it against the

15  defendant in any way in your deliberations in the jury room.

16      I instruct you that anything you may have seen or

17  heard about this case outside the courtroom is not evidence and

18  must be disregarded.  Indeed, as I've instructed you throughout

19  this case, you may not read, view, or listen to any media or

20  press report or Internet or social media posting about this

21  case or about the people or issues referred to during this

22  trial.  Your verdict must be based solely on the evidence or

23  lack of evidence that came out in the courtroom and the Court's

24  instructions on the law.

25      In your deliberations and in reaching your verdict,

L3JHRAM5                          Charge

you must consider each count separately and determine whether

the government has carried its burden of proof with respect to

the charge.  I will provide you with a verdict form, and you

will need to report the results of your deliberations on each

count on the verdict form.

        The indictment contains three counts.  Each count

constitutes a separate offense or crime.  You must consider

each count of the indictment separately, and you must return a

separate unanimous verdict as to each count.  There is no

significance to the order of the numbered counts or the

specific number of counts charged.

        You may only find the defendant guilty of a particular

count if the government has proven each element of the offense

charged with respect to the count beyond a reasonable doubt.

Your verdict as to one count should not control your decision

as to any other count.

        Ladies and gentlemen, let's stand up and stretch.

        Let me turn to the substantive law.

        The defendant, Geovanny Fuentes Ramirez, has formally

been charged in what is called an indictment.  An indictment is

simply an accusation.  It's no more than the means by which a

criminal case is started.  It is not evidence.  It is not proof

of a defendant's guilt.  It creates no presumption, and it

permits no inference that a defendant is guilty.  You are to

give no weight to the fact that an indictment has been returned

1    against the defendant.

2            Before you begin your deliberations, you will be

3    provided with a copy of the indictment.  I will first summarize

4    the offenses charged and then explain in detail the elements of

5    the charged offenses.

6            Count One charges the defendant with conspiring to

7    violate the narcotics laws of the United States by entering

8    into an agreement to engage in one or more of the following

9    types of conduct: importing cocaine into the United States;

10   manufacturing or distributing cocaine, knowing or intending

11   that it would be imported into the United States; and

12   possessing cocaine with intent to distribute, or manufacturing

13   or distributing cocaine, on board an aircraft registered in the

14   United States.  That's what Count One charges.

15           Count Two charges the defendant with using or carrying

16   machine guns or destructive devices, or aiding and abetting the

17   use or carrying of machines guns or destructive devices, during

18   and in relation to the crime charged in Count One.

19           Count Three charges the defendant with conspiring to

20   use and carry machine guns or destructive devices in connection

21   with, and to possess machine guns or destructive devices in

22   furtherance of, the crime charged in Count One.

23           That's a summary of the three charges.  Mr. Fuentes

24   Ramirez has entered a plea of not guilty and is presumed

25   innocent of all charges.  You must consider each charge

L3JHRAM5                          Charge

1    separately and determine whether the government has carried its

2    burden of proof with respect to that charge.  In order to

3    convict the defendant of a charge, it's necessary for you to

4    find the government has proven each and every element of the

5    specific charge by proof beyond a reasonable doubt.

6          So let me turn now to Count One.  To sustain its

7    burden of proof with respect to the charge of conspiracy

8    contained in Count One, the government must prove beyond a

9    reasonable doubt the following two elements:

10          That the conspiracy charged in Count One existed.  In

11    other words, that from at least in or about 2009 up to and

12    including 2020, there was an agreement or understanding between

13    two or more persons to engage in one or more of the following

14    types of conduct: (1) import a controlled substance into the

15    U.S., (2) manufacture and distribute a controlled substance

16    knowing or intending that the controlled substance would be

17    imported into the U.S., or (3) possess a controlled substance

18    with intent to distribute and manufacture a controlled

19    substance on board an aircraft registered in the United States.

20          And then the second element is that the defendant

21    knowingly and intentionally associated himself with and joined

22    in the conspiracy.

23          So what is a conspiracy?  A conspiracy is an agreement

24    or understanding between two or more persons to accomplish by

25    joint action a criminal or unlawful purpose.

1          The essence of conspiracy is an unlawful agreement to

2     violate the law.  The success or failure of a conspiracy is not

3     material to the question of guilt or lack of guilt, for a

4     conspiracy is a crime entirely separate and distinct from the

5     substantive crime that may be the goal of the conspiracy.  The

6     crime of conspiracy is complete once the defendant enters into

7     the unlawful agreement.

8          To establish the existence of a conspiracy, the

9     government is not required to show that two or more persons sat

10     around a table and entered into a solemn pact, orally or in

11     writing, stating that they have formed a conspiracy to violate

12     the law and setting forth details of the plans and the means by

13     which the unlawful object is to be carried out or the part to

14     be played by each conspirator.  Indeed, it would be

15     extraordinary if there were such a formal document or specific

16     agreement.  The adage "actions speak louder than words" is

17     applicable here.

18          When people undertake to enter a criminal conspiracy,

19     much is left to an unexpressed understanding.  Conspirators do

20     not usually reduce their agreements to writing, nor do they

21     publicly broadcast their plans.  Express language or specific

22     words are not required to indicate assent or attachment to a

23     conspiracy.  From its nature, a conspiracy is almost invariably

24     characterized by secrecy, which makes detection difficult.

