Avraham C. Moskowitz (AM 8913)
Christopher R. Neff (CN 1655)
Moskowitz & Book, LLP
345 Seventh Avenue, 21st Floor
New York, New York 10001
(212) 221-7999

Eylan Schulman (ES 9955)
Schulman Trial, PLLC
20 Vesey St, Suite 1400
New York, NY 10007
(212) 874-2500

*Attorneys for Defendant*
*Geovanny Fuentes Ramirez*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | 15 Cr. 379 (PKC) |
| **v.** | |
| **GEOVANNY FUENTES RAMIREZ,** | |
| **Defendant.** | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT**
**GEOVANNY FUENTES RAMIREZ'S**
**MOTION TO SET ASIDE THE VERDICT OR FOR A NEW TRIAL**

## TABLE OF CONTENTS

INTRODUCTION................................................................................................................ 1

STATEMENT OF THE FACTS ..................................................................................... 4

ARGUMENT ..................................................................................................................... 4

    I.    The Government's Evidence Was Insufficient to Sustain Mr. Fuentes Ramirez's
        Convictions ........................................................................................................... 4

        A.    Legal Standards on a Rule 29 Motion ................................................ 4

        B.    The Evidence was Insufficient to Support a Conviction on Either Conspiracy
            Count ................................................................................................. 5

            1.    The Evidence was Insufficient to Prove Beyond a Reasonable Doubt that Mr.
                Fuentes Ramirez Conspired with Rivera ................................................ 8

            2.    The Evidence was Insufficient to Establish Beyond a Reasonable Doubt that Mr.
                Fuentes Ramirez Engaged in a Continuing Conspiracy After 2013 .................. 10

        C.    The Evidence was Insufficient to Support a Conviction for Possession of a
            Machinegun in Furtherance of a Narcotics Conspiracy .................................... 17

        D.    Venue in the Southern District was Improper .................................... 19

    II.    The Court Should Grant Mr. Fuentes Ramirez a New Trial ......................................... 19

        A.    Evidence from Geo's Social Media and iCloud Accounts, Admitted "Subject to
            Connection," Should Have Been Stricken Because the Government Failed
            Sufficiently to Connect the Evidence to the Defendant. .................................... 20

        B.    The Court Erred in Declining to Give the Statute of Limitations Instruction
            Requested by the Defendant ............................................................... 23

        C.    The Court Erred in Permitting Rivera to Testify to Statements Made by Metro
            and to Mr. Fuentes Ramirez's Alleged Statements at the MCC ........................ 25

CONCLUSION .................................................................................................................. 26

## **TABLE OF AUTHORITIES**

**Cases**

*Bourjaily v. United States*, 483 U.S. 171 (1987) ......................................................... 20

*Dickson v. Microsoft Corp.*, 309 F.3d 193 (4th Cir. 2002) ........................................... 11

*Kotteakos v. United States*, 328 U.S. 750 (1946) ................................................... 10, 11

*United States v. Amato,* 15 F.3d 230 (2d Cir. 1994) ...................................................... 6

*United States v. Andujar*, 49 F.3d 16 (1st Cir. 1995) ..................................................... 8

*United States v. Archer*, 977 F.3d 181 (2d Cir. 2020) .................................................. 19

*United States v. Bell*, 584 F.3d 478, 2009 WL 3353084 (2d Cir. 2009) ........................ 23

*United States v. Clark*, 740 F.3d 808 (2d Cir. 2014) ..................................................... 5

*United States v. D'Amato,* 39 F.3d 1249 (2d Cir. 1994) ................................................ 4

*United States v. Ferguson*, 246 F.3d 129 (2d Cir. 2001) .............................................. 19

*United States v. Friedman*, 300 F.3d 111 (2d Cir. 2002) ........................................... 6, 8

*United States v. Hamilton*, 334 F.3d 170 (2d Cir.2003) ................................................ 4

*United States v. Hawkins*, 547 F.3d 66 (2d Cir. 2008) .................................................. 5

*United States v. Jones*, 30 F.3d 276 (2d Cir. 1994) ...................................................... 7

*United States v. Leslie*, 102 F.3d 1093 (2d Cir. 1997) ................................................... 4

*United States v. Lorenzo*, 534 F.3d 153 (2d Cir. 2008) ................................................. 5

*United States v. Manarite*, 448 F.2d 583 (2d Cir.1971) .............................................. 10

*United States v. Martinez-Sandoval*, 2003 WL 1442454 (S.D.N.Y. March 6, 2003) ..... 8

*United States v. Nusraty,* 867 F.2d 759 (2d Cir. 1989) .................................................. 7

*United States v. Ortiz*, No. S15 08 Cr. 548 (DC), 2009 WL 3415370 (S.D.N.Y. Oct. 23, 2009) .. 4

*United States v. Pauling*, 256 F. Supp. 3d 329 (S.D.N.Y. 2017), *aff'd and remanded*, 924 F.3d 649 (2d Cir. 2019) ........................................................................................................ 5

*United States v. Rodriguez,* 392 F.3d 539 (2d Cir. 2004) .......................................... 7, 8

*United States v. Rubin*, 844 F.2d 979 (2d Cir. 1988) .................................................... 6

*United States v. Samaria*, 239 F.3d 228 (2d Cir. 2001) ........................................... 6, 7

*United States v. Ulbricht*, 31 F. Supp. 3d 540 (S.D.N.Y. 2014) ........................... 10, 11

*United States v. Valle*, 807 F.3d 508 (2d Cir. 2015) ..................................................... 5

*United States v. Vazquez*, 113 F.3d 383 (2d Cir. 1997) ............................................... 23

*United States v. Villegas,* 899 F.2d 1324 (2d Cir. 1990) ............................................... 7

*United States v. Weiner*, 152 F. App'x 38 (2d Cir. 2005) ............................................. 6

*United States v. Wexler*, 838 F.2d 88 (3d Cir. 1988) .................................................... 7

## Statutes

18 U.S.C. § 3238 ........................................................................................................ 21

Fed. R. Crim. P. 29 ................................................................................................... 1, 2

Fed. R. Crim. P. 33 ................................................................................................. 1, 21

Fed. R. Crim. P. 801(d)(2)(E) ..................................................................................... 25

Fed. R. Crim. P. 804(b)(3) .......................................................................................... 25

## INTRODUCTION

Geovanny Fuentes Ramirez respectfully submits this memorandum of law in support of his motion for a judgment of acquittal, pursuant to Fed. R. Crim. P. 29, or, in the alternative, for a new trial pursuant to Fed. R. Crim. P. 33.

