UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

  - v. -

GEOVANNY FUENTES RAMIREZ,

      Defendant.

S6 15 Cr. 379 (PKC)

**THE GOVERNMENT'S OPPOSITION TO THE
DEFENDANT'S POST-TRIAL MOTIONS**

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Jacob Gutwillig
Michael D. Lockard
Jason A. Richman
Elinor Tarlow
Assistant United States Attorneys
 *Of Counsel*

## <u>TABLE OF CONTENTS</u>

THE TRIAL EVIDENCE ........................................................................................... 2

I.   The Defendant Establishes a Cocaine Laboratory in Honduras ....................................... 2

II.  The Defendant Commits Acts of Violence to Help Leonel Rivera and Transports Multiple Drug Loads Totaling Over Approximately 1,000 Kilograms of Cocaine ................... 4

A. The Cocaine Shipment from El Tigre, Honduras (425 – 530 kilograms).................... 5

B. The Cocaine Shipment from Congressman Najera Montoya (500 – 570 Kilograms)... 6

C. The Cocaine Shipment to the Defendant's Airstrip (425 – 500 Kilograms) ................ 7

III. The Defendant Murders A Law Enforcement Officer and Bribes A Judge After Police Raid His Laboratory........................................................................................ 8

IV.  The Defendant Expands His Narcotics Trafficking, Seeks Assistance Collecting a Drug-Trafficking Debt, Murders Another Drug Trafficker ....................................... 10

V.   The Defendant Engages In Drug-trafficking Under the Protection of National Party Leaders, Including Juan Orlando Hernandez Alvarado ............................................ 12

VI.  The Defendant Furthers His Violent Drug-Trafficking Business Through Corrupt Military and Police Contacts................................................................................. 14

A. The Defendant Receives Support from Military Officials......................................... 14

B. The Defendant's Corrupt Police Contacts ............................................................... 16

VII. The Defendant's Post-Arrest Admissions............................................................... 17

PROCEDURAL HISTORY.......................................................................................... 19

ARGUMENT ............................................................................................................... 20

I.   The Evidence Overwhelmingly Established the Defendant's Guilt ................................. 20

A. Applicable Law ..................................................................................................... 20

1.    Rule 29 ........................................................................................................ 20

2.    Venue .......................................................................................................... 21

B. Discussion ............................................................................................................ 21

1.    The Government Established That The Defendant Participated in the Charged Conspiracies ................................................................................................ 21

2.    The Trial Evidence Showed the Defendant's Participation in the Charged Conspiracies Through His Arrest................................................................... 27

3.    The Evidence Established the Defendant's Use of Machineguns in Furtherance of the Narcotics Conspiracy....................................................... 32

4.    Venue Was Proper in the Southern District of New York.............................. 32

II. A New Trial Is Not Warranted...........................................................................40

A. Applicable Law ...................................................................................40

    1.    Rule 33 ...................................................................................40

    2.    Defense Requests for Jury Instructions...........................................41

B. Discussion ...........................................................................................42

    1.    Evidence from the Instagram and iCloud Accounts Was Properly Admitted 42

    2.    No Statute of Limitations Instruction Was Required....................48

    3.    Rivera's Testimony Was Properly Admitted.................................49

CONCLUSION........................................................................................................53

The Government respectfully submits this memorandum in opposition to the motion by defendant Geovanny Fuentes Ramirez (the "defendant"), pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, for a judgment of acquittal or for a new trial (the "Motion" (Dkt. No. 316)).

*First*, the defendant seeks a judgment of acquittal under Rule 29, arguing that there was insufficient evidence to support his conviction on any of the three counts of indictment S6 15 Cr. 379 (PKC) (the "Indictment"), and specifically that the evidence was insufficient to prove beyond a reasonable doubt that the defendant conspired with Devis Leonel Rivera Maradiaga ("Rivera"); that the defendant engaged in a continuing conspiracy after 2013; that the defendant possessed a machinegun in furtherance of the narcotics conspiracy charged in Count One; and that venue was improper in this District. This Motion ignores substantial trial evidence demonstrating each of these points and establishing venue in this District. The defendant's Rule 29 motion should be denied.

*Second*, the defendant moves for a new trial, under Rule 33, based on the Court's rulings admitting certain evidence seized from Instagram and iCloud accounts; permitting Rivera to testify about certain statements made by the defendant's co-conspirator, Melvin Sandres, a/k/a "Metro," and the defendant's statements while in custody at the Metropolitan Correctional Center (the "MCC"); and declining to give the defendant's requested jury instruction about the applicable statute of limitations. The evidentiary issues were the subject of extensive briefing, both *in limine* and during trial, and the Court property admitted the electronic and testimonial evidence. The defendant's argument relating to statute of limitations misunderstands the relevant law and, as the

Court recognized during trial, was not necessary or required.  The defendant's Rule 33 motion also should be denied.

## THE TRIAL EVIDENCE

The trial evidence overwhelmingly established that the defendant was a violent narcotics trafficker who produced and distributed thousands of kilograms of cocaine for importation into the United States.  To accomplish this massive level of drug distribution, the defendant partnered with some of the most powerful drug cartels in Honduras and Mexico; relied on protection from high-ranking Honduran officials, military personnel, and police; commanded men armed with military-grade weapons, including machineguns and grenade launchers; controlled a cocaine laboratory that produced huge quantities of cocaine, fueled by boat loads of cocaine base from South America; controlled clandestine airstrips to receive planes filled with cocaine; bribed law enforcement officials and politicians, including Juan Orlando Hernandez Alvarado ("Hernandez"), the President of Honduras; and engaged in acts of violence, including five murders.

I.      **The Defendant Establishes a Cocaine Laboratory in Honduras**

In the 2000s, the defendant and his drug-trafficking partner and co-conspirator, Sandres, distributed kilogram-quantities of cocaine in Miami, Florida.  (Tr. 283-84, 287).  Sandres also was a *sicario*—a hitman—for a drug-trafficking organization in Honduras known as the *Cachiros* and provided security for shipments of cocaine arriving in Honduras by boat and by airplane and being transported within Honduras.  (Tr. 232).

In approximately 2009 or 2010, the defendant and Sandres partnered to start a cocaine laboratory located outside Choloma, Honduras, in the Cerro Negro region (the "Laboratory").  The defendant's workers at the Laboratory processed cocaine base that the defendant imported from

Colombia by go-fast boat.  (Tr. 291, 352-54). [1]  The defendant secured the Laboratory with approximately 20 or 30 men armed with AR-15s, AK-47s, and grenade launchers.  (Tr. 291; *see also* Tr. 668-71).

Approximately two months after the defendant established the Laboratory, Sandres introduced the defendant to Sandres' cousin, Rivera, one of the leaders of the *Cachiros*.  (Tr. 281, 285, 290-91, 352-54).  The defendant, Rivera, and Sandres met inside the defendant's car at a gas station owned by Rivera in Omoa, Cortez Department, Honduras.  (Tr. 285-86).  Armed security for the defendant, Sandres, and Rivera stood guard and each of the three men inside the car were armed, including the defendant's semiautomatic pistol and two short-barrel AR-15 semiautomatic rifles.  (Tr. 286-87).  During that meeting, the defendant described the Laboratory, and explained how his contacts in the military police and preventative police could help the *Cachiros* with transporting cocaine shipments through Honduras.  (Tr. 287-88).  The defendant asked Rivera to partner with him and Sandres in the Laboratory and to provide money for security and shipments of cocaine base from Colombia.  (Tr. 290).  Rivera declined the request but agreed to buy two cars from the defendant, paying about $50,000 more than they were worth.  (Tr. 291-92).

After the Omoa gas station meeting, Sandres met with Rivera at a car repair shop that the *Cachiros* used to install traps in vehicles and to stash drug money.  Sandres provided more details about the defendant's corrupt law enforcement connections, identifying Comisionado Martinez,

---

[1] On another occasion, the defendant showed Rivera a go-fast boat that the defendant had used to import cocaine base, and subsequently modified to a fishing vessel.  Rivera's brother, Javier Rivera Maradiaga, bought the boat from the defendant and gave it to Rivera, but Rivera found that the concealed compartments made the boat handle poorly and he gave it to another trafficker.  (Tr. 352-54).

Colonel Motino, an officer named Nuila, and an officer named Rojas as particular corrupt connections. (Tr. 295).[2] Comisionado Martinez refers to Ramon Aldaberto Martinez Hernandez ("Martinez"), who served as a Comisionado (a high-ranking officer) in the Honduran National Police (the "HNP"), including as the Director of Finance for the HNP. (Tr. 141, 135-36, 592; GX 502, 1208-T).

## II. The Defendant Commits Acts of Violence to Help Leonel Rivera and Transports Multiple Drug Loads Totaling Over Approximately 1,000 Kilograms of Cocaine

A few months after Sandres' meeting with Rivera at the repair shop, the defendant and Sandres met again with Rivera, this time at a nightclub in Choloma owned by Sandres. (Tr. 299-300). Sandres invited Rivera to the nightclub because the defendant wanted to meet with him. (Tr. 300). The defendant, Sandres, and Rivera each came to the meeting with armed guards carrying AR-15s and .9 millimeter handguns. (Tr. 300-01).

During the meeting, the defendant told Rivera that he murdered the a boat mechanic who owed Rivera approximately $40,000 because the mechanic had been "badmouthing" Rivera. (Tr. 301-02). The defendant explained that, with the help of a police chief in Acantilado, Honduras, the defendant took the mechanic to the Honduras-Guatemala border and tortured him, including by cutting off the mechanic's finger and beating him in the face, before killing him with "two mercy shots to the head." (Tr. 302-03). The defendant then showed Rivera a photograph on his phone, which Rivera recognized as the mechanic, face-up and bloodied. (Tr. 303-04). Sandres

---

[2] As discussed *infra*, the defendant kept personal and home contact information for Martinez and numerous other high-ranking Honduran police, military, and government officials, which law enforcement recovered from his phone at his arrest in 2020. *See* Trial Evidence, *infra*, Part VI.

added that the defendant was "a good person to have on our side because . . . he can kill anyone we want if we ask him to." (Tr. 304-05).

After the meeting at the nightclub, the defendant protected and transported three large drug shipments for Rivera between approximately 2010 and 2012.  For each of these three drug shipments, the defendant and Sandres supplied a team of trucks and armed men to escort and guard the freight truck transporting the cocaine, and the defendant made his network of corrupt police contacts available for additional protection and assistance passing through checkpoints.  (Tr. 328-39).  The defendant personally carried a Glock pistol that had been modified to fire automatically, as well as an AR-15 assault rifle; and rode in a truck with a concealed trap to carry additional weapons.  (Tr. 293-94).  The defendant's security team carried numerous additional firearms, including a 40mm grenade launcher, so that they could repel any efforts to interdict or steal the cocaine shipment.  (Tr. 310).

