UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
UNITED STATES OF AMERICA,

                                        15-cr-379 (PKC)

        -against-

                                   OPINION AND
                                   ORDER

GEOVANNY FUENTES RAMIREZ,

                    Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.:

        On June 3, 2020, defendant Geovanny Fuentes Ramirez was charged with three

counts of narcotics and weapons-related offenses in a sixth superseding indictment (the

"Indictment;" Doc. 164).  Count One charged defendant with conspiring with others in Honduras

to import cocaine into the United States.  Count Two charged him with possessing machineguns

and destructive devices during and in relation to the charged drug trafficking crime.  Count Three

charged him with conspiring to possess machineguns and destructive devices during and in

relation to the charged drug trafficking crime.

        Following an approximate two-week jury trial, defendant was convicted on all

three counts of the Indictment.  In response to special interrogatories, the jury found that the

offenses in Counts Two and Three involved a machinegun but not a destructive device.  Before

the Court are defendant's motions for acquittal or, alternatively, a new trial.  Rules 29 & 33, Fed.

R. Crim. P.  For reasons to be explained, the motions will be denied.

I.      Defendant's Rule 29 Motion for Judgment of Acquittal

Defendant asserts that the evidence was insufficient to support any count of conviction.  He argues that even if the evidence was sufficient, the conspiracy charged in Count One ended in 2013, which would be outside the five-year limitations period, 18 U.S.C. § 3282. He further argues that if the conspiracy in Count One ended in 2013, then Counts Two and Three are also time barred because they charge possession of a machine gun or conspiracy to possess a machine gun during and in relation to Count One's cocaine conspiracy.  Lastly, defendant urges that venue was improper in the Southern District of New York.

A.      Legal Standard

Rule 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  In reviewing such a motion, the court "must view the evidence in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government."  United States v. Anderson, 747 F.3d 51, 60 (2d Cir. 2014) (internal quotation marks omitted).  A court must "defer[ ] to the jury's evaluation of the credibility of witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence."  United States v. Jones, 482 F.3d 60, 68 (2d Cir. 2006); United States v. Florez, 447 F.3d 145, 156 (2d Cir. 2006) ("We will not attempt to second-guess a jury's credibility determination on a sufficiency challenge."). The court must deny the motion if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  United States v. Aguilar, 585 F.3d 652, 656 (2d Cir. 2009) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)).

Such deference is "especially important when reviewing a conviction of conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare

case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." Anderson, 747 F.3d at 72–73 (internal quotation marks omitted). "To sustain a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (internal quotation marks omitted); see also United States v. Santos, 541 F.3d 63, 71 (2d Cir. 2008) ("[T]he conspiratorial agreement itself may be established by proof of a tacit understanding among the participants, rather than by proof of an explicit agreement, and the absence of an actual sale or seizure of narcotics does not render insufficient the proof of a conspiracy to distribute it."). Included in the government's burden is the requirement "that the defendant possessed the specific intent to commit the offense that was the object of the conspiracy . . . ." United States v. Valle, 807 F.3d 508, 516 (2d Cir. 2015). "[A] defendant's mere presence at the scene of a crime, his general knowledge of criminal activity, or his simple association with others engaged in a crime are not, in themselves, sufficient to prove the defendant's criminal liability for conspiracy." Anderson, 747 F.3d at 61. But in the absence of an explicit agreement to join a conspiracy, the Court looks for evidence that the defendant knew "the essential nature of the plan" and "has 'associated himself with the venture in some fashion, participated in it as something that he wished to bring about, or sought by his action to make it succeed.' " Santos, 541 F.3d at 72 (quoting United States v. Vargas, 986 F.2d 35, 39 (2d Cir. 1993)). If a conspiracy is shown to exist, "it does not take overwhelming proof to link additional defendants to it." United States v. Desimone, 119 F.3d 217, 223 (2d Cir. 1997).

>  B.   A Reasonable Jury Could Find the Trial Testimony
>       To be Credible and, Taken in the Totality of Evidence,
>       <u>Sufficient to Support a Conviction on Counts One and Three.</u>

Defendant urges that the evidence was insufficient to prove beyond a reasonable doubt that he engaged in the conspiracy charged in Count One.  The defendant views the charged conspiracy as including Devis Leonel Rivera Maradiaga and those dealing, working or interacting with or through him.  The government views the evidence quite differently as demonstrating a larger and enduring conspiracy that included Honduran police, Honduran government officials and cocaine traffickers who at times worked cooperatively and at times competitively using Honduras as the site for packaging, processing and/or shipping cocaine destined for the United States.

Rivera, a cooperating witness, was a former leader of a drug-trafficking organization in Honduras called the *Cachiros* and provided extensive testimony in support of the government's case.  (Trial Transcript ("Tr.") at 271–73).  Rivera pled guilty to trafficking narcotics between approximately 2002 and 2013 and surrendered to the United States' government in 2015.  (Tr. 270–73; GX 10 (Rivera Plea Agreement)).  Pursuant to a plea agreement, Rivera pled guilty to crimes including acting as a leader of a continuing criminal enterprise and conspiring to import cocaine into the United States, and in his plea agreement, accepted responsibility for murders of seventy-eight individuals.  (GX 10).  As the Court instructed the jury, Rivera's participation may be considered in determining whether the charged conspiracy existed until November 2013, at which time Rivera started cooperating with the government.  (Tr. 1159).

In addition to Rivera's testimony, the government presented the testimony of Jose Sanchez, a former accountant at Graneros Nacionales ("Graneros"), a grain company located in

Choloma, Honduras and owned by Fuad Jarufe.  (Tr. 651–52).  As described in more detail below, Sanchez witnessed meetings in which defendant gave cash to Honduran political officials and also was given cash by defendant in his role at Graneros.  In addition, the government introduced statements made by defendant in a post-arrest interview where he waived his <u>Miranda</u> rights and evidence obtained from defendant's cell phone that was seized at the time of his arrest. The government also presented evidence from three law enforcement witnesses, an expert in firearms and ammunitions analysis, an expert in Honduran history, photographs, text messages and other documentary evidence.  Defendant did not testify or call any witnesses.

Rivera testified that he met defendant around 2009 or 2010 through Melvin Sandres (a/k/a "Metro").  Sandres worked for the *Cachiros* and told Rivera that defendant and he had partnered to sell cocaine in Miami for approximately two years.  (Tr. 281–83).  Rivera testified that he met defendant and Sandres in a car parked at a gas station owned by Rivera.  (Tr. 281).  Each man was armed, with defendant carrying a semiautomatic pistol and two "sawed-off AR-15s," and had armed security in the area.  (Tr. 286–87).  Defendant asked Rivera to invest in a cocaine laboratory in the Cerro Negro region that he and Sandres started.  Rivera declined because he thought the risk of getting caught by law enforcement was too high.  (Tr. 290–92). However, Rivera purchased two cars from defendant and paid him in United States' currency. (Tr. 291–92).  A few months later, defendant, Sandres and Rivera met at a nightclub owned by Sandres each accompanied by armed guards carrying AR-15s.  (Tr. 299–300).  Defendant told Rivera that he murdered a boat mechanic who owed Rivera money and was "badmouthing" him. (Tr. 301–02).  Rivera testified that he understood defendant was trying to earn his trust in order to engage in cocaine trafficking with him.  (Tr. 304).

