# M&B

## M O S K O W I T Z   &   B O O K ,   L L P

345 Seventh Avenue, 21ˢᵗ Floor

Avraham C. Moskowitz
AMoskowitz@mb-llp.com

New York, NY 10001
Phone: (212) 221-7999
Fax: (212) 398-8835

August 17, 2021

**SENTENCING MEMORANDUM**

The Honorable P. Kevin Castel
United States District Court
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl St., Courtroom 11D
New York, NY 10007-1312

Re:  U.S. v. Geovanny Fuentes Ramirez
     15 Cr. 379 (PKC)

Dear Judge Castel:

This letter is respectfully submitted on behalf of defendant Geovanny Fuentes Ramirez ("Geovanny"), whose sentencing is scheduled to take place before Your Honor on August 31, 2021. Without minimizing the serious nature of the crimes of which Geovanny was convicted, it is respectfully submitted that the mandatory minimum sentence of forty years imprisonment is appropriate in this case. If the Court sentences Geovanny to the mandatory minimum sentence of forty years, and if Geovanny earns the full measure of "good time" available, he will be well into his eighties by the time he is released. A sentence longer than the mandatory minimum would therefore be greater than necessary to achieve the statutory goals of sentencing set forth in 18 U.S.C. § 3553(a).

Geovanny was arrested and detained in the Southern District of Florida on March 1, 2020, while visiting his sons, who live in Orlando, and exploring a renewable energy opportunity. On June 3, 2020, he was charged in the Southern District of New York by superseding indictment with cocaine importation conspiracy (Count 1); possession of machineguns and destructive devices in furtherance of the conspiracy (Count 2), and conspiracy to possess machineguns and destructive devices in furtherance of the drug conspiracy (Count 3). Geovanny was arraigned, pleaded not guilty, and remanded. After a jury trial, Geovanny was convicted on all three Counts on March 22, 2021.

Attached to this submission are letters of support for Geovanny. The letters demonstrate the support Geovanny has from friends, family and community. The letters show Geovanny's commitment to his family and community, and his ability to impact people in a positive way. Geovanny is a supportive father, loving son, committed partner, and proud Honduran, passionate about bringing renewable energy to his home country.

Geovanny has adjusted to the requirements of prison and has had no disciplinary infractions. Geovanny has tried to use his time incarcerated to improve himself, exemplifying his willingness and ability to conform to society's rules and contribute in a positive way. While the PSR indicates Geovanny has not participated in educational, programming, or work assignments while incarcerated at the Metropolitan Correctional Center ("MCC"), it ignores the fact that the MCC has been almost entirely locked down for well over a year, with no educational, programming, or work opportunities available. When such opportunities again arise, Geovanny intends to take full advantage of them. Moreover, for most of his time at the MCC, Geovanny has been actively involved in preparing for trial and assisting counsel in his own defense.

Analysis of the 18 U.S.C. § 3553(a) factors, acknowledgment of the positive adjustment Geovanny is making towards his time in prison, and recognition that recidivism significantly decreases for offenders released after the age of sixty, support the imposition of the mandatory minimum sentence of forty years imprisonment.

## I.  The Advisory Sentencing Guidelines Range

As the Supreme Court has repeatedly explained, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Peugh v. United States*, 569 U.S. 530, 536 (2013) (*quoting Gall v. United States*, 552 U.S. 38, 49 (2007)). The U.S. Probation Department calculated an advisory Guideline sentence of life imprisonment, with a mandatory minimum sentence of forty years, representing the mandatory minimum of ten years for Count 1 plus the mandatory minimum of thirty years for Count 2, to run consecutively.[1] The advisory Guideline sentence is derived from a total offense level of 43 and criminal history category of I. (PSR ¶ 127.)

## II.  The Minimum Sentence is Sufficient to Achieve the Statutory Purposes of Sentencing

After calculating the appropriate Guidelines range, the Court must apply the considerations set forth in 18 U.S.C. § 3553(a), make an individualized assessment, and impose a

---

[1] Defendant respectfully reserves for appeal his arguments, outlined in Defendant's post-trial motion, that Counts 2 and 3 should be dismissed, which would result in a significantly different Guidelines calculation. Indeed, dismissal of Counts 2 and 3 would reduce the applicable mandatory minimum sentence by 30 years. Additionally, the Defendant objects to the guidelines calculation in the PSR which includes enhancements, in paragraphs 74-81, that were not found by the jury in its verdict. Those enhancements are based entirely on the uncorroborated testimony of Leonel Rivera which is not credible and should not be used to add 12 points to the Defendant's offense level.

sentence that is "sufficient, but not greater than necessary" to meet the objectives of federal sentencing. *See* 18 U.S.C. § 3553(a); *Gall v. United States, supra*. Each of the Section 3553(a) considerations relevant to this case counsels in favor of imposing the mandatory minimum sentence permitted under the Guidelines, a forty-year sentence of imprisonment.

## A.      The Nature and Circumstances of the Offense

The offenses of which Geovanny was convicted are described in the PSR, and the Court, having heard the evidence at trial, is familiar with all of the relevant circumstances. The Court is also aware that the only evidence that Geovanny participated in any acts of violence came from the uncorroborated testimony of Leonel Rivera, the Government's star cooperating witness who blithely admitted to committing more than seventy murders and who was shown to have lied on the witness stand, under oath, on prior occasions. It is respectfully submitted, notwithstanding the Court's determination that the evidence was sufficient to support a conviction, that the paucity of evidence that Geovanny engaged in any acts of violence or that he engaged in any criminal activity after 2013, combined with the ample evidence of his activities as a productive legitimate businessman in subsequent years, is a factor worthy of consideration when considering the nature and circumstances of the offenses of which Geovanny was convicted. It is also noteworthy that despite the criminality and violence to which he was exposed throughout his upbringing, Geovanny has no prior convictions or juvenile adjudications.

## B.      The History and Characteristics of the Defendant

Punishment in the federal system must be tailored not solely to the offense, but also to the offender. *See Lockett v. Ohio*, 438 U. S. 586 (1978); *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *see also*, 18 U.S.C. § 3661 and 21 U.S.C. § 850. Accordingly, as Justice O'Connor noted in her concurring opinion in *California v. Brown*, 479 U.S. 538 (1987), evidence about offenders' backgrounds and character is relevant to sentencing because of the belief, held by this society, that people who commit criminal acts that are attributable to disadvantaged backgrounds, or to emotional and mental problems, may be less culpable for sentencing purposes than those who have not had such experiences. *Id*. at 545.

Geovanny is a fifty-two-year-old father, grandfather, son, partner, and environmental entrepreneur. His success as a businessman and the strength of his family are telling evidence of his true character, especially when considered against the backdrop of his upbringing. Geovanny is a native son of Choloma, one of the most violent cities in Honduras, a country infamous for its violence and poverty. Choloma, the third largest city in Honduras, lies near the industrial hub of San Pedro Sula and the border with Guatemala. Like in most parts of Honduras, "crime is both endemic and rampant in Choloma."[2]   Honduras is the most violent country in the world,

---

[2] Doctors Without Borders, *Part 1: Cycles of Violence in Honduras*, ALERT, Vol. 19, No. 3 (Fall 2018), available at https://www.doctorswithoutborders.org/what-we-do/news-stories/story/part-1-cycles-violence-honduras (last visited Aug 12, 2021).

measured by the homicide rate reaching 90.4 per 100,000 inhabitants in 2012.[3]  In 2012, the murder rate was 20 times the rate in the United States.  Fewer than ten percent of homicides are investigated and prosecuted by Honduran officials.

Besides the violence, Honduras is one of the poorest countries in Latin America, with two-thirds of its roughly 9 million people living in poverty.[4]  Many households in Honduras still remain without electricity—especially those in rural villages, many of which are now being electrified for the first time through the use of renewable energy sources like solar and biomass.[5]

Relative to the poverty around him, Geovanny was raised under average circumstances by parents Daniel Fuentes Games and Maria Priscilla Ramirez.  (PSR ¶ 95.)  Geovanny was raised as a devout Catholic; as an adult, he remains a god-fearing man, but no longer considers himself a Catholic. (PSR ¶ 100.)

Geovanny is the oldest of five siblings.  (PSR ¶ 96.)  The Court has received letters from each of Geovanny's three sisters.  Middle sister Zenia describes how as the "eldest brother, [Geovanny] always displayed a sense of responsibility and honor towards our family.  When our father passed away he took over the role of family leader . . . I attest that my brother is a believer, an honest person, an excellent son, father and uncle."  (Ltr. of Zenia Patricia Fuentes Ramirez, annexed as Ex. A.)  Sisters Linda and Jenny discuss how the five siblings were "united" and Geovanny stood out as "upright, totally responsible, honest, supportive and trustworthy person. His relationship with [our] parents was and has always been respectful and responsible.  He has always kept close and has put into practice the values instilled in us by the family.  He has always been very attentive, providing help and support at any time."  (Ltrs. of Linda Ivette Fuentes Ramirez and Jenny Juliana Fuentes Ramirez, annexed as Exs. B and C, respectively.)



**Geovanny's aunt with his daughter P.F. and his mother, Maria Priscilla**

---

[3]  Louis-Alexandre Berg and Marlon Carranza, *Crime, Violence, and Community-Based Prevention in Honduras. Justice, security, and development series*, World Bank, Washington, DC (June 2015).

[4]  *Id.*

[5]  The Borgen Project, *Reaching for Energy Self-Sufficiency: Renewable Energy in Honduras*, <u>available at</u> https://borgenproject.org/renewable-energy-in-honduras/ (last visited Aug. 15, 2021).

Geovanny's father died in 2009, at age 70, from medical complications of diabetes. (PSR ¶ 18.) Since his father's passing, Geovanny and his sister Jenny Fuentes have taken care of their mother in their family home in Choloma Cortes, Honduras. (*Id.*) One of the most devastating collateral consequences of this case has been the impact Geovanny's incarceration has had on his 74-year-old mother, who relied on his daily support and assistance until his arrest. Geovanny, who is deeply remorseful for the harm his conviction has caused to his family, was notably "distraught and in tears when discussing his mother" during his PSR interview. (PSR ¶ 95.)

Geovanny overcame the initial challenges of growing up in Honduras and graduated from Dionisio de Herrara High School in San Pedro Sula. (PSR ¶ 114.) After high school, Geovanny worked in the textile industry for about twenty-six years, working for different textile and garment manufacturers. (PSR ¶ 119.) Geovanny enjoyed his work and was well-respected by his employers and others in the industry, but he always dreamed of more.

Geovanny found his true calling when he realized that his home country was blessed with abundant renewable energy in the form of "biomass," much of which was treated as waste product at the time, and began to strategize ways in which he could utilize biomass not only to become wealthy, but also to protect and preserve the environment he loved. According to the U.S. Energy Information Administration, biomass is "renewable organic material that comes from plants and animals." https://www.eia.gov/energyexplained/biomass. Biomass sources for energy include:

- Wood and wood processing wastes—firewood, wood pellets, and wood chips, lumber and furniture mill sawdust and waste, and black liquor from pulp and paper mills
- Agricultural crops and waste materials—corn, soybeans, sugar cane, switchgrass, woody plants, and algae, and crop and food processing residues
- Biogenic materials in municipal solid waste—paper, cotton, and wool products, and food, yard, and wood wastes
- Animal manure and human sewage. *Id.*

 

**Biomass production by Geovanny's company, Agroforestal Fuentes**

With only a high school education, Geovanny realized that he lacked the expertise to pursue his biomass idea without assistance or further education, and that success would require resources that were not available to him in Honduras. Accordingly, he participated in a program at Louisiana State University and developed a method of converting biomass that would otherwise go to waste into a high efficiency biofuel. At first, his production capacity was limited, and he was able to create and sell his fuel only in comparatively small quantities. As the method improved, however, and by reinvesting his modest profits, Geovanny's biomass business began to thrive.[6] In March 2013, Geovanny created a company called Agroforestal Fuentes, which soon landed a contract to become the primary supplier of biomass for Gildan, a Canadian based textile company with an industrial complex in Honduras. (PSR ¶ 117.) A copy of the contract with Gildan is attached hereto as Exhibit K. Agroforestal Fuentes was extraordinarily successful both in making productive use of biomass that would otherwise have gone to waste and in creating jobs for the impoverished people of Honduras. By the time of Geovanny's arrest, his company employed 30 permanent employees and 100 contractors in Choloma and across Honduras. (PSR ¶ 117.)

 

**Agroforestal Fuentes biomass production work-sites**

Besides his passion for bringing renewable energy to his native country, Geovanny is most deeply connected to his family. His long-time business protégé, Alan Almanzar, first knew Geovanny as a visionary businessman but later came to know him as a devoted family man. Alan describes observing Geovanny around his three sons, Cristian, Geovanny, and Jose Simon, ages 29, 26, and 20, respectively, and young daughter P.F., who is just 5 years old. (Ltr. of business protégé Alan Almanzar, annexed as Ex. E.) Contrary to the Government's insinuations at trial, Geovanny's sons have thrived in their personal lives and have themselves matured into successful, legitimate and law-abiding businessmen. His oldest sons, Cristian and Geovanny Jr.,

---

[6] Jose Armando Zelaya Vairo, met Geovanny when they both worked in the textiles industry and describes Geovanny, early in his career, as as "an ambitious, hard pushing type… the go-to guy to get things done," and as a person who "always came through" and could be "trust[ed with] your most critical deadlines in production." Mr. Zelaya Vairo, who himself founded a 2000-employee textile plant, recounts his experience observing Geovanny grow and succeed as an entrepreneur in his letter to the Court, annexed hereto as Ex. D.

work together in a kitchen counter installation company in Florida and reside in the same building in Orlando. (PSR ¶ 103.) Each of them now has two young children, Geovanny's first grandchildren, who range in age from nine months to six-years-old. Geovanny's youngest son, Jose Simon, still lives in Honduras, where his college career was interrupted as a consequence of his father's arrest.

Almanzar frequently stayed with Geovanny and his family when visiting Honduras. During those visits, Almanzar observed Geovanny to be an unusually hard worker, getting up early each morning to go to work at Agroforestal Fuentes. Almanzar comments that Geovanny is a "great man, in my opinion everything I know about him is good in God's eyes. If he's found guilty, please be merciful and just, don't put him away forever, the man has a great family, and no one will be able to fill his spot." (Ex. E.)

Cristian Fuentes, Geovanny's oldest son, hopes the Court knows about the values his father instilled in him; to work hard both in the fields and in business settings. Geovanny taught his son "good principles and manners and how to be a good citizen." (Ltr. of son Cristian Daniel Fuentes Ramirez, annexed as Ex. F.) This case has been devastating because Cristian has always been very close to his father and "it hurts me every time my daughter says she needs to see him and she cannot as, in addition to being an excellent father, he is also an excellent grandfather and friend." *Id.* Cristian is grateful his father "always looked after [him], my siblings and my mother. He has always been a respectful and responsible individual, who always taught us good principles and manners and how to be a good citizen." *Id.*

Middle son Geovanny, Jr. is grateful to his father for putting food on the table, ensuring the family "would never lack for anything. He has always tried, within his means, to provide the best education for us, a roof where to live in and, the most important thing, [he has taught] us how to best behave in society." (Ltr. of son Geovanny Daniel Gutierrez, annexed as Ex. G.) Geovanny taught him that family comes first and how to be an exceptional friend helping "everyone he could." *Id.* Geovanny, Jr. shares that "[t]his is a difficult process, because we have always been very united, and this separation has not been easy on the family." *Id.*



**Geovanny and daughter P.F., now five-years-old**

Geovanny's niece Linda describes Geovanny as an "exemplary human being" and reflects on living with Geovanny, developing a strong friendship, and sharing in her best achievements with her uncle. Linda explains how this case caused the family to be "incomplete," but Linda has faith they can "be a full family again" in the future. (Ltr. of Linda Maria Leiva Fuentes, annexed as Ex. H.)

Those who know Geovanny best describe him as having the fear of God in him, a "heart for people, particularly those in need." (Ltr. of Jose A. Zelaya Vairo, Colleague from Textile Industry, annexed as Ex. D.) In business, Geovanny demonstrates "responsible, civic and honest behavior in his person; in addition to being known in the social field as a hard-working person and without a history of dubious reputation." (Ltr. of Jose L. Jimenez, President/CEO of Optima & Sihon Textiles, annexed as Ex. I.)

