UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

    - v. -

GEOVANNY FUENTES RAMIREZ,

                Defendant.

S6 15 Cr. 379 (PKC)

## THE GOVERNMENT'S SENTENCING SUBMISSION

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
One Saint Andrew's Plaza
New York, New York 10007

Jacob Gutwillig
Michael D. Lockard
Jason A. Richman
Elinor Tarlow
Assistant United States Attorneys
    *Of Counsel*

## <u>TABLE OF CONTENTS</u>

THE DEFENDANT'S CRIMINAL CONDUCT ........................................................................ 3

    I.    The Defendant Establishes a Cocaine Laboratory in Honduras ............................ 3

    II.    The Defendant Commits Acts of Violence to Help Leonel Rivera and Transports
    Multiple Drug Loads Totaling Over Approximately 1,000 Kilograms
    of Cocaine ........................................................................................................ 5

        A.    The Cocaine Shipment from El Tigre, Honduras
        (425 – 530 Kilograms) ....................................................................... 6

        B.    The Cocaine Shipment from Congressman Najera Montoya
        (500 – 570 Kilograms) ....................................................................... 8

        C.    The Cocaine Shipment to the Defendant's Airstrip
        (425 – 500 Kilograms) ....................................................................... 8

    III.    The Defendant Murders A Law Enforcement Officer and Bribes A Judge After
    Police Raid His Laboratory.............................................................................. 10

    IV.    The Defendant Expands His Narcotics Trafficking, Seeks Assistance Collecting a
    Drug-Trafficking Debt, Murders Another Drug Trafficker ................................. 12

    V.    The Defendant Engages In Drug-trafficking Under the Protection of National
    Party Leaders, Including Juan Orlando Hernandez Alvarado ............................. 14

    VI.    The Defendant Furthers His Violent Drug-Trafficking Business Through Corrupt
    Military and Police Contacts............................................................................. 17

        A.    The Defendant Receives Support from Military Officials........................ 17

        B.    The Defendant's Corrupt Police Contacts ................................. 20

    VII.    The Defendant's Post-Arrest Admissions.......................................................... 22

THE SENTENCING GUIDELINES RECOMMEND LIFE IMPRISONMENT ....................... 24

    I.    Count One ........................................................................................................ 24

        A.    Drug Quantity: § 2D1.1(a)(5) ............................................................ 24

        B.    Violence: § 2D1.1(b)(2)...................................................................... 27

        C.    Use of Private Aircraft: § 2D1.1(b)(3)................................................. 27

        D.    Bribes: § 2D1.1(b)(11)........................................................................ 28

        E.    Premises for Manufacturing Cocaine: § 2D1.1(b)(12) ........................... 29

        F.    Criminal Livelihood: § 2D1.1(b)(16)(E) ................................................ 29

    II.    Counts Two and Three: Use of Weapons .......................................................... 33

    III.    Grouping Analysis ........................................................................................... 34

DISCUSSION ............................................................................................................. 35

    I.       The Court Should Impose a Life Sentence ........................................... 35

           A.      The Nature and Circumstances of the Offense .......................... 35

           B.      The History and Characteristics of the Defendant .................... 41

           C.      The Need to Afford Adequate Deterrence ................................. 42

           D.      A Life Sentence Would Not Result in Unwarranted Sentencing Disparities ................................................................................. 44

    II.      The Defendant's Sentencing Arguments Are Meritless ...................... 49

           A.      The Defendant's Arguments Do Not Merit A Non-Guidelines Sentence ..................................................................................... 49

           B.      The COVID-19 Pandemic Does Not Support A Non-Guidelines Sentence ..................................................................................... 52

    III.    The Court Should Order the Defendant to Forfeit $151,724,375 ........ 55

           A.      Applicable Law .......................................................................... 55

           B.      Discussion .................................................................................. 55

    IV.    The Court Should Order the Defendant to Pay a $10 Million Fine ..... 58

           A.      Applicable Law .......................................................................... 58

           B.      Discussion .................................................................................. 58

CONCLUSION ......................................................................................................... 61

The Government respectfully submits this memorandum in response to the defendant's sentencing submission (Dkt. No. 369 ("Def. Mem.")), and in connection with the sentencing in this matter, currently scheduled for August 31, 2021 at 2:00 p.m.  Following a jury trial, the defendant was found guilty of (i) participating in a conspiracy to import cocaine into the United States, in violation of 21 U.S.C. § 963; (ii) using machineguns in furtherance of his drug-trafficking offense, in violation of 18 U.S.C. § 924(c)(1)(a)(i); and (iii) participating in a conspiracy to carry and use machineguns in furtherance of his drug-trafficking offense, in violation of 18 U.S.C. § 924(o).

The defendant was a violent narcotics trafficker who produced and distributed thousands of kilograms of cocaine for importation into the United States.  He was a key player in the state-sponsored narco-trafficking that has plagued Honduras.  To accomplish this massive level of drug distribution, the defendant established a cocaine laboratory that produced huge quantities of cocaine, fueled by boat loads of cocaine base smuggled from South America, to pump cocaine into the United States; partnered with some of the most powerful drug cartels in Honduras and Mexico to transport and sell his cocaine; bought protection from high-ranking Honduran government officials, military personnel, and police; commanded men armed with military-grade weapons, including machineguns; and, with his own hands, engaged in cruel, deadly acts of violence.  In short, the defendant bribed those he could, and he killed those he could not.

The defendant's corruption reached the highest level of the Government of Honduras.  He entered into a drug-trafficking partnership with President Juan Orlando Hernandez Alvarado ("Hernandez") to flood the United States with cocaine; to, as President Hernandez put it, "[stuff the] drugs up the gringos' noses." (Tr. 694).  This deal made the defendant untouchable: his drugs

had safe passage, courtesy of the Honduran military; he was protected from investigation in Honduras; and, perhaps most importantly for the defendant, from extradition to the United States. To remove all risk, the defendant also bribed a high-ranking Honduran judge and other influential law enforcement officials, using his drug money to buy immunity.  As recently as 2019, while the case against President Hernandez's brother unfolded publicly before this Court, the defendant traveled to the Honduran Presidential residence to pay more cocaine-fueled bribes to Hernandez. The defendant's partnership with President Hernandez is emblematic of the corrosive corruption that has been a pox on Honduras.

So too is the defendant's extreme violence, including committing five brutal murders.  The defendant began his drug-trafficking career as a *sicario*, a killer for hire—and that inclination to violence, to torture and callous murder, continued and grew as his own cocaine distribution expanded.  The defendant tortured, murdered, and left "half-buried" a boat mechanic who owed money to Devis Leonel Rivera Maradiaga ("Rivera"), a powerful drug-trafficker who, following that murder, became one of the defendant's partners.  He ruthlessly beat, tortured, and killed, with "two mercy shots to the head," (Tr. 302-03) a law enforcement officer who dared investigate his cocaine factory.  His drug rivals fared no better; the defendant, along with a member of the Honduran National Police, killed two by lighting them on fire.  He paid for the murder-for-hire of another trafficker who owed the defendant money from a drug transaction.  He commanded battalions of gang members acting as armed security and as soldiers in violent drug wars.

The defendant's combination of high-level corruption and extreme violence is unique— and uniquely horrific.  He bribed a President with a briefcase full of drug money; and he murdered

2

a law enforcement officer who threatened to disrupt that cocaine cash-flow, as the officer begged the defendant not to make his young daughter an orphan.

Because of the defendant's decade-plus of violent cocaine trafficking, the United States Probation Office (the "Probation Office") has recommended a within-Guidelines sentence of life imprisonment, emphasizing that his conduct "shocks one's conscience," as he was a "prolific and violent drug trafficker . . . [who] was at the top of the drug trafficking chain." (Final Presentence Investigation Report, dated June 11, 2021, Dkt. No. 350 ("PSR") at 28). This recommendation is appropriate based on the § 3553(a) factors. The defendant trafficked tons of cocaine, committed at least five murders, and bribed government officials, including President Hernandez, contributing to the corrosive cycle of drug-trafficking, violence, and corruption that has afflicted Honduras. Accordingly, the Government respectfully submits that the Court should impose a sentence of life imprisonment, order the defendant to forfeit $151,724,375, and pay a $10 million fine.

## THE DEFENDANT'S CRIMINAL CONDUCT

The defendant's egregious conduct was laid bare at trial and is set forth, in detail, by the PSR, to which the defendant offered no objections.

## I.     The Defendant Establishes a Cocaine Laboratory in Honduras

In the 2000s, the defendant and his drug-trafficking partner and co-conspirator, Melvin Sandres, distributed kilogram-quantities of cocaine in Miami, Florida. (Tr. 283-84, 287; PSR ¶ 26). Sandres also was a *sicario*—a hitman—for a drug-trafficking organization in Honduras known as the *Cachiros*[1] and provided security for shipments of cocaine arriving in Honduras by

---

[1] The *Cachiros* was "a violent drug trafficking organization in Honduras" that "coordinate[d] the movement of drugs to and from Honduras for Colombian and Mexican drug trafficking

boat and by airplane and being transported within Honduras. (Tr. 232; PSR ¶ 26).

In approximately 2009 or 2010, the defendant and Sandres partnered to start a cocaine laboratory located outside Choloma, Honduras, in the Cerro Negro region (the "Laboratory"). The defendant's workers at the Laboratory processed cocaine base that the defendant imported from Colombia by go-fast boat. (Tr. 291, 352-54; PSR ¶ 27). The defendant secured the Laboratory with approximately 20 or 30 men armed with AR-15s, AK-47s, and grenade launchers. (Tr. 291; *see also* Tr. 668-71; PSR ¶ 27).

Approximately two months after the defendant established the Laboratory, Sandres introduced the defendant to Rivera, Sandres' cousin and one of the leaders of the *Cachiros*. (Tr. 281, 285, 290-91, 352-54; PSR ¶ 28). The defendant, Rivera, and Sandres met inside the defendant's car at a gas station owned by Rivera in Omoa, Cortez Department, Honduras. (Tr. 285-86). Armed security for the defendant, Sandres, and Rivera stood guard and each of the three men inside the car were armed, including the defendant, who was armed with a semiautomatic pistol and two short-barrel AR-15 semiautomatic rifles. (Tr. 286-87). During that meeting, the defendant described the Laboratory and explained how his contacts in the military police and preventative police could help the *Cachiros* with transporting cocaine shipments through Honduras. (Tr. 287-88; PSR ¶ 28). The defendant asked Rivera to partner with he and Sandres in the Laboratory and to provide money for security and shipments of cocaine base from Colombia.

---

organizations, including the Sinaloa Cartel" and it was "reported that *Los Cachiros* controls 90 percent of the clandestine airstrips in Honduras, and it uses these airstrips to facilitate the entry of drugs into Honduras and Guatemala." OFAC, *Treasury Targets "Los Cachiros" Drug Trafficking Organization in Honduras* (Sept. 19, 2013), https://www.treasury.gov/press-center/press-releases/pages/jl2168.aspx.

(Tr. 290; PSR ¶ 28).  Rivera declined the request but agreed to buy two cars from the defendant, paying about $50,000 more than they were worth.  (Tr. 291-92; PSR ¶ 28).

After the Omoa gas station meeting, Sandres met with Rivera at a car repair shop that the *Cachiros* used to install traps in vehicles and to stash drug money.  Sandres provided more details about the defendant's corrupt law enforcement connections, identifying Ramon Aldaberto Martinez Hernandez, a/k/a "Comisionado Martinez," Colonel Motino, an officer named Nuila, and an officer named Rojas as particular corrupt connections.  (Tr. 295; PSR ¶ 28).[2]  Comisionado Martinez, for example, served in the Honduran National Police (the "HNP"), including as the Director of Finance for the HNP.  (Tr. 141, 135-36, 592; GX 502, 1208-T).

## II. The Defendant Commits Acts of Violence to Help Leonel Rivera and Transports Multiple Drug Loads Totaling Over Approximately 1,000 Kilograms of Cocaine

A few months after Sandres' meeting with Rivera at the repair shop, the defendant and Sandres met again with Rivera, this time at a nightclub in Choloma owned by Sandres.  (Tr. 299-300; PSR ¶ 29).  Sandres invited Rivera to the nightclub because the defendant wanted to meet with him.  (Tr. 300; PSR ¶ 29).  The defendant, Sandres, and Rivera each came to the meeting with armed guards carrying AR-15s and 9 millimeter handguns.  (Tr. 300-01; PSR ¶ 29).

During the meeting, the defendant told Rivera that he murdered a boat mechanic who owed Rivera approximately $40,000 because the mechanic had been "badmouthing" Rivera.  (Tr. 301-02; PSR ¶ 29).  The defendant explained that, with the help of a police chief in Acantilado, Honduras, the defendant took the mechanic to the Honduras-Guatemala border and tortured him,

---

[2] As discussed *infra*, the defendant kept personal and home contact information for Martinez and numerous other high-ranking Honduran police, military, and government officials, which law enforcement recovered from his phone at his arrest in 2020.  *See* Criminal Conduct, *infra*, Part VI.

including by cutting off the mechanic's finger and beating him in the face, before killing him with "two mercy shots to the head." (Tr. 302-03; PSR ¶ 29). The defendant then showed Rivera a photograph on his phone, which Rivera recognized as the mechanic, face-up and bloodied. (Tr. 303-04; PSR ¶ 29). Sandres added that the defendant was "a good person to have on our side because . . . he can kill anyone we want if we ask him to." (Tr. 304-05; PSR ¶ 29).