25          You need only find that the defendant entered into the

L3JHRAM5                         Charge

1   unlawful agreement alleged in the indictment with one or more

2   persons in order to find that a conspiracy existed.

3          If, upon consideration of the evidence, direct and

4   circumstantial, you find beyond a reasonable doubt that two or

5   more persons had a meeting of the minds -- that is, they agreed

6   to work together in furtherance of the unlawful scheme -- then

7   the proof of the existence of the conspiracy is established.

8          In order for the government to prove a conspiracy, it

9   must prove that the conspiracy existed between at least two

10  individuals who are not acting at the direction of the

11  government at the time of the conspiracy.  In this case, one of

12  the government witnesses, Leonel Devis Rivera Maradiaga, was

13  acting at the direction of the government beginning in

14  November 2013.  As a result, Rivera Maradiaga may not be

15  considered by you in determining whether the government has

16  proved beyond a reasonable doubt that an agreement or

17  understanding was reached between two or more individuals to

18  accomplish the object of the conspiracy from the time Rivera

19  Maradiaga began acting at the direction of the government in

20  November 2013.

21         However, Rivera Maradiaga may be considered by you in

22  determining whether such an agreement existed before he started

23  acting at the direction of the government.  In other words, the

24  relevant question is whether the government has proven beyond a

25  reasonable doubt that the criminal agreement charged in Count

L3JHRAM5                          Charge

1    One was reached between the defendant or other individuals who

2    are not working at the direction of the government at the time.

3         The object of a conspiracy is the illegal goal that

4    the coconspirators agree or hope to achieve.

5         As I mentioned previously, there are three objects,

6    and they are, again, importation of a controlled substance from

7    a place outside the U.S. into the U.S., manufacture or

8    distribution of a controlled substance with knowledge or intent

9    that some of the controlled substance would be unlawfully

10   imported into the U.S., or the possession of a controlled

11   substance with intent to distribute or the manufacturing or

12   distribution of a controlled substance on board an aircraft

13   registered in the U.S.

14        The government does not have to prove all three

15   objects charged.  Rather, proof beyond a reasonable doubt of an

16   agreement to accomplish any one of the three objects of the

17   alleged conspiracy is sufficient.  You must be unanimous as to

18   which object you find the defendant guilty of.  That is, you

19   must all be in agreement with respect to at least one of the

20   alleged objects of the conspiracy charged in Count One.

21        With respect to the second object -- the distribution

22   or manufacture of a controlled substance with intent or

23   knowledge that some of the controlled substance would be

24   imported into the U.S. -- it is not necessary for the

25   government to prove that the conspiracy had as its object both

L3JHRAM5                    Charge

1    the distribution and the manufacture of a controlled substance.

2    It is sufficient if you find that the conspiracy was aimed at

3    either the manufacture or the distribution of a controlled

4    substance with the intent or knowledge that some of it would

5    later be imported into the U.S.  Here, too, you must be

6    unanimous as to which of these objectives -- manufacture or

7    distribution or both -- the conspiracy had.

8             With respect to the third object -- the manufacturer

9    or distribution or the possession with intent to distribute a

10   controlled substance on board an aircraft registered in the

11   U.S. -- it is not necessary for the government to prove that

12   the conspiracy had as its object the manufacture and

13   distribution of a controlled substance, as well as the

14   possession of a controlled substance with intent to distribute.

15   It is sufficient if you find that the conspiracy was aimed at

16   any one of those objectives on board an aircraft registered in

17   the United States.  Here, too, you must be unanimous as to

18   which of these objectives -- manufacture or distribution or

19   possession with intent to distribute or all three -- the

20   conspiracy had.

21            I instruct you that cocaine is a controlled substance,

22   but the purity of the narcotics involved is not an element of

23   the crime charged, so you need not be concerned with that.  I

24   also instruct you that the defendant need not know the exact

25   nature of the drug.  Also, in considering whether a conspiracy

L3JHRAM5                    Charge

existed, you need not consider whether the government has

proved that a particular quantity of a controlled substance was

involved in the charged conspiracy.

        Now let me define the terms "import," "distribute,"

"manufacture," "possession with intent to distribute," and

"onboard an aircraft registered in the U.S.," as they're used

in the objects of Count One.

        The term "import" has its common, everyday meaning,

namely, to bring or introduce something into an area of the

United States.  To import a substance means to bring or

transport a substance into the U.S. from someplace outside the

U.S.

        It is not necessary for you to find that the defendant

or any coconspirator actually carried, or agreed to actually

carry, a controlled substance into the U.S.  Nor must you

conclude that others in the conspiracy ultimately succeeded in

actually bringing the controlled substance into the U.S.

        "Distribute," it means the actual, constructive, or

attempted transfer of a controlled substance.  To distribute

simply means to deliver, to possess -- I'm sorry, to deliver,

to pass on, to hand over something to another person or to

cause it to be delivered, passed on, or handed over to another.

Distribution does not require a sale, but it includes sales.

        "Manufacture" means to produce, prepare, or process,

in this context, a controlled substance, or to engage or

participate in a process that results in the production of the

controlled substance.

Again, with respect to Count One, since defendant is

charged with conspiring to manufacture or distribute a

controlled substance, it's not necessary that you find that the

defendant actually manufactured or distributed a controlled

substance.  Nor must you conclude that others in the conspiracy

actually manufactured or distributed anything.  You need only

find that the defendant and others knowingly agreed to

manufacture or distribute a controlled substance.