As will be discussed more fully below, the evidence in this case was insufficient to establish guilt beyond a reasonable doubt.  First, the evidence was altogether insufficient to establish that Mr. Fuentes-Ramirez engaged in either charged conspiracy, much less that he possessed a machine gun in furtherance of the charged narcotics conspiracy.  Moreover, assuming *arguendo* that there was sufficient evidence to show that Mr. Fuentes Ramirez conspired with Government witness Devis Leonel Rivera Maradiaga ("Leonel Rivera" or "Rivera") more than a decade ago, there was not sufficient evidence to show that Defendant remained a member of a conspiracy after he and Rivera had a "falling out" in 2013.

The Government's only direct evidence of Mr. Fuentes Ramirez's agreement to join in a conspiracy, other than the fact that he associated with other individuals whom the Government accuses of having engaged in narcotics trafficking, is Leonel Rivera's testimony concerning events that took place many years ago, and for which the applicable statute of limitations has long since run.  However, the evidence at trial demonstrated that Leonel Rivera and Mr. Fuentes Ramirez had a falling out in 2013, allegedly going so far as to attempt to kill one another, which dispute ended their alleged joint enterprise.

Other than Mr. Fuentes Ramirez's friendships and familial relationships with people the Government accuses of narcotics trafficking—largely without evidence other than those individuals' relationship with Mr. Fuentes Ramirez—there is very little to suggest that he engaged in any unlawful conduct after his alleged joint enterprise with Rivera came to an end.

Thus, there was insufficient evidence for the jury to conclude that Mr. Fuentes Ramirez engaged in an unlawful narcotics or weapons conspiracy, or that he possessed a machine gun in furtherance of a narcotics conspiracy, within the statute of limitations period.

Because the Government failed to prove that Mr. Fuentes Ramirez conspired with any of the Leonel Rivera co-conspirators who were first rendered to the Southern District upon their arrests, the Government also failed to establish venue in the Southern District of New York.

For all these reasons, the Court should enter a judgment of acquittal pursuant to Rule 29.

In the alternative, the Defendant requests a new trial because errors made in his first trial rendered that trial fundamentally unfair. First, the Court admitted evidence seized from social medial accounts belonging to Mr. Fuentes Ramirez's son Geovanny ("Geo") "subject to connection," but declined to strike that evidence despite the Government's failure to establish any permissible basis for the use of that evidence against the Defendant. Absent any evidence that Mr. Fuentes Ramirez and his son were co-conspirators, the jury's consideration of evidence related to his son was highly prejudicial to the Defendant—especially with regard to Count Two.

Second, the Court erred in declining to give the statute of limitations charge requested by the Defendant. First, there was ample evidence from which the jury could have concluded that any conspiracy involving Mr. Fuentes Ramirez ended no later than 2013, when he and Rivera parted ways. It was therefore error not to instruct the jury that they had to find evidence beyond a reasonable doubt either that Mr. Fuentes Ramirez entered into a conspiracy within the five-year period prior to his indictment or that a pre-existing conspiracy continued into that five year period as a prerequisite to conviction on Counts One and Three. Moreover, although the Court expressly recognized that all three charges against Mr. Fuentes Ramirez were

subject to a five-year statute of limitations, the Court nevertheless declined to give a statute of limitations instruction because Counts One and Three of the Indictment are subject to a presumption of continuity, notwithstanding that Count Two was not subject to the same presumption. This error impermissibly permitted the jury to convict Mr. Fuentes Ramirez on Count Two on the basis of testimony concerning the Defendant's activities in 2013 or earlier. Specifically, the only evidence that Mr. Fuentes Ramirez possessed or used machineguns in furtherance of a narcotics conspiracy was Rivera's testimony that he possessed machineguns at meetings and Jose Sanchez's testimony that Mr. Fuentes Ramirez's workers at a coffee farm that Sanchez believed to be a cocaine laboratory carried machineguns—events as to which the statute of limitations has long since expired.

Finally, the Court erred by permitting Rivera to testify to out-of-court statements by Metro after causing his unavailability by murder, and by permitting Rivera to testify to "admissions" purportedly made when Rivera, on behalf of the Government, interrogated Mr. Fuentes Ramirez outside the presence of his counsel. This error, too, was highly prejudicial and damaging to Mr. Fuentes Ramirez's ability to obtain a fair trial, because the statements he allegedly made to Rivera are the most significant evidence that he became or remained a member of a criminal conspiracy after 2013.

These fundamental errors denied Mr. Fuentes Ramirez a fair trial. Accordingly, the Court should order a new trial pursuant to Rule 33 on all counts of the Indictment—or, at a minimum, on Count Two.

## STATEMENT OF THE FACTS

Having presided over the trial, the Court is fully familiar with the facts of the case and thus, they will not be summarized herein.  Rather, any specific facts relevant to particular arguments below will be integrated herein.

## ARGUMENT

I.    **The Government's Evidence Was Insufficient to Sustain Mr. Fuentes Ramirez's Convictions**

A.  Legal Standards on a Rule 29 Motion

To succeed on a Rule 29 motion, the defendant must demonstrate that "no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Leslie*, 102 F.3d 1093, 1100 (2d Cir. 1997) (citations omitted).  The jury's guilty verdict will be upheld only "if, after viewing the evidence in the light most favorable to the Government and drawing all reasonable inferences in its favor, the court concludes that any rational trier of fact could not have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Ortiz*, No. S15 08 Cr. 548 (DC), 2009 WL 3415370, at *1 (S.D.N.Y. Oct. 23, 2009) (citation and internal quotation marks omitted); *United States v. Hamilton*, 334 F.3d 170 (2d Cir. 2003).  Because a conviction cannot be based on "speculation and surmise alone," the Government "must do more than introduce evidence at least as consistent with innocence as with guilt."  *United States v. D'Amato,* 39 F.3d 1249, 1256 (2d Cir. 1994) (citations and internal quotation marks omitted).