### A.      The Cocaine Shipment from El Tigre, Honduras (425 – 530 kilograms)

The first cocaine shipment the defendant joined in with the *Cachiros* consisted of between approximately 425 and 530 kilograms of cocaine sent by the Colombian cocaine trafficker Alfonso Sierra-Vargas, a/k/a "Renteria," to an airstrip in Eastern Honduras.  (Tr. 305-06).  Sierra-Vargas used planes obtained from the United States to send cocaine shipments to the *Cachiros* Honduras.  (Tr. 327).  After the *Cachiros* moved this cocaine shipment from the airstrip to a ranch near El Tigre, Honduras, the defendant transported it across the country to the *Los Valles* cartel[3]—at the

---

[3] In December 2013, Miguel Arnulfo Valle Valle and his brother Luis Alonso Valle Valle (the "Valles"), the leaders of the *Los Valles* cartel, and others, were charged with cocaine-importation conspiracy in the Southern District of Florida.  *See* No. 13 Cr. 20897 (S.D. Fla. Dec. 4, 2013).  In June 2014, the Valles and others were charged with drug-trafficking offenses in the Eastern District

time, one of the most powerful drug-trafficking organizations in Honduras—near the Guatemalan border on the western edge of Honduras.  (Tr. 307-313; GX. 501).

The defendant met at the El Tigre ranch with Rivera, Sandres and two of his armed guards, a truck driver, and an individual known as "Yuca," who worked for Sierra-Vargas.  (Tr. 307-08). Everyone was armed, including the defendant, who was carrying an AR-15 and a green Glock with a selector switch for automatic firing.  (Tr. 308; *see also* Tr. 1011-12).  The defendant and Sandres arrived at the ranch with a car that had a hidden compartment that contained additional weapons for the transport.  (Tr. 308).  The defendant organized a convoy of three or four security cars to safeguard the truck carrying the cocaine.  The defendant assured Rivera that, if he encountered a checkpoint or a military operation, the defendant would call Martinez to remove the checkpoint. (Tr. 309).  If there were an attack on the convoy, the defendant told Rivera, he always carried AR-15s and grenade launchers and would be able to repel any attack.  (Tr. 310).  The defendant successfully delivered this drug shipment to the *Los Valles* cartel.  Rivera paid the defendant and Sandres, together, one payment of approximately $60,000 or $70,000 in cash.  (Tr. 315).

**B.     The Cocaine Shipment from Congressman Najera Montoya (500 – 570 Kilograms)**

Approximately three to four months later, the defendant worked with Rivera on a cocaine shipment of between approximately 500 and 570 kilograms of cocaine sent by plane to an airstrip in Eastern Honduras controlled by former Honduran Congressman Fredy Renan Najera Montoya

---

of Virginia.  *See* No. 14 Cr. 135 (E.D. Va. June 19, 2014).  Honduras extradited the Valles in December 2014.  The Valles pleaded guilty to the charges in both Districts in 2016, and each was sentenced principally to 30 years' imprisonment.

("Najera").[4]  (Tr. 317-318).  Like the prior cocaine shipment, the Colombian Sierra-Vargas cartel supplied the cocaine and it was delivered to the *Los Valles* cartel.  (Tr. 318).

After the Cachiros moved the cocaine shipment from Najera's airstrip to a ranch near Tocoa, Honduras, the defendant further transported it across the country west to the *Los Valles* cartel, near the Guatemalan border.  (Tr. 319-20).  The defendant and Sandres protected the cocaine using the same vehicles, weapons, and tactics the defendant used in cocaine shipment. (Tr. 320). Rivera again paid the defendant in cash for his role in transporting the drugs.  (Tr. 321).

### C.    The Cocaine Shipment to the Defendant's Airstrip (425 – 500 Kilograms)

In approximately 2012, the defendant worked with Rivera on a cocaine shipment consisting of between approximately 425 and 500 kilograms of cocaine that Fernando Josue Chang Monroy, a/k/a "Jack,"[5] sent to Honduras on a U.S.-registered plane.  The cocaine-laden aircraft landed at an airstrip near Choloma controlled by the defendant and an associate known as "Compita."  (Tr. 322-23, 326-27, 355).  A worker for the Cachiros, standing lookout on the highway where the

---

[4] Najera pled guilty to conspiring to import cocaine in to the United States, in violation of Title 21, United States Code, Section 963; using firearms in furtherance of his drug-trafficking offense, in violation of Title 18, United States Code, Section 924(c); and participating in a conspiracy to carry and use machineguns and destructive devices in furtherance of his drug-trafficking offense, in violation of Title 18, United States Code, Section 924(o).  He is scheduled to be sentenced by Judge Gardephe on June 11, 2021.  *See United States v. Fredy Renan Najera Montoya*, 15 Cr. 378 (PGG).

[5] In December 2015, Chang Monroy was extradited from Guatemala and charged with cocaine-importation conspiracy and money laundering offenses in the Eastern District of Virginia.  *See United State v. Fernando Josue Chang Monroy*, 3:14-cr-00075-HEH-1 (E.D.V.A. June 3, 2014). Chang Monroy pleaded guilty to those charges pursuant to a cooperation agreement with the United States Attorney's Office in the Eastern District of Virginia.  Chang Monroy testified as a Government witness at the October 2019 trial of Juan Antonio Alvarado Hernandez ("Tony Hernandez").  *See United States v. Juan Antonio Alvarado Hernandez*, S2 15 Cr. 379 (PKC).

defendant would bring the cocaine out from the airstrip, was detained by Honduran police. (Tr. 327). The defendant called on Comisionado Martinez to try to get the worker released, but Martinez reported back that the arresting officer had not heard Martinez when he called. (Tr. 327-28). The defendant then called Leopoldo Crivelli, the Mayor of Choloma, to secure the worker's release. (Tr. 8). The arresting officers released the worker on the spot and returned his weapon to him. (*Id.*).

The defendant transported the cocaine near the Guatemalan border and delivered it to Chang Monroy, so that Chang Monroy could deliver it to Mexican buyers responsible for importing the drugs into the United States. (Tr. 323). Like the previous two cocaine shipments, the defendant assisted Rivera in transporting the cocaine by truck. (Tr. 324-25). Jack paid Rivera in cocaine (not cash), giving him 10% of the total shipment of cocaine; in turn, Rivera paid the defendant in cocaine for his role in the drug transaction. (Tr. 325).

## III.  The Defendant Murders A Law Enforcement Officer and Bribes A Judge After Police Raid His Laboratory

In approximately 2011, during the time period the defendant was protecting and transporting half-ton cocaine shipments for the *Cachiros*, Honduran law enforcement raided the Laboratory. (Tr. 339, 341, 664). Law enforcement did not find drugs or the defendant at the Laboratory because the defendant was warned in advance by Jose Miguel Handal Perez, a/k/a "Chepe Handal," a prolific drug trafficker based in San Pedro Sula, Honduras.[6] (Tr. 331). After

---

[6] On April 9, 2013, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Chepe Handal as a Specially Designated Narcotics Trafficker. OFAC also designated Handal's spouse, father, and several of Handal's companies located in San Pedro Sula, Honduras. *See* U.S. TREASURY DEPT., *Treasury Designates Honduran Drug Traffickers* (Apr. 9, 2013), *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl1888.aspx.

the Cachiros declined the defendant's offer to invest in the Laboratory, the defendant partnered with Handal  to secure investments in cocaine base to be processed at the Laboratory and access to Handal's own network of corrupt law enforcement contacts in the San Pedro Sula area to protect the Laboratory's operations.  (Tr. 331-32).  In addition to Handal's warning, "Polito" Crivelli, the son of Coloma Mayor Leopoldo Crivelli (Tr. 331), leaked a police investigation of the Laboratory to the defendant.  After the raid, the defendant left Choloma for approximately a month or two to avoid possible arrest. (Tr. 671-72; 811).

A few months later, the police officer who organized the Laboratory raid was drinking at Sandres' nightclub in Choloma, tragically unaware that he was in the proverbial lion's den. (Tr. 342).  The defendant and Sandres, however, realized who the officer was and kidnapped and murdered him.  (Tr. 342).  The defendant, Sandres, and the defendant's *sicarios* took the officer to Laguna de Ticamaya, a lake outside Choloma.  (Tr. 342-43, GX 503).  The defendant and his confederates tortured the officer, beating him up, hitting him in the face, and putting a plastic bag over his head to suffocate him.  (Tr. 343-44).  Pins were put through the officer's fingers and his hands were beaten with a pistol.  (Tr. 344).  The officer "was asking for them not to kill him because he had a daughter, a small daughter whom he did not want to leave orphan."  (Tr. 344). The purpose of this brutal torture was interrogation: the defendant wanted to know if his money launderer and benefactor, Fuad Jarufe, had been implicated in the investigation relating to the Laboratory.  (Tr. 344-46).  After the defendant was satisfied that the officer had "told them the truth" about the investigation (Tr. 354)—namely, that Jarufe's name had not been mentioned—the defendant killed the officer, firing "three mercy shots to his head."  (Tr. 346).

The defendant also bribed a high-ranking Honduran judge to obstruct the investigation relating to the Laboratory.  Approximately 30 to 40 days after the raid, the defendant went to the offices of Graneros, the grain company located in Choloma, headed by Jarufe, which the defendant used to launder the proceeds of his drug trafficking.  (Tr. 654-55).  While there, the defendant met with Julio Cesar Barahona, then the President of the Judiciary in Honduras, a position appointed by the President of Congress, then Juan Orlando Hernandez.  (Tr. 679, 742).  Upon his arrival, Barahona stated that he had been sent by the "boss" so that he could "help out" the defendant.  (Tr. 680).  Barahona met with the defendant in Jarufe's office, and, at the conclusion of their meeting, Jarufe instructed Jose Sanchez, a Graneros accountant who witnessed the meeting, to make out a check to Barahona in the amount of 30,000 lempiras from the defendant's Graneros account.  (Tr. 680-82).  The defendant repaid Graneros in cash payments consisting of $20 bills.  (Tr. 682).[7]

## IV.   The Defendant Expands His Narcotics Trafficking, Seeks Assistance Collecting a Drug-Trafficking Debt, Murders Another Drug Trafficker

With his Laboratory back up and running, and protected from further interference, the defendant expanded his narcotics trafficking.  In approximately 2013, the defendant, Sandres, and Javier Choloma, and Rivera met to discuss a proposed shipment of cocaine.  (Tr. 356).  Javier Choloma a former official from the administration of Honduran President Roberto Micheletti.  (Tr. 356).  During the meeting, the defendant and Sandres asked Rivera to lend them $1 million to

_____

[7] As a precaution against the possibility of a national police investigation relating to the Laboratory, the defendant and Sandres also transferred nominal ownership of Atletico Choloma, a soccer club, to a straw owner, Javier Choloma.  (Tr. 358-59).  *See also* INSIGHT CRIME, *Why Are So Many Honduras Soccer Bosses Involved in Crime?* (Dec. 15, 2015), *available at* https://insightcrime.org/news/analysis/why-are-so-many-honduras-soccer-bosses-involved-in-crime/ (describing, *inter alia*, the 2015 arrest of Atletico Choloma's President, Javier Hernandez).

invest in an approximately 2-ton drug shipment of from Colombia.  (Tr. 357).  Javier Choloma later told Rivera that the cocaine would arrive at Puerto Cortes, where Jarufe had a contact at the port.  (Tr. 357).  Rivera decided not to lend the defendant and Sandres the $1 million, which led to a rift. (Tr. 358, 368).  In approximately 2013, Rivera met with "Juanito" Guzman, a representative of the Sinaloa cartel, then the largest drug cartel in Mexico and headed by Juanito's cousin, Joaquin "Chapo" Guzman.  (Tr. 360-61).  During that meeting, Juanito described the defendant's business with the Sinaloa cartel. In approximately 2012 or 2013, the defendant supplied the cartel at least three tons of cocaine, in three shipments of approximately 500, 1,000, and 1,500 kilograms, respectively.  (Tr. 361-62).  The third shipment the defendant and Sandres sold to the Sinaloa cartel was wet, degrading its quality lowering the price for which the cocaine could be sold.  (Tr. 362).