Although Rivera declined defendant's invitation to participate in the Cerro Negro laboratory, defendant later informed Rivera that he partnered with another drug trafficker named Chepe Handel.  Rivera testified that defendant's lab was raided by law enforcement, but that defendant told him no drugs were found because Handel and Leopoldo Crivelli, the son of the mayor of Choloma, warned defendant in advance regarding the law enforcement activity.  (Tr. 331–32).  Defendant further stated that he and Sandres overheard a police officer involved in the raid discussing it at a nightclub owned by Sandres.  Defendant, Sandres and others who worked for them subsequently kidnapped, tortured and killed the officer.  (Tr. 339–41; 342–46).  Defendant tortured the officer because he wanted to find out if Fuad Jarufe was implicated in the investigation.  (Tr. 344–46).

Rivera testified that between approximately 2010 and 2012, defendant helped Rivera and the *Cachiros* transport three shipments of cocaine through Honduras.  Rivera testified that the ultimate destination for the cocaine shipments was the United States.  (Tr. 312, 323).  The first shipment of cocaine was sent from Columbia by an individual known as Renteria to an airstrip which the *Cachiros* controlled in Eastern Honduras.  (Tr. 305–08).  The *Cachiros* moved the cocaine to a ranch in El Tigre, Honduras where defendant, Rivera, Sandres, an individual known as Yuca, who worked for Renteria, and others met, and the cocaine was placed in a truck with a hidden compartment.  According to Rivera, defendant carried a green Glock with a selector switch, which allows for firing in bursts, and an AR-15 rifle.  (Tr. 307–08).  Defendant told Rivera that he had three to four vehicles of armed guards carrying AR-15s to provide security.  (Tr. 307–11).  Defendant also stated that he would use his contacts in the military or police if the transport were to be stopped at a checkpoint.  (Tr. 307–11).  Defendant successfully delivered the cocaine to the Valle brothers' cartel near the Guatemalan border and was paid

$60,000 to $70,000 in cash by Rivera.  (Tr. 311–15).  Approximately three to four months later,

Rivera met with Sandres and defendant regarding the second cocaine shipment.  This shipment

similarly involved defendant transporting approximately 500 to 750 kilograms of cocaine that

arrived in Honduras via an airstrip controlled by Fredy Najera, a former member of the

Honudras' Congress.  (Tr. 317–18).  Similar to the first shipment, the cocaine was supplied by

Renteria, and defendant and Metro transported it to the Valle brothers' cartel.  (Tr. 317–21).  The

third time defendant transported cocaine with Rivera was in 2012.  Rivera asked defendant to

receive an airplane from Columbia carrying between approximately 425 and 500 kilograms of

cocaine at an airstrip that defendant controlled in the Cortes Department of Honduras.  (Tr. 322–

23).  The cocaine was sent by a Guatemalan drug-trafficker known as Jack, on a U.S. registered

plane.  (Tr. 322–27).  At the highway where defendant planned to exit the airstrip with the

cocaine, a member of the *Cachiros* acting as a lookout was detained by Honduran police.  (Tr.

327).  Defendant first called Ramon Aldaberto Martinez Hernandez ("Comisionado Martinez"),

a high-ranking official in the Honduran National Police but could not reach him.  (Tr. 136, 327,

592).  Defendant next called the Mayor of Choloma and secured the release of the lookout.  (Tr.

327–28).  Defendant successfully transported the cocaine by truck to Jack at the Guatemalan

border.  (Tr. 324–25).

Rivera further testified about defendant's drug trafficking involving other

individuals.  In approximately 2013, Rivera met with "Juanito" Guzman, a member of the

Sinaloa drug cartel based in Mexico.  Guzman told Rivera that in 2012 and 2013 defendant and

Sandres supplied the Sinaloa cartel with three shipments of cocaine between 500 and 1,500

kilograms but that the last shipment was of poor quality.  (Tr. 360–63).  Rivera also testified that

another drug trafficker known as Pluto stated that defendant provided him with 100 kilograms of

cocaine on consignment.  Pluto could not sell the cocaine because it was of low quality and therefore could not pay defendant back.  (Tr. 363–365).

In approximately 2013, defendant and Rivera's relationship deteriorated after Rivera refused to participate in a cocaine purchase from Columbia being organized by defendant, Sandres and Javier Choloma, the former treasurer in the administration of Honduran president Robert Micheletti.  (Tr. 357–358).  Rivera subsequently learned from a *sicario*, or hired killer, named Vaquero that Sandres and defendant had hired *sicarios* to kill Rivera and his brother.  (Tr. 367–68).  Rivera understood that defendant was upset because he had not provided funds for the cocaine shipment.  (Tr. 367–68).  Rivera asked Vaquero to kill Sandres and defendant.  (Tr. 368). Vaquero succeeded in killing Sandres and attempted to kill defendant.  (Tr. 368–70).  Vaquero went to defendant's home with approximately 15 men, but "defendant had approximately 25 to 30 people that were heavily armed, and that they ran into them as they were coming into the house, and that they fired at the [gang members]."  (Tr. 370).  Accordingly, from approximately 2013 onwards, defendant did not engage in drug trafficking with Rivera.  (Tr. 373).

The testimony of Jose Sanchez described how between 2003 and 2014, Sanchez observed defendant bring United States' currency to Graneros two to three times a month. Sanchez personally accepted the currency from defendant and gave defendant a check in lempiras in exchange.  (Tr. 651–655).  In addition, Sanchez testified that Jarufe asked him to make a delivery to defendant at the Cerro Negro property, prior to the raid by law enforcement. (Tr. 665–67).  While at the Cerro Negro laboratory, Sanchez testified that there were armed guards carrying AK-47s.  (Tr. 668–69).

Sanchez also testified regarding payments that defendant made to political and judicial officials in Honduras.  Approximately 30 to 40 days after the law enforcement raid on

the Cerro Negro laboratory, Sanchez testified that defendant, Jarufe and Julio Cesar Barahona, the president of the Honduran judicial branch, met at Graneros.  (Tr. 670–72, 79).  Barahona stated that "the boss is sending me here so that I can help the fellow out any way I can."  (Tr. 680).  Sanchez understood the "boss" to be Juan Orlando Hernandez, Honduras' President of Congress at the time, and "the fellow" to refer to defendant.  (Tr. 680).  Jarufe instructed Sanchez to write a check to Barahona for 30,000 lempiras from defendant's Graneros account.  (Tr. 680–82).  Defendant paid Graneros back in periodic cash payments of $20 bills.  (Tr. 682).