Geovanny is respected in his community for providing support to farmers during stressful times such as the "fight against the weevil blight, which caused great damage to our palm crop." That work was carried out through Agroforestal Fuentes, which also stood out for its support in rural areas where reforestation projects were carried out. Throughout this period he proved to be an honest, responsible and hard-working person." (Ltr. of Hector Castro, General at Invercam, annexed as Ex. J.)



**Geovanny, his son and grandchildren**

C. The Court Should Consider Geovanny's Harsh Prison Conditions and Geovanny's Physical Condition in Crafting an Appropriate Sentence.

In crafting an appropriate sentence, the Court should also consider the horrific conditions of confinement Geovanny has experienced while incarcerated at a pretrial facility during the COVID-19 outbreak. "The pandemic ... has made ... incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus, have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." *United States v. Rodriguez*, 2020 U.S. Dist. LEXIS 181004, at *7, 8 (S.D.N.Y. Sep. 30, 2020).

The miserable conditions at the MCC since March 2020 have been well-documented and amply justify downward variances for individuals who have endured them.  The MCC was in crisis before COVID-19 and has been almost entirely locked down for well over a year. Sentencing courts have observed the increased hardships local federal prisoners have had to endure while imprisoned during this crisis.  In May 2020, Judge Oetken, while imposing a time-served sentence in a narcotics case, remarked that conditions in federal prisons are so much more punitive than usual that "it's essentially the equivalent of either time and a half or two times what would ordinarily be served." *See, U.S. v. Daniel Gonzalez*, 18 Cr. 669 (JPO), Sentencing Proceeding (S.D.N.Y. April 2, 2020).  Former Chief Judge Colleen McMahon "firmly" agreed with Judge Oetken "that we should be providing some extra time for anybody who spent time in MCC or MDC during this lockdown."  *U.S. v. Tiffany Days*, 19 Cr. 619 (CM), Sentencing Proceeding at 11 (S.D.N.Y. April 29, 2021).  Judge McMahon noted that conditions at the local federal jails are "inhumane" and "significantly worse than… anyone thought possible in the last 400 years in a federal jail in America."  *Id*.  In imposing the minimum sentence available, Judge McMahon told the defendant that she "shouldn't have to suffer for the incompetence of the United States Department of Justice and its subsidiary agency, the Bureau of Prisons."

More recently, in a gun case in the Eastern District, Judge Eric Komitee imposed a below-Guidelines sentence to account for "harsher than usual" conditions of detention and explained at sentencing that the defendant was held in conditions "tantamount to unearned

disciplinary segregation or worse."  *U.S. v. Garland Battle*, 20-CR-349 (EK), Sentencing Proceeding and Statement of Reasons (E.D.N.Y. April 22, 2021).

We respectfully request that the Court credit Geovanny for the time he has spent in nearly constant lockdown, without access to family and friends or rehabilitative programming, and living in fear for his life when considering the appropriate sentence.

Geovanny's physical health is another basis for leniency in sentencing.  Geovanny suffers from diabetes and high blood pressure, necessitating seven different medications per day.  (PSR ¶ 109.)  Geovanny was also severely injured while in U.S. Marshal custody *en route* from Florida to New York to defend against the instant charges.  On the U.S. Marshal plane flight, Geovanny fell, hitting his head and causing a lumbar spine injury, leading to persistent lower back pain and headaches.  *Id*.  Geovanny also contracted Covid-19 in November 2020 while in the MCC, leading to a long and arduous recovery.  *Id*.

Moreover, Geovanny's medical history of diabetes and high blood pressure put him within the group of people the Centers for Disease Control and Prevention categorizes as most-at-risk from complications from contracting COVID-19.  Pursuant to 18 U.S.C. § 3553(a)'s mandate, sentencing courts should consider the need to provide medical care, or other treatment to offenders.  Even under the Guidelines regime, a defendant's physical condition "may be relevant in determining whether a departure is warranted, if, individually or in combination with other offender characteristics, it is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines."  *See* U.S.S.G. § 5H1.4; *see e.g.*, *United States v. Rioux*, 97 F.3d at 663 (2d Cir. 1996) (upholding district court's conclusion that, in combination,

defendant's medical condition and charitable and civic good deeds warranted downward departure).

Finally, it is respectfully submitted that the Court should also take into consideration that Geovanny will be permanently separated from his wife and children who live in Honduras, who may never be able to visit him or who, at best, will be able to visit him on rare occasions. If Geovanny is sentenced to a mandatory minimum and if he is lucky enough to survive a forty-year prison sentence, his children will be middle-aged upon his release and will barely recognize him, let alone know him. That factor alone makes any sentence imposed on Geovanny much harsher than a similar sentence imposed on a United States citizen, who will have the opportunity to maintain his relationships with his family members while incarcerated.

D. The Mandatory Minimum Sentence of Forty Years Will Achieve the Statutory Purposes of Sentencing

Having considered the history and characteristics of the defendant and the nature and circumstances of his offense, Section 3553(a) directs the Court to impose a sentence no greater than necessary to achieve certain statutory objectives, including the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; the need for general and specific deterrence; the need to provide the defendant with

needed training, medical care, and correctional treatment in the most effective manner; and the need to avoid unwarranted sentence disparities among similarly-situated defendants. It is respectfully submitted that the statutory mandatory minimum sentence of forty years is no greater than necessary to achieve these objectives.

As the first statutory objective, there is no dispute that Geovanny was convicted of serious crimes which require punishment. However, it is respectfully submitted that the mandatory minimum of forty years of incarceration is more than sufficient to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. In imposing a just punishment, it is significant that Geovanny has never previously been convicted of a crime or adjudicated a juvenile offender. A sentence of the mandatory minimum will punish Geovanny sufficiently while recognizing the value in Geovanny being able to work towards a release sometime in his mid-eighties.

The minimum mandatory sentence would also be sufficient but not greater than necessary to provide for general and specific deterrence. As to general deterrence, there can be no doubt that any term of years of incarceration in the federal system is a very substantial penalty. It is highly unlikely that imposing the maximum available sentence would have any additional deterrent effect over and beyond the deterrence to be achieved through imposition of a still draconian sentence of forty years, especially in light of social science research suggesting that the prospect of a long term of imprisonment does not generally provide a substantially greater

deterrent effect than does the prospect of imprisonment in general.[7]  No person capable of rational decision-making (and thus capable of being deterred), would consider the potential outcomes and decide that the possible rewards to be obtained by engaging in narcotics and weapons conspiracies would be worth forty years in prison, but that forty-five or fifty years (or life for that matter) would be a price too steep to pay.  Accordingly, nothing more than the minimum permissible sentence is necessary to serve the goal of general deterrence.

The minimum mandatory sentence would also be adequate to protect the public from further crimes by Geovanny.  Assuming the minimum forty-year sentence and the application of good time credit, Geovanny stands to be released when he is in his eighties.  Geovanny has adjusted well to incarceration and not been involved in any disciplinary matters, and there is every reason to believe he will continue to make personal progress in the remainder of his term.

Having considered the history and characteristics of the defendant and the nature and circumstances of his offense, Section 3553(a) directs the Court to impose a sentence no greater than necessary to achieve certain statutory objectives, including the need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; the need for general and specific deterrence; the need to provide the defendant with needed training, medical care, and correctional treatment in the most effective manner; and the need to avoid unwarranted sentence disparities among similarly-situated defendants.  It is respectfully submitted that the mandatory minimum sentence of forty years imprisonment will be sufficient, but not greater than necessary, to serve the statutory goals of sentencing and is therefore warranted in this case.

Respectfully submitted,

Avraham C. Moskowitz

Christopher R. Neff

Eylan Schulman

---

[7] *See, e.g.*, Steven F. Durflauf and Daniel S. Nagin, *Imprisonment and Crime: Can Both Be Reduced?,* 10 CRIMINOLOGY & PUBLIC POLICY 13 (Feb. 2011).

EXHIBIT A

**TRANSLATION**

Dear Sirs,

I extend cordial greetings to you, wishing you success in your work.

I hereby state for the record that I am Geovanny Daniel Fuentes Ramírez's sister. As the eldest brother, he has always displayed a sense of responsibility and honor towards our family. When our father passed away, he took over the role of family leader.

We are a family consisting of five, very united siblings. We have shared many moments of happiness, love and difficulties.

I attest that my brother is a believer, an honest person, an excellent son, father and uncle.

Yours faithfully,
Zenia Patricia Fuentes Ramirez
      -1974

# EXHIBIT B

**TRANSLATION**

June 13, 2021

Dear Sirs:

I extend cordial and respectful greetings to you.

I hereby state for the record that I am Geovanny Daniel Fuentes Ramírez's sister; we were very united as siblings, we lived together for a long time until the time I got married and parted from my family.

Throughout this time, my brother has been an upright, totally responsible, honest, supportive and trustworthy person. His relationship with my parents was and has always been respectful and responsible. He has always kept close and has put into practice the values instilled in us by the family. He has always been very attentive, providing help and support at any time.

There is no question in my mind, with what I have just said, that my brother has been a very exemplary individual to my family.

Very truly yours,

Linda Ivette Fuentes Ramírez
    -1970-

_____

EXHIBIT C

# TRANSLATION

June 10, 2021

Dear Sirs:

I extend cordial and respectful greetings to you.

I hereby state for the record that I am Geovanny Daniel Fuentes Ramírez's youngest sister; we were very united as siblings, we lived together for a long time, we had a great time until the time each of us decided to get married and start a family.

Throughout this time, my brother has been an upright, totally responsible, honest, supportive and trustworthy person. His relationship with my parents was and has always been respectful and responsible. He has always kept close and has put into practice the values instilled in us by the family. He has always been very attentive, providing help and support at any time.

There is no question in my mind, with what I have just said, that my brother has been a very exemplary individual to my family.

Very truly yours,

Jenny Juliana Fuentes Ramírez
        - 1983 –
Cel.

Jenny Fuentes.

EXHIBIT D

San Pedro Sula, Honduras
October 25, 2020


Re. Geovanny Daniel Fuentes Ramirez


To whom it may concern


Dear Sir:


My name is Jose Armando Zelaya Vairo national from Honduras, for the last 25 years I have worked in the apparel/textile industry in Honduras and off shore for several US based companies, serving in the capacity of General Manager, Plant Operations Director for over 5000 people operations and recently I was and are still named Director of Quality with responsibility over Honduras, El Salvador, Mexico and The United States operation for my current employer Delta Apparel who sells to the US Market and private brands some USD$400 MM per year, some of my former employers are Hanes, Fruit and Gildan all of whom directly or through their local subsidiaries have employed my services along in my career, I have a Master in Theology post graduate studies from the SETECA Theology institute in Guatemala, I am active fellow Christian, serving God on the same Church for 40 years, half of them as a Sunday School teacher, I am the proud father of 3 and have been married to the same woman for over 30 years and counting, God bless her heart.

I met Mr. Fuentes early on in my career, as a Junior Engineer in a plant manufacturing woven bottoms we both worked for, based out of South Carolina, that had just moved part of their manufacturing South, I was hired in the capacity of Contractor Manager, back then Geovanny was nothing but an ambitious hard pushing type finishing production manager, the go to guy to get things done, you certainly would trust your most critical deadlines in production to him, as he always came though, no matter the sacrifice, no matter how rough were the challenges, back then he saw opportunities where others saw obstacles, we were both in our mid to late 20's.

After a few years and several different jobs each on the apparel ladder separately, we joined forces in an operation that was mismanaged by a Korean group, Geovanny, myself and three others took upon ourselves the debt of that company, and saved 500 jobs of a Levi's Strauss pant manufacturing plant, without a nickel in our pockets we went in, convinced the brand to give us a chance and produced for them for nearly a year, managed to pay the five hundred workers sacrificing ourselves and our families along the way many times, but it was late 90's and we were one of hundreds of companies that went out of business of one of the major recessions of the industry has seen in the last 30 years. Both of us were in the street no money again, heartbroken but alive.

Confidential

The next five years Geovanny managed to position himself as trusted men for a Denim jeans company of a well know family in the apparel business in Honduras, with the Kattan Group, he started there as a plant engineer and soon became the right hand man for the Kattan's deciding brother in charge of several operations. I lost track of him shortly after that to go to my first tour outside Honduras in the Dominican Republic, I moved and lived there with my family to start a 2000 employee large scale Textile Plant for Hanes, still in operation today at Hanes brands Dos Rios in Bonao, Dominican Republic.

When I got back, Geovanny was just starting a 3 year investigation with the University of Louisiana on the development o a recipe for high efficiency biofuel, time after which he sold with great success in small quantities to several small to medium scale biomass burners in town, which granted him after a 6-month negotiation a contract with Gildan for supply of the Biomass recipe in a large scale, he did service that account successfully for few years, until the contract service was removed and then he had to continue selling his biomass with well known and reputable companies in the country, some of which he or I had work for before. The playground got tougher and competitors were everywhere from what once was a flourishing new business to a cumbersome market for biomass suppliers here, so last two to three years I personally had to hand Geovanny a parachute or two to make a school kid payment or groceries on a deadline, not easy.

I was in the United States during a company trip visiting a customer in Tampa, FL at the beginning of the Pandemic when Geovanny was brought to the US authorities and detained for charges I cannot bring myself to believe until the moment I am writing this letter, we had spoken a few days prior his trip and he was in the US looking at some investor, someone who would help him with a few projects he was looking at starting or revamping quite honestly still having it rough.

Geovanny is hardheaded sometimes, has a bad reputation for being though on others by product of his relentless pursuit for excellence, he is illiterate in both speaking and writing, but he'd always stroke me a man of vision, and I believe there is fear of God in him, he has a heart for people, particularly those in need, his goals and motivations are not bigger than that to making him break any of the old laws, or leave children or family with a mark on their backs, he is not a criminal, he has faults, especially in his personal family life but he is not guilty of the charges brought against him.

JOSE ARMANDO ZELAYA VAIRO
-1968-

# EXHIBIT E

*Honorable P. Kevin Castel*
*Senior United States District Judge*
*United States Courthouse*
*500 Pearl St.*
*New York, NY 10007*

Dear Judge Castel,

My name is Alan, I am a friend of Geovanny Fuentes from Dominican Republic and currently living in the United States. I met Geovanny in a mobile phone game named "Boom Beach". Since the day we met, we became really good friends via that game, so he invited me to come visit him and his family. When I came to Honduras, around 2015, I learned nothing but good from him and his family, his kids are great and were raised well by him. In my stay I never saw or heard anything suspicious from Geovanny, it's very hard for me to believe everything that is going on in his life because he, in my eyes, was just a great man loved by everybody around him. Every day while I was there, Geovanny woke up early in the morning like a normal hard-working man to go to work at his company "Agroforestal" and I know this because he always asked me to come with him, he didn't want me to have to stay in the house bored and alone all day. During his free time, which was mostly Sundays we would always go fishing, that was his favorite thing to do.

I learned about his situation in the news and it's sad to read all that knowing that Geovanny was always a kind, good hearted gentleman. I never saw him arguing with his kids nor wife, the man was always hard working, smiling, grilling, doing karaokes and drinking beers near the pool in the backyard. The closest thing to a problem I heard from him was a conversation with the bank, I believe he was past due his bills.

I remember him being pulled over one time, I was there and also his wife, his mother, and his son Simon. The pull over was a normal pull over like any other: license and registration, policeman went back to his car, came back 5 minutes later, everything OK and we were back on our way. So, if he had all those military connections or whatever, why he just didn't say something like "Call this person", or how this policeman didn't recognize him if he was so notorious? Those are little details that make me wonder.

I am not saying that the man is a saint, and he didn't do all this. All I'm saying is that he's a great man, in my opinion everything I know about him is good in God's eyes. If he's found guilty, please be merciful and just, don't put him away forever, the man has a great family, and no one will be able to fill his spot.

ALAN ALMANZAR

# EXHIBIT F

**TRANSLATION**[1]

August 13, 2021

Dear Honorable Judge Kevin Castel,

I extend cordial greetings to you.