After the meeting at the nightclub, the defendant protected and transported three large drug shipments for Rivera between approximately 2010 and 2012. For each of these three drug shipments, the defendant and Sandres supplied a team of trucks and armed men to escort and guard the freight truck transporting the cocaine, and the defendant relied on his network of corrupt police contacts for additional protection and assistance passing through checkpoints. (Tr. 328-39; PSR ¶ 30). The defendant personally carried a Glock pistol that had been modified to fire automatically, as well as an AR-15 assault rifle; and rode in a truck with a concealed trap to carry additional weapons. (Tr. 293-94; PSR ¶ 30). The defendant's security team carried numerous additional firearms, including a 40mm grenade launcher, a "monito," so that they could repel any efforts to interdict or steal the cocaine shipment. (Tr. 310; PSR ¶ 30).

### A.     The Cocaine Shipment from El Tigre, Honduras (425 – 530 Kilograms)

The first cocaine shipment the defendant joined in with the *Cachiros* consisted of between approximately 425 and 530 kilograms of cocaine sent by the Colombian cocaine trafficker Alfonso Sierra-Vargas, a/k/a "Renteria," to an airstrip in Eastern Honduras. (Tr. 305-06; PSR ¶ 31). Sierra-Vargas used planes obtained from the United States to send cocaine shipments to the *Cachiros* in Honduras. (Tr. 327; PSR ¶ 31). After the *Cachiros* moved this cocaine shipment from the airstrip to a ranch near El Tigre, Honduras, the defendant transported it across the country to the *Los Valles*

cartel[3]—at the time, one of the most powerful drug-trafficking organizations in Honduras—near the Guatemalan border on the western edge of Honduras. (Tr. 307-313; GX. 501; PSR ¶ 31).

The defendant met at the El Tigre ranch with Rivera, Sandres and two of his armed guards, a truck driver, and an individual known as "Yuca," who worked for Sierra-Vargas. (Tr. 307-08). Everyone was armed, including the defendant, who was carrying an AR-15 and a green Glock with a selector switch for automatic firing. (Tr. 308; *see also* Tr. 1011-12). The defendant and Sandres arrived at the ranch with a car that had a hidden compartment that contained additional weapons for the transport. (Tr. 308). The defendant organized a convoy of three or four security cars to safeguard the truck carrying the cocaine. The defendant assured Rivera that, if he encountered a checkpoint or a military operation, the defendant would call Martinez to remove the checkpoint. (Tr. 309). If there were an attack on the convoy, the defendant told Rivera, he always carried AR-15s and grenade launchers and would be able to repel any attack. (Tr. 310). The defendant successfully delivered this drug shipment to the *Los Valles* cartel. Rivera paid the defendant and Sandres, together, one payment of approximately $60,000 or $70,000 in cash. (Tr. 315; PSR ¶ 31).

---

[3] In December 2013, Miguel Arnulfo Valle Valle and his brother Luis Alonso Valle Valle (the "Valles"), the leaders of the *Los Valles* cartel, and others, were charged with cocaine-importation conspiracy in the Southern District of Florida. *See* No. 13 Cr. 20897 (S.D. Fla. Dec. 4, 2013). In June 2014, the Valles and others were charged with drug-trafficking offenses in the Eastern District of Virginia. *See* No. 14 Cr. 135 (E.D. Va. June 19, 2014). Honduras extradited the Valles in December 2014. The Valles pleaded guilty to the charges in both Districts in 2016, and each was sentenced principally to 30 years' imprisonment.

**B.      The Cocaine Shipment from Congressman Najera Montoya (500 – 570 Kilograms)**

Approximately three to four months later, the defendant worked with Rivera on a cocaine shipment of between approximately 500 and 570 kilograms of cocaine sent by plane to an airstrip in Eastern Honduras controlled by former Honduran Congressman Fredy Renan Najera Montoya ("Najera").[4]  (Tr. 317-318; PSR ¶ 32).  Like the prior cocaine shipment, the Colombian Sierra-Vargas cartel supplied the cocaine and it was delivered to the *Los Valles* cartel.  (Tr. 318; PSR ¶ 32).

After the Cachiros moved the cocaine shipment from Najera's airstrip to a ranch near Tocoa, Honduras, the defendant further transported it across the country west to the *Los Valles* cartel, near the Guatemalan border.  (Tr. 319-20; PSR ¶ 33).  The defendant and Sandres protected the cocaine using the same vehicles, weapons, and tactics the defendant had used in the previous cocaine shipment. (Tr. 320; PSR ¶ 33).  Rivera again paid the defendant in cash for his role in transporting the drugs.  (Tr. 321; PSR ¶ 33).

**C.      The Cocaine Shipment to the Defendant's Airstrip (425 – 500 Kilograms)**

In approximately 2012, the defendant worked with Rivera on a cocaine shipment consisting of between approximately 425 and 500 kilograms of cocaine that Fernando Josue Chang Monroy,

---

[4] Najera pled guilty to conspiring to import cocaine in to the United States, in violation of Title 21, United States Code, Section 963; using firearms in furtherance of his drug-trafficking offense, in violation of Title 18, United States Code, Section 924(c); and participating in a conspiracy to carry and use machineguns and destructive devices in furtherance of his drug-trafficking offense, in violation of Title 18, United States Code, Section 924(o).  He is scheduled to be sentenced by Judge Gardephe on September 3, 2021.  *See United States v. Fredy Renan Najera Montoya*, 15 Cr. 378 (PGG).

a/k/a "Jack,"[5] sent to Honduras on a U.S.-registered plane.  (Tr. 322-23; PSR ¶ 34).  The cocaine-laden aircraft landed at an airstrip near Choloma controlled by the defendant and an associate known as "Compita."  (Tr. 322-23, 326-27, 355; PSR ¶ 34).  A worker for the *Cachiros*, standing lookout on the highway where the defendant would bring the cocaine out from the airstrip, was detained by Honduran police.  (Tr. 327; PSR ¶ 34).  The defendant called on Comisionado Martinez to try to get the worker released, but Martinez reported back that the arresting officer had not heard Martinez when he called.  (Tr. 327-28; ¶ PSR 34).  The defendant then called Leopoldo Crivelli, the Mayor of Choloma, to secure the worker's release.  (Tr. 328; PSR ¶ 34).  The arresting officers released the worker on the spot and returned his weapon to him.  (Tr. 328; PSR ¶ 34).

The defendant transported the cocaine near the Guatemalan border and delivered it to Chang Monroy, so that Chang Monroy could deliver it to Mexican buyers responsible for importing the drugs into the United States.  (Tr. 323; PSR ¶ 35).  Like the previous two cocaine shipments, the defendant assisted Rivera in transporting the cocaine by truck.  (Tr. 324-25; PSR ¶ 35).  Chang Monroy paid Rivera in cocaine (not cash), giving him 10% of the total shipment of cocaine; in turn, Rivera paid the defendant in cocaine for his role in the drug transaction.  (Tr. 325; PSR ¶ 35).

---

[5] In December 2015, Chang Monroy was extradited from Guatemala and charged with cocaine-importation conspiracy and money laundering offenses in the Eastern District of Virginia.  *See United State v. Fernando Josue Chang Monroy*, 3:14-cr-00075-HEH-1 (E.D.V.A. June 3, 2014).  Chang Monroy pleaded guilty to those charges pursuant to a cooperation agreement with the United States Attorney's Office in the Eastern District of Virginia.  Chang Monroy testified as a Government witness at the October 2019 trial of Juan Antonio Alvarado Hernandez ("Tony Hernandez").  *See United States v. Juan Antonio Alvarado Hernandez*, S2 15 Cr. 379 (PKC).

III.    **The Defendant Murders A Law Enforcement Officer and Bribes A Judge After Police Raid His Laboratory**

In approximately 2011, during the time period the defendant was protecting and transporting half-ton cocaine shipments for the *Cachiros*, Honduran law enforcement raided the Laboratory.  (Tr. 339, 341, 664; PSR ¶ 36).  Law enforcement did not find drugs or the defendant at the Laboratory because the defendant was warned in advance by Jose Miguel Handal Perez, a/k/a "Chepe Handal," a prolific drug trafficker based in San Pedro Sula, Honduras.[6]  (Tr. 331; PSR ¶ 36).  After the *Cachiros* declined the defendant's offer to invest in the Laboratory, the defendant partnered with Handal to secure investments in cocaine base to be processed at the Laboratory and access to Handal's own network of corrupt law enforcement contacts in the San Pedro Sula area to protect the Laboratory's operations.  (Tr. 331-32; PSR ¶ 36).  In addition to Handal's warning, "Polito" Crivelli, the son of Coloma Mayor Leopoldo Crivelli (Tr. 331; PSR 36), leaked a police investigation of the Laboratory to the defendant.  After the raid, the defendant left Choloma for approximately a month or two to avoid possible arrest.  (Tr. 671-72, 811; PSR ¶ 36).

A few months later, the police officer who organized the Laboratory raid was drinking at Sandres' nightclub in Choloma.  (Tr. 342; PSR ¶ 37).  The defendant and Sandres, however, realized who the officer was and kidnapped and murdered him.  (Tr. 342; PSR ¶ 37).  The defendant, Sandres, and the defendant's *sicarios* took the officer to Laguna de Ticamaya, a lake

---

[6] On April 9, 2013, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") designated Chepe Handal as a Specially Designated Narcotics Trafficker.  OFAC also designated Handal's spouse, father, and several of Handal's companies located in San Pedro Sula, Honduras.  *See* U.S. TREASURY DEPT., *Treasury Designates Honduran Drug Traffickers* (Apr. 9, 2013), *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl1888.aspx.

outside Choloma.  (Tr. 342-43; GX 503; PSR ¶ 37).  The defendant and his confederates tortured the officer, beating him up, hitting him in the face, and putting a plastic bag over his head to suffocate him.  (Tr. 343-44; PSR ¶ 37).  They put pins through the officer's fingers and beat his hands with a pistol.  (Tr. 344; PSR ¶ 37).  The officer "was asking for them not to kill him because he had a daughter, a small daughter whom he did not want to leave orphan."  (Tr. 344; PSR ¶ 37).  The purpose of this brutal torture was interrogation: the defendant wanted to know if his money launderer and benefactor, Fuad Jarufe, had been implicated in the investigation relating to the Laboratory.  (Tr. 344-46; PSR ¶ 37).  After the defendant was satisfied that the officer had "told them the truth" about the investigation (Tr. 354)—namely, that Jarufe's name had not been mentioned—the defendant killed the officer, firing "three mercy shots to his head."  (Tr. 346; PSR ¶ 37).

The defendant also bribed a high-ranking Honduran judge to obstruct the investigation relating to the Laboratory.  (PSR ¶ 38).  Approximately 30 to 40 days after the raid, the defendant went to the offices of Graneros, the grain company located in Choloma, headed by Jarufe, which the defendant used to launder the proceeds of his drug trafficking.  (Tr. 654-55; PSR ¶ 38).  While there, the defendant met with Julio Cesar Barahona, then the President of the Judiciary in Honduras, a position appointed by the President of Congress, then Juan Orlando Hernandez.  (Tr. 679, 742; PSR ¶ 38).  Upon his arrival, Barahona stated that he had been sent by the "boss" so that he could "help out" the defendant.  (Tr. 680; PSR ¶ 38).  Barahona met with the defendant in Jarufe's office, and, at the conclusion of their meeting, Jarufe instructed Jose Sanchez, a Graneros accountant who witnessed the meeting, to make out a check to Barahona in the amount of 30,000

lempiras from the defendant's Graneros account. (Tr. 680-82; PSR ¶ 38). The defendant repaid

Graneros in cash payments consisting of $20 bills. (Tr. 682; PSR ¶ 38).[7]

## IV.   The Defendant Expands His Narcotics Trafficking, Seeks Assistance Collecting a Drug-Trafficking Debt, Murders Another Drug Trafficker

With his Laboratory back up and running, and protected from further interference, the

defendant expanded his narcotics trafficking. (PSR ¶ 39). In approximately 2013, the defendant,

Sandres, Javier Choloma, and Rivera met to discuss a proposed shipment of cocaine. (Tr. 356;

PSR ¶ 39). Javier Choloma was a former official from the administration of Honduran President

Roberto Micheletti. (Tr. 356; PSR ¶ 39). During the meeting, the defendant and Sandres asked

Rivera to lend them $1 million to invest in an approximately 2-ton drug shipment of from

Colombia. (Tr. 357; PSR ¶ 39). Javier Choloma later told Rivera that the cocaine would arrive at

Puerto Cortes, where Jarufe had a contact at the port. (Tr. 357; PSR ¶ 39). Rivera decided not to

lend the defendant and Sandres the $1 million, which led to a rift. (Tr. 358, 368; PSR ¶ 39). In

approximately 2013, Rivera met with "Juanito" Guzman, a representative of the Sinaloa cartel,

then the largest drug cartel in Mexico and headed by Juanito's cousin, Joaquin "Chapo" Guzman.