Possession with intent to distribute.  The word

"distribution" means the process of actual, constructive, or

attempted transfer of a controlled substance, including a sale.

Distribution does not require a sale, but includes sales.

The legal concept of possession may differ from the

everyday usage of the term.  Actual possession is what most of

us think of as possession, that is, having physical, custody or

control of an object, as I possess this bottle of water.

However, a person need not have actual physical possession,

that is, physical custody of an object, in order to be in legal

possession of it.  If a person has the ability to exercise

substantial control over an object, even if he or she does not

have the object in his physical custody, and that person has

the intent to exercise control, then the person is in

possession of that object.  This is called "constructive

1    possession."

2            Control over an object may be demonstrated by the

3    existence of a working relationship between one person having

4    the power or ability to control the item and another person who

5    has actual physical custody.  The person having control

6    "possesses" the narcotics because he or she has an effective

7    working relationship with the person who has actual physical

8    custody of the narcotics and because he or she can direct the

9    movement or transfer or disposition of the narcotics.  In

10   addition, an individual may have possession of an item that is

11   not found on his person because that individual has a

12   relationship to the location where the item is maintained.  In

13   this matter, for example, a businessperson may possess things

14   that are scattered through a number of stores or offices or

15   installations around the country.

16           More than one person can have control over the same

17   narcotics.  The law recognizes that possession may be sole or

18   joint.  If one person has an actual or constructive possession

19   of a thing, possession is sole.  If more than one person has

20   possession of it, as I've defined possession for you, then

21   possession is joint.  That is what is meant by "possession."

22           Finally, possession and ownership are not the same.  A

23   person can possess an object and not be the owner.

24           Let me give you an example.  As I told you, if I hold

25   this bottle up, I possess it.  All right.  Another example,

L3JHRAM5                    Charge

let's say that I brought some candy in and left it on Flo's

desk.  Flo knows that she can't eat all of the candy and that

she better leave some for me.  I do not physically possess the

candy.  It's on Flo's desk, but I do have control over it.  Flo

also has control over it.  I can be said to possess the candy

jointly with Flo.

       One more example.  Say my grandmother left me some

jewelry, maybe someone's watch when she died, and it is now

sitting in a safe deposit box at the bank.  My siblings and I

know that we are the only people who can get into that box.  Do

we have possession of the jewelry?  Absolutely, we have

possession of it, even though it's in a safe deposit box inside

a bank and not in our hands, not even in our homes.

       If you find that a person knowingly possessed a

controlled substance, then you must decide whether the person

intended to distribute it.  Possession with intent to

distribute simply means the possession of a controlled

substance with the intention or purpose to distribute.  As I

explained, to distribute means simply to transfer to another.

       Often it is possible to determine whether someone had

an intent to distribute from the quantity of the drugs that

were possessed, although the possession of a large quantity of

narcotics does not necessarily mean that an individual intended

to distribute them.  On the other hand, an individual may have

intended to distribute a controlled substance even if he did

L3JHRAM5                          Charge

1   not possess a large quantity of it.

2            The government need prove only one object of the

3   conspiracy.  The government need not prove all three.  You must

4   be unanimous, however, as to which act, if any, was proven

5   beyond a reasonable doubt to have been the object of the

6   conspiracy.

7            I also instruct you that the defendant need not know

8   that the narcotics would be or were possessed on board an

9   aircraft that was registered in the United States.  If the

10  government proves that an aircraft used or intended to be used

11  in the conspiracy was registered in the United States, that is

12  enough.

13           Ladies and gentlemen, please stand up and stretch.

14           If you conclude that the government has proven beyond

15  a reasonable doubt the existence of the conspiracy charged in

16  Count One, then you must next determine whether the defendant

17  participated in the conspiracy with knowledge of its unlawful

18  purpose, and in furtherance of its unlawful objective or

19  objectives.

20           The government must prove beyond a reasonable doubt

21  that the defendant knowingly and intentionally entered into the

22  conspiracy charged in Count One with a criminal intent, that

23  is, with a purpose to violate the law, and that the defendant

24  agreed to take part in the conspiracy to promote and cooperate

25  in its unlawful objective or objectives.

1    An act is done knowingly and intentionally if it is

2    done deliberately and purposely.  That is, a defendant's acts

3    must have been the product of the defendant's conscious

4    objective rather than the product of a mistake or accident,

5    mere negligence, or some other innocent reason.  The fact that

6    the acts of a defendant, without knowledge, merely happen to

7    further the purpose or objectives of the conspiracy does not

8    make the defendant a member.

9    Now, science has not yet devised a manner of looking

10   into a person's mind and knowing what that person is thinking.

11   I think I said that to you when we were doing jury selection.

12   However, you do have before you evidence of certain acts,

13   conduct, and conversations.  The government contends that these

14   acts, conduct, and conversations show, beyond a reasonable

15   doubt, the defendant's knowledge of the unlawful purpose of the

16   conspiracy.  By pleading not guilty, the defendant denies he

17   committed the charged offense.  It is for you to determine

18   whether the government has proven, beyond a reasonable doubt,

19   the defendant's knowledge and intent.