While a defendant's burden with respect to a Rule 29 motion is considerable, "[i]n reviewing the verdict with such a high level of deference to the jury's determinations, the Court is also mindful of its responsibility to protect the defendant's Fifth Amendment rights."  *United*

*States v. Pauling*, 256 F. Supp. 3d 329, 334 (S.D.N.Y. 2017), *aff'd and remanded*, 924 F.3d 649 (2d Cir. 2019), *citing United States v. Valle*, 807 F.3d 508, 513 (2d Cir. 2015).  If courts "'are to be faithful to the constitutional requirement that no person may be convicted unless the Government has proven guilt beyond a reasonable doubt, we must take seriously our obligation to assess the record to determine . . . whether a jury could *reasonably* find guilt[] beyond a reasonable doubt.'"  *Id.* (*quoting Valle*, 807 F.3d at 515 (emphasis in original), *in turn quoting United States v. Clark*, 740 F.3d 808, 811 (2d Cir. 2014)).   "In particular, 'specious inferences are not indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is probably guilty. If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt.'"  *Id.* (*quoting United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).  *See also United States v. Hawkins*, 547 F.3d 66, 71 (2d Cir. 2008).

### B.  The Evidence was Insufficient to Support a Conviction on Either Conspiracy Count

The trial evidence in this case was insufficient to support a conviction beyond a reasonable doubt on either conspiracy count, Counts One and Three of the Indictment, for two principal reasons.  First, the evidence was insufficient to demonstrate that Mr. Fuentes Ramirez entered into a criminal conspiracy at any time, with anyone.  Second, assuming *arguendo* that the evidence was sufficient to demonstrate that Mr. Fuentes Ramirez reached an unlawful agreement with Rivera, the evidence did not show beyond a reasonable doubt that he remained involved in an unlawful conspiracy after the end of his relationship with Rivera.  Instead, Mr. Fuentes Ramirez's agreement with Rivera, if indeed one existed, was limited in scope to the business

relationship between them, and did not involve other individuals with whom Rivera separately conspired. Thus, when the relationship between Mr. Fuentes Ramirez and Rivera ended in 2013, so too ended the sole conspiracy arguably supported by the evidence implicating Mr. Fuentes Ramirez. All of the evidence dating more recently than 2013 is at least as compatible with innocence as with guilt, and that evidence taken together does not establish guilt beyond a reasonable doubt. Accordingly, the jury's verdict on the conspiracy counts must be vacated and a judgment of acquittal entered.

As the Second Circuit has instructed repeatedly, "the fundamental element of a conspiracy is unlawful agreement." *United States v. Rubin*, 844 F.2d 979, 983 (2d Cir. 1988). To establish the existence of a conspiracy, the Government is required to prove the existence of a "meeting of the minds" among the purported conspirators, as to at least the general nature of the plan, if not every detail of its execution. *United States v. Weiner*, 152 F. App'x 38, 40 (2d Cir. 2005). The Government need not present evidence of a formal or express agreement, but it must, at a minimum, prove that the conspirators shared "a tacit understanding to engage in the offense." *See United States v. Amato,* 15 F.3d 230, 235 (2d Cir. 1994).

Accordingly, even when a defendant has associated himself with persons proven to be conspirators, and even if he has demonstrated through conduct his suspicion that criminal activity of some kind is afoot, the Government must prove that he knew the specific unlawful aim of the conspiracy, and that he acted intentionally to achieve that unlawful objective. *United States v. Samaria*, 239 F.3d 228, 233–34 (2d Cir. 2001); *United States v. Friedman*, 300 F.3d 111, 124 (2d Cir. 2002) ("[p]roof that the defendant knew that *some* crime would be committed is not enough") (emphasis in original).

- 6 -

Indeed, as the Court stated in *Samaria*, permitting a guilty verdict without proof of a defendant's knowledge of the conspiracy's illegal objective, and his specific intent to join the conspiracy in furtherance of that objective, "would be to permit suspicious circumstances or association with criminals to suffice as proof of conspiracy." *United States v. Samaria*, 239 F.3d at 240. *See also United States v. Wexler*, 838 F.2d 88, 91–92 (3d Cir. 1988).

The *Samaria* Court also reaffirmed the principle that "mere presence at the scene of a criminal act or association with conspirators does not constitute intentional participation in the conspiracy, *even if the defendant has knowledge of the conspiracy*." *United States v. Samaria*, 239 F.3d at 235 (*citing United States v. Jones*, 30 F.3d 276, 282 (2d Cir. 1994)) (emphasis added) (other citations omitted).

A defendant's knowledge and participation in a conspiracy with the requisite criminal intent may be demonstrated by circumstantial evidence. *See, e.g., United States v. Villegas,* 899 F.2d 1324, 1338–39 (2d Cir. 1990). However, there must "be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Nusraty,* 867 F.2d 759, 763 (2d Cir. 1989) (citations and internal quotation marks omitted); *United States v. Rodriguez,* 392 F.3d 539, 545 (2d Cir. 2004); *United States v. Samaria*, 239 F.3d at 233–34.

As the Second Circuit summarized in *Rodriguez*, "the conspiracy and substantive charges, both of which are specific intent crimes, required the government to establish that Rodriguez knowingly and intentionally participated in the [charged] drug deal[.]" *United States v. Rodriguez*, 392 F.3d at 545 (citations omitted). In fact, the Court characterized the defendant's knowledge of the precise crime to be undertaken, and the concurrent specific intent to commit it,

as triggering "the critical question []: whether the government proved beyond a reasonable doubt that Rodriguez had the knowledge and specific intent to aid and abet a *drug* transaction." *Id.* at 546.