The defendant also worked with other drug traffickers during this period.  In or about 2012 or 2013, the defendant provided another drug trafficker, Edgar Rios, a/k/a "Pluto," with 100 kilograms of cocaine on consignment, meaning that Rios would sell the drugs and pay the defendant from the proceeds.  (Tr. 363-64).  However, because the cocaine was low quality, Rios could not sell it and was unable to pay back the defendant.  (Tr. 364).  As a result, the defendant and Sandres contracted a *sicario* named "Vaquero" to murder Rios.  (Tr. 364-65).

The defendant committed two more drug-related murders in or about 2012 or 2013. Two assassins murdered Sandres' brother over a cocaine debt, and the defendant located and murdered them in revenge. (Tr. 347-52). The defendant, Sandres, and Juan Manuel Avila-Meza,[8] then a

---

[8] Avila-Meza pled guilty to conspiring to import cocaine into the United States, in violation of Title 21, United States Code, Sections 959(c) and 963.  In March 2021, he was sentenced to 144 months' imprisonment.  *See United States v. Juan Manuel Avila-Meza*, 15 Cr. 174 (LGS).

member of the Honduran National Police, found the two victims out driving.  The defendant and

Avila-Meza used their cars to box the victims in, took them out of their car and kidnapped them.

(Tr. 349-50). The victims were taken to took them to a ranch in Naco, Cortés, Honduras. (Tr. 350).

There, the defendant, Sandres, and Avila-Meza  beat, tortured, and shot the victims. (Tr. 350). The

defendant poured gasoline on the two men, and Avila-Meza lit them on fire. (Tr. 350-51).

## V.   The Defendant Engages In Drug-trafficking Under the Protection of National Party Leaders, Including Juan Orlando Hernandez Alvarado

The defendant conspired with politicians, ranging from local to national officials.  As

described above, these officials included Leopoldo Crivelli, the mayor of Choloma, and Barahona,

a high-ranking Honduran judge.  The defendant also conspired with Hernandez, the current

President of Honduras.

In or about 2013, while Hernandez was running for President of Honduras, the defendant

entered into a cocaine-trafficking partnership with Hernandez. whom he called by the nickname

"Juancho." (Tr. 691-701).  Graneros' accountant saw the defendant meeting with Hernandez—

who regularly visited Graneros to collect "quotas" of purported campaign contributions from

Jarufe—twice, where the defendant paid Hernandez bribes totaling approximately $25,000 and

discussed the Laboratory. (*Id.*).  During the first meeting, Hernandez asked the defendant for access

to the Laboratory because it was a short distance from Puerto Cortez, Honduras' largest port city.

(*Id.*).  The defendant agreed and, in exchange, Hernandez told the defendant that the Honduran

police and military would protect the defendant's cocaine shipments and protect the defendant

from prosecution.  (*Id.*).  Specifically, Hernandez advised the defendant "not to worry about the

law because Attorney General [Oscar] Chinchilla had been appointed to protect them and also the

drugs transportation through the different routes, and that these transportations will have the

protection of the military and the police, and that they would handle security of the drugs, and that by the time the United States came to know the truth, they would have amended the law in their favor because [President of the Honduran Congress Mauricio] Oliva and Chinchilla were already on it, they'd be untouchable."  (Tr. 694).  Hernandez then said that he and the defendant would "[stuff the] drugs up the gringos' noses, and they're never even going to know it," which Sanchez understood as "[a] mockery of the United States people."  (Tr. 694, 698).  Hernandez told the defendant to report to Juan Antonio Alvarado Hernandez ("Tony Hernandez"), Hernandez's brother and at the time a major Honduran drug-trafficker.  (Tr. 694-95).[9]  At the conclusion of this first meeting, the defendant gave Hernandez a $15,000 cash bribe.  (Tr. 696).  During the second of the two meetings, after the defendant and Hernandez discussed politics, the defendant gave Hernandez a $10,000 bribe.  (Tr. 701).  The defendant maintained a relationship with Hernandez and Gutierrez, the latter of whom maintained photographs in his iCloud account depicting himself and Hernandez, as well as of Hernandez and Martinez.  (GX 915, 918).

And the defendant continued to meet with, and pay bribes to, Hernandez. (Tr. 389).  As the defendant admitted to Rivera, the defendant met Hernandez twice in 2019. The defendant met Hernandez at Graneros and gave Hernandez a bribe of approximately 450,000 lempiras. The defendant met Hernandez again in the Honduran capital and paid him a second, unspecified bribe.

---

[9] In October 2019, following trial, Tony Hernandez was convicted of cocaine importation conspiracy, in violation of Title 21, United States Code, Section 963; possession of machineguns and destructive devices in furtherance of that conspiracy, in violation of Title 18, United States Code, Section 924(c); and conspiracy to possess machineguns and destructive device, in violation of Title 18, United States Code, Section 924(o).  On March 30, 2021, this Court sentenced Tony Hernandez principally to life imprisonment.  *See United States v. Juan Antonio Hernandez Alvarado*, S2 15 Cr. 379 (PKC).

(Tr. 389).  Both bribes were for protection so that the defendant would not be arrested in Honduras.  (Tr. 389).  Data on the defendant's phone from the navigation application Waze reflects that, on or about May 29 and June 12, 2019, after filings in the Tony Hernandez prosecution disclosing that Hernandez was an investigative target, the defendant traveled to Casa Presidencial, the Presidential residence.  (Tr. 869-71; GX 201-201).  The defendant also met, at Hernandez's direction, with Martinez and a senior Honduran Air Force officer to discuss a money-laundering company that Hernandez wanted the defendant to sell to him.  (Tr. 387-88).

## VI.   The Defendant Furthers His Violent Drug-Trafficking Business Through Corrupt Military and Police Contacts

The defendant's drug trafficking operation thrived, in part, because of his corrupt contacts in the military and the police.

### A.   The Defendant Receives Support from Military Officials

The defendant received support from the highest levels of the Honduran military.  Rene Orlando Ponce Fonseca, a Honduran general and leader of the 105th Battalion in San Pedro Sula, later the head of FUSINA (a Honduran anti-drug multi-agency task force) for the Honduran north coast (Tr. 595), and later the head of all military forces in Honduras, provided the defendant with assistance, military equipment, uniforms, and weapons.  In approximately 2014, after the two meetings at Graneros in 2013 at which the defendant bribed Hernandez, Sanchez found a box at Graneros that contained "police vests and Army and police uniforms," along with "a piece of paper inside the box that said 'for Geovanny Fuentes,' and on the side of it was something like a seal that said '105th Brigade.'"  (Tr. 705).  Sanchez testified that the police/military vests he found in the box, with a note addressed to the defendant, were similar to an image identified on Gutierrez's iCloud account depicting the defendant wearing a police/military-type vest.  (Tr. 705, GX 917).

14

Thereafter, on a different occasion, the defendant showed Sanchez a "heavy military-grade weapon" that he had received from the military. (Tr. 707). Like the police/military-type vests, Gutierrez's iCloud account contains numerous images depicting a military-style AR-15 rifle with a "Navy insignia." (*See, e.g.,* GX 901, 929; Tr. 107-08). Years later, in January 2021, after the Government had filed its initial motions *in limine* on January 8, 2021, Gutierrez exchanged messages with another co-conspirator in which Gutierrez acknowledged that the Government had correctly identified the green rifle that the Honduran military had given to the defendant. (GX 935-T at Rows 15-21). In addition to Ponce Fonseca and the 105th Brigade, other of the defendant's military contacts include Colonel Leandro Flores, head of an anti-gang unit; and Colonel Melgar, a commander in an anti-narcotics multi-agency task force. (GX502).

The defendant also received information and support from members of the Honduran military. Lieutenant Colonel Salgado, a/k/a "Comanche," provided the defendant with information about law enforcement activities. The defendant maintained Comanche's contact information in his phone (Tr. 154; *see also* GX 504) and, on or about November 6 and 7, 2019, the two communicated about drug-related activities, including drug-related murders. (*See, e.g.*, GX 201-6 at Rows 10-14). On or about November 18, 2019, the defendant and Comanche also exchanged messages about the *Los Valles* cartel. Comanche sent the defendant a news article about a son of Arnulfo Valle Valle having been murdered in Copan, to which the defendant responded:

| Defendant | Arnulfo's son was nailed. |
|-----------|---------------------------|
| Comanche | Yeah, man, it's fucked up. |
| Defendant | The competition.  Or the cops. |
| | It's the end for these people, comanche. |

(GX 201-8 at Rows 3-9).

B.      **The Defendant's Corrupt Police Contacts**

As described above, the defendant maintained corrupt police contacts who assisted him in his drug trafficking activities, including Martinez, a high-ranking HNP officer.  (Tr. 141, 135-36, 592; GX 502, 1208-T).  The defendant's drug partnership with Martinez continued up to the time of the defendant's arrest. In April 2015, Martinez shared information about a murder investigation with Geovanny Daniel Gutierrez ("Gutierrez"), one of the defendant's sons and co-conspirators, in order to find out if the victims were the defendant's bodyguards.  (GX 933-T at 3-4).

On or about February 25, 2020, Martinez provided the defendant with specific instructions about how to determine whether his phone was being wiretapped, and how to remove any such wiretap—*i.e.*, how to destroy evidence.

| Martinez | 1st step |
|---|---|
| | *#21# if it's tapped |
| | 2nd step |
| | *#62# if the calls are being forwarded |
| | 3rd step |
| | ##002# to untap calls |
| Defendant | 🤣 |
| Martinez | To see if you have been tapped |
| | Already *#06# |
| | You will see the IME and if you |
| | See / 1, you have been tapped |
| | Once, and so on. |

(GX 201-14-T at 4; *see also* Tr. 143-46).  Later in the same conversation, also on or about February 25, 2020, the defendant told Martinez how another of the defendant's police contacts had warned the defendant about talking so openly on the phone because of wiretaps: "[M]y friend over there told me that, that they were checking us out, that they had us, uh, there, that they were listening to us, that I should not be talking so much crap." (GX 201-14-T at 5). Martinez's instructions for defeating wiretaps also appeared in Gutierrez's phone.  (GX 928).

Other police contacts of the defendant's include Wilson Antonio Alvarenga Nunez, a member of the Direccion de Logistica for the national police; Raul Martinez Alvarado, a national police officer; subcomisionado Munguia Antunez; and a subcomisionado Sauceda.

## VII.    The Defendant's Post-Arrest Admissions

On March 1, 2020, the defendant was arrested in Miami, waived his *Miranda* rights, and made incriminating statements to law enforcement.[10]  For example, the defendant admitted to knowing and having relationships with his key drug-trafficking co-conspirators:

- The defendant said he had known Sandres for a long time; that he had heard from others, including media reporting and Martinez, that Sandres engaged in drug trafficking with the *Cachiros*; that Sandres owned a nightclub in Choloma, which the defendant went to "several times"; that "sometimes there were meetings" at the nightclub; and that Sandres introduced the defendant to Rivera.