In 2013, Juan Orlando Hernandez was running for President of Honduras.  Sanchez testified regarding two meetings he observed during this period at Graneros involving defendant and Hernandez.  At the first meeting, Hernandez said he was interested in working with defendant on his "drug lab."  (Tr. 693).  Hernandez stated that defendant should not "worry about the law because Attorney General Chinchilla . . . had been appointed to protect them and also the drugs [sic] transportation through the different routes, and that these transportations will have the protection of the military and the police . . . .  [W]e are going to snuff drugs up the gringo' noses, and they're never even going to know it."  (Tr. 694).  Sanchez further testified that Hernandez provided defendant with the cell phone number of his brother, Tony Hernandez, who would give defendant instructions.  (Tr. 693).  Sanchez testified that defendant gave Hernandez approximately $15,000 in United States' currency for help "with the campaign," and Hernandez gave the currency to Sanchez for him to exchange.  (Tr. 685–97).  During a second meeting observed by Sanchez, defendant gave $10,000 in United States' currency to Hernandez and said it was "[s]o you can help yourself out in the campaign."  (Tr. 701).

In approximately 2014, Sanchez found a box in Jarufe's office and opened it thinking that it contained stationery.  (Tr. 703–04).  Sanchez testified that inside the box were

9

"police vests and Army and police uniforms" with a note inside the box that said "for Geovanny

Fuentes" and a seal that indicated it was from the 105th military brigade.  (Tr. 704–05).  The

head of the 105th military brigade was Rene Orlando Ponce Fonseca.  (Tr. 705; GX 308).

On defendant's Rule 29 motion, he argues that Rivera's testimony was incredible

and uncorroborated.  Defense counsel extensively cross-examined Rivera regarding his

cooperation with the government, role in the *Cachiros* and the seventy-eight murders listed in his

plea agreement.  Defendant argues, without citation to evidence, that the cross-examination

established that Rivera lied under oath, failed to remember important details of recent events and

followed the government's lead on answering questions about the identity of individuals he

admitted to murdering.  (Def's Mem. at 8–9).  However, defendant's vigorous cross-examination

of Rivera did not undermine Rivera's core-testimony regarding defendant's participation in a

narcotics conspiracy and use or carrying of machine guns during and in relation to that

conspiracy.  The testimony of Rivera was supported by other evidence introduced at trial.  In

defendant's post-arrest interview, although defendant denied engaging in drug trafficking, he

admitted to knowing Sandres, Rivera and Vaquero.  (GX 401-Tr. at 401-3, 401-6, 401-9).

Defendant stated that Sandres owned a nightclub and introduced him to Rivera.  (GX 401-Tr. at

401-13; 401–22).  He also admitted to selling two cars to Rivera for United States' currency.

(GX 401-Tr. at 401-20 & 401–21).  Defendant's cell phone contained contact information for

Comisionado Martinez, the police official who Rivera testified that defendant called in an

attempt to release the lookout while transporting cocaine.  (GX 502).

Testimony from Jose Sanchez corroborated Rivera's testimony that law

enforcement raided the Cerro Negro laboratory.  (Tr. 664–65, 671).  Prior to the raid, Sanchez

also observed armed guards with AK-47s at the Cerro Negro laboratory.  (Tr. 668–71).

Moreover, in defendant's post-arrest statement, he stated that a lab was discovered on Jarufe's land in Cerro Negro.  (GX 401-Tr. at 401-9).  Defendant stated that there was an investigation looking into whether the lab processed cocaine but that no cocaine was found.  Defendant "provided a statement" for the investigation because he performed maintenance work on the land.  (Id.)  Defendant further stated that at some point Jarufe gave him the land in Cerro Negro so that defendant could operate a coffee plantation.  (Id.)  A reasonable jury could credit defendant's asserted knowledge of the Cerro Negro laboratory but reject his innocuous explanation.

The Court carefully instructed the jury on weighing the testimony of cooperating witnesses, noting that the testimony "should be given the weight that it deserves in light of the facts and circumstances before you, taking into account the witness' demeanor, candor, the strength and accuracy of a witness' recollection, his background, and the extent to which his testimony is or is not corroborated by other evidence in the case."  (Tr. 1147).  The jury implicitly found the testimony of Leonel Rivera to be credible.

A court should not "second-guess a jury's apparent decision to credit a witness's testimony except in extreme cases where the testimony was . . . 'incredible on its face' or it 'def[ied] physical realities.' "  United States v. Robinson, 749 F. App'x 35, 37 (2d Cir. 2018) (summary order) (quoting United States v. Truman, 688 F.3d 129, 139 (2d Cir. 2012); Anderson, 747 F.3d at 60–61 ("[A] federal conviction may be supported by the uncorroborated testimony of even a single accomplice witness if that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt.").  Although there might be certain cases where witness testimony is incredible as a matter of law, this is not such a case.  Rather, this case falls squarely under the general principal that "[i]t is not for the court on a Rule 29 motion to make

credibility determinations . . . ."  United States v. Autuori, 212 F.3d 105, 118 (2d Cir. 2000). The Court concludes that a reasonable jury could find Rivera's testimony credible and, taken in the totality of evidence, sufficient to support that defendant participated in the conspiracies charged in Counts One and Three.

>   C.   There Was Sufficient Probative Evidence from Which a Reasonable Jury Could Conclude that the Charged Conspiracy Continued Past 2013.

Defendant moved under Rule 29 at the close of the government's evidence arguing that the alleged conspiracies were barred by the statute of limitations.  The Court denied the motion subject to the right to renew.  Defendant now urges that the government failed to prove that the conspiracy charged in Count One, which is a predicate for the charges in Counts Two and Three, continued after 2013 and thus was within the five year limitations period.

It is black letter law that "'[c]onspiracy is generally a continuing crime,' meaning that its commission 'is not complete until the purposes of the conspiracy have been accomplished or abandoned.' "  United States v. Martinez, 862 F.3d 223, 232 (2d Cir. 2017), judgment vacated sub nom. on other grounds, Rodriguez v. United States, 139 S. Ct. 2772 (2019) (quoting United States v. Eppolito, 543 F.3d 25, 47 (2d Cir. 2008)).  The conspiracy charged in Count One, as well as the conspiracy charged in Count Three, are alleged to have existed in or about 2009 up to and including in or about 2020.  (Indictment ¶¶ 1, 6, 7).  For reasons explained in the previous section, the evidence was sufficient for the jury to find that the conspiracy was formed and existed during the time period charged in the Indictment, and as an element of the conspiracy charges, the government was not required to prove that the conspiracy continued past a certain time.  See Smith v. United States, 568 U.S. 106, 111 (2013) ("Commission of the crime *within the statute-of-limitations period* is not an element of the conspiracy offense." (emphasis in original)).