I hereby note for the record that I am Mr. Geovanny Fuentes Ramirez's son. I wish you to know that he is a person who has always looked after myself, my siblings and my mother. He has always been a respectful and responsible individual, who always taught us good principles and manners and how to be a good citizen. I do not remember him ever bringing us up by telling us to take the easy way in life; on the contrary, he taught us how to work in the countryside (farming), and then in the company owned by him to generate biomass, all of which [he achieved] through loans from banking institutions. For this reason, it hurts me to see my father in jail, as he is my father and I have always been very close to him. It hurts me every time my daughter says she needs to see him and she cannot as, in addition to being an excellent father, he is also an excellent grandfather and friend.

I respectfully ask you, Hon. Judge Kevin Castel, to greatly take my father's case into consideration.

May God bless your life and may you have continued success in your daily activities.

Very truly yours,

Cristhian Daniel Fuentes Ramirez
     -1992-

---

[1] Translator's Note: Letter sent via email on Aug. 15, 2021, at 9:51 a.m.

EXHIBIT G

**TRANSLATION**[1]

August 13, 2021

Honorable Judge Kevin Castel,

I extend cordial greetings to you.

I hereby note for the record that I am Mr. Geovanny Daniel Fuentes Ramirez's second son and wish you to know, at the same time, that he is a responsible individual, who has always looked after our family so it would never lack for anything. He has always tried, within his means, to provide the best education for us, a roof where to live in and, the most important thing, [he has taught] us how to best behave in society. He has always been a loving father; we have always shared good moments within the family, as that has always been his priority; he is an exceptional friend and husband who has always helped everyone he could. This is a difficult process, because we have always been very united, and this separation has not been easy on the family.

I respectfully write you, Hon. Judge Kevin Castel, to let you know that I have a great human being as a father and for you to be able to take his case into consideration.

May you have continued success in your daily activities.

Very truly yours,

Geovanny Daniel Gutierrez

[1] Translator's Note: Letter sent via email on Aug. 15, 2021, at 9:50 a.m.

EXHIBIT H

**TRANSLATION**

June 13, 2021

To whom it may concern:

I am pleased to write you to hereby state my best memories in favor of my uncle, Geovanny Daniel Fuentes Ramírez.

Throughout my short life, I have lived together with my uncle, and we have developed a strong friendship, sharing in my best achievements, as well as my teenager's insanity. On his part, he has always stressed family values, by teaching true love towards the family. I know my uncle is not a perfect individual, as no one else is, but he has tried hard to have a perfect family, with the thousands imperfections surrounding us.

But what happened came to pass, and we are incomplete as a family. But despite this, I remember the smile on his face and how he adored to share in any type of games with us, as long as we had a good time. The most important thing was that we were healthy and united. I know we will be a full family again in future.

By stating the above, I, Geovanny Daniel Fuentes Ramírez's niece, have no objection at all to say that he has been an exemplary human being in this world.

Kind regards.

Very truly yours,

Linda María Leiva Fuentes
    -2000-

EXHIBIT I





ZONA LIBRE LA LIMA, CA-13, Autopista Aeropuerto, LA LIMA, CORTES, HONDURAS.   MOBILE: +(504)8752-2944
email: optima.ceo@optimatex.com

OCTOBER 29, 2020
**TO WHOM IT MAY CONCERN/**

**YOUR HONOR:**

### Personal Reference Letter

I respectfully present myself to you, my name is Jose L. Jimenez, president of a textile company in Honduras under the name of Optima & Sihon Textiles.

Through this letter and very respectfully, I declare that I have knowledge of the person named Geovanny Daniel Fuentes Ramirez, whom I know personally and whose relationship is merely due to businesses of a legal nature in the jurisdiction of Honduras, Central America. Our company hereinafter dedicated to textile operations, states in the same way having hired Mr. Fuentes Ramirez at the time for professional consulting purposes in the field of energy, transport, steel rod and automotive vehicles, being that he has knowledge in the commercial area of these items. Personally, I have known Mr. Fuentes Ramirez for the past 2 years, and I have been able to perceive a responsible, civic and honest behavior in his person; In addition to being known in the social field as a hard-working person and without a history of dubious reputation. I say this with great responsibility and under my full mental and conscience skills in this regard. In appreciation of the time spent reading this manifesto, I am very grateful to you.

Cordially...

**JOSE L. JIMENEZ**
**PRESIDENT / CEO**
**OPTIMA & SIHON TEXTILES S. DE R.L. DE C.V.**

EXHIBIT J

**Inversiones de Campana S. de R.L. de C.V.** | **INVERCAM**

San Pedro Sula, Cortés
November 06, 2020

**Honorable Juez Kevin Castel**

We hereby note for the record that Mr. Geovanny Daniel Fuentes Ramírez, domiciled in the city of San Pedro Sula, Honduras, holder of I.D. ███-1969-███, provided support to us in the fight against the weevil (*picudo*) blight, which caused great damage to our palm crop. That work was carried out through his company, Agroforestal Fuentes, which also stood out by its support in rural areas where reforestation projects were carried out.

Throughout this period he proved to be an honest, responsible and hard-working person.

Because of the foregoing, we are giving the best recommendations and pray you will extend the utmost consideration at his trial.

There being nothing further we remain,

Cordially yours,

HÉCTOR CASTRO
GERENTE GENERAL

# EXHIBIT K

**CONTRATO DE SUMINISTRO DE BIOMASA**

**Entre:**

**GILDAN HONDURAS PROPERTIES, S. DE R.L.**
**("Gildan")**

**Y**

**AGROFORESTAL FUENTES, S. DE R.L.**
**("El Proveedor")**

**14 de Marzo del 2013**

Código de Conducta



## GILDAN CÓDIGO DE CONDUCTA

Siempre que sea GILDAN funciona, nos guiamos por el presente CÓDIGO DE CONDUCTA. Todos los empleados de Gildan y socios de negocios deben adherirse a estos principios. Estos se exponen a continuación:

1. *Trabajo Infantil*: No emplear a una persona bajo la edad de 18 años.

2. *El trabajo forzoso*: No hacer uso del trabajo forzoso, ya sea en la forma de trabajo penitenciario, mano de obra contratada, la servidumbre por deudas o de otra manera.

3. *Compensación*: Nosotros pagamos el salario mínimo legal o el salario prevaleciente en la industria, que sea mayor. Nos compensar todas las horas extraordinarias realizadas con las primas por mandato legal las horas extraordinarias hora.

4. *Beneficios*: Cumplimos con todas las disposiciones relativas a las prestaciones por mandato legal.

5. *Las horas de trabajo / horas extras*: Cumplimos con el mandato legal y regular de las horas extraordinarias limitaciones hora. Las horas de trabajo no exceda de 60 horas semanales, incluidas las horas regulares y horas extras, o el cumplimiento de los límites legales si son menores. Ofrecemos todos los empleados con un día fuera de cada siete. Informamos a los empleados por escrito en el momento de la contratación sí las horas extraordinarias obligatorias es una condición de empleo.

6. *Salud y Seguridad*: Tomamos todas las medidas necesarias a fin de proporcionar un ambiente seguro y saludable para todos los empleados y para evitar accidentes o lesiones que surjan de o que ocurre en el curso del trabajo. Asimismo, tomamos todas las medidas necesarias para garantizar condiciones saludables y seguras en los centros residenciales de los empleados, en su caso.

7. *Medio Ambiente*: Cumplimos con las normas vigentes del país y leyes ambientales.

8. *La libertad de asociación y negociación colectiva*: Reconocemos y respetamos el derecho de los trabajadores a la libertad sindical y negociación colectiva.

9. *El acoso o abuso*: Cada empleado debe ser tratado con respeto y dignidad. el acoso físico, sexual, psicológico o verbal o abuso de cualquier tipo no serán tolerados.

10. **La disciplina y la terminación**: La disciplina y los procedimientos de terminación son estandarizados e incluyen una serie de advertencias antes de la suspensión o el despido. Los procedimientos disciplinarios no incluyen el uso de las deducciones punitivos o renuncias forzadas.

11. **Libertad de Movimiento**: Una vez autorizado, y en circunstancias especiales (en caso de emergencia o en una cuestión de urgencia personales, muerte o enfermedad de un miembro de la familia), los empleados pueden salir de la instalación y no son penalizados. Los empleados tienen acceso libre y razonable a los servicios de agua potable y aseo.

12. **Procedimiento de Quejas**: Los empleados están autorizados para presentar quejas que se aborden de anera sistemática con el fin de proteger la privacidad de los empleados y protegerlos de represalias.

13. **Embarazo**: Las trabajadoras no se les preguntó sobre su estado de embarazo ni se les requiere para ser una prueba de embarazo. Cumpli os con todas las leyes locales e internacionales sobre las condiciones laborales de las trabajadoras embarazadas, incluyendo pero no limitado a periodos de descanso y asientos adecuados.

14. **Discriminación**: No discriminación en la contratación, salarios, beneficios, promociones, disciplina o la terminación sobre la base de sexo, raza, religión, edad, discapacidad, aspecto físico, el embarazo, orientación sexual, nacionalidad, afiliación sindical, opinión política o social o étnico origen.

15. **Documentación e Inspección**: Nosotros mantenemos un archivo con documentación que sean necesarios para demostrar el cumplimiento con este Código de Conducta, y pondrá estos docu entos disponibles para GILDAN o sus auditores designados para la inspección.

2

**"Combustible de Terceros"** se refiere a Biomasa o Biomasa Sustituta comprada por Gildan de una tercera parte que no sea el Proveedor.

**"Buenas Prácticas de la Industria Energética"** se refiere a las prácticas, métodos, y actos empleados o aprobados por una porción significativa de la industria de conversión de Biomasa en energía durante el correspondiente período de tiempo, o las prácticas, métodos y actos que, en el ejercicio de un juicio razonable a la luz de los hechos conocidos al momento de tomar una decisión, hubieran podido esperarse para lograr el resultado deseado a un costo razonable consistente con las buenas prácticas comerciales, la confiabilidad, seguridad, y celeridad. No se pretende que la Buena Práctica de la Industria Energética se limite a la práctica, método o acto óptimo, con exclusión de todos los demás, sino que se pretende que incluya prácticas, métodos y actos aceptables generalmente aceptados en la industria.

**"Caso de Incumplimiento"** tendrá el significado establecido en las Secciones 10.1 y 10.2.

**"Calderas"** se refiere a las calderas generadoras de vapor que queman Biomasa y que se encuentran en la Planta.

**"Código de Conducta de la FLA"** se refiere al conjunto de normas establecidas de tiempo en tiempo por la Fair Labor Association (o *Asociación para el Trabajo Justo* - FLA por sus siglas en inglés), entidad de la cual Gildan es miembro, y cuyas normas sirven de complemento a las contenidas o establecidas en el Código de Conducta.

**"Código de Conducta"** se refiere al conjunto de normas establecidas de tiempo en tiempo por Gildan Activewear Inc. sobre la cual se basan sus relaciones comerciales con sus proveedores y contratistas. Un ejemplar de este Código de Conducta formar parte de este Acuerdo y constituye su Anexo A.

**"Efecto Materialmente Adverso"** Significa con respecto a cualquiera de las Partes, (a) un cambio materialmente adverso en, o un efecto materialmente adverso en, las operaciones, negocios, activos, propiedades, obligaciones (actuales o contingentes), condición (financiera u otra) o prospectos durante la vigencia de este Acuerdo. de dicha Parte; (b) un detrimento en los derechos de dicha Parte, o en la habilidad de dicha parte de ejecutar sus obligaciones o (c) un efecto materialmente adverso en la legalidad, validez, efecto vinculante o capacidad de ejecutar contra dicha Parte.

**"Emergencia o Situación de Inseguridad"** significa una condición o situación que crea un riesgo de pérdida de vidas, lesiones o daños a la propiedad u otra condición insegura.

**"Especificaciones"** significa las especificaciones enumeradas en Anexo D.

**"Factura"** tiene el significado establecido en la Sección 6.2.

"**Fecha de Entrada en Vigencia**" se refiere a la fecha de firma del presente Acuerdo.

"**Fecha de Terminación Anticipada**" tendrá el significado establecido en la Sección 10.3.

"**Fuerza Mayor**" significa actos de Dios, incendios, tormentas, rayos, inundaciones, huracanes, marejadas, terremotos, deslizamientos de tierra, explosiones, bloqueos, conmoción civil, actos de un enemigo público, insurrecciones, motines, epidemias, accidentes, conflictos laborales, detenciones y restricciones gubernamentales y de personas, y cualesquier otro evento de carácter similar, siempre que tal evento no hubiera sido razonablemente previsible y bajo el control de la Parte afectada, y el cual, por el ejercicio de diligencia razonable, la Parte afectada no pueda prevenir o superar. Un Evento de Fuerza Mayor no incluirá la falta de disponibilidad o retrasos en la entrega de la Biomasa, mano de obra, servicio o materiales, a menos que fuesen causados por un evento que de otro modo sería aquí definido como un Evento de Fuerza Mayor, y tal evento no incluirá sequías o enfermedades que afectan la producción de madera que impactan los niveles de suministro.

"**Gildan**" tendrá el significado establecido en el Preámbulo.

"**Gravamen(es)**" se refiere a cualquier garantía prendaria o hipotecaria, embargo (ejecutivo o preventivo), pignoración, carga, interés de garantía real, oposición, cesión, defecto de título, usupación u otras cargas, convención restrictiva, condición o restricción o servidumbre o gravamen de cualquier tipo, bien sea en material de contratos o en virtud de alguna acción gubernamental y que haya sido o no registrado, inscrito o de otro modo legalmente validado o perfeccionado en virtud de acción gubernamental aplicable, o cualquier preferencia, prioridad o arreglo preferencial de cualquier tipo o naturaleza, incluyendo los derechos de un vendedor o arrendador en virtud de un contrato de venta condicional, arrendamiento de capital u otro acuerdo de retención de título.

"**Impuestos**" significa todos los impuestos, tasas u otras contribuciones, incluyendo, ingresos, consumo, bienes, ventas, franquicias, intangibles, retención, y de seguridad social impuestas por la Autoridad Gubernamental, y cualquier interés o penalidad correspondientes.

"**Información Confidencial**" tendrá el significado establecido en la Sección 13.1

"**Inventario de Reserva**" tendrá el significado establecido en la Sección 4.3.

"**Leyes Aplicables**" significan las leyes, estatutos, códigos, actos, tratados, ordenanzas, órdenes, juicios, mandatos, decretos, requerimientos, reglas, regulaciones, aprobaciones gubernamentales, licencias, permisos, directivas, y requisitos de todas autoridades reguladoras y gubernamentales aplicables, ya sean nacionales, estatales, provinciales, locales o municipales.

"**Normas de Gildan**" se refiere a las reglas y los reglamentos ocasionalmente adoptados por Gildan Activewear Inc. y sus Afiliadas con relación a la ética comercial y las normas de medio ambiente, los cuales fueren comunicados al Proveedor, incluyendo, sin limitación, el Código de Conducta y la Política Ambiental, las normas de reducción presupuestaria y el Código de Conducta de la FLA y las normas del Programa Mundial de Producción Responsable de Prendas de Vestir (*Worldwide Responsible Apparel Production*).

"**Obligación de Entrega**" tendrá el significado establecido en la Sección 4.1 (a)

"**Pago por Terminación**" tendrá el significado establecido en la Sección 10.4.

"**Parte Indemnizada**" tendrá el significado establecido en la Sección 11(a).

"**Parte Indemnizante**" tendrá el significado establecido en la Sección 11(a).

"**Partes Indemnizadas de Gildan**" se refiere a las Afiliadas, los directores, ejecutivos, empleados y agentes de Gildan.

"**Partes**" se refiere, en su conjunto, a Gildan y al Proveedor (incluyendo sus respectivos causahabientes y cesionarios autorizados), y "**Parte**" se refiere a uno cualquiera de ellos.

"**Pérdida**" o "**Pérdidas**" tendrá el significado establecido en la Sección 11(a).

"**Periodo de Facturación**" tendrá el significado establecido en la Sección 6.2.

"**Período de Vigencia**" tendrá el significado establecido en la Sección 3.