(Tr. 360-61; PSR ¶ 39). During that meeting, Juanito described the defendant's business with the

Sinaloa cartel. (Tr. 361; PSR ¶ 39). In approximately 2012 or 2013, the defendant supplied the

cartel at least three tons of cocaine, in three shipments of approximately 500, 1,000, and 1,500

---

[7] As a precaution against the possibility of a national police investigation relating to the Laboratory, the defendant and Sandres also transferred nominal ownership of Atletico Choloma, a soccer club, to a straw owner, Javier Choloma. (Tr. 358-59). *See also* INSIGHT CRIME, *Why Are So Many Honduras Soccer Bosses Involved in Crime?* (Dec. 15, 2015), *available at* https://insightcrime.org/news/analysis/why-are-so-many-honduras-soccer-bosses-involved-in-crime/ (describing, *inter alia*, the 2015 arrest of Atletico Choloma's President, Javier Hernandez).

kilograms, respectively.  (Tr. 361-62; PSR ¶ 39).  The third shipment the defendant and Sandres sold to the Sinaloa cartel was wet, degrading its quality lowering the price for which the cocaine could be sold.  (Tr. 362; PSR ¶ 39).

The defendant also worked with other drug traffickers during this period.  (PSR ¶ 40).  In or about 2012 or 2013, the defendant provided another drug trafficker, Edgar Rios, a/k/a "Pluto," with 100 kilograms of cocaine on consignment, meaning that Rios would sell the drugs and pay the defendant from the proceeds.  (Tr. 363-64; PSR ¶ 40).  However, because the cocaine was low quality, Rios could not sell it and was unable to pay back the defendant.  (Tr. 364; PSR¶ 40).  As a result, the defendant and Sandres contracted a *sicario* named "Vaquero" to murder Rios.  (Tr. 364-65; PSR ¶ 40).

The defendant committed two more drug-related murders in or about 2012 or 2013.  (PSR ¶ 41).  Two assassins murdered Sandres' brother over a cocaine debt, and the defendant located and murdered them in revenge. (Tr. 347-52; PSR ¶ 41). The defendant, Sandres, and Juan Manuel Avila-Meza,[8] then a member of the Honduran National Police, found the two victims out driving. The defendant and Avila-Meza used their cars to box the victims in, took them out of their car and kidnapped them. (Tr. 349-50; PSR ¶ 41). The victims were taken to took them to a ranch in Naco, Cortés, Honduras.  (Tr. 350; PSR ¶ 41).  There, the defendant, Sandres, and Avila-Meza beat, tortured, and shot the victims.  (Tr. 350; PSR ¶ 41).  The defendant poured gasoline on the two men, and Avila-Meza lit them on fire.  (Tr. 350-51; PSR ¶ 41).

---

[8] Avila-Meza pled guilty to conspiring to import cocaine into the United States, in violation of Title 21, United States Code, Sections 959(c) and 963.  In March 2021, he was sentenced to 144 months' imprisonment. *See United States v. Juan Manuel Avila-Meza*, 15 Cr. 174 (LGS).

V.     **The Defendant Engages In Drug-trafficking Under the Protection of National Party Leaders, Including Juan Orlando Hernandez Alvarado**

The defendant conspired with politicians, ranging from local to national officials.  As described above, these officials included Leopoldo Crivelli, the mayor of Choloma, and Barahona, a high-ranking Honduran judge.  The defendant also conspired with Hernandez, the current President of Honduras.  (PSR ¶ 42).

By at least 2013, while Hernandez was running for President of Honduras, the defendant started to work directly with Hernandez, whom he called "Juancho." (Tr. 691-701; PSR ¶ 43). Graneros' accountant saw the defendant meeting with Hernandez—who regularly visited Graneros to collect "quotas" of purported campaign contributions from Jarufe—twice, where the defendant paid Hernandez bribes totaling approximately $25,000 and discussed the Laboratory.  (*Id.*). During the first meeting, Hernandez asked the defendant for access to the Laboratory because it was a short distance from Puerto Cortez, Honduras' largest port city.  (*Id.*).  The defendant agreed and, in exchange, Hernandez told the defendant that the Honduran police and military would protect the defendant's cocaine shipments and protect the defendant from prosecution.  (*Id.*).

Specifically, Hernandez advised the defendant "not to worry about the law because Attorney General [Oscar] Chinchilla had been appointed to protect them and also the drugs transportation through the different routes, and that these transportations will have the protection of the military and the police, and that they would handle security of the drugs, and that by the time the United States came to know the truth, they would have amended the law in their favor because [President of the Honduran Congress Mauricio] Oliva and Chinchilla were already on it, they'd be untouchable."  (Tr. 694; PSR ¶ 43).

Hernandez then said that he and the defendant would "[stuff the] drugs up the gringos' noses, and they're never even going to know it," which Sanchez understood as "[a] mockery of the United States people."  (Tr. 694, 698; PSR ¶ 43).  Hernandez told the defendant to report to Juan Antonio Alvarado Hernandez ("Tony Hernandez"), Hernandez's brother and at the time a major Honduran drug-trafficker.  (Tr. 694-95; PSR ¶ 43).[9]  At the conclusion of this first meeting, the defendant gave Hernandez a $15,000 cash bribe.  (Tr. 696; PSR ¶ 44).  During the second of the two meetings, after the defendant and Hernandez discussed politics, the defendant gave Hernandez a $10,000 bribe.  (Tr. 701; PSR ¶ 44).  The defendant maintained a relationship with Hernandez and Geovanny Daniel Gutierrez ("Gutierrez"), the latter of whom maintained photographs in his iCloud account depicting himself and Hernandez, as well as of Hernandez (pictured below, second from right) and Comisionado Martinez (pictured below, second from left). (GX 915, 918).

---

[9] In October 2019, following trial, Tony Hernandez was convicted of cocaine importation conspiracy, in violation of Title 21, United States Code, Section 963; possession of machineguns and destructive devices in furtherance of that conspiracy, in violation of Title 18, United States Code, Section 924(c); and conspiracy to possess machineguns and destructive device, in violation of Title 18, United States Code, Section 924(o).  On March 30, 2021, this Court sentenced Tony Hernandez principally to life imprisonment.  *See United States v. Juan Antonio Hernandez Alvarado*, S2 15 Cr. 379 (PKC).



And the defendant continued to meet with, and pay bribes to, Hernandez. (Tr. 389). As the defendant admitted to Rivera, the defendant met Hernandez twice in 2019. The defendant met Hernandez at Graneros and gave Hernandez a bribe of approximately 450,000 lempiras. The defendant met Hernandez again in the Honduran capital and paid him a second, unspecified bribe. (Tr. 389; PSR ¶ 44). Both bribes were for protection so that the defendant would not be arrested in Honduras. (Tr. 389; PSR ¶ 44). Data on the defendant's phone from the navigation application Waze reflects that, on or about May 29 and June 12, 2019, after filings in the Tony Hernandez prosecution disclosing that Hernandez was an investigative target, the defendant traveled to Casa Presidencial. (Tr. 869-71; GX 201-201; PSR ¶ 44). On May 28, 2019, the Government filed its opposition to Tony Hernandez's pre-trial motions, along with a declaration appended thereto. (*See* ECF Nos. 57, 58). The declaration included as an exhibit an application for authorization to obtain certain information pursuant to Title 18, United States Code, Section 2703(d), which, for the first

time, publicly identified Juan Orlando Hernandez as a target of the Government's investigation. (*See* Dkt. No. 58, Ex. 7 at ¶ 9; *see also* Tr. 869).  Similarly, on June 12, 2019, Tony Hernandez filed a reply brief in further support of his pre-trial motions.  (*See* Dkt. No. 64).  The defendant traveled to Casa Presidencial on or about May 29, 2019, the day after the Government publicly identified President Hernandez as a target of its investigation; and also on or about June 12, 2019, *the same day* Tony Hernandez filed his reply brief.  The defendant also met, at Hernandez's direction, with Martinez and a senior Honduran Air Force officer to discuss a money-laundering company that Hernandez wanted the defendant to sell to him.  (Tr. 387-88; PSR ¶ 44).

## VI.    The Defendant Furthers His Violent Drug-Trafficking Business Through Corrupt Military and Police Contacts

The defendant's drug trafficking operation thrived, in part, because of his corrupt contacts in the military and the police.

### A.    The Defendant Receives Support from Military Officials

The defendant received support from the highest levels of the Honduran military.  Rene Orlando Ponce Fonseca, a Honduran general and leader of the 105th Battalion in San Pedro Sula, later the head of FUSINA (a Honduran anti-drug multi-agency task force) for the Honduran north coast (Tr. 595), and later the head of all military forces in Honduras, provided the defendant with assistance, military equipment, uniforms, and weapons.  (PSR ¶ 46).  In approximately 2014, after the two meetings at Graneros in 2013 at which the defendant bribed Hernandez, Sanchez found a box at Graneros that contained "police vests and Army and police uniforms," along with "a piece of paper inside the box that said 'for Geovanny Fuentes,' and on the side of it was something like a seal that said '105th Brigade.'"  (Tr. 705; PSR ¶ 46).  Sanchez testified that the police/military vests he found in the box, with a note addressed to the defendant, were similar to an image

identified on Gutierrez's iCloud account depicting the defendant wearing a police/military-type vest. (Tr. 705; GX 917; PSR ¶ 46).



Thereafter, on a different occasion, the defendant showed Sanchez a "heavy military-grade weapon" that he had received from the military. (Tr. 707; PSR ¶ 47). Like the police/military-type vests, Gutierrez's iCloud account contains numerous images depicting a military-style AR-15 rifle with a "Navy insignia." (*See, e.g.,* GX 901, 929; Tr. 107-08; PSR ¶ 47). Years later, in January 2021, after the Government had filed its initial motions *in limine* on January 8, 2021, Gutierrez exchanged messages with another co-conspirator in which Gutierrez acknowledged that the Government had correctly identified the green rifle that the Honduran military had given to the

18

defendant.  (GX 935-T at Rows 15-21).  In addition to Ponce Fonseca and the 105th Brigade, other

of the defendant's military contacts include Colonel Leandro Flores, head of an anti-gang unit; and

Colonel Melgar, a commander in an anti-narcotics multi-agency task force. (GX 502).

The defendant also received information and support from members of the Honduran

military.  Lieutenant Colonel Salgado, a/k/a "Comanche," provided the defendant with information

about law enforcement activities.  The defendant maintained Comanche's contact information in

his phone (Tr. 154; *see also* GX 504) and, as recently as December 2019, the two communicated

about drug-related activities, including drug-related murders.  (PSR ¶ 48).  For example, between

approximately October 26 and 29, 2019, Comanche sent the defendant numerous press articles

relating to the murder of Nery Orlando Lopez Sanabria, a drug trafficker whose seized narcotics

ledgers were introduced at the *Hernandez* trial in October 2019.  (*Hernandez* Tr. 50-51, 224, 767).

As reported in articles Comanche sent the defendant: "Narco with Links to Tony in NY Trial

Murdered."  Comanche sent numerous articles reporting on Sanabria's murder, many of which

published Sanabria's lawyer's accusation that the Honduran government was responsible for the

murder and that Sanabria had been promised a transfer to a different prison if he refuted his drug

ledgers  (*See* Gov't Letter dated Feb. 22, 2021, Dkt. No. 250 at 3, Ex. A).

On or about November 18, 2019, the defendant and Comanche also exchanged messages

about the *Los Valles* cartel.  Comanche sent the defendant a news article about a son of Arnulfo

Valle Valle having been murdered in Copan, to which the defendant responded:

| Defendant | Arnulfo's son was nailed. |
|-----------|----------------------------|
| Comanche | Yeah, man, it's fucked up. |
| Defendant | The competition.  Or the cops. |
| | It's the end for these people, comanche. |

(GX 201-8 at Rows 3-9; PSR ¶ 48).

19

Comanche and the defendant also exchanged communications about the murder of a Honduran defense lawyer, who was described as the attorney both for Sanabria and for members of the *Los Valles* cartel. The *Los Valles* cartel, like Sanabria, were the subject of extensive testimony at the *Hernandez* trial. (*E.g.*, *Hernandez* Tr. 153-56, 200, 381-85, 401-02, 447-41, 766-67, 797-98). Less than two months after the reported murder of Sanabria, Pinto also was murdered in Honduras. On or about December 9, 2019, Comanche wrote to the defendant, "Attorney Luis Pinto, the lawyer for the Valles, has just been murdered." (Tr. 849-50; GX 201-8 at Row 1). The defendant responded, by voice note, "Well, they knew what they were facing, now. Things are so bad here . . . those lawyers are going to be subdued, man, very, very clever." (*Id.*). Later in the conversation, the defendant continued, observing that, "Money is go-, it's nice, [C]omanche, money is nice, do you think a lawyer doesn't know it'll be—it's easy as pie, defending a narco like that, the money is nice, but well, you have the consequences there, the enemies." (*Id.*).