20   It is not necessary for the defendant to have been the

21   owner of or responsible for the controlled substance that was

22   intended to cross the United States border.  Other individuals

23   or organizations may be the owners of or responsible for the

24   narcotics intended to cross the border, but the defendant may

25   nevertheless be guilty of conspiring to distribute or

1    manufacture the narcotics with knowledge or intent that they be

2    imported if the government proves the elements of Count One as

3    I am explaining them.

4         It is not necessary for the government to show that

5    the defendant was fully aware of every detail of that

6    conspiracy or that defendant knew every other member of that

7    conspiracy.  A defendant may know only one other member of that

8    conspiracy and still be a coconspirator.  It is not necessary

9    for a defendant to receive any monetary benefit from his

10   participation in the conspiracy or to have a financial stake in

11   its outcome.  It is enough if he participated in the conspiracy

12   intentionally and knowingly.

13        The duration and extent of a defendant's participation

14   in the conspiracy charged in Count One has no bearing on the

15   issue of the defendant's guilt.  A defendant need not have

16   joined the conspiracy at the outset.  He may have joined it at

17   any time in its progress, and he will still be held responsible

18   for all that was done before he joined and all that was done

19   during the conspiracy's existence while he was a member.  Each

20   member of a conspiracy may perform separate and distinct acts.

21   Some conspirators play minor roles, while others play major

22   roles.  An equal role is not what the law requires.  Even a

23   single act may be sufficient to draw a defendant within the

24   scope of the conspiracy.

25        However, a person's mere presence at the scene of a

L3JHRAM5                          Charge

1    crime does not by itself make him a member of the conspiracy.

2    Similarly, a person's mere association with a member of the

3    conspiracy does not make that person a member of the

4    conspiracy, even when the association is coupled with knowledge

5    that a conspiracy exists.

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L3JKRAM6

1          THE COURT:  (Continuing)  What is necessary is that a

2     defendant participate in the conspiracy with knowledge of its

3     unlawful purpose and with an intent to aid in the

4     accomplishment of its unlawful objective or objectives.

5          A conspiracy, once formed, is presumed to continue

6     until either its objective is accomplished or there is some

7     affirmative act of termination by its members.  So, too, once a

8     person is found to be a member of a conspiracy, he is presumed

9     to continue his membership in the venture until its

10    termination, unless it is shown by some affirmative proof that

11    he withdrew and dissociated himself from it.

12         The conspiracy charged in Count One is alleged to have

13    existed from in or about 2009, up to and including in or about

14    2020.  It is not essential that the government prove the

15    conspiracy alleged started and ended on any specific date.  It

16    is sufficient if you find that the conspiracy was formed and

17    that it existed for some time around the dates that I just

18    mentioned.

19         When people enter into a conspiracy to accomplish an

20    unlawful end, they become agents or partners of one another in

21    carrying out the conspiracy.  Accordingly, the reasonably

22    foreseeable acts or statements of any other member of the

23    conspiracy, committed in furtherance of the common purpose of

24    the conspiracy, are deemed under the law to be the acts or

25    statements of all of the members of the conspiracy, and all of

L3JKRAM6

1    the members of the conspiracy are responsible for such acts or

2    statements.  This rule applies even though such acts or

3    statements were not made or committed in the defendant's

4    presence or were made or committed without his knowledge.

5         If, and only if, you find the government has proved

6    beyond a reasonable doubt that the defendant is guilty of

7    participating in the conspiracy charged in Count One, you must

8    then determine the type of controlled substance involved in the

9    conspiracy and its weight.

10        You will be provided with a verdict form that will

11   include spaces for you to indicate your determination as to

12   drug type and quantity.

13        The government has alleged that cocaine was the

14   controlled substance involved in the conspiracy charged in

15   Count One.  I instruct you, as a matter of law, that cocaine is

16   a controlled substance, as I previously defined for you.  The

17   government need not prove the purity of the cocaine; any

18   mixture or substance containing a detectable amount of cocaine

19   is sufficient.

20        You need not determine the precise quantity of

21   cocaine.  Instead, if you reach the question of quantity,

22   indicate on the form whether the government has established

23   beyond a reasonable doubt that the conspiracy involved five

24   kilograms and more of mixtures or substances containing a

25   detectable amount of cocaine.  Your finding on quantity must be

L3JKRAM6

unanimous in the sense that all of you must agree that the conspiracy involved at least the quantity you indicate.  Only if you all agree that the conspiracy involved five kilograms and more of cocaine should you mark that finding on the verdict form.

In making your determination about quantity, you should include whatever quantity of cocaine was involved in any act or acts in which the defendant personally and directly participated.

If you find that the defendant personally or directly participated in a jointly undertaken drug transaction, he is responsible for the full quantity of the drugs involved in that transaction.  Or series of transactions, I should say.

In addition, in making your determination about quantity, you should also include any other quantity of cocaine involved, so long as the quantity was either known to the defendant or reasonably foreseeable to him and within the scope of the conspiracy.  Reasonably foreseeable means the defendant could have reasonably anticipated the type and quantity of drugs involved in the conspiracy.

Count Two charges the defendant with using and carrying machine guns or destructive devices in connection with, as well as aiding and abetting the possession of machine guns or destructive devices in connection with, the drug-trafficking crime charged in Count One of the indictment.