Consequently, "where the Government seeks to prove a fact that is also an element of the offense by circumstantial evidence … the inferences [must be] sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *United States v. Friedman*, 300 F.3d at 124.

Accordingly, despite the fact that membership in a conspiracy can be proven through circumstantial evidence, the evidence is nevertheless insufficient to sustain a conviction when "the circumstantial evidence regarding Defendant's specific intent to join the conspiracy equally supports competing theories of guilt and innocence." *United States v. Martinez-Sandoval*, 2003 WL 1442454, at *6 (S.D.N.Y. March 6, 2003). *See also United States v. Andujar*, 49 F.3d 16, 22 (1st Cir. 1995) (reversing drug conspiracy conviction because evidence "offer[ed] equal support to both [the defendant's] mere presence theory, and the prosecution's theory that [the defendant] was knowingly acting as a facilitator and go-between in the conspiracy[,]" because "[w]hen a jury is confronted . . . with equally persuasive theories of guilt and innocence it cannot rationally find guilt beyond a reasonable doubt") (footnote omitted).

Applying those principles to the facts of the case, it is evident that neither conspiracy conviction may be upheld.

### 1. The Evidence was Insufficient to Prove Beyond a Reasonable Doubt that Mr. Fuentes Ramirez Conspired with Rivera

The Government's case was strongest with regard to whether Mr. Fuentes Ramirez conspired with Rivera prior to 2013. It is nevertheless submitted that the evidence on

that point, which consisted primarily of Rivera's cooperator testimony, was insufficient to establish Mr. Fuentes Ramirez's membership in, and intentional participation in, the charged conspiracies even prior to 2013.   Among other problems with the Government's case, cross-examination established that Rivera lied under oath on multiple occasions, without repercussions; that he failed to remember important details of more-recent events, even while claiming to remember every minor detail of transactions implicating Mr. Fuentes Ramirez; and that he followed the Government's lead, rather than his own recollections, even in matters as important as the identity of his 78 murder victims and the circumstances and means through which he carried out those 78 murders.   To say the least, Rivera's uncorroborated testimony provided reasonable doubt.

Equally importantly, Rivera testified that his agreement with Mr. Fuentes Ramirez came to an unequivocal end in 2013, when he and Mr. Fuentes Ramirez purportedly contrived to murder one another.   Specifically, Rivera testified in no uncertain terms that he had a narcotics-trafficking business with the defendant "[a]pproximately between 2011 and 2013," but that he stopped having a drug-trafficking business with the defendant in 2013 after "several arguments" resulted in "breaking up [their] relationship." (Tr. 273.)   Thereafter, Rivera continued trafficking drugs until 2015.   His activities between the end of his relationship with Mr. Fuentes Ramirez and the end of his drug-trafficking career involved other members of the Cachiros, the Valle brothers' organization, Tony Hernandez, and numerous other traffickers and associates about whom he testified—but he never again worked with the Defendant, directly or indirectly.   He had no first-hand knowledge of the Defendant's activities after 2013.   Accordingly, no reasonable jury could have found, beyond a reasonable doubt, that Mr. Fuentes Ramirez

conspired with Rivera from "at least in or about 2009 up to and including in or about 2020," as alleged in Counts 1 and 3 of the Indictment.

      2.  *The Evidence was Insufficient to Establish Beyond a Reasonable Doubt that Mr. Fuentes Ramirez Engaged in a Continuing Conspiracy After 2013*

Assuming *arguendo* that Rivera's testimony was sufficient to establish that he and Mr. Fuentes Ramirez conspired from 2011 until sometime in 2013, the evidence at trial was nevertheless insufficient to establish beyond a reasonable doubt that Mr. Fuentes Ramirez was engaged in a continuing conspiracy after the end of his relationship with Rivera.

Courts in the Second Circuit and elsewhere distinguish between two fundamental types of conspiracy, often conceptualized by analogy as "chain" conspiracies and as "wheel" conspiracies (sometimes referred to as "hub and spoke" conspiracies). *See, e.g.*, *United States v. Ulbricht*, 31 F. Supp. 3d 540, 553 (S.D.N.Y. 2014). In a chain conspiracy, there might be several different layers of workers and managers, working together to achieve a single goal. "For example, in a narcotics conspiracy, a chain may be comprised of producers, exporters, wholesalers, middlemen, and dealers. The success of each 'link' in the chain depends on the success of the others, even though each individual conspirator may play a role that is separated by great distance and time from the other individuals involved." *Id.* By contrast, in a wheel conspiracy, "one person typically acts as a central point while others act as 'spokes' by virtue of their agreement with the central actor." *Id.* (citing *Kotteakos v. United States*, 328 U.S. 750, 754–55 (1946)). In other words, in a hub-and-spoke or "wheel" conspiracy, "members of a 'core' group deal with a number of contacts who are analogized to the spokes of a wheel and are connected with each other only through the core conspirators." *Id.* (quoting *United States v. Manarite*, 448 F.2d 583, 589 (2d Cir.1971)).

To prove that a hub-and-spoke arrangement is a single conspiracy, rather than multiple conspiracies with some of the same members at their center, the Government must show that there was a "rim" around the spokes, such that each of the "spokes" became coconspirators with one another. *Id.* The required "rim" of a functional wheel conspiracy is established by showing that "each defendant ... participated in the conspiracy with the common goal or purpose of the other defendants." *Id.* "In the absence of such a 'rim,' the spokes are acting independently with the hub; while there may in fact be multiple separate conspiracies, there cannot be a single conspiracy." *Id. See also Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002) ("A rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." (citing *Kotteakos*, 328 U.S. at 755)).