- The defendant admitted to knowing Vaquero, who the defendant said "started working with Sandres . . . like in security"; "threaten[ed] one [of the defendant's] sons"; "was a hitman"; and was later killed.

- The defendant admitted to knowing Chepe Handal very well; that Chepe Handal "studied" commerce with the defendant; that Chepe Handal was "very close" with Jarufe; and that Chepe Handal did "drug trafficking stuff" for a living.

- The defendant said that he knew Rios; that he met Rios in Choloma; that "at the end we realized that [Rios] was involved in drug trafficking things"; and that Rios was killed.

- The defendant said he met Rivera and his brother, Javier Rivera, and that Javier Rivera's daughter married the defendant's son, but he claimed that he never did anything illegal with them.  The defendant also said that he had a meeting with Rivera at a gas station that Rivera owned in Omoa, Cortés, which the defendant went to because it was close to a "marina" at "Acantilados."  The defendant also said that he

---

[10] The interview was conducted in Spanish, and English translations of the defendant's statements were received in evidence.  Certain portions of this interview, as well as the corresponding translated transcript, were admitted as evidence at trial:  GX 401-T, 401-TR, 401-1, 402, 402-T, 401-3, 401-4, 401-5, 401-6, 401-8, 401-9, 401-10, 401-12, 401-13, 401-14, 401-15, 401-16, 401-17, 401-19, 401-20, 401-21, 401-22, 401-23, 401-24, 401-24-R, 401-25, and 401-26.

sold Rivera two cars for tens of thousands of dollars, which Rivera paid for in two installments of U.S. currency.

- The defendant admitted to knowing Jarufe very well; that Jarufe had financed one of the defendant's businesses with loans; and that Jarufe was a financial supporter of Hernandez.

- The defendant admitted that Hernandez was at Graneros "all the time" when Hernandez was campaigning.

- The defendant admitted to having relationships with several police officers, including Martinez and "the Saucedas," with one of whom the defendant said he was particularly close.

The defendant also made admissions about the Laboratory in "Cerro Negro." The defendant said that "[m]any years ago, there was a lab that was discovered in one of the properties that belonged to [Jarufe]" and that the lab was "supposedly" for "cocaine" but "nothing was found there." He also said that when law enforcement raided the Laboratory, he gave a statement to law enforcement because he "provided maintenance" to a "coffee plantation" located on the property. The defendant also admitted that at some point the property with the Laboratory belonged to him because Jarufe "gave it to [him]." (*See* GX 401-TR at 11-14, GX 409).

Additionally, at the time of his arrest, the defendant had multiple police and military contacts in his cellphone, including "Comisionado Martinez," identified as Ramon Aldaberto Martinez Hernandez, a former police Comisionado and the director of finance for the Honduras National Police until approximately 2017. (GX 502, 1208, 1208-T).[11]

---

[11] After Martinez was identified in a pretrial *in limine* filing as the author of WhatsApp chats with the defendant based on his LinkedIn page, the page was taken down in an apparent attempt by Martinez to remove evidence of his participation in the conspiracy. (Tr. 225-227; *see also* ECF No. 224 at 38, 44-45; ECF No. 250 at 5).

## PROCEDURAL HISTORY

On February 28, 2020, the defendant was charged by sealed complaint with narcotics and firearms offenses.  (*See* ECF No. 1, the "Complaint").  On June 3, 2020, a grand jury sitting in this District returned the Indictment, charging the defendant in three counts.  Count One charged the defendant with conspiring to import cocaine to the United States; to manufacture, distribute, or possess with intent to distribute cocaine knowing, intending, or having reasonable cause to believe it would be imported to the United States; and to distribute or possess with intent to distribute cocaine on board a U.S.-registered aircraft, in violation of Title 21, United States Code, Section 963.  Count Two charged the defendant with possessing machineguns and destructive devices during and in relation to the drug trafficking crime charged in Count One, in violation of Title 18, United States Code, Section 924(c). Count Three charged the defendant with conspiring to possess machineguns and destructive devices during and in relation to the drug trafficking crime charged in Count One, in violation of Title 18, United States Code, Section 924(o)

Trial commenced on March 8, 2021. The Government concluded its case-in-chief on March 18, 2021.  At the close of the Government's case, the defendant moved, pursuant to Federal Rule of Criminal Procedure 29, for a verdict of acquittal.  (Tr. 1024).  Specifically, the defendant argued that there had been no evidence presented within the five-year period prior to the Indictment being returned in May 2020.  (Tr. 1024-6).  This Court denied the defendant's motion, subject to renewal in a post-verdict motion.  (Tr. 1026).  On March 22, 2021, the jury convicted the defendant of all counts.  For both Counts Two and Three, the jury found that the offenses involved a machinegun but did not find that the offenses involved a destructive device.

## ARGUMENT

**I.     The Evidence Overwhelmingly Established the Defendant's Guilt**

**A.     Applicable Law**

**1.     Rule 29**

Federal Rule of Criminal Procedure 29(a) provides that a "court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  However, "[a] defendant bears a heavy burden in seeking to overturn a conviction on grounds that the evidence was insufficient."  *United States v. Cruz*, 363 F.3d 187, 197 (2d Cir. 2004).  "[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."  *Cavazos v. Smith*, 565 U.S. 1, 2 (2011).  A Rule 29 motion "does not provide the trial court"—or, on review, the court of appeals—"with an opportunity to substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury."  *United States v. Anderson*, 747 F.3d 51, 59-60 (2d Cir. 2014) (quotation marks omitted).  The evidence must be viewed "in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government."  *United States v. Persico*, 645 F.3d 85, 104 (2d Cir. 2011) (quotation marks omitted).  A court "may reverse a guilty verdict only if evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *United States v. Ng*, — F.3d —, 2019 WL 3755676, at *11 (2d Cir. Aug. 9, 2019) (quotation marks omitted).

With respect to a conspiracy conviction, the deference accorded a jury's verdict is "especially important" because "a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's

scalpel." *United States v. Santos*, 541 F.3d 63, 70 (2d Cir. 2008) (quotation marks omitted). "[T]he conspiratorial agreement itself may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement . . . ." *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997).

###### 2. Venue

The Government bears the burden of proving, by a preponderance of the evidence, that venue exists. *United States v. Stephenson*, 895 F.2d 867, 874 (2d Cir. 1990). 18 U.S.C. § 3238 provides, in relevant part, that, "[t]he trial of all offenses begun or committed … out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one or two or more joint offenders, is arrested or is first brought[.]" 18 U.S.C. § 3238; *see also United States v. Miller*, 808 F.3d 607, 616-21 (2d Cir. 2015); *United States v. Herbert*, No. 03 CR. 211 (SHS), 2005 WL 106909, at *1 (S.D.N.Y. Jan. 19, 2005) (denying motion of a defendant convicted of narcotics offenses where the defendant was first brough into the United States in the Southern District of New York).

#### B. Discussion

###### 1. The Government Established That The Defendant Participated in the Charged Conspiracies

The defendant argues that the evidence was "insufficient to establish [the defendant's] membership in, and intentional participation in, the charged conspiracies even prior to 2013." (Mot. at 8-10). This argument was made to, and rejected by, the jury.

The defendant was part of a wide-ranging conspiracy to traffic tons of cocaine for importation into the United States. The defendant was not, as he argues, a spoke on the *Cachiros*' hub. (Mot. at 10-12). The defendant's cocaine importation conspiracy began in the 2000s with

Sandres, when they imported cocaine to Miami for distribution.  Subsequently, the defendant ran his own cocaine production facility, the Laboratory, where he and produced tons of cocaine.  The defendant partnered with the *Cachiros* and the *Los Valles* cartel to transport cocaine; with Najera, Compita, and Chang-Monroy to receive cocaine-laden aircraft; with Honduran police and politicians to protect cocaine loads and the Laboratory; and with Chepe Handal to secure cocaine base for, and operate, the Laboratory.  The defendant bought cocaine and cocaine base from South American suppliers and sold cocaine to the Sinaloa cartel, to Pluto, and to Hernandez.  The defendant was an important link in a massive cocaine distribution chain, the end goal of which was to import cocaine into the United States.

The defendant argues, first, that the evidence was insufficient to prove that he conspired with Rivera.  (*See* Mot. at 8-9).  In addition to being factually inaccurate, this legal contention is foreclosed by our binding precedent.  In assessing sufficiency arguments, this Court must defer to the jury's assessment of witness credibility.  *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012).  More specifically, we have emphasized that it is "well established that a federal conviction may be supported 'by the uncorroborated testimony' of even a single accomplice witness 'if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.'"  *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) (quoting *United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990)).  The defendant fails to explain persuasively why Rivera's testimony could not be credited, and relied upon, by the jury.  Rivera was the subject of more than a day of vigorous, wide-ranging cross-examination by defense counsel, in which counsel sought to undermine his credibility and attack his character.  There is no evidence that Rivera "lied under oath on multiple occasions," that his memory was inconsistent, or that he was coached by the

Government.  (*See* Mot. at 8-9).  The defendant fails even to cite a single purported example of these allegations.  Defense counsel questioned Rivera, in detail, on the 78 murders to which he has admitted and the tons of cocaine he has trafficked.  Based on its verdict, the jury ultimately credited Rivera's testimony, which was corroborated by other witnesses and exhibits admitted into evidence.  Rivera's testimony was corroborated by the testimony of Sanchez, who also saw the defendant's guarded Laboratory (Tr. 668-71), who witnessed his money laundering (Tr. 654-55), who confirmed the defendant's high-level military and police connections (Tr. 703-04, 707), and who witnessed the defendant's bribes to Hernandez, the President-to-be (Tr. 696-97, 701).  Rivera's testimony was corroborated by the defendant's cellphone, which was replete with evidence of his corrupt police, military, and political contacts, including Martinez, Hernandez, and many others.  (*See, e.g.,* GX 502).  Rivera's testimony also was corroborated by the defendant's communications with his co-conspirators about deleting wiretaps (GX 201-14-T; *see also* Tr. at 143-46), and the *Los Valles* cartel (GX 201-6).  The defendant himself corroborated Rivera in the defendant's own post-arrest admissions, where he acknowledged, among other things, that he knew several of his co-conspirators, including Sandres, the *Cachiros*, Chepe Handal, Rios, Vaquero, Jarufe, and Hernandez, whom the defendant admitted was at Graneros frequently when Hernandez was campaigning for President, and the exact time and place where the defendant and Hernandez conspired to traffic cocaine from the Laboratory through Puerto Cortes under the protection of the Honduran military, police, and government officials.  *See supra* VIII.  The jury reasonably could have relied on any, or all, of this evidence, in addition to Rivera's testimony, in finding that the defendant was a member of the charged conspiracies.  *See, e.g.*, *United States v.*

*Brown*, 937 F.2d 32, 37 (2d Cir. 1991) ("Juries are free to choose any one of a host of reasonable interpretations in inferring criminal intent.").

Additionally, the defendant's challenge to Rivera's credibility is misplaced in a Rule 29 motion. Credibility is a quintessential question for the jury. "It is not for the court on a Rule 29 motion to make credibility determinations." *United States v. Autori*, 212 F.3d 105, 118 (2d Cir. 2000). Moreover, it is "well established that a federal conviction may be supported 'by the uncorroborated testimony' of even a single accomplice witness 'if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.'" *United States v. Florez*, 447 F.3d 145, 155 (2d Cir. 2006) (quoting *United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990)). Here, the defendant had ample opportunity to attempt to discredit Rivera, including through exhaustive cross-examination in an effort to establish the charges the defendant makes in the Motion. The jury's verdict demonstrates that any credibility challenges were resolved in favor of the defendant's guilt, as the jury was entitled to do.