However, the Supreme Court, has "held the Government must prove the time of the conspiracy offense if a statute-of-limitations defense is raised." Id. at 113 (citing Grunewald v. United States, 353 U.S. 391, 396 (1957).  The government may satisfy that burden "when it prove[s] that the conspiracy continued past the statute-of-limitations period.  For the offense in these conspiracy prosecutions was not the initial act of agreement, but the banding-together against the law effected by that act, which continues until termination of the conspiracy or, as to a particular defendant, until that defendant's withdrawal." Id. ‼️As noted, each charged crime has a five-year statute-of-limitations under 18 U.S.C. section 3282.  The Indictment in this case was returned on June 3, 2020.  Accordingly, for the charged offenses to fall within the five-year limitations period, the conspiracies must have continued to exist as of June 3, 2015.

Because conspiracy is a continuing offense, "the limitations period begins only when the purposes of the conspiracy have been accomplished or abandoned." Martinez, 862 at 232.  "'[T]he crucial question in determining whether the statute of limitations has run is the scope of the conspiratorial agreement. . . .' " Eppolito, 543 F.3d at 47 (quoting Grunewald, 353 U.S. at 397).

The charged conspiracy does not require proof of an overt act.  See United States v. Grammatikos, 633 F.2d 1013, 1023 (2d Cir. 1980).  "Where a conspiracy statute . . . does not require proof of an overt act and the indictment alleges a 'conspiracy [that] contemplates a continuity of purpose and a continued performance of acts,' and the government has introduced sufficient evidence to show that such a conspiracy existed, the conspiracy 'is presumed to exist until there has been an affirmative showing that it has been terminated.' " Eppolito, 543 F.3d at 48 (internal citations omitted) (quoting United States v. Spero, 331 F.3d 57, 60 (2d Cir. 2003)). If a continuing conspiracy is shown to exist, "the burden is on the defendant to prove that the

conspiracy was terminated or that he took affirmative steps to withdraw." Id. at 49.  Termination

of the conspiracy requires "evidence from which the jury could have found that the goals of the

conspiracy were accomplished in some final manner." Spero, 331 F.3d at 61.  To effect a

withdrawal, "proof merely that [defendant] ceased conspiratorial activity is not enough," and

defendant "must not take any subsequent acts to promote the conspiracy or receive any

additional benefits from the conspiracy" Eppolito, 543 F.3d at 49 (internal quotation marks

omitted).

Defendant urges that, at most, a reasonable jury could find that he conspired with

Rivera and Sandres, but that any such a conspiracy ended in 2013, when Rivera had Sandres

killed and attempted to have defendant killed.  (Def's Mem at 10; Def's Reply at 1).[1]  Defendant

argues that prior to 2013 there is scant evidence he engaged in the charged conspiracy with

individuals other than Rivera or Sandres and that after 2013 the evidence was insufficient to

establish defendant's participation in any conspiracy.  In arguing that the conspiracy ended in

2013, defendant asserts the record shows, at most, a hub-and-spoke conspiracy with the

*Cachiros*, led by Rivera, at the center.  (Def's Mem at 11 (citing United States v. Ulbricht, 31 F.

Supp. 3d 540, 554 (S.D.N.Y. 2014) ("In a hub-and-spoke (or 'wheel') conspiracy, one person

typically acts as a central point while others act as 'spokes' by virtue of their agreement with the

central actor.")))  From defendant's vantage point, placing Rivera in the center of such a

conspiracy has the benefit of potentially ending defendant's involvement in 2013 after he had a

falling out with Rivera.  The defendant's hub-and-spoke conspiracy conflicts with the

government's theory of the case that defendant participated in a wide-ranging conspiracy to

traffic cocaine through Honduras that was ultimately destined for the United States.  The Court

---

[1] Defendant's claim that a reasonable jury could find that, at most, he conspired with Sandres was raised for the first time in his reply memorandum.

concludes that taken in the light most favorable to the government, the evidence introduced at trial supports the government's theory.

The Indictment charged that from in or about 2009 up through at least 2020 defendant and others known and unknown conspired to import cocaine into the United States.  It also charged him with possessing and conspiring to possess machineguns and destructive devices during and in relation to the cocaine importation conspiracy.  The Second Circuit "has gone quite far in finding single conspiracies in narcotics cases."  United States v. Bertolotti, 529 F.2d 149, 154 (2d Cir. 1975); see also United States v. Berger, 224 F.3d 107, 115 (2d Cir. 2000) ("In the context of narcotics operations, for example, we have held that even where there are multiple groups within an alleged conspiracy, a single conspiracy exists where the groups share a common goal and depend upon and assist each other, and we can reasonably infer that 'each actor was aware of his part in a larger organization where others performed similar roles.' " (quoting Bertolotti, 529 F.2d at 154)).  "The co-conspirators need not have agreed on the details of the conspiracy, so long as they agreed on the essential nature of the plan."  United States v. Geibel, 369 F.3d 682, 689 (2d Cir. 2004) (internal quotations marks omitted).  "Moreover, 'a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance.' " Berger, 224 F.3d at 114–15 (quoting United States v. Maldonado–Rivera, 922 F.2d 934, 963 (2d Cir.1990)); accord United States v. Payne, 591 F.3d 46, 61 (2d Cir. 2010). [2]  "Changes in membership, differences in time periods, and/or shifting emphases in the location of operations do not necessarily require a finding of more than one conspiracy."  Jones, 482 F.3d at 72.

---

[2] Defendant's Rule 29 motion does not assert that the evidence proved multiple conspiracies but that if the government proved a conspiracy, it was a hub-and-spoke conspiracy.

The evidence viewed in the light most favorable to the government was sufficient to permit a reasonable jury to find the existence of an overarching conspiracy to traffic cocaine and to use machineguns during and relation to that conspiracy and that defendant's participation in the conspiracy extended beyond just his relationship with Rivera and the *Cachiros*.  The government presented evidence of mutual dependence and assistance among co-conspirators in pursuit of the common aim of importing cocaine into the United States from Honduras.  The record includes evidence that defendant's armed guards protected him personally, the Cerro Negro Laboratory and the shipments of cocaine he trafficked with Rivera.  Defendant conspired to import cocaine into the United States with Rivera and other co-conspirators, such as the Sinaloa Cartel, Columbian suppliers and government officials in Honduras.  There was no evidence that defendant had a falling out with the Sinaloa Cartel, Columbian suppliers or the government officials, or that any of them withdrew from the conspiracy.  There is no requirement that each member participate in every instance of or at every stage of the narcotics trafficking that took place in the conspiracy.  See Eppolito, 543 F.3d at 48 (stating that where alleged co-conspirators do not know of one another's identities or involvement, a reasonable jury may find a single conspiracy in the case "(1) that the scope of the criminal enterprise proven fits the pattern of the single conspiracy alleged in the indictment, and (2) that the defendant participated in the alleged enterprise with a consciousness of its general nature and extent").  Similarly, defendant used his relationships with military, police and government officials to support his trafficking activities with multiple co-conspirators and in connection with the Cerro Negro laboratory.  See Payne, 591 F.3d at 62 (noting that a reasonable jury could find members of the conspiracy "support[ed] each other with money, weapons, and retaliatory actions when

needed").  There was evidence that participants in the conspiracy used common sources of cocaine supply from Columbia.