"**Persona**" se refiere a una persona física, sociedad, sociedad limitada, empresa conjunta, agente fiduciario, fideicomiso, corporación, compañía, compañía de responsabilidad limitada, organización sin constituir u otra entidad, o un gobierno, estado o agencia o subdivisión política del mismo, teniendo los pronombres un significado similarmente amplio.

"**Planta**" se refiere a Río Nance I, Río Nance II, Río Nance III, Río Nance IV y Río Nance V.

"**Río Nance I**" significa la fábrica textil operada por Gildan Activewear Honduras Textile Company, S. de R.L.

"**Río Nance II**" significa la fábrica textil operada por Gildan Choloma Textiles, S. de R.L.

"**Río Nance III**" significa la fábrica calcetinera operada por Gildan Honduras Hosiery Factory, S. de R.L.

**"Rio Nance IV"** significa la fábrica calcetinera operada por Gildan Hosiery Río Nance, S. de R.L.

**"Rio Nance V"** significa la fábrica textil operada por Gildan Mayan Textiles. S. de R.L.

**"Plazo de Renovación"** tendrá el significado establecido en la Sección 3.

**"Plazo Inicial"** tendrá el significado establecido en la Sección 3.

**"Política Ambiental"** se refiere al Código de Práctica Ambiental y al Política A biental de Gildan Activewear Inc., que se adjuntan como **Anexo C**, que pueden ser enmendados o actualizados de vez en cuando por Gildan Activewear Inc. a su sola discreción.

**"Proveedor"** tendrá el significado establecido en el Preámbulo.

**"Punto de Entrega"** se refiere al (los) punto(s) en el (los) cual(es) se entrega la Biomasa en la Planta, como se establece en el **Anexo B**.

**"Tasa de Interés"** Significa una tasa anual de interés igual al menor de (a) la tasa promedio publicada por la autoridad gubernamental bancaria correspondiente para operaciones pasivas en dólares o (b) la tasa de interés máxima autorizada por las leyes aplicables,

### 2.3 Anexos

El presente Acuerdo está complementado por los Anexos que se listan a continuación, los cuales deberán ser considerados como parte integral de este Acuerdo, a saber:

> Anexo A – Código de Conducta
>
> Anexo B – Punto de Entrega
>
> Anexo C – Política Ambiental
>
> Anexo D – Especificaciones
>
> Anexo E – Biomasa Sustituta

### 3. VIGENCIA DEL ACUERDO

Este Acuerdo entrará en vigor a partir de la Fecha de Entrada en Vigencia y continuará por un periodo de diez (10) años (el **"Plazo Inicial"**). Posteriormente, el Plazo Inicial se renovará automáticamente por períodos sucesivos y consecutivos de un (01) año (cada uno **"Plazo de Renovación"**), a menos que una de las Partes le notifique por escrito a la otra su intención de no renovarlo, con por lo menos treinta (30) días de anticipación. El Plazo Inicial y cualquier Plazo de Renovación se denominarán colectivamente el **"Período de Vigencia"**. No obstante lo

anterior o cualquier otra disposición en contrario, Gildan podrá dar término de manera anticipada al presente Acuerdo, en cualquier momento, sin alegar causa y sin con ello comprometer su responsabilidad civil o penal frente al Proveedor (incluyendo a sus causahabientes y cesionarios autorizados), mediante notificación por escrito al Proveedor con treinta (30) días de anticipación.

## 4. COMPRA DE LOS SUMINISTROS DE BIOMASA

### 4.1 Obligación de Entrega

(a)     Sujeto a los términos y condiciones del presente Acuerdo, cada día durante el Periodo de Vigencia, el Proveedor deberá poner a la disposición, entregar y vender en el Punto de Entrega, y Gildan aceptará y comprará en el Punto de Entrega, Biomasa (i) en una cantidad mínima de Cuatrocientas Toneladas Métricas por día (400 TM/día) (equivalentes a un total anual de Ciento Cuarenta Mil Toneladas Métricas al día (140,000 TM/año) de Biomasa, (ii) con un contenido meta de humedad de Cuarenta por ciento (40%), y (iii) que cumple con las otras Especificaciones (la "Obligación de Entrega"). El Suplidor acuerda y entiende que la cantidad actual de toneladas métricas entregadas a Gildan dependerá del contenido de humedad y del valor calorífico de la Biomasa entregada.

(b)     Durante la vigencia del presente contrato , el proveedor deberá (i) suplir exclusivamente a Gildan con toda su producción presente y/o futura de Biomasa, (ii) Otorgar el primer derecho de opción de compra de toda su producción presente y/o futura a Gildan, y (iii) Informar a Gildan de todo incremento en su capacidad de producción a efecto de que este último ejercite sus correspondientes derechos.

(c)     En cualquier momento durante el Período de Vigencia, Gildan podrá modificar la Obligación de Entrega en más o menos un diez por ciento (10%) mediante notificación por escrito al Proveedor con treinta (30) días de anticipación. En caso de que Gildan aumente la Obligación de Entrega por más de un diez por ciento (10%) pero no más de un veinte por ciento (20%), Gildan avisará el Proveedor con noventa (90) días de anticipación. Si Gildan quiere aumentar la Obligación de Entrega por un veintiún por ciento (21%) o más, y siempre que el Proveedor acepte dicha aumento, Gildan notificará el Proveedor con ciento ochenta (180) días de anticipación. Gildan podrá también revisar la Obligación de Entrega al final de cada Año Contractual, con el fin de redefinir la Obligación de Entrega para el siguiente Año Contractual. Dicha reevaluación se basará en el cumplimiento del Proveedor y la calidad de la Biomasa suministrada.

(d)     El Proveedor entregará la Biomasa en cualquier tiempo, veinticuatro (24) horas del día, cada día (incluso feriados) del Año Contractual; siempre que el Proveedor respete cualquier suspensión de Obligación de Entrega previsto en el presente Acuerdo, incluyendo, sin limitación, cualquiera suspensión que figura en la Sección 4.8.

(e)     El Proveedor notificará de inmediato Gildan de cualquier posible escasez, incluso por razones de Fuerza Mayor, en el suministro de la Biomasa que pueda resultar en demora o falta de entrega de Biomasa.

(f)     En cualquier tiempo, si el Proveedor desea o debe sustituir la Biomasa con un tipo alternativo de biomasa, el Proveedor solo estará autorizado a hacerlo con previo permiso por escrito de Gildan, y estará autorizado a usar exclusivamente la Biomasa Sustituta que figura en el Anexo E.

### 4.2     Falta de Entrega

En caso de que el Proveedor no pueda entregar o no entregue la Biomasa de acuerdo con el Artículo 4.1 por razones que no sean de Fuerza Mayor, el Proveedor debe notificar Gildan inmediatamente y Gildan podrá adquirir Biomasa de Terceros para compensar por la entrega fallida.

### 4.3     Mantenimiento de Inventario de Reserva

El Proveedor deberá mantener en sus instalaciones de almacenamiento, una cantidad de Biomasa por lo menos igual a la Obligación de Entrega correspondiente a [catorce (14)] días en total (el "Inventario de Reserva"). El Proveedor garantiza que la Biomasa podrá ser almacenada por un período de [un (1)] año calendario sin que se afecten las Especificaciones de esa Biomasa.

### 4.4     Falta en Mantener el Suministro de Reserva

(a)     En caso de que el Proveedor no logre mantener el Inventario de Reserva de acuerdo con el Artículo 4.3 por razones que no sean de Fuerza Mayor, deberá dar aviso inmediato de ello a Gildan.

(b)     Si después de catorce (14) días del día del aviso de falta de mantener el Inventario de Reserva, el Proveedor no está en cumplimiento de su obligación de mantener la cantidad requerida para el Inventario de Reserva, Gildan tendrá el derecho de adquirir una cantidad de Biomasa de Terceros acordado por escrito con el Proveedor para permitir el Proveedor de restablecer su Inventario de Reserva, y al mismo tiempo permitiendo Gildan satisfacer su demanda de combustible.

### 4.5     Daños y Perjuicios por Incumplimiento en la Entrega y en el Mantenimiento del Inventario de Reserva

Si Gildan adquiere Biomasa de Terceros de acuerdo con la Sección 4.2 o 4.4(b), el Proveedor deberá reembolsar a Gildan, o deducir de los montos que Gildan deba pagar, un monto igual a la diferencia positiva entre (i) el costo real de Gildan por la adquisición de Biomasa de Terceros adquirido de acuerdo con la Sección 4.2 o 4.4(b), incluso el precio de tal Biomasa de Terceros y costos asociados de transporte y otros costos operativos relacionados al suministro de tal Biomasa de Terceros, y (ii) el monto igual al Precio del Contrato (el cual para este fin será el promedio del Precio del Contrato pagado durante el período de cuatro (4) meses anteriores o, en el caso de que menos de cuatro (4) meses hayan transcurrido desde la Fecha de

Entrada en Vigencia, el promedio del Precio del Contrato pagado desde la Fecha de Entrada en Vigencia), multiplicado por la cantidad que el Proveedor ha fallado en mantener el Inventario de Reserva. La renuncia de daños indirectos o derivados que se establece en la Sección 14.19(e) no se aplicará respecto a los daños establecidos en esta Sección.

### 4.6 Resolución por Falta de Mantener Inventario de Reserva y por Falta de Entrega

(a)    En caso de que el Proveedor no logre restablecer su Inventario de Reserva dentro de [veintiocho (28)] días desde la fecha de notificación de la falta de Mantener Inventario de Reserva, este constituirá un Caso de Incumplimiento del Proveedor según lo dispuesto en la Sección 10.2 (a) y Gildan podrá dar terminado este Acuerdo de conformidad con la Sección 10.3.

(b)    Si el Proveedor no logra suministrar la Biomasa, por razones que no sean de Fuerza Mayor, por un período total de [treinta (30)] días o más, durante cualquier Año Contractual (quedando entendido que dichos [treinta (30)] días no necesitan ser consecutivos) o por un período de [quince (15)] días consecutivos, este constituirá un Caso de Incumplimiento del Proveedor según lo dispuesto en la Sección 10.2 (b) y Gildan podrá dar termino a este Acuerdo de conformidad con la Sección 10.3.

### 4.7 Interrupción en la Entrega

Si, en cualquier momento durante el Período de Vigencia, Gildan determina, a su sola discreción, que la calidad de la Biomasa que le ha entregado el Proveedor en el Punto de Entrega u otros eventos crean una Emergencia u otra Situación de Inseguridad en la Planta o con respecto las Calderas, Gildan podrá tomar medidas para corregir dicha Emergencia o Situación de Inseguridad, incluyendo interrumpir o bloquear el flujo y entrega de la Biomasa a la Planta o las Calderas.

### 4.8 Suspensión de Obligación de Aceptar el Suministro de Biomasa

No obstante estipulación en contrario en el presente Acuerdo, Gildan no tendrá obligación alguna de aceptar ni pagar por la Biomasa durante un período (i) en el cual el Proveedor no pusiese la Biomasa a disposición de Gildan, (b) durante interrupciones temporales, programadas o no programadas, en la operación de la Planta, (c) en el cual las obligaciones de cualquiera de las Partes fuesen suspendidas debido a un Evento de Fuerza Mayor, o (d) en el cual se produjese una interrupción en la entrega conforme a Sección 4.7. Gildan hará esfuerzos razonables para notificar al Proveedor de (i) una suspensión programada por lo menos [diez (10)] días antes del inicio programado de la suspensión o (ii) cuando fuese posible, notificar por adelantado cualquier otra suspensión de las operaciones. Sin limitar la generalidad de lo anterior, Gildan deberá contactar de inmediato al Proveedor en caso de una interrupción no anticipada en la recepción de la Biomasa a ser suministrada en virtud del presente Acuerdo.

### 4.9 Título de Propiedad sobre la Biomasa:

(a)    Título Válido. El Proveedor declara y garantiza que (i) al momento de la entrega de la Biomasa a Gildan en virtud del presente Acuerdo, tendrá título de propiedad válido, y autoridad de derechos plenos y sin reservas para vender dicha Biomasa a Gildan; y (ii) que todo la Biomasa entregada por el Proveedor en el Punto de Entrega estará libre Gravámenes. El Proveedor deberá indemnizar y mantener a las Partes Indemnizadas de Gildan protegidas contra todo tipo de Pérdidas resultantes del incumplimiento de esta declaración. Las indemnizaciones estipuladas en esta Sección 4.9(a) sobrevivirán la terminación o vencimiento del presente Acuerdo.

(b)    Título. La posesión y titularidad sobre la Biomasa entregada por el Proveedor a Gildan en virtud del presente Acuerdo, pasarán del Proveedor a Gildan luego de la descarga de la Biomasa en el Punto de Entrega. Se considerará que el Proveedor tiene la posesión y el control exclusivos, y título de propiedad, y que será responsable de dicha Biomasa, hasta que el mismo haya sido descargado de sus vehículos en el Punto de Entrega, y Gildan haya inspeccionado, medido y aprobado la Biomasa, momento en el cual y después del cual se considerará que se ha realizado la transferencia de la propiedad a Gildan, quien, a partir de ese momento, tendrá la posesión y control exclusivos, y título de propiedad, y que será responsable de la Biomasa. Luego de la transferencia de la propiedad del Proveedor a Gildan, Gildan tendrá el derecho de utilizar la Biomasa a su sola discreción.

(c)    Derechos de Propiedad Intelectual. El Proveedor declara y garantiza que al momento de la entrega de la Biomasa a Gildan, no estará infringiendo los derechos de propiedad intelectual de terceros en lo que respecta a la Biomasa, incluyendo, sin limitación, cualesquier derechos de propiedad intelectual de terceros sobre la biomasa de madera triturada, sus métodos de reproducción, agricultura, cosecha y uso. El Proveedor deberá indemnizar y mantener a las Partes Indemnizadas de Gildan libres e indemnes de y contra todo tipo de Pérdidas resultantes del incumplimiento de esta declaración. Las indemnizaciones estipuladas en esta Sección 4.9(c) sobrevivirán la terminación o vencimiento del presente Acuerdo.

4.10    La Propiedad de los Atributos Medioambientales

Gildan conservará la titularidad de todos los Atributos Medioambientales asociados a la Planta. A requerimiento por escrito de Gildan, el Proveedor deberá cooperar con Gildan para firmar los documentos, instrumentos y garantías adicionales, suministrar la información, y realizar los actos adicionales que fuesen razonablemente necesarios y oportunos para que Gildan (i) pueda cumplir con los requisitos de cualquier programa de certificación, registro, incentivo o de rendición de informes relacionado con los Atributos Medioambientales, y (b) pueda vender los Atributos Medioambientales.

5.    INSPECCIÓN DE CALIDAD

5.1    Especificaciones de Calidad e Inspección

(a)     Toda la Biomasa entregada por el Proveedor en el Punto de Entrega deberá cumplir con las Especificaciones, y Gildan inspeccionará de forma regular toda la Biomasa entregada en el Punto de Entrega con el fin de determinar si cumple con las Especificaciones.

(b)     Antes de la transferencia del título del Proveedor a Gildan, para cada embarque de la Biomasa entregada a Gildan en virtud del presente Acuerdo, Gildan medirá (a) el peso (medido en toneladas métricas) usando las balanzas que se encuentran en la Planta, y (b) la humedad (medida en porcentaje de humedad por tonelada métrica) usando los dispositivos de medición de humedad que se encuentran en la Planta, de dicha Biomasa. Para fines del presente Acuerdo, el peso registrado por las referidas balanzas y la humedad medida por los referidos dispositivos de medición de humedad se considerarán el peso y la humedad de dicho embarque de la Biomasa. El Proveedor no estará permitido de descargar la Biomasa antes de que los resultados de las inspecciones hayan confirmado el cumplimiento de Biomasa con las Especificaciones, y Gildan haya aprobado la Biomasa en la presencia de un representante del Proveedor.

(c)     Gildan entregará al Proveedor un informe diario por embarque indicando el peso y el contenido de humedad de cada embarque de la Biomasa.