### B.     The Defendant's Corrupt Police Contacts

As described above, the defendant maintained corrupt police contacts who assisted him in his drug trafficking activities, including Martinez, a high-ranking HNP officer. (Tr. 135-36, 141, 592; GX 502, 1208-T; PSR ¶ 49). The defendant's drug partnership with Martinez continued up to the time of the defendant's arrest. In April 2015, Martinez shared information about a murder investigation with Gutierrez, one of the defendant's sons and co-conspirators, in order to find out if the victims were the defendant's bodyguards. (GX 933-T at 3-4; PSR ¶ 49).

On or about February 25, 2020, Martinez provided the defendant with specific instructions about how to determine whether his phone was being wiretapped, and how to remove any such wiretap—*i.e.*, how to destroy evidence.

| Martinez | 1st step<br>*#21# if it's tapped<br>2nd step<br>*#62# if the calls are being forwarded<br>3rd step<br>##002# to untap calls |
| --- | --- |
| Defendant | 🤣 |
| Martinez | To see if you have been tapped<br>Already *#06#<br>You will see the IME and if you<br>See / 1, you have been tapped<br>Once, and so on. |

(GX 201-14-T at 4; *see also* Tr. 143-46; PSR ¶ 50). Later in the same conversation, also on or about February 25, 2020, the defendant told Martinez how another of the defendant's police contacts had warned the defendant about talking so openly on the phone because of wiretaps: "[M]y friend over there told me that, that they were checking us out, that they had us, uh, there, that they were listening to us, that I should not be talking so much crap." (GX 201-14-T at 5; PSR ¶ 49). Martinez's instructions for defeating wiretaps also appeared in Gutierrez's phone. (GX 928; PSR ¶ 49).

      Other police contacts of the defendant's include Wilson Antonio Alvarenga Nunez, a member of the Direccion de Logistica for the national police; Raul Martinez Alvarado, a national police officer; subcomisionado Munguia Antunez; and a subcomisionado Sauceda.

## VII.    The Defendant's Post-Arrest Admissions

On March 1, 2020, the defendant was arrested in Miami, waived his *Miranda* rights, and made incriminating statements to law enforcement.[10]   For example, the defendant admitted to knowing and having relationships with his key drug-trafficking co-conspirators:

- The defendant said he had known Sandres for a long time; that he had heard from others, including media reporting and Martinez, that Sandres engaged in drug trafficking with the *Cachiros*; that Sandres owned a nightclub in Choloma, which the defendant went to "several times"; that "sometimes there were meetings" at the nightclub; and that Sandres introduced the defendant to Rivera.

- The defendant admitted to knowing Vaquero, who the defendant said "started working with Sandres . . . like in security"; "threaten[ed] one [of the defendant's] sons"; "was a hitman"; and was later killed.

- The defendant admitted to knowing Chepe Handal very well; that Chepe Handal "studied" commerce with the defendant; that Chepe Handal was "very close" with Jarufe; and that Chepe Handal did "drug trafficking stuff" for a living.

- The defendant said that he knew Rios; that he met Rios in Choloma; that "at the end we realized that [Rios] was involved in drug trafficking things"; and that Rios was killed.

- The defendant said he met Rivera and his brother, Javier Rivera, and that Javier Rivera's daughter married the defendant's son, but he claimed that he never did anything illegal with them.  The defendant also said that he had a meeting with Rivera at a gas station that Rivera owned in Omoa, Cortés, which the defendant went to because it was close to a "marina" at "Acantilados."  The defendant also said that he sold Rivera two cars for tens of thousands of dollars, which Rivera paid for in two installments of U.S. currency.

---

[10] The interview was conducted in Spanish, and English translations of the defendant's statements were received in evidence.  Certain portions of this interview, as well as the corresponding translated transcript, were admitted as evidence at trial:  GX 401-T, 401-TR, 401-1, 402, 402-T, 401-3, 401-4, 401-5, 401-6, 401-8, 401-9, 401-10, 401-12, 401-13, 401-14, 401-15, 401-16, 401-17, 401-19, 401-20, 401-21, 401-22, 401-23, 401-24, 401-24-R, 401-25, and 401-26.

- The defendant admitted to knowing Jarufe very well; that Jarufe had financed one of the defendant's businesses with loans; and that Jarufe was a financial supporter of Hernandez.

- The defendant admitted that Hernandez was at Graneros "all the time" when Hernandez was campaigning.

- The defendant admitted to having relationships with several police officers, including Martinez and "the Saucedas," with one of whom the defendant said he was particularly close.

The defendant also made admissions about the Laboratory in "Cerro Negro." The defendant said that "[m]any years ago, there was a lab that was discovered in one of the properties that belonged to [Jarufe]" and that the lab was "supposedly" for "cocaine" but "nothing was found there." He also said that when law enforcement raided the Laboratory, he gave a statement to law enforcement because he "provided maintenance" to a "coffee plantation" located on the property. The defendant also admitted that at some point the property with the Laboratory belonged to him because Jarufe "gave it to [him]." (*See* GX 401-TR at 11-14, GX 409).

Additionally, at the time of his arrest, the defendant had multiple police and military contacts in his cellphone, including "Comisionado Martinez," identified as Ramon Aldaberto Martinez Hernandez, a former police Comisionado and the director of finance for the Honduras National Police until approximately 2017. (GX 502, 1208, 1208-T).[11]

---

[11] After Martinez was identified in a pretrial *in limine* filing as the author of WhatsApp chats with the defendant based on his LinkedIn page, the page was taken down in an apparent attempt by Martinez to remove evidence of his participation in the conspiracy. (Tr. 225-27; *see also* Dkt. No. 224 at 38, 44-45; Dkt. No. 250 at 5).

**THE SENTENCING GUIDELINES RECOMMEND LIFE IMPRISONMENT**

Based on an offense level of 52, which is capped at 43, and Criminal History Category I, the Guidelines recommend a sentence of life imprisonment with a mandatory minimum sentence of 10 years' imprisonment on Count One and a mandatory consecutive 30-year term on Count Two.  The defendant made no factual objections to the PSR; however, in his sentencing submission, the defendant "objects to the guidelines calculation in the PSR which include enhancements, in paragraphs 74-81, that were not found by the jury in its verdict."  (Def. Mem. at 2, n.2).  For the reasons set forth below, each of the sentencing enhancements set forth in the PSR applies.

**I.  Count One**

**A.  Drug Quantity: § 2D1.1(a)(5)**

Pursuant to U.S.S.G. § 2D1.1(a)(5), the base offense level for Count One is 38 because the offense involved approximately 21 tons of cocaine, well over the 450-kilogram threshold..  (PSR ¶¶ 61, 74).[12]  The Government calculates the approximately 21 ton quantity—which, as described below, reflects a conservative estimate—as follows:

- **Cocaine Shipments with Rivera:**  Rivera testified about three cocaine shipments he completed with the defendant, totaling approximately 425 to 530 kilograms (Tr. 305-06), approximately 500 to 570 kilograms (Tr. 317-18), and approximately 425 to 500 kilograms (Tr. 322-23, 326-27, 355).  At minimum, these three shipments reflected approximately 1,350 kilograms of cocaine trafficked by the defendant.

---

[12] The approximately 5 ton estimate in the PSR reflected a very conservative one that did not include the Laboratory's production for the years following 2013 until the defendant's arrest.

- **<u>Cocaine Sold to Sinaloa</u>:** Rivera testified also three shipments of cocaine the defendant sold to the Sinaloa Cartel, totaling approximately 3,000 kilograms. These specific shipments alone, at the low end, represent approximately 4,350 kilograms of cocaine.

- **<u>Cocaine Produced at Defendant's Laboratory</u>:** Additionally, as described by both Rivera and the defendant owned and operated Laboratory, established in approximately 2009 or 2010 (Tr. 291, 352-54) and guarded by 20 to 30 armed men (Tr. 291; *see also* Tr. 668-71). (PSR ¶ 27). The Laboratory produced approximately 200 to 300 kilograms of cocaine per month from cocaine base imported from Colombia. (*See* Ex. A, 3501-127; Ex. B, 3501-133; Ex. C, 3501-155). Though the Laboratory operations were temporarily interrupted by the 2011 raid, by 2012 it was productive again, so productive that Hernandez, then the President of Congress and a candidate for President of the country, became an investor. (*See* The Defendant's Criminal Conduct, *supra*, Part V). Even assuming, conservatively, that the Laboratory stopped producing cocaine around the time of the 2011 raid, assuming approximately 200 kilograms per month for the months spanning January 2012 through the defendant's arrest in March 2020, yields approximately 17.2 tons of cocaine.[13] *See* U.S.S.G. § 2D1.1 app. n.5 (noting that a drug quantity estimate can include "the size or capability of any laboratory involved").

This is a conservative estimate that does not take into account an additional approximately 185 tons of cocaine that arguably are attributable to the defendant. Pursuant to U.S.S.G. § 2D1.1 app. n.5, relevant conduct principles govern the drug quantity for which a defendant is responsible; and, under U.S.S.G. §§ 1B1.3(a)(1)(B) or (a)(2), the defendant is responsible for the 185 tons of cocaine for which this Court has found Tony Hernandez, the defendant's co-conspirator, responsible. (Hernandez Presentence Investigation Report, Dkt. No. 129 at ¶ 47; *see also Hernandez* (Dkt. No. 326 ("Hernandez Sent. Tr.") at 11)). In 2013, President Hernandez specifically directed the defendant to work with Tony Hernandez, even providing the defendant

---

[13] This figure assumes the approximately 100 kilograms of cocaine the defendant provided Rios on consignment (Tr. 362-63) came from the Laboratory; and those 100 kilograms are included in the 17.2 tons.

with Tony Hernandez's cellphone number.   (Tr. 695; PSR ¶ 43).   And the trial evidence demonstrated this was not a one-off event.  As set forth above, in 2019, several years after that meeting, the defendant traveled to Casa Presidencial on or immediately after relevant filings in the Tony Hernandez prosecution.  (*See* The Defendant's Criminal Conduct, *supra*, Part V).  Moreover, the trial evidence established a significant amount of overlap between the defendant's and Tony Hernandez's co-conspirators, including the *Cachiros*, *Los Valles*, Fredy Najera, Chang Monroy, Handel, Renteria, and Yuca.   The defendant's co-conspirators collectively imported a truly unfathomable quantity of cocaine: Rivera testified that the *Cachiros* imported approximately 130 tons of cocaine (*Hernandez* Tr. at 764); *Los Valles* were "responsible for the distribution of tens of thousands of kilograms of cocaine per month directly into the United States," s*ee* U.S. TREASURY DEPT., *Treasury Targets Honduran Drug Trafficking Organization and its Network* (Aug.   20,   2014),   *available   at*   https://www.treasury.gov/press-center/press-releases/Pages/jl2611.aspx.; Najera, in his plea agreement, admitted to importing approximately 20 tons of cocaine (*see* Dkt. No. 242, Ex. 2); Chang Monroy testified that he imported a total of approximately 200 tons of cocaine, including approximately 15 tons working with Tony Hernandez (*Hernandez* Tr. 912); and Handal was "responsible for the coordination and distribution of multi-ton shipments of cocaine from Colombian sources of supply into Honduras" (*supra* n.7). Beyond his Honduran co-conspirators, the defendant also provided approximately three tons of cocaine to the Sinaloa Cartel—headed, of course, by El Chapo, who was responsible for the importation or attempted importation of approximately 1,213,100 kilograms of cocaine and 1,440 kilograms of cocaine base, among other drugs.  (*See United States v. Joaquin Archivaldo Gusman Loera*, Criminal Docket No. 09-0446 (E.D.N.Y.), Dkt,. No. 648 at 2).

In short, the defendant is responsible for *at least* over 21 tons of cocaine, and likely much more, which does not include relevant conduct attributed to and admitted by his co-conspirators.

## B.  Violence: § 2D1.1(b)(2)

Pursuant to U.S.S.G. § 2D1.1(b)(2), a two-level enhancement is applied because the defendant directed the use of violence in connection with Count One.  (PSR ¶ 75).  The trial evidence showed that the defendant engaged in acts of violence in furtherance of his drug trafficking, including five murders.

The defendant murdered a boat mechanic who owed Rivera money to get into Rivera's good graces, in an attempt to earn Rivera's trust and partner with him in trafficking cocaine.  (Tr. 301-04).  Following the 2011 police raid on his Laboratory, the defendant kidnapped, tortured, and murdered one of the officers involved, executing the officer himself with "three mercy shots to his head."  (Tr. 342-46).  In addition to the boat mechanic and the officer, the defendant committed three additional drug-related murders.  When Rios was unable to pay a drug debt owed to the defendant and Sandres, they contracted a *sicario* named "Vaquero" to murder Rios (Tr. 364-65).  And, in or about 2012 and 2013, the defendant, Sandres, and Avila-Meza brutally tortured and murdered two assassins who had killed Sandres' brother over a drug debt, with the defendant pouring gasoline on the two men and Avila-Meza lighting them on fire.  (Tr. 350-51).