L3JKRAM6

1            Specifically, Count Two charges that from at least in

2       or about 2009, up to and including in or about 2020, the

3       defendant during, and in relation to the narcotics importation

4       conspiracy charged in Count One, knowingly used and carried

5       firearms in furtherance of the conspiracy.  Count Two also

6       charges the defendant with aiding and abetting the use,

7       carrying, and possession of those firearms, specifically

8       including machine guns that were capable of automatically

9       shooting more than one shot without manual reloading by a

10      single function of the trigger, as well as destructive devices.

11           In order to convict the defendant on Count Two, the

12      government must prove the following elements beyond a

13      reasonable doubt:

14           First, that the defendant committed the

15      drug-trafficking crime charged in Count One of the indictment.

16      Therefore, if you conclude the defendant's guilt has been

17      proven beyond a reasonable doubt as to Count One, then this

18      element has been satisfied.  If the government has not met its

19      burden as to Count One, this element is not satisfied.

20           Second, the defendant knowingly used or carried a

21      firearm during and in relation to the drug-trafficking crime in

22      Count One, or possessed a firearm in furtherance of that

23      drug-trafficking crime charged in Count One, or aided and

24      abetted another in such use, carrying, or possession of a

25      firearm.

L3JKRAM6

I will define certain of the terms related to the second element of Count Two.

In order to prove the defendant used — this is on the meaning of the word "use" — used machine guns or destructive devices, the government must prove beyond a reasonable doubt an active employment of a machine gun or destructive device by the defendant during and in relation to the commission of a drug-trafficking crime.

This does not mean that the defendant must actually fire or attempt to fire the machine guns or destructive devices, although that would obviously constitute use of the machine guns or destructive device. Brandishing, displaying, or even referring to the machine gun or destructive device, so that others present know that the defendant has a machine gun or destructive device available, if needed, all constitute use of a machine gun or destructive device. The mere possession of a machine gun or destructive device at or near the site of the crime without active employment, as I just described it, is not, however, sufficient to constitute use of a machine gun or destructive device.

In order to prove that the defendant carried a machine gun or destructive device, the government must prove beyond a reasonable doubt that the defendant had a machine gun or destructive device within his control, so that it was available in such a way, that it furthered the commission of the crime.

L3JKRAM6

The defendant need not have held a machine gun or destructive device physically; that is, have had actual possession of it on his person.

If you find the defendant had dominion and control over the place where a machine gun or destructive device was located, and had the power and intention to exercise control over that machine gun or destructive device, and that the machine gun or destructive device was immediately available to him in such a way that it furthered the commission of the drug-trafficking crime charged in Count One, you may find the government has proven that the defendant carried the machine gun or destructive device.

I've previously defined the word "possess," and those instructions apply here.

I will add, also, that possession of a machine gun or destructive device in furtherance of a drug-trafficking crime requires that the defendant possessed a machine gun or destructive device and the possession advances or moves forward the crime. The mere presence of a machine gun or destructive device is not enough. Possession in furtherance requires that the possession be incident to and an essential part of the crime. The machine gun or destructive device must have played some part in furthering the crime in order for this element to be satisfied.

I advise you that the fact that a defendant has a

L3JKRAM6

license to carry a firearm is not a defense to Count Two.

Now, I will now instruct you on the concept of aiding and abetting.  For Count Two, the defendant may be found guilty if he aided and abetted a third party who committed the crime. Aiding and abetting liability is its own theory of criminal liability.

Under the relevant statute, one way the defendant may be found guilty of aiding and abetting a crime is if the defendant, while not himself committing the crime, assisted another person or persons in committing the crime. Specifically, under the federal aiding and abetting statute, whoever aids, abets, counsels, commands, induces, or procures the commission of an offense is punishable as a principal.  A person who aids and abets another to commit an offense is just as guilty of that offense as if he had committed it himself. Therefore, if you find that the government has proved beyond a reasonable doubt that another person actually committed a crime with which the defendant is charged, and that the defendant aided and abetted that person in the commission of the crime, then you may find the defendant guilty of that crime. Obviously, no one can be convicted of aiding and abetting the criminal acts of another if no crime was committed by the other person.  But if you do find that a crime was committed, then you must consider whether the defendant aided and abetted the commission of the crime.

L3JKRAM6

Under this theory, in order to aid and abet another to commit a crime, it is necessary that the defendant willfully and knowingly associated himself in some way with the crime, and that he willfully and knowingly sought by some act to help make the crime succeed.  Participation in a crime is willful if action is taken voluntarily and intentionally or, in the case of a failure to act, with the specific intent to fail to do something the law requires to be done — that is, with a bad purpose either to disobey or disregard the law.

The mere presence of the defendant where a crime is being committed, even when coupled with knowledge by the defendant that a crime is being committed, is not sufficient to make the defendant guilty as an aider and abettor.  Such a defendant would only be guilty of the offenses as an aider and abettor if, in addition to knowing of the criminal activity, he actually took some action intending to help the crime succeed.

In considering this theory of liability, ask yourselves these questions:

Did the defendant participate in the crime charged as something he wished to bring about?

Did he associate himself with the criminal venture knowingly and willfully?

Did he seek by his actions to make the criminal venture succeed?

If he did, then the defendant is an aider and abettor,

L3JKRAM6

1   and therefore guilty of the offense.

2           Under the statute, another way a defendant may be

3   found guilty of aiding and abetting the criminal acts of

4   another is if the defendant intentionally caused another person

5   to physically commit the crime.  Specifically, the statute

6   provides that whoever willfully causes an act to be done which

7   if directly performed by him or another would be an offense is

8   punishable as a principal.