In his testimony, Rivera described a hub-and-spoke arrangement of conspirators, with the Rivera brothers at its center. To carry out their narcotics trafficking business, the Rivera brothers made arrangements with a variety of other people and organizations, each of whom had a defined role, but whose roles did not rely on one another. Rivera established relationships with cocaine suppliers in other countries, who could supply him with cocaine. He established relationships with representatives of law enforcement and the Honduran government, who could provide him with protection and ensure that his shipments would not be seized before he could ship them out of the country, and he established relationships with people who could provide him with boats and aircraft that could carry his cocaine to his desired destinations, and with airstrips those aircraft could use. And, of course, he established conspiratorial relationships with assassins who were willing to carry out dozens of murders at his direction, in order to protect his

organization.   In short, Rivera and his brother Javier were the "hub" at the center of their conspiratorial organization, and they established multiple spokes without which their conspiracy could not function.   The "rim" that held the entire operation together and made it work was that the conspirators, regardless of their role, intended that Rivera's cocaine trafficking organization be successful.

The wheel described by Rivera broke when he and Mr. Fuentes Ramirez had their falling out in 2013, after which they had no further business together.   From that day forward, Mr. Fuentes Ramirez had no reason to want Rivera's business to succeed.   For Mr. Fuentes Ramirez, the conspiracy was over—even if it continued thereafter, so far as the others involved were concerned.   And there was no evidence that Mr. Fuentes Ramirez engaged in a conspiracy to traffic cocaine, or to possess machine guns in furtherance of a narcotics offense, thereafter.

According to Rivera, he first met Mr. Fuentes Ramirez through Metro, Rivera's cousin.   Mr. Fuentes Ramirez had previously sold relatively small amounts of cocaine in Miami on Metro's behalf, but that arrangement had ended and Mr. Fuentes Ramirez had returned to Honduras.   (Tr. 284, 287.)   At the time Metro approached Rivera about him, Mr. Fuentes Ramirez wanted to start transporting cocaine for Rivera's organization.   Mr. Fuentes Ramirez and Metro told Rivera that he had contacts in the Honduran law enforcement community, which he could leverage to Rivera's advantage if Rivera brought him in.   (Tr. 284–85.)   Mr. Fuentes Ramirez also told Rivera that he and Metro had recently started a drug lab, where they intended to refine cocaine base from Colombia into pure cocaine for distribution and asked him for money they could use to pay guards and import cocaine base.   (Tr. 290–91.)   Rivera declined to invest in the lab and initially resisted Metro's proposal that he bring Mr. Fuentes Ramirez into his organization.   Sometime later, Rivera met again with Metro to discuss Mr. Fuentes Ramirez's

contacts in law enforcement, and Metro told him that Mr. Fuentes Ramirez could recruit, among other law-enforcement personnel, an individual named Comisionado Martinez, who had previously worked for a trafficker known as "Paico" and who was now willing to act on behalf of Rivera's organization. (Tr. 294–96.) Rivera already had corrupt police officers on his payroll but supposedly wished to have a greater presence in the specific geographic areas where Mr. Fuentes Ramirez and his police contacts were located. (Tr. 298–99.) For that reason, among others, and after initially resisting Metro's requests that Mr. Fuentes Ramirez be recruited into Rivera's conspiracy, Rivera ultimately decided to let Mr. Fuentes Ramirez join his operation and work as a transporter, using his contacts in law enforcement to protect Rivera's cocaine shipments. (Tr. 298–99, 304–05.) The first transaction Mr. Fuentes Ramirez handled for Rivera took place in 2011, and he continued working for Rivera intermittently for approximately two years. (Tr. 305, 317, 320–21, 324–29.) According to statements Metro allegedly made to Rivera, Mr. Fuentes Ramirez also worked separately with Metro and Metro's brother on a number of drug transactions they carried out (and a number of acts of violence in connection with those transactions) during the same approximate period of time. (Tr. 339–350.)

In 2013, Mr. Fuentes Ramirez and Metro asked Rivera to loan them $1 million so that they could bring in a large shipment of cocaine from Colombia. (Tr. 356–57.) Rivera asked another drug trafficker he trusted about the deal, and that trafficker told him he did not believe the proposed transaction was legitimate. (Tr. 357–58.) Rivera therefore refused to lend the money. (Tr. 358.) Mr. Fuentes Ramirez and Metro were unhappy with Rivera's refusal to lend them money and plotted to kill him. When Rivera learned of the plot, he had Metro killed. (Tr. 367–69.) Rivera also tried to have Mr. Fuentes Ramirez killed, but Mr. Fuentes Ramirez fought off Rivera's assassins. (Tr. 369.) Thereafter, Mr. Fuentes Ramirez and Rivera ended their

relationship once and for all, and they did no business together after 2013. (Tr. 273, 371, 372–73.)

Notably, there is very little evidence that Mr. Fuentes Ramirez conspired to traffic in narcotics separately from his partnerships with Rivera and Metro, or that he engaged in any narcotics transactions after Rivera terminated Mr. Fuentes Ramirez's role in the Cachiros organization and murdered Metro in 2013.   After that date, the Government relied solely on evidence that was at most equivocal, as compatible with innocence as with guilt.

For example, the Government alleges that President Hernandez, while campaigning for office, asked Mr. Fuentes Ramirez to reopen his alleged drug laboratory on the coffee farm in Cerro Negro and operate it for the President's benefit.  But there was no testimony or other evidence that Mr. Fuentes Ramirez accepted that offer.

The Government alleges that Mr. Fuentes Ramirez gave money to President Hernandez on two occasions, transactions that Government witness, Jose Sanchez, characterized as "bribes." (Tr. 648.)  The Government theory is that these payments were made in response to Hernandez's purported offer to help Mr. Fuentes Ramirez reopen the Cerro Negro facility. However, Sanchez testified that the police raid that closed the facility took place in 2011, that President Hernandez ran for his current office in 2013, and that the two meetings between Mr. Fuentes Ramirez and President Hernandez took place during Hernandez's campaign for his current office. (Tr. 664, 691, 718.)   At the first meeting, Mr. Fuentes Ramirez addressed candidate Hernandez as "Juancho," which Sanchez understood to be indicative that the two were close friends.  (Tr. 693.)   Hernandez told Mr. Fuentes Ramirez that he wanted Mr. Fuentes Ramirez and his drug lab to work for him; in response, Mr. Fuentes Ramirez just smiled.  (Tr. 693–94.)  Hernandez said the law would not be a problem, because the police and the military

- 14 -

would handle transportation security.  (Tr. 694.)  Later, at the same meeting, Mr. Fuentes Ramirez gave Hernandez $15,000, which he said was to help with Hernandez's campaign. (Tr. 696.)