Second, the defendant argues that there is no evidence that he continued to conspire to traffic in cocaine, and to possess firearms in furtherance thereof, after his 2013 falling out with Rivera. (Mot. 9-17). The defendant argues that the Cachiros were the center of a "hub-and-spoke" conspiracy, with the *Cachiros*' trafficking as the sole object of the conspiracy. (*Id*. at 11-12). The defendant's characterization is flatly contradicted by the trial evidence, which showed a large and wide-ranging conspiracy to traffic in cocaine destined for the United States, and which demonstrated that the defendant conspired with an enormous number of people—including, but by no means limited to, the *Cachiros*—to do so.

As the trial evidence amply demonstrated, the defendant had a large cast of co-conspirators in his endeavors to manufacture, distribute, and possess with intent to distribute cocaine for importation into the United States and onboard U.S.-registered aircraft.  He conspired with Sandres, his long-time partner from their days importing kilogram-quantities of cocaine to Miami for sale.  *See* Trial Evidence, *supra*, Part I.  The defendant and Sandres partnered in forming and operating the Laboratory; in protecting and transporting loads of cocaine with the *Cachiros*; in selling cocaine to Sinaloa and Pluto; in committing (along with co-conspirator Avila-Meza and others) drug-related kidnappings and murders.  *See* Trial Evidence, *supra*, Parts I-V.  The defendant commanded teams of security and *sicarios*, battalions of co-conspirators who safeguarded the Laboratory, protected drug shipments, guarded the defendant, and committed murders and kidnappings on his orders.  *See* Trial Evidence, *supra*, Parts I, II, and IV.  The defendant conspired with the Sinaloa cartel, to whom he sold at least three tons of cocaine.  *See* Trial Evidence, *supra*, Part IV.  The defendant conspired with the *Los Valles* cartel, to whom he delivered at least approximately 1.5 tons of cocaine.  *See* Trial Evidence, *supra*, Part II.  The defendant conspired with Chang Monroy, Yuca, Sierra-Vargas, Congressman Najera, and Compita to obtain cocaine and transport it from South America to Honduras, from where it could be further distributed to Guatemala, Mexico, and ultimately the United States.  *See* Trial Evidence, *supra*, Part II.  The defendant conspired with a staggering number of police and military officials, including Martinez, who protected drug shipments and drug workers from law enforcement and provided the defendant with intelligence on drug-related police investigations and tools to defeat law enforcement scrutiny and Ponce Fonseca, who provided the defendant with military uniforms and equipment; and many others.  *See* Trial Evidence, *supra*, Parts V, VI.

The defendant conspired further, locally in San Pedro Sula, with Chepe Handal, who became a partner in the Laboratory and shared the benefits of his corrupt police network. *See* Trial Evidence, *supra*, Part III. The defendant conspired with Javier Choloma, who introduced the defendant to potential narcotics transactions and protected the defendant's cocaine-fueled business interests through straw ownership. *See* Trial Evidence, *supra*, Part IV. The defendant conspired with Leopoldo Crivelli, the Mayor of Choloma, and Crivelli's son, who helped the defendant launder the proceeds of (and thus promoted) his cocaine trafficking and ran interference with law enforcement to protect that business. *See* Trial Evidence, *supra*, Parts III, V. The defendant conspired with Jarufe, who owned the land where the Laboratory was located and invested in its operations, who also laundered the proceeds of the defendant's cocaine trafficking, and who facilitated the defendant's relationships with corrupt political officials. *See* Trial Evidence, *supra*, Part III. The defendant conspired with Hernandez, who provided the defendant with political and law enforcement protection for his cocaine-trafficking business in exchange for bribes and access to the Laboratory's cocaine production. *See* Trial Evidence, *supra*, Part V. The defendant conspired with Tony Hernandez, Hernandez's brother and the point of contact for the defendant's partnership with Hernandez in the Laboratory's operations. *See* Trial Evidence, *supra*, Part V. The defendant conspired with Barahona, head of the Honduran judiciary; and with Chinchilla, the Honduran Attorney General, who each provided the defendant (and his powerful co-conspirators) with protection from law enforcement. *See* Trial Evidence, *supra*, Part IV. The defendant also conspired with Gutierrez, who threatened potential witnesses and who acted as the defendant's representatives in dealing with other co-conspirators after the defendant was arrested. *See* Trial Evidence, *supra*, Parts V, VI.

Thus, the defendant's contentions that he only conspired with, at most, Rivera; and that the *Cachiros* were at the hub of any such conspiracy; are both refuted by the evidence. The defendant's falling out with Rivera did not end the illegal agreement or the defendant's participation in it; it ended only the defendant's relationship with one of many co-conspirators. The defendant maintained his illicit partnerships with Hernandez, Martinez, the Sinaloa cartel, his squads of security and sicarios, South American cocaine and cocaine base suppliers, and numerous other co-conspirators, which were independent of his relationship with the *Cachiros*, functioning as an important link in the chain of importing cocaine into the United States.

### 2. The Trial Evidence Showed the Defendant's Participation in the Charged Conspiracies Through His Arrest

The defendant argues also that, generally and beyond Rivera, the evidence was insufficient to show that he continued to conspire to violate the narcotics laws, and to possess and conspire to possess firearms in furtherance of that crime, after 2013. The defendant argues that the evidence showed only his "mere presence" when others were committing drug trafficking, or that the evidence was "as compatible with innocence as guilt." (Mot. at 7, 14). The defendant's arguments ignore significant portions of the trial evidence. The evidence readily showed that the defendant's participation in the charged conspiracies continued up to, and past, the time of his arrest.

"[I]t is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011). All inferences from the evidence must be drawn in the Government's favor so long as they are "*reasonable*." *United States v. MacPherson*, 424 F.3d 183, 190 (2d Cir. 2005) (emphasis added). To demand that each such inference instead be independently established *beyond a reasonable doubt* would flout black-letter law and usurp the jury's role; "[t]he possibility that inferences consistent with

innocence as well as with guilt might be drawn from circumstantial evidence is of no matter to sufficiency analysis because 'it is the task of the jury, not the court, to choose among competing inferences.' " *Id.* (quoting *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004)). Accordingly, even assuming the "equipoise" rule that the defendant invokes remains good law, *see                    United                    States                    v. Cannon*, 636 F. App'x 30, 32 (2d Cir. 2016) (noting the open question), the question of whether "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence," *Valle*, 807 F.3d 508, 515 (2d Cir. 2015) is one that is posed *after* all reasonable inferences from individual pieces of evidence are drawn *in favor of the Government*. *See United States v. Aquart*, 912 F.3d 1, 44-45 (2d Cir. 2018).

As the Court recognized in addressing the defendant's argument at trial that there was no evidence in the record to establish that the defendant had continued to participate in a conspiracy after 2013, stating that "[c]onspiracy is a continuing offense," and "[w]here a conspiracy statute does not require proof of an overt act and the indictment alleges a conspiracy that contemplates a continuity of purpose and a continued performance of acts, and the government has introduced to show that such a conspiracy existed, the conspiracy is presumed to exist until there is an affirmative showing that it has been terminated … which is usually demonstrated that the goals of the conspiracy were accomplished in some final manner or that [the defendant] took affirmative steps to withdraw."   (Tr. 1038).   Nowhere does the defendant address the black letter law that "conspiracy is a continuing offense" and "a defendant who has joined a conspiracy continues to violate the law through every moment of [the conspiracy's] existence, and he becomes responsible

for the acts of his co-conspirators in pursuit of their common plot." *Smith v. United States*, 568 U.S. 106, 111, (2013) (internal quotations and citations omitted). The burden is on the defendant to establish that the conspiracy has ended, whether by the defendant's withdrawal or for another reason, such as that the conspiracy's objectives or aims have been accomplished or abandoned. *See id.* "[S]chemes to import or distribute controlled substances are the subjects of specifically drawn statutes" and "overt acts in furtherance of such specifically prohibited agreements need be neither pleaded nor proven." *United States v. Grammatikos*, 633 F.2d 1013, 1023 (2d Cir. 1980) (internal citations omitted).

In or about 2009 or 2010, when he began operating the Laboratory with Sandres, the defendant joined conspiracies to traffic cocaine into the United States (Count One) and to use firearms, including machineguns (Count Three), to do so. (Tr. 273, 290-91). *See* Trial Evidence, *supra*, Part I. Try as he might to cabin the conspiracies only to the defendant and Rivera, there is significant evidence of the defendant's narcotics importation and firearms conspiracies both before and after 2013. Moreover, there is nothing in the record suggesting either that the defendant withdrew from the conspiracies or that the aims of the conspiracies were achieved or abandoned. "Mere cessation of the conspiratorial activity by the defendant is not sufficient to prove withdrawal. The defendant 'must also show that he performed some act that affirmatively established that he disavowed his criminal association with the conspiracy, either the making of a clean breast to the authorities, or communication of the abandonment in a manner reasonably calculated to reach co-conspirators." *United States v. Leslie*, 658 F.3d 140, 143 (2d Cir. 2011) (internal quotations and citations omitted). Rather, "[u]nless a conspirator produces affirmative

29

evidence of withdrawal, his participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators." *Id.* (internal quotations and citations omitted).

The Government established that the conspiracies charged in Counts One and Three continued after 2013; and the defendant and the defendant has offered no evidence to establish withdrawal, much less to satisfy the relevant legal standard. The defendant met with, and bribed, Hernandez, a member of the conspiracy, on two occasions in 2019. (Tr. 389, 869-71). Rivera's testimony on this point is corroborated by other testimonial and physical evidence. Special Agent Sandalio Gonzalez testified that on or about May 28, 2019 there was a public filing in the prosecution *United States v. Juan Antonio Alvarado Hernandez* that revealed for the first time publicly allegations against Hernandez. (Tr. 869-870). The jury could reasonably infer that the defendant met with JOH the *following day*, based on data from the Waze application stored on the defendant's cellphone indicating that he initiated navigation to Casa Presidencial Honduras. (*See* GX 201-201 at Rows 4-6, 8, 9). The jury could draw a similar reasonable inference regarding June 12, 2019. On *the same day* of a filing in the Tony Hernandez prosecution, Waze data from the defendant's cellphone reflects navigation to Casa Presidencial. (Tr. 869-70; GX 201-201 at Rows 25, 26, 29).