Viewing the record in the light most favorable to the government, the evidence established a cocaine trafficking conspiracy and weapons conspiracy with a number of named and unnamed co-conspirators.  Defendant conspired with Sandres, Chepe Handal, cocaine base suppliers and his armed guards in operating the Cerro Negro laboratory.  During a police investigation into the lab, Leopoldo Crivelli, the son of the mayor of Choloma, and Julio Cesar Barahona, the President of Honduran judiciary, provided information and protection.  Defendant and Sandres conspired with the *Cachiros*, led by Rivera, in transporting and protecting cocaine. In connection with these shipments, defendant's armed guards protected the shipments and he conspired with others including, but not limited to, Renteria, Yuca, Fredy Najera, Jack and the Valle brothers' cartel to supply and transport the cocaine.  Leopoldo Crivelli and Comissionado Martinez protected the shipments from law enforcement.  Defendant and Sandres sold three tons of cocaine to Juanito Guzman of the Sinaloa cartel.  Moreover, defendant conspired with Jarufe who assisted with defendant's money laundering through Graneros and facilitated connections with Honduran government officials, including Juan Orlando Hernandez, for defendant to traffic cocaine into the United States.

Given the scope of the conspiracy and number of participants, a reasonable jury could find that the conspiracy was not terminated by either defendant's falling out with Rivera or Sandres' death.  The scope of the conspiratorial agreement to import cocaine into the United States, and possess machineguns during and in relation to this conspiracy, contemplates a continuity of purpose and a continued performance of acts.  The record supports a finding that this was an open-ended conspiracy to traffic large quantities of cocaine with the ultimate

destination of the United States and not discrete instances of drug trafficking focused on the activities of the *Cachiros* or Rivera.  The conspiracy's scope of operations involved defendant engaging in trafficking activities both with and without the *Cachiros* or Rivera.  From the totality of the evidence, the jury could reasonably infer that defendant had the ability to acquire a supply of cocaine or in the case of the laboratory, cocaine base, independent of Rivera based on evidence of defendant's drug trafficking without Rivera and his operation of the Cerro Negro laboratory.  The evidence was also sufficient for the jury to reasonably infer that defendant's conduct continued after Sandres' death.  For example, the record shows, that independent of Sandres, defendant had armed guards at his disposal, who protected defendant during the murder attempt directed by Rivera, and defendant met with Hernandez regarding the operations of the Cerro Negro laboratory.  Moreover, a change in membership of the conspiracy does not necessarily terminate a conspiracy.  See Eppolito, 543 F.3d at 55 ("This record did not permit the conclusion as a matter of law that the retirements of Eppolito and Caracappa and the imprisonment of Casso and Kaplan . . .  put an end to the Eppolito/Caracappa conspiracy . . . .").

Rivera testified that while housed at the Metropolitan Correctional Center ("MCC"), defendant told him about certain post-2013 events indicative of defendant's continued participation in a conspiracy, albeit after Rivera exited that conspiracy.  First, defendant told Rivera that he met with Juan Orlando Hernandez on two occasions and paid him in exchange for protection and not to be arrested in Honduras.  (Tr. 388–89).  Second, defendant told Rivera that he met with a military officer and Comisionado Martinez where the officer said that Hernandez "was sending him the message to sell him the money laundering . . . company that he had" and that Hernandez would pay $13 million for it.  (Tr. 388).

In March 2015, text messages between defendant's son, Geovanny Daniel Gutierrez, and Comisionado Martinez discussed how three of defendant's bodyguards were murdered.  (GX 933-T at 3–4).  Moreover, text messages from 2020 show that defendant requested instructions from Comisionado Martinez on how to detect and delete a wiretap on his phone.  (GX 201-14-T at 4).  When defendant's phone was seized at the time of his arrest in 2020, it included multiple pictures of United States' currency, which the jury could reasonably infer to be proceeds of narcotics trafficking.  (GX 201-167, 201-168).  After defendant's arrest in 2020, two photos posted to Gutierrez's Instagram account show firearms with "frog emojis." (GX 1107, 1113; Tr. 132–35).  Testimony at trial established that in this context a "frog" refers to a snitch or cooperating witness.  (Tr. 132–35).  A reasonable jury could conclude that the conspiracy continued long past 2013.

Defendant urges that the post-2013 evidence demonstrates only that he associated with certain individuals and was insufficient to prove his membership in a conspiracy.  This misconstrues the nature of the continuing conspiracy that the government established at trial. Because a reasonable jury could find that the charged conspiracies existed and contemplated a continuity of purpose, the conspiracy is presumed to continue.  Drawing all reasonable inferences in the government's favor, the evidence supports both the continued existence of the charged conspiracy and defendant's continued participation.

Lastly, there was not evidence from which a reasonable jury could find that the conspiracy was terminated or that defendant took affirmative steps to withdraw.  See Spero, 331 F.3d at 61.  Defendant's argument regarding termination of the conspiracy, namely, the fallout with Rivera and death of Sandres, fails because the conspiracy was much broader than defendant's contention that it was a hub-and-spoke conspiracy centered upon Rivera.  Defendant

has failed to carry his burden to show that he affirmatively withdrew from the conspiracy or articulate any other theory of withdrawal grounded in the evidence.

The jury had sufficient evidence before it to reasonably conclude that a conspiracy to import cocaine into the United States and a conspiracy to use weapons during and in relation to that conspiracy continued to exist past 2013 and that defendant became a member of the conspiracy with knowledge of its unlawful purpose.  There is no basis to grant a judgment of acquittal on this asserted ground.

> D.   There was Sufficient Probative Evidence from Which a Reasonable Jury Could Find that Defendant Used Machineguns During and in Relation to the Narcotics Conspiracy.

Defendant urges that there was insufficient evidence to establish that he possessed machineguns during and in relation to the charged narcotics conspiracy in violation of 18 U.S.C § 924(c).  With respect to this offense, the Court instructed the jury as follows:

> Count Two charges that from at least in or about 2009, up to and including in or about 2020, the defendant, during and in relation to the narcotics importation conspiracy charged in Count One, knowingly used and carried firearms in furtherance of the conspiracy.  Count Two also charges the defendant with aiding and abetting the use, carrying and possession of those firearms, specifically including machineguns that were capable of automatically shooting more than one shot without manual reloading by a single function of the trigger, as well as destructive devices.

(Tr. 1173).