5.2     **Incumplimiento del Contenido de Humedad**

(a)     Contenido de humedad meta de Biomasa será Cuarenta por ciento (40 %). En el caso de que el contenido de humedad supere Cincuenta por ciento (50%), Gildan podrá, a su entera discreción, (i) negarse a aceptar la totalidad o parte de la entrega del Suministro de Combustible (incluyendo las porciones del Suministro de Combustible que si están conformes a las Especificaciones del Suministro de Combustible) o (ii) aceptar el Suministro de Combustible que no se encuentra conforme con las especificaciones y reducir el Precio del Contrato de dicho embarque en un uno por ciento (1%) por cada punto porcentual (1%) de contenido de humedad que exceda el sesenta por ciento (60%).

(b)     Si Gildan se niega a aceptar todos o una porción de los fardos de conformidad con la Sección 5.2, Gildan podrá adquirir Biomasa de Terceros para compensar Biomasa no conforme que se ha negado a aceptar. El Proveedor reembolsará a Gildan, o deducirá de los montos debidos por Gildan al Proveedor, un monto igual a la diferencia positiva entre (i) el costo real de Gildan de adquisición de Biomasa de Terceros requerido para el fiuncionamiento de la Planta, incluso el precio de dicha Biomasa de Terceros, y asociados costos de transportación y otros costos operacionales relacionados al suministro de dicha Biomasa de Terceros, y (ii) el monto igual al Precio del Contrato (el cual para este fin será el promedio del Precio del Contrato pagado durante el período de los cuatro (4) meses anteriores o, en caso de que menos de cuatro (4) meses hayan transcurrido desde la Fecha de Entrada en Vigencia, el promedio del Precio del Contrato pagado desde la Fecha de Entrada en Vigencia), multiplicada por la cantidad de Biomasa no conforme que Gildan se ha negado a aceptar. La renuncia

 12

de daños indirectos o derivados que se establece en la Sección 14.19(c) no se aplicará respecto a los daños establecidos en esta Sección.

### 5.3 Incumplimiento de las Especificaciones aparte de la Humedad

En caso que la Biomasa, o parte de la misma, no cumpla con las Especificaciones aparte de las relativas a la humedad y el correspondiente valor calorífico según lo establecido en Anexo D:

(a)        para el primer embarque que no cumpla con las Especificaciones, Gildan deberá de inmediato notificar al Proveedor indicando los detalles del incumplimiento, y el Proveedor tendrá derecho a acceder a la Planta, con el consentimiento previo de Gildan, para llevar a cabo sus propias pruebas al embarque que no cumpla con las Especificaciones; o

(b)        posteriormente, a cada embarque que no cumpla con las Especificaciones, Gildan, a su sola discreción, podrá (i) negarse a aceptar la totalidad o parte de dicho embarque (incluyendo las porciones que conformen a las Especificaciones), o (ii) aceptar Biomasa no conforme y reducir el Precio del Contrato para dicho embarque en un monto acordado por escrito por las Partes. Si Gildan se niega a aceptar la totalidad o una porción del embarque, Gildan tendrá el derecho de adquirir Biomasa de Terceros para compensar por la Biomasa no conforme que se ha negado a aceptar. El Proveedor reembolsará Gildan, o deducirá de los montos debidos por Gildan al Proveedor, un monto igual a la diferencia positiva entre (i) el costo real de Gildan de adquisición de Biomasa de Terceros requerido por el funcionamiento de la Planta, incluso el precio de dicha Biomasa de Terceros, y asociados costos de transportación y otros costos operacionales relacionados al suministro de dicha Biomasa de Terceros, y (ii) el monto igual al Precio del Contrato (el cual, para este fin será el promedio del Precio del Contrato pagado durante el período de los cuatro (4) meses anteriores, o en caso de que menos de cuatro (4) meses hayan transcurrido después la Fecha de Entrada en Vigencia, el promedio del Precio del Contrato pagado desde la Fecha de Entrada en Vigencia), multiplicada por la cantidad de Biomasa no conforme que Gildan se ha negado a aceptar. La renuncia de los daños indirectos y derivados que se establece en la Sección 14.19(c) no se aplicará respecto a los daños establecidos en esta Sección.

### 5.4 Gastos de Devolución de Embarque que no Cumpla con las Especificaciones

En caso que Gildan se niegue a aceptar la totalidad o una porción de un embarque no conforme según lo establecido la Sección 5.2(a) o 5.3(b), el Proveedor asumirá los gastos asociados a la devolución de dicho embarque al Proveedor.

### 5.5 Contaminación de la Biomasa que Ocasione Daños a los Equipos

En el caso de que el Proveedor entregue la Biomasa en el Punto de Entrega que no cumpla con las Especificaciones y que ocasione daños a los equipos, lo cual requiera de reparaciones inmediatas e imprevistas, y que dichos daños no sean el resultado del desgaste

normal por el uso entonces Gildan compensará cualquier monto que le adeude al Proveedor contra los gastos en los que haya incurrido para tales reparaciones.

### 5.6 Terminación por Falta de Cumplimiento con las Especificaciones

Si el Proveedor no suministra Biomasa que cumpla con las Especificaciones, por un período total de treinta (30) días o más durante cualquier Año Contractual (quedando entendido que dichos treinta (30) días no necesitan ser consecutivos) o por un período de [quince (15)] días consecutivos, la misma constituirá un Caso de Incumplimiento del Proveedor según lo dispuesto en la Sección 10.2(c) y Gildan podrá dar término a este Acuerdo de conformidad con la Sección 10.3.

## 6. PRECIO; PAGO E IMPUESTOS

### 6.1 Precio

Durante los primeros cinco (5) años del contrato Gildan pagará al Proveedor un precio de Cuarenta y Seis Dólares de los Estados Unidos de América (US$46.00) por Tonelada de Biomasa de madera triturada entregada, ajustado según lo dispuesto en la Sección 5.2 si procede. Este precio se considerará incluye todos los costos relacionados con la Biomasa, incluyendo, sin limitación, todos los costos de transporte, empaque y cualesquier otros costos de administración o gestión incurridos por el Proveedor. El precio será revisado entre las partes seis (6) meses antes de la culminación del quinto año del suministro.

### 6.2 Facturas y Pago

El Proveedor presentará a Gildan, una vez por semana (cada uno, un "Período de Facturación") un estado de cuenta que muestre (i) la cantidad total de la Biomasa entregada a Gildan durante el Período de Facturación anterior, cada uno con su respectivo contenido de humedad y el Precio del Contrato (ajustado según lo dispuesto en la Sección 5.2 si procede) y (ii) el monto total asociado a dicho Período de Facturación en dólares de los Estados Unidos de América (cada uno, una "Factura"). Cada Factura deberá ser presentada dentro de los cinco (5) días después del último día de cada Período de Facturación, y Gildan pagará al Proveedor con fondos inmediatamente disponibles mediante una transferencia electrónica de fondos o conforme a otras instrucciones contenidas en la Factura, dentro de los siete (07) días siguientes a la fecha de recepción de la Factura por Gildan. Si la fecha de vencimiento del pago no es un Día Laborable, el pago deberá ser efectuado al siguiente Día Laborable.

### 6.3 Pagos Adeudados a Gildan

En caso de que el Proveedor deba indemnizar a Gildan por daños y perjuicios en virtud del presente Acuerdo, Gildan deducirá del monto a pagar por dichos daños y perjuicios según la Factura correspondiente al Período de Facturación en el cual dicho monto debiese ser pagado a Gildan. En el caso que, en un Período de Facturación, los montos a pagar a Gildan excedan las sumas adeudadas al Proveedor por dicho Período de Facturación, Gildan deducirá dicho exceso del monto a pagar según la Factura correspondiente al (a los) siguiente(s) Período(s) de Facturación; entendiéndose, sin embargo, que si el Proveedor no ha pagado todas las cantidades

14

adeudadas a Gildan en un plazo de seis (6) meses contados a partir del Periodo de Facturación en el cual dichos montos se hicieron pagaderos, el Proveedor deberá remitir el pago a Gildan por el balance restante dentro de los diez (10) días contados a partir de la entrega de la primera Factura en el séptimo (7°) mes.

### 6.4 Registros de Facturación. Auditoría:

(a) Mantenimiento de Registros. Cada una de las Partes deberá mantener registros completos y precisos según fuese necesario con el fin de constatar la exactitud de los correspondientes datos, estimados o estados de gastos presentados sometidos en virtud del presente Acuerdo hasta la que se produzca de último entre las siguientes fechas: (i) un período de por lo menos cinco (5) años después de la fecha en que Gildan recibió la Factura, o (ii) si hay una controversia relativa a una Factura, la fecha que sea cinco (5) años después de la fecha en que dicho conflicto hubiese sido resuelto.

(b) Derechos de Auditoría. Cada una de las Partes, mediante notificación por escrito a la otra con treinta (30) días de anticipación, exclusivamente a su cuenta y riesgo, tiene derecho a que sus representantes debidamente autorizados examinen los registros de la otra Parte, durante el horario regular de trabajo, en la medida en que sea razonablemente necesario para verificar la exactitud de cualquier estado, cargo o cálculo efectuado de conformidad con lo establecido en el presente Acuerdo. Cada una de las Partes tendrá un (1) año después de la fecha en que una Factura hubiese sido recibida para auditar esa Factura. Los derechos de auditoría establecidos en el presente Acuerdo estarán sujetos a las obligaciones de confidencialidad a la Parte receptora en lo que respecta a terceros. Cada Parte hará los esfuerzos comercialmente razonables para lidiar o cumplir con dichas obligaciones de confidencialidad para que cada una de las Partes pueda ejercer sus derechos de auditoría previstos en el presente Acuerdo, incluyendo la redacción de determinada información siempre que dicha redacción no afecte los derechos de auditoría de la Parte receptora.

### 6.5 Disputas de Facturación

En el caso de presentarse objeciones a una Factura, la Parte contendiente deberá especificar el monto que objeta y pagar el monto que acepta a la fecha límite de pago o antes de esa fecha. Todas las disputas de facturación serán resueltas de conformidad con la Sección 14.22. El pago de la suma no disputada no se considerará como una renuncia al derecho de la Parte contendiente de disputar el referido monto en el futuro, y la aceptación de dicho pago no se considerará como renuncia del derecho de la otra Parte de cobrar dicho monto en el futuro. Toda Factura que no ha sido disputada dentro de un (1) año siguiente a la fecha de recepción de dicha Factura será concluyente, definitiva y no podrá ser objeto de ajuste.

### 6.6 Impuestos

El Proveedor deberá pagar o hacer que sean pagados todos los Impuestos por concepto de o relacionados con la Biomasa o por concepto de o relacionados con la venta o la disponibilidad de la Biomasa que produjesen antes de la entrega de la Biomasa en el Punto de Entrega. Gildan no será responsable de Impuestos de la Índole de impuestos sobre la renta, de franquicia, capital o ganancias brutas aplicados al Proveedor con respecto a sus estatutos sociales, ingresos u operaciones. Si a una de las Partes se le requiere remitir o pagar Impuestos que son responsabilidad de la otra Parte, según lo aquí previsto, dicha Parte deberá reembolsar inmediatamente a la otra tales Impuestos. Ambas Partes harán esfuerzos razonables para la gestión del presente Acuerdo e implementar sus disposiciones de conformidad con su intención de reducir al mínimo los impuestos. Nada de lo aquí contenido obligará ni hará a una Parte pagar o ser legalmente responsable de pagar ningún Impuesto del cual estuviera exenta en virtud de las Leyes Aplicables.

7. **FUERZA MAYOR**

7.1 **Acaecimiento de Eventos de Fuerza Mayor y Notificación**

Siempre que una Parte se encuentre impedida por un evento de Fuerza Mayor de continuar, en todo o en parte, sus obligaciones bajo el presente Acuerdo o de cumplir, en todo o en parte, las condiciones bajo el presente Acuerdo, y que dicha Parte (la "Parte Reclamante") notifique y proporcione detalles del evento de Fuerza Mayor a la otra Parte tan pronto sea posible y, luego a menos que de otra manera sea especificado en este Acuerdo, la Parte Reclamante sea excusada del cumplimiento de sus obligaciones y del cumplimiento de las condiciones con respecto a dicha transacción durante el periodo en que el evento de Fuerza Mayor le impida el cumplimiento a dicha Parte. La Parte Reclamante empleara los esfuerzos comercialmente razonables para remediar el evento de Fuerza Mayor y mitigar sus efectos. La suspensión del cumplimiento de las obligaciones y las condiciones contractuales debidas al evento de Fuerza Mayor no tendrán una duración ni alcance mayor a los requeridos por dicho evento de Fuerza Mayor. La Parte Reclamante deberá notificara tan pronto le sea posible a la Parte no reclamante en cuanto le sea posible retomar el cumplimiento de sus obligaciones y las condiciones bajo este Acuerdo, si esto le es posible. Mientras la Parte no reclamante no sea así notificada, no será requerida a cumplir o retomar el cumplimiento de sus obligaciones hacia la parte Reclamante correspondientes a las obligaciones de la Parte Reclamante excusadas por el Evento de Fuerza Mayor. Ninguna de las Partes será excusada de de la aplicación del Articulo 7 respecto a cualquier responsabilidad por incumplimiento de cualquiera de las obligaciones que debieron ser cumplidas o previstas previo al evento de Fuerza Mayor. En el caso de que el Proveedor sea la Parte Reclamante, el Proveedor empleara los esfuerzos comercialmente razonables para proveer la Biomasa sustituta a Gildan mientras dure el evento de Fuerza Mayor.

7.2 **Terminación por Causa de Fuerza Mayor**

(a) Cualquiera de las Partes puede dar por terminado el presente Acuerdo, sin responsabilidad de la otra Parte, notificando dicha terminación a la otra Parte, si un evento de Fuerza Mayor ocurre e impide a una de las Partes de (i) hacer disponible, por parte del

16

Proveedor, por tomar, por parte de Gildan, toda la Biomasa, o (ii) cumplir sus otras obligaciones materiales o condiciones bajo el presente Acuerdo por un periodo de al menos seis (6) meses consecutivos. Dicha terminación será eficaz inmediatamente después del primer día luego de la expiración del periodo de seis (6) meses.

(b)     No obstante las disposiciones de la sección 7.2 (a), si el evento de Fuerza Mayor (i) afecta material y adversamente la Planta, y (ii) es de una naturaleza tal que su suspensión puede ser corregida mediante la reparación o restauración de la Planta u otras acciones por Gildan, Gildan proporcionará al Proveedor tan pronto le sea posible luego de tal evento de Fuerza Mayor, pero en ningún caso luego de seis (6) meses luego del acaecimiento del evento de Fuerza Mayor, los planes de restauración o reparación de la Planta. El Proveedor no tendrá derecho de dar por terminado el presente Acuerdo.

7.3     **Obligaciones**

Ninguna de las Partes será excusada de la aplicación del Artículo 7 por responsabilidad derivada del incumplimiento de las obligaciones que debieron ser cumplidas o previstas previo al Evento de Fuerza Mayor. Para evitar dudas, en el caso de un evento de Fuerza Mayor con respecto a Gildan, el Proveedor podrá vender toda una porción de la Biomasa durante tal evento de Fuerza Mayor.

8.     **OBLIGACIONES DEL PROVEEDOR**

8.1     **Obligaciones del Proveedor**

Además de las obligaciones del Proveedor establecidas en los Artículos 4 y 5, durante el Período de Vigencia, el Proveedor por este medio conviene, acuerda y se compromete con lo establecido a continuación:

(a)     Cumplimiento. El Proveedor deberá cumplir con todas sus obligaciones contractuales de una manera diligente y profesional en consonancia con las prácticas profesionales aceptadas para actividades de similar naturaleza y deberá fabricar, producir y abastecer la Biomasa en pleno cumplimiento de las Especificaciones, las Normas de Gildan, y cualesquiera otras normas profesionales razonables que Gildan pudiera ocasionalmente implementar.

(b)     Cumplimiento de las Leyes Aplicables. El Proveedor deberá cumplir con las Leyes Aplicables que pudieren serle aplicables o que pudieren tener jurisdicción sobre él o sobre el manejo, almacenamiento, transporte y entrega de la Biomasa, y el Proveedor deberá obtener todos los permisos, licencias, seguros y otras formas de documentación requerida por las Leyes Aplicables a fin de estar al día en el cumplimiento de tales obligaciones.