## C.  Use of Private Aircraft: § 2D1.1(b)(3)

Pursuant to U.S.S.G. § 2D1.1(b)(3), a two-level enhancement is applied because the defendant used private aircraft in connection with the importation of cocaine.  (PSR ¶ 76).  The defendant controlled clandestine airstrips, such as Compita (Tr. 322-23, 326-27, 355; PSR ¶ 34), to receive planes filled with cocaine.  Each of the three cocaine shipments on which he partnered

with Rivera included the use of private aircraft. The first cocaine shipment the defendant joined in with the *Cachiros*, of approximately 425 to 530 kilograms of cocaine, was delivered by the drug-trafficker Renteria, using a plane obtained from the United States, to a private airstrip in Eastern Honduras. (Tr. 305-06, 327). Similarly, the second shipment, of approximately 500 to 570 kilograms, was sent to the defendant and the *Cachiros* at a private airstrip located in Eastern Honduras, this one controlled by Najera. The third cocaine shipment on which the defendant collaborated with Rivera, in approximately 2012 of approximately 425 to 500 kilograms of cocaine, was sent by Chang Monroy to Honduras on a U.S.-registered plane. (Tr. 322-23, 326-27, 355).

### D. Bribes: § 2D1.1(b)(11)

Pursuant to U.S.S.G. § 2D1.1(b)(11), a two-level enhancement is applied because the defendant bribed law enforcement officials to facilitate Count One. (PSR ¶ 77).

The defendant bribed law enforcement officials and politicians, including Hernandez, for protection and safe passage of his drug shipments. Approximately a month after Honduran police related the Laboratory, the defendant bribed Barahona, a high-ranking Honduran judge to obstruct any subsequent investigation into the Laboratory. (Tr. 680-682). Trial testimony established that the defendant also paid bribes directly to Hernandez, including while Hernandez was running for President of Honduras and after he assumed that position. The defendant paid Hernandez two bribes, totaling approximately $25,000 and provided Hernandez with something much more valuable: access to the Laboratory, where he produced massive amounts of cocaine, and which only was a short distance from Puerto Cortez, Honduras' largest port city. (Tr. 691-701). And the defendant continued to pay bribes to Hernandez after the latter became President of Honduras. In

approximately 2019, the defendant paid bribes to Hernandez on two occasions, one for approximately 450,000 lempiras and the second of an unspecified amount, for protection so that the defendant would not be arrested in Honduras.  (Tr. 389).

### E.   Premises for Manufacturing Cocaine: § 2D1.1(b)(12)

Pursuant to U.S.S.G. § 2D1.1(a)(12), a two-level enhancement is applied because the defendant maintained premises for the purpose of manufacturing cocaine.   (PSR ¶ 78). Specifically, the defendant and Sandres, later in partnership with the *Cachiros*, established and operated the Laboratory outside Choloma, Honduras, where the defendant's workers processed cocaine that the defendant imported from Colombia by go-fast boat. The Laboratory produced approximately 200 to 300 kilograms of cocaine each month, ultimately to be imported to the United States.  (*See* Exs. A, B, C).  The defendant secured the Laboratory with 20 to 30 men armed with automatic weapons, including machineguns and grenade launchers.  (Tr. 291; *see also* 668-71). And he protected the Laboratory, and his cocaine operation, with violence; for example, murdering an officer involved in the 2011 raid of the Laboratory.

### F.   Criminal Livelihood: § 2D1.1(b)(16)(E)

Pursuant to U.S.S.G. § 2D1.1(b)(16)(E), an additional two levels are added because the defendant "committed the offense as part of a pattern of criminal conduct engaged in as a livelihood."  (PSR ¶ 79).[14]  The defendant participated in the cocaine-importation conspiracy between 2009 and 2020.  Approximately 11 years is more than sufficient to constitute a "pattern

---

[14] The defendant was also "directly involved in the importation of a controlled substance." U.S.S.G. § 2D1.1(b)(16)(C).  But that enhancement does not apply due to the application of U.S.S.G. § 2D1.1(b)(3).  *See* U.S.S.G. § 2D1.1 app. n.20.

of criminal conduct" under the Guidelines.  *See* U.S.S.G. § 4B1.3 app. n.1 ("'Pattern of criminal conduct' means planned criminal acts occurring over a substantial period of time.").

The defendant's drug trafficking also constituted a "criminal livelihood."  *See id.* app. n.2. First, as discussed below in the section regarding forfeiture, the Government estimates that the defendant made approximately $151,724,375 in connection with Count One.  In any given year, he earned greatly in excess of $14,500, which is the Guidelines threshold determined by calculating 2,000 times the federal hourly minimum wage of $7.25.  *See id.*  For example, for his role in the first cocaine shipment he partnered on with the *Cachiros*—delivering approximately 425 to 530 kilograms of cocaine to *Los Valles* cartel—Rivera paid the defendant and Sandres, together, approximately $60,000 or $70,000 in cash.  (Tr. 315).  Second, "the totality of circumstances shows that [the defendant's] criminal conduct was" his "primary occupation." U.S.S.G. § 4B1.3 app. n.2.  The defendant claims that, between 2009 and 2013, he "operated a farm in Choloma" that "produced coffee, corn, rice, [and] potatoes, among other things" from which he earned approximately $2,000 monthly.  (PSR ¶ 118).  This claim of operating a "farm" is contradicted by the trial evidence, which showed that this "farm" was actually a cocaine laboratory, and "was merely a front for the defendant's criminal conduct," U.S.S.G. § 4B1.3 app. n.2.

## G.  Leadership: § 3B1.1(a)

Pursuant to U.S.S.G. § 3B1.1(a), a four-level aggravating-role adjustment is applied because the defendant was an organizer and leader of the criminal activity, and Count One involved five or more participants and was otherwise extensive.  (PSR ¶ 80).

First, Count One "involved five or more participants or was otherwise extensive." U.S.S.G.

§ 3B1.1(a).   "A 'participant' is a person who is criminally responsible for the commission of the offense, but need not have been convicted."   U.S.S.G. § 3B1.1 cmt. n.1.   Far beyond five participants, the defendant commanded a security team at the Laboratory of approximately 20 to 30 men armed with AR-15s, AK-47s, and grenade launchers.   (Tr. 291; *see also* Tr. 668-71).   He also directed a team of armed men in transporting the three large cocaine shipments on which he partnered with Rivera.   In addition to Rivera, the Government established at trial that the offense involved numerous other drug traffickers, as well as politicians and judges, police, and members of the military:

- **Drug Traffickers**:   Tony Hernandez (*e.g.*, Tr. 694-95), Melvin Sandres (*e.g.*, Tr. 283-84, 287,  Fernando Josue Chang Monroy (*e.g.*, Tr. 322-23, 326-27, 355), Sierra-Vargas and "Yuca" (*e.g.*, Tr. 305-06), Jose Miguel Handal Perez (*e.g.*, Tr. 331), Edgar Rios (*e.g.*, Tr. 362-63), and Miguel Arnulfo Valle Valle and his brother Luis Alonso Valle Valle (*e.g.*, Tr. 307-13).

- **Politicians and Judges**:   Juan Orlando Hernandez (*e.g.*, Tr. 691-701), Fredy Renan Najera Montoya (*e.g.*, Tr. 317-18), Julio Cesar Barahona (*e.g.*, Tr. 680-82), Javier Choloma (*e.g.*, Tr. 356), Leopoldo Crivelli (*e.g.*, Tr. 328), and "Polito" Crivelli (*e.g.*, Tr. 331).

- **Military**:   Rene Orlando Ponce Fonseca (*e.g.*, Tr. 595) and Lieutenant Colonel Salgado, a/k/a "Comanche" (*e.g.*, Tr. 154).

- **Police**: Juan Manuel Avila-Meza (*e.g.*, Tr. 349-50) and Ramon Aldaberto Martinez Hernandez (*e.g.*, Tr. 225-27).

Additionally, at trial, the Government established that the offense involved other criminals, including Geovanny Daniel Gutierrez, one of the defendant's sons.   (*E.g.*, Tr. 705-07).

Second, the trial evidence demonstrated that the defendant was one of the leaders and organizers of the conspiracy.   *See United States v. Gayle*, 797 F. App'x 46, 51 (2d Cir. 2019) ("The leadership enhancement applies . . . where the defendant is a leader; nowhere do the Guidelines state that there can be only one leader in a conspiracy.").   The Court previously applied this

enhancement to Tony Hernandez, finding him to be a leader of the conspiracy as well.  (*See* Hernandez PSR ¶ 71; Hernandez Sent. Tr. at 11).  "There can, of course, be more than one person who qualifies as a leader or organizer of criminal activity."  U.S.S.G. § 3B1.1 app. n.4.  Here, the defendant employed numerous men as part of his criminal organization.  *See* U.S.S.G. § 3B1.1 app. n.4 (identifying "the degree of control and authority exercised over others" as a relevant consideration).

For example, in approximately 2009 or 2010, the defendant and Sandres established the Laboratory, which the defendant secured with approximately 20 or 30 men armed with AR-15s, AK-47s, and grenade launchers.  (Tr. 291, 668-71; PSR ¶ 27).  The defendant then recruited the *Cachiros* to join in his cocaine distribution enterprise, leveraging Sandres' relationship with the *Cachiros* to forge a partnership with Rivera.  (*See* Tr. 281, 285, 290-91, 352-54; PSR ¶ 28; *see also* U.S.S.G. § 3B1.1 app. n.4 (listing "the recruitment of accomplices" as a factor in considering whether the leadership enhancement applies)).  At the defendant's meeting with Rivera a few months later, when he told Rivera about murdering the boat mechanic and formalized their cocaine partnership, the defendant (as well as Sandres and Rivera) arrived with armed guards carrying AR-15s and .9-millmeter handguns.  (Tr. 300-01; PSR ¶ 29).  For each of the three cocaine shipments the defendant transported for Rivera, he and Sandres provided a team of trucks and armed men to escort and guard the freight truck transporting the cocaine—the defendant personally carried weapons, rode in a truck with a concealed trap to carry more weapons, and his team carried even more firearms still, including a 40mm grenade launcher.  (*See* Tr. 293-94, 328-39, 310; PSR ¶ 30).  Beyond directing teams of armed men to safeguard the Laboratory and protect cocaine shipments, and possessing weapons himself, the defendant, of course, possessed and used firearms in

murdering the boat mechanic and the law enforcement officer.  The defendant also possessed weapons when he was not transporting cocaine or killing people.  For example, when the defendant and his workers transported Sanchez to pick up money, there were "many weapons" in the defendant's car, including a shotgun, semi-automatic pistol, AK-47.  (Tr. 707-08).  The defendant also was carrying what Sanchez described as a "military-grade weapon" that Sanchez understood the defendant had received from the military as a "gift," which the defendant showed Sanchez and said, "I hope someone crosses my path so I can debut this new little toy that a friend gave me as a gift."  (Tr. 707).

Perhaps most telling of the defendant's leadership role was that he partnered directly with Hernandez, then a presidential candidate, and his brother Tony Hernandez, himself a major narcotics trafficker.  In 2019, during the course of the Government's prosecution of Tony Hernandez, the defendant went to Casa Presidencial *twice*; and, as demonstrated at trial, paid two *more* bribes to then-*President* Hernandez.  Meeting with the President about the prosecution of his brother, and continuing to bribe him, reflects the defendant's power in Honduras and that he was involved in "planning [and] organizing" the offense.

## II.   Counts Two and Three: Use of Weapons

Pursuant to U.S.S.G. § 2K2.4(b), the Guidelines sentence for Count Two, the defendant's use of machineguns and destructive devices in furtherance of the Count One drug-trafficking conspiracy, is the mandatory consecutive 360 months' imprisonment.  (PSR ¶ 72).

Although the offense level for the Count Three conspiracy to use machineguns and destructive devices does not impact the offense-level calculation due to the grouping analysis set forth below, several Guidelines enhancements illustrate the severity of this additional crime.

Pursuant to U.S.S.G. § 2K2.1(b)(1), an enhancement of at least six levels applies because the Count Three conspiracy involved a large armory of heavy weapons, including 40mm grenade launchers, AK-47s, AR-15s, semi-automatic and automatic pistols, shotguns, and extended magazines.  Men working under the defendant's command, including guarding the Laboratory, those transporting cocaine, and the army of gang members providing the defendant's security, carried heavy weaponry, and the defendant himself possessed and used firearms. With approximately 20 or 30 armed men at the Laboratory; three cocaine shipments with Rivera, with the defendant directing at least 10 men during each shipment plus additional weapons in the vehicle(s); plus approximately 25 to 30 armed gang members providing security and engaging in battle with Vaquero's sicarios; plus weapons the defendant, Rivera, and Sandres possessed at their meeting, along with their armed security teams, assuming at least five weapons each; and, finally, the firearms the defendant used to murder the boat mechanic and the law enforcement officer.  Beyond these (conservatively estimated) approximately more than 100 firearms attributed directly to the defendant, his men, and meetings at which he physically was present, the defendant was a member of the conspiracy involved in *Hernandez*. The defendant's firearms conspiracy thus involved hundreds weapons. (*See* Gov't Sent. Submission, Dkt. No. 269 at 39).  Finally, a 15-level enhancement applies, pursuant to U.S.S.G. § 2K2.1(b)(4), because Count Three also involved rocket-propelled grenade launchers.  (Tr. 291, 301, 308, 310; PSR ¶ 30).