9           Thus, as to Count Two, if the defendant intentionally

10  caused another to possess a machine gun or a destructive device

11  during and in relation to or in furtherance of the

12  drug-trafficking crime charged in Count One, then the defendant

13  is guilty of the crime charged in Count Two just as if he had

14  physically committed the crime himself.

15          Finally, you may also find the defendant guilty of

16  aiding and abetting the crime charged in Count Two if you find

17  that he actively participated in the drug-trafficking crime

18  charged in Count One with advance knowledge that another

19  participant in the crime would use or carry a machine gun or

20  destructive device during and in relation to, or possess a

21  machine gun or destructive device in furtherance of, that

22  crime.  Advance knowledge means knowledge at the time the

23  defendant can attempt to alter the plan or withdraw from it.

24  Knowledge of the machine gun or destructive device may, but

25  does not have to, exist before the underlying crime is begun.

L3JKRAM6

It is sufficient if the knowledge is gained in the middle of the underlying crime, so long as the defendant continues to participate in the crime and has a realistic opportunity to withdraw from it.  You may, but need not, infer that the defendant has sufficient foreknowledge if you find that defendant committed his participation in the crime after learning about the use, carrying, or possession of a machine gun or destructive device by a confederate.

If, and only if, you find the government has proved beyond a reasonable doubt that the defendant is guilty of committing or aiding and abetting the commission of the firearms offense in Count Two, you must then determine whether the offense involved a machine gun or destructive device.  The verdict form will include spaces for you to indicate your determinations as to the type of firearm on Count Two.

A machine gun is any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manually reloading by a single function of the trigger.

Destructive device includes any explosive bomb or grenade, and any type of weapon other than a shotgun or a shotgun shell that will expel a projectile by the action of an explosive or other propellant, that has any barrel with a bore of more than one-half inch in diameter.  A bore is the hollow interior of the barrel of a gun.

L3JKRAM6

1    Count Three is also a conspiracy charge.  It charges

2    that from at least in or about 2009, up to and including in or

3    about 2020, the defendant agreed with others to use and carry a

4    firearm during and in relation to the drug-trafficking crime

5    charged in Count One of the indictment, or to possess a firearm

6    in furtherance of the drug-trafficking crime charged in Count

7    One.

8        Specifically, Count Three charges that from at least

9    in or about 2009, up to and including in or about 2020, the

10   defendant and others intentionally and knowingly combined,

11   conspired, confederated, and agreed together and with each

12   other to violate the federal laws prohibiting using or carrying

13   firearms in furtherance of the narcotics importation conspiracy

14   charged in Count One.  The object of the conspiracy charged in

15   Count Three is the knowing use and carrying of firearms, and

16   the knowing possession of firearms, in furtherance of the

17   narcotics importation conspiracy charged in Count One,

18   including machine guns that were capable of automatically

19   shooting more than one shot without manually reloading by a

20   single function of the trigger, as well as destructive devices.

21       To sustain its burden of proof with respect to the

22   charge of conspiracy contained in Count Three of the

23   indictment, the government must prove beyond a reasonable doubt

24   the following two elements:

25       That the conspiracy charged in Count Three existed.

L3JKRAM6

In other words, from at least in or about 2009, up to and
including 2020, there was an agreement or understanding between
two or more persons to engage in one or more of the following
types of conduct:  To use or carry a firearm during and in
relation to the drug-trafficking crime charged in Count One of
the indictment, or to possess a firearm in furtherance of the
crime charged in Count One.

         Second, that the defendant knowingly and intentionally
associated himself with, and joined in, the conspiracy.

         I have already provided you instructions on what it
means to use or carry a machine gun or destructive device in
relation to a drug-trafficking crime, or possess a machine gun
or a destructive device in furtherance of that crime.  I've
already instructed you on the law of conspiracy, and you should
follow those instructions with respect to Count Three.  All of
those instructions apply equally here.

         If, and only if, you find that the government has
proved beyond a reasonable doubt that the defendant is guilty
of committing the firearms offense charged in Count Three, you
must then determine whether the offense involved a machine gun
or a destructive device.

         I have instructed you on the meaning of the terms
"machine gun" and "destructive device" in connection with Count
Two, and those instructions apply equally for the special
interrogatory on Count Three.

L3JKRAM6

1    There will be a verdict sheet.  Each of you will get

2    it.  Only your foreperson will fill it out, sign it, and return

3    it after the jury reaches a verdict.

4    Yes?

5    JUROR:  Can I go to the bathroom?

6    THE COURT:  Yes.

7    Stand up and stretch.  There's not much more to go.

8    (Pause)

9    THE COURT:  Congress has determined that certain acts

10   begun or committed outside the territorial jurisdiction of the

11   United States are chargeable under U.S. law.  This applies to

12   Counts One, two, and Three of the indictments — there are three

13   counts — thus, the government need not prove that the crime was

14   committed in the Southern District of New York, this district,

15   or that the defendant himself was present here.  Instead, it is

16   enough if you find that the point of entry where any

17   coconspirator of the defendant was first brought into the

18   United States was in the Southern District of New York.  And I

19   think I told you already, it's Manhattan, the Bronx,

20   Westchester, Dutchess, Orange, Rockland, Putnam, and Sullivan

21   Counties.

22   Thus, for example, if you determine that one of the

23   defendant's coconspirators was first brought into the United

24   States within the Southern District of New York in connection

25   with the coconspirator's arrest, venue would be appropriate in

L3JKRAM6

1    the Southern District of New York as to the defendant.