Sanchez's testimony did not extinguish reasonable doubt that Mr. Fuentes Ramirez acted independently of Rivera's conspiracy or that he conspired to engage in narcotics or firearms offenses after withdrawing from that conspiracy in 2013.  Importantly, according to Sanchez, Mr. Fuentes Ramirez did not expressly agree to work for Hernandez or to reopen the Cerro Negro facility when Hernandez allegedly asked him to do so.

There was also ample trial evidence that Mr. Fuentes Ramirez and President Hernandez were friends, or at least friendly acquaintances, and the amounts Mr. Fuentes Ramirez allegedly contributed to President Hernandez were far lower than the cost of bribing a president, as recounted by Rivera.  The contributions were made during the president's election campaigns, and there is nothing unlawful about a businessman supporting politicians financially—especially those politicians with whom they are friendly.  Indeed, Sanchez's testimony about the second meeting between Mr. Fuentes Ramirez and Hernandez reinforces the conclusion that these transactions were merely campaign contributions.  At that meeting, per Sanchez, the only conversation was about politics—and Mr. Fuentes Ramirez made a donation of $10,000 to Hernandez's campaign during that meeting.  (Tr. 700–01.)  The payments from Mr. Fuentes Ramirez to candidate Hernandez are therefore more in keeping with permissible campaign contributions than with a criminal conspiracy.

The Government argues that Mr. Fuentes Ramirez visited the presidential residence twice during the trial of Tony Hernandez, but the only evidence that he did so is that he searched a GPS device for the location of the presidential residence on two occasions.  The trial

testimony established that the Presidential Residence was in a commercial area of the capital where there are hotels and restaurants and thus it is equally, if not more likely, that Mr. Fuentes Ramirez was visiting that part of the city to go to a hotel or restaurant and not to visit the President.  And if Mr. Fuentes Ramirez did visit with President Hernandez during his brother's trial, there is nothing unlawful about a person visiting with a friend during times of family trouble.

The Government argues that Mr. Fuentes Ramirez must have continued conducting drug business after Rivera kicked him out of his organization and murdered Metro because he had the telephone numbers of his country's president, vice president, former president, and numerous other political, military, and police officials when he was arrested some seven years later.  The Government argued in summation—but did not prove through evidence at trial—that some of those individuals were corrupt, and it asked the jury to infer that Mr. Fuentes Ramirez must have continued trafficking drugs after 2013 because no legitimate businessperson would have the ability to contact so many government officials.  The Government also pointed to Geovanny's post-arrest statement, in which he admitted knowing numerous individuals who are accused of being drug traffickers, including some who worked with Rivera prior to 2013 and continued to do so even after Rivera and Mr. Fuentes Ramirez parted ways, arguing that innocent people simply do not know so many criminals.  But the Government's arguments ignore the well-established principle that the fact an individual knows and associates with a criminal—or even knows about, and is present during, specific criminal acts—is insufficient to prove that individual's membership in a criminal conspiracy.

Finally, the Government argues that images of guns and conversations about current events that were recovered from Mr. Fuentes Ramirez's phone, together with images

recovered from his son Geo's social media accounts, demonstrate that Mr. Fuentes Ramirez remained in the drug business after 2013.  This argument, too, is without merit.  Even if the individuals with whom Mr. Fuentes Ramirez communicated were corrupt (as the government argues but did not prove through evidence), there is nothing unlawful about the conversations.  Nor is there any evidence to demonstrate who took the photographs that were found on Mr. Fuentes Ramirez's phone, when they were taken, or for what purpose.  Similarly, there is no evidence that Geo was involved in drug trafficking, or that his posts were anything more than a young man's bluster and bravado in the face of the possibility that his father would be imprisoned for life on the basis of the false testimony of a mass murderer.  The posts certainly do not establish that Mr. Fuentes Ramirez was at any time engaged with his son in a narcotics or gun conspiracy.

Accordingly, the Court should enter a judgment of acquittal on both conspiracy counts.

C.   The Evidence was Insufficient to Support a Conviction for Possession of a Machinegun in Furtherance of a Narcotics Conspiracy

Count Two charges Mr. Fuentes Ramirez with using or carrying a machinegun or destructive device, or aiding and abetting the use or carrying of a machinegun or destructive device, during and in relation to the narcotics conspiracy charged in Count One.  The jury convicted the defendant of using a machinegun but found insufficient evidence that he possessed or used a destructive device, as that term is defined in the relevant statute.

Mr. Fuentes Ramirez's conviction on Count Two must be vacated, and a judgment of acquittal entered, for two principal reasons.  First, as argued at Point I(B), the evidence was insufficient to establish his guilt of Count One beyond a reasonable doubt.

Second, even if there was sufficient evidence to establish guilt on the conspiracy charge, there was not sufficient evidence to demonstrate beyond a reasonable doubt that the defendant used a machinegun in relation to a narcotics offense, as opposed to for some other reason, within the statute of limitations.

As the Court correctly instructed the jury, "use" of a machine gun under the relevant statute requires something more than mere possession, such as brandishing or displaying the weapon in furtherance of the charged conspiracy (or aiding and abetting another in doing so). Accordingly, the photographs of weapons taken from Mr. Fuentes Ramirez's telephone, which arguably support an inference that he possessed a machinegun, do not establish a violation of the relevant statue. All of the testimony about Mr. Fuentes Ramirez (or anyone associated with Mr. Fuentes Ramirez) using a machinegun related to events that took place more than five years before the Indictment in this case. There was no evidence that Mr. Fuentes Ramirez personally used a machinegun within the statutory period, or that he aided and abetted anyone else in using a machinegun in furtherance of narcotics activity in the five years preceding the Indictment. To the extent the Government relied on Geo's social media posts to assert "use" of a machinegun, there was no evidence that Mr. Fuentes Ramirez counseled, commanded, or induced Geo to make those posts. Nor is there any evidence that he adopted those posts as his own statements or approved of them after the fact. Indeed, there is no evidence as to when the pictures from Geo's social media posts or iCloud account were taken or by whom, nor is there any evidence that Mr. Fuentes Ramirez was even aware of the pictures or the social media posts.