The continuation of the conspiracies charged in Counts One and Three—which, again, the Government need not prove—also was established by other objective evidence. For example, Sanchez testified that, in 2014, the defendant showed Sanchez a military-grade green firearm the defendant said had been given to him by the Honduran military, further illustrating—and corroborating—the protection promised to the defendant by Hernandez, and provided by Ponce Fonseca and others. In or about April 2015, Martinez and Gutierrez exchanged messages,

discussing, among other things, the defendant's bodyguards having been murdered.  (*See* GX 933-T).  Martinez wrote, in part, "Did you know the 3 that were killed in Cortes in a white truck … Because they were saying that they were your dad's bodyguards."  (GX 933-T at 3, Rows 9, 19).  Martinez continued that "[t]he police from Cortes called me and told me."  (GX 933-T at 4, Rows 29).  A jury could fairly infer that these communications about the murder of the defendant's bodyguards indicate that the defendant continued to engage in narcotics trafficking, and to use firearms, including machineguns, in furtherance of that.  In particular, the term "bodyguards" could be interpreted as similar to the armed workers who guarded the Laboratory (Tr. 291, 668-71), as well as those who guarded the defendant's cocaine shipments (*see, e.g.,* Tr. 307-10).  Similarly, that Martinez learned about this from "the police in Cortes" (GX 933-T at 4, Row 29), could indicate that the defendant, and his co-conspirators, still had access to the corrupt law enforcement contacts he used in furtherance of his drug trafficking business.  *See* Trial Evidence, *supra*, Part VI.  These inferences are bolstered further by the defendant's own communications with Martinez, from *February 2020*, about avoiding and deleting wiretaps; and that the instructions Martinez provided also were stored as a note in Gutierrez's iCloud account.  *See* Trial Evidence, *supra*, Part VI.  They also are supported by the pictures of bulk U.S. currency, consistent in appearance with narcotics proceeds, found on the defendant's cellphone, which was seized at the time of his March 2020 arrest.  (*See, e.g.,* 201-167, 201-168).

Indeed, even *after* his arrest, the defendant's emails from the MCC evidence his continued involvement with co-conspirators, including Gutierrez, Martinez, and Comanche, in an effort to obtain information about criminal conduct committed in furtherance of the conspiracy, such as about the Laboratory and the defendant's murder of the boat mechanic.  (GX 701-T – 709-T).  In

addition to apparent references to his murder of the boat mechanic and the Laboratory at Cerro Negro, the defendant also sent emails asking to "pressure Sauceda" and "talk to Chinchilla," referencing a police official and the Honduran Attorney General whom, as set forth above, Hernandez explicitly referenced to the defendant as someone who would assist in protecting their transportation of drugs and immunizing them from prosecution.  (708-T; *see also* Tr. 694).

### 3. The Evidence Established the Defendant's Use of Machineguns in Furtherance of the Narcotics Conspiracy

The defendant bears the burden to show either that he exited from the conspiracy or that it otherwise ended.  He has done neither.  Moreover, it is well-recognized black-letter law that conspiracy is a continuing offense and that a Section 924(c) offense is tethered to the predicate count for purposes of that analysis.  There is more than ample evidence in the record to suggest that the defendant's participation in the narcotics conspiracy (as well as the firearms conspiracy charged in Count Three) continued until 2020, as did his use and possession of firearms in furtherance of the narcotics conspiracy.

The defendant argues principally that the only evidence supporting the defendant's conviction on Count Two are photographs of firearms seized from the defendant's cellphone and Gutierrez's Instagram and iCloud accounts.  (Mot. at 17-18 ).  Under Second Circuit law, it was not possible for the jury to convict the defendant on Count Two based on conduct outside the statute of limitations.  *See United States v. Delgado*, 971 F.3d 144, 157 (2d Cir. 2020) (citing *United States v. Payne*, 591 F.3d 46, 69 (2d Cir. 2010) ("Conspiracy is a continuing offense. … When a defendant is convicted of violating § 924(c)(1)(A) for using or carrying a firearm during and relation to a crime that is a continuing offense, the § 924(c)(1) crime itself is a continuing offense.")).  "Federal law criminalizes the mere possession of a firearm only if that possession is

'in furtherance' of a drug trafficking crime." *United States v. Johnson*, 452 F. Supp. 3d 36, 75 (S.D.N.Y. 2019) (quoting *United States v. Lewter*, 402 F.3d 319, 321 (2d Cir. 2005)). "Under [Second Circuit] precedent, 'the requirement . . . that the gun be possessed in furtherance of a drug crime may be satisfied by a showing of some nexus between the firearm and the drug selling operation.'" Id. at 75 (quoting *United States v. Finely*, 245 F.3d 199, 203 (2d Cir. 2001)). The "ultimate question" in determining whether the Government has demonstrated the requisite nexus is "whether the firearm 'afforded some advantage (actual, potential, real or contingent) relevant to the vicissitudes of drug trafficking." *Id.* at 75 (quoting *Lewter*, 402 F.3d at 322).

That such a nexus existed was established beyond a reasonable doubt. The defendant arrived at his first meeting with Rivera, at the gas station in Omoa Cortez, armed with a semiautomatic pistol and two short-barreled AR-15 semiautomatic rifles. (Tr. 286-87). He guarded his Laboratory with approximately 20 or 30 men armed with AR-15s, AK-47s, and grenade launchers. (Tr. 291). And the defendant protected his cocaine shipments with security cars and men armed with machineguns, including the defendant himself, who during at least one cocaine shipment carried an AR-15 and a green Glock with a selector switch for automatic firing. (Tr. 308-10). Sanchez corroborated Rivera's testimony about the defendant's personal use and carrying of machineguns, recalling how in approximately 2014 the defendant showed Sanchez a green "heavy military-grade weapon" and said "I hope someone crosses my path so I can debut this new little toy that a friend gave me as a gift." (Tr. 707). The defendant's phone, seized at the time of his March 2020 arrest, is replete with photographs of firearms, including machineguns. (*See, e.g.,* GX 201-102 – 201-114). Gutierrez, the defendant's son and co-conspirator, maintained

in his iCloud account multiple images depicting a green military-style AR-15 rifle with a "Navy insignia." (*See, e.g.,* GX 901, 929; Tr. 107-08).





In January 2021 Gutierrez acknowledged that the Government had, in its recently-filed pretrial motions *in limine*, correctly identified the green military weapon. (GX 935-T at Rows 15-21). The defendant's cellphone and Gutierrez's Instagram and iCloud accounts contained photographs of firearms that were similar in nature, in addition to the images of the green rifles. For example, the defendant's cellphone (GX 201-106) and Gutierrez's iCloud account (GX 929) both contain pictures of a similar-looking gold pistol (Tr. 110-11):

 

These were not merely just pictures of guns—the images depict the types of guns, including automatic rifles, that the trial evidence demonstrated were used in furtherance of the charged conspiracies. Moreover, there was what the defendant and his co-conspirators indicated they would do with these weapons. On or about May 17, 2020, *month* after the defendant's March 1, 2020 arrest, an image was posted to Gutierrez's Instagram account depicting firearms and three "frog emojis." (GX 1107; Tr. 132-35). Then, or about September 14, 2020, the defendant posted yet another picture of firearms—including assault weapons, extended magazines, and semiautomatic pistols—along with overlaid text reading "Hola" followed by a frog emoji, "Hi Snitch." (*See* GX 1113; *see also* Tr. 135).

 

The jury could reasonably infer that these images, posted after the defendant's arrest, demonstrate a co-conspirator's effort to intimidate potential witnesses from taking steps that could disrupt the prosecution of the defendant and/or disrupt the conspiracy's illegal operations.  Put differently, these images, in context, could give rise to the inference that the conspiracies charged in Count One and Count Three continued until the defendant's arrest, and that firearms, including machineguns, were used in furtherance of the narcotics conspiracy.

The defendant's cellphone—again, seized at the time of his March 2020 arrest—also contains photographs representing bulk U.S. currency, which are consistent in appearance with drug-trafficking proceeds.  (*See, e.g.,* 201-167, 201-168).  Gutierrez's Instagram account contains

similar photographs of bulk U.S. currency. (*See, e.g.,* GX 920, 921, 922, 923, 924, 925). One of these images depicts bundles of U.S. currency wrapped up in $100, $50, and $20 denominations. (GX 922). These images of bulk U.S. currency on both the defendant's phone and Gutierrez's iCloud account are consistent with the testimony at trial that Rivera paid the defendant in cash for his participation in transporting drug loads (Tr. 292, 312-13, 315, 321), bribed Hernandez in cash (Tr. 696-97, 701), and laundered his drug money at Graneros in cash (Tr. 653-55). The jury could reasonably infer from this testimony, in combination with the photographs of cash on both the defendant's phone and his co-conspirator's, and son's, iCloud account, that the cash represented proceeds of narcotics trafficking and that the weapons, including machineguns—also pictured on the defendant's phone and on Gutierrez's accounts—were being used to protect the drug money in furtherance of the ongoing conspiracy. Moreover, the defendant can point to nothing in the record that he withdrew from the conspiracy or that it otherwise ended.

Beyond the defendant's personal use of firearms, including machineguns, the evidence also is sufficient under Count Two to convict him under an aiding and abetting theory. "Generally, to establish a conviction through the use of section 2(b), the government must prove that the defendant had the mental state necessary to violate the underlying criminal statute and that the defendant 'willfully caused' another to commit the necessary act." *United States v. Gabriel*, 125 F.3d 89, 99 (2d Cir. 1997). With respect to narcotics conspiracy specifically, "[a]n active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun. In such a case, the accomplice has decided to join in the criminal venture, and share in its benefits, with full awareness of its scope—that the plan calls not just for a drug sale, but for an armed one." *Rosemond* v. *United States*, 572 U.S. 65,

77-78 (2014).  As this Court instructed the jury, "you may also find the defendant guilty of aiding and abetting the crime charged in Count Two if you find that he actively participated in the drug-trafficking crime charged in Count One with advance knowledge that another participant in the crime would use or carry a machine gun or destructive device during and in relation to, or possess a machinegun or destructive device in furtherance of, that crime."  (Tr. 1178).  In addition to his failed argument that he did not personally use a machinegun, the defendant, somewhat incredibly, argues that neither was there evidence he aided or abetting anyone else in doing so during the relevant statutory period.  (Mot. at 18).  The evidence from Gutierrez's iCloud and Instagram accounts, described *infra* Argument, Part II.B.1, hardly is the only trial evidence demonstrating, at a minimum, that the defendant aided and abetted the use and possession of firearms in furtherance of the cocaine importation conspiracy.  In 2013, the defendant agreed with Hernandez to ship massive amounts of cocaine from his Laboratory—as Hernandez put it, for the Laboratory to "work for him."  (Tr. 693-95).  Hernandez was elected President the following year and remains in office.  Approximately six years later, in 2019, the defendant again bribed Hernandez.  *See* Trial Evidence, *supra*, Part V.  Moreover, he did so on days on or about significant files in the prosecution of Tony Hernandez, another of the defendant's co-conspirators with whom Hernandez had directed the defendant to work.  *See* Trial Evidence, *supra*, Part V.  Those filings revealed, for the first time, allegations of narcotics trafficking against Hernandez.  (Tr. 869).  Based on this alone—the two sets of bribes, in 2013 and 2019, to his powerful co-conspirator—the jury could have inferred that the defendant continued operating his Laboratory and transporting cocaine, both of which, as Rivera described, involved men armed with firearms, including machineguns.  *See* Trial Evidence, *supra*, Parts I, II.  Strengthening that inference are the numerous photographs of

bulk quantities of U.S. currency, consistent with drug-trafficking proceeds, found on Gutierrez's Instagram account.  (*See, e.g.,* GX 920, 921, 922, 923, 924, 925).  Put simply, the trial evidence shows that the narcotics conspiracy continued through the defendant's arrest, and from the evidence about use of firearms, including machineguns, as part of that conspiracy, the jury could have concluded, at least, that the defendant of Count Two on aiding and abetting theory.