"[T]he requirement in § 924(c)(1) that the gun be possessed in furtherance of a drug crime may be satisfied by a showing of some nexus between the firearm and the drug selling operation."  United States v. Finley, 245 F.3d 199, 203 (2d Cir. 2001).  As the Court instructed the jury, "[t]he mere presence of a machine gun . . . is not enough.  Possession in furtherance requires that the possession be incident to and an essential part of the crime."  (Tr 1175); accord United States v. Lewter, 402 F.3d 319, 322 (2d Cir. 2005) ("'[I]n furtherance'

means that the gun afforded some advantage (actual or potential, real or contingent) relevant to the vicissitudes of drug trafficking.").  Moreover, defendant may be found guilty if he aided and abetted another in the use, carrying, or possession of a firearm in furtherance of the narcotics conspiracy.  Rosemond v. United States, 572 U.S. 65, 70 (2014).  "An active participant in a drug transaction has the intent needed to aid and abet a § 924(c) violation when he knows that one of his confederates will carry a gun.  In such a case, the accomplice has decided to join in the criminal venture, and share in its benefits, with full awareness of its scope—that the plan calls not just for a drug sale, but for an armed one."  Id.

There is no basis to grant a judgment of acquittal on this asserted ground. Defendant's Cerro Negro laboratory was protected by armed men with machineguns.  (Tr. 291, 668–71).  While transporting cocaine shipments defendant similarly protected the drugs by using armed guards with machineguns, and during at least one of the shipments personally carried an AR-15 and a green Glock with a selector switch for firing in bursts.  (Tr. 308–10).  Photographs from defendant's cellphone seized after his arrest and from Gutierrez's social media accounts include pictures of firearms and machineguns.  (GX 201-102 – 201-114; 903-14; 1104-13). Viewing the evidence in the light most favorable to the government, a reasonable jury could find that defendant's possession of machineguns "facilitated or advanced the instant drug trafficking offense by protecting himself, his drugs, and his business."  United States v. Snow, 462 F.3d 55, 63 (2d Cir. 2006) (internal quotation marks omitted), or that he aided and abetted such possession.

Defendant further challenges the sufficiency of the evidence on grounds that he did not possess machineguns during and in relation to the charged narcotics conspiracy within the statute of limitations.  The statute of limitations for the offense is five years.  18 U.S.C. §

3282.  "Conspiracy is a continuing offense. . . . When a defendant is convicted of violating §

924(c)(1)(A) for using or carrying a firearm during and in relation to a crime that is a continuing

offense, the § 924(c)(1) crime itself is a continuing offense."  Payne, 591 F.3d at 49; accord

United States v. Delgado, 971 F.3d 144, 157 (2d Cir. 2020).

As discussed in the previous section, there was sufficient evidence for the jury to

find that the charged conspiracy had continuing purposes or goals and that it continued into the

limitations period.  Accordingly, under Second Circuit precedent, the section 924(c) charge itself

is a continuing offense and possession is presumed to continue until the underlying conspiracy

runs its course.  See Payne, 591 F.3d at 49.  There was no evidence that defendant's possession

or use of machineguns ceased outside of the limitations period.  Based upon the evidence, a

reasonable jury could conclude that defendant committed the offense charged in Count Two and

that it continued within the five-year statute of limitations period.

E.  The Government Has Proven by the Preponderance of the Evidence that Venue in
the Southern District of New York Was Proper.

Under 18 U.S.C. section 3238, "[t]he trial of all offenses begun or committed

upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be

in the district in which the offender *or any one of two or more joint offenders*, is arrested or is

first brought . . . ."  18 U.S.C. § 3238 (emphasis added).  Defendant was arrested in Miami,

Florida, but the government identifies multiple co-conspirators who were first brought to this

District (GX 504; Tr. 862–63), including Rivera, Renteria, and Juan Manuel Avila Meza, a

corrupt police officer who participated with defendant in murdering an individual who had killed

Sandres' brother over a drug debt.  (Tr. 347–52).

Defendant concedes that he has not located case law supporting that venue was improper but raised the argument to preserve it for appeal. The Court concludes that the government has established that venue was proper in the Southern District of New York.

II.    Defendant's Rule 33 Motion for a New Trial

Defendant moves for a new trial under Rule 33 on three grounds: (1) evidence from the social media and iCloud accounts of defendant's son, Gutierrez, should have been stricken; (2) the Court erred in declining to give a jury instruction relating to the statute of limitations; and (3) the Court erred in permitting Rivera to testify regarding certain statements made by Sandres and defendant. For reasons to be explained, defendant's motion will be denied.

A.    Legal Standard

Rule 33 provides that, "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Although granting such a motion is in the court's discretion, "that discretion should be exercised sparingly." United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992); accord United States v. Archer, 977 F.3d 181, 187 (2d Cir 2020). "The ultimate test is whether letting a guilty verdict stand would be a manifest injustice . . . . There must be a real concern that an innocent person may have been convicted." United States v. Canova, 412 F.3d 331, 349 (2d Cir. 2005) (citations and internal quotations omitted).

Generally, a court "has broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29." United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001). But "a district court may not reweigh the evidence and set aside the verdict simply because it feels some other result would be more reasonable," and "must be careful to consider

any reliable trial evidence as a whole, rather than on a piecemeal basis." <u>Archer</u>, 977 F.3d at

189–90 (internal quotation marks omitted).

    B.  Evidence from Gutierrez's Social Media and iCloud Accounts Was Properly <u>Admitted.</u>

At trial, the Court admitted "subject to connection" evidence from Gutierrez's,

defendant's son, social media and iCloud accounts and, following submissions from the parties,

denied defendant's motion to strike these exhibits at the close of evidence.  In defendant's Rule

33 motion, he reasserts that the government failed to establish that Gutierrez and defendant were

co-conspirators and that it was error for the Court to admit the evidence as co-conspirator

statements under Rule 801(d)(2)(E), Fed. R. Evid.

Rule 801(d)(2)(E) provides that a statement is not hearsay if "offered against an

opposing party and . . . was made by the party's coconspirator during and in furtherance of the

conspiracy."  To be admissible the court must find by a preponderance of the evidence "(a) that

there was a conspiracy, (b) that its members included the declarant and the party against whom

the statement is offered, and (c) that the statement was made during the course of and in

furtherance of the conspiracy." <u>United States v. Gupta</u>, 747 F.3d 111, 123 (2d Cir. 2014)

(quoting <u>Maldonado-Rivera</u>, 922 F.3d at 958).  "Admissibility depends on the nature of the

statement offered—in particular what objective it sought to advance—and whether the defendant

was jointly engaged with the declarant in a conspiracy seeking that objective." <u>United States v.</u>

<u>Russo</u>, 302 F.3d 37, 46 (2d Cir. 2002).  "In determining the existence and membership of the

alleged conspiracy, the court must consider the circumstances surrounding the statement, as well

as the contents of the alleged coconspirator's statement itself." <u>Gupta</u>, 747 F.3d at 123.