(c)   Cumplimiento del Código de Conducta. El Proveedor deberá cumplir con el Código de Conducta, así como con las normas internacionalmente reconocidas relativas prácticas y normas del trabajo ocasionalmente vigentes. El Proveedor también acuerda y se compromete (i) a cumplir en todo momento con el Código de Conducta de la FLA o códigos similares; y (ii) a facilitar cualquier monitoreo externo independiente y cualquier auditoría interna de Gildan a las facilidades usadas para la producción, empaque o aprovisionamiento de la Biomasa y remediar todos los hallazgos de tal auditoría interna o externa.

(d)   Seguridad en el Lugar de Trabajo. El Proveedor deberá cumplir con todas las Leyes Aplicables relativas a salud y seguridad en el lugar de trabajo, y, asimismo, deberá cumplir con todas las reglas, procedimientos y políticas sobre seguridad en el lugar de trabajo, en todo momento, cuando esté presente en las Plantas o localidades propiedad de Gildan.

(e)   Prácticas de Empleo. Con respecto a las prácticas de empleo, el Proveedor deberá cumplir, en todo momento (incluso después de la terminación del presente Acuerdo, por la causa que fuere), con las más estrictas de (i) las disposiciones del Código de Conducta relativas a empleo; o (ii) los locales Leyes Aplicables que rigen el empleo y las relaciones laborales, así como con la Declaración Universal de los Derechos Humanos adoptada por las Naciones Unidas.

(f)   Prácticas Comerciales. El Proveedor, en todas sus negociaciones con transportistas regulares, proveedores, funcionarios públicos y Gildan, deberá apegarse a los más altos estándares de honestidad, integridad, trato justo y conducta ética. El Proveedor se obliga a abstenerse de toda práctica comercial perjudicial para el negocio o la reputación de Gildan o sus marcas de fábrica.

(g)   Anticorrupción. El Proveedor y los agentes y mandatarios del Proveedor no harán, ofrecerán, autorizarán, prometerán, recibirán o accederán a recibir, en violación de las Leyes Aplicables (incluyendo, más específicamente, las leyes aplicables sobre anticorrupción), ninguna contribución, dádiva, soborno, descuento, beneficio, pago de influencia, comisión ilegal, pago de facilitación u otro pago, o cualquier otra cosa de alor a una Persona o de una Persona, pública o privada, ya sea directa o indirectamente, (i) a fin de obtener un trato favorable en el desempeño del negocio bajo este Acuerdo, (ii) para pagar por el tratamiento favorable en el negocio asegurado, (iii) para obtener concesiones especiales u otra ventaja indebida, a favor o en relación con el Proveedor, en cumplimiento de las obligaciones requeridas por este Acuerdo, o (iv) para obtener o retener de otro modo un negocio o una ventaja en la realización de negocios para Gildan, o para cualquier otra Persona de otra forma. El Proveedor declara y garantiza además (a) que está familiarizado con las disposiciones de la Ley de Canadá sobre la Corrupción de Agentes Oficiales Públicos Extranjeros (la "Ley CFPO"), la Ley Pública 95-213 de los Estados Unidos de América, la Ley de 1977 sobre Prácticas Extranjeras de Corrupción, y sus modificaciones (la "Ley FCPA") y el Acto Anti-Soborno del Reino Unido de 2010 (la "Ley UKBA"), y (b) que el Proveedor



18

y sus agentes en todo momento observarán y cumplirán con las normas de conducta requeridas por la Ley CFPO, la Ley FCPA y la Ley UKBA. El Proveedor declara y garantiza además que la contraprestación, o cualquier parte de la misma, pagada por Gildan (o sus Afiliadas o contratistas, según sea el caso) al Proveedor en virtud del presente Acuerdo, y la contraprestación, o cualquier parte de la misma, pagada por el Proveedor a sus agentes o a terceros, constituyen una contraprestación estrictamente por servicios legalmente prestados o los bienes vendidos y que no han sido otorgadas, directa o indirectamente, a través de esa parte o alguna Persona interesada en dicha parte, para influir, en contravención de la Ley CFPO, la Ley FCPO o la Ley UKBA, o cualquier otra Ley Aplicable, cualquier acto o decisión de un funcionario público o cualquier otra Persona, o inducir a un funcionario público o cualquier otra Persona a que use su influencia para afectar algún acto o decisión de un gobierno u otra Persona a fin de ayudar al Proveedor a obtener o conservar un negocio o asegurar una ventaja indebida al actuar en virtud del presente Acuerdo.

(h)     Dádivas. El Proveedor y sus agentes no podrán prometer, ofrecer ni hacer dádivas, entretenimiento u otras gratificaciones a los empleados o representantes de Gildan.

(i)     Prácticas Medioambientales. El Proveedor deberá cumplir con la Política Ambiental. El Proveedor no podrá utilizar químicos, pesticidas o herbicidas en cualquier cultivo de donde se extraiga el producto a ser utilizado como la Biomasa en virtud del presente Acuerdo, sin el consentimiento previo y por escrito del Departamento de Medio Ambiente de Gildan.

(j)     La Responsabilidad por la Biomasa, las Operaciones y el Negocio. El Proveedor será el único responsable de sus obligaciones establecidas en virtud de subcontratos o cualquier otro contrato con los empleados, agentes, Afiliadas, o cualquier proveedor de servicios, y cualesquiera otros actos, acuerdos o convenios efectuados con respecto del negocio o las operaciones del Proveedor. Ninguna disposición del presente Acuerdo se interpretará como una exigencia a que Gildan actúe en virtud de tales acuerdos o documentos, o con respecto a cualquier obligación del Proveedor relacionada con sus negocios u operaciones.

9.     DECLARACIONES Y GARANTÍAS DEL PROVEEDOR

El Proveedor declara y garantiza que, a la fecha de la firma del presente Acuerdo y en todo momento durante el Período de Vigencia:

(a)     Cumplimiento con las Especificaciones. El Proveedor garantiza que la Biomasa que será entregada en virtud del presente Acuerdo cumplirá con las Especificaciones.

(b)     Conformidad con las Leyes Aplicables. La Biomasa recolectada, transportada y entregada por el Proveedor deberá (i) cumplir con todas las Leyes Aplicables promulgadas por los organismos reguladores competentes,

incluyendo, en la medida que proceda, el Ministerio de Medio Ambiente, el Consejo Nacional de Energía (CNE), y el Ministerio de Trabajo de los Estados Unidos de América; (ii) cumplir con todos los requisitos de cualesquier otras leyes, normas y regulaciones de los Estados Unidos de América y cualquier otro país que tenga jurisdicción, y sus respectivos gobiernos estatales y locales; y (iii) estar sujeto a las garantías regulares del Proveedor con respecto al suministro de la Biomasa, además de las garantías establecidas en este Acuerdo.

(c) <u>Constitución y Autorización</u>. El Proveedor es una sociedad comercial constituida, organizada y existente bajo las leyes de Honduras, y tiene personalidad jurídica propia para poseer y operar sus bienes, conducir sus negocios, suscribir el presente Acuerdo y cumplir con las obligaciones puestas a su cargo en virtud del presente Acuerdo. La firma, formalización y cumplimiento del presente Acuerdo por parte del Proveedor han sido debidamente autorizada a través de todos los actos corporativos necesarios.

(d) <u>Firma y Formalización</u>. El Acuerdo ha sido debidamente firmado y formalizado, y constituye una obligación legal, válida y compromisoria del Proveedor, ejecutable en su contra de conformidad con sus términos.

(e) <u>Litigios</u>. No existen acciones, demandas ni procesos pendientes ni potenciales en contra del Proveedor, o de sus bienes, por ante cualquier tribunal o Autoridad Gubernamental que, si ser decididos en contra del Proveedor, tendrían un Efecto Material Adverso en las transacciones contempladas en el presente Acuerdo.

(f) <u>Cumplimiento de las Leyes Aplicables</u>. La suscripción y formalización del presente Acuerdo, la consumación de las transacciones contempladas en el mismo, y la satisfacción y el cumplimiento por el Proveedor con las disposiciones del presente Acuerdo no entrarán en conflicto con o podrán constituir una violación o incumplimiento de una Ley Aplicable actualmente en vigor que pueda ser aplicada al Proveedor, a los documentos de incorporación del Proveedor, o de cualquier escritura de fideicomiso, contrato de garantía prendaria o hipotecaria, contrato de préstamo u otra evidencia de deuda o cualquier otro contrato o instrumento del cual el Proveedor sea parte o por medio del cual haya comprometido sus bienes.

(g) <u>Licencias Necesarias</u>. El Proveedor ha obtenido todas las licencias, permisos, certificados y autorizaciones necesarias para cumplir con sus obligaciones contractuales y conducir su negocio con Gildan, incluyendo, sin limitación, los relacionados con incendio, la seguridad y salud pública, y la importación de bienes (tales como certificados de material peligroso y fumigación) y el Proveedor cumple cabalmente, y seguirá cumpliendo, con todas las referidas licencias, permisos, certificados y autorizaciones, así como con todas las Leyes Aplicables.

20

(h)     Recursos Financieros. El Proveedor dispone de suficientes recursos financieros y empresariales y la capacidad para satisfacer sus obligaciones en virtud del presente Acuerdo.

(i)     Propiedad Intelectual. No existe ninguna demanda pendiente que haya sido formulada por una Persona impugnando o cuestionando el uso del Proveedor de alguna propiedad intelectual o la validez o efectividad de la propiedad intelectual del Proveedor, y el Proveedor tampoco conoce ninguna base válida para cualquier reclamo, a menos que dicha demanda no pudiera razonablemente esperarse que tenga un Efecto Material Adverso. El uso de la propiedad intelectual por parte del Proveedor, y la conducción de la actividad comercial del Proveedor, tal como son conducidos actualmente, no infringen ni de otro modo violan los derechos de ninguna Persona, a menos que dicha infracción no pudiera razonablemente esperarse que tenga un Efecto Material Adverso y no existen demandas pendientes o, según conocimiento del Proveedor, que pudieran tener tal efecto.

10.     **INCUMPLIMIENTO Y TERMINACIÓN**

10.1    **Casos de Incumplimiento de Gildan**

Cualquiera de los siguientes casos o circunstancias que se suscitasen constituirán un "**Caso de Incumplimiento**" de Gildan:

(a)     Gildan no realiza un pago, salvo en el caso de los montos relacionados con cualquier Factura disputada por Gildan, cuando debiese efectuarse según las disposiciones del presente Acuerdo (libre de daños y perjuicios pendientes y cualesquiera otros derechos de compensación que Gildan pudiera tener de conformidad con el presente Acuerdo), y tal incumplimiento de realizar un pago no es corregido en un plazo de treinta (30) días después de notificación por escrito del Proveedor;

(b)     Gildan no cumple con alguna otra obligación de las previstas en el presente Acuerdo, lo que produciría un Efecto Material Adverso sobre el Proveedor, que no sea el incumplimiento de Gildan con una obligación de las establecidas en el presente Acuerdo para la cual un recurso específico ha sido acordado, y dicho incumplimiento no es corregido en un plazo de treinta (30) días después de la notificación por escrito del Proveedor;

(c)     Alguna declaración o garantía formulada por Gildan en el presente Acuerdo se comprueba que ha sido falsa o engañosa en algún respecto material al momento de ser formulada o deja de ser cierta durante el Período de Vigencia si al dejar de serlo pudiera razonablemente esperarse que tenga un impacto material adverso sobre el Proveedor y dicho incumplimiento no es corregido en un plazo de treinta (30) días después de notificación por escrito del Proveedor;

(d)     Conducta dolosa o fraude real de Gildan en relación con este Acuerdo;

(e)     Gildan interpone una petición de insolvencia o quiebra voluntaria o de reorganización o arreglo de conformidad con las Leyes Aplicables o de conformidad con alguna ley de una Autoridad Gubernamental relativa a insolvencia, o Gildan aprovecha voluntariamente dicha ley mediante respuesta o por otros medios;

(f)     Un caso de quiebra o cualquier proceso fundamentado en otra ley sobre insolvencia es interpuesto en contra de Gildan en calidad de deudora, y que podría impactar materialmente la capacidad de Gildan para cumplir con sus obligaciones contractuales, a menos que dicho caso fuese desestimado o suspendido dentro de los ciento ochenta (180) días después de la fecha de interpuesto dicho proceso.

10.2    Casos de Incumplimiento del Proveedor

Se considera un "Caso de Incumplimiento" del Proveedor la aparición de cualquiera de los siguientes eventos o circunstancias que se citan a continuación:

(a)     El Proveedor no mantiene una cantidad del Inventario de Reserva según lo establecido en la Sección 4.2 y no reestablece dicho Inventario de Reserva dentro de veintiocho (28) días según se contempla en la Sección 4.4.

(b)     El Proveedor no entrega la Biomasa por un período total de treinta (30) días o más durante cualquier Año Contractual (quedando entendido que dichos treinta (30) días no tienen que ser consecutivos) o por un período de quince (15) días consecutivos según lo establecido en la Sección 4.6(b).

(c)     El Proveedor no entrega Biomasa que cumpla las Especificaciones por un período total de treinta (30) días o más durante cualquier Año Contractual (quedando entendido que dichas treinta (30) días no tienen que ser consecutivos) o por un período de quince (15) días consecutivos según lo establecido en la Sección 5.6.

(d)     El Proveedor no realiza un pago cuando debiese efectuarse según las disposiciones del presente Acuerdo (neto de daños y perjuicios pendientes y cualesquier otros derechos de compensación que el Proveedor pudiera tener de conformidad con el presente Acuerdo), y tal incumplimiento no es corregido en un plazo de treinta (30) días después de notificación por escrito de Gildan;

(e)     Alguna declaración o garantía formulada por el Proveedor en el presente Acuerdo se comprueba que ha sido falsa o engañosa en algún respecto material al momento de ser formulada o deja de ser cierta durante el Período de Vigencia si al dejar de serlo pudiera razonablemente esperarse que tenga un impacto material adverso sobre Gildan y dicho incumplimiento no es corregido en un plazo de treinta (30) días después de notificación por escrito de Gildan;

(f) Los resultados de la Segunda Auditoría, según lo establecido en el Artículo 12 indican que el Proveedor no cumple cabalmente los Estándares Auditorías.

(g) El Proveedor no provee, entrega o mantiene cobertura de seguro como se establece en la Sección 14.1.

(h) El Proveedor cede el presente Acuerdo o cualquiera de sus derechos establecidos en virtud del mismo (excepto como pudiere estar permitido según lo estipulado en la Sección 14.2);

(i) El Proveedor no cumple con alguna otra obligación de las previstas en el presente Acuerdo, lo que produciría un Efecto Material Adverso sobre Gildan, que no sea el incumplimiento de Gildan con una obligación de las establecidas en el presente Acuerdo para la cual un recurso específico ha sido acordado, y dicho incumplimiento no es corregido en un plazo de treinta (30) días después de notificación por escrito de Gildan;

(j) Por conducta dolosa o fraude real del Proveedor en relación con este Acuerdo;

(k) El Proveedor interpone una petición de insolvencia o quiebra voluntaria o de reorganización o arreglo de conformidad con las leyes de Honduras relativas a quiebra o de conformidad con alguna ley de una Autoridad Gubernamental relativa a insolvencia, o el Proveedor aprovecha voluntariamente dicha ley mediante respuesta o por otros medios; o

(l) Un caso de quiebra o cualquier proceso fundamentado en otra ley sobre insolvencia es interpuesto en contra del Proveedor en calidad de deudor, y que podría impactar materialmente la capacidad del Proveedor para cumplir con sus obligaciones contractuales, a menos que dicho caso fuese desestimado o suspendido dentro de los ciento ochenta (180) días después de la fecha de interpuesto dicho proceso.

10.3 **Terminación por un Caso de Incumplimiento**

(a) Si se produce un Caso de Incumplimiento la Parte que no está en falta tendrá derecho, en cualquier momento, rescindir este Acuerdo mediante notificación por escrito a la Parte que ha incumplido. La fecha de dicha notificación escrita se considerará la fecha efectiva de rescisión de este Acuerdo (la "**Fecha de Terminación Anticipada**").