## III.  Grouping Analysis

Pursuant to U.S.S.G. § 3D1.2(c), Count One and Count Three are grouped because the Count One cocaine-importation conspiracy includes a specific offense characteristic relating to use of weapons, U.S.S.G. § 2D1.1(b)(1), that is embodied in the Count Three weapons conspiracy.

Therefore, pursuant to U.S.S.G. § 3D1.3(a), the offense level for the group comprised of Counts One and Three is the highest offense level of the counts in the group, which is 52—capped at level 43 pursuant to U.S.S.G. ch. 5, part A, app. n.2—for Count One.  Based on Criminal History Category I, the Guidelines recommend a sentence of life imprisonment.

## DISCUSSION

## I.  The Court Should Impose a Life Sentence

### A.   The Nature and Circumstances of the Offense

The defendant produced massive quantities of cocaine for importation into the United States.  From his cocaine laboratory, he pumped out hundreds of kilograms of cocaine each month, partnering first with Sandres, then the Sinaloa Cartel, the *Cachiros*, and the Valles, and ultimately with President Hernandez, to send that cocaine to the United States, to "[stuff the] drugs up the gringos' noses."  (Tr. 694).  The defendant built and maintained his drug trafficking business through a combination of corruption and violence.  The defendant trafficked a colossal amount of cocaine, well over the 5 tons estimated in the PSR.  But what distinguishes him, even among other significant narcotics traffickers, is the brutal violence he used to establish himself and run his cocaine operation; and, of course, his drug-trafficking partnership with the President of Honduras.  The defendant's rise to prominence, through murder and bribery, is emblematic of the confluence of drugs, violence, and corruption that have inflicted immeasurably harm on his country; and on this one, through the export of untold tons of cocaine.  (*See, e.g.*, Dkt. No. 288 ("Hernandez Stmt. of Reasons") at 3 ("Defendant and his co-conspirators were indifferent to the consequences of their acts on the lives of people in their own country and in this country.")).

The defendant wanted so badly to expand his drug-trafficking operation that he killed a total stranger, based on hearsay, for the opportunity.  In approximately 2009 or 2010, soon after establishing the Laboratory with Sandres, the defendant sought out Rivera, to form a partnership with the powerful *Cachiros*.  At their first meeting, the defendant boasted about all the cocaine his laboratory was producing, and about his contacts in the military police and preventative police could help them, together, transport cocaine shipments throughout Honduras.  (Tr. 287-88; PSR ¶ 28).  But the defendant went further in proving his worth to Rivera.  When he learned about the boat mechanic who had "badmouthed" Rivera, the defendant, with the help of a police chief, tortured and murdered the mechanic.  (Tr. 302-03; PSR ¶ 29).  Sandres, himself a *sicario*, knew exactly what this meant, telling Rivera that the defendant was "a good person to have on our side because . . . he can kill anyone we want if we ask him to." (Tr. 304-05; PSR ¶ 29).  That initial episode is instructive.  It demonstrates the defendant's access to corrupt governmental officials—in this case, law enforcement, the police chief who helped him torture and murder the boat mechanic—and the brutal violence he used to achieve his goal of growing his drug-trafficking business.

The defendant continued his pattern of corruption and violence.  When his drug laboratory was raided in 2011, no drugs were found and he was not apprehended—because he had been warned ahead of time by Handal.  After the raid, the defendant bribed Barahona, a high-ranking judge, to ensure that nothing would come of the official investigation into the Laboratory.  He could claim, as he did in his post-arrest interview and maintains now, that "nothing was ever done there, nothing was found" and he was simply a humble coffee farmer.  (*See* GX 401-9/TR at 13; PSR ¶ 118). Then, he took revenge, illustrating through extreme violence what happened to those

who threatened his lucrative cocaine business; his source of money and power.  The defendant, Sandres, and others, mercilessly tortured an officer involved in the raid.  They hit him in the face; put a bag over his head to suffocate him; and put pins through his fingers.  They murdered him, in cold blood, as the officer begged them not to make his young daughter an orphan.  The defendant, understandably, cites in his submission his desire to see his family.  But the argument that his being deprived of access to his wife and children in Honduras makes his sentence relatively harsher than a similar sentence imposed on a United States citizen rings hollow; the officer the defendant tortured and murdered never had the chance to see his family again.

With the cocaine flowing from his laboratory, the protection of corrupt police officials, and the prospect of extreme violence—and the clear proclivity toward it—the defendant continued to build his drug trafficking operation.  He transported tons of cocaine from Eastern Honduras westward, to its ultimate destination in the United States, with a veritable who's who of prolific Honduran drug traffickers and government officials: President Hernandez, Tony Hernandez, the *Cachiros*, *Los Valles*, former congressman Najera, the Sinaloa Cartel, Sierra-Vargas, Chang Monroy, Chepe Handal, and Avila-Meza of the Honduran National Police, among others.  These co-conspirators, like the defendant, trafficked monumental amounts of cocaine.  130 tons for Rivera, tons *per month* by *Los Valles*, 200 tons for Chang Monroy, and Najera admitted to 20 tons, among others.  (*See* The Sentencing Guidelines Recommend Life Imprisonment, *supra*, Part I.A).  And, of course, the Court held Tony Hernandez responsible for 185 tons.  (*Id.*).  The principal reasons President Hernandez was interested in working with the defendant was the massive amount of cocaine the defendant was producing at the Laboratory and its proximity to Puerto Cortes, *i.e.*, Juan Orlando Hernandez wanted to work with the defendant because he had lots of cocaine and it

was easy to move; to import to the United States.  (Tr. 691-701; PSR ¶ 43).  At that meeting, in or about 2013, Hernandez directed the defendant to work with Tony Hernandez.  (*Id.*).  In light of the defendant's meetings with President Hernandez in 2019, on or about the dates of relevant filings in the Tony Hernandez prosecution, it is a fair inference that the defendant worked with Tony Hernandez from 2013 until Tony Hernandez's arrest in or about November 2018, and that at least some of Tony Hernandez's 185 tons came from the defendant's laboratory.  Finally, and in addition to all these Honduran drug-traffickers, the defendant sold three tons of cocaine to the former head of the largest narcotics trafficking organization in Mexico, Chapo Guzman.

The defendant brutalized and murdered the boat mechanic, the officer, and three other murder victims.  By contrast to Tony Hernandez, who ordered murders but did not physically commit them himself, the defendant killed—and sadistically tortured—his victims.  (*Cf.* Dkt. No. 269 at 20-22).  The defendant's massive cocaine production and distribution operation harmed many others.  *Tons and tons of cocaine.*  In this District, we often see individual addicts, families, and communities ravaged by far smaller quantities of drugs and violence.  Here, the defendant's actions impacted nations, from Honduras to Guatemala to Mexico and, ultimately, to the United States.  (*See, e.g.*, Ex. D, *A Year of Setbacks to Honduras' Anti-Corruption Efforts*, Washington Office on Latin America (Feb. 4, 2021)).

In its recent sentencing of Tony Hernandez, one of the defendant's drug trafficking partners, this Court compared narcotics trafficking through Honduras to *La Cosa Nostra*, observing that, "Years ago law enforcement proceeded against La Cosa Nostra, or the mafia, by repeatedly going after leaders and organizers of these organized crime families, their impact has been weakened.  They are a shadow of what they once were."  (Hernandez Stmt. of Reasons at 5).

The Court's analogy to the mafia is an apt comparison. Just as *La Cosa Nostra*'s violence and corruption once pervaded certain areas of the New York metropolitan area, so too do narcotraffickers in Honduras, like the defendant. The deleterious consequences of such large-scale narcotics trafficking, and the violence that accompanies it, are far-reaching. "It corrupts every facet of society." (*Id.* at 2). "The harm that is done by a ton of cocaine is almost incalculable. The lives affected, the families affected, the communities affected by drugs of that type and that volume is staggering." *United States v. Palagio Suarez*, No. 16 Cr. 453 (RJS) (Dkt. No. 160, Tr. 27). "[T]he drugs at issue here cripple individuals and destroy[] families and whole communities." *United States v. Santibanez*, No. 13 Cr. 912 (RJS), 2020 WL 3642166, at *3 (S.D.N.Y. July 6, 2020) (quotations omitted). Assuming 8,000 doses per kilogram (Tr. 248), the defendant sent over 172 *million* individual-use cocaine doses to the United States, without regard to the resultant devastation and in order to enrich himself.. While doing so, he "participated in an important way in the distribution of a substance, which creates misery in the lives of the people who use it," and he "was indifferent to the poison that was being distributed and ruining people's lives." *United States v. Aguirre Cuero*, No. 15 Cr. 125 (PKC) (Dkt. No. 36, Tr. 22, 24).

The defendant's drug business did not impact only those who used the drugs, or those he killed in maintaining his business. The harm caused by narcotics distribution, weapons, and violence, and the corruption that so often accompanies those things, as it did here, hurts regular people. People simply trying to make a living. Jose Sanchez was one of those people. Sanchez had a solid, well-paying job as an accountant at Graneros. He watched the defendant's rise, accepting his deposits—in increasing frequency and amount over the years—as the defendant made more and more from drug dealing. He knew of the defendant's violence. He watched, but

in a place so dominated by narcotics traffickers and corrupt government officials, he was powerless.  And his life was totally upended when he saw, in front of him, the defendant discuss using his Laboratory with the President of Honduras.

After the murders, the tons of cocaine with the *Cachiros* and *Los Valles* and El Chapo, and successfully churning out enormous quantities of cocaine from his laboratory, the defendant reached the pinnacle of state-sponsored, Honduran narco-trafficking.  The seriousness of his offense is crystallized by the company he kept; ultimately, Hernandez.  The defendant would supply the cocaine, from his Laboratory; and the President would provide protection, from the military, to ship that massively profitable cocaine through Puerto Cortes, inoculate the defendant from prosecution in Honduras, and ensure he was not extradited to the United States.  This was for the *express purpose*, as the President said, of "[stuffing] the drugs up the gringos' noses."  The defendant, a massively powerful and violent drug trafficker, and President Hernandez, the most powerful person in Honduras, partnered with the *goal* of flooding the United States with cocaine, and they laughed while doing it.  This partnership represents the pinnacle of what the defendant worked to achieve; through violence and corruption, he callously sought to inflict immeasurable harm on untold victims.

In sum, the sheer amount of the cocaine the defendant trafficked, the five brutal murders he committed, and his insidious bribery and corruption merit the Guidelines sentence of life.  While the defendant is personally responsible for distributing less cocaine than Tony Hernandez, the defendant's 21,550 kilograms of cocaine is orders of magnitude greater than almost any of the defendants prosecuted for drug-trafficking crimes in this District.  And the defendant's direct participation in extreme violence sets him apart from even Hernandez.  The defendant e merits no

leniency, and the nature and circumstances of this offense warrant the most severe punishment available in this case.

### B. The History and Characteristics of the Defendant

The history and characteristics of the defendant also support a Guidelines sentence of life imprisonment.  Unlike many defendants who appear in this District, the defendant "was raised under average economic circumstances" in a "loving and close knit" family.  (PSR ¶ 97-8).  Indeed, as the defendant himself told the Probation Office, he had the "perfect life."  (PSR ¶ 98).  Notwithstanding those advantageous circumstances, the defendant committed truly awful crimes.

This is the defendant's first conviction.  (PSR ¶ 89).  That, however, is no indication of the defendant's actual criminal history and, if anything, is an aggravating factor in this case.  The defendant was never apprehended for his many crimes, including five murders, because he bribed and partnered with those responsible for bringing him to justice.  Police, judges, and even President Hernandez, were his co-conspirators.  He poured gasoline on one of his murder victims; Avila-Meza, a member of the Honduran National Police, lit the match.  The defendant bribed Barahona to make sure his cocaine production was not interrupted, and that his laboratory was not revealed to be more than a coffee farm.  President Hernandez himself made sure that cocaine would reach its destination in the United States, and that the defendant never would be extradited to answer for his crimes.  That the defendant was able to traffic tons of cocaine through Central America and evade arrest for over a decade speaks to the magnitude of his conduct and that he, through corruption and violence, was above the law—not to a life previously well lived.  Even after the arrests in recent years of multiple of his co-conspirators, including Tony Hernandez, the defendant felt secure enough to travel to the United States in March 2020.  Non-ironically, and emblematic

41

of the defendant's hubris, he was arrested at Miami International Airport under circumstances very similar to those surrounding Tony Hernandez's November 2018 arrest.  If the defendant and his co-conspirators had not systematically and successfully destroyed any possibility of their own arrests and prosecution, he assuredly would have been brought to justice years ago.  That he was not, and instead has an unblemished criminal record, only speaks to the heinous nature of his offense and the corrupt system he enjoyed.  The defendant's history and characteristics provide no justification for leniency in this case.