2           You will note that the indictment alleges that certain

3    acts occurred on or about various dates.  It does not matter if

4    the evidence you heard at trial indicates that a particular act

5    occurred on a different date.  The law requires only a

6    substantial similarity between the dates alleged in the

7    indictment and the dates established by the evidence.

8           Now, a few concluding instructions:

9           The possible punishment of a defendant in the event of

10   a conviction is not a proper consideration for the jury and

11   should not, in any way, enter into or influence your

12   deliberations.  The duty of imposing sentence belongs to the

13   judge, and the judge alone.  Your function is to weigh the

14   evidence and to determine whether the defendant is or is not

15   guilty upon the basis of the evidence and the law.

16          Therefore, I instruct you not to consider possible

17   punishment in any way in your deliberations.

18          We have the exhibits loaded or ready to be loaded on

19   the computer downstairs, and they will be available in the jury

20   room.  If you want any testimony read back, please send out a

21   note specifying what you want to hear.  Please be as specific

22   as possible if you request any testimony to be read back.  If

23   you want any further explanation of the law, you may also

24   request that.

25          Your requests for testimony — in fact, any

L3JKRAM6

communication with the Court — should be made in writing,
signed by your foreperson, and given to the deputy marshal
outside the jury room.  In any event, do not tell me or anyone
else what the vote is until after a unanimous verdict is
reached.

I'm also, as I said, sending a copy of the indictment
in.  And, again, the indictment is just an accusation; it's not
evidence.

Some of you took notes during the trial.  Notes that
any of you took may not be given any greater weight or
influence in determination of the case than the recollections
or impressions of another juror, whether from notes or from
memory, with respect to the evidence or what conclusions should
be drawn.  Any difference between a juror's recollection and
another juror's notes should be settled by asking to have the
court reporter read back the transcript, for it is the record,
rather than any juror's notes, upon which the jury must base
its determination of the facts.

In a few moments, you'll retire to decide the case.
It is your duty as jurors to consult with one another and to
deliberate with a view to reaching an agreement.  Each of you
must decide the case for himself or herself, but you should do
so only after a consideration of the case with your fellow
jurors, and you should not hesitate to change an opinion when
convinced that it is erroneous.  Your verdict must be

L3JKRAM6

unanimous, but you are not bound to surrender your

conscientiously held beliefs concerning the weight or effect of

the evidence for the mere purpose of returning a verdict solely

because of the opinions of other jurors.

Discuss and weigh your respective opinions

dispassionately, without regard to sympathy, without regard to

prejudice or favor for either party, and adopt the conclusion

that in your good conscience appears to be in accordance with

the evidence and the Court's instructions on the law.

Please remember, you're not partisans; you are judges,

judges of the facts, not representatives of a constituency or a

cause.

If at any point you find yourselves divided, do not

inform the Court of the vote.  Once you have reached a verdict,

do not announce what the verdict is until I ask you to do so in

the courtroom.

Once you get into the jury room, you must select a

foreperson who will be responsible for signing all

communications to the Court on behalf of the jury and for

handing them to the deputy marshal.  This should not be

understood to mean that an individual cannot send a note to the

Court should the foreperson refuse to do so.

After you reached a final verdict, your foreperson

will advise the deputy marshal, outside your door, that you

have reached a verdict.  The foreperson fills out one copy of

L3JKRAM6

1  the verdict sheet, signs it as foreperson, and puts the date on

2  it, and puts it in an envelope, and hands it to the deputy

3  marshal, indicating that the envelope contains the verdict.

4        I will stress that each of you must be in agreement

5  with the verdict that is announced in court.  Once your verdict

6  is announced by your foreperson in open court and officially

7  recorded, it cannot ordinarily be revoked.

8        Your function now is to weigh the evidence in this

9  case and to determine whether the government has or has not

10 proven beyond a reasonable doubt the guilt of Defendant

11 Geovanny Fuentes Ramirez with respect to each of the three

12 counts in the indictment.

13       You must base your verdict solely on the evidence or

14 lack of evidence in this case and these instructions.  I am

15 sure that if you listen to the views of your fellow jurors, and

16 if you apply your own common sense, you will reach a verdict in

17 accordance with the evidence and the law.

18       Finally, let me state that your oath that you took at

19 the beginning of this trial sums up your duty, and that is:

20 Without fear or favor to anyone, you will well and truly try

21 the issues, based solely upon the evidence or lack of evidence

22 and the Court's instructions as to the law.

23       Ladies and gentlemen, that concludes my instructions.

24 Please stand up and stretch while I meet with the attorneys at

25 the sidebar.

L3JKRAM6

1          (At the sidebar)

2          THE COURT:  Anything from the defendant?

3          MR. MOSKOWITZ:  No, your Honor.

4          THE COURT:  Anything from the government?

5          MR. LOCKARD:  No, your Honor.

6          THE COURT:  All right.

7          This is what I'm going to do:

8          Flo, do you have the numbers of the alternates?  I'm

9   going to instruct the alternates that they're still on jury

10  duty, that they're subject to recall, that they should go about

11  their business but they cannot read anything about the case or

12  discuss the case, and we'll let them know when there's a

13  verdict, et cetera.