Accordingly, the Court should enter a judgment of acquittal on Count Two.

D.  <u>Venue in the Southern District was Improper</u>

To establish venue in the Southern District of New York, the Government relied on its theory that a co-conspirator was first brought to this district following arrest outside the United States, and the Court accordingly charged the jury on the venue pursuant to 18 U.S.C. § 3238.   However, because none of the individuals identified by the Government were coconspirators in any conspiracy that existed within the statute of limitations, and because Mr. Fuentes Ramirez himself was arrested in Miami, venue does not lie in the Southern District of New York.  The defense has not located any case law for the proposition that venue under 18 U.S.C. § 3238 is only proper if the alleged conspiracy occurred within the statute of limitations and acknowledges that venue under other provisions may be based on events outside the statute of limitations, but respectfully raises this argument for purposes of preservation for appeal.

II.      **The Court Should Grant Mr. Fuentes Ramirez a New Trial**

Rule 33 permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33.  The rule gives the trial court "broad discretion . . . to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice."  *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001) (citation omitted).

A district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be "manifest injustice" to let the verdict stand.  *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020).  "[A]bsent a situation in which the evidence was patently incredible or defied physical realities, or where an evidentiary or instructional error compromised the reliability of the verdict, a district court must defer to the jury's resolution of conflicting evidence

. . . [and] must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis." *Id.* at 188–89.

It is respectfully submitted that a new trial is warranted by evidentiary and instructional error in this case.

A. Evidence from Geo's Social Media and iCloud Accounts, Admitted "Subject to Connection," Should Have Been Stricken Because the Government Failed Sufficiently to Connect the Evidence to the Defendant.

First, the Court admitted evidence seized from social medial accounts belonging to Mr. Fuentes Ramirez's son Geo "subject to connection," but denied the Defendant's motion to strike that evidence at close of trial even though the Government failed to link Geo to the alleged conspiracies or otherwise establish any permissible basis for the use of that evidence against the Defendant.  Absent any evidence that Mr. Fuentes Ramirez and his son were co-conspirators, permitting the jury to consider evidence seized from Geo compromised the integrity of the verdict, especially with regard to Count Two.

Admission of evidence as the statement of a co-conspirator requires a showing, by a preponderance of the evidence, (1) that there was a conspiracy involving the declarant and the party against whom the statement is offered, and (2) the statement was made "during the course and in furtherance of the conspiracy." *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  No such showing was made in this case.  Specifically, there was no evidence that Geo and Mr. Fuentes Ramirez were coconspirators.  As detailed in the context of Defendant's Rule 29 motion, there was vanishingly little evidence to suggest that Mr. Fuentes Ramirez remained a member of any conspiracy after his relationship with Rivera ended in 2013—and, other than the social media posts and iCloud photos themselves, there was no evidence whatsoever that Geo was a member of a narcotics conspiracy.  While it is undisputed that the declarant's statements may be

considered when weighing their admissibility, the seized social media posts, even in conjunction with the photographs seized from Geo, do not establish by a preponderance of the evidence that Geo conspired with Mr. Fuentes Ramirez or that the social media posts were made in furtherance of the charged conspiracy.

When considering the defendant's motion to strike the 900 and 1100 series of evidence, the Court found Geo to be a conspirator primarily on the basis of several categories of photographs. (Tr. 1039–41.)  First, the Court pointed to photographs of the Defendant wearing a bulletproof vest and a military beret, and of the Defendant and his son together, in which the son is wearing a Honduran National Police hat.  Based on Geo's apparent age in these photographs, they were taken years after Mr. Fuentes Ramirez allegedly procured corrupt services from police and military officials between 2011 and 2013.  The Court next pointed to photographs featuring the Defendant, an adolescent Geo, and President Hernandez, as well as photographs of Commissioner Martinez and President Hernandez together.   Finally, the Court pointed to photographs of firearms and "bulk quantities" of currency.

These photographs, taken together, do not establish by a preponderance of the evidence a conspiratorial relationship between Mr. Fuentes Ramirez and his son, even when considered alongside Geo's social media posts.  First, there is nothing intrinsically unlawful about possessing or wearing a bulletproof vest, or a hat bearing a law enforcement insignia. Indeed, souvenir shops all over New York City sell hats and other merchandise bearing logos and insignia associated with the NYPD, the FBI, and other law enforcement agencies. Moreover, even crediting the Government's theory that the hats shown in Geo's photographs were derived from Mr. Fuentes Ramirez's alleged corrupt activities on behalf of Rivera prior to 2013, there was no evidence that Geo played any role in that activity—and his wearing a hat that

might have come from his father is not evidence of his own membership in a conspiracy, even if his father might originally have obtained the hat in connection with a conspiracy.  Nor is there anything odd about Mr. Fuentes Ramirez or his son being photographed with President Hernandez, whether at a campaign event or at a personal one.  Individuals are permitted to be friendly with politicians—even politicians accused of corruption—and it is well established that an individual's friendly relations with a criminal do not, without more, expose him to criminal liability.  Finally, other than supposition and argument by the Government, nothing connected the photographs of guns and cash to any criminal activity.

The Court next considered Geo's social media posts, and specifically his use of a frog emoji, which the Government's translator identified, based on lay expertise, as a pejorative meaning "snitch" in Spanish.  The Court determined that use of the emoji made the inference of Geo's membership in the conspiracy "even more persuasive" than did the photographs. (Tr. 1040.)  But the social media posts—and even Geo's use of the emoji—both of which came months after Mr. Fuentes Ramirez's arrest, are at least as compatible with his role as the innocent and frightened son of a wrongfully accused man as they are with membership in a criminal conspiracy.  In short, the evidence that Geo was a coconspirator and that his social media posts were in furtherance of the charged conspiracy fell far short of the required preponderance standard, and it was error to admit the social media posts as coconspirator statements under Rule 801(d)(2)(E).