The defendant also erroneously suggests that "because the verdict returned by the jury does not identify the specific machinegun used or possessed by [Gutierrez], or when the use or possession occurred" it is therefore impossible to determine whether the defendant was convicted on Count Two based on conduct alleged to have occurred within the applicable statute of limitations period.  (Mot. at 24-25).  However, under Second Circuit law, "a defendant who uses multiple firearms in relation to a single drug-trafficking crime may be charged with only one violation of § 924(c)(1)."  *United States v. Medina*, 642 F. App'x 59 (2d Cir. 2016) (citing *United States v. Lindsay*, 985 F.2d 666 (2d Cir. 1993)).  In doing so, the Second Circuit noted that "Congress considered the appropriate 'unit of prosecution' under Section 924(c)(1) to be 'the underlying drug-trafficking offense, not the separate firearms.'"  *Id.  See also United States v. Mejia*, 545 F.3d 179, 205 (2d Cir. 2008) ("the appropriate unit of prosecution under § 924(c)(1) is the predicate offense")).  The defendant's assertion that the jury was required to "identify the specific machinegun used or possessed by [Gutierrez], or when the use or possession occurred" (Mot. at 25) is therefore incorrect under Second Circuit law.  The jury could fairly have found, based on the testimony of witness and/or physical evidence offered at trial, detailed above, that firearms—including machineguns—were used in furtherance of the narcotics importation

conspiracy charged in Count One, and was not required to identify a specific firearm or time—of which, as the evidence demonstrated, there were many.

### 4.     Venue Was Proper in the Southern District of New York

The Court should reject the defendant's challenge to the sufficiency of the venue evidence. (Mot. at 19).  The evidence demonstrated that several of the defendant's "joint offenders," 18 U.S.C. § 3238, were first brought to this District when they entered the United States for prosecution.  (*See* GX 504).  The joint offenders included Rivera; Sierra-Vargas, the Colombia-based trafficker who sent cocaine from Colombia for one shipment that the defendant facilitated in or about 2010 or 2011 (*see* Tr. 305-06); Avila-Meza, the defendant's corrupt HNP contact with whom, in or about 2012 or 2013, the defendant beat, tortured, and murdered two assassins who had killed Sandres' brother over a drug debt (*see* Tr. 347-52); Fredy Renan Najera Montoya, the former Honduran Congressman who controlled the airstrip where one of those cocaine loads landed (*see* Tr. 317-18).  Each of these defendants was first brought to the Southern District of New York, including Avila-Meza in 2016 and Najera in 2018.  (Tr. 861-63; *see also* GX 504).

There are sufficient facts in the record to provide by a preponderance of the evidence that venue was proper in this District, and the Court should reject the defendant's argument.

## II.     A New Trial Is Not Warranted

### A.     Applicable Law

#### 1.     Rule 33

Rule 33 "motions for a new trial are disfavored in the Second Circuit."  *United States* v. *Gambino*, 59 F.3d 353, 364 (2d Cir. 1995).  "The defendant bears the burden of proving that he is entitled to a new trial under Rule 33 . . . ."  *United States* v. *McCourty*, 562 F.3d 458, 475 (2d Cir.

2009).  "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice."  *United States* v. *Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001) (citation and internal quotation marks omitted).  Granting a new trial "must be done sparingly and in the most extraordinary circumstances." *United States v. Archer*, 977 F.3d 181, 187 (2d Cir. 2020) (internal quotations omitted."  "[A] district court may not grant a Rule 33 motion based on the weight of the evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." *Id.* at 188.  In *Archer*, the Second Circuit explained further:

> We stress that, under this standard, a district court may not 'reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable.'  To the contrary, absent a situation in which the evidence was 'patently incredible or defie[d] physical realities,' or where an evidentiary or instructional error compromised the reliability of the verdict, a district court must 'defer to the jury's resolution of conflicting evidence.'  And, as it must do under Rule 29, a district court faced with a Rule 33 motion must be careful to consider any reliable trial evidence as a whole, rather than on a piecemeal basis.

> *Id.* at 188-89.L 6807833, at *4 (quoting *United States* v. *Canova*, 412 F.3d 331, 349 (2d Cir. 2005)).

## 2.     Defense Requests for Jury Instructions

A defendant seeking a jury instruction regarding a defense theory must establish that (i) the instruction "accurately represent[s] the law in every respect," (ii) the instruction "represents a theory of defense with a basis in the record that would lead to acquittal," and (iii) the defense theory "is not effectively presented elsewhere in the charge." *United States v. Martinez*, 769 F. App'x 12, 14-15 (2d Cir. 2019).

### B.      Discussion

#### 1.      Evidence from the Instagram and iCloud Accounts Was Properly Admitted

On March 2, 2021, the Government submitted a supplemental motion *in limine*, seeking to introduce then recently-seized evidence obtained from certain Instagram and iCloud accounts belonging to Gutierrez.  (Dkt. No. 253).  At the close of the evidence, the defendant submitted a less-than-two-page letter seeking to strike the Government Exhibits admitted from the Instagram and iCloud accounts.  (Dkt. No. 271).[12]  The defendant argued that these exhibits were irrelevant, inflame the passions of the jury, and do not qualify as co-conspirator statements pursuant to Rule 801(b)(2)(E).  (*See* Dkt. No. 271 at 2).  In response, the Government submitted a detailed letter— supplementing it's earlier 11-page, unopposed letter memorandum—refuting each of the defendant's meritless arguments.  (*See* Dkt. No. 272).  The Court  concluded that Gutierrez's statements in the Instagram and iCloud accounts were made "during and in furtherance of the conspiracy" and were admissible under either Rule 801(d)(2)(E) or 804(b)(3).  (Tr. 1039-41).

"In the Second Circuit, district courts 'routinely admit[] coconspirator statements into evidence in the presence of the jury on a conditional basis, subject to the later submission of the necessary evidence .… [W]here such hearsay is 'admitted subject to connection, the judge must determine, when all the evidence is in, whether in his view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered.'"  *United States v. Miller*, No. 12 CR 0368 PAC, 2012 WL 4791992, at *4 (S.D.N.Y. Oct. 9, 2012) (internal quotations and

---

[12] The exhibits the defendant sought to strike were GX 901-935, 933-T, 1101-1125, 1109-T, 1110-T, 1111-T, 1112-T, 1113-T, 1124-T, and 1125-T.

citations omitted).  To be admissible, "there must be evidence that there was a conspiracy involving the declarant and the nonoffering party, and … the statement [must have been] made 'during the course and in furtherance of the conspiracy.'"  *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).  "[A] co-conspirator's statements can be admitted against a defendant if the government can show by a preponderance of the non-hearsay evidence that a conspiracy existed, that the defendant and declarant were members of it, that the statement was made in the course of the conspiracy, and that the statement was made in furtherance of the conspiracy."  *United States v. Kusek*, 647 F. Supp. 1150, 1153 (S.D.N.Y. 1986) (collecting cases).  "Generally, a trial court will admit a co-conspirator's statements subject to connection with the conspiracy, and makes the appropriate findings as to connection at the close of the Government's case."  *Id.*  That is what the Court appropriately did here.  (Tr. 1039-41).

The evidence at trial established that Gutierrez was a member of the charged conspiracies.  *See supra* Argument, Part I.B.3.  Like the defendant, Gutierrez maintained contact information for numerous co-conspirators including at least a dozen law enforcement or military officials, as well as Fuad Jarufe and Jarufe's family.  (*See* GX 926, 927).  Gutierrez communicated with these individuals about the defendant's crimes.  For example, electronic communications from Gutierrez's iCloud account reflect that, in April 2015, Gutierrez and Martinez discussed the defendant's bodyguards being killed in the Cortes Department, and Gutierrez agreed to look into it.  (*See* GX 933-T).  Similarly the defendant's prison emails reflect that Gutierrez communicated with Martinez and Comanche about the Laboratory and the mechanic's murder in an effort to obtain non-public information about those matters.  (*See* GX 701-09-T).  Gutierrez also maintained

the same wiretap delete codes provided by Martinez to the defendant as a note in Gutierrez's iCloud account.  (GX 928).

Gutierrez's own communications make clear his specific knowledge of, and participation in, the conspiracies.  On January 11, 2021 communication between Gutierrez and "Krizia Murillo," in which they identify a number of the co-conspirators referenced, *anonymously*, by the Government's January 8, 2021 motions *in limine*.  (Tr. 873-76; GX 935-T).  In that exchange, the participants correctly identified "CC-10" as Barahona; "CC-1" as Sandres; "CC-4" as "Juancho," *i.e.*, the nickname the defendant used for Hernandez; and "Edgar," referencing Edgar Rios, a/k/a "Pluto."  (*See id.*).  Gutierrez wrote, "I know all of them" and "All of them are there."  (GX 935-T at Rows 7, 15).  In an apparent reference to the fact that Sandres and Rios were by that time deceased, Murillo wrote, "So are they going to bring them back to life or what the heck?"  "[S]tatements between coconspirators that may be found to be in furtherance of the conspiracy include statements that provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy."  *United States v. Maldonado-Rivera*, 922 F.2d 934, 959 (2d Cir. 1990) (internal citations omitted).  Here, Gutierrez, a co-conspirator, is discussing the status of other co-conspirators, and of the conspiracy as a whole.

Photographs stored on Gutierrez's iCloud and Instagram accounts also reflect the defendant's and Gutierrez's close relationship with their co-conspirators and law enforcement.  Photographs are not "statements," and thus, the rule against hearsay provides no basis for their exclusion.  *United States v. Moskowitz*, 581 F.2d 14, 21 (2d Cir. 1978) ("The sketch itself, as distinguished from . . . statements about it, need not fit an exception to the rule against hearsay

because it is not a 'statement' and therefore can no more be 'hearsay' than a photograph identified by a witness."). Rather, the issue is whether the photographs and videos were relevant and, therefore, admissible. The photographs and videos plainly satisfied that threshold requirement and were properly admitted at trial. For example, in his iCloud account Gutierrez maintained a photograph of the defendant in a bulletproof vest and Honduran military beret (GX 917); similarly, on Gutierrez's Instagram account was a photograph of the defendant and Gutierrez, with Gutierrez wearing a Honduran National Police hat (GX 1115):

 

These photographs were relevant and admissible to show the defendant's significant connections with Honduran military and law enforcement officials, which witnesses explained the defendant used to commit his drug-trafficking and weapons offenses. (Tr. 284-85, 287-88, 291, 294-95, 694, 702-03). Photographs stored in Gutierrez's iCloud account also demonstrate his ties to other co-conspirators, including a picture of Gutierrez with Hernandez (GX 915), as well as one showing Hernandez and Martinez (GX 918). These photographs demonstrate the close relationships between Hernandez and his co-conspirators, including the defendant. (Tr. 294-95, 691-701).

Supporting this inference were Gutierrez's communications, illustrating specific knowledge about the conspiracy, including about the green military-style rifle. *See supra* Argument, Part I.B.3. Gutierrez's iCloud and Instagram accounts also contain numerous photographs and videos of other ammunition and firearms. (*See, e.g.,* GX 903-14, 1104, 1104-13). These photographs, again, depict weapons like those used in furtherance of the defendant's drug-trafficking and violence. (Tr. 286, 308, 371). For example, the weapons include pictures of firearms with extended magazines, sued to fire more rounds of ammunition more quickly without the firearm needing to be reloaded. (*See, e.g.*, GX 907, pictured below; Tr. 83-84, 1013-14).