Based on the evidence discussed above in connection with defendant's Rule 29

motion, this Court could reasonably find—and did find—by a preponderance of the evidence the

existence of a conspiracy to import cocaine into the United States and a conspiracy to possess

machineguns during and in relation to the cocaine importation conspiracy and the participation

of defendant and his son Gutierrez in those conspiracies.

        As an initial matter, some of the evidence seized from Gutierrez's accounts

included photographs, which are considered physical evidence and are not hearsay.  See United

States v. Moskowitz, 581 F.2d 14, 21 (2d Cir. 1978) ("The sketch itself, as distinguished from . .

. statements about it, need not fit an exception to the rule against hearsay because it is not a

'statement' and therefore can no more be 'hearsay' than a photograph identified by a witness.").

Gutierrez's accounts included photographs of cash (GX 920–925); defendant in a bulletproof

vest and Honduran military beret (GX 917); defendant and Gutierrez, with Gutierrez wearing a

Honduran National Police hat (GX 1115); and Gutierrez with Hernandez (GX 915).  Several

photographs from these accounts also depict weapons and ammunition, including firearms with

extended magazines and machineguns.  (GX 903-14, 1104-13).  As the Court stated when

considering the issue at trial:

> Now, as in many or most drug conspiracy cases, some of these items could
> have an innocent explanation. . . . It doesn't mean that it can't be a tool of
> the trade. But in combination these physical items of evidence, i.e.,
> photographs of cash, bulletproof vests, presence with other persons who
> from other evidence were shown to be members of the conspiracy,
> photographs of firearms, all . . . weave together to place Mr. Gutierrez in
> the conspiracy.

(Tr. 1040).  In addition, the Court may consider the hearsay statements themselves but may not

base its findings entirely on the statements.  United States v. Gigante, 166 F.3d 75, 82 (2d Cir.

1999) ("[W]hile the hearsay statement itself may be considered in establishing the existence of

the conspiracy, there must be some independent corroborating evidence of the defendant's

participation in the conspiracy.").  The circumstances surrounding Gutierrez's statements as well

as their context provide additional support for his participation in the conspiracy.  They include

communications between Gutierrez and Comisionado Martinez from April 2015 discussing the

defendant's bodyguards being killed in which Gutierrez agrees to look into the events.  (GX 933-

T).  Gutierrez's iCloud account also contained the same codes to delete wiretaps that

Comisionado Martinez provided to defendant.  (GX 928).  Lastly, after defendant's arrest,

photographs from Gutierrez's accounts show firearms overlaid with a frog "emoji," which is a

symbol for a "snitch" or government informant.  (GX 1107, 1113; Tr. 132–35).

It was not error to admit the evidence seized from Gutierrez's social media and

iCloud accounts.

C.  <u>The Court Did Not Err by Declining to Give a Statute of Limitations Instruction.</u>

"'A jury instruction is erroneous if it misleads the jury as to the correct legal

standard or does not adequately inform the jury on the law.' "  <u>United States v. Finazzo</u>, 850 F.3d

94, 105 (2d Cir. 2017) (quoting <u>United States v. Rowland</u>, 826 F.3d 100, 115 (2d Cir. 2016)).  A

defendant challenging a jury instruction "bears the burden of showing that the requested

instruction accurately represented the law in every respect and that, viewing as a whole the

charge actually given, he was prejudiced."  <u>United States v. Rutigliano</u>, 790 F.3d 389, 401 (2d

Cir. 2015) (internal quotation marks and citation omitted).

"A criminal defendant is entitled to have instructions presented relating to any

theory of defense for which there is any foundation in the evidence, no matter how weak or

incredible that evidence may be."  <u>Rowland</u>, 826 F.3d at 115 (internal quotation marks and

alterations omitted).  "The defendant bears the burden of establishing that an adequate

evidentiary basis exists for the requested charge."  <u>Id.</u>

As will be seen, defendant sought no "theory of defense" instruction and submitted no statute of limitations instruction.  Instead, defense counsel alluded generally to a treatise that contained a statute of limitations instruction for a conspiracy charged under a statute that required proof of an overt act during a limitations period or where defendant's withdrawal from the conspiracy was placed at issue.  The conspiracies charged in this case did not require proof of an overt act during the limitations period and no claim of withdrawal was made.

Following the close of the government's evidence, defendant moved under Rule 29 motion for a judgment of acquittal on statute limitations grounds.  (Tr. 1026).  In support of the motion, defense counsel urged that:

> The indictment in this case was returned in May of 2020. There is not a single piece of evidence of anything that Mr. Fuentes did after 2013. Maybe, maybe there's something in 2014, but there is certainly nothing in this record reflecting any illegal activity by Mr. Fuentes in the statute of limitations period.

(Tr. 1024).  Following a brief response by the government, the Court asked defense counsel:

> THE COURT: All right. Well, here is another question. Just as a matter of black letter law, apart from the evidence in this case for the moment, if a person is found to have joined a conspiracy, is there not a presumption that the membership continues unless and until there is an affirmative act of withdrawal?
>
> [DEFENSE COUNSEL]: The question for the Court, I think -- yeah, the answer is as a matter of black letter law, that would be correct. If the government had put in any evidence of criminal activity by coconspirators in 2015, that may be an argument, but there is none of that in this case.

(Tr. 1025–26).  The Court denied defendant's motion subject to renewal.  (Tr. 1026).

Thereafter, defense counsel requested that "in light of the discussion at sidebar, I would ask the Court to add a statute of limitations charge, which I think is appropriate under the circumstances." (Tr. 1034).  He suggested and stated his non-objection to using the statute-of-

limitations charge in Sand & Siffert.[3]  (Tr. 1034).  The Court stated that it would review the Sand

& Siffert instruction and "that the government and defense is also invited to submit anything

they wish to on the issue."  (Tr. 1034).  Based on the Court's review, the Sand & Siffert

instructions suggested by defense counsel only provide model statute of limitations instructions

for a conspiracy in which the government must prove an overt act or where the defendant asserts

a withdrawal defense.  Vol. 2 ¶ 19.01.   Despite the Court's invitation, neither defendant nor the

government made a submission on the issue.  The next morning, prior to charging the jury, the

Court denied the requested statute of limitations instructions because "the government has

introduced sufficient evidence to show that such a conspiracy [that contemplates a continuity of

purpose] existed, the conspiracy is presumed to exist until there is an affirmative showing that it

has been terminated."  (Tr. 1038).  Accordingly, the Court concluded that "as continuing

offenses, the indictment was timely returned within five years from the period of time that the

conspiracy was alleged to have continued to."  (Tr. 1038).  At the conclusion of the jury charge,

the Court asked defendant if there were any objections to the charge as delivered and none were

made.  (Tr. 1187).