(b) No obstante cualquier disposición en contrario en esta Sección 10.3, la Parte que no está en falta no tendrá el derecho a rescindir este Acuerdo si ha ocurrido un Caso de Incumplimiento y la Parte que ha incumplido ha comenzado a corregir el incumplimiento con mejores esfuerzos dentro del período de cura aplicable, y dicho Caso de Incumplimiento puede ser corregido por la Parte que ha incumplido dentro de un plazo razonable. En tal situación, las

Partes acordarán mutuamente un período adicional razonable durante el cual es previsible que el Caso de Incumplimiento será de hecho curado por la Parte que ha incumplido y que buscará dicha cura de manera diligente (el "**Plazo de Cura Prolongado**"). Si el Caso de Incumplimiento no se ha curado dentro del Plazo de Cura Prolongado, la Parte que no está en falta podrá rescindir este Acuerdo inmediatamente según lo establecido en la Sección 10.3(a).

### 10.4    Pago por Terminación

Si Gildan termina este Acuerdo en virtud del presente Artículo 10, además de cualesquiera otros recursos que asisten a Gildan en virtud del presente Acuerdo o bajo las Leyes Aplicables, el Proveedor pagará Gildan daños, en la sola discreción de Gildan (el "**Pago por Terminación**"). El Pago por Terminación será un monto igual a la diferencia positiva entre (i) el costo real de Gildan de adquisición de Biomasa de Terceros requerido por el funcionamiento de la Planta, incluso el precio de dicha Biomasa de Terceros y costos asociados de transportación y otros costos operacionales relacionados al suministro de dicha Biomasa de Terceros desde la Fecha de Terminación Anticipada has la fecha cuando Gildan empieza a recibir Biomasa o Biomasa Sustituta en virtud de un relación de suministro de largo plazo comercialmente razonable con un proveedor tercero (el "**Período de Daños**"), y (ii) un monto igual al Precio del Contrato (el cual para este fin será el promedio del Precio del Contrato pagado por cada embarque de Biomasa entregado durante los cuatro (4) meses anteriores o, si menos de cuatro (4) meses han transcurrido desde la Fecha de Efectividad, el promedio del Precio del Contrato pagado desde la Fecha de Efectividad), multiplicado por la cantidad de la Obligación de Entrega que hubiera sido requerido ser suministrada a Gildan durante el Período de Daños si el presente Acuerdo no hubiera sido terminado.

### 10.5    Deber/Derecho de Mitigar

Cada una de las Partes acuerda que tiene el deber de mitigar daños, y que deberá hacer esfuerzos comercialmente razonables para minimizar cualquier daño en el que pudiera incurrir a consecuencia del cumplimiento o incumplimiento de la otra Parte con el presente Acuerdo (incluyendo el aprovisionamiento o la compra de Biomasa Sustituta); entendiéndose que en ningún caso la Parte que mitiga estará obligada a pagar la Parte que incumple ningún monto relacionado con dicha mitigación.

### 10.6    Efecto de la Terminación de este Acuerdo.

La terminación del presente Acuerdo no eximirá ninguna de las Partes de cualquier obligación o responsabilidad incumplida por la referida Parte a partir de la Fecha de Terminación Anticipada, incluyendo cualesquier daños incurridos por cualquiera Parte como consecuencia de cualquier incumplimiento o Caso de Incumplimiento bajo el presente Acuerdo antes de la Fecha de Terminación Anticipada. Las disposiciones del presente Acuerdo continuarán vigentes solamente en la medida que fuese necesario (i) para realizar los ajustes y facturaciones finales correspondientes al período anterior a la rescisión con respecto a la Biomasa puesto a disposición antes de la Fecha de Terminación Anticipada; y (ii) el pago de cualquier dinero adeudado a una de las Partes en virtud del presente Acuerdo; entendiéndose, sin embargo, que la rescisión no

24

afectará ni excusará el cumplimiento de las Partes con cualquier disposición del presente Acuerdo que por sus términos deba prolongarse más allá de tal terminación.

## 11. INDEMNIZACIÓN

(a)    El Proveedor y Gildan (cada uno, una "**Parte Indemnizante**") deberán defender, indemnizar, y mantener a la otra Parte y sus Afiliadas, directores, ejecutivos, empleados y agentes (colectivamente la "**Parte Indemnizada**") protegidos contra todo tipo de reclamaciones, demandas, pérdidas, responsabilidades y gastos, incluyendo razonables honorarios legales, por lesiones personales, muerte o daños a inmuebles y bienes tangibles relacionados con la Parte Indemnizada o algún tercero (colectivamente, "**Pérdidas**") cuando derivasen, resultasen, o fueren causados por la negligencia o el dolo de la Parte Indemnizante, sus Afiliadas, directores, ejecutivos, empleados o agentes, siempre que la renuncia a daños derivados según lo establecido en la Sección 14.19 no se aplicare con respecto a las reclamaciones efectuadas por terceros.

(b)    No obstante cualquier disposición en contrario en esta Sección 11 ninguna de las Partes tendrá derecho a ser indemnizada en virtud del presente Acuerdo por sus Pérdidas cuando las mismas fueren causadas por su propia negligencia o dolo, o por la negligencia o dolo de sus Afiliados, directores, ejecutivos, empleados o agentes.

(c)    Las obligaciones de indemnización y los derechos de las Partes establecidos en este Artículo 11 continuarán en vigor después de la terminación de este Acuerdo por [dos (2)] años después de la fecha efectiva de la terminación de este Acuerdo.

## 12. AUDITORIAS / INSPECCIONES

En cualquier momento durante el horario normal del Proveedor, Gildan y/o su(s) representante(s) tendrán el derecho de inspeccionar las instalaciones y los vehículos en los cuales se recolecta y transporta la Biomasa, para revisar si el Proveedor cumple constantemente con los términos de este Acuerdo, incluyendo, sin limitación, el cumplimiento del Política Ambiental, el Código de Conducta, y el Código de Conducta de la FLA (las "**Normas de Auditoría**"). Además de lo anterior, una (1) vez al año, en cualquier momento durante el horario normal del Proveedor, Gildan y/o su(s) representante(s) realizarán una auditoría de calidad para confirmar el cumplimiento del Proveedor de las Normas de Auditoría (la "**Auditoría Anual**"). Todos los honorarios y gastos incurridos por Gildan en relación con la Auditoría Anual correrán a cargo de Gildan. En el caso de que los resultados de la Auditoría Anual indiquen que el Proveedor no cumpla con las Normas de Auditoría, el Proveedor tendrá noventa (90) días de tomar medidas correctivas necesarias y cumplir con las Normas de Auditoría. Después de dichas noventa (90) días, Gildan y/o sus representantes realizarán una segunda auditoría de calidad para verificar la implementación de cualesquier medidas correctivas, y para confirmar el cumplimiento del Proveedor de las Normas Auditorías (la "**Segunda Auditoría**"). Todos los honorarios y gastos

incurridos por Gildan en relación con la Segunda Auditoría, incluyendo, sin limitación, cualesquier honorarios pagados a una firma auditora externa, correrán a cargo del Proveedor. En el caso de que los resultados de la Segunda Auditoría indiquen que el Proveedor no cumpla cabalmente con las Normas Auditorías, esto constituirá un Caso de Incumplimiento del Proveedor según lo establecido en la Sección 10.2(f) y Gildan podrá, a su sola discreción, rescindir este Acuerdo. El Proveedor deberá cooperar plenamente con todas dichas auditorías y inspecciones, y dará Gildan y su(s) representante(s) pleno y libre acceso para permitir la realización de dichas auditorías e inspecciones.

## 13.  CONFIDENCIALIDAD

### 13.1  Información Confidencial

Para los fines del presente Acuerdo, el término "**Información Confidencial**" se refiere a toda información relacionada con cualquiera de las Partes y dada a conocer por esa Parte (la "**Parte Reveladora**") a la otra (la "**Parte Receptora**"), sea verbalmente o por escrito, y hubiese sido o no designada como información confidencial, incluyendo, sin limitación, información financiera, estratégica, comercial o de fabricación; planos, especificaciones u otra información técnica relacionada con la maquinaria o equipos y las distribuciones de la Planta; información sobre precios; costos, planes comerciales y de mercadeo; información relacionada con el suministro de Biomasa, estimados de suministros de Biomasa, origen del suministro de Biomasa, u otros tipos de suministros de combustible usados por dicha Parte, necesidades y preferencias, servicios, corredores o Proveedores, clientes, potenciales clientes, personal, capacitación, y políticas; los métodos de producción, procesos, procedimiento, técnicas, investigaciones, conocimientos técnicos, requisitos, o resultados o proyectos de desarrollo; secretos de comercio, software de computadora (sea en formato de código fuente o código objeto), diseños de documentación, dibujos, y manuales; la existencia o los términos de acuerdos confidenciales; y diagramaciones, procesos y/o propiedad intelectual, junto con todos los análisis, compilaciones, proyecciones, informes, estudios, análisis de mercado y documentos similares, independientemente que dicha Información Confidencial sea preparada para o por cualquiera de las Partes (incluyendo Información Confidencial preparada por cualquiera de las Partes para la otra Parte o sus contratistas) o por los respectivos directores, ejecutivos, empleados, asesores legales o financieros, contables y otros agentes y representantes de cada una de las Partes. Para los fines de este Artículo 13, "Parte Reveladora" y "Parte Receptora" también se referirán a las Afiliadas de dichas Partes. Las Partes además acuerdan y es su intención que la Información Confidencial incluya toda información y todos los documentos que caigan dentro de la definición de este Artículo 13, incluso si la información y los documentos hubiesen sido suministrados antes de la fecha del presente Acuerdo, siendo la intención de las Partes que tales información y documentos previamente dados a conocer estén protegidos y no sean usados ni dados a conocer en violación del presente Acuerdo.

### 13.2  Exclusiones

No obstante lo anterior, para fines del presente Acuerdo, no constituirá Información Confidencial:

(a)     información que esté o llegase a estar disponible para el público en general, si no es como resultado de que la Parte Receptora la diese a conocer, directa o indirectamente, en violación del presente Acuerdo;

(b)     información ya conocida por la Parte Receptora y que no está de otro modo sujeta a obligaciones de confidencialidad para con la Parte Reveladora, siempre que la Parte Receptora pueda demostrar con pruebas convincentes y documentadas que la Parte Receptora conocía y había obtenido lícitamente dicha información antes del momento en que la hubiese dado a conocer;

(c)     información que sea independientemente desarrollada por al Parte Receptora sin utilizar Información Confidencial y sin violar ninguna de las obligaciones establecidas en virtud del presente Acuerdo; o

(d)     información que sea lícitamente recibida por la Parte Receptora libre de restricciones de una fuente, que no sean la Parte Reveladora o sus representantes, con derecho legal a suministrar dicha información.

13.3   Convenios

La Parte Receptora:

(a)     deberá ma tener la confidencialidad y no podrá divulgar, transmitir ni de otro modo dar a conocer, y tampoco hacer o permitir que sea divulgada, transmitida o de otro modo dada a conocer a terceros en manera alguna, ninguna Información Confidencial sin previo consentimiento por escrito de la Parte Reveladora;

(b)     no podrá usar en manera alguna la Información Confidencial, excepto como fuere necesario y apropiado en el curso de cumplir con sus obligaciones para con la Parte Reveladora con relación al presente Acuerdo:

(c)     deberá mantener un control estricto sobre la Información Confidencial y limitar estrictamente que se dada a conocer solamente a sus empleados o agentes (i) que necesiten dicha Información Confidencial para los fines del presente Acuerdo, y (ii) que hayan sido informados de las convenciones de confidencialidad contenidas en el presente Acuerdo y a quienes se les haya dado específicamente instrucciones de cumplir con sus términos. La Parte Receptora será legalmente responsable de cualquier revelación o uso que hiciese indebidamente alguno de sus empleados o agentes a quienes dicha Información Confidencial fuese dada a conocer; y

(d)     deberá realizar esfuerzos comercialmente razonables y prudentes para proteger la Información de revelación y uso prohibidos en virtud del presente Acuerdo y de robo o pérdida, incluyendo, sin que la enumeración sea limitativa, restringir el fotocopiado, almacenamiento electrónico y otra reproducción de la Información Confidencial a lo que fuese necesario para suministrar copias a los referidos empleados o agentes de la Parte Receptora. La Parte Receptora deberá

notificar de inmediato a la Parte Reveladora y cooperar con la Parte Reveladora tan pronto la Parte Receptora se enterase que alguna Información Confidencial se ha perdido o ha sido comprometida.

### 13.4 Propiedad de la Parte Reveladora

La Información Confidencial intercambiada seguirá siendo propiedad de la Parte Reveladora y, a solicitud verbal o por escrito, la Parte Receptora deberá devolver a la Parte Reveladora toda la Información Confidencial recibida en forma tangible y deberá destruir inmediatamente todas las notas, resúmenes, papeles de trabajo, documentos almacenados electrónicamente u otros documentos preparados a partir de la Información Confidencial. Dicha destrucción, a solicitud, deberá ser certificada por escrito por un ejecutivo de la Parte Receptora.

### 13.5 Daño Irreparable

La Parte Receptora reconoce y acuerda (i) que la Parte Reveladora sería irreparablemente perjudicada si la Parte Receptora o sus empleados o agentes violasen el presente Acuerdo; (ii) que una compensación monetaria no sería suficiente por violación, violación anticipada o amenaza de violación del presente Acuerdo por parte de la Parte Receptora o cualquiera de sus empleados o agentes; y (iii) que, además de cualesquiera otros derechos y recursos que le asisten en derecho o equidad, la Parte Reveladora tendrá derecho a demandar ejecución de contrato y a medidas cautelares preliminares y permanentes como recursos en caso de violación, violación anticipada o amenaza de violación del presente Acuerdo por parte de la Parte Receptora o cualquiera de sus empleados o agentes, en la mayor medida en que lo permitan las Leyes Aplicables. Nada de lo aquí contenido podrá interpretarse como que limita o prohíbe a la Parte Reveladora perseguir cualesquiera otros recursos legales o equitativos que pudieran asistirle en caso de tal violación, real, anticipada o potencial, incluyendo, sin que la enumeración sea limitativa, los derechos y recursos de la Parte Reveladora, si los hay, establecidos en las leyes aplicables sobre secretos de comercio, marcas de fábrica, patentes y derechos de autor.

### 13.6 Limitación de Responsabilidad

La Parte Reveladora no tendrá ninguna responsabilidad para con la Parte Receptora ni ninguno de sus empleados o agentes derivada de la entrega o el uso de la Información Confidencial por parte de la Parte Receptora o cualquiera de sus empleados o agentes, excepto en los casos expresamente establecidos en este Acuerdo.

### 13.7 Divulgación Obligatoria

Si a la Parte Receptora le fuese solicitado u ordenado (por deposición, interrogatorio, solicitud de información o documentos, citación, demanda o proceso similar, o por orden de una corte o tribunal de jurisdicción competente, un organismo gubernamental o para cumplir con las leyes de valores aplicables o con los requerimientos de las bolsas de valores) que revele alguna Información Confidencial que le hubiese sido dada a conocer, la Parte Receptora deberá notificarlo de inmediato por escrito a la Parte Reveladora de manera que la Parte Reveladora (con la cooperación de la Parte Receptora, si así le fuese solicitado por y a expensas de la Parte Reveladora) pueda solicitar una orden de protección o interponer otro recurso adecuado. En caso que tal orden de protección u otro recurso adecuado no fuesen concedidos, o si la Parte

Reveladora elige renunciar a la ejecución de los términos del presente Acuerdo, la Parte Receptora acuerda que suministrará solamente la parte de la Información Confidencial que legalmente fuera obligatorio suministrar y que hará esfuerzos razonables por obtener una garantía de que se dará un trato confidencial a dicha Información Confidencial. En todo caso, la Parte Receptora será legalmente responsable de cualquier revelación o uso indebidos de la Información Confidencial.

### 13.8 Supervivencia

Las obligaciones de la Parte Receptora en lo que respecta a toda información para la que continúe aplicando la definición de Información Confidencial sobrevivirán indefinidamente y en todo el mundo; entendiéndose, sin embargo, que si las restricciones de este Artículo 13 cuando se aplicaren indefinidamente a una Información Confidencial en específico estarían en violación de Leyes Aplicables o harían el presente Acuerdo inejecutable, entonces en lo que respecta a esa Información Confidencial solamente, las obligaciones de la Parte Receptora establecidas en este Artículo 13 expirarán tres (3) años después de la terminación del presente Acuerdo.