### C.  The Need to Afford Adequate Deterrence

A life sentence also is necessary to serve the purpose of affording adequate specific and general deterrence to criminal conduct.  The defendant's crime has been the subject of a great deal of public attention in the United States, Honduras, and elsewhere in South and Central America.  In particular, the defendant's bribes to President Hernandez were front-page news, and garnered significant attention from political observers and government officials as well.  This Court encountered a similar situation in the trial of President Hernandez's brother, Tony Hernandez, which also generated significant attention.  Here, the allegations of corruption were so stark and the evidence so vivid—a murdering drug-trafficking bribing a sitting president with briefcases full of cash, laughing about flooding the United States with cocaine—the coverage focused, in part, on the legitimacy of the Hernandez Administration.  (Ex. E, *A Damning Portrait of Presidential Corruption, but Hondurans Sound Resigned*, New York Times (March 23, 2021)).  In sentencing Tony Hernandez to life imprisonment, the Court stated:

> Ending the movement of cocaine from Colombia through Honduras, Guatemala
> and Mexico is a hope of all good people of Honduras and the United States and
> other countries of the Americas.  We can hope that looking back in years to come
> today will have been an important step in eliminating the corrupting influence of
> narco trafficking.

(Hernandez Stmt. of Reasons at 5).  This case presents a similar messaging opportunity.  The

deterrent effect of the sentence imposed by the Court in this case will resonate not only with drug

traffickers and government officials in Honduras, to any whose lives have been harmed by drugs,

violence, and corruption, that the American justice system will prosecute and punish such

repugnant conduct.

Specific deterrence is particularly important in this case.  The defendant committed five

brutal murders.  He killed the boat mechanic, a total stranger, to curry favor with the *Cachiros*; he

callously tortured and shot a law enforcement officer who dared threaten his cocaine factory; he

paid a *sicario* to kill a former partner who could not repay a drug debt; and he brutally murdered,

by *lighting on fire*, two rival drug-dealers to avenge Sandres' brother.  Permanent incapacitation

is an extraordinary remedy, and the rationale for such a sanction applies to a small fraction of truly

dangerous criminal defendants; the defendant is one.



████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████

### D.  A Life Sentence Would Not Result in Unwarranted Sentencing Disparities

A life sentence would not result in unwarranted sentencing disparities.  *See* 18 U.S.C. § 3553(a)(6).  Very few drug-trafficking cases involve the mix of aggravating factors that this case presents.  In fiscal year 2020, fewer than 1% of 15,877 cases involving the application of U.S.S.G. § 2D1.1 included, as this case does, a base offense level of 38 (and the defendant's offense involved quantities of cocaine that were nearly 48 times greater than the 450- kilogram threshold).[15]  The defendant's other Guidelines offense characteristics are similarly hard to come

---

[15] The statistics set forth in this section are taken from reports prepared by the Sentencing Commission, which are available at:

by.  For example, only 1.2% of the 15,877 cases involved an enhancement pursuant to U.S.S.G. § 2D1.1(b)(2), which applies here, based on the defendant's use of violence.  And just 41 cases— 0.3%—involved the enhancement relating to his criminal livelihood pursuant to U.S.S.G. § 2D1.1(b)(16)(E).  The same is true of drug-trafficking cases such as this one involving enhancements for aggravating role.  Courts applied aggravating role adjustments pursuant to U.S.S.G. § 3B1.1 in 948 drug-trafficking cases in fiscal year 2020, and the defendant is noteworthy among that 6% of defendants because the highest-available, four-level enhancement applies.

The same is true of the small number of cases involving circumstances, like this one, that under U.S.S.G. § 5K could warrant upward departures.  In the fiscal year 2020, of 31,875 total sentencings, courts departed upward in only 261 cases.  Given the Guidelines range of life imprisonment, the Government does not seek an upward departure here.  But the upward departures would otherwise apply, showing that the Guidelines range in no way overstates the defendant's culpability. Among other things: the defendant murdered multiple victims and the "means by which life was taken" included brutal torture (*see* U.S.S.G. § 2K2.1); the defendant "abducted" and "[took] hostage" two of his five victims, the boat mechanic and the law enforcement officer (*see* U.S.S.G. § 5K2.4); he used and possessed extraordinarily dangerous weapons, including a Glock with a selector switch, AR-15s, AK-47s, and grenade launchers (*see*

---

(i)    https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/Use_of_SOC_Guideline_Based.pdf;

(ii)    https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/Ch3_Guideline_Based.pdf; and

(iii)    https://www.ussc.gov/sites/default/files/pdf/research-and-publications/annual-reports-and-sourcebooks/2020/2020-Annual-Report-and-Sourcebook.pdf

U.S.S.G. § 2K2.6 ("The extent of the increase ordinarily should depend on the dangerousness of the weapon, the manner in which it was used, and the extent to which its use endangered others.")); and because the defendant's conduct, particularly his gruesome torture of the boat mechanic and the law enforcement officers, and his murdering two drug trafficking rivals by burning them alive, was "unusually heinous, cruel, brutal, or degrading to the victim" (*see* U.S.S.G. § 2K2.8 (specifically stating that "[e]xamples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.")).

Analogous prosecutions of large-scale, violent drug traffickers provide useful points of comparison that support a within-Guidelines sentence here. Though, to be clear, the defendant's combination of massive drug trafficking, violence, and corruption makes him more culpable than others who received life sentences for similar conduct. For example, the Southern District of Florida prosecution of Sergio Neftali Mejía Duarte, which resulted in a trial conviction for cocaine-importation conspiracy and a life sentence, is similar in nature to the present case and also supports a Guidelines sentence here. *See* 15 Cr. 20540 (S.D.F.L.); *see also United States v. Mejía Duarte*, 780 F. App'x 730 (11th Cr. 2019). The trial evidence established that Mejía Duarte was responsible for transporting approximately 20,000 kilograms of United States-bound cocaine. Mejía Duarte and his workers possessed firearms, including automatic rifles, in furtherance of their drug-trafficking activities. Mejía Duarte's organization engaged in acts of violence against its rivals, including murders. The defendant—who bribed President Hernandez and a high-ranking Honduran judge, in addition to leveraging his corrupt military and police contacts—is substantially more culpable in terms of bribery and political corruption, as well as the five brutal murders he

committed, and trafficked at least approximately one ton more of cocaine.  Accordingly, Mejía Duarte's case supports the imposition of a life sentence.[16]

Another case that supports a life sentence is *United States v. Waldemar Lorenzana Cordon*, 03 Cr. 331 (CKK) (D.D.C.).  In 2018, a Guatemalan drug trafficker named Waldemar Lorenzana Cordon was sentenced in the District of Columbia principally to life imprisonment following a trial conviction for cocaine-importation conspiracy.  *See* 03 Cr. 331 (CKK) (D.D.C.).   The Government attributed an unspecified "thousands" of kilograms of cocaine to Lorenzana Cordon's offense, and the court applied enhancements for leadership and use of weapons.  And, in contrast, the enhancements for violence, bribery, and criminal livelihood—each applicable here—were not applied there.  Accordingly, a Guidelines sentence in this case would be consistent with Lorenzana Cordon.  There also have been analogous cases in this District.  In 2019, Judge Sullivan sentenced a Honduran drug trafficker named Hector Emilio Fernandez Rosa to a life sentence.  *United States v. Fernandez-Rosa*, 849 F. App'x 15, 16 (2d Cir. 2021).   .  Fernandez Rosa pleaded guilty to cocaine-distribution conspiracy, was responsible for the importation of 155 tons of cocaine and methamphetamine, and ordered or participated in 19 murders.  Fernandez Rosa's case supports a Guidelines sentence in this one as well; in particular, with respect to violence.  While Fernandez Rosa caused more murders, as Judge Sullivan recognized, "[e]ach [murder] alone would merit a

---

[16] In 2017, one of Mejía Duarte's associates, Juan Carlos Arvizu Hernandez, was sentenced principally to 30 years' imprisonment following a trial conviction for cocaine-importation conspiracy.  *See* 17 Cr. 20130 (RNS) (S.D.Fl.).  Arvizu Hernandez was not a political official, he was not convicted of § 924(c) violations, and he was responsible for the importation of 5,000 kilograms of cocaine, rather than approximately 21 tons, more than four times as much, like the defendant here.  The defendant is also more culpable than Arvizu Hernandez in terms of weapons possession, bribery, political corruption, and obstruction.

life sentence." (Sent. Tr. 111). Judge Sullivan concluded that Fernandez Rosa deserved "many life sentences." (*Id.* at 111-12). The defendant's extreme violence and corrupt conduct, which from a violence perspective is comparable with Fernandez Rosa's, certainly justifies at least one such sentence.

Similarly, in *United States v. Suarez*, Judge Forrest sentenced a Colombia-based drug trafficker who pleaded guilty to cocaine importation conspiracy to 648 months' imprisonment, which the court intended to be "effectively a life sentence." No. 11 Cr. 836 (KBF), 2014 WL 1998234 (S.D.N.Y. May 15, 2014). Judge Forrest found that the offense involved "thousands of kilograms of cocaine" and weapons possession. The Court also applied enhancements for leadership and criminal livelihood and concluded that Suarez "caused men armed with weapons to murder two men." 2014 WL 1998234, at *3. The defendant's conduct is similar, in terms of the quantity of cocaine and extreme violence, to Suarez's, but even more disturbing: The defendant killed three more victims, participated personally in murder, and applied brutal torture. Thus, *Suarez* also supports imposing a life sentence here.

In sum, all of the above considerations support the imposition of Guidelines sentence recommended by the Probation Office. The defendant, through violence and bribery, caused damage and pain in Honduras, the United States, and elsewhere, for more than a decade. The defendant trafficked tons of cocaine; he murdered five men; and he partnered with some of the most dangerous drug traffickers in the world, including President Hernandez. He points to nothing that merits leniency, and the Court should impose a Guidelines sentence of life imprisonment.

## II.   The Defendant's Sentencing Arguments Are Meritless

The defendant makes several principal arguments in support of his position that the Court should impose the mandatory minimum sentence of forty years.   As detailed below, the defendant's sentencing arguments do not merit the below-Guidelines sentence he seeks.

### A.   The Defendant's Arguments Do Not Merit A Non-Guidelines Sentence

First, the defendant continues, as he did in his failed post-trial motions, to assert that "the only evidence that [the defendant] participated in any acts of violence came from the uncorroborated testimony of [Rivera][.]" (Def. Mem. at 3).   The jury is presumed to have credited Rivera beyond a reasonable doubt, and his testimony is more than sufficient to satisfy the preponderance standard at sentencing.   *See United States v. Lobo*, No. 15 Cr. 174 (LGS), 2017 WL 2838187, at *2 (S.D.N.Y. June 30, 2017) (crediting Rivera's testimony at a *Fatico* hearing in a related case).   The Government previously has enumerated the important was that Rivera's testimony was corroborated at the defendant's trial.   (*See* Gov't Opp'n to Defendant's Post-Trial Motions ("Gov't Post-Trial Opp'n"), Dkt. No. 338, at 22).   Here, the defendant focuses on corroboration of his five brutal murders.   At trial, Rivera's testimony was corroborated by the defendant's own words.   While incarcerated at the Metropolitan Correctional Center (the "MCC") awaiting trial, on December 25, 2020, the defendant emailed Gutierrez, the defendant's son and co-conspirator, asking "urgently" for information about "[a] mechanic from Guatemala that showed up half-buried in Choloma, I think that was 2011 or 12[.]"   (*See, e.g.*, GX 701-T).   Nowhere in the Government's discovery produced prior to December 25, 2020 was there a suggestion of the means by which the defendant killed the boat mechanic, where he left the dead

body, or how his victim was buried.  The defendant, *with his own words from prison*, corroborated his own violence, bringing to light facts previously unknown to the Government about that murder.

Next, the defendant argues that his family history and economic hardships in Honduras, including the violence endemic to the country, counsel in favor of leniency.  (*Id.* at 3-5).  In support of a request for leniency, the defendant cites various statistics about the violence endemic to Honduras, and, in particular, to Choloma; seemingly at odds with his "perfect life."  (Def. Mem. 3-4; PSR ¶ 98).  He points also to the poverty pervasive in Honduras, stating that "[m]any households in Honduras still remain without electricity[.]"  (*Id.*).  No mention is made, however, in the defendant's role in perpetuating the cycles of violence and poverty that have plagued Honduras.  Due in part to the ravages of violent narcotics traffickers like the defendant, approximately two in every three Hondurans lives in poverty.  (Ex. F, *Why People Flee Honduras*, Politico Magazine (June 7, 2019)).  The defendant claims that, between 2009 and 2013, he operated a farm that produced coffee, corn, rice, and potatoes, among other things; and that, from 2013 to 2018, he owned and operated Agorforestal Fuentes, a company he claims generated approximately $70,000 weekly, with 30 permanent employees and about 100 sub-contractors.  (PSR ¶¶ 117, 118).  Assuming *arguendo* the defendant's actual source of income was coffee and biomass, he had a thriving business and ample opportunity to become entangled in violence and corruption; unlike many of his fellow citizens.  Of course, the defendant's narrative is implausible, contradicted by the trial evidence, and demonstrates that, even now, the defendant continues to disclaim responsibility for his own actions, and the harm caused to the many others left in his wake.