14         Where do we stand on the exhibits?  Do you have it?

15         THE LAW CLERK:  We have them on a disk.  We have to

16  load them up to the jury room, which should take a moment.

17         THE COURT:  Okay, good.  And you're going to do that?

18         THE LAW CLERK:  Yes.

19         THE COURT:  Okay.

20         THE DEPUTY CLERK:  Because 5 left, Alternate 1 is in

21  is, so we have Alternate 2, 3, and 4.

22         THE COURT:  What seats are they in?

23         THE DEPUTY CLERK:  This is 16, 15, 14.  That's their

24  numbers.

25         THE COURT:  All right.  Stay right here.  Actually you

L3JKRAM6

1    better go back to your seats because I have to swear the

2    marshal in too.

3              (In open court)

4              THE COURT:  Where is Juror No. 14?  Can you raise your

5    hand.

6              Juror No. 15, can you raise your hand.

7              Juror No. 16, can you raise your hand.

8              All right.  You are still on jury duty, and you are

9    subject to recall.  Because you're still on this jury, you're a

10   sworn member of this jury, I instruct you that you may not

11   discuss the case with anyone.  You may not read or research

12   anything about the case.  Why?  Because you are subject to

13   being recalled, if during deliberations that became necessary,

14   and you would be asked, under oath, whether or not you had

15   discussed the case or read anything.

16             I promise you that we will call you when you are

17   relieved of that obligation.  When this jury is discharged, we

18   will call you right away and let you know, and then you're free

19   to discuss the case with anybody you choose.  But you are

20   subject to recall during the deliberation process.

21             You may go about your lives.  Go back to work or home

22   or whatever you choose, as long as you are reachable.  You

23   can't leave New York or anything like that; you have to be in a

24   position to come back, if required and if requested.

25             With that, I'm going to say goodbye for now and tell

L3JKRAM6

1    you how much I deeply admire your service in this case.

2              So, with that, if those three jurors could please

3    return to the jury room and collect your belongings, you may

4    then depart the building.  If this were non-COVID times, I'd be

5    everybody stand up in deference to you, but we honor your

6    service.  Thank you.

7              (Alternate jurors not present)

8              THE COURT:  And if the deputy marshal will come

9    forward, the oath will be administered.

10             (Deputy marshal sworn)

11             THE COURT:  Thank you.

12             Now, ladies and gentlemen, just informationally:  As I

13   said to you, know that you're in the deliberation mode, and not

14   only may you discuss the case among yourselves — you're

15   required to — you may work on a schedule that's a little bit

16   more in your control.  I will assume that you will want to

17   leave the building at 5:00 o'clock today.  If, for some reason,

18   you want to stay longer, that's not a problem whatsoever, but I

19   just ask that you just give a short note to the deputy marshal

20   and he will let us know.  So that's the only thing I request

21   there.

22             The exhibits are being loaded onto the computer

23   downstairs, if you want to look at any of them.

24             One rule:  If you leave today at 5:00 o'clock, be back

25   here 9:30 Monday morning.  All right?

L3JKRAM6

1      You may not begin your deliberations unless and until

2 all 12 of you are present.  So, if somebody is delayed, you

3 can't start talking about the case until the 12th person has

4 arrived.  So that's where we are.  You may now discuss the case

5 among yourselves, and you may return to the jury room.

6      (Jury not present)

7      THE COURT:  So, a few housekeeping and other matters:

8      Number one, I subscribe to what I call the

9 eight-minute rule, which is, if we get a note from the jury,

10 you have to be someplace where you'll be back in this courtroom

11 within eight minutes, and Flo has to be able to reach you so

12 that you are back in this courtroom.

13      Me practice, generally, is, if we get a note, I'll

14 have it marked, I'll know what's in the note, but Flo will show

15 it to you when you get to the courtroom, even before I take the

16 bench, so you can begin working or formulating your ideas as to

17 how to respond to it.  So, that's that.

18      Now, I want to talk to the lawyers for a moment.  I

19 think the presentation of evidence by Mr. Lockard,

20 Mr. Gutwillig, Mr. Moskowitz, and Mr. Schulman was uncommonly

21 good, it was superior.  It's a credit to the bar of the

22 Southern District of New York.  And I want each of you to know

23 that you're always welcome back in this courtroom, that I have

24 a high opinion of each of the four of you.

25      It becomes my duty, as the trial judge, from time to

L3JKRAM6

1     time, to move people along or to tell an attorney when I think

2     questioning is not appropriate or out of line or do whatever

3     one needs to do to fairly have the case proceed, and I make no

4     apology for that.  But I also quickly add that if it was the

5     case that I said or did anything which in any way offended you,

6     please don't take offense at it — I have a genuine high regard

7     of you, very well done, very well tried, very effectively tried

8     — it's just what I do for a living; we're in different roles in

9     this case.  So, we don't know what the jury's verdict will be,

10    we don't know the outcome, but I think you all should go home

11    to your families confident that you acquitted your roles in

12    this wonderful system that we have.

13            We're adjourned.  Thank you.

14        I also want to thank our court reporters and our

15    interpreters, our deputy marshals, our paralegals, or the

16    government's paralegal I should say, for all of their

17    assistance, and I certainly thank my own staff.  Thank you.

18        (Recess pending verdict)

19

20

21

22

23

24

25