The Court further found, in the alternative, that the social media posts would be admissible under Rule 804(b)(3) because they would prove Geo's and Martinez's guilt, and because Geo and Martinez were unavailable.  This, too, was error—there was no showing that

either individual was unavailable, and the social medial posts were not inculpatory of either of them.

The consequences of this evidentiary error were devastating and compromised the integrity of the verdict.  With the exception of the social media posts featuring photographs of automatic weapons alongside text and emojis that the Government characterized as threatening a cooperating witness, there was no evidence at trial that Mr. Fuentes Ramirez (or anyone associated with him) used or possessed a machine gun in furtherance of a narcotics conspiracy after 2013.  Accordingly, Geo's social media posts and photographs were the sole basis upon which Mr. Fuentes Ramirez could have been convicted on Count Two.  Moreover, because there was vanishingly little trial evidence that Mr. Fuentes Ramirez remained a member of a conspiracy after his relationship with Rivera ended in 2013, the social media posts and photographs are highly likely to have been a substantial basis for Mr. Fuentes Ramirez's convictions on Counts One and Three.

### B.   The Court Erred in Declining to Give the Statute of Limitations Instruction Requested by the Defendant

"A jury instruction is erroneous if it misleads the jury as to the correct legal standard or does not adequately inform the jury on the law."  *United States v. Bell*, 584 F.3d 478, 2009 WL 3353084, at *4 (2d Cir. 2009) (*per curiam*).  In general, a criminal defendant is entitled to a jury instruction reflecting his defense theory "for which there is some foundation in the proof, no matter how tenuous that defense may appear to the trial court."  *United States v. Vazquez*, 113 F.3d 383, 386 (2d Cir. 1997) (internal quotation marks and citations omitted).

Here, there was a substantial foundation in the proof to support the Defendant's request for a statute of limitations instruction.  First, there was ample evidence from which the

jury could have concluded that any conspiracy involving Mr. Fuentes Ramirez ended no later than 2013, when he and Rivera parted ways.  The jury could have concluded from that evidence that Mr. Fuentes Ramirez withdrew from and terminated his role in the charged conspiracy more than five years before the Indictment was filed.  Accordingly, notwithstanding the presumption that a narcotics (or gun) conspiracy continues until its aims are achieved or until it is affirmatively terminated, there was a foundation for the Defendant's requested charge with regard to Counts One and Three of the Indictment.  Further, the firearms offense charged in Count Two is not subject to a presumption of continuation, and the testimonial evidence concerning Mr. Fuentes Ramirez's possession and use of firearms in furtherance of a narcotics conspiracy all related to events occurring in 2013 or before, well outside the statute of limitations period.

Although the Court expressly recognized that all three charges against Mr. Fuentes Ramirez were subject to a five-year statute of limitations, the Court nevertheless declined to give a statute of limitations instruction.  This error compromised the integrity of the verdicts on Counts One and Three by permitting the jury to convict Mr. Fuentes Ramirez for his role in alleged conspiracies from which he withdrew in 2013, outside the statute of limitations period.  It also compromised the integrity of the verdict on Count 2 by permitting a conviction based on testimony by Rivera and Sanchez concerning the Defendant's personal and constructive possession and use of machineguns in and before 2013, at meetings with Rivera and at the Cerro Negro facility.  The statute of limitations on those events expired years before the indictment was brought.  Finally, this error compromised the integrity of the verdict on Count Two even to the extent Geo's photographs and social media posts were properly admitted or that other post-2013 evidence might have been probative of possession or use of a machinegun by Geo, whether

- 24 -

directly or on an aiding and abetting theory.  This is so because the verdict returned by the jury does not identify the specific machinegun used or possessed by Geo, or when the use or possession occurred.  It is thus impossible to determine from the verdict whether Geo was convicted on the basis of conduct in or before 2013, on the basis of Geo's social media posts or other evidence within the statute of limitations period, or on the basis of some combination of the two.

It is respectfully submitted that the erroneous jury instructions compel a new trial pursuant to Rule 33.

C. The Court Erred in Permitting Rivera to Testify to Statements Made by Metro and to Mr. Fuentes Ramirez's Alleged Statements at the MCC

Finally, the Court erred by admitting Rivera's testimony concerning "admissions" purportedly made to him by Mr. Fuentes Ramirez when Rivera, on behalf of the Government, interrogated Mr. Fuentes Ramirez at the MCC, outside the presence of his counsel.  The Court also erred by admitting Rivera's testimony about statements allegedly made by Metro notwithstanding that Rivera caused Metro's unavailability by murdering him at or around the time Rivera became a cooperating witness and began acting on behalf of the Government.  For the reasons set forth in Defendant's opposition to the Government's motions *in limine*, ECF No. 36 herein, Rivera's testimony on these subjects should have been excluded.

This error, too, was damaging to Mr. Fuentes Ramirez's ability to obtain a fair trial and likely compromised the verdicts.  Specifically, the statements Rivera allegedly obtained from Mr. Fuentes Ramirez in violation of *Massiah* were the most significant evidence offered for the proposition that Mr. Fuentes Ramirez continued to engage in unlawful activity after withdrawing from Rivera's conspiracy in 2013, and the statements attributed to Metro were the

most significant evidence that Mr. Fuentes Ramirez at any time engaged in criminal activity that was not in furtherance of Rivera's conspiracy.

Because these evidentiary issues likely compromised the integrity of the verdict, a new trial should be ordered.

## **<u>CONCLUSION</u>**

For the reasons set forth above and based on the authorities cited herein, it is respectfully requested that the Court enter a judgment of acquittal or, in the alternative, order a new trial in the interests of justice.

Dated:  April 23, 2021
          New York, New York

Respectfully submitted,

Avraham C. Moskowitz

Christopher R. Neff

- 26 -