Other photographs and videos on Gutierrez's iCloud and Instagam accounts, depicting bulk quantities of U.S. currency consistent with drug-trafficking proceeds also indicate Gutierrez's participation the charged conspiracies. (*See supra* Argument, Part I.B.3; *see also* GX 920, 921, 922, 923, 924, 925). Several photographs from Gutierrez's Instagram account contain overlad text that reflects Gutierrez's comments on the photographs. These include, among others, photographs of (i) bulk U.S. currency with the comment, "Sunday Funday" (GX 1109-T); (ii) two assault rifles and two handguns with the comment, "The prettiest thing you will see today" (GX 1110-T); and firearms with frog emojis, discussed above (*see supra* Argument, Part I.B.3; *see also* GX 1107, 1113, 1125). For the reasons discussed above, these photographs were relevant and admissible as direct evidence of the charged crimes. The overlaid text also was properly admitted as co-conspirator statements under Rule 801(d)(2)(E) because Gutierrez was furthering the conspiracy by boasting to others about the success of Gutierrez's activities and his perceived power. For similar reasons, the statements were admissible under Rule 804(b)(3) because Gutierrez's remarks would be probative of his guilt were he to stand trial on drug-trafficking or weapons charges. Importantly, and as detailed above, *see supra* Argument, Part I.B.3, at least two of these images including references to "snitch" were taken *after* the defendant's March 2020 arrest. (*See* GX 1107-r, 1113-r; Tr. 132-35). The evidence from Gutierrez's iCloud and Instagram accounts was, as described here and above, corroborative of testimony and other trial evidence proving the defendant's guilt. Moreover, that evidence, including communications with Martinez; images of machineguns and bulk U.S. currency; photographs with and of other co-conspirators, such as Hernandez and Martinez; and the postings related to "snitches," some of which were dated *after* the defendant's arrest, all demonstrate Gutierrez's participation in the charged conspiracies.

Accordingly, the defendant's Rule 33 motion regarding the Court's admission of the evidence seized from Gutierrez's iCloud and Instagram accounts did not result in a manifest injustice and should be denied for the reasons the Court set forth on the record (Tr. 1039-41), described above, and in the Government's previous briefing (Dkt. Nos. 253, 272).

### 2.    No Statute of Limitations Instruction Was Required

The defendant has not established that the Court's jury instructions were erroneous, much less that the instructions resulted in manifest injustice.

The defendant argues that "the jury could have concluded that any conspiracy involving [the defendant] ended no later than 2013, when he and Rivera parted ways." (Mot. at 24). This fails to take into account, as set forth in more detail above, that the defendant's conspiracy went far beyond his drug-trafficking with Rivera and extended well past 2013. As the Court observed in denying the defendant's request to give an instruction relating to the statute of limitations, "schemes to import or distribute controlled substances are the subjects of specifically drawn statutes . . . [and] overt acts in furtherance of such specifically prohibited agreements need be neither pleaded nor proven." *United States v. Grammatikos*, 633 F.2d 1013, 1023 (2d Cir. 1980) (internal citations omitted); *see also United States v. Shabani*, 513 U.S. 10, 115 S. Ct. 382, 382, 130 L. Ed. 225 (1994). (Tr. 1037-39). "For limitations purposes, the conspiracy may be deemed terminated when, in a broad sense, its objectives have either been accomplished or abandoned, not when its last overt act was committed." *Grammatikos*, 633 F.2d at 1023. Put differently, "where the government has presented sufficient evidence to show a conspiracy that has continuing purpose or goals, the burden is on the defendant to prove that the conspiracy was terminated ...." (Tr. 1038).

48

The defendant argues, without any evidence in the record to support the proposition, that "[t]he jury could have concluded from [the] evidence that [the defendant] withdrew from and terminated his role in the charged conspiracy more than five years before the Indictment was filed" in 2020. (Mot. at 24). But that is not the applicable legal standard. "Since conspiracy is a continuing offense, a defendant who has joined a conspiracy continues to violate the law 'through every moment of [the conspiracy's] existence.'" *Smith v. United States*, 568 U.S. 106, 111 (2013) (internal quotations and citations omitted). A defendant arguing withdrawal must show "'affirmative action … to disavow or defeat the purpose' of the conspiracy." *Id.* at 113; *see also United States v. Johnson*, 469 F.Supp.3d 193, 209 (S.D.N.Y. 2019). The record contains no evidence that the defendant withdrew from the charged conspiracies. Rather, the defendant's argument seems to be that, because he ceased working with Rivera, his participation in the conspiracy ended. This ignores both the law that conspiracy is a continuing offense, and the significant evidence demonstrating that the conspiracy continued until the defendant's arrest in March 2020.

Accordingly, the Court's decision to reject the defendant's request for a statute of limitations instruction did not result in manifest injustice.

### 3.       Rivera's Testimony Was Properly Admitted

Finally, the defendant claims as a basis for a new trial the Court's admission of certain statements made by (i) Sandres to Rivera and (ii) the defendant to Rivera. The defendant does not identify the testimony he argues "likely compromised the verdict." (Mot. 25-26). Rather, the defendant dedicates less than a single page to this argument, simply reiterating failed arguments this Court rejected before trial. The Government set out in detail in its motions *in limine* the basis

for admitting certain statements Sandres made to Rivera (Dkt. No. 224 at 14-19, 27-29; Dkt. No. 242 at 14-17) and made by the defendant to Rivera while both were in custody at the MCC (Dkt. No. 224 at 25-29).  The Court issued pre-trial rulings that this testimony was admissible.  (Feb. 16, 2021 Tr. at 15-16, 30-31).  For the reasons set forth in the Government's pre-trial motions and on the record at the final pre-trial conference, Rivera's testimony was properly admitted and its admission did not result in manifest injustice.

### a. Statements Made by Sandres to Rivera

At the final pre-trial conference, addressing the defendant's argument that Sandres' statements to Rivera should be inadmissible because Rivera caused Sandres' unavailability by murdering him, the Court stated that "there is no evidence that … the murder of [Sandres] had anything in any way, shape, or form to do with eliminating him as a testifying witness in a trial." (FPTC Tr. at 15-16).

Rivera testified that Sandres was Rivera's cousin and that he began working for the Cachiros in approximately 2003.  (Tr. 282).  Sandres worked for the Cachiros as a *sicario* and assisted in escorting cocaine shipments.  (Tr. 282).  Sandres introduced the defendant to Rivera, and explained that Sandres and the defendant had been working together in Miami and "that the defendant was selling approximately one to five kilos of cocaine per month[.]" (Tr. 284).  Sandres also told Rivera that the defendant wanted to work with Rivera in escorting cocaine shipments and that the defendant had contacts in the preventative police who could assist in removing any checkpoints to facilitate drug shipments.  (Tr. 284-85).  As expected, Rivera also testified about Sandres' statements, in approximately 2013, that Sandres and the defendant requested that Rivera lend them $1 million to invest in a cocaine shipment.  (Tr. 356-58).

The same rationale that supported the Court's ruling to admit these statements prior to trial applies now with equal force.  While Leonel Rivera caused Sandres' murder, he did not do so while he was working for the Government.  The defendant's suggestion otherwise is baseless.  The defendant also suggests that Sandres' statements to Rivera should have been barred because, as a matter of equity, Rivera procured Sandres' unavailability by murdering him.  However, the purpose of the waiver-by-misconduct doctrine is, as set forth in the Government's motions *in limine*, "that a *defendant* may not benefit from his or her wrongful prevention of future testimony from a witness or potential witness."  *See United States v. Dhinsa*, 243 F.3d 635, 652 (2d Cir. 2001) (internal quotations omitted).  This rule typically is applied in situations "where a defendant has silenced a witness through the use of threats, violence or murder" and, as a result, forfeits his right to object to hearsay testimony.  *See United States v. Mastrangelo*, 693 F.2d 269, 272 (2d Cir. 1982).  That argument is not applicable here, whether there is nothing to suggest that Rivera killed Metro to gain a benefit on the theoretical chance that, at a future trial, admissions made by Sandres to Rivera would be offered as evidence against the defendant.

Accordingly, Sandres' statements to Rivera were properly admitted and allowing the jury to consider them did not result in manifest injustice.

### b. The Defendant's Statements to Rivera at the MCC

Rivera's testimony about the defendant's statements to him at MCC was properly admitted and its admission did not result in manifest injustice.

Rivera testified on direct examination about statements the defendant made to him during two conversations while both were in custody at the MCC.  (Tr. 387-88).  Rivera testified that, on the first occasion, the two met near the prison showers and the defendant approached Rivera and

greeted him.  (Tr. 387-88).  The defendant then "started cursing the president of Honduras, Juan Orlando Hernandez, because [the] defendant was saying that the president of Honduras was to blame for his incarceration …."  (Tr. 387-88).  The defendant also told Rivera that he had met on two occasions, at Hernandez's direction, with Martinez and a senior Honduran Air Force officer to discuss a money-laundering company that Hernandez wanted Fuentes Ramirez to sell to him. (Tr. 387-88).  During the first of these meetings in 2019, the defendant paid Hernandez a bribe of approximately 450,000 lempiras; during the second, the defendant provided another bribe.  (Tr. 389).  On redirect examination, after being cross-examined about these conversations with the defendant at the MCC, Rivera testified that the defendant had told Rivera that he did not intend to go to trial and that "he was going to ask the DEA to let him out of prison for a month" because the defendant "had evidence, photos and videos, that would show how [Hernandez] was receiving shipments of cocaine."  (Tr. 575).

"More than a cooperation agreement is required to make an informant a government agent with regard to a particular defendant.  An informant becomes a government agent vis-a-vis a defendant when the informant is 'instructed by the police to get information about the particular defendant.'"  *United States v. Whitten*, 610 F.3d 168, 193 (2d Cir. 2010) (internal quotations omitted).  Thus, in order to establish a Sixth Amendment violation, a defendant must demonstrate that law enforcement, in directing its informant, took deliberate action to elicit incriminating remarks.  *See, e.g.*, *Kuhlmann*, 477 U.S. 436, 459 (1986); *see also Birbal*, 113 F.3d 342, 345 (2d Cir. 1997) ("Although 'the government [has] an affirmative obligation not to *solicit* incriminating statements from the defendant in the absence of his counsel,' there is no constitutional violation when a government informant merely listens and reports." (internal quotations omitted)).

Rivera testified that the defendant approached him in the MCC; moreover, Rivera was not acting at law enforcement's direction, and there is no evidence in the record suggesting otherwise. The defendant's statements to Rivera about his meetings with Hernandez were properly admitted. So too was Rivera's testimony, on redirect, after defense counsel inquired on cross examination about these conversations at the MCC.  Accordingly, admitting this evidence did not result in manifest injustice and their admission is not the basis for a new trial.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should deny the defendant's post-trial motions.


Dated: New York, New York
        May 21, 2021

                                                Respectfully Submitted,

                                                AUDREY STRAUSS
                                                United States Attorney for the
                                                Southern District of New York

                                        By:      _____/s/_____
                                                Jacob Gutwillig
                                                Michael D. Lockard
                                                Jason A. Richman
                                                Elinor Tarlow
                                                Assistant United States Attorneys
                                                212-637-2215 / 2193 / 2589 / 1036

cc:     Defense Counsel
        By ECF