　　　　　The arguments presently advanced, that defendant withdrew from the conspiracy

or the purposes of the conspiracy were accomplished in 2013 after his falling out with Rivera,

were not raised in defendant's generic request for a statute-of-limitations charge.  "In order to be

preserved, an objection to the jury instructions must be made by 'inform[ing] the court of the

specific objection and the grounds for the objection before the jury retires to deliberate.' "

United States v. Grote, 961 F.3d 105, 114 (2d Cir. 2020) (quoting Rule 30, Fed. R. Civ. P.);

accord Jones v. United States, 527 U.S. 373, 388 (1999).  "'[A] request for an instruction before

---

[3] Sand & Siffert, Modern Federal Jury Instruction – Criminal.

the jury retires' does not preserve 'an objection to the instruction actually given by the court.' "

United States v. Crowley, 318 F.3d 401, 412 (2d Cir. 2003) (quoting Jones, 527 U.S. at 388).

Similarly, the Second Circuit "has repeatedly held that a party who has requested an instruction

that has not been given is not relieved of the requirement that he state distinctly his objection to

the instruction that is given . . . . " Id. (internal quotation marks and alteration omitted).  A party

is relieved from renewing an objection following the jury charge only if the previous objection

"ma[de] its position clear, and it was evident in the circumstances that renewal of the objection

would be futile because the court had clearly manifested its intention to reject the objection."

Grote, 961 F.3d at 115

    When requesting the statute-of-limitations instruction, defendant made no

reference to his falling out with Rivera.  Defendant likewise did not assert that he withdrew from

the conspiracy or that the conspiracy's objective had been accomplished after he stopped

working with Rivera but argued that he never participated in such a conspiracy.  These new

theories are presented for the first time in defendant's post-trial motion.  In directing the Court to

Sand & Siffert, defendant cited to an instruction that, at best, applies to a conspiracy where an

overt act is required or a claim of withdrawal was made.  Even on this motion for a new trial,

defendant fails to point to an instruction in Sand & Siffert that the Court should have but did not

deliver; nor has he ever furnished any form of statute-of-limitations instructions.  Thus,

defendant failed to preserve the argument that a statute-of-limitations instruction was warranted

because the charged conspiracy ended in 2013 or defendant withdrew from such a conspiracy

after his falling out with Rivera.

Even if defendant had preserved the argument now raised in his post-trial motion, there was not a foundation in the evidence for a statute-of-limitations instruction.  The Court instructed that jury that:

> A conspiracy, once formed, is presumed to continue until either its objective is accomplished or there is some affirmative act of termination by its members. So, too, once a person is found to be a member of a conspiracy, he is presumed to continue his membership in the venture until its termination, unless it is shown by some affirmative proof that he withdrew and dissociated himself from it.

(Tr. 1170).  The jury was also instructed that Rivera began acting at the direction of the government in November 2013 and could not be considered by the jury in determining whether an agreement existed to accomplish the object of the cocaine importation conspiracy after that date.  (Tr. 1159–60).  The conspiracy alleged in the Indictment was not confined to defendant conspiring to traffic narcotics with Rivera and his associates.  As the Court has noted, conspiracy is continuing offense, and there was ample evidence of a conspiracy to traffic cocaine through Honduras that was ultimately destined for the United States between and among narcotics traffickers in Honduras and other countries, government officials and law enforcement that did in fact continue.  In the absence of evidence from which a reasonable jury could find a withdrawal by defendant or that the conspiracy's objective was accomplished, it would have been improper to instruct the jury further on these issues.  See, e.g., United States v. White, 552 F.3d 240, 246 (2d Cir. 2009) ("A federal court may decline to instruct on an affirmative defense, moreover, when the evidence in support of such a defense would be legally insufficient." (internal quotation marks omitted)); United States v. Gonzalez, 407 F.3d 118, 122 (2d Cir. 2005) ("[T]here was insufficient evidence to sustain the defense of coercion or duress. The district court therefore properly denied Gonzalez's request for a corresponding jury instruction.").  Accordingly, the Court did not err by declining to give a statute-of-limitations instruction.

D.  The Court Did Not Err in Permitting Rivera to Testify Regarding Certain
    <u>Statements Made by Sandres and Defendant.</u>

Defendant argues that Rivera should not have been permitted to testify regarding statements (1) made by Sandres and (2) made by defendant while he was at the MCC.  The Court addressed both of these arguments in connection with defendant's pre-trial motions <u>in</u> <u>limine</u>.  With the benefit of a full trial record, the Court finds no basis to revise its prior rulings that the statements were admissible.

First, defendant urges that statements made by Sandres should be excluded as a matter of equity because Rivera caused Sandres' unavailability by murdering him.  However, defendant points to no evidence in the record that Rivera ordered Sandres killed in order to eliminate him as a testifying witness at trial.  <u>See</u> <u>United States v. Dhinsa</u>, 243 F.3d 635, 652 (2d Cir. 2001) ("[A] defendant may not benefit from his or her wrongful prevention of future testimony from a witness or potential witness.").

Second, defendant urges that Rivera's testimony on defendant's statements to him at the MCC were procured in violation of <u>Massiah v. United States</u>, 377 U.S. 201 (1964) and its progeny.  "'[O]nce the right to counsel has attached, the Sixth Amendment imposes on the government an affirmative obligation not to solicit incriminating statements from the defendant in the absence of his counsel.' "  <u>United States v. Siri-Reynoso</u>, 807 F. App'x 103, 107 (2d Cir. 2020) (quoting <u>United States v. Rosa</u>, 11 F.3d 315, 329 (2d Cir. 1993)).  "Although the government has an affirmative obligation not to solicit incriminating statements from the defendant in the absence of his counsel . . . there is no constitutional violation when a government informant merely listens and reports."  <u>United States v. Birbal</u>, 113 F.3d 342, 345 (2d Cir. 1997) (internal citations, quotations and alterations omitted).  "A jailhouse informant is deemed to have conducted an interrogation in violation of a defendant's Sixth Amendment

<u>Massiah</u> rights if the informant was acting as a 'government agent' who deliberately elicited the incriminating information."  <u>United States v. Whitten</u>, 610 F.3d 168 (2d Cir. 2010) (internal quotation marks and alterations omitted).  "More than a cooperation agreement is required to make an informant a government agent with regard to a particular defendant.  <u>Id.</u>

        At trial, Rivera testified that defendant initiated the conversations with him at the MCC and there is no evidence that the government directed Rivera to get information from defendant.  (Tr. 387–88).  On this record, there is no basis to conclude that defendant's statements should have been excluded.

CONCLUSION

        The Court has considered all of the arguments raised by defendant, including those not expressly addressed herein.  Defendant's motions for a judgment of acquittal under Rule 29 and for a new trial under Rule 33 are DENIED.  The Clerk is directed to terminate the motions.  (Doc 316).

        SO ORDERED.

Dated:  New York, New York
       June 22, 2021

P. Kevin Castel
United States District Judge