## 14. CLÁUSULAS MISCELÁNEAS

### 14.1 Póliza de Seguro

El Proveedor deberá presentar a Gildan los certificados de seguros que certifiquen que el Proveedor mantiene una póliza de seguro de responsabilidad civil general, incluyendo cobertura productos y operaciones completadas, y que cobra sus actividades directa o indirectamente relacionadas con el cumplimiento del presente Acuerdo. Tales pólizas deberán cubrir al Proveedor por un monto mínimo, a ser acordado entre las partes dentro de un periodo de noventa días siguientes a la firma del presente contrato, por incidente contra demandas de terceros por lesiones corporales, incluyendo muerte y daños a la propiedad. Gildan deberá ser agregada como asegurado adicional nombrado en la póliza de seguro de responsabilidad civil del Proveedor.

### 14.2 Cesión

Con excepción de lo que se estipula a continuación, el presente Acuerdo no podrá ser cedido ni transferido por el Proveedor sin previo consentimiento expreso y por escrito de Gildan. El Proveedor acuerda que Gildan podrá libremente ceder el presente Acuerdo o delegar sus derechos y privilegios, o el cumplimiento, los deberes u obligaciones, a sus Afiliadas, sin notificación ni previo consentimiento del Proveedor. Una cesión del presente Acuerdo, efectuada según lo permitido en el mismo, tendrá fuerza legal y redundará en beneficio de los correspondientes causahabientes y cesionarios. Toda tentativa de ceder el presente Acuerdo o delegar o subcontratar el cumplimiento, los deberes u obligaciones aquí estipulados sin autorización según lo requerido en virtud del presente Acuerdo, no tendrá efecto legal y se considerará nula y carente de validez. Para los presentes fines, el término "cesión", además de la transferencia del presente Acuerdo o de los derechos u obligaciones establecidos en virtud del mismo, sea de manera voluntaria, involuntaria, por operación de la ley o por otros medios, se considerará que incluye:

    (a)    la liquidación o disolución del Proveedor, y

(b)    la fusión, consolidación o reorganización de los proveedores en o con otra compañía u otra entidad, como resultado de la cual el Proveedor no es la empresa sobreviviente o resultante.

## 14.3    Subcontratación

El Proveedor será responsable de los actos o incumplimientos de los subcontratistas, sus agentes o empleados, tal como si fuesen los actos o incumplimientos del Proveedor, y deberá notificar a Gildan, con no menos de cinco (5) días de anticipación:

(a)    la intención de nombrar a un subcontratista, con indicación detallada que deberá incluir su experiencia; y

(b)    el inicio previsto de los trabajos del subcontratista.

No obstante cualquier disposición en contrario en el presente Acuerdo, el Proveedor deberá garantizar que cada subcontratista cumpla con los términos y condiciones del presente Acuerdo.

## 14.4    Notificaciones

Todas las notificaciones u otras comunicaciones a darse o hacerse bajo el presente Acuerdo por cualquiera de las Partes estarán por escrito y se considerarán como eficaces al entregarse personalmente, cuando sean enviados a través de un servicio de mensajería expresa o a través de fax seguidas de confirmación por escrita, en las direcciones indicadas a continuación:

Para Gildan:

Gildan Honduras Properties, S. de R.L.
Attn: Carlos Duran – Vice-Presidente, Ingeniería
Parque Industrial Zip San Miguel VI
15.5 Km autopista hacia Puerto Cortés
Río Nance, Choloma, Honduras, C.A.

Con copia a:

Legal Department
Gildan Activewear Inc.
600 de Maisonneuve Boulevard West
Montréal, Québec H3A 3J2, Canadá
Facsimile No.: (514) 734-8379

Para el Proveedor:

Agroforestal Fuentes, S. de R.L.
Attn: Geovanny Fuentes – Gerente General

Choloma, Cortes, Honduras
Facsimile No.:

### 14.5  Inexistencia de relación de Agencia o Asociación

Las Partes acuerdan que el presente Acuerdo no crea una relación fiduciaria o laboral entre ellas, que Gildan y el Proveedor son y serán independientes, y que nada en el presente Acuerdo tiene la intención de hacer de una de las Partes un agente general o especial, empresa conjunta, socio, o empleado de la otra con ningún propósito. Todas las Personas que participen en la ejecución del presente Acuerdo en nombre y representación del Proveedor son y seguirán siendo los empleados o agentes del Proveedor y no se considerarán como empleados o agentes de Gildan. El Proveedor no tendrá autoridad para vincular, comprometer u obligar a Gildan, y acuerda que no hará declaraciones a terceros de que posee tal autoridad.

### 14.6  Acuerdo Completo

Este Acuerdo constituye el entendido completo entre las Partes con respecto al objeto del mismo, y es la realización completa y definitiva de las intenciones y propósitos de Gildan y del Proveedor. Los términos y condiciones contenidos en este Acuerdo tendrán prioridad sobre cualquiera otros que resulten conflictivos o contradictorios. No hay acuerdos, declaraciones o garantías de ningún tipo, expresa o implícita, con excepción de lo expresamente establecido en el presente Acuerdo. Ninguna modificación, prórroga o exención del Acuerdo o cualquiera de sus disposiciones será vinculante, a menos que por escrito y firmado por ambas Partes.

### 14.7  Renuncia de Obligaciones

No se considerará que Gildan y el Proveedor han renunciado ni han reducido ningún derecho reservado por el presente Acuerdo (incluyendo, sin limitación, el derecho de exigir el total cumplimiento de cada término del presente Acuerdo o a declarar que una violación del mismo constituye un incumplimiento y poner fin al presente Acuerdo antes del vencimiento del Período de Vigencia), en virtud de:

      (a)    cualquier costumbre o la práctica de las Partes en discrepancia con los términos del presente Acuerdo; o

      (b)    cualquier incumplimiento, negativa o negligencia de Gildan o el Proveedor de ejercer algún derecho de los establecidos en virtud del presente Acuerdo, o para insistir en el total cumplimiento de la otra Parte con sus obligaciones contractuales.

### 14.8  Los Derechos de las Partes son Acumulativos

Los derechos de las Partes establecidos en virtud del presente Acuerdo son acumulativos y el caso que una de las Partes ejerciere algún derecho o recurso de los permitidos en virtud del presente Acuerdo no impedirá que ejerza o ejecute cualquier otro derecho o recurso de los permitidos en virtud del presente Acuerdo o de los que pudieren asistir en derecho o equidad a Gildan o al Proveedor.

### 14.9 Divisibilidad

Si un tribunal de jurisdicción competente decidiere de forma definitiva que cualquier término o disposición de este Acuerdo es inválido por cualquier razón, dicha invalidación no afectará la validez del parte restante de este Acuerdo, cual parte restante seguirá en pleno vigor y efecto. Es la intención de las Partes que este Acuerdo y todas sus disposiciones se aplicarán en el mayor alcance permitido por la ley.

### 14.10 El Tiempo es Esencial

El tiempo es expresamente esencial en lo que respecta al cumplimiento de las Partes con sus respectivas obligaciones establecidas en virtud del presente Acuerdo.

### 14.11 Ejemplares

El presente Acuerdo podrá ser firmado vía fax y en uno ó más ejemplares, cada uno de los cuales, una vez firmado y entregado, se considerará un original, y todos juntos constituirán uno sólo y el mismo documento.

### 14.12 Ley Aplicable

Este Acuerdo se regirá e interpretará de conformidad con las leyes de Honduras.

### 14.13 Idioma

No obstante cualquier traducción de este Acuerdo y/o cualesquier Anexos referidos aquí a un idioma que no sea el español, las Partes reconocen y acuerdan lo siguiente:

(a)  todos los cuestiones de interpretación de este Acuerdo y/o dichos Anexos se resolverán con referencia al mismo escrito en español y la versión en español prevalecerá;

(b)  todas las comunicaciones entre las Partes con respecto al presente Acuerdo y cualesquiera acuerdos relacionados serán en español; y

(c)  en caso de conflicto, las disposiciones del presente Acuerdo escritas en español prevalecerán sobre las disposiciones del presente Acuerdo escritas en cualquier otro idioma.

### 14.14 Terceros Beneficiarios

El presente Acuerdo ha sido previsto únicamente para beneficio de las Partes, sus cesionarios autorizados y causahabientes, y no es su intención conferir, ni conferirá, derechos o beneficios a ningún tercero que no sea parte ni signatario del mismo.

### 14.15 Negociaciones de Libre Competencia

Cada una de las Partes expresamente declara y garantiza a la otra que: (a) antes de la ejecución de este Acuerdo, dicha Parte se ha informado por completo de los términos, el

contenido, las condiciones, y los efectos de este Acuerdo; (b) dicha Parte se ha basado única y totalmente de su propio juicio para la ejecución y firma de este Acuerdo; (c) dicha Parte ha tenido la oportunidad de buscar y ha obtenido la asesoría de un abogado antes de firmar este Acuerdo; (d) dicha Parte ha actuado de manera libre y voluntariamente al firmar este Acuerdo; (e) dicha Parte no está actuando bajo coacción, ya sea económica o física, al firmar este Acuerdo, y (f) este Acuerdo es el resultado de las negociaciones de libre competencia llevadas a cabo por y entre las Partes y sus respectivos abogados.

### 14.16 Interpretación

Las Partes acuerdan y reconocen que han participado conjuntamente en la negociación y redacción de este Acuerdo. En caso de ambigüedad o duda en cuanto a su intención o interpretación, el presente Acuerdo se interpretará como si hubiese sido elaborado y redactado conjuntamente por las Partes, en aplicación al derecho común, y no habrá presunciones ni cargas de la prueba que favorezcan a una Parte en virtud de la autoría de cualquiera de las disposiciones del presente Acuerdo. Toda referencia a una ley, nacional o extranjera, se considerará que también se refiere a todas las reglas y reglamentos promulgados en virtud de la misma, a menos que el contexto requiera otra cosa.

### 14.17 Gastos

Con excepción de lo dispuesto en el presente Acuerdo, cada una de las Partes pagará sus propios honorarios y gastos, incluidos todos los honorarios de abogados, incurridos en relación a este Acuerdo o cualquier transacción contemplada en este Acuerdo.

### 14.18 Supervivencia de los Convenios

En la medida en que los convenios mutuos de las Partes bajo este Acuerdo creen obligaciones que sobreviven la terminación o vencimiento de este Acuerdo, las disposiciones aplicables de este Acuerdo se considerarán haber sobrevivido dicha terminación o vencimiento para el propósito limitado de aplicar tales convenios y obligaciones de conformidad con las disposiciones de este Acuerdo.

### 14.19 Renuncia y Exclusión de Otros Daños y Perjuicios:

(a)    Las partes confirman que las estimaciones de los daños y los recursos expresamente estipulados en el presente Acuerdo satisfacen el propósito esencial del mismo. Todas las limitaciones de responsabilidad contenidas en el presente Acuerdo, incluyendo, sin limitación, las relativas a la limitación general de responsabilidad del proveedor y la renuncia a daños derivados, se aplicarán incluso si los recursos por violación de garantía estipulados en el presente acuerdo se considerasen que "carecen de su propósito esencial" o que de otro modo se consideran carentes de validez o in-ejecutorios.

(b)    Para una violación de cualquiera de las disposiciones para las cuales se ha estipulado una estimación de los daños y un recurso expreso y exclusivo, tal estimación de los daños o recurso expreso será el recurso único y exclusivo, la responsabilidad legal del deudor se limitará a lo establecido en dicha

disposición, y se renuncia a todos los demás recursos o compensaciones por daños y perjuicios en derecho o equidad.

(c)    Si en el presente acuerdo no ha sido expresamente estipulado un recurso o estimación de los daños, la responsabilidad legal del deudor se limitará a los daños directos solamente. Aparte de lo establecido en las secciones 4.4 (b), 5.2. y 5.3 ninguna de las Partes será legalmente responsable para con la otra por daños derivados, incidentales, ejemplares o indirectos, lucro cesante u otros daños por interrupción de las actividades comerciales, por ley, o de índole contractual o extracontractual.

(d)    Cuando en virtud del presente Acuerdo debiere pagarse daños que sean liquidados, incluyendo los relacionados con la sección 4.5, las Partes reconocen que los daños son difíciles o imposibles de determinar, que en todo caso obtener una compensación adecuada es inconveniente, y que los daños liquidados constituyen una aproximación razonable de la pérdida o perjuicio anticipado.

(e)    Las Partes reconocen y acuerdan que los daños monetarios y los recursos expresos aquí estipulados constituyen una compensación adecuada por violación de los términos del presente Acuerdo, y cada una de las Partes renuncia a todo derecho que pudiera tener de demandar la ejecución específica de alguna obligación de la otra Parte en virtud de lo establecido en el presente Acuerdo.

## 14.20   Buena Fe y Trato Justo; Sentido Común

Las Partes acuerdan actuar razonablemente y de conformidad con los principios de buena fe y trato justo en el cumplimiento del presente Acuerdo. Salvo disposición expresa en contrario en el presente Acuerdo, (a) siempre que el presente Acuerdo requiera el consentimiento, aprobación o acción similar de una de las Partes, dicho consentimiento, aprobación o acción similar no deberá ser irrazonablemente negado o retrasado, y (b) siempre que el presente Acuerdo conceda a una de las Partes derecho a determinar, requerir, especificar o realizar alguna acción similar con respecto a distintos asuntos, tal determinación, requisito o acción similar deberá ser razonable; entendiéndose que la anterior cláusula (b) no modificará ninguno de los plazos específicamente enumerados establecidos en otra parte del presente Acuerdo.

## 14.21   Honorarios Legales

En caso de iniciarse una acción o proceso legal entre las Partes que suscriben el presente Acuerdo concerniente a alguna de las disposiciones del presente Acuerdo o los derechos y obligaciones de una de las Partes relacionados con el presente Acuerdo, la Parte que prevalezca en justicia en ocasión de tal acción o proceso, por fallo del tribunal, tendrá derecho al reembolso de sus razonables honorarios legales y costas judiciales incurridos con relación a la referida acción o proceso.

14.22 **Solución de Disputas**

(a) Cualquier disputa, controversia o reclamo que se derive o surja en relación con este Acuerdo, o incumplimiento, terminación o invalidez del mismo, y que no se resuelva mediante discusión de buena fe entre las Partes involucradas, deberá ser resuelto mediante arbitraje de conformidad con las Reglas de Arbitraje del Centro de Conciliación y Arbitraje de la Cámara de Comercio e Industrias de Cortés (CCIC) in la ciudad de San Pedro Sula, Honduras y de conformidad con las siguientes disposiciones: (i) el número de árbitros será tres (3); (ii) el lugar de arbitraje será la ciudad de San Pedro Sula. Honduras; (iii) el idioma que se utilizará en el procedimiento de arbitraje será el español; (iv) cualquier fallo arbitral será definitivo y vinculante para las Partes involucradas; y (v) el fallo emitido por los árbitros podrá ser registrado ante una corte que tenga jurisdicción sobre cualquiera de las Partes involucradas.

(b) Las Partes cumplirán el fallo arbitral sin invocar ningún tipo de inmunidad, y el fallo emitido por los árbitros podrá ser registrado ante una corte que tenga juirsdicción, o una solicitud podrá hacerse a tal tribunal para obtener una aceptación judicial de dicho fallo arbitral y una orden de ejecución, según sea el caso. Cualquier fallo monetario deberá considerarse libre de deducciones o descuentos. Las leyes de la Republica de Honduras deberán ser aplicadas por los árbitros en la resolución de disputas entre las Partes.

**HECHO Y FIRMADO** en tantos originales como partes contratantes, en la ciudad de Choloma, Cortés, a los 14 días del mes de Marzo del año 2013.

**GILDAN HONDURAS PROPERTIES, S. DE R.L.**
Nombre: Marco Castro
Cargo: Vicepresidente de Finanzas y Gerente General

**AGROFORESTAL FUENTES S. DE R.L.**
Nombre: Geovanny Fuentes
Cargo: Gerente General