On this point, it bears noting that the defendant shamelessly submitted a letter in support from a co-conspirator.  The Government has previously chronicled the evidence showing Gutierrez

was a member of the defendant's conspiracy, and the Court found—during and after trial—that, indeed, Gutierrez was a co-conspirator. (*See, e.g.*, Gov't Post-Trial Opp'n at 33-37). Most damning were the images, posted to Gutierrez's Instagram account, following the defendant's arrest in March 2020, threatening "snitches."

 

(*See* GX1107, 1113; *see also* Tr. 135). Gutierrez's message is not complicated: possible witnesses should fear violence. And yet, in support of leniency, the defendant submits a letter *from* Gutierrez, describing how the defendant has taught him how to "best behave in society." (Def. Mem. at 7, Ex. G). Clearly, Gutierrez internalized exactly how the defendant behaved in society: violently, devoid of regard for the well-being of others, and without shame.

51

## B. The COVID-19 Pandemic Does Not Support A Non-Guidelines Sentence

In this submission, the defendant argues that the conditions of confinement at the Metropolitan Correctional Center (the "MCC") as a result of, among other things, the COVID-19 pandemic, warrant leniency in imposing sentence. In particular, the defendant cites his contracting COVID-19 in November 2020, as well as lockdowns imposed at MCC during and prior to the pandemic. (Def. Mem. at 9). While COVID-19 is undoubtedly serious, the defendant's arguments concerning the pandemic do not support his sentencing position.

---

[17] Certain of the defendant's Bureau of Prisons ("BOP") medical records from 2020 and 2021 are attached as Ex. G. Notwithstanding the well-established presumption of open access, *see United States v. Amodeo*, 71 F.3d 1044, 1048-50 (2d Cir. 1995), the Government respectfully requests permission, in order to protect the defendant's privacy interests, to file Ex. G under seal. *See generally* SDNY Electronic Case Filing Rules & Instructions § 21.4 (urging parties to exercise "[c]aution when filing documents that contain, *inter alia*, "[m]edical records, treatment and diagnosis").

███████████████████████████████████████████████████████

████████████████████████████████████████████ Accordingly,

a variance on this basis is not appropriate.

       The measures particular to the defendant's experience—quarantine at the MCC, for example—were challenging, but equally necessary to the BOP's mandate of mitigating the virus's spread and limiting the defendant's exposure to others. As the Court is aware, the BOP generally, and the MCC specifically, are actively managing the risks presented by COVID-19. Starting in January 2020, the BOP implemented an Action Plan for COVID-19.[18] The BOP continues to revise and update that Action Plan in response to the fluid nature of the COVID-19 pandemic, and in response to the latest guidance from experts at the World Health Organization ("WHO"), the Centers for Disease Control and Prevention (the "CDC"), and the Office of Personnel Management. In addition, the BOP created an "agency task force" to study and coordinate its response to COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the WHO, the CDC, the Office of Personnel Management, Department of Justice, and the Office of the Vice President." BOP's current Action Plan, which the MCC has implemented, includes numerous measures designed to protect inmates and staff from the coronavirus pandemic.[19] Moreover, COVID-19 tests and vaccines are now widely available at BOP facilities. The BOP has administered approximately 119,569 COVID-19 tests and approximately 211,230 vaccine doses.[20] These and other steps show that the BOP is

---

[18] *See* https://www.bop.gov/coronavirus/overview.jsp#bop_covid-19_response.

[19] *See* https://www.bop.gov/coronavirus/covid19_status.jsp.

[20] *See* https://www.bop.gov/coronavirus/.

meaningfully addressing the risk posed by COVID-19 to inmates, and that it has taken the threat seriously, has mitigated it, and continues to update policies and procedures in accord with the facts and recommendations, as well as directives from the Attorney General.

The Government recognizes that the pandemic has in some circumstances made inmates' incarceration "harsher and more punitive than would otherwise have been the case … because the federal prisons … have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." *United States v. Rodriguez*, No. 00 Cr. 761 (JSR), 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020) (internal quotation marks and citation omitted). These effects are an amplification of the effects that COVID-19 and responsive measures have had throughout society, including long periods of isolation and quarantining, social distancing, remote work and schooling, and other measures. The defendant, like other inmates, has been subject to lockdowns at MCC in an effort to prevent the spread of COVID-19 within that facility. However, on the current record, the defendant has not demonstrated that his incarceration has been substantially harsher because of COVID-19. *See United States v. Pinto-Thomas*, 454 F. Supp. 3d 327, 331 (S.D.N.Y. 2020) ("[A]s stated by the Court during oral argument on the instant motions, lockdowns are a routine fact of life for incarcerated defendants and are hardly extraordinary.").

In sum, the defendant has not articulated why current BOP policies and procedures are insufficient to provide him a reasonable level of care, let alone why the spread of COVID-19 in prison facilities should outweigh the gravity of the defendant's offenses.

## III.   The Court Should Order the Defendant to Forfeit $151,724,375

### A.   Applicable Law

Pursuant to Title 21, United States Code, Section 853, "a defendant convicted of a drug crime 'shall forfeit . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of' the crime of conviction." *United States v. Roberts*, 660 F.3d 149, 165 (2d Cir. 2011) (quoting 21 U.S.C. § 853(a)(1)).   "Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied, or broader words to define the scope of what was to be forfeited." *United States v. Monsanto*, 491 U.S. 600, 607 (1989).  The purpose of forfeiture is "punitive rather than restitutive," *Roberts*, 660 F.3d at 166, and the defendant's ability to pay is irrelevant, *United States v. Awad*, 598 F.3d 76, 78 (2d Cir. 2010).

"[T]he forfeiture statute for drug crimes is not limited to profits from those crimes." *United States v. Khan*, 761 F. App'x 43, 47 (2d Cir. 2019).   "[D]istrict courts may use general points of reference as a starting point for a forfeiture calculation and make reasonable extrapolations supported by a preponderance of the evidence." *United States v. Roberts*, 660 F.3d 149, 166 (2d Cir. 2011).  The defendant is liable to forfeit all gross proceeds that he personally obtained, directly or indirectly, but is not liable for proceeds received that the defendant did not personally acquire. *Honeycutt v. United States*, 137 S. Ct. 1626, 1635 (2017).

### B.   Discussion

The Government's forfeiture calculation is based on trial testimony and proffer material from Rivera, Sanchez, and Special Agent Gregg Mervis.

Rivera testified that between approximately 2010 and 2012 he partnered with the defendant on three cocaine shipments: *First*, of approximately 425 to 530 kilograms of cocaine, sent by Renteria to an airstrip in Honduras and ultimately transported by the defendant to the *Los Valles* cartel. (Tr. 305-313). For the defendant's work protecting and transporting this shipment, Rivera testified that he paid the defendant and Sandres, together, one payment of approximately $60,000 or $70,000 in cash. (Tr. 315). *Second*, of approximately 500 to 700 kilograms of cocaine, sent by Renteria and, again, delivered by the defendant to *Los Valles* cartel. (Tr. 318-320). Rivera paid the defendant and Sandres approximately $70,000 to $80,000 for their roles in protecting and transporting the drugs. (Tr. 321; *see also* Ex. H, 3501-152, at 8). *Third*, of approximately 425 to 500 kilograms, sent to the Compita airstrip and transported by the defendant to Jack. (Tr. 323-25). Rivera testified that Jack paid Rivera in cocaine, giving him 10% of the total shipment, half of which Rivera paid to Sandres (also in cocaine) for Sandres and the defendant. (Tr. 325; *see also* Ex. I, 3501-153).

Rivera also testified that, in approximately 2012 or 2013, the defendant supplied the Sinaloa cartel with approximately three tons of cocaine. (Tr. 361-62).

Finally, each month the defendant's Laboratory produced at least approximately 200 to 300 of kilograms of cocaine per month. (*See* Exs. A, B, C). The most conservative estimate of the Laboratory's production yields a quantity of approximately 21 tons of cocaine, and likely much more. (*See* The Sentencing Guidelines Recommend Life Imprisonment, *supra*, Part I.A).

Special Agent Mervis testified that the price of cocaine increases as it is transported through Central America to the United States: in Colombia, approximately $2,500 to $3,000 per kilogram; in Honduras, approximately $7,500 to $9,000 per kilogram; in Mexico near the border

with Guatemala, approximately $12,000 to $16,000 per kilogram; and in the United States, approximately $30,000 to $35,000 per kilogram.  (Tr. 256).  Based on Special Agent Mervis' expert testimony, and using the low end of all cash and quantity estimates and applying the low end of the Honduras price of cocaine for all valuations, the Government calculates the forfeiture amount as follows:

| Witness | Quantity / Time Period | Methodology | Defendant's Gross Proceeds | Tr. Cites |
|---|---|---|---|---|
| Shipments with Rivera | First Shipment | Rivera paid defendant and Sandres $60,000 or $70,000, which they divided. | $30,000 | 313 |
| | Second Shipment | Rivera paid the defendant and Sandres $70,000 to $80,0000, which they divided. | $35,000 | 321 |
| | Third Shipment | Rivera paid the defendant and Sandres each 5% of 425 kilograms, or 21.25 kilograms.  Using the $7,500 Honduras price and the low end of the range, worth $159,375. | $159,375 | 325 |
| Shipments with Sinaloa Cartel | Approximately 3 tons | 3 tons sold to Sinaloa Cartel. Assuming the cartel paid the $7,500 Honduras price rather than Mexico price, a total value of $22.5 million. | $22.5 million | 361-62 |
| Laboratory | Approximately 17.2 tons | Approximately 17.2 tons of cocaine at the least, as calculated above. Using the $7,500 Honduras price, worth $129 million. | $129 million | See Exs. A, B, C |
| | | **Total** | **$151,724,375**[21] | |

---

[21] If the estimates used the higher end of the Honduras cocaine price ($9,000 instead of $7,500) and quantities instead of the more conservative, lower end ($70,000 instead of $60,000; $80,000 instead of $70,000; and 500 kilograms instead of 425 kilograms), this total would be $182,090,010.

## IV.  The Court Should Order the Defendant to Pay a $10 Million Fine

The defendant has not met his burden of demonstrating an inability to pay a fine and, in light of the balancing of the Section 3553(a) factors, the Government respectfully submits that the Court should impose a within-Guidelines, statutory-maximum fine of $10 million.

### A.  Applicable Law

The Guidelines provide that "[t]he court shall impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a).  "The burden of establishing inability to pay rests on defendant."  *United States v. Salameh*, 261 F.3d 271, 276 (2d Cir. 2001) (citing *United States v. Thompson*, 227 F.3d 43, 45 (2d Cir. 2000)).  "Evidence of lucrative illegal activity may support an inference that such funds, although hidden, remain at the defendant's disposal."  *United States v. Fields*, 113 F.3d 313, 325 (2d Cir. 1997); *United States v. Orena*, 32 F.3d 704, 716 (2d Cir. 1994) (explaining that "evidence of lucrative illegal activity can support a judge's finding that a defend-ant is able to pay a fine").  Where a defendant fails to demonstrate an inability to pay a fine, the Court must craft one based in part on consideration of the § 3553(a) factors.  *See* 18 U.S.C. § 3572(a); *see also United States v. Elfgeeh*, 515 F.3d 100, 136 (2d Cir. 2008).

### B.  Discussion

Pursuant to U.S.S.G. § 5E1.2(c)(4), the maximum Guidelines fine in this case corresponds to the maximum fine authorized by statute, which is $10 million.  *See* 21 U.S.C. § 960(b).  The Government respectfully submits that, based on consideration of the Section 3553(a) factors, the maximum fine prescribed by Congress and the Sentencing Commission is appropriate in this case.

The defendant cannot meet his burden of establishing inability to pay a fine.  While the defendant claims he has no assets in the United States and that a Honduran bank has seized his residence in Honduras, *see* PSR ¶¶ 121-124, the defendant admitted to the Probation Office that, from about March 2013 to 2018, he owned and operated Agorforestal Fuentes, purportedly a large biomass business that generated approximately $70,000 weekly for providing several hundred tons of biomass to Gildan, a Canadian-based textile company, *see* PSR ¶ 117.  The defendant tries to have it both ways: claiming that he supported himself by operating a thriving biomass business, not from selling cocaine; and now stating that he is destitute, and unable to pay a fine.  If indeed he earned that much from biomass he should pay a fine.  And, if, as the trial evidence proved, he made tens of millions of dollars in blood and drug money from selling unfathomable quantities of cocaine, he certainly should pay a fine.





(*See, e.g.*, GX 201-106, Tr. 221; GX 201-168, Tr. 84).

Therefore, absent a stronger showing by the defendant of an inability to pay, the statutory

maximum fine of $10 million is appropriate.

60

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should sentence the defendant to life imprisonment and require forfeiture in the amount of $151,724,375, and order the defendant to pay the maximum $10 million fine.


Dated: New York, New York
       August 24, 2021

                                        Respectfully Submitted,

                                        AUDREY STRAUSS
                                        United States Attorney for the
                                        Southern District of New York

                                 By:    _____/s/_____
                                        Jacob Gutwillig
                                        Michael D. Lockard
                                        Jason A. Richman
                                        Elinor Tarlow
                                        Assistant United States Attorneys
                                        212-637-2215 / 2193 / 2589 / 1036

cc:    Defense Counsel
